UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

MARTY PAUL, an individual, and
BRIAN BUSKIRK, an individual,

          Plaintiffs,

v.

RBC CAPITAL MARKETS, LLC, a
Minnesota limited liability company; ROYAL
BANK OF CANADA, a Canadian corporation;
and ROYAL BANK OF CANADA US
WEALTH ACCUMULATION PLAN, an
employee benefit plan,

          Defendants.

Case No. 3:16-cv-05616-RBL

**DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT ON
PENSION PLAN ISSUE**

**NOTE ON MOTION CALENDAR:
Oct. 20, 2017**

ORAL ARGUMENT REQUESTED

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Dr., 5th Floor
Chicago, IL 60601
+1.312.324.1000

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................... 1

II. STATEMENT OF FACTS ............................................................................ 2

    A.    **RBC Designed And Modified The WAP To Attract And Retain Key Employees By Providing A Flexible Vehicle Into Which Bonuses And Other Incentives Are Paid** ........................................................... 2

        1.    The WAP Was A Vehicle For Paying Bonuses And Other Incentive Awards—And Its Terms Were Amended And Restated Each Year ........................................................................ 3

        2.    By Its Express Terms, The WAP Does Not Purport To Be A "Pension Plan." ......................................................................... 5

        3.    The WAP Required Distribution Of Benefits Upon Vesting Absent A Directive To The Contrary ..................................... 5

        4.    The WAP Grants RBC Broad Discretion Over The WAP—And It Has Used That Discretion To Modify The Terms And Conditions Of Participation ....................................................... 6

    B.    **Plaintiffs Leave RBC To Start Their Own Firm And Now Seek To Recover Bonuses And Other Awards Forfeited Under The Express Terms Of The WAP** .................................................................................... 7

    C.    **Plaintiffs' Claims And Procedural History** ................................... 9

III. ARGUMENT ............................................................................................... 10

    A.    **Summary Judgment Standards** ................................................... 10

    B.    **Collateral Estoppel Does Not Apply Because The Issue Presented Here Is Not "Identical" To Any Issue "Actually Litigated" In *Tolbert*** ........ 10

    C.    **The WAP Is Not A "Pension Benefit Plan" Governed By ERISA** ................ 12

        1.    The WAP Was Not Designed For The Primary Purpose of Providing Retirement Income, Nor Did It Compel Any Participant To Receive It ........................................................ 14

        2.    The WAP Is A "Bonus Plan" Under DOL Regulations .......................... 15

        3.    The WAP's Design And Operation Neither "Systematically Defer" Nor "Result In" The Deferral Of Income To Retirement Or Termination ...................................................................... 19

            a.    The WAP's Express Terms Neither "Resulted In" Nor "Systematically Deferred" Payments Until Termination ............. 20

            b.    The WAP's "Surrounding Circumstances" Neither "Systematically Deferred" Nor "Resulted In" Post-Termination Deferrals ............................................. 23

IV. CONCLUSION ............................................................................................ 24

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Dr., 5th Floor
Chicago, IL 60601
+1.312.324.1000

# I. INTRODUCTION

Defendants RBC Capital Markets, LLC, Royal Bank of Canada, and Royal Bank of Canada US Wealth Accumulation Plan ("WAP" or "Plan") move for summary judgment on the threshold basis that the WAP was not an "pension benefit plan" governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(2). Designed to attract and retain key employees by awarding bonuses and other incentives payable *during* employment, absent written directive otherwise, the WAP was neither intended nor operated as a "pension" plan.

In enacting ERISA, Congress did not "attempt to control every aspect of the employer-employee relationship or every promise made to employees." *Murphy v. Inexco Oil Co.*, 611 F.2d 570, 574 (5th Cir. 1980); *see also Rich v. Shrader*, 823 F.3d 1205, 1211 (9th Cir. 2016) (citing *Murphy* with approval). Here, plaintiffs must prove the WAP was an "employee pension benefit plan," which requires establishing the WAP was designed for the primary purpose of providing retirement income to employees or, by its "express terms" or "surrounding circumstances," "results in [the] deferral of income" to retirement or termination. 29 U.S.C. § 1002(2)(a). In light of undisputed facts, plaintiffs cannot carry this burden as a matter of law.

To start, a decision by the Fifth Circuit Court of Appeals in another case involving the WAP is not binding precedent in this Court, nor does it preclude RBC from asserting that the WAP in effect at the time of plaintiffs' departures from RBC was not a "pension benefit plan" under ERISA. *See Tolbert v. RBC Capital Markets, LLC*, 758 F.3d 619 (5th Cir. 2014). As explained below, the decision in *Tolbert* was confined to a single "amended and restated" version of the WAP, meaning the issues resolved were neither "identical" to those here, nor "actually litigated" by RBC in that proceeding. Collateral estoppel does not apply.

Turning to the merits, the WAP's undisputed primary purpose was to attract and retain key employees at RBC, not provide income at retirement or beyond. And it did so by serving as the central vehicle into which RBC paid bonuses and other awards to employees across various business lines, subject to particular vesting schedules. Only a select group of employees was eligible to participate each year, and awards RBC chose to pay into the Plan were on top of those

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Dr., 5th Floor
Chicago, IL 60601
+1.312.324.1000

employees' regular compensation *and* other savings options, such as a 401(k) plan.  Incentive plans like the WAP are commonplace in the financial services industry, and the Plan was a central recruiting and retention tool over which RBC retained complete discretion in deciding the form and amount of benefits, the vesting schedules, and whether to make any awards at all.

Second, nothing in the WAP's terms evinces an intention to provide post-termination income, nor does the Plan's design or operation compel (or even favor) such deferrals.  To the contrary, consistent with participants' status as highly compensated, sophisticated employees—most of whom, like plaintiffs, were financial advisors managing millions of dollars for other people—the WAP simply afforded flexibility over how to use the Plan to best suit their individual circumstances.  To that end, participants automatically received a payout of WAP awards while employed at RBC, *unless* they expressly chose otherwise for *each* year in which they participated.  Thus, whether any payment of WAP awards was deferred to retirement or termination was not by operation of the Plan, but rather the direct result of each employee's choice.  There is no dispute that some WAP participants did not even have the option to receive their WAP awards upon retirement or termination, nor can plaintiffs dispute that *they* in fact received sizeable distributions from the WAP while still employed at RBC.

Therefore, the question before the Court boils down to whether RBC's decision to afford some WAP participants the mere *option* to defer awards until retirement or separation automatically converted the WAP into an ERISA "pension benefit plan."  For good reason, courts addressing analogous circumstances have rejected such a bright-line rule favoring ERISA coverage.  The Court should do the same here, and grant summary judgment in RBC's favor.

## II.  STATEMENT OF FACTS[1]

**A.  RBC Designed And Modified The WAP To Attract And Retain Key Employees By Providing A Flexible Vehicle Into Which Bonuses And Other Incentives Are Paid.**

The Royal Bank of Canada is a leader in the financial services industry, providing investment banking, financial planning, and other financial services to both individual and

---

[1] Unless noted otherwise, all exhibits referenced herein are attached to the Declaration of M. Russell.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
PAGE 2

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

institutional clients. RBC has operated various business lines over the years, but one consistent driver of its success has been its ability to recruit and retain valuable, high-performing employees. *See, e.g.*, Ex. A, 2011 FC Comp. Plan at 2; Ex. B, Sikich Tr. 52:18-25, 155:9-21 (the WAP serves to "attract[] and retain[] top-performing financial advisors"). Chief among these key employees are RBC's financial advisors or consultants ("FCs"), responsible for obtaining and nurturing RBC's clients, providing sound advice, and in turn generating billions in annual revenue for RBC. Ex. C, 2009 FC Comp. Plan at 2; Ex. D, Paul Tr. at 65:19-24, 106:13-23.

RBC faces enormous competition in recruiting and retaining high-performing and valuable FCs. Not only are these employees hard to come by and difficult to keep, but when they leave a firm, they frequently take their clients (and often other RBC employees) with them. *See, e.g.*, Ex. D at 68:20-24, 106:13-107:4; Ex. E, Buskirk Tr. 42:21-43:10, 47:1-16. Plaintiffs here are prime examples, as Paul recruited Buskirk from RBC after Paul was terminated for cause, both taking nearly all of their clients with them. *Infra* § II.B.

### 1. The WAP Was A Vehicle For Paying Bonuses And Other Incentive Awards—And Its Terms Were Amended And Restated Each Year.

Given their importance, RBC designed and maintained the WAP primarily to recruit and retain high-performing FCs and other valuable and highly compensated employees. *See* Ex. F, Sikich Decl. ¶ 9; Ex. B at 52:18-25, 155:9-21; Ex. A at 2, 8. The WAP represents one of two central components of a FC's compensation. The first—available to all FCs—was a monthly commission-based payment, determined as a defined percentage of the FC's gross "production" over the year.[2] *See, e.g.*, Ex. A at 3.

The second—available only to FCs participating in the WAP—were certain annual bonuses. Ex. A at 3-4. In particular, the WAP in effect at the time of each plaintiff's departures from RBC provided for two types of bonuses paid to FCs into the WAP, each based in part on performance and contributions to RBC over the prior year. First, a "Productivity Bonus" was

---

[2] In short, a FC's "production" refers to the overall revenue generated for RBC attributable to his or her clientele. RBC's annual "Compensation Plan" includes various policies regarding what is included as "production" for purposes of compensation, but such details are not material to this motion. *See* Ex. A at 3-6.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

awarded in an amount equal to 2.25% to 5% of the FC's gross production for the year. *See id.* at 3; 8-9. Second, a "Loyalty Bonus" was awarded based upon the FC's annual production and length of service at RBC. *Id.*; Ex. G, 2011 FC WAP Summary. Both bonuses were available only to those FCs who satisfied the conditions for WAP eligibility—which must occur *each* year, meaning participation was not guaranteed from year-to-year. *See* Ex. A at 3, 8-10; Ex. F ¶ 8.[3]

To advance RBC's goal of retaining successful FCs and other employees, these bonuses were not made immediately available. Rather, they became payable after a specified vesting period, which for FCs was a "cliff" vesting after five years.[4] If a participant's employment at RBC ended in the interim, these bonus payments were forfeited. *See* Ex. G at 1-2.[5]

By awarding annual bonuses subject to vesting, the WAP not only incentivized FCs to increase production (and thus their bonuses), but also helped to retain valuable employees by requiring continued service to receive those awards. *See* Ex. B at 57:1-13; Ex. K, Buchert Tr. 74:15-22, 112:3-14. Indeed, RBC's plan competes with comparable compensation plans used throughout the industry. Ex. B at 18:22-19:9, 53:1-14, 55:10-19, 155:14-18. The WAP therefore helps RBC attract other FCs and prevent competitors from recruiting those already at RBC.[6]

---

[3]    In addition to serving as the primary vehicle for bonuses, the WAP allowed eligible participants to voluntarily defer a portion of their compensation. Ex. H, 2011 WAP § 2.2. These deferrals always were 100 percent vested and *could not* be forfeited. Compl. ¶ 19; Ex. G at 1, 3. Plaintiffs do not raise any claim with respect to their voluntary WAP deferrals, nor can they dispute they received a full distribution of such amounts. *See* Compl. ¶ 62; *see also* Ex. E at 91:6-11, 94:9-12, 108:2-9. These voluntary deferrals therefore are not at issue in this case.

Moreover, the WAP in effect when each plaintiff separated from RBC has provisions regarding "Mandatory Deferred Compensation." Ex. H § 2.3; Ex. I, 2012 Frozen WAP § 2.3. These deferrals applied only to complex and branch directors and certain PCG presidents and directors, and were eliminated in 2010. *See* Ex. J, 2009-11 WAP Grids (2011). Mandatory deferrals for this sub-set of employees vested more quickly over a "2 year graduated" schedule, with one-third vesting immediately, one-third after the end of the first plan year, and one-third after the following plan year (*i.e.*, all mandatory deferrals vested within two years). *Id.* (2010).

[4] *See* Ex. J; Ex. A at 8-9; Ex. E at 91:6-24. Awards to other WAP-eligible employees had different vesting periods. For example, Branch Director awards were subject to a four-year "cliff" vesting period. *See* Ex. J. "Cliff" vesting simply means the awards are 0% vested for five years, at which point they became 100% vested.

[5] *See also* Ex. E at 91:6-24, 104:3-22. Certain exceptions were allowed for participants whose employment ended due to death or disability; under an approved "business transition agreement"; and whose age plus years-of-service totaled at least 60 and who signed a non-competition/non-solicitation agreement. Ex. H § 4.2; *see infra* § III.C.3.a.

[6] The WAP serves similar purposes for employees other than FCs, including "branch" and "complex" directors. *See* Ex. J. These management employees—who, like Paul, continue to serve as FCs and maintain a book of business— also are eligible for bonuses via the WAP. Certain divisional presidents, vice presidents, and other highly compensated employees also received similar awards in the WAP. *Id.*; *see* Ex. L, Jt. Stip. re: WAP Eligibility.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
PAGE 4

### 2. By Its Express Terms, The WAP Does Not Purport To Be A "Pension Plan."

The WAP's terms reflect RBC's intention that it would not operate as a "pension plan" under ERISA. Section 5.10 states that although the WAP is "not intended to be a tax-qualified plan under [Internal Revenue] Code Section 401, the Plan *might be determined to be* an 'employee pension benefit plan' as defined by ERISA." Ex. H § 5.10 (emphasis added). The same section then states, however, that *even if* the WAP is ever "determined to be" an ERISA plan, RBC "believes that it constitutes" a top-hat plan, "exempt from many ERISA requirements." *Id.* The WAP's introduction (*id.* § 1.1) reinforces the Plan's purposes:

> [The WAP] is a nonqualified, deferred compensation plan pursuant to which a select group of management or highly compensated employees . . . may be offered the opportunity to elect to defer receipt of a portion of their compensation to be earned with respect to an upcoming Plan year. The Plan is designed to provide an opportunity for such employees to invest a portion of their compensation in tax-deferred savings and investment options in an effort to support long-term savings and allow such employees to share in the Company's growth and profitability, if any.

### 3. The WAP Required Distribution Of Benefits Upon Vesting Absent A Directive To The Contrary.

Consistent with these objectives, WAP awards were distributed while participants are still employed. Specifically, the WAP required participants to receive an "in-service" distribution—*i.e.*, paid upon vesting—absent a specific election otherwise. Ex. H § 5.2(b)(iv); Ex. F ¶ 4.

Thus, for each Plan year, a participant made a new election as to how that year's contributions would be paid. Ex. F ¶ 4. And starting in 2007, participants made a separate election for *each type* of contribution; for example, they could defer voluntary contributions (if any) until termination, while electing to receive RBC's awards and bonuses immediately upon vesting. *See* Ex. G at 4. If the participant made no election, the WAP mandated that RBC's contributions for that year would be distributed upon vesting ("in-service"). Ex. F ¶ 4; Ex. G at 4. In each year for which complete information is available (2007 to 2011), the majority of WAP participants (ranging from 51.25% to 66.28% each year) elected to receive an in-service distribution of their WAP contributions. Ex. F ¶ 6.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

#### 4. The WAP Grants RBC Broad Discretion Over The WAP—And It Has Used That Discretion To Modify The Terms And Conditions Of Participation.

The WAP document, by design, afforded RBC substantial discretion over the how the WAP operated in any given year, including the types of awards RBC may grant, the amount and form they would take, their applicable vesting period, who would be eligible to participate, and nearly all other core elements of awards granted into the Plan.[7]  Consistent with this discretion, the WAP has undergone various changes and amendments over time, in reaction to the competitive marketplace for these key employees and feedback from participants.  *See* Ex. F ¶ 9.

As one example, through 2009, RBC awarded certain "Matching Contributions" into the WAP for some eligible employees.  *See* Ex. J; Ex. C at 8-10.  Matching Contributions were a function of participants' gross production in the preceding year and tenure at RBC, as well as the amount the participant voluntarily deferred into the WAP in that year.[8]  Like the Productivity and Loyalty bonuses in later years, these various Matching Contributions were available *only* to WAP-eligible employees and could only be paid into the WAP.  *See* Ex. C at 3, 7-8.  That is, they did not represent compensation the employee would otherwise receive, but rather functioned as RBC's method for paying awards for performance during the preceding year.  *Id.*

Starting in 2010, RBC eliminated Matching Contributions for FCs and branch directors, in favor of increased Productivity and Loyalty bonuses.  Ex. J (2010-11); Ex. K at 131:6-132:8.  As such, RBC's bonus payments no longer were linked at all to a participant's voluntary deferrals.  *Id.*; Ex. A (the WAP is "a simple plan which gives [participants] freedom and flexibility to manage your cash flows by choosing how much you voluntarily defer without

---

[7] *See, e.g.*, Ex. H § 2.2 (granting "discretion to limit the amount of Voluntary Deferred Compensation" and set the maximum compensation participants may defer); *id.* § 2.6 (allowing RBC to establish all performance-based measures for determining Matching Contributions and to make whatever other "Discretionary Contributions" RBC decides "in its sole discretion"); *id.* § 4.2 (allowing RBC, "in its sole discretion," to establish when a participant's account will vest); *id* § 7.1 (granting RBC the "full power and discretionary authority" to determine, inter alia, Company Contributions, eligibility, and certain vesting provisions).

[8] For instance, in 2009, RBC paid FCs a "fixed match" equal to 25% of the participant's voluntary deferral, while also paying a "premium match" ranging from 5.0% to 40% of a participant's voluntary deferrals if the FC had more than six years of service, depending upon production levels.  *See* Ex. N, 2009 FC WAP Summary.  For other types of employees, such as PCG Directors, RBC operated a "Short Term Incentive Program (STI)," part of which paid a "variable match" into the WAP, with the amount "tied to the financial performance of RBC" and "based on return on equity (ROE) and net income before taxes (NIBT)."  Ex. O, 2009 PCG Director Summary at 2.

impacting the company contributions you receive"). That is, a WAP participant could elect not to make *any* voluntary contributions, yet receive bonuses into the WAP. *See id.* ("If you choose not to enroll for Voluntary Contributions in 2010, you should still make a distribution election for your Productivity Bonus and RBC Loyalty Bonus. If no distribution election is made, they will default to be paid as an in-service distribution valued on July 1, 2016.").

As another example, RBC exercised its discretion, effective in 2007, to establish specific terms of participation for FCs and branch directors with gross production between $300,000 and $350,000.[9] These employees remained eligible to participate in the WAP—and received bonuses and awards accordingly—but were *required* to take distributions of those awards upon vesting, without even the option to defer those awards any longer. *Id.* RBC then modified the WAP again, effective in 2010, increasing the eligibility for all FCs and branch directors from $300,000 to $400,000 in gross production over the preceding year. *See* Ex. L ¶ 8.

In addition to RBC's use of discretion granted by the WAP, the Plan itself was "amended and restated" several times. The WAP authorized RBC to "amend[] or terminate[]" the WAP "at any time by the Committee or the Board of Directors of the Company or by the Company[.]" Ex. H § 9.1. Each "amended and restated" WAP document provides that such "restatement supersedes all prior versions of the Plan and any deferrals or contributions made pursuant to a prior version of the Plan will be governed by this Plan." *Id.* § 1.1. Finally, effective as of January 1, 2012, RBC decided to "freeze" the existing WAP to all new contributions. Ex. I § 1.1(c). Accordingly, amounts already contributed to the Plan before that date have been or will be distributed in accordance with the terms of the Plan and each participant's election. *Id.*

**B.    Plaintiffs Leave RBC To Start Their Own Firm And Now Seek To Recover Bonuses And Other Awards Forfeited Under The Express Terms Of The WAP.**

Plaintiffs Paul and Buskirk worked together in RBC's Gig Harbor, Washington branch. Ex. D at 14-16. Paul does not dispute he was highly compensated by RBC, and for good reason, as he averaged over $1.3 million in compensation *per year* from 2006 to 2010. *See* Ex. D at 55-

---

[9] *See* Ex. F ¶ 5. RBC established similar restrictions to employees eligible to participate from the "Fixed Income-Non-Commissioned, Banking" business line. Ex. J (2009).

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

59 (recounting annual compensation). In March 2011, RBC terminated Paul for cause, and he has since gone on to operate an office under affiliations with three different companies. *Id.* at 13-15. At each step, Paul not only took his clients, but he also recruited four other FCs to leave RBC to join him—including Buskirk, who still works with Paul today. *Id.*; Ex. E at 13:13-14:21.

Buskirk was a successful FC in his own right. In the years before he left RBC to join Paul, he estimated earning $350,000 to $400,000 annually, though "there were obviously some years where it was more than that." Ex. E at 75:7-14. Buskirk also took nearly all of his clients when he left, testifying this is typical in an industry where "most brokers get a fairly large percentage of their clients following them." *Id.* at 46:25-47:14.

On top of their substantial commission-based earnings, RBC paid both Paul and Buskirk significant bonuses and other awards into the WAP. From 2007 until his termination in March 2011 alone, RBC paid Paul over *$1.1 million* in awards into the WAP, not even accounting for investment growth over that period. Ex. P, Paul WAP Stmts. (*see* "Employer Contributions"). Likewise, RBC paid Buskirk over *$255,000* in WAP awards from 2007 until he left in 2012. Ex. Q, Buskirk WAP Stmts. (same); Ex. R, Buskirk 2006-2007 Total Comp. Stmts.

Both plaintiffs also repeatedly elected to receive "in-service" distributions of some WAP awards, rather than defer for retirement. *See* Ex. D at 37:24-38:16 ("I think I made some [in-service elections]. I don't remember how many."). Between 2007 and 2011 alone, Paul received payouts from the WAP totaling nearly *$855,000*, ranging from $139,000 to $260,800 per year. Ex. P ("Withdrawals"). Meanwhile, Paul had elected in-service, lump-sum payouts for all WAP contributions from 2006 to 2011. *See* Ex. S, Ltr. to M. Paul, at MP 138. Likewise, in just the four years before leaving RBC in 2012, Buskirk received in-service payouts of around *$376,000* from the WAP, ranging from $73,300 to $107,200 per year. Ex. Q ("Withdrawals").

When Paul was terminated for cause in March 2011, he received a full distribution of all voluntary contributions to the WAP and associated returns (nearly $1 million), which were always 100% vested and are not subject to challenge here. Ex. P at 486 (showing distribution of non-forfeited amounts); Dkt. 1, Compl. ¶¶ 36, 49, 52. Pursuant to the WAP, however, Paul

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

forfeited his remaining WAP awards because he was terminated for cause.[10]  *Id.*; Ex. H § 4.3.

Buskirk participated in the WAP until he left RBC in 2012.  He also received a distribution of all

voluntary contributions and all RBC awards vested as of that date.  Ex. Q at 4613; Ex. E at

90:14-20, 108:2-9.  Buskirk fully understood that his decision to leave RBC meant he would

forfeit any remaining *unvested* RBC awards in the WAP.  *Id.* at 104-06, 137-38.  However, by

his calculation, his earnings at Paul's new firm would—in just "a couple years"—more than

compensate for the roughly $300,000 of WAP awards he would forego by leaving RBC.  *Id.*

**C.  Plaintiffs' Claims And Procedural History.**

Each plaintiff filed a claim with RBC challenging the forfeitures of amounts in their

WAP accounts.  Compl. ¶¶ 35-38, 48-52.  These claims, virtually identical and sent by the same

legal counsel, asserted that the WAP was an "employee pension benefit plan" subject to ERISA,

and did not qualify as a "top hat" plan exempt from many of ERISA's substantive provisions.

*Id.*  The WAP Committee denied both plaintiffs' claims and subsequent appeals.  *Id.* ¶¶ 44, 57.

On February 19, 2013, Paul filed a complaint against RBC.  *See* No. 3:13-cv-05119-RBL.

At that time, however, the aforementioned *Tolbert* lawsuit was pending in the Southern District

of Texas.  No. 4:11-cv-107.  On March 27, 2013, the *Tolbert* district court (Hon. Keith P.

Ellison) granted RBC's motion for summary judgment, finding the WAP dated Nov. 1, 2008 was

not a "pension benefit plan" governed by ERISA.  2013 WL 3503286, at *15 (S.D. Tex. Mar. 27,

2013).  The *Tolbert* plaintiffs appealed, however, at which time Paul agreed to voluntarily

dismiss his complaint, while RBC agreed to toll the statute of limitations for Paul's WAP-related

claims pending the *Tolbert* appeal.  Compl. ¶ 45 n.1.  After the denial of Buskirk's WAP appeal

on September 11, 2013, he and RBC entered into a similar tolling agreement.  *See id.* ¶ 58 n.2.

On July 14, 2014, the Fifth Circuit reversed and remanded in *Tolbert*.  758 F.3d 619.  In

light of this development and pending cross-motions for summary judgment in that case, RBC

agreed to extend the tolling agreement with both Paul and Buskirk pending resolution of the

*Tolbert* case.  Compl. ¶¶ 45 n.1, 58 n.2.  Plaintiffs filed this suit on July 11, 2016.  Dkt. 1.

---

[10] Paul's lawsuit does not challenge RBC's determination that his termination was "for cause" under the WAP.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
PAGE 9

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

## III.    ARGUMENT

### A.    Summary Judgment Standards

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  While reasonable inferences should be drawn in the non-movant's favor, "the mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  To defeat a motion for summary judgment, the non-moving party must go beyond the pleadings to "present significant probative evidence tending to support its claim or defense."  *Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).  Failure of proof as to any essential element of a party's claim is sufficient to require the dismissal of that claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### B.    Collateral Estoppel Does Not Apply Because The Issue Presented Here Is Not "Identical" To Any Issue "Actually Litigated" In *Tolbert*.

Before turning to the merits, RBC anticipates that plaintiffs will argue the Fifth Circuit's decision in *Tolbert* should preclude it from litigating whether the WAP is a "pension benefit plan" under ERISA.  However, issue preclusion (*i.e.*, collateral estoppel) does not apply, because the question presented is neither "identical" to the issue resolved in *Tolbert* nor "actually litigated" in that case.  Rather, plaintiffs' claims are governed by amended WAP documents, and they were subject to materially different terms and conditions under those versions of the Plan.

Collateral estoppel prevents "a defendant from relitigating the issues which a defendant previously litigated and lost against another plaintiff."  *Syverson v. Int'l Bus. Machines Corp.*, 472 F.3d 1072, 1078 (9th Cir. 2007) (citing *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 329 (1979)).  Applying "offensive nonmutual issue preclusion is appropriate only if (1) there was a full and fair opportunity to litigate the *identical* issue in the prior action, (2) the issue was *actually litigated* in the prior action, (3) the issue was decided in a final judgment, and (4) the party against whom issue preclusion is asserted was a party or in privity with a party to the prior

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

action." *Id.* at 1078. Simply put, the issues presented here are not "identical" to those "actually litigated" and resolved in *Tolbert*.

*First*, this case involves evaluating iterations of the WAP the *Tolbert* court expressly declined to address. The *Tolbert* district court specifically limited its holding and analysis to the WAP dated Nov. 1, 2008—the "version . . . in effect at the time of [plaintiff's] termination from employment"—emphasizing it "*has not included in its analysis* any subsequent versions of the WAP that may have been promulgated." 2013 WL 3503286, at *3-4 & n.4 (emphasis added).[11] In other words, the *Tolbert* court articulated precisely what issue it resolved: whether the Nov. 1, 2008 WAP (and only that WAP) was an ERISA "pension benefit plan."

This clarification—unnecessary had the court intended to resolve the same issue for all versions of the WAP—is alone sufficient to establish the "issue" resolved in *Tolbert* was not "identical" to those RBC presents here. Plaintiffs cannot dispute the WAP was "amended and restated" after the Nov. 1, 2008 Plan—including by the time they separated from RBC. *Supra* § II.A.4. "Collateral estoppel is inappropriate if there is any doubt as to whether an issue was actually litigated in a prior proceeding." *Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d 904, 912 (9th Cir. 1997) (quotations omitted) (applying issue preclusion where second lawsuit concerned the *identical* agreement at issue in prior suit). Here, the *Tolbert* court eliminated "any doubt" that its ruling was confined to the WAP dated Nov. 1, 2008.[12]

*Second*, even if application of different versions of the WAP were not alone enough, plaintiffs cannot dispute that RBC exercised its broad discretion to *administer* the WAP differently since 2009. As one example, starting in 2010, RBC eliminated certain forms of "Matching Contribution" awards paid into the WAP, instead increasing the Productivity Bonus

---

[11] Underscoring its point, the *Tolbert* district court also emphasized the provision in the Nov. 1, 2008 WAP stating that it "supersedes all prior versions of the Plan and any deferrals or contributions made pursuant to a prior version of the Plan will be governed by this Plan." 2013 WL 3503286, at * 4 n.6.

[12] *See Duran v. AT&T Corp.*, 2001 WL 1334280, at *7 (S.D. Ohio Aug. 22, 2001) (collateral estoppel did not apply to issues related to (1) provisions of agreement considered but not relevant for holding in first case, and (2) new versions of agreement not previously in dispute); *see also Rybarczyk v. TRW, Inc.*, 235 F.3d 975, 982 (6th Cir. 2000) (reversing application of collateral estoppel because amendments were not at issue in prior lawsuit but were operative for current litigation); *cf. Cent. Delta Water Agency v. United States*, 306 F.3d 938, 953 (9th Cir. 2002) (issue preclusion did not apply where prior suit was based on an earlier version of a plan containing different terms).

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

and implementing a new Loyalty Bonus. *Supra* § II.A.4. Importantly, these changes—which required no modification to the actual text of the WAP—meant participants no longer made voluntary deferrals before receiving such awards; rather, RBC paid these bonuses without *any* employee contributions. *Id.* As addressed below, such facts are relevant to RBC's substantive arguments, and the fact that core changes may not be reflected in the WAP's written terms does not render them inconsequential. Plaintiffs are of course free to point to textual similarities in an effort to analogize their claims to *Tolbert*, but that ruling is not binding precedent; it did not address the "identical" issues here; and RBC is not estopped from asserting its defenses.

*Third*, underscoring the point above, the question of whether the WAP falls within the DOL's "bonus program" regulation was not "actually litigated" or decided in *Tolbert*, even with respect to the Nov. 1, 2008 WAP. *See infra* § III.C.2; 29 C.F.R. § 2510.3-2(c). As the Fifth Circuit observed, RBC did not argue directly to the district court that the Nov. 1, 2008 WAP was a "bonus program"—meaning this question was not properly before the Fifth Circuit. 758 F.3d at 627; *see also Steen*, 106 F.3d at 912 ("[F]or collateral estoppel to apply, the issue to be foreclosed in the second litigation must have been litigated and decided in the first case."); *Duran*, 2001 WL 1334280, at *7 ("If an issue is not argued, or though argued is ignored by the court, or is reserved, the decision does not constitute a precedent to be followed."). Although the Fifth Circuit nonetheless went on to address, in dicta, whether the Nov. 1, 2008 WAP might be a "bonus program," its analysis is flawed (as discussed below) and, regardless, its discussion of an argument it acknowledged RBC did not make does not mean the issue was "actually litigated" or that the same analysis would apply for versions of the WAP *after* November 1, 2008. For these reasons, collateral estoppel does not apply, and the Court should turn to the merits.

**C.      The WAP Is Not A "Pension Benefit Plan" Governed By ERISA.**

The WAP is not the type of benefit program Congress intended to regulate by ERISA. The statute was enacted in 1974 primarily to address a growing trend of long-term employees who had been promised—but then stripped of—"anticipated retirement benefits owing to [a] lack of vesting" and funding in traditional defined-benefit pension plans. *Murphy*, 611 F.2d at 574

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

(ERISA "sought only to deal with those types of plans that had created the problems it sought to remedy"); *see also Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 375 (1980) (Congress wanted to ensure "that if a worker has been promised a defined pension benefit upon retirement . . . he actually will receive it"). However, courts have cautioned that ERISA was not intended, nor should it be interpreted, to constrain employers in designing a benefit program best suited for their particular needs and workforces, nor should it create such restriction or red-tape that it dissuades offering voluntary benefits in the first place—even for plans that *are* governed by ERISA. *See, e.g.*, *Conkright v. Frommert*, 559 U.S. 506, 517 (2010) ("Congress sought to create a system that is [not] so complex that administrative costs, or litigation expenses, unduly discourage employers from offering [ERISA] plans in the first place.") (quotations omitted).

ERISA therefore only applies to "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both[.]" 29 U.S.C. § 1002(3); *Rich*, 823 F.3d at 1210.[13] ERISA defines a "pension benefit plan" as one that "by its express terms or as a result of surrounding circumstances . . . (i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond[.]" 29 U.S.C. § 1002(2)(A). Interpreting this definition, the Department of Labor has explained that a pension benefit plan "*shall not* include payments made by an employer to some or all of its employees as bonuses for work performed, *unless* such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees." 29 C.F.R. § 2510.3-2(c) (emphases added).

Consistent with the statute's underlying purposes, courts have cautioned that ERISA's definition of a "pension benefit plan" is not "algorithmic" and should not "be read as an elastic girdle that can be stretched to cover any content that conceivably fits within its reach." *Murphy*, 611 F.2d at 575. Rather, the Court must carefully evaluate the actual plan at issue to assess whether its "express terms" or "surrounding circumstances" bring it within ERISA's purview. In doing so, the Ninth Circuit recently agreed, as a matter of first impression, "that the *paramount*

---

[13] Plaintiffs do not contend that the WAP is a "welfare benefit plan." *See* Compl. ¶ 14.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
PAGE 13

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

*consideration* is whether the primary purpose of the plan is to provide deferred compensation or *other retirement benefits*." *Rich*, 823 F.3d at 1210 (emphases added) (citing *Murphy*, 611 F.2d at 575; *Oatway v. Am. Int'l Group, Inc.*, 325 F.3d 184, 188-89 (3d Cir. 2003); *Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929, 931-34 (8th Cir. 1999)); *see also Williams v. Wright*, 927 F.2d 1540, 1547 (11th Cir. 1991) (focus of the "pension plan" inquiry is whether a plan "was designed primarily for the purpose of providing retirement income").

Here, the WAP does not constitute a "pension benefit plan" under ERISA for several reasons. First, its undisputed purpose was *not* to "provide retirement income," but rather to retain key employees, incentivize increased production, and afford eligible employees flexibility to tailor their participation to their individual needs. Second, the WAP is the central repository for the performance-based bonuses RBC paid these select employees over the years, rendering it a "bonus program." And third, nothing about the WAP "systematically defers" awards to post-termination, or otherwise "results in a deferral of income" until such time. Rather, any such deferral "results" directly from a participant's unfettered *choice*—and absent such election, the WAP requires participants to receive payment of WAP awards while still employed at RBC.

### 1. The WAP Was Not Designed For The Primary Purpose of Providing Retirement Income, Nor Did It Compel Any Participant To Receive It.

First, the WAP did not "provide retirement income" under ERISA § 3(2)(A)(i) because it was neither intended nor designed to do so. *See Rich*, 823 F.3d at 1211 ("[B]ecause the SRP was not designed or intended to provide retirement or deferred income, it is not covered by ERISA."); *Boos v. AT&T, Inc.*, 643 F.3d 127, 134 (5th Cir. 2011) ("The words 'provides retirement income' patently refer only to plans *designed for the purpose of paying retirement income* whether as a result of their express terms or surrounding circumstances.") (emphasis in original). Courts, including the Ninth Circuit, have uniformly found that plans designed primarily to reward or retain employees—as opposed to providing retirement income—are not governed by ERISA. *See Rich*, 823 F.3d at 1210; *Callan v. Merrill Lynch, Inc.*, 2010 WL

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

1    3452371, *8 (S.D. Cal. Aug. 30, 2010) ("Courts have consistently held that plans created to

2    incentivize performance and not provide retirement income . . . are not ERISA plans.").[14]

3         Here, the WAP was not designed to pay retirement or post-termination income.  The

4    WAP terms evidence RBC's intention that it was *not* a "pension benefit plan," and its primary

5    purpose was to attract and retain key employees by awarding bonuses and other incentives

6    subject to specified vesting periods.  *Supra* § II.A.  The WAP is offered in addition to RBC's

7    retirement programs, and it was considered an integral part of RBC's retention objectives

8    (particularly for FCs like Paul and Buskirk).  *Id.*  And it is undisputed that the WAP never

9    conditioned or required *any* distribution upon termination; rather, such a payout would result

10   only from a participant's choice, not the WAP's terms or design.  *Id.*  Indeed, even the Fifth

11   Circuit in *Tolbert* agreed with RBC on this point with respect to the Nov. 1, 2008 WAP, finding

12   the Plan does not "provide retirement income" for purposes of § 3(2)(A)(i), because "the WAP

13   was not designed to provide retirement income, considering, for example:  the WAP's statement

14   of purpose (announcing the goal of allowing "employees to share in [RBC's] growth and

15   profitability") and the *de facto* distribution date (immediately upon vesting)."  758 F.3d at 624.

16        2.    **The WAP Was A "Bonus Plan" Under DOL Regulations.**

17        Thus, if the WAP was a "pension benefit plan," plaintiffs must establish that, by its

18   "express terms or surrounding circumstances," the WAP "results in a deferral of income" until

19   retirement or termination for purposes of ERISA § (3)(2)(A)(ii).  Here, however, the WAP

20   constitutes a "bonus program" under DOL regulations, thus removing it from ERISA coverage.

21   29 C.F.R. § 2510.3-2(c).  Neither ERISA nor the regulation offer a formal definition of a "bonus

22   program."  The only guidance in the regulation itself is that such a program contemplates

23   "*payments made* by an employer . . . as bonuses for work performed."  *Id.* (emphasis added).  As

24

---

25   [14] *See also Boos*, 643 F.3d at 133 (finding no "pension plan" where "the primary thrust of the plan is to reward
     employees during their active years"); *Oatway*, 325 F.3d at 189 (ERISA inapplicable where plan was "designed to
26   provide a financial incentive for employees to remain with AIG and improve their performance"); *Emmenegger*, 197
     F.3d at 932 (same where plan's "objectives" were to "encourag[e] selected managers to stay with" the company and
     "compensat[e] [them] for services rendered"); *McKinsey v. Sentry Ins.*, 986 F.2d 401, 406 (10th Cir. 1993) (same
     where plan was designed to reward "loyalty" and "provid[e] a method for sharing in the growth of the Company").

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

such, the DOL acknowledges "bonuses" as a common form of compensation that employees

might receive over a period of time (*e.g.*, subject to a vesting period or other restrictions), and

thus may come due only after an employee retires or terminates employment. But unless such

bonuses are "systematically deferred to the termination of covered employment or beyond, or so

as to provide retirement income to employees," then the simple fact such a bonus is payable after

termination does not convert the program into an ERISA "pension plan." *See infra* § III.C.3.a.

RBC indisputably made "payments" to both Paul and Buskirk into the WAP "as bonuses

for work performed." As noted, the WAP was RBC's primary vehicle for paying (sizeable)

performance-based bonuses to FCs and other key employees.[15] *Supra* § II.A. Employees had to

meet the WAP's eligibility requirements each year in order to participate in the WAP and,

therefore, receive such bonuses. *Id.* And RBC retained significant discretion over WAP awards,

which were in addition to participants' regular compensation. *See Rich*, 823 F.3d at 1211

(employer's discretion to grant awards "further weighs against ERISA coverage"); *Oatway*, 325

F.3d at 189 (plaintiff's awards "were discretionary, given in recognition of special service, and

awarded in addition to his regular compensation").

Nothing unique about the WAP should exclude it from the "bonus program" regulation.

Plaintiffs almost certainly will point to the Fifth Circuit's ruling in *Tolbert*. However, that

court's analysis is dicta, flawed in multiple respects, and, regardless, did not address the WAP in

effect when plaintiffs terminated from RBC. The first basis for the Fifth Circuit's conclusion

was that "RBC admits that the WAP is not a 'bonus program.'" 758 F.3d at 626. However,

because the version of the WAP at issue in *Tolbert* provided for bonus awards tied in part to a

participant's decision to voluntarily defer additional amounts into the WAP, RBC argued that

*even if* the regulation did not apply directly, its purpose and rationale nevertheless should apply

---

[15] For example, in 2010 alone, RBC paid Paul a Productivity Bonus of nearly $100,000 and a Loyalty Bonus of roughly $87,000, for a total of around $187,000 into the WAP. Ex. T, Paul 2010 Bonus Stmt. Meanwhile, in 2011, Buskirk received a Productivity Bonus of $24,500, and a Loyalty Bonus of $28,500, for a total of around $53,000. Ex. U, Buskirk 2011 Bonus Stmt. Indeed, between 2007 and 2012, RBC paid Paul over *$1.1 million*, and Buskirk over *$255,000*, in contributions into the WAP. *Supra* § II.B. Buskirk even described participating in the WAP itself as "a bonus," explaining he chose to do so each year to "[b]e able to defer income and participate in the bonus." Ex. E at 86 ("[Y]ou had the choice of using [the WAP] or not. It was based on production. It was a bonus.").

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
PAGE 16

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

equally to plans like the WAP. *See* Appellees' Br., at 37-38, Civ. App. 13-20213 (5th Cir. Oct. 16, 2013). Not only is this not an "admission" that the Nov. 1, 2008 WAP was not a "bonus program," but it says nothing about later versions of the Plan.

More importantly, the Fifth Circuit's ensuing dicta conflates the question of whether the WAP "deferred compensation" at all, with the relevant question of whether the compensation being deferred constituted "bonuses for work performed." *Tolbert*, 758 F.3d at 626. In finding the WAP "is not a bonus plan," the *Tolbert* court cited *only* the WAP's statement of purpose, which provides that it is a "deferred compensation plan."[16] *Id.* But these are not mutually exclusive, and the deferral of compensation alone does not determine ERISA status. Nearly every case addressing this issue involves some form of "compensation"—bonus or otherwise—being deferred and received at a later date. *See, e.g., Forte v. BNP Paribas*, 2015 WL 3604317, at *3 (S.D.N.Y. June 8, 2015) (finding "there can be no question" that a "Deferred Compensation Scheme" that "defers a proportion of [annual] bonus awards" subject to forfeiture "is a bonus plan," where the "clear purpose of this plan is to incentivize employee performance, not to allow employees to collect retirement income").[17] Indeed, the prospect of bonuses being paid out at a later date presumably is why the DOL felt guidance was warranted in the first place.[18]

---

[16] This basis for the Fifth Circuit's ruling also conflicts with the Ninth Circuit's instruction that an employer's characterization of a plan does not govern its status under ERISA. *See McCloone v. Intel Corp.*, 1 F. App'x 715, 716 (9th Cir. 2001) ("Even though Intel's compensation handbook unfortunately might give lay employees the impression that all benefits are covered by ERISA, the impression conveyed to laypersons does not establish whether ERISA coverage exists[.]"); *see also MDPhysicians & Assocs., Inc. v. State Bd. of Ins.*, 957 F.2d 178, 183 n.7 (5th Cir. 1992) ("ERISA protection and coverage turns on whether the [plan] satisfies the statutory definition . . . , not whether the entity that established and maintained the [plan] intended ERISA to govern [it].").

[17] *See also, e.g., McKinsey*, 986 F.2d at 406 (finding a "deferred compensation" plan was a "bonus program" because its purpose was to promote a strong interest in the company and award production, despite that employees "*can* defer payment of bonus and interest allocations until the termination of employment or to provide retirement income") (emphasis in original); *Houston v. Saracen Energy Advisors*, 2009 WL 890384, at *4 (S.D. Tex. Mar. 27, 2009) (noting plaintiff "received phantom stock, *otherwise known as deferred compensation*, in the [plan] for the work he performed and the profits he generated") (emphasis added); *In re Segovia*, 404 B.R. 896, 916 (N.D. Cal. 2009) (describing stock options as "*a form of compensation*" allowing payment at a future date) (emphasis added).

[18] For the same reasons, the Ninth Circuit's subsequent reference to *Tolbert* in *Rich* is not apposite here. *See* 823 F.3d at 1211. In *Rich*, the court simply noted that the Fifth Circuit relied on the WAP's description as a "deferred compensation plan" and thus allowed "for the deferral of compensation." *Id.* But again, whether the WAP allowed for the "deferral of compensation" is only half of the equation. The question for purposes of the "bonus program" regulation is whether the "compensation" being "deferred" is a *bonus* for work performed. That is the case here.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

The Eighth Circuit's ruling in *Emmenegger* is instructive on this point. Although the Fifth Circuit distinguished the WAP from the "phantom stock" plan at issue in that case, it had "no quibble" with the Eighth Circuit's core holding that the mere "option to defer the receipt of income" did not create an ERISA pension plan. *Tolbert*, 758 F.3d at 626. Rather, the Fifth Circuit dismissed *Emmenegger's* relevance to the WAP *strictly* because the former plan was deemed a "bonus program." *Id.* Closer examination of the two actually reinforces a finding that the WAP also falls within that category, as they parallel each other in several key respects.[19]

The plan in *Emmenegger* was designed to retain key employees by providing "phantom stock" awards. 197 F.3d at 931-32. "Phantom stock" is not actual equity, but rather a notional award that appreciates in line with a company's performance and stock price. *Id.* Similar to bonuses under the WAP, these awards were subject to vesting and, once vested, could be redeemed at any time. Participants could receive payment of their vested benefits at "redemption value" upon "certain triggering events, such as *retirement*, disability, death, *termination without cause*, or takeover." *Id.* at 932 (emphases added). However, participants also could choose to cash in their vested awards while still employed, receiving either redemption value or the lesser "book value." *Id.* at 932-33. Applying the "bonus program" regulation, the Eighth Circuit held this was not an ERISA pension plan. Nothing required redemption of the awards at retirement, nor penalized doing so before that time. Rather, much like the WAP, whether to take a distribution after termination was "strictly at the option" of the participant." *Id.* at 933.

There is no principled distinction between the "phantom stock" at issue in *Emmenegger* and RBC's WAP awards here. Both plans were designed to reward and retain key employees through the payment of bonuses. Both plans provided such awards as compensation subject to vesting, *i.e.*, granted on one date but not payable until a later date. Both plans allowed for the appreciation of awards, depending in part on how long they were deferred—in fact, the WAP would be no different at all had RBC chosen to value participants' accounts solely by the price of

---

[19] The Ninth Circuit similarly agreed with the Eighth Circuit's holding in *Emmenegger* that "the mere possibility that income *can* be deferred does not mandate ERISA coverage." *Rich*, 823 F.3d at 1211.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

RBC stock, rather than allowing them to choose other notional investments.  And both plans let the *participant* choose distributions while employed or at retirement or termination.  For the same reasons as in *Emmenegger*, the WAP is a "bonus program" under 29 C.F.R. § 2510.3-2(a).

### 3. The WAP's Design And Operation Neither "Systematically Defer" Nor "Result In" The Deferral Of Income To Retirement Or Termination.

Nothing about the WAP "systematically defers" payment of bonuses to the termination of employment.  29 C.F.R. § 2510.3-2(c).  And even if the bonus regulation does not apply, the WAP itself does not "result in" any such deferral.  Under either formulation, it is undisputed that every WAP participant was free to use the Plan as he or she wanted, and deferral until retirement was the "result" of the participant's choice, not the design or operation of the WAP.

To start, there should be no practical difference in evaluating whether a plan's express terms or surrounding circumstances "result in" a deferral until termination (for purposes of 29 U.S.C. § 1002(2)(A)(ii)), and whether "income" that happens to take the form of a "bonus" is "systematically deferred" to termination of employment (for purposes of 29 C.F.R. § 2510.3-2(c)).  After all, what else is a "systematic" deferral other than one caused by a "system" (either written or the result of "surrounding circumstances")?  The ultimate question remains whether *the plan* causes deferrals to be paid upon retirement as a matter of course.

In this respect, the DOL regulation is interpretive, not definitional, as it "clarif[ies] the terms 'employee pension benefit plan' and 'pension plan' . . . by setting forth safe harbors" for certain common types of compensation programs.  29 C.F.R. § 2510.3-2(a).  Nowhere does ERISA define a "bonus program," nor did the DOL purport to establish an exclusive list of every arrangement falling outside ERISA's coverage.  And for good reason, as employers may offer a virtually unlimited universe of compensation programs with unique features.  Thus, the better understanding is that the DOL recognized "bonus programs" are a common compensation device often involving deferrals for some period of time.  As such, the regulation simply clarifies that for the payment of "bonuses for work performed" to "result in" deferral until termination under ERISA § 3(2)(A)(ii), those awards must be "systematically deferred."  And courts have applied

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

this "systematic deferral" language to a variety of plans designed primarily to reward or incentivize employees, even where employees also had the option to defer those bonuses.[20]

As outlined below, however, the WAP satisfies *either* approach, because it indisputably allowed for distribution while still employed—in fact, required it absent a contrary election—as opposed to conditioning the receipt of payments upon termination. Because the same circumstances satisfy both standards, RBC addresses them together below.

### a. The WAP's Express Terms Neither "Resulted In" Nor "Systematically Deferred" Payments Until Termination.

Because the "paramount consideration" in this context is whether the WAP's primary purpose was to provide retirement benefits, courts have held unanimously that an ERISA "pension plan" does not exist simply because compensation "*can* be deferred" until after an employee retires. *Rich*, 823 F.3d at 1211. Rather, no pension plan exists where such post-termination payment is "incidental" to the primary purpose of the plan, or occurs by mere "happenstance" or as a result of the passage of time.[21] To the contrary, the DOL has advised that a plan does not fall within ERISA unless it *conditions* distributions upon retirement or termination.[22] It is the "design of the plan at issue"—and "not the individual participants'

---

[20] *See, e.g.*, *Callan*, 2010 WL 11508843 at *8 (applying bonus regulation for program intended "to award top performing [financial advisors] and provide financial incentive for employees to remain with Merrill Lynch and improve their performance there," even where awards did not vest for eight years and certain participants "could continue to have his or her [plan] awards vest and paid out for up to *10 years after he or she retired*); *Critelli v. Fidelity Nat'l Title Ins. Co. of N.Y.*, 2007 WL 749693, at *1 (E.D.N.Y. Mar. 7, 2007) (applying bonus regulation where participants could "defer[] payment of portions of [their] salary, and up to 100% of [their] annual bonus, until a future date"); *Hahn v. Nat'l Westminster Bank, N.A.*, 99 F. Supp. 2d 275, 279 (E.D.N.Y. 2000) (applying bonus regulation because plan "was created to provide additional compensation to current employees in recognition of their value," rather than to provide future compensation for retirement).

[21] *Emmenegger*, 197 F.3d at 933 (deferral to retirement due to vesting "would only occur by happenstance"); *Oatway*, 325 F.3d at 189 (any "post-retirement payments were only incidental to the goal of providing current compensation" in a manner "designed to provide a financial incentive for employees to remain with AIG"); *McKinsey*, 986 F.2d at 406 (holding that option to "defer payment of bonus and interest allocations until the termination of employment" under a "deferred compensation plan" designed to promote "loyalty to the organization" and "provid[e] a method for sharing in the growth of the Company" did not trigger ERISA coverage).

[22] DOL Op. Ltr. 82-29A, 1982 WL 21212, at *2 (where a plan does not *condition* distribution" of benefits "upon termination or retirement," then it "is not by its express terms an employee pension benefit plan" under ERISA); *see also* DOL Op. Ltr. 2002-13A, 2002 WL 31846478, at *3 (same); DOL Op. Ltr. 84-12A, 1984 WL 23427, at *2 (same); DOL Op. Ltr. 81-24A, 1981 WL 17745, at *2 (same).

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

intended use of the proceeds"—that matters. *Houston v. Aramark Corp.*, 112 F. App'x 132, 136 (3d Cir. 2004); *Emmenegger*, 197 F.3d at 933.[23]

Here, nothing in the WAP's "express terms" requires or conditions receipt of WAP awards on termination or retirement. Rather, the WAP's purpose and design are fully consistent with its non-retirement function. Section 1.1 states that the Plan will "provide an opportunity for [qualifying] employees to invest a portion of their compensation in tax-deferred savings and investment options in an effort to support long-term savings and to allow such employees to share in the Company's growth and profitability[.]" Ex. H. Section 5.11 further clarifies the WAP was "not intended" to be an ERISA pension plan, but if it nevertheless was found to be one, RBC "believe[d] that it constitute[d]" an exempt top-hat plan. *Id.* The WAP's express terms thus make clear it was designed to provide a mechanism for paying bonuses and other awards in a manner *not* governed by ERISA. *See Tolbert*, 758 F.3d at 624.

Nothing else in the WAP's terms should be read to "result in" retirement distributions. Some participants were required to take their awards promptly upon vesting (*without* the option of deferring further), and everyone else did so by default, absent a written election to the contrary. As such, the only thing that "results in" deferrals until retirement is the participant's decision to do so. *Tolbert* aside, RBC has located no decision holding that merely allowing an employee the option of deferring for as long as he or she wants—including until retirement— automatically converts a plan that otherwise pays such awards during employment into an ERISA "pension plan." Multiple cases hold to the contrary. *Supra* § III.C.3.

As for *Tolbert*, the Fifth Circuit's conclusion that the "express terms" of the Nov. 1, 2008 WAP were determinative as to whether the WAP "results in" post-termination deferrals is incorrect. *See* 758 F.3d at 625-27. To start, the court again bifurcated its analysis, first asking only whether the WAP's express terms "result in" the deferral of compensation *at all*, before moving to the pertinent question of whether the WAP's terms require deferrals "to the

---

[23] *See also McKinsey*, 986 F.2d at 406 (same); *Critelli*, 2007 WL 749693, at *4 ("It is well established in the Second Circuit that a mere option to defer compensation is insufficient to trigger ERISA coverage").

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

termination of covered employment or beyond." *Id.* RBC has never disputed that the WAP permits the deferral of income. Indeed, any "bonus" payment subject to vesting or otherwise not distributed for a period of time is, by definition, deferred "income." On the critical question here, however—whether the WAP's express terms "result in" *post-termination* deferrals—the court found only that the WAP "contemplate[d]" employees deferring until termination—and it cited as support only provisions allowing for *early vesting* of RBC awards if certain conditions are satisfied. *Tolbert*, 758 F.3d at 626.

The WAP's vesting provisions, however, accelerate the vesting of benefits that would not otherwise be paid until a later date (if at all), thus *reducing* the deferral period. Ex. H §§ 4.1, 4.2(a)-(b), 5.2(b)(iv); Ex. G at 5. These provisions do not reflect an intention or design to *defer* such awards *to* separation. Rather, this is the very sort of "incidental" payment that might occur when an employee receives awards subject to vesting, but then leaves before those awards vest. To take an example, the 2011 WAP allows for immediate vesting for an employee who meets the Plan's requirements for "Retirement" and executes a non-competition and non-solicitation agreement. Ex. H § 4.2. The WAP defines "Retirement" as the separation of an employee whose age plus years of service with RBC equals 60 or more. *Id.* § 1.2. Consequently, a 45-year old FC who began working at RBC at age 30 would satisfy the WAP's definition of "Retirement." If that FC received WAP bonuses in the few years before his departure, some would not have vested yet, and he would be at risk of forfeiting them. However, the WAP allows him to receive those unvested benefits at age 45. This FC did not defer his WAP awards *to* the termination of employment, but rather was permitted to *accelerate* his deferral period so he could take his money *when* he left, in exchange for satisfying the conditions of WAP § 4.2. And if that participant had no unvested WAP awards, § 4.2 would not apply to him at all.

Thus, the sole basis for the Fifth Circuit's decision runs headlong into the core principle that no "pension plan" arises simply because payment happens to occur after termination. As a result, the only "express terms" of the WAP the Fifth Circuit cited necessarily impact only WAP awards made in the few years preceding an employee's separation. There is no conceptual

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

difference in this situation from a participant in a phantom stock or "deferred bonus" program who receives an award in the final few years of employment, but who cannot exercise those awards until after retiring or leaving the employer. In both instances, the fact that awards may be paid after separation is based on timing, not the function of the plans. And for these reasons, courts have repeatedly held that similar accelerated vesting or payment provisions do not result in ERISA coverage.[24] Ultimately the Fifth Circuit apparently spotted the buzzwords "Retirement" and "Separation" in the WAP, without considering their actual operation or resulting impact on the relevant legal question. Neither these provisions—nor anything else in the WAP's express terms—bring the WAP within ERISA's definition of a pension plan.

### b. The WAP's "Surrounding Circumstances" Neither "Systematically Deferred" Nor "Resulted In" Post-Termination Deferrals.

Nor did anything about the WAP's "surrounding circumstances" have the effect of deferring participants' distributions until retirement or termination. 29 U.S.C. § 1002(2)(A)(ii). As the DOL has advised, a plan "might" be a pension plan as a result of surrounding circumstances "if distributions under the [p]lan are skewed towards the last years of participants' careers," DOL Op. Ltr. 81-27A, 1981 WL 17748, at *3, or "if an employer . . . prevents or discourages participants' requesting or receiving" pre-termination distributions, DOL Op. Ltr. 90-17A, 1990 WL 263441, at *2. No such circumstances exist here.

*First*, although the WAP allowed some participants to defer distributions until termination, this was not a result compelled by "the operation or administration of the [WAP]." *See, e.g.*, DOL Op. Ltr. 84-12A, 1984 WL 23427, at *2 (a plan might be a pension plan if its

---

[24] *See, e.g.*, *Callan*, 2010 WL 345237 at *1, *8 (finding a plan created to "incentivize performance" of Merrill Lynch financial advisors was not an ERISA plan, even where awards did not vest for eight years and the plan contained a "Rule of 65" provision, whereby "a long-term employee (of at least 20 years of employment) who decided to take early retirement could continue to have his or her FACAAP awards vest and paid out for *up to 10 years after he or she retired*"); *see also McKinsey*, 986 F.2d at 406 (finding plan not subject to ERISA even though unvested payments "vest upon her/his death *or retirement*"); *Saracen Energy*, 2009 WL 890384, at *7 ("Although the Plan *contemplates* distributing benefits to participants after their termination, retirement, death, or disability, *if these events occur prior to the vesting date*, it is neither part of the Plan's purpose nor its intent to systematically defer distribution until the termination of or beyond employment or to provide retirement income.") (emphases added); *Hahn*, 99 F. Supp. at 277 (finding no ERISA plan despite that unvested awards automatically vested upon retirement and could be exercised up to *three years after* retirement).

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

"operation or administration" resulted in deferral of income extending to termination or beyond). To the contrary, the WAP was designed and operated such that distributions were presumptively made *before* termination. Nothing about the WAP's operation "skewed" distributions "towards the last years of participants' careers." DOL Adv. Op. 81-27A 1981 WL 17748, at *3.

*Second*, RBC did not prevent or discourage anyone from taking in-service distributions. Nor did RBC promote or incentivize participants to select a retirement distribution. Rather, RBC *required* some participants to receive exclusively in-service distributions and consistently encouraged everyone else to select whatever distribution option works for them. *See, e.g.*, Ex. M, 2006 FC WAP Summary at 4 ("[Y]ou can use your [WAP] distributions for any purpose."). And if a participant did not timely submit a written election to defer until termination, the WAP *mandated* the benefits be distributed immediately upon vesting. Ex. H § 5.2(b)(iv). As a result, the majority of WAP participants—between 51 and 66 percent—were scheduled to receive in-service distributions of WAP benefits between 2007 and 2011. *Supra* § II.A.3. As noted, both Paul and Buskirk were among that majority, collectively receiving roughly $1.2 million in payouts while employed over that same period. *Id.* § II.B. The WAP participants' actual use of the Plan, therefore, belies any suggestion that although the WAP's "express terms" did not require retirement distributions, it somehow did so through its "surrounding circumstances."

Accordingly, that some participants exercised their *option* of deferring WAP awards to termination does not alter the fundamental nature of the Plan. The "design of the plan at issue, not the individual participants' intended use of the proceeds, must be the perspective from which" ERISA status is determined. *Houston*, 112 F. App'x. at 136. Here, the WAP's express purpose and design was to maximize RBC's ability to attract and retain key employees in a competitive industry. That a minority chose to take their awards upon termination does not constitute a "surrounding circumstance" transforming the WAP into an ERISA pension plan.

## IV.    **CONCLUSION**

For the above reasons, the Court should grant summary judgment to RBC on all claims.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

DATED: September 28, 2017          Respectfully submitted,


                                   By: /s/ Matthew A. Russell
                                       Matthew A. Russell

                                       Sari M. Alamuddin (*admitted pro hac vice*)
                                          sari.alamuddin@morganlewis.com
                                       Christopher J. Boran (*admitted pro hac vice*)
                                          christopher.boran@morganlewis.com
                                       Matthew A. Russell (*admitted pro hac vice*)
                                          matthew.russell@morganlewis.com
                                       **MORGAN, LEWIS & BOCKIUS LLP**
                                       77 West Wacker Drive, 5th Floor
                                       Chicago, Illinois 60601
                                       312.324.1000 (Telephone)
                                       312.323.1001 (Facsimile)

                                       Kevin J. Hamilton (WSBA #15648)
                                       William B. Stafford (WSBA #39849)
                                       Perkins Coie LLP
                                       1201 Third Avenue, Suite 4900
                                       Seattle, WA 98101-3099
                                       206.359.8000 (Telephone)
                                       206.359.9000 (Facsimile)

                                       *Attorneys for Defendants*

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 28, 2017, I electronically filed the foregoing Defendants' Motion for Summary Judgment on Pension Plan Issue with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

        /s/ *Matthew A. Russell*
        Matthew A. Russell

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000