1                   THE HONORABLE RONALD B. LEIGHTON

2

3

4

5

6                  UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF WASHINGTON
7

8  MARTY PAUL, an individual, and
    BRIAN BUSKIRK, an individual,
9                          Case No. 3:16-cv-05616-RBL

             Plaintiffs,
10                        **DECLARATION OF MATTHEW
                        A. RUSSELL IN SUPPORT OF
11  v.                          DEFENDANTS' MOTION FOR
                        SUMMARY JUDGMENT ON
12  RBC CAPITAL MARKETS, LLC, a       PENSION PLAN ISSUE**
    Minnesota limited liability company; ROYAL
13  BANK OF CANADA, a Canadian corporation;
    and ROYAL BANK OF CANADA US
    WEALTH ACCUMULATION PLAN, an
14  employee benefit plan,

15             Defendants.

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF MATTHEW A. RUSSELL IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   I, Matthew A. Russell, declare and state as follows:

2   1.      I am an associate at the law firm of Morgan, Lewis & Bockius LLP and one of the

3   attorneys representing Defendants RBC Capital Markets, LLC, Royal Bank of Canada, and the

4   Royal Bank of Canada US Wealth Accumulation Plan in the above-captioned lawsuit.  I am

5   competent to make this declaration and have personal knowledge of the facts stated herein.

6   2.      The documents referenced below have either been produced in this litigation or

7   generated over the course of this litigation.

8   3.      Attached as **Exhibit A** is a true and correct copy of a portion of the RBC 2011

9   Financial Consultant Compensation Plan, bates numbered RBC-Paul 00006679 to RBC-Paul

10  00006693.

11  4.      Attached as **Exhibit B** is a true and correct copy of selected pages of the

12  deposition transcript of Gabriella Sikich taken on July 11, 2017, in this litigation.

13  5.      Attached as **Exhibit C** is a true and correct copy of a portion of the RBC 2009

14  Financial Consultant Compensation Plan, bates numbered RBC-Paul 00006615 to RBC-Paul

15  00006628.

16  6.      Attached as **Exhibit D** is a true and correct copy of selected pages of the

17  deposition transcript of plaintiff Marty Paul taken on April 27, 2017, in this litigation.

18  7.      Attached as **Exhibit E** is a true and correct copy of selected pages of the

19  deposition transcript of plaintiff Brian Buskirk taken on April 28, 2017, in this litigation.

20  8.      Attached as **Exhibit F** is a true and correct copy of the Declaration of Gabriella

21  Sikich, dated January 25, 2012, as prepared for and filed in the matter of *Tolbert, et al. v. RBC*

22  *Capital Markets Corp., et al.*, No. 4:11-cv-00107 (S.D. Tex.) (Ellison, J.), bates numbered RBC-

23  Paul 00011925 to RBC-Paul 00011928.

24

25

26  DECLARATION OF MATTHEW A. RUSSELL IN SUPPORT OF
    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
    PAGE 1

9.      Attached as **Exhibit G** is a true and correct copy of the 2011 Financial Consultant RBC U.S. Wealth Accumulation Plan summary brochure, bates numbered TOLBERT 0000640 to TOLBERT 0000645.

10.     Attached as **Exhibit H** is a true and correct copy of the Amended and Restated Royal Bank of Canada U.S. Wealth Accumulation Plan and Prospectus, dated November 1, 2010, and effective January 1, 2011, bates numbered RBC-Paul 00000102 to RBC-Paul 00000123.

11.     Attached as **Exhibit I** is a true and correct copy of the Amended and Restated Royal Bank of Canada U.S. Wealth Accumulation Plan and Prospectus, Frozen as of January 1, 2012, dated January 1, 2012, bates numbered RBC-Paul 00003341 to RBC-Paul 00003362.

12.     Attached as **Exhibit J** are true and correct copies of the "US Wealth Accumulation Plan (WAP) Summary" grids for the Plan years 2009 (bates numbered TOLBERT 0000692 to TOLBERT 0000693), 2010 (bates numbered TOLBERT 0000711 to TOLBERT 0000712), and 2011 (bates numbered TOLBERT 0000713 to TOLBERT 0000714).

13.     Attached as **Exhibit K** is a true and correct copy of selected pages of the deposition transcript of Tammy Buchert taken on July 12, 2017, in this litigation.

14.     Attached as **Exhibit L** is a true and correct copy of the Stipulation of Facts Regarding WAP Eligibility, entered into by the parties in this litigation on September 25, 2017.

15.     Attached as **Exhibit M** is a true and correct copy of the RBC U.S. Wealth Accumulation Plan, 2006 Summary of Plan Provisions for Financial Consultants brochure, bates numbered RBC 000113 to RBC 000116.

16.     Attached as **Exhibit N** is a true and correct copy of the 2009 Financial Consultant RBC U.S. Wealth Accumulation Plan summary brochure, bates numbered RBC 000226 to RBC 000230.

DECLARATION OF MATTHEW A. RUSSELL IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
PAGE 2

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

17.     Attached as **Exhibit O** is a true and correct copy of the 2009 PCG Director RBC U.S. Wealth Accumulation Plan summary brochure, bates numbered RBC 000221 to RBC 000225.

18.     Attached as **Exhibit P** are true and correct copies of the first pages of plaintiff Marty Paul's annual Wealth Accumulation Plan account statements, for the years 2006 to 2012, bates numbered as follows:   2006 (RBC-Paul 0000410); 2007 (RBC-Paul 00000424); 2008 (RBC-Paul 00000437); 2009 (RBC-Paul 00000451); 2010 (RBC-Paul 00000463); 2011 (RBC-Paul 00000474); 2012 (RBC-Paul 00000486).

19.     Attached as **Exhibit Q** are true and correct copies of the first pages of plaintiff Brian Buskirk's annual Wealth Accumulation Plan account statements, for the years 2009 to 2012, bates numbered as follows:   2009 (RBC-Paul 00004570); 2010 (RBC-Paul 00004592); 2011 (RBC-Paul 00004542); 2012 (RBC-Paul 00004613).

20.     Attached as **Exhibit R** is a true and correct copy of plaintiff Brian Buskirk's "FC Total Compensation Statement" for the years 2006 and 2007, produced by plaintiffs in this litigation and bates numbered BB 000062 to BB 000063.

21.     Attached as **Exhibit S** is a true and correct copy of a March 15, 2012 Letter from Gabriella Sikich to Marty Paul (and attachments), produced by plaintiffs in this litigation and bates numbered MP 000113 to MP 000141.

22.     Attached as **Exhibit T** is a true and correct copy of plaintiff Marty Paul's RBC Wealth Management 2010 WAP Productivity and RBC Loyalty Bonuses Year-End Statement, bates numbered RBC-Paul 000011251.

23.     Attached as **Exhibit U** is a true and correct copy of plaintiff Brian Buskirk's RBC Wealth Management 2011 WAP Productivity and RBC Loyalty Bonuses Year-End Statement, bates numbered RBC-Paul 000011270.

DECLARATION OF MATTHEW A. RUSSELL IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
PAGE 3

1    I declare under penalty of perjury under the laws of the United States that the foregoing is

2    true and correct.

3    DATED: September 28, 2017          Respectfully submitted,

4
                                       By: /s/ *Matthew A. Russell*
5                                          Matthew A. Russell

6                                          Sari M. Alamuddin (*admitted pro hac vice*)
                                              sari.alamuddin@morganlewis.com
7                                          Christopher J. Boran (*admitted pro hac vice*)
                                              christopher.boran@morganlewis.com
8                                          Matthew A. Russell (*admitted pro hac vice*)
                                              matthew.russell@morganlewis.com
9                                          MORGAN, LEWIS & BOCKIUS LLP
10                                         77 West Wacker Drive, 5th Floor
                                           Chicago, Illinois 60601
11                                         312.324.1000 (Telephone)
                                           312.323.1001 (Facsimile)
12
13                                         Kevin J. Hamilton (WSBA #15648)
                                           William B. Stafford (WSBA #39849)
14                                         Perkins Coie LLP
                                           1201 Third Avenue, Suite 4900
15                                         Seattle, WA 98101-3099
                                           206.359.8000 (Telephone)
16                                         206.359.9000 (Facsimile)

17                                         *Attorneys for Defendants*

18

19

20

21

22

23

24

25

26
DECLARATION OF MATTHEW A. RUSSELL IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
PAGE 4

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 28, 2017, I electronically filed the foregoing Declaration of Matthew A. Russell in Support of Defendants' Motion for Summary Judgment on Pension Plan Issue with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

        /s/ *Matthew A. Russell*
       Matthew A. Russell

DECLARATION OF MATTHEW A. RUSSELL IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
PAGE 5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| MARTY PAUL, an individual, and BRIAN BUSKIRK, an individual, | |
| Plaintiffs, | |
| v. | Case No. 3:16-cv-05616-RBL |
| RBC CAPITAL MARKETS, LLC, a Minnesota limited liability company; ROYAL BANK OF CANADA, a Canadian corporation; and ROYAL BANK OF CANADA US WEALTH ACCUMULATION PLAN, an employee benefit plan, | Honorable Judge Ronald B. Leighton |
| Defendants. | |

**INDEX OF EXHIBITS IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ON PENSION PLAN ISSUE**

| Exhibit | Document | Bates Label |
|---|---|---|
| A | RBC 2011 Financial Consultant Compensation Plan | RBC-Paul 6679-6693 |
| B | Excerpts of Gabriella Sikich's Deposition Transcript, July 11, 2017 | n/a |
| C | RBC 2009 Financial Consultant Compensation Plan | RBC-Paul 6615-6628 |
| D | Excerpts of Plaintiff Marty Paul's Deposition Transcript, April 27, 2017 | n/a |
| E | Excerpts of Plaintiff Brian Buskirk's Deposition Transcript, April 28, 2017 | n/a |
| F | Declaration of Gabriella Sikich, dated January 25, 2012 | RBC-Paul 11925-11928 |
| G | 2011 Financial Consultant RBC U.S. Wealth Accumulation Plan Summary Brochure | TOLBERT 640-645 |
| H | Amended and Restated Royal Bank of Canada U.S. Wealth Accumulation Plan and Prospectus, dated November 1, 2010, and effective January 1, 2011 ("2011 WAP") | RBC-Paul 102-123 |
| I | Amended and Restated Royal Bank of Canada U.S. Wealth Accumulation Plan and Prospectus, Frozen as of January 1, 2012, dated January 1, 2012 ("2012 Frozen WAP") | RBC-Paul 3341-3362 |

| J | US Wealth Accumulation Plan (WAP) Summary Grids for the Plan years 2009, 2010, and 2011 | TOLBERT 692-693 (2009)<br><br>TOLBERT 711-712 (2010)<br><br>TOLBERT 713-714 (2011) |
|---|---|---|
| K | Excerpts of Tammy Buchert's Deposition Transcript, July 12, 2017 | n/a |
| L | Stipulation of Facts Regarding WAP Eligibility, September 25, 2017 | n/a |
| M | 2006 Financial Consultant RBC U.S. Wealth Accumulation Plan Summary Brochure | RBC 113-116 |
| N | 2009 Financial Consultant RBC U.S. Wealth Accumulation Plan Summary Brochure | RBC 226-230 |
| O | 2009 PCG Director RBC U.S. Wealth Accumulation Plan Summary Brochure | RBC 221-225 |
| P | First Pages of Plaintiff Marty Paul's Annual Wealth Accumulation Plan Account Statements for the years 2006 to 2012 | RBC-Paul 410 (2006)<br>RBC-Paul 424 (2007)<br>RBC-Paul 437 (2008)<br>RBC-Paul 451 (2009)<br>RBC-Paul 463 (2010)<br>RBC-Paul 474 (2011)<br>RBC-Paul 486 (2012) |
| Q | First Pages of Plaintiff Brian Buskirk's Annual Wealth Accumulation Plan Account Statements for the years 2009 to 2012 | RBC-Paul 4570 (2009)<br>RBC-Paul 4592 (2010)<br>RBC-Paul 4542 (2011)<br>RBC-Paul 4613 (2012) |
| R | Plaintiff Brian Buskirk's FC Total Compensation Statement for the years 2006 and 2007 | BB 63 (2006)<br>BB 62 (2007) |
| S | March 15, 2012 Letter from Gabriella Sikich to Marty Paul and Attachments | MP 113-141 |
| T | Plaintiff Marty Paul's RBC Wealth Management 2010 WAP Productivity and RBC Loyalty Bonuses Year-End Statement | RBC-Paul 11251 |
| U | Plaintiff Brian Buskirk's RBC Wealth Management 2011 WAP Productivity and RBC Loyalty Bonuses Year-End Statement | RBC-Paul 11270 |

MORGAN, LEWIS & BOCKIUS LLP<br>Attorneys at Law<br>77 W. Wacker Drive, 5th Floor<br>Chicago, IL 606015-1596<br>+1.312.324.1000

# Exhibit A

# 2011 FINANCIAL CONSULTANT COMPENSATION PLAN

RBC Wealth Management

CONFIDENTIAL

*RBC Wealth Management, a division of RBC Capital Markets Corporation, Member NYSE/FINRA/SIPC.*

# FC Compensation Plan Contents

**Effective November 1, 2010**[1]

Our Compensation Philosophy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

Total FC Compensation Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

Commission-Based Earnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

    Base Commission Grid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    Fee-Based Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Production Credits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Determining Commission-Based Earnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Minimum Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

RBC U.S. Wealth Accumulation Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

    Annual Enrollment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    Productivity Bonus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    RBC Loyalty Bonus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    Employee Voluntary Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    Investment Flexibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    Distribution Options . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    Early Vesting of Company Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    Tax Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Additional Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**

    RBC Alternative Asset Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    Commodity Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    Determining Additional Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Ticket Size and Discounting Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**

Employee Trade Discount Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

Finishing Well - Monetize Your Practice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

    FC Succession Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    FC Business Transition Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Title Recognition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

Award Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

FC Error Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

FC Business Spending Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

Comprehensive Compensation Example . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**

**Note:**

[1] *The 2011 FC Compensation Plan is effective for transactions settling on or after November 1, 2010.*

*RBC Wealth Management reserves the right to change, correct, modify or revoke any of the programs discussed in this document at any time with or without notice. Financial consultants are at-will employees and nothing in this document should be construed to create a contract or give rise to any contractual rights. In all employment decisions, RBC Wealth Management reserves the right to take such action as it deems appropriate given the specific circumstances relating to those decisions.*

CONFIDENTIAL

RBC-PAUL000006681

# Our Compensation Philosophy

At RBC Wealth Management, we help our clients effectively manage their wealth and achieve their financial goals, while maintaining our Stewardship commitment to our clients, communities, environment and employees. In the wake of recent market turmoil, these values and actions will help us lead the way in restoring public confidence in the securities industry and our financial system.

To deliver on this important mission, we are focused on attracting and retaining the most talented Financial Consultants, by offering a competitive compensation plan that encourages exceptional personal and business performance. The RBC Wealth Management Financial Consultant Compensation Plan rewards individuals for their productivity, their loyalty to RBC, and their individual contributions to the firm's success, while adhering to regulatory standards for compensation plan design and implementation. We proudly remain one of the highest paying firms in the industry and offer the unique RBC U.S. Wealth Accumulation Plan (WAP), which provides Financial Consultants with a vehicle to create long-term, sustainable wealth.

RBC is pleased to be able to offer this comprehensive compensation program to you. As always, I want to thank you for your continued dedication to your clients, to RBC Wealth Management and for choosing to build your practice at RBC. I hope you "finish well" at our firm.

Sincerely,

John Taft

*CEO of RBC U.S. Wealth Management*

CONFIDENTIAL

RBC-PAUL000006682

# Total FC Compensation Overview

When you choose to work at RBC Wealth Management, your total compensation comes from a variety of sources. Combined, these sources are designed to encourage and reward your growth and success. The following is an overview of the Financial Consultant (FC) Compensation Plan, which is effective November 1, 2010. If you have specific questions about your individual compensation, please talk with your complex director.

| FC Compensation Components (% of Annual Production) | | | | | |
|---|---|---|---|---|---|
| Annual Production From | To | Base Commission | Wealth Accumulation Plan Productivity Bonus | Wealth Accumulation Plan RBC Loyalty Bonus[1] | Total FC Compensation[2] |
| $5,000,000 | And up | 50.00 | 5.00 | 2.00 to 4.00 | 57.00 to 59.00 |
| 2,500,000 | $4,999,999 | 49.00 | 4.50 | 2.00 to 4.00 | 55.50 to 57.50 |
| 2,000,000 | 2,499,999 | 48.00 | 4.00 | 2.00 to 4.00 | 54.00 to 56.00 |
| 1,500,000 | 1,999,999 | 47.00 | 3.50 | 2.00 to 4.00 | 52.50 to 54.50 |
| 1,250,000 | 1,499,999 | 46.00 | 3.50 | 2.00 to 4.00 | 51.50 to 53.50 |
| 1,000,000 | 1,249,999 | 46.00 | 3.25 | 2.00 to 4.00 | 51.25 to 53.25 |
| 800,000 | 999,999 | 45.00 | 3.00 | 1.50 to 3.50 | 49.50 to 51.50 |
| 600,000 | 799,999 | 44.00 | 3.00 | 1.50 to 3.50 | 48.50 to 50.50 |
| 500,000 | 599,999 | 43.00 | 2.25 | 1.00 to 3.00 | 46.25 to 48.25 |
| 400,000 | 499,999 | 42.00 | 2.25 | 0.25 to 1.25 | 44.50 to 45.50 |
| 350,000 | 399,999 | 40.00 | – | | 40.00 |
| 300,000 | 349,999 | 39.00 | – | | 39.00 |
| 250,000 | 299,999 | 34.00 | – | | 34.00 |
| 225,000 | 249,999 | 28.00 | – | – | 28.00 |
| 200,000 | 224,999 | 25.00 | – | | 25.00 |
| 0 | 199,999 | 20.00 | – | | 20.00 |

**Notes:**

[1] *RBC Loyalty Bonus is based on your annual production, length of service as an RBC Wealth Management FC, and Director's, President's, and Chairman's Council levels for the current year.  For illustration purposes only, the above bonus rates assume Director's Council in the $500,000-$599,999 range, President's Council in the $600,000-$799,999 range, and Chairman's Council in the $1,000,000-$1,249,999 range.*

[2] *Excludes impact of RBC Wealth Management-paid benefits (e.g., social security, health and dental plans), and certain adjustments or reductions to base commissions that result in commission-based earnings.*

CONFIDENTIAL

RBC-PAUL000006683

# Commission-Based Earnings

**BASE COMMISSION GRID**

At RBC Wealth Management, we believe you can achieve success by providing your clients with the products and services that meet their individual needs and investment objectives. Accordingly, our base commission grid rewards productivity and does not differentiate by product. As a reward for serving your clients and growing your business, the base commission rates increase incrementally as you achieve higher levels of production.

The monthly base commission rate is driven by your trailing six-month production. Gross production is included for compensation purposes when a transaction or fee has settled. Only those transactions settled on or before the last business day of the month will be included in the monthly base commission calculation. Fees and trails are included in gross production when received by the firm. Production credits are included in gross production after revenue is received and as soon as administratively feasible.

| Gross Production Range | | | | Current Month Base Commission Rate |
|---|---|---|---|---|
| Annualized Production[1] | | Trailing Six-Month Production | | |
| From | To | From | To | |
| $5,000,000 | And up | $2,500,000 | And up | 50.0% |
| 2,500,000 | $4,999,999 | 1,250,000 | $2,499,999 | 49.0% |
| 2,000,000 | 2,499,999 | 1,000,000 | 1,249,999 | 48.0% |
| 1,500,000 | 1,999,999 | 750,000 | 999,999 | 47.0% |
| 1,000,000 | 1,499,999 | 500,000 | 749,999 | 46.0% |
| 800,000 | 999,999 | 400,000 | 499,999 | 45.0% |
| 600,000 | 799,999 | 300,000 | 399,999 | 44.0% |
| 500,000 | 599,999 | 250,000 | 299,999 | 43.0% |
| 400,000 | 499,999 | 200,000 | 249,999 | 42.0% |
| 350,000 | 399,999 | 175,000 | 199,999 | 40.0% |
| 300,000 | 349,999 | 150,000 | 174,999 | 39.0% |
| 250,000 | 299,999 | 125,000 | 149,999 | 34.0% |
| 225,000 | 249,999 | 112,500 | 124,999 | 28.0% |
| 200,000 | 224,999 | 100,000 | 112,499 | 25.0% |
| – | 199,999 | – | 99,999 | 20.0% |

***Note:***

[1] *The monthly base commission rate is driven by your trailing six-month production. Annualized production is shown for illustration purposes only.*

**Example: Determining the Monthly Base Commission Rate**

▓ Your last five months' production is $270,000 and your current month's production is $55,000, for a six-month total of $325,000. Therefore, your base commission rate for the current month is 44 percent.

CONFIDENTIAL                                                                            RBC-PAUL000006684

**FEE-BASED PROGRAMS**

One hundred percent of the RBC Advisor, Portfolio Focus, and Managed Account Program fee is credited to gross production. For Consulting Solutions, including Specialty Portfolios, a portion of the fee ranging from 5-75 basis points (depending on the particular manager and strategy selected) will be withheld from FC gross production for payment of outside money manager fees and other costs. See the Participating Managers List on InfoNET for details. For RBC Total Portfolio, 10-70 basis points (depending on the allocation of the account to money managers and mutual funds as well as whether the client has selected the tax management feature) will be withheld from FC gross production for payment of outside money manager fees, overlay portfolio manager fees, and other costs. For accounts with referral partners, the portion of the fee paid to the referral partner is withheld from gross production. See details on program pricing in the IAG fee booklet on InfoNET.

Program fees are credited to gross production on the 11th business day of the first month of the calendar quarter (January, April, July, and October) and vest throughout the quarter. If the FC of record on an account changes or the account leaves the program, any unvested program fees will be collected from the original FC's gross production, *or otherwise*, and if applicable, credited to the gross production of the new FC of record. The base commission rate on fee-based programs is determined by the Base Commission Grid.  Clients in RBC Advisor non-rebalance and Portfolio Focus have the option of selecting an off-calendar-quarter billing cycle.  For accounts with an off-calendar-quarter billing cycle, program fees are credited to gross production on the 11th business day of the first month following the billing cycle quarter.

**PRODUCTION CREDITS**

Serving your clients extends beyond transactions and fee-based programs.  Products such as Margin and Premier Line of Credit loans and referrals to other products are an important part of meeting the needs and objectives of your clients.  Monthly, FCs receive production credits on average Margin and Premier Line of Credit balances equal to an annual rate of 6 basis points. RBC Wealth Management FCs also receive production credits for the following list of fees:

- Finders Fees
- RBC Global Asset Management (U.S.) Inc. Referral Fees
- Private Placement and Venture Capital Investment Fees
- Accredited Wealth Management Services Fees
- RBC Capital Advisors Referral Fees
- Commercial Mortgage Referral Fees

Production credits will be included in your gross production as soon as administratively feasible after RBC Wealth Management receives the revenue and will help drive your monthly base commission rate and your Productivity and RBC Loyalty Bonuses.  Production credits will be paid out at your monthly base commission rate.

**Calculation and Timing of Margin Production Credit**

The margin production credit is calculated by multiplying your average monthly net margin balances by 6 basis points (bps), dividing by 365 days, and multiplying by the number of days in the balance month.  Average monthly balances will be used to calculate the current month production credit.

CONFIDENTIAL

RBC-PAUL000006685

**Margin Example**

| | | |
|---|---|---:|
| Average Monthly Loan Balance | $ | 3,000,000 |
| Annual Production Credit Rate | x | 6 bps |
| Annualized Margin Production Credit | $ | 1,800.00 |
| 365 days | ÷ | 365 |
| Number of Days in Month | x | 30 |
| Monthly Margin Production Credit | $ | 147.95 |
| Example Base Commission Rate | x | 44% |
| Margin Earnings Included in Commission-Based Earnings | $ | 65.10 |

## Calculation and Timing of Premier Line of Credit Production Credit

You will receive a production credit on the Premier Line of Credit (loans are offered by International Wealth Management) outstanding loan balances.  Premier Line of Credit production credits are calculated by multiplying the month's average outstanding loan balance by 6 basis points (bps), dividing by 365 days, and multiplying by number of days in the balance month.  The production credit for Premier Line of Credit is based on a one-month lag (e.g., August balances will be used to calculate the September production credit).

**Premier Line of Credit Example**

| | | |
|---|---|---:|
| Prior Month's Average Loan Balance | $ | 2,000,000 |
| Annual Production Credit Rate | x | 6 bps |
| Annualized Premier Line of Credit Production Credit | $ | 1,200.00 |
| 365 days | ÷ | 365 |
| Number of Days in Month | x | 31 |
| Monthly Premier Line of Credit Production Credit | | 101.92 |
| Example Base Commission Rate | x | 44% |
| Premier Line of Credit Earnings Included in Commission-Based Earnings | $ | 44.84 |

## DETERMINING COMMISSION-BASED EARNINGS

Your commission-based earnings are determined by reducing your base commission by an amount determined by RBC Wealth Management, which includes (but is not limited to) costs associated with errors, customer settlements or judgments, licensing fees, write-offs (such as account-associated fees), and client associate compensation sharing. Commission-based earnings are paid on the tenth of each month for the prior month's production.

CONFIDENTIAL

RBC-PAUL000006686

**MINIMUM COMPENSATION**

The Department of Labor's Fair Labor Standards Act (FLSA) guidelines require that exempt employees — which includes financial consultants — must earn monthly minimum compensation. In addition, certain states require exempt employees earn an amount greater than the FLSA requirements:

- $2,773.33 – California minimum per state law

- $2,356.25 – New York minimum per state law

- $2,058.33 – Connecticut minimum per state law

- $1,971.67 – All other states' minimum

If your monthly commission-based earnings calculated per the RBC Wealth Management FC Compensation Plan falls below the minimum compensation required by law, you will receive additional pay to bring your total monthly compensation to the required minimum.  The additional pay you receive will be offset in future months against your commission-based earnings or any FC Succession or Business Transition earnings.  Minimum compensation amounts are subject to change, in accordance with state and federal law.  Amounts listed are as of June 2010.

**Example: Minimum Compensation**

- If an FC in Wisconsin earns $971.67 of commission-based earnings in January, the firm will pay a total of $1,971.67 (minimum amount required by the FLSA) and then offset commission-based earnings in future months by $1,000.00.

-  If the FC generates $3,000.00 of commission-based earnings in February, the firm will offset the $1,000.00 that was paid in January, leaving commission-based earnings for February of $2,000.00.

CONFIDENTIAL

RBC-PAUL000006687

# RBC U.S. Wealth Accumulation Plan

The RBC U.S. Wealth Accumulation Plan (WAP) is among the most innovative and attractive deferred compensation vehicles in our industry. The WAP is also an integral part of your RBC Total Rewards package at RBC Wealth Management, providing you with the freedom and flexibility to manage your cash flows by choosing how much you voluntarily defer without impacting the company contributions you receive.

The following chart is provided to give you a summary of the 2011 WAP. Please review the full Plan Document and Prospectus for the actual terms and conditions of the Plan. The Wealth Calculator is available to model how the WAP could work for you. The full WAP Plan Document, Prospectus and Calculator are located on the FC Compensation Link on the Reports tab of RBC LaunchPad.

| 2011 WAP Components Summary | | | | | |
|---|---|---|---|---|---|
| **Component** | **Range** | **Eligibility** | **Investment Options** | **Date Credited to WAP Account** | **Vesting Periods** |
| **Productivity Bonus** | Up to 5% of FY 2011 production (see Productivity Bonus Grid) | FY 2011 production of at least $400,000 | Invested in the same allocation as Voluntary Contributions | February 29, 2012 | 100% vested on January 1, 2017 |
| **RBC Loyalty Bonus** | Up to 4% of FY 2011 production (see RBC Loyalty Bonus Grid) | FY 2011 production of at least $400,000 | RBC Share Account | February 29, 2012 | 100% vested on January 1, 2017 |
| **Voluntary Contributions** | 0 – 50% of WAP-eligible compensation | Prior Year (FY 2010) production of at least $400,000 | Participant chooses allocation among the plan's investment options | Each payroll period beginning January 10, 2011 | Contributions and investment gain/loss always 100% vested |

**ANNUAL ENROLLMENT**

Annual WAP enrollment for eligible FCs occurs each December. During the enrollment process, eligible FCs may enroll in Voluntary Contributions, make investment elections and make distribution elections for voluntary contributions and WAP bonuses. Eligible FCs will receive enrollment information via e-mail.

If you do not have a distribution election in place for 2011, the 2011 WAP Productivity and RBC Loyalty Bonuses will be valued on July 1, 2017, and paid to you as soon as possible after that date.

CONFIDENTIAL

RBC-PAUL000006688

**PRODUCTIVITY BONUS**

▨ The Productivity Bonus is based on your 2011 fiscal year production.  See the 2011 Productivity Bonus grid below for details.

▨ The bonus is credited to your WAP account using the same investment elections you have in place for Voluntary Contributions. If you do not have an investment election in place, your Productivity Bonus will be invested in the RBC Interest Account. You have the ability to transfer balances in and out of the RBC Interest Account.  See page 11 for details.

▨ You must be employed as an RBC Wealth Management financial consultant or branch director on October 31, 2011 to be eligible for the 2011 Productivity Bonus. The bonus will be credited to your WAP account on February 29, 2012, and become 100 percent vested on January 1, 2017, after a five-year cliff vesting period.

| 2011 Productivity Bonus Grid | | |
|---|---|---|
| Fiscal Year Gross Production | | Productivity Bonus |
| From | To | |
| $5,000,000 | And up | 5.00% |
| $2,500,000 | $4,999,999 | 4.50% |
| $2,000,000 | $2,499,999 | 4.00% |
| $1,250,000 | $1,999,999 | 3.50% |
| $1,000,000 | $1,249,999 | 3.25% |
| $600,000 | $999,999 | 3.00% |
| $400,000 | $599,999 | 2.25% |

**RBC LOYALTY BONUS**

▨ The RBC Loyalty Bonus is based on your level of production and length of service as a financial consultant or branch director with RBC.  See the 2011 RBC Loyalty Bonus grid below for details.

▨ This bonus is credited into the RBC Share Account.

▨ You must be employed as an RBC Wealth Management financial consultant or branch director on October 31, 2011 to be eligible for the bonus. The 2011 RBC Loyalty Bonus will be credited to your WAP account on February 29, 2012, and become 100 percent vested on January 1, 2017, after a five-year cliff vesting period.

| 2011 RBC Loyalty Bonus Grid | | | | | | |
|---|---|---|---|---|---|---|
| | | Years of Service[1] | | | | |
| 2011 Production Basis | 2009 Levels[2] | < 6 | 6-10 | 11-15 | 16-20 | 21+ |
| 2011 Chairman's Council[3] | 1,026,379 | 2.00% | 2.50% | 3.00% | 3.50% | 4.00% |
| 2011 President's Council[3] | 600,300 | 1.50% | 2.00% | 2.50% | 3.00% | 3.50% |
| 2011 Director's Council[3] | 450,225 | 1.00% | 1.50% | 2.00% | 2.50% | 3.00% |
| $400,000 | 400,000 | 0.25% | 0.50% | 0.75% | 1.00% | 1.25% |

[1] *Years of Service is defined as the number of full calendar years completed as an RBC Wealth Management FC or branch director as of December 31, 2011. The calendar year in which you were hired is counted as one full year of service. For example, if you were hired on December 18, 2010, you would earn two years of service toward the 2011 RBC Loyalty Bonus. The hire date used in determining length of service for the RBC Loyalty Bonus, FC title recognition, and FC award programs (e.g. Chairman's Council) is an employee's continuous service date as an RBC Wealth Management financial consultant or branch director.*

[2] *Recognition levels will be based on 2011 fiscal year-end results.  2009 production is shown for illustration purposes only.*

[3] *See Award Programs on page 25 for a description of these recognition levels.*

CONFIDENTIAL

RBC-PAUL000006689

**EMPLOYEE VOLUNTARY CONTRIBUTIONS**

The WAP offers you the choice to contribute up to 50 percent of your total WAP-eligible compensation[1], allowing you to significantly increase your total wealth accumulation over the course of your career at RBC.

To be eligible for participation in 2011 WAP Voluntary Contributions, financial consultants and branch directors must have fiscal year 2010 production of at least $400,000.  Those who joined RBC in fiscal year 2010 must have trailing twelve-month production at their prior firm of at least $400,000 to participate in 2011 Voluntary Contributions.

**Key points on employee Voluntary Contributions:**

- You do not have to make Voluntary Contributions to receive WAP bonuses.

- Contributions are pre-tax, so they lower your taxable wages.

- You are always 100 percent vested in your Voluntary Contributions and any related earnings/losses.

- Your 2011 WAP contribution and distribution elections apply to all WAP-eligible compensation[1] paid to you from January 1, 2011 through December 31, 2011.

- You cannot change your WAP Voluntary Contribution election mid-year.

***Note:***

[1] *WAP-eligible compensation includes commission-based earnings, transitional pay, FC recruiting bonuses, and branch director salary and bonuses.  Excluded from WAP-eligible compensation are the following: income from stock options, forgivable loan payments, expense allowances, moving expense payments, and non-cash payments.  See the RBC U.S.A. Retirement and Savings Plan Document for further details.*

**INVESTMENT FLEXIBILITY**

The WAP offers a wide range of investment options for your Productivity Bonus and Voluntary Contributions, listed in the chart below.  You can find detailed information on the investment options in the Investment Summary or online at www.netbenefits.com. The RBC Loyalty Bonus is automatically credited into the RBC Share Account.

There is an additional fee associated with all options other than the RBC Share Account and RBC Interest Account. A 25 basis points (bps) per year charge will be deducted on a quarterly basis (6.25 bps per quarter).  The amount of the quarterly fee will be determined by multiplying the value of your mutual fund accounts at the end of the quarter by 6.25 bps.

| Investment Name | Ticker Symbol | Investment Name | Ticker Symbol |
|---|---|---|---|
| American Balanced Class A | ABALX | Metropolitan West Total Return Bond Class I | MWTIX |
| American EuroPacific Growth Class A | AEPGX | RBC Interest Account | N/A |
| American Fundamental Investors Class A | ANCFX | RBC Share Account | RY |
| American Growth Fund of America Class A | AGTHX | Tamarack Mid Cap Growth Class I | TMCIX |
| Artisan International Value Fund | ARTKX | Third Avenue Small Cap Value | TASCX |
| BlackRock Global Allocation Class A | MDLOX | Van Kampen Comstock Class I | ACSDX |
| BlackRock Small Cap Growth Equity Inst C | PSGIX | Van Kampen Sml Cap Growth Class I | VISCX |
| Eagle Mid Cap Stock Class I | HMCJX | Vanguard Inflation Protected Securities Fund Admiral Shares | VAIPX |
| Fidelity Select Gold Fund | FSAGX | | |
| Fidelity U.S. Equity Index Commingled Pool | N/A | Vanguard Institutional Index Fund Institutional Shares | VINIX |
| Jensen Portfolio Class I | JENIX | | |
| Managers Systematic Value Instl Class | MSYSX | Vanguard Windsor II Fund Admiral Shares | VWNAX |
| | | Virtus Mid-Cap Value Class A | FMIVX |

**Default Investment Elections**

If you do not make an investment election for your Productivity Bonus and Voluntary Contributions, the investment election will default to the RBC Interest Account.

CONFIDENTIAL

RBC-PAUL000006690

**Investment Transfers – Up to 12 Transfers per Year**

- You can transfer any existing balances in your WAP account related to your Productivity Bonus and Voluntary Contributions up to 12 times per calendar year.

- You can transfer existing balances related to Productivity Bonus and Voluntary Contributions into and out of any investment option, including the RBC Share Account.

- You may change your investment elections for future Productivity Bonus and Voluntary Contributions.

**Restrictions on the RBC Share Account**

- The RBC Loyalty Bonus must remain in the RBC Share Account until distribution or until you retire from RBC.

- All fixed match and premium match contributions from previous plan years must remain in the RBC Share Account until distribution or until you retire from RBC.

- After retirement, restrictions on the RBC Share Account are lifted and you may choose to move your contributions into any of the investment options offered in the WAP.  You will still be limited to 12 transfers per year.

You can view your account, transfer existing balances or change investment elections for future contributions online at www.netbenefits.com.

**DISTRIBUTION OPTIONS**

You will make a distribution election for each type of contribution you are eligible for in 2011.  You can make a different election for your Productivity Bonus, RBC Loyalty Bonus, and Voluntary Contributions.  All distributions are valued on July 1 and paid as soon as possible after the valuation date.

If you choose not to enroll for Voluntary Contributions in 2011, you should still make a distribution election for your Productivity Bonus and RBC Loyalty Bonus.  If no distribution election is made, they will default to be paid as an in-service distribution valued on July 1, 2017.

**You have two choices for your distribution options:**

**1)  Retirement Distribution**

With a retirement distribution, you spread your WAP distribution over 1 to 10 years after you leave RBC if you satisfy the "Rule of 60."  To satisfy the Rule of 60, your age plus your years of service with any RBC company must equal 60 or more at the time you separate from service.  If you elect the retirement distribution option and leave RBC prior to satisfying the Rule of 60, WAP payments will be made in one lump sum valued on July 1 in the year after your separation from service.

If you want a retirement distribution for any of your 2011 contributions, you must make the election at the time you enroll in the plan for 2011.

**2)  In-Service Distribution**

The in-service distribution allows you to receive your 2011 WAP contributions in one lump sum while you are still employed with RBC.  Your 2011 WAP Productivity Bonus and RBC Loyalty Bonus will fully vest in 2017, so the earliest in-service valuation date you can elect without losing any company contributions is July 1, 2017.

**You must be employed on the in-service date you select to receive the payment.  If you separate from service prior to the in-service date selected, vested WAP payments will be made in one lump sum valued on July 1 in the year after you leave.**

CONFIDENTIAL

RBC-PAUL000006691

Changes can be made to your in-service distribution dates after your original election.  However, the following rules will apply:

- Any new date must be at least five years after the current distribution date on file.

- All changes must be made by June 30 in the year before the distribution is scheduled to occur.  For example, you would need to change a July 1, 2017 distribution date by June 30, 2016.  An e-mail reminder will be sent to notify you that this date is approaching.

- You will be allowed to change in-service distribution dates more than once, but the new distribution date you elect must always be at least five years after the distribution date on file.

**EARLY VESTING OF COMPANY CONTRIBUTIONS**

Eligible WAP balances[1] will vest under the following situations:

**1) Approved Retirement**

You will become fully vested in your entire WAP balance[1] if you satisfy the Rule of 60 (your age plus your years of service with any RBC company equals 60 or more at the time you separate from service) and are offered, and sign, a one-year non-compete agreement. Contact RBC U.S. Retirement Benefits for a copy of the non-compete agreement.

**2) Business Transition**

You will become fully vested in your entire WAP balance[1] if you transition clients to another RBC FC and end your employment with RBC through the RBC Business Transition program.

**3) Death**

If you pass away while employed with RBC, your entire account balance will become vested and paid in one lump sum to your beneficiary(ies) as soon as administratively possible.  If you pass away after you leave RBC, but prior to your account being fully distributed, the entire balance remaining in your account will be paid in one lump sum to your beneficiary(ies) as soon as administratively possible.

**4) Disability**

You will become fully vested in your entire WAP balance if you qualify for RBC's Long Term Disability (LTD) plan and remain on LTD for 12 consecutive months.  Your entire WAP balance will be vested and paid to you in one lump sum within 90 days after 12 consecutive months on LTD.

***Note:***

[1] *Excluding amounts specifically precluded from early vesting by contract, including but not limited to acquisition-related contributions.*

CONFIDENTIAL

RBC-PAUL000006692

**TAX CONSIDERATIONS**

All of your Voluntary Contributions are made on a pre-tax basis, meaning that they lower your taxable income and are not subject to federal and state income taxes until distributed, under current tax laws.  In addition, you do not pay federal or state taxes on your earnings, reinvested dividends or company contributions until you receive a distribution.

**FICA Taxes**

Social Security and Medicare ("FICA") taxes are withheld from your Voluntary Contributions at the time the deduction is made from your paycheck.

FICA taxes must be paid on WAP bonuses in the year that they become vested and no longer subject to forfeiture. In the year of vesting for current employees, any applicable FICA tax will be withheld from your November paycheck.

If you have an early vesting event and become fully vested in your company contributions, FICA taxes will be due on these vested amounts.  If you are receiving business transition payments, a prorated amount of FICA tax will be withheld from your remaining payments.  If you are not receiving business transition payments, the FICA tax will be deducted from your WAP distributions.

**Federal and State Taxes on WAP Distributions**

When you receive a WAP distribution, federal tax (25 percent) plus applicable state and local tax will be withheld from your payment. Federal tax at a rate of 35 percent will be withheld on annual supplemental wages (bonus or lump sum payments) over $1,000,000.  The distribution will be treated as ordinary income in the year it is distributed and will be reported on a form W-2.  FICA taxes have already been paid on your vested dollars and will not be withheld from the distribution.

**This document should not be considered as providing tax advice.  You should consult your tax advisor to discuss your personal financial situation.**

**This document does not constitute a prospectus nor an offer or solicitation to invest in the RBC U.S. Wealth Accumulation Plan. Before investing, please read the RBC U.S. Wealth Accumulation Plan Document and Prospectus.  A copy is available online at <u>www.netbenefits.com</u>.  You also may wish to consult with your tax advisor to discuss your specific financial situation.**

CONFIDENTIAL

RBC-PAUL000006693

# Exhibit B

Paul, et ano. v. RBC Capital Markets, LLC, et al.                                      Gabriela Sikich

---

Page 1

```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA
_____

                                )
MARTY PAUL, an individual; and  )
BRIAN BUSKIRK, an individual,   )
                                )
          Plaintiffs,           )
                                )
     v.                         )  No. 3:16-cv-05616-RBL
                                )
RBC CAPITAL MARKETS, LLC, a     )
Minnesota limited liability     )
company; ROYAL BANK OF CANADA,  )
a Canadian corporation; and     )
ROYAL BANK OF CANADA US WEALTH  )
ACCUMULATION PLAN, an employee  )
benefit plan,                   )
                                )
          Defendants.           )
_____


          DEPOSITION UPON ORAL EXAMINATION

                       OF

                 GABRIELA SIKICH
_____


          Taken at 50 South Sixth Street
               Minneapolis, Minnesota


DATE TAKEN:  July 11, 2017
REPORTED BY:  Ryan Ziegler, RPR, CCR 3348
```

---

Page 2

```
 1
 2        A P P E A R A N C E S
 3
   FOR PLAINTIFFS:
 4       JEREMY E. ROLLER
         Yarmuth Wilsdon, PLLC
 5       1420 Fifth Avenue
         Suite 1400
 6       Seattle, Washington  98101
         206.516.3800
 7       jroller@yarmuth.com
 8
   FOR DEFENDANTS:
 9
         MATTHEW A. RUSSELL
10       Morgan, Lewis & Bockius, LLP
         77 West Wacker Drive
11       Fifth Floor
         Chicago, Illinois  60601
12       312.324.1771
         matthew.russell@morganlewis.com
13
         CASEY E. JARCHOW
14       Senior Counsel - Employment
         RBC Wealth Management
15       RBC Plaza
         60 South Sixth Street
16       Minneapolis, Minnesota  55402
         612.371.7672
17       casey.jarchow@rbc.com
18
19            * * * * *
20
21
22
23
24
25
```

---

Page 3

```
 1         DEPOSITION OF GABRIELA SIKICH
 2            EXAMINATION INDEX
 3   EXAMINATION BY                     PAGE
 4   Mr. Roller . . . . . . . . . . . . . .  7
 5             * * * * *
 6            EXHIBIT INDEX
 7   *** EXHIBIT NOS. 1-15, 20-32 & 34-42 ARE CONFIDENTIAL ***
 8   *** EXHIBIT NOS. 19 & 33 ARE CONFIDENTIAL/AEO ***
 9   EXHIBITS FOR IDENTIFICATION               PAGE
10   1 3/13/2011 Letter from Brent C. Sabin to US
       Department of Labor, RBC000001            51
11
12   2 11/30/2004 Amended and Restated Royal Bank of
       Canada US Wealth Accumulation Plan and
       Prospectus, RBC-PAUL000003455 - RBC-PAUL000003473  57
13
14   3 11/1/2006 Amended and Restated Royal Bank of
       Canada US Wealth Accumulation Plan and
       Prospectus, RBC-PAUL000000043 - RBC-PAUL000000060  58
15
16   4 11/1/2007 Amended and Restated Royal Bank of
       Canada US Wealth Accumulation Plan and
       Prospectus, RBC-PAUL000000061 - RBC-PAUL000000079  59
17
18   5 11/1/2008 Amended and Restated Royal Bank of
       Canada US Wealth Accumulation Plan and
       Prospectus, RBC-PAUL000000080 - RBC-PAUL000000101  61
19
20   6 11/1/2009 Amended and Restated Royal Bank of
       Canada US Wealth Accumulation Plan and
       Prospectus, RBC-PAUL000003138 - RBC-PAUL000003159  62
21
22   7 11/1/2010 Amended and Restated Royal Bank of
       Canada US Wealth Accumulation Plan and Prospectus  62
23   8 1/1/2012 Amended and Restated Royal Bank of
       Canada US Wealth Accumulation Plan and
24     Prospectus, RBC-PAUL000003341 - RBC-PAUL000003362  63
25
```

---

Page 4

```
 1   EXHIBITS FOR IDENTIFICATION (cont.)        PAGE
 2   9 12/6/2011 Amended and Restated Royal Bank of
       Canada US Wealth Accumulation Plan and
 3     Prospectus, RBC-PAUL000003386 - RBC-PAUL000003408  64
   10 5/17/2006 Letter from Janet M. Den Uyl to
 4     Gabriela Sikich, with enclosure,
       TOLBERT0001384-TOLBERT0001394            84
 5 11 2011 RBC U.S. Wealth Accumulation Plan,
 6     TOLBERT0000633-TOLBERT0000635            89
 7
   12 RBC U.S. Wealth Accumulation Plan, FC Select
 8     Participants, TOLBERT0000636-TOLBERT0000639  91
 9 13 RBC U.S. Wealth Accumulation Plan for Financial
       Consultants & Branch Directors, TOLBERT0000640-
10     TOLBERT0000645                           95
11 14 RBC U.S. Wealth Accumulation Plan for Regional
       Directors & Complex Directors, TOLBERT0000646-
12     TOLBERT0000651                           97
13 15 11/30/2011 Letter from Geoffrey H. Bracken to
       the Honorable Keith P. Ellison, with enclosure,
14     RBC-PAUL000001363 - RBC-PAUL000010373   98
15 16 Document Excerpt: "Tab 2011 WAP-Eligible"  115
16 17 Document Excerpt: Spreadsheet              116
17 18 Document Excerpt: "2008 WAP-Eligible"      120
18 19 4/8/2005 2006 FC Compensation Planning
       Meeting #1, TOLBERT0000772-TOLBERT0000788  128
19
20 20 3/23/2006 RBC US Wealth Accumulation Plan ("WAP")
       Strategy and Planning Session, TOLBERT0001347-
21     TOLBERT0001368                           133
22 21 3/31/2006 E-mail re: "Update on WAP Strategy &
       Planning Session," TOLBERT0002295         150
23 22 4/19/2006 E-mail re: "WAP Initiative,"
       TOLBERT0001072                           153
24
25 23 4/23/2008 Meeting Invite, TOLBERT0002118   158
```

---

1 (Pages 1 to 4)

Paul, et ano. v. RBC Capital Markets, LLC, et al.                                      Gabriela Sikich

---

Page 17

1    Q.   Anything in it was inaccurate?
2    A.   Correct.
3    Q.   You testified truthfully and accurately in all
4    three of those depositions?
5    A.   Yes, I did.
6    Q.   Ms. Sikich, when did you begin working at -- well,
7    let me back up.
8         Who is your employer?
9    A.   RBC.  Royal Bank of Canada.
10   Q.   So it's RBC, not RBC Capital Markets?
11   A.   RBC Ca- -- would be probably RBC Capital Markets.
12   I work, actually, in the HR department.
13   Q.   Do you get a paystub?
14   A.   It just says "RBC."
15   Q.   What is your position at RBC --
16   A.   Currently --
17   Q.   -- currently?
18   A.   -- I'm the senior manager of the U.S. deferred
19   compensation plans.
20   Q.   When did you take that position?
21   A.   I believe it was probably back in 2005.
22   Q.   We're going to talk a little bit more about your
23   job duties later, but can you briefly just tell me what
24   your responsibilities are in that position?
25   A.   Currently?

---

Page 18

1    Q.   Yes.
2    A.   Currently, what I do is I'm -- I'm the senior
3    manager of the U.S. deferred compensation plans, so my
4    main -- my main role is to ensure governance of the -- of
5    the programs.
6         We now currently have, actually, two deferred comp
7    plans.  We have, as you -- as you referred earlier, the new
8    wealth accumulation plan, and then we've also rolled out
9    what we refer to as the U.S. deferred advantage plan,
10   otherwise known as DAP.
11        So I handle the governance.  I own all of the
12   communications.  I provide -- ensure the fact that,
13   administratively, the -- you know, the functions are
14   carried out correctly, such as the annual distributions.
15   We have the annual enrollment.
16        I ensure about 409A compliance.  I actually preside
17   as secretary to the WAP committee, which basically has --
18   they're mandated -- is the invest- -- oversight of the
19   investment options offered in the plans.
20   Q.   Anything else?
21   A.   Plan design.
22   Q.   What do you mean by "plan design"?
23   A.   Over -- over the course, like I said, as I've
24   mentioned, is -- is that the plan -- the WAP in particular
25   has really kind of evolved over the years.

---

Page 19

1         So what we have done is, over the course of the
2    years, since this is such a key, instrumental recruiting
3    and retention tool, is that we wanted to ensure the fact
4    that A, No. 1, it was competitive; No. 2, that it
5    was -- the participants that were participating really
6    appreciated the fact of "this is such an elite program."
7         And so with that, as strategies changed as far as
8    recruiting and retention, along with that came plan design
9    changes to mirr- -- to mirror up to that.
10   Q.   We'll get into those plan design changes a bit
11   later.
12        When you were talking about your responsibilities
13   a few moments ago, I thought that you were referring to
14   your current responsibilities as opposed to how those
15   responsibilities may have looked when you assumed your
16   current position back in 2005.  Have your responsibilities
17   changed from 2005 to the present?
18   A.   The responsibilities haven't changed.
19   Q.   It's just kind of what you've done and what you
20   described about making changes to the WAP over time that
21   have changed?
22   A.   Right.  Basically, my responsibilities and my
23   duties are the same as they were back in 2005.  There was
24   just a lot more activity prior to, you know, the evolution
25   of 409A --

---

Page 20

1    Q.   Yeah.
2    A.   -- where you had a lot more flexibility as far as
3    changing your plan; whereas now, we're very -- we're
4    somewhat locked in, and so I don't do as many plan design
5    changes since I really can't at this point in time.
6    Q.   Who do you report to?
7    A.   My manager is Dan Szabo.
8    Q.   And that's S-Z-A-B-O?
9    A.   That's correct.
10   Q.   What is Mr. Szabo's position?
11   A.   He is the director of compensation for the U.S.
12   and Caribbean.
13   Q.   And that's for RBC?
14   A.   Correct.
15   Q.   Were you at RBC prior to taking your current
16   position in 2005?
17   A.   Yes.
18   Q.   And what was your position prior to 2005?
19   A.   I actually worked in P- -- private clients group
20   as a retirement plan consultant.
21   Q.   What is private client group?
22   A.   It supports wealth management.  It's just
23   basically all the services that -- for FAs, such as -- for
24   example, my role was, as a retirement plan consultant, is I
25   would actually travel out to my specific region, and I

---

BUELL REALTIME REPORTING, LLC
SEATTLE 206.287.9066  OLYMPIA 360.534.9066  SPOKANE 509.624.3261  NATIONAL 800.846.6989

Paul, et ano. v. RBC Capital Markets, LLC, et al.                    Gabriela Sikich

Page 49

1    If you know, did Capital Markets have financial
2  consultants working for it?
3    A.  They don't have commissioned finan- -- no.
4    Q.  So that would all be staff?  There wouldn't be
5  financial consultants under Capital Markets?
6    A.  Correct.  The only one that have commissioned
7  financial consultants would be wealth management.
8    Q.  Okay.  I understand.
9    We went down a little detour talking about the WAP
10  committee and then the operating committee.  You're not a
11  member of the WAP committee; is that correct?
12    A.  I -- the old WAP committee?
13    Q.  Yes.
14    A.  I was not a member.
15    Q.  Were you an adviser to the old WAP committee?
16    A.  Yes.
17    Q.  And what did you do in the context of that
18  advisory role?
19    A.  I would help actually -- they would meet on a
20  quarterly basis, and I would actually help prepare the --
21  the meeting agendas and meeting materials.
22    Q.  And to meet on a quarterly basis, in those
23  quarterly meetings, was it dealing with -- was one of the
24  things they dealt with appeals from plan participants?
25    A.  Correct.

Page 50

1    Q.  Was another thing they dealt with restatement of
2  the -- the WAP document?
3    A.  Correct.
4    Q.  Were there other things they dealt with at those
5  quarterly meetings?
6    A.  The investment review and monitoring.
7    Q.  In addition to dealing with the claims, the
8  changes to the plan document, and the investment review and
9  monitoring, were there other things that the WAP committee
10  did back in that pre-2013 time period?
11    A.  No.
12    Q.  Now we're going to go even further back in time,
13  so we're going to have to cast our minds back way -- I
14  think back toward the turn of the century, and I want to
15  talk a little bit -- or ask you a little bit about the
16  origins of the WAP.
17    Can you tell me when the WAP started?  And here,
18  again, as throughout this deposition, unless I specify
19  otherwise, I'm talking about the old WAP.
20    A.  I don't know when it actually started.  I do know
21  it was in place at the time of the acquisition by -- RBC
22  acquired Dain Rauscher.  And at that point in time -- so
23  that was 2001.  I do know that Dain Rauscher had a deferred
24  compensation plan known as WAP prior to that.  I cannot
25  state for how long.  I can say it was more than ten years.

Page 51

1    (Exhibit No. 1 marked.)
2  BY MR. ROLLER:
3    Q.  Ms. Sikich, you've been handed what's been marked
4  Exhibit 1.  Do you recognize this?
5    A.  No, I do not.
6    Q.  Have you ever seen this before?
7    A.  No.
8    I take that back.  This was where I -- there's an
9  old file that talked about the top-hat exemp- -- exemption
10  filing for the WAP.
11    Q.  And this document's dated March 13, 2001.  Do you
12  see that?
13    A.  Yes, I do.
14    Q.  Was that prior to RBC's acquisition of Dain?
15    A.  It was right around the -- the -- what prompted
16  this was RBC's acquisition of Dain.  I'm not sure of,
17  specifically, the time frame.
18    Q.  Now that you've had -- had a moment to -- to
19  review it, do you have any further understanding of what
20  this is?
21    A.  What this is, is that -- that, basically, the --
22  prior to the acquisition, the old deferred compensation was
23  actually distributed to all plan participants, so we were
24  establishing basically a brand-new WAP in 2001.
25    And it is my understanding that -- is -- is that

Page 52

1  Brent Sabin, who was the VP of be- -- manager actually then
2  requested a top-hat exemption for this newly created WAP.
3    Q.  And by this letter, he was informing the
4  Department of Labor of the intention that this newly
5  created WAP would be top-hat --
6    A.  Correct.
7    Q.  -- exempt?
8    Do you know if any similar letter has ever been
9  sent by anyone at RBC to the Department of Labor?
10    A.  No, I do not.
11    Q.  Given your position, would you be in a position to
12  know if that happened?
13    A.  Yes, I would.
14    Q.  So given that you would be in a position to know
15  whether this happened and you don't know if it happened, is
16  it fair to conclude that it did not happen?
17    A.  I would agree.
18    Q.  We touched on this a little bit earlier, but I
19  want to talk a little bit about what your and RBC's views
20  are of the purpose of the WAP.  Why does it exist?
21    A.  Purpose of the WAP is primarily for recruiting and
22  retention.  It is -- even though it -- we do offer it
23  across all U.S. business lines, it is basically the most
24  premier plan for recruiting and retention for wealth
25  management for FAs and BDs.

13 (Pages 49 to 52)

Paul, et ano. v. RBC Capital Markets, LLC, et al.                    Gabriela Sikich

---

Page 53

1      Q.   And when you say it's the premier plan, you're
2   referring to "premier" in relation to what is offered by
3   RBC or "premier" as far as the industry goes?
4      A.   Both.
5      Q.   Why do you say that?
6      A.   This plan has been very near and dear to, you
7   know, the -- the top-of-the-house wealth management as far
8   as making sure that we offer the best and best of deferred
9   compensation within the industry.  And, again, this goes
10  right back to the recruiting and retention.
11      And so I think that it has always been touted to
12  our population, our FA and BD population, the benefit of
13  this program, primarily because it is so rich with company
14  contributions and bonuses.
15      Q.   So you think the reason that it's the best -- best
16  of the best is that the company makes contributions to the
17  WAP on behalf of participating -- it would only be
18  participating FCs; correct?  Today --
19      MR. RUSSELL:  Objection --
20  BY MR. ROLLER:
21      Q.   -- versus -- I'm sorry.  Not today.  Under the old
22  WAP, the company contributions would only be to FCs; is
23  that right?  Or am I wrong on that?
24      A.   Old WAP or new WAP, the only company
25  contributions -- well, I take that back.  The only company

---

Page 54

1   contributions were for our commissioned group in wealth
2   management.
3      Historically, though, there was a group of what we
4   referred to as the fixed income group, and they also did
5   have some type of company contribution.  I don't recall.
6   It's been many, many years, but it has evolved over the
7   years.  So, today, the only company contributions are for
8   our commissioned group.
9      Q.   And tell me how it is a recruiting tool.
10      A.   I -- the recruiting tool is the fact that we have
11  a plan that not only has very generous company
12  contributions, but also a plan that, over the course of
13  many years, a lot of these deferred compensation plans have
14  had a lot of restrictions as far as investment opportunity,
15  is one.
16      And so I think that we -- we became center stage
17  at the fact that, No. 1, we provided an array of mutual
18  fund investment choices, which typically, maybe, in a
19  deferred compensation plan, you wouldn't find.  You'd
20  typically find maybe that they were handcuffed into the
21  company stock.
22      And then over time too, I think just the whole
23  concept of having the experience where they can go in and
24  they can earmark these hypothetical investments; right?
25  But it gives them investment flexibility.  It gives them

---

Page 55

1   the ability to develop their own investment strategy within
2   their deferred compensation.
3      And then, additionally, I think that we have the
4   ability for a participant to then also elect the timing of
5   when those distributions are paid out, and they can earmark
6   that based on their own personal needs, whether it be
7   in-service or post employment.
8      I think the key thing is flexibility and the fact
9   that it had very generous company contributions.
10      Q.   And you mentioned that one of the really
11  attractive features of the WAP is that there were an array
12  of choices, a broader array, in your view, than offered by
13  many competitors; is that correct?
14      A.   I would say historically we were kind of -- that
15  we -- we provide more investment flexibility.  Over the
16  course of time, that -- that competitive edge -- I mean, I
17  think that now it's very commonplace that you're going to
18  find our competitors offering the same type of investment
19  flexibility.
20      Q.   So others have caught up to some extent?
21      A.   Yes.
22      Q.   And let's say back ten years ago or so, there was
23  more separation between RBC and competitors in that regard;
24  is that correct?
25      A.   I would say that that was correct.

---

Page 56

1      Q.   And is one of the reasons that it was hard to --
2   harder to hedge against hypothetical investments, the more
3   there are, as opposed to just having it be company stock?
4      MR. RUSSELL:  Objection to form.
5      A.   Define "harder to hedge."
6   BY MR. ROLLER:
7      Q.   Well, if you offer 20 different mutual funds and
8   need to take steps to ensure that RBC doesn't suffer a loss
9   when one of those mutual funds goes through the roof and
10  the -- the participant then takes a distribution, RBC would
11  have to do things internally so that those -- those dollars
12  would be there to -- to pay out when Mutual Fund A tripled
13  in value; right?
14      MR. RUSSELL:  Objection to form.
15      A.   The decision in how a company hedges is -- is
16  really a corporate decision.  And so for RBC, we have taken
17  the position that we hedge it based on holding the same
18  type of assets or mutual funds as the participants.
19      Is it more difficult to hedge 5 funds versus 20
20  funds?  I wouldn't say more difficult.  I would say that
21  you're just going to have to realign a transaction over
22  mult- -- more funds.  I wouldn't say that makes it more
23  difficult.
24  BY MR. ROLLER:
25      Q.   Okay.  I'd like to talk a little bit about the

---

14 (Pages 53 to 56)

Paul, et ano. v. RBC Capital Markets, LLC, et al.                                    Gabriela Sikich

Page 57

1  retention aspect.  What makes the WAP -- "the WAP," again,
2  speaking of the old WAP -- a good retention device?
3        A.  For the fact that it has generous company
4  contributions and that we handcuff them through a vesting
5  schedule.  So other -- you know, it basically retains them
6  to say that, "We're going to give you this company
7  contribution, but it's not going to vest until the end of
8  this period."
9        Q.  And so when you say handcuffing them, it means, if
10  I'm thinking of leaving, I may need to stay around.  I'll
11  maybe think twice if there's a quarter million dollars
12  that's going to vest, say, four years from now?
13        A.  Correct.
14           (Exhibit No. 2 marked.)
15  BY MR. ROLLER:
16        Q.  Ms. Sikich, you've been handed what's been marked
17  Exhibit 2.  What I'd like to do now is go through a number
18  of plan documents and prospectuses for -- for the WAP over
19  time, some of which may or may not be at issue in this
20  litigation.
21           I don't think I'm going to ask you a lot of
22  questions about the exact terms of these documents.  It's
23  a -- there's a lot of -- a lot of print in there, but I
24  just want to identify them and do ask a handful of
25  questions.

Page 58

1           So you've been marked Exhibit 2.  Do you recognize
2  this?
3        A.  Yes, I do.
4        Q.  And what is this?
5        A.  This is the plan document, amended and restated
6  plan document, prospectus.
7        Q.  And the document is dated November 30, 2004, on
8  the front page; correct?
9        A.  Correct.
10        Q.  And just directing your attention to the end of
11  Section 1.1, looking at that, can you tell when this plan
12  is effective for?
13        A.  The plan is effective starting January 1st of
14  2005.
15        Q.  And you see that in the very last sentence of
16  Section 1.1?
17        A.  Yes.
18        Q.  And in the first part of that sentence, the plan
19  reads, "The plan was formerly known as the RBC Dain
20  Rauscher wealth accumulation plan."  Do you see that?
21        A.  Yes.
22        Q.  And is it your understanding that that reference
23  is to the plan referenced in Exhibit 1, Mr. Sabin's letter?
24        A.  Yes.
25           (Exhibit No. 3 marked.)

Page 59

1  BY MR. ROLLER:
2        Q.  Ms. Sikich, you've been marked exhibit -- handed
3  what's been marked Exhibit 3.  Do you recognize this?
4        A.  Yes, I do.
5        Q.  And what is it?
6        A.  The amended, restated plan document, slash,
7  prospectus.
8        Q.  When's this document dated?
9        A.  November 1st, 2006.
10        Q.  And can you tell from paragraph 1.1 when this
11  document went into effect?
12        A.  It became effective January 1st of 2007.
13        Q.  And is it -- is it RBC's position that this is an
14  amendment and restatement of the plan that was set forth at
15  Exhibit 2?
16        A.  Correct.
17           MR. RUSSELL:  I'm going to object to form,
18  and the witness is speaking on her own behalf and not on
19  behalf of RBC.
20  BY MR. ROLLER:
21        Q.  Subject to that objection?
22           MR. RUSSELL:  You can answer.
23        A.  Yes.
24           (Exhibit No. 4 marked.)
25

Page 60

1  BY MR. ROLLER:
2        Q.  Ms. Sikich, you've been handed what's been marked
3  Exhibit 4.  Do you recognize this document?
4        A.  Yes, I do.
5        Q.  What is it?
6        A.  Amended and restated plan document, slash,
7  prospectus.
8        Q.  And it's dated November 1, 2007; correct?
9        A.  That's correct.
10        Q.  And then again I'd like to direct your attention
11  to paragraph 1.1, particularly the -- the bolded clause of
12  the very last sentence in 1.1, which states, "And was
13  further amended and restated effective for the plan year
14  beginning on January 1, 2007."  Do you see that?
15        A.  I do.
16        Q.  Can you tell me why the date of the document is
17  chronologically after the effective date of the document?
18           MR. RUSSELL:  Objection to form.
19        A.  I don't recollect why.  I would probably surmise
20  that it was -- there were no plan changes or amendments to
21  the actual document.
22  BY MR. ROLLER:
23        Q.  If there were no plan changes and amend- -- or
24  amendments to the actual document, why create a new
25  document?

15 (Pages 57 to 60)

Paul, et ano. v. RBC Capital Markets, LLC, et al.                                    Gabriela Sikich

Page 153

1   2006 what her actual title and position was, but she
2   definitely was what I would consider an executive.
3          (Exhibit No. 22 marked.)
4   BY MR. ROLLER:
5       Q.   Ms. Sikich, do you remember -- sorry.  Do you
6   recognize Exhibit 22?
7       A.   Yes, I do.
8       Q.   What is it?
9       A.   It is an e-mail memo from John Taft, who is our
10  CEO.  And after having multiple discussions, his goal --
11  discussions with myself, his goal was to basically try
12  to -- this was to enhance and -- and create, you know,
13  the -- the best FA -- FA-recruiting tool as WAP.
14         And looking at -- he basically pointed to me to
15  basically go through and provide -- and support some of
16  these enhancements that he wanted to introduce to the -- to
17  the -- to the program.
18      Q.   And Mr. Taft references an all-hands-on-deck
19  briefing.  Do you know what he's referring to there?
20      A.   The all-hands-on-deck briefing was -- again, I'm
21  not necessarily sure specifically who was in the room.  I
22  was in the room.  And John had, at that time -- had a real
23  fixation on the branding of "finishing well."
24         And part of that "finishing well" is that he
25  really looked at the WAP program as being kind of his

Page 154

1   "finishing well" top product.  And so it just became a very
2   strong mission for him back at that -- that time that he
3   wanted to have the premier deferred compensation program
4   out on the street.
5       Q.   I want to come back around to the "finishing well"
6   in a moment, but do you know whether the all-hands-on-deck
7   briefing was different than the March 23 presentation we've
8   been discussing?
9       A.   My recollection is that it was a separate meeting,
10  because I -- it was a conversation versus a presentation.
11         So in other words, this was a presentation on
12  the -- March 23rd versus this was myself, I know John was
13  there, and maybe several other individuals just having this
14  conversation of really "finishing well," using WAP as
15  really the key kind of arsenal in this "finishing well,"
16  you know, strategy.
17      Q.   Do you know whether it was before or after the
18  March 23 presentation?
19      A.   That, I can't say.
20      Q.   Mr. Taft, in the second paragraph, references the
21  "growing size of the plan, which creates a material impact
22  on our financials."  Do you know what he's talking about
23  there where he talks about material impact on the
24  financials?
25      A.   Yes.  Having any type of deferred compensation

Page 155

1   plan, it has -- and, again, this is not my area of
2   expertise, but it has -- it comes with a cost.  And it
3   comes with a cost -- it -- it totally impacts your P&L,
4   because of the volatility of the various different
5   investments that you have offered.
6          So with an equity-based type of investment lineup,
7   you're going to have more volatility, and it's going to
8   impact your P&L, and then there's also the cost of capital.
9          Again, this is not my area of expertise, but I've
10  been privy to some of these conversations, because as WAP
11  had grown significantly over a period of time, there was a
12  greater impact to the P&L, and there was a greater, you
13  know, cost component.
14         So part of this conversation is, yes, we want to
15  have the richest plan out there, the best plan out there
16  for attracting -- attracting and retaining top-performing
17  financial advisers, but the flip side, it does come with
18  the cost.
19         So the question is, is there a way that we can
20  still have this premier program and still try to mitigate
21  some of the volatility and the cost component?
22      Q.   And is the volatility mitigated by a better
23  hedging strategy, or are there other ways, if you know?
24      A.   Yes.  There are some other hedging tools such
25  as -- you could do a COLI, corporate-owned life insurance,

Page 156

1   but that has some negatives.
2          I mean, there's other different vehicles you could
3   use, but at the -- but at the end, you have
4   counter-initiatives: one where you want to have the most
5   robust plan, and one where you want to maintain -- or
6   flatten out the volatility and reduce the cost.  Those
7   don't mesh well.
8       Q.   I get it.
9          Mr. Taft goes on and mentions concerns on the
10  top-hat status of the plan.  Do you know what he was
11  referring to there?
12      A.   It's conversations that I've had with John in the
13  past and basically said that we wanted to get -- be
14  proactive.
15         Because even though there wasn't any guidance per
16  se out there, we need to ensure the fact that -- even
17  though there was no definition of what constitutes a select
18  group of employees, the flip side is -- working with
19  outside counsel is we just -- we just need to monitor this
20  so that we don't get to a place where we feel that this --
21  that our deferred compensation was not considered to be
22  offered to your true top producers and a select group.
23         It was -- we'd had multiple conversations on this
24  as far as -- because such a considerable part of the -- of
25  the FAs' compensation was in the form of a bonus which was

39 (Pages 153 to 156)

Paul, et ano. v. RBC Capital Markets, LLC, et al.                              Gabriela Sikich

---

Page  217

1   **Q.  -- do you know what their job responsibilities**
2   **are?  I know it's a very broad question.**
3       A.  I would say that they would be considered -- and,
4   again, since eligibility is compensation-driven, if I were
5   to look at that population, I would say that they were in
6   executive, high-level, managerial-type of positions.
7       **Q.  If I were to ask, for example, what the job**
8   **responsibilities of an individual with a position title**
9   **"Head U.S. Wholesale Infrastructure," could you tell me**
10  **what that person does?**
11      A.  No, I cannot.
12      **Q.  Who could I talk to that could tell me that?**
13      A.  You'd have to go to the business line and
14  identify -- or even compensation for that.
15      **Q.  They would -- compensation would -- Tammy might**
16  **know?**
17      A.  Yes.
18          MR. ROLLER:  That's all I have.
19          MR. RUSSELL:  All right.
20          MR. ROLLER:  Thank you.
21          MR. RUSSELL:  Maybe give me five minutes to
22  look at my notes --
23          MR. ROLLER:  Sure.
24          MR. RUSSELL:  -- and make sure I don't have
25  any follow-up --

---

Page  218

1           MR. ROLLER:  Of course.
2           MR. RUSSELL:  -- but I don't think I will.
3       (Pause in the proceedings.)
4           MR. RUSSELL:  I have no questions for the
5   witness, so.
6           MR. ROLLER:  Great.  Thank you very much.
7           MR. RUSSELL:  And we'll reserve signature.
8       (Deposition concluded at 5:07 p.m.)
9       (Signature was reserved.)
10
11
12              *    *    *    *    *
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page  219

1              C E R T I F I C A T E
2
3   STATE OF MINNESOTA
4   COUNTY OF DAKOTA
5
6       I, Ryan Ziegler, a Certified Shorthand Reporter in
7   and for the State of Washington, do hereby certify that the
8   foregoing transcript of the deposition of Gabriela Sikich,
9   having been duly sworn, on July 11, 2017, is true and
10  accurate to the best of my knowledge, skill, and ability.
11      I do further certify that I am a disinterested
12  person in this cause of action and that I am not a relative
13  of the attorneys for any of the parties.
14      IN WITNESS WHEREOF, I have hereunto set my hand
15  and seal this July 18, 2017.
16
17
18
19          _____
            RYAN ZIEGLER, RPR, CCR
20
21
22
23
24
25

---

55  (Pages 217 to 219)

# Exhibit C

# 2009 FINANCIAL CONSULTANT COMPENSATION PLAN



RBC Wealth Management

EXHIBIT
6
Paul   5-27-17
depobook.com



*RBC Wealth Management, a division of RBC Capital Markets Corporation, Member NYSE/FINRA/SIPC.*

RBC-PAUL000006616

# FC Compensation Plan Contents

**EFFECTIVE NOVEMBER 1, 2008[1]**

Our Compensation Philosophy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
Total FC Compensation Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
Commission-Based Earnings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
   Base Commission Grid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
   Fee-Based Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
   Employee Trade Discount Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
   Determining Commission-Based Earnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
   Minimum Compensation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
RBC US Wealth Accumulation Plan Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
RBC US Wealth Accumulation Plan Components . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8
   WAP Productivity Bonus. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8
   Voluntary Deferral of Cash Compensation into WAP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8
   Fixed Match on Voluntary WAP Deferrals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
   Premium Match on Voluntary WAP Deferrals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
   Accelerated Vesting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
RBC - USA Retirement and Savings Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   Participation and Matching Eligibility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   Employee Contributions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   Fixed Company Matching Contribution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   Investment Options . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Margin Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
RBC Premier Line of Credit Compensation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Standby Letters of Credit Compensation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
Money Market Funds (MMF)/Credit Interest Program (CIP) Compensation . . . . . . . . . . . 16
Additional Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
   Compensation on Other Products and Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
   Commodity Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
   Determining Additional Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
Ticket Size and Discounting Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
FC Business Transition Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
FC Business Continuity Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
Title Recognition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Award Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
FC Error Policy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
FC Business Spending Accounts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
Comprehensive Compensation Example . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Note:*

[1] *The 2009 FC Compensation Plan is effective for transactions settling on or after November 1, 2008.*

*RBC Wealth Management reserves the right to change, correct, modify or revoke any of the programs discussed in this document at any time with or without notice. Nothing in this document should be construed to create a contract or give rise to any contractual rights. In all employment decisions, RBC Wealth Management reserves the right to take such action as it deems appropriate given the specific circumstances relating to those decisions.*

CONFIDENTIAL

RBC-PAUL000006617

# Our Compensation Philosophy

At RBC Wealth Management, we believe that the strong relationships between our financial consultants and clients are the key to long-term success. In order to provide our clients with the quality advice and financial services to which they are accustomed, one of our top priorities is attracting and retaining the top financial consultants in the industry.

It is our desire for RBC Wealth Management to become *the* place where experienced financial consultants want to conduct their business. You've chosen to build your business here and we hope you stay and finish well here. We believe RBC Wealth Management is the place to be for a number of reasons, including the availability of RBC's global resources, our firm's longstanding entrepreneurial culture, and overall goal to become the best investment, advisory and wealth management boutique in the country.

Another key element to help financial consultants finish well at RBC Wealth Management is our compensation program, as we proudly remain one of the highest paying firms in the industry. The RBC U.S. Wealth Accumulation Plan (WAP), our deferred compensation program, also offers you the significant opportunity to build long-term wealth.

We are pleased to be able to offer you this compensation plan, because we believe it is one of the very best-if not *the best*-plan on the street. As always, we thank you for your continued commitment to RBC Wealth Management and your clients. You are a major part of our success, and together, we will make RBC Wealth Management the best investment, advisory and wealth management boutique in the country.

Sincerely,

Jim Chapman
*PCG President, East Division*

Karl Leaverton
*PCG President, West Division*

CONFIDENTIAL

RBC-PAUL000006618

# Total FC Compensation Overview

When you choose to work at RBC Wealth Management, your total compensation comes from a variety of sources. Combined, these sources are designed to encourage and reward your growth and success. The following is an overview of the Financial Consultant (FC) Compensation Plan, which is effective November 1, 2009. If you have specific questions about your individual compensation, please talk with your complex director.

| | FC COMPENSATION COMPONENTS (% OF ANNUAL PRODUCTION) | | | | |
|---|---|---|---|---|---|
| Annual Production | Base Commission | WAP Productivity Bonus | WAP Matches[1] | Retirement Plan Matches[1] | Total FC Compensation[2] |
| $1,500,000 | 45.00% | 5.00% | 4.40% | 0.10% | 54.50% |
| 1,250,000 | 45.00% | 3.75% | 4.40% | 0.10% | 53.25% |
| 1,000,000 | 45.00% | 3.50% | 4.40% | 0.20% | 53.10% |
| 800,000 | 44.00% | 3.50% | 3.60% | 0.20% | 51.30% |
| 600,000 | 43.00% | 3.50% | 3.50% | 0.30% | 50.30% |
| 500,000 | 42.00% | 2.50% | 3.20% | 0.30% | 48.00% |
| 400,000 | 41.00% | 2.50% | 1.50% | 0.40% | 45.40% |
| 350,000 | 40.00% | 1.75% | 1.50% | 0.40% | 43.65% |
| 300,000 | 39.00% | 1.75% | 1.50% | 0.50% | 42.75% |
| 250,000 | 37.00% | – | – | 0.60% | 37.60% |
| 225,000 | 35.00% | – | – | 0.70% | 35.70% |
| 200,000 | 32.00% | – | – | 0.80% | 32.80% |
| 175,000 | 28.00% | – | – | 0.90% | 28.90% |
| Below 175,000 | 20.00% | – | – | 1.00% | 21.00% |

**Notes:**

[1] *Wealth Accumulation Plan (WAP) and Retirement Plan match assumes full FC participation and maximum length of service for WAP premium match purposes.*

[2] *Excludes impact of other cash compensation (such as margin, premier line of credit, money market fund/credit interest program, referral fees, etc.), RBC Wealth Management-paid benefits (social security, health and dental plans), and certain reductions to base commissions.*

## FACTORS IMPACTING YOUR TOTAL COMPENSATION

As you read through this document, you will see that in addition to productivity, several other factors may impact your total compensation.

- Your level of voluntary participation in the WAP and Retirement Plan.
- Your length of service as an RBC Wealth Management FC.
- Your ticket size and discounting practices.

*RBC Wealth Management 2009 Financial Consultant Compensation Plan* 3

# Commission-Based Earnings

**BASE COMMISSION GRID**

At RBC Wealth Management, we believe you can achieve success by providing your clients with the products and services that meet their individual needs. Accordingly, our base commission grid rewards productivity and does not differentiate by product. To reward you for serving your clients and growing your business, the base commission rates increase incrementally as you achieve higher levels of production.

The monthly base commission rate is driven by your trailing six-month production. Gross production is included for compensation purposes when a ticket or fee has settled. Only those tickets settled on or before the last business day of the month will be included in the monthly base commission calculation. Fees and trails are included in gross production when received by the firm.

| Gross Production Range | | | | Current Month Base Commission Rate |
|---|---|---|---|---|
| Annualized Production[1] | | Trailing Six-Month Production | | |
| From | To | From | To | |
| 1,000,000 | And up | 500,000 | And up | 45.0% |
| 800,000 | 999,999 | 400,000 | 499,999 | 44.0% |
| 600,000 | 799,999 | 300,000 | 399,999 | 43.0% |
| 500,000 | 599,999 | 250,000 | 299,999 | 42.0% |
| 400,000 | 499,999 | 200,000 | 249,999 | 41.0% |
| 350,000 | 399,999 | 175,000 | 199,999 | 40.0% |
| 300,000 | 349,999 | 150,000 | 174,999 | 39.0% |
| 250,000 | 299,999 | 125,000 | 149,999 | 37.0% |
| 225,000 | 249,999 | 112,500 | 124,999 | 35.0% |
| 200,000 | 224,999 | 100,000 | 112,499 | 32.0% |
| 175,000 | 199,999 | 87,500 | 99,999 | 28.0% |
| – | 174,999 | – | 87,499 | 20.0% |

**Note:**

[1] The monthly base commission rate is driven by your trailing six-month production. Annualized production is shown for illustration purposes only.

**Example: Determining the Monthly Base Commission Rate**

Your last five months' production is $270,000 and your current month's production is $55,000, for a six-month total of $325,000. Therefore, your base commission rate for the current month will be 43 percent.

CONFIDENTIAL

RBC-PAUL000006620

## FEE-BASED PROGRAMS

One hundred percent of the RBC Advisor, Portfolio Focus, and Managed Account Program fee is credited to gross production. For Consulting Solutions, approximately 50 basis points on equity/balanced accounts and approximately 25 basis points on fixed income accounts will be withheld from FC gross production for payment of outside money manager fees and other costs. For RBC Total Portfolio, 10 to 70 basis points (depending on the allocation of the account to money managers and mutual funds as well as whether the client has selected the tax management feature) will be withheld from FC gross production for payment of outside money manager fees, overlay portfolio manager fees, and other costs. For accounts with referral partners, the portion of the fee that is paid to the referral partner is subtracted from gross production. See details on program pricing in the IAG fee booklet on InfoNET.

Program fees are credited to gross production on the 11th business day of the first month of the calendar quarter (January, April, July, and October) and vest throughout the quarter. If the FC of record on an account changes or the account leaves the program, any unvested program fees will be collected from the original FC's gross production, *or otherwise*, and if applicable, credited to the gross production of the new FC of record. The base commission rate on fee-based programs is determined by the Base Commission Grid.

## EMPLOYEE TRADE DISCOUNT POLICY

Under the Employee Trade Discount Policy, employees are charged a discounted client commission on transactions in their personal accounts and discounted fees for employee-eligible Investment Advisor Group accounts. For transactions executed under the Employee Trade Discount Policy, including an FC's personal account(s), FCs are credited with the gross commission with no payout.

**Under the Policy, Employee-Paid Commissions are:**

- Equity trades – the lesser of $50 or the recommended client commission.
- Bond trades – $25.
- Mutual funds and unit investment trusts (UITs) – purchased at net asset value (NAV) provided the fund or UIT prospectus has a NAV provision for employees of broker/dealers.

**Under the Policy, Employee-Paid Fees are:**

- Consulting Solutions – 50 percent discount to the standard fee range (discount does not apply to money manager's fee). For assistance with calculating the account fee minimum for specific money managers, please contact your regional Managed Portfolio Strategies Consultant.
- RBC Total Portfolio – 50 percent discount to the standard fee range (discount does not apply to management fee). Account fee minimum reduced by 50 percent or $125 for mutual fund and ETF-only accounts; $1,500 for accounts utilizing money managers.
- Managed Account Program – 50 percent discount to the standard fee range.  Account fee minimum reduced by 50 percent or $600 for equity/balance; $325 for fixed income.
- RBC Advisor – 50 percent discount to the standard fee range.  Account fee minimum reduced by 50 percent or $250 ($125 for accounts that are 100 percent fixed income, mutual fund, ETFs, UITs, and/or cash).
- Investment Access and Standard Accounts – annual fee waived.
- IRAs – 50 percent discount on annual fee.
- Focus – 50 percent discount to the standard fee range.  The account fee minimums are reduced by 50 percent or a minimum of $375 for equity/balanced, $187.50 for fixed income.

All fee based programs using a discounted fee schedule do not receive a payout.

CONFIDENTIAL

RBC-PAUL000006621

Complete details regarding the Employee Trade Discount Policy can be found on InfoNET currently located at HR/Me and RBC USA. Select My Workplace. Select Work/Life. Click on Employee Accounts (RBC Wealth Management). Click on Employee Trade Discount Policy. Click on the complete policy link.

## DETERMINING COMMISSION-BASED EARNINGS

Your commission-based earnings are determined by reducing your base commission by an amount determined by RBC Wealth Management, which includes (but is not limited to) costs associated with errors, customer settlements or judgments, licensing fees, write-offs, such as account-associated fees, and client associate compensation sharing. Commission-based earnings are paid on the tenth of each month for the prior month's production.

## MINIMUM COMPENSATION

The Department of Labor's Fair Labor Standards Act (FLSA) guidelines require that exempt employees — which includes FCs — must earn monthly minimum compensation depending upon their state of residence:

- $2,773.33 – 2008 and 2009 California minimum per state law
- $2,323.10 – 2008 and 2009 New York minimum per state law
- $2,058.33 – 2008 and 2009 Connecticut minimum per state law
- $1,971.67 – 2008 and 2009 minimum all other states

If your monthly net compensation calculated per the RBC Wealth Management FC Compensation Plan falls below the minimum compensation required by law, you will receive additional pay to bring your total monthly compensation to the required minimum. The additional pay you receive will be offset in future months against your base commissions.

### Example: Minimum Compensation

If an FC in Wisconsin earns $971.67 net compensation in January, the firm will pay a total of $1,971.67 (minimum amount required by the FLSA) and then offset base commissions in future months by $1,000.00.

If the FC generates $3,000.00 of base commissions in February, the firm will offset the $1,000.00 that was paid in January, leaving base commissions of $2,000.00.

CONFIDENTIAL

RBC-PAUL000006622

# RBC US Wealth Accumulation Plan Overview

The RBC US Wealth Accumulation Plan (WAP) allows you to share in the ongoing prosperity of the company, while providing you with an excellent opportunity to defer compensation and build long-term wealth. The plan is comprised of a WAP productivity bonus, voluntary deferral of cash compensation, and company matching contributions. See the RBC US Wealth Accumulation Plan document for complete details.

| RBC US WEALTH ACCUMULATION PLAN – AT A GLANCE | | | |
|---|---|---|---|
| **WAP Component** | **Production Requirement** | **Amount** | **Company Match** |
| WAP Productivity Bonus | $300,000 in fiscal year 2009 (Nov 2008 – Oct 2009) | 1.75% to 5.00% of gross production depending on production level | n/a |
| Voluntary Deferral of Cash Compensation | $300,000 in fiscal year 2008[1] | Up to 30% of 2009 calendar year cash compensation | First 15% of cash compensation deferred is matched |

Matches on Voluntary Deferral:
- Fixed Match – 25% match on first 15% of cash compensation deferred
- Premium Match – 5% to 40% match (depending on production and years of service) on first 15% of cash compensation deferred

Vesting: The 2009 WAP productivity bonus and company matches are credited to your WAP account in February of 2010 and become fully vested five years later in January of 2015. Voluntary deferrals of cash compensation are always 100% vested. See separate WAP enrollment information for complete details.

## WAP TIME PERIODS

The WAP utilizes both calendar and fiscal year time periods. Below is a summary of the time periods incorporated in each WAP component.

A. WAP Productivity Bonus – the 2009 bonus is based on fiscal year 2009 (November 2008 – October 2009) production and is credited to your WAP account in February 2010.

B. Voluntary Deferral of Cash Compensation – eligibility for calendar year 2009 voluntary deferral is based on fiscal year 2008 (November 2007 – October 2008) production. The annual enrollment period will occur in December 2008 and apply to 2009 calendar year deferrals.

C. Fixed and Premium Matches – the 2009 matches are applied to eligible 2009 calendar year deferrals and invested in the RBC Share Account[2] in February 2010.

*Notes:*

[1] *Eligibility status for voluntary deferrals of cash compensation is determined at the beginning of fiscal year 2009 based on 2008 production. See WAP time periods (B) above.*

[2] *One share in the RBC Share Account is equal to the market value of one common share of Royal Bank of Canada.*

CONFIDENTIAL

RBC-PAUL000006623

# RBC US Wealth Accumulation Plan Components

**WAP PRODUCTIVITY BONUS**

When you achieve $300,000 or more in fiscal year production (November 2008 – October 2009), you are rewarded with a WAP productivity bonus, ranging from 1.75 to 5.00 percent of your fiscal year production as shown in the table below.

| Annual Gross Production | | WAP Productivity |
| From | To | Bonus Rate |
|---|---|---|
| 1,500,000 | And up | 5.00% |
| 1,250,000 | 1,499,999 | 3.75% |
| 600,000 | 1,249,999 | 3.50% |
| 400,000 | 599,999 | 2.50% |
| 300,000 | 399,999 | 1.75% |

The 2009 WAP productivity bonus is determined after fiscal year-end 2009 and automatically credited to your WAP account in February 2010. The bonus becomes 100 percent vested in January 2015 (a five-year cliff vesting period). As part of your WAP account, the bonus may be invested in any of the WAP investment options and investment elections may be changed up to 12 times per calendar year. Additional vesting and investment option information will be included in the RBC US Wealth Accumulation Plan enrollment materials distributed in December. Please note that the production bonus is subject to Social Security and Medicare taxes in the year it becomes vested.

**Example: WAP Productivity Bonus**

An FC produces $600,000 in fiscal year 2009. The FC's WAP productivity bonus is calculated as follows:

| | |
|---|---:|
| Fiscal Year Production | $ 600,000 |
| WAP Productivity Bonus Rate | × 3.50% |
| WAP Productivity Bonus | $ 21,000 |

The bonus is credited to the FC's WAP account in February 2010 and becomes 100 percent vested in January 2015 (a five-year cliff vesting period).

**VOLUNTARY DEFERRAL OF CASH COMPENSATION INTO WAP**

If your 2008 fiscal year production is at least $300,000, you will be eligible to make voluntary deferrals into the WAP for calendar year 2009. You must re-qualify each year to be able to make voluntary deferrals into the WAP in the coming year. During the annual enrollment period that runs from late November through mid December 2008, you may elect to defer up to 30 percent of your calendar year 2009 total cash compensation. Your voluntary deferrals may be invested in any of the WAP investment options and investment elections may be changed up to 12 times per calendar year. Any amounts you defer will remain tax-deferred until they are distributed to you. Your distribution will be treated as ordinary income and applicable Federal and State taxes will be withheld. Your voluntary deferrals and associated earnings are always 100 percent vested.

Another benefit of deferring your compensation into the WAP is that the first 15 percent of cash compensation deferred is eligible for a company fixed match of 25 percent and potentially a premium match, depending on your productivity and length of service. WAP matches are described on pages 9 and 10.

*8   RBC Wealth Management 2009 Financial Consultant Compensation Plan*

**FIXED MATCH ON VOLUNTARY WAP DEFERRALS**

RBC Wealth Management will automatically provide a 25 percent fixed match on the first 15 percent of 2009 calendar year cash compensation you defer. The 2009 fixed match is automatically invested in the RBC Share Account[1] in February 2010 and becomes 100 percent vested in January 2015 (a five-year cliff vesting period). The balances associated with company matches and any associated earnings cannot be transferred out of the RBC share account with the exception of FCs who retire from RBCWM.

**PREMIUM MATCH ON VOLUNTARY WAP DEFERRALS**

RBC Wealth Management further rewards you for productivity and length of service with a premium match (on the first 15 percent of cash compensation deferred), according to the grid below. The 2009 premium match is automatically invested in the RBC Share Account[1] in February 2010 and becomes 100 percent vested in January 2015 (a five-year cliff vesting period). The balances associated with company matches and any associated earnings cannot be transferred out of the RBC share account with the exception of FCs who retire from RBCWM.

| WAP PREMIUM MATCH GRID | | | | | |
|---|---|---|---|---|---|
| | Length of Service[2] | | | | |
| 2009 Production Basis | ‹ 6 Years | 6 - 10 Years | 11 - 15 Years | 16 - 20 Years | 21+ Years |
| 2009 Chairman's Council[3] | 15% | 20% | 25% | 30% | 40% |
| 2009 President's Council[3] | 10% | 15% | 20% | 25% | 30% |
| 2009 Director's Council[3] | 5% | 10% | 15% | 20% | 25% |

**TOTAL COMPANY MATCH ON VOLUNTARY WAP DEFERRALS**

The fixed and premium matches provide great opportunity to build on your voluntary deferrals. Combined, the fixed and premium match will amount to a company match ranging from 25 to 65 percent of every dollar you defer (on the first 15 percent of cash compensation deferred) depending on your productivity and length of service as displayed in the table below. Please note that the fixed match and the premium match contributions are subject to Social Security and Medicare taxes in the year they become vested.

| COMBINED WAP MATCH FIXED 25% + PREMIUM = TOTAL MATCH SHOWN BELOW | | | | | |
|---|---|---|---|---|---|
| | Length of Service[2] | | | | |
| 2009 Production Basis | ‹ 6 Years | 6 - 10 Years | 11 - 15 Years | 16 - 20 Years | 21+ Years |
| 2009 Chairman's Council[3] | 40% | 45% | 50% | 55% | 65% |
| 2009 President's Council[3] | 35% | 40% | 45% | 50% | 55% |
| 2009 Director's Council[3] | 30% | 35% | 40% | 45% | 50% |
| Equal to or Less than the 2009 Director's Council[3] | 25% | 25% | 25% | 25% | 25% |

*Notes:*

[1] *One share in the RBC Share Account is equal to the market value of one common share of Royal Bank of Canada.*

[2] *Length of Service is defined as the number of full calendar years completed as an RBC Wealth Management FC as of December 31, 2009. The calendar year in which you were hired is counted as one full year of service. For example, if you were hired on December 18, 2008, you would earn two years of service toward the 2009 premium match.*

[3] *2009 Chairman's Council production is defined as the 2009 fiscal year production level of the 120th FC or the production goal set in August 2009, whichever results in a greater number of program qualifiers. 2009 President's Council production is defined as the 2009 fiscal year production level of the 400th FC or the production goal set in August 2009, whichever results in a greater number of program qualifiers. 2009 Director's Council production is defined as 75% of the fiscal year end President's Council threshold.*

CONFIDENTIAL

RBC-PAUL000006625

**Example: WAP Voluntary Deferral and Matching Program**

An FC with 12 years of service produces $600,000 in fiscal year 2009. During calendar year 2009, the FC receives $263,100 in cash compensation. The FC contributes 15 percent to the WAP on a voluntary basis. The FC's voluntary deferral and company matches are calculated as follows:

**FC Voluntary Deferral**

| | | |
|---|---:|---|
| Cash Compensation | $ 263,100 | Includes commissions and other cash compensation |
| FC Voluntary WAP Deferral % | × 15% | |
| FC Voluntary WAP Deferral $ | $ 39,465 | |

**Company Match Rates**

| | | |
|---|---:|---|
| Fixed Match | 25% | |
| Premium Match | + 20% | Assumes President's Council |
| Total Company Matches | 45% | |

**Total Company Matches on Voluntary Deferral**

| | | |
|---|---:|---|
| Fixed Match | $ 9,866 | 25% times $39,465 |
| Premium Match | + 7,893 | 20% times $39,465 |
| Total Company Matches | $ 17,759 | |

The 2009 fixed and premium matches are credited to the FC's WAP account in February 2010 and invested in the RBC Share Account. They become 100 percent vested in January 2015 (a five-year cliff vesting period).

**ACCELERATED VESTING**

There are two ways to accelerate the vesting of previously unvested WAP balances:

1) Depart the firm after meeting the following requirements:

   ▓ Satisfy the "rule of 60," which is age and RBC Wealth Management years of service added together to equal 60 or more years; and

   ▓ Sign a one-year non-compete agreement.

   or

2) Participate in the FC Business Transition Plan (see page 22 for details).

CONFIDENTIAL

RBC-PAUL000006626

# RBC – USA Retirement and Savings Plan

The RBC – USA Retirement and Savings Plan (Retirement Plan) is an important piece of your total compensation program. Over the long term, you can build significant value in your account. Please see the Retirement Plan's Summary Plan Description, prospectus and plan document or call the Retirement Benefits Help Line at 1-866-697-1002 for complete details.

| RETIREMENT PLAN – AT A GLANCE | | | |
|---|---|---|---|
| **Plan Component** | **Amount** | **Timing of Contributions** | **Vesting** |
| Voluntary Pre-tax Contribution | Up to 50% of pay | Each pay period | Always fully vested |
| Voluntary After-tax Contribution | Up to 5% of pay (not eligible for match) | Each pay period | Always fully vested |
| Voluntary Roth After-tax Contribution | Up to 50% of pay | Each pay period | Always fully vested |
| Company Fixed Match | 100% match on the first 6% of pre-tax and/or Roth pay you contribute, limited to $1,500 per calendar year | Each pay period in which you make a voluntary pre-tax and/or Roth contribution | Fully vested after five years of service from date of hire |

Additionally:

- Pre-tax and/or Roth employee contributions are limited to $16,500 per IRS rules for 2009.
- FCs who are 50 years of age or older by the end of the 2009 calendar year may make an additional pre-tax catch-up contribution of $5,500 to the Retirement Plan per IRS rules for 2009.
- Voluntary and matching contributions may be invested in any of the Retirement Plan investment options.

**PARTICIPATION AND MATCHING ELIGIBILITY**

All employees are eligible to contribute to the Retirement Plan as soon as administratively possible after their date of hire. You are eligible for the company match the first of the month following one full year of service.

**EMPLOYEE CONTRIBUTIONS**

You may contribute up to 50 percent of your pay on a pre-tax basis. In addition to the pre-tax contribution, you may also contribute up to an additional 5 percent of your pay on an after-tax basis. Your contributions are automatically withheld from your paychecks. The maximum dollar amount you are allowed to contribute pre-tax is determined annually by the federal government. For calendar year 2009 the pre-tax contribution limit is $16,500. Employee pre-tax and after-tax contributions are always 100 percent vested.

Employees who are 50 years of age or older by the end of the calendar year may make an additional pre-tax catch-up contribution to the Retirement Plan. For the plan year 2009, the IRS will allow you to contribute an additional $5,500 on top of your regular pre-tax savings. Catch-up contributions are not eligible for company matching contributions.

CONFIDENTIAL

RBC-PAUL000006627

**FIXED COMPANY MATCHING CONTRIBUTION**

The Company provides a fixed matching contribution to employees who participate in the Retirement Plan. The fixed match provides a dollar-for-dollar matching contribution on the first 6 percent of compensation you contribute on a pre-tax and/or Roth basis. The match is applied to calendar year contributions. The fixed match is made to your account each pay period in which you make a contribution. The company match for FCs is limited to a maximum of $1,500 each year.

The fixed company match vests on a graduated schedule during your first five years of service (0%, 25%, 50%, 75%, and 100%) and is fully vested after five years of service from your date of hire.  The fixed matching contribution is invested according to your investment elections.

**INVESTMENT OPTIONS**

You have a wide range of core investment funds and a self-directed mutual fund window for investment selection. You can transfer money between any of the investment options daily, if you choose.

CONFIDENTIAL

RBC-PAUL000006628

# Exhibit D

## Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
2                WESTERN DISTRICT OF WASHINGTON
3                         AT TACOMA
4
5   MARTY PAUL, an individual; and    )
    BRIAN BUSKIRK, an individual,     )
6                                     )
                 Plaintiffs,          )  Case No.
7                                     )
           vs.                        )
8                                     )  3:16-cv-05616-RBL
    RBC CAPITAL MARKETS, LLC, a       )
9   Minnesota limited liability       )
    company; ROYAL BANK OF CANADA, a  )
10  Canadian corporation; and ROYAL   )
    BANK OF CANADA US WEALTH          )
11  ACCUMULATION PLAN, an employee    )
    benefit plan,                     )
12                                    )
                 Defendants.          )
13
14  _____
15
        VIDEOTAPED DEPOSITION OF MARTY PAUL, VOLUME I
16
                    April 27, 2017
17
                     8:00 a.m.
18
19             1201 Third Avenue, Suite 4900
20                 Seattle, Washington
21
22
23
24
25          Eva P. Jankovits, CCR No. 1915
```

## Page 2

```
1              APPEARANCES OF COUNSEL
2
    On Behalf of the Plaintiffs:
3
        JEREMY E. ROLLER
4       Yarmuth Wilsdon, PLLC
        1420 Fifth Avenue
5       Suite 1400
        Seattle, WA  98101
6       206.516.3800
        206.516.3888 Fax
7       jroller@yarmuth.com
8
    On Behalf of the Defendants:
9
        SARI M. ALAMUDDIN
10      MATTHEW A. RUSSELL
        Morgan Lewis
11      77 West Wacker Dr
        Chicago, IL  60601
12      312.324.1158
        312.324.1001 Fax
13      sari.alamuddin@morganlewis.com
14
    Also Present:
15
        Todd Schnell, RBC Client Rep
16      Lucas Cheadle, Videographer
          Esquire Deposition Services
17
18
19
20
21
22
23
24
25
```

## Page 3

```
1                 INDEX OF EXAMINATION
2
    WITNESS: MARTY PAUL
3
4   EXAMINATION                             PAGE
5   BY MR. ALAMUDDIN                          7
6
7                 INDEX TO EXHIBITS
8   DEFENDANTS'    DESCRIPTION              PAGE
9   Exhibit No. 1  1-page Your 2000 Enrollment  35
                   Form for the Retirement Plan
10                 and WAP.  Confidential.
                   Bates No. MP000335
11
12  Exhibit No. 2  17-page Royal Bank of Canada  40
                   Summary Description of 2003
13                 RBC Dain Rauscher Wealth
                   Accumulation Plan.
14                 Confidential.  Bates Nos. RBC
                   001065-1081
15  Exhibit No. 3  6 pages, pay statements.    54
                   Confidential.  Bates Nos.
16                 RBC-PAUL000005068-5073
17  Exhibit No. 4  1-page 2008 pay statement.  59
                   Confidential.  Bates No.
18                 RBC-PAUL000003576
19  Exhibit No. 5  6-page 2010 WAP Components   63
                   Summary.  Confidential.
20                 Bates Nos. RBC 000259-264
21  Exhibit No. 6  32-page 2009 Financial       64
                   Consultant Compensation Plan.
22                 Confidential.  Bates Nos.
                   RBC-PAUL000006615-6646
23
24  Exhibit No. 7  76 pages, Retirement Savings  76
                   Statements.  Confidential.
25                 Bates Nos.
                   RBC-PAUL000000410-485
```

## Page 4

```
1           INDEX TO EXHIBITS (Continuing)
2   DEFENDANTS'    DESCRIPTION              PAGE
3   Exhibit No. 8  7-page Advisory Council      83
                   Meetings January 27 & 28,
4                  2009.  Confidential.
                   Attorney's Eyes Only.  Bates
5                  Nos. TOLBERT0000862-868
6   Exhibit No. 9  2-page e-mail from RBC US    91
                   Benefits Department, dated
7                  12/11/06.  Confidential.
                   Bates Nos. RBC 000314-315
8
    Exhibit No. 10 2-page e-mail from RBC US    92
9                  Benefits Department (RBC
                   Dain) dated 5/21/07.
10                 Confidential.  Bates Nos.
                   TOLBERT0001034-1035
11
    Exhibit No. 11 1-page e-mail from RBC US    93
12                 Retirement Benefits
                   Department, dated 9/23/2008
13
    Exhibit No. 12 8-page e-mail from Jim and   95
14                 Karl, dated 11/19/08.
                   Confidential.  Bates Nos. RBC
15                 001406-1412
16  Exhibit No. 13 9-page RBC US Financial     132
                   Consultant Succession
17                 Agreement.  Confidential.
                   Bates Nos.
18                 RBC-PAUL000007288-7296
19  Exhibit No. 14 9-page RBC US Financial     136
                   Consultant Success Agreement.
20                 Confidential.  Bates Nos.
                   RBC-PAUL000003676-3684
21
    Exhibit No. 15 2-page e-mail from RBC US   137
22                 Retirement Benefits
                   Department, dated 11/24/08.
23                 Confidential.  Bates Nos. RBC
                   0000705-706
24
25
```



Page 13

1    A. -- so I would say in some cases no.
2    Q. Which --
3        THE COURT REPORTER: I'm going to ask you to
4   keep your voice up, please.
5        THE WITNESS: Oh. Sure.
6        THE COURT REPORTER: Thanks.
7        THE WITNESS: Okay.
8    Q. (By Mr. Alamuddin) Which are the documents
9   that helped refresh your memory as to the events?
10       A. I couldn't separate in a conversation, without
11  seeing them, which ones I -- helped me remember events
12  and which ones seemed cloudy or don't really recall.
13       Q. Can you give me a thumbnail sketch of your
14  professional history following graduation from college.
15       A. Well, I've pretty much been a financial advisor
16  for 23 years and started at RBC. Well, at the time it
17  was called Dain Bosworth. Graduated from University of
18  Washington, was hired by Dain Bosworth August 1st, 1994,
19  and have been either a registered Series 7 advisor or a
20  registered IAR advisor ever since.
21       Q. After your tenure with RBC ended, where did you
22  go next?
23       A. I went to Northwest Asset Management.
24       Q. So that would have been 2011 till when?
25       A. Until 2014.

Page 14

1    Q. And where did you go after that?
2    A. I've went to Concert -- I think it was called
3   Concert Wealth Management or Concert Advisor Services;
4   I'm not quite sure.
5    Q. Are you still there?
6    A. No. We are now using an RIA called Sowell
7   Asset Management. We still use Concert Advisor Services
8   for our technology as a third party but not as our RIA.
9    Q. When you say "we," who are you referring to
10  besides yourself?
11       A. There are four other advisors.
12       Q. And those are...?
13       A. Kim Taurman, George Bonney, Brady Buskirk, and
14  Brian Buskirk.
15       Q. What is the relationship, if any, between the
16  two Buskirks?
17       A. Father and son.
18       Q. Did any of these four other advisors besides
19  Brian Buskirk work with you at RBC?
20       A. Yes.
21       Q. Who?
22       A. All of them.
23       Q. Did they all go with you to Northwest Asset
24  Management as well?
25       A. Yes.

Page 15

1    Q. And to Concert and then Sowell?
2    A. Yes.
3    Q. Did you -- who was it that first went to
4   Northwest Asset Management from RBC? Was that you?
5        MR. ROLLER: Object to the form, but you can
6   answer.
7    A. Yes, that was me.
8    Q. (By Mr. Alamuddin) And did you recruit these
9   individuals to come with you?
10       MR. ROLLER: Same objection, but you can
11  answer.
12       A. Yes.
13       Q. (By Mr. Alamuddin) And why did you do that?
14       A. Well, we -- I had recruited them all to RBC,
15  and we all enjoyed working together.
16       Q. (By Mr. Alamuddin) Did you -- when you
17  recruited them to RBC, did you recruit them all -- all at
18  once, or did you recruit them one at a time?
19       A. One at a time.
20       Q. And how -- how was it that you were able to
21  recruit them to RBC?
22       A. I don't know what you mean by "how."
23       Q. What did you do to induce them to leave
24  wherever they were working to join RBC?
25       A. Well, I always -- I was the branch manager at

Page 16

1   RBC, but I was a producing advisor. And I think they
2   were drawn to working with me as the way I ran my own
3   business and the culture I created within the office.
4    Q. What kind of culture did you create?
5    A. You know, I think the work ethic, fairness,
6   respect, leadership. I think I was a humble leader and
7   led by example.
8    Q. And who was it that you first recruited?
9    A. Well, Brian and I worked together at RBC, so
10  Brian was actually my first mentor when I first got out
11  of college. So I guess the first person that joined me
12  in Gig Harbor -- well, in Gig Harbor, Kim Taurman was my
13  sales assistant originally. We opened the office
14  together in 1997, but I joined RBC in 1994 and that was
15  in Bremerton, Washington, and that's where I met Brian
16  Buskirk.
17       Q. I see.
18       A. So Brian joined me in Gig Harbor in 2004, but
19  he was already at RBC. We just had a working
20  relationship for ten years. Then George Bonney, and then
21  I hired Brady. So I think in that chronological order.
22       Q. So for Ms. Taurman or Mr. Bonney or Brady
23  Buskirk, did you provide them with any signing bonus or
24  promissory note to --
25       A. No.



1  elect that, then yes.
2      Q.  Sitting here today, do you remember why you
3  elected a distribution date of 2005?
4      A.  I don't.  I don't recall why I chose that.
5      Q.  Do you recall that the WAP allowed you to, as
6  an investment option -- not -- excuse me.  Let me
7  rephrase that.
8          Do you recall that the WAP allowed you to elect
9  either an in-service distribution or defer compensation
10  until following termination?
11          Do you recall that being an option?
12      A.  Following termination?
13      Q.  Yeah.
14      A.  No, I don't recall that being an option.
15      Q.  Do you recall in-service distribution being an
16  option under the WAP?
17      A.  I recall a portion of the WAP being allowed
18  during service, but I also recall the bulk of it being
19  for retirement.
20      Q.  Which portion do you recall being allowed in
21  service?
22      A.  I think whenever it was eligible.  I don't
23  really recall what portion that was.
24      Q.  Did you make in-service distribution elections
25  while you were a participant in the WAP?

1      A.  I think I made some.  I don't remember how
2  many.
3      Q.  And can you tell me the reasons why you made
4  some in-service distribution elections?
5      A.  I don't really remember having a reason, so I
6  don't -- I don't know what the reason would have been.
7      Q.  You just selected them by happenstance or
8  chance?
9      A.  Well, I don't think I selected them every time.
10      Q.  Right.
11      A.  So, you know, I have four kids, so I don't know
12  if there was a life event going on.  And, again, I was --
13  each time, if you did, you didn't even get it when you
14  elected it for several years into the future, so I
15  don't -- I mean, there was no event-driven reason, and --
16  so no, I don't recall a specific reason.
17      Q.  You mentioned four kids.  Did you elect
18  in-service distributions, for example, to fund -- help
19  fund education?
20      A.  No.
21      Q.  Did you read this enrollment form before you
22  signed it?
23      A.  The one that's in front of me?
24      Q.  Yes, sir.
25      A.  I don't know if I ever read it from number one

1  through number five in detail, but I obviously signed it,
2  so there were parts that I read.  I don't -- I don't ever
3  recall having training on it or seminars on it or -- no.
4      Q.  If you look at the penultimate paragraph in the
5  document, the one that reads, I agree that my deferred
6  compensation shall be reflected only in unfunded
7  accounts.
8          Do you recall reading that particular
9  paragraph?
10      A.  Where is it?
11      Q.  It's the penultimate paragraph, so --
12      A.  I don't know what you mean --
13          MR. ROLLER:  Second to last.
14      A.  -- "penultimate."
15      Q.  (By Mr. Alamuddin)  Second to last.  Sorry.
16      A.  Sorry.  Okay.  Let me read it real --
17      Q.  Yeah.
18      A.  -- quick again.
19      Q.  Sure.
20      A.  (Witness peruses document.)
21          No, I do not recall reading that.
22      Q.  Separate and apart from whether you recall
23  reading this particular paragraph, did you know that the
24  WAP was an unfunded plan?
25      A.  No.  I don't even know what "unfunded" means.

1          MR. ALAMUDDIN:  Let's mark this as Exhibit 2.
2          (Exhibit No. 2 marked for
3           identification.)
4          THE WITNESS:  Thank you.
5      Q.  (By Mr. Alamuddin)  Mr. Paul, I'm showing you
6  what we marked as Defendants' Exhibit 2, which is a
7  multipage document entitled Royal Bank of Canada, Summary
8  Description of 2003 RBC Dain Rauscher Wealth Accumulation
9  Plan.
10          First question is:  Have you seen this document
11  before?
12      A.  Not that I remember.
13      Q.  Do you recall receiving, on an annual basis,
14  summary descriptions of the wealth accumulation plan?
15      A.  Not that I remember.
16      Q.  It could have happened; you just don't
17  remember?
18      A.  Yeah.
19      Q.  Have you ever, throughout your -- did you ever,
20  throughout your tenure at RBC, read the wealth
21  accumulation plan document?
22      A.  Not that I remember.
23      Q.  Did you read any documents that describe the
24  wealth accumulation plan?
25      A.  No, not that I remember.



Page 53

1    A. I have no idea.
2    Q. -- dollars?
3        And you said that your -- your definition of
4    "highly compensated" is somebody that's paid
5    substantially more.
6        What -- how do you define "substantially"
7    there?
8    A. Well, I think where you have a significant
9    difference in lifestyle. You know, somebody that makes
10   $500,000 versus somebody that makes $80,000, that's a
11   substantial difference to me.
12   Q. Do you -- do you believe that somebody who
13   makes $500,000 a year is highly compensated?
14   A. In some industries they are. I -- I think that
15   by the time I left, no, I would not consider somebody
16   that makes $500,000 highly compensated, again, because I
17   feel like highly compensated means, you know, top
18   performer. Top performers were making, you know, in
19   excess of a million to $2 million a year.
20   Q. That would have included you, correct?
21   A. Um --
22   Q. You were a top performer?
23   A. I was a chairman's council producer.
24   Q. That -- you wouldn't consider yourself a top
25   performer?

Page 54

1    A. I would consider -- there was a few years where
2    I was a top performer, if a top performer's maybe the top
3    75.
4    Q. And you were making over a million dollars a
5    year at RBC, correct?
6    A. I think there were a couple years that I made
7    over a million dollars a year.
8    Q. Well, let's see if we can...
9        (Exhibit No. 3 marked for
10       identification.)
11   THE WITNESS: Thank you.
12   Q. (By Mr. Alamuddin) Mr. Paul, I'm showing you
13   what we've marked as Exhibit -- Exhibit 3.
14   Do you recognize these documents?
15   A. I don't recognize them because I've only had
16   them in front of me for a minute --
17   Q. Please take --
18   A. -- a few seconds.
19   Q. -- whatever time you need.
20   A. (Witness peruses document.)
21   Okay.
22   Q. Have you had a chance to review Exhibit 3?
23   A. Yes.
24   Q. Do you recognize these documents?
25   A. I don't recognize the documents, but I see what

Page 55

1    they're saying.
2    Q. All right. Well, let's -- let's take a look at
3    RBC-PAUL 5073, which is the last page in the document.
4    This looks to be a pay statement for 2010 pay period
5    ending 12/20/2010; do you see that?
6    A. I do.
7    Q. And it says that year-to-date your gross pay
8    was somewhere slightly over $1.3 million; am I right?
9    A. Correct.
10   Q. And is that -- does that accurately reflect
11   approximately what you made in 2010 in terms of gross
12   pay?
13   A. I believe so.
14   Q. Would you --
15   A. Based on this, yes.
16   Q. Separate and apart from this, do you recall
17   making somewhere around $1.32 million in 2010?
18   A. I don't know what the exact dollar amount was,
19   but this appears to be some form of an employment summary
20   for that year from RBC.
21   Q. Do you have any reason to dispute the accuracy
22   of this pay statement?
23   A. No.
24   Q. Would you agree that $1.3 million -- someone
25   who makes $1.3 million dollars is highly compensated?

Page 56

1    A. In this industry, at that time, I think that
2    was a highly compensated person.
3    Q. If you turn to 5072, this is a pay statement
4    for 2006. Pay period end date's 12/20/2006; do you see
5    that?
6    A. Yes.
7    Q. And it indicates that your gross pay
8    year-to-date 2006 was $1.132 million. Again, do you have
9    any reason to dispute that statement?
10   A. No.
11   Q. Would you agree with me that as -- somebody who
12   makes -- who made $1.1 million in 2006 was a highly
13   compensated employee?
14   A. Yes.
15   Q. Let's go to 5071. This is a pay statement for
16   2009; do you see that?
17   A. Yes.
18   Q. And it indicates that year-to-date you have
19   made slightly over $1.1 million in gross pay, correct?
20   A. Correct.
21   Q. And, again, do you have any reason to dispute
22   the accuracy of that?
23   A. No.
24   Q. Would you agree with me that somebody who made
25   $1.1 million in 2009 was a highly compensated employee?



Page 57

1    A. Yes.

2    Q. If you turn to 5070, this is a pay payment for

3    2007. And it indicates you made in gross pay slightly

4    over $1.8 million in 2007. Am I reading that correctly?

5    A. Yes.

6    Q. Any reason to dispute the accuracy of that

7    number?

8    A. No.

9    Q. Would you agree with me that somebody who made

10   $1.8 million in 2007 was a highly compensated employee?

11   A. Yes.

12   Q. And if you turn to the next page, 5069, this is

13   2011. And this is a -- through the pay period of

14   6/30/2011, and it indicates gross pay $322,000.

15       And, of course, in 2011 that's when your

16   employment was terminated, correct?

17   A. Correct.

18   Q. And it was terminated in March?

19   A. Correct.

20   Q. And so, just doing the math, three months in,

21   you were probably annualizing to somewhere around

22   $1.2 million in gross pay. Would that be accurate?

23       MR. ROLLER: Object to the form.

24       THE WITNESS: I don't know if I'm supposed to

25   answer when he says that.

Page 58

1        MR. ALAMUDDIN: You can answer unless he

2    instructs you not to answer.

3        THE WITNESS: Okay.

4        MR. ROLLER: Can you read back the question?

5        MR. ALAMUDDIN: Sure.

6        MR. ROLLER: I just want to make sure...

7            (The record was read.)

8        MR. ROLLER: Can we go off the record for a

9    second?

10       MR. ALAMUDDIN: Sure.

11       THE VIDEOGRAPHER: The time is 9:17 a.m. We're

12   off the record.

13           (Discussion off the record.)

14       THE VIDEOGRAPHER: The time is 9:18 a.m. We're

15   now on the record.

16       MR. ROLLER: Why don't you read back --

17       THE COURT REPORTER: You want me to read again?

18       MR. ROLLER: -- the question.

19       Marty, go ahead and answer.

20       THE WITNESS: Okay.

21           (The record was read.)

22       A. I think it's accurate that I was annualizing

23   that. I don't know I would have finished there or not,

24   but...

25       Q. (By Mr. Alamuddin) Fair enough.

Page 59

1    A. Yeah.

2    Q. Assuming you had finished at around

3    $1.2 million, would you agree that somebody who made

4    $1.2 million in 2011 would be a highly compensated

5    employee?

6    A. Yes.

7        MR. ALAMUDDIN: Okay. Let's take a look at --

8    let's make this 4.

9            (Exhibit No. 4 marked for

10               identification.)

11       THE WITNESS: Thank you.

12   Q. (By Mr. Alamuddin) And this is a document

13   marked RBC 3576. It is a pay statement for calendar year

14   2008.

15       Do you see that?

16   A. Yes, I do.

17   Q. And it indicates that in calendar year 2008,

18   your gross pay was slightly over $1.4 million.

19       Do you have any reason to dispute the accuracy

20   of that statement -- of that number?

21   A. No, I do not.

22   Q. Would you agree with me that in -- somebody who

23   was making $1.4 million in 2008 was a highly compensated

24   employee?

25   A. Yes, I would.

Page 60

1        MR. ALAMUDDIN: Why don't we go off. We've

2    been going for a while. Let's take a break for five

3    minutes or so.

4        THE VIDEOGRAPHER: The time is 9:19 a.m. This

5    is the end of Disc 1. We're now off the record.

6            (Recess from 9:19 a.m. to

7                9:30 a.m.)

8

9        THE VIDEOGRAPHER: The time is 9:31 a.m. This

10   is the beginning of Disc 2 in the deposition of Marty

11   Paul. We're now on the record.

12

13           EXAMINATION (Continuing)

14   BY MR. ALAMUDDIN:

15   Q. Mr. Paul, I'd like you to go back and take a

16   look at Exhibit 3. Sorry. Exhibit 2, I think it is.

17   Yeah.

18       I want to ask you about some other provisions

19   of that document. Again, go to RBC 001066.

20   A. Okay.

21   Q. Section B, Material Terms of the Plan. There's

22   an eligibility paragraph there. Do you see that?

23   A. Under General Nature and Purpose of the Plan?

24   Q. Actually under Section B, Material Terms of the

25   Plan.



Page 65

1  you received annually from RBC a document of some kind
2  describing what the financial compens- -- consultant
3  compensation would be?
4      A.  You know, I don't remember it being this
5  formal, so no.
6      Q.  My question was a little different.  Would you
7  --
8      A.  Oh, sorry.
9          MR. ALAMUDDIN:  Would you repeat it, please?
10             (The record was read.)
11     A.  No.
12     Q.  (By Mr. Alamuddin)  All right.  Let's take a
13  look at this document.
14         If you turn to RBC-PAUL 0006618, there's a -- a
15  sort of introductory letter titled Our Compensation
16  Philosophy signed by Jim Chapman and Karl Leaverton; do
17  you see that?
18     A.  I do.
19     Q.  In the first paragraph, the letter reads, At
20  RBC Wealth Management, we believe that the strong
21  relationships between our financial consultants and
22  clients are the key to long-term success.
23         Would you agree with that statement?
24     A.  Yes.
25     Q.  It goes on to read, In order to provide our

Page 66

1  clients with the quality advice and financial services to
2  which they are accustomed, one of our top priorities is
3  attracting and retaining the top financial consultants in
4  the industry.
5         Would you agree that that was a top priority of
6  RBC's when you worked there?
7      A.  I don't know what top -- top three, top five --
8  but I think it was important to retain employees.
9      Q.  And to attract employees as well, attract
10  financial consultants?
11     A.  Yeah.  In order to grow a company, you need to
12  attract and retain.
13     Q.  And -- and what did you use when you were a
14  branch manager to attract financial consultants to join
15  RBC?  What tools did you use?
16     A.  I used the culture in my office.  I actually
17  didn't use RBC as a brand or Merrill Lynch or Morgan
18  Stanley or Smith Barney, because I recruited people from
19  every firm.
20     Q.  When you were recruiting individuals to join
21  RBC, did the topic of deferred compensation come up at
22  all?
23     A.  No.
24     Q.  Nobody ever asked you what -- whether there was
25  a deferred compensation option at RBC?

Page 67

1      A.  I don't recall deferred compensation being a
2  topic.  I think everybody in the industry kind of
3  understood that everybody's pay was about the same.  I
4  don't know if any one firm really stood out as having
5  something better or different than the other.
6      Q.  Did you ever -- when you were recruiting
7  financial consultants to join RBC, did you ever provide
8  them with a promissory note?
9      A.  Yes.
10     Q.  What percentage of the time would you provide
11  financial consultants joining RBC with a promissory note?
12     A.  Well, that changed a lot over 17 years.
13     Q.  Sure.
14     A.  Early in the days -- I opened the office in
15  1997 -- you might pay 30 percent upfront bonus.  Then
16  over time, eventually it got to a hundred percent.  I
17  don't know if I recruited anybody higher than that, but I
18  know the industry kept going higher.  I haven't been
19  there for six years.  So those -- those ranges.
20     Q.  And just to be clear, you're talking -- when
21  you talk 30 percent and a hundred percent, you're talking
22  dollars, right?
23     A.  The dollars they received in the promissory
24  note were reflective of the production they did of the
25  firm they left.

Page 68

1      Q.  Correct.  But that's what the 30 to a hundred
2  percent is you're referring --
3      A.  Correct.
4      Q.  -- to?
5      A.  Correct.
6      Q.  All right.  So my question was a little
7  different, which is --
8      A.  Oh, sorry.
9      Q.  That's okay.  -- what percentage of FCs that
10  you recruited received a promissory note to join RBC?
11     A.  I don't know if any didn't, but I don't know if
12  it's a hundred percent.  I would say it's a high
13  percentage.
14     Q.  And what was the purpose of providing them with
15  a promissory note?
16     A.  The purpose was to mitigate the risk of moving
17  their business, predominantly.
18     Q.  Can you elaborate on that?  What does that
19  mean?
20     A.  Well, when a broker moves, they risk their
21  clients not coming with them, and that would affect their
22  income.  And that wasn't unique to RBC.  You know, all
23  firms would compensate somebody in some form of a
24  promissory note or bonus to move their business.
25     Q.  Was there any other purpose behind the



Page 73

1 being a $300,000 production requirement at some point in
2 time?
3     A. No, because it seems very low to me because
4 I -- I know by 2009 -- or I think I know by 2009 they
5 were lowering the payout of production levels. And a
6 $300,000 producer in 2009 I don't think was above
7 30 percent. I would have assumed it to be higher.
8     Q. My question was a little different, which was
9 --
10     A. Sorry.
11     Q. -- did you -- does that refresh your
12 recollection as to the -- as to 300,000 production being
13 the qualifying criteria for the WAP at any point in time?
14     A. No.
15     Q. Turn to Page 6619.
16     A. Okay.
17     Q. This is a page entitled Total FC Compensation
18 Overview; do you see that?
19     A. I do.
20     Q. And it indicates an annual production of
21 300,000 equates to a 39 percent base commission rate; do
22 you see that?
23     A. I do.
24     Q. Does that refresh your recollection as to
25 39 percent instead of 30 percent being the base pay rate

Page 74

1 for 300,000 production as of fiscal year 2010?
2     A. No. I just remember brokers always complaining
3 they weren't paid enough.
4     Q. Did you complain you weren't paid enough?
5     A. No. I just always felt that if I worked hard,
6 pay would take care of itself.
7     Q. Did you become aware that at some point in time
8 there was what was called a loyalty bonus that was also
9 called into the WAP by the company?
10     A. I remember a loyalty bonus.
11     Q. And what do you remember about the loyalty
12 bonus?
13     A. I just remember the longer you were there, you
14 eventually qualified for it.
15     Q. And that loyalty bonus, was it paid into the
16 WAP?
17     A. I don't remember. I didn't really pay much
18 attention to my pay stubs. They were electronic, or at
19 least at some point in technology time they were
20 electronic, so I never even saw a pay stub.
21         And my point is there was multiple ways I got
22 paid on -- in my total compensation. I never took the
23 time to look at every single line item, so...
24     Q. Do you know if the loyalty bonus pay-ins were
25 contingent on making voluntary WAP distributions?

Page 75

1     A. I don't know.
2     Q. Did you receive any bonuses, whether
3 production, loyalty or otherwise, that were not paid into
4 the WAP?
5     A. I don't know. I -- I don't know because I know
6 there was a period of time where I had -- like I
7 mentioned earlier, where I had voluntary and mandatory.
8 And I think it was a percentage of my income. I don't
9 know whether one was -- one was paid into the WAP or one
10 was paid out to me. It just -- it was...
11     Q. Well, except I'm not asking --
12     A. I'm trying to answer --
13     Q. -- about your --
14     A. -- your question.
15     Q. -- your -- your contributions.
16     A. Yeah.
17     Q. I'm asking about bonuses that were paid to you.
18         And the question was whether there was any
19 bonus that you received that was not paid into the WAP?
20     A. Like I said, I think that when I elect 10
21 percent, it wouldn't matter whether it was a bonus or
22 whether it was commission or whether it was branch
23 manager pay or -- or whatever. It would just be 10
24 percent of my pay. So I -- I'm trying to answer your
25 question. I don't recall whether they segregated a style

Page 76

1 of a bonus to be eligible or not eligible to contribute
2 that portion of it to the WAP.
3     Q. I'm trying to find out whether there's any
4 bonus payout that you received that -- that was not paid
5 into the WAP.
6     A. Not that I can remember.
7     Q. Did you receive annually rankings of FCs in
8 terms of production? Is that something the company
9 provided its brokers?
10     A. I think they posted it. I don't know if they
11 provided it. I think if you went to find it, you could
12 probably find it, but I don't remember them posting it.
13     Q. Were you aware where you stood in terms of
14 production in the company?
15     A. Not exactly. I mean, I knew -- no, not
16 exactly, because there was various times, you know, from
17 the time 1994 when I started to, you know, 2011 when I --
18 2011 when I was terminated.
19         (Exhibit No. 7 marked for
20             identification.)
21     MR. ALAMUDDIN: We at 7?
22     THE COURT REPORTER: Yes.
23     Q. (By Mr. Alamuddin) All right. Mr. Paul, I'm
24 showing you what we've marked as Defendants' Exhibit 7,
25 which is a multipage document, Bates labeled RBC-PAUL 410



ESQUIRE
DEPOSITION SOLUTIONS

Page 105

1    A. Okay.
2    Q. All right. If you turn to Page 6618 of the
3 document, again, that's that letter entitled Compensation
4 Philosophy.
5    A. What number was it?
6    Q. 6618.
7       MR. ROLLER: I think we're in --
8       THE WITNESS: In 7?
9       MR. ROLLER: That's not Exhibit 7.
10      MR. RUSSELL: Yeah, 6.
11      MR. ALAMUDDIN: Oh, is it 6? Sorry. Sorry.
12 My fault.
13      THE WITNESS: It started with 4s here. That's
14 why I knew it was probably not right.
15      So it's Exhibit 6?
16      MR. ALAMUDDIN: Yes, Exhibit 6, the 2009
17 Financial Consultant Compensation Plan.
18      THE WITNESS: And what number?
19      MR. ALAMUDDIN: 6618.
20      THE WITNESS: Okay.
21    Q. (By Mr. Alamuddin) The last paragraph reads,
22 We are pleased to be able to offer you this compensation
23 plan, because we believe it is one of the very best -- if
24 not the best -- plan on the street.
25      Did you agree with that statement, meaning that

Page 106

1 the FC compensation plan at RBC was one of the very best,
2 if not the best, plan on the street?
3    A. Well, I didn't really know much about what
4 other plans were. I think everybody was trying to
5 compete with a similar fashion. And I don't remember
6 anybody having the secret sauce as far as everybody went
7 to work there because Merrill Lynch's plan was the best
8 or everybody went to work at RBC because it was the best.
9 So no, I don't -- I don't remember ever seeing facts of
10 that, and I don't -- I think this is an opinion.
11    Q. My question is, do you share it?
12    A. No.
13    Q. Earlier you told me when I asked you whether
14 the -- the -- the market for high-producing FCs was
15 competitive, you -- you responded by telling me the
16 market for all FCs was competitive.
17    A. Mm-hm.
18    Q. Why was it so competitive in your opinion?
19    A. Well, because revenue was important.
20    Q. What do you mean?
21    A. Whether you were a $200,000 or a $5 million
22 producer, revenue was important to the profitability of
23 the company.
24    Q. Were there any other reasons in your opinion
25 that made the FC market competitive?

Page 107

1    A. I think it was shrinking.
2    Q. In what sense?
3    A. Just the -- the fail rate was high. The
4 retention rate was low. Costs were rising.
5    Q. By "shrinking," do you mean that the -- the
6 number of qualified FCs being available was being
7 reduced?
8    A. No. I think it tended -- mostly was influenced
9 by the hiring -- hiring behavior of the companies. You
10 know, they're just -- they hire a lot when times are good
11 and they don't hire when times are bad, and they probably
12 should reverse their behavior.
13    Q. I guess I'm not following why that would make
14 the market competitive for FCs.
15    A. Well, you asked why the market was -- was
16 shrinking.
17    Q. No. I asked you --
18    A. Oh, sorry.
19    Q. -- whether there were --
20    A. Sorry.
21    Q. -- other reasons why the market was competi- --
22 you mentioned revenue was important. I was asking why in
23 your opinion there were other reasons why the market for
24 FCs was competitive.
25    A. Why there was other -- I think revenue was the

Page 108

1 primary reason why it was competitive.
2    Q. Were there any other reasons in your opinion?
3    A. Well, I think it was important to have enough
4 FCs to have a brand. You know, certainly numbers played
5 a role in that. That probably led to my comment about
6 the number of hires and attrition and -- yeah. So I
7 think just sheer numbers was important.
8    Q. Any other reasons in your opinion that made the
9 market competitive?
10    A. Well, you had to have sheer numbers and you had
11 to have revenue in order to be in certain locations. If
12 you didn't have enough numbers, you didn't have very --
13 you didn't have as many offices, and that would reduce
14 the visibility of your brand. So I guess those are my
15 two or three reasons.
16      MR. ALAMUDDIN: Why don't we take a quick
17 break.
18      THE VIDEOGRAPHER: The time is 10:49 a.m.
19 We're now going off the record.
20           (Recess from 10:49 a.m. to
21           10:57 a.m.)
22
23      THE VIDEOGRAPHER: The time is 10:57 a.m. This
24 is the beginning of Disc 3 in the deposition of Marty
25 Paul. We're now on the record.



## Page 153

1
2  Date:  May 9, 2017
3
4
5
6  To:  Sari M. Alamuddin
     Morgan Lewis
7    77 West Wacker Dr
     Chicago, IL  60601
8
9  Case:  PAUL, ET AL. V RBC CAPITAL MARKETS, LLC, ET AL.
    Cause No.:  3:16-cv-05616-RBL
10
11
12       YOU ARE HEREBY NOTIFIED that the following original
    transcript has been sealed and served upon you for filing:
13
    Deposition of: MARTY PAUL
14
    Taken:       April 27, 2017
15
    Signature:   Waived  _____
16
              Reserved  __X__
17
       Within 30 days or before the trial date, the witness
18  should forward to you the original signed correction sheet,
    which can be filed separately at the time of trial.
19
20          Do not open the sealed transcript.
21
22
    cc:  Jeremy E. Roller
23
24
25

## Page 154

1  Date: May 9, 2017
2
   To:  Jeremy E. Roller
3    Yarmuth Wilsdon, PLLC
     1420 Fifth Avenue, Suite 1400
4    Seattle, WA  98101
5  Case:   PAUL, ET AL. vs. RBC CAPITAL MARKETS, LLC, ET AL.
    Cause No.:   3:16-cv-05616-RBL
6  Deposition of: MARTY PAUL
    Date Taken:   April 27, 2017
7
       The above transcript must be read and the Correction
8  Sheet signed within 30 days of this notice or before the
    trial date.  If the Correction Sheet is not signed within
9  that time period, signature will be deemed waived for all
    purposes.
10
       Please contact the witness and arrange a convenient
11  time and place for reading and signing.
12     After the Correction Sheet is signed, please mail the
    signed original Correction Sheet to:
13
            Sari M. Alamuddin
14           Morgan Lewis
            77 West Wacker Dr
15           Chicago, IL  60601
16  FAX ADDITIONAL COPIES TO:
    Esquire Deposition Services
17  Fax No.: 206.624.9995
18  Reporter: Eva P. Jankovits, CCR
    License No.: 1915
19
20  cc: Sari M. Alamuddin
21
22
23
24
25

## Page 155

1
2  Date:    May 9, 2017
3
4  To:     MARTY PAUL
        c/o Jeremy E. Roller
5       Yarmuth Wilsdon, PLLC
        1420 Fifth Avenue, Suite 1400
6       Seattle, WA  98101
7  Case:    PAUL, ET AL. vs. RBC CAPITAL MARKETS, LLC, ET AL.
    Deposition of: MARTY PAUL
8  Date Taken:    April 27, 2017
9
10      The above transcript must be read and the Correction
    Sheet signed within 30 days of this notice or before the
11  trial date.  If the Correction Sheet is not signed within
    that time period, signature will be deemed waived for all
12  purposes.
13  __X__Following the instructions given on the Correction
    Sheet, please read the enclosed transcript, sign the
14  Correction sheet, and mail the signed Correction Sheet to
    our office at 701 Fifth Avenue, Suite 6630, Seattle,
15  Washington 98104.
16  _____Please contact our office and make an appointment to
    come in and read your deposition transcript.  Office hours
17  are 8:00 a.m. to 5:00 p.m., Monday through Friday.  Without
    a scheduled appointment, the transcript will not be
18  available.
19  Other:
20
21  Reporter: Eva P. Jankovits, CCR
    License No.:  1915
22
23
24  cc: Sari M. Alamuddin, Jeremy E. Roller
25



# Exhibit E

## Page 1

```
 1        IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
 2               IN AND FOR THE COUNTY OF KING
 3   _____
 4   MARTY PAUL, an individual; and     )
     BRIAN BUSKIRK, an individual;      )
 5                                      )
                                        )   Case No.
 6                                      )
             Plaintiffs,                )   3:16-cv-05616-RBL
 7                                      )
         vs.                            )
 8                                      )
     RBC CAPITAL MARKETS, LLC, a        )
 9   Minnesota limited liability        )
     company; ROYAL BANK OF CANADA, a   )
10   Canadian corporation; and ROYAL    )
     BANK OF CANADA US WEALTH           )
11   ACCUMULATION PLAN, an employee     )
     benefit plan,                      )
12                                      )
             Defendants.                )
13   _____
14
15
         VIDEOTAPED DEPOSITION OF BRIAN W. BUSKIRK
16
17                  April 28, 2017
18                   8:33 a.m.
19
            1201 Third Avenue, Suite 4900
20
               Seattle, Washington
21
22
23
24
25          Eva P. Jankovits, CCR No. 1915
```

## Page 2

```
 1              APPEARANCES OF COUNSEL
 2
     On Behalf of the Plaintiffs:
 3
         JEREMY E. ROLLER
 4       Yarmuth Wilsdon, PLLC
         1420 Fifth Avenue
 5       Suite 1400
         Seattle, WA  98101
 6       206.516.3800
         206.516.3888 Fax
 7       jroller@yarmuth.com
 8
     On Behalf of the Defendants:
 9
         MATTHEW A. RUSSELL
10       SARI ALAMUDDIN
         Morgan Lewis
11       77 West Wacker Dr
         Chicago, IL  60601
12       312.324.1771
         312.324.1001 Fax
13       marussell@morganlewis.com
14
     Also Present:
15
         Todd Schnell, RBC representative
16       Lucas Cheadle, Videographer
         Esquire Deposition Services
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1                INDEX OF EXAMINATION
 2
     WITNESS:  BRIAN W. BUSKIRK
 3
 4   EXAMINATION                              PAGE
 5   BY MR. RUSSELL                             6
 6
 7                INDEX TO EXHIBITS
 8   DEFENDANTS'   DESCRIPTION               PAGE
 9   Exhibit No. 19  10 pages, 2006-2013 W-2s    8
10   Exhibit No. 20  2-page DRI Officer Title   34
                     Nomination.  Bate Nos.
11                   RBC-PAUL000004377-4378
12   Exhibit No. 21  2-page Change Notice Payroll  37
                     Authorization.  Bates Nos.
13                   RBC-PAUL000004371-4372
14   Exhibit No. 22  16 pages, letter to Dawn    48
                     Crocheron from Todd E.
15                   Schwartz dated 8/10/12.
                     Confidential.
16                   RBC-PAUL000009931-9946
17   Exhibit No. 23  1-page letter to Brian     76
                     Buskirk from Paula H.
18                   Phillippe, dated 2/2/01.
                     Confidential.  Bates No.
19                   RBC-PAUL000004374
20   Exhibit No. 24  29-page 2006 Financial     80
                     Consultant Compensation Plan.
21                   Confidential.  Bates Nos.
                     RBC000006459-6487
22
23   Exhibit No. 25  63-page RBC US Deferred    96
                     Compensation Plan.
24                   Confidential.  Bates Nos.
                     RBC-PAUL000004570-4632
25
```

## Page 4

```
 1           INDEX TO EXHIBITS (Continuing)
 2   DEFENDANTS'   DESCRIPTION               PAGE
 3   Exhibit No. 26  2-page Wealth Accumulation  96
                     Plan.  Confidential.  Bates
 4                   Nos. RBC-PAUL000004364-4365
 5   Exhibit No. 27  18-page Wealth Accumulation  110
                     Plan.  2003 Plan Year.
 6                   Confidential.  Bates Nos. RBC
                     001108-1125
 7
     Exhibit No. 28  3-page letter to Kristen   142
 8                   Kimmell from Jeffrey G.
                     Curnutt, dated 1/22/13.
 9                   Bates Nos. BB000044-046
10   Exhibit No. 29  17-page Brian Buskirk's    147
                     Answers and Objections to
11                   Defendants' First Set of
                     Interrogatories
12
13
14            PREVIOUSLY MARKED EXHIBITS
15   DEFENDANTS'        DESCRIPTION        PAGE NO.
16   Exhibit No. 5   2011 WAP summary          122
17   Exhibit No. 8   Advisory Council Meeting,  127
                     dated January of 2009.
18                   Tolbert 862
19   Exhibit No. 15  E-mail from RBC Benefits   131
                     Department, dated
20                   November 24th, 2008.  2009
                     WAP Enrollment
21
     Exhibit No. 17  Complaint for Damages      144
22
23
24
25
                                              4
```



ESQUIRE
DEPOSITION SOLUTIONS

1  construction and sailed commercially off the beach there
2  in Waikiki and also in Maui and Kaanapali.
3        And then after my second tour of duty in
4  Alaska, I went -- moved to back to Maui from 1973 until
5  the end of 1979.
6     Q.  Okay.  And was there a period where you worked
7  for an entity called G. Buskirk & Associates?
8     A.  Yeah.  Real estate.  That's my mom.
9     Q.  Okay.
10    A.  I did -- sold real estate.  I was a real estate
11  broker from 1980 until I joined Bettcher & Company in
12  '83, so for two and a half, three years.
13    Q.  Okay.  We'll walk through a little bit of your
14  -- the details of that.  One of the other you mentioned
15  you went to Northwest Asset Management following RBC?
16    A.  RBC.
17    Q.  After that did you go directly to Lighthouse?
18  Did I get that?
19    A.  Actually, we went to Concert.  And in the
20  process, Concert is still in charge of our technology.
21  But we formed our own 1099, which is Lighthouse Wealth
22  Strategies, and now we also work with a group called
23  Sowell Management, S-o-w-e-l-l, and they do our
24  compliance and our -- our billing.
25    Q.  When you say "we" there, what do you mean by

1  "we"?
2     A.  There's a group of five brokers.  I'm one of
3  five.
4     Q.  And who are the other four?
5     A.  Marty Paul, Kim Taurman, George Bonney, Brady
6  Buskirk, and myself.
7     Q.  Brady Buskirk, is that a relation of yours?
8     A.  My son.
9     Q.  Your son.
10       And did all of those -- or which -- maybe I
11  should ask which of those folks also worked at RBC when
12  you were there?
13    A.  All of them.
14    Q.  All five?  And which of those folks also came
15  to Northwest Asset Management?
16    A.  All of them.
17    Q.  And did they also -- did you travel as a group
18  to the -- I think you said Concert?
19    A.  We did.  Marty was always kind of leading the
20  pack, and we didn't go as a group, but we went
21  individually and eventually ended up together again.
22    Q.  You mentioned Marty Paul.  He's also a
23  plaintiff in this case; right?
24    A.  Yes.
25    Q.  Did you -- you're aware he was -- had his

1  deposition yesterday?
2     A.  Yes.
3     Q.  Did you speak with Mr. Paul?
4     A.  Briefly.  Yeah.  Briefly.
5     Q.  And when was that?
6     A.  Yesterday, last night.
7     Q.  What did you guys discuss?
8     A.  Kind of the traffic, the time to get here.
9  Where to park.  And a bit about the deposition yesterday,
10  though I had a meeting I had to go to and so it was
11  short.  We really didn't talk more than three or four
12  minutes.
13    Q.  Was this is a phone call or in person?
14    A.  Phone call.
15    Q.  What about the deposition in particular about
16  his deposition did you discuss?
17    A.  Just pretty much how it went for him and not
18  really anything specific about what he had gotten into or
19  what you were talking about.
20    Q.  What generally?
21    A.  Compensation.
22    Q.  And can you expand on that?
23    A.  I think probably about highly compensated
24  versus not highly compensated.
25    Q.  What did Mr. Paul say about that topic?

1     A.  Just that you'd asked him if he thought he was
2  highly compensated.
3     Q.  That you would be -- "you" meaning me, that I
4  would ask --
5     A.  I'm sorry.  Yes.
6     Q.  Had asked him?
7     A.  Mm-hm.
8     Q.  And did he expand beyond that?
9     A.  No, not really.
10    Q.  Did he reveal his testimony about what you
11  thought was, kind of, highly compensated?
12    A.  No, he didn't.
13    Q.  Was there anything else you can recall
14  discussing with him?
15    A.  No, not really.  It was really a short -- I was
16  in the car on the way to another program.  And I had to
17  cut him off, and I picked him up just as we were leaving
18  -- as I was getting closer, so really didn't have a
19  chance to get into it at all.  Then I got here so early
20  this morning that I haven't talked to him since.
21       I did truly, though, ask him how long it took
22  him to get here and where he had parked, and he -- he
23  just had a very few minutes to just kind of talk about
24  his day and how long it took and how long he was here and
25  that he had taken a break during the middle of the day.



1    Q. -- or branch?

2       And why did you do that?

3    A. As simple as a commute.

4    Q. That's the only reason?

5    A. Well, Marty Paul was the manager at the Gig

6  Harbor office.

7    Q. And what did the --

8    A. They built a new -- I'm sorry. They built a

9  new building and they were closer to my home.

10   Q. What about Marty Paul being the manager there

11  was a reason for you to change branches?

12   A. I was Marty's mentor when he started in the

13  business, and we formed a good relationship and it made

14  it easy to make the move.

15   Q. Why -- why was that easy then?

16   A. Well, the commute for one. Plus, the people in

17  Marty's office I thought were all exceptional.

18   Q. You mentioned you were Marty's mentor. Do you

19  recall about what time he joined RBC?

20   A. I really don't. Probably the middle '90s

21  maybe.

22   Q. How did you come to know him initially?

23   A. He was recruited by Pat Elliot, who was the

24  manager at the time. I met him through the office. RBC

25  had a -- Dain had a mentor program that for all new

1  brokers they asked an existing producing broker to be

2  their mentors, and they asked me to be Marty's mentor.

3    Q. And so I take it at that time he was at the --

4  wherever you were -- I guess it was --

5    A. Silverdale.

6    Q. -- Silverdale at that point?

7    A. Yes.

8    Q. And at some point then I gather he left to

9  start the Gig Harbor office?

10   A. He did.

11   Q. Do you remember when that was?

12   A. Oh, I would think it was probably 2000, though

13  I'm not exactly sure.

14   Q. And just practically speaking, how did it come

15  to be that you decided to go to Gig Harbor? There's a

16  four-year gap there. Was there a reason?

17   A. Well, we moved up to Bainbridge I think in

18  2002, and practically speaking, they built a new

19  building, which created space for my business. And it

20  just made a lot of sense to me.

21   Q. Did Mr. Paul reach out to you or recruit you in

22  any way to come?

23   A. I think -- I'm sure he did. But I say that

24  because I got recruited a lot. And it was an easy

25  transition. I didn't move firms. I just moved my

1  office.

2    Q. When you say you were recruited a lot, can you

3  elaborate on that? You mean by other -- other firms?

4    A. Yes.

5    Q. Was that true throughout your time at RBC/Dain?

6    A. It's really all to do with production. As your

7  production ramps up, your recruitment also ramps up.

8    Q. How often would another firm, for example,

9  reach out to you?

10   A. Couple times a year.

11   Q. And recognizing they might all be different,

12  what's their -- what do they say? I mean, do they give

13  you a pitch? Do they just sort of test your interest?

14   A. Well, the last one was when I was in Gig

15  Harbor, Merrill Lynch of Tacoma called and wanted to know

16  if I wanted to manage that office because I had the

17  management license. And then they tell you, you know,

18  they'll pay you upfront money. In this case it was two

19  times following 12 months' production. But it never felt

20  right moving for me or for my clients. And I never did

21  it.

22   Q. I want to take a couple -- first of all, do you

23  recall when that particular conversation was or overture?

24   A. That had to be in 2011.

25   Q. You mentioned a license to manage, I think, or

1  something similar?

2    A. Series 8.

3    Q. And that was one reason why you were

4  attractive, to your understanding, to Merrill Lynch?

5    A. One reason, yeah.

6    Q. What other reasons do you think?

7    A. Production.

8    Q. Do you recall in 2011, at the time of that

9  conversation, what your production might have been?

10   A. I really don't recall, but I'd have to think it

11  was around 800,000.

12   Q. You mentioned an offer of upfront money, I

13  think is how you phrased it; two times...?

14   A. Trailing.

15   Q. I missed what you said. Trailing 12-month

16  production?

17   A. Yes.

18   Q. So if my math is right, that's 1.6 million if

19  the 800,000 --

20   A. If --

21   Q. -- is accurate?

22   A. And that number is always moving. And that was

23  negotiable, but I never negotiated. But they're paying

24  three times now.

25   Q. Three times trailing months?



Page 45

1    A.  Yeah.  It continues to ramp up.
2    Q.  Why do you think that is?
3    A.  Competition.
4    Q.  I take it you understand it's now up to three
5    times.  Is that sort of a number that's known in the
6    industry what the other competitors are paying?
7    A.  Yes.
8    Q.  I'm circling back now.  You mentioned a
9    Series 8, the production.  Were there any other reasons
10   why Merrill Lynch might have found you to be an
11   attractive candidate?
12   A.  Not to my knowledge.
13   Q.  That you can think of.  Okay.
14        Now, I want to ask, you said "upfront money."
15   Is that just a straight cash bonus?  How was that paid?
16   A.  It's an -- on a contract.  They pay you the
17   money to come over.  And that's negotiable how you take
18   it, but you can in fact take it all up front.  The
19   contracts have extended in length of time.  Initially
20   when I first started being recruited it was three years.
21   And I think now it's all the way up to eight, but you
22   don't stay eight years, then you pay back the bonus.
23   Q.  So you -- in those -- when you call it a
24   contract, you receive a lump sum and it's paid back over
25   time, or do you -- would you lose it all --

Page 46

1    A.  No.
2    Q.  -- at the end of eight years?
3    A.  They forgive it over time.  It's not paid back.
4    Q.  It's a promissory --
5    A.  Yes.
6    Q.  -- note that --
7        In your discussions -- or maybe discussion,
8    conversation, with Merrill Lynch that you've been talking
9    about, was there ever any discussion of your deferred
10   comp that you might lose from RBC if you were to leave?
11   A.  No.
12   Q.  You then said -- I think one of the things you
13   said, It just never really felt right to -- to leave to
14   Merrill Lynch in this instance, but in other instances I
15   assume?
16   A.  Yes.
17   Q.  And it didn't feel right for your clients, is
18   what I thought you said.
19   A.  That's true.
20   Q.  Can you explain why you felt that way?
21   A.  New account numbers, new statements, new
22   checking accounts.  I'm a firm believer that people that
23   change firms do it for all the wrong reasons.  And it's
24   simply selfish.
25   Q.  I take it it's sort of implicit in your answer,

Page 47

1    is that if you were to leave yourself, that your clients
2    would -- would go with you?
3    A.  Yes.
4    Q.  And is that usual or unusual for the industry?
5    A.  No.
6    Q.  No to which?
7    A.  No, it's not unusual.  I know broker-dealers
8    think differently, but most clients are the broker's
9    clients and the broker-dealer believes it's their --
10   their clients.  But we got -- I think most brokers get a
11   fairly large percentage of their clients following them.
12   Q.  When you ultimately did leave RBC in 2012,
13   estimate what percentage of your clients moved with you?
14   A.  97.
15   Q.  Sounds like not much of an estimate.
16   A.  We tracked that pretty carefully.
17   Q.  I'm going to show you another document here.
18   A.  Do you want me to hold these?
19   Q.  You can leave them there.
20   A.  Okay.
21   Q.  There's a few we might come back to.
22   A.  Okay.
23   Q.  Probably not those exactly, but give me one
24   second.
25       Don't let this pile of papers scare you.  I'm

Page 48

1    not going to show you every one.  I promise.  We'd be
2    here for three days.
3            (Exhibit No. 22 marked for
4             identification.)
5        THE WITNESS:  Thank you.
6    Q.  (By Mr. Russell)  So you've been handed what I
7    believe is Exhibit -- Defense Exhibit 22.  Take a moment
8    to look at that, if you would.
9        Is this a document you recognize?
10   A.  Not really.
11   Q.  So it's Bates labeled -- the first page is
12   RBC-PAUL 9931.  For some reason it appears that it was
13   produced -- the first three pages are -- look, to me at
14   least, to be identical.  But it appears to be a letter
15   dated August 10th, 2012, from someone named Todd
16   Schwartz.
17       Do you see that?
18   A.  I do.
19   Q.  And the subject line is:  Brian Buskirk
20   resignation letter.
21   A.  I do.  It is.
22   Q.  Did you ever see this letter?
23   A.  Oh, I'm sure I did.
24   Q.  So in the text of the letter, it reflects that
25   you're resigning your position at RBC Capital Markets



1   Q. (By Mr. Russell) Just the execs in Canada or
2   where? I mean...
3   A. Not even so much the execs in Canada because
4   for years it wasn't the execs in Canada. I mean, we were
5   based in Minneapolis, though the bank is based, but I'm
6   talking about the people that ran the broker side of RBC.
7   I mean, you know, as brokers, we would talk all the time
8   about what Irv Weiser was being paid or Ron Tschetter was
9   being paid or...
10       But you know, it's -- it's ludicrous to sit
11  there and think that I'm not -- or didn't make good
12  money. But it's -- I just never felt like I was being
13  compensated by RBC. If anything, I thought they should
14  pay me more.
15       Q. To that point, you mentioned earlier that
16  each -- each year there was a grid, right, with a
17  percentage of a payout and that was set by RBC; right?
18       A. Yes.
19       Q. Do you think Marty Paul was a highly
20  compensated employee?
21       A. You know, once again, Marty was a manager. And
22  the only compensation I -- I would even relate to as far
23  as being highly compensated was his management fee that
24  he got from RBC. You know, he made a good living, but
25  it's hard for me to say that he was being compensated by

1   RBC because he was earning what he was making.
2       Q. Well, and that's not quite my question.
3       I mean, it's still compensation, is it not, the
4   commissions that you would receive?
5       A. I suppose define "compensation."
6       Q. Money paid for work performed, for example.
7       A. Money paid or money earned?
8       Q. Well, what would you -- how would you define
9   "compensation" in your own opinion?
10       A. I would say compensation is money paid. I
11  think what we did was money earned.
12       Q. Were you given a W-2 for the years that you
13  worked at RBC?
14       A. I was.
15       Q. Did that reflect compensation?
16       A. It did, but it -- it reflected it through
17  commissions.
18       Q. Who was on your -- who was the provider of your
19  W-2?
20       A. RBC or Dain.
21       Q. Do you believe that your total compensation in
22  a year paid by Dain or RBC falls within the definition of
23  compensation?
24       A. In the general sense, yes.
25       Q. So putting aside the source of it, whether it's

1   from your commissions versus your salary, collectively
2   did you consider yourself to be a highly compensated
3   employee?
4       MR. ROLLER: Object to the form.
5       You can answer.
6       A. I made a good living.
7       Q. (By Mr. Russell) What -- if you can recall,
8   and I recognize because it was commission-based it might
9   have varied, what would you think your average annual
10  income, compensation, whichever term you want to use, was
11  for the time period that you were -- let's say 2006 till
12  the time you left in 2012?
13       A. 350 to 400. You know, there were obviously
14  some years where it was more than that. For instance,
15  okay, so when RBC bought Dain Bosworth, we had a
16  three-year retention bonus from RBC. And mine, I think,
17  was about $150,000 a year. I was -- I was highly
18  compensated by RBC for that retention bonus because that
19  was given to me just because I chose to stay with RBC
20  based on my longevity and production at the company, at
21  Dain.
22       So then yes, I felt that I was being highly
23  compensated for staying. But that went away in three
24  years.
25       Q. In years -- in years you didn't have that

1   bonus?
2       A. Yeah.
3       Q. When you were earning the 350 to 400 -- I may
4   have asked this, so I apologize, but that's what we're
5   talking about -- did you consider that to be highly
6   compensated?
7       A. You know, I never thought about it. It was
8   just what I earned and what I made. But I -- I think
9   that I have felt for the last 20 years I've made a good
10  living. And if you want to take that as me saying I was
11  highly compensated, then that's fine.
12       Q. I want to check one -- show you one document
13  real quick here.
14           (Exhibit No. 23 marked for
15            identification.)
16       THE WITNESS: Thanks.
17       Q. (By Mr. Russell) So you've been handed what's
18  been marked Defendants' Exhibit 23. It's Bates labeled
19  RBC-PAUL 4374. Do you recognize this document?
20       A. I don't, but I mean, I'm sure I got it.
21       Q. Well, let's walk through. It's dated February
22  of 2001. It's your name there. I think that might be
23  the same address that you said is no longer current, but
24  was that a former address?
25       A. Yes, it was.



1    A.  Yes.
2    Q.  The third -- well, I guess it's more than a
3  third, but the next column is Retirement Plan Matches?
4    A.  Same.
5    Q.  And --
6    A.  Based on maximum length of service, full
7  participation.
8    Q.  And then the last is a total, which appears to
9  tally up the various percentages?
10    A.  It does.
11    Q.  Do you recall receiving this type of plan?
12    A.  I do.
13    Q.  Was that an annual publication?
14    A.  I -- I think it was.
15    Q.  And would this change year to year?  "This"
16  being the compensation plan?
17    A.  Not -- not every year, but, you know, usually
18  there were a little -- a few changes every other year or
19  things like that, but no, not every year.
20    Q.  Yeah.  Since we're already on this one, I'm
21  jumping -- jumping ahead a little bit, but if you'll go a
22  few pages in, the bottom right is RBC 6466.
23    A.  Okay.
24    Q.  And this is titled RBC US Wealth Accumulation
25  Plan Overview; do you see that?

1    A.  I do.
2    Q.  First sentence, The -- the WAP allows you to
3  share in the ongoing prosperity of the company while
4  providing you with an excellent opportunity to defer
5  compensation and build long-term wealth.
6      Would you agree with that statement?
7    A.  I would.
8    Q.  Maybe we'll just take a step back.
9      Can you tell me today what your recollection is
10  of the WAP and how it worked?  I know that's broad, but
11  what -- how did it operate?  How did you use it, for
12  example?
13    A.  Well, I think it's important to realize -- or
14  clarify you didn't have to use it.  I mean, you qualified
15  and you had the choice of using it or not.  It was based
16  on production.  It was a bonus.  You could fund it
17  personally out of your own income as another deferral,
18  and based on longevity and production, the company would
19  match that referral [sic] percentage.
20    Q.  Anything else that you remember?
21    A.  No.
22    Q.  And I take it -- well, I know, because we're
23  sitting here, you qualified for the WAP at least in some
24  years?
25    A.  I qualified -- so is this when it was

1  established?  2006?
2    A.  No.  I just offered you that one as an example
3  --
4    A.  Oh.
5    Q.  -- of the compensation plan.
6    A.  Yeah, I qualified for it every year.
7    Q.  And did you opt to use it every year?
8    A.  I did.
9    Q.  Why?
10    A.  Be able to defer income and participate in the
11  bonus.
12    Q.  This might seem like a dumb question, but in --
13  why was it a benefit to be able to defer income?
14    A.  Don't pay taxes on earnings, capital gains,
15  dividends, income, interest.  It's a qualified plan.
16    Q.  What does that mean?
17    A.  It defers taxes.  Doesn't forgive them, but it
18  defers them.
19    Q.  And as you said, dividends, gains, whereas in a
20  regular brokerage, you transfer or make a trade, you're
21  going to get a capital gains tax; that's all deferred?
22    A.  That's all deferred.
23    Q.  When you said "qualified," I think I asked what
24  that meant.  You said it means it defers taxes.  Is there
25  anything else that you mean by "a qualified plan"?

1    A.  No.
2    Q.  You -- I think you said this, but -- so if I
3  asked it, I apologize.  I know you said you qualified
4  every year, and then did you participate in every year
5  you qualified?
6    A.  I did.
7    Q.  You've mentioned the bonuses are paid into the
8  WAP.  There's also matching.
9      Did you make your own voluntary contributions?
10    A.  I did.  You had to get the bonus and the
11  matching.
12    Q.  Right.  I was going to say, "voluntary" seems
13  like you didn't have to, but you're saying in order to
14  get --
15    A.  Yes.  No, you didn't have to, but if you wanted
16  to participate in the plan to get the bonus and the
17  matching, you had to fund yourself.
18    Q.  And to be clear, the bonus and matching, that's
19  contributions from RBC?
20    A.  Yeah, exactly.
21    Q.  We can look at some documents here in a second,
22  but what were your options with respect to distributions
23  of the money you put into the WAP?
24    A.  I'm not sure I understand the question.
25    Q.  When you deferred money, when did you defer it



1  to?

2      A.  That's a good question.  I think you had an

3  option of deferring it to after 55 years old or 59 and a

4  half.  I'm not sure what the year.  Or there was a

5  five-year period I think you could take it.  I never

6  really gave that much thought because I never planned on

7  taking it early.

8      Q.  Okay.  I want to back up there.  So to your

9  recollection, the two options were what is essentially

10  retirement age?

11      A.  Yes.

12      Q.  Close to retirement age?

13      A.  Yeah.  Take them at retirement --

14      Q.  Or --

15      A.  -- or if, after 55, they allowed you to take a

16  certain percentage if you've been with the company for a

17  period of time.  I don't remember really how it was

18  structured in regards to distribution, but there were a

19  couple of different options which I don't really recall

20  specifically.

21      Q.  You did mention there's a five-year period that

22  you could take it.  What did you mean by that?

23      A.  I -- you know, I'm not really quite sure, but I

24  think that, once again, that the options were retirement

25  age or at 55.  If you had been in it for five years, you

1  could take -- start taking some distributions.  If you've

2  been --

3      Q.  While you were still employed?

4      A.  Yeah.  If you've been with the company for a

5  long enough period of time.

6      Q.  It's your recollection that -- that -- well, I

7  think what you said was you never planned to take it

8  early?

9      A.  No.

10      Q.  So do you recall that you deferred it all until

11  --

12      A.  I --

13      Q.  -- until when?

14      A.  -- still deferred it.  When I left RBC and what

15  I ended up getting, it's been deferred into my IRA.

16      Q.  You said what you "ended up getting."  So you

17  received a payout from the WAP?

18      A.  I did.

19      Q.  At what time?  Upon your departure from RBC?

20      A.  Yes.  I think three or four months later.

21      Q.  And how much -- do you recall now how much

22  it -- it was?

23      A.  I don't.

24      Q.  Well, we can look at it in a --

25      A.  Yeah.

1      Q.  -- second, but...

2          We talked about the -- the vesting period on

3  the retention unit program earlier where -- whereby if

4  you left the company before four years, you -- you lose

5  whatever's left.

6          Do you recall the WAP deferral being subject to

7  any vesting?

8      A.  My contribution was -- I think it had a

9  five-year vesting sched--- no.  I think my contribution

10  was not.  It was immediately vested, but the matching and

11  the bonus were at a five-year vesting schedule.

12      Q.  Again, probably simple because we talked about

13  it, but meaning that if you left the company before the

14  five years were up, whatever's not vested, what happened

15  to it?

16      A.  Goes away.

17      Q.  Where did you obtain this understanding of the

18  plan and how it worked?

19      A.  I think in documents like this (indicating).

20  And it's probably in here somewhere.

21      Q.  We can look at it in a -- in a second.

22          To -- to your knowledge today, was it -- did it

23  operate this way throughout the time you participated?

24      A.  It did.

25      Q.  Let's take a look.  So you were on the page.

1  It's -- it's 6466.  As I -- I think you probably hit on

2  most of these, actually.

3          I'm looking at the table there.  Sort of

4  gives -- it's titled At A Glance.  You've got the

5  component of the WAP, which the first one is the

6  productivity bonus; the second one is voluntary deferral.

7  I understand that to be what you mentioned, your

8  voluntarily deferral; is that right?

9      A.  That is right.

10      Q.  There's a production requirement there in the

11  second column, so to qualify for the WAP productivity

12  bonus, you had to produce at least 300,000 in fiscal year

13  2006.

14          Do you see that?

15      A.  I do.

16      Q.  We've already talked a little bit about your

17  production, but it was fairly -- well, nearly double

18  that, in most of your years at least?

19      A.  It was.

20      Q.  The second, it's still 300,000 to -- to be

21  eligible for the voluntary deferral in fiscal year 2005.

22          Do you see that?

23      A.  I do.

24      Q.  And then it's got the amounts that you're

25  allowed -- well, for the bonus that you might receive or



1 the -- the voluntary deferral that you're allowed to --
2 to defer.
3      The voluntary deferral says up to 30 percent of
4 your 2006 calendar year cash compensation.  Do you see
5 that?
6      A.  I do.
7      Q.  Do you recall what percentage of your
8 compensation you elected to defer?
9      A.  I don't.
10      Q.  And then I think, as you noted, there's a
11 company match column.  They would match the first
12 15 percent of your cash compensation of your voluntary
13 deferral.
14      See that?
15      A.  Mm-hm.
16      Q.  Just below that, there's matches on voluntary
17 deferral; do you see that?
18      A.  I do.
19      Q.  There's a premium match that says 5 to
20 40 percent match depending on production and years of
21 service on the first 15 percent of cash compensation
22 deferred.
23      Do you know what that means beyond what's
24 written there?
25      A.  No, other -- it's pretty self-explanatory.  I

1 think the premium match, the 5 to 40 percent range, was
2 based on production and years of service.
3      Q.  The -- then the last box there, Vesting:  The
4 2006 WAP productivity bonus and company matches are
5 credited to your WAP account in February of 2007 and
6 become fully vested five years later in January of 2017.
7 See that?
8      A.  I do.
9      Q.  And then as you have previously recalled, it
10 says, Voluntary deferrals of cash compensation are always
11 100 vested.
12      A.  That is correct.
13      Q.  Okay.  The last sentence there says, See WAP
14 enrollment information for complete details.
15      Do you recall getting an annual enrollment
16 package?
17      A.  You know, I don't, not after I initially just
18 started with the WAP, but I'm sure we got one, but I
19 don't remember.  You know, I don't remember looking.
20      Q.  Yeah.
21      A.  The only reason that I would look, I suppose,
22 is if I thought the percentages were changing, which they
23 really didn't.  But the productivity and length of
24 service time frames and numbers would change
25 periodically.

1      Q.  Okay.  Do you recall whether you had to elect
2 your distribution choice each year?
3      A.  Yes.
4      Q.  How did you go about doing that?
5      A.  They give you the parameters.  They give you
6 the options.  And I don't remember what the options were,
7 but I remember having the ability every year.  And you
8 could change one year to the next.
9      Q.  So if we're in 2017, I could take my WAP
10 deferral five years from now, but my next year's I could
11 take at retirement or --
12      A.  Yeah.  I mean, you -- you could change.  And I
13 always basically just ran mine out to the five-year
14 vesting.
15      Q.  And what do you mean by that?  You would take
16 it when it became vested at five years?
17      A.  Yeah.  Or -- or you had the ability to take it
18 at retirement.
19      Q.  How did you typically elect yours?
20      A.  I took it at retirement.
21      Q.  Did you make different elections for the RBC
22 contributions and your voluntary contributions?
23      A.  No.
24      Q.  Are you aware of any other WAP participants?
25 Do you know other people that participated?

1      A.  Sure.
2      Q.  Do you happen to know whether they elected
3 in-service as opposed to retirement?
4      A.  No.  No idea.
5      Q.  Wasn't something you talked about?
6      A.  No.
7      Q.  Okay.  There's a lot of pages to this one, but
8 we're not going to go through them all; don't worry.
9      (Exhibit No. 25 marked for
10           identification.)
11      THE WITNESS:  This is good stuff.
12      MR. RUSSELL:  Yeah.
13      THE WITNESS:  This just really takes me back.
14      MR. RUSSELL:  Yeah.
15      You can go ahead and take a look at that, but
16 I'm actually going to give you another one at the same
17 time and start with it.  I apologize for that.
18      So I think you've been handed what's been
19 marked --
20      THE COURT REPORTER:  Hold on a second.
21      MR. RUSSELL:  -- Exhibit 25.  And I'm also
22 going to be handing you what will be marked Exhibit 26.
23      (Exhibit No. 26 marked for
24           identification.)
25      Q.  (By Mr. Russell)  So, yeah, if you don't mind



1  from the deferred compensation plan.

2      Would you agree at least with that?

3      A.  I would.

4      Q.  Do you recall whether you received account

5  statements for your -- your WAP balance?

6      A.  I did.  What a great year.

7      Q.  I know.  I circled the --

8      A.  Up 50 percent.

9      Q.  I circled the 50 percent.  No, I wasn't going

10  to ask you about it, but that looked pretty good.

11      A.  I did that every year.  Gee --

12      Q.  We can show --

13      A.  -- whiz.

14      Q.  -- you things that say the contrary.

15      A.  Yeah.

16      Q.  So you said you did receive these.

17      How did you receive WAP account statements?

18      A.  In the mail to my address, 7646.

19      Q.  But you don't recall seeing this one in

20  particular?

21      A.  No, not this one in particular, but I know we

22  got them.

23      Q.  I wanted to ask you -- so the first page, we

24  can just start there I guess.  There's -- if you look at

25  this sort of summary right on the front, there's a --

1  one, two, three -- four lines down, a withdrawal of about

2  73,000 or so.  Do you see that?

3      A.  I do.

4      Q.  Do you happen to recall, I guess, first whether

5  you made a withdrawal in 2009?

6      A.  I don't.

7      Q.  So I take it then you wouldn't know why there's

8  a withdrawal reflected?

9      A.  I'm actually surprised there is.

10      Q.  So if we turn to -- each of these is -- well,

11  let's -- one more question there.  Your beginning balance

12  of the WAP that year was about 350,000.  Is that about

13  right?  353,000?

14      A.  Correct.

15      Q.  And your ending balance year end was 522,000.

16  See that?

17      A.  That's right.

18      Q.  Just below that it shows Additional

19  Information, Vested Balance.  See the 295,000?

20      A.  Correct.

21      Q.  What -- what do you understand that to be?

22      A.  Money that has been put in either by me or my

23  employer that's fully vested.

24      Q.  So with respect to the RBC side, it's been in

25  there for more than five years most likely?

1      A.  Correct.

2      Q.  The -- each of these is a fair number of pages,

3  but if you go to 4592, that is the -- a similar statement

4  for 2010.  See that?

5      A.  I do.

6      Q.  So jumping to the point:  Same line, there's a

7  withdrawal line, and it's just over a $101,000.  Do you

8  see that?

9      A.  I do.

10      Q.  Do you recall --

11      A.  I don't.

12      Q.  And similar to the last year then, I take it

13  you wouldn't have any reason to know why there's a

14  withdrawal?

15      A.  Unless I was overspending.  I don't remember

16  withdrawing, but who knows?

17      Q.  I don't need to go through every year, unless

18  you want to, but there are withdrawals in most years.

19  I'm -- what I'm wondering is whether those were

20  distributions from the WAP while you were in service at

21  RBC?

22      A.  I -- I would have to say I don't really know.

23      Q.  Okay.  Before we put this one away, if you go

24  to 4613, which is closer to the back, do you see that

25  one?

1      A.  I do.

2      Q.  So this is the statement for 2012.

3      First, there is a line for withdrawal again in

4  2012.  See that?

5      A.  I do.

6      Q.  We -- I think we covered this, but 2012 was the

7  year that you left RBC?

8      A.  Correct.

9      Q.  There's a forfeiture line this year of

10  approximately 297,000.  Do you see that?

11      A.  I do.

12      Q.  What do you understand that to be?

13      A.  The part of the wealth accumulation that was

14  forfeited to RBC.

15      Q.  Why was it forfeited, to your understanding?

16      A.  Probably not vested.

17      Q.  When you decided to leave RBC in 2012, did you

18  understand that one of the consequences would be that the

19  unvested amount would be forfeited?

20      A.  I did.

21      Q.  You did.

22      A.  I did.

23      Q.  Did it play a role in your decision to leave?

24      A.  No.

25      Q.  No.  Why's that?



Page 105

1    A.  Because the benefits of leaving were so much
2    greater than staying.
3         I -- I do want you to know that I -- I drank
4    the Kool Aid at RBC.  I really thought we were just the
5    best thing going on the street, and I still do, and I
6    really appreciated my years there, but the succession
7    agreement that RBC had was a three-year time frame.  And
8    I couldn't monetize my business fully through RBC's
9    succession plan.  In other words, they allowed me to sell
10   my business for a hundred percent of my trailing 12, or
11   one time my trailing 12.  And if you were to do that, the
12   person buying my business wouldn't have the opportunity
13   to make any money really themselves for three years
14   because they would be paying me.
15        What I've agreed to now is a 10-year payout but
16   two times trailing 12.  And it's a lot more amenable to
17   anybody by buying my book.  Also, my payout is so much
18   greater today than it was at RBC that I probably will
19   make up the loss of the 300,000 in a couple years.
20        Q.  When you say the payout in both instances, you
21   mean the money that will still accrue to you from your
22   clients once you are in --
23        A.  My payouts --
24        Q.  -- in succession?
25        A.  If we're -- I'm sorry.

Page 106

1    Q.  It's okay.  I do it too.
2    A.  My payout at RBC was 43 or 44 percent, the
3    payout.  Today it's 90.  So I'm really monetizing my book
4    at a very more substantial rate than I was at RBC.
5    Q.  And that was important to you as you near the
6    end of your career?
7    A.  You know, that wasn't as important to me as the
8    ability to have a better succession plan.  And I
9    guarantee you that myself, as well as numerous other
10   people, had the conversation with RBC that they had to do
11   something about their succession plan product, that it
12   wasn't amenable.
13        Q.  Can you explain a little bit more why?  You
14   mentioned the difference in the hundred percent of your
15   trailing 12 versus two times.
16        A.  So -- so, for instance, if -- if I got one-time
17   book value, my payment would have been 800,000.  They
18   gave that time frame three years to get paid out.  So
19   whoever bought my book was going to have to come up with,
20   you know, 400,000 -- 300- -- 280,000, whatever the number
21   is, on an annual basis.  Because of RBC's payout, they
22   can't really monetize the business themselves and pay me
23   also.
24        So whoever bought my book is going to be paying
25   me 280,000, but the book's only generating 320.  So

Page 107

1    they're only making $40,000 a year for three years, with
2    the risk of my book not being successful or not being
3    able to monetize the business, where now, because the
4    payout is so much greater with where I'm at, I can go
5    ahead and step up and take that over a 10-year period and
6    the number doesn't really dissuade anybody buying my book
7    from making a good living while they're buying my book.
8    Q.  I see.  If I could summarize, so because you
9    can stretch it over 10 years, you can earn yourself
10   over that time period?
11   A.  Yeah.
12   Q.  And the person purchasing your book can spread
13   that amount over 10 years instead of three?
14   A.  Yeah.  For instance, you know, after all costs,
15   my payout's probably 73 percent.  And on 800,000 -- let's
16   just round it out and say it's $575,000.  That money is
17   in my business with my Buskirk Wealth.  He has the
18   ability to pay me a certain amount of money on an annual
19   basis and still make a very good living himself.  I mean,
20   the minute I retire and go into our succession agreement,
21   his income will double.  Probably more than double --
22        Q.  Mm-hm.
23        A.  -- so he can't wait.
24        Q.  He's begging for the early --
25        A.  No, he's not.  He's not really, but I'm sure

Page 108

1    he's totally aware of it.
2    Q.  So circling back to the -- when you left RBC,
3    on this 2012 account, there does remain a vested balance,
4    if you look at 4613, of $215,330.
5    A.  They paid that out.
6    Q.  That was my next question.  So that -- you
7    received that.  I think you referred to that earlier
8    when -- a few months after you left?
9    A.  Yeah.
10   Q.  Okay.  We've seen a few places the eligibility
11   to participate in the WAP, so for the one year I think we
12   looked at, it was $300,000.
13        Do you recall over time whether that changed,
14   $300,000 production?
15        A.  I -- I don't exactly, but I know it changed.
16   And -- and part of that is inflation.  I mean, the market
17   itself -- I mean, when I started with the market, Dow was
18   at a thousand.  And nobody was -- very few people were
19   doing a hundred thousand gross a year.  And they had to
20   be flexible in the amounts on the wealth accumulation
21   because if they -- if they left it at the numbers that
22   they maybe originally started with, you know, 10 years
23   later everybody qualified.
24        Q.  Right, because the production is correlated
25   with the performance?



Page 137

1    Do you remember whether they would forfeit
2  their WAP benefits that are invested when they left?
3    A. I don't, but I'm sure they did.
4    Q. But it wasn't something you ever discussed with
5  them?
6    A. No, no.
7    Q. How about when you left RBC in 2012 and you had
8  been recruited by Mr. Paul; did the two of you discuss
9  what would happen with your WAP benefits when you left?
10    A. I knew what was going to happen with my
11  benefits. And, yeah, we discussed it and -- you know, we
12  ran the numbers, and I didn't agree with it. And a part
13  of it is because when you look at some of this
14  documentation, it was always RBC's pitch that your
15  payouts were greater than 50 percent because of the WAP.
16  And I always figured that that was part of my
17  compensation. And I knew, though, that I would lose what
18  I lost, but I didn't agree with it.
19    Q. Mm-hm. Assuming you qualified, or anyone, a
20  broker, qualified every year and contributed into the
21  WAP, there always would have been some amount unvested,
22  right, because each year's would have been subject to the
23  next five years' vesting period?
24    A. But if you retired, you got the fully --
25  fully -- the full amount.

Page 138

1    Q. Okay. So yes to the first question?
2    A. Yes to the first question.
3    Q. The vesting accelerated if you --
4    A. Retired.
5    Q. -- met qualifications --
6    A. Yeah.
7    Q. -- for retirement?
8    A. Yeah.
9    Q. Okay. When you had the discussions with
10  Mr. Paul about the WAP, what -- what did those entail?
11  What did you talk about?
12    A. Just the fact that I -- I knew what I was
13  losing and just that what I was getting would more than
14  make up for what I was losing.
15    Q. And that's what you meant by "ran the numbers"?
16    A. Yeah.
17    Q. When you say what you were getting, what does
18  that mean?
19    A. Increased payout, ability to run our own firm.
20    Q. Okay. Anything else that you remember?
21    A. No.
22    Q. At some point -- well, I should back up.
23    When -- when did you learn about your WAP
24  forfeiture?
25    A. I think most people already -- always knew it

Page 139

1  was there. And it was part of --
2    (Cell phone interruption.)
3    THE WITNESS: I'm sorry.
4    Part of the structure.
5    MR. RUSSELL: You want to grab it?
6    THE WITNESS: No, I would just silence it, but
7  if you don't mind it ringing for a second --
8    MR. RUSSELL: Okay.
9    THE WITNESS: -- or two.
10    MR. RUSSELL: Sure.
11    Q. (By Mr. Russell) I guess my question probably
12  wasn't very clear, but when do you recall being told
13  formally that you were going to be forfeiting the --
14    A. No.
15    Q. -- unvested amount?
16    A. No. Other than this document that you showed
17  earlier that showed the forfeiture.
18    Q. Your account statement?
19    A. Yeah. I didn't really know what that number
20  would be in a finalization, but I knew it was probably
21  somewhere around 300,000.
22    Q. Well, if we could pull out your -- your
23  resignation letter again, it was Exhibit 22, I believe.
24    A. (Witness complies.)
25    Q. Okay. Did you find that?

Page 140

1    A. I did.
2    Q. This is on the letterhead and -- and signed
3  by -- letterhead of Schwartz Law Group and the attorney
4  is Todd Schwartz.
5    So I take it you retained an attorney at some
6  point?
7    A. No, I didn't. That was -- came from Northwest.
8    Q. And can you describe what you mean by that?
9    A. He -- I'm sure he was employed by Northwest as
10  their legal counsel, and they -- they sent out the letter
11  of resign-- -- resignation. I didn't see it or they let
12  me know they were going to do it.
13    Q. Okay. And it says here in this paragraph, the
14  last full paragraph, The investment advisory firm he will
15  be joining is a member of the protocol.
16    That firm would be Northwest then --
17    A. Yes.
18    Q. -- to your understanding?
19    A. Yes.
20    Q. Okay.
21    A. This was a sad day for me. It really was.
22    Q. Yeah.
23    A. I'd been with them for a very long time, and
24  I'd been intimately involved with everybody at RBC and
25  the growing of RBC and Dain, and I didn't do it lightly.



Page 153

1  We're now back on the record.

2

3        MR. RUSSELL:  I don't have any more questions.

4        MR. ROLLER:  No questions.

5        THE VIDEOGRAPHER:  This concludes today's

6  proceedings.  The time is 12:52 p.m.  And we're going off

7  the record.

8              (Signature reserved.)

9              (Deposition concluded at

10               12:52 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

Page 154

1  STATE OF WASHINGTON )
                       ) ss
2  County of King      )

3        I, Eva P. Jankovits, the undersigned Washington
   Certified Court Reporter, pursuant to RCW 5.28.010 authorized
   to administer oaths and affirmations in and for the State of
4  Washington, do hereby certify:

5        That the annexed and foregoing deposition of BRIAN
6  W. BUSKIRK was taken before me and completed on
   April 28, 2017, and thereafter was transcribed under my
7  direction;

8        I further certify that according to CR 30 (e) the
   witness was given the opportunity to examine, read and sign
9  the deposition after the same was transcribed, unless
   indicated in the record that the review was reserved;

10

11        I further certify that I am not a relative or
   employee of any such attorney or counsel, and that I am not
   financially interested in the said action or the outcome
12  thereof;

13        I further certify that the witness before
   examination was by me duly sworn to testify the truth, the
14  whole truth and nothing but the truth;

15        I further certify that the deposition, as
   transcribed, is a full, true and correct transcript of the
16  testimony, including questions and answers, and all
   objections, motions and exceptions of counsel made and taken
17  at the time of the foregoing examination and was prepared
   pursuant to Washington Administrative Code 308-14-135, the
18  transcript preparation format guideline;

19        I further certify that I am herewith securely
   sealing the said deposition and promptly delivering the same
20  to Attorney Matthew A. Russell.

21        IN WITNESS WHEREOF, I have hereunto set my
   signature this 9th day of May, 2017.

22

23

   _____
24  Eva P. Jankovits, Certified Court Reporter No. 1915
   in and for the State of Washington, residing in
   Seattle, Washington.
25  My CCR certification expires 7/3/17.

---

Page 155

1  Our Assignment No.  J0560823

2

3  Case Caption:  PAUL, ET AL. Vs. RBC CAPITAL MARKETS, LLC, ET
   AL.

4

5

6        DECLARATION UNDER PENALTY OF PERJURY

7        I declare under penalty of perjury that I have read the

8  entire transcript of my deposition taken in the

9  above-captioned matter or the same has been read to me, and

10  the same is true and accurate, save and except for changes

11  and/or corrections, if any, as indicated by me on the

12  DEPOSITION ERRATA SHEET hereof, with the understanding that

13  I offer these changes as if still under oath.

14

15  Signed on the _____ day of _____, 2017.

16

17  _____

18  BRIAN W. BUSKIRK

19

20

21

22

23

24

25

---

Page 156

1              DEPOSITION ERRATA SHEET

2

3  Page No.____Line No.____Change to:_____

4  _____

5  Reason for change:_____

6  Page No.____Line No.____Change to:_____

7  _____

8  Reason for change:_____

9  Page No.____Line No.____Change to:_____

10  _____

11  Reason for change:_____

12  Page No.____Line No.____Change to:_____

13  _____

14  Reason for change:_____

15  Page No.____Line No.____Change to:_____

16  _____

17  Reason for change:_____

18  Page No.____Line No.____Change to:_____

19  _____

20  Reason for change:_____

21  Page No.____Line No.____Change to:_____

22  _____

23  Reason for change:_____

24        SIGNATURE:_____DATE:_____

25              BRIAN W. BUSKIRK


ESQUIRE
DEPOSITION SOLUTIONS

# Exhibit F

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| BRENDA TOLBERT, | § | |
| | § | |
| Plaintiff | § | |
| | § | Case No.:  4:11-CV-00107 |
| v. | § | |
| | § | Judge Keith P. Ellison |
| RBC CAPITAL MARKETS | § | |
| CORPORATION n/k/a RBC CAPITAL | § | |
| MARKETS, LLC, ET AL., | § | |
| Defendants. | § | |
| | § | |
| | § | |

## DECLARATION OF GABRIELA SIKICH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Gabriela Sikich, declare pursuant to 28 U.S.C. § 1746 that the factual statements set forth below are true and correct to the best of my knowledge, information and belief:

1.     I am over the age of 18.  I have personal knowledge of the facts stated in this Declaration, and if called to testify to these facts, I would be competent to do so.

2.     I am currently employed by RBC Capital Markets Corporation as a U.S. Defined Contribution Plan Manager.  I have held my current position since December 2005.

3.     In my position as Defined Contribution Plan Manager, I have certain responsibilities concerning the RBC-sponsored benefit plans, including the Royal Bank of Canada U.S. Wealth Accumulation Plan ("WAP").  Based on my years of experience with the WAP, I am familiar with its terms and operation.

DB1/ 68692132.1

RBC-PAUL000011925

4.     In each year a participant participates in the WAP, he or she is asked to make an election as to whether he will receive a distribution of his or her voluntary deferrals and/or company contributions from that year while still employed by RBC ("in-service" distribution), or instead, after he or she leaves the company ("retirement" distribution).  If the participant does not make an election one way or the other, then by default, his or her voluntary deferrals and company contributions for that year will be designed for in-service distribution.

5.     However, for the 2007, 2008 and 2009 Plan years, the WAP's operation mandated that company contributions made to Financial Consultants and Branch Directors whose qualifying production was between $300,000 and $350,000 had to be designated for in-service distribution, and could not be designated for retirement distribution.

6.     I have reviewed information available to me in my position at RBC reflecting WAP participants' annual distribution elections.   In each Plan year for which complete information is available, including 2007-2011, the majority of WAP participants elected "in-service" distributions of their voluntary deferrals and company contributions.  This information is summarized in the chart below:

| Plan Year | In-Service Distribution | Retirement Distribution | Percent In-Service |
|---|---|---|---|
| 2007 | 741 | 677 | 52.26% |
| 2008 | 862 | 820 | 51.25% |
| 2009 | 971 | 605 | 61.61% |
| 2010 | 857 | 436 | 66.28% |
| 2011 | 505 | 467 | 51.95% |

DB1/ 68692132.1

CONFIDENTIAL

RBC-PAUL000011926

7.      Each year, in or around mid-November, the benefits department identifies those employees who will be eligible for and invited to participate in the following year's WAP based, generally, on their compensation or production over the past year.  In addition, employees who are hired throughout the course of the Plan year will be deemed immediately eligible to participate in the WAP, depending on their production at their prior employer or based on the terms of their hire at RBC.  For example, Financial Consultants hired during the 2008 Plan year became immediately eligible to participate in the 2008 WAP if their "trailing twelve-month production" at their prior employer exceeded $300,000.  Likewise, non-production employees hired during the 2008 Plan year became immediately eligible to participate in the 2008 WAP if the terms of their hire guaranteed that they would receive annual cash compensation of more than $150,000.

8.      Because eligibility for the WAP was determined anew each Plan year, it was common for employees to be eligible for and participate in the WAP in some Plan years, but not in others.  Under no circumstances were employees permitted to be "grandfathered" into the WAP based on their eligibility in previous Plan years.

9.      Because the WAP was an important tool for attracting and retaining Financial Consultants, RBC sought out feedback from these individuals with respect to potential changes to the WAP.  RBC obtained this feedback both informally and through formal focus group discussions.  Over the years, participant feedback resulted in substantive changes to the WAP, including but not limited to:  (1) additional investment options were added to the WAP; (2) the number of investment "exchanges" that could be made within the WAP each year was increased; (3) matching contributions were eliminated in favor of an increased Productivity Bonus rate and the addition of a Loyalty Bonus.

DB1/ 68692132.1

RBC-PAUL000011927

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 25th day of January, 2012.

_____
Gabriela Sikich

DB1/ 68692132.1

CONFIDENTIAL

RBC-PAUL000011928

# Exhibit G



Exhibit [illegible]
Witness SIKICH, G.
Date 7.11.2017
Buell Realtime Reporting
(206) 287-9066

# RBC U.S. Wealth Accumulation Plan
# For Financial Consultants & Branch Directors

The RBC U.S. Wealth Accumulation Plan (WAP) is among the most innovative and attractive deferred compensation vehicles in our industry. The WAP is also an integral part of your RBC Total Rewards package at RBC Wealth Management. It is a simple plan which gives you freedom and flexibility to manage your cash flows by choosing how much you voluntarily defer without impacting the company contributions you receive.

The following chart is provided to give you a summary of the 2011 WAP. Please review the full Plan Document and Prospectus for the actual terms and conditions of the Plan. The Wealth Calculator is available to model how the WAP could work for you. The full WAP Plan Document and Prospectus along with the Wealth Calculator are located on the FC Compensation Plan Documents, Forms & Calculators link on the Reports tab of LaunchPad.

| 2011 WAP Components Summary | | | | | |
|---|---|---|---|---|---|
| Component | Range | Eligibility | Investment Options | Date Credited to WAP Account | Vesting Periods |
| **Productivity Bonus** | Up to 5% of FY 2011 production (see Productivity Bonus Grid) | FY 2011 production of at least $400,000 | Invested in the same allocation as Voluntary Contributions | February 29, 2012 | 100% vested on January 1, 2017 |
| **RBC Loyalty Bonus** | Up to 4% of FY 2011 production (see RBC Loyalty Bonus Grid) | FY 2011 production of at least $400,000 | RBC Share Account | February 29, 2012 | 100% vested on January 1, 2017 |
| **Voluntary Contributions** | 0 – 50% of WAP eligible compensation | Prior Year (FY 2010) production of at least $400,000 | Participant chooses allocation among the plan's investment options | Each payroll period | Contributions and investment gain/loss always 100% vested |

## ANNUAL ENROLLMENT

Annual WAP enrollment for eligible financial consultants and branch directors occurs each December. During the enrollment process, eligible FCs and BDs may enroll in Voluntary Contributions, make investment elections and make distribution elections for Voluntary Contributions and WAP bonuses.

If you choose not to enroll for Voluntary Contributions in 2011, you should still make a distribution election for your Productivity Bonus and RBC Loyalty Bonus. If no distribution election is made, they will default to an in-service distribution valued on July 1, 2017.

## BENEFICIARY ELECTIONS

You are encouraged to make beneficiary elections in both your WAP and 401k accounts online at www.netbenefits.com. After you enroll in the WAP, you will be able to click on a link from the confirmation page that will take you to the Beneficiary section of your profile to update or assign your beneficiary. You can also access the Beneficiary section of your profile at any time by clicking on the "Your Profile" tab. Only beneficiary elections made online will be reflected in the Beneficiary section of your profile.

*RBC Wealth Management 2011 Financial Consultants & Branch Director Wealth Accumulation Plan* 1

**PRODUCTIVITY BONUS**

- The Productivity Bonus is based on your 2011 fiscal year production. See the 2011 Productivity Bonus grid below for details.

- The bonus is credited to your WAP account using the same investment elections you have in place for Voluntary Contributions. If you do not have an investment election in place, your Productivity Bonus will be invested in the RBC Interest Account. You have the ability to transfer balances in and out of the RBC Interest Account. See the section on investment transfers on page 4 for details.

- You must be employed as an RBC Wealth Management financial consultant or branch director on October 31, 2011 to be eligible for the 2011 Productivity Bonus. The bonus will be credited to your WAP account on February 29, 2012 and becomes 100% vested on January 1, 2017, after a five-year cliff vesting period.

| 2011 Productivity Bonus Grid | | |
|---|---|---|
| **Fiscal Year Gross Production** | | **Productivity Bonus** |
| **From** | **To** | |
| Over $5,000,000 | | 5.00% |
| $2,500,000 | $4,999,999 | 4.50% |
| $2,000,000 | $2,499,999 | 4.00% |
| $1,250,000 | $1,999,999 | 3.50% |
| $1,000,000 | $1,249,999 | 3.25% |
| $600,000 | $999,999 | 3.00% |
| $400,000 | $599,999 | 2.25% |

**RBC LOYALTY BONUS**

- The RBC Loyalty Bonus is based on your level of production and length of service as a financial consultant or branch director with RBC. See the 2011 RBC Loyalty Bonus grid below for details.

- This bonus is credited into the RBC Share Account.

- You must be employed as an RBC Wealth Management financial consultant or branch director on October 31, 2011 to be eligible for the bonus. The 2011 RBC Loyalty Bonus will be credited to your WAP account on February 29, 2012 and becomes 100% vested on January 1, 2017, after a five-year cliff vesting period.

| 2011 RBC Loyalty Bonus Grid | | | | | | |
|---|---|---|---|---|---|---|
| | | **Years of Service**[1] | | | | |
| **2011 Production Basis** | **2010 Levels**[2] | **< 6** | **6-10** | **11-15** | **16-20** | **21+** |
| 2011 Chairman's Council[3] | 1,173,858 | 2.00% | 2.50% | 3.00% | 3.50% | 4.00% |
| 2011 President's Council[3] | 711,244 | 1.50% | 2.00% | 2.50% | 3.00% | 3.50% |
| 2011 Director's Council[3] | 533,433 | 1.00% | 1.50% | 2.00% | 2.50% | 3.00% |
| $400,000 | 400,000 | 0.25% | 0.50% | 0.75% | 1.00% | 1.25% |

[1] Years of Service is defined as the number of full calendar years completed as an RBC Wealth Management FC or BD as of December 31, 2011. The calendar year in which you were hired is counted as one full year of service. For example, if you were hired on December 18, 2010, you would earn two years of service toward the 2011 RBC Loyalty Bonus.

[2] Recognition levels will be based on 2011 fiscal year-end results. 2010 production is shown for illustration purposes only.

[3] See Award Programs in the 2011 FC Compensation Plan for a description of these recognition levels.

TOLBERT0000641

## EMPLOYEE VOLUNTARY CONTRIBUTIONS

WAP offers you the choice to contribute up to 50% of your total WAP-eligible compensation[4], allowing you to significantly increase your total wealth accumulation over the course of your career at RBC.

To be eligible for participation in 2011 WAP Voluntary Contributions, financial consultants and branch directors must have fiscal year 2010 production of at least $400,000. Those who joined RBC in fiscal year 2010 must have trailing twelve month production at their prior firm of at least $400,000 to participate in 2011 Voluntary Contributions.

### Key points on employee Voluntary Contributions:

- You do not have to make Voluntary Contributions to receive WAP bonuses.

- Contributions are pre-tax, so they lower your taxable wages.

- You are always 100% vested in your Voluntary Contributions and any related earnings/losses.

- Your 2011 WAP contribution rate election applies to all WAP-eligible compensation[4] paid to you from January 1, 2011 through December 31, 2011.

- You cannot change your WAP Voluntary Contribution election intra-year.

*Note: [4] WAP-eligible compensation includes commission-based earnings, transitional pay, FC recruiting bonuses, and Branch Director salary and bonuses. Excluded from WAP-eligible compensation are the following: income from stock options, forgivable loan payments, expense allowances, moving expense payments, and non-cash payments. See the RBC U.S.A. Retirement and Savings Plan summary plan description available online at www.netbenefits.com for further details.*

## INVESTMENT FLEXIBILITY

The WAP offers a wide range of investment options for your Productivity Bonus and Voluntary Contributions, listed in the chart below. You can find detailed information on the investment options in the Investment Summary or online at www.netbenefits.com.  The RBC Loyalty Bonus is automatically credited into the RBC Share Account.

There is an additional fee associated with all options other than the RBC Share Account and RBC Interest Account because of the cost of offering these options in the plan.  25 basis points (bps) per year will be deducted on a quarterly basis (6.25 bps per quarter). The amount of the quarterly fee will be determined by multiplying the value of your mutual fund accounts at the end of the quarter by 6.25 bps.

| Investment Name | Ticker | Investment Name | Ticker |
|---|---|---|---|
| American Balanced Class A | ABALX | Jensen Portfolio Class I | JENIX |
| American EuroPacific Growth Class A | AEPGX | Managers Systematic Value Instl Class | MSYSX |
| American Fundamental Investors Class A | ANCFX | Metropolitan West Total Return Bond Cl I | MWTIX |
| American Growth Fund of America Class A | AGTHX | RBC Interest Account | N/A |
| Artisan International Value | ARTKX | RBC Share Account | RY |
| BlackRock Global Allocation Class A | MDLOX | RBC SMID Cap Growth Fund Class I | TMCIX |
| BlackRock Small Cap Growth Equity Inst C | PSGIX | T. Rowe Price Mid Cap Growth | RPMGX |
| Eagle Mid Cap Stock Class I | HMCJX | Third Avenue Small Cap Value | TASCX |
| Fidelity Select Gold Portfolio | FSAGX | Vanguard Inflation Protected Sec Adm | VAIPX |
| Fidelity U.S. Equity Index Commingled Pool | N/A | Vanguard Institutional Index Fund Inst'l | VINIX |
| Invesco Van Kampen Comstock CL Y | ACSDX | Vanguard Windsor II Fund Admiral | VWNAX |
| Invesco Van Kampen Small Cap Growth CL Y | VISCX | Virtus Mid-Cap Value Class A | FMIVX |

### Default Investment Elections

If you do not make an investment election for your Productivity Bonus and Voluntary Contributions, the investment election will default to the RBC Interest Account.

*RBC Wealth Management 2011 Financial Consultant & Branch Director Wealth Accumulation Plan  3*

TOLBERT0000642

**Investment Transfers – Up to 12 Transfers per Year**

- You can transfer any existing balances in your WAP account related to your Productivity Bonus and Voluntary Contributions up to 12 times per calendar year.
- You can transfer existing balances in your Productivity Bonus and Voluntary Contributions into and out of any investment option, including the RBC Share Account.
- You have the option to change your investment elections to determine how your future Productivity Bonus and Voluntary Contributions are invested.

## Restrictions on the RBC Share Account

- Starting January 1, 2011 RBC Share Account restrictions will be lifted for participants who are at least age 55 to allow for greater flexibility as you plan for retirement. You will still be limited to 12 transfers per year.
- The RBC Loyalty Bonus must remain in the RBC Share Account until you turn age 55 or retire from RBC.
- All Fixed and Premium Match contributions from previous plan years must remain in the RBC Share Account until you turn age 55 or retire from RBC.

You can view your account, transfer existing balances or change investment elections for future contributions online at www.netbenefits.com.

## DISTRIBUTION OPTIONS

You will make a distribution election for each type of contribution you are eligible for in 2011. You can make a different election for your Productivity Bonus, RBC Loyalty Bonus, and Voluntary Contributions. All distributions are valued on July 1 and paid as soon as possible after this date.

If you choose not to enroll for Voluntary Contributions in 2011, you should still make a distribution election for your Productivity Bonus and RBC Loyalty Bonus. If no distribution election is made, they will default to be paid as an in-service distribution valued on July 1, 2017.

**You have two choices for your distribution options:**

**1) Retirement Distribution**

With a retirement distribution, you spread your WAP distribution over 1 to 10 years after you leave RBC if you satisfy the "Rule of 60." To satisfy the Rule of 60, your age plus your years of service with any RBC company must equal 60 or more at the time you separate from service. If you elect the retirement distribution option and leave RBC prior to reaching the Rule of 60, WAP payments will be made in one lump sum valued on July 1 in the year after your separation from service. If you want a retirement distribution for any of your 2011 contributions, you must make the election at the time you enroll in the plan for 2011.

**2) In-Service Distribution**

The in-service distribution allows you to receive your 2011 WAP distribution in one lump sum while you are still employed with RBC. Your 2011 WAP balance will fully vest in 2017, so the earliest in-service valuation date you can elect without losing any company contributions is July 1, 2017.

**You must be employed on the in-service date you select to receive the payment. If you separate from service prior to the in-service date selected, WAP payments will be made in one lump sum valued on July 1 in the year after you leave.**

Changes can be made to your in-service distribution dates after your original election. However, the following rules will apply:

- Any new date must be at least five years after the current distribution date on file.
- All changes must be made by June 30 in the year before the distribution is scheduled to occur. For example, you would need to change a July 1, 2017 distribution date by June 30, 2016. An e-mail reminder will be sent to notify you that this date is approaching.
- You will be allowed to change in-service distribution dates more than once, but the new distribution date you elect must always be at least five years after the distribution date on file.

*RBC Wealth Management 2011 Financial Consultant & Branch Director Wealth Accumulation Plan  4*

**EARLY VESTING OF COMPANY CONTRIBUTIONS**

Your entire balance in the WAP will vest under the following situations:

1) **Approved Retirement**

   You will become fully vested in your entire WAP balance[5] if you satisfy the Rule of 60 (your age plus your years of service with any RBC company equals 60 or more at the time you separate from service) and are offered, and sign, a one-year non-compete agreement. Contact RBC U.S. Retirement & Benefits Administration for a copy of the non-compete agreement.

2) **Business Transition**

   You will become fully vested in your entire WAP balance[5] at the time you separate from service if you participate in the Business Transition program.

3) **Death**

   If you pass away while employed with RBC, your entire account balance will become vested and paid in one lump sum to your beneficiary(ies) as soon as administratively possible. If you pass away after you leave RBC, but prior to your account being fully distributed, the entire balance remaining in your account will be paid in one lump sum to your beneficiary(ies) as soon as administratively possible.

4) **Disability**

   You will become fully vested in your entire WAP balance if you qualify for RBC's Long Term Disability (LTD) plan and remain on LTD for 12 consecutive months. Your entire WAP balance will be vested and paid to you in one lump sum within 90 days after 12 consecutive months on LTD.

*Note:*   [5]*Excluding amounts specifically precluded from early vesting by contract, including but not limited to acquisition related contributions.*

**TAX CONSIDERATIONS**

All of your Voluntary Contributions are made on a pre-tax basis, meaning that they lower your taxable income and are not subject to federal and state income taxes until distributed, under current tax laws. In addition, you do not pay federal or state taxes on your earnings, reinvested dividends or company contributions until you receive a distribution.

**FICA Taxes**

Social Security and Medicare ("FICA") taxes are withheld from your Voluntary Contributions at the time the deduction is made from your paycheck.

FICA taxes must be paid on WAP company contributions in the year that they become vested and no longer subject to forfeiture as follows:

▪ **Current Employees**:  In the year of vesting, any applicable FICA tax will be withheld from your November paycheck.

▪ **Employees who leave RBC before November in the year of vesting**: FICA tax from amounts vested earlier in the year will be prorated and withheld from any paychecks (including business transition payments, if applicable) you receive after you leave.  If RBC cannot recover FICA taxes from remaining paychecks, they will be deducted from the net pay of your WAP distribution.

   If you have an early vesting event and become fully vested in your company contributions, FICA taxes will be due on these newly vested amounts. RBC will withhold a prorated portion of the FICA tax from any paychecks (including business transition payments, if applicable) you receive after you leave.  If RBC cannot recover FICA taxes from remaining paychecks, they will be deducted from the net pay of your WAP distribution.

CONFIDENTIAL                                                                    TOLBERT0000644

**Federal, State, and Local Tax Withholding on WAP Distributions**

When you receive a WAP distribution, applicable federal, state, and local taxes will be withheld. The distribution will be treated as ordinary income in the year it is distributed and will be reported on a form W-2.

- Federal tax will be withheld from your payment at a rate of 25%. A rate of 35% will be withheld on annual supplemental wages (bonus and lump sum payments) over $1,000,000 received from RBC during a calendar year.

- If you have lived in the same state since you began participating in the WAP and have only worked in one location, RBC will withhold state and local taxes, if applicable, in the same manner as your regular pay checks.

- If you have lived in multiple states or traveled outside your state of residence for work, RBC may be required to withhold state and local taxes on WAP distributions based on:

    1) Your state of residence in the year contributions vested; and

    2) Non-resident tax withholding for the states you traveled to for work in the year the contributions vested.

    Your state of residence will be based on RBC's payroll records and your travel will be based on the annual travel survey you complete. You may be required to file multiple state tax returns if you have lived in multiple states or traveled outside your state of residence for work. Please consult your tax advisor for all questions about your personal tax situation.

**This document should not be considered as providing tax advice. You should consult your tax advisor to discuss your personal financial situation.**

**Information provided in this summary is subject to change.**

**This document does not constitute a prospectus nor an offer or solicitation to invest in the RBC U.S. Wealth Accumulation Plan. Before investing, please read the RBC U.S. Wealth Accumulation Plan Document and Prospectus. A copy is available online at www.netbenefits.com. You also may wish to consult with your tax advisor to discuss your specific financial situation.**

CONFIDENTIAL

TOLBERT0000645

# Exhibit H

# Amended and Restated

## Royal Bank of Canada

## US Wealth Accumulation Plan

## And Prospectus

---

## The date of this document is NOVEMBER 1, 2010

This document constitutes part of
a prospectus covering securities
that have been registered under
The Securities Act of 1933

RBC Financial Group

## TABLE OF CONTENTS

**Page**

SECTION 1 INTRODUCTION ....................................................................................1
   1.1   General Nature and Purpose of the Plan ..........................................................1
   1.2   Definitions...........................................................................................................1
   1.3   Rules of Interpretation ......................................................................................5

SECTION 2 DEFERRALS AND DEEMED INVESTMENTS......................................5
   2.1   Eligibility............................................................................................................5
   2.2   Election to Voluntarily Defer Compensation ..................................................5
   2.3   Mandatory Deferral of Compensation .............................................................6
   2.4   Election of Investments......................................................................................6
   2.5   Intra-Plan Transfers .........................................................................................6
   2.6   Company Contributions .....................................................................................6

SECTION 3 INFORMATION CONCERNING INVESTMENT ALTERNATIVES ...................7
   3.1   Company Common Shares..................................................................................7
   3.2   Plan Interest Rate ..............................................................................................8
   3.3   Mutual Funds .....................................................................................................8
   3.4   Valuation ............................................................................................................8

SECTION 4 VESTING................................................................................................9
   4.1   Vesting of Voluntary Deferred Compensation ...............................................9
   4.2   Vesting of Mandatory Deferred Compensation and Company Contributions................9
   4.3   Termination For Cause ......................................................................................9
   4.4   Terminations Due to Restructuring...................................................................9
   4.5   Change in Control ............................................................................................10
   4.6   Forfeitures ........................................................................................................10

SECTION 5 DISTRIBUTIONS ...............................................................................10
   5.1   Distributions.....................................................................................................10
   5.2   Distribution Dates............................................................................................10
   5.3   Distribution Due to a Change In Control .......................................................12
   5.4   Form of Distributions.......................................................................................12
   5.5   Distributions to Beneficiaries .........................................................................13
   5.6   Designation of Beneficiary ..............................................................................13
   5.7   Disclaimers by Beneficiaries ...........................................................................14
   5.8   Federal Income Tax .........................................................................................14
   5.9   Tax Withholding ..............................................................................................15
   5.10 ERISA Matters .................................................................................................15

SECTION 6 SPENDTHRIFT PROVISIONS ...........................................................15

SECTION 7 ADMINISTRATION .............................................................................16
   7.1   The Committee..................................................................................................16
   7.2   Claims Procedure .............................................................................................16

CONFIDENTIAL

RBC-PAUL000000103

## TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 7.3 | Making a Claim | 16 |
| 7.4 | Requesting Review of a Denied Claim | 16 |
| 7.5 | In General | 17 |

SECTION 8 OTHER ADMINISTRATIVE MATTERS ................................................ 17

| | | |
|---|---|---|
| 8.1 | Reporting | 17 |
| 8.2 | Plan Obligor; Status as Unsecured General Creditors | 17 |
| 8.3 | Disclaimer of Employment and Bonus Rights | 18 |
| 8.4 | Administrative Expenses of the Plan | 18 |
| 8.5 | No Compensation Under the Qualified Plan | 18 |
| 8.6 | Voting Rights | 18 |
| 8.7 | Governing Law | 18 |

SECTION 9 AMENDMENT OR TERMINATION ................................................ 18

| | | |
|---|---|---|
| 9.1 | Amendments to and Termination of Plan | 18 |
| 9.2 | Merger | 19 |
| 9.3 | Applicability to Successors | 19 |

CONFIDENTIAL                                                                 RBC-PAUL000000104

## SECTION 1
## INTRODUCTION

**1.1     General Nature and Purpose of the Plan**.   The Royal Bank of Canada US Wealth Accumulation Plan (the "**Plan**") is a nonqualified, deferred compensation plan pursuant to which a select group of management or highly compensated employees of the Royal Bank of Canada (the "**Company**") and its Participating Subsidiaries (collectively, the "**Employers**") may be offered the opportunity to elect to defer receipt of a portion of their compensation to be earned with respect to the upcoming Plan Year.  The Plan is designed to provide an opportunity for such employees to invest a portion of their compensation in tax-deferred savings and investment options in an effort to support long-term savings and allow such employees to share in the Company's growth and profitability, if any.   The Plan was formerly known as the RBC Dain Rauscher Wealth Accumulation Plan, was amended and restated effective for the Plan Year beginning on January 1, 2005, was further amended and restated effective for the Plan Year beginning on January 1, 2007, was further amended and restated effective for the Plan Year beginning on January 1, 2008, was further amended and restated effective for the Plan Year beginning on January 1, 2010 and **is hereby further amended and restated effective for the Plan Year beginning on January 1, 2011**.  This Plan restatement supersedes all prior versions of the Plan and any deferrals or contributions made pursuant to a prior version of the Plan will be governed by this Plan.

**1.2     Definitions**.

"**Account Balance**" means, for any given date, a Participant's Deferred Compensation and Company Contributions, plus or minus the hypothetical investment performance thereon.

"**Adverse Benefit Determination**" means a claim for benefits by a Participant, beneficiary or personal representative that has been denied in whole or in part.

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**Cause**" means, as determined by the Committee or its assignee, the occurrence of any one of the following: (a) any act of dishonesty, willful misconduct, negligence, gross negligence, intentional or conscious abandonment or neglect of duty; (b) any failure by the Employee to comply with any written policy, rule or code, including but not limited to an Employer's Code of Conduct or Code of Ethics, as applicable; (c) commission of a criminal activity, fraud or embezzlement; (d) violation of any rule or regulation of any self-regulatory agency with which the Employee is licensed, regardless of whether such agency takes disciplinary action against the Employee; (e) the loss or suspension of any license necessary to perform in the occupation for which Employee was hired, or the commission of any action that would cause Employee to become unbondable; (f) a failure to reasonably cooperate in any

investigation or proceeding concerning an Employer or any Employer Affiliate; (g) any unauthorized disclosure or use of confidential information or trade secrets; (h) any violation of any restrictive covenant, such as a non-compete, non-solicit or non-disclosure agreement, between the Participant and an Employer or any Employer Affiliate; (i) personal or professional conduct of Employee which, in the reasonable and good faith judgment of the Committee or its assignee, injures or tends to injure the reputation of an Employer or otherwise adversely effects the interests of an Employer; (j) failure to perform Employee's duties and obligations to a level required by an Employer; or (k) any other act as determined by the Committee in good faith; provided, however, that in the event an Employee is party to an employment agreement with an Employer that contains a different definition of Cause, the definition of Cause contained in such employment agreement will be controlling.

"**Change in Control**" means the Company's sale of (a) at least 75% of the equity or (b) all or substantially all of the assets of a Participating Subsidiary to a person or entity (or a collection of Persons or entities acting as a group) that is not a Company Affiliate, other Employer or Employer Affiliate.  A Change in Control will be deemed to have occurred only if such transaction meets the requirements of a "change in control" (as described in Treasury Regulation § 1.409A-3(i)(5)) with respect to the Participating Subsidiary.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended, and includes the regulations and guidance in effect thereunder.

"**Committee**" means the Head of Human Resources, or those executives designated by the Head of Human Resources to administer this Plan.  The members of the Committee, if any, serve at the pleasure of the Head of Human Resources, who has the power to appoint and remove members from time to time.

"**Company**" means Royal Bank of Canada, a Schedule I bank under the Bank Act (Canada) with its corporate headquarters in Toronto, Ontario, Canada, and any successor or assign.

"**Company Contribution**" means additional contributions that may be made by the Company in the form of a Matching Contribution or a Discretionary Contribution.

"**Deferred Compensation**" means, with respect to each Participant, the sum of his or her Voluntary Deferred Compensation and Mandatory Deferred Compensation.

"**Disability**" means the Participant's injury or illness that both (a) qualifies him or her for benefits under a long-term disability plan covering eligible employees of the Participant's Employer and (b) causes the Participant to be absent from his or her employment with his or her Employer for a continuous period of not less than 12 months.

"**Discretionary Contribution**" means a Company Contribution described in Section 2.6(b).

"**Election Form**" means the eligible Employee's written election setting forth (a) the percentage of an Employee's Gross Cash Compensation he or she elects to defer, (b) the

-2-

                                                                                                 RBC-PAUL000000106

distribution dates for his or her Deferred Compensation and Company Contributions, and (c) such other information as determined by the Committee.

"**Employee**" means an individual classified as a common law employee by, and on the payroll of, an Employer.

"**Employers**" means the Company and Participating Subsidiaries.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and includes the regulations and guidance in effect thereunder.

"**FICA**" means the Federal Insurance Contribution Act.

"**Fund Addition Date**" means such times as interest or dividends are paid or other distributions are made in connection with a Mutual Fund.

"**Gross Cash Compensation**" has the meaning ascribed to "Recognized Compensation" under the Qualified Plan on the first day of each Plan Year to which an election to defer compensation relates.  Gross Cash Compensation is Recognized Compensation that is earned by an Employee for services rendered during a Plan Year, whether or not paid in such Plan Year, and includes any amounts an Employee contributes to the Qualified Plan or an employer-sponsored cafeteria plan from his or her total compensation.  If an Employee so elects at the time of entering into a business transition plan with an Employer, payments from a business transition plan are included in Gross Cash Compensation.  The preceding sentence is applicable only for business transition plans entered into on or after January 1, 2007.

"**In-Service Payment Date**" means a distribution date, as elected by the Employee on his or her Election Form, that occurs while the Participant is an Employee (or an employee of an Employer Affiliate).

"**Mandatory Deferred Compensation**" means the percentage of an Employee's Gross Compensation that the Committee may, from time to time and in its sole and absolute discretion, designate as a required deferral to the Plan for such Employee.

"**Matching Contribution**" means a Company Contribution described in <u>Section 2.6(a)</u>.

"**Matching Threshold Amount**" means an amount of Deferred Compensation, as determined by the Committee with respect to each Plan Year, that is credited to a Participant's account during such Plan Year that may be eligible for a Matching Contribution in accordance with standards and guidelines determined annually by the Committee.

"**Mutual Funds**" means any of the mutual funds that have been selected by the Committee, as supplemented, replaced or eliminated from time-to-time at the discretion of the Committee.

"**Mutual Fund Price**" means, unless otherwise determined by the Committee, the daily reported closing price of an interest in, or units of, the Mutual Funds.

-3-

RBC-PAUL000000107

"**NYSE**" means the New York Stock Exchange.

"**Participant**" means an individual who has an Account Balance.

"**Participating Subsidiary**" means a corporation, now or in the future, affiliated with the Company that adopts, or has adopted, the Plan.  No corporation may become a Participating Subsidiary without prior consent of the Committee.  Such participation is subject to such limitations as the Committee may impose and will cease upon a Change in Control of such Participating Subsidiary.

"**Person**" means any individual, sole proprietorship, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, institution, public benefit corporation, entity or government instrumentality, division, agency, body or department.

"**Plan**" means the Royal Bank of Canada US Wealth Accumulation Plan, as set forth in this document and as amended from time to time.

"**Plan Interest Rate**" means an interest rate determined from time to time by the Committee.

"**Plan Obligor**" means the party that is responsible for satisfaction of amounts payable to Participants.

"**Plan Year**" means, with respect to a particular year, the 12-month period beginning January 1 and ending December 31 of such year.

"**Qualified Plan**" means the RBC-U.S.A. Retirement and Savings Plan, as amended from time to time.

"**Retirement**" means the Separation of a Participant whose age and years of employment (as determined using the service rules set forth in the Qualified Plan) with the Employers when combined equals 60.

"**Separation**" means the separation of employment from the Employers or any Employer Affiliate, as the case may be, of a Participant, other than due to such Participant's death, Disability or termination for Cause pursuant to the terms set forth herein.  Transfers of employment among the Employers and their Affiliates will not be a "Separation" for purposes of this Plan, and any Separation must constitute a "separation from service" under Code Section 409A.

"**Valuation Date**" means the business day that falls on or immediately after July 1 of each year that a distribution is due a Participant.

"**Voluntary Deferred Compensation**" means the portion or percentage of an Employee's Gross Compensation that the Employee elects to defer to the Plan in accordance with Section 2.2.

-4-

**1.3      Rules of Interpretation**.  Whenever appropriate, words used herein in the singular may be read in the plural, or words used herein in the plural may be read in the singular; the masculine may include the feminine and the words "hereof," "herein" or "hereunder" or other similar compounds of the word "here" mean and refer to this entire Plan and not to any particular paragraph or section of this Plan unless the context clearly indicates to the contrary.  The titles given to the various sections of this Plan are inserted for convenience of reference only and are not part of this Plan and they will not be considered in determining the purpose, meaning or intent of any provision hereof.  Any reference in this Plan to a statute or regulation will be considered also to mean and refer to any subsequent amendment or replacement of that statute or regulation.

## SECTION 2
## DEFERRALS AND DEEMED INVESTMENTS

**2.1      Eligibility**.

(a)      Employees eligible to participate in the Plan are any of the select group of management or highly compensated employees of an Employer whose compensation or production otherwise exceeds a level deemed appropriate by the Committee and who are invited to become Participants by the Committee.

(b)      No deferrals, Company Contributions or other benefits are available under the Plan, other than deferrals, Company Contributions or other benefits in respect of services rendered to the Employers by an Employee:

(i)      who is a non-resident of Canada for purposes of the Income Tax Act (Canada) throughout the period during which the services were rendered; or

(ii)      other than services that were primarily (A) rendered in Canada; (B) rendered in connection with a business carried on by an Employer in Canada; or (C) a combination of services described in (A) and (B).

(c)      Notwithstanding anything in the Plan to the contrary, individuals who are employees of a "nonqualified entity," as that term is described under Code Section 457A, are not eligible to participate in the Plan.  No deferrals, Company Contributions or other benefits are available under the Plan with respect to compensation for services rendered by such an employee.

**2.2      Election to Voluntarily Defer Compensation**.  Eligible Employees may enroll in the Plan by electing to make Voluntary Deferred Compensation contributions for the next succeeding Plan Year.  The Committee has the discretion to limit the amount of Voluntary Deferred Compensation or the amount of Gross Compensation that may be taken into account for making Voluntary Deferred Compensation contributions.  Elections must be made no later than December 31 of the year immediately preceding the year in which such Voluntary Deferred Compensation will be earned; provided, however, that subject to such changes as may be determined by the Committee, a new Employee who is eligible to participate in the Plan has 30 days from such Employee's hiring date to submit an Election Form for such Plan Year.  **For a given Plan Year, an election to defer compensation is irrevocable after it is accepted by the Committee**.  An election by an Employee who is first eligible to participate in the Plan during a

-5-

                                                                         RBC-PAUL000000109

given year becomes effective beginning the first day of the month following the date such Election Form is submitted and accepted by the Committee.

The Committee will from time to time establish the maximum percentage of a Participant's Gross Cash Compensation that he or she may elect to defer under the Plan. Voluntary Deferred Compensation will be deferred by payroll reduction.

**2.3    Mandatory Deferral of Compensation.**  On each payroll date, the Employers will reduce each eligible Employee's Gross Compensation by any Mandatory Deferred Compensation and contribute it to the Plan on such Employee's behalf.

**2.4    Election of Investments**.  On each Plan Year's Election Form, a Participant (or Employee for the first Election Form) may choose the form of the hypothetical investment of his or her Deferred Compensation by electing to credit such deferrals for any Plan Year to one or more of the hypothetical investments established by the Committee.  The available hypothetical investments are described in <u>SECTION 3</u>.  If a Participant fails to elect how deferrals are deemed to be invested, such Deferred Compensation will be deemed to be invested at the Plan Interest Rate.

Accounts for Participants will be established for bookkeeping purposes only and will not be considered as, or as evidence of the creation of, a trust fund or a transfer or other segregation of assets for the benefit of the Participants or their estates.  Such accounts will be established and credited with the appropriate amounts as provided for in the Plan as of the end of each business day, or in the case of any Company Contributions determined after the end of the Plan Year, on or around the last day of February following the end of the Plan Year.  Amounts deemed credited to a Participant's account in cash will not be credited with interest, and will not be deemed to be invested in any interest-bearing item.

**2.5    Intra-Plan Transfers**.  Subject to such rules as the Committee, from time to time and in its sole and absolute discretion, may impose, a Participant may elect to have all or a portion of his or her Account Balance transferred to any other type of hypothetical investment. Participants may initiate an intra-Plan transfer by submitting a request in writing to the Company in such form as the Committee determines.  Requests made during any month to transfer Account Balances into another hypothetical investment will be honored at the time/times determined by the Committee.

**2.6    Company Contributions**.  The Committee will establish whether and the extent to which a Participant is eligible for one or more of the following types of Company Contributions:

(a)    *Matching Contributions*.  The Company may make Matching Contributions equal to a percentage of a Participant's Voluntary Deferred Compensation up to the Matching Threshold Amount, subject to the following:

(i)    The Matching Threshold Amount and related Matching Contributions may vary with certain performance-based measures established by the Participating Subsidiary, or such other performance factors as determined by the Committee. The Matching Threshold Amount will be based on a performance grid approved annually by the Committee and distributed to each Participant.

-6-

RBC-PAUL000000110

(ii)     If a Participant is entitled to a Matching Contribution, after the end of the Plan Year (or at such other time as the Committee, in its sole discretion, determines) his or her account will be deemed to have been allocated the number of Company common shares, including fractional shares, resulting from dividing the amount of such Matching Contribution by the closing price per Company common share on the NYSE as reported on the day of crediting.

(iii)     The Participant may diversify his or her Matching Contributions and related investment returns from a deemed investment in Company common shares at any time after the Participant reaches age 55 or, if earlier, upon the Participant's Separation, _provided_ that the applicable Employer classifies such Separation as "retirement" on the applicable separation from service forms.  For this purpose, classification as "retirement" is not necessarily a "Retirement," as used in this Plan.

(b)     *Discretionary Contributions.*  The Company may make Discretionary Contributions in such other amount as determined by the Committee in its sole discretion. The Discretionary Contribution amount may vary from Participant to Participant and may be made based on any criteria, including recommendations from a Participating Subsidiary, as determined by the Committee.  If a Participant is entitled to a Discretionary Contribution, his or her account will be deemed to have been allocated the amount of such Discretionary Contribution on the date determined by the Committee.  Such Discretionary Contribution will be invested as determined by the Committee in its discretion, but may be based on any election by such eligible Participant, and may be changed by the Participant at any time.

## SECTION 3
## INFORMATION CONCERNING INVESTMENT ALTERNATIVES

**3.1     Company Common Shares**.

(a)     *Company Common Shares.*  For any Plan Year, in connection with a Participant's election to have a portion of his or her Deferred Compensation credited toward Company common shares, such Participant's account will be deemed to have been allocated the number of Company common shares, including fractional shares, resulting from dividing such portion of the Participant's Deferred Compensation and Company Contributions allocated to the investment in Company common shares by the closing price per Company common share on the NYSE as reported on the day of crediting.

(b)     *Dividends on Company Common Shares.*  At such times as the Company declares dividends on its common shares, an amount equal to the number of Company common shares credited to a Participant's account on the record date multiplied by the declared dividend per share in U.S. dollars (such dividend to be calculated without taking into account any and all Canadian withholding taxes to which such dividend might be subject, if actually paid) will be credited, on the payment date, to such Participant's account in cash (if dividends are paid in cash) or in Company common shares (if

-7-

     RBC-PAUL000000111

dividends are declared in common shares), or in such other property determined by the Committee.

(c)   *Additional Purchases of Company Common Shares.*  All amounts credited to a Participant's account as a result of cash dividends will be used on a daily basis (or on such other date as determined by the Committee in its sole discretion) to purchase hypothetical Company common shares.  The number of additional Company common shares credited to each Participant's account after the end of each day due to the hypothetical purchases described in this paragraph will be equal to the number of Company common shares, including fractional shares, derived by dividing the total amount of cash credited to the Participant's account as described in this Section 3.1 by the closing price per Company common share on the NYSE as reported on the date of the hypothetical purchase of the Company common shares credited to such Participant's account under this Section 3.1.

**3.2   Plan Interest Rate**.  Participants may elect to have all or a portion of their Deferred Compensation invested at the Plan Interest Rate.

**3.3   Mutual Funds**.

(a)   *Mutual Funds.*  A Participant who is eligible to diversify their Account under Section 2.6(a)(iii) may elect to have all or a portion of their Deferred Compensation, Discretionary Contributions, and Matching Contributions deemed invested in one or more Mutual Funds.  A Participant's account will be allocated the number of units (including fractional units) of a Mutual Fund equal to the portion of his or her Account Balance allocated to investments in Mutual Funds divided by the Mutual Fund Price.

(b)   *Interest or Dividends on Mutual Funds.*  On each Fund Addition Date, a determination will be made as to the number of units (including fractional units) of the Mutual Fund that will be credited to a Participant's account as of the Fund Addition Date. On the Fund Addition Date, an amount equal to the number of units of the Mutual Fund credited to a Participant's account multiplied by the amount of the interest or dividend per unit of the Mutual Fund will be credited to such Participant's account, or other fund determined by the Committee.  Interest payments or other distributions will be deemed reinvested in additional units of the Mutual Fund at prevailing market prices on the Fund Addition Date.

**3.4   Valuation**.  Except for changes resulting from intra-Plan transfers described in Section 2.5, the notional value of a Participant's accounts will be updated daily to reflect any increases or decreases in the value of the Participant's hypothetical investment.

The account of a Participant with a hypothetical investment in Mutual Funds will be debited by an amount representing a quarterly fee.  The amount of the quarterly fee will be determined by multiplying the value of the Participant's hypothetical investment in Mutual Funds, as described above, by a decimal determined by the Committee, which for 2009 is

-8-

0.000625.  The Committee will from time to time review this calculation and may change the decimal factor used in this calculation.

## SECTION 4
## VESTING

**4.1**     **Vesting of Voluntary Deferred Compensation**.   All Voluntary Deferred Compensation recorded in a Participant's account will be fully vested at all times.

**4.2**     **Vesting of Mandatory Deferred Compensation and Company Contributions**. Mandatory Deferred Compensation and Company Contributions in a Participant's account will vest on the date or dates determined by the Committee, in its sole discretion.  The Committee will announce any prospective change in the vesting schedule with respect to Mandatory Deferred Compensation and Company Contributions (and the related investment returns, if any) prior to December 31 of the year preceding each new Plan Year.  Unless otherwise amended by the Committee, all time period measurements for the vesting schedules established by the Committee will begin on January 1 of the Plan Year following the Plan Year to which a Company Contribution relates.   Notwithstanding the foregoing, a Participant's Mandatory Deferred Compensation and Company Contributions will immediately vest in full upon:

> (a)     the death or Disability of such Participant while an employee of an Employer or an Employer Affiliate; or

> (b)     the Separation of a Participant, who prior to Separation and with the consent of his or her Employer, has (i) entered into a business transition agreement with the Private Client Group or (ii) met the requirements under the Plan for Retirement and who has entered into a non-competition, non-solicitation and related agreement at the request of the Participant's employer in the form then approved by the Committee.  The non-competition agreement will require a Participant, for at least a one-year period, to refrain from participating, directly or indirectly, in any business in which an Employer is engaged at the time of such Participant's Separation in any geographic area in which the Employer, as appropriate, is competing at such time.

**4.3**     **Termination For Cause**.   Notwithstanding anything to the contrary in this SECTION 4, if a Participant is involuntarily terminated for Cause from an Employer or an Employer Affiliate at any time prior to the distribution of his or her Account Balance, upon such Participant's Separation, all of his or her Mandatory Deferred Compensation and Company Contributions will be forfeited, regardless of whether the vesting schedule has otherwise been satisfied with respect to such shares or assets, and the proceeds thereof will be deemed returned to the Company.  The Committee has full discretionary authority to determine whether a Participant was terminated for Cause, and, if (a) a Participant has a voluntary Separation, and (b) the Committee thereafter determines that the Participant could have been involuntary terminated by an Employer or Employer Affiliate for Cause, then the Participant will be treated as though he or she was involuntarily terminated for Cause for all purposes of this Plan.

**4.4**     **Terminations Due to Restructuring**.   In the event a Participant ceases to be employed by the Employers and their Affiliates due to an organizational restructuring (as

-9-

determined in the sole discretion of the Committee), all Mandatory Deferred Compensation in such Participant's account will become vested, but all unvested Company Contributions will be forfeited.

**4.5     Change in Control**.   In the event of a Change in Control of a Participating Subsidiary, each Participant who is employed by such Participating Subsidiary immediately prior to the date on which the Change in Control is consummated and who, due to the Change in Control (as determined by the Committee), is no longer employed by an Employer immediately after the Change in Control will become vested in his or her Mandatory Deferred Compensation and Company Contributions as follows:

     (a)     *Minimum Vesting*.   The unvested portion of each affected Participant's Mandatory Deferred Compensation and Company Contributions will be vested pro rata, based on the period of time that has elapsed from the effective date of the contribution to the date of the Change in Control relative to the total vesting period related to such contribution.   Before a Change in Control event, the Committee will establish a reasonable method for calculating the pro rata portion of each affected Participant's Account Balance.

     (b)     *Discretionary Vesting*.   The Board has the discretionary authority to vest any amount held in an affected Participant's account that remains unvested after the application of paragraph (a) above.   In making its determination, the Board may consider the terms of the transaction governing the Change in Control, the financial impact on the Employers, and any other factors it deems relevant to its determination.

**4.6     Forfeitures**.   Except as otherwise specifically set forth herein, all Company Contributions and Mandatory Deferred Compensation and related deemed investment returns that are not vested on the Participant's Separation date will be deemed forfeited, and such Participant's account will be appropriately reduced.

## SECTION 5
## DISTRIBUTIONS

**5.1     Distributions**.   Except as otherwise described below, upon electing to participate in the Plan for a Plan Year, a Participant will also make an election with respect to the timing of the payment of the amounts credited to such Participant's account for such Plan Year.

**5.2     Distribution Dates**.

     (a)     *Distribution Pursuant to the In-Service Payment Date*.   If the Participant selected an In-Service Payment Date, then subject to this <u>SECTION 5</u> and any other terms and conditions the Committee may impose, distributions will be made in a single payment in the specified year promptly after, but in no event after the 90th day following, July 1 of such year.   With the consent of the Committee, a Participant may change the In-Service Payment Date pursuant to the procedures established by the Committee and the restrictions under Code Section 409A, which generally require making a written request more than 12 months in advance of the In-Service Payment Date and selecting a new In-Service Payment Date that will occur at least five years after the originally selected date.

-10-

RBC-PAUL000000114

(b)     *Distribution on Separation or Retirement.*

(i)     If (A) the Participant elected payment on Separation on his or her Election Form or (B) if such Separation occurs prior to the otherwise scheduled In-Service Payment Date, then subject to this <u>SECTION 5</u> and any other terms and conditions the Committee may impose, the Participant's Account Balance will be distributed due to Separation, less any amount owed by the Participant to an Employer at the time of Separation pursuant to a promissory note or otherwise incurred in the normal course of business; <u>provided</u>, however, that any offset is limited to $5,000 and will occur at the same time and in the same amount as the debt otherwise would have been paid by the Participant.

(ii)     If distribution is made due to Separation, distributions will be made in either a lump sum payment or in installments, as selected by the Participant on his or her Election Form.  Available forms of distribution include a single lump sum or, if a Participant meets the requirements for Retirement at the time of Separation, substantially equal annual installments for up to ten years.

(iii)     Any single lump sum payment and the first installment of any series of installment payments will be made promptly after, but in no event after the 90th day following, the July 1 of the Plan Year that begins following the year of Separation, and each annual installment will occur promptly after, but in no event after the 90th day following, the July 1 of each year thereafter.  Subject to reduction as set forth in clause (i) above, each installment will be equal to a fraction of all vested amounts deemed allocated to the Participant's account, the numerator of such fraction being one and the denominator being the number of installments remaining to be paid.  For example, if the Participant has elected five annual installments, the first installment will be equal to one-fifth of the Participant's total vested Account Balance on the date such Account Balance is valued for purposes of the first payment date and the second installment will be equal to one-fourth of the Participant's account on the date such account is valued for purposes of the second payment date, etc.

(iv)     If the Participant did not indicate a distribution date on his or her Election Form, or if the Election Form was not timely filed, then distribution of the Account Balance will be made promptly after, but in no event after the 90th day following, the July 1 immediately after the date of vesting.

(v)     Distributions pursuant to this section will be made pro-rata from all of a Participant's hypothetical investments.

(vi)     For purposes of Code Section 409A, each installment payment will be treated as a separate single payment.

(c)     *Distributions Following Death or Disability.*   Distributions following death will follow the procedures set forth in <u>Section 5.5</u>.  Distributions following Disability will be made in a single payment to the Participant promptly after, but in no

-11-

event after the 90th day following, the date the Participant satisfies the definition of Disability.

    (d)    *Other*.

        (i)    The Committee reserves the right to distribute accounts and terminate participation of Participants who transfer employment outside of the United States; <u>provided</u>, however, that no acceleration of distribution will be made in contravention of Code Section 409A.

        (ii)    Notwithstanding anything to the contrary in this <u>Section 5.2</u>, but subject to <u>Section 5.3</u>, all Deferred Compensation and Company Contributions contributed to this Plan during a period when a Participant was deemed a "special participant" under a prior version of this Plan will be distributed in full promptly after, but in no event after the 90th day following, the July 1 of the sixth Plan Year following the Plan Year for which the contribution is made. The Participant's account will be valued as of the Valuation Date on or immediately preceding the distribution date.

    **5.3**    **Distribution Due to a Change In Control**. If, as a result of a Change in Control, a Participant's employer that is a Participating Subsidiary ceases to be a Participating Subsidiary under the Plan, each Participant who is employed by such Participating Subsidiary immediately prior to the date on which the Change in Control is consummated and who, due to the Change in Control (at the determination of the Committee), is no longer employed by a Participating Subsidiary immediately after the Change in Control will receive his or her vested Account Balance on the date on or promptly after, but in no event after the 90th day following, the date the Change in Control is consummated.

    **5.4**    **Form of Distributions**.

    (a)    *Distributions of Company Common Shares*.

        (i)    All distributions of hypothetical investments in Company common shares will be in the form of Company common shares, less the number of common shares equal to the minimum amount necessary to satisfy withholding requirements with respect to all applicable federal, state and local taxes. Any Company common shares distributed under the Plan will be Company common shares that have been previously issued and that are currently trading in the market, or, subject to the approval of the Board of Directors of the Company and any required regulatory and shareholder approvals, authorized but previously unissued Company common shares;

        (ii)    The value of each Company common share credited to a Participant's account will be equal to the closing price per Company common share on the NYSE as reported for the Valuation Date; and

        (iii)    All distributions will be in the form of whole Company common shares. Fractional shares, if any, will be distributed in cash.

-12-

RBC-PAUL000000116

(b)      *Distributions of Investments in Mutual Funds*.  A Participant's hypothetical investment in mutual funds will be distributed in cash, less the amount of cash necessary to satisfy withholding requirements with respect to all applicable federal, state and local taxes.  The value of a Participant's hypothetical investment in Mutual Funds will be determined by multiplying the total number of units of the Mutual Fund credited to the Participant's account by the Mutual Fund Price, in each case, measured as close as practicable to the Valuation Date.

(c)      *Distributions of Investment in the Plan Interest Rate*.  A Participant's hypothetical investment in the Plan Interest Rate will be distributed in cash, less the amount of cash needed to satisfy withholding requirements with respect to all applicable federal, state and local taxes.

Notwithstanding <u>Section 5.4(b)</u> or <u>(c)</u>, as applicable, the Committee, in its sole and absolute discretion, may cause distributions with respect to a Participant's Account Balance to be made, at the Company's option, in Company common shares that have been previously issued and that are currently trading in the market, or, subject to the approval of the Board of Directors of the Company and any required regulatory and shareholder approvals, authorized but previously unissued shares; the value of all such shares will be equal to the closing price per Company common share on the NYSE as reported for the Valuation Date.

**5.5      Distributions to Beneficiaries**.  Distribution of the Account Balance of a Participant who dies before any payment to such Participant is made will be made to such Participant's beneficiary or the Participant's estate in a single lump sum as of the date of the Participant's death. If the Participant dies after payments have commenced but before distribution is completed, the Participant's remaining Account Balance will be distributed to the Participant's beneficiary in lump sum after the Participant's death.  For purposes of complying with Code Section 409A, such distribution will occur by the end of the calendar year in which the death occurs or by the fifteenth day of the third month following the date of death, if later. Notwithstanding the foregoing sentence, if the Committee is not timely notified of the death of the Participant and therefore cannot reasonably begin or make payments by the distribution deadline required by Code Section 409A, a lump sum distribution will be made to the beneficiary as soon as possible following the Committee's receipt of the death notification, subject to any tax, interest, and penalties imposed by Section 409A.

**5.6      Designation of Beneficiary**.  Each Participant has the right to designate in writing, in form satisfactory to the Committee, one or more beneficiaries to receive the unpaid vested balance of the Participant's account in the event of such Participant's death, and may change or revoke any prior beneficiary designation by a similar instrument in writing.  Any beneficiary designation must be received by the Committee before the Participant's death.  Any beneficiary designation of a Participant's spouse will be made void in the event of a divorce, unless either a binding court order provides otherwise or the Participant redesignates his or her former spouse as the beneficiary.  If a Participant fails to designate a beneficiary or, having revoked a prior beneficiary designation, fails to designate a new beneficiary, or in the event the Participant's beneficiary designation fails, in whole or in part, by reason of the prior death of a designated beneficiary, divorce or for any other cause, then the undistributed vested balance of the

-13-

Participant's account, or the portion thereof as to which such designation fails, as the case may be, will be paid to the Participant's estate.

**5.7     Disclaimers by Beneficiaries**.  A beneficiary entitled to a distribution of all or a portion of a deceased Participant's accounts may disclaim his or her interest therein subject to the following requirements.  To be eligible to disclaim, a beneficiary must be a natural person, must not have received a distribution of all or any portion of such accounts at the time such disclaimer is executed and delivered, and must have attained at least 21 years of age as of the date of the Participant's death.  Any disclaimer must be in writing and must be executed personally by the beneficiary before a notary public.  A disclaimer will state that the beneficiary's entire interest in the undistributed accounts is disclaimed or will specify what portion thereof is disclaimed.  To be effective, duplicate original executed copies of the disclaimer must be both executed and actually delivered to the Committee after the date of the Participant's death but not later than 180 days after the date of the Participant's death.  A disclaimer will be irrevocable when delivered to the Committee.  A disclaimer will be considered to be delivered to the Committee only when actually received by the Committee.  The Committee will be the sole judge of the content, interpretation and validity of a purported disclaimer.  Upon the filing of a valid disclaimer, the beneficiary will be considered not to have survived the Participant as to the interest disclaimed and any distribution made to the beneficiary will be reversed.  A disclaimer by a beneficiary will not be considered to be a transfer of an interest in violation of the provisions of SECTION 6 and will not be considered to be an assignment or alienation of benefits in violation of any law prohibiting the assignment or alienation of benefits under this Plan.  The Committee will not  recognize any other form of attempted disclaimer.

**5.8     Federal Income Tax**.

(a)     *Tax Consequences of Participating in the Plan*.  The Plan provides that the election to defer any portion of a Participant's compensation, and the establishment of a fixed date or schedule for payment, is made prior to the performance of the personal services for an Employer to which the compensation relates.  Accordingly, the Company believes that Participants are not expected to recognize either the deferred amounts or the Company Contributions as ordinary income for federal income tax purposes until such amounts are actually paid or distributed to them by the Company; provided, that, such amounts may still be subject to FICA taxes when deferred to the Plan.  Similarly, the Company is not expected to be allowed any income tax deduction on account of the Plan until, and for its taxable year in which, a Participant recognizes ordinary income hereunder, to the extent such amount satisfies the general rules concerning deductibility of compensation.  As described above and in Section 5.9 below, it is expected that the Company will be required to withhold or otherwise collect income and other payroll taxes upon such amounts as required under Code Section 3402 and certain other Code sections.

(b)     *Compliance with Code Section 409A*.  Except as specifically provided in Section 5.5, it is intended that any income or payments to a Participant provided pursuant to this Plan will not be subject to the additional tax and interest under Code Section 409A. The provisions of the Plan will be interpreted and construed in favor of complying

-14-

with any applicable requirements of Code Section 409A necessary to avoid the imposition of additional tax, interest or penalties under Code Section 409A.

(c)     *Participants Should Consult Their Tax Advisors.*  Due to the complexity of the applicable provisions of the Code, this summary of certain federal income tax consequences sets forth only the general tax principles affecting the Plan.  These general tax principles are subject to changes that may be brought about by subsequent legislation or by regulations and administrative rulings, which may be applied on a retroactive basis.  Neither the Company nor any Participating Subsidiary has obtained, and as a result of various provisions the Plan is not eligible for, a ruling from the Internal Revenue Service regarding the federal income tax consequences associated with participation in the Plan.  Participants may be subject to state or local income taxes as a result of their election to defer compensation pursuant to the Plan, and Participants should refer to the applicable laws in those jurisdictions.  **Accordingly, each Plan Participant should consult his or her own tax counsel on questions regarding tax liabilities arising upon any election to defer compensation pursuant to the Plan and any distributions made to such Participant pursuant to the Plan.**

**5.9     Tax Withholding.**  All distribution payments will be treated as wages for tax purposes and therefore will be made net of all applicable income, FICA (to the extent not already withheld at the time of deferral), payroll and other taxes required to be withheld.  In connection with any event that gives rise to a federal or other governmental tax withholding obligation on the part of the Company or any of its Affiliates relating to amounts under the Plan (including, without limitation, FICA tax), (a) a Participant's employer may deduct or withhold (or cause to be deducted or withheld) from any payment or distribution to a Participant, whether or not pursuant to the Plan, or (b) the Committee will be entitled to require that the Participant remit cash to the Company, his or her employer or any of its Affiliates (through payroll deductions or otherwise), in each case in an amount sufficient in the opinion of the Company to satisfy such withholding obligations.  Further, as permitted under Treasury Regulation § 1.409A-3(j)(4)(vi), the distribution of a Participant's account may be accelerated to satisfy employment taxes and wage withholding at the source.

**5.10     ERISA Matters.**  Although the Plan is not intended to be a tax-qualified plan under Code Section 401, the Plan might be determined to be an "employee pension benefit plan" as defined by ERISA.  If the Plan is determined to be an "employee pension benefit plan," the Company believes that it constitutes an unfunded plan of deferred compensation maintained for a select group of management or highly compensated employees and, therefore, exempt from many ERISA requirements.  A statement has been filed with the Department of Labor to comply with ERISA reporting and disclosure requirements.

**SECTION 6**
**SPENDTHRIFT PROVISIONS**

Neither any Participant nor the personal representative of any Participant has any transferable interest in the Participant's account or any right to anticipate, alienate, dispose of, pledge or encumber the same prior to actual receipt of payments in accordance with the rules described in <u>SECTION 4</u> and <u>SECTION 5</u>, nor will the same be subject to attachment,

-15-

garnishment, execution following judgment or other legal process instituted by creditors of the Participant or the personal representative of the Participant.

**SECTION 7**
**ADMINISTRATION**

**7.1     The Committee**.   The Plan will be administered by the Committee.   The Committee has the full power and sole discretionary authority to make all determinations provided for in the Plan, including, without limitation, promulgating rules and regulations as the Committee considers necessary or appropriate for the implementation and management of the Plan as well as rules to address potential conflicts of interest and determination of a termination of employment due to Cause under <u>Section 4.3</u>; <u>provided</u> that the Board of Directors of the Company also has the full power and discretionary authority to make determinations with respect to the Plan having the effect of materially increasing the cost of the Plan to an Employer, including, without limitation, decisions regarding Company Contributions, eligibility to participate in the Plan, and discretionary vesting in the event of a Change in Control (as described in <u>Section 4.5(b)</u>).

**7.2     Claims Procedure**.   If any Participant or his or her estate is in disagreement with any determination that has been made for payment under this Plan, a claim may be presented to the Committee in accordance with procedures set forth in this <u>SECTION 7</u>.

**7.3     Making a Claim**.   The claim must be written and must be delivered to the Committee within 90 days the Participant or beneficiary knows or should have known of his or her claim for benefits.   Within 90 days after the claim is delivered, the claimant will receive either: (a) a decision or (b) a notice describing special circumstances requiring a specified amount of additional time (but no more than 180 days from the day the claims as delivered) to reach a decision.

In the event of an Adverse Benefit Determination, the claimant will receive a written or electronic notice specifying: (a) the reasons for the determination; (b) the Plan provisions on which the Adverse Benefit Determination is based; (c) any additional information needed in connection with the claim and the reason such information is needed; and (d) a description of the Plan's review procedures, including a statement of the Participant's right to bring a civil action under ERISA Section 502(a) following an Adverse Benefit Determination upon appeal.   Notice of the claimant's right to request a review (as described in <u>Section 7.4</u>) will also be given to the claimant.

**7.4     Requesting Review of a Denied Claim**.   A claimant may request that a denied claim be reviewed.   The request for review must be written and must be delivered to the Committee within 60 days after claimant's receipt of written or electronic Adverse Benefit Determination.   A request for review may (but is not required to) include issues and comments that the claimant wants considered in the review, even if such information was not provided in the initial request for benefits.   The claimant may examine pertinent Plan documents, including the records and other documentation, by asking the Committee for such documents.   Within 60 days after delivery of a request for review, the claimant will receive either: (a) a decision; or (b) a

-16-

                                                                                      RBC-PAUL000000120

notice describing special circumstances requiring a specified amount of additional time (but no more than 120 days from the day the request for review was delivered) to reach a decision.

The Committee may require the claimant to submit such additional facts, documents or other material as it deems necessary or advisable in making its review. The Committee will notify the claimant in writing or electronically of its decision. If the Adverse Benefit Determination is confirmed in whole or in part, the communication will set forth: (a) the specific reasons for the decision; (b) the specific references to the Plan provisions on which the decision is based; (c) a statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to and copies of all documents, records, or other information relevant to the claim; and (d) a statement regarding the claimant's right to bring an action under ERISA Section 502(a).

**7.5    In General**.  All decisions on claims and on reviews of denied claims will be made by the Committee.  The Committee also reserves the right to delegate its authority to make decisions.  The Committee may, in its discretion, hold one or more hearings.  If a claimant does not receive a decision within the specified time, the claimant should assume the claim or appeal was denied on the date the specified time expired.  The claimant may, at the claimant's own expense, have an attorney or other representative act on behalf of the claimant, but the Committee reserves the right to require a written authorization.

No action at law or in equity may be brought to recover benefits or otherwise enforce the provisions of the Plan unless the Participant or beneficiary has exhausted all remedies under this SECTION 7.  Any action brought after exhaustion of such remedies must be brought within ninety (90) days after the Participant or beneficiary has received final notice of an Adverse Benefit Determination under Section 7.4.

## SECTION 8
## OTHER ADMINISTRATIVE MATTERS

**8.1    Reporting**.  As soon as administratively feasible after each calendar quarter end, the Company will prepare and make available to each Participant a report showing (a) the amounts credited to the Participant's account since the last report from the Company, and (b) the amounts of any distributions made since the last report.  At its discretion, the Company may prepare and make available more frequent reports to Participants.

**8.2    Plan Obligor; Status as Unsecured General Creditors**.

(a)    The Company will be the Plan Obligor with respect to distributions from all accounts; provided, however, that the Participant's Participating Subsidiary will be the Plan Obligor with respect to investments of Mandatory Deferred Compensation and related Company Contributions thereon, except as set forth in Section 8.2(b) below.

(b)    The Company will be the Plan Obligor with respect to all accounts of Participants who are residents, for tax purposes, in California and Arizona during the Plan Year.

-17-

(c)   All Participants are general unsecured creditors of the relevant Plan Obligor with respect to amounts payable pursuant to distributions from the accounts described in (a) and (b) above.

As such, Participants and their estates will not have any secured or preferred interest by way of trust, escrow, lien or otherwise in any specific assets, of the Employers.  The Plan does not require that any hypothetical investments under this Plan be funded by the Company.  If a Plan Obligor, in fact, elects to set aside monies or other assets to meet its obligations under the Plan (there being no obligation to do so) through the creation of a trust or otherwise, such monies or other assets will be subject to the claims of its general creditors, and neither any Participant nor any beneficiary of any Participant will have a legal, beneficial or security interest therein.

**8.3   Disclaimer of Employment and Bonus Rights**.  The Plan is not a contract for employment and does not grant any employee the right to be retained in the employment of the Employers or to obtain any compensation.  Upon dismissal or severance of employment, no Participant will have any right or interest under the Plan, other than as specifically provided herein.

**8.4   Administrative Expenses of the Plan**.  Participants will be responsible for all administrative expenses incurred with respect to this Plan and for all administrative expenses and other fees of this Plan (to the extent such expenses are not paid by the Company), including the costs of outsourced record-keeping (which expenses will be deducted proportionately among Participants' accounts).

**8.5   No Compensation Under the Qualified Plan**.  Unless the Qualified Plan specifically provides otherwise, no amounts of Deferred Compensation and related Company Contributions, if any, credited to any account of a Participant will constitute "Recognized Compensation" for purposes of the Qualified Plan, as such terms are defined in such plan, nor any other employee benefit plan of the Company or its Affiliates.

**8.6   Voting Rights**.  Participants' accounts under the Plan are bookkeeping accounts and, accordingly, Participants will not have any voting rights with respect to any common shares or any units or other interests in Mutual Funds deemed allocated to any Participant's account.

**8.7   Governing Law**.  This instrument has been executed and delivered in the State of Minnesota and has been drawn in conformity to the laws of that state to the extent not preempted by federal law and will be construed and enforced in accordance with the laws of the State of Minnesota.

## SECTION 9
## AMENDMENT OR TERMINATION

**9.1   Amendments to and Termination of Plan**.  While the Company intends for the Plan to continue indefinitely, it may be amended or terminated at any time by the Committee or the Board of Directors of the Company or by the Company, including, without limitation (a) to ensure that neither the Plan Obligors nor the Participants are subject to adverse Canadian or United States tax consequences and (b) to modify the form of distribution of Participants' accounts; provided, however, that no such amendment or termination will have the effect of

-18-

RBC-PAUL000000122

(i) reducing the vested portion of amounts already credited to a Participant's account; (ii) extending the time of distribution of such Participant's accounts, without the consent of such Participant and only in a manner permitted by Code Section 409A; or (iii) causing a violation of Code Section 409A.  In the event of a termination of the Plan, all accounts will be deemed vested and amounts credited thereto will be distributed to Participants in accordance with the distribution guidelines under Code Section 409A.

**9.2**   **Merger**.  The Committee may cause all or part of this Plan to be merged with all or a part of any other nonqualified deferred compensation plan maintained by any company.  If the Committee agrees to such a merger, the Committee will specify in writing the terms and conditions of such merger and may obtain such consents and agreements as it deems necessary or desirable.

**9.3**   **Applicability to Successors**.  This Plan will be binding upon and inure to the benefit of the Company and to the extent that the Company is a Plan Obligor under the Plan for any accounts, the Participating Subsidiaries, their successors and assigns, each Participant, his or her personal representatives and any beneficiaries.  If the Company becomes a party to any merger, consolidation or reorganization, this Plan will remain in full force and effect as any obligation of the Company or its successors in interest.

CONFIDENTIAL

RBC-PAUL000000123

# Exhibit I

# Amended and Restated

### Royal Bank of Canada

### US Wealth Accumulation Plan

### And Prospectus

## FROZEN AS OF JANUARY 1, 2012

## The date of this document is JANUARY 1, 2012

This document constitutes part of
a prospectus covering securities
that have been registered under
The Securities Act of 1933

CONFIDENTIAL

RBC-PAUL000003341

## TABLE OF CONTENTS

**Page**

SECTION 1 INTRODUCTION ...................................................................................................1
   1.1   General Information about the Plan...............................................................................1
   1.2   Definitions....................................................................................................................1
   1.3   Rules of Interpretation .................................................................................................5

SECTION 2 DEFERRALS AND DEEMED INVESTMENTS....................................................6
   2.1   Eligibility ......................................................................................................................6
   2.2   Election to Voluntarily Defer Compensation ...............................................................6
   2.3   Mandatory Deferral of Compensation ..........................................................................6
   2.4   Election of Investments and Accounts..........................................................................6
   2.5   Investment Fund Exchanges .........................................................................................6
   2.6   Company Contributions ................................................................................................7

SECTION 3 INFORMATION CONCERNING INVESTMENT ALTERNATIVES ....................7
   3.1   Company Common Shares. ...........................................................................................7
   3.2   Plan Interest Rate .........................................................................................................8
   3.3   Mutual Funds ...............................................................................................................8
   3.4   Valuation ......................................................................................................................8

SECTION 4 VESTING................................................................................................................9
   4.1   Vesting of Voluntary Deferred Compensation .............................................................9
   4.2   Vesting of Mandatory Deferred Compensation and Company Contributions.................9
   4.3   Termination For Cause .................................................................................................9
   4.4   Terminations Due to Restructuring.............................................................................10
   4.5   Change in Control ......................................................................................................10
   4.6   Forfeitures ..................................................................................................................10

SECTION 5 DISTRIBUTIONS .................................................................................................10
   5.1   Distributions...............................................................................................................10
   5.2   Distribution Dates......................................................................................................10
   5.3   Distribution Due to a Change In Control ....................................................................12
   5.4   Form of Distributions.................................................................................................12
   5.5   Distributions to Beneficiaries ....................................................................................13
   5.6   Designation of Beneficiary .........................................................................................14
   5.7   Disclaimers by Beneficiaries .....................................................................................14
   5.8   Federal Income Tax ...................................................................................................14
   5.9   Tax Withholding ........................................................................................................15
   5.10 ERISA Matters ..........................................................................................................15

SECTION 6 SPENDTHRIFT PROVISIONS ............................................................................16

60908027_9

CONFIDENTIAL
RBC-PAUL000003342

SECTION 7 ADMINISTRATION ...................................................................................16
   7.1  The Company ...............................................................................................16
   7.2  Claims Procedure ........................................................................................16
   7.3  Making a Claim ...........................................................................................16
   7.4  Requesting Review of a Denied Claim ......................................................17
   7.5  In General ....................................................................................................17

SECTION 8 OTHER ADMINISTRATIVE MATTERS .................................................17
   8.1  Reporting .....................................................................................................17
   8.2  Plan Obligor; Status as Unsecured General Creditors ...............................18
   8.3  Disclaimer of Employment and Bonus Rights ...........................................18
   8.4  Administrative Expenses of the Plan ..........................................................18
   8.5  Voting Rights ...............................................................................................18
   8.6  Governing Law ............................................................................................18

SECTION 9 AMENDMENT OR TERMINATION ........................................................19
   9.1  Amendments to and Termination of Plan ...................................................19
   9.2  Merger .........................................................................................................19
   9.3  Applicability to Successors .........................................................................19

60908027_9

CONFIDENTIAL

RBC-PAUL000003343

**SECTION 1**
**INTRODUCTION**

1.1      **General Information about the Plan**.

(a)      Nature and Purpose.  The Royal Bank of Canada US Wealth Accumulation Plan (the "**Plan**") is a nonqualified, deferred compensation plan pursuant to which a select group of management or highly compensated employees of the Royal Bank of Canada (the "**Company**") and its Participating Subsidiaries (collectively, the "**Employers**") had been offered the opportunity to elect to defer receipt of a portion of their compensation to be earned with respect to the upcoming Plan Year.  The Plan was designed to provide an opportunity for such employees to invest a portion of their compensation in tax-deferred savings and investment options in an effort to support long-term savings and allow such employees to share in the Company's growth and profitability, if any.

(b)      History.  The Plan was formerly known as the RBC Dain Rauscher Wealth Accumulation Plan, was amended and restated effective for the Plan Year beginning on January 1, 2005, was further amended and restated effective for the Plan Year beginning on January 1, 2007, was further amended and restated effective for the Plan Year beginning on January 1, 2008, was further amended and restated effective for the Plan Year beginning on January 1, 2010, was further amended and restated effective for the Plan Year beginning on January 1, 2011 and **is hereby further amended and restated effective for the Plan Year beginning on January 1, 2012**.  This Plan restatement supersedes all prior versions of the Plan and any deferrals or contributions made pursuant to a prior version of the Plan are governed by this Plan.

(c)      Frozen Status.  Effective January 1, 2012 (the "**Effective Date**"), the Plan is frozen and the Plan will not accept any new Participants or Company Contributions or Deferred Contributions (other than Final Company Contributions Voluntary Deferrals) with respect to any compensation relating to periods beginning on or after the Effective Date.  Amounts contributed to the Plan will be distributed in accordance with the terms of the Plan or any Participant election, as appropriate; the frozen status of the Plan will not accelerate or delay any distribution date.

1.2      **Definitions**.

"**Account Balance**" means, for any given date, a Participant's Deferred Compensation and Company Contributions, plus or minus the hypothetical investment performance thereon.

"**Adverse Benefit Determination**" means a claim for benefits by a Participant, beneficiary or personal representative that has been denied in whole or in part.

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or

60908027_9

indirectly, whether through the ownership of voting securities, by contract or otherwise; the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**Business**" means the chief officer and/or operating committee of each Participating Subsidiary.

"**Cause**" means, as determined by the Company or its assignee, in consultation with internal legal counsel, the occurrence of any one of the following: (a) any act of dishonesty, willful misconduct, negligence, gross negligence, intentional or conscious abandonment or neglect of duty; (b) any failure by the Employee to comply with any written policy, rule or code, including but not limited to an Employer's Code of Conduct or Code of Ethics, as applicable; (c) commission of a criminal activity, fraud or embezzlement; (d) violation of any rule or regulation of any self-regulatory agency with which the Employee is licensed, regardless of whether such agency takes disciplinary action against the Employee; (e) the loss or suspension of any license necessary to perform in the occupation for which Employee was hired, or the commission of any action that would cause Employee to become unbondable; (f) a failure to reasonably cooperate in any investigation or proceeding concerning an Employer or any Employer Affiliate; (g) any unauthorized disclosure or use of confidential information or trade secrets; (h) any violation of any restrictive covenant, such as a non-compete, non-solicit or non-disclosure agreement, between the Participant and an Employer or any Employer Affiliate; (i) personal or professional conduct of Employee which, in the reasonable and good faith judgment of the Company or its assignee, injures or tends to injure the reputation of an Employer or otherwise adversely effects the interests of an Employer; (j) failure to perform Employee's duties and obligations to a level required by an Employer; or (k) any other act as determined by the Company in good faith; provided, however, that in the event an Employee is party to an employment agreement with an Employer that contains a different definition of Cause, the definition of Cause contained in such employment agreement will be controlling.

"**Change in Control**" means the Company's sale of (a) at least 75% of the equity or (b) all or substantially all of the assets of a Participating Subsidiary to a person or entity (or a collection of Persons or entities acting as a group) that is not the Company, and Employer or an Affiliate of either. A Change in Control will be deemed to have occurred only if such transaction meets the requirements of a "change in control" (as described in Treasury Regulation § 1.409A-3(i)(5)) with respect to the Participating Subsidiary.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended, and includes the regulations and guidance in effect thereunder.

"**Committee**" means the WAP Committee (or successor committee), and any person, entity or office to whom the Committee properly delegates any authority related to this Plan. The members of the Committee, if any, serve at the pleasure of the Company, which has the power to appoint and remove members from time to time.

"**Company**" means Royal Bank of Canada, a Schedule I bank under the Bank Act (Canada) with its corporate headquarters in Toronto, Ontario, Canada, and any successor or assign, and any person, entity or office, including the Compensation Team, to whom the Company delegates any authority related to this Plan.

60908027_9

CONFIDENTIAL

RBC-PAUL000003345

"**Company Contribution**" means additional contributions that may have been made by the Employers in the form of a Matching Contribution or a Discretionary Contribution.

"**Deferred Compensation**" means, with respect to each Participant, the sum of his or her Voluntary Deferred Compensation and Mandatory Deferred Compensation.

"**Disability**" means the Participant's injury or illness that both (a) qualifies him or her for benefits under a long-term disability plan covering eligible employees of the Participant's Employer and (b) causes the Participant to be absent from his or her employment with his or her Employer for a continuous period of not less than 12 months.

"**Discretionary Contribution**" means a Company Contribution described in Section 2.6(b).

"**Effective Date**" means January 1, 2012.

"**Employee**" means an individual classified as a common law employee by, and on the payroll of, an Employer.

"**Employers**" means the Company and Participating Subsidiaries.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and includes the regulations and guidance in effect thereunder.

"**FICA**" means the Federal Insurance Contribution Act.

"**Final Contributions**" means (a) the Company Contribution related to the 2011 Plan Year, which contribution is to be made on or about January 3, 2012, and (b) the Voluntary Deferrals related to the short-term incentive plan, which contribution is to be made on or about March 30, 2012.

"**Fund Addition Date**" means such times as interest or dividends are paid or other distributions are made in connection with a Mutual Fund.

"**Gross Cash Compensation**" has the meaning ascribed to "Recognized Compensation" under the Qualified Plan on the first day of each Plan Year to which an election to defer compensation relates.  Gross Cash Compensation is Recognized Compensation that is earned by an Employee for services rendered during a Plan Year, whether or not paid in such Plan Year, and includes any amounts an Employee contributes to the Qualified Plan or an employer-sponsored cafeteria plan from his or her total compensation.   Notwithstanding anything to the contrary, if "Recognized Compensation" included any distributions from deferred compensation plans, Gross Cash Compensation included such amounts only to the extent that any further deferral of such amounts into this Plan did not cause the imposition of an additional tax under Code Section 409A.

"**In-Service Payment Date**" means a distribution date, as elected by the Employee on his or her Election, that occurs while the Participant is an Employee (or an employee of an Employer Affiliate).

-3-

CONFIDENTIAL                                                                                    RBC-PAUL000003346

"**Mandatory Deferred Compensation**" means the percentage of an Employee's Gross Compensation for periods before the Effective Date that the Business may have, in its sole and absolute discretion, designated as a required deferral to the Plan for such Employee.

"**Matching Contribution**" means a Company Contribution described in <u>Section 2.6(a)</u>.

"**Matching Threshold Amount**" means an amount of Deferred Compensation, as determined by the Business with respect to each Plan Year before the Effective Date, that had been credited to a Participant's account during such Plan Year that was eligible for a Matching Contribution in accordance with standards and guidelines determined by the Business.

"**Mutual Funds**" means any of the mutual funds that have been selected by the Committee, as supplemented, replaced or eliminated from time-to-time at the discretion of the Committee.

"**Mutual Fund Price**" means, unless otherwise determined by the Committee, the daily reported closing price of an interest in, or units of, the Mutual Funds.

"**NYSE**" means the New York Stock Exchange.

"**Participant**" means an individual who has an Account Balance.

"**Participating Subsidiary**" means a corporation affiliated with the Company that had adopted the Plan with the Company's consent.  Such participation is subject to such limitations as the Company may impose and will cease upon a Change in Control of such Participating Subsidiary.  No Affiliate corporation may become a Participating Subsidiary on or after the Effective Date.

"**Person**" means any individual, sole proprietorship, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, institution, public benefit corporation, entity or government instrumentality, division, agency, body or department.

"**Plan**" means this frozen Royal Bank of Canada US Wealth Accumulation Plan, as set forth in this document and as amended from time to time.

"**Plan Interest Rate**" means an interest rate determined from time to time by the Committee.

"**Plan Obligor**" means the party that is responsible for satisfaction of amounts payable to Participants.

"**Plan Year**" means, with respect to a particular year, the 12-month period beginning January 1 and ending December 31 of such year.

"**Qualified Plan**" means the RBC-U.S.A. Retirement and Savings Plan, as amended from time to time.

-4-

CONFIDENTIAL                                          RBC-PAUL000003347

"**Retirement**" means the Separation of a Participant whose age and years of employment (as determined using the service rules set forth in the Qualified Plan) with the Employers when combined equals 60.

"**Separation**" means the separation of employment from the Employers or any Affiliate of an Employer, as the case may be, of a Participant, other than due to such Participant's death, Disability or termination for Cause pursuant to the terms set forth herein. Transfers of employment among the Employers and their Affiliates will not be a "Separation" for purposes of this Plan, and any Separation must constitute a "separation from service" under Code Section 409A.

"**Valuation Date**" means the date on which a distribution is valued, which the business day that falls on the following dates (or, if such date does not fall on a business day, the next following business day) for the following distribution events:

(a)     In-Service Payment Date—the July 1 of each year that a distribution is due a Participant.

(b)     Separation or Retirement—the July 1 of each year that a distribution is due a Participant.

(c)     Death:

(i)     The later of: (A) the date of death, and (B) the date of such Participant's final Voluntary Deferred Compensation contribution; and

(ii)     For any contributions made after the date of death, the date of the final Company Contribution made on behalf of the deceased Participant; and

(iii)     For any deemed dividends paid after the Participant's death pursuant to Section 3.1(b), the dividend payment date.

(d)     Disability—the date that the Participant meets the 12-month period of Disability requirement.

(e)     Other (as described in Section 5.2(d))—the July 1 of each year that a distribution is due a Participant.

(e)     Change in Control—the date of the Change in Control.

"**Voluntary Deferred Compensation**" means the portion or percentage of an Employee's Gross Compensation for periods before the Effective Date that the Employee had elected to defer to the Plan in accordance with Section 2.2.

**1.3     Rules of Interpretation.**   Whenever appropriate, words used herein in the singular may be read in the plural, or words used herein in the plural may be read in the singular; the masculine may include the feminine and the words "hereof," "herein" or "hereunder" or other similar compounds of the word "here" mean and refer to this entire Plan and not to any

-5-

CONFIDENTIAL                                                                     RBC-PAUL000003348

particular paragraph or section of this Plan unless the context clearly indicates to the contrary. The titles given to the various sections of this Plan are inserted for convenience of reference only and are not part of this Plan and they will not be considered in determining the purpose, meaning or intent of any provision hereof.  Any reference in this Plan to a statute or regulation will be considered also to mean and refer to any subsequent amendment or replacement of that statute or regulation.

## SECTION 2
## DEFERRALS AND DEEMED INVESTMENTS

**2.1    Eligibility**.  Employees who were eligible to participate in the Plan had been any of the select group of management or highly compensated employees of an Employer whose compensation or production otherwise exceeded a level deemed appropriate by the Company and who were invited to become Participants by the Business or Company.  As of the Effective Date, no new Employees became eligible to participate in the Plan.

**2.2    Election to Voluntarily Defer Compensation**.  For Plan Years beginning prior to the Effective Date, Eligible Employees could enroll in the Plan by electing to make Voluntary Deferred Compensation contributions for the next succeeding Plan Year pursuant to the election procedures in place at the time of the election.

**2.3    Mandatory Deferral of Compensation**.  For Plan Years beginning prior to the Effective Date, on each payroll date, the Employers would reduce each eligible Employee's Gross Compensation by any Mandatory Deferred Compensation and contribute it to the Plan on such Employee's behalf.

**2.4    Election of Investments and Accounts**.  On each Plan Year's Election, a Participant (or Employee for the first Election) could choose the form of the hypothetical investment of his or her Deferred Compensation by electing to credit such deferrals for any Plan Year to one or more of the hypothetical investments established by the Committee.   The available hypothetical investments as of the Effective Date are described in <u>SECTION 3</u>.  If a Participant failed to elect how deferrals are deemed to be invested, such Deferred Compensation are deemed to be invested at the Plan Interest Rate.

Accounts for Participants have been established for bookkeeping purposes only and are not to be considered as, or as evidence of the creation of, a trust fund or a transfer or other segregation of assets for the benefit of the Participants or their estates.  Such accounts were established and credited with the appropriate amounts as provided for in the Plan as of the end of each business day, or in the case of any Company Contributions determined after the end of the Plan Year, on or around the last day of February following the end of the applicable Plan Year.  Amounts deemed credited to a Participant's account in cash will not be credited with interest, and will not be deemed to be invested in any interest-bearing item.

**2.5    Investment Fund Exchanges**.  Subject to such rules as the Company, from time to time and in its sole and absolute discretion, may impose, a Participant may elect to have the investment of all or a portion of his or her Account Balance exchanged for another type of hypothetical investment.  Participants may initiate an investment fund exchanges by submitting a

-6-

request in writing or online to the Company in such form as the Company determines. Requests made during any month to transfer Account Balances into another hypothetical investment will be honored at the time/times determined by the Company.

**2.6   Company Contributions**. For Plan Years beginning prior to the Effective Date, the Business established whether and the extent to which a Participant was eligible for one or more of the following types of Company Contributions:

(a)   *Matching Contributions*. The Employers may have made Matching Contributions equal to a percentage of a Participant's Voluntary Deferred Compensation up to the Matching Threshold Amount. Such contribution was deemed to have been invested in Company common shares. The Participant may diversify his or her Matching Contributions and related investment returns from a deemed investment in Company common shares at any time after the Participant reaches age 55 or, if earlier, upon the Participant's Separation, <u>provided</u> that the applicable Employer classifies such Separation as "retirement" on the applicable separation from service forms. For this purpose, classification as "retirement" is not necessarily a "Retirement," as used in this Plan.

(b)   *Discretionary Contributions*. The Employers may have made Discretionary Contributions in such other amount as determined by the Business in its sole discretion. The Discretionary Contribution amount could vary from Participant to Participant and may have been made based on any criteria, as determined by the Business. Such Discretionary Contribution was and will continue to be invested as determined by the Business in its discretion, but may be based on any election by such eligible Participant, and may be changed by the Participant at any time.

**SECTION 3**
**INFORMATION CONCERNING INVESTMENT ALTERNATIVES**

**3.1   Company Common Shares**.

(a)   *Company Common Shares*. For any Plan Year, in connection with a Participant's election to have a portion of his or her Deferred Compensation credited toward Company common shares, such Participant's account will be deemed to have been allocated the number of Company common shares, including fractional shares, resulting from dividing such portion of the Participant's Deferred Compensation and Company Contributions allocated to the investment in Company common shares by the closing price per Company common share on the NYSE as reported on the day of crediting.

(b)   *Dividends on Company Common Shares*. At such times as the Company declares dividends on its common shares, an amount equal to the number of Company common shares credited to a Participant's account on the record date multiplied by the declared dividend per share in U.S. dollars (such dividend to be calculated without taking into account any and all Canadian withholding taxes to which such dividend might be subject, if actually paid) will be credited, on the payment date, to such Participant's account in cash (if dividends are paid in cash) or in Company common shares (if

60908027_9

dividends are declared in common shares), or in such other property determined by the Company.

(c)      *Additional Purchases of Company Common Shares.*  All amounts credited to a Participant's account as a result of cash dividends will be used on a daily basis (or on such other date as determined by the Company in its sole discretion) to purchase hypothetical Company common shares.  The number of additional Company common shares credited to each Participant's account after the end of each day due to the hypothetical purchases described in this paragraph will be equal to the number of Company common shares, including fractional shares, derived by dividing the total amount of cash credited to the Participant's account as described in this Section 3.1 by the closing price per Company common share on the NYSE as reported on the date of the hypothetical purchase of the Company common shares credited to such Participant's account under this Section 3.1.

**3.2      Plan Interest Rate**.  Participants may elect to have all or a portion of their Deferred Compensation invested at the Plan Interest Rate.

**3.3      Mutual Funds**.

(a)      *Mutual Funds.*  A Participant may elect to have all or a portion of their Deferred Compensation, Discretionary Contributions, and, if eligible to diversify their Account under Section 2.6(a), Matching Contributions deemed invested in one or more Mutual Funds.  A Participant's account will be allocated the number of units (including fractional units) of a Mutual Fund equal to the portion of his or her Account Balance allocated to investments in Mutual Funds divided by the Mutual Fund Price.

(b)      *Interest or Dividends on Mutual Funds.*  On each Fund Addition Date, a determination will be made as to the number of units (including fractional units) of the Mutual Fund that will be credited to a Participant's account as of the Fund Addition Date. On the Fund Addition Date, an amount equal to the number of units of the Mutual Fund credited to a Participant's account multiplied by the amount of the interest or dividend per unit of the Mutual Fund will be credited to such Participant's account, or other fund determined by the Committee.  Interest payments or other distributions will be deemed reinvested in additional units of the Mutual Fund at prevailing market prices on the Fund Addition Date.

**3.4      Valuation**.  Except for changes resulting from plan investment fund exchanges described in Section 2.5, the notional value of a Participant's accounts will be updated daily through the applicable Valuation Date to reflect any increases or decreases in the value of the Participant's hypothetical investment.

The account of a Participant with a hypothetical investment in Mutual Funds will be debited by an amount representing a quarterly fee.  The amount of the quarterly fee will be determined by multiplying the value of the Participant's hypothetical investment in Mutual Funds, as described above, by a decimal determined by the Company, which for 2012 is

60908027_9

0.000625.  The Company will from time to time review this calculation and may change the decimal factor used in this calculation.

## SECTION 4
## VESTING

**4.1     Vesting of Voluntary Deferred Compensation**.   All Voluntary Deferred Compensation recorded in a Participant's account will be fully vested at all times.

**4.2     Vesting of Mandatory Deferred Compensation and Company Contributions**.   Mandatory Deferred Compensation and Company Contributions in a Participant's account will vest on the date or dates determined by the Business, in its sole discretion.   Unless otherwise amended by the Business, all time period measurements for the vesting schedules established by the Business will begin on January 1 of the Plan Year following the Plan Year to which a Company Contribution relates. Notwithstanding the foregoing, a Participant's Mandatory Deferred Compensation and Company Contributions will immediately vest in full upon:

(a)     the death or Disability of such Participant while an employee of an Employer or an Employer Affiliate; or

(b)     the Separation of a Participant, who prior to Separation and with the consent of his or her Employer, has met the requirements under the Plan for Retirement and who has entered into a non-competition, non-solicitation and related agreement at the request of the Participant's employer in the form then approved by the Business.   The non-competition agreement will require a Participant, for at least a one-year period, to refrain from participating, directly or indirectly, in any business in which an Employer is engaged at the time of such Participant's Separation in any geographic area in which the Employer, as appropriate, is competing at such time, provided that such vesting shall be accelerated only for Company Contributions that the Business deems as other than retention, back-end recruiting or front-end recruiting, unless a separate agreement between the Participant and an Employer provides otherwise; or

(c)     the Separation of a Participant who, prior to Separation has entered into a business transition agreement with the Private Client Group, _provided_ that such vesting shall be accelerated only for Company Contributions that the Business deems as other than retention, back-end recruiting or front-end recruiting, unless a separate agreement between the Participant and an Employer provides otherwise.

**4.3     Termination For Cause**.   Notwithstanding anything to the contrary in this SECTION 4, if a Participant is involuntarily terminated for Cause from an Employer or an Employer Affiliate at any time prior to the distribution of his or her Account Balance, upon such Participant's Separation, all of his or her Mandatory Deferred Compensation and Company Contributions will be forfeited, regardless of whether the vesting schedule has otherwise been satisfied with respect to such shares or assets, and the proceeds thereof will be deemed returned to the Company.   The Company has full discretionary authority to determine whether a Participant was terminated for Cause, and, if (a) a Participant has a voluntary Separation, and

-9-

CONFIDENTIAL                                                                                   RBC-PAUL000003352

(b) the Company thereafter determines that the Participant could have been involuntary terminated by an Employer or Employer Affiliate for Cause, then the Participant will be treated as though he or she was involuntarily terminated for Cause for all purposes of this Plan.

**4.4    Terminations Due to Restructuring**.  In the event a Participant ceases to be employed by the Employers and their Affiliates due to an organizational restructuring (as determined in the sole discretion of the Company), all Mandatory Deferred Compensation in such Participant's account will become vested, but all unvested Company Contributions will be forfeited.

**4.5    Change in Control**.  In the event of a Change in Control of a Participating Subsidiary, each Participant who is employed by such Participating Subsidiary immediately prior to the date on which the Change in Control is consummated and who, due to the Change in Control (as determined by the Company), is no longer employed by an Employer immediately after the Change in Control will become vested in his or her Mandatory Deferred Compensation and Company Contributions as follows:

(a)    *Minimum Vesting*.  The unvested portion of each affected Participant's Mandatory Deferred Compensation and Company Contributions will be vested pro rata, based on the period of time that has elapsed from the effective date of the contribution to the date of the Change in Control relative to the total vesting period related to such contribution.  Before a Change in Control event, the Company will establish a reasonable method for calculating the pro rata portion of each affected Participant's Account Balance.

(b)    *Discretionary Vesting*.  The Board has the discretionary authority to vest any amount held in an affected Participant's account that remains unvested after the application of paragraph (a) above.  In making its determination, the Board may consider the terms of the transaction governing the Change in Control, the financial impact on the Employers, and any other factors it deems relevant to its determination.

**4.6    Forfeitures**.  Except as otherwise specifically set forth herein, all Company Contributions and Mandatory Deferred Compensation and related deemed investment returns that are not vested on the Participant's Separation date will be deemed forfeited, and such Participant's account will be appropriately reduced.

## SECTION 5
## DISTRIBUTIONS

**5.1    Distributions**.    Except as otherwise described below, upon electing to participate in the Plan for a Plan Year, a Participant had made an election with respect to the timing of the payment of the amounts credited to such Participant's account for such Plan Year.

**5.2    Distribution Dates**.

(a)    *Distribution Pursuant to the In-Service Payment Date*.  If the Participant selected an In-Service Payment Date, then subject to this SECTION 5 and any other terms and conditions the Company may impose, distributions will be made in a single

-10-

CONFIDENTIAL                                                                    RBC-PAUL000003353

payment in the specified year promptly after, but in no event after the 90th day following, July 1 of such year.  The Participant's account will be valued as of the Valuation Date on or immediately preceding the distribution date.  With the consent of the Company, a Participant may change the In-Service Payment Date pursuant to the procedures established by the Company and the restrictions under Code Section 409A, which generally require making a written request more than 12 months in advance of the In-Service Payment Date and selecting a new In-Service Payment Date that will occur at least five years after the originally selected date.

(b)      *Distribution on Separation or Retirement.*

(i)      If (A) the Participant elected payment on Separation on his or her Election or (B) if such Separation occurs prior to the otherwise scheduled In-Service Payment Date, then subject to this SECTION 5 and any other terms and conditions the Company may impose, the Participant's Account Balance will be distributed due to Separation, less any amount owed by the Participant to an Employer at the time of Separation pursuant to a promissory note or otherwise incurred in the normal course of business.

(ii)      If distribution is made due to Separation, distributions will be made in either a lump sum payment or in installments, as selected by the Participant on his or her Election.  Available forms of distribution include a single lump sum or, if a Participant meets the requirements for Retirement at the time of Separation, substantially equal annual installments for up to ten years.

(iii)      Any single lump sum payment and the first installment of any series of installment payments will be made promptly after, but in no event after the 90th day following, the July 1 of the Plan Year that begins following the year of Separation, and each annual installment will occur promptly after, but in no event after the 90th day following, the July 1 of each year thereafter.  Subject to reduction as set forth in clause (i) above, each installment will be equal to a fraction of all vested amounts deemed allocated to the Participant's account, the numerator of such fraction being one and the denominator being the number of installments remaining to be paid.  For example, if the Participant has elected five annual installments, the first installment will be equal to one-fifth of the Participant's total vested Account Balance on the date such Account Balance is valued for purposes of the first payment date and the second installment will be equal to one-fourth of the Participant's account on the date such account is valued for purposes of the second payment date, etc.

(iv)      If the Participant did not indicate a distribution date on his or her Election, or if the Election was not timely filed, then distribution of the Account Balance will be made promptly after, but in no event after the 90th day following, the July 1 of the Plan Year following the Plan Year in which such Separation occurs.

-11-

CONFIDENTIAL                                                                            RBC-PAUL000003354

(v)     Distributions pursuant to this section will be made pro-rata from all of a Participant's hypothetical investments, and the Participant's account will be valued as of the Valuation Date on or immediately preceding the distribution date.

(vi)     For purposes of Code Section 409A, each installment payment will be treated as a separate single payment.

(c)     *Distributions Following Death or Disability.*   Distributions following death will follow the procedures set forth in <u>Section 5.5</u>.   Distributions following Disability will be made in a single payment to the Participant promptly after, but in no event after the 90th day following, the date the Participant satisfies the definition of Disability.   The Participant's account will be valued as of the Valuation Date on or immediately preceding the distribution date.

(d)     *Other*.

(i)     The Company reserves the right to distribute accounts and terminate participation of Participants who transfer employment outside of the United States; <u>provided</u>, <u>however</u>, that no acceleration of distribution will be made in contravention of Code Section 409A.

(ii)     Notwithstanding anything to the contrary in this <u>Section 5.2</u>, but subject to <u>Section 5.3</u>, all Deferred Compensation and Company Contributions contributed to this Plan during a period when a Participant was deemed a "special participant" under a prior version of this Plan will be distributed in full promptly after, but in no event after the 90th day following, the July 1 of the sixth Plan Year following the Plan Year for which the contribution is made.   The Participant's account will be valued as of the Valuation Date on or immediately preceding the distribution date.

**5.3      Distribution Due to a Change In Control**.   If, as a result of a Change in Control, a Participant's employer that is a Participating Subsidiary ceases to be a Participating Subsidiary under the Plan, each Participant who is employed by such Participating Subsidiary immediately prior to the date on which the Change in Control is consummated and who, due to the Change in Control (at the determination of the Company), is no longer employed by a Participating Subsidiary immediately after the Change in Control will receive his or her vested Account Balance on the date on or promptly after, but in no event after the 90th day following, the date the Change in Control is consummated.   The Participant's account will be valued as of the Valuation Date on or immediately preceding the distribution date.

**5.4      Form of Distributions**.

(a)     *Distributions of Company Common Shares.*

(i)     All distributions of hypothetical investments in Company common shares will be in the form of Company common shares, less the number of common shares equal to the minimum amount necessary to satisfy withholding requirements with respect to all applicable federal, state and local taxes.   Any

-12-

CONFIDENTIAL                                                                 RBC-PAUL000003355

Company common shares distributed under the Plan will be Company common shares that have been previously issued and that are currently trading in the market, or, subject to the approval of the Board of Directors of the Company and any required regulatory and shareholder approvals, authorized but previously unissued Company common shares;

      (ii)    The value of each Company common share credited to a Participant's account will be equal to the closing price per Company common share on the NYSE as reported for the Valuation Date; and

      (iii)    All distributions will be in the form of whole Company common shares.  Fractional shares, if any, will be distributed in cash.

    (b)    *Distributions of Investments in Mutual Funds.*  A Participant's hypothetical investment in mutual funds will be distributed in cash, less the amount of cash necessary to satisfy withholding requirements with respect to all applicable federal, state and local taxes.  The value of a Participant's hypothetical investment in Mutual Funds will be determined by multiplying the total number of units of the Mutual Fund credited to the Participant's account by the Mutual Fund Price, in each case, measured as close as practicable to the Valuation Date.

    (c)    *Distributions of Investment in the Plan Interest Rate.*  A Participant's hypothetical investment in the Plan Interest Rate will be distributed in cash, less the amount of cash needed to satisfy withholding requirements with respect to all applicable federal, state and local taxes.

Notwithstanding Section 5.4(b) or (c), as applicable, the Company, in its sole and absolute discretion, may cause distributions with respect to a Participant's Account Balance to be made, at the Company's option, in Company common shares that have been previously issued and that are currently trading in the market, or, subject to the approval of the Board of Directors of the Company and any required regulatory and shareholder approvals, authorized but previously unissued shares; the value of all such shares will be equal to the closing price per Company common share on the NYSE as reported for the Valuation Date.

    **5.5**    **Distributions to Beneficiaries**.  Distribution of the Account Balance, based on the Valuation Date, of a Participant who dies before any payment to such Participant is made will be made to such Participant's beneficiary in a single lump sum provided that the Company has received a copy of the death certificate and completed distribution forms and considers such certificate and forms to be in good order.  If the Participant dies after payments have commenced but before distribution is completed, the Participant's remaining Account Balance will be distributed to the Participant's beneficiary in lump sum after the Participant's death.  For purposes of complying with Code Section 409A, such distribution will occur by the end of the calendar year in which the death occurs or by the fifteenth day of the third month following the date of death, if later.  Notwithstanding the foregoing sentence, if the Company is not timely notified of the death of the Participant and therefore cannot reasonably begin or make payments by the distribution deadline required by Code Section 409A, a lump sum distribution will be made to the beneficiary as soon as possible following the Company's receipt of the death

-13-

notification, distribution forms, and death certificate in good order, subject to any tax, interest, and penalties imposed by Section 409A.

**5.6     Designation of Beneficiary**.   Each Participant has the right to designate in writing or online, in form satisfactory to the Company, one or more beneficiaries to receive the unpaid vested balance of the Participant's account in the event of such Participant's death, and may change or revoke any prior beneficiary designation by a similar instrument in writing.   Any beneficiary designation must be received by the Company before the Participant's death.   Any beneficiary designation of a Participant's spouse will be made void in the event of a divorce.   If a Participant fails to designate a beneficiary or, having revoked a prior beneficiary designation, fails to designate a new beneficiary, or in the event the Participant's beneficiary designation fails, in whole or in part, by reason of the prior death of a designated beneficiary, divorce or for any other cause, then the undistributed vested balance of the Participant's account, or the portion thereof as to which such designation fails, as the case may be, will be paid to the Participant's spouse, or if none, the Participant's estate.

**5.7     Disclaimers by Beneficiaries**.   A beneficiary entitled to a distribution of all or a portion of a deceased Participant's accounts may disclaim his or her interest therein subject to the following requirements.   To be eligible to disclaim, a beneficiary must be a natural person, must not have received a distribution of all or any portion of such accounts at the time such disclaimer is executed and delivered, and must have attained at least 21 years of age as of the date of the Participant's death.   Any disclaimer must be in writing and must be executed personally by the beneficiary before a notary public.   A disclaimer will state that the beneficiary's entire interest in the undistributed accounts is disclaimed or will specify what portion thereof is disclaimed.   To be effective, duplicate original executed copies of the disclaimer must be both executed and actually delivered to the Company after the date of the Participant's death but not later than 180 days after the date the Company has actual knowledge of the Participant's death.   A disclaimer will be irrevocable when delivered to the Company.   A disclaimer will be considered to be delivered to the Company only when actually received by the Company.   The Company will be the sole judge of the content, interpretation and validity of a purported disclaimer.   Upon the filing of a valid disclaimer, the beneficiary will be considered not to have survived the Participant as to the interest disclaimed and any distribution made to the beneficiary will be reversed.   A disclaimer by a beneficiary will not be considered to be a transfer of an interest in violation of the provisions of SECTION 6 and will not be considered to be an assignment or alienation of benefits in violation of any law prohibiting the assignment or alienation of benefits under this Plan.   The Company will not recognize any other form of attempted disclaimer.

**5.8     Federal Income Tax**.

(a)     *Tax Consequences of Participating in the Plan*.   The Plan provides that the election to defer any portion of a Participant's compensation, and the establishment of a fixed date or schedule for payment, is made prior to the performance of the personal services for an Employer to which the compensation relates.   Accordingly, the Company believes that Participants are not expected to recognize either the deferred amounts or the Company Contributions as ordinary income for federal income tax purposes until such amounts are actually paid or distributed to them by the Company; provided, that such

-14-

CONFIDENTIAL                                                                                                              RBC-PAUL000003357

amounts may still be subject to FICA taxes when deferred to the Plan or become vested under the Plan.   Similarly, the Company is not expected to be allowed any income tax deduction on account of the Plan until, and for its taxable year in which, a Participant recognizes ordinary income hereunder, to the extent such amount satisfies the general rules concerning deductibility of compensation.  As described above and in <u>Section 5.9</u> below, it is expected that the Company will be required to withhold or otherwise collect income and other payroll taxes upon such amounts as required under Code Section 3402 and certain other Code sections.

(b)     *Compliance with Code Section 409A.*  Except as specifically provided in <u>Section 5.5,</u> it is intended that any income or payments to a Participant provided pursuant to this Plan will not be subject to the additional tax and interest under Code Section 409A. The provisions of the Plan will be interpreted and construed in favor of complying with any applicable requirements of Code Section 409A necessary to avoid the imposition of additional tax, interest or penalties under Code Section 409A.

(c)     *Participants Should Consult Their Tax Advisors.*  Due to the complexity of the applicable provisions of the Code, this summary of certain federal income tax consequences sets forth only the general tax principles affecting the Plan.  These general tax principles are subject to changes that may be brought about by subsequent legislation or by regulations and administrative rulings, which may be applied on a retroactive basis. Neither the Company nor any Participating Subsidiary has obtained, and as a result of various provisions the Plan is not eligible for, a ruling from the Internal Revenue Service regarding the federal income tax consequences associated with participation in the Plan. Participants may be subject to state or local income taxes as a result of their election to defer compensation pursuant to the Plan, and Participants should refer to the applicable laws in those jurisdictions. **Accordingly, each Plan Participant should consult his or her own tax counsel on questions regarding tax liabilities arising upon any election to defer compensation pursuant to the Plan and any distributions made to such Participant pursuant to the Plan.**

**5.9    Tax Withholding**.  All distribution payments will be treated as wages for tax purposes and therefore will be made net of all applicable income, FICA (to the extent not already withheld at the time of deferral), payroll and other taxes required to be withheld.  In connection with any event that gives rise to a federal or other governmental tax withholding obligation on the part of the Company or any of its Affiliates relating to amounts under the Plan (including, without limitation, FICA tax), (a) a Participant's employer may deduct or withhold (or cause to be deducted or withheld) from any payment or distribution to a Participant, whether or not pursuant to the Plan, or (b) the Company will be entitled to require that the Participant remit cash to the Company, his or her employer or any of its Affiliates (through payroll deductions or otherwise), in each case in an amount sufficient in the opinion of the Company to satisfy such withholding obligations.  Further, as permitted under Treasury Regulation § 1.409A-3(j)(4)(vi), the distribution of any Participant's account may be accelerated to satisfy employment taxes and wage withholding at the source.

**5.10    ERISA Matters**.  Although the Plan is not intended to be a tax-qualified plan under Code Section 401, the Plan might be determined to be an "employee pension benefit plan"

-15-

CONFIDENTIAL

as defined by ERISA.  If the Plan is determined to be an "employee pension benefit plan," the Company believes that it constitutes an unfunded plan of deferred compensation maintained for a select group of management or highly compensated employees and, therefore, exempt from many ERISA requirements.  A statement has been filed with the Department of Labor to comply with ERISA reporting and disclosure requirements.

## SECTION 6
## SPENDTHRIFT PROVISIONS

Neither any Participant nor the personal representative of any Participant has any transferable interest in the Participant's account or any right to anticipate, alienate, dispose of, pledge or encumber the same prior to actual receipt of payments in accordance with the rules described in <u>SECTION 4</u> and <u>SECTION 5</u>, nor will the same be subject to attachment, garnishment, execution following judgment or other legal process instituted by creditors (including current or former spouses) of the Participant or the personal representative of the Participant.

## SECTION 7
## ADMINISTRATION

**7.1    The Company**.  The Plan will be administered by the Company.  The Company has the full power and sole discretionary authority to make all determinations provided for in the Plan, including, without limitation, promulgating rules and regulations as the Company considers necessary or appropriate for the implementation and management of the Plan as well as rules to address potential conflicts of interest and determination of a termination of employment due to Cause under <u>Section 4.3</u>; <u>provided</u> that the Board of Directors of the Company also has the full power and discretionary authority to make determinations with respect to all provisions of the Plan.  More information about Plan administration may be obtained by calling US HRSC at 1 (866) 477-3783.

**7.2    Claims Procedure**.  If any Participant or his or her estate is in disagreement with any determination that has been made for payment under this Plan, a claim may be presented to the Company in accordance with procedures set forth in this <u>SECTION 7</u>.

**7.3    Making a Claim**.  The claim must be written and must be delivered to the Company within 90 days of the date on which the Participant or beneficiary knows or should have known of his or her claim for benefits.  Within 90 days after the claim is delivered, the claimant will receive either: (a) a decision or (b) a notice describing special circumstances requiring a specified amount of additional time (but no more than 180 days from the day the claims as delivered) to reach a decision.

In the event of an Adverse Benefit Determination, the claimant will receive a written or electronic notice specifying: (a) the reasons for the determination; (b) the Plan provisions on which the Adverse Benefit Determination is based; (c) any additional information needed in connection with the claim and the reason such information is needed; and (d) a description of the Plan's review procedures, including a statement of the Participant's right to bring a civil action under ERISA Section 502(a) following an Adverse Benefit Determination upon appeal.  Notice

-16-

CONFIDENTIAL

RBC-PAUL000003359

of the claimant's right to request a review (as described in <u>Section 7.4</u>) will also be given to the claimant.

**7.4      Requesting Review of a Denied Claim**.  A claimant may request that a denied claim be reviewed.  The request for review must be written and must be delivered to the Committee within 60 days after claimant's receipt of written or electronic Adverse Benefit Determination.  A request for review may (but is not required to) include issues and comments that the claimant wants considered in the review, even if such information was not provided in the initial request for benefits.  The claimant may examine pertinent Plan documents, including the records and other documentation, by asking the Committee for such documents.  Within 60 days after delivery of a request for review, the claimant will receive either: (a) a decision; or (b) a notice describing special circumstances requiring a specified amount of additional time (but no more than 120 days from the day the request for review was delivered) to reach a decision.

The Committee may require the claimant to submit such additional facts, documents or other material as it deems necessary or advisable in making its review. The Committee will notify the claimant in writing or electronically of its decision.  If the Adverse Benefit Determination is confirmed in whole or in part, the communication will set forth:  (a) the specific reasons for the decision; (b) the specific references to the Plan provisions on which the decision is based; (c) a statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to and copies of all documents, records, or other information relevant to the claim; and  (d) a statement regarding the claimant's right to bring an action under ERISA Section 502(a).

**7.5      In General**.  All decisions on claims and on reviews of denied claims will be made by the Committee.  The Committee also reserves the right to delegate its authority to make decisions.  The Committee may, in its discretion, hold one or more hearings.  If a claimant does not receive a decision within the specified time, the claimant should assume the claim or appeal was denied on the date the specified time expired.  The claimant may, at the claimant's own expense, have an attorney or other representative act on behalf of the claimant, but the Committee reserves the right to require a written authorization.

No action at law or in equity may be brought to recover benefits or otherwise enforce the provisions of the Plan unless the Participant or beneficiary has exhausted all remedies under this <u>SECTION 7</u>.  Any action brought after exhaustion of such remedies must be brought within ninety (90) days after the Participant or beneficiary has received final notice of an Adverse Benefit Determination under <u>Section 7.4</u>.

## SECTION 8
## OTHER ADMINISTRATIVE MATTERS

**8.1      Reporting**.  As soon as administratively feasible after each calendar quarter end, the Company will prepare and make available to each Participant a report showing (a) the amounts credited to the Participant's account since the last report from the Company, and (b) the amounts of any distributions made since the last report.  At its discretion, the Company may prepare and make available more frequent reports to Participants.

-17-

60908027_9

                                                                        RBC-PAUL000003360

**8.2     Plan Obligor; Status as Unsecured General Creditors**.

(a)     The Company will be the Plan Obligor with respect to distributions from all accounts; provided, however, that the Participant's Participating Subsidiary will be the Plan Obligor with respect to investments of (i) amounts the Company deems mandatory contributions, (ii) Company Contributions related to such mandatory contributions and (iii) all investment returns on amounts described in (i) and (ii), except as set forth in Section 8.2(b) below.

(b)     The Company will be the Plan Obligor with respect to all accounts of Participants who are residents, for tax purposes, in California and Arizona during the Plan Year.

(c)     All Participants are general unsecured creditors of the relevant Plan Obligor with respect to amounts payable pursuant to distributions from the accounts described in (a) and (b) above.

As such, Participants and their estates will not have any secured or preferred interest by way of trust, escrow, lien or otherwise in any specific assets, of the Employers.  The Plan does not require that any hypothetical investments under this Plan be funded by the Company.  If a Plan Obligor, in fact, elects to set aside monies or other assets to meet its obligations under the Plan (there being no obligation to do so) through the creation of a trust or otherwise, such monies or other assets will be subject to the claims of its general creditors, and neither any Participant nor any beneficiary of any Participant will have a legal, beneficial or security interest therein.

**8.3     Disclaimer of Employment and Bonus Rights**.  The Plan is not a contract for employment and does not grant any employee the right to be retained in the employment of the Employers or to obtain any compensation.  Upon dismissal or severance of employment, no Participant will have any right or interest under the Plan, other than as specifically provided herein.

**8.4     Administrative Expenses of the Plan**.  Participants will be responsible for all administrative expenses incurred with respect to this Plan and for all administrative expenses and other fees of this Plan (to the extent such expenses are not paid by the Company), including the costs of outsourced record-keeping (which expenses will be deducted proportionately among Participants' accounts).

**8.5     Voting Rights**.  Participants' accounts under the Plan are bookkeeping accounts and, accordingly, Participants will not have any voting rights with respect to any common shares or any units or other interests in Mutual Funds deemed allocated to any Participant's account.

**8.6     Governing Law**.  This instrument has been executed and delivered in the State of Minnesota and has been drawn in conformity to the laws of that state to the extent not preempted by federal law and will be construed and enforced in accordance with the laws of the State of Minnesota.

60908027_9

CONFIDENTIAL                                          RBC-PAUL000003361

## SECTION 9
## AMENDMENT OR TERMINATION

**9.1    Amendments to and Termination of Plan**.  The Plan may be amended from time to time by the Company or terminated at any time by the Board of Directors of the Company.  Amendments may include, without limitation (a) to ensure that neither the Plan Obligors nor the Participants are subject to adverse Canadian or United States tax consequences and (b) to modify the form of distribution of Participants' accounts; provided, however, that no such amendment or termination will have the effect of (i) reducing the vested portion of amounts already credited to a Participant's account;   (ii) extending the time of distribution of such Participant's accounts, without the consent of such Participant and only in a manner permitted by Code Section 409A; or (iii) causing a violation of Code Section 409A.   In the event of a termination of the Plan, all accounts will be deemed vested and amounts credited thereto will be distributed to Participants in accordance with the distribution guidelines under Code Section 409A.

**9.2    Merger**.  The Company may cause all or part of this Plan to be merged with all or a part of any other nonqualified deferred compensation plan maintained by any company.  If the Company agrees to such a merger, the Company will specify in writing the terms and conditions of such merger and may obtain such consents and agreements as it deems necessary or desirable.

**9.3    Applicability to Successors**.  This Plan will be binding upon and inure to the benefit of the Company and to the extent that the Company is a Plan Obligor under the Plan for any accounts, the Participating Subsidiaries, their successors and assigns, each Participant, his or her personal representatives and any beneficiaries.  If the Company becomes a party to any merger, consolidation or reorganization, this Plan will remain in full force and effect as any obligation of the Company or its successors in interest.

60908027_9

CONFIDENTIAL

RBC-PAUL000003362

# Exhibit J

2009 RBC – US WEALTH ACCUMULATION PLAN (WAP) SUMMARY

| | Financial Consultant Production over $350,000 | Financial Consultant Production $300,000 to $350,000 | Branch Directors PCG Complex and Branch Directors | Branch Directors Production $300,000 to $350,000 | General, Capital Markets, GPB, STII XEC, Staff, VAM, Liberty, Centura, Non-PCG Commission, | Financial Consultant Select teams (No Match) | PCG Directors |
|---|---|---|---|---|---|---|---|
| WAP Packet Code on SAP and Region code (on PSW (payroll code during enrollment) | FINCONSULT | FCENTRY | BRANCHMGR | BRMGRENTRY | STIIXEC | FCSELECT | PCGDIRECT |
| Eligibility | 2008 fiscal year gross production greater than $350,000. Also includes FBW BDs. | 2008 fiscal year gross production between $300,000 and $350,000 | BD/CD title and have 2008 FY production greater than $350,000 or 2008 Ben Sal of at least $150,000 | BD/CD title and have 2008 FY production of $300,000 to - $350,000 | 2008 (10/1/07 to 9/30/08) Ben Sal of at least $350,000

Or

Liberty: PL06 and above + 2008 Ben Sal of at least $350,000

Centura: Vice President level and above as designated by RBC Banking US Operating Committee + 2008 Ben Sal of at least $350,000

Non-Centura and Liberty: New hires during FY 2008 with base salary + guaranteed bonus of $350,000

Centura and Liberty: New hires during FY 2008 with job-title + base salary of $350,000 | 2008 fiscal year gross production greater than $350,000 | PCG Presidents and Regional Directors |
| All Deferrals Start with Comp Above | $0 (all earnings are eligible for deferrals) | $0 (all earnings are eligible for deferrals) | $100,000 calendar year earnings, includes salary paid from January 2009 to December 2009, plus all 2009 FY incentive comp paid in 2009 or early 2010 | $100,000 calendar year earnings, includes salary paid from January 2009, plus all 2009 FY incentive comp paid in 2009 or early 2010 | Up to 90% of STI paid April 2009 through March 2010. For commission only, up to 90% of commission paid April 2009 - March 2010. | $0 (all earnings are eligible for deferrals) | $100,000 calendar year earnings, includes salary paid from January 2009 to December 2009, plus all 2009 FY incentive comp paid in 2009 or early 2010 |
| Deferral Period | 1/1/09 - 12/31/09 | 1/1/09 - 12/31/09 | 1/1/09 - 12/31/09 | 1/1/09 - 12/31/09 | 4/1/09 - 3/31/10 | 1/1/09 - 12/31/09 | 1/1/09 - 12/31/09 |
| Distribution Elections | Retirement In-Service | Must take a distribution on 7/1/2015 | Retirement In-Service | Must take a distribution on 7/1/2014 | Retirement In-Service | Retirement In-Service | Retirement In-Service |
| RIF"s | Unvested Mandatory dollars will vest and be paid out in one lump sum, unless Retirement Distribution was elected and Rule of 60 is satisfied. Unvested Company Contributions will be forfeited and not paid out to participant | | | | | | |

Employee Contributions

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Mandatory Contrib. | N/A | N/A | 10% (matched) | 10% (matched) | N/A | N/A | Scale 10% $100k - $500k, 15% $500k - $1m, 20% >$1m |
| Employee Contribs - Matched | 0% - 15% (FBW elig after integration) | 0% - 15% (FBW elig after inttegration) | 0% - 10% | 0% - 10% | N/A | N/A | 0% - 10% |
| Employee Contribs - Unmatched | 0% - 15% | 0% - 15% | 0% - 10% | 0% - 10% | Up to 90% of STI | 0% - 30% | 0% - 10% |

CONFIDENTIAL

TOLBERT0000692

| | Financial Consultant Production above $350,000 | Financial Consultant Production $300,000 to $350,000 | PCG Complex and Branch Directors | Branch Directors Production $300,000 to $350,000 | General, Capital Markets, GFB, STII XEC, Staff, VAM, Liberty, Cordova, Non-PCG Commission | Financial Consultant Select teams (No Match) | PCG Director |
|---|---|---|---|---|---|---|---|
| **Employee Contributions** — Fixed Match - Invested in RBC Shares | 25% | 25% | NA | NA | No company match | No company match | NA |
| Variable Match - Invested in RBC Shares | NA | NA | Match level based on performance of RBC Financial Group. Match can range from 15% to 50% and is targeted at 25%. | Match level based on performance of RBC Financial Group. Match can range from 15% to 50% and is targeted at 25%. | No company match | No company match | Match level based on performance of RBC Financial Group. Match can range from 15% to 50% and is targeted at 25%. |
| Premium Match - Invested in RBC Shares | 0% - 40% based on gross production and length of service. | 0% - 40% based on gross production and length of service. | 0% - 40% based on gross production and length of service for producing BD/CDs only. | 0% - 40% based on gross production and length of service for producing BD/CDs only. | NA | NA | NA |
| Productivity Bonus | 1.75% - 5% of gross production (starting at $300,000 in production) invested same as employee deferrals; no additional match on Productivity Bonus | 1.75% - 5% of gross production (starting at $300,000 in production) invested same as employee deferrals; no additional match on Productivity Bonus | 1.75% - 5% of gross production (starting at $300,000 in production); no additional match on Productivity Bonus **paid as cash for BD/CDs | 1.75% - 5% of gross production (starting at $300,000 in production), no additional match on Productivity Bonus **paid as cash for BD/CDs | NA | NA | NA |
| **401k** — 401k Comp | Contribute up to IRS limit | Contribute up to IRS limit | Contributions on up to $100,000 of comp for all BD/CDs - even if not WAP eligible | Contributions on up to $100,000 of comp for all BD/CDs - even if not WAP eligible | Contribute up to IRS limit | Contribute up to IRS limit | Contributions on up to $100,000 of comp |
| 401k Match | Match dollar for dollar on 6%, up to $1,500 for all FCs even if not WAP eligible | Match dollar for dollar on 6%, up to $1,500 for all FCs even if not WAP eligible | Match dollar for dollar on 6%, up to $100,000 of comp - 6%, up to $100,000 of comp maximum $6,000 for all BC/CDs even if not WAP eligible | Match dollar for dollar on 6%, up to $100,000 of comp - maximum $6,000 for all BC/CDs even if not WAP eligible | Match dollar for dollar on 6% of pay, up to IRS limit | Match dollar for dollar on 6%, up to $1,500 for all FCs even if not WAP eligible | Match dollar for dollar on 6%, up to $100,000 of comp - maximum $6,000 |
| **Vesting** — Vesting - Company contribs | 5 year cliff vesting from date of contribution. 100% vested 1/1/2015 | 5 year cliff vesting from date of contribution. 100% vested 1/1/2015 | 4 year cliff vesting from date of contribution. 100% vested 1/1/2014 | 4 year cliff vesting from date of contribution. 100% vested 1/1/2014 | NA | NA | 4 year cliff vesting from date of contribution. 100% vested 1/1/2014 |
| Vesting - Mandatory contribs | NA | NA | Mandatory – 2 year graduated (1/3 vested immediately, 1/3 vested 1/1/11, 1/3 vested 1/1/12) | Mandatory – 2 year graduated (1/3 vested immediately, 1/3 vested 1/1/11, 1/3 vested 1/1/12) | NA | NA | Mandatory – 2 year graduated (1/3 vested immediately, 1/3 vested 1/1/11, 1/3 vested 1/1/12) |
| Vesting - Voluntary contribs | Always 100% vested | Always 100% vested | Always 100% vested | Always 100% vested | Always 100% vested | Always 100% vested | Always 100% vested |
| Available Investments for Employee contribs | RBC Share Account RBC Interest Account Mutual Funds | | | | | | |
| Investment Transfer Flexibility | Investment elections for existing balances may be changed up to 12 times per calendar year. Transfers of RBC Shares will be done on the day of the month requested, just like all other investments. Can exchange any non-matching (vol and prod bonus) contributions into and out of the RBC Share Account, effective 1/1/09. Can change investment elections for future contributions daily (no limits). "R" status can move all contributions out of the RBC Share Account. | | | | | | |

CONFIDENTIAL

TOLBERT0000693

| | 2010 Financial Consultant and Branch Directors | 2010 PCG Complex and Regional Directors | 2010 Financial Consultant - Select teams (No Match) | General, Capital Markets, GPB, STIEXEC, Staff, VAM, Liberty, Centura, Non-PCG Commission |
|---|---|---|---|---|
| **WAP Packet Code on SAP and Region Code on PSW (payroll code during enrollment)** | FINCONSULT | BRANCHMGR | FCSELECT | STIEXEC |
| **Eligibility** | 2009 fiscal year gross production over $400,000 for all FCs and BDs | CD or RD title and have 2009 Ben Sal of at least $250,000 | 2009 fiscal year gross production over $400,000 | **Liberty:** PL06 and above + 2009 Ben Sal of at least $350,000.  New hires during FY 2009 at PL06 with base salary of $350,000.<br><br>**Centura:** Vice President level and above as designated by RBC Banking US Operating Committee + 2009 Ben Sal of at least $350,000. New hires during FY 2009 with job title + base salary of $350,000.<br><br><u>Non Centura and Liberty:</u>  2009 Ben Sal of at least $350,000.  New hires during FY 2009 with base salary + guaranteed bonus of $350,000 |
| **All Deferrals Start with Compensation Above** | $0 (all earnings are eligible for deferrals) | $100,000 calendar year earnings, includes salary paid from 1/1/10 - 12/31/10, plus all 2010 FY incentive comp paid in 2010 or early 2011 | $0 (all earnings are eligible for deferrals) | Up to 90% of STI paid April 2010 through March 2011.  For commission only, up to 90% of commission paid April 2010 - March 2011. |
| **Deferral Period** | 1/1/2010 - 12/31/2010 | 1/1/2010 - 12/31/2010 | 1/1/2010 - 12/31/10 | 4/1/2010 - 3/31/2011 |
| **Distribution Elections** | Retirement<br>In-Service | Retirement<br>In-Service | Retirement<br>In-Service | Retirement<br>In-Service |
| **Employee Contributions — Mandatory Contributions** | N/A | 10% (matched) | N/A | N/A |
| **Employee Contributions — Employee Contributions - Matched** | N/A - No longer a fixed match in the WAP for FCs or BDs | 0% - 10% | N/A | N/A |
| **Employee Contributions — Employee Contributions - Unmatched** | 0% - 50% | 0% - 10% | 0% - 50% | Up to 90% of STI |

CONFIDENTIAL

TOLBERT0000711

FOR HR USE ONLY - DO NOT DISTRIBUTE

| | | 2010 Financial Consultant and Branch Directors | 2010 PCG Complex and Regional Directors | 2010 Financial Consultant - Select teams (No Match) | General, Capital Markets, GPB, STIEXEC, Staff, VAM, Liberty, Centura, Non-PCG Commission |
|---|---|---|---|---|---|
| **Employer Contributions** | Fixed Match - Invested in RBC Shares | 2009 last year available | N/A | N/A | N/A |
| | Variable Match - Invested in RBC Shares | N/A | Match level based on performance of RBC.  Match can range from 15% to 50% and is targeted at 25%. | N/A | N/A |
| | Premium Match - Invested in RBC Shares | 2009 last year available | N/A | N/A | N/A |
| | RBC Loyalty Bonus (starting at $400,000 in production) - Invested in RBC Shares | 0.25% - 4% of FY production. Based on production and length of service as a FC or BD with RBC. | N/A | N/A | N/A |
| | Productivity Bonus (starting at $400,000 in production) | 2.25% - 5% of FY production. Contributed to WAP account for all FCs and BDs. | N/A | N/A | N/A |
| **Vesting** | Vesting - Company Contributions | 5 year cliff vesting from date of contribution. 100% vested 1/1/2016 | 4 year cliff vesting from date of contribution.  100% vested 1/1/2015 | N/A | N/A |
| | Vesting - Mandatory Contributions | N/A | Mandatory – 2 year graduated  (1/3 vested immediately, 1/3 vested 1/1/12, 1/3 vested 1/1/13) | N/A | N/A |
| | Vesting - Voluntary Contributions | Always 100% vested | Always 100% vested | Always 100% vested | Always 100% vested |
| **401k** | 401k Comp | Defer up to IRS limit | Deferrals on up to $100,000 of comp for all CD & RDs | Defer up to IRS limit | Defer up to IRS limit |
| | 401k Match | As of 2/1/2009, FCs and BDs are not eligible to receive 401k match. | As of 2/1/2009, CDs are not eligible to receive 401k match. As of 3/1/2009, RDs are not eligible to receive 401k match. | As of 2/1/2009, FCs and BDs are not eligible to receive 401k match. | Match dollar for dollar on 6% of pay, up to IRS limit |
| | RIFs | Unvested Mandatory dollars will vest<br>Unvested Company Contributions will be forfeited | | | |
| | Investments - EE Contributions & Productivity Bonus | RBC Share Account<br>RBC Interest Account<br>Mutual Funds | | | |
| | Investment Transfer Flexibility | Investment elections for existing balances may be changed up to 12 times per calendar year.<br>Can exchange any non-matching (vol and prod bonus) contributions into and out of the RBC Share Account, effective 1/1/09.<br>Can change investment elections for future contributions daily (no limits).<br>"R" status can move all contributions out of the RBC Share Account. | | | |

CONFIDENTIAL   TOLBERT0000712

**2011 RBC – US WEALTH ACCUMULATION PLAN (WAP) SUMMARY**    FOR HR USE ONLY - DO NOT DISTRIBUTE

| | 2011 Financial Consultant and Branch Directors | 2011 PCG Complex and Regional Directors | 2011 Financial Consultant - Select teams (No Match) | General, Capital Markets, GPB, STIEXEC, Staff, VAM, Liberty, Centura, Non-PCG Commission |
|---|---|---|---|---|
| WAP Packet Code on SAP and Region Code on PSW (payroll code during enrollment) | FINCONSULT | BRANCHMGR - on PSW, but will show FINCONSULT on SAP in 2011 | FCSELECT | STIEXEC |
| Eligibility (For 1/1/2011) | 2010 fiscal year gross production over $400,000 for all FCs and BDs | CD or RD title and have 2010 Ben Sal of at least $250,000 | 2010 fiscal year gross production over $400,000 | Liberty: PL06 and above + 2010 Ben Sal of at least $350,000.  New hires during FY 2010 at PL06 with base salary of $350,000. Centura: Vice President level and above as designated by RBC Banking US Operating Committee + 2010 Ben Sal of at least $350,000.  New hires during FY 2010 with job title + base salary of $350,000. Non Centura and Liberty:  2010 Ben Sal of at least $350,000.  New hires during FY 2010 with base salary + guaranteed bonus of $350,000 |
| All Deferrals Start with Compensation Above | $0 (all earnings are eligible for deferrals) | $0 (all earnings are eligible for deferrals) | $0 (all earnings are eligible for deferrals) | Up to 90% of STI paid April 2011 through March 2012.  For commission only, up to 90% of commission paid April 2011 - March 2012. |
| Deferral Period | 1/1/2011 - 12/31/2011 | 1/1/2011 - 12/31/2011 | 1/1/2011 - 12/31/2011 | 4/1/2011 - 3/31/2012 |
| Distribution Elections | Retirement In-Service | Retirement In-Service | Retirement In-Service | Retirement In-Service |
| Mandatory Contributions | N/A | N/A | N/A | N/A |
| Employee Contributions - Matched | N/A - No longer a fixed match in the WAP for FCs or BDs (started with 2010 plan) | N/A - No longer a variable match in the WAP for CDs or RDs (starting with 2011 plan) | N/A | N/A |
| Employee Contributions - Unmatched | 0% - 50% | 0% - 50% | 0% - 50% | Up to 90% of STI |

*(Left margin label spanning Mandatory/Employee rows: Employee Contributions)*

CONFIDENTIAL

TOLBERT0000713

2011 RBC – US WEALTH ACCUMULATION PLAN (WAP) SUMMARY

FOR HR USE ONLY - DO NOT DISTRIBUTE

| | | 2011 Financial Consultant and Branch Directors | 2011 PCG Complex and Regional Directors | 2011 Financial Consultant - Select teams (No Match) | General, Capital Markets, GPB, STIEXEC, Staff, VAM, Liberty, Centura, Non-PCG Commission |
|---|---|---|---|---|---|
| **Employer Contributions** | **Fixed Match - Invested in RBC Shares** | 2009 was last year for fixed match | N/A | N/A | N/A |
| | **Variable Match - Invested in RBC Shares** | N/A | 2010 was last year for variable match | N/A | N/A |
| | **WAP Bonus** | | 5% WAP Rate x Bonus Target x Year End Bonus Score | | |
| | **Premium Match - Invested in RBC Shares** | 2009 was last year for premium match | N/A | N/A | N/A |
| | **RBC Loyalty Bonus (starting at $400,000 in production) - Invested in RBC Shares** | 0.25% - 4% of FY production.  Based on production and length of service as a FC or BD with RBC. | N/A | N/A | N/A |
| | **Productivity Bonus (starting at $400,000 in production)** | 2.25% - 5% of FY production | N/A | N/A | N/A |
| **Vesting** | **Vesting - Company Contributions** | 5 year cliff vesting from date of contribution. 100% vested 1/1/2017 | 4 year cliff vesting from date of contribution. 100% vested 1/1/2016 | N/A | N/A |
| | **Vesting - Mandatory Contributions (No new Mandatory deferrals effective plan year 2011)** | N/A | N/A | N/A | N/A |
| | **Vesting - Voluntary Contributions** | Always 100% vested | Always 100% vested | Always 100% vested | Always 100% vested |
| **401k** | **401k Comp** | Defer up to IRS limit | Defer up to IRS limit | Defer up to IRS limit | Defer up to IRS limit |
| | **401k Match** | As of 2/1/2009, FCs and BDs are not eligible to receive 401k match. | As of 2/1/2009, CDs are not eligible to receive 401k match. As of 3/1/2009, RDs are not eligible to receive 401k match. | As of 2/1/2009, FCs and BDs are not eligible to receive 401k match. | Match dollar for dollar on 6% of pay, up to IRS limit |
| | **RIFs** | Unvested Mandatory dollars from prior plan years will vest<br>Unvested Company Contributions will be forfeited | | | |
| | **Investments - EE Contributions & Productivity Bonus** | RBC Share Account<br>RBC Interest Account<br>Mutual Funds | | | |
| | **Investment Transfer Flexibility** | Investment elections for existing balances may be changed up to 12 times per calendar year.<br>Can change investment elections for future contributions daily (no limits).<br>RBC Loyalty Bonus along with Fixed and Premium Match from prior years must remain in RBC Share Account (until age 55 or retirement)<br>"R" status can move all contributions from all sources out of the RBC Share Account.<br>Effective 1/1/2011 age 55 and older may diversify all contributions from all sources out of the RBC Share Account. | | | |

CONFIDENTIAL

TOLBERT0000714

# Exhibit K

Paul, et ano. v. RBC Capital Markets, LLC, et al.                                    Tammy Buchert

---

**Page 1**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

_____

)
MARTY PAUL, an individual; and  )
BRIAN BUSKIRK, an individual,   )
                                )
        Plaintiffs,    )
                                )
    v.                 )  No. 3:16-cv-05616-RBL
                                )
RBC CAPITAL MARKETS, LLC, a    )
Minnesota limited liability    )
company; ROYAL BANK OF CANADA, )
a Canadian corporation; and    )
ROYAL BANK OF CANADA US WEALTH )
ACCUMULATION PLAN, an employee )
benefit plan,                  )
                                )
        Defendants.    )
_____

DEPOSITION UPON ORAL EXAMINATION

OF

TAMMY BUCHERT

_____

Taken at 50 South Sixth Street
Minneapolis, Minnesota

DATE TAKEN:  July 12, 2017
REPORTED BY:  Ryan Ziegler, RPR, CCR 3348

---

**Page 2**

```
 1
               A P P E A R A N C E S
 2
 3    FOR PLAINTIFFS:
 4        JEREMY E. ROLLER
          Yarmuth Wilsdon, PLLC
 5        1420 Fifth Avenue
          Suite 1400
 6        Seattle, Washington  98101
          206.516.3800
 7        jroller@yarmuth.com
 8
 9    FOR DEFENDANTS:
10        MATTHEW A. RUSSELL
          Morgan, Lewis & Bockius, LLP
11        77 West Wacker Drive
          Fifth Floor
12        Chicago, Illinois  60601
          312.324.1771
13        matthew.russell@morganlewis.com
14        CASEY E. JARCHOW
          Senior Counsel - Employment
15        RBC Wealth Management
          RBC Plaza
16        60 South Sixth Street
          Minneapolis, Minnesota  55402
17        612.371.7672
          casey.jarchow@rbc.com
18
19
              * * * * *
20
21
22
23
24
25
```

---

**Page 3**

```
 1           DEPOSITION OF TAMMY BUCHERT
 2               EXAMINATION INDEX
 3    EXAMINATION BY                      PAGE
 4    Mr. Roller . . . . . . . . . . . . . . . . . . .   5
 5
 6               * * * * *
 7
 8
 9               EXHIBIT INDEX
10    *** EXHIBIT NOS. 2-12 ARE DESIGNATED CONFIDENTIAL ***
11    EXHIBITS FOR IDENTIFICATION              PAGE
12    1 10/5/2016 Defendants' Initial Disclosures   41
13    2 2009 Financial Consultant Compensation Plan,
        RBC-PAUL000006615 - RBC-PAUL000006646        49
14
15    3 October I E Summary Report, RBC-PAUL000003627   78
16    4 10/2011 Commission Analysis, RBC-PAUL000004418 -
        RBC-PAUL000004425                            80
17    5 12/19/2008 Marty Paul Pay Statement,
        RBC-PAUL000003576                            83
18
19    6 4/8/2005 2006 FC Compensation Planning Pre-read
        Materials for Meeting #1, TOLBERT0000750-
        TOLBERT0000771                               99
20
21    7 8/21/20006 Mercer Report Re: Wealth Accumulation
        Plan (WAP), RBC Financial Group, TOLBERT0001076-
        TOLBERT0001110                              115
22
23    8 7/9/2008 2010 FC Compensation Planning Packet,
        TOLBERT0000905-TOLBERT0000908               117
24    9 Wealth Accumulation Plan - Preliminary
        Considerations 2007 Spreadsheet,
25      TOLBERT00001228-TOLBERT0001229              121
```

---

**Page 4**

```
 1    EXHIBITS FOR IDENTIFICATION (cont.)       PAGE
 2    10 10/23/2007 FY2009 FC Compensation Working
         Slides - Second Review Meeting,
 3       TOLBERT0000983-TOLBERT0000994            124
 4    11 9/9/2008 2010 FC Compensation Planning Packet,
         TOLBERT0000951-TOLBERT0000959            129
 5
 6    12 5/19/2010 2011 FC Compensation Regional Director
         Meeting Packet, RBC-PAUL000005699 -
 7       RBCPAUL000005714                         137
      *** EXHIBIT NOS. 2-12 ARE DESIGNATED CONFIDENTIAL ***
 8
 9               * * * * *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

BUELL REALTIME REPORTING, LLC
SEATTLE 206.287.9066  OLYMPIA 360.534.9066  SPOKANE 509.624.3261  NATIONAL 800.846.6989

Paul, et ano. v. RBC Capital Markets, LLC, et al.                    Tammy Buchert

Page 73

1    A.   Mm-hmm.
2    Q.   -- page 6.  What are licensing fees?
3    A.   Every year, financial advisers have to be licensed
4  in the state in which -- states in which they do business.
5  They're given an allowance based on their production level.
6         If they exceed that allowance, then they'll be
7  charged those licensing fees that are in excess of what the
8  allowance is.
9    Q.   And that -- that deduction would be made on a
10 monthly basis or an annual basis?
11   A.   The calculation is done annually, because of an
12 annual enrollment.  I don't know if it is taken off of one
13 paycheck or several paychecks.  I don't know.
14   Q.   And "client associate -- associate compensation
15 sharing," does that have something to do where one client
16 is shared by more than one financial adviser?
17   A.   No.
18   Q.   What is that?
19   A.   This is when we talked earlier, the CA sharing.
20 This is a financial adviser choosing to pay $200 a month to
21 their client associate.  This is where that is.  That's --
22 that calculation -- kind of the order of compensation, that
23 happens before we call it "commission-based earnings."
24   Q.   So that -- that client associate compensation
25 sharing, that's -- that's taken off at the determination of

Page 74

1  the commission-based earnings stage?
2    A.   Yes.
3    Q.   Let's turn to page 7, the -- where the header is
4  "RBC U.S. Wealth Accumulation Plan Overview," and I note
5  that on the -- bottom of that box, there's a provision
6  about vesting.
7         And for 2009, it reads, "The 2009 WAP productivity
8  bonus and company matches are credited to your WAP account
9  in February of 2010 and become fully vested five years
10 later in January of 2015."  Do you know why productivity
11 bonuses and company matches in the WAP are vested sometime
12 after they're credited to the account?
13   A.   I know it to be a fact.  I don't know the
14 reasonings why.
15   Q.   Do you know, is it a retention device?
16   A.   I believe so.
17   Q.   And why would it be a retention device?
18   A.   Because if somebody leaves RBC and they have money
19 in the wealth accumulation plan that's subject to
20 forfeiture, they lose that -- lose those funds.  So to me,
21 that's a retention advice -- a retention device to say,
22 "Stay with us."
23   Q.   Do financial consultants have the ability to say,
24 "Okay.  I'm -- I'm" -- let's just look at the grid on page
25 3.  "I'm a half-million dollar producer.  That puts me in

Page 75

1  the 42 percent base commission rate; right?  But for some
2  reason, I'm special.  I want to be 45 percent"?  Does that
3  ever happen?
4    A.   Yes.
5    Q.   And are those upward adjustments ever made?
6    A.   Yes.
7    Q.   Why?
8    A.   Whatever that special circumstance in your
9  example, executives in the -- so divisional directors,
10 complex directors believed that that special circumstance
11 warranted an increase or warranted granting their request
12 to have a higher payout rate.
13   Q.   And do you have any examples of what those special
14 circumstances might be?
15   A.   I don't get involved in those discussions on those
16 decisions.  I -- I'm trying to think if I have an example
17 of one.
18        An example might be, "I helped you, Divisional
19 Director, with a significant recruiting effort, and I did
20 all of these things for the firm.  I think for a year or
21 two" -- or whatever they are pitching -- "I should have a
22 higher base rate for that."  That'd be an example of an
23 ex- -- a special circumstances I could see.
24   Q.   Do you know how often that happens?
25        MR. RUSSELL:  Object to form.  You're

Page 76

1  referring to the example in the last answer or negotiations
2  generally?
3         MR. ROLLER:  I'm just -- I'm referring to
4  negotiation of the base rate generally.
5    A.   It happens -- how -- when you say "how often," I
6  can't give you a number of any point in time how many
7  people have it.
8         We do monitor that, and on a periodic basis, we
9  would review that report of -- line by line of who has a
10 rate, when it is expiring, if it is expiring, to make sure
11 that management who approved those continues to be aware of
12 those and is just apprized.
13        You know, one of these could be made one year.  A
14 year later, it's still there.  We want to make sure that
15 they're aware that it's still there.  So I can't -- I can't
16 give you a number of how many it is.  That report could be
17 several pages long.
18 BY MR. ROLLER:
19   Q.   And do financial consultants coming to the firm
20 ever get a sign-on bonus?
21   A.   Yes.
22   Q.   And how's -- how are those determined?
23   A.   There is a standard structure that our firm has
24 that involves a promissory note and potentially some
25 contributions or additional notes after time.  That's the

19 (Pages 73 to 76)

Paul, et ano. v. RBC Capital Markets, LLC, et al.                    Tammy Buchert

Page 109

Page 111

Page 110

Page 112

1    almost a cover sheet for 21, but I'm not -- I'm not sure.
2        A.  It is.
3        Q.  So page 20 reads, "Revisit Hook Development
4    (Unvested WAP Balances)."  What is "hook development"?
5        A.  "Hook" is industry jargon for the retention -- a
6    retention measure of your deferred compensation plan.
7        Q.  So can you tell me why the term "hook" is used?
8        A.  I don't know.  It's industry jargon.
9        Q.  And what is the -- what is the concept?
10       A.  That there is retention value in having unvested
11   WAP balances.  Yeah.  Retention value.
12       Q.  Because if a participant leaves before vesting,
13   they don't get the balances?
14       A.  Depending on the forfeiture provisions, yes.
15       Q.  And on page 20, a question is posed.  "When will
16   the full impact of WAP hook development be achieved for
17   Dain and TAS FCs?"  Do you see that?
18       A.  Mm-hmm.  Yes.
19       Q.  First of all, what is TAS?
20       A.  Tucker Anthony Sutro.  It's another wealth
21   management firm that we purchased, and close to the
22   acquisition time or just shortly after, we would still
23   measure things on who were original Dain Rauscher FAs and
24   who were those who were formerly Tucker Anthony Sutro FAs.
25           And so as they came on board, sometimes they're --

28 (Pages 109 to 112)

Paul, et ano. v. RBC Capital Markets, LLC, et al.                                    Tammy Buchert

| Page 129 | Page 131 |
|---|---|

**Page 131**

1     Q.   The first comment says, "Goal - Improved Optics"?
2     A.   Yes.
3     Q.   Do you know what that means?
4     A.   Yes.
5     Q.   What does it mean?
6     A.   Under the current plan -- labeled up here as
7    "current plan," so at that time -- we had a bonus,
8    productivity bonus, and we had matches on the voluntary
9    contributions.  Optically, we found that financial advisers
10   thought very -- and they could very clearly understand, "My
11   productivity bonus is 5 percent," or whatever it may be.
12        It -- it wasn't optically easy for them to say,
13   "Oh, and I got another X percent of total production or,
14   you know, X percent of production in matches, things
15   that -- the other pieces the company gave to me."  The
16   matches were significant, but they were, I'd say,
17   under-perceived by the field.
18        When -- when they would talk about how much our
19   plan pays a financial versus -- a financial adviser versus,
20   say, a competitor plan, they would quickly say, "Grid,
21   productivity bonus," and they would forget about trying to
22   estimate the value of these two matches.
23        So then if we changed how we paid this money by
24   saying, "We have a productivity bonus, we have an LOS --
25   length-of-service -- bonus, all based on grids that's very

| Page 130 | Page 132 |
|---|---|

**Page 132**

1    easy to pick out a percentage," optically, the value,
2    whether it's the same amount of money, they can understand
3    better, "I'm getting X percent in commission grid, X
4    percent in a bonus, X percent in a bonus.  Here's how much
5    RBC is paying me as a percent of production versus somebody
6    I might be looking at elsewhere."
7         So it's improved optics for an FA to understand
8    the total value of what they're receiving from the company.
9         Q.   So is it fair to say that the -- the resources or
10   dollars, perhaps, that would have, under the -- what's
11   listed here as "Current FC" --
12        A.   Mm-hmm.
13        Q.   -- under the fixed match and premium match were
14   shifted over to the productivity bonus and the new
15   length-of-service bonus to boost the levels of the -- that
16   productivity bonus and add the length-of-service bonus?
17             MR. RUSSELL:  Object to form.
18        A.   I think the shift was primarily between moving
19   money from -- that we were paying out in the form of these
20   matches to this LOS bonus.
21   BY MR. ROLLER:
22        Q.   To the length-of-service bonus?
23        A.   Yes.
24        Q.   And why do you say that as opposed to the
25   productivity bonus?

33  (Pages 129 to 132)

Paul, et ano. v. RBC Capital Markets, LLC, et al.                                              Tammy Buchert

Page 145

```
 1    questions.  Mr. Russell may.
 2              MR. RUSSELL:  I have no questions for the
 3    witness.
 4              MR. ROLLER:  Thank you very much.
 5              THE WITNESS:  You're welcome.
 6         (Deposition concluded at 3:00 p.m.)
 7         (Signature was reserved.)
 8
 9
10                   *   *   *   *   *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 146

```
 1              C E R T I F I C A T E
 2
 3    STATE OF MINNESOTA
 4    COUNTY OF DAKOTA
 5
 6         I, Ryan Ziegler, a Certified Shorthand Reporter in
 7    and for the State of Washington, do hereby certify that the
 8    foregoing transcript of the deposition of Tammy Buchert,
 9    having been duly sworn, on July 12, 2017, is true and
10    accurate to the best of my knowledge, skill, and ability.
11         I do further certify that I am a disinterested
12    person in this cause of action and that I am not a relative
13    of the attorneys for any of the parties.
14         IN WITNESS WHEREOF, I have hereunto set my hand
15    and seal this July 21, 2017.
16
17
18
19             _____
                 RYAN ZIEGLER, RPR, CCR
20
21
22
23
24
25
```



37 (Pages 145 to 146)

# Exhibit L

Honorable Ronald B. Leighton

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MARTY PAUL, an individual; and
BRIAN BUSKIRK, an individual,

                    Plaintiffs,

      v.

RBC CAPITAL MARKETS, LLC, a
Minnesota limited liability company;
ROYAL BANK OF CANADA, a
Canadian corporation; and ROYAL
BANK OF CANADA US WEALTH
ACCUMULATION PLAN, an employee
benefit plan,

                 Defendants.

No. 3:16-cv-05616-RBL

STIPULATION OF FACTS
REGARDING WAP ELIGIBILITY

Plaintiffs Marty Paul and Brian Buskirk ("Plaintiffs") and defendants RBC Capital

Markets, LLC, Royal Bank of Canada, and Royal Bank of Canada US Wealth

Accumulation Plan ("Defendants") (Plaintiffs and Defendants collectively, the "Parties"),

hereby stipulate to the following facts:[1]

---

[1] Defendants do not by these stipulations concede that any stipulated fact is relevant in this case and reserve the right in the future to dispute the relevance of such information.

STIPULATION OF FACTS
REGARDING WAP ELIGIBILITY
NO. 3:16-CV-05616-RBL – PAGE 1

1.    The eligibility requirements to participate in the Royal Bank of Canada U.S. Wealth Accumulation Plan ("WAP") in 2003 were as follows:

    (a)    **General ("GENERAL")**: 2002 Annualized Calendar Year Cash Compensation greater than $150,000.

    (b)    **Financial Consultants ("FINCONSULT")**: 2002 Fiscal Year ("FY") Annualized Gross Production of greater than $300,000.

    (c)    **Fixed Income, Commissioned ("FICMCOMM")**: 2002 Annualized Calendar Year Cash Compensation of greater than $150,000.

    (d)    **Fixed Income, Non-Commissioned ("FICMNONCOM")**: 2002 Annualized Calendar Year Cash Compensation of greater than $150,000.

    (e)    **Private Client Group (PCG) Branch Managers ("BRANCHMGR" )**: Title of PCG Branch Manager.

    (f)    **SEG Directors ("DIRECTOR")**: Title of SEG Director.

2.    The eligibility requirements to participate in the WAP in 2004 were as follows:

    (a)    **General ("GENERAL")**: Eligible Pay 11/1/2002 through 10/31/2003 *plus* FY 2003 Bonus totaling at least $150,000, *or* a New Hire in FY 2003 with a base salary of at least $150,000.

    (b)    **Financial Consultants ("FINCONSULT")**: 2003 FY Production of greater than $300,000.

    (c)    **Fixed Income, Commissioned ("FICMCOMM")**: Eligible Pay 11/1/2002 through 10/31/2003 *plus* FY 2003 Bonus totaling at least $150,000, *or* a new hire during FY 2003 with annualized paid compensation of at least $150,000.

    (d)    **Fixed Income, Non-Commissioned ("FICMNONCOM")**: Eligible Pay 11/1/2002 through 10/31/2003 *plus* FY 2003 Bonus totaling at least $150,000, *or* a New Hire during FY 2003 with (i) a base salary of at least $150,000 *or* (ii) guarantee of at least $150,000 in FY 2004.

    (e)    **PCG Branch Managers ("BRANCHMGR")**: Title of PCG Branch Manager.

    (f)    **Directors ("DIRECTOR")**: Title and/or designation of RBC Dain Rauscher Director.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 West Wacker Drive
Chicago, IL  60601-5094
+1.312.324.1000

(g) **RBC Liberty, Capital Markets, Centura and Mortgage**:

(i) <u>Liberty and RBC Capital Markets employees</u> (**"Liberty" and "CAPITAL MARKETS"**): Title of Vice President level and above.

(ii) <u>Centura employees</u> (**"Centura"**): Title of Vice President level and above, as designated by RBC Banking U.S. Operating Committee, *and* minimum FY 2003 Total Cash Compensation of at least $150,000.

(iii) <u>Mortgage employees</u> (**"Mortgage"**): Title of Mortgage Loan Officer with minimum FY 2003 Total Cash Compensation of at least $150,000.

3. The eligibility requirements to participate in the WAP in 2005 were as follows:

(a) **General ("GENERAL"):** Eligible Pay 11/1/2003 through 10/31/2004 *plus* FY 2004 bonus totaling at least $150,000, *or* a New Hire during FY 2004 with a base salary of at least $150,000.

(b) **Financial Consultants ("FINCONSULT")**: 2004 FY Production of greater than $300,000.

(c) **Fixed Income, Commissioned ("FICMCOMM")**: Eligible Pay 11/1/2003 through 10/1/2004 *plus* FY 2004 bonus totaling at least $150,000, *or* a New Hire during FY 2004 with annualized paid compensation of at least $150,000.

(d) **Fixed Income, Non-Commissioned ("FICMNONCOM")**: Eligible Pay 11/1/2003 through 10/31/2004 *plus* FY 2004 bonus totaling at least $150,000, *or* a New Hire during FY 2004 with (i) a base salary of at least $150,000 *or* (ii) guarantee of at least $150,000 in FY 2005.

(e) **PCG Branch Managers ("BRANCHMGR")**: Title of PCG Branch Manager.

(f) **Directors ("DIRECTOR")**: Title and/or designation of RBC Dain Rauscher Director.

(g) **RBC Liberty, Capital Markets, Centura and Mortgage**:

(i) <u>Liberty employees</u> (**"LIBERTY"**): Title of Vice President level and above.

(ii) <u>Capital Markets employees</u> (**"CAPITALMKT"**): FY 2004 Total Cash Compensation of at least $150,000.

STIPULATION OF FACTS
REGARDING WAP ELIGIBILITY
NO. 3:16-CV-05616-RBL – PAGE 3

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 West Wacker Drive
Chicago, IL  60601-5094
+1.312.324.1000

      (iii)   <u>Centura employees</u> (**"CENTURA"**): Title of Vice President level and above, as designated by RBC Banking U.S. Operating Committee, *and* minimum FY 2004 Total Cash Compensation of at least $150,000.

      (iv)   <u>Mortgage employees</u> (**"MORTGAGE"**): Status as a commissioned employee *and* a minimum FY 2004 Total Cash Compensation of at least $150,000.

4.    The eligibility requirements to participate in the WAP in 2006 were as follows:

(a)    **General ("GENERAL")**: Eligible pay 11/1/2004 through 10/31/2005 *plus* FY 2005 bonus totaling at least $150,000, *or* a New Hire during FY 2005 with a base salary of at least $150,000.

(b)    **Financial Consultants ("FINCONSULT")**: 2005 FY Production of greater than $300,000.

(c)    **Fixed Income, Commissioned ("FICMCOMM")**: Eligible pay 11/1/2004 through 10/31/2005 *plus* FY 2005 bonus totaling at least $150,000, *or* a New Hire during FY 2005 with annualized paid compensation of at least $150,000.

(d)    **Fixed Income, Non-Commissioned ("FICMNONCOMM")**: Eligible pay 11/1/2004 through 10/31/2005 *plus* FY 2005 bonus totaling at least $150,000, *or* a New Hire during FY 2005 with (i) a base salary of at least $150,000 *or* (ii) guarantee of at least $150,000 in FY 2006.

(e)    **PCG Complex and Branch Directors ("BRANCHMGR")**: Title of Branch Director or Complex Director.

(f)    **Directors ("DIRECTOR")**: Title and/or designation of RBC Dain Rauscher Director.

(g)    **RBC Liberty, Capital Markets and Centura**:

      (i)   <u>Liberty employees</u> (**"LIBERTY"**): Title of Vice President level and above *and* minimum FY 2005 Total Cash Compensation of at least $150,000.

      (ii)   <u>Capital Markets employees</u> (**"CAPITALMKT"**): FY 2005 Total Cash Compensation of at least $150,000.

      (iii)   <u>Centura employees</u> (**"CENTURA"**): Title of Vice President level and above, as designated by RBC Banking U.S. Operating

STIPULATION OF FACTS
REGARDING WAP ELIGIBILITY
NO. 3:16-CV-05616-RBL – PAGE 4

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 West Wacker Drive
Chicago, IL  60601-5094
+1.312.324.1000

Committee, *and* minimum FY 2005 Total Cash Compensation of at least $150,000.

(h) **Executive Level Presidents ("STIEXEC"):**  Includes a small number (approximately 4) of executive level presidents with greater than $150,000 in FY 2005 Total Cash Compensation.

5. The eligibility requirements to participate in the WAP in 2007 were as follows:

(a) **Financial Consultants ("FINCONSULT")**: 2006 FY Production of greater than $350,000.

(b) **Financial Consultants with Production $300,000 to $350,000 ("FCENTRY")**: 2006 FY Production between $300,000 and $350,000.

(c) **PCG Complex and Branch Directors ("BRANCHMGR")**: Title of Branch Director or Complex Director *and* (i) 2006 FY Production greater than $350,000 *or* (ii) 2006 Benefits Salary of at least $150,000.

(d) **Branch and Complex Directors with Production between $300,000 and $350,000 ("BRMGENTRY")**: Title of Branch Director or Complex Director *and* 2006 FY Production of $300,000 to $350,000.

(e) **RBC General, Capital Markets, GPB, STIEXEC, Centura and Liberty**:

(i) <u>Liberty employees</u> **("LIBERTY")**:  designation of "PL06" and above *and* 2006 Benefits Salary of at least $150,000, including new hires during FY 2006 with the requisite job level *and* a base salary of at least $150,000;

(ii) <u>Centura employees</u> **("CENTURA")**:  designation of Vice President and above *and* 2006 Benefits Salary of at least $150,000, including new hires during FY 2006 with the requisite job level *and* base salary of at least $150,000;

(iii) <u>Non-Centura and Non-Liberty employees</u> **("CAPITAL MARKETS" AND "STIEXEC" and "GENERAL")**:  2006 Benefits Salary of at least $150,000, including new hires in 2007 with a base salary of at least $150,000.

(f) **Fixed Income, Commissioned ("FICMCOMM")**: 2006 Benefits Salary of at least $150,000 *or* a New Hire during 2007 with (i) a base salary of $150,000 *or* (ii) guarantee of at least $150,000 in FY 2007.

STIPULATION OF FACTS
REGARDING WAP ELIGIBILITY
NO. 3:16-CV-05616-RBL – PAGE 5

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 West Wacker Drive
Chicago, IL  60601-5094
+1.312.324.1000

(g)   **Fixed Income, Non-Commissioned Banking ("FIGNCBANK"):** 2006 Benefits Salary of at least $150,000 *or* a New Hire during FY 2006 with (i) a base salary of $150,000 *or* (ii) guarantee of at least $150,000 in FY 2007.

(h)   **Fixed Income, Non-Commissioned Non-Banking ("FIGNC")**: 2006 Benefits Salary of at least $150,000 *or* a New Hire during FY 2006 with (i) a base salary of $150,000 *or* (ii) guarantee of at least $150,000 in FY 2007.

(i)   **PCG Directors ("PCGDIRECT")**: Title of PCG President or Regional Director.

6.   The eligibility requirements to participate in the WAP in 2008 were as follows:

(a)   **Financial Consultants ("FINCONSULT")**: 2007 FY Production of greater than $350,000.

(b)   **Financial Consultants with Production $300,000 to $350,000 ("FCENTRY")**: 2007 FY Production between $300,000 and $350,000.

(c)   **PCG Complex and Branch Directors ("BRANCHMGR")**: Title of Branch Director or Complex Director *and* (i) 2007 FY Production greater than $350,000 *or* (ii) 2007 Benefits Salary of at least $150,000.

(d)   **Branch and Complex Directors with Production between $300,000 and $350,000 ("BRMGENTRY")**: Title of Branch Director or Complex Director *and* (i) 2007 FY Production of $300,000 to $350,000 *or* (ii) 2007 Benefits Salary of at least $150,000.

(e)   **General, Capital Markets, GPB, STIEXEC, VAM, Liberty, Centura ("STIEXEC")**:

(i)   Liberty employees:  designation of "PL06" and above *and* 2007 Benefits Salary of at least $150,000, including new hires during FY 2007 with the requisite job level *and* a base salary of at least $150,000;

(ii)   Centura employees:  designation of Vice President and above *and* 2007 Benefits Salary of at least $150,000, including new hires during FY 2007 with the requisite job level *and* base salary of at least $150,000;

(iii)   Non-Centura and Non-Liberty employees:  2007 Benefits Salary of at least $150,000, including new hires in FY 2007 with a base salary of at least $150,000.

STIPULATION OF FACTS
REGARDING WAP ELIGIBILITY
NO. 3:16-CV-05616-RBL – PAGE 6

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 West Wacker Drive
Chicago, IL  60601-5094
+1.312.324.1000

(f)    **Fixed Income, Commissioned ("FICMCOMM")**: 2007 Benefits Salary of at least $150,000 *or* a New Hire during 2007 with (i) a base salary of $150,000 *or* (ii) guarantee of at least $150,000 in FY 2008

(g)    **Fixed Income, Non-Commissioned Banking ("STIEXEC"):** 2007 Benefits Salary of at least $150,000 *or* a New Hire during 2007 with (i) a base salary of $150,000 *or* (ii) guarantee of at least $150,000 in FY 2008

(h)    **Fixed Income, Non-Commissioned Non-Banking ("STIEXEC")**: 2007 Benefits Salary of at least $150,000 *or* a New Hire during 2007 with (i) a base salary of $150,000 *or* (ii) guarantee of at least $150,000 in FY 2008

(i)    **PCG Directors ("PCGDIRECT")**: Title of PCG President or Regional Director

7.    The eligibility requirements to participate in the WAP in 2009 were as follows:

(a)    **Financial Consultants ("FINCONSULT")**: 2008 FY Production of greater than $350,000

(b)    **Financial Consultants with Production from $300,000 to $350,000 ("FCENTRY")**: 2008 FY Production between $300,000 and $350,000.

(c)    **PCG Complex and Branch Directors ("BRANCHMGR")**: Title of Branch Director or Complex Director *and* (i) 2008 FY Production greater than $350,000 *or* (ii) 2008 Benefits Salary of at least $150,000

(d)    **Branch and Complex Directors with Production between $300,000 and $350,000 ("BRMGENTRY")**: Title of Branch Director or Complex Director *and* 2008 FY Production of $300,000 to $350,000.

(e)    **General, Capital Markets, GPB, STIEXEC, VAM, Liberty, Centura, Non-PCG Commission ("STIEXEC")**:

    (i)    <u>Liberty</u>: designation of PL06 and above *and* 2008 Benefits Salary of at least $350,000, including new hires during FY 2008 with the requisite job level *and* a base salary of at least $350,000;

    (ii)    <u>Centura</u>: designation of Vice President and above *and* 2008 Benefits Salary of at least $350,000, including new hires during FY 2008 with the requisite job level *and* base salary of at least $350,000;

    (iii)    <u>Non-Centura and Non-Liberty</u>: 2008 Benefits Salary of at least $350,000, including new hires in FY 2008 with a base salary plus guaranteed bonus of at least $350,000.

STIPULATION OF FACTS
REGARDING WAP ELIGIBILITY
NO. 3:16-CV-05616-RBL – PAGE 7

      (f)    **Financial Consultants, Select Teams (No match) ("FCSELECT")**: 2008 FY Production greater than $350,000.

      (g)    **PCG Directors ("PCGDIRECT")**: Title of PCG President or Regional Director.

8.    The eligibility requirements to participate in the WAP in 2010 were as follows:

      (a)    **Financial Consultants and Branch Directors ("FINCONSULT")**: 2009 FY Production greater than $400,000

      (b)    **PCG Complex and Regional Directors ("BRANCHMGR")**: Title of Complex Director or Regional Director *and* 2009 Benefits Salary of at least $250,000

      (c)    **Financial Consultants, Select Teams (No match) ("FCSELECT")**: 2009 FY Production greater than $400,000

      (d)    **General, Capital Markets, GPB, STIEXEC, VAM, Liberty, Centura, Non-PCG Commission ("STIEXEC")**:

            (i)    <u>Liberty</u>: designation of PL06 and above *and* 2009 Benefits Salary of at least $350,000, including new hires during FY 2009 with the requisite job level and a base salary of at least $350,000;

            (ii)    <u>Centura</u>: designation of Vice President and above *and* 2009 Benefits Salary of at least $350,000, including new hires during FY 2009 with the requisite job level *and* base salary of at least $350,000;

           (iii)    <u>Non-Centura and Liberty</u>: 2009 Benefits Salary of at least $350,000, including new hires during FY 2009 with a base salary plus guaranteed bonus of at least $350,000

9.    The eligibility requirements to participate in the WAP in 2011 were as follows:

      (a)    **Financial Consultants and Branch Directors ("FINCONSULT")**: 2010 FY Production greater than $400,000.

      (b)    **PCG Complex and Regional Directors ("BRANCHMGR" or "BRANCHMGR-RD")**: Title of Complex Director or Regional Director *and* 2010 Benefits Salary of at least $250,000

      (c)    **Financial Consultants, Select Teams (No match) ("FCSELECT")**: 2010 FY Production greater than $400,000

STIPULATION OF FACTS
REGARDING WAP ELIGIBILITY
NO. 3:16-CV-05616-RBL – PAGE 8

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 West Wacker Drive
Chicago, IL  60601-5094
+1.312.324.1000

(d) **General, Capital Markets, GPB, STIEXEC, VAM, Liberty, Centura, Non-PCG Commission ("STIEXEC"):**

    (i) <u>Liberty</u>: designation of PL06 and above *and* 2010 Benefits Salary of at least $350,000, including new hires during FY 2010 with the requisite job level and a base salary of at least $350,000;

    (ii) <u>Centura</u>: designation of Vice President and above *and* 2010 Benefits Salary of at least $350,000, including new hires during FY 2010 with the requisite job level *and* base salary of at least $350,000;

    (iii) <u>Non-Centura and Liberty</u>: 2010 Benefits Salary of at least $350,000, including new hires during FY 2010 with a base salary plus guaranteed bonus of at least $350,000

10.    In addition to the foregoing requirements, the WAP plan document in effect for each of the years set forth in paragraphs 1-9 above provides that any employee "of an Employer" may become eligible to participate in the WAP. *See, e.g.*, Nov. 1, 2008 WAP § 2.1(a). "Employer" is defined as "the Company and Participating Subsidiaries," and the "Company" is defined as "Royal Bank of Canada, a Schedule I bank under the Bank Act (Canada) with its corporate headquarters in Toronto, Ontario, Canada, and any successor or assign." *See id.* § 1.2. Each version of the WAP further provides that an employee neither reside nor perform the majority of his or her services in Canada in order to become eligible for the WAP in any given year. *See, e.g.*, *id.* § 2.1(b).

11.    All employees who met the applicable requirements set forth in paragraphs 1-10 above were eligible for and invited to participate in the WAP.

12.    Defendants did not further limit participation in the WAP from among the above-described pool of WAP-eligible employees.

STIPULATION OF FACTS
REGARDING WAP ELIGIBILITY
NO. 3:16-CV-05616-RBL – PAGE 9

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 West Wacker Drive
Chicago, IL  60601-5094
+1.312.324.1000

DATED: September 25, 2017

**YARMUTH WILSDON PLLC**

By: /s/  Jeremy E. Roller
    Jeremy E. Roller, WSBA No. 32021
    Elizabeth S. Weinstein, WSBA No. 45763
1420 Fifth Avenue, Suite 1400
Seattle, WA  98101
Phone: 206.516.3800
Fax:    206.516.3888
Email: jroller@yarmuth.com
        eweinstein@yarmuth.com

*Attorneys for Plaintiffs Marty Paul and
Brian Buskirk*

**MORGAN, LEWIS & BOCKIUS LLP**

By: /s/  Sari M. Alamuddin
    Sari M. Alamuddin, admitted *pro hac vice*
    Christopher J. Boran, admitted *pro hac vice*
    Matthew A. Russell, admitted *pro hac vice*
77 West Wacker Drive, Fifth Floor
Chicago, IL  60601
Phone: 312.324.1000
Fax:    312.323.1001
Email: Sari.alamuddin@morganlewis.com
        Christopher.boran@morganlewis.com
        Matthew.russell@morganlewis.com

**PERKINS COIE LLP**

By: /s/ Kevin J. Hamilton
    Kevin J. Hamilton, WSBA No. 15648
    William B. Stafford, WSBA No. 39849
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax:    206.359.9000
Email: KHamilton@perkinscoie.com
        WStafford@perkinscoie.com

*Attorneys for Defendants RBC Capital
Markets, LLC, Royal Bank of Canada, and
Royal Bank of Canada US Wealth
Accumulation Plan*

STIPULATION OF FACTS
REGARDING WAP ELIGIBILITY
NO. 3:16-CV-05616-RBL – PAGE 10

714.01 ri141503

# Exhibit M

# RBC US Wealth Accumulation Plan

## 2006 Plan Year

SUMMARY OF PLAN PROVISIONS

FOR

FINANCIAL CONSULTANTS



CONFIDENTIAL
RBC 000113

Because your 2005 fiscal year production was at least $300,000, you are eligible to participate in the 2006 RBC US Wealth Accumulation Plan (WAP). WAP is designed for those employees who contribute greatly to the success of the firm. It provides highly compensated employees with an excellent opportunity to accumulate long-term wealth. Read on to learn more about the RBC US Wealth Accumulation Plan and how it can work for you.

## PLAN HIGHLIGHTS

Below are highlights of the 2006 WAP. You should refer to the rest of this plan summary and the Plan Document and Prospectus available to you when you enroll online at Fidelity for full details of the plan.

### CONTRIBUTIONS

*Your voluntary deferrals can total up to 30 percent:*

- Your deferrals up to 15 percent of your 2006 eligible compensation are eligible for matching contributions; plus
- You can defer an additional 15 percent of your 2006 eligible compensation that will be unmatched.

*Matching contributions made by the company\*:*

- Fixed match of 25 percent on each eligible dollar that you defer.
- Premium match of up to 40 percent based on your 2006 fiscal year production and your length of service.
- Total matching contributions range from 25 percent to 65 percent of eligible contributions you make to the plan.

*WAP Productivity Bonus\*:*

- Productivity Bonus between 1.75% and 5% based on 2006 fiscal year production.

*\*Subject to five-year cliff vesting. Match and Productivity Bonus earned for 2006 will vest on January 1, 2012.*

### DAILY VALUATION

Your account value will be updated daily.

### ONLINE ACCESS AT WWW.401K.COM

You can view your account information online, including balances, contribution activity, investment elections and vested status.

### WAP & 401(K) WORK HAND-IN-HAND

- You can make 401(k) deferrals on all of your eligible compensation.
- All Financial Consultants have a limit on their 401(k) company match of $1,500 for 2006. This limit applies regardless of whether the Financial Consultant is eligible for or participating in WAP.

### DISTRIBUTION OPTIONS

You choose the distribution option that will apply to all deferrals and matching contributions for 2006. Your options are:

- Distribute in two annual installments after you leave RBC; or
- Distribute while still employed in a lump sum in the year you elect as soon as administratively feasible after July 1st.

### SPECIAL RETIREMENT PROVISIONS

Participants who retire may qualify for an approved retirement that will provide full vesting of all contributions. Please refer to the Plan Document and Prospectus for full details which is available to you when you enroll online at Fidelity.

### INVESTMENT CHOICES

You have the ability to direct your own deferrals to any of the investment choices that are offered (including mutual funds) and be eligible for the matching contribution made by the company.

- RBC Share Account;
- RBC Interest Account; and
- Mutual Fund Accounts:
  - American Balanced Fund;
  - Van Kampen Comstock Fund;
  - Growth Fund of America;
  - U.S. Equity Index Commingled Pool;
  - RBC Midcap Fund;
  - FMI Focus Fund \*;
  - Wasatch Core Growth Fund; and
  - EuroPacific Growth Fund.

\* *Effective 1/1/06 the FMI Focus Fund will be replaced with the Third Avenue Small Cap Value Fund. At that time any balance in the FMI Focus Fund will be liquidated and rolled into the Third Avenue Fund.*

If no investment election is made your own deferrals will default to the RBC Interest Account. Remember, you cannot transfer existing balances into the RBC Share Account so if you want to direct your deferrals into that fund make sure that you make an investment election through www.401k.com. You can change investment elections for future contributions daily.

### INVESTMENT TRANSFER FLEXIBILITY

You have the ability to transfer only non-matching contribution balances out of the RBC Share Account under the same exchange rules that apply to the other investment options. You can change your investment elections for existing balances up to six times per calendar year on any business day that you choose. To transfer existing balances, access your WAP account online at www.401k.com and choose "Change Investments" and "Exchanges" to make changes.

You cannot transfer existing balances into the RBC Share Account. Only through future contributions will you have the ability to increase your balance in the RBC Share Account. All matching company contributions must remain in the RBC Share Account.

2

CONFIDENTIAL
RBC 000114

## TAX-DEFERRED SAVINGS OPPORTUNITY

Voluntary deferrals for the 2006 plan are broken into two categories:

- Deferrals eligible for matching contributions; and
- Additional deferrals not eligible for matching contributions.

Your voluntary deferrals from 0 percent to 15 percent into your WAP account will be eligible for matching contributions, regardless of the investment options you choose. You can also defer up to another 15 percent, over and above your matched deferrals, to your WAP account. You are always 100-percent vested in the value of all your voluntary deferrals.

All of your deferrals to the plan are made on a pre-tax basis, meaning that they lower your taxable income and are not subject to income taxes until distributed, under current tax laws. In addition, your earnings, reinvested dividends, and matching contributions grow tax-deferred in the plan until you receive a distribution.

In order to maximize the matching contributions made by the company, you should voluntarily defer at least 15 percent to the WAP.

**Important:** Under the WAP, your deferral election applies to all of your calendar year cash compensation. Deferrals for the 2006 WAP start with the cash compensation paid in January 2006 (for prior month's production). Therefore, the 2006 plan covers paychecks you receive January 2006 through December 2006.

## VARIETY OF INVESTMENT CHOICES

When you enroll in the plan, you choose how your voluntary deferrals will be credited among the different investment options. All investment options are eligible for company match.

There will be an additional fee associated with the mutual fund options due to the cost of offering these options in the plan. A 25 basis point per year charge will be deducted on a quarterly basis (6.25 bp per quarter). The amount of the quarterly fee will be determined by multiplying the value of your mutual fund accounts at the end of the quarter by 6.25 bp.

Please refer to the Plan Investment Summary included in your WAP packet for additional fund details.

## WAP BONUS AND COMPANY MATCHING CONTRIBUTIONS

In addition to your voluntary deferrals, you may be eligible for the following bonus or matching contributions by the company to your WAP account:

- WAP Productivity Bonus;
- Fixed match;
- Premium match

These contributions vest according to a five-year cliff vesting schedule.

### ANNUAL WAP PRODUCTIVITY BONUS

The WAP Productivity Bonus rewards all Financial Consultants with 2006 fiscal year (Nov. 2005 – Oct 2006) production of $300,000 or more by putting a bonus of between 1.75 percent and 5 percent of production into the WAP. This bonus is not eligible for a company match. If you don't defer on a voluntary basis, you are still eligible for the WAP Productivity Bonus. This bonus will be credited in late February 2007, vests after five years on January 1, 2012 and will be allocated among the investment choices the same way as you have chosen for your voluntary deferrals. The 2006 WAP Productivity Bonus grid is as follows:

| 2006 WAP Productivity Bonus Grid | | |
|---|---|---|
| Annual Gross Production | | WAP Productivity Bonus |
| From | To | |
| $300,000 | $399,999 | 1.75% |
| $400,000 | $599,999 | 2.50% |
| $600,000 | $1,249,999 | 3.50% |
| $1,250,000 | $1,499,999 | 3.75% |
| $1,500,000 and up | | 5.00% |

### COMPANY MATCHING CONTRIBUTIONS

The first 15 percent of your voluntary deferrals are eligible for the fixed match and premium match contributions. Combined, these matching contributions can give you a total match ranging from 25 percent to 65 percent into your WAP account.

*Fixed Match*

Your fixed match is equal to 25 percent on the first 15 percent of your eligible voluntary deferrals. This match will be credited to WAP in the RBC Share Account in late February 2007 and will vest after five years on January 1, 2012.

3

CONFIDENTIAL
RBC 000115

*Premium Match*

The premium match gives Financial Consultants at a qualifying level of production up to an additional 40 percent match on eligible deferrals, depending upon production and length of service. This match will be credited to WAP in the RBC Share Account in late February of 2007 and will vest after five years on January 1, 2012. Refer to the 2006 premium match grid for details.

| 2006 Premium Match Grid | | | | | |
|---|---|---|---|---|---|
| 2006 Production Basis | Length of Service in Years[1] | | | | |
| | < 6 | 6-10 | 11-15 | 16-20 | 21+ |
| Greater than 75% of 2006 President's Council[2] | 5% | 10% | 15% | 20% | 25% |
| 2006 President's Council[2] | 10% | 15% | 20% | 25% | 30% |
| 2006 Chairman's Council[2] | 15% | 20% | 25% | 30% | 40% |

Notes:
[1] *Length of Service is defined as the number of full calendar years completed as an RBC Dain FC as of December 31, 2006. The calendar year in which you were hired is counted as one full year of service. For example, if you were hired on December 18, 2005, you would earn two years of service toward the 2006 premium match.*
[2] *2006 Chairman's Council production is defined as the 2006 fiscal year production level of the 100th FC or the production goal set in August 2006, whichever results in the greater number of program qualifiers. 2006 President's Council production is defined as the 2006 fiscal year production level of the 350th FC or the production goal set in August 2006, whichever results in the greater number of program qualifiers.*

## AN IMPORTANT PART OF YOUR FINANCIAL FUTURE

Perhaps one of the most important features of the plan is the role it can play in helping you plan your financial future. Not only do participants benefit from the advantages of tax-deferred savings and growth, but they also help supplement their income in future years.

Each time you enroll, you elect to receive the value of your deferral as soon as administratively feasible after July 1 in a specified year or in two annual installments after you leave the company. While your elections under the plan are irrevocable, you can use your distribution for any purpose.

Being eligible for the RBC US Wealth Accumulation Plan is no small accomplishment. It demonstrates that we recognize that you have achieved a level in the firm where your contributions to the success of the firm are significant. But you can't take full advantage of this outstanding plan unless you sign up.

If you think the plan looks right for you, please enroll online today.

| 2006 WAP Components Summary | | | | |
|---|---|---|---|---|
| Component | Range | Investment Options | Date Credited to WAP Account | Vesting Periods |
| Voluntary Deferrals | • 0 – 15% of eligible compensation starting with $1 (matched) <br> • 0 – 15% of eligible compensation starting with $1 (unmatched) | • RBC Share Account <br> • RBC Interest Account <br> • Mutual Fund Accounts | Each payroll period | Immediate vesting |
| WAP Productivity Bonus | 1.75% to 5% of FY 2006 production (see WAP Productivity Bonus Grid) | • RBC Share Account <br> • RBC Interest Account <br> • Mutual Fund Accounts | February 2007 | 5 years after bonus is credited (January 1, 2012) |
| Fixed Match | 25% | • RBC Share Account | February 2007 | 5 years after match is credited (January 1, 2012) |
| Premium Match | 0% to 40% (see Premium Match Grid) | • RBC Share Account | February 2007 | 5 years after match is credited (January 1, 2012) |

*This summary does not constitute a prospectus nor an offer or solicitation to invest in the RBC US Wealth Accumulation Plan. Before investing, please read the RBC US Wealth Accumulation Plan Document and Prospectus. To obtain a copy, go online at www.401k.com. You also may wish to consult with your tax advisor to discuss your specific financial situation.*

4

CONFIDENTIAL
RBC 000116

# Exhibit N



# 2009 FINANCIAL CONSULTANT
# RBC U.S. WEALTH ACCUMULATION PLAN

Retaining and attracting the very best people is one of the pillars of RBC's strategy. One of the most important ways in which RBC executes that strategy is by offering a menu of retirement savings and deferred compensation vehicles that are among the most innovative and attractive in our industry.

RBC's U.S. Wealth Accumulation Plan ("WAP") provides employees with opportunities to finish well at RBC by building long-term wealth on a tax-deferred basis. Participating in WAP allows you to convert your income into savings on a pre-tax basis – keeping those dollars working tax-deferred and maximizing the wealth you accumulate over the course of your career.

Please take the time to review the rest of this WAP summary, the Plan Document and Prospectus, and the Investment Summary to see how the WAP can benefit you.

## CONTRIBUTIONS

The WAP is an integral part of your RBC Total Rewards package at RBC Wealth Management. It combines personal contributions with company contributions to help you accumulate wealth on a pre-tax basis throughout your career at RBC Wealth Management. Details on employee voluntary contributions and the three types of company contributions available under the WAP are outlined below. You can also use the 2009 WAP Calculator at http://infonet/contents/GroupSites/PrivateClientGroup/WAPCalculator.htm to model how the WAP could work for you.

### EMPLOYEE VOLUNTARY CONTRIBUTIONS

WAP offers you the choice to contribute up to 30% of your total WAP-eligible compensation*, allowing you to significantly increase your total wealth accumulation. WAP deferrals are all pre-tax, so they lower your taxable wages.

Key points on employee voluntary contributions:
- **Match-eligible voluntary contributions:** Your voluntary contributions up to 15% of your WAP-eligible compensation* are eligible for both the fixed and the premium company matches.
- **Non match-eligible voluntary contributions:** You can contribute an additional 0 – 15%, over and above your match-eligible contributions. These contributions are not eligible for the fixed or premium company match.
- You are always 100% vested in your voluntary contributions and any related earnings.
- If you want to maximize company contributions, you should consider contributing 15%.
- Your 2009 WAP elections apply to all WAP-eligible compensation* paid to you from January 1, 2009 through December 31, 2009. You cannot change your elections mid-year.

### COMPANY CONTRIBUTIONS

1) **Fixed Match**
   You will receive a fixed match of 25% on all of your match-eligible voluntary contributions. So, for every $1 of match-eligible voluntary contributions you make, you will get a $0.25 match.

   Key points on the fixed match:
   - Only match-eligible voluntary contributions will receive the 25% fixed match.
   - The fixed match will be credited into the RBC Share Account at the end of February 2010.
   - There is a five-year cliff vesting period on the fixed match. The 2009 fixed match will become 100% vested on January 1, 2015.

CONFIDENTIAL
RBC 000226

## 2) Premium Match

The premium match gives you up to a 40% match on match-eligible voluntary contributions. You will receive a 0% - 40% premium match based on your level of production and length of service as a financial consultant, branch director, or complex director with RBC. See the 2009 premium match grid below for details.

Key points on premium match:

- Premium match is 0 – 40% of your match-eligible voluntary contributions.
- Credited into the RBC Share Account at the end of February 2010.
- There is a five-year cliff vesting period. The 2009 premium match will become 100% vested on January 1, 2015.

| 2009 Premium Match Grid | | | | | |
|---|---|---|---|---|---|
| | Years of Service[1] | | | | |
| 2009 Production Basis | < 6 | 6-10 | 11-15 | 16-20 | 21+ |
| 2009 Regional Director's Council[2] | 5% | 10% | 15% | 20% | 25% |
| 2009 President's Council[3] | 10% | 15% | 20% | 25% | 30% |
| 2009 Chairman's Council[4] | 15% | 20% | 25% | 30% | 40% |

[1] *Years of Service is defined as the number of full calendar years completed as an RBC Wealth Management FC as of December 31, 2009. The calendar year in which you were hired is counted as one full year of service. For example, if you were hired on December 18, 2008, you would earn two years of service toward the 2009 premium match.*

[2] *2009 Regional Director's Council is defined as 75% of the President's Council production requirement.*

[3] *2009 President's Council production is defined as the 2009 fiscal year production level of the 280th FC after Chairman's Council or the production goal set in August 2009, based on July production numbers, whichever results in the greater number of program qualifiers.*

[4] *2009 Chairman's Council production is defined as the 2009 fiscal year production level of the 120th FC or the production goal set in August 2009, based on July production numbers, whichever results in the greater number of program qualifiers.*

## 3) WAP Productivity Bonus

All financial consultants with 2009 fiscal year (November 2008 – October 2009) production of at least $300,000 are eligible for the WAP productivity bonus – even if you choose not to make voluntary contributions to the WAP. The WAP productivity bonus ranges from 1.75% to 5% of your production.

Key points regarding the WAP productivity bonus:

- The WAP productivity bonus is based on your 2009 fiscal year production and ranges from 1.75% to 5% of your production. Refer to the 2009 WAP productivity bonus grid below for details.
- Credited to your WAP account using the same investment elections you have in place for voluntary contributions at the end of February 2010. If you do not have an investment election in place, your productivity bonus will be invested in the RBC Interest Account.
- There is a five-year cliff vesting period on the WAP productivity bonus. The 2009 WAP productivity bonus will become 100% vested on January 1, 2015.
- If you do not make any 2009 voluntary contributions and do not have a distribution election in place for 2009, the WAP productivity bonus will be valued on July 1, 2015, and paid to you as soon as possible after this date.

| 2009 WAP Productivity Bonus Grid | | |
|---|---|---|
| Annual Gross Production | | WAP Productivity Bonus |
| From | To | |
| $300,000 | $399,999 | 1.75% |
| $400,000 | $599,999 | 2.50% |
| $600,000 | $1,249,999 | 3.50% |
| $1,250,000 | $1,499,999 | 3.75% |
| $1,500,000 and up | | 5.00% |

CONFIDENTIAL
RBC 000227

## INVESTMENT OPTIONS

The WAP offers you the flexibility to choose how your voluntary contributions and productivity bonus are invested. The fixed match and premium match are invested in the RBC Share Account and must remain in the RBC Share Account until you retire from RBC.   Investment choices for your voluntary contributions and productivity bonus include:

| Investment Options | Ticker Symbols |
|---|---|
| Alliance Bernstein International Value Adv | ABIYX |
| American Balanced Fund | ABALX |
| American Fundamental Investors A | ANCFX |
| BlackRock Small Cap Growth I | PSGIX |
| Eagle Mid Cap Stock I | HMCJX |
| Europacific Growth Fund | AEPGX |
| Growth Fund of America | AGTHX |
| Jensen I | JENIX |
| Managers Systematic Value I | MSYSX |
| Metropolitan West Total Return Bond | MWTIX |
| RBC Interest Account | N/A |
| RBC Share Account | RY |
| Tamarack MidCap Fund I | TMCIX |
| Third Avenue Small Cap Value | TASCX |
| U.S. Equity Index Commingled Pool | N/A |
| Van Kampen Comstock Fund | ACSTX |
| Vanguard Institutional Index | VINIX |
| Vanguard Windsor II Admiral | VWNAX |
| Virtus Mid-Cap Value Fund A | FMIVX |
| Wasatch Core Growth Fund | WGROX |
| **Available late Q1 2009** | |
| BlackRock Global Allocation I | MALOX |
| Vanguard Inflation-Protected Securities Admiral Shares | VAIPX |

If you do not make an investment election for your voluntary contributions and productivity bonus, the contributions will default to the RBC Interest Account.

There is an additional fee associated with all options other than the RBC Share Account and RBC Interest Account because of the cost of offering these options in the plan.  A 25 basis point ("bp") per year charge will be deducted on a quarterly basis (6.25 bp per quarter).  The amount of the quarterly fee will be determined by multiplying the value of your mutual fund accounts at the end of the quarter by 6.25 bp.

*Please refer to the Plan's Investment Summary for additional details on the investment options offered in the WAP.*

## INVESTMENT FLEXIBILITY

You can transfer any existing balances in your WAP account related to your voluntary contributions and productivity bonus up to twelve times per calendar year.  Beginning January 1, 2009 you can transfer existing balances in your voluntary contributions and productivity bonus into and out of the RBC Share Account. You also have the option to change your investment elections for how your future contributions are invested.

Limits on the transfers include:
- All fixed match and premium match contributions must remain in the RBC Share Account until you retire from RBC.  After retirement, you may choose to move your fixed and premium match contributions into any of the investment options offered in the WAP.
- You are limited to twelve exchanges per calendar year.

*To view your account, transfer existing balances or to change investment elections for future contributions, go online to www.401k.com.*

CONFIDENTIAL
RBC 000228

## DISTRIBUTION OPTIONS

When you enroll in the WAP for 2009, you will be asked to make a distribution election for each type of contribution that you could have in 2009; you can make a separate election for your voluntary contributions, fixed match, premium match and the WAP productivity bonus. All distributions are valued on July 1 and paid as soon as possible after July 1.

You have two choices for your distribution options:

1) **Retirement Distribution**

   With a retirement distribution, you spread your WAP distribution over 1 to 10 years after you leave RBC if you satisfy the "Rule of 60." You satisfy the Rule of 60 if your age plus your years of service with any RBC company equals 60 or more at the time you separate from service. If you elect the retirement distribution option and leave RBC prior to reaching the Rule of 60, your distribution will be paid to you in one lump sum valued on July 1 in the year after your separation from service.

   If you want a retirement distribution for any of your 2009 contributions, you must make the election at the time you enroll in the plan for 2009.

2) **In-Service Distribution**

   The in-service distribution allows you to receive your WAP distribution in one lump sum while you are still employed with RBC. You select the year that you want to take the distribution; all distributions are valued as of July 1 in the year you select and paid as soon as possible after July 1. Your 2009 WAP balance will fully vest in 2015, so the earliest in-service valuation date you can elect without losing any company contributions is July 1, 2015.

   **You must be employed on the in-service date you select to receive the payment. If you separate from service prior to the in-service date selected, your WAP distribution will be paid to you in one lump sum valued on July 1 in the year after you leave.**

   Changes can be made to your in-service distribution dates after your original election. However, the following rules will apply:

   - Any new date must be at least five years after the current distribution date on file.
   - All changes must be made by June 30 in the year before the distribution is set to happen. For example, you would need to change a July 1, 2015 distribution date by June 30, 2014. An e-mail reminder will be sent to notify you that this date is approaching.
   - You will be allowed to change in-service distribution dates more than once, but the new distribution date you elect must always be at least five years after the distribution date on file.

## EARLY VESTING ON COMPANY CONTRIBUTIONS

If you retire from RBC, you will become fully vested in your entire WAP balance if you satisfy the Rule of 60 and sign a one-year non-compete agreement. You satisfy the Rule of 60 if your age plus your years of service with any RBC company equals 60 or more at the time you separate from service. Contact RBC US Retirement Benefits for a copy of the non-compete agreement.

You will also become fully vested in your entire WAP balance if you enter into the FC Business Transition Program.

## TAX CONSIDERATIONS

All of your voluntary contributions are made on a pre-tax basis, meaning that they lower your taxable income and are not subject to federal and state income taxes until distributed, under current tax laws. In addition, you do not pay federal or state taxes on your earnings, reinvested dividends or company contributions until you receive a distribution.

CONFIDENTIAL
RBC 000229

## FICA TAXES

Social Security and Medicare ("FICA") taxes are withheld from your voluntary contributions at the time the deduction is made from your paycheck.

FICA taxes must be paid on company contributions in the year that they become vested and no longer subject to forfeiture. In the year of vesting, any applicable FICA tax will be withheld from your paycheck.

If you have an approved retirement and become fully vested in your company contributions, FICA taxes will be due on these vested amounts. If you are receiving business transition payments a prorated amount of FICA tax will be withheld from your remaining payments. If you are not receiving business transition payments the FICA tax will be deducted from your WAP account prior to your WAP distribution.

## FEDERAL AND STATE TAXES ON WAP DISTRIBUTIONS

When you receive a WAP distribution, a 25% federal tax plus applicable state tax will be withheld from your payment. A 35% federal tax will be withheld on annual supplemental wages (bonus and lump sum payments) over $1,000,000. The distribution will be treated as ordinary income in the year it is distributed and will be reported on a form W-2. FICA taxes have already been paid on your vested dollars and will not be withheld from the distribution.

*This document should not be considered as providing tax advice. You should consult your tax advisor to discuss your personal financial situation.*

| 2009 WAP Components Summary | | | | |
|---|---|---|---|---|
| Component | Range | Investment Options | Date Credited to WAP Account | Vesting Periods |
| Voluntary Contributions | • Matched: 0 – 15%<br>• Unmatched: 16 – 30% | Participant chooses allocation among any investment options offered in the plan | Each payroll period | Contributions and investment gain/loss always 100% vested |
| Fixed Match | 25% | RBC Share Account | Late February 2010 | 100% vested on January 1, 2015 |
| Premium Match | 0% to 40% (see Premium Match Grid) | RBC Share Account | Late February 2010 | 100% vested on January 1, 2015 |
| WAP Productivity Bonus | 1.75% to 5% of FY 2009 production (see WAP Productivity Bonus Grid) | Invested in the same allocation as Voluntary Contributions | Late February 2010 | 100% vested on January 1, 2015 |

\* WAP eligible compensation has the meaning ascribed to "Recognized Compensation" under the RBC U.S.A. Retirement and Savings Plan and includes base compensation, bonuses and commissions that are an integral part of regular compensation as determined by the Committee, holiday and vacation pay, overtime pay, and "transitional pay." Excluded from eligible compensation are all of the following: income from stock options, hiring bonuses, expense allowances, moving expense payments, and non cash payments.

*This document does not constitute a prospectus nor an offer or solicitation to invest in the RBC U.S. Wealth Accumulation Plan. Before investing, please read the RBC U.S. Wealth Accumulation Plan Document and Prospectus. A copy is available online at www.401k.com. You also may wish to consult with your tax advisor to discuss your specific financial situation.*

CONFIDENTIAL
RBC 000230

# Exhibit O



# 2009 PCG DIRECTOR
# RBC U.S. WEALTH ACCUMULATION PLAN

Retaining and attracting the very best people is one of the pillars of RBC's strategy. One of the most important ways in which RBC executes that strategy is by offering a menu of retirement savings and deferred compensation vehicles that are among the most innovative and attractive in our industry.

RBC's U.S. Wealth Accumulation Plan ("WAP") provides employees with opportunities to finish well at RBC by building long-term wealth on a tax-deferred basis. Participating in WAP allows you to convert your income into savings on a pre-tax basis – keeping those dollars working tax-deferred and maximizing the wealth you accumulate over the course of your career.

Please take the time to review the rest of this WAP summary, the Plan Document and Prospectus, and the Investment Summary to see how the WAP can benefit you.

## CONTRIBUTIONS

The WAP is an integral part of your RBC Total Rewards package at RBC Wealth Management. It combines personal contributions with company contributions to help you accumulate wealth on a pre-tax basis throughout your career at RBC Wealth Management. Details on employee and variable match company contributions available under the WAP are outlined below.

### EMPLOYEE CONTRIBUTIONS

2009 employee contributions apply to all WAP-eligible compensation* over $100,000 paid to you from January 1, 2009 through December 31, 2009, including your 2009 Short Term Incentive (STI) payment if you chose to defer your STI into 2010. WAP deferrals are all pre-tax, so they lower your taxable wages.

1) **Mandatory Contributions**
   As a PCG Director, you are required to contribute between 10% to 20% of your WAP-eligible compensation* over $100,000 to the WAP as per the 2009 mandatory contributions chart below. Mandatory contributions are match eligible; please see the next page for details.

| 2009 Mandatory Contributions | |
|---|---|
| Compensation Range | Mandatory WAP Contribution |
| $100,000 - $500,000 | 10% |
| $500,000 - $1,000,000 | 15% |
| $1,000,000 and over | 20% |

   These contributions vest gradually over two years: 1/3 becomes vested immediately; 1/3 becomes vested on January 1, 2011 and the remaining 1/3 becomes vested on January 1, 2012.

2) **Voluntary Contributions**
   In addition to the mandatory contributions, you can also make voluntary contributions on up to 20% of your WAP-eligible earnings* over $100,000.

   Key points on voluntary contributions:

   - **Match-eligible voluntary contributions**: Your voluntary contributions up to 10% of your WAP-eligible compensation* are eligible for the variable match.
   - **Non match-eligible voluntary contributions**: You can contribute an additional 0 – 10%, over and above your match-eligible contributions. These contributions are not eligible for the variable match.
   - You are always 100% vested in your voluntary contributions and any related earnings.
   - If you want to maximize company contributions, you should consider contributing 10%.
   - Your 2009 WAP elections apply to all WAP-eligible compensation* over $100,000 paid to you from January 1, 2009 through December 31, 2009, including your 2009 Short Term Incentive (STI) payment if you chose to defer your STI into 2010. You cannot change your elections mid-year.

CONFIDENTIAL
RBC 000221

**VARIABLE MATCH COMPANY CONTRIBUTION**

You will receive a variable match of 15% to 50% based on a payout factor under RBC's Short Term Incentive Program (STI). The variable match is tied to the financial performance of RBC and is targeted at 25 percent. The RBC STI payout levels are based on return on equity (ROE) and net income before taxes (NIBT). Regardless of RBC's STI performance, you will receive a minimum match of at least 15 percent.

Example

Let's assume that based on FY 2009, RBC's STI payout level is set at 110 percent of target. The WAP variable match percentage for the year would be 110 percent times the 25 percent target match. The result would be a variable match of 27.5 percent on all eligible deferrals for the plan year. The following grid shows additional examples of the variable match levels.

| 2009 WAP Variable Match Grid | |
| --- | --- |
| STI Payout (% of target) | Variable Match |
| 0% | 15.00% |
| 50% | 15.00% |
| 75% | 18.75% |
| 100% | 25.00% |
| 125% | 31.25% |
| 150% | 37.50% |
| 200% | 50.00% |

Key points on variable match:

- Only mandatory contributions and match-eligible voluntary contributions will receive the variable match.
- The variable match will be credited into the RBC Share Account at the end of February 2010.
- There is a four-year cliff vesting period on the variable match. The 2009 variable match will be 100% vested on January 1, 2014.

## INVESTMENT OPTIONS

The WAP offers you the flexibility to choose how your mandatory and voluntary contributions are invested. The variable match is invested in the RBC Share Account and must remain in the RBC Share Account until you retire from RBC. Investment choices for your mandatory and voluntary contributions include:

| Investment Options | Ticker Symbols | Investment Options | Ticker Symbols |
| --- | --- | --- | --- |
| Alliance Bernstein International Value Adv | ABIYX | Tamarack MidCap Fund I | TMCIX |
| American Balanced Fund | ABALX | Third Avenue Small Cap Value | TASCX |
| American Fundamental Investors A | ANCFX | U.S. Equity Index Commingled Pool | N/A |
| BlackRock Small Cap Growth I | PSGIX | Van Kampen Comstock Fund | ACSTX |
| Eagle Mid Cap Stock I | HMCJX | Vanguard Institutional Index | VINIX |
| Europacific Growth Fund | AEPGX | Vanguard Windsor II Admiral | VWNAX |
| Growth Fund of America | AGTHX | Virtus Mid-Cap Value Fund A | FMIVX |
| Jensen I | JENIX | Wasatch Core Growth Fund | WGROX |
| Managers Systematic Value I | MSYSX | | |
| Metropolitan West Total Return Bond | MWTIX | **Available late Q1 2009** | |
| RBC Interest Account | N/A | BlackRock Global Allocation I | MALOX |
| RBC Share Account | RY | Vanguard Inflation-Protected Securities | VAIPX |

If you do not make an investment election for your mandatory and voluntary contributions, the contributions will default to the RBC Interest Account.

There is an additional fee associated with all options other than the RBC Share Account and RBC Interest Account because of the cost of offering these options in the plan. A 25 basis point ("bp") per year charge will be deducted on a quarterly basis (6.25 bp per quarter). The amount of the quarterly fee will be determined by multiplying the value of your mutual fund accounts at the end of the quarter by 6.25 bp.

*Please refer to the Plan's Investment Summary for additional details on the investment options offered in the WAP.*

2  RBC U.S. 2009 Wealth Accumulation Plan Summary – PCG Director

CONFIDENTIAL
RBC 000222

## INVESTMENT FLEXIBILITY

You can transfer any existing balances in your WAP account related to your mandatory and voluntary contributions up to twelve times per calendar year. Beginning January 1, 2009 you can transfer existing balances in your mandatory and voluntary contributions into and out of the RBC Share Account. You also have the option to change your investment elections for how your future contributions are invested.

Limits on the transfers include:
- All variable match contributions must remain in the RBC Share Account until you retire from RBC. After retirement, you may choose to move your matching contributions into any of the investment options offered in the WAP.
- You are limited to twelve exchanges per calendar year.

*To view your account, transfer existing balances or to change investment elections for future contributions, go online to www.401k.com.*

## DISTRIBUTION OPTIONS

When you enroll in the WAP for 2009, you will be asked to make a distribution election for each type of contribution that you could have in 2009; you can make a separate election for your mandatory contributions, voluntary contributions, and variable match. All distributions are valued on July 1 and paid as soon as possible after July 1.

You have two choices for your distribution options:

1)  **Retirement Distribution**

    With a retirement distribution, you spread your WAP distribution over 1 to 10 years after you leave RBC if you satisfy the "Rule of 60." You satisfy the Rule of 60 if your age plus your years of service with any RBC company equals 60 or more at the time you separate from service. If you elect the retirement distribution option and leave RBC prior to reaching the Rule of 60, your distribution will be paid to you in one lump sum valued on July 1 in the year after your separation from service.

    If you want a retirement distribution for any of your 2009 contributions, you must make the election at the time you enroll in the plan for 2009.

2)  **In-Service Distribution**

    The in-service distribution allows you to receive your WAP distribution in one lump sum while you are still employed with RBC. You select the year that you want to take the distribution; all distributions are valued as of July 1 in the year you select and paid as soon as possible after July 1. Your 2009 WAP balance will fully vest in 2014, so the earliest in-service valuation date you can elect without losing any company contributions is July 1, 2014.

    **You must be employed on the in-service date you select to receive the payment. If you separate from service prior to the in-service date selected, your WAP distribution will be paid to you in one lump sum valued on July 1 in the year after you leave.**

    Changes can be made to your in-service distribution dates after your original election. However, the following rules will apply:

    - Any new date must be at least five years after the current distribution date on file.

    - All changes must be made by June 30 in the year before the distribution is set to happen. For example, you would need to change a July 1, 2014 distribution date by June 30, 2013. An e-mail reminder will be sent to notify you that this date is approaching.

    - You will be allowed to change in-service distribution dates more than once, but the new distribution date you elect must always be at least five years after the distribution date on file.

CONFIDENTIAL
RBC 000223

## EARLY VESTING ON COMPANY CONTRIBUTIONS

If you retire from RBC, you will become fully vested in your entire WAP balance if you satisfy the Rule of 60 and sign a one-year non-compete agreement.  (You satisfy the Rule of 60 if your age plus your years of service with any RBC company equals 60 or more at the time you separate from service.)  Contact RBC US Retirement Benefits for a copy of the non-compete agreement.

## TAX CONSIDERATIONS

All of your mandatory and voluntary contributions are made on a pre-tax basis, meaning that they lower your taxable income and are not subject to federal and state income taxes until distributed, under current tax laws.  In addition, you do not pay federal or state taxes on your earnings, reinvested dividends or company contributions until you receive a distribution.

### FICA TAXES

Social Security and Medicare ("FICA") taxes are withheld from your mandatory and voluntary contributions at the time the deduction is made from your paycheck.

FICA taxes must be paid on company contributions in the year that they become vested and no longer subject to forfeiture.  In the year of vesting, any applicable FICA tax will be withheld from your paycheck.

If you have an approved retirement and become fully vested in your company contributions, FICA taxes will be due on these vested amounts.  FICA tax will be deducted from your WAP account prior to your WAP distribution.

### FEDERAL AND STATE TAXES ON WAP DISTRIBUTIONS

When you receive a WAP distribution, a 25% federal tax plus applicable state tax will be withheld from your payment.  A 35% federal tax will be withheld on annual supplemental wages (bonus and lump sum payments) over $1,000,000.  The distribution will be treated as ordinary income in the year it is distributed and will be reported on a form W-2.  FICA taxes have already been paid on your vested dollars and will not be withheld from the distribution.

*This document should not be considered as providing tax advice.  You should consult your tax advisor to discuss your personal financial situation.*

## 401(K) CONSIDERATIONS

All PCG Directors are limited to making 401k contributions on $100,000 in the calendar year.  Therefore, you must defer at least 17% into the 401k if you want to reach the 2009 IRS maximum contribution of $16,500.  You can view your current elections and make any changes online at www.401k.com or by calling the RBC US Retirement Helpline at (866) 697-1002.

CONFIDENTIAL
RBC 000224

| 2009 WAP Components Summary | | | | |
|---|---|---|---|---|
| **Component** | **Range** | **Investment Options** | **Date Credited to WAP Account** | **Vesting Periods** |
| Mandatory Contributions | 10% - 20% of WAP-eligible compensation* over $100,000 (see mandatory contributions chart) | Participant chooses allocation among any investment options offered in the plan | Each payroll period | 1/3 vests immediately 1/3 vests 1/1/2011 1/3 vests 1/1/2012 |
| Voluntary Contributions | ▪ Matched: first 0 – 10% of WAP-eligible compensation* over $100,000 ▪ Unmatched: next 0 – 10% of WAP-eligible compensation* over $100,000 | Participant chooses allocation among any investment options offered in the plan | Each payroll period | Contributions and investment gain/loss always 100% vested |
| Variable Match | Match level based on performance of RBC.  Match can range from 15% to 50% and is targeted at 25%. | RBC Share Account | Late February 2010 | 100% vested on January 1, 2014 |
| Premium Match | Match based on level of production and years of service. Match can range from 0% to 40% (see Premium Match Grid) | RBC Share Account | Late February 2010 | 100% vested on January 1, 2014 |

\*WAP eligible compensation has the meaning ascribed to "Recognized Compensation" under the RBC U.S.A. Retirement and Savings Plan and includes base compensation, bonuses and commissions that are an integral part of regular compensation as determined by the Committee, holiday and vacation pay, overtime pay, and "transitional pay."  Excluded from eligible compensation are all of the following:  income from stock options, hiring bonuses, expense allowances, moving expense payments, and non cash payments.

*This document does not constitute a prospectus nor an offer or solicitation to invest in the RBC U.S. Wealth Accumulation Plan. Before investing, please read the RBC U.S. Wealth Accumulation Plan Document and Prospectus.  A copy is available online at www.401k.com.  You also may wish to consult with your tax advisor to discuss your specific financial situation.*

CONFIDENTIAL
RBC 000225

# Exhibit P



**RBC US Deferred
Compensation Plan**

## Retirement Savings Statement

January 1, 2006 - December 31, 2006

ENV#MG000006
MG 14022   T

MARTY PAUL


If you have questions about your account, please call
the RBC - U.S.A. Retirement Help Line at Fidelity at
1-866-697-1002 8:30 am to midnight EST or access your
account on-line at www.netbenefits.com/RBC

## Your Account Summary

| | |
|---|---|
| **Beginning Balance** | **$705,970.86** |
| Employee Contributions | 103,234.92 |
| Employer Contributions | 176,384.66 |
| Dividends and Interest | 31,852.31 |
| Fees | -1,460.23 |
| Change in Market Value | 108,276.50 |
| **Ending Balance** | **$1,124,259.02** |

| **Additional Information** | |
|---|---|
| Vested Balance | $753,106.60 |

| **Inception to date contribution** | |
|---|---|
| Your Personal Rate of Return | 16.8% |
| Year to Date | 16.8% |

Your Personal Rate of Return is calculated with a time-weighted
formula, widely used by financial analysts to calculate investment
earnings. It reflects the results of your investment selections as
well as any activity in the plan account(s) shown. There are other
Personal Rate of Return formulas used that may yield different
results. Remember that past performance is no guarantee of future
results.

## Your Asset Allocation



Stocks 100%

Your investments are currently allocated among the displayed
asset classes. Percentages and totals may not be exact due to
rounding.

## Your Account Activity

Use this section as a summary of transactions that occurred in your account during the statement period.

| Activity | AF<br>EuroPacific Gth A | AF<br>Grth Fund Amer A | Fid<br>US Eq Indx | RBC<br>Share Account | RBC<br>SMID Cap Grth I |
|---|---|---|---|---|---|
| **Beginning Balance** | **$6,847.71** | **$115,343.51** | **$205,026.21** | **$267,325.50** | **$111,427.93** |
| Employee Contributions | 25,808.72 | 25,808.74 | 25,808.75 | 0.00 | 25,808.71 |
| Employer Contributions | 25,808.72 | 25,808.74 | 25,808.75 | 73,149.74 | 25,808.71 |
| Exchanges | 75,000.01 | 0.00 | -75,000.01 | 0.00 | 0.00 |
| Dividends and Interest | 10,018.20 | 7,044.26 | 0.00 | 10,587.79 | 4,202.06 |
| Fees | -286.41 | -374.09 | -430.58 | -16.08 | -353.07 |
| Change in Market Value | 7,024.93 | 7,966.95 | 27,206.29 | 70,666.03 | -4,587.70 |
| **Ending Balance** | **$150,221.88** | **$181,598.11** | **$208,419.41** | **$421,712.98** | **$162,306.64** |

Please read this statement carefully. Any error must be reported to Fidelity Investments within 90 days.

CONFIDENTIAL

RBC-PAUL000000410



**RBC US Deferred Compensation Plan**

## Retirement Savings Statement
January 1, 2007 - December 31, 2007

ENV#MG000007
MG 14022   T

MARTY PAUL


If you have questions about your account, please call the RBC - U.S.A. Retirement Help Line at Fidelity at 1-866-697-1002 8:30 am to midnight EST or access your account on-line at www.netbenefits.com/RBC

## Your Account Summary

| | |
|---|---|
| **Beginning Balance** | **$1,124,259.02** |
| Employee Contributions | 176,071.60 |
| Employer Contributions | 296,340.28 |
| Dividends and Interest | 73,539.00 |
| Withdrawal | -204,555.77 |
| Fees | -1,867.56 |
| Change in Market Value | 78,994.42 |
| **Ending Balance** | **$1,542,780.99** |

| **Additional Information** | |
|---|---|
| Vested Balance | $1,056,325.06 |

| **Inception to date contribution** | |
|---|---|
| Your Personal Rate of Return | 11.7% |
| Year to Date | 11.7% |

Your Personal Rate of Return is calculated with a time-weighted formula, widely used by financial analysts to calculate investment earnings. It reflects the results of your investment selections as well as any activity in the plan account(s) shown. There are other Personal Rate of Return formulas used that may yield different results. Remember that past performance is no guarantee of future results.

## Your Asset Allocation



Stocks 100%

Your investments are currently allocated among the displayed asset classes. Percentages and totals may not be exact due to rounding.

## Your Account Activity
Use this section as a summary of transactions that occurred in your account during the statement period.

| Activity | AF EuroPacific Gth A | AF Grth Fund Amer A | Fid US Eq Indx | RBC Share Account | RBC SMID Cap Grth I |
|---|---|---|---|---|---|
| **Beginning Balance** | **$150,221.88** | **$181,598.11** | **$208,419.41** | **$421,712.98** | **$162,306.64** |
| Employee Contributions | 44,017.87 | 44,017.92 | 44,017.92 | 0.00 | 44,017.89 |
| Employer Contributions | 44,017.87 | 44,017.92 | 44,017.92 | 120,268.68 | 44,017.89 |
| Dividends and Interest | 20,597.17 | 17,199.95 | 0.00 | 16,479.01 | 19,262.87 |
| Withdrawal | -12,690.89 | -19,064.49 | -21,892.47 | -134,875.58 | -16,032.34 |
| Fees | -430.77 | -473.60 | -507.97 | -15.50 | -439.72 |
| Change in Market Value | 12,673.30 | 4,743.28 | 11,944.74 | 46,519.84 | 3,113.26 |
| **Ending Balance** | **$258,406.43** | **$272,039.09** | **$285,999.55** | **$470,089.43** | **$256,246.49** |

Please read this statement carefully. Any error must be reported to Fidelity Investments within 90 days.

0007  MG000007    0001   20130306  MG4K
Fidelity Investments, P.O. Box 770003, Cincinnati, OH 45277-0065

CONFIDENTIAL

RBC-PAUL000000424



**RBC US Deferred Compensation Plan**

# Retirement Savings Statement

January 1, 2008 - December 31, 2008

ENV#MG000008
MG 14022   T

MARTY PAUL


If you have questions about your account, please call the RBC - U.S.A. Retirement Help Line at Fidelity at 1-866-697-1002 8:30 am to midnight EST or access your account on-line at www.netbenefits.com/RBC

## Your Account Summary

| | |
|---|---|
| **Beginning Balance** | **$1,542,780.99** |
| Employee Contributions | 132,436.93 |
| Employer Contributions | 317,312.11 |
| Dividends and Interest | 36,899.66 |
| Withdrawal | -260,831.63 |
| Fees | -2,307.12 |
| Change in Market Value | -690,323.14 |
| **Ending Balance** | **$1,075,967.80** |

| **Additional Information** | |
|---|---|
| Vested Balance | $717,755.43 |

| **Inception to date contribution** | |
|---|---|
| Your Personal Rate of Return | -39.5% |
| Year to Date | -39.5% |

Your Personal Rate of Return is calculated with a time-weighted formula, widely used by financial analysts to calculate investment earnings.  It reflects the results of your investment selections as well as any activity in the plan account(s) shown.  There are other Personal Rate of Return formulas used that may yield different results.  Remember that past performance is no guarantee of future results.

## Your Asset Allocation



Stocks 100%

Your investments are currently allocated among the displayed asset classes.  Percentages and totals may not be exact due to rounding.

## Your Account Activity

Use this section as a summary of transactions that occurred in your account during the statement period.

| Activity | AF EuroPacific Gth A | AF Grth Fund Amer A | Fid US Eq Indx | RBC Share Account | RBC SMID Cap Grth I |
|---|---|---|---|---|---|
| **Beginning Balance** | **$258,406.43** | **$272,039.09** | **$285,999.55** | **$470,089.43** | **$256,246.49** |
| Employee Contributions | 33,109.24 | 33,109.24 | 33,109.24 | 0.00 | 33,109.21 |
| Employer Contributions | 33,109.24 | 33,109.24 | 33,109.24 | 184,875.18 | 33,109.21 |
| Dividends and Interest | 12,770.94 | 2,064.47 | 0.00 | 20,194.41 | 1,869.84 |
| Withdrawal | -25,315.90 | -36,444.98 | -40,235.34 | -128,819.03 | -30,016.38 |
| Fees | -558.00 | -586.18 | -601.42 | -12.48 | -549.04 |
| Change in Market Value | -123,174.50 | -110,572.44 | -107,610.70 | -235,600.81 | -113,364.69 |
| **Ending Balance** | **$188,347.45** | **$192,718.44** | **$203,770.57** | **$310,726.70** | **$180,404.64** |

Please read this statement carefully.  Any error must be reported to Fidelity Investments within 90 days.

CONFIDENTIAL                     RBC-PAUL000000437



**RBC US Deferred Compensation Plan**

# Retirement Savings Statement

January 1, 2009 - December 31, 2009

ENV#MG000009
MG 14022   T

MARTY PAUL


If you have questions about your account, please call the RBC - U.S.A. Retirement Help Line at Fidelity at 1-866-697-1002 8:30 am to midnight EST or access your account on-line at www.netbenefits.com/RBC

## Your Account Summary

| | |
|---|---|
| **Beginning Balance** | **$1,075,967.80** |
| Employee Contributions | 100,494.70 |
| Employer Contributions | 206,444.25 |
| Dividends and Interest | 29,069.91 |
| Withdrawal | -138,940.29 |
| Fees | -2,304.10 |
| Adjustments | 399.20 |
| Change in Market Value | 562,750.58 |
| **Ending Balance** | **$1,833,882.05** |

**Additional Information**

| | |
|---|---|
| Vested Balance | $1,101,406.79 |

**Inception to date contribution**

| | |
|---|---|
| Your Personal Rate of Return | 52.4% |
| Year to Date | 52.4% |

Your Personal Rate of Return is calculated with a time-weighted formula, widely used by financial analysts to calculate investment earnings. It reflects the results of your investment selections as well as any activity in the plan account(s) shown. There are other Personal Rate of Return formulas used that may yield different results. Remember that past performance is no guarantee of future results.

## Your Asset Allocation



Stocks 100%

Your investments are currently allocated among the displayed asset classes. Percentages and totals may not be exact due to rounding.

## Your Account Activity

Use this section as a summary of transactions that occurred in your account during the statement period.

| Activity | AF EuroPacific Gth A | AF Grth Fund Amer A | Fid US Eq Indx | RBC Share Account | RBC SMID Cap Grth I |
|---|---|---|---|---|---|
| **Beginning Balance** | **$188,347.45** | **$192,718.44** | **$203,770.57** | **$310,726.70** | **$180,404.64** |
| Employee Contributions | 25,123.68 | 25,123.69 | 25,123.68 | 0.00 | 25,123.65 |
| Employer Contributions | 25,123.68 | 25,123.69 | 25,123.68 | 105,949.55 | 25,123.65 |
| Dividends and Interest | 4,595.75 | 2,105.97 | 0.00 | 22,368.19 | 0.00 |
| Withdrawal | -16,815.34 | -24,399.05 | -28,296.96 | -48,153.75 | -21,275.19 |
| Fees | -601.30 | -581.24 | -562.99 | -12.92 | -545.65 |
| Adjustments | 98.70 | 101.14 | 99.64 | 0.00 | 99.72 |
| Change in Market Value | 68,803.02 | 61,737.49 | 50,647.55 | 327,969.24 | 53,593.28 |
| **Ending Balance** | **$294,675.64** | **$281,930.13** | **$275,905.17** | **$718,847.01** | **$262,524.10** |

Please read this statement carefully. Any error must be reported to Fidelity Investments within 90 days.

Fidelity Investments, P.O. Box 770003, Cincinnati, OH 45277-0065

CONFIDENTIAL



**RBC US Deferred Compensation Plan**

# Retirement Savings Statement

January 1, 2010 - December 31, 2010

ENV#MG000010
MG 14022   T

MARTY PAUL



If you have questions about your account, please call the RBC - U.S.A. Retirement Help Line at Fidelity at 1-866-697-1002 8:30 am to midnight EST or access your account on-line at www.netbenefits.com/RBC

## Your Account Summary

| | |
|---|---|
| **Beginning Balance** | **$1,833,882.05** |
| Employee Contributions | 240,091.54 |
| Employer Contributions | 94,967.49 |
| Dividends and Interest | 34,119.55 |
| Withdrawal | -220,323.94 |
| Fees | -3,105.69 |
| Adjustments | 707.30 |
| Change in Market Value | 155,022.53 |
| **Ending Balance** | **$2,135,360.83** |

| Additional Information | |
|---|---|
| Vested Balance | $1,534,874.38 |

| Inception to date contribution | |
|---|---|
| Your Personal Rate of Return | 11.2% |
| Year to Date | 11.2% |

Your Personal Rate of Return is calculated with a time-weighted formula, widely used by financial analysts to calculate investment earnings. It reflects the results of your investment selections as well as any activity in the plan account(s) shown. There are other Personal Rate of Return formulas used that may yield different results. Remember that past performance is no guarantee of future results.

## Your Asset Allocation



Stocks 100%

Your investments are currently allocated among the displayed asset classes. Percentages and totals may not be exact due to rounding.

## Your Account Activity

Use this section as a summary of transactions that occurred in your account during the statement period.

| Activity | AF EuroPacific Gth A | AF Grth Fund Amer A | Fid US Eq Indx | RBC Share Account | RBC SMID Cap Grth I |
|---|---|---|---|---|---|
| **Beginning Balance** | **$294,675.64** | **$281,930.13** | **$275,905.17** | **$718,847.01** | **$262,524.10** |
| Employee Contributions | 60,022.85 | 60,022.90 | 60,022.90 | 0.00 | 60,022.89 |
| Employer Contributions | 0.00 | 0.00 | 0.00 | 94,967.49 | 0.00 |
| Dividends and Interest | 4,801.58 | 2,736.66 | 0.00 | 26,581.31 | 0.00 |
| Withdrawal | -28,161.82 | -31,016.64 | -33,774.99 | -97,963.72 | -29,406.77 |
| Fees | -782.61 | -758.43 | -749.60 | -13.86 | -801.19 |
| Adjustments | 178.48 | 176.22 | 176.28 | 0.00 | 176.32 |
| Change in Market Value | 22,388.62 | 31,122.73 | 40,007.27 | -29,014.54 | 90,518.45 |
| **Ending Balance** | **$353,122.74** | **$344,213.57** | **$341,587.03** | **$713,403.69** | **$383,033.80** |

Please read this statement carefully. Any error must be reported to Fidelity Investments within 90 days.

CONFIDENTIAL

RBC-PAUL000000463



**RBC US Deferred Compensation Plan**

## Retirement Savings Statement

January 1, 2011 - December 31, 2011

ENV#MG000011
MG 14022   T

MARTY PAUL



REDACTED

If you have questions about your account, please call the RBC - U.S.A. Retirement Help Line at Fidelity at 1-866-697-1002 8:30 am to midnight EST or access your account on-line at www.netbenefits.com/RBC

## Your Account Summary

| | |
|---|---|
| **Beginning Balance** | **$2,135,360.83** |
| Employee Contributions | 64,532.50 |
| Employer Contributions | 186,988.65 |
| Dividends and Interest | 42,272.78 |
| Fees | -3,957.27 |
| Change in Market Value | -103,017.44 |
| **Ending Balance** | **$2,322,180.05** |

| **Additional Information** | |
|---|---|
| Vested Balance | $1,546,271.58 |

| **Inception to date contribution** | |
|---|---|
| Your Personal Rate of Return | -1.9% |
| Year to Date | -1.9% |

Your Personal Rate of Return is calculated with a time-weighted formula, widely used by financial analysts to calculate investment earnings. It reflects the results of your investment selections as well as any activity in the plan account(s) shown. There are other Personal Rate of Return formulas used that may yield different results. Remember that past performance is no guarantee of future results.

## Your Asset Allocation



Stocks 100%

Your investments are currently allocated among the displayed asset classes. Percentages and totals may not be exact due to rounding.

## Your Account Activity

Use this section as a summary of transactions that occurred in your account during the statement period.

| Activity | AF<br>EuroPac Growth R6 | AF<br>EuroPacific Gth A | AF<br>Grth Fund Amer A | AF<br>Grth Fund Amer R6 | Fid<br>US Eq Indx |
|---|---|---|---|---|---|
| **Beginning Balance** | **$0.00** | **$353,122.74** | **$344,213.57** | **$0.00** | **$341,587.03** |
| Employee Contributions | 13,320.85 | 2,812.27 | 2,812.28 | 13,320.85 | 16,133.12 |
| Employer Contributions | 24,931.82 | 0.00 | 0.00 | 24,931.82 | 24,931.82 |
| Exchanges | 356,490.58 | -356,490.58 | -351,227.24 | 351,227.24 | 0.00 |
| Dividends and Interest | 6,976.34 | 0.00 | 0.00 | 4,240.39 | 0.00 |
| Fees | -933.76 | 0.00 | 0.00 | -948.06 | -969.13 |
| Change in Market Value | -60,717.38 | 555.57 | 4,201.39 | -27,663.64 | 5,806.27 |
| **Ending Balance** | **$340,068.45** | **$0.00** | **$0.00** | **$365,108.60** | **$387,489.11** |

Please read this statement carefully. Any error must be reported to Fidelity Investments within 90 days.

CONFIDENTIAL

Print This Page



**RBC US Deferred
Compensation Plan**

MARTY PAUL


**Retirement Savings Statement**

☎ Customer Service: (866) 697-1002
Fidelity Investments Institutional
Operations Company, Inc.
82 Devonshire Street
Boston, MA 02109

## Your Account Summary    Statement Period: 01/01/2012 to 12/31/2012

| | |
|---|---|
| **Beginning Balance** | **$2,322,180.09** |
| Forfeitures | -$1,612,152.78 |
| Dividends and Interest | $8,488.69 |
| Withdrawal | -$956,130.92 |
| Fees | -$640.50 |
| Change in Market Value | $238,255.42 |
| **Ending Balance** | **$0.00** |

This plan represents a non-qualified plan that is "unfunded" for tax purposes. Any account and/or balances represented here are bookkeeping entries that measure the plan sponsor's obligation to you. Neither you nor the plan hold actual balances in the funds listed in this plan.

Your Personal Rate of Return

**This Period**                                                     **9.3%**

Your Personal Rate of Return is calculated with a time-weighted formula, widely used by financial analysts to calculate investment earnings. It reflects the results of your investment selections as well as any activity in the plan account(s) shown. There are other Personal Rate of Return formulas used that may yield different results. Remember that past performance is no guarantee of future results.

## Market Value of Your Account    Statement Period: 01/01/2012 to 12/31/2012

Displayed are the beginning and ending values of your account in dollars, and either shares of mutual funds or Company Stock.

| Investment | Shares as of 12/31/2011 | Shares as of 12/31/2012 | Price as of 12/31/2011 | Price as of 12/31/2012 | Market Value as of 12/31/2011 | **Market Value as of 12/31/2012** |
|---|---|---|---|---|---|---|
| **Stock Investments** | | | | | **$2,322,180.09** | **$0.00** |
| Large Cap | | | | | | |
| AF Grth Fund Amer R6 | 12,712.695 | 0.000 | $28.72 | $34.34 | $365,108.62 | $0.00 |
| FID US Eq Indx | 8,657.040 | 0.000 | $44.76 | $51.91 | $387,489.12 | $0.00 |
| Mid-Cap | | | | | | |
| RBC Smid Cap Grth I | 32,371.122 | 0.000 | $13.24 | $13.74 | $428,593.66 | $0.00 |
| International | | | | | | |
| AF Europac Growth R6 | 9,680.286 | 0.000 | $35.13 | $41.18 | $340,068.46 | $0.00 |
| RBC Share Account | 15,716.645 | 0.000 | $50.96 | $60.30 | $800,920.23 | $0.00 |
| **Account Totals** | | | | | **$2,322,180.09** | **$0.00** |

Remember that a dividend payment to fund shareholders reduces the share price of the fund, so a decrease in the share price for the statement period does not necessarily reflect lower fund performance.

https://plansponsorservices300.fidelity.com/plansponsor/sponsor/online_statement_detail.do    03/07/13

CONFIDENTIAL

# Exhibit Q



**RBC US Deferred
Compensation Plan**

**Retirement Savings Statement**

January 1, 2009 - December 31, 2009

ENV#MG000008
MG 14022  T



BRIAN BUSKIRK
**REDACTED**

If you have questions about your account, please call
the RBC - U.S.A. Retirement Help Line at Fidelity at
1-866-697-1002 8:30 am to midnight EST or access your
account on-line at www.netbenefits.com/RBC

## Your Account Summary

| | |
|---|---|
| Beginning Balance | **$353,244.50** |
| Employee Contributions | 31,972.82 |
| Employer Contributions | 40,683.93 |
| Dividends and Interest | 8,921.93 |
| Withdrawal | -73,364.70 |
| Fees | -742.87 |
| Change in Market Value | 161,318.66 |
| Ending Balance | **$522,034.27** |

| Additional Information | |
|---|---|
| Vested Balance | $295,910.14 |

| Inception to date contribution | |
|---|---|
| Your Personal Rate of Return | 50.6% |
| Year to Date | 50.6% |

Your Personal Rate of Return is calculated with a time-weighted
formula, widely used by financial analysts to calculate investment
earnings. It reflects the results of your investment selections as
well as any activity in the plan account(s) shown. There are other
Personal Rate of Return formulas used that may yield different
results. Remember that past performance is no guarantee of future
results.

## Your Asset Allocation



■ Stocks 100%

Your investments are currently allocated among the displayed
asset classes. Percentages and totals may not be exact due to
rounding.

## Your Account Activity

Use this section as a summary of transactions that occurred in your account during the statement period.

| Activity | AB<br>Intl Value Adv | AF<br>EuroPacific Gth A | AF<br>Fundamntl Invs A | AF<br>Grth Fund Amer A | AMG<br>Sys Lg Cp Val IS |
|---|---|---|---|---|---|
| Beginning Balance | $7,213.96 | $57,858.23 | $2,260.44 | $50,639.64 | $2,573.43 |
| Employee Contributions | 3,065.16 | 3,197.30 | 3,197.26 | 3,197.30 | 1,532.57 |
| Employer Contributions | 2,246.92 | 2,246.92 | 2,246.91 | 2,246.92 | 1,123.45 |
| Exchanges | -13,006.53 | 13,006.53 | 0.00 | 0.00 | 0.00 |
| Dividends and Interest | 25.41 | 1,538.86 | 115.18 | 429.87 | 62.81 |
| Withdrawal | 0.00 | -4,677.10 | 0.00 | -13,675.98 | 0.00 |
| Fees | -8.81 | -207.75 | -20.46 | -126.52 | -13.81 |
| Change in Market Value | 2,132.70 | 23,367.38 | 2,486.83 | 13,418.78 | 1,414.52 |
| Ending Balance | $1,668.81 | $96,330.37 | $10,286.16 | $56,130.01 | $6,692.97 |

Please read this statement carefully. Any error must be reported to Fidelity Investments within 90 days.

CONFIDENTIAL                                                                              RBC-PAUL000004570



**RBC US Deferred
Compensation Plan**

**Retirement Savings Statement**

January 1, 2010 - December 31, 2010

ENV#MG000009
MG 14022   T

BRIAN BUSKIRK



If you have questions about your account, please call
the RBC - U.S.A. Retirement Help Line at Fidelity at
1-866-697-1002 8:30 am to midnight EST or access your
account on-line at www.netbenefits.com/RBC

## Your Account Summary

| | |
|---|---|
| Beginning Balance | $522,034.27 |
| Employee Contributions | 37,441.29 |
| Employer Contributions | 29,829.26 |
| Dividends and Interest | 9,748.30 |
| Withdrawal | -101,170.63 |
| Fees | -882.84 |
| Change in Market Value | 33,821.79 |
| Ending Balance | $530,821.44 |

| Additional Information | |
|---|---|
| Vested Balance | $308,858.64 |

| Inception to date contribution | |
|---|---|
| Your Personal Rate of Return | 11.1% |
| Year to Date | 11.1% |

Your Personal Rate of Return is calculated with a time-weighted
formula, widely used by financial analysts to calculate investment
earnings. It reflects the results of your investment selections as
well as any activity in the plan account(s) shown. There are other
Personal Rate of Return formulas used that may yield different
results. Remember that past performance is no guarantee of future
results.

## Your Asset Allocation



■ Stocks 100%

Your investments are currently allocated among the displayed
asset classes. Percentages and totals may not be exact due to
rounding.

## Your Account Activity

Use this section as a summary of transactions that occurred in your account during the statement period.

| Activity | AB<br>Intl Value Adv | AF<br>EuroPacific Gth A | AF<br>Fundamntl Invs A | AF<br>Grth Fund Amer A | AMG<br>Sys Lg Cp Val IS |
|---|---|---|---|---|---|
| Beginning Balance | $1,668.81 | $96,330.37 | $10,286.16 | $56,130.01 | $6,692.97 |
| Employee Contributions | 0.00 | 3,744.13 | 3,744.12 | 3,744.13 | 0.00 |
| Employer Contributions | 0.00 | 1,384.29 | 1,384.28 | 1,384.29 | 0.00 |
| Exchanges | -1,381.18 | 0.00 | 0.00 | 0.00 | 47.86 |
| Dividends and Interest | 0.00 | 1,232.34 | 247.91 | -13,212.90 | 0.00 |
| Withdrawal | 0.00 | -16,460.28 | 0.00 | -129.48 | -18.18 |
| Fees | -1.11 | -223.02 | -37.28 | -129.48 | -18.18 |
| Change in Market Value | -286.52 | 4,621.64 | 1,845.69 | 4,095.97 | 1,157.22 |
| Ending Balance | $0.00 | $90,629.47 | $17,470.88 | $52,430.90 | $7,879.87 |

Please read this statement carefully. Any error must be reported to Fidelity Investments within 90 days.

CONFIDENTIAL                                                                    RBC-PAUL000004592



**RBC US Deferred Compensation Plan**

## Retirement Savings Statement

January 1, 2011 - December 31, 2011

ENV#MG000010
MG 14022   T



BRIAN BUSKIRK

If you have questions about your account, please call the RBC - U.S.A. Retirement Help Line at Fidelity at 1-866-697-1002 8:30 am to midnight EST or access your account on-line at www.netbenefits.com/RBC

## Your Account Summary

| | |
|---|---:|
| **Beginning Balance** | **$530,821.44** |
| Employer Contributions | 37,116.78 |
| Dividends and Interest | 16,571.34 |
| Withdrawal | -107,199.13 |
| Fees | -923.03 |
| Change in Market Value | -18,728.19 |
| **Ending Balance** | **$457,659.21** |

**Additional Information**

| | |
|---|---:|
| Vested Balance | $253,444.51 |

**Inception to date contribution**

| | |
|---|---:|
| Your Personal Rate of Return | -1.8% |
| Year to Date | -1.8% |

Your Personal Rate of Return is calculated with a time-weighted formula, widely used by financial analysts to calculate investment earnings. It reflects the results of your investment selections as well as any activity in the plan account(s) shown. There are other Personal Rate of Return formulas used that may yield different results. Remember that past performance is no guarantee of future results.

## Your Asset Allocation



Stocks 100%

Your investments are currently allocated among the displayed asset classes. Percentages and totals may not be exact due to rounding.

## Your Account Activity

Use this section as a summary of transactions that occurred in your account during the statement period.

| Activity | ABF Sm Cap Val Inst | AF EuroPac Growth R6 | AF EuroPacific Gth A | AF Fundamntl Invs A | AF Grth Fund Amer A |
|---|---:|---:|---:|---:|---:|
| **Beginning Balance** | **$0.00** | **$0.00** | **$90,629.47** | **$17,470.88** | **$52,430.90** |
| Employer Contributions | 0.00 | 1,855.84 | 0.00 | 1,855.84 | 0.00 |
| Exchanges | 10,229.26 | 53,269.59 | -90,760.89 | 0.00 | -53,068.19 |
| Dividends and Interest | 52.98 | 645.77 | 0.00 | 323.65 | 0.00 |
| Withdrawal | 0.00 | -20,709.23 | 0.00 | 0.00 | 0.00 |
| Fees | -13.97 | -150.31 | 0.00 | -49.25 | 0.00 |
| Change in Market Value | 1,641.06 | -3,432.72 | 131.42 | -791.25 | 637.29 |
| **Ending Balance** | **$11,909.33** | **$31,478.94** | **$0.00** | **$18,809.87** | **$0.00** |

Please read this statement carefully. Any error must be reported to Fidelity Investments within 90 days.

CONFIDENTIAL

RBC-PAUL000004542



**RBC US Deferred
Compensation Plan**

**Retirement Savings Statement**

January 1, 2012 - December 31, 2012

ENV#MG000011
MG 14022  T


BRIAN BUSKIRK

If you have questions about your account, please call
the RBC - U.S.A. Retirement Help Line at Fidelity at
1-866-697-1002 8:30 am to midnight EST or access your
account on-line at www.netbenefits.com/RBC

## Your Account Summary

| | |
|---|---:|
| Beginning Balance | $457,659.21 |
| Employee Contributions | 20,558.84 |
| Employer Contributions | 53,091.00 |
| Forfeitures | -297,676.04 |
| Dividends and Interest | 13,783.99 |
| Withdrawal | -94,770.89 |
| Fees | -881.79 |
| Change in Market Value | 63,565.95 |
| Ending Balance | $215,330.27 |

| Additional Information | |
|---|---:|
| Vested Balance | $215,330.27 |

| Inception to date contribution | |
|---|---:|
| Your Personal Rate of Return | 18.3% |
| Year to Date | 18.3% |

Your Personal Rate of Return is calculated with a time-weighted
formula, widely used by financial analysts to calculate investment
earnings. It reflects the results of your investment selections as
well as any activity in the plan account(s) shown. There are other
Personal Rate of Return formulas used that may yield different
results. Remember that past performance is no guarantee of future
results.

## Your Asset Allocation



■ Stocks 100%

Your investments are currently allocated among the displayed
asset classes. Percentages and totals may not be exact due to
rounding.

## Your Account Activity

Use this section as a summary of transactions that occurred in your account during the statement period.

| Activity | ABF Sm Cap Val Inst | AF EuroPac Growth R6 | AF Fundamntl Invs A | AF Grth Fund Amer R6 | AMG Sys Lg Cp Val IS |
|---|---:|---:|---:|---:|---:|
| Beginning Balance | $11,909.33 | $31,478.94 | $18,809.87 | $38,302.46 | $7,242.49 |
| Employee Contributions | 1,027.94 | 2,055.88 | 2,055.88 | 2,055.88 | 0.00 |
| Employer Contributions | 1,225.20 | 2,450.40 | 2,450.40 | 2,450.40 | -3,524.00 |
| Forfeitures | -7,310.24 | -12,643.35 | -12,499.00 | -12,479.40 | 80.84 |
| Dividends and Interest | 338.17 | 397.22 | 335.98 | 285.23 | 0.00 |
| Withdrawal | 0.00 | -8,768.14 | 0.00 | -13,196.77 | -19.12 |
| Fees | -35.04 | -76.41 | -57.85 | -91.08 | 1,146.22 |
| Change in Market Value | 1,610.52 | 4,892.16 | 3,235.83 | 6,937.41 | 1,146.22 |
| Ending Balance | $8,765.88 | $19,786.70 | $14,331.11 | $24,264.13 | $4,926.43 |

Please read this statement carefully. Any error must be reported to Fidelity Investments within 90 days.

CONFIDENTIAL                                                                    RBC-PAUL000004613

# Exhibit R

## 2006 FC Total Compensation Statement [1]

| BRIAN BUSKIRK – GH07 | | | $ | % Gross |
|---|---|---|---|---|
| **Gross Commissions** | | | 653,275 | 100.0% |
| | | | | |
| **Cash Compensation:** | | | | |
| Base Commissions and Interest | | | 273,424 | 41.9% |
| | | | | |
| **Total Cash Compensation** | | | 273,424 | 41.9% |
| | | | | |
| **Long-Term Compensation:** | | | | |
| WAP Productivity Bonus | | | 22,865 | 3.5% |
| WAP Fixed Match | | | 9,284 | 1.4% |
| WAP Fixed Match @ Full Participation [2] | 9,284 | 1.4% | | |
| WAP Premium Match | | | 11,141 | 1.7% |
| WAP Premium Match @ Full Participation [2] | 11,141 | 1.7% | | |
| RBC USA Retirement & Savings Plan Match | | | 1,500 | 0.2% |
| | | | | |
| **Total Long-Term Compensation (Subject to Vesting)** | | | 44,790 | 6.9% |
| | | | | |
| **Employee Benefits:** | | | | |
| Employee Insurance (company cost of medical, dental, and basic life) | | | 8,695 | 1.3% |
| Social Security | | | 9,649 | 1.5% |
| | | | | |
| **Total Employee Benefits:** | | | 18,344 | 2.8% |
| | | | | |
| **Total FC Compensation & Benefits (Subject to Vesting)** | | | 336,558 | 51.5% |

## Notes:

(1) This statement provides a summary of 2006 plan year financial consultant compensation only. It does not include: complex or branch director compensation, assistant branch manager compensation, compensation sharing, transitional bonuses, or transitional salary. In general, compensation is based on FY2006 gross production. Benefits, WAP matches and Retirement and Savings Plan matches are based on a calendar year cycle. Some of the long-term compensation on the statement above is unvested. Vesting depends on the vesting schedule and conditions of the applicable plan and is contingent on continued employment at RBC Dain Rauscher.

(2) Represents amount of match if FC fully participated in WAP, defined as voluntarily deferring 15% of eligible compensation into the WAP.

*See next page for retirement and deferred plan balances*

BB000063

## 2007 FC Total Compensation Statement [1]

| BRIAN BUSKIRK – GH07 | | | $ | % Gross |
|---|---|---|---|---|
| **Gross Commissions** | | | 780,406 | 100.0% |
| | | | | |
| **Cash Compensation:** | | | | |
| Base Commissions and Interest | | | 331,014 | 42.4% |
| **Total Cash Compensation** | | | 331,014 | 42.4% |
| | | | | |
| **Long-Term Compensation:** | | | | |
| WAP Productivity Bonus | | | 27,314 | 3.5% |
| WAP Fixed Match | | | 11,091 | 1.4% |
| WAP Fixed Match @ Full Participation[2] | 11,091 | 1.4% | | |
| WAP Premium Match | | | 13,309 | 1.7% |
| WAP Premium Match @ Full Participation[2] | 13,309 | 1.7% | | |
| RBC USA Retirement & Savings Plan Match | | | 1,500 | 0.2% |
| **Total Long-Term Compensation (Subject to Vesting)** | | | 53,214 | 6.8% |
| | | | | |
| **Employee Benefits:** | | | | |
| Employee Insurance (company cost of medical, dental, and basic life) | | | 8,716 | 1.1% |
| Social Security | | | 10,294 | 1.3% |
| **Total Employee Benefits:** | | | 19,010 | 2.4% |
| **Total FC Compensation & Benefits (Subject to Vesting)** | | | 403,238 | 51.7% |

## Notes:

(1) This statement provides a summary of 2007 plan year financial consultant compensation only. It does not include: complex or branch director compensation, assistant branch manager compensation, compensation sharing, transitional bonuses, or transitional salary. In general, compensation is based on FY2007 gross production. Benefits, WAP matches and Retirement and Savings Plan matches are based on a calendar year cycle. Some of the long-term compensation on the statement above is unvested. Vesting depends on the vesting schedule and conditions of the applicable plan and is contingent on continued employment at RBC Dain Rauscher.

(2) Represents amount of match if FC fully participated in WAP, defined as voluntarily deferring 15% of eligible compensation into the WAP.

***See next page for retirement and deferred plan balances***

# Exhibit S



March 15, 2012

Marty Paul

REDACTED

RE:  RBC US Wealth Accumulation Plan ("WAP")

Dear Mr. Paul:

As you are aware, during your employment with RBC, you participated in the RBC US Wealth Accumulation Plan ("WAP").  As of February 28, 2012, your total balance, vested and unvested, was $2,592,046.

As you further are aware, your employment with RBC terminated on March 7, 2011. After reviewing the circumstances of your separation from employment, and pursuant to the provisions of the Plan, including but not limited to Sections 4.3, the WAP Committee determined that your separation from RBC was for "cause."  Accordingly, your Company Contributions (and mandatory deferrals), both vested and unvested, have been forfeited in the amount of $1,612,152.

If you have any questions regarding this decision, or desire to challenge this decision, we refer you to the Plan, including Section 7, or invite you to contact the Committee directly through Gabriela Sikich at (612) 371-7666 or Gabriela.Sikich@RBC.com.

Sincerely,

Gabriela Sikich
US Defined Contribution Plans Manager

EXHIBIT
16
Paul  9-27-17

MP000113

# Amended and Restated

## Royal Bank of Canada

## US Wealth Accumulation Plan

### And Prospectus

**The date of this document is NOVEMBER 1, 2010**

This document constitutes part of
a prospectus covering securities
that have been registered under
The Securities Act of 1933

RBC Financial Group

MP000114

# TABLE OF CONTENTS

**Page**

SECTION 1 INTRODUCTION ....................................................................1
   1.1   General Nature and Purpose of the Plan.................................1
   1.2   Definitions.........................................................................1
   1.3   Rules of Interpretation ....................................................5

SECTION 2 DEFERRALS AND DEEMED INVESTMENTS..........................5
   2.1   Eligibility. ........................................................................5
   2.2   Election to Voluntarily Defer Compensation .....................5
   2.3   Mandatory Deferral of Compensation ..............................6
   2.4   Election of Investments....................................................6
   2.5   Intra-Plan Transfers .......................................................6
   2.6   Company Contributions ..................................................6

SECTION 3 INFORMATION CONCERNING INVESTMENT ALTERNATIVES ...................7
   3.1   Company Common Shares. ...............................................7
   3.2   Plan Interest Rate ..........................................................8
   3.3   Mutual Funds .................................................................8
   3.4   Valuation.........................................................................8

SECTION 4 VESTING...............................................................................9
   4.1   Vesting of Voluntary Deferred Compensation ...................9
   4.2   Vesting of Mandatory Deferred Compensation and Company Contributions................9
   4.3   Termination For Cause ....................................................9
   4.4   Terminations Due to Restructuring..................................9
   4.5   Change in Control ...........................................................10
   4.6   Forfeitures ......................................................................10

SECTION 5 DISTRIBUTIONS ....................................................................10
   5.1   Distributions....................................................................10
   5.2   Distribution Dates ..........................................................10
   5.3   Distribution Due to a Change In Control ..........................12
   5.4   Form of Distributions......................................................12
   5.5   Distributions to Beneficiaries .........................................13
   5.6   Designation of Beneficiary ..............................................13
   5.7   Disclaimers by Beneficiaries ...........................................14
   5.8   Federal Income Tax ........................................................14
   5.9   Tax Withholding .............................................................15
   5.10 ERISA Matters...............................................................15

SECTION 6 SPENDTHRIFT PROVISIONS ...................................................15

SECTION 7 ADMINISTRATION..................................................................16
   7.1   The Committee.................................................................16
   7.2   Claims Procedure ...........................................................16

MP000115

## TABLE OF CONTENTS
### (continued)

|  |  | Page |
|---|---|---|
| 7.3 | Making a Claim | 16 |
| 7.4 | Requesting Review of a Denied Claim | 16 |
| 7.5 | In General | 17 |
| **SECTION 8 OTHER ADMINISTRATIVE MATTERS** | | 17 |
| 8.1 | Reporting | 17 |
| 8.2 | Plan Obligor; Status as Unsecured General Creditors | 17 |
| 8.3 | Disclaimer of Employment and Bonus Rights | 18 |
| 8.4 | Administrative Expenses of the Plan | 18 |
| 8.5 | No Compensation Under the Qualified Plan | 18 |
| 8.6 | Voting Rights | 18 |
| 8.7 | Governing Law | 18 |
| **SECTION 9 AMENDMENT OR TERMINATION** | | 18 |
| 9.1 | Amendments to and Termination of Plan | 18 |
| 9.2 | Merger | 19 |
| 9.3 | Applicability to Successors | 19 |

-ii-

## SECTION 1
## INTRODUCTION

**1.1    General Nature and Purpose of the Plan.**  The Royal Bank of Canada US Wealth Accumulation Plan (the "**Plan**") is a nonqualified, deferred compensation plan pursuant to which a select group of management or highly compensated employees of the Royal Bank of Canada (the "**Company**") and its Participating Subsidiaries (collectively, the "**Employers**") may be offered the opportunity to elect to defer receipt of a portion of their compensation to be earned with respect to the upcoming Plan Year.  The Plan is designed to provide an opportunity for such employees to invest a portion of their compensation in tax-deferred savings and investment options in an effort to support long-term savings and allow such employees to share in the Company's growth and profitability, if any.  The Plan was formerly known as the RBC Dain Rauscher Wealth Accumulation Plan, was amended and restated effective for the Plan Year beginning on January 1, 2005, was further amended and restated effective for the Plan Year beginning on January 1, 2007, was further amended and restated effective for the Plan Year beginning on January 1, 2008, was further amended and restated effective for the Plan Year beginning on January 1, 2010 and **is hereby further amended and restated effective for the Plan Year beginning on January 1, 2011.**  This Plan restatement supersedes all prior versions of the Plan and any deferrals or contributions made pursuant to a prior version of the Plan will be governed by this Plan.

**1.2    Definitions.**

"**Account Balance**" means, for any given date, a Participant's Deferred Compensation and Company Contributions, plus or minus the hypothetical investment performance thereon.

"**Adverse Benefit Determination**" means a claim for benefits by a Participant, beneficiary or personal representative that has been denied in whole or in part.

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**Cause**" means, as determined by the Committee or its assignee, the occurrence of any one of the following: (a) any act of dishonesty, willful misconduct, negligence, gross negligence, intentional or conscious abandonment or neglect of duty; (b) any failure by the Employee to comply with any written policy, rule or code, including but not limited to an Employer's Code of Conduct or Code of Ethics, as applicable; (c) commission of a criminal activity, fraud or embezzlement; (d) violation of any rule or regulation of any self-regulatory agency with which the Employee is licensed, regardless of whether such agency takes disciplinary action against the Employee; (e) the loss or suspension of any license necessary to perform in the occupation for which Employee was hired, or the commission of any action that would cause Employee to become unbondable; (f) a failure to reasonably cooperate in any

MP000117

investigation or proceeding concerning an Employer or any Employer Affiliate; (g) any unauthorized disclosure or use of confidential information or trade secrets; (h) any violation of any restrictive covenant, such as a non-compete, non-solicit or non-disclosure agreement, between the Participant and an Employer or any Employer Affiliate; (i) personal or professional conduct of Employee which, in the reasonable and good faith judgment of the Committee or its assignee, injures or tends to injure the reputation of an Employer or otherwise adversely effects the interests of an Employer; (j) failure to perform Employee's duties and obligations to a level required by an Employer; or (k) any other act as determined by the Committee in good faith; provided, however, that in the event an Employee is party to an employment agreement with an Employer that contains a different definition of Cause, the definition of Cause contained in such employment agreement will be controlling.

"**Change in Control**" means the Company's sale of (a) at least 75% of the equity or (b) all or substantially all of the assets of a Participating Subsidiary to a person or entity (or a collection of Persons or entities acting as a group) that is not a Company Affiliate, other Employer or Employer Affiliate. A Change in Control will be deemed to have occurred only if such transaction meets the requirements of a "change in control" (as described in Treasury Regulation § 1.409A-3(i)(5)) with respect to the Participating Subsidiary.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended, and includes the regulations and guidance in effect thereunder.

"**Committee**" means the Head of Human Resources, or those executives designated by the Head of Human Resources to administer this Plan. The members of the Committee, if any, serve at the pleasure of the Head of Human Resources, who has the power to appoint and remove members from time to time.

"**Company**" means Royal Bank of Canada, a Schedule I bank under the Bank Act (Canada) with its corporate headquarters in Toronto, Ontario, Canada, and any successor or assign.

"**Company Contribution**" means additional contributions that may be made by the Company in the form of a Matching Contribution or a Discretionary Contribution.

"**Deferred Compensation**" means, with respect to each Participant, the sum of his or her Voluntary Deferred Compensation and Mandatory Deferred Compensation.

"**Disability**" means the Participant's injury or illness that both (a) qualifies him or her for benefits under a long-term disability plan covering eligible employees of the Participant's Employer and (b) causes the Participant to be absent from his or her employment with his or her Employer for a continuous period of not less than 12 months.

"**Discretionary Contribution**" means a Company Contribution described in Section 2.6(b).

"**Election Form**" means the eligible Employee's written election setting forth (a) the percentage of an Employee's Gross Cash Compensation he or she elects to defer, (b) the

-2-

distribution dates for his or her Deferred Compensation and Company Contributions, and (c) such other information as determined by the Committee.

"**Employee**" means an individual classified as a common law employee by, and on the payroll of, an Employer.

"**Employers**" means the Company and Participating Subsidiaries.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and includes the regulations and guidance in effect thereunder.

"**FICA**" means the Federal Insurance Contribution Act.

"**Fund Addition Date**" means such times as interest or dividends are paid or other distributions are made in connection with a Mutual Fund.

"**Gross Cash Compensation**" has the meaning ascribed to "Recognized Compensation" under the Qualified Plan on the first day of each Plan Year to which an election to defer compensation relates. Gross Cash Compensation is Recognized Compensation that is earned by an Employee for services rendered during a Plan Year, whether or not paid in such Plan Year, and includes any amounts an Employee contributes to the Qualified Plan or an employer-sponsored cafeteria plan from his or her total compensation. If an Employee so elects at the time of entering into a business transition plan with an Employer, payments from a business transition plan are included in Gross Cash Compensation. The preceding sentence is applicable only for business transition plans entered into on or after January 1, 2007.

"**In-Service Payment Date**" means a distribution date, as elected by the Employee on his or her Election Form, that occurs while the Participant is an Employee (or an employee of an Employer Affiliate).

"**Mandatory Deferred Compensation**" means the percentage of an Employee's Gross Compensation that the Committee may, from time to time and in its sole and absolute discretion, designate as a required deferral to the Plan for such Employee.

"**Matching Contribution**" means a Company Contribution described in <u>Section 2.6(a)</u>.

"**Matching Threshold Amount**" means an amount of Deferred Compensation, as determined by the Committee with respect to each Plan Year, that is credited to a Participant's account during such Plan Year that may be eligible for a Matching Contribution in accordance with standards and guidelines determined annually by the Committee.

"**Mutual Funds**" means any of the mutual funds that have been selected by the Committee, as supplemented, replaced or eliminated from time-to-time at the discretion of the Committee.

"**Mutual Fund Price**" means, unless otherwise determined by the Committee, the daily reported closing price of an interest in, or units of, the Mutual Funds.

-3-

MP000119

"NYSE" means the New York Stock Exchange.

"Participant" means an individual who has an Account Balance.

"Participating Subsidiary" means a corporation, now or in the future, affiliated with the Company that adopts, or has adopted, the Plan. No corporation may become a Participating Subsidiary without prior consent of the Committee. Such participation is subject to such limitations as the Committee may impose and will cease upon a Change in Control of such Participating Subsidiary.

"Person" means any individual, sole proprietorship, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, institution, public benefit corporation, entity or government instrumentality, division, agency, body or department.

"Plan" means the Royal Bank of Canada US Wealth Accumulation Plan, as set forth in this document and as amended from time to time.

"Plan Interest Rate" means an interest rate determined from time to time by the Committee.

"Plan Obligor" means the party that is responsible for satisfaction of amounts payable to Participants.

"Plan Year" means, with respect to a particular year, the 12-month period beginning January 1 and ending December 31 of such year.

"Qualified Plan" means the RBC-U.S.A. Retirement and Savings Plan, as amended from time to time.

"Retirement" means the Separation of a Participant whose age and years of employment (as determined using the service rules set forth in the Qualified Plan) with the Employers when combined equals 60.

"Separation" means the separation of employment from the Employers or any Employer Affiliate, as the case may be, of a Participant, other than due to such Participant's death, Disability or termination for Cause pursuant to the terms set forth herein. Transfers of employment among the Employers and their Affiliates will not be a "Separation" for purposes of this Plan, and any Separation must constitute a "separation from service" under Code Section 409A.

"Valuation Date" means the business day that falls on or immediately after July 1 of each year that a distribution is due a Participant.

"Voluntary Deferred Compensation" means the portion or percentage of an Employee's Gross Compensation that the Employee elects to defer to the Plan in accordance with Section 2.2.

-4-

MP000120

**1.3     Rules of Interpretation.** Whenever appropriate, words used herein in the singular may be read in the plural, or words used herein in the plural may be read in the singular; the masculine may include the feminine and the words "hereof," "herein" or "hereunder" or other similar compounds of the word "here" mean and refer to this entire Plan and not to any particular paragraph or section of this Plan unless the context clearly indicates to the contrary. The titles given to the various sections of this Plan are inserted for convenience of reference only and are not part of this Plan and they will not be considered in determining the purpose, meaning or intent of any provision hereof. Any reference in this Plan to a statute or regulation will be considered also to mean and refer to any subsequent amendment or replacement of that statute or regulation.

## SECTION 2
## DEFERRALS AND DEEMED INVESTMENTS

**2.1     Eligibility.**

(a)     Employees eligible to participate in the Plan are any of the select group of management or highly compensated employees of an Employer whose compensation or production otherwise exceeds a level deemed appropriate by the Committee and who are invited to become Participants by the Committee.

(b)     No deferrals, Company Contributions or other benefits are available under the Plan, other than deferrals, Company Contributions or other benefits in respect of services rendered to the Employers by an Employee:

(i)     who is a non-resident of Canada for purposes of the Income Tax Act (Canada) throughout the period during which the services were rendered; or

(ii)     other than services that were primarily (A) rendered in Canada; (B) rendered in connection with a business carried on by an Employer in Canada; or (C) a combination of services described in (A) and (B).

(c)     Notwithstanding anything in the Plan to the contrary, individuals who are employees of a "nonqualified entity," as that term is described under Code Section 457A, are not eligible to participate in the Plan. No deferrals, Company Contributions or other benefits are available under the Plan with respect to compensation for services rendered by such an employee.

**2.2     Election to Voluntarily Defer Compensation.** Eligible Employees may enroll in the Plan by electing to make Voluntary Deferred Compensation contributions for the next succeeding Plan Year. The Committee has the discretion to limit the amount of Voluntary Deferred Compensation or the amount of Gross Compensation that may be taken into account for making Voluntary Deferred Compensation contributions. Elections must be made no later than December 31 of the year immediately preceding the year in which such Voluntary Deferred Compensation will be earned; provided, however, that subject to such changes as may be determined by the Committee, a new Employee who is eligible to participate in the Plan has 30 days from such Employee's hiring date to submit an Election Form for such Plan Year. **For a given Plan Year, an election to defer compensation is irrevocable after it is accepted by the Committee.** An election by an Employee who is first eligible to participate in the Plan during a

-5-

given year becomes effective beginning the first day of the month following the date such Election Form is submitted and accepted by the Committee.

The Committee will from time to time establish the maximum percentage of a Participant's Gross Cash Compensation that he or she may elect to defer under the Plan. Voluntary Deferred Compensation will be deferred by payroll reduction.

**2.3    Mandatory Deferral of Compensation.** On each payroll date, the Employers will reduce each eligible Employee's Gross Compensation by any Mandatory Deferred Compensation and contribute it to the Plan on such Employee's behalf.

**2.4    Election of Investments.** On each Plan Year's Election Form, a Participant (or Employee for the first Election Form) may choose the form of the hypothetical investment of his or her Deferred Compensation by electing to credit such deferrals for any Plan Year to one or more of the hypothetical investments established by the Committee. The available hypothetical investments are described in <u>SECTION 3</u>. If a Participant fails to elect how deferrals are deemed to be invested, such Deferred Compensation will be deemed to be invested at the Plan Interest Rate.

Accounts for Participants will be established for bookkeeping purposes only and will not be considered as, or as evidence of the creation of, a trust fund or a transfer or other segregation of assets for the benefit of the Participants or their estates. Such accounts will be established and credited with the appropriate amounts as provided for in the Plan as of the end of each business day, or in the case of any Company Contributions determined after the end of the Plan Year, on or around the last day of February following the end of the Plan Year. Amounts deemed credited to a Participant's account in cash will not be credited with interest, and will not be deemed to be invested in any interest-bearing item.

**2.5    Intra-Plan Transfers.** Subject to such rules as the Committee, from time to time and in its sole and absolute discretion, may impose, a Participant may elect to have all or a portion of his or her Account Balance transferred to any other type of hypothetical investment. Participants may initiate an intra-Plan transfer by submitting a request in writing to the Company in such form as the Committee determines. Requests made during any month to transfer Account Balances into another hypothetical investment will be honored at the time/times determined by the Committee.

**2.6    Company Contributions.** The Committee will establish whether and the extent to which a Participant is eligible for one or more of the following types of Company Contributions:

(a)    *Matching Contributions.* The Company may make Matching Contributions equal to a percentage of a Participant's Voluntary Deferred Compensation up to the Matching Threshold Amount, subject to the following:

(i)    The Matching Threshold Amount and related Matching Contributions may vary with certain performance-based measures established by the Participating Subsidiary, or such other performance factors as determined by the Committee. The Matching Threshold Amount will be based on a performance grid approved annually by the Committee and distributed to each Participant.

-6-

MP000122

(ii)     If a Participant is entitled to a Matching Contribution, after the end of the Plan Year (or at such other time as the Committee, in its sole discretion, determines) his or her account will be deemed to have been allocated the number of Company common shares, including fractional shares, resulting from dividing the amount of such Matching Contribution by the closing price per Company common share on the NYSE as reported on the day of crediting.

(iii)    The Participant may diversify his or her Matching Contributions and related investment returns from a deemed investment in Company common shares at any time after the Participant reaches age 55 or, if earlier, upon the Participant's Separation, provided that the applicable Employer classifies such Separation as "retirement" on the applicable separation from service forms. For this purpose, classification as "retirement" is not necessarily a "Retirement," as used in this Plan.

(b)     *Discretionary Contributions.*  The Company may make Discretionary Contributions in such other amount as determined by the Committee in its sole discretion. The Discretionary Contribution amount may vary from Participant to Participant and may be made based on any criteria, including recommendations from a Participating Subsidiary, as determined by the Committee. If a Participant is entitled to a Discretionary Contribution, his or her account will be deemed to have been allocated the amount of such Discretionary Contribution on the date determined by the Committee.  Such Discretionary Contribution will be invested as determined by the Committee in its discretion, but may be based on any election by such eligible Participant, and may be changed by the Participant at any time.

## SECTION 3
## INFORMATION CONCERNING INVESTMENT ALTERNATIVES

3.1     **Company Common Shares.**

(a)     *Company Common Shares.*  For any Plan Year, in connection with a Participant's election to have a portion of his or her Deferred Compensation credited toward Company common shares, such Participant's account will be deemed to have been allocated the number of Company common shares, including fractional shares, resulting from dividing such portion of the Participant's Deferred Compensation and Company Contributions allocated to the investment in Company common shares by the closing price per Company common share on the NYSE as reported on the day of crediting.

(b)     *Dividends on Company Common Shares.*  At such times as the Company declares dividends on its common shares, an amount equal to the number of Company common shares credited to a Participant's account on the record date multiplied by the declared dividend per share in U.S. dollars (such dividend to be calculated without taking into account any and all Canadian withholding taxes to which such dividend might be subject, if actually paid) will be credited, on the payment date, to such Participant's account in cash (if dividends are paid in cash) or in Company common shares (if

-7-

MP000123

dividends are declared in common shares), or in such other property determined by the Committee.

(c)     *Additional Purchases of Company Common Shares.* All amounts credited to a Participant's account as a result of cash dividends will be used on a daily basis (or on such other date as determined by the Committee in its sole discretion) to purchase hypothetical Company common shares. The number of additional Company common shares credited to each Participant's account after the end of each day due to the hypothetical purchases described in this paragraph will be equal to the number of Company common shares, including fractional shares, derived by dividing the total amount of cash credited to the Participant's account as described in this Section 3.1 by the closing price per Company common share on the NYSE as reported on the date of the hypothetical purchase of the Company common shares credited to such Participant's account under this Section 3.1.

**3.2     Plan Interest Rate.** Participants may elect to have all or a portion of their Deferred Compensation invested at the Plan Interest Rate.

**3.3     Mutual Funds.**

(a)     *Mutual Funds.* A Participant who is eligible to diversify their Account under Section 2.6(a)(iii) may elect to have all or a portion of their Deferred Compensation, Discretionary Contributions, and Matching Contributions deemed invested in one or more Mutual Funds. A Participant's account will be allocated the number of units (including fractional units) of a Mutual Fund equal to the portion of his or her Account Balance allocated to investments in Mutual Funds divided by the Mutual Fund Price.

(b)     *Interest or Dividends on Mutual Funds.* On each Fund Addition Date, a determination will be made as to the number of units (including fractional units) of the Mutual Fund that will be credited to a Participant's account as of the Fund Addition Date. On the Fund Addition Date, an amount equal to the number of units of the Mutual Fund credited to a Participant's account multiplied by the amount of the interest or dividend per unit of the Mutual Fund will be credited to such Participant's account, or other fund determined by the Committee. Interest payments or other distributions will be deemed reinvested in additional units of the Mutual Fund at prevailing market prices on the Fund Addition Date.

**3.4     Valuation.** Except for changes resulting from intra-Plan transfers described in Section 2.5, the notional value of a Participant's accounts will be updated daily to reflect any increases or decreases in the value of the Participant's hypothetical investment.

The account of a Participant with a hypothetical investment in Mutual Funds will be debited by an amount representing a quarterly fee. The amount of the quarterly fee will be determined by multiplying the value of the Participant's hypothetical investment in Mutual Funds, as described above, by a decimal determined by the Committee, which for 2009 is

-8-

MP000124

0.000625.  The Committee will from time to time review this calculation and may change the decimal factor used in this calculation.

## SECTION 4
## VESTING

**4.1    Vesting of Voluntary Deferred Compensation.**    All Voluntary Deferred Compensation recorded in a Participant's account will be fully vested at all times.

**4.2    Vesting of Mandatory Deferred Compensation and Company Contributions.** Mandatory Deferred Compensation and Company Contributions in a Participant's account will vest on the date or dates determined by the Committee, in its sole discretion.  The Committee will announce any prospective change in the vesting schedule with respect to Mandatory Deferred Compensation and Company Contributions (and the related investment returns, if any) prior to December 31 of the year preceding each new Plan Year.  Unless otherwise amended by the Committee, all time period measurements for the vesting schedules established by the Committee will begin on January 1 of the Plan Year following the Plan Year to which a Company Contribution relates.  Notwithstanding the foregoing, a Participant's Mandatory Deferred Compensation and Company Contributions will immediately vest in full upon:

      (a)    the death or Disability of such Participant while an employee of an Employer or an Employer Affiliate; or

      (b)    the Separation of a Participant, who prior to Separation and with the consent of his or her Employer, has (i) entered into a business transition agreement with the Private Client Group or (ii) met the requirements under the Plan for Retirement and who has entered into a non-competition, non-solicitation and related agreement at the request of the Participant's employer in the form then approved by the Committee.  The non-competition agreement will require a Participant, for at least a one-year period, to refrain from participating, directly or indirectly, in any business in which an Employer is engaged at the time of such Participant's Separation in any geographic area in which the Employer, as appropriate, is competing at such time.

**4.3    Termination For Cause.**    Notwithstanding anything to the contrary in this SECTION 4, if a Participant is involuntarily terminated for Cause from an Employer or an Employer Affiliate at any time prior to the distribution of his or her Account Balance, upon such Participant's Separation, all of his or her Mandatory Deferred Compensation and Company Contributions will be forfeited, regardless of whether the vesting schedule has otherwise been satisfied with respect to such shares or assets, and the proceeds thereof will be deemed returned to the Company.  The Committee has full discretionary authority to determine whether a Participant was terminated for Cause, and, if (a) a Participant has a voluntary Separation, and (b) the Committee thereafter determines that the Participant could have been involuntary terminated by an Employer or Employer Affiliate for Cause, then the Participant will be treated as though he or she was involuntarily terminated for Cause for all purposes of this Plan.

**4.4    Terminations Due to Restructuring.**    In the event a Participant ceases to be employed by the Employers and their Affiliates due to an organizational restructuring (as

-9-

determined in the sole discretion of the Committee), all Mandatory Deferred Compensation in such Participant's account will become vested, but all unvested Company Contributions will be forfeited.

4.5     **Change in Control.**  In the event of a Change in Control of a Participating Subsidiary, each Participant who is employed by such Participating Subsidiary immediately prior to the date on which the Change in Control is consummated and who, due to the Change in Control (as determined by the Committee), is no longer employed by an Employer immediately after the Change in Control will become vested in his or her Mandatory Deferred Compensation and Company Contributions as follows:

(a)     *Minimum Vesting.*  The unvested portion of each affected Participant's Mandatory Deferred Compensation and Company Contributions will be vested pro rata, based on the period of time that has elapsed from the effective date of the contribution to the date of the Change in Control relative to the total vesting period related to such contribution.   Before a Change in Control event, the Committee will establish a reasonable method for calculating the pro rata portion of each affected Participant's Account Balance.

(b)     *Discretionary Vesting.*  The Board has the discretionary authority to vest any amount held in an affected Participant's account that remains unvested after the application of paragraph (a) above. In making its determination, the Board may consider the terms of the transaction governing the Change in Control, the financial impact on the Employers, and any other factors it deems relevant to its determination.

4.6     **Forfeitures.**  Except as otherwise specifically set forth herein, all Company Contributions and Mandatory Deferred Compensation and related deemed investment returns that are not vested on the Participant's Separation date will be deemed forfeited, and such Participant's account will be appropriately reduced.

## SECTION 5
## DISTRIBUTIONS

5.1     **Distributions.**  Except as otherwise described below, upon electing to participate in the Plan for a Plan Year, a Participant will also make an election with respect to the timing of the payment of the amounts credited to such Participant's account for such Plan Year.

5.2     **Distribution Dates.**

(a)     *Distribution Pursuant to the In-Service Payment Date.*  If the Participant selected an In-Service Payment Date, then subject to this <u>SECTION 5</u> and any other terms and conditions the Committee may impose, distributions will be made in a single payment in the specified year promptly after, but in no event after the 90th day following, July 1 of such year. With the consent of the Committee, a Participant may change the In-Service Payment Date pursuant to the procedures established by the Committee and the restrictions under Code Section 409A, which generally require making a written request more than 12 months in advance of the In-Service Payment Date and selecting a new In-Service Payment Date that will occur at least five years after the originally selected date.

-10-

MP000126

(b)     *Distribution on Separation or Retirement.*

(i)     If (A) the Participant elected payment on Separation on his or her Election Form or (B) if such Separation occurs prior to the otherwise scheduled In-Service Payment Date, then subject to this SECTION 5 and any other terms and conditions the Committee may impose, the Participant's Account Balance will be distributed due to Separation, less any amount owed by the Participant to an Employer at the time of Separation pursuant to a promissory note or otherwise incurred in the normal course of business; provided, however, that any offset is limited to $5,000 and will occur at the same time and in the same amount as the debt otherwise would have been paid by the Participant.

(ii)     If distribution is made due to Separation, distributions will be made in either a lump sum payment or in installments, as selected by the Participant on his or her Election Form. Available forms of distribution include a single lump sum or, if a Participant meets the requirements for Retirement at the time of Separation, substantially equal annual installments for up to ten years.

(iii)     Any single lump sum payment and the first installment of any series of installment payments will be made promptly after, but in no event after the 90th day following, the July 1 of the Plan Year that begins following the year of Separation, and each annual installment will occur promptly after, but in no event after the 90th day following, the July 1 of each year thereafter. Subject to reduction as set forth in clause (i) above, each installment will be equal to a fraction of all vested amounts deemed allocated to the Participant's account, the numerator of such fraction being one and the denominator being the number of installments remaining to be paid. For example, if the Participant has elected five annual installments, the first installment will be equal to one-fifth of the Participant's total vested Account Balance on the date such Account Balance is valued for purposes of the first payment date and the second installment will be equal to one-fourth of the Participant's account on the date such account is valued for purposes of the second payment date, etc.

(iv)     If the Participant did not indicate a distribution date on his or her Election Form, or if the Election Form was not timely filed, then distribution of the Account Balance will be made promptly after, but in no event after the 90th day following, the July 1 immediately after the date of vesting.

(v)     Distributions pursuant to this section will be made pro-rata from all of a Participant's hypothetical investments.

(vi)     For purposes of Code Section 409A, each installment payment will be treated as a separate single payment.

(c)     *Distributions Following Death or Disability.* Distributions following death will follow the procedures set forth in Section 5.5. Distributions following Disability will be made in a single payment to the Participant promptly after, but in no

-11-

event after the 90th day following, the date the Participant satisfies the definition of Disability.

    (d)   *Other*.

    (i)    The Committee reserves the right to distribute accounts and terminate participation of Participants who transfer employment outside of the United States; provided, however, that no acceleration of distribution will be made in contravention of Code Section 409A.

    (ii)    Notwithstanding anything to the contrary in this Section 5.2, but subject to Section 5.3, all Deferred Compensation and Company Contributions contributed to this Plan during a period when a Participant was deemed a "special participant" under a prior version of this Plan will be distributed in full promptly after, but in no event after the 90th day following, the July 1 of the sixth Plan Year following the Plan Year for which the contribution is made. The Participant's account will be valued as of the Valuation Date on or immediately preceding the distribution date.

**5.3**    **Distribution Due to a Change In Control.**  If, as a result of a Change in Control, a Participant's employer that is a Participating Subsidiary ceases to be a Participating Subsidiary under the Plan, each Participant who is employed by such Participating Subsidiary immediately prior to the date on which the Change in Control is consummated and who, due to the Change in Control (at the determination of the Committee), is no longer employed by a Participating Subsidiary immediately after the Change in Control will receive his or her vested Account Balance on the date on or promptly after, but in no event after the 90th day following, the date the Change in Control is consummated.

**5.4**    **Form of Distributions.**

    (a)   *Distributions of Company Common Shares*.

    (i)    All distributions of hypothetical investments in Company common shares will be in the form of Company common shares, less the number of common shares equal to the minimum amount necessary to satisfy withholding requirements with respect to all applicable federal, state and local taxes. Any Company common shares distributed under the Plan will be Company common shares that have been previously issued and that are currently trading in the market, or, subject to the approval of the Board of Directors of the Company and any required regulatory and shareholder approvals, authorized but previously unissued Company common shares;

    (ii)    The value of each Company common share credited to a Participant's account will be equal to the closing price per Company common share on the NYSE as reported for the Valuation Date; and

    (iii)    All distributions will be in the form of whole Company common shares. Fractional shares, if any, will be distributed in cash.

-12-

MP000128

(b) *Distributions of Investments in Mutual Funds.* A Participant's hypothetical investment in mutual funds will be distributed in cash, less the amount of cash necessary to satisfy withholding requirements with respect to all applicable federal, state and local taxes. The value of a Participant's hypothetical investment in Mutual Funds will be determined by multiplying the total number of units of the Mutual Fund credited to the Participant's account by the Mutual Fund Price, in each case, measured as close as practicable to the Valuation Date.

(c) *Distributions of Investment in the Plan Interest Rate.* A Participant's hypothetical investment in the Plan Interest Rate will be distributed in cash, less the amount of cash needed to satisfy withholding requirements with respect to all applicable federal, state and local taxes.

Notwithstanding Section 5.4(b) or (c), as applicable, the Committee, in its sole and absolute discretion, may cause distributions with respect to a Participant's Account Balance to be made, at the Company's option, in Company common shares that have been previously issued and that are currently trading in the market, or, subject to the approval of the Board of Directors of the Company and any required regulatory and shareholder approvals, authorized but previously unissued shares; the value of all such shares will be equal to the closing price per Company common share on the NYSE as reported for the Valuation Date.

**5.5    Distributions to Beneficiaries.**  Distribution of the Account Balance of a Participant who dies before any payment to such Participant is made will be made to such Participant's beneficiary or the Participant's estate in a single lump sum as of the date of the Participant's death. If the Participant dies after payments have commenced but before distribution is completed, the Participant's remaining Account Balance will be distributed to the Participant's beneficiary in lump sum after the Participant's death. For purposes of complying with Code Section 409A, such distribution will occur by the end of the calendar year in which the death occurs or by the fifteenth day of the third month following the date of death, if later. Notwithstanding the foregoing sentence, if the Committee is not timely notified of the death of the Participant and therefore cannot reasonably begin or make payments by the distribution deadline required by Code Section 409A, a lump sum distribution will be made to the beneficiary as soon as possible following the Committee's receipt of the death notification, subject to any tax, interest, and penalties imposed by Section 409A.

**5.6    Designation of Beneficiary.** Each Participant has the right to designate in writing, in form satisfactory to the Committee, one or more beneficiaries to receive the unpaid vested balance of the Participant's account in the event of such Participant's death, and may change or revoke any prior beneficiary designation by a similar instrument in writing. Any beneficiary designation must be received by the Committee before the Participant's death. Any beneficiary designation of a Participant's spouse will be made void in the event of a divorce, unless either a binding court order provides otherwise or the Participant redesignates his or her former spouse as the beneficiary. If a Participant fails to designate a beneficiary or, having revoked a prior beneficiary designation, fails to designate a new beneficiary, or in the event the Participant's beneficiary designation fails, in whole or in part, by reason of the prior death of a designated beneficiary, divorce or for any other cause, then the undistributed vested balance of the

-13-

Participant's account, or the portion thereof as to which such designation fails, as the case may be, will be paid to the Participant's estate.

**5.7    Disclaimers by Beneficiaries.**  A beneficiary entitled to a distribution of all or a portion of a deceased Participant's accounts may disclaim his or her interest therein subject to the following requirements.  To be eligible to disclaim, a beneficiary must be a natural person, must not have received a distribution of all or any portion of such accounts at the time such disclaimer is executed and delivered, and must have attained at least 21 years of age as of the date of the Participant's death.  Any disclaimer must be in writing and must be executed personally by the beneficiary before a notary public.  A disclaimer will state that the beneficiary's entire interest in the undistributed accounts is disclaimed or will specify what portion thereof is disclaimed.  To be effective, duplicate original executed copies of the disclaimer must be both executed and actually delivered to the Committee after the date of the Participant's death but not later than 180 days after the date of the Participant's death.  A disclaimer will be irrevocable when delivered to the Committee.  A disclaimer will be considered to be delivered to the Committee only when actually received by the Committee.  The Committee will be the sole judge of the content, interpretation and validity of a purported disclaimer.  Upon the filing of a valid disclaimer, the beneficiary will be considered not to have survived the Participant as to the interest disclaimed and any distribution made to the beneficiary will be reversed.  A disclaimer by a beneficiary will not be considered to be a transfer of an interest in violation of the provisions of SECTION 6 and will not be considered to be an assignment or alienation of benefits in violation of any law prohibiting the assignment or alienation of benefits under this Plan.  The Committee will not recognize any other form of attempted disclaimer.

**5.8    Federal Income Tax.**

(a)    *Tax Consequences of Participating in the Plan.*  The Plan provides that the election to defer any portion of a Participant's compensation, and the establishment of a fixed date or schedule for payment, is made prior to the performance of the personal services for an Employer to which the compensation relates. Accordingly, the Company believes that Participants are not expected to recognize either the deferred amounts or the Company Contributions as ordinary income for federal income tax purposes until such amounts are actually paid or distributed to them by the Company; provided, that, such amounts may still be subject to FICA taxes when deferred to the Plan.  Similarly, the Company is not expected to be allowed any income tax deduction on account of the Plan until, and for its taxable year in which, a Participant recognizes ordinary income hereunder, to the extent such amount satisfies the general rules concerning deductibility of compensation. As described above and in Section 5.9 below, it is expected that the Company will be required to withhold or otherwise collect income and other payroll taxes upon such amounts as required under Code Section 3402 and certain other Code sections.

(b)    *Compliance with Code Section 409A.*  Except as specifically provided in Section 5.5, it is intended that any income or payments to a Participant provided pursuant to this Plan will not be subject to the additional tax and interest under Code Section 409A. The provisions of the Plan will be interpreted and construed in favor of complying

-14-

MP000130

with any applicable requirements of Code Section 409A necessary to avoid the imposition of additional tax, interest or penalties under Code Section 409A.

(c) *Participants Should Consult Their Tax Advisors.* Due to the complexity of the applicable provisions of the Code, this summary of certain federal income tax consequences sets forth only the general tax principles affecting the Plan. These general tax principles are subject to changes that may be brought about by subsequent legislation or by regulations and administrative rulings, which may be applied on a retroactive basis. Neither the Company nor any Participating Subsidiary has obtained, and as a result of various provisions the Plan is not eligible for, a ruling from the Internal Revenue Service regarding the federal income tax consequences associated with participation in the Plan. Participants may be subject to state or local income taxes as a result of their election to defer compensation pursuant to the Plan, and Participants should refer to the applicable laws in those jurisdictions. **Accordingly, each Plan Participant should consult his or her own tax counsel on questions regarding tax liabilities arising upon any election to defer compensation pursuant to the Plan and any distributions made to such Participant pursuant to the Plan.**

**5.9    Tax Withholding.**  All distribution payments will be treated as wages for tax purposes and therefore will be made net of all applicable income, FICA (to the extent not already withheld at the time of deferral), payroll and other taxes required to be withheld.  In connection with any event that gives rise to a federal or other governmental tax withholding obligation on the part of the Company or any of its Affiliates relating to amounts under the Plan (including, without limitation, FICA tax), (a) a Participant's employer may deduct or withhold (or cause to be deducted or withheld) from any payment or distribution to a Participant, whether or not pursuant to the Plan, or (b) the Committee will be entitled to require that the Participant remit cash to the Company, his or her employer or any of its Affiliates (through payroll deductions or otherwise), in each case in an amount sufficient in the opinion of the Company to satisfy such withholding obligations.   Further, as permitted under Treasury Regulation § 1.409A-3(j)(4)(vi), the distribution of an Participant's account may be accelerated to satisfy employment taxes and wage withholding at the source.

**5.10    ERISA Matters.**  Although the Plan is not intended to be a tax-qualified plan under Code Section 401, the Plan might be determined to be an "employee pension benefit plan" as defined by ERISA.  If the Plan is determined to be an "employee pension benefit plan," the Company believes that it constitutes an unfunded plan of deferred compensation maintained for a select group of management or highly compensated employees and, therefore, exempt from many ERISA requirements.  A statement has been filed with the Department of Labor to comply with ERISA reporting and disclosure requirements.

## SECTION 6
## SPENDTHRIFT PROVISIONS

Neither any Participant nor the personal representative of any Participant has any transferable interest in the Participant's account or any right to anticipate, alienate, dispose of, pledge or encumber the same prior to actual receipt of payments in accordance with the rules described in <u>SECTION 4</u> and <u>SECTION 5</u>, nor will the same be subject to attachment,

-15-

MP000131

garnishment, execution following judgment or other legal process instituted by creditors of the Participant or the personal representative of the Participant.

## SECTION 7
## ADMINISTRATION

**7.1    The Committee.**   The Plan will be administered by the Committee.   The Committee has the full power and sole discretionary authority to make all determinations provided for in the Plan, including, without limitation, promulgating rules and regulations as the Committee considers necessary or appropriate for the implementation and management of the Plan as well as rules to address potential conflicts of interest and determination of a termination of employment due to Cause under Section 4.3; provided that the Board of Directors of the Company also has the full power and discretionary authority to make determinations with respect to the Plan having the effect of materially increasing the cost of the Plan to an Employer, including, without limitation, decisions regarding Company Contributions, eligibility to participate in the Plan, and discretionary vesting in the event of a Change in Control (as described in Section 4.5(b)).

**7.2    Claims Procedure.**   If any Participant or his or her estate is in disagreement with any determination that has been made for payment under this Plan, a claim may be presented to the Committee in accordance with procedures set forth in this SECTION 7.

**7.3    Making a Claim.**   The claim must be written and must be delivered to the Committee within 90 days the Participant or beneficiary knows or should have known of his or her claim for benefits.   Within 90 days after the claim is delivered, the claimant will receive either: (a) a decision or (b) a notice describing special circumstances requiring a specified amount of additional time (but no more than 180 days from the day the claims as delivered) to reach a decision.

In the event of an Adverse Benefit Determination, the claimant will receive a written or electronic notice specifying: (a) the reasons for the determination; (b) the Plan provisions on which the Adverse Benefit Determination is based; (c) any additional information needed in connection with the claim and the reason such information is needed; and (d) a description of the Plan's review procedures, including a statement of the Participant's right to bring a civil action under ERISA Section 502(a) following an Adverse Benefit Determination upon appeal.   Notice of the claimant's right to request a review (as described in Section 7.4) will also be given to the claimant.

**7.4    Requesting Review of a Denied Claim.**   A claimant may request that a denied claim be reviewed.   The request for review must be written and must be delivered to the Committee within 60 days after claimant's receipt of written or electronic Adverse Benefit Determination.   A request for review may (but is not required to) include issues and comments that the claimant wants considered in the review, even if such information was not provided in the initial request for benefits.   The claimant may examine pertinent Plan documents, including the records and other documentation, by asking the Committee for such documents.   Within 60 days after delivery of a request for review, the claimant will receive either: (a) a decision; or (b) a

-16-

notice describing special circumstances requiring a specified amount of additional time (but no more than 120 days from the day the request for review was delivered) to reach a decision.

The Committee may require the claimant to submit such additional facts, documents or other material as it deems necessary or advisable in making its review. The Committee will notify the claimant in writing or electronically of its decision. If the Adverse Benefit Determination is confirmed in whole or in part, the communication will set forth: (a) the specific reasons for the decision; (b) the specific references to the Plan provisions on which the decision is based; (c) a statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to and copies of all documents, records, or other information relevant to the claim; and (d) a statement regarding the claimant's right to bring an action under ERISA Section 502(a).

**7.5    In General.** All decisions on claims and on reviews of denied claims will be made by the Committee. The Committee also reserves the right to delegate its authority to make decisions. The Committee may, in its discretion, hold one or more hearings. If a claimant does not receive a decision within the specified time, the claimant should assume the claim or appeal was denied on the date the specified time expired. The claimant may, at the claimant's own expense, have an attorney or other representative act on behalf of the claimant, but the Committee reserves the right to require a written authorization.

No action at law or in equity may be brought to recover benefits or otherwise enforce the provisions of the Plan unless the Participant or beneficiary has exhausted all remedies under this SECTION 7. Any action brought after exhaustion of such remedies must be brought within ninety (90) days after the Participant or beneficiary has received final notice of an Adverse Benefit Determination under Section 7.4.

## SECTION 8
## OTHER ADMINISTRATIVE MATTERS

**8.1    Reporting.** As soon as administratively feasible after each calendar quarter end, the Company will prepare and make available to each Participant a report showing (a) the amounts credited to the Participant's account since the last report from the Company, and (b) the amounts of any distributions made since the last report. At its discretion, the Company may prepare and make available more frequent reports to Participants.

**8.2    Plan Obligor; Status as Unsecured General Creditors.**

(a)    The Company will be the Plan Obligor with respect to distributions from all accounts; provided, however, that the Participant's Participating Subsidiary will be the Plan Obligor with respect to investments of Mandatory Deferred Compensation and related Company Contributions thereon, except as set forth in Section 8.2(b) below.

(b)    The Company will be the Plan Obligor with respect to all accounts of Participants who are residents, for tax purposes, in California and Arizona during the Plan Year.

-17-

MP000133

(c)     All Participants are general unsecured creditors of the relevant Plan Obligor with respect to amounts payable pursuant to distributions from the accounts described in (a) and (b) above.

As such, Participants and their estates will not have any secured or preferred interest by way of trust, escrow, lien or otherwise in any specific assets, of the Employers.  The Plan does not require that any hypothetical investments under this Plan be funded by the Company.  If a Plan Obligor, in fact, elects to set aside monies or other assets to meet its obligations under the Plan (there being no obligation to do so) through the creation of a trust or otherwise, such monies or other assets will be subject to the claims of its general creditors, and neither any Participant nor any beneficiary of any Participant will have a legal, beneficial or security interest therein.

**8.3     Disclaimer of Employment and Bonus Rights.**  The Plan is not a contract for employment and does not grant any employee the right to be retained in the employment of the Employers or to obtain any compensation.  Upon dismissal or severance of employment, no Participant will have any right or interest under the Plan, other than as specifically provided herein.

**8.4     Administrative Expenses of the Plan.**  Participants will be responsible for all administrative expenses incurred with respect to this Plan and for all administrative expenses and other fees of this Plan (to the extent such expenses are not paid by the Company), including the costs of outsourced record-keeping (which expenses will be deducted proportionately among Participants' accounts).

**8.5     No Compensation Under the Qualified Plan.**  Unless the Qualified Plan specifically provides otherwise, no amounts of Deferred Compensation and related Company Contributions, if any, credited to any account of a Participant will constitute "Recognized Compensation" for purposes of the Qualified Plan, as such terms are defined in such plan, nor any other employee benefit plan of the Company or its Affiliates.

**8.6     Voting Rights.**  Participants' accounts under the Plan are bookkeeping accounts and, accordingly, Participants will not have any voting rights with respect to any common shares or any units or other interests in Mutual Funds deemed allocated to any Participant's account.

**8.7     Governing Law.**  This instrument has been executed and delivered in the State of Minnesota and has been drawn in conformity to the laws of that state to the extent not preempted by federal law and will be construed and enforced in accordance with the laws of the State of Minnesota.

## SECTION 9
## AMENDMENT OR TERMINATION

**9.1     Amendments to and Termination of Plan.**  While the Company intends for the Plan to continue indefinitely, it may be amended or terminated at any time by the Committee or the Board of Directors of the Company or by the Company, including, without limitation (a) to ensure that neither the Plan Obligors nor the Participants are subject to adverse Canadian or United States tax consequences and (b) to modify the form of distribution of Participants' accounts; provided, however, that no such amendment or termination will have the effect of

-18-

MP000134

(i) reducing the vested portion of amounts already credited to a Participant's account; (ii) extending the time of distribution of such Participant's accounts, without the consent of such Participant and only in a manner permitted by Code Section 409A; or (iii) causing a violation of Code Section 409A. In the event of a termination of the Plan, all accounts will be deemed vested and amounts credited thereto will be distributed to Participants in accordance with the distribution guidelines under Code Section 409A.

**9.2    Merger.** The Committee may cause all or part of this Plan to be merged with all or a part of any other nonqualified deferred compensation plan maintained by any company. If the Committee agrees to such a merger, the Committee will specify in writing the terms and conditions of such merger and may obtain such consents and agreements as it deems necessary or desirable.

**9.3    Applicability to Successors.** This Plan will be binding upon and inure to the benefit of the Company and to the extent that the Company is a Plan Obligor under the Plan for any accounts, the Participating Subsidiaries, their successors and assigns, each Participant, his or her personal representatives and any beneficiaries. If the Company becomes a party to any merger, consolidation or reorganization, this Plan will remain in full force and effect as any obligation of the Company or its successors in interest.

-19-

MP000135

PAUL, MARTY  14022 – RBC US DEFERRED COMPENSATION PLAN  https://workplaceservices400.fidelity.com/netbenefits/savings2/s00/s00...



**RBC US Deferred
Compensation Plan**

MARTY PAUL



**Retirement Savings Statement**

☎ Customer Service: (866) 697-1002
Fidelity Investments Institutional Operations
Company, Inc.
82 Devonshire Street
Boston, MA 02109

## Your Account Summary
Statement Period: 01/01/2012 to 01/31/2012

| | |
|---|---|
| **Beginning Balance** | **$2,322,180.09** |
| Change in Market Value | $117,905.55 |
| **Ending Balance** | **$2,440,085.64** |
| **Additional Information** | |
| Vested Balance | $1,637,975.20 |

This plan represents a non-qualified plan that is "unfunded" for tax purposes. Any account
and/or balances represented here are bookkeeping entries that measure the plan sponsor's
obligation to you. Neither you nor the plan hold actual balances in the funds listed in this plan.

### Your Personal Rate of Return

This Period                                                                5.1%

Your Personal Rate of Return is calculated with a time-weighted formula, widely used by
financial analysts to calculate investment earnings. It reflects the results of your investment
selections as well as any activity in the plan account(s) shown. There are other Personal Rate of
Return formulas used that may yield different results. Remember that past performance is no
guarantee of future results.

## Your Asset Allocation
Statement Period: 01/01/2012 to 01/31/2012



■ 100.00% Stock Investments: $2,440,085.64

Your account is allocated among the asset classes specified above as of 01/31/2012.
Percentages and totals may not be exact due to rounding.

3/19/2012 9:19 PM

MP000136

AUL, MARTY 14022 – RBC US DEFERRED COMPENSATION PLAN   https://workplaceservices400.fidelity.com/netbenefits/savings2/soa/soa...

## Market Value of Your Account          Statement Period: 01/01/2012 to 01/31/2012

Displayed are the beginning and ending values of your account in dollars, and either shares of mutual funds or Company Stock.

| Investment | Shares as of 12/31/2011 | Shares as of 01/31/2012 | Price as of 12/31/2011 | Price as of 01/31/2012 | Market Value as of 12/31/2011 | Market Value as of 01/31/2012 |
|---|---|---|---|---|---|---|
| **Stock Investments** | | | | | **$2,322,180.09** | **$2,440,085.64** |
| Large Cap | | | | | | |
| AF Grth Fund Amer R6 | 12,712.695 | 12,712.695 | $28.72 | $30.79 | $365,100.62 | $391,423.87 |
| FID US Eq Indx | 8,657.040 | 8,657.040 | $44.76 | $46.76 | $387,469.12 | $404,803.18 |
| Mid-Cap | | | | | | |
| RBC Smid Cap Grth I | 32,371.122 | 32,371.122 | $13.24 | $14.21 | $428,593.66 | $459,993.64 |
| International | | | | | | |
| AF Europac Growth R6 | 9,680.286 | 9,680.286 | $35.13 | $37.27 | $340,068.46 | $360,784.26 |
| RBC Share Account | 15,716.645 | 15,716.645 | $50.96 | $52.37 | $800,920.23 | $823,080.69 |
| **Account Totals** | | | | | **$2,322,180.09** | **$2,440,085.64** |

Remember that a dividend payment to fund shareholders reduces the share price of the fund, so a decrease in the share price for the statement period does not necessarily reflect lower fund performance.

Some of the administrative services performed for the Plan were underwritten from the total operating expenses of the Plan's investment options.

## Market Value by Plan Year          Statement Period: 01/01/2012 to 01/31/2012

This section displays the Market Value of your account by Year of Deferral.

| Plan Year | Contribution Source | Distribution Election | Distribution Type | Market Value on 01/31/2012 | Effective Date |
|---|---|---|---|---|---|
| 2006 2006 Employee Voluntary | Employee Voluntary | 2012 | Lump Sum | $114,498.75 | Current |
| 2006 2006 Employee Mandatory | Employee Mandatory | 2012 | Lump Sum | $114,498.67 | Current |
| 2006 2006 Employer 4 Yr Cliff | Employer 4 Yr Cliff | 2012 | Lump Sum | $164,314.28 | Current |
| 2006 Total | | | | $393,311.70 | |
| 2007 2007 Employee Voluntary | Employee Voluntary | 2012 | Lump Sum | $172,545.52 | Current |
| 2007 2007 Employee Mandatory | Employee Mandatory | 2012 | Lump Sum | $172,545.54 | Current |
| 2007 2007 Employer 4 Yr Cliff | Employer 4 Yr Cliff | 2012 | Lump Sum | $225,791.00 | Current |
| 2007 Total | | | | $570,882.06 | |
| 2008 2008 Employee Voluntary | Employee Voluntary | 2013 | Lump Sum | $164,066.72 | Current |

3/19/2012 9:19 PM

MP000137

PAUL, MARTY 14022 - RBC US DEFERRED COMPENSATION PLAN   https://workplaceservices400.fidelity.com/netbenefits/savings2/sod/sod...

| | | | | | |
|---|---|---|---|---|---|
| 2008<br>2008 Employee Mandatory | Employee Mandatory | 2013 | Lump Sum | $164,066.70 | Current |
| 2008<br>2008 Employer 4 Yr Cliff | Employer 4 Yr Cliff | 2013 | Lump Sum | $254,059.97 | Current |
| **2008 Total** | | | | $582,193.39 | |
| 2009<br>2009 Employee Voluntary | Employee Voluntary | 2014 | Lump Sum | $138,277.61 | Current |
| 2009<br>2009 Employee Mandatory | Employee Mandatory | 2014 | Lump Sum | $138,277.53 | Current |
| 2009<br>2009 Employer 4 Yr Cliff | Employer 4 Yr Cliff | 2014 | Lump Sum | $98,424.49 | Current |
| **2009 Total** | | | | $374,979.63 | |
| 2010<br>2010 Employee Voluntary | Employee Voluntary | 2016 | Lump Sum | $277,065.36 | Current |
| 2010<br>2010 Employer 5 Yr Cliff | Employer 5 Yr Cliff | 2016 | Lump Sum | $80,490.96 | Current |
| 2010<br>2010 PCG WAP Bonus 5YR Cliff | PCG WAP Bonus 5YR Cliff | 2016 | Lump Sum | $97,242.29 | Current |
| **2010 Total** | | | | $454,798.61 | |
| 2011<br>2011 Employee Voluntary | Employee Voluntary | 2017 | Lump Sum | $63,920.28 | Current |
| **2011 Total** | | | | $63,920.28 | |
| **Total Market Value** | | | | **$2,440,085.67** | |

## Market Value of Distributions          Statement Period: 01/01/2012 to 01/31/2012

This section displays the current Market Value of your account by distribution election.

| Distribution Year: | Funds: | Shares On:<br>01/31/2012 | Price On:<br>01/31/2012 | Market Value:<br>01/31/2012 | Total Market Value:<br>01/31/2012 |
|---|---|---|---|---|---|
| **2012** | | | | | |
| Lump Sum | RBC Smid Cap Grth I | 11,350.474 | $14.21 | $161,290.23 | |
| Lump Sum | AF Europac Growth R6 | 3,554.651 | $37.27 | $132,481.84 | |
| Lump Sum | AF Grth Fund Amer R6 | 4,535.791 | $30.79 | $139,657.00 | |
| Lump Sum | RBC Share Account | 7,449.022 | $52.37 | $390,105.28 | |
| Lump Sum | FID US Eq Indx | 3,008.114 | $46.76 | $140,659.41 | $964,193.76 |
| **2013** | | | | | |
| Lump Sum | RBC Smid Cap Grth I | 6,724.714 | $14.21 | $95,558.19 | |
| Lump Sum | AF Europac Growth R6 | 1,938.123 | $37.27 | $72,233.85 | |
| Lump Sum | AF Grth Fund Amer R6 | 2,552.848 | $30.79 | $78,602.19 | |
| Lump Sum | RBC Share Account | 4,851.250 | $52.37 | $254,059.97 | |
| Lump Sum | FID US Eq Indx | 1,748.058 | $46.76 | $81,739.19 | $582,193.39 |
| **2014** | | | | | |
| Lump Sum | RBC Smid Cap Grth I | 5,784.352 | $14.21 | $82,195.64 | |
| Lump Sum | AF Europac Growth R6 | 1,574.787 | $37.27 | $58,692.31 | |
| Lump Sum | AF Grth Fund Amer R6 | 2,128.393 | $30.79 | $65,533.22 | |

3/19/2012 9:19 PM

MP000138

| | | | | | |
|---|---|---|---|---|---|
| Lump Sum | RBC Share Account | 1,879.406 | $52.37 | $98,424.49 | |
| Lump Sum | FID US Eq Indx | 1,499.871 | $46.76 | $70,133.97 | |
| | | | | | $374,979.63 |
| **2016** | | | | | |
| Lump Sum | RBC Smid Cap Grth I | 7,324.554 | $14.21 | $104,081.91 | |
| Lump Sum | AF Europac Growth R6 | 2,218.264 | $37.27 | $82,674.70 | |
| Lump Sum | AF Grth Fund Amer R6 | 2,978.152 | $30.79 | $91,697.30 | |
| Lump Sum | RBC Share Account | 1,536.967 | $52.37 | $80,490.96 | |
| Lump Sum | FID US Eq Indx | 2,049.909 | $46.76 | $95,853.74 | |
| | | | | | $454,798.61 |
| **2017** | | | | | |
| Lump Sum | RBC Smid Cap Grth I | 1,187.028 | $14.21 | $16,867.67 | |
| Lump Sum | AF Europac Growth R6 | 394.481 | $37.27 | $14,701.56 | |
| Lump Sum | AF Grth Fund Amer R6 | 517.511 | $30.79 | $15,934.17 | |
| Lump Sum | FID US Eq Indx | 351.088 | $46.76 | $16,416.88 | |
| | | | | | $63,920.28 |

**Total Market Value:**                                                       $2,440,085.67

## Your Contribution Elections as of                                 As of 03/20/2012

This section displays the funds in which your future contributions will be invested.

### Your Current Investment Elections as of 03/20/2012

**All Eligible Sources**

| Investment Option | Current % |
|---|---|
| **Stock Investments** | |
| LARGE CAP | |
| AF GRTH FUND AMER R6 | 25% |
| FID US EQ INDX | 25% |
| MID-CAP | |
| RBC SMID CAP GRTH I | 25% |
| INTERNATIONAL | |
| AF EUROPAC GROWTH R6 | 25% |
| **Total** | **100%** |

**PCG WAP BONUS 4YR CLIFF**

| Investment Option | Current % |
|---|---|
| **Stock Investments** | |
| RBC SHARE ACCOUNT | 100% |
| **Total** | **100%** |

**3 YR GRADUATED VEST.**

MP000139

🌐 Due to plan rules your contribution elections for this source/source group are restricted.

| Investment Option | Current % |
|---|---|
| **Stock Investments** | |
| RBC SHARE ACCOUNT | 100% |
| **Total** | **100%** |

### ER SPECIAL CONT 4YR GRAD

🌐 Due to plan rules your contribution elections for this source/source group are restricted.

| Investment Option | Current % |
|---|---|
| **Stock Investments** | |
| RBC SHARE ACCOUNT | 100% |
| **Total** | **100%** |

### ER SPECIAL CONT 5YR CLIF

🌐 Due to plan rules your contribution elections for this source/source group are restricted.

| Investment Option | Current % |
|---|---|
| **Stock Investments** | |
| RBC SHARE ACCOUNT | 100% |
| **Total** | **100%** |

### DAP 5YR RESTRICT VEST

🌐 Due to plan rules your contribution elections for this source/source group are restricted.

| Investment Option | Current % |
|---|---|
| **Stock Investments** | |
| RBC SHARE ACCOUNT | 100% |
| **Total** | **100%** |

### DAP EMPLOYER 5 YEAR CLIFF

🌐 Due to plan rules your contribution elections for this source/source group are restricted.

3/19/2012 9:19 PM

MP000140

PAUL, MARTY 14022 - RBC US DEFERRED COMPENSATION PLAN   https://workplaceservices400.fidelity.com/netbenefits/savings2/sod/sod...

| Investment Option | Current % |
|---|---|
| **Stock Investments** | |
| RBC SHARE ACCOUNT | 100% |
| | |
| **Total** | **100%** |

## Your Contribution Summary

Statement Period: 01/01/2012 to 01/31/2012

| Contributions | Employee Voluntary | Employee Mandatory | Employer Match 4YR Cliff | Employer 5 Yr Cliff |
|---|---|---|---|---|
| Period to date | $0.00 | $0.00 | $0.00 | $0.00 |
| Total Account Balance | $930,374.20 | $589,388.46 | $742,589.73 | $80,490.96 |
| Total Vested Balance | $930,374.20 | $543,286.72 | $164,314.28 | $0.00 |

| Contributions | PCG WAP Bonus 5YR Cliff |
|---|---|
| Period to date | $0.00 |
| Total Account Balance | $97,242.29 |
| Total Vested Balance | $0.00 |

## Your Account Activity

Statement Period: 01/01/2012 to 01/31/2012

Use this section as a summary of transactions that occurred in your account during the statement period.

| Activity | RBC Smid Cap Grth I | AF Europac Growth R6 | AF Grth Fund Amer R6 | RBC Share Account |
|---|---|---|---|---|
| Beginning Balance | $428,593.66 | $340,068.46 | $365,108.62 | $800,920.23 |
| Change in Market Value | $31,399.98 | $20,715.80 | $26,315.25 | $22,160.46 |
| Ending Balance | $459,993.64 | $360,784.26 | $391,423.87 | $823,080.69 |

| Activity | FID US Eq Indx | Total |
|---|---|---|
| Beginning Balance | $387,489.12 | $2,322,180.09 |
| Change in Market Value | $17,314.06 | $117,905.55 |
| Ending Balance | $404,803.18 | $2,440,085.64 |

Questions?  Call (866) 697-1002

NetBenefits® provided by



© 1996-2012 FMR LLC
All rights reserved.

Terms of Use   Privacy   Security

IA=2 SZ=3

3/19/2012 9:19 PM

MP000141

# Exhibit T

# RBC Wealth Management
## 2010 WAP Productivity and RBC Loyalty Bonuses
## Year-End Statement

**MARTY PAUL**

| | |
|---|---|
| FC # | 517 |
| Hire Date | 8/1/94 |
| Years of Service | 17 |
| Branch | Gig Harbor |

| | | |
|---|---|---|
| **$ 186,989** | **Total 2010 WAP Productivity and RBC Loyalty Bonuses** |
| *7.50%* | *% of Production* |

**Award Timing and Information:**

The WAP productivity and RBC loyalty bonuses are credited to your WAP account as of February 28, 2011 and are viewable on www.netbenefits.com shortly thereafter. Please see your FC Compensation Plan document for full information about WAP contributions including vesting provisions. Contact your complex or branch director if you have any questions on WAP compensation. General questions on the WAP can be directed to the RBC US HR Service Center at 1-866-477-3783.

**2010 WAP Bonus Calculations:**

| | | |
|---|---|---|
| $ | 2,493,182 | 2010 Annual Production |
| | 4.00% | Productivity Bonus Rate |
| $ | 99,727 | Productivity Bonus |
| | 3.50% | RBC Loyalty Bonus Rate |
| $ | 87,261 | RBC Loyalty Bonus |

**For Your Reference: 2010 WAP Productivity and RBC Loyalty Bonus Grids**

| 2010 WAP Productivity Bonus Grid | | |
|---|---|---|
| **Annual Gross Production** | | **WAP Productivity Bonus Rate** |
| **From** | **To** | |
| $5,000,000 | And up | 5.00% |
| 2,500,000 | $4,999,999 | 4.50% |
| 2,000,000 | 2,499,999 | 4.00% |
| 1,250,000 | 1,999,999 | 3.50% |
| 1,000,000 | 1,249,999 | 3.25% |
| 600,000 | 999,999 | 3.00% |
| 400,000 | 599,999 | 2.25% |

| 2010 WAP RBC Loyalty Bonus Grid | | | | | |
|---|---|---|---|---|---|
| **2010 Production Basis** | **Length of Service** | | | | |
| | **< 6 Years** | **6 – 10 Years** | **11 – 15 Years** | **16 – 20 Years** | **21+ Years** |
| 2010 Chairman's Council = $1,173,858 | 2.00% | 2.50% | 3.00% | 3.50% | 4.00% |
| 2010 President's Council = $711,244 | 1.50% | 2.00% | 2.50% | 3.00% | 3.50% |
| 2010 Director's Council = $533,433 | 1.00% | 1.50% | 2.00% | 2.50% | 3.00% |
| $400,000 | 0.25% | 0.50% | 0.75% | 1.00% | 1.25% |

Length of Service is defined as the number of full calendar years completed as an RBC Wealth Management FC as of December 31, 2010. The calendar year in which you were hired is counted as one full year of service. For example, if you were hired on December 18, 2009, you would earn two years of service toward the 2010 WAP RBC Loyalty Bonus.

CONFIDENTIAL

RBC-PAUL000011251

# Exhibit U

## RBC Wealth Management
## 2011 Productivity and RBC Loyalty Bonuses
## Year-End Statement

| | |
|---|---|
| FA Name | **BRIAN BUSKIRK** |
| FA# | R3G |
| Hire Date | 07/21/86 |
| Length of Service | 26 |
| Branch | Gig Harbor |

| | |
|---|---|
| **$53,091** | **Total 2011 Productivity and RBC Loyalty Bonuses** |
| 6.50% | *% of Production* |

### A.  2011 Bonus Calculations

$816,784   2011 Annual Production

3.00% Productivity Bonus Rate
$24,504   Productivity Bonus

3.50% RBC Loyalty Bonus Rate
$28,587   RBC Loyalty Bonus

### B.  WAP Award Timing and Information

The Productivity and RBC Loyalty Bonuses are credited to your WAP account as of January 3, 2012 and are viewable on www.netbenefits.com shortly thereafter. Please see the FA Compensation Plan document for full information about WAP contributions, including vesting provisions. Contact your Complex or Branch Director if you have any questions on these bonuses. General questions on the WAP can be directed to the RBC US HR Service Center at 1–866–477–3783.

### C.  For Reference: 2011 Productivity and RBC Loyalty Bonus Grids

| 2011 Productivity Bonus Grid | | |
|---|---|---|
| Annual Gross Production | | Productivity Bonus Rate |
| From | To | |
| $5,000,000 | And up | 5.00% |
| 2,500,000 | $4,999,999 | 4.50% |
| 2,000,000 | 2,499,999 | 4.00% |
| 1,250,000 | 1,999,999 | 3.50% |
| 1,000,000 | 1,249,999 | 3.25% |
| 600,000 | 999,999 | 3.00% |
| 400,000 | 599,999 | 2.25% |

> Please Note – the Wealth Accumulation Plan/Deferred Advantage Plan changes announced for 2012 plan year do not impact your 2011 WAP awards.

| 2011 RBC Loyalty Bonus Grid | | | | | |
|---|---|---|---|---|---|
| 2011 Production Basis | Length of Service | | | | |
| | < 6 Years | 6 – 10 Years | 11 – 15 Years | 16 – 20 Years | 21+ Years |
| 2011 Chairman's Council = $1,136,526 | 2.00% | 2.50% | 3.00% | 3.50% | 4.00% |
| 2011 President's Council = $771,541 | 1.50% | 2.00% | 2.50% | 3.00% | 3.50% |
| 2011 Director's Council = $578,656 | 1.00% | 1.50% | 2.00% | 2.50% | 3.00% |
| $400,000 | 0.25% | 0.50% | 0.75% | 1.00% | 1.25% |

Length of Service is defined as the number of full calendar years completed as an RBC Wealth Management Financial Advisor as of December 31, 2011. The calendar year in which you were hired is counted as one full year of service. For example, if you were hired on December 18, 2010, you would earn two years of service toward the 2011 RBC Loyalty Bonus.

 **RBC Wealth Management**®

A division of RBC Capital Markets, LLC, Member NYSE/FINRA/SIPC.

RBC-PAUL000011270