1

Honorable Ronald B. Leighton

2

3

4

5

6

7

8        UNITED STATES DISTRICT COURT
      WESTERN DISTRICT OF WASHINGTON
9                 AT TACOMA

10
    MARTY PAUL, an individual; and
11  BRIAN BUSKIRK, an individual,          No. 3:16-cv-05616-RBL

12                  Plaintiffs,            **PLAINTIFFS' MOTION FOR
                                           PARTIAL SUMMARY JUDGMENT**
13        v.
                                           NOTE ON MOTION CALENDAR:
14  RBC CAPITAL MARKETS, LLC, a            October 20, 2017
    Minnesota limited liability company;
15  ROYAL BANK OF CANADA, a                **ORAL ARGUMENT REQUESTED**
    Canadian corporation; and ROYAL
16  BANK OF CANADA US WEALTH
    ACCUMULATION PLAN, an employee
17  benefit plan,

18                  Defendants.

19

20

21

22

23

24

25

26



1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

## I. INTRODUCTION AND RELIEF REQUESTED

Defendants RBC Capital Markets, Royal Bank of Canada, and Royal Bank of Canada US Wealth Accumulation Plan (collectively, "RBC" or "Defendants") improperly and illegally forfeited millions of dollars of compensation that plaintiffs Marty Paul and Brian Buskirk ("Plaintiffs") had earned when employed by RBC Capital Markets. This compensation was due to Plaintiffs under the Royal Bank of Canada US Wealth Accumulation Plan ("WAP"). The purported forfeiture violates Sections 203(a)(1) and 203(a)(2)(B) of the Employee Retirement Income Security Act ("ERISA"). 29 U.S.C. §§ 1053(a)(1), 1053(a)(2)(B). Defendants contend that the forfeiture was permissible both (1) because the WAP is not an ERISA-covered "employee pension benefit plan," and thus ERISA provisions are not applicable, and (2) because, if determined to be an "employee pension benefit plan," the WAP is a "top hat" plan exempt from many of ERISA's substantive requirements. *See* 29 U.S.C. §§ 1002(2)(A), 1051(2), 1081(a)(3), 1101(a)(1).

This case hinges on two questions. First, is the WAP an "employee pension benefit plan" under 29 U.S.C. § 1002(2)(A)? If so, is the WAP a "top hat" plan, *i.e.*, a rare form of pension benefit plan that is maintained "primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees" such that, because it may cover only a small portion of RBC's workforce who have sufficiently high compensation and bargaining power, Congress determined is exempt from most of ERISA's substantive protections?

This motion is directed toward the first question: whether the WAP is an "employee pension benefit plan" under ERISA.[1] This exact question has already been answered affirmatively by the United States Court of Appeals for the Fifth Circuit and, accordingly,

---

[1] As referenced in the Stipulated Motion and Order Regarding Dispositive Motions Briefing Schedules (Dkt. No. 23), should the Court grant Plaintiffs' Partial Motion for Summary Judgment or deny Defendants' anticipated summary judgment motion on this issue, the Parties anticipate addressing the "top hat" exemption issue in later-filed summary judgment motions.

YARMUTH WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

this Court should grant summary judgment in Plaintiffs' favor because that court's finding that the WAP is an "employee pension benefit plan" collaterally estops Defendants from re-litigating the issue. *See Tolbert v. RBC Capital Mkts.*, 758 F.3d 619 (5th Cir. 2014). The Fifth Circuit's decision is dispositive of this issue. But even if the Court finds that collateral estoppel does not apply, *Tolbert*'s reasoning mandates a finding that the WAP is an "employee pension benefit plan" under ERISA. Finally, independent analysis of the WAP shows that both by the WAP's express terms and its surrounding circumstances, it is an "employee pension benefit plan" under ERISA.

## II.    BACKGROUND

### A. RBC's Wealth Accumulation Plan.

Many years ago RBC's predecessor, Dain Bosworth, began a deferred compensation plan, known as the "Wealth Accumulation Plan" or the "WAP." Deposition of Gabriela Sikich (July 11, 2017) ("Sikich Dep.") at 50:17-23.[2] When RBC acquired Dain, RBC began operating the WAP. *Id.* The WAP's stated purpose is "to provide an opportunity for [certain] employees to invest a portion of their compensation in tax-deferred savings and investment options in an effort to support long-term savings and allow such employees to share in the Company's growth and profitability, if any." Weinstein Decl., Ex. 2 (2008 Plan Document) ¶ 1.1. For certain employees, RBC determined WAP eligibility based on total cash compensation; for others—specifically financial consultants—WAP eligibility was based on the financial consultant's fiscal year gross production, which is composed of fees and commissions clients pay to RBC. Sikich Dep., 39:2-40:1; Deposition of Tammy Buchert (July 12, 2017) ("Buchert Dep.") at 43:7-20.[3]

---

[2] Relevant excerpts from the deposition of Gabriela Sikich, RBC's U.S. Deferred Compensation Manager, are attached as Exhibit 1 to the Declaration of Elizabeth S. Weinstein in Support of Plaintiffs' Motion for Partial Summary Judgment ("Weinstein Decl.").

[3] Relevant excerpts from the deposition of Tammy Buchert, RBC's former Manager of Financial Compensation Planning, are attached as Exhibit 3 to the Weinstein Declaration.

YARMUTH WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

1    Any participant's WAP contributions could consist of up to three separate

2    components: (1) voluntary deferral contributions made by an employee entirely at an

3    employee's discretion (although at times the amount of the deferral was limited by RBC);

4    (2) mandatory deferral contributions, which were required to be made by certain employees

5    at RBC's discretion; and (3) company contributions made by RBC at RBC's discretion.[4]

6    *See* Weinstein Decl., Exs. 2, 6-12 (2005-2012 WAP Plan Documents) ¶¶ 2.2-2.3, 2.6.  A

7    participant is fully vested at all times in his voluntary deferral contributions; however,

8    mandatory deferral contributions and company contributions purport to vest at a time

9    determined by the WAP Committee, or vest automatically upon an employee's separation

10   from RBC when that separation qualifies as "retirement."[5]  *Id.* ¶¶ 4.1-4.2.  WAP

11   participants can elect to defer distributions to a date after retirement/separation or an in-

12   service date.  *Id.* ¶¶ 5.2-5.3; Buchert Dep., 53:8-13; Weinstein Decl., Ex. 13 at 3 (explaining

13   the two distribution options).

14         The WAP offered RBC financial consultants and other employees a significant

15   opportunity to build long-term wealth.  Buchert Dep., 52:16-25.  The WAP was considered

16   a "key element" of RBC's branding concept "Finishing Well," a marketing phrase used by

17   RBC to describe "a program developed that would be available to people who are at the end

18   of their career, more towards retirement or moving into retirement."  *Id.*, 51:22-52:5.

19   Gabriela Sikich, the U.S. Deferred Compensation Manager for RBC, described the

20   "Finishing Well" initiative as motivated by RBC's intention "to be the place where

---

[4] As an example, for the year 2009, financial consultants were permitted to voluntarily defer up to 30% of the calendar year's cash compensation (voluntary deferral contributions), the first 15% of which was matched by RBC (company contributions).  *See* Weinstein Decl., Ex. 4 (2009 Financial Consultant Compensation Plan) at 7-10.  Additionally, financial consultants were entitled to a WAP productivity bonus of 1.75% to 5% of gross production, depending on production level (company contributions).  *Id.*  Further, RBC branch directors, like Mr. Paul, were *required* to make a 10% deferral of all cash compensation over $100,000 (mandatory deferral contributions).  *See* Weinstein Decl., Ex. 5 (2009 Branch Director Compensation Plan) at 9.

[5] If Plaintiffs are correct that the WAP is not a "top hat" plan, the WAP's purported delayed vesting of mandatory contributions and company contributions violates ERISA's mandatory minimum vesting schedule.  *See* 29 U.S.C. § 1053(a)(2)(B).  But that is not at issue in this motion, and will be resolved on Plaintiffs' "top hat" summary judgment motion or at trial.

---



1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1  [financial analysts] would come and retire." Sikich Dep., 157:8-25 (explaining that "the

2  'finishing well' concept is, 'We want you to retire with RBC, and what can we do to

3  facilitate that?'" and that the "finishing well" concept was "a really strong, strong initiative"

4  at RBC); *see also* Weinstein Decl., Ex. 4 (2009 FC Comp. Plan) at 2 (explaining  RBC's

5  "compensation philosophy" as including the hope that employees "stay and finish well

6  here," and that the WAP "offers [employees] the significant opportunity to build long-term

7  wealth.")

8      As such, a central feature of the WAP was allowing participants to elect distribution

9  of WAP funds during retirement.  Sikich Dep., 55:3-7; 93:12-23 (explaining that the WAP

10  allows participants to "earmark" distribution timing "based on their personal needs, whether

11  it be in-service or post-employment.").  RBC's marketing materials on the WAP made clear

12  that the retirement savings feature was an integral element of the WAP.  *See, e.g.*,

13  Weinstein Decl., Ex. 14 at slide 3 (explaining that the WAP is an "[i]ndustry-leading wealth

14  accumulation plan [that] provides financial consultants with a vehicle to gather great

15  wealth, provide investment flexibility, and plan for their retirement."); Ex. 15 (WAP

16  Overview) at 1 (describing the WAP as "a deferred compensation plan" that was "a defined

17  contribution supplemental executive retirement plan"); Ex. 16 (Email from RBC's Private

18  Client Group Presidents describing the WAP as "a nonqualified retirement plan").

19      Although a single WAP existed at least from the time of RBC's acquisition of Dain

20  until 2012, RBC periodically made revisions to the plan documents governing the WAP.[6]

21  _____

22  [6] *See, e.g.*, The Amended and Restated Royal Bank of Canada U.S. Wealth Accumulation Plan dated
    November 30, 2004, effective January 1, 2005 ("2005 Plan Document") (Weinstein Decl., Ex. 6); the
23  Amended and Restated Royal Bank of Canada U.S. Wealth Accumulation Plan dated November 1, 2006,
    effective January 1, 2007 ("First 2007 Plan Document") (Weinstein Decl., Ex. 7); the Amended and Restated
24  Royal Bank of Canada U.S. Wealth Accumulation Plan dated November 1, 2007, effective January 1, 2007
    ("Second 2007 Plan Document") (Weinstein Decl., Ex. 8); the Amended and Restated Royal Bank of Canada
25  U.S. Wealth Accumulation Plan dated November 1, 2008, effective January 1, 2008 ("2008 Plan Document")
    (Weinstein Decl., Ex. 2); the Amended and Restated Royal Bank of Canada U.S. Wealth Accumulation Plan
    dated November 1, 2009, effective January 1, 2010 ("2010 Plan Document") (Weinstein Decl., Ex. 9); the
26  Amended and Restated Royal Bank of Canada U.S. Wealth Accumulation Plan dated November 1, 2010,
    effective January 1, 2011 ("2011 Plan Document") (Weinstein Decl., Ex. 10); and the Amended and Restated



YARMUTH WILSON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

Sikich Dep. 77:18-21, 132:1-5 ("We've used the terminology 'versions,' historically, because there are all these different versions of the program. But…using the word 'version,' does not mean that there are multiple different WAP plans."). Thus, for the time period relevant to Plaintiffs' claims—2005 through 2012—different "versions" of the WAP plan document governed the WAP.[7] In 2012, RBC created a new deferred compensation plan, separate from the WAP, by "freezing" the WAP and replacing it with a new wealth accumulation plan with drastically more stringent eligibility requirements and other modifications (the "New WAP"). *See* Weinstein Decl., Ex. 12 (2012 Frozen Plan Document) (indicating that the WAP was "frozen as of January 1, 2012); Ex. 11 (2012 New WAP Plan Document) ("This Plan is a new plan that is wholly separate from the US Wealth Accumulation Plan…that was frozen as of January 1, 2012"); Sikich Dep., 76:21-24 (affirming that the New WAP is "an entirely separate plan" from the WAP).

## B. Plaintiffs' Participation in the WAP.

Mr. Paul participated in the WAP through March 7, 2011, when RBC terminated Mr. Paul's employment. Weinstein Decl., Exs. 18-19, 23. Mr. Buskirk participated in the WAP through August 10, 2012, when he left RBC. Weinstein Decl., Exs. 20-22.

RBC characterized Mr. Paul's termination "for cause," and therefore seized Mr. Paul's Mandatory Deferral Contributions (which was money he earned and was forced to contribute to the WAP due to his status as an RBC branch director) and Company

---

Royal Bank of Canada U.S. Wealth Accumulation Plan, Frozen as of January 1, 2012, dated January 1, 2012 ("2012 Frozen Plan Document") (Weinstein Decl., Ex. 12).

[7] Plaintiffs anticipate that RBC will claim that the "versions" of the WAP that were in effect at the time of Plaintiffs' separations from RBC and at the time of their WAP forfeitures (the 2012 Frozen Plan Document (for Mr. Buskirk) and the 2011 Plan Document (for Mr. Paul)) should apply here. Weinstein Decl., Ex. 17 at 5. The Parties' dispute over which WAP plan documents govern Plaintiffs' claims is not material to this Motion, however, as the plan documents RBC claims are applicable are merely a subset of the plan documents Plaintiffs claim are applicable. (The earliest funds improperly forfeited by RBC were deposited to the WAP by Mr. Paul in 2005.) As such, Plaintiffs' analysis covers the plan documents RBC claims are applicable in addition to those Plaintiffs claim are applicable, and this Court need not resolve the question of which plan documents are applicable to rule on Plaintiffs' Motion for Partial Summary Judgment.



YARMUTH WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

Contributions to the WAP.  Weinstein Decl., Ex. 19.  Mr. Paul forfeited $1,612,152 from his WAP account as of February 28, 2012.  *Id.*  Following Mr. Buskirk's separation from RBC, Mr. Buskirk's purportedly unvested Company Contributions in the amount of $297,676 were forfeited as of November 30, 2012.  Weinstein Decl., Ex. 20.

**C.  Procedural History.**

On February 19, 2013, Mr. Paul first brought suit against RBC, alleging various claims under ERISA.  *See Paul v. RBC Capital Mkts., LLC, et al.*, No. 3:13-cv-05119-RBL (W.D. Wash.).  Because similar issues regarding the WAP were the subject of a separate purported class-action litigation brought in Texas by a former RBC employee, *Tolbert v. RBC Capital Mkts. Corp.*, No. H-11-0107 (S.D. Tex.), Mr. Paul and RBC agreed to toll Paul's claims pending the resolution of the *Tolbert* case, and sought voluntary dismissal of those claims without prejudice, which this Court ordered on May 3, 2013.[8]

The *Tolbert* district court initially found that the WAP was not an "employee pension benefit plan" and therefore was not subject to ERISA.  Tolbert appealed.  On July 14, 2014, in a 3-0 decision the Fifth Circuit reversed the *Tolbert* district court, finding that the WAP was an employee pension benefit plan.  *Tolbert v. RBC Capital Mkts. Corp.*, 758 F.3d 619 (5th Cir. 2014).  Following remand from the Fifth Circuit, the district court denied Tolbert's class certification motion, after which the parties settled and dismissed the case.

On July 11, 2016, Plaintiffs brought this lawsuit.  In a letter dated June 28, 2017, Plaintiffs proposed entering a joint stipulation with RBC on the WAP's status as an employee pension benefit plan under 29 U.S.C. § 1002(2)(A)(ii), per the *Tolbert* holding.  Weinstein Decl., Ex. 24.  In a written response and telephonic conference, RBC declined to so stipulate.  Weinstein Decl., Ex. 25 and ¶ 27.  Instead, the Parties agreed to file cross motions for summary judgment on the threshold "employee pension benefit plan" issue.

---

[8] Mr. Buskirk entered a similar tolling agreement with RBC in October of 2013.

YARMUTH WILSON PLLC
1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

# III.    ARGUMENT

ERISA's purpose is to "protect…the interests of participants in employee benefit plans and their beneficiaries" by (1) "requiring the disclosure and reporting to participants and beneficiaries"; (2) "establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans;" and (3) "providing for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b). As such, courts have mandated that ERISA be "liberally construed to protect participants in employee benefits plans." *LeGras v. AETNA Life Ins. Co.*, 786 F.3d 1233, 1236 (9th Cir. 2015) (citing *McElwaine v. US West, Inc.*, 176 F.3d 1167, 1172 (9th Cir. 1999)).

Under ERISA, an "employee pension benefit plan" (also referred to as a "pension plan") is defined as "any plan, fund, or program…maintained by an employer to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program (i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond." 29 U.S.C. § 1002(2)(A)(i)-(ii). The rights of a pension plan participant to plan contributions are non-forfeitable, so long as the participant has completed at least three years of service (if a "cliff" schedule is used) or six years of service (if a graded schedule is used). 29 U.S.C. § 1053(a)(2)(B). Additionally, ERISA forbids plan amendments that have the effect of eliminating or reducing participants' benefits. 29 U.S.C. § 1054(g)(2).

In determining whether a plan constitutes a pension plan under ERISA, courts of the Ninth Circuit analyze a plan's express terms and the circumstances surrounding the plan. *Vincenzo v. Hewlett-Packard Co.*, No. 3:12-cv-03480-JCS, 2012 U.S. Dist. LEXIS 146161, at *8-9 (N.D. Cal. Oct. 10, 2012). Whether a particular plan constitutes an ERISA-covered pension plan is determined "in light of all surrounding facts and circumstances from the point of view of a reasonable person." *Kanne v. Conn. Gen. Life Ins. Co.*, 867 F.2d 489, 492 (9th Cir. 1988).

YARMUTH WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

Summary judgment is appropriate where "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Assoc.*, 809 F.2d 626 (9th Cir. 1987). Here, summary judgment on whether the WAP is an ERISA-covered pension plan is proper because the Fifth Circuit has already decided this issue in *Tolbert v. RBC*, 758 F.3d 619, 625 (5th Cir. 2014). *Tolbert* collaterally estops RBC from re-litigating this issue, thus ending the inquiry of whether the WAP is an ERISA-covered pension plan. Even if the collateral estoppel doctrine did not apply, however, the *Tolbert* Court's finding that the WAP is a pension plan is extraordinarily persuasive authority, and the Court should make the same finding based upon the Fifth Circuit's unanimous and well-reasoned analysis.

Additionally, independent analysis of the WAP itself under either the "express terms" or the "surrounding circumstances" test demonstrates that the Fifth Circuit properly decided this issue. By its express terms, the WAP results in deferral of income by employees for periods extending to the termination of covered employment or beyond. Alternatively, an analysis of the surrounding circumstances reveals that the WAP results in the same deferral of income for periods extending to termination or beyond. Moreover, any attempt by RBC to claim that the WAP is a "bonus plan" instead of a pension plan must fail because (and as confirmed by the Fifth Circuit in *Tolbert*) the WAP was not such a plan under established ERISA precedent.

**A. *Tolbert* Collaterally Estops Defendants From Re-Litigating Whether the WAP Is a Pension Plan.**

As noted above, the Fifth Circuit has already unanimously answered the question presented here. In *Tolbert v. RBC Capital Markets Corp.*, 758 F.3d 619, 625 (5th Cir. 2014), the Fifth Circuit found that pursuant to the "express terms" test, the WAP "fits comfortably within the meaning of subsection (ii) [of 29 U.S.C. § 1002(2)(A)]", and thus was an employee pension benefit plan. *Id.* at 626. That finding estops RBC from re-litigating the issue in this case.



YARMUTH WILSON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

**1. The *Resolution Trust* Factors.**

Collateral estoppel "exists to prevent a party from having a second chance to make their case after they have already received a full and fair opportunity to present their arguments in court." *McCoy v. Foss Mar. Co.*, 442 F. Supp. 2d 1103, 1107 (W.D. Wash. 2006). Collateral estoppel can be used offensively to foreclose the re-litigation of issues when: "(1) [the defendant] was afforded a full and fair opportunity to litigate the issues in prior actions; (2) the issues were actually litigated and necessary to support the judgments; (3) the issues were decided against [the defendant] in final judgments; and (4) [the defendant] was a party or in privity with a party in the prior proceedings." *Resolution Trust Corp. v. Keating*, 186 F.3d 1110, 1114 (9th Cir. 1999); *see also Town of N. Bonneville v. Callaway*, 10 F.3d 1505, 1507 (9th Cir. 1993) (affirming application of offensive collateral estoppel).

District courts have "broad discretion" to apply collateral estoppel offensively, and generally refrain from doing so only when the result would treat the defendant unfairly. *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 330, 99 S. Ct. 645, 58 L. Ed. 2d (1979); *see, e.g., McCoy*, 442 F. Supp. 2d at 1106-07 (applying "nonmutual offensive collateral estoppel" where *Resolution Trust* factors were met). Instances in which the offensive application of collateral estoppel would be considered "unfair" are limited, such as when the defendant had "little incentive to defend vigorously, particularly if future suits are not foreseeable," when "the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant," or when "the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result." *Parklane*, 439 U.S. at 330-31.

Here, all of the *Resolution Trust* factors are met. Because RBC was the defendant in the *Tolbert* case, and because that case resulted in a final judgment on the WAP's status as an employee pension benefit plan under ERISA, there can be no doubt that the issue was



1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

decided against RBC in a final judgment. Nor is there doubt that RBC had a "full and fair opportunity" to litigate the issue of whether the WAP is an ERISA-covered pension plan. None of the *Parklane Hosiery* bases for unfairness to RBC—nor any other basis for unfairness to RBC—exist here. In fact, RBC had every incentive to mount a vigorous defense in the *Tolbert* case considering (1) the purported class action plaintiff in *Tolbert* claimed extensive monetary damages (likely many hundreds of millions of dollars) on behalf of a large putative class, which could have resulted in significant financial consequences for RBC, and (2) RBC knew of Mr. Paul's and Mr. Buskirk's claims at the time of its defense of the *Tolbert* plaintiff's claims, and indeed had agreed to toll Plaintiffs' claims pending the resolution of the *Tolbert* case.

"The issues" in this case "were actually litigated and necessary to support the judgments" in *Tolbert*. *McCoy*, 442 F. Supp. 2d at 1107. This Motion seeks resolution of the exact same issue resolved in *Tolbert*: whether the WAP is an employee pension benefit plan under 29 U.S.C. § 1002(2)(A)(i)-(ii).

### 2. *Tolbert*'s Holding: "The WAP Fits Comfortably Within The Meaning of Subsection [29 U.S.C. § 1002(2)(A)(ii)]."

Any argument that *Tolbert* did not resolve the same issue present in this case because the *Tolbert* Court analyzed the 2008 Plan Document, which is but one of the WAP plan documents applicable to Plaintiffs' claims, does not withstand scrutiny. As RBC's U.S. Deferred Compensation Manager explained, there is but a single WAP, which holds contributions made by the various participating employees over the course of many years. Sikich Dep., 77:6-21. While RBC created plan documents to govern the WAP, and over time made minor amendments and revisions to those plan documents, all of the plan documents governed a single plan—the WAP. *Id.*, 77:18-21, 132:1-5.[9] The Fifth Circuit's

---

[9] Contrary to what Plaintiffs anticipate Defendants may argue here—that there were many WAPs and *Tolbert* dealt only with one—there is, in fact, a single WAP at issue in this litigation. When RBC wanted to create a new, distinct WAP, it knew how to do that: by freezing the WAP and publishing a new WAP Plan Document, which explicitly announced that "[t]his is a new plan that is wholly separate from the U.S. wealth



holding was that "**the WAP** fits comfortably within the meaning of subsection [29 U.S.C. § 1002(2)(A)(ii)]," not that the **2008 Plan Document** fits within the meaning of ERISA. *Tolbert*, 758 F.3d at 626 (emphasis added). Moreover, any argument that RBC converted the WAP to a non-covered plan through amendments to post-2008 Plan Documents would be an admission that the WAP violated 29 U.S.C. § 1054(g)(2), which prohibits a plan from removing participant protections and benefits.

### 3. The "Express Terms" Remain Unchanged Through the Applicable Plan Documents.

That the Fifth Circuit analyzed only one of the WAP plan documents applicable to Plaintiffs' claims in no way undercuts application of collateral estoppel in this case. The *Tolbert* district court, and thus the Fifth Circuit, analyzed the 2008 Plan Document and not any prior or subsequent version of the plan documents because plaintiffs in that case based their claims only on the 2008 Plan Document. *Tolbert v. RBC Capital Mkts. Corp.*, No. H-11-0107, 2013 U.S. Dist. LEXIS 100476, at *3 n.4 (S.D. Tex. Mar. 27, 2013). However, that analysis applies with equal force to Plaintiffs' claims here because the "express terms" examined by the Fifth Circuit have remained substantively (and in many cases, literally) unaltered in the amended and revised WAP plan documents applicable in this case. *See, e.g.*, *Steen v. John Hancock Life Ins. Co.*, 106 F.3d 904, 912 (9th Cir. 1997) (applying collateral estoppel where prior case considered same agreement and party based its claims on the same operative facts as the prior case).

The Fifth Circuit specifically detailed which "express terms" of the 2008 Plan Document supported its conclusion that the WAP was an employee pension benefit plan:

---

accumulation plan formerly called the RBC Dain Rauscher wealth accumulation plan that was frozen on January 1, 2012." *See* Sikich Dep., 64:13-65:6; Weinstein Decl., Ex. 12 (Frozen 2012 Plan Document) & Ex. 11 (2012 New WAP Plan Document). The Court should not countenance RBC's reliance on small differences in the WAP plan documents (all of which are immaterial to the inquiry of whether the WAP is an employee pension benefit plan) when its own employees have admitted there was a single plan and when (finally aware that the WAP was in grave danger of being found not to be "top hat") RBC knew how to and did create a new, separate plan.



1    (1) the "statement of purpose," which "refers to the WAP as a 'deferred compensation

2        plan' and explains that, by design, employees have the option 'to defer receipt of a

3        portion of their compensation to be earned with respect to the upcoming Plan

4        Year'";

5    (2) the "Voluntary Deferred Compensation" and "Mandatory Deferred Compensation"

6        provisions, which "plainly refer to income that is deferred";

7    (3) the "vesting sections," which "explain that, *upon separation*, unvested amounts vest

8        immediately" (emphasis in original); and

9    (4) the "distribution sections," which provide that "[i]f distribution is made due to

10       Separation," then "[a]vailable forms of distribution include a single lump sum or, if

11       a Participant meets the requirements for Retirement at the time of Separation,

12       substantially equal annual installments for up to ten years."

13   *Tolbert*, 758 F.3d at 625-26.  These express terms—and these express terms alone—are

14   what the Fifth Circuit relied upon in finding that the WAP is an ERISA-covered pension

15   plan.  *Id.*

16       The corresponding provisions in the 2005 through 2012 Frozen Plan Documents

17   contain few differences or revisions—none of which are substantive—to these enumerated

18   "express terms."  Specifically, across all of the applicable Plan Documents, (1) the

19   "statement of purpose" contains the language cited by the Fifth Circuit regarding deferral;

20   (2) the "Voluntary Deferred Compensation" and "Mandatory Deferred Compensation"

21   provisions "plainly refer to income that is deferred," as referenced by the Fifth Circuit;

22   (3) the "Vesting Sections" contain the language cited by the Fifth Circuit regarding

23   unvested amounts vesting immediately upon separation (except the 2005 Plan Document,

24   which provides for immediate vesting upon the one-year anniversary of the participant's

25

26

YARMUTH WILSON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

Approved Retirement[10]); and (4) the "distribution sections" provide for distribution in installments when a separated employee has met the retirement requirements, as referenced by the Fifth Circuit. Weinstein Decl., Exs. 2, 6-12, 26. The identical or substantially identical nature of these provisions across various WAP plan documents is shown in Exhibit 26 to the Weinstein Declaration.

As such, and unlike in cases where the application of collateral estoppel has been rejected because provisions underlying a plaintiff's claim differ meaningfully from those in a prior case, the applicable plan document provisions here are substantively identical to the provisions considered in *Tolbert*. *Cf. Cent. Delta Water Agency v. United States*, 306 F.3d 938, 945, 952-53 (9th Cir. 2002) (rejecting application of collateral estoppel where plaintiff's claim depended upon how much water defendant released per water release management report and prior case involved a prior plan with substantively *different* water release quantity provisions); *Rybarczyk v. TRW, Inc.*, 235 F.3d 975, 980-82 (6th Cir. 2000) (rejecting application of collateral estoppel where plaintiff's claims concentrated on amendments to defined benefit plan that were *not a part of prior plan* considered in prior litigation). Moreover, Plaintiffs' claims against RBC allege conduct identical to the claims made in *Tolbert*. *Cf. Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1399 (9th Cir. 1992) (rejecting application of collateral estoppel because plaintiff made different claims against defendant regarding different conduct in prior litigation; prior case alleged preventing migration of wildlife, and later case alleged killing wildlife); *Duran v. AT&T Corp.*, No. C-2-99-418, 2001 U.S. Dist. LEXIS 22327, at *17-18 (S.D. Oh. Aug. 22, 2001) (rejecting application of collateral estoppel where plaintiff made claims beyond the scope of claims made in the prior litigation).

---

[10] This minor difference is entirely consistent with the *Tolbert* Court's analysis, as both this provision of the 2005 Plan Document and the language upon which *Tolbert* relied provided for vesting after termination of employment, therefore resulting in the "deferral of income by employees for periods extending to the termination of covered employment or beyond." 29 U.S.C. § 1002(2)(A)(ii).



**4. The "Bonus Program" Defense Does Not Overcome Collateral Estoppel.**

RBC has indicated that it intends to claim that the WAP was a "bonus program" under 29 C.F.R. § 2510.3-2(c), and that this defense was not litigated in *Tolbert*. RBC cannot overcome collateral estoppel by raising this defense. In fact, the Fifth Circuit considered RBC to have "admit[ted] that the WAP [was] not a 'bonus program' under § 2510.3-2(c)," noting that RBC "never argued otherwise at the district court. For good reason: The WAP's statement of purpose provides that the WAP is a 'deferred compensation plan' allowing employees 'to defer receipt of a portion of their compensation to be earned with respect to the upcoming Plan Year.' That is not a bonus plan." *Tolbert*, 758 F.3d at 626.

RBC should not be permitted to perform an end-run around issue preclusion by manufacturing so meritless a defense to Plaintiffs' claims that RBC chose not to litigate the defense in the *Tolbert* case. Indeed, the very purpose of offensive collateral estoppel—preventing a defendant from "relitigating the issues which the defendant previously litigated and lost against another plaintiff"—would be frustrated by such a tactic. *See Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.,* 402 U.S 313, 329, 91 S. Ct. 1434, 28 L. Ed. 2d 788 (1971). Moreover, as demonstrated in Section III(C)(3), *infra*, an analysis of RBC's "bonus plan" defense fails of its own accord.

\*    \*    \*    \*    \*

The Fifth Circuit has already decided that the WAP is an employee pension benefit plan under 29 U.S.C. § 1002(2)(A)(i)-(ii). Because all of the requirements of collateral estoppel are met, RBC should not be permitted to re-litigate this issue, and the question of whether the WAP is an ERISA-covered pension plan should considered settled in this litigation. Based upon collateral estoppel alone, this Court can and should find on summary judgment that the WAP is an "employee pension benefit plan" under ERISA.

YARMUTH WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

**B. The Fifth Circuit's Analysis of the WAP's Express Terms is Persuasive Authority on Whether the WAP is a Pension Plan.**

Even without collateral estoppel, however, the *Tolbert* decision serves as persuasive authority that the WAP is an employee pension benefit plan under 29 U.S.C. § 1002(2)(A). The <u>same benefit plan</u> is at issue in both *Tolbert* and this litigation. Sikich Dep., 77:18-21, 132:1-5. And, following the language of 29 U.S.C. § 1002(2)(A), courts of the Ninth Circuit perform the same "express terms" analysis that the *Tolbert* Court used to determine that the WAP is an ERISA-covered pension plan. *See, e.g., Vincenzo*, 2012 U.S. Dist. LEXIS 146161, at *8-9; *Daniels-Hall v. Nat'l Educ. Ass'n*, No. C 07-5339RBL, 2008 U.S. Dist. LEXIS 41309, at *20 (W.D. Wash. May 23, 2008). Lastly, the specific "express terms" examined by the Fifth Circuit, which formed the basis of its determination that the WAP results in a deferral of income "for periods extending to the termination of covered employment or beyond," remain unchanged in the WAP documents that could apply to Plaintiffs' claims.

Moreover, the Ninth Circuit has specifically endorsed the Fifth Circuit's approach in *Tolbert*, holding up the WAP as an example of an employee pension benefit plan. In *Rich v. Shrader*, the Ninth Circuit examined a stock rights plan, determining that it did not constitute an ERISA-covered pension plan because the plan's primary purposes were to provide incentives to employees and to provide for the employer's capital needs. 823 F.3d 1205, 1210-11 (9th Cir. 2016). As part of its analysis, the Ninth Circuit distinguished *Tolbert*, explaining that, unlike the WAP, the plan at issue in *Rich* "was never referred to by [the employer] as a deferred compensation plan, and its primary purpose…was not the deferral of compensation." 823 F.3d at 1211.

The Fifth Circuit has already thoroughly analyzed the WAP by detailing the four specific sections of the Plan Documents that make explicit references to income deferral, and coming to a reasoned determination that, by its "express terms," the WAP constitutes a

YARMUTH WILSON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

pension plan under ERISA. There is no basis for this Court to re-analyze the same language to answer the same question that the *Tolbert* Court has already answered.

### C. An Independent Analysis of the WAP Shows That it Constitutes an Employee Benefit Pension Plan.

Should this Court perform an independent analysis of the WAP, it will result in the same finding as the Fifth Circuit's in *Tolbert*. The Ninth Circuit requires a "broad" interpretation of 29 U.S.C. § 1002(2)(A)(i)-(ii), whereby "a pension plan is established if a reasonable person could ascertain the benefits, beneficiaries, source of financing, and procedures for receiving benefits." *Modzelewski v. Resolution Trust Corp.*, 14 F.3d 1374, 1376 (9th Cir. 1994) (plan calculating payments based on age and length of service, identifying beneficiaries, and setting out a schedule for payments, constitutes an ERISA-covered plan); *Rich,* 823 F.3d at 1210 (when determining whether a plan is covered by ERISA, "the paramount consideration is whether the primary purpose of the plan is to provide deferred compensation or other retirement benefits"). Here, examination of the WAP's "express terms" and "surrounding circumstances" reveals that it is an ERISA-covered pension plan.

#### 1. By Its Express Terms, the WAP "Results in the Deferral of Income by Employees for Periods Extending to the Termination of Covered Employment or Beyond."

As ERISA makes clear, a plan that "by its express terms" either "provides retirement income to employees" or "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond" is an employee pension benefit plan. 29 U.S.C. § 1002(2)(A)(i)-(ii). Plans containing express terms that result in deferral of income for periods extending to termination of employment or beyond consistently have been found to be employee pension benefit plans under ERISA. *See, e.g., In re Meinen*, 228 B.R. 368, 380 (Bankr. W.D. Pa. 1998) (plan is ERISA-covered on the basis of express terms that "provide[] retirement income to employees participating in the Plan and result[] in a deferral of income by the same employees for periods extending to the



termination of their covered employment"); *Freund v. Marshall & Illsley Bank*, 485 F. Supp. 629, 633-34 (W.D. Wis. 1979) (where "express terms" show plan "was established to provide retirement income to employees…this fact alone establishes ERISA coverage").

Indeed, when a plan results in the deferral of income to separation or beyond, even the inclusion of terms providing participants the option of withdrawing funds pre-retirement do not defeat the pension-plan status. *See, e.g.*, *Darden v. Nationwide Mut. Ins. Co.*, 922 F.2d 203, 207 (4th Cir. 1991), *rev'd on other grounds*, 503 U.S. 318 (1992) (plan was covered by ERISA when "<u>one</u> of the purposes of the Plan was to provide retirement benefits") (emphasis added); *Holzer v. Prudential Equity Group LLC*, 458 F. Supp. 587, 592-3 (N.D. Ill. 2006) (possibility for employees to receive distribution after retirement sufficient for ERISA coverage); *In re Meinen*, 228 B.R. at 380 (it "matters not [for purposes of ERISA-coverage] that employees participating in the [plan] have the option of withdrawing employer contributions from the Plan prior to either their retirement or termination of covered employment").

In contrast, plans are considered not to be covered by ERISA when they have a primary purpose <u>other than</u> deferral of compensation, retirement, or long-term savings, such as rewarding performance (*see* Section III(C)(3), *infra*), or providing financial assistance to the company. *See, e.g.*, *Shrader*, 823 F.3d at 1211 (9th Cir. 2016) (plan's primary purpose was to provide incentives to employees and to provide for employer's capital needs); *Segovia v. Schoenmann*, 408 Fed. App'x 61, 62 (9th Cir. 2011) (plan's stated purpose was to "motivate key employees to produce a superior return" and "to facilitate recruiting and retaining talented executives"); *Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929, 933 (8th Cir. 1999) (plan was an "incentive plan" the purpose of which was to further the interests of the employer, retain employees, and compensate employees for services rendered). These plans generally do not contain terms providing for deferred compensation, or, if they do provide for deferred compensation, they do so for only a short

YARMUTH WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

number of years such that, for most employees, deferral of compensation to retirement is impossible. *See, e.g., Vincenzo*, 2012 U.S. Dist. LEXIS 146161, at *9 (plan contained no provision for deferred compensation and provided for 7-year maximum term for awards under plan); *Aikens v. U.S. Transformer, Inc.*, No. CV-07-138-E-EJL-LMB, 2008 U.S. Dist. LEXIS 19285, at *21-27 (D. Id. Mar. 11, 2008) (plan contained provision for deferred compensation but conditioned distribution on passage of time, not separation or retirement); *Serio v. Wachovia Secs., LLC*, No. 06-cv-4681, 2007 U.S. Dist. LEXIS 63341, at *12-13 (D.N.J. Aug. 27, 2007) (plan provided for deferred compensation for a fixed deferred period of 4 to 8 years such that payment after retirement was "merely incidental" to plan).

Unlike the plans found <u>not</u> to be covered by ERISA, the WAP's express terms make clear that the deferral of income until retirement or separation from employment was a central feature of the WAP. Indeed, the first sentence of the "Introduction" section defines the WAP as a "deferred compensation plan." Weinstein Decl., Exs. 2, 6-12 (Plan Documents). The "Vesting" section explicitly provides that contributions "immediately vest in full upon the Separation of a Participant."[11] *Id.* And the "Distribution" section explicitly provides that forms of distribution include "a single lump sum or, if a Participant meets the requirements for Retirement at the time of Separation, substantially equal annual installments for up to ten years."[12] *Id.*; *see also* Weinstein Decl. Ex. 26. These sections of the Plan Documents show that Defendants purposefully designed the WAP to provide for distribution extending to termination of employment or beyond. Unlike in the cases cited

---

[11] All but the 2005 Plan Document contain identical language. The 2005 Plan Document differs only in that provides for immediate vesting upon the one-year anniversary of the participant's approved retirement. Weinstein Decl., Ex. 6 (2005 Plan Document).

[12] All but the 2005 Plan Document and the 2007 Plan Documents contain identical language. The 2005 Plan Document instead provides for distribution upon separation in two annual installments. Weinstein Decl., Ex. 6 (2005 Plan Document). The 2007 Plan Documents contain the following language: "[p]articipants may elect payment in a single lump sum or a participant may elect that if he or she meets the requirements for Retirement at the time of Separation, then distributions will be made to him or her in up to ten annual installments." Weinstein Decl., Exs. 7 (First 2007 Plan Document) & 8 (Second 2007 Plan Document).

YARMUTH WILSON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

above, these express terms provide no support for the theory that the WAP's primary purpose was an incentive plan. *Cf. Shrader*, 823 F.3d at 1205; *Segovia*, 408 Fed. App'x at 62; *Emmenegger*, 197 F.3d at 933. Nor does the WAP contain any time limitation on the deferral of compensation. *Cf. Vincenzo*, 2012 U.S. Dist. LEXIS 146161, at *9; *Aikens*, U.S. Dist. LEXIS 19285, at *21-25). Thus, it could not be said payment after termination of employment was "merely incidental" to the WAP. *Cf. Serio*, 2007 U.S. Dist. LEXIS 63341, at *12-13. Moreover, it is undisputed that the WAP <u>did</u> result in the deferral of income for periods extending to termination or beyond. Indeed, when asked about a prior sworn statement she made to the effect that in 2007, 43 percent of all WAP assets were elected for in-service distribution, RBC's U.S. Defined Contribution Plan Manager admitted that meant "that the other 50 [sic, 57] percent of WAP assets were elected for distribution after separation or in retirement." Sikich Dep., 214:17-215:2 & Ex. 27 ¶ 12.

In analyzing the express terms of a plan, courts also look to whether the employer has represented the plan as a "retirement plan" in promotional materials, whether employers have encouraged employees to leave their funds in the plan until retirement, and whether employees considered the plan to be part of their retirement planning. *See, e.g.*, *Darden,* 922 F.2d at 207-8 (4th Cir. 1991) (finding plan was covered by ERISA based on employer's representation of plan as a retirement plan in promotional materials, witness's acknowledgment that the purpose of the plan was to provide retirement benefits, and employees' consideration of the plan as part of their retirement scheme); *Freund*, 485 F. Supp. at 633-34 (finding plan was covered by ERISA based on employer's encouragement to employees to leave funds in the plan until retirement, and that both the employer and the employees considered the funds in the plan to be retirement benefits).

RBC's marketing materials clearly indicate that income deferral to post-separation and beyond was the intended purpose of the WAP. Weinstein Decl., Ex. 4 at 2 ("The [WAP], our deferred compensation program, also offers you the significant opportunity to

YARMUTH WILSON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

build long-term wealth."); Ex. 14 at slide 3 (The WAP "provides financial consultants with a vehicle to gather great wealth, provide investment flexibility and plan for their retirement."); Ex. 15 at 1 (The WAP "is a defined contribution supplemental executive **retirement plan** (DC SERP).") (emphasis added).  Indeed, RBC considered the WAP a "key element" of its "Finishing Well" initiative.  Buchert Dep., 51:22-52:5; 52:16-25; Sikich Dep., 157:8-25.

By these "express terms," the WAP plainly results in the deferral of income for periods extending to the termination of covered employment or beyond and is thus an ERISA-covered plan, not an incentive plan.

### 2. As a Result of the Surrounding Circumstances, the WAP "Results in the Deferral of Income by Employees for Periods Extending to the Termination of Covered Employment or Beyond."

Under ERISA, even if the "express terms" of a plan do not provide for the deferral of income to termination and beyond, a plan is an employee pension benefit plan if, "as a result of surrounding circumstances," the plan results in a deferral of income by employees for periods extending to the termination of covered employment or beyond.  29 U.S.C. § 1002(2)(A)(ii).  In other words, "even if [a plan] is not expressly intended to be a pension plan under ERISA, a pension plan may nevertheless be created by surrounding circumstances."  *Vincenzo*, 2012 U.S. Dist. LEXIS 146161, at *11; *see also Aikens*, 2008 U.S. Dist. LEXIS 19285, at *25 (citing DOL Advisory Opinions).

To determine whether an ERISA-covered pension plan results from surrounding circumstances, relevant factors include whether: "(1) the plan is administered in a way that had the effect of providing retirement income to employees; (2) the plan resulted in a deferral of income by employees extending to termination of covered employment or beyond; or (3)…communications to plan participants suggested that the plan was established or maintained for either or both of these purposes."  *Vincenzo*, 2012 U.S. Dist. LEXIS 14616, at *11 (citing DOL ERISA Opinion Letter 90-17A, 1990 WL 263441, 2);

YARMUTH  WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

*see also Serio*, 2007 U.S. Dist. LEXIS 63341, at *12-13 (undertaking "surrounding circumstances" test by considering the "purpose of the plan" based on its "design and structure," and whether the employer promoted the plan as a retirement plan); *Freund*, 485 F. Supp. at 634 (finding plan was covered by ERISA based on "surrounding circumstances" such as evidence that both the employer and participants considered the plan to provide retirement benefits).

Here, the record shows ample evidence of surrounding circumstances resulting in the deferral of income to retirement or separation from employment. A central feature of the WAP is that it provides participants the opportunity to elect to defer distributions until after they leave RBC. Sikich Dep., 55:3-7; 93:12-23 ("the participant…had the ability to elect a distribution post-employment, and they could have spread it out anywhere between one and ten years, and they would make that election at the time that they enrolled in the plan for that particular year [assuming the participant satisfied the Rule of 60]"); Buchert Dep., 53:8-13; 138:22-139:12 (explaining that through her experience with WAP participants, she learned that they valued the ability to plan for their retirement through the WAP). Further, at least in some years, over 50 percent of WAP assets were allocated for distribution in retirement or after separation from employment. Sikich Dep., 214:17-215:2. In addition, as described above, the marketing materials and Defendants' administration of the WAP make clear that the WAP could (and did) result in the provision of income in retirement and post-employment. *See* Section III(C)(1), *supra*; *cf. In re Segovia*, 404 B.R. at 922 (finding "surrounding circumstances" did not result in ERISA-coverage where there was no evidence that the employer promoted the plan as a retirement plan or administered the plan to have the effect of providing retirement income).

### 3. The WAP is Not a Bonus Plan Because It Was Not an Incentive Plan.

As noted above (Section III(A)(4), *supra*), RBC has indicated that it intends to claim that the WAP was a "bonus program" under 29 C.F.R. § 2510.3-2(c), a notion the Fifth

YARMUTH  WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

Circuit dismissed outright in the *Tolbert* case. *Tolbert*, 758 F.3d at 626 (on its face, a "deferred compensation plan" is not a "bonus plan").

A bonus plan whereby an employer makes payments to employees "as bonuses for work performed," is generally exempt from ERISA requirements, unless the payments made pursuant to a bonus plan are "systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees." 29 C.F.R. § 2510.3-2(c) (2006). To determine whether a plan constitutes a "bonus plan," courts look to the following factors: "(1) the express purpose of the plan; (2) whether the employer has discretion to award the benefit; (3) whether the bonus is for work performed; (4) whether payments are systematically deferred to the termination of covered employment or beyond, so as to provide retirement income to employees; (5) how the company promoted the plan; and (6) whether penalties were imposed to deter redemption before retirement." *Rich v. Shrader*, 2011 U.S. Dist. LEXIS 108616, at *19 (S.D. Cal. Sep. 22, 2011) (finding plan was bonus plan based on language in plan documents specifically providing for employee incentives and making clear participation in plan was not tied to retirement program, as well as employer's board having sole discretion of awards) *aff'd Rich v. Shrader*, 823 F.3d 1205 (9th Cir. 2016).

Plans that have the explicit purpose of providing bonuses or aligning employee and corporate interests may be considered bonus plans. *See, e.g.*, *Miller v. Olsen*, No. 3:15-cv-00571-AC, 2016 WL 4154936, at * 3-4 (D. Or. Aug. 4, 2016) (plan's primary purpose was to reward employees and encourage longevity); *Houston v. Saracen Energy Advisors, LP*, No. H-08-1948, 2009 U.S. Dist. LEXIS 26307, at *9-16 (S.D. Tex. Mar. 27, 2009) (plan's stated purpose was to provide incentives related to performance and continued employment, an opportunity to participate in employer's profits and losses, and deferred compensation); *Emmenegger*, 197 F.3d at 933 (plan's stated purpose was to align the interests of senior management and the stockholder, provide employee incentives, and compensation).



YARMUTH WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

Conversely, if contributions to a plan are made for a purpose other than performance rewards or employee incentives, the plan is not a bonus plan. *See, e.g., Holzer,* 458 F. Supp. 2d at 591 (plan cannot be considered a bonus plan because awards were not made to employees as performance rewards).

Here, as in *Holzer*, the WAP is not a bonus plan for the simple reason that contributions made to the WAP were not exclusively, or even mostly, performance rewards. As the plan documents themselves make clear, the WAP consists of voluntary deferral contributions, mandatory deferral contributions, and company contributions. Weinstein Decl., Ex. 2, 6-12 ¶¶ 2.2-2.3, 2.6. As Ms. Sikich testified, branch managers were required to make mandatory deferred contributions on a formulaic basis. Sikich Dep.,126:21-127:7. In fact, through 2009, Mr. Paul was required to make mandatory deferred contributions, and his contributions for the years 2006 through 2009 totaled $506,961.04. Thus, mandatory contributions accounted for well over one-third of the $1,344,567.60 that Mr. Paul contributed to the WAP from 2006 and 2012. Weinstein Decl., Exs. 2, 6-12, 18 & ¶ 30. These mandatory contributions clearly are not performance rewards, and neither are voluntary deferrals, which were made by the participants themselves at their election. Weinstein Decl., Ex. 2 (2008 Plan Document) at ¶ 1.2 (defining "mandatory deferred compensation" and "voluntary deferred compensation").

Moreover, there is no support in the language of the Plan Documents or in materials discussing the WAP for the proposition that the purpose of the WAP was to provide participants performance rewards, or to serve as employee incentives. *See* Section III(C)(1), *infra*. To the contrary, RBC itself characterized the WAP as a *defined contribution supplemental executive retirement plan* (DC SERP). *See* Weinstein Decl. Ex. 15 (WAP Overview) at slide 1. In addition, even the small part of the WAP that was comprised of performance rewards was not discretionary or determined on a case-by-case basis. Instead, bonuses were calculated on a formulaic basis, awarding participants a

YARMUTH WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

certain percentage of their annual production, based on years of service. Buchert Dep., 58:2-12. For instance, in 2009, the productivity bonus range was 1.75% of annual production for a production level of $300,000, going up to 5% of annual production for a production level of $1,500,000. Weinstein Decl., Ex. 4 at 19; *see also* Weinstein Decl., Ex. 15 at slide 8 (showing productivity bonuses based on level of production and loyalty bonuses based on production and years of service) & Ex. 28 (WAP Regional Directors & Complex Directors Summary) at 1 (showing formulas for deferral calculations); Sikich Dep., 95:16-25. After the financial consultant compensation plan was set, RBC had no discretion relating to the amount of this portion of company contributions. It was a simple calculation. The WAP's formulaic approach to bonus calculation stands in stark contrast to the plans found to be "bonus plans," in which employers had discretion over bonus determinations. *Cf. Rich,* 823 F. 3d at 1211 (board had "sole discretion" to grant awards to participants); *Kuhbier v. McCartney*, 2017 U.S. Dist. LEXIS 33231, at *30-44 (S.D.N.Y. Mar. 8, 2017) (plan administrator had discretion over awarding benefits); *Miller,* 2016 WL 4154936, at *3-4 (administrators had total discretion to determine participation rights).

RBC's attempt to characterize the WAP as a "bonus plan" under 29 C.F.R. § 2510.3-2(c) fails because contributions to the WAP were not performance rewards. Instead, as made clear by both the express terms and the circumstances surrounding the WAP, it was a deferred compensation plan that resulted in the deferral of income to the termination of employment or beyond.

## IV.    CONCLUSION

For the reasons set forth above, this Court should grant Plaintiffs' Motion for Partial Summary Judgement and find that the WAP is an employee pension benefit plan under 29 U.S.C. § 1002(2)(A)(i)-(ii).

YARMUTH  WILSON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

Dated: September 28, 2017.

**YARMUTH WILSDON PLLC**

By: *s/Jeremy E. Roller*
Jeremy E. Roller, WSBA No. 32021
Elizabeth Weinstein, WSBA No. 45763
1420 Fifth Avenue, Suite 1400
Seattle, WA 98101
Phone: 206.516.3800
Fax: 206.516.3888
Email: jroller@yarmuth.com
            eweinstein@yarmuth.com

*Attorneys for Plaintiffs Marty Paul and
Brian Buskirk*

YARMUTH WILSDON PLLC
1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

**PERKINS COIE LLP**
Kevin J. Hamilton
William B. Stafford
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Email: khamilton@perkinscoie.com
   wstafford@perkinscoie.com

**MORGAN, LEWIS & BOCKIUS LLP**
Sari M. Alamuddin, *pro hac vice*
Christopher J. Boran, *pro hac vice*
Matthew A. Russell, *pro hac vice*
77 West Wacker Drive, Fifth Floor
Chicago, IL 60601
Email: sari.alamuddin@morganlewis.com
   christopher.boran@morganlewis.com
   matthew.russell@morganlewis.com

*Attorneys for Defendants RBC Capital*
*Markets, LLC, Royal Bank of Canada, and*
*Royal Bank of Canada US Wealth*
*Accumulation Plan*

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Dated: September 28, 2017 at Seattle, Washington.

       *s/Sue Stephens*     
       Sue Stephens, Legal Assistant

PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL – Page 26



1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

714.01 ri281501 9/28/17