The Honorable Ronald B. Leighton

1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

| | |
|---|---|
| MARTY PAUL, an individual, and BRIAN BUSKIRK, an individual,<br><br>                Plaintiffs,<br><br>v.<br><br>RBC CAPITAL MARKETS, LLC, a Minnesota limited liability company; ROYAL BANK OF CANADA, a Canadian corporation; and ROYAL BANK OF CANADA US WEALTH ACCUMULATION PLAN, an employee benefit plan,<br><br>                Defendants. | Case No. 3:16-cv-05616-RBL<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**NOTE ON MOTION CALENDAR:** Oct. 20, 2017 |

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
(NO. 3:16-CV-05616-RBL)

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................. 1

II.   RESPONSE TO PLAINTIFFS' FACTUAL BACKGROUND ....................................... 3

III.  ARGUMENT ..................................................................................... 6

    A.    RBC Is Not Collaterally Estopped From Presenting Its Arguments Here ............. 6

        1.    Plaintiffs Concede Tolbert Addressed Only The November 1, 2008 WAP, While They Purport To Base Their Claims On Other Versions Of The Plan ................................................................. 7

        2.    The WAP Was Administered Differently From Year-To-Year Without Changes To The Plan Language ................................. 8

        3.    Tolbert Did Not Resolve Whether The WAP In Effect At The Time Of These Plaintiffs' Departures Was A "Bonus Program." ........... 10

    B.    The WAP Was Not A Pension Benefit Plan Under ERISA ......................... 12

        1.    Plaintiffs Do Not Argue That The WAP "Provides Retirement Income." ....................................................................... 12

        2.    The WAP Is A "Bonus Program" Under DOL Regulations ................... 13

        3.    The WAP Did Not "Systematically Defer" Income To Retirement, Nor Does It "Result In" Such Deferrals, Which Occurred Only By Participant Choice ................................................... 17

            a.    The WAP's "Express Terms" Do Not Establish A Pension Plan ................................................................. 18

            b.    The "Surrounding Circumstances" Do Not Establish A Pension Plan ................................................................. 21

IV.   CONCLUSION ................................................................................. 24

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (NO. 3:16-CV-05616-RBL) – PAGE i

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Dr., 5th Floor
Chicago, IL 60601
+1.312.324.1000

# I.      INTRODUCTION

Plaintiffs' Motion for Partial Summary Judgment fails for multiple reasons.[1]  At the end of the day, however, it is undisputed that not a single WAP participant was required to defer any WAP awards until retirement or termination of employment, nor were they encouraged or incentivized to do so.  Thus, the question here boils down to whether affording some (but not all) participants the unfettered *option* of keeping their WAP contributions in the Plan until they left RBC automatically converted the WAP into a "pension plan" governed by ERISA.  Aside from the Fifth Circuit's flawed reasoning in *Tolbert v. RBC Capital Markets, LLC*, 758 F.3d 619 (5th Cir. 2014), plaintiffs cite no case reaching such a holding, while numerous courts have held to the contrary under analogous circumstances.  The Court should not blindly accept the ruling in *Tolbert*, which plaintiffs adopt wholesale here, but rather critically evaluate its analysis.

*First*, the Court should reject plaintiffs' attempt to preclude RBC from even raising the issue.  It is plaintiffs' burden to establish that collateral estoppel is appropriate, including showing "with clarity and certainty what was determined by the prior judgment." *Clark v. Bear Stearns & Co., Inc.*, 966 F.2d 1318, 1321 (9th Cir. 1992).  And yet their own Motion effectively concedes that the Fifth Circuit *did not* resolve the "identical" issue now before the Court:  "The *Tolbert* district court, and thus the Fifth Circuit, analyzed the 2008 Plan Document and not any prior or subsequent version of the plan documents because plaintiffs in that case based their claims only on the 2008 Plan Document."  PMSJ at 11.  This alone is sufficient to reject collateral estoppel here—particularly given that plaintiffs simultaneously take the position that the November 1, 2008 WAP at issue in *Tolbert* was "*but one* of the WAP plan documents *applicable to [their] claims*." *Id.* at 10 (emphases added).

The remainder of plaintiffs' argument on this point conflates collateral estoppel with the merits, asking this Court to analogize to *Tolbert* and thus claiming the Fifth Circuit's "analysis applies with equal force" here.  PMSJ at 11.  Even if that were true—it is not, as explained below

---

[1] Most of RBC's arguments in support of its Motion for Summary Judgment (Dkt. 24, cited as "DMSJ") apply equally to its opposition to plaintiffs' Motion (Dkt. 26, cited as "PMSJ").  Thus, in addition to the arguments here, and to avoid unnecessary duplication, RBC incorporates its Motion and supporting exhibits as if fully set forth herein.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Dr., 5th Floor
Chicago, IL 60601
+1.312.324.1000

and in RBC's Motion—a mere "resemblance" between the two cases does not suffice.  *See Clark*, 966 F.2d at 1320.  In any event, although the WAP's "express terms" were similar from year-to-year, RBC exercised its broad discretion to *operate* the WAP differently, in ways material to its status as an ERISA pension plan.  *See* DMSJ at 6-7.  RBC is not precluded altogether from raising an argument the *Tolbert* district court specifically declined to address.

*Second*, turning to the merits, plaintiffs do not establish that the WAP was a "pension benefit plan" under ERISA.  They do not argue that the WAP was designed or intended to provide retirement income to employees, the "paramount consideration" in this determination. *Rich v. Shrader*, 823 F.3d 1205, 1210 (9th Cir. 2016); *see also* 29 U.S.C. § 1002(2)(A)(i).  This was not the WAP's primary purpose, which was to attract and retain key employees by serving as the central vehicle through which RBC paid bonuses and other awards subject to vesting periods.  As such, the WAP qualifies as a "bonus program" excluded from ERISA's definition of a "pension plan," as it indisputably provided payments to participants as "bonuses for work performed."  29 C.F.R. § 2510.3-2(c).  The dispositive question thus becomes whether the WAP, by its design or administration, either systematically deferred, or "result[ed] in" the deferral of, income until termination.  29 U.S.C. § 1002(2)(A)(ii).  But it is undisputed that nothing about the WAP compelled a participant to defer *any* WAP awards until retirement or termination.  To the contrary, participants automatically received a payout of WAP awards upon vesting and while employed at RBC unless they expressly chose otherwise—meaning post-termination payments were not caused by operation of the WAP, but as the direct result of each participant's choice.

For these reasons, and those more fully set forth below, the Court should deny plaintiffs' Motion and grant summary judgment in favor of RBC on all claims.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

## II.    RESPONSE TO PLAINTIFFS' FACTUAL BACKGROUND[2]

Plaintiffs' recitation of the facts purportedly material to their Motion is most notable for what it *does not* dispute, reinforcing that summary judgment in RBC's favor is appropriate.  In particular, plaintiffs' Motion either concedes or fails to dispute the following:

**1.  The WAP was not designed to "provide retirement income," but rather to award performance and align key employees' financial interests with those of RBC.**

The WAP's statement of purpose provides that the Plan affords participants the benefit of "tax-deferred savings and investment options in an effort to support long-term savings and allow such employees to share in the Company's growth and profitability, if any."  PMSJ at 2.  Consistent with this objective, participation in the WAP for FCs, branch directors, and others was "based on the [employee's] fiscal year gross production, which is composed of fees and commissions clients pay to RBC."  *Id.* at 2.  Likewise, the "WAP Bonus" for Regional Directors and Complex Directors was "directly tied to [their] personal performance and increasing complex net revenue as [their] CD compensation target potential increases with revenue."  Pls.' Ex. 28 at 2.  And, the WAP plan document makes clear that in certain years, the bonus awards RBC paid in the form of matching contributions were in shares of RBC common stock.  *See* Pls.' Ex. 10 § 2.6.  In other words, the WAP directly aligned participants' performance and personal incentives with RBC's interests in maximizing revenue and profitability.

**2.  The WAP's primary purpose was to recruit and retain key employees.**

The reason RBC established the WAP as a vehicle to pay bonuses and other awards was to recruit and retain valuable, high-producing employees.  *See* DMSJ at 3-4.  And RBC did so by paying performance-based awards subject to specified vesting periods that required employees to remain with RBC until those awards vested.  *Id.*  Plaintiffs do not dispute that this was the WAP's core objective, as the record is replete with evidence that it was.  *Id.*

---

[2] In addition to the specific assertions of fact to which RBC responds in this Opposition, it incorporates by reference the "Statement of Facts" in its own Motion, as well as the exhibits cited in support thereof.  *See* DMSJ at 2-9.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

**3. The WAP was the primary vehicle through which RBC paid annual bonuses—and RBC granted Paul and Buskirk sizeable performance-based bonuses into the WAP.**

In furtherance of these interests, RBC in fact paid WAP participants substantial performance-based bonuses into the Plan each year in which they qualified.  These awards were in addition to participants' other compensation and only available to WAP-eligible employees, meaning the WAP constituted RBC's primary vehicle for paying annual performance-based bonuses to these key employees.  *See* DMSJ at 3-4.[3]  In fact, plaintiffs' own exhibits show that between 2006 and 2011 alone, RBC awarded Paul over $1.2 million into the WAP, while awarding Buskirk over $123,000 in the years of 2009, 2010, and 2012 alone.  Pls.' Exs. 18-20; *see also* DMSJ at 8 (RBC awarded Buskirk over $255,000 from 2007 until he left in 2012).

**4. The WAP did not require distribution upon separation or retirement, nor did RBC promote or market the WAP to the contrary.**

The WAP did not require any WAP participant to receive a payout of *any* contributions upon retirement or separation.  *See, e.g.*, PMSJ at 4.  Rather, as plaintiffs concede, the WAP foreclosed that option for some participants, while affording others, for each year in which they participated, the discretion to "earmark" the distribution option that worked best for them "based on their personal needs, whether it be in-service or post-employment." *Id.* (quoting Pls.' Ex. 1); *see* DMSJ at 4, 5.  Consistent with the flexibility the WAP gave participants, RBC presented the Plan as an opportunity for FCs and other valuable employees to have the "freedom and flexibility to manage" their savings as they saw fit, and earn tax-deferred returns as a tool in building "long-term wealth." *See id.* at 6.  Plaintiffs do not point to any RBC communications discouraging participants from electing in-service distributions, penalizing participants for doing so, or otherwise causing WAP payouts to be skewed toward the end of employment.  *Id.*

---

[3] Plaintiffs' Motion repeatedly refers to WAP awards as "bonuses" or rewards for performance or production. *See, e.g.*, PMSJ at 3 n.4 (describing the "WAP productivity bonus"); *id.* at 23 (conceding the WAP was a repository for "performance rewards"); *id.* at 23-24 (purportedly describing how "bonuses were calculated" and that eligible employees were "award[ed]" such bonuses based on "a certain percentage of their annual production" or "based on years of service"); *id.* at 24 (describing the "productivity *bonus* range," and citing an exhibit "showing productivity *bonuses* based on level of production and loyalty *bonuses* based on production and years of service).

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
PAGE 4

**5. WAP participants had to elect, on an annual basis, to receive payouts at separation.**

Despite that their own exhibits make it clear, plaintiffs' Motion omits the fact that, by *default*, any WAP award or contribution was paid "in-service" (*i.e.*, upon vesting and during employment).  Participants thus had to affirmatively elect, for each year in which they participated, to keep any awards or contributions in the WAP for a longer period of time.[4]  In actuality, the majority of WAP participants elected in-service distributions, as opposed to separation or retirement, in each year from 2007 to 2011.  *Id.* at 5.

**6. Paul and Buskirk took large distributions from the WAP while employed at RBC.**

Plaintiffs' exhibits also demonstrate that between 2007 and 2011, Paul received in-service payouts of over $824,000 from the WAP, and he had elected to receive similar lump-sum payouts of WAP contributions RBC made from 2008 to 2011 (which he later forfeited upon being terminated for cause).  Pls.' Ex. 18; *see also* DMSJ at 8.  Likewise, Buskirk received over $269,000 in in-service payouts in just 2009, 2010, and 2012 alone.  Pls.' Ex. 20; *see also* DMSJ at 8 (showing Buskirk received around $376,000 while employed between 2007 and 2011).

**7. The WAP granted RBC discretion to administer the Plan differently each year.**

The WAP plan document specifically granted RBC broad discretion over the operation of the WAP, including the availability, amount, and conditions for *each* type of contribution authorized under the Plan (*i.e.*, company contributions, voluntary deferrals, and/or mandatory contributions).  *See* PMSJ at 3 (acknowledging that (i) company contributions were "made by RBC at RBC's discretion"; (ii) "at times the amount of [voluntary] deferral [contributions] was limited by RBC"; and (iii) mandatory deferral contributions were "at RBC's discretion"); *see also* DMSJ at 6 n.7 (providing example WAP provisions granting RBC this discretion).

**8. RBC exercised its discretion to operate the WAP materially differently over time.**

Plaintiffs concede that "RBC periodically made revisions to the plan documents governing the WAP," meaning that (according to them) "different 'versions' of the WAP plan

---

[4] *See, e.g.*, Pls.' Ex. 13 at 3 ("If you want a retirement distribution for your 2011 contributions, you *must make the election* at the time you enroll in the plan for 2011."); Pls.' Ex. 28 at 4 ("If you choose not to enroll for Voluntary Contributions in 2011, you should still make a distribution election for your WAP Bonus.  If no distribution election is made, the bonus distribution will default to an in-service distribution valued on July 1, 2016."); *see* DMSJ at 5.

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
PAGE 5

document governed the WAP" over the period at issue.  PMSJ 4-5 & n.6.  Plaintiffs also do not (and cannot) dispute that in exercising the discretion granted by the Plan document, RBC *administered* the WAP differently from year-to-year, including making fundamental changes to the terms and conditions of participation—yet *without* changes to the WAP plan language.[5]

*       *       *

As outlined below, these undisputed facts, in addition to those set forth in more detail in RBC's own Motion, are sufficient to establish summary judgment in RBC's favor on all claims.

### III.    ARGUMENT

**A.    RBC Is Not Collaterally Estopped From Presenting Its Arguments Here.**

Plaintiffs first contend that the Fifth Circuit's ruling in *Tolbert* precludes RBC from even raising the argument that the WAP in effect when they left RBC was not a "pension plan" under ERISA.  As outlined in RBC's Motion, the dispositive question on this point is straightforward: Is the issue presented "identical" to the one "actually litigated" and resolved against RBC in *Tolbert*?  DMSJ at 10-12; *Syverson v. Int'l Bus. Machines Corp.*, 472 F.3d 1072, 1078 (9th Cir. 2007).  Plaintiffs bear the burden of establishing "with clarity and certainty what was determined by the prior judgment."  *Clark*, 966 F.2d at 1320; *see Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d 904, 912 (9th Cir. 1997) ("The party asserting collateral estoppel must first show that the estopped issue is identical to an issue litigated in a previous action.").  Accordingly, courts typically do not apply collateral estoppel "if there is *any doubt* as to whether an issue was actually litigated in the prior action."  *Inter-Modal Rail Employees Ass'n v. Burlington N. & Santa Fe Ry. Co.*, 210 F.3d 383, *3 (9th Cir. 2000) (unpublished) (emphasis added).  Here, plaintiffs' own Motion establishes the issues presented *are not* "identical" to those in *Tolbert*.

---

[5] *Compare, e.g.*, PMSJ at 3 n.4 (describing 2009 FC bonuses and matching awards, and "mandatory deferral contributions" for branch directors), *with* Pls.' Ex. 28 at 1-2 (describing the 2011 WAP for Regional and Complex Directors, including changes from 2010 to eliminate matching contributions and mandatory deferrals, instead paying a "WAP Bonus"), *and* Defs.' Ex. G (describing 2011 WAP for FCs and branch directors, reflecting no matching contributions, and RBC contributions as "Productivity" and "Loyalty" bonuses only), *and* Defs.' Ex. J (reflecting the terms applicable to each subset of WAP-eligible employees from 2009 to 2011).  *See also* DMSJ at 6-7.

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
PAGE 6

1.  **Plaintiffs Concede *Tolbert* Addressed Only The November 1, 2008 WAP, While They Purport To Base Their Claims On Other Versions Of The Plan.**

Plaintiffs' Motion acknowledges that this case involves iterations of the WAP that the *Tolbert* district court expressly declined to address.  Specifically, plaintiffs agree that "[t]he *Tolbert* district court, and thus the Fifth Circuit, analyzed the 2008 Plan Document and *not any prior or subsequent version* of the plan documents because plaintiffs in that case based their claims *only on the 2008 Plan Document*."  PMSJ at 11 (emphases added).  Indeed, the *Tolbert* district court went out of its way to limit its holding and analysis only to "the version . . . in effect at the time of [plaintiff's] termination from employment," emphasizing it "*has not included in its analysis* any subsequent version of the WAP that may have been promulgated." 2013 WL 3503286, at \*4 & n.4 (S.D. Tex. Mar. 27, 2013) (emphasis added).  And it did so, in part, because that version of the WAP stated that it "supersedes all prior versions of the Plan[,] and any deferrals or contributions made pursuant to a prior version of the Plan will be governed by this Plan."  *Id.* at \*4 n.6.  In other words, the *Tolbert* court articulated exactly what issue it was (and was not) resolving.  This case, however, involves the very "subsequent version[s]" of the WAP that the *Tolbert* court declined to consider.  This alone defeats collateral estoppel.[6]

Plaintiffs' Motion only underscores this conclusion by arguing that *multiple* versions of the WAP should apply to their claims.  PMSJ at 4-5, 10.  Plaintiffs concede that "RBC periodically made revisions to the plan documents governing the WAP," assert that "for the time period relevant to Plaintiffs' claims—2005 to 2012—different 'versions' of the WAP plan document governed the WAP," and thus argue that the November 1, 2008 WAP is "but one of the WAP plan documents" applicable to their claims.  *Id.*  And yet in the same breath, plaintiffs aver that, for purposes of collateral estoppel, there was only "one WAP" over the entire time period, meaning a ruling the *Tolbert* court specifically limited to the November 1, 2008 WAP

---

[6] Indeed, the mere fact that *Tolbert* addressed events occurring over a different time period is alone sufficient to reject collateral estoppel here.  *See Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 327-28 (1955) (prior judgment covering an earlier time period does not have preclusive effect in suit involving another time period even where "essentially the same course of wrongful conduct" is alleged).

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
PAGE 7

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

should apply to *all* of their claims, regardless of whether different terms and conditions—or a newly amended and restated WAP—applied. *Id.* at 11-12.

Plaintiffs cannot have it both ways. If they believe different WAP plan documents govern their claims, then they must concede that the only "issue" even arguably resolved by *Tolbert* was with respect to the November 1, 2008 WAP plan document. If, on the other hand, plaintiffs want to argue that there has been only "one WAP" to which all of their claims are subject, it necessarily must be the version in effect at the time of their departures from RBC, as subsequent WAP plan documents superseded prior versions. But under *either* formulation, *Tolbert* did not resolve the issue before this Court, which pertains to the WAP in effect when plaintiffs left RBC in 2011 and 2012. This is more than enough to reject the application of collateral estoppel. *See* DMSJ at 11-12 (citing cases holding that collateral estoppel does not apply where issues arise from new contracts, despite similar terms); *contra Steen*, 106 F.3d at 912 (applying collateral estoppel where second lawsuit concerned the *identical* agreement).

Instead, the analogy plaintiffs draw is a merits argument they can certainly make to suggest *Tolbert* should be compelling authority. But answering the question of whether *Tolbert* resolved the "identical" issue presented here must begin (and end) with the actual question in that case, which excluded other versions of the WAP.

### 2. The WAP Was Administered Differently From Year-To-Year Without Changes To The Plan Language.

Even if the application of different versions of the WAP alone were not enough to reject collateral estoppel, plaintiffs' exclusive reliance upon a handful of textual similarities between versions of the Plan does not alter the outcome. *See* PMSJ at 11-13. To start, the fact that the *Tolbert* court deemed certain provisions of the November 1, 2008 WAP to be relevant to its analysis of a different Plan document does not automatically extend its ruling to *similar* provisions in later versions, without regard to other potentially material differences.

Plaintiffs' myopic focus on the language of the WAP plan document ignores how RBC operated and administered the Plan. *Supra* at II(8). As outlined in RBC's Motion (at 6-7), the

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

WAP afforded RBC broad discretion—without any changes to the WAP's "express terms"—to modify how the Plan operated, including whether to make contributions at all and, if so, the form they would take, in what amount, to whom, when they vest, and when they could be paid.  As the dispute on the merits makes clear, facts like these are central to determining whether ERISA applies.  And yet plaintiffs do not (and cannot) dispute that RBC modified components of the WAP each year, without any corresponding change to the "express terms" upon which they rely.  Thus, it is not enough to point to textual similarities to preclude RBC's argument, as the question before the Court cannot be resolved without considering how the WAP actually operated.

The flaw in plaintiffs' overbroad approach is best illustrated by an example.  Assume that effective in 2010, RBC decided to remove even the *option* for WAP participants to receive their awards upon separation or retirement, requiring instead that all participants will be paid in-service immediately after a five-year vesting period.  Putting aside that RBC would have to answer to participants upset about such restrictions, the Plan's existing "express terms" granted RBC the discretion to take this action (and RBC did just that for certain participants from 2007 to 2010, DMSJ at 7).  In this scenario, the *only* "Company Contributions" RBC would have paid into the WAP were "productivity" and "loyalty" bonuses, which participants were required to take in-service.  Even plaintiffs cannot reasonably dispute such an arrangement would constitute a "bonus program" under 29 C.F.R. § 2510.3-2(c).  *See infra* at III.B.2; DMSJ at 15-16.  And yet under their reasoning, RBC would be collaterally estopped from even *making* this argument, because the prior November 1, 2008 WAP at issue in *Tolbert* contained similar "express terms."

In fact, plaintiffs' Motion makes a similar point.  They observe that RBC froze the WAP to new contributions, effective January 1, 2012, and instituted a "new WAP" on the same date.  PMSJ at 5.  From this, plaintiffs suggest that because RBC did not formally implement an entirely new Plan sooner, this somehow proves that any dispute over the "old WAP" is "identical" to *Tolbert*, while an argument over the "new WAP" would not be precluded.

This is a classic elevation of form over substance.  To start, RBC *did* promulgate new, "amended and restated" Plan documents effective on January 1 of 2010, 2011, and 2012, each

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

stating it "supersedes all prior versions" and governs all WAP contributions.  Pls.' Exs. 9-10, 12
§ 1.1.  That RBC did so via an amendment, not an entirely new plan document, is irrelevant in
determining whether the issue presented here is the same as in *Tolbert*.  Regardless, the logic of
plaintiffs' argument suggests that if RBC had frozen the WAP at the end of 2009, implemented a
"new WAP" effective January 1, 2010, and yet *administered* that "new WAP" exactly as it did
the "old WAP" in 2010 and 2011—*e.g.*, increasing WAP bonuses, eliminating matching and
mandatory contributions, etc., *see* DMSJ at 6-7—then RBC *would not* be collaterally estopped
from making the very same arguments it now makes.  But the time period and "express terms"
underlying this argument would not have changed.  Proving this point, the "new WAP" *also*
contained the same "express terms" upon which plaintiffs now rely.[7]  Does *Tolbert* also preclude
RBC from arguing the "new WAP" was not an ERISA pension plan?  Of course not.

### 3.  *Tolbert* Did Not Resolve Whether The WAP In Effect At The Time Of These Plaintiffs' Departures Was A "Bonus Program."

Plaintiffs also argue that RBC seeks "an end-run around issue preclusion" by arguing the
WAP at issue here constitutes a "bonus program" under 29 C.F.R. § 2510.3-2(c).  PMSJ at 14.
But the only support they offer for this assertion is *dicta* from the Fifth Circuit's ruling in
*Tolbert*, which, as addressed above, pertained exclusively to the November 1, 2008 WAP.  *Id.*
Thus, even if the Court were to credit the *Tolbert* court's discussion, this *still* would not represent
a holding on the "identical" question here, which pertains to the WAP in effect when Paul and
Buskirk left RBC in 2011 and 2012.  RBC would be entitled to assert this argument even if it *had*
argued directly in *Tolbert* that the November 1, 2008 WAP was a "bonus program."

Plaintiffs' Motion, however, concedes that RBC did not "litigate [this] defense in the
*Tolbert* case," also citing the Fifth Circuit's observation that RBC "never argued" to the district
court that the November 1, 2008 WAP was a "bonus program."  PMSJ at 14.  Though the Fifth

---

[7] *Compare* PMSJ at 12 *and* Pls.' Ex. 26 (outlining the four express WAP terms at issue in *Tolbert* and upon which plaintiffs rely here), *with* Pls.' Ex. 11 § 1.1 (referring to the "new WAP" as a "nonqualified deferred compensation plan" allowing employees to "defer receipt of a portion of their compensation until specific in-service or post-employment distribution dates"); *id.* § 2.2 (allowing for the election of voluntary deferrals); *id.* § 4.2 (including the same accelerated vesting provision under certain specified conditions); *id.* § 5.2(b) (including provision for distributions upon a qualified "Retirement," meaning satisfying the "Rule of 60," *see* § 1.2 (Definitions)).

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
PAGE 10

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

Circuit nevertheless chose to address this question, its discussion of an argument it already acknowledged RBC never made does not render the issue "actually litigated."  And it certainly does not establish the issue was "identical" to RBC's arguments here.  *See* DMSJ at 12.[8]

Moreover, although plaintiffs posit that RBC chose not to make this argument in *Tolbert* because it was "meritless," RBC's position in both lawsuits fits hand-in-glove with the principles above.  That is, RBC did not argue directly in *Tolbert* that the WAP was a "bonus program" precisely *because* the WAP operated differently under the November 1, 2008 Plan than it did in 2010 and 2011.  In 2009, certain WAP awards were made as matching contributions tied, in part, to a participant's own voluntary deferrals into the WAP.  DMSJ at 6.  Although RBC sees no material difference between a "matching contribution" and a "bonus"—in both instances, RBC pays money for work performed, based on an FC's production—it argued that even if the 2009 WAP was not a "pure" bonus program (because it required voluntary contributions to receive such bonuses), the rationale of the DOL regulation should apply equally.  *See id.* at 17.

Material changes to the way RBC administered the WAP in 2010 and 2011, however, removed any doubt that the WAP in those years was, in fact, a "bonus program."  RBC established "productivity" and "loyalty" bonuses; it decoupled such bonuses from participants' voluntary deferrals (*i.e.*, eliminated "matching contributions"); and it removed "mandatory contributions" for other non-FC employees.  DMSJ at 7.  As a result, an employee could participate in the WAP *exclusively* to receive bonuses.  The impact of these changes illustrates both that (1) the issues in the two cases are far from "identical," and (2) the Court cannot mechanically extend the reasoning in *Tolbert* to issues that court did not resolve.

For these reasons, RBC is not precluded from raising its defenses that the WAP at issue here is not a "pension plan" governed by ERISA, and the Court should proceed to the merits.

---

[8] *See, e.g.*, *Eureka Fed. Sav. & Loan Ass'n v. Am. Cas. Co. of Reading, Pa.*, 873 F.2d 229, 233 (9th Cir. 1989) (affirming collateral estoppel did not apply because second lawsuit concerned an argument the court did not hear in the first); *Duran v. AT&T Corp.*, 2001 WL 1334280, at *7 (S.D. Ohio Aug. 22, 2001) ("If an issue is not argued, or though argued is ignored by the court, or is reserved, the decision does not constitute a precedent to be followed.").

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
PAGE 11

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

**B.      The WAP Was Not A Pension Benefit Plan Under ERISA.**

1      Turning to the merits—and assuming the Court correctly declines plaintiffs' invitation to

2    blindly adopt the Fifth Circuit's ruling in *Tolbert* without "independent analysis," *see* PMSJ at

3    15-16—RBC's Motion explains in detail why the WAP is not the type of benefit program

4    ERISA was designed to regulate and, therefore, why plaintiffs cannot meet their burden of

5    establishing the WAP was a "pension benefit plan."  *See* DMSJ at 12-14.  RBC incorporates

6    these arguments by reference and focuses on the specific arguments raised by plaintiffs' Motion.

7    Ultimately, however, plaintiffs' Motion fails for the same reasons RBC's Motion should be

8    granted: (1) the WAP was not designed to "provide retirement income"; (2) the WAP constituted

9    an exempt "bonus program" under DOL regulations; and (3) regardless, the WAP did not require

10    that *any* WAP awards be paid out upon separation or retirement; just the opposite, distributions

11    were made in-service unless a participant expressly chose otherwise.

12          **1.      Plaintiffs Do Not Argue That The WAP "Provides Retirement Income."**

13      Plaintiffs' Motion does not contend that the WAP "provides retirement income to

14    employees" for purposes of 29 U.S.C. § 1002(2)(A)(i).  *See* PMSJ at 16, 20 (arguing only that

15    the WAP "results in" deferral of income to retirement or separation).  For good reason, as the

16    Ninth Circuit is clear that to satisfy this provision, a plan must be "designed or intended" to do

17    so, *Rich*, 823 F.3d at 1210-11, while it and other courts have uniformly held that plans designed

18    to award or retain employees are not governed by ERISA, *see* DMSJ at 14-15 (collecting cases).

19      As RBC's Motion explains, the WAP's primary purpose was to attract and retain

20    valuable employees by awarding bonuses and other incentives subject to specified vesting

21    periods.  DMSJ at 15.  RBC offered the WAP over and above its retirement programs, and it was

22    integral to RBC's retention efforts.  *Id.*  The WAP never required taking any distribution upon

23    termination, but instead merely afforded some WAP participants the option of doing so.  Even

24    the Fifth Circuit in *Tolbert* agreed the November 1, 2008 WAP "was not designed to provide

25    retirement income, considering, for example:  the WAP's statement of purpose (announcing the

26

goal of allowing 'employees to share in [RBC's] growth and profitability') and the *de facto* distribution date (immediately upon vesting)."  758 F.3d at 624; *see also* DMSJ at 14-15.

### 2.      The WAP Is A "Bonus Program" Under DOL Regulations.

Thus, if the WAP was an ERISA "pension plan," plaintiffs must establish that, "by its express terms or as a result of surrounding circumstances," the WAP "result[ed] in a deferral of income" until retirement or termination for purposes of 29 U.S.C. § 1002(2)(A)(ii).

Here, however, the WAP was an exempt "bonus program."  *See* 29 C.F.R. § 2510.3-2(c). RBC's Motion outlines this argument, DMSJ at 15-18, and plaintiffs' Motion largely concurs with the legal framework, *see* PMSJ at 22.  That is, the parties agree the DOL regulation defines a "bonus program" simply as "payments to employees 'as bonuses for work performed.'"  *Id.* Plaintiffs also identify several factors pertaining to this question, including the "express purpose of the plan," whether RBC "has discretion to award the benefits," and whether the "bonus is for work performed."  *Id.*[9]  They further concede that plans with "the explicit purpose of providing bonuses or aligning employee and corporate interests may be considered bonus plans."  *Id.*

And yet, despite volumes of evidence to the contrary, plaintiffs argue that "contributions to the WAP *were not* performance rewards"; that the WAP *did not* "provid[e] bonuses or align[] employee and corporate interests"; and that "there is *no support* in the . . . materials discussing the WAP for the proposition that the purpose of the WAP was to provide participants performance rewards, or to serve as employee incentives."  PMSJ at 22-24 (emphases added). These assertions are patently incorrect, as evidenced by plaintiffs' own Motion and exhibits, not to mention the fact that RBC paid *them* substantial bonuses into the WAP.  *Id.* at 8.

Plaintiffs cannot reasonably dispute that the WAP was designed to reward performance and served as RBC's primary vehicle for paying bonuses to valuable employees.[10]  The WAP's

---

[9] The remaining three factors plaintiffs list pertain not to whether a plan is a "bonus program" in the first instance, but whether it is nevertheless covered by ERISA because it "systematically defers" the awards to the termination of employment.  *See* PMSJ at 22.  This is a separate analysis, as addressed below and in RBC's Motion (at 19).

[10] In fact, in the same paragraph in which plaintiffs argue there is "no support" for finding that the WAP provided "performance awards," plaintiffs assert that the "*performance rewards*" payable into the WAP were "not discretionary"; that WAP "*bonuses* were calculated on a formulaic basis"; that WAP participants were "*award[ed]* . . . a certain percentage of their annual *production*"; that the "productivity *bonus*" paid via the WAP

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
PAGE 13

1  introduction states that it allows eligible employees an opportunity "to share in the Company's

2  growth and profitability, if any," *see* Pls.' Ex. 10 § 1.1, belying the assertion that the Plan did not

3  "align[] employee and corporate interests," PMSJ at 22.  Elsewhere the WAP provides that

4  "whether and the extent to which" participants may receive certain awards "may vary with

5  certain *performance-based* measures established" by RBC, or "such other *performance* factors as

6  determined by the [WAP] Committee."  Pls.' Ex. 10 § 2.6.  It goes on to provide that such

7  awards "will be based on a *performance* grid approved annually by the Committee[.]"  *Id.*

8         Consistent with these express WAP terms, RBC directly tied the available WAP bonus

9  awards—and, for that matter, eligibility to participate in the WAP in the first place—to the

10  amount of *production* FCs achieved over the prior fiscal year.  *See* DMSJ at 3-4.[11]  Employees

11  had to re-qualify for the WAP every year—itself an incentive to maximize performance—and

12  the amount of WAP awards grew as performance increased.  *See* PMSJ at 24; Pls.' Ex. 1 at 95

13  (describing productivity and loyalty bonuses, stating that "[t]he higher production, the higher the

14  contribution is to the plan").  And Paul and Buskirk were awarded a total of more than $1 million

15  in bonuses from RBC from 2007 and 2012 alone.  DMSJ at 16.  Plaintiffs are complicating a

16  fairly simple question:  Does the WAP provide for payments to employees as "bonuses for work

17  performed"?  It plainly does, and therefore those payments "*shall not*" be included within

18  ERISA's definition of a "pension plan."  29 C.F.R. § 2510.3-2(c).[12]

19  _____

20  was within a certain range; that the "productivity *bonuses* [were] based on level of production"; and that "loyalty *bonuses* [were] based on production and years of service."  PMSJ at 23-24 (emphases added).

21  [11] Likewise, plaintiffs' own exhibits establish that the WAP paid bonuses to reward performance.  *See, e.g.*, Pls.' Ex.

22  4 at 7-8 (eligible FCs are "rewarded with a WAP productivity bonus," the amount of which "depend[s] on production level"); *id.* at 9 (describing RBC's matching contributions as a "further reward[] . . . for productivity and length of service"); Pls.' Ex. 28 at 2 (describing the "WAP Bonus" for Regional and Complex Directors as "allow[ing] your company contributions into WAP to be directly tied to your personal performance and increasing

23  complex net revenue as your CD compensation target potential increases with revenue").

24  [12] Plaintiffs are also incorrect that WAP bonuses were "not discretionary."  PMSJ at 23.  Indeed, plaintiffs carefully avoid acknowledging that RBC retains *complete* discretion over whether to pay such bonuses, in what amounts, and

25  subject to what vesting periods—and that RBC in fact modified these terms over the years at issue.  *See* DMSJ at 6-7.  Instead, plaintiffs contend that such bonuses were not determined *individually* each year, but rather were set

26  based upon a participant's level of production.  PMSJ at 23-24.  Putting aside that this contradicts their position that these were not "performance awards," RBC determined, for each year, what those awards would be and in what form they would be paid.  There is no reason to create a requirement that a "bonus" must be individually determined for it to constitute a "bonus," and other courts have had no problem applying the "bonus program" regulation to

Plaintiffs' authorities do not suggest otherwise. Several of their cases actually support RBC, as they apply the DOL regulation to "deferred compensation" plans where a purpose of those plans, like the WAP, was "to incentivize employee performance." *See* DMSJ at 17 & n.17 (citing, *inter alia*, *Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929 (8th Cir. 1999); *Houston v. Saracen Energy Advisors, LP*, 2009 WL 890384 (S.D. Tex. Mar. 27, 2009)). The only other cases plaintiffs cite are inapposite. For example, *Holzer v. Prudential Equity Group LLC*, 458 F. Supp. 587 (N.D. Ill. 2006), resolved a Rule 12 motion to dismiss, meaning the court considered only the plan document in evaluating whether plaintiffs stated a viable claim.[13] More importantly, the defendants in *Holzer* did not even argue that the plan in question was a "bonus program," given that "everyone within certain classes of employees is allowed . . . to participate," and awards were "not granted to certain employees as performance awards." *Id.* at 591 (emphasis added). But granting "performance awards" is precisely what the WAP did.

In contrast to plaintiffs' dearth of case law, RBC's Motion cites numerous cases applying the "bonus program" regulation to various "deferred compensation" or "deferred income" arrangements similar to the WAP. DMSJ at 17 & n.17. RBC's Motion also addresses the Eighth Circuit's ruling in *Emmenegger* in detail, given the similarities to the WAP (*id.* at 18), but a ruling by a sister court in this Circuit is also instructive. *See Callan*, 2010 WL 3452371. *Callan* considered a deferred compensation plan for Merrill Lynch financial advisors. Like the WAP, "criteria for Awards [under that plan] will be established periodically" by Merrill Lynch, though generally are "stated as an amount equal to a percentage of achievement against established goals[.]" *Id.* at *8. Like the WAP, the Merrill Lynch plan sought to "award top performing employees and provide financial incentive for employees to remain with Merrill Lynch and improve their performance there." *Id.* Like the WAP, the plan in *Callan* "left to the sole discretion of Merrill Lynch" the details of how "to calculate or determine the benefits of the

---

similar plans. *See, e.g.*, *Callan v. Merrill Lynch*, 2010 WL 3452371, at *8-9 (S.D. Cal. Aug. 30, 2010) (applying bonus program regulation to deferred compensation plan for financial advisors based on their production).

[13] In a subsequent ruling, the *Holzer* court made clear that, "as I held in ruling on defendants' motion to dismiss, I cannot yet determine whether the Plan is governed by ERISA." 520 F. Supp. 2d 922, 927 (N.D. Ill. 2007).

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
PAGE 15

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

plan." *Id*. And like the WAP, "no employee is guaranteed awards under the [Merrill Lynch plan]; he or she is given awards only according to the company's assessment of his or her contribution to the financial well-being of the company." *Id*. Applying the DOL regulation, the court found the Merrill Lynch plan was not subject to ERISA—and it did so despite that plan awards were subject to an eight-year vesting schedule (three years longer than the WAP for FCs); contained a "Rule of 65" provision allowing participants to accelerate vesting and receive payouts upon "retirement" (five years nearer to *actual* retirement age than the WAP's "Rule of 60"); and allowed distributions for up to ten years after such "retirement." *Id.* at *1.

In actuality, it appears plaintiffs' position is that the WAP is not a "bonus program" not because it failed to pay "bonuses for work performed," but rather because it did not do so *exclusively*. *See* PMSJ at 22. Plaintiffs cite no authority for imposing such a requirement. As noted, the regulation states only that ERISA's definition of a "'pension plan' shall not include *payments made* . . . as bonuses for work performed[.]" 29 C.F.R. § 2510.3-2(c) (emphasis added). The only relevant question, therefore, is whether RBC made "payments" to employees into the WAP "as bonuses for work performed." It clearly did.

Regardless, even applying plaintiffs' unwritten "exclusivity" requirement, the WAP as administered in 2010 and 2011 did not tie RBC's bonus awards to *any* other WAP contribution. *See* DMSJ at 6. Stated differently, FCs who earned a productivity or loyalty bonus in 2010 or 2011, as Paul and Buskirk each did, could have participated in the WAP *solely* to receive those bonuses. *Id.* If the participant took those awards upon vesting, as was the default, then paying these bonuses would have been the Plan's exclusive function. Nor do plaintiffs explain anywhere why the opportunity to make *additional* voluntary deferrals should alter the outcome. Plaintiffs concede that those deferrals were 100% vested at all times, and they received every penny of their voluntary contributions when they left RBC. *See* PMSJ at 6; DMSJ at 8-9.

For these reasons, as well as those outlined in RBC's Motion, the WAP was a "bonus program" under 29 C.F.R. § 2510.3-2(c), and plaintiffs present nothing to suggest otherwise.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

### 3.    The WAP Did Not "Systematically Defer" Income To Retirement, Nor Does It "Result In" Such Deferrals, Which Occurred Only By Participant Choice.

Nothing about the WAP "systematically defers" payment of bonuses to the termination of employment.  29 C.F.R. § 2510.3-2(c).  And even if the bonus regulation does not apply, the WAP itself does not "result in" any such deferral, either by its "express terms" or its "surrounding circumstances."  29 U.S.C. § 1002(2)(A)(ii).  Under either formulation, it is undisputed that all WAP participants were free to use the Plan as they saw fit, and deferrals until retirement only "resulted" from the participant's choice, not the design or operation of the WAP.

As explained in RBC's Motion, there should be no practical difference in evaluating whether the WAP's express terms or surrounding circumstances "result in" a deferral until termination (for purposes of 29 U.S.C. § 1002(2)(A)(ii)), and whether "income" that happens to take the form of a "bonus" is "systematically deferred" to termination of employment (for purposes of 29 C.F.R. § 2510.3-2(c)).  The question in both instances remains whether the *plan* at issue causes or compels deferrals to be paid at retirement as a matter of course.  DMSJ at 19.

According to the Ninth Circuit, the "paramount consideration" in this determination is whether the WAP's "primary purpose" was "to provide deferred compensation or other retirement benefits."  *Rich*, 823 F.3d at 1210.[14]  Thus, courts have held unanimously that an ERISA "pension plan" does not arise simply because compensation "*can* be deferred" until after an employee retires, *id.* at 1211, nor does a pension plan exist where post-termination payments are "incidental" to the primary purpose of the plan, occur by mere "happenstance," or result only from the passage of time, *see* DMSJ at 20.  Accordingly, the DOL has repeatedly advised that a plan does not fall within ERISA unless it *conditions* distributions upon retirement or termination, *id.* at 20, and it is therefore the "design of the plan at issue"—and "not the individual

---

[14] Plaintiffs contend the Ninth Circuit's ruling in *Rich* "specifically endorsed the Fifth Circuit's approach in *Tolbert*, holding up the WAP as an example of an employee pension benefit plan."  PMSJ at 15.  This is an overstatement, at best, of the *Rich* court's reference to *Tolbert*.  As RBC's Motion explains (at 17 n.18), the Ninth Circuit simply noted the Fifth Circuit's reliance on the WAP's description as a "deferred compensation plan" and its provision "for the deferral of compensation."  *Id.*  Not only is this a far cry from "holding up the WAP as an example" of a pension plan, but whether the WAP allowed for the "deferral of compensation" is only half of the equation.  The relevant question is whether such deferral was required *until termination or retirement*—and the Ninth Circuit went on to cite with approval the Eighth Circuit's conclusion that "the mere possibility that income *can* be deferred does not mandate ERISA coverage."  823 F.3 at 1211.  That "mere possibility" is all that the WAP afforded participants.

participants' intended use of the proceeds"—that matters, *Houston v. Aramark Corp.*, 112 F. App'x 132, 136 (3d Cir. 2004); *see* DMSJ at 21.  Applying these principles, neither the WAP's "express terms" nor "surrounding circumstances" bring it within ERISA's coverage.

### a. The WAP's "Express Terms" Do Not Establish A Pension Plan.

Plaintiffs' Motion does not dispute that some participants were required to take their WAP awards promptly upon vesting (*without* the option of deferring further), while everyone else did so by default, absent a written election to the contrary.  DMSJ at 5.  The only way a participant would defer WAP awards to retirement or termination is by choice, not operation of the Plan—and nothing in the actual text of the WAP plan document stipulates otherwise.

Nonetheless, plaintiffs argue that the WAP's "express terms" should be deemed to "result in" the deferral of compensation to termination based upon the same flawed reasoning used by the Fifth Circuit in *Tolbert*.  *See* PMSJ at 16.  In fact, plaintiffs concede that the *sole* grounds for the Fifth Circuit's decision were the same handful of WAP provisions RBC addressed in its Motion (at 21-22), noting that "[t]hese express terms—and *these express terms alone*—are what the Fifth Circuit relied upon in finding that the WAP is an ERISA-covered pension plan."  *Id.* at 12.  Specifically, plaintiffs here rely upon the following WAP provisions:

(1) "[T]he first sentence of the 'Introduction' section," which "defines the WAP as a 'deferred compensation plan.'"  *Compare* PMSJ at 12, *with id.* at 18.
(2) "The 'Vesting' section," which "provides that contributions 'immediately vest in full upon the Separation of a Participant.'"  *Id.*
(3) "[T]he 'Distribution' section," which "provides that forms of distribution include 'a single lump sum or, if a Participant meets the requirements for Retirement at the time of Separation, substantially equal installments for up to ten years.'"  *Id.*

Plaintiffs are correct that these are the only provisions upon which the Fifth Circuit based its ruling.  But that fact is precisely why the Fifth Circuit's reasoning is incorrect.  DMSJ at 21-22.

To begin, whether the WAP is described as a "deferred compensation" plan or allows the deferral of compensation *at all* is not the relevant question.  RBC has not disputed that the WAP results in the deferral of compensation—after all, to "defer compensation" simply means to earn income on one date and receive it on another.  This is true of any "bonus" payment, performance

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
PAGE 18

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 60605-1596
+1.312.324.1000

award, or other income subject to a vesting schedule or delayed distribution—and it was true of the plans in most of the cases finding such plans are not governed by ERISA. *See* DMSJ at 17 (collecting cases equating "bonus programs" with "deferred compensation" and/or finding "deferred compensation" programs not subject to ERISA). In fact, plaintiffs' own descriptions of the cases they cite concede as much.[15] Rather, the critical question is whether the WAP's express terms "result[] in" deferrals *to retirement or termination.* 29 U.S.C. § 1002(2)(A).

Moreover, the WAP's accelerated vesting and distribution provisions do not address that question. Rather, these provisions accelerate the vesting and payment of benefits that would not otherwise be paid until a later date (if at all), thus *reducing* the deferral period. As explained in RBC's Motion, these provisions do not reflect an intention or design to *defer* such awards *to* separation. Rather, this is the very sort of "incidental" payment that might occur when an employee receives awards subject to vesting, but then leaves or retires before those awards vest. *See* DMSJ at 20. Stated another way, FCs receiving awards under these provisions were simply allowed to accelerate the deferral period in order to receive funds they would have otherwise forfeited upon leaving RBC, in exchange for satisfying the conditions of the WAP. And if these participants had no unvested WAP awards, the provisions plaintiffs cite would not apply at all.

Thus, the Fifth Circuit's decision runs headlong into the principle that no "pension plan" arises simply because payment happens to occur after termination. There is no conceptual difference in this situation from a participant in a phantom stock program (as in *Emmenegger*) or a "deferred bonus" program (as in *Callan*) who receives an award in the final few years of employment, but cannot take those awards until after leaving the employer. In both instances, the fact that awards may be paid after separation is based on timing, not the function or design of

---

[15] For example, plaintiffs attempt to distinguish the WAP from plans found not to be governed by ERISA by arguing that although the latter plans "*do provide* for deferred compensation," it is "for only a short number of years," and describe one such case as "contain[ing] a provision for deferred compensation," while another "provided for deferred compensation for a fixed deferred period of 4 to 8 years"). PMSJ at 17-18. Plaintiffs also cite the Eighth Circuit's ruling in *Emmenegger*, 197 F.3d 929, arguing the plan in that and other cases "generally do not contain terms for providing deferred compensation." PMSJ at 17. But as RBC's Motion explained (at 17-18), this is precisely what the plans at issue in *Emmenegger* and other cases did.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

1  the plans.  And for these reasons, courts have repeatedly held that similar accelerated vesting or

2  payment provisions do not result in ERISA coverage.[16]

3      None of plaintiffs' authorities holds to the contrary.  In fact, plaintiffs tacitly concede that

4  they, like RBC, have located no case holding that the mere *option* to keep money in a plan until

5  an employee leaves automatically establishes an ERISA pension plan.  Instead, plaintiffs ask the

6  Court to apply cases holding that plans with a default *retirement* distribution do not avoid ERISA

7  coverage simply because they provide an option of "withdrawing funds pre-retirement."  PMSJ

8  at 16-17 (citing *In re Meinen*, 228 B.R. 368 (Bankr. W.D. Pa. 1998); *Darden v. Nationwide Mut.*

9  *Ins. Co.*, 922 F.2d 203 (4th Cir. 1991), *rev'd on other grounds*, 503 U.S. 318 (1992)).  But these

10  cases underscore why the inverse structure in the WAP is a critical fact compelling a different

11  result.  In *Meinen*, default payouts were at retirement; the plan limited the amount of in-service

12  benefits a participant could take; and it imposed penalties for doing so.  *See* 228 B.R. at 381.

13  Similarly, in *Darden*, the benefits under the plan were payments into an annuity that would

14  provide an income stream in retirement, although it had an early retirement provision allowing a

15  participant to receive "early *reduced* deferred compensation benefits at his termination upon

16  reaching the age of 50[.]"  922 F.2d at 207 (emphasis added).  By contrast, the WAP designated

17  that awards automatically would be paid out *before* retirement—with no penalty—unless a

18  participant affirmatively chose otherwise.  DMSJ at 5.  Just as offering the mere option to take a

19  default retirement benefit early does not negate a "pension plan" under ERISA, neither should

20  the mere option of voluntarily deferring a default in-service award *create* one.

21      Finally, plaintiffs pepper their discussion of the WAP's "express terms" with other

22  "surrounding circumstances," such as how RBC supposedly "marketed" the Plan and the alleged

23  distribution elections WAP participants made over time.  PMSJ at 19-20.  These facts are not

24  relevant to the inquiry of whether the WAP's "express terms" caused participants to defer

25  income to termination.  Rather, they are part of a separate analysis addressed below.

26

---

[16] DMSJ at 23 n.24 (collecting cases finding no pension plan despite accelerated vesting or distribution provisions).

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

### b.      The "Surrounding Circumstances" Do Not Establish A Pension Plan.

1    Because the Fifth Circuit based its decision solely on the WAP's "express terms," it

2    never reached the question of whether the WAP systematically deferred income to retirement or

3    separation, or "result[ed] in" such deferrals, as the result of "surrounding circumstances."  *See*

4    758 F.3d at 626 n.5; 29 U.S.C. § 1002(2)(A)(ii).  The *Tolbert* district court, however, carefully

5    considered and rejected nearly identical arguments to those plaintiffs now re-hash here, and this

6    Court should do the same.  2013 WL 3503286, at *10-13.

7    Despite that a plan's "express terms" do not condition payments upon retirement or

8    separation, it may still constitute a "pension plan" if it is operated or administered so as to cause

9    such distributions.  Thus, the DOL has advised that a plan "might" be a pension plan as a result

10   of surrounding circumstances "if distributions under the [p]lan are skewed towards the last years

11   of participants' careers," DOL Op. Ltr. 81-27A, 1981 WL 17748, at *3, or "if an employer . . .

12   prevents or discourages participants' requesting or receiving [pre-termination distributions],"

13   DOL Op. Ltr. 90-17A, 1990 WL 263441, at *2.  Here, however, the undisputed facts belie any

14   suggestion that RBC was tipping the scales in favor of retirement income or distributions.

15   Plaintiffs do not even argue that circumstances like those the DOL identified exist here.

16   *See* DMSJ at 23-24.  Instead, plaintiffs base their position on three "circumstances": (1) the

17   WAP "provide[d] the opportunity to elect to defer distributions until after [participants] leave

18   RBC"; (2) the WAP's "marketing materials" and "administration" suggested the Plan could be

19   used to save for retirement, if a participant so desired; and (3) "[a]t least in some years, over 50

20   percent of WAP assets were allocated for distribution in retirement or after separation from

21   employment."  PMSJ at 21.  None of these facts, however, establish that the WAP's

22   "surrounding circumstances" resulted in conditioning distributions upon retirement or separation.

23   *First*, that the WAP offered the *opportunity* to defer compensation to the termination of

24   employment is not a "surrounding circumstance."  It is an "express term" of the WAP, and such

25   an option is not sufficient to establish an ERISA "pension plan" for the reasons above.  *See also*

26   DMSJ at 21.  Rather, the pertinent question is whether the Court can glean from "surrounding

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
PAGE 21

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

circumstances" that, notwithstanding the default in-service distribution, RBC administered the WAP so as to implicitly require post-termination payouts, either because they were skewed until that time (*e.g.*, by imposing a 20-year vesting period), or RBC prevented, penalized, or dissuaded participants from taking their WAP awards in-service.  In other words, whether participants were compelled to take the "opportunity" the WAP provided.

Here, WAP distributions were not "skewed towards the last years of participants' careers," as they became payable annually on a rolling basis as the awards vested.[17]  Although the WAP allowed some participants the option of keeping their awards in the Plan, this was not a result compelled by the "operation or administration of the [WAP]."  *See, e.g.*, DOL Op. Ltr. 84-12A, 1984 WL 23427, at *2 (a plan might be a pension plan if its "operation or administration" resulted in deferral of income extending to termination).  To the contrary, the WAP was designed and operated such that distributions were presumptively made *before* termination, meaning any consequent payment at retirement was caused by each participant, not the WAP itself.

*Second*, plaintiffs' characterizations of the way in which RBC purportedly "market[ed]" the WAP are inaccurate and incomplete.  To start, an employer's own characterizations of a plan do not dictate its legal status under ERISA.[18]  Rather, these types of "surrounding circumstances" are relevant only insofar as they had actual *consequences*—either skewing distributions until retirement, discouraging or penalizing participants from taking distributions in-service, or something else from which the Court can infer that despite the lack of "express terms" requiring post-termination payouts, the "surrounding circumstances" actually were compelling them. *Supra* at 21.  Thus, plaintiffs' citation to just two *internal* presentations using the word

---

[17] Thus, any RBC employee who qualified for the WAP each year would *always* have some amount of unvested awards in the Plan.  For example, someone who participated in the WAP for 10 consecutive years would have—and may have already received distributions of—five years of vested awards, while her awards from year six would vest this year, her awards from year seven would vest in two years, and so on.

[18] *See McCloone v. Intel Corp.*, 1 F. App'x 715, 716 (9th Cir. 2001) (despite that communications "unfortunately might give lay employees the impression that all benefits are covered by ERISA, the impression conveyed to laypersons does not establish whether ERISA coverage exists"); *MDPhysicians & Assocs., Inc. v. State Bd. of Ins.*, 957 F.2d 178, 183 n.7 (5th Cir. 1992) ("ERISA protection and coverage turns on whether the [plan] satisfies the statutory definition . . . , not whether the [employer] . . . intended ERISA to govern").

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
PAGE 22

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

"retirement" in reference to the WAP—out of dozens of similar materials and thousands of pages RBC produced—is immaterial, even if those documents were not contradicted by the vast majority of other evidence.  PMSJ at 4 (citing Exs. 14 and 15).

But those isolated references stand in stark contrast to the wealth of evidence establishing that RBC offered the WAP as a flexible plan that participants could use however they liked.  *See* DMSJ at 2-7; Pls.' Exs. 13 & 28 (both describing the WAP as "a simple plan which gives you freedom and flexibility to manage your cash flows[.]"); *see also Tolbert*, 2013 WL 3503286, at *13 ("In none of the communications referenced by plaintiffs did RBC encourage, much less require, participants to defer receipt of their WAP benefits until retirement or termination, or discourage participants from taking their benefits on an in-service basis.").

In fact, the only actual participant communication plaintiffs cite states that the WAP "offers [FCs] the significant opportunity to build long-term wealth."  PMSJ at 19-20 (citing Ex. 4).  But this says nothing about retirement or when a participant may *receive* any "long-term wealth" they might accumulate.  Rather, it suggests precisely why participation in the WAP was a valuable benefit in and of itself:  the opportunity to defer awards that would otherwise be taxed immediately, thereby earning tax-deferred growth.  *Cf. Tolbert*, 2013 WL 3503286, at *6 (finding "no supporting authority holding that" a purpose of "'support[ing] long-term savings' is equivalent to 'provid[ing] retirement income'").  For the same reasons, plaintiffs' argument that RBC maintained a nebulous "finishing well" campaign is immaterial.  *See* PMSJ at 3-4.  RBC has never disputed that a primary purpose of the WAP was to retain valuable FCs and other key employees.  Thus, the notion that RBC told these employees it preferred that they finish out their careers at RBC, rather than leave and take their clients with them, is unremarkable.  *See, e.g.*, Pls.' Ex. 4 at 2 ("It is our desire for RBC Wealth Management to become *the* place where experienced [FCs] want to conduct their business.  You've chosen to build your business here, and we hope you stay and finish well here."); *see also Tolbert*, 2013 WL 3503286, at *12 (rejecting plaintiffs' reliance on the "Finishing Well Strategy").

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

*Third*, plaintiffs do not establish that the *effect* of the "surrounding circumstances" they cite was to compel the deferral of benefits until retirement. Indeed, plaintiffs themselves received more than $1 million in in-service payouts between 2007 and 2011 alone. DMSJ at 8. If "surrounding circumstances" were influencing WAP participants to such a degree that the WAP should be deemed a *de facto* "pension plan," plaintiffs clearly were not getting the message. And they were not alone, as the plaintiffs in *Tolbert* took in-service payouts "during their employment for reasons unrelated to retirement planning," including to finance their children's college educations. 2013 WL 3503286, at *13. In fact, a majority of WAP participants—between 51 and 66 percent—were scheduled to receive in-service distributions of WAP awards in each year between 2007 and 2011. DMSJ at 5 (citing Ex. F) The WAP participants' actual use of the Plan, therefore, belies plaintiffs' assertion that the "surrounding circumstances" they cite actually required or "result[ed] in" post-termination distributions.[19]

Ultimately, plaintiffs cite nothing to suggest RBC put its thumb on the scale in favor of post-termination payouts from the WAP. Just the opposite, the WAP called for in-service distributions unless participants expressly elected otherwise; RBC told participants the WAP served as a flexible plan they could use however they wanted; and the evidence establishes that participants, including both Paul and Buskirk, did exactly that.

## IV.   CONCLUSION

For the above reasons, as well as those set forth in RBC's Motion for Summary Judgment, the Court should deny plaintiffs' motion for partial summary judgment, grant summary judgment in RBC's favor on all counts, and dismiss this action with prejudice.

---

[19] Plaintiffs' argument that more than half of *all WAP assets* were designated for post-termination distributions in one of the several years in dispute (2007) misses the mark. PMSJ at 19, 21. To start, this fact pertains only to 2007, saying nothing about other years. More fundamentally, citing the percentage of total WAP *assets* is misplaced, for the simple reason that funds earmarked for payment at termination *remained* in the WAP until employees left RBC, while money chosen for in-service distribution was actually paid out. Naturally, a greater percentage of "all WAP assets" would be slated for termination; they are the only funds that stay in the Plan. Thus, the better indicator of how WAP participants actually utilized the Plan is the percentage of *participants* making in-service elections in each year. Indeed, plaintiffs' Motion omits that the very exhibit they cite states that in 2007, 57 percent of WAP *participants* elected in-service distribution for at least some part of their WAP contributions. Pls.' Ex. 27 ¶ 12.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

1    DATED: October 20, 2017          Respectfully submitted,

2

3                                   By: /s/ *Matthew A. Russell*
                                     Matthew A. Russell

4

5                                      Sari M. Alamuddin (*admitted pro hac vice*)
                                       sari.alamuddin@morganlewis.com

6                                      Christopher J. Boran (*admitted pro hac vice*)
                                       christopher.boran@morganlewis.com

7                                      Matthew A. Russell (*admitted pro hac vice*)
                                       matthew.russell@morganlewis.com

8                                      MORGAN, LEWIS & BOCKIUS LLP
                                     77 West Wacker Drive, 5th Floor

9                                      Chicago, Illinois 60601
                                     312.324.1000 (Telephone)

10                                     312.323.1001 (Facsimile)

11                                     Kevin J. Hamilton (WSBA #15648)

12                                     William B. Stafford (WSBA #39849)
                                    Perkins Coie LLP

13                                     1201 Third Avenue, Suite 4900
                                    Seattle, WA 98101-3099

14                                     206.359.8000 (Telephone)
                                    206.359.9000 (Facsimile)

15

16                                     *Attorneys for Defendants*

17

18

19

20

21

22

23

24

25

26

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

1

## <u>CERTIFICATE OF SERVICE</u>

2

      I hereby certify that on October, 2017, I electronically filed the foregoing Defendants'

3

Opposition to Plaintiffs' Motion for Partial Summary Judgment with the Clerk of the Court using

4

the CM/ECF system, which will send notification of such filing to all counsel of record.

5

6
                                /s/ *Matthew A. Russell*

                                Matthew A. Russell

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000