Honorable Ronald B. Leighton

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MARTY PAUL, an individual; and
BRIAN BUSKIRK, an individual,

                Plaintiffs,

     v.

RBC CAPITAL MARKETS, LLC, a
Minnesota limited liability company;
ROYAL BANK OF CANADA, a
Canadian corporation; and ROYAL
BANK OF CANADA US WEALTH
ACCUMULATION PLAN, an employee
benefit plan,

                Defendants.

No. 3:16-cv-05616-RBL

**DECLARATION OF ELIZABETH S. WEINSTEIN IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' RULE 56(D) MOTION**

NOTE ON MOTION CALENDAR:
October 20, 2017

**ORAL ARGUMENT REQUESTED**

I, ELIZABETH S. WEINSTEIN, declare as follows:

1.      I am one of the attorneys representing Plaintiffs Marty Paul and Brian Buskirk in this action. I make this declaration based on my personal knowledge and on records maintained by my firm with respect to the above-captioned matter.

2.      On September 13, 2017, Plaintiffs served on Defendants RBC Capital Markets and Royal Bank of Canada (collectively, "RBC") Plaintiffs' Third and Fourth Interrogatories and Plaintiffs' Fourth Requests for Production.

YARMUTH WILSDON PLLC
1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1    3.    On October 13, 2017, RBC served on Plaintiffs Defendants' Consolidated

2    Responses and Objections to Plaintiffs' Third and Fourth Interrogatories and Defendants'

3    Consolidated Responses and Objections to Plaintiffs' Fourth Requests for Production.

4    4.    Attached hereto as **Exhibit 1** is a true and correct copy of Defendants'

5    Consolidated Responses and Objections to Plaintiffs' Third and Fourth Interrogatories

6    dated October 13, 2017.

7    5.    Attached hereto as **Exhibit 2** is a true and correct copy of Defendants'

8    Consolidated Responses and Objections to Plaintiffs' Fourth Requests for Production dated

9    October 13, 2017.

10    6.    In certain interrogatories, Plaintiffs seek information related to what

11    percentage of WAP distributions each year were elected for in-service distributions versus

12    distributions at or after separation.  That information is related to the inquiry, under 29

13    U.S.C. § 1002(2)(A), of whether a plan "as a result of surrounding circumstances…(i)

14    provides retirement income to employees, or (ii) results in a deferral of income by

15    employees for periods extending to the termination of covered employment or beyond"

16    because it shows what portion of WAP assets provided or resulted in post-separation

17    income to employees.

18      a.    Interrogatory No. 7 seeks the percentage of WAP assets elected for in-

19           service distribution for each year 2005 to the present.  *See* Ex. 1 at 2.

20      b.    Interrogatory No. 8 seeks the percentage of WAP assets elected for

21           distribution after separation for each year 2005 to the present.  *See* Ex. 1

22           at 4.

23      c.    RBC responded that it "will undertake reasonable efforts to identify and

24           provide information responsive" to these interrogatories, "if it exists" for

25           each year 2005 to 2011.

26

YARMUTH WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

7.       In certain interrogatories and requests for production, Plaintiffs seek information and documents related to the composition of WAP funds by contribution type, *i.e.* Matching Contributions, Discretionary Contributions, Mandatory Deferred Compensation, and Voluntary Deferred Compensation.  That information is directly relevant to RBC's argument that the WAP is a bonus plan because it will show how much of the WAP is composed of contributions that could be characterized as bonuses, and how much of the WAP is composed of contributions that cannot be characterized as bonuses. Whereas Discretionary Contributions could be characterized as bonuses, Matching Contributions (made by RBC in an amount matching WAP participants' voluntary contributions), Mandatory Deferred Compensation (made by WAP participants) and Voluntary Deferred Compensation (made by WAP participants) cannot plausibly be characterized as bonuses.

        a.   Interrogatory No. 9 and Request for Production Nos. 98 and 99 seek information and documents related to Mandatory Deferred Compensation for each year 2005 to the present.  RBC responded that it "will undertake reasonable efforts" to identify and provide or produce responsive information and documents, "if it exists," for each year 2005 to 2011.

        b.   Interrogatory No. 10 and Request for Productions Nos. 100 and 101 seek information and documents related to Discretionary Contributions for each year 2005 to the present.  RBC responded that it "will undertake reasonable efforts" to identify and provide or produce responsive information and documents, "if it exists," for each year 2005 to 2011.

        c.   Interrogatory No. 11 and Request for Production Nos. 102 and 103 seek information and documents related to Mandatory Deferred Compensation for each year 2005 to the present.  RBC responded that it

YARMUTH WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1      "will undertake reasonable efforts" to identify and provide or produce

2      responsive information and documents, "if it exists," for each year 2005

3      to 2011.

4      d.   Interrogatory No. 12 and Request for Production Nos. 104 and 105 seek

5      information and documents related to Voluntary Deferred Compensation

6      from 2005 to the present.  RBC responded that it "will undertake

7      reasonable efforts" to identify and provide or produce responsive

8      information and documents, "if it exists," for each year 2005 to 2011.

9      e.   Request for Production No. 106 seeks documents showing the value of

10      all assets in the WAP for each year 2005 to the present.  RBC responded

11      that it "will undertake reasonable efforts to identify and provide

12      information responsive" to this interrogatory, if it exists, for each year

13      2005 to 2011.

14      8.     Attached hereto as **Exhibit 3** is a true and correct copy of Defendants' Reply

15 in Support of Their Motion for Summary Judgment filed on March 26, 2012 in *Tolbert v.*

16 *RBC Capital Markets Corp., et al.*, No. 4:11-CV-107 (USDC SD Tex.), and produced in

17 this matter by Defendants as RBC-PAUL000010100-27.

18      9.     Attached hereto as **Exhibit 4** is a true and correct copy of Defendants'

19 Motion for Summary Judgment and Brief in Support filed on January 26, 2012 in *Tolbert v.*

20 *RBC Capital Markets Corp., et al.*, No. 4:11-CV-107 (USDC SD Tex.), and produced in

21 this matter by Defendants as RBC-PAUL000009947-10001.

22      10.    Attached hereto as **Exhibit 5** is a true and correct copy of the Brief of

23 Defendants-Appellees filed on October 16, 2013 in *Tolbert v. RBC Capital Markets Corp.,*

24 *et al.*, No. 13-20213 (5th Cir.).

25      I declare under penalty of perjury of the laws of the United States of America that

26 the foregoing is true and correct.

DECL WEINSTEIN IN OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL SJ AND IN
SUPPORT OF PLAINTIFFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL – Page 4

YARMUTH WILSDON PLLC
1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1     Dated:  October 20, 2017, at Seattle, Washington.

2

3                        *s/Elizabeth S. Weinstein*

4                        Elizabeth S. Weinstein

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

YARMUTH  WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on this date, I electronically filed the foregoing document with

3  the Clerk of the Court using the CM/ECF system, which will send notification of such filing

4  to the following:

5  **PERKINS COIE LLP**
   Kevin J. Hamilton
6  William B. Stafford
   1201 Third Avenue, Suite 4900
7  Seattle, WA 98101-3099
   Email: khamilton@perkinscoie.com
8          wstafford@perkinscoie.com

9

10 **MORGAN, LEWIS & BOCKIUS LLP**
   Sari M. Alamuddin*, pro hac   vice*
11 Christopher J. Boran, *pro hac vice*
   Matthew A. Russell, *pro hac vice*
12 77 West Wacker Drive, Fifth Floor
   Chicago, IL 60601
13 Email: sari.alamuddin@morganlewis.com
           christopher.boran@morganlewis.com
14         matthew.russell@morganlewis.com

15
   *Attorneys for Defendants RBC Capital*
16 *Markets, LLC, Royal Bank of Canada, and*
   *Royal Bank of Canada US Wealth*
17 *Accumulation Plan*

18

19     I declare under penalty of perjury under the laws of the State of Washington that the

20 foregoing is true and correct.

21     Dated:  October 20, 2017 at Seattle, Washington.

22                                  *s/Sue Stephens*
                                    _____
23                                  Sue Stephens, Legal Assistant

24

25

26

DECL WEINSTEIN IN OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL SJ AND IN
SUPPORT OF PLAINTIFFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL – Page 6

714.01 rj200602 10/20/17



YARMUTH WILSDON PLLC
1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

# EXHIBIT 1

Honorable Ronald B. Leighton

1

2

3

4

5                                   UNITED STATES DISTRICT COURT
                                    WESTERN DISTRICT OF WASHINGTON
6                                              AT TACOMA

7    MARTY PAUL, an individual; and                    Case No. 3:16-cv-05616-RBL
     BRIAN BUSKIRK, an individual,
8                                                      DEFENDANTS' CONSOLIDATED
                          Plaintiff,                   RESPONSES AND OBJECTIONS TO
9                                                      PLAINTIFFS' THIRD AND FOURTH
                  v.                                   INTERROGATORIES
10
     RBC CAPITAL MARKETS, LLC, a
11   Minnesota limited liability company;
     ROYAL BANK OF CANADA, a
12   Canadian corporation; and ROYAL
     BANK OF CANADA US WEALTH
13   ACCUMULATION PLAN, an employee
     Benefit plan,
14
15                        Defendants.

16

17        Pursuant to Federal Rules of Civil Procedure 26 and 33, Defendants RBC Capital

18   Markets, LLC and the Royal Bank of Canada (collectively referred to as "Defendants"), by and

19   through their attorneys, Morgan, Lewis & Bockius LLP, provide the following objections and

20   responses to the Third and Fourth Interrogatories made by Plaintiffs Marty Paul ("Paul") and

21   Brian Buskirk ("Buskirk"), (collectively referred to as "Plaintiffs").[1]

22

23

24   _____
     [1] Plaintiffs issued a separate Third Interrogatory to Defendant Royal Bank of Canada and a Fourth Interrogatory to
25   Defendant RBC Capital Markets, which were identical except for the identity of the Defendant.  Therefore, with the
     consent of plaintiffs' counsel, Defendants have consolidated their responses and objections to each set of
26   Interrogatories into this single document.

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' THIRD AND FOURTH INTERROGATORIES
NO. 3:16-CV-05616-RBL - PAGE 1                                    MORGAN, LEWIS & BOCKIUS LLP
                                                                         77 W. Wacker Drive
DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND                              Chicago, IL 60601
                                                                          +1.312.324.1000
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 8

**GENERAL OBJECTIONS**

1.  Defendants object to these Interrogatories to the extent they seek attorney work product, information or communications protected by the attorney-client privilege or any other applicable privilege, confidentiality, or immunity provided by law, trial preparation materials, and/or information beyond the scope of Rule 26 of the Federal Rules of Civil Procedure.  The responses to these Interrogatories, or parts thereof, are not intended to be and shall not be deemed a waiver of the attorney-client privilege, the work product rule, or any other applicable privilege.

2.  Defendants object to these Interrogatories to the extent they attempt to alter or expand the requirements of the Federal Rules of Civil Procedure, the Court's Local Rules, or any other applicable law.

3.  Defendant's responses are based only upon such information and documents as are presently available to it.  Defendant's investigation is continuing, and it expressly reserves the right to supplement and/or amend its responses and objections to these Interrogatories as may be appropriate in light of additional information obtained in connection with its continuing investigation of this case, and to use such information in any hearing or proceeding.

**SPECIFIC OBJECTIONS AND RESPONSES TO THIRD AND FOURTH INTERROGATORIES**

**INTERROGATORY NO. 7:**

For each year from 2005 to the present, what percentage of all WAP assets were elected for in-service distribution?

**RESPONSE TO INTERROGATORY NO. 7:**

Defendants object to this Interrogatory on the grounds it is vague, ambiguous, overbroad, and not proportional to the needs of this case.  In particular, the phrase "all WAP assets" is unclear, vague, and ambiguous, particularly insofar as there are no "WAP assets" because the

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' THIRD AND FOURTH INTERROGATORIES
NO. 3:16-CV-05616-RBL - PAGE 2

MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive
Chicago, IL 60601
+1.312.324.1000

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 9

1   WAP is an unfunded plan in which participants have only notional accounts.  This Interrogatory

2   also is unclear as to what "WAP assets" it refers (for example, it may be read to refer to the total

3   outstanding WAP liabilities at a given point in time, the total "WAP assets" contributed in each

4   year referenced by this Request, or some other amount or information), further rendering this

5   Interrogatory unclear, overbroad, not relevant to any party's claim or defense in this matter, and

6   not proportional to the needs of the case.  Defendants further object to this Interrogatory on the

7   grounds that it seeks information that is overbroad, not relevant to any party's claim or defense

8   in this matter, and not proportional to the needs of the case.  In particular, Defendants object to

9   this Interrogatory to the extent it seeks the requested information after the WAP was frozen to all

10  new contributions as of January 1, 2012, as plaintiffs do not assert any claims with respect to

11  their participation in the WAP after January 1, 2012.  As such, identifying the information sought

12  by this Interrogatory is neither proportional to the needs of this case nor has any bearing upon the

13  parties' claims and defenses in this lawsuit.  Defendants further object to this Interrogatory to the

14  extent it purports to seek separate responses regarding each year from 2005 to the present and,

15  therefore, contains multiple discrete subparts.  Without waiving such objection, Defendants will

16  respond to this Interrogatory, but reserves the right to object to further interrogatories to the

17  extent they exceed the maximum number of interrogatories permitted by Fed. R. Civ. P. 33.

18      Subject to and without waiving the foregoing specific and general objections, Defendants

19  respond that they will undertake reasonable efforts to identify and provide information

20  responsive to this Interrogatory, if it exists, reflecting the percentage of the total assets

21  contributed to the WAP in each year from 2005 to 2011 for which participants elected an "in-

22  service" distribution.  By way of further response, Defendants also direct plaintiffs to paragraph

23  six of the January 25, 2012 declaration of Gabriella Sikich, provided in the matter of *Tolbert, et*

24  *al. v. RBC Capital Markets, Corp., et al.*, No. 4:11-cv-00107 (S.D. Tex.), which was produced in

25  this matter and sets forth the number and percentage of participants who elected to receive in-

26  service distributions of their WAP contributions in each year from 2007 to 2011.

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' THIRD AND FOURTH INTERROGATORIES
NO. 3:16-CV-05616-RBL - PAGE 3
DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 10

MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive
Chicago, IL 60601
+1.312.324.1000

1    **INTERROGATORY NO. 8:**

2         For each year from 2005 to the present, what percentage of all WAP assets were elected

3    for distribution after separation?

4    **RESPONSE TO INTERROGATORY NO. 8:**

5         Defendants object to this Interrogatory on the grounds it is vague, ambiguous, overbroad,

6    and not proportional to the needs of this case.  In particular, the phrase "all WAP assets" is

7    unclear, vague, and ambiguous, particularly insofar as there are no "WAP assets" because the

8    WAP is an unfunded plan in which participants have only notional accounts.  This Interrogatory

9    also is unclear as to what "WAP assets" it refers (for example, it may be read to refer to the total

10   outstanding WAP liabilities at a given point in time, the total "WAP assets" contributed in each

11   year referenced by this Request, or some other amount or information), further rendering this

12   Interrogatory unclear, overbroad, not relevant to any party's claim or defense in this matter, and

13   not proportional to the needs of the case.  Defendants further object to this Interrogatory on the

14   grounds that it seeks information that is overbroad, not relevant to any party's claim or defense

15   in this matter, and not proportional to the needs of the case.  In particular, Defendants object to

16   this Interrogatory to the extent it seeks the requested information after the WAP was frozen to all

17   new contributions as of January 1, 2012, as plaintiffs do not assert any claims with respect to

18   their participation in the WAP after January 1, 2012.  As such, identifying the information sought

19   by this Interrogatory is neither proportional to the needs of this case nor has any bearing upon the

20   parties' claims and defenses in this lawsuit.  Defendants further object to this Interrogatory to the

21   extent it purports to seek separate responses regarding each year from 2005 to the present and,

22   therefore, contains multiple discrete subparts.  Without waiving such objection, Defendants will

23   respond to this Interrogatory, but reserves the right to object to further interrogatories to the

24   extent they exceed the maximum number of interrogatories permitted by Fed. R. Civ. P. 33.

25        Subject to and without waiving the foregoing specific and general objections, Defendants

26

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' THIRD AND FOURTH INTERROGATORIES
NO. 3:16-CV-05616-RBL - PAGE 4

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 11

respond that they will undertake reasonable efforts to identify and provide information responsive to this Interrogatory, if it exists, reflecting the percentage of the total assets contributed to the WAP in each year from 2005 to 2011 for which participants elected a distribution upon separation. By way of further response, Defendants also direct plaintiffs to paragraph six of the January 25, 2012 declaration of Gabriella Sikich, provided in the matter of *Tolbert, et al. v. RBC Capital Markets, Corp., et al.*, No. 4:11-cv-00107 (S.D. Tex.), which sets forth the number and percentage of participants who elected to receive distributions of their WAP contributions upon separation in each year from 2007 to 2011.

**INTERROGATORY NO. 9:**

For each year from 2005 to the present, what percentage of all WAP assets were derived from Matching Contributions (as "Matching Contribution" is defined in the WAP)?

**RESPONSE TO INTERROGATORY NO. 9:**

Defendants object to this Interrogatory on the grounds it is vague, ambiguous, overbroad, and not proportional to the needs of this case. In particular, the phrase "all WAP assets" is unclear, vague, and ambiguous, particularly insofar as there are no "WAP assets" because the WAP is an unfunded plan in which participants have only notional accounts. This Interrogatory also is unclear as to what "WAP assets" it refers (for example, it may be read to refer to the total outstanding WAP liabilities at a given point in time, the total "WAP assets" contributed in each year referenced by this Request, or some other amount or information), further rendering this Interrogatory unclear, overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case. Defendants further object to this Interrogatory on the grounds that it seeks information that is overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case. In particular, Defendants object to this Interrogatory to the extent it seeks the requested information after the WAP was frozen to all new contributions as of January 1, 2012, as plaintiffs do not assert any claims with respect to

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' THIRD AND FOURTH INTERROGATORIES
NO. 3:16-CV-05616-RBL - PAGE 5
DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 12

MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive
Chicago, IL 60601
+1.312.324.1000

1  their participation in the WAP after January 1, 2012.  As such, identifying the information sought

2  by this Interrogatory is neither proportional to the needs of this case nor has any bearing upon the

3  parties' claims and defenses in this lawsuit.  Defendants further object to this Interrogatory to the

4  extent it purports to seek separate responses regarding each year from 2005 to the present and,

5  therefore, contains multiple discrete subparts.  Without waiving such objection, Defendants will

6  respond to this Interrogatory, but reserves the right to object to further interrogatories to the

7  extent they exceed the maximum number of interrogatories permitted by Fed. R. Civ. P. 33.

     Subject to and without waiving the foregoing specific and general objections, Defendants

respond that they will undertake reasonable efforts to identify and provide information

responsive to this Interrogatory, if it exists, reflecting the amount of Matching Contributions

RBC made to the WAP in each year from 2005 to 2011 and for which such data or information

still exists, from which plaintiffs may calculate the percentage sought by this Interrogatory.


**INTERROGATORY NO. 10:**

     For each year from 2005 to the present, what percentage of all WAP assets were derived

from Discretionary Contributions (as "Discretionary Contribution" is defined in the WAP)?

**RESPONSE TO INTERROGATORY NO. 10:**

     Defendants object to this Interrogatory on the grounds it is vague, ambiguous, overbroad,

and not proportional to the needs of this case.  In particular, the phrase "all WAP assets" is

unclear, vague, and ambiguous, particularly insofar as there are no "WAP assets" because the

WAP is an unfunded plan in which participants have only notional accounts.  This Interrogatory

also is unclear as to what "WAP assets" it refers (for example, it may be read to refer to the total

outstanding WAP liabilities at a given point in time, the total "WAP assets" contributed in each

year referenced by this Request, or some other amount or information), further rendering this

Interrogatory unclear, overbroad, not relevant to any party's claim or defense in this matter, and

not proportional to the needs of the case.  Defendants further object to this Interrogatory on the

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' THIRD AND FOURTH INTERROGATORIES
NO. 3:16-CV-05616-RBL - PAGE 6

MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive
Chicago, IL 60601
+1.312.324.1000

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 13

1  grounds that it seeks information that is overbroad, not relevant to any party's claim or defense
2  in this matter, and not proportional to the needs of the case.  In particular, Defendants object to
3  this Interrogatory to the extent it seeks the requested information after the WAP was frozen to all
4  new contributions as of January 1, 2012, as plaintiffs do not assert any claims with respect to
5  their participation in the WAP after January 1, 2012.  As such, identifying the information sought
6  by this Interrogatory is neither proportional to the needs of this case nor has any bearing upon the
7  parties' claims and defenses in this lawsuit.  Defendants further object to this Interrogatory to the
8  extent it purports to seek separate responses regarding each year from 2005 to the present and,
9  therefore, contains multiple discrete subparts.  Without waiving such objection, Defendants will
10  respond to this Interrogatory, but reserves the right to object to further interrogatories to the
   extent they exceed the maximum number of interrogatories permitted by Fed. R. Civ. P. 33.

11      Subject to and without waiving the foregoing specific and general objections, Defendants
12  respond that they will undertake reasonable efforts to identify and provide information
13  responsive to this Interrogatory, if it exists, reflecting the amount of Discretionary Contributions
14  RBC made to the WAP in each year from 2005 to 2011 and for which such data or information
15  still exists, from which plaintiffs may calculate the percentage sought by this Interrogatory.

16

17  **INTERROGATORY NO. 11:**

18      For each year from 2005 to the present, what percentage of all WAP assets were derived
19  from Mandatory Deferred Compensation (as "Mandatory Deferred Compensation" is defined in
20  the WAP)?

21  **RESPONSE TO INTERROGATORY NO. 11:**

22      Defendants object to this Interrogatory on the grounds it is vague, ambiguous, overbroad,
23  and not proportional to the needs of this case.  In particular, the phrase "all WAP assets" is
24  unclear, vague, and ambiguous, particularly insofar as there are no "WAP assets" because the
25  WAP is an unfunded plan in which participants have only notional accounts.  This Interrogatory

26

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' THIRD AND FOURTH INTERROGATORIES
NO. 3:16-CV-05616-RBL - PAGE 7

Morgan, Lewis & Bockius LLP
77 West Wacker Drive
Chicago, IL 60601
+1.312.324.1000

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 14

also is unclear as to what "WAP assets" it refers (for example, it may be read to refer to the total outstanding WAP liabilities at a given point in time, the total "WAP assets" contributed in each year referenced by this Request, or some other amount or information), further rendering this Interrogatory unclear, overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case. Defendants further object to this Interrogatory on the grounds that it seeks information that is overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case. In particular, Defendants object to this Interrogatory to the extent it seeks the requested information after the WAP was frozen to all new contributions as of January 1, 2012, as plaintiffs do not assert any claims with respect to their participation in the WAP after January 1, 2012. As such, identifying the information sought by this Interrogatory is neither proportional to the needs of this case nor has any bearing upon the parties' claims and defenses in this lawsuit. Defendants further object to this Interrogatory to the extent it purports to seek separate responses regarding each year from 2005 to the present and, therefore, contains multiple discrete subparts. Without waiving such objection, Defendants will respond to this Interrogatory, but reserves the right to object to further interrogatories to the extent they exceed the maximum number of interrogatories permitted by Fed. R. Civ. P. 33.

Subject to and without waiving the foregoing specific and general objections, Defendants respond that they will undertake reasonable efforts to identify and provide information responsive to this Interrogatory, if it exists, reflecting the amount of Mandatory Deferred Compensation made into the WAP in each year from 2005 to 2011 and for which such data or information still exists, from which plaintiffs may calculate the percentage sought by this Interrogatory.

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' THIRD AND FOURTH INTERROGATORIES
NO. 3:16-CV-05616-RBL - PAGE 8
DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 15

MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive
Chicago, IL 60601
+1.312.324.1000

**INTERROGATORY NO. 12:**

For each year from 2005 to the present, what percentage of all WAP assets were derived from Voluntary Deferred Compensation (as "Voluntary Deferred Compensation" is defined in the WAP)?

**RESPONSE TO INTERROGATORY NO. 12:**

Defendants object to this Interrogatory on the grounds it is vague, ambiguous, overbroad, and not proportional to the needs of this case. In particular, the phrase "all WAP assets" is unclear, vague, and ambiguous, particularly insofar as there are no "WAP assets" because the WAP is an unfunded plan in which participants have only notional accounts. This Interrogatory also is unclear as to what "WAP assets" it refers (for example, it may be read to refer to the total outstanding WAP liabilities at a given point in time, the total "WAP assets" contributed in each year referenced by this Request, or some other amount or information), further rendering this Interrogatory unclear, overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case. Defendants further object to this Interrogatory on the grounds that it seeks information that is overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case. In particular, Defendants object to this Interrogatory to the extent it seeks the requested information after the WAP was frozen to all new contributions as of January 1, 2012, as plaintiffs do not assert any claims with respect to their participation in the WAP after January 1, 2012. As such, identifying the information sought by this Interrogatory is neither proportional to the needs of this case nor has any bearing upon the parties' claims and defenses in this lawsuit. Defendants further object to this Interrogatory to the extent it purports to seek separate responses regarding each year from 2005 to the present and, therefore, contains multiple discrete subparts. Without waiving such objection, Defendants will respond to this Interrogatory, but reserves the right to object to further interrogatories to the extent they exceed the maximum number of interrogatories permitted by Fed. R. Civ. P. 33.

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' THIRD AND FOURTH INTERROGATORIES
NO. 3:16-CV-05616-RBL - PAGE 9
DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 16

MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive
Chicago, IL 60601
+1.312.324.1000

Subject to and without waiving the foregoing specific and general objections, Defendants respond that they will undertake reasonable efforts to identify and provide information responsive to this Interrogatory, if it exists, reflecting the amount of Voluntary Deferred Compensation made into the WAP in each year from 2005 to 2011 and for which such data or information still exists, from which plaintiffs may calculate the percentage sought by this Interrogatory.

Dated: October 13, 2017

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' THIRD AND FOURTH INTERROGATORIES
NO. 3:16-CV-05616-RBL - PAGE 10
DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 17

MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive
Chicago, IL 60601
+1.312.324.1000

1

## RULE 26(g) CERTIFICATION

2
3
4

The undersigned attorney has read the foregoing Responses and Objections to Plaintiffs' Third and Fourth Interrogatories to Defendants, and certifies that the responses and objections are in compliance with Federal Rule of Civil Procedures 26(g).

5

DATED:  October 13, 2017.

6

**MORGAN, LEWIS & BOCKIUS LLP**

7

By: _/s/  Matthew A. Russell_

8
9

Sari M. Alamuddin (*admitted pro hac vice*)
Christopher J. Boran (*admitted pro hac vice*)
Matthew A. Russell (*admitted pro hac vice*)

10
11
12
13

77 West Wacker Drive, Fifth Floor
Chicago, IL 60601
Phone: 312.324.1000
Fax: 312.323.1001
Email: sari.alamuddin@morganlewis.com
            christopher.boran@morganlewis.com
            matthew.russell@morganlewis.com

14
15

*Attorneys for Defendants RBC Capital Markets, LLC, Royal Bank of Canada, and Royal Bank of Canada US Wealth Accumulation Plan*

16
17
18
19
20
21
22
23
24
25
26

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' THIRD AND FOURTH INTERROGATORIES
NO. 3:16-CV-05616-RBL - PAGE 1

MORGAN, LEWIS & BOCKIUS LLP
77 W. Wacker Drive
Chicago, IL 60601
+1.312.324.1000

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 18

1

## CERTIFICATE OF SERVICE

2
     I hereby certify that on this date, I served this document on all parties of record via e-mail

3
on October 13, 2017.

4

5
          **YARMUTH WILSDON PLLC**

6
          Jeremy E. Roller, WSBA No. 32021
          Elizabeth S. Weinstein, WSBA No. 45763

7
          1420 Fifth Avenue, Suite 1400
          Seattle, WA  98101

8
          Phone:  206.516.3800
          Fax:  206.516.3888

9
          Email:  jroller@yarmuth.com
                    eweinstein@yarmuth.com

10

11
     *Attorneys for Plaintiffs Marty Paul and Brian Buskirk*

12

13
                          /s/  *Matthew A. Russell*

14
                          Matthew A. Russell

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
DECLARATION IN OPPOSITION TO PLTFS' PARTIAL SJ AND
TO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 19

MORGAN, LEWIS & BOCKIUS LLP
77 W. Wacker Drive
Chicago, IL 60601
+1.312.324.1000

# EXHIBIT 2

Honorable Ronald B. Leighton

1

2

3

4

5                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
6                                      AT TACOMA

7   MARTY PAUL, an individual; and              Case No. 3:16-cv-05616-RBL
    BRIAN BUSKIRK, an individual,
8                                               DEFENDANTS' CONSOLIDATED
                        Plaintiff,              RESPONSES AND OBJECTIONS TO
9                                               PLAINTIFFS' FOURTH REQUESTS FOR
              v.                                PRODUCTION
10
    RBC CAPITAL MARKETS, LLC, a
11  Minnesota limited liability company;
    ROYAL BANK OF CANADA, a
12  Canadian corporation; and ROYAL
    BANK OF CANADA US WEALTH
13  ACCUMULATION PLAN, an employee
    Benefit plan,
14
15                      Defendants.

16

17         Pursuant to Federal Rules of Civil Procedure 26 and 34, Defendants RBC Capital

18  Markets, LLC and the Royal Bank of Canada (collectively referred to as "Defendants"), by and

19  through their attorneys, Morgan, Lewis & Bockius LLP, provide the following objections and

20  answers to the Fourth Requests for Production of Documents made by Plaintiffs Marty Paul

21  ("Paul") and Brian Buskirk ("Buskirk), (collectively referred to as "Plaintiffs").[1]  Subject to the

22  objections and responses set forth below, Defendants will produce copies of documents

23  responsive to Plaintiffs' Fourth Requests for Production as soon as practicable.

24

25  _____
    [1] Plaintiffs issued separate Fourth Requests for Production to RBC Capital Markets, LLC, and the Royal Bank of
26  Canada, which were identical except for the identity of the Defendant.  Therefore, with the consent of plaintiffs'
    counsel, Defendants have consolidated their responses and objections to each set of Requests for Production into this
    single document.

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS                    MORGAN, LEWIS & BOCKIUS LLP
DECLARATION IN OPPOSITION TO MTN PARTIAL SJ AND                              77 W. Wacker Drive
TO PLTFS' RULE 56(D) MOTION                                                  Chicago, IL 60601
NO. 3:16-cv-05616-RBL - Page 21                                             +1.312.324.1000

## GENERAL OBJECTIONS

The following General Objections apply to each of Plaintiffs' Fourth Requests for Production of Documents ("Requests") and are expressly incorporated by reference as part of the responses to each of the Requests. The responses to the Requests are subject to and do not waive the following General Objections, regardless of whether a General Objection or specific objection is stated in the response.

1. Defendants object to these Requests to the extent they seek: attorney work product, information or communications protected by the attorney-client privilege or any other applicable rule of privilege, confidentiality, or immunity provided by law, trial preparation materials, identification or production of documents prepared in anticipation of litigation and/or after the commencement of this litigation, and/or documents beyond the scope of Rule 26 of the Federal Rules of Civil Procedure. Any response to any Request, or a part thereof, is not intended to be and shall not be deemed a waiver of the attorney-client privilege, the work product rule, or any other applicable privilege.

2. Defendants object to each Request to the extent it seeks information that cannot be disclosed without violating the right to privacy of Defendants, their agents and/or employees, and/or any other person or entity that is otherwise privileged or immune from discovery.

3. Defendants object to these Requests to the extent they attempt to alter or expand the requirements of the Federal Rules of Civil Procedure, the Court's Local Rules, or any other applicable law.

4. Defendants object to the Document Requests to the extent that they are overbroad as to time and scope and/or to the extent that they purport to require the production of information and documents which are not within Defendants' possession, custody or control; are immaterial; are irrelevant; and/or which are neither relevant to the claims or defenses at issue nor proportional to the needs of the case.

5. Defendants object to the Requests to the extent that they call for information that is confidential, proprietary, or invades the legitimate privacy interests of third parties.

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' FOURTH REQUESTS FOR PRODUCTION
NO. 3:16-cv-05616-RBL - Page 22

MORGAN, LEWIS & BOCKIUS LLP
77 W. Wacker Drive
Chicago, IL 60601
+1.312.324.1000

DECL. WEINSTEIN QPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 22

Defendants will produce such information pursuant to the agreed upon confidentiality order governing this matter.

6.     A response that Defendants will produce responsive documents is not an indication that such documents exist, but only a representation that, subject to and limited by the objections (specifically including all General Objections), non-privileged responsive documents will be made available if they do exist.

7.     The fact that Defendants have provided documents in response to part or all of any individual Document Request is not intended and shall not be construed to be (a) a waiver of all or part of any objection to any individual Document Request, or (b) an indication that such documents are not also responsive to other individual Document Requests.

8.     The responses made herein to the Discovery Requests and the production of documents in response thereto in no way waive:

   a.     Defendants' objections to competency, relevancy, materiality, privilege or admissibility of any such Document Request, of the response thereto, or of any document or information referred to or produced pursuant to the Document Request or response;

   b.     Defendants' objections to the use of such responses or documents, or to the subject matter thereof, in any proceeding, including the trial of this or any other action; or

   c.     Defendants' objections to any other or future document or discovery requests.

9.     Defendants' responses are based only upon such information and documents as are presently available to them.  Defendants' investigation is continuing, and they expressly reserve the right to supplement and/or amend their responses and objections to these Requests as may be appropriate in light of additional information and/or documents obtained or reviewed in connection with its continuing investigation of this case, and to use such information or documents in any hearing or proceeding.

**SPECIFIC OBJECTIONS AND RESPONSES TO REQUESTS FOR PRODUCTION**

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' FOURTH REQUESTS FOR PRODUCTION
RE:16-cv-WEINSTEIN QRPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 23

MORGAN, LEWIS & BOCKIUS LLP
77 W. Wacker Drive
Chicago, IL 60601
+1.312.324.1000

1    **REQUEST FOR PRODUCTION NO. 90:**

2        Please produce all amendments to, revisions to, and/or restatements of the New WAP.

3    **RESPONSE TO REQUEST FOR PRODUCTION NO. 90:**

4        Defendants object to this Request to the extent that it seeks confidential and privileged

5    information protected by the attorney-client privilege and/or work product doctrine, particularly

6    insofar as this Request purports to seek draft documents prepared by or with the advice of

7    counsel.  Defendants further object to this Request on the grounds that the phrase "revisions to"

8    is vague, ambiguous, and renders this Request unclear, overbroad, not relevant to any party's

9    claim or defense in this matter, and not proportional to the needs of the case.  Defendants also

10   object to this Request on the grounds that it seeks information that is overbroad, not relevant to

11   any party's claim or defense in this matter, and not proportional to the needs of the case.  Among

12   other things, plaintiffs do not challenge or raise any claims with respect to the "New WAP";

13   neither plaintiff forfeited any funds under the "New WAP"; and Defendants have already

14   produced the only version of the "New WAP" to which either plaintiff even could have been

15   subject (the Bates number of which plaintiffs' Fourth Requests for Production cites specifically).

16   In light of the foregoing objections, as well as Defendants' production of the "New WAP"

17   already cited by plaintiffs' Fourth Requests for Production, Defendants will not be producing

18   additional documents in response to this Request.

19

20   **REQUEST FOR PRODUCTION NO. 91:**

21       Please produce all documents describing the qualifications to become or remain a

22   participant in the New WAP from January 1, 2012 to the present.

23   **RESPONSE TO REQUEST FOR PRODUCTION NO. 91:**

24       Defendants object to this Request to the extent that it seeks confidential and privileged

25   information protected by the attorney-client privilege and/or work product doctrine, particularly

26   insofar as this Request purports to seek any and "all documents" that in any way "describ[e] the

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' FOURTH REQUESTS FOR PRODUCTION
 NO. 3:16-cv-05616-RBL IN SUPPORT OF DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 24

MORGAN, LEWIS & BOCKIUS LLP
77 W. Wacker Drive
Chicago, IL 60601
+1.312.324.1000

qualifications" for the "New WAP."  Defendants further object to this Request on the grounds that the phrases "to become" and "remain" are vague, ambiguous, and renders this Request unclear, overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case.  Defendants also object to this Request on the grounds that it seeks information that is overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case.  Among other things, plaintiffs do not challenge or raise any claims with respect to the "New WAP"; neither plaintiff forfeited any funds under the "New WAP"; Defendants have already produced the only version of the "New WAP" to which either plaintiff even could have been subject (the Bates number of which plaintiffs' Fourth Requests for Production cites specifically); and plaintiffs have deposed RBC witnesses concerning the "qualifications" for the "New WAP," including the eligibility requirements for both production and non-production employees.  As such, searching for and identifying "all documents" responsive to this Request is not proportional to the needs of this case and, the qualifications related to the "New WAP" do not bear upon the parties' claims and defenses.  In light of the foregoing objections, Defendants will not be producing additional documents in response to this Request.

**REQUEST FOR PRODUCTION NO. 92:**

Please produce all documents reflecting the number of participants in the New WAP from January 1, 2012 to the present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 92:**

Defendants object to this Request on the grounds that the phrase "documents reflecting" is vague, ambiguous, and renders this Request unclear, overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case, as such phrase could be read to encompass any number or variety of documents or data pertaining to the "New WAP."  Defendants also object to this Request on the grounds that it seeks information that is overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' FOURTH REQUESTS FOR PRODUCTION
DECL. WEINSTEIN, QPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 25

MORGAN, LEWIS & BOCKIUS LLP
77 W. Wacker Drive
Chicago, IL 60601
+1.312.324.1000

needs of the case.  Among other things, plaintiffs do not challenge or raise any claims with respect to the "New WAP"; neither plaintiff forfeited any funds under the "New WAP"; Defendants have already produced the only version of the "New WAP" to which either plaintiff even could have been subject (the Bates number of which plaintiffs' Fourth Requests for Production cites specifically); and plaintiffs have deposed RBC witnesses concerning the "New WAP."  As such, searching for and identifying "all documents reflecting" the information sought by this Request is not proportional to the needs of this case and, the "number of participants in the New WAP" has no bearing upon the parties' claims and defenses in this lawsuit.  In light of the foregoing objections, Defendants will not be producing additional documents in response to this Request.

**REQUEST FOR PRODUCTION NO. 93:**

Please produce all documents reflecting the percentage of all Employers' United States-based employees who were eligible to participate in the New WAP for each plan year from January 1, 2012 to the present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 93:**

Defendants object to this Request on the grounds that the phrase "documents reflecting" is vague, ambiguous, and renders this Request unclear, overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case, as such phrase could be read to encompass an number or variety of documents or data pertaining to the "New WAP."  Defendants also object to this Request on the grounds that it seeks information that is overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case.  Among other things, plaintiffs do not challenge or raise any claims with respect to the "New WAP"; neither plaintiff forfeited any funds under the "New WAP"; Defendants have already produced the only version of the "New WAP" to which either plaintiff even could have been subject (the Bates number of which plaintiffs' Fourth Requests for Production cites specifically); and plaintiffs have deposed RBC witnesses concerning the "New

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' FOURTH REQUESTS FOR PRODUCTION
NO. 3:16-cv-05616-RBL - Page 26

MORGAN, LEWIS & BOCKIUS LLP
77 W. Wacker Drive
Chicago, IL 60601
+1.312.324.1000

DECL. WEINSTEIN QBPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 26

WAP."  As such, searching for and identifying "all documents reflecting" the information sought by this Request is not proportional to the needs of this case and, the "percentage of all Employees' United States-based employees who were eligible to participate in the New WAP" has no bearing upon the parties' claims and defenses in this lawsuit.  In light of the foregoing objections, Defendants will not be producing additional documents in response to this Request.

**REQUEST FOR PRODUCTION NO. 94:**

Please produce all documents disclosing, discussing, and/or explaining New WAP eligibility criteria or requirements for each plan year from January 1, 2012 to the present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 94:**

Defendants object to this Request on the grounds that it seeks confidential and privileged information protected by the attorney-client privilege and work product doctrine.  Defendants further object to this Request on the grounds that the phrases "disclosing", "discussing" and "explaining" are vague, ambiguous, and renders this Request unclear, overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case, as such phrase could be read to encompass any number or variety of documents pertaining to the "New WAP" and contains no limitations with respect to the author, intended recipients, or otherwise. Defendants also object to this Request on the grounds that it seeks information that is overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case.  Among other things, plaintiffs do not challenge or raise any claims with respect to the "New WAP"; neither plaintiff forfeited any funds under the "New WAP"; Defendants have already produced the only version of the "New WAP" to which either plaintiff even could have been subject (the Bates number of which plaintiffs' Fourth Requests for Production cites specifically); and plaintiffs have deposed RBC witnesses concerning the "New WAP."  As such, searching for and identifying "all documents disclosing, discussing, and/or explaining" the information sought by this Request is neither proportional to the needs of this case nor has any bearing upon the parties' claims and defenses in this lawsuit. In light of the foregoing objections,

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' FOURTH REQUESTS FOR PRODUCTION
DECL. WEINSTEIN QPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 27

MORGAN, LEWIS & BOCKIUS LLP
77 W. Wacker Drive
Chicago, IL 60601
+1.312.324.1000

Defendants will not be producing additional documents in response to this Request.

**REQUEST FOR PRODUCTION NO. 95:**

Please produce all documents that reflect the average annual compensation of employees who were eligible to participate in the New WAP for each plan year from January 1, 2012 to the present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 95:**

Defendants object to this Request on the grounds that it seeks confidential and privileged information protected by the attorney-client privilege and work product doctrine. Defendants further object to this Request on the grounds that the phrase "reflect the average annual compensation" is vague, ambiguous, and renders this Request unclear, overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case. Defendants also object to this Request on the grounds that it seeks information that is overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case. Among other things, plaintiffs do not challenge or raise any claims with respect to the "New WAP"; neither plaintiff forfeited any funds under the "New WAP"; Defendants have already produced the only version of the "New WAP" to which either plaintiff even could have been subject (the Bates number of which plaintiffs' Fourth Requests for Production cites specifically); and plaintiffs have deposed RBC witnesses concerning the "New WAP." As such, searching for and identifying "all documents that reflect" the information sought by this Request is neither proportional to the needs of this case nor has any bearing upon the parties' claims and defenses in this lawsuit. In light of the foregoing objections, Defendants will not be producing additional documents in response to this Request.

**REQUEST FOR PRODUCTION NO. 96:**

Please produce documents sufficient to show the production level required to qualify for President Council from Fiscal Year 2011 to the present.

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' FOURTH REQUESTS FOR PRODUCTION
DECL. WEINSTEIN QRPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 28

MORGAN, LEWIS & BOCKIUS LLP
77 W. Wacker Drive
Chicago, IL 60601
+1.312.324.1000

**RESPONSE TO REQUEST FOR PRODUCTION NO. 96:**

Defendants object to this Request on the grounds that the phrase "sufficient to show" is vague, ambiguous, and renders this Request unclear, overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case.  Defendants also object to this Request on the grounds that it seeks information that is overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case.   In particular, plaintiffs do not assert any claims with respect to their participation in the WAP after January 1, 2012, as plaintiff Paul terminated employment with RBC in 2011, and plaintiff Buskirk terminated employment with RBC in 2012.  Accordingly, searching for and identifying "documents sufficient to show" the information sought by this Request is neither proportional to the needs of this case nor has any bearing upon the parties' claims and defenses in this lawsuit, particularly insofar as it seeks documents and information created after plaintiffs left RBC. Without waiving the foregoing objections, Defendants direct plaintiffs to the 2011 FC Compensation Plan (RBC-Paul 000006679-6710), which states estimated production thresholds to qualify for the 2011 President's Council (*see, e.g.*, RBC-Paul 000006683, 000006689).   In light of the foregoing objections and response, Defendants will not be producing additional documents in response to this Request.

**REQUEST FOR PRODUCTION NO. 97:**

Please produce documents sufficient to show the production level required to qualify for Chairman Council from Fiscal Year 2011 to the present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 97:**

Defendants object to this Request on the grounds that the phrase "sufficient to show" is vague, ambiguous, and renders this Request unclear, overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case.  Defendants also object to this Request on the grounds that it seeks information that is overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case.   In

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS TO PLAINTIFFS' FOURTH REQUESTS FOR PRODUCTION NO. 3:16-cv-05616-RBL - Page 29

DECL. WEINSTEIN QBPO DEFS' MTN PARTIAL SJ AND ISO PLTFS' RULE 56(D) MOTION NO. 3:16-cv-05616-RBL - Page 29

MORGAN, LEWIS & BOCKIUS LLP
77 W. Wacker Drive
Chicago, IL 60601
+1.312.324.1000

particular, plaintiffs do not assert any claims with respect to their participation in the WAP after January 1, 2012, as plaintiff Paul terminated employment with RBC in 2011, and plaintiff Buskirk terminated employment with RBC in 2012.  Accordingly, searching for and identifying "documents sufficient to show" the information sought by this Request is neither proportional to the needs of this case nor has any bearing upon the parties' claims and defenses in this lawsuit, particularly insofar as it seeks documents and information created after plaintiffs left RBC. Without waiving the foregoing objections, Defendants direct plaintiffs to the 2011 FC Compensation Plan (RBC-Paul 000006679-6710), which states estimated production thresholds to qualify for the 2011 Chairman's Council (*see, e.g.*, RBC-Paul 000006683, 000006689).   In light of the foregoing objections and response, Defendants will not be producing additional documents in response to this Request.

**REQUEST FOR PRODUCTION NO. 98:**

For each year from 2005 to the present, please produce documents sufficient to show the value of WAP assets derived from Matching Contributions (as "Matching Contribution" is defined in the WAP).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 98:**

Defendants object to this Request on the grounds that the phrases "sufficient to show" and "WAP assets" are vague, ambiguous, and render this Request unclear, overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case.  Defendants further object to this Request on the grounds that there are no "WAP assets," insofar as the WAP is an unfunded plan in which participants have only notional accounts, and the Request is unclear as to what "WAP assets" it refers (for example, the total of all outstanding WAP liabilities at a given point in time, the "WAP assets" RBC contributed in each year referenced by this Request, or some other amount or information), further rendering this Request unclear, overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case.  Defendants also object to this Request on the grounds that

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' FOURTH REQUESTS FOR PRODUCTION
DECL. WEINSTEIN QIPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 30

MORGAN, LEWIS & BOCKIUS LLP
77 W. Wacker Drive
Chicago, IL 60601
+1.312.324.1000

1  it seeks information that is overbroad, not relevant to any party's claim or defense in this matter,

2  and not proportional to the needs of the case, to the extent it seeks the requested information after

3  the WAP was frozen to all new contributions as of January 1, 2012, as plaintiffs do not assert any

4  claims with respect to their participation in the WAP after January 1, 2012.  As such, searching

5  for and identifying all "documents sufficient to show" the information sought by this Request is

6  neither proportional to the needs of this case nor has any bearing upon the parties' claims and

   defenses in this lawsuit.

7       Subject to and without waiving these objections and the General Objections above,

8  Defendants will undertake reasonable efforts to identify and produce documents responsive to

9  this Request, if any exist, reflecting the amount of Matching Contributions RBC made to the

10  WAP in each year from 2005 to 2011 and for which such data or information still exists.

11

12  **REQUEST FOR PRODUCTION NO. 99:**

13       For each year from 2005 to the present, please produce documents sufficient to show the

14  percentage of WAP assets derived from Matching Contributions (as "Matching Contribution" is

15  defined in the WAP).

16  **RESPONSE TO REQUEST FOR PRODUCTION NO. 99:**

17       Defendants object to this Request on the grounds that the phrases "sufficient to show"

18  and "WAP assets" are vague, ambiguous, and render this Request unclear, overbroad, not

19  relevant to any party's claim or defense in this matter, and not proportional to the needs of the

20  case.  Defendants further object to this Request on the grounds that there are no "WAP assets,"

21  insofar as the WAP is an unfunded plan in which participants have only notional accounts, and

22  the Request is unclear as to what "WAP assets" it refers (for example, the total of all outstanding

23  WAP liabilities at a given point in time, the "WAP assets" RBC contributed in each year

24  referenced by this Request, or some other amount or information), further rendering this Request

25  unclear, overbroad, not relevant to any party's claim or defense in this matter, and not

26  proportional to the needs of the case.  Defendants also object to this Request on the grounds that

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' FOURTH REQUESTS FOR PRODUCTION
DECL. WEINSTEIN, QPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 31

MORGAN, LEWIS & BOCKIUS LLP
77 W. Wacker Drive
Chicago, IL 60601
+1.312.324.1000

1  it seeks information that is overbroad, not relevant to any party's claim or defense in this matter,

2  and not proportional to the needs of the case, to the extent it seeks the requested information after

3  the WAP was frozen to all new contributions as of January 1, 2012, as plaintiffs do not assert any

4  claims with respect to their participation in the WAP after January 1, 2012.  As such, searching

5  for and identifying all "documents sufficient to show" the information sought by this Request is

6  neither proportional to the needs of this case nor has any bearing upon the parties' claims and

defenses in this lawsuit.

7        Subject to and without waiving these objections and the General Objections above,

8  Defendants will undertake reasonable efforts to identify and produce documents responsive to

9  this Request, if any exist, reflecting the amount of Matching Contributions RBC made to the

10  WAP in each year from 2005 to 2011 and for which such data or information still exists, from

11  which plaintiffs may calculate the percentage of total WAP contributions.

12

13  **REQUEST FOR PRODUCTION NO. 100:**

14        For each year from 2005 to the present, please produce documents sufficient to show the

15  value of WAP assets derived from Discretionary Contributions (as "Discretionary Contribution"

16  is defined in the WAP).

17  **RESPONSE TO REQUEST FOR PRODUCTION NO. 100:**

18        Defendants object to this Request on the grounds that the phrases "sufficient to show"

19  and "WAP assets" are vague, ambiguous, and render this Request unclear, overbroad, not

20  relevant to any party's claim or defense in this matter, and not proportional to the needs of the

21  case.  Defendants further object to this Request on the grounds that there are no "WAP assets,"

22  insofar as the WAP is an unfunded plan in which participants have only notional accounts, and

23  the Request is unclear as to what "WAP assets" it refers (for example, the total of all outstanding

24  WAP liabilities at a given point in time, the "WAP assets" RBC contributed in each year

25  referenced by this Request, or some other amount or information), further rendering this Request

26  unclear, overbroad, not relevant to any party's claim or defense in this matter, and not

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' FOURTH REQUESTS FOR PRODUCTION
IN SUPPORT IN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 32

MORGAN, LEWIS & BOCKIUS LLP
77 W. Wacker Drive
Chicago, IL 60601
+1.312.324.1000

proportional to the needs of the case.  Defendants also object to this Request on the grounds that it seeks information that is overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case, to the extent it seeks the requested information after the WAP was frozen to all new contributions as of January 1, 2012, as plaintiffs do not assert any claims with respect to their participation in the WAP after January 1, 2012.  As such, searching for and identifying all "documents sufficient to show" the information sought by this Request is neither proportional to the needs of this case nor has any bearing upon the parties' claims and defenses in this lawsuit.

Subject to and without waiving these objections and the General Objections above, Defendants will undertake reasonable efforts to identify and produce documents responsive to this Request, if any exist, reflecting the amount of Discretionary Contributions RBC made to the WAP in each year from 2005 to 2011 and for which such data or information still exists.

**REQUEST FOR PRODUCTION NO. 101:**

For each year from 2005 to the present, please produce documents sufficient to show the percentage of WAP assets derived from Discretionary Contributions (as "Discretionary Contribution" is defined in the WAP).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 101:**

Defendants object to this Request on the grounds that the phrases "sufficient to show" and "WAP assets" are vague, ambiguous, and render this Request unclear, overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case.  Defendants further object to this Request on the grounds that there are no "WAP assets," insofar as the WAP is an unfunded plan in which participants have only notional accounts, and the Request is unclear as to what "WAP assets" it refers (for example, the total of all outstanding WAP liabilities at a given point in time, the "WAP assets" RBC contributed in each year referenced by this Request, or some other amount or information), further rendering this Request unclear, overbroad, not relevant to any party's claim or defense in this matter, and not

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' FOURTH REQUESTS FOR PRODUCTION
NO. 3:16-cv-05616-RBL - Page 33

DECL. WEINSTEIN QRPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 33

MORGAN, LEWIS & BOCKIUS LLP
77 W. Wacker Drive
Chicago, IL 60601
+1.312.324.1000

proportional to the needs of the case.  Defendants also object to this Request on the grounds that it seeks information that is overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case, to the extent it seeks the requested information after the WAP was frozen to all new contributions as of January 1, 2012, as plaintiffs do not assert any claims with respect to their participation in the WAP after January 1, 2012.  As such, searching for and identifying all "documents sufficient to show" the information sought by this Request is neither proportional to the needs of this case nor has any bearing upon the parties' claims and defenses in this lawsuit.

Subject to and without waiving these objections and the General Objections above, Defendants will undertake reasonable efforts to identify and produce documents responsive to this Request, if any exist, reflecting the amount of Discretionary Contributions RBC made to the WAP in each years from 2005 to 2011 and for which such data or information still exists, from which plaintiffs may calculate the percentage of total WAP contributions.

**REQUEST FOR PRODUCTION NO. 102:**

For each year from 2005 to the present, please produce documents sufficient to show the value of WAP assets derived from Mandatory Deferred Compensation (as "Mandatory Deferred Compensation" is defined in the WAP).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 102:**

Defendants object to this Request on the grounds that the phrases "sufficient to show" and "WAP assets" are vague, ambiguous, and render this Request unclear, overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case.  Defendants further object to this Request on the grounds that there are no "WAP assets," insofar as the WAP is an unfunded plan in which participants have only notional accounts, and the Request is unclear as to what "WAP assets" it refers (for example, the total of all outstanding WAP liabilities at a given point in time, the "WAP assets" RBC contributed in each year referenced by this Request, or some other amount or information), further rendering this Request

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS TO PLAINTIFFS' FOURTH REQUESTS FOR PRODUCTION NO. 3:16-cv-05616-RBL - Page 34

MORGAN, LEWIS & BOCKIUS LLP
77 W. Wacker Drive
Chicago, IL 60601
+1.312.324.1000

DECL. WEINSTEIN ORPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 34

unclear, overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case. Defendants also object to this Request on the grounds that it seeks information that is overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case, to the extent it seeks the requested information after the WAP was frozen to all new contributions as of January 1, 2012, as plaintiffs do not assert any claims with respect to their participation in the WAP after January 1, 2012.  As such, searching for and identifying all "documents sufficient to show" the information sought by this Request is neither proportional to the needs of this case nor has any bearing upon the parties' claims and defenses in this lawsuit.

Subject to and without waiving these objections and the General Objections above, Defendants will undertake reasonable efforts to identify and produce documents responsive to this Request, if any exist, reflecting the amount of Mandatory Deferred Compensation made into the WAP in each year from 2005 to 2011 and for which such data or information still exists.

**REQUEST FOR PRODUCTION NO. 103:**

For each year from 2005 to the present, please produce documents sufficient to show the percentage of WAP assets derived from Mandatory Deferred Compensation (as "Mandatory Deferred Compensation" is defined in the WAP).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 103:**

Defendants object to this Request on the grounds that the phrases "sufficient to show" and "WAP assets" are vague, ambiguous, and render this Request unclear, overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case.  Defendants further object to this Request on the grounds that there are no "WAP assets," insofar as the WAP is an unfunded plan in which participants have only notional accounts, and the Request is unclear as to what "WAP assets" it refers (for example, the total of all outstanding WAP liabilities at a given point in time, the "WAP assets" RBC contributed in each year referenced by this Request, or some other amount or information), further rendering this Request

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' FOURTH REQUESTS FOR PRODUCTION
NO. 5 (WEINSTEIN QRPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 35

MORGAN, LEWIS & BOCKIUS LLP
77 W. Wacker Drive
Chicago, IL 60601
+1.312.324.1000

1   unclear, overbroad, not relevant to any party's claim or defense in this matter, and not
2   proportional to the needs of the case.  Defendants also object to this Request on the grounds that
3   it seeks information that is overbroad, not relevant to any party's claim or defense in this matter,
4   and not proportional to the needs of the case, to the extent it seeks the requested information after
5   the WAP was frozen to all new contributions as of January 1, 2012, as plaintiffs do not assert any
6   claims with respect to their participation in the WAP after January 1, 2012.  As such, searching
7   for and identifying all "documents sufficient to show" the information sought by this Request is
8   neither proportional to the needs of this case nor has any bearing upon the parties' claims and
    defenses in this lawsuit.

9        Subject to and without waiving these objections and the General Objections above,
10  Defendants will undertake reasonable efforts to identify and produce documents responsive to
11  this Request, if any exist, reflecting the amount of Mandatory Deferred Compensation made into
12  the WAP in each year from 2005 to 2011 and for which such data or information still exists,
13  from which plaintiffs may calculate the percentage of total WAP contributions.

14

15  **REQUEST FOR PRODUCTION NO. 104:**

16       For each year from 2005 to the present, please produce documents sufficient to show the
17  value of WAP assets derived from Voluntary Deferred Compensation (as "Voluntary Deferred
18  Compensation" is defined in the WAP).

19  **RESPONSE TO REQUEST FOR PRODUCTION NO. 104:**

20       Defendants object to this Request on the grounds that the phrases "sufficient to show"
21  and "WAP assets" are vague, ambiguous, and render this Request unclear, overbroad, not
22  relevant to any party's claim or defense in this matter, and not proportional to the needs of the
23  case.  Defendants further object to this Request on the grounds that there are no "WAP assets,"
24  insofar as the WAP is an unfunded plan in which participants have only notional accounts, and
25  the Request is unclear as to what "WAP assets" it refers (for example, the total of all outstanding
26  WAP liabilities at a given point in time, the "WAP assets" RBC contributed in each year

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' FOURTH REQUESTS FOR PRODUCTION
NO. 3:16-cv-05616-RBL - Page 36

DECL. WEINSTEIN, QRPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 36

MORGAN, LEWIS & BOCKIUS LLP
77 W. Wacker Drive
Chicago, IL 60601
+1.312.324.1000

referenced by this Request, or some other amount or information), further rendering this Request unclear, overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case. Defendants also object to this Request on the grounds that it seeks information that is overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case, to the extent it seeks the requested information after the WAP was frozen to all new contributions as of January 1, 2012, as plaintiffs do not assert any claims with respect to their participation in the WAP after January 1, 2012. As such, searching for and identifying all "documents sufficient to show" the information sought by this Request is neither proportional to the needs of this case nor has any bearing upon the parties' claims and defenses in this lawsuit.

Subject to and without waiving these objections and the General Objections above, Defendants will undertake reasonable efforts to identify and produce documents responsive to this Request, if any exist, reflecting the amount of Voluntary Deferred Compensation made into the WAP in each year from 2005 to 2011 and for which such data or information still exists.

**REQUEST FOR PRODUCTION NO. 105:**

For each year from 2005 to the present, please produce documents sufficient to show the percentage of WAP assets derived from Voluntary Deferred Compensation (as "Voluntary Deferred Compensation" is defined in the WAP).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 105:**

Defendants object to this Request on the grounds that the phrases "sufficient to show" and "WAP assets" are vague, ambiguous, and render this Request unclear, overbroad, not relevant to any party's claim or defense in this matter, and not proportional to the needs of the case. Defendants further object to this Request on the grounds that there are no "WAP assets," insofar as the WAP is an unfunded plan in which participants have only notional accounts, and the Request is unclear as to what "WAP assets" it refers (for example, the total of all outstanding WAP liabilities at a given point in time, the "WAP assets" RBC contributed in each year referenced by this Request, or some other amount or information), further rendering this Request

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS TO PLAINTIFFS' FOURTH REQUESTS FOR PRODUCTION NOS. 91-130 IN SUPPORT OF DEFS' MTN PARTIAL SJ AND ISO PLTFS' RULE 56(D) MOTION NO. 3:16-cv-05616-RBL - Page 37

MORGAN, LEWIS & BOCKIUS LLP
77 W. Wacker Drive
Chicago, IL 60601
+1.312.324.1000

1   unclear, overbroad, not relevant to any party's claim or defense in this matter, and not

2   proportional to the needs of the case.  Defendants also object to this Request on the grounds that

3   it seeks information that is overbroad, not relevant to any party's claim or defense in this matter,

4   and not proportional to the needs of the case, to the extent it seeks the requested information after

5   the WAP was frozen to all new contributions as of January 1, 2012, as plaintiffs do not assert any

6   claims with respect to their participation in the WAP after January 1, 2012.  As such, searching

7   for and identifying all "documents sufficient to show" the information sought by this Request is

8   neither proportional to the needs of this case nor has any bearing upon the parties' claims and

    defenses in this lawsuit.

9          Subject to and without waiving these objections and the General Objections above,

10   Defendants will undertake reasonable efforts to identify and produce documents responsive to

11   this Request, if any exist, reflecting the amount of Voluntary Deferred Compensation made into

12   the WAP in each year from 2005 to 2011 and for which such data or information still exists,

13   from which plaintiffs may calculate the percentage of total WAP contributions.

14   **REQUEST FOR PRODUCTION NO. 106:**

15          For each year from 2005 to the present, please produce documents sufficient to show the

16   value of all assets in the WAP.

17   **RESPONSE TO REQUEST FOR PRODUCTION NO. 106:**

18          Defendants object to this Request on the grounds that the phrases "sufficient to show"

19   and "assets in the WAP" are vague, ambiguous, and render this Request unclear, overbroad, not

20   relevant to any party's claim or defense in this matter, and not proportional to the needs of the

21   case.  Defendants further object to this Request on the grounds that there are no "assets in the

22   WAP," insofar as the WAP is an unfunded plan in which participants have only notional

23   accounts, and the Request is unclear as to what "assets in the WAP" it refers (for example, the

24   total of all outstanding WAP liabilities at a given point in time, the "WAP assets" RBC

25   contributed in each year referenced by this Request, or some other amount or information),

26   further rendering this Request unclear, overbroad, not relevant to any party's claim or defense in

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' FOURTH REQUESTS FOR PRODUCTION
OF DOCUMENTS ISO ORPO DEFS MTN PARTIAL SJ AND
DECL. WEINSTEIN, ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 38

MORGAN, LEWIS & BOCKIUS LLP
77 W. Wacker Drive
Chicago, IL 60601
+1.312.324.1000

1   this matter, and not proportional to the needs of the case.  Defendants also object to this Request

2   on the grounds that it seeks information that is overbroad, not relevant to any party's claim or

3   defense in this matter, and not proportional to the needs of the case, to the extent it seeks the

4   requested information after the WAP was frozen to all new contributions as of January 1, 2012,

5   as plaintiffs do not assert any claims with respect to their participation in the WAP after January

6   1, 2012.   As such, searching for and identifying all "documents sufficient to show" the

7   information sought by this Request is neither proportional to the needs of this case nor has any

8   bearing upon the parties' claims and defenses in this lawsuit.

9       Subject to and without waiving these objections and the General Objections above,

10  Defendants will undertake reasonable efforts to identify and produce documents responsive to

11  this Request, if any exist, reflecting the total amount of WAP contributions in each year from

12  2005 to 2011 and for which such data or information still exists.

13  Dated: October 13, 2017

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' FOURTH REQUESTS FOR PRODUCTION
NO. 3:16-cv-05616-RBL - Page 39

MORGAN, LEWIS & BOCKIUS LLP
77 W. Wacker Drive
Chicago, IL 60601
+1.312.324.1000

DECL. WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 39

## RULE 26(g) CERTIFICATION

The undersigned attorney has read the foregoing Consolidated Responses and Objections to Plaintiffs' Fourth Requests for Production to Defendants, and certifies that the responses and objections are in compliance with Federal Rule of Civil Procedures 26(g).

Dated: October 13, 2017

**MORGAN, LEWIS & BOCKIUS LLP**

By:   /s/ *Matthew A. Russell*

Sari M. Alamuddin, (*admitted pro hac vice*)
Christopher J. Boran, (*admitted pro hac vice*)
Matthew A. Russell, (*admitted pro hac vice*)

77 West Wacker Drive, Fifth Floor
Chicago, IL 60601
Phone:  312.324.1000
Fax:     312.323.1001
Email:  sari.alamuddin@morganlewis.com
          christopher.boran@morganlewis.com
          matthew.russell@morganlewis.com

*Attorneys for Defendants RBC Capital Markets, LLC, Royal Bank of Canada, and Royal Bank of Canada US Wealth Accumulation Plan*

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' FOURTH REQUESTS FOR PRODUCTION
DECL. WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 40

MORGAN, LEWIS & BOCKIUS LLP
77 W. Wacker Drive
Chicago, IL 60601
+1.312.324.1000

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I served the foregoing document on all parties of record *via e-mail* on October 13, 2017.

**YARMUTH WILSDON PLLC**

Jeremy E. Roller, WSBA No. 32021
Elizabeth S. Weinstein, WSBA No. 45763
1420 Fifth Avenue, Suite 1400
Seattle, WA  98101
Phone:   206.516.3800
Fax:      206.516.3888
Email:   jroller@yarmuth.com
           eweinstein@yarmuth.com

*Attorneys for Plaintiffs Marty Paul and Brian Buskirk*

/s/  Matthew A. Russell

Matthew A. Russell

DEFENDANTS' CONSOLIDATED RESPONSES AND OBJECTIONS
TO PLAINTIFFS' FOURTH REQUESTS FOR PRODUCTION
DECL. WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 41

MORGAN, LEWIS & BOCKIUS LLP
77 W. Wacker Drive
Chicago, IL 60601
+1.312.324.1000

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| BRENDA TOLBERT, | § | |
| | § | |
| | § | |
| Plaintiff | § | No. 4:11-CV-107 |
| | § | |
| v. | § | Judge Keith P. Ellison |
| | § | |
| RBC CAPITAL MARKETS | § | |
| CORPORATION N/K/A RBC CAPITAL | § | |
| MARKETS, LLC; RBC CENTURA | § | |
| BANK N/K/A RBC BANK (USA); RBC | § | |
| U.S. INSURANCE SERVICES INC. | § | |
| | § | |
| Defendants. | § | |
| | § | |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Sari M. Alamuddin (admitted *pro hac vice*)
  Ill. State Bar No. 6215689
Christopher J. Boran (admitted *pro hac vice*)
  Ill. State Bar No. 6282552
Matthew A. Russell (admitted *pro hac vice*)
  Ill. State Bar No. 6290632
**MORGAN, LEWIS & BOCKIUS LLP**
77 W. Wacker Drive, Fifth Floor
Chicago, Illinois 60601
T: 312.324.1000
F: 312.324.1001
E: cboran@morganlewis.com

Alison J. Gates
  Tex. State Bar No. 24055535
  Fed. ID No. 706309
**MORGAN, LEWIS & BOCKIUS LLP**
1000 Louisiana, Suite 4200
Houston, Texas 77002
T:  713.890.5157
F:  713.890.5001

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
CONFIDENTIAL
RBC-PAUL000010100

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ................................................................................................................... 1

ARGUMENT ............................................................................................................................ 3

I.    The WAP Is Not An Employee Pension Benefit Plan Under ERISA ................................. 3

    A.    The DOL Regulation Interpreting The "Employee Pension Benefit Plan"
        Definition And Cases Applying That Regulation Are Applicable Here ................. 3

    B.    The WAP Is Not Expressly Designed Primarily To Provide Retirement
        Or Post-Termination Benefits ............................................................................. 5

    C.    The WAP Does Not Systematically Defer Compensation To Retirement
        Or Post-Termination As A Result Of Surrounding Circumstances ........................ 6

II.   Even If ERISA Applies, Defendants Are Entitled To Summary Judgment Because
    The WAP Qualifies For ERISA's Top Hat Exemptions ..................................................... 8

    A.    The Fifth Circuit Has Not Adopted A "Substantial Influence" Test And,
        Even If It Had, RBC Still Wins ........................................................................... 8

    B.    It Is Immaterial Whether WAP-Eligible Employees
        Also Were Management ..................................................................................... 12

    C.    Plaintiff's Arguments Concerning Royal Bank's Total Workforce And The
        Experts' Analyses Are Misguided And Immaterial .............................................. 12

        1.    The Court Should Consider The Total Workforce Of All Plan Sponsor
            Employers, Including The Royal Bank's ................................................... 12

        2.    Plaintiff's Attempts To Legitimize Solomon's Compensation Analyses
            And To Discredit Niden's Eligibility Rate Determinations Fail .............. 15

            • Solomon's Compensation Analyses ........................................... 15
            • Niden's Eligibility Rate Determinations .................................... 15

III.  Plaintiff Failed To Exhaust The WAP's Administrative Claims Procedure ..................... 17

IV.   Plaintiff's Fiduciary Breach Claim Is Time-Barred As To Pre-2009 Plan Years ............. 17

    A.    Plaintiff Had Sufficient Information To Understand Her Claims More Than Three
        Years Before Filing The Complaint ...................................................................... 17

    B.    Plaintiff's Claims Are Also Barred By ERISA's Six-Year Statute Of Repose ..... 18

    C.    The Fraud Or Concealment Exception Does Not Apply ...................................... 19

V.    Plaintiff Has Not Sued Any WAP Fiduciary ................................................................... 20

CONCLUSION ...................................................................................................................... 20

CONFIDENTIAL

RBC-PAUL000010101

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alexander v. Brigham & Women's Physicians Org., Inc.,*
467 F. Supp. 2d 136 (D. Mass. 2006) .......................................................11, 12

*Alexander v. Brigham & Women's Physicians' Org., Inc.,*
513 F.3d 37 (1st Cir. 2008)........................................................... *passim*

*Babcock v. Hartmax Corp.,*
182 F.3d 336 (5th Cir. 1999) .......................................................17, 18

*Banks v. F.D.I.C.,*
374 Fed. App'x 532, (5th Cir. Mar. 24, 2010) ..................................19

*Belka v. Rowe Furniture Corp.,*
571 F. Supp. 1249 (D. Md. 1983) .................................................16

*Callan v. Merrill Lynch & Co., Inc.,*
2010 WL 3452371 (S.D.Cal. Aug. 30, 2010) .........................10, 12, 13

*Caputo v. Pfizer, Inc.,*
267 F.3d 181 (2d Cir. 2001)........................................................19

*Carrabba v. Randalls Food Markets, Inc.,*
38 F. Supp. 2d 468 (N.D. Tex. 1999) ............................................9

*Carrabba v. Randalls Food Markets, Inc.,*
252 F.3d 721 (5th Cir. 2001) ......................................................9

*Citigroup Inc. v. Fed. Ins. Co.,*
649 F.3d 367 (5th Cir. 2011) ......................................................19

*Critelli v. Fidelity Nat'l Title Ins. Co. of New York,*
2007 WL 749693 (E.D.N.Y. Mar. 7, 2007) .....................................5

*Daft v. Advest, Inc.,*
658 F.3d 583 (6th Cir. 2011) ................................................. *passim*

*Darden v. Nationwide Mut. Ins. Co.,*
717 F. Supp. 388 (E.D.N.C. 1989), *aff'd* 922 F.2d 303 (4th Cir. 1991), *rev'd on other rounds* 122 S.Ct. 1344 (1992)....................................................15, 16

iii

CONFIDENTIAL

RBC-PAUL000010102

*Demery v. Extebank*,
    1998 U.S. Dist. LEXIS 23655 (E.D.N.Y. Nov. 23, 1998)................................................12

*Demery v. Extebank Deferred Comp. Plan*,
    216 F.3d 283 (2d Cir. 2000)............................................................10, 11, 12, 16

*Duggan v. Hobbs*,
    99 F.3d 307 (9th Cir. 1996) .................................................................................10

*Gluck v. Unisys Corp.*,
    960 F.2d 1168, 1177 (3d Cir. 1992) ...................................................................18

*Gosselink v. AT&T, Inc.*,
    1999 WL 33737341 (S.D. Tex. Aug. 4, 1999) ..............................................19, 20

*Hagel v. United Land Co.*,
    759 F. Supp. 1199 (E.D. Va. 1991) .......................................................................7

*Hogan v. Kraft Foods*,
    969 F.2d 142 (5th Cir. 1992) ..............................................................................19

*Hughes Aircraft Co. v. Jacobson*,
    525 U.S. 432 (1999)............................................................................................20

*In re Meinen*,
    228 B.R. 368 (Bankr. W.D. Pa. 1998) ..................................................................6

*In re The Colonial Bancgroup, Inc.*,
    436 B.R. 695 (M.D. Ala. June 25, 2010) ...............................................................9

*In re Tucker Freight Lines, Inc.*,
    789 F. Supp. 884 (W.D. Mich. 1991) ....................................................................4

*Int'l Paper Co. v. Suwyn*,
    978 F. Supp. 506 (S.D.N.Y. 1997) ........................................................................4

*Kirschbaum v. Reliant Energy, Inc.*,
    526 F.3d at 243 (5th Cir. 2008)...........................................................................20

*Larson v. Northrop Corp.*,
    21 F.3d 1164 (D.C. Cir. 1994) ............................................................................19

*Lasheen v. Loomis Co.*,
    2006 WL 618289 (E.D. Cal. Mar. 9, 2006) .........................................................13

iv

CONFIDENTIAL

RBC-PAUL000010103

*Lockheed Corp. v. Spink*,
  517 U.S. 882, 890 (1996)..................................................................20

*McKinsey v. Sentry Ins.*,
  986 F.2d 401 (10th Cir. 1993) .........................................................6, 7

*Mullett, v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*,
  2002 WL 32298599 (E.D. Pa. Feb. 26, 2002) ...............................6, 7, 8

*Murphy v. Inexco Oil Co.*,
  611 F.2d 570 (5th Cir. 1980) ...........................................................1, 8

*Radford v. Gen. Dynamics Corp.*,
  151 F.3d 396 (5th Cir. 1998) .............................................................19

*Reed v. City of Arlington*,
  650 F.3d 571 (5th Cir. 2011) .............................................................14

*Serio v. Wachovia Secs., LLC*,
  2007 WL 2462626 (D.N.J. Aug. 27, 2007) ......................................2, 5

*Spitz v. Berlin Indus., Inc.*,
  1994 WL 48593 (N.D. Ill. Feb. 16, 1994) ............................................6

*Williams v. Wright*,
  927 F.2d 1540 (11th Cir. 1991) ...........................................................4

*Wright v. Heyne*,
  349 F.3d 321 (6th Cir. 2003) .............................................................18

## STATUTES

29 C.F.R. § 2510.3 .............................................................................3, 4,

29 U.S.C. § 1051(2) ..............................................................................2,

29 U.S.C. § 1081(a)(3) .........................................................................2,

29 U.S.C. § 1101(a)(1)...............................................................2, 10, 12

29 U.S.C. § 1104(c) ...............................................................................4

29 U.S.C. § 1113(1) .............................................................................18

29 U.S.C. § 1113(2) .................................................................................

v

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
CONFIDENTIAL
RBC-PAUL000010104

**OTHER AUTHORITIES**

40 Fed. Reg. 34526-01 .............................................................................................4

44 Fed. Reg. 11761 ..................................................................................................4

DOL Op. Ltr. 77-85 ..................................................................................................6

DOL Op. Ltr. 80-31A ...............................................................................................6

DOL Op. Ltr. 83-33A ...............................................................................................6

DOL Op. Ltr. 84-12A ...............................................................................................5

DOL Op. Ltr. 90-14A ...........................................................................................9, 10

DOL Op. Ltr. 98-02A ...............................................................................................5

DOL Op. Ltr. 2002-13A ...........................................................................................5

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 48

CONFIDENTIAL

RBC-PAUL000010105

## INTRODUCTION

Plaintiff's 64-page "Response to Defendants' Motion for Summary Judgment and Reply in Support of [Her] Motion for Partial Summary Judgment" ("Response") strives mightily to convince the Court that some dispute of material fact precludes summary judgment in favor of Defendants (collectively "RBC").  But when the dust settles, the following facts are undisputed:

- the WAP (or "Plan") mandates that all WAP benefits be distributed to participants before termination or retirement, unless the individual participant elects otherwise;

- the clear majority of participants—as much as 66%—chose not to override the WAP's automatic in-service distributions;

- only 2.84% of the Plan sponsors' total workforce was ever eligible for the WAP;

- eligible employees earned at least 2.2 to 5.5 times more than the total workforce;

- the WAP's language and purposes are consistent with the top hat provisions;

- Plaintiff admittedly failed to exhaust the WAP's claims procedures;

- Plaintiff has had knowledge of the facts necessary to understand her "top hat" claim since 2003; and

- RBC's only role with respect to the WAP pertained to matters of Plan design.

These eight facts demonstrate that: (1) the WAP is not an ERISA pension plan; (2) even if it were, it is an exempt top hat plan; (3) Plaintiff is barred from pursuing her claims in court for lack of administrative exhaustion; (4) her pre-2009 claims are time-barred; and (5) she has sued the wrong parties.  Accordingly, summary judgment in favor of RBC is warranted.

To start, because the WAP mandates that benefits be paid in-service unless participants elect otherwise, and given that the clear majority of participants did not elect otherwise, Plaintiff cannot prove that the WAP is primarily "designed for the purpose of paying retirement income whether as a result of [its] express terms or surrounding circumstances." *Murphy v. Inexco Oil Co.*, 611 F.2d 570, 575 (5th Cir. 1980).  Plaintiff devotes roughly 30 pages of argument to try and overcome these dispositive facts—to no avail.  First, Plaintiff argues that the Court cannot

1

CONFIDENTIAL

RBC-PAUL000010106

consider the DOL regulation interpreting ERISA's pension plan definitions, because the WAP is not exclusively a "bonus program" as defined therein. But this argument is contradicted by the regulation's purpose of providing illustrative guidance, as well cases applying its principles to plans like the WAP that do not fit neatly within any of the regulation's specific plan categories.

Second, Plaintiff argues that the WAP's "express terms" demonstrate that it is primarily designed to provide retirement income. But this argument erroneously presumes that the mere option to receive benefits at retirement or termination is sufficient to trigger ERISA's coverage. In fact, when retirement or post-termination benefits are left to participant choice, the plan typically is not covered by ERISA. *See, e.g., Serio v. Wachovia Secs., LLC*, 2007 WL 2462626, at *4 (D.N.J. Aug. 27, 2007).

Third, Plaintiff points out that some participants received WAP benefits upon retirement or termination. But when this occurred, it was not the result of the WAP's *systematic* operation; rather, the WAP's only relevant systematic attribute is to automatically designate participants' benefits for in-service distribution. Although participants could elect to override that default rule, it is undisputed that the clear majority of participants did not.

The undisputed facts also leave no doubt that, even if the WAP were an ERISA pension plan, it is an exempt "top hat" plan. *See* 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1). Plaintiff asks this Court to do something no court has ever done before: to hold that an unfunded deferred compensation Plan offered to just 2.84% of all Plan sponsor employees, who earned easily more than double that of the workforce as a whole, does *not* satisfy ERISA's top hat provisions. Plaintiff's principal argument is that RBC has not proved that "all" or a "majority" of WAP participants had the opportunity to negotiate personalized Plan terms. However, the Fifth Circuit has not adopted this so-called "substantial influence" test. And even if it had, the undisputed facts show that WAP participants have substantial influence as heavily-recruited employees

2

CONFIDENTIAL

RBC-PAUL000010107

within the financial services industry, and that they *used* that influence to effect various substantive changes to the WAP.

Plaintiff also tries to evade the undisputed fact that just 2.84% of all Plan sponsor employees were ever eligible to participate in the WAP by simply asking the Court not to consider employees of one Plan sponsor, The Royal Bank of Canada ("Royal Bank").  Not surprisingly, she offers no legal support for her novel request—it is well-settled that a plan sponsor's "total workforce" must be considered in the top hat analysis. *See, e.g., Daft v. Advest, Inc.*, 658 F.3d 583, 595 (6th Cir. 2011).  Regardless, even if the Court were to limit its analysis as Plaintiff suggests, the WAP still satisfies ERISA's top hat provisions.

Finally, Plaintiff purports to dispute whether she failed to exhaust the WAP's administrative remedies, whether her claims with respect to the pre-2009 Plan years are time-barred, and whether she has named any fiduciary defendant.  Once again, however, the undisputed material facts trump her arguments.  Accordingly, for these reasons and those set forth in RBC's earlier briefs (Doc. Nos. 91 & 92), the Court should enter summary judgment in favor of RBC and dismiss Plaintiff's claims in their entirety.

## ARGUMENT

### I.     The WAP Is Not An Employee Pension Benefit Plan Under ERISA.

#### A.     The DOL Regulation Interpreting The "Employee Pension Benefit Plan" Definition And Cases Applying That Regulation Are Applicable Here.

Plaintiff predicates much of her ERISA plan argument on her contention that the WAP is not "exclusively a bonus program" under 29 C.F.R. § 2510.3-2(c), and thus it is improper for RBC to rely on authority applying that regulation. Pl. Resp. at 6.  However, the DOL regulation merely "clarifies the limits of the defined terms 'employee pension benefit plan' and 'pension plan,' . . . by identifying certain specific plans" that do not meet that definition. 29 C.F.R.

3

CONFIDENTIAL                                                                            RBC-PAUL000010108

§ 2510.3-2(a); *see also* 44 Fed. Reg. 11761, 11762 (Mar. 2, 1979) (explaining that a "plan not meeting the conditions of the regulation might nonetheless *not* constitute a pension plan" (emphasis added)); 40 Fed. Reg. 34526-01 (Aug. 15, 1975) (explaining that the regulation's purpose is "to provide guidance to determine coverage under [ERISA]"). This interpretive regulation does not, as Plaintiff suggests, prescribe an exhaustive list of all plans that fall outside of ERISA's coverage—nor could it, given the innumerable variations in employee benefits.[1]

Accordingly, courts rely on cases applying that regulation when evaluating plans that, like the WAP, do not fit squarely within one of its categories. *See, e.g.*, *Williams v. Wright*, 927 F.2d 1540, 1546 (11th Cir. 1991) (explaining that "[a]lthough [the DOL] regulation is not applicable here, the crucial distinction made by" courts interpreting it "is entirely relevant"); *Int'l Paper v. Suwyn*, 978 F. Supp. 506, 510-12 (S.D.N.Y. 1997) (applying bonus plan reasoning to a non-bonus plan); *In re Tucker Freight Lines, Inc.*, 789 F. Supp. 884, 890-91 (W.D. Mich. 1991) (same). As these cases demonstrate, the DOL's regulation (and cases applying it) are instructive in determining whether Plaintiff has established that the WAP is governed by ERISA.[2]

---

[1]    Plaintiff also incorrectly asserts that the regulation imposes a burden of proof on RBC. *See* Pl. Resp. at 2, 16. The ERISA cases Plaintiff cites for this erroneous proposition have nothing to do with the DOL regulation interpreting ERISA's pension plan definitions. Rather, they address ERISA's *statutory* safe harbor defense, 29 U.S.C. § 1104(c), which relieves plan fiduciaries from fiduciary liability under certain circumstances. Unlike § 1104(c), the requirement that the WAP be an "employee pension benefit plan" is not a statutory affirmative defense, but rather, part of Plaintiff's burden to establish ERISA's coverage. *See* Def. MSJ at 20.

[2]    This conclusion is particularly appropriate here, given the parallels between the WAP and a typical bonus plan. As Plaintiff acknowledges, a typical bonus plan "is one that gives increased compensation to 'reward,' 'encourage,' or 'incentivize.'" Pl. Resp. at 19. Similarly, under the WAP, participants receive Productivity and Loyalty Bonuses, which *reward, encourage* and *incentivize* both exceptional performance and continued loyalty. *See* Def. MSJ at 25. Or as Plaintiff succinctly put it: "the WAP [is] a huge carrot," designed to "entice and retain quality employees." Am. Cmpl. ¶¶ 76-77; Pl. MPSJ. at 6-7 (recognizing the same as "undisputed facts").

4

CONFIDENTIAL                                                  RBC-PAUL000010109

### B. The WAP, By Its Express Terms, Is Not Designed Primarily To Provide Retirement Or Post-Termination Benefits.

It is undisputed that the WAP *mandates* that benefits be paid out "in-service," unless participants expressly elect otherwise. Def. MSJ at 8-9; Ex. 3, Sikich Decl. ¶¶ 4-5.[3] Nevertheless, Plaintiff argues that the WAP's "express terms" prove that it is designed primarily to provide retirement income. Pl. Resp. at 9-14. This argument fails.

The crux of Plaintiff's argument is that the WAP "mak[es] receipt of income at retirement . . . an express plan option." Pl. Resp. at 11. But it is not enough that benefits *might* be deferred to retirement or termination. Rather, to constitute an ERISA pension plan, the receipt of benefits must be expressly conditioned on those events. *See, e.g.*, DOL Op. Ltr. 2002-13A (Dec. 6, 2002) (because neither plan "expressly condition[s] distribution" on termination or retirement, they "are not by their express terms employee pension benefit plans"); DOL Op. Ltr. 98-02A (Mar. 6, 1998) (same); DOL Op. Ltr. 84-12A (Feb. 23, 1984) (same).[4]

Furthermore, when it comes to "deferred compensation" plans like the WAP, "the critical factor in determining whether a [plan] is an ERISA pension plan is whether [it] allows payments to be made to employees during active employment." *Serio*, 2007 WL 2462626, at *4. Where, as here, "payment during employment [is] a strong possibility for many [p]articipants," then the mere option to defer benefits to retirement or termination does not trigger ERISA's coverage. *Id.* at *5; *see also* Def. MSJ at 21-24; *Critelli v. Fidelity Nat'l Title Ins. Co. of New York*, 2007 WL 749693, at *4 (E.D.N.Y. Mar. 7, 2007) ("It is well established in the Second Circuit that a mere option to defer compensation is insufficient to trigger ERISA coverage.").

---

[3]   "Ex. _" citations throughout reference exhibits attached to RBC's motion for summary judgment (Doc. No. 91).

[4]   Cherry-picking statements from Plan-related communications, Plaintiff claims that RBC "repeatedly characterized the WAP as a 'retirement' plan." Pl. Resp. at 12-14. However, only two of the selected statements refer (erroneously) to the WAP as a "retirement plan." Pl. Exs. 8 & 16. The others merely underscore that the WAP allows participants to defer current pay in a manner that best suits their needs, and distinguish the WAP from RBC's actual retirement plan, the 401(k) plan, *see* Def. MSJ at 6. Regardless, cherry-picking employer statements cannot create a genuine issue of material fact given the WAP's language and operation. *See* Def. Resp. MPSJ at 25-26.

5

CONFIDENTIAL                                      RBC-PAUL000010110

Although Plaintiff cites a handful of cases and DOL opinion letters that purportedly show that a plan permitting in-service receipt of benefits may still be covered by ERISA, Pl. Resp. at 21-22, those authorities are easily distinguished. In both *Meinen* and *Spitz*, the plans substantially limited the amount of in-service benefits that could be obtained and, in *Meinen*, the plan also imposed penalties on the receipt of those benefits. *See In re Meinen*, 228 B.R. 368, 381 (Bankr. W.D. Pa. 1998); *Spitz v. Berlin Indus., Inc.*, 1994 WL 48593, at *4 (N.D. Ill. Feb. 16, 1994). These same characteristics were present in the plans addressed in the DOL letters Plaintiff cites. *See* DOL Op. Ltr. 80-31A (May 22, 1980) (penalties including forfeiture of company matching contributions); DOL Op. Ltr. 83-33A (June 23, 1983) (early distribution "subject to certain conditions" not described); DOL Op. Ltr. 77-85 (Nov. 10, 1997) (only some benefits available).

By contrast, the WAP automatically designates benefits to be paid out *before* termination or retirement (unless the participant elected otherwise), with no penalty. *See* Def. MSJ at 8-9; Ex. 3, Sikich Decl. ¶¶ 4-6.[5] In other words, it is not the express terms of the WAP, but rather, the participants themselves who determine whether they will receive retirement or post-termination benefits. Accordingly, by its express terms, the WAP is not an ERISA pension plan.

## C. The WAP Does Not Systematically Defer Compensation To Retirement Or Post-Termination As A Result Of Surrounding Circumstances.

Plaintiff also argues that the WAP is a retirement plan based on the surrounding circumstances because: (i) RBC promoted the WAP as a retirement plan, (ii) the WAP provides participants with "tax benefits," and (iii) some WAP benefits were deferred to periods beyond

---

[5]    That Company contributions under the WAP are subject to either a four- or five-year vesting period, Def. MSJ at 8, does not undermine the conclusion that the WAP is *not* designed primarily to provide retirement or post-termination income. *See, e.g., McKinsey v. Sentry Ins.*, 986 F.2d 401, 405-06 (10th Cir. 1993) (holding that 5- to 7-year vesting period under deferred compensation plan designed to promote sales productivity and sales agent loyalty did not trigger ERISA's coverage); *Mullett v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 2002 WL 32298599, at *2-4 (E.D. Pa. Feb. 26, 2002) (10-year vesting period for company contributions did not trigger ERISA's coverage).

6

CONFIDENTIAL

RBC-PAUL000010111

termination due to vesting.  *See* Pl. Resp. 23-32.  However, none of these arguments suffices to prove that WAP benefits are "systematically" deferred to retirement or termination.

First, Plaintiff's argument that RBC promoted the WAP as a retirement plan requires construing any mention of "long-term savings" or "wealth accumulation" contained in any WAP communication as an effort to encourage participants to use the WAP as a retirement plan.  But such statements merely reflect that the WAP is a deferred compensation plan, which participants are told to use in whatever manner best suits their individual financial goals.  *See* Def. MSJ at 25-26.  Moreover, in terms of the WAP's "systematic" operation—which is the critical inquiry— the WAP *automatically* designates participants' benefits for *in-service* distribution, unless they expressly elect otherwise.  Def. MSJ at 8-9; Ex. 3, Sikich Decl. ¶¶ 4-6.  This systematic attribute of the Plan contradicts Plaintiff's assertion that the WAP was intended primarily to provide retirement income, as does the undisputed fact that, each year, up to 66% of WAP participants chose not to use the WAP as a retirement benefit.  Ex. 3, Sikich Decl. ¶ 6.

Second, Plaintiff's contention that the WAP is a retirement plan because it creates "tax benefits" goes too far.  Any form of deferred compensation will provide a tax benefit (by deferring taxation to future periods), and thus this factor is hardly determinative.  Indeed, courts routinely hold that various types of benefit plans are not governed by ERISA, despite providing obvious tax advantages.  *See, e.g.*, *McKinsey*, 986 F.2d at 406 (involving deferred compensation plan); *Mullett*, 2002 WL 32298599, at *4 (same); *Hagel v. United Land Co.*, 759 F. Supp. 1199, 1202 (E.D. Va. 1991) (profit-sharing plan with vesting schedule not an ERISA plan where "[i]ts purpose was not retirement income, but deferral of profit sharing income for tax purposes").

Finally, Plaintiff argues that, because Company Contributions under the WAP are subject to vesting periods, WAP participants will always have some unvested WAP benefits when they retire or terminate their employment.  *See* Pl. Resp. at 30-32.  But this argument wrongly

7

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 55

CONFIDENTIAL

assumes that WAP participants qualify for the WAP each year of their employment, and it has been flatly rejected by the courts.  *See, e.g., Murphy*, 611 F.2d at 575-76; *Serio*, 2007 WL 2462626, at \*5; *Mullett*, 2002 WL 32298599, at \*4.  This Court should do the same.

## II.   Even If ERISA Applies, Defendants Are Entitled To Summary Judgment Because The WAP Qualifies For ERISA's Top Hat Exemptions.

The critical facts that inform the quantitative and qualitative factors courts evaluate to determine whether a plan satisfies ERISA's top hat provisions are undisputed.  *Quantitatively*, just 2.84% of all Plan sponsor employees (U.S. and Canadian) were ever eligible to participate in the WAP.  *See* Def. MSJ at 15.  Even if one considers only the Plan sponsors' U.S. employees, the WAP's overall eligibility rate was just 13.39% or 15.51%.  *See* Def. Resp. MPSJ at 14-15.

*Qualitatively*, the average compensation of WAP eligible employees, at all times, was between 2.2 and 5.5 times greater than that of all Plan sponsor employees (or 3.2 to 7.2 times greater if median compensation is used), and exceeded that of all non-eligible employees by even greater multiples.  *See* Def. MSJ at 16-19; Def. Resp. MPSJ at 15-19.  There also is no genuine dispute that the WAP's language and purpose are consistent with ERISA's top hat exemptions. *See* Def. MSJ at 35-37; Def. Resp. MPSJ at 42-43.

Plaintiff therefore is asking this Court to do something no court has ever done before: to find that an unfunded deferred compensation plan offered to just 2.84% of all plan sponsor employees, who earned much more than double that of the total workforce, does *not* satisfy ERISA's top hat provisions.  Because none of Plaintiff's arguments justifies this unprecedented request, summary judgment should be granted in RBC's favor on the top hat issue as well.

### A.   The Fifth Circuit Has Not Adopted A "Substantial Influence" Test And, Even If It Had, RBC Still Wins.

Twenty-two years ago, the DOL noted in passing its "view" that, in enacting ERISA's top hat exemptions, "Congress recognized that certain individuals, by virtue of their position or

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION

CONFIDENTIAL

RBC-PAUL000010113

compensation level, have the ability to affect or substantially influence, through negotiations or otherwise, the design and operation of their deferred compensation plan . . . , and, therefore, would not need the substantive rights and protections of Title I [of ERISA]."  DOL Op. Ltr. 90-14A (May 8, 1990) (addressing only whether a plan was "unfunded" and not whether it was offered to a "select group").  In doing so, the DOL did not prescribe a test to qualify for ERISA's top hat exemptions, but rather, merely provided "a gloss on Congress's intentions in enacting" those provisions.  *Alexander v. Brigham & Women's Physicians Org., Inc.*, 513 F.3d 37, 47 (1st Cir. 2008); *see also, e.g.*, *In re The Colonial Bancgroup, Inc.*, 436 B.R. 695, 708 (M.D. Ala. 2010).

Nonetheless, Plaintiff contends that the Fifth Circuit has adopted this "gloss" as a controlling legal element, such that a plan cannot qualify for ERISA's top hat exemptions absent proof that "all" or "a majority" of participants were able to individually "negotiate" personalized plan terms.  Pl. Resp. at 35.  Plaintiff's contention, based on a one-sentence affirmance of the district court's decision in *Carrabba*, is mistaken.  *See Carrabba v. Randalls Food Mkts., Inc.*, 38 F. Supp. 2d 468 (N.D. Tex. 1999), *aff'd*, 252 F.3d 721 (5th Cir. 2001) (*per curiam*).  As discussed, *see* Def. Resp. MPSJ at 44-45, not even the district court in *Carrabba*, much less the Fifth Circuit, endorsed Plaintiff's expansive view of the DOL's opinion letter.  Rather, while the court noted in *dicta* that the letter was "perhaps" useful to the top hat analysis, its actual holding was much more limited: "[t]he furthest the court can go is to express the conclusion that it cannot find from the evidence that the participants of the [plan] were 'a select group[.]'"  *Id.* at 478.[6]

Furthermore, while Plaintiff is correct that some courts have considered the DOL's letter in connection with the top hat analysis, *none* has held that "when an otherwise valid top-hat plan

---

[6] This holding is hardly surprising, considering that the *Carrabba* court was not presented with evidence that the plan was limited to a small percentage of the employer's total workforce, or any meaningful analysis of the compensation disparity between the "plan members and non-members," such that it could satisfy any of the quantitative and qualitative factors courts have developed since *Carrabba*. *See, e.g.*, *Daft*, 658 F.3d at 595.

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 57

CONFIDENTIAL

RBC-PAUL000010114

is offered to a 'select group of management or highly compensated employees,' that plan will lose its exempt status if any one of the covered employees lacks individual bargaining power." *Alexander*, 513 F.3d at 47, 48 n.9 (addressing *Duggan v. Hobbs*, 99 F.3d 307 (9th Cir. 1996) and other cases considering the DOL's letter); *see also Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 289-90 (2d Cir. 2000) (holding that plan satisfied ERISA's top hat exemptions, despite the record's "silen[ce] as to plaintiffs' ability to negotiate the terms of the [p]lan"); *Callan v. Merrill Lynch & Co., Inc.*, 2010 WL 3452371, at *10-12 (S.D. Cal. Aug. 30, 2010) (holding that plan satisfied top hat exemptions, despite plaintiff's declaration that he lacked bargaining power). This is because the quantitative and qualitative factors courts use to evaluate top hat plans, *see, e.g., Daft*, 658 F.3d at 595, on their own, provide a reliable method for ensuring a plan is maintained for a "select group," 29 U.S.C. § 1101(a)(1).

Regardless, even if one could imagine a scenario in which a quantitatively and qualitatively select group of employees somehow lack the ability to "affect or substantially influence . . . their deferred compensation plan," DOL Op. Ltr. 90-14A, that is not the case here. Plaintiff does not dispute that the WAP was routinely evaluated and adjusted to ensure that it remained a highly attractive benefit to its participants. *See* Def. MSJ at 11-12. Nor does she dispute that this was done because WAP participants are heavily recruited by RBC's competitors and can easily take all of their clients with them should they choose to leave. *See id.*

WAP participants not only wield "substantial influence" but also *used* that influence to effect substantive changes to the WAP, including: additional WAP investment options; modifications allowing participants to invest with greater frequency; and eliminating matching contributions in favor of Productivity and Loyalty bonuses, so participants could increase their WAP benefits without making voluntary contributions. Ex. 3, Sikich Decl. ¶ 9. These undisputed facts demonstrate precisely the type of "substantial influence" Congress had in mind

10

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 58

CONFIDENTIAL

RBC-PAUL000010115

when it enacted ERISA's top hat provisions. *See Alexander v. Brigham & Women's Physicians Org., Inc.*, 467 F. Supp. 2d 136, 147 (D. Mass. 2006) (holding that participants "had the power to influence the terms and operation of plan," because (i) the plan was "established as a result of the threat that [participants] would leave . . . for a more lucrative position," and (ii) a participant proposal to modify the plan "was adopted"), *aff'd*, 513 F.3d 37 (1st Cir. 2008).

Plaintiff nonetheless argues that RBC has not shown that "all" or "a majority" of WAP participants bargained for individualized Plan terms. Pl. Resp. at 35. However, she has not identified any authority for the proposition that, to satisfy the top hat exemptions, an employer must prove the existence of bargaining power as to individual plan participants. *Cf. Alexander*, 513 F.3d at 47-48 & n.9 (noting that cases have not gone this far and that it would lead to "bizarre" results). To the contrary, the most analogous case Plaintiff cites to support her position—*Demery*—significantly undermines it. Pl. Resp. at 34. In *Demery*, the Second Circuit held that a plan was sufficiently quantitatively and qualitatively select to satisfy ERISA's top hat exemptions. 216 F.3d at 287-89. The court then went on to reject plaintiffs' argument that summary judgment was, nonetheless, unwarranted because they lacked the ability to negotiate the plan's terms. As the court explained, "the record [was] silent as to plaintiffs' ability to negotiate the terms of the [p]lan, and there [was] no evidence that they attempted to do so." *Id.* at 289-90. Accordingly, the court held that there was no evidence of an "absence of bargaining power sufficient to raise a question of fact," and thus summary judgment in favor of the employer on the top hat issue was entirely appropriate. *Id.* at 290.

The *Demery* reasoning applies with even greater force here because the record is *not* silent as to bargaining power. Rather, it is undisputed that the WAP was designed, evaluated and modified so as to attract and retain valuable employees, and that those employees, in turn, were able to effect "substantive changes to the WAP[.]" Ex. 3, Sikich Decl. ¶ 9. Moreover, while

11

CONFIDENTIAL

Plaintiff testified that she never attempted to influence the WAP, she admitted that it would not surprise her if other participants did. Ex. A (attached), Tolbert Dep. at 131:4-132:9. Thus, even if the Court considers the issue, Plaintiff has failed to present any "evidence suggesting an absence of bargaining power sufficient to raise a question of fact" that could preclude summary judgment in favor of RBC. *Demery*, 216 F.3d at 290; *see also, e.g., Alexander*, 467 F. Supp. 2d at 146-47.

**B.      It Is Immaterial Whether WAP-Eligible Employees Also Were Management.**

Plaintiff argues that "RBC has failed to prove" that the WAP was primarily maintained for management employees. Pl. Resp. at 36-37.   However, the top hat provisions cover plans "maintained for a select group of management *or* highly compensated employees."   29 U.S.C. § 1101(a)(1) (emphasis added).   Because the undisputed facts demonstrate that the WAP was maintained for a select group of highly compensated employees, it is immaterial whether they all were management employees as well.  *See* Def. Resp. MPSJ at 33-36.[7]

**C.      Plaintiff's Arguments Concerning Royal Bank's Total Workforce And The Experts' Analyses Are Misguided And Immaterial.**

**1.      The Court Should Consider The Total Workforce Of All Plan Sponsor Employers, Including The Royal Bank's.**

It is undisputed that non-party Royal Bank is a WAP sponsor, Am. Cmpl. ¶ 19, and that many of its employees qualify for the WAP each year, *see* Ex. B (attached), 2d Sikich Decl. ¶ 4.

---

[7]     Plaintiff argues that *Demery* limited its holding that a 15.34% plan eligibility rate was sufficiently *quantitatively* select to satisfy ERISA's top hat provisions solely to plans that are maintained for management, as opposed to highly compensated, employees. *See* Pl. Resp. at 47-48. Plaintiff is mistaken. While *Demery* recognized that many of the plan's participants were management employees, it also found that, regardless, they were "highly compensated" within the meaning of the top hat provisions because their "average salary . . . was more than double that of the average salary of all [plan sponsor] employees." 216 F.3d at 289. Thus, the court in no way suggested that its finding as to the plan's quantitative selectivity turned on whether employees were "management" or "highly compensated." Nor have subsequent decisions interpreted *Demery* so narrowly. *See, e.g., Alexander*, 513 F.3d at 46 (citing *Demery*'s eligibility percentage in holding that a plan with *no* management employees satisfied ERISA's top hat provisions); *Callan*, 2010 WL 3452371, at *10 (same and citing *Demery* for the proposition that "plans that limit participation to 15% or less of the workforce have consistently been treated as top hat plans"). Plaintiff's narrow reading of *Demery* also is undermined by the court's conclusion that, even if 10% to 15% of eligible employees were not "highly compensated" or "management," it would not have changed its holding that the plan satisfied ERISA's top hat provisions. *See Demery*, 216 F.3d at 289 (noting that "two or three" out of approximately 30 eligible employees, *see Demery v. Extebank Deferred Comp. Plan (B)*, 1998 U.S. Dist. LEXIS 23655, at *7 (E.D.N.Y. Nov. 23, 1998), may not have been either highly compensated or management).

12

CONFIDENTIAL

RBC-PAUL000010117

It also is undisputed that only 2.84% of all WAP sponsor employees, including Royal Bank, were ever eligible to participate in the WAP. *See* Def. MSJ at 15. However, Plaintiff argues that the Court should ignore these facts because: (i) there is "no authority" for including Royal Bank's non-U.S. employees in the "total workforce"; and (ii) RBC did not expressly rely on this information in prior litigation or internally. Pl. Resp. at 37-41. Neither argument has merit.

First, Plaintiff is wrong in suggesting that there is no authority for including a plan sponsor's non-U.S. employees in the "total workforce" for top hat purposes. In evaluating whether a plan satisfies the top hat exemptions, courts consider both the "actual language of the plan" and the "*total workforce*" of those employers who sponsor the plan. *Daft*, 658 F.3d at 595 (emphasis added); *see also, e.g., Callan*, 2010 WL 3452371, at *10-12 (considering Merrill Lynch's "total workforce" and the plan's "plain language"). Here, the WAP makes clear that it is provided to all employees of the Royal Bank and its "Participating Subsidiaries" (*i.e.*, the named defendants), provided they: (i) perform the majority of their services outside of Canada; and (ii) satisfy the production or compensation thresholds prescribed by the WAP Committee. *See* Def. MSJ at 9; Am. Cmpl. Ex. A, 2008 WAP §§ 1.1 & 2.1. Given the Plan's clear terms, there is no sound basis for excluding from the "total workforce" Royal Bank employees who failed to meet the Plan's first eligibility requirement, while simultaneously including (as Plaintiff has) the thousands of employees who failed to meet the second requirement.[8]

This conclusion is reinforced by the First Circuit's decision in *Alexander*. There, the court considered the plan sponsor's total workforce, even though the vast majority of its employees were not "surgeons who were full-time faculty at Harvard Medical School" and, thus—much like Royal Bank's Canadian employees—could not have qualified for the plan

---

[8]   ERISA is fully applicable to plans administered within the U.S. that are provided for the benefit of U.S. and foreign employees alike. *See, e.g., Lasheen v. Loomis Co.*, 2006 WL 618289 (E.D. Cal. Mar. 9, 2006).

13

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION

CONFIDENTIAL                                                                RBC-PAUL000010118

regardless of how much they earned. *Alexander*, 467 F. Supp. 2d at 140; *see also Alexander*, 513 F.3d at 41. In short, the top hat cases support the conclusion that the total workforce of all plan sponsor employers must be considered, regardless of whether certain employees can satisfy the plan's non-financial eligibility requirements.

Second, Plaintiff offers no sound basis for precluding RBC from relying on the undisputed facts concerning Royal Bank's total workforce. Plaintiff does not argue, for example, that judicial estoppel applies. Presumably, this is because Plaintiff knows that any such argument is a loser: RBC has never maintained that Royal Bank's non-U.S. employees are immaterial to the top hat analysis, nor has any court ever "accepted" such a position. *See, e.g.*, *Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011) (judicial estoppel requires a showing that "the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position . . . [and that] a court accepted the prior position").[9]

Plaintiff's complaint also rings especially hollow, considering that she has repeatedly tried to use information concerning Royal Bank's Canadian employees for her own benefit. Both in the Amended Complaint and in her motion for partial summary judgment, Plaintiff has argued that the compensation of Royal Bank's Canadian executives supports her contention that the WAP is not a top hat plan. *See* Am. Cmpl. ¶ 101; Pl. MPSJ at 35-36. Moreover, while Plaintiff characterizes RBC's reliance on the Canadian data as "insidious[,]" Pl. Resp. at 39, there is no question she has had a full and fair opportunity to evaluate that data.[10]

---

[9]   Plaintiff's assertions concerning when and whether RBC considered all Royal Bank employees in its internal analyses, *see, e.g.*, Pl. Resp. at 39 ("RBC's internal analyses have never focused on its 'total workforce' worldwide."), are inherently speculative and prove nothing. As Plaintiff's previous motion to compel briefing in this case concedes, there is a wealth of privileged information concerning RBC's internal analyses that has not been produced (because it is privileged) and of which Plaintiff has no knowledge. *See* Doc Nos. 59, 61, 66, 69-71.

[10]   Plaintiff's discussion of the proposed stipulations RBC's counsel circulated during fact discovery is irrelevant. That proposal—which Plaintiff solicited but ultimately rejected—was based on the discovery record at the time and, thus, did not address non-party Royal Bank's data, which Plaintiff never sought during discovery. Regardless, by their own terms, the *proposed* stipulations did not preclude arguments based on *other* facts. *See* Pl. Ex. 33.

14

CONFIDENTIAL

RBC-PAUL000010119

In any event, even if the Court were to limit its top hat analysis to the Plan sponsors' U.S. workforce, it would not save Plaintiff from summary judgment. Even excluding Royal Bank's total workforce, the WAP's overall eligibility rate (either 13.39% or 15.51%) is sufficient to render it *quantitatively* select, and the compensation disparity between WAP participants and the U.S. workforce (or non-eligible employees) is sufficiently great to render the Plan *qualitatively* select. *See* Def. MSJ at 30-35; Def. Resp. MPSJ at 30-36.

2.    **Plaintiff's Attempts To Legitimize Solomon's Compensation Analyses And To Discredit Niden's Eligibility Rate Determinations Fail.**

**Solomon's Compensation Analyses.** Plaintiff offers no response to RBC's specific criticisms of Solomon's alternative compensation analyses. *See* Def. Resp. MPSJ at 37-41. Rather, she simply restates Solomon's conclusion that certain WAP-eligible employees—Financial Consultants—earned "only" 1.78 to 2.21 times more than that of all U.S. employees (including both eligible and ineligible alike), and argues that Solomon's alternative analyses are supported by several district court decisions. *See* Pl. Resp. at 41-45. This is insufficient.

To begin with, Plaintiff's contention that Solomon's comparison of the average pay of a subset of WAP eligible employees to that of all U.S. employees is consistent with the approach taken in *Darden* is mistaken. Pl. Resp. at 43 (citing *Darden v. Nationwide Mut. Ins. Co.*, 717 F. Supp. 388, 397 (E.D.N.C. 1989)). Unlike Solomon, the *Darden* court did not slice up eligible employees into isolated groups and then compare their pay to that of all plan sponsor employees. Rather, the court compared the average compensation of eligible employees *as a whole* (all "agents") to that of two groups of *non-eligible* employees ("non-agents" and "management").

15

CONFIDENTIAL                                                RBC-PAUL000010120

*Id.* at 397.  In other words, the *Darden* analysis is consistent with the test recognized by the Sixth

Circuit in *Daft*, 658 F.3d at 595, which the WAP indisputably satisfies, Defs. MSJ at 34-35.[11]

Plaintiff's reference to the test applied by the Court in *Belka*, *see* Pl. Resp. 44-45, of

which Solomon was aware but chose not to perform, further undercuts Solomon's analyses.  In

*Belka*, the court found that the plan was a top hat plan because "almost all" of its participants

were "among the highest paid 25 percent of all employees." *Belka v. Rowe Furniture Corp.*, 571

F. Supp. 1249, 1253 (D. Md. 1983).  And the undisputed results of that test here—which Niden

did perform—strongly support the conclusion that the WAP was maintained for a select group of

highly compensated employees.  *See* Def. Resp. MPSJ at 39-40.

In sum, the parties have identified three valid, qualitative tests courts have used to

determine whether a plan is maintained for a select group of highly compensated employees:

(1) the compensation disparity between plan-eligible employees and the total workforce, *see,*

*e.g.*, *Demery*, 216 F.3d at 289; (2) the compensation disparity between plan-eligible employees

and non-eligible employees, *see, e.g.*, *Daft*, 658 F.3d at 595; and (3) whether eligible employees

are "among the highest paid 25 percent" of the total workforce, *see Belka*, 571 F. Supp. at 1253.

Because the undisputed results under each supports a finding that the WAP was maintained for

highly compensated employees, Plaintiff's flawed alternative analyses are fruitless.

**Niden's Eligibility Rate Determinations.**  Plaintiff next argues that the methodology

Solomon used to calculate the WAP's annual eligibility rate is superior to Niden's methodology.

Pl. Resp. at 45-46.  However, Plaintiff offers no answer to the various points supporting the

opposite conclusion, including that Niden's methodology: (i) tracks the WAP eligibility

determination process; (ii) is consistent with the approach courts use to determine employee

---

[11]   Regardless, even considering WAP eligible Financial Consultants in isolation, it is clear that they are a select, highly-compensated group.  Not only did they earn roughly double that of the U.S. workforce, but they also earned between 2.9 and 4.0 times more than non-eligible U.S. employees.  *See* Def. Resp. MPSJ at 41-42.

16

CONFIDENTIAL                                                                                   RBC-PAUL000010121

percentages in ERISA contexts; and (iii) provides a practical way for employers to evaluate their top hat plans amidst substantial workforce volatility. *See* Def. Resp. MPSJ at 30-33.

Instead, the best Plaintiff has to offer is her contention that Niden's analysis "includes both newly hired <u>and</u> terminated employees." Pl. Resp. at 46. But this argument misunderstands RBC's two-phased eligibility determination process. *See* Def. Resp. MPSJ at 30-33. It also ignores that an employee's resignation has no effect on whether she was deemed eligible for the WAP prior to or during the Plan year. Ex. C (attached), Solomon Dep. at 42:5-19.[12]

**III.    Plaintiff Failed To Exhaust The WAP's Administrative Claims Procedure.**

The only argument Plaintiff offers beyond those the parties have already briefed, *see* Def. MSJ at 37-38, is that RBC has "waived" its administrative exhaustion defense by not pleading it in a formal answer. Pl. Resp. at 49-50. This argument is frivolous. First, because RBC moved to dismiss the Amended Complaint under Rule 12(b)(6), it had no obligation to file an answer.[13] Second, RBC moved to dismiss the Amended Complaint *based* on the exhaustion defense.

**IV.    Plaintiff's Fiduciary Breach Claim Is Time-Barred As To Pre-2009 Plan Years.**

**A.    Plaintiff Had Sufficient Information To Understand Her Claims More Than Three Years Before Filing The Complaint.**

RBC's opening brief (at 39-42) demonstrates that Plaintiff's fiduciary breach claim, as it relates to pre-2009 Plan years, is time-barred because she was aware of the "material facts necessary to understand that some claim exist[ed]" more than three years before she filed suit. *Babcock v. Hartmarx Corp.*, 182 F.3d 336, 339 (5th Cir. 1999). Plaintiff responds that it is "incredulous" to expect her to "magically surmise that the WAP might" not have qualified as a top hat plan. Pl. Resp. at 54. Plaintiff's rhetoric cannot preclude summary judgment.

---

[12]    Plaintiff also accuses Niden of "double counting," but the technical glitch she is pejoratively referring to had no material effect whatsoever on the eligibility percentages Niden calculated. Ex. D (attached), Niden Rev. ¶ 7.

[13]    Plaintiff's identical waiver argument as to RBC's statute of limitations defenses fails for the same reason.

17

CONFIDENTIAL                                                                    RBC-PAUL000010122

Plaintiff's core contention, that one cannot obtain "actual knowledge" of a top hat claim without specialized ERISA knowledge and details about the plan's eligibility percentages, is untenable. If Plaintiff's view were adopted, the limitations period would not begin to run until after a plaintiff has retained an attorney and taken discovery. But this is far more than ERISA demands. *See, e.g., Babcock*, 182 F.3d at 340 (recognizing the Fifth Circuit has never held that, to have "actual knowledge," a plaintiff must know the precise cause of action giving rise to a claim); *Wright v. Heyne*, 349 F.3d 321, 331 (6th Cir. 2003) (refusing to begin limitations period only after a plaintiff "learns from the attorney that he has [a fiduciary breach] claim"); *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1177 (3d Cir. 1992) ("actual knowledge" does not mean "the statute of limitations can never begin to run until a plaintiff first consults with a lawyer").

Plaintiff also ignores her own admissions, which make clear that she considered her own WAP eligibility as proof that it was not a top hat plan. *See* Def. MSJ at 40-42. Plaintiff likewise admitted that, by no later than 2003, she was fully aware of the WAP's eligibility requirements, its vesting and forfeiture provisions, its "unfunded" status, and that it was supposed to be "for a select group of management or highly compensated employees." Ex. A, Tolbert Dep. Ex. 14, 2002 SPD at 2, 5-7, 9; *see also* Am. Cmpl. ¶ 97; Ex. A, Tolbert Dep. at 128:10-129:10. In short, Plaintiff had everything she needed to know to understand her top hat claims before January 2008, and her pre-2009 Plan year claims are time-barred as a result.

## B.     Plaintiff's Claims Are Also Barred By ERISA's Six-Year Statute Of Repose.

Plaintiff's only response to RBC's assertion that her claims are, in part, precluded by ERISA's six-year statute of repose is that RBC failed to identify the precise date of "the last action which constituted a part of the breach or violation." Pl. Resp. at 55. However, RBC must establish only that the "last action" constituting a part of the alleged breach occurred before January 11, 2005 (six years before this suit was filed), 29 U.S.C. § 1113(1), and Plaintiff has

18

CONFIDENTIAL

RBC-PAUL000010123

cited no contrary authority.  *Cf. Radford v. Gen. Dynamics Corp.*, 151 F.3d 396, 399 (5th Cir. 1998) (noting that the "last action" constituting a fiduciary breach was at an undefined time prior to the date plaintiff obtained actual knowledge); *Banks v. F.D.I.C.*, 374 Fed. App'x 532, 535 n.3 (5th Cir. Mar. 24, 2010) (claim time-barred based on unspecified date outside limitations period).

Here, Plaintiff's own allegations and testimony demonstrate that if RBC committed any breach with respect to the pre-2009 Plan years, the "last action" must have occurred more than six years before she filed her complaint.  *See* Def. MSJ at 42-44.  Plaintiff has made no effort to dispute, as she must, the facts underlying this conclusion.  *See, e.g., Citigroup, Inc. v. Fed. Ins. Co.*, 649 F.3d 367, 371 (5th Cir. 2011) (once a party establishes elements of a limitations defense, "the burden shifts to the nonmovant to provide specific facts showing the existence of a genuine issue for trial").  Thus, Plaintiff's claim is partially time-barred on this additional basis.

## C.    The Fraud Or Concealment Exception Does Not Apply.

Plaintiff bears the burden of establishing the applicability of the "fraud and concealment" exception under 29 U.S.C. § 1113(2).  *See Gosselink v. AT&T, Inc.*, 1999 WL 33737341, at *12-13 (S.D. Tex. Aug. 4, 1999).  She first needed to plead with particularity the facts supporting the alleged "fraud or concealment."  *See, e.g., Larson v. Northrop Corp.*, 21 F.3d 1164, 1173 (D.C. Cir. 1994) ("[A]llegations of fraudulent concealment, which toll the statute of limitations, must meet the requirements of Fed. R. Civ. P. 9(b)."); *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001) (same).  And she must ultimately prove that RBC "had both actual knowledge that a wrong had occurred and a fixed purpose to conceal the wrong from the injured party."  *Hogan v. Kraft Foods*, 969 F.2d 142, 145 (5th Cir. 1992).

Plaintiff has done neither.  Rather, she merely baldly asserts that RBC has "continued to insist that the WAP is and always was a valid top hat plan," and that "Plaintiff had no access . . . to RBC's analyses or studies" regarding the WAP.  Pl. Resp. at 56.  This is plainly insufficient to

19

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 67

CONFIDENTIAL

RBC-PAUL000010124

support application of the "fraud or concealment" exception. *See, e.g., Gosselink*, 1999 WL 33737341, at *13 ("simply assert[ing], in a conclusory fashion, that [defendant] concealed its violations of ERISA" does not suffice).

## V.   Plaintiff Has Not Sued Any WAP Fiduciary.

Plaintiff argues that RBC is a WAP fiduciary because the Operating Committee had a role in evaluating the WAP's compliance with ERISA's top hat provisions, determining the WAP's overall design (including whether it would be funded), and amending its eligibility provisions. Pl. Resp. at 58-63.   But the functions Plaintiff has described are not *fiduciary* in nature. *See, e.g., Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 443-45 (1999); *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 251 (5th Cir. 2008) ("[W]hen employers undertake actions to adopt, modify or terminate a plan, 'they do not act as fiduciaries but are analogous to the settlors of the trust.'" (quoting *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996)).   Thus, by identifying the Operating Committee's role in the design and amendment of the WAP, Plaintiff has only reinforced the conclusion that RBC did not act as a fiduciary with respect to the WAP.[14]

### CONCLUSION

For all of the foregoing reasons, RBC respectfully submits that the Court should grant summary judgment in RBC's favor and dismiss Plaintiff's claims in their entirety.

Respectfully submitted,

RBC Capital Markets Corporation; RBC Capital Markets, LLC; RBC Centura Bank; and RBC U.S. Insurance Services, Inc.

by:  s/ Christopher J. Boran

---

[14]   While Plaintiff also argues that RBC is a creditor with respect to participants' vested WAP benefits, Pl. Resp. 62-63, this does not translate into fiduciary status. Plaintiff is merely taking issue with the fact that the WAP was *designed* to be unfunded.   But acts of plan design do not trigger fiduciary status. *See, e.g., Hughes Aircraft Co.*, 525 U.S. at 443-45; *Kirschbaum*, 526 F.3d at 251.

20

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 68

CONFIDENTIAL

RBC-PAUL000010125

Alison J. Gates
  TX State Bar No.24055535
  Federal ID No. 706309
**MORGAN, LEWIS & BOCKIUS LLP**
1000 Louisiana, Suite 4200
Houston, Texas 77002
T: 713.890.5157
F: 713.890.5001

Sari M. Alamuddin (admitted *pro hac vice*)
  Ill. State Bar No. 6215689
Christopher J. Boran (admitted *pro hac vice*)
  Ill. State Bar No. 6282552
Matthew A. Russell (admitted *pro hac vice*)
  Ill. State Bar No. 6290632
**MORGAN, LEWIS & BOCKIUS LLP**
77 West Wacker Drive, Fifth Floor
Chicago, Illinois 60601
T: 312.324.1000
F: 312.323.1001
E: cboran@morganlewis.com

21

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION

CONFIDENTIAL

RBC-PAUL000010126

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Defendants' Reply in Support of Their Motion for Summary Judgment has been sent to counsel of record through the Court's CM/ECF system and by U.S. mail, return receipt requested, this 26th day of March, 2012, as follows:

> Mr. Geoffrey H. Bracken
> Gardere Wynne Sewell LLP
> 1000 Louisiana, Suite 3400
> Houston, Texas 77002-5007
>
> Mr. William G. Whitehill
> Mr. Joe B. Harrison
> Gardere Wynne Sewell LLP
> 1601 Elm Street, Suite 3000
> Dallas, Texas 75201

s/ Christopher J. Boran

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 70

CONFIDENTIAL

RBC-PAUL000010127

# EXHIBIT 4

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| BRENDA TOLBERT, | § | |
|  | § | |
|  | § | |
| Plaintiff, | § | No. 4:11-CV-107 |
|  | § | |
| v. | § | Judge Keith P. Ellison |
|  | § | |
| RBC CAPITAL MARKETS | § | |
| CORPORATION N/K/A RBC CAPITAL | § | |
| MARKETS, LLC; RBC CENTURA BANK | § | |
| N/K/A RBC BANK (USA); RBC U.S. | § | |
| INSURANCE SERVICES INC. | § | |
|  | § | |
| Defendants. | § | |
|  | § | |

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## AND BRIEF IN SUPPORT

---

Sari M. Alamuddin (admitted pro hac vice)
Ill. State Bar No. 6215689
Christopher J. Boran (admitted pro hac vice)
Ill. State Bar No. 6282552
Matthew A. Russell (admitted pro hac vice)
Ill. State Bar No. 6290632
**MORGAN, LEWIS & BOCKIUS LLP**
77 W. Wacker Drive, Fifth Floor
Chicago, Illinois 60601
T: 312.324.1000
F: 312.324.1001
E: cboran@morganlewis.com

Alison J. Gates
Tex. State Bar No. 24055535
Fed. ID No. 706309
**MORGAN, LEWIS & BOCKIUS LLP**
1000 Louisiana, Suite 4200
Houston, Texas 77002
T: 713.890.5157
F: 713.890.5001

CONFIDENTIAL

RBC-PAUL000009947

# TABLE OF CONTENTS

**Page(s)**

**TABLE OF AUTHORITIES** ...................................................................... iii

**INTRODUCTION AND SUMMARY OF ARGUMENT** .......................... 1

**NATURE AND STAGE OF PROCEEDINGS** ........................................ 4

**STATEMENT OF ISSUES TO BE CONSIDERED** .............................. 5

**STATEMENT OF UNDISPUTED FACTS** .............................................. 6

I.   The WAP Is Designed To Attract And Retain Valuable Employees By Allowing Them To Defer Compensation To A Time Of Their Choosing ............................................. 6

    A.   The WAP Provides Deferred Compensation In The Form Of Bonuses And Matching Contributions ................................................................... 7

    B.   Participants' WAP Benefits Are Distributed While They Are Still Employed At RBC, Unless The Participant Specifically Elects Otherwise ............................ 8

II.   The WAP's Eligibility Requirements .................................................. 9

III.   The Composition Of WAP Participants ............................................. 11

    A.   Financial Consultants ................................................................ 11

    B.   Complex Directors And Branch Directors ................................. 12

    C.   Business Line Directors And Presidents, And Regional Directors ........ 13

    D.   Other Non-Production Participants ........................................... 14

IV.   WAP Eligible Employees Represent A Fraction Of The Plan Sponsors' Total Workforce And Earn Substantially More Than The Workforce as a Whole ............................ 15

    A.   Only A Fraction Of Plan Sponsor Employees Are Eligible For The WAP ...... 15

    B.   WAP Eligible Employees Earn Substantially More Than Non-Eligible Employees And The Workforce As A Whole ........................................ 16

        1.   WAP Eligible Employees Earned Significantly More Than The Workforce As A Whole ................................................. 16

        2.   WAP Eligible Employees Earned Significantly More Than Non-Eligible Employees ................................................. 18

V.   The WAP Contains An Administrative Claims Procedure, Which Plaintiff Chose Not To Exhaust ................................................................................... 19

**ARGUMENT** ....................................................................................... **20**

I.   Plaintiff's Claims Fail Because The WAP Is Not Governed by ERISA .......... 20

i

CONFIDENTIAL

RBC-PAUL000009948

A.   For ERISA To Apply, Plaintiff Must Show That The WAP Was
Expressly Designed To Provide Retirement Income, Or That It
Does So As A Result Of Its "Systematic" Operation ...............................................20

B.   The Undisputed Facts Demonstrate That The WAP Is Not An Employee
Pension Benefit Plan Under ERISA .................................................................23

1.   The WAP Is Not Designed To Provide Retirement Income.....................23

2.   The WAP's Operation Does Not Result In The Systematic
Deferral Of Income To Retirement Or Periods Beyond Termination .......25

II.   Even Assuming ERISA Applies, The WAP Is A "Top Hat" Plan Exempt From ERISA's
Vesting, Funding And Fiduciary Duty Provisions.................................................27

A.   The WAP Is Unfunded..............................................................................27

B.   The WAP Is Maintained For The Primary Benefit Of A Select Group
Of Highly Compensated Employees ............................................................29

1.   Only A Fraction Of The Total Workforce Qualifies For The WAP..........29

2.   Even When Compared To The U.S. Workforce Only,
The WAP Is Sufficiently Select.................................................................30

3.   The WAP Primarily Benefits Highly Compensated Employees ..............32

(a)   WAP Eligible Employees Earned Significantly More
Than Double That Of The Workforce As A Whole .....................32

(b)   WAP Eligible Employees Earned Vastly More than
Non-Eligible Employees.............................................................34

4.   The WAP's Plain Language And Primary Purpose Are
Consistent With ERISA's Top Hat Requirements.....................................35

III.   Defendants Are Entitled To Summary Judgment Because Plaintiff Admittedly
Failed To Comply With The WAP's Administrative Claims Procedure..........................37

IV.   Defendants Are Entitled To Summary Judgment To the Extent Plaintiff Seeks To
Recover For Plan Years Prior To 2009...............................................................39

A.   Plaintiff Had Actual Knowledge Of Her Claim More Than Three
Years Before She Filed This Action ............................................................39

B.   Plaintiff's Claims Challenging The WAP's Top Hat Status Prior To
2009 Also Are Barred By ERISA's Six-Year Statute Of Repose ........................42

C.   If The Court Agrees That Plaintiff's Claims Properly Arise Under
ERISA § 502(a)(1)(B), Then A Two-Year Statute Of Limitations
Should Apply...........................................................................................45

V.   Plaintiff Has Failed To Name Any Defendant Who Can Be Held Liable For
The Alleged Breaches Of Fiduciary Duty ........................................................46

**CONCLUSION** ...........................................................................................**47**

ii

CONFIDENTIAL

RBC-PAUL000009949

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abbott v. Lockheed Martin Corp.,*
    2009 WL 839099 (S.D. Ill. Mar. 31, 2009) ...................................................43

*Alexander v. Brigham and Women's Physicians Org., Inc.,*
    513 F.3d 37 (1st Cir. 2008)..........................................27, 29, 30, 33, 36

*Alexander v. Brigham & Women's Physicians Org., Inc.,*
    467 F. Supp. 2d 136, 139 (D. Mass. 2006) ...............................................36

*Archer v. Nissan Motor Acceptance Corp.,*
    550 F.3d 506 (5th Cir. 2008) ....................................................................42

*Babcock v. Hartmarx Corp.,*
    182 F.3d 336 (5th Cir. 1999) .............................................................39, 42

*Belka v. Rowe Furniture Corp.,*
    571 F. Supp. 1249 (D. Md. 1983) ......................................................33, 34

*Berger v. AXA Network LLC,*
    459 F.3d 804 (7th Cir. 2006) .............................................................43, 44

*Boos v. AT&T, Inc.,*
    643 F.3d 127 (5th Cir. 2011) ....................................................................20

*Callan v. Merrill Lynch & Co., Inc.,*
    2010 WL 3452371 (S.D.Cal. Aug. 30, 2010) ......................................*Passim*

*Daft v. Advest, Inc.,*
    658 F.3d 583 (6th Cir. 2011) ............................................29, 32, 34, 35

*Darden v. Nat'l Mut. Ins. Co.,*
    717 F. Supp. 388 (E.D.N.C. 1989), *aff'd* 922 F.2d 303 (4th Cir. 1991), *rev'd on other*
    *grounds* 122 S.Ct. 1344 (1992)..........................................................30, 31

*David v. Alphin,*
    2011 WL 4402759, at * 11-12 (W.D.N.C. Sept. 22, 2011) .............................43

*Davis v. Guardian Life Ins. Co. of America,*
    2007 WL 2491344 (W.D. La. Aug. 30, 2007).............................................20

iii

CONFIDENTIAL

RBC-PAUL000009950

*Demery v. Extebank Deferred Comp. Plan (B)*,
   216 F.3d 283 (2d Cir. 2000)................................................................*Passim*

*Emmenegger v. Bull Moose Tube Co.*,
   197 F.3d 929 (8th Cir. 1999) .............................................................*Passim*

*Gluck v. Unisys Corp.*,
   960 F.2d 1168 (3d Cir. 1992)...............................................................40, 41

*Gosselink v. Am. Tel. & Tel., Inc.*,
   1999 WL 33737341 (S.D. Tex. Aug. 4, 1999) .............................................43

*Hagel v. United Land Co.*,
   759 F. Supp. 1199 (E.D. Va. 1991) ...........................................................22

*Hahn v. Nat'l Westminster Bank, N.A.*,
   99 F. Supp. 2d 275 (E.D.N.Y. 2000) .............................................21, 22, 26

*Houston v. Saracen Energy Advisors, L.P.*,
   2009 WL 890384 (S.D. Tex. Mar. 27, 2009)................................................22

*Hughes Aircraft Co. v. Jacobson*,
   525 U.S. 432 (1999)...............................................................................3, 46, 47

*Int'l Paper Co. v. Suwyn*,
   978 F. Supp. 506 (S.D.N.Y. 1997) ...............................................21, 22

*Kanawi v. Bechtel Corp.*,
   590 F. Supp. 2d 1213 (N.D. Cal. 2008)......................................................43

*Kaufman v. S&A Rest. Corp.*,
   2008 WL 2242621 (N.D. Tex. May 30, 2008) ............................................23

*Kirschbaum v. Reliant Energy, Inc.*,
   526 F.3d 243 (5th Cir. 2008) ......................................................................46

*Leber v. Citigroup, Inc.*,
   2010 WL 935442 (S.D.N.Y. Mar. 16, 2010) .........................................43, 44

*Lockheed Corp. v. Spink*,
   517 U.S. 882 (1996)......................................................................................46

*Long v. Excel Telecomms. Corp.*,
   2000 WL 1562808 (N.D. Tex. Oct. 18, 2000) ............................................20

*Maher v. Strachan Shipping Co.*,
   68 F.3d 951 (5th Cir. 1995) .........................................................................40

iv

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION

CONFIDENTIAL

RBC-PAUL000009951

*Martin v. Pub. Serv. Elec. & Gas Co., Inc.,*
   271 Fed. Appx. 258 (3d Cir. 2008)................................................................43

*McGowin v. Manpower Int'l, Inc.,*
   363 F.3d 556 (5th Cir. 2004) ..........................................................2, 37, 38

*McKinsey v. Sentry Ins.,*
   986 F.2d 401 (10th Cir. 1993) ...............................................................22, 26

*Murphy v. Inexco Oil Co.,*
   611 F.2d 570 (5th Cir. 1980) ..........................................................1, 20, 21, 22

*Phillips v. Alaska Hotel and Rest. Employees Pension Fund,*
   944 F.2d 509 (9th Cir. 1991) .................................................................43, 44

*Radford v. Gen'l Dynamics Corp.,*
   151 F.3d 396 (5th Cir. 1998) ......................................................................42

*Raskin v. CyNet, Inc.,*
   131 F. Supp. 2d 906 (S.D. Tex. 2001) ......................................................21

*Reich v. Lancaster,*
   55 F.3d 1034 (5th Cir. 1995) ......................................................................40

*Reliable Home Health Care, Inc. v. Union Cent. Ins. Co.,*
   295 F.3d 505 (5th Cir. 2002) ..........................................................27, 28, 31

*Simpson v. Ernst & Young,*
   879 F. Supp. 802 (S.D. Ohio 1994) ..........................................................34

*Tibble v. Edison Int'l,*
   639 F. Supp. 2d 1074 (C.D. Cal. 2009) ....................................................43

*Williams v. Wright,*
   927 F.2d 1540 (11th Cir. 1991) ...........................................................21, 22

## STATUES AND REGULATIONS

29 U.S.C. § 1001, et seq.............................................................................1

29 U.S.C. § 1002(2)(A).........................................................................20, 21

29 U.S.C. § 1002(3) ................................................................................5, 9

29 U.S.C. § 1002(21) ..................................................................................46

v

CONFIDENTIAL

RBC-PAUL000009952

29 U.S.C. § 1051(2) ................................................................................................27

29 U.S.C. § 1081(a)(3) ............................................................................................27

29 U.S.C. § 1101(a) .......................................................................................2, 27, 36

29 U.S.C. § 1113(1) .........................................................................................*Passim*

29 U.S.C. § 1113(2) .................................................................................3, 39, 42

29 U.S.C. § 1132(a)(1)(B) ..............................................................................*Passim*

29 U.S.C. § 1132(a)(2) ....................................................................................*Passim*

29 U.S.C. § 1132(a)(3) ....................................................................................*Passim*

## OTHER AUTHORITIES

Fed. R. Civ. P. 56 ....................................................................................................1

Minn. Stat. § 541.07 ..........................................................................................45, 46

vi

CONFIDENTIAL

RBC-PAUL000009953

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff brings this purported class action under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. ("ERISA"), to recover "all vested accrued" benefits she claims have been unlawfully "forfeited" under the Royal Bank of Canada U.S. Wealth Accumulation Plan (the "WAP" or "Plan"). *See* Am. Cmpl. (Doc. No. 24) ¶ 117. The undisputed facts make clear that Plaintiff's claims fail as a matter of law for several independent reasons. *See* Fed. R. Civ. P. 56.

To start with, the WAP is not an "employee pension benefit plan" governed by ERISA. More specifically, Plaintiff cannot establish, as she must, that the WAP is "designed for the purpose of paying retirement income whether as a result of [its] express terms or surrounding circumstances." *Murphy v. Inexco Oil Co.*, 611 F.2d 570, 574 (5th Cir. 1980). Applying this test, courts hold that where a plan is designed for a purpose other than providing retirement benefits and does not, by way of its express terms or "systematic" operation, result in the deferral of benefits to retirement or termination of employment, it does not constitute a plan covered by ERISA. *See, e.g., Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929, 933-34 (8th Cir. 1999).

And that is precisely the case here. The primary purpose of the WAP is to attract and retain key employees by paying them bonuses subject to particularized vesting schedules. Furthermore, WAP participants automatically receive distributions of their WAP benefits while still employed at RBC unless they expressly choose otherwise. Hence, the WAP cannot properly be deemed an "employee pension benefit plan" subject to ERISA, and Plaintiff's claims fail on that preliminary basis. *See, e.g., id.* at 933 (finding no ERISA plan where deferring compensation to retirement was "strictly at the option of the participant").

Even assuming, *arguendo*, that the WAP is an ERISA-covered plan, Plaintiff's claims

1

CONFIDENTIAL

RBC-PAUL000009954

still cannot survive summary judgment.  First, the undisputed facts show that the WAP qualifies for ERISA's "top hat" exemptions.  These exemptions preclude liability for alleged breaches of fiduciary duty where a plan is unfunded and maintained "primarily" for "a select group of management or highly compensated employees."  29 U.S.C. § 1101(a).  Here, Plaintiff concedes that the WAP is unfunded.  Further, only 2.85% to 3.31% of all Plan sponsor employees were ever eligible to participate in the WAP, and those who did earned significantly more than double that of the workforce as a whole.  Thus, the WAP qualifies for ERISA's top hat exemptions. *See, e.g., Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 289 (2d Cir. 2000) (affirming summary judgment for defendants' based on top hat exemptions, where 15.34% of employees qualified and their average pay was "more than double" that of the total workforce).

Second, Plaintiff admittedly has failed to exhaust the administrative claims procedure set forth in Section 7 of the WAP.  Plaintiff's failure to exhaust has already been extensively briefed in connection with Defendants' pending motion to dismiss the amended complaint.  As that briefing demonstrates, Plaintiff's attempt to re-cast her claim for unpaid WAP benefits under ERISA § 502(a)(1)(B) as fiduciary breach claims under §§ 502(a)(2) and (a)(3), is simply a transparent effort to avoid her obligation to exhaust administrative remedies before filing suit.  Moreover, Plaintiff's sworn testimony in this matter confirms that she is not entitled to the so-called "futility" exception to the exhaustion requirement.  *See, e.g., McGowin v. Manpower Int'l, Inc.*, 363 F.3d 556, 559 (5th Cir. 2004) ("[a] failure to show hostility or bias on the part of the administrative review committee" precludes exception from the exhaustion requirement).

Third, to the extent Plaintiff's claims are based on events prior to the 2009 Plan year, they are barred by the applicable statute of limitations.  Plaintiff alleges that the WAP's eligibility requirements, which did not materially change between 2002 and 2009, rendered the Plan

2

CONFIDENTIAL

RBC-PAUL000009955

insufficiently "select" to constitute a top hat plan during the period she was eligible to participate in it (*i.e.*, 2003-2008). Thus, assuming that her claims properly arise under ERISA §§ 502(a)(2) and (a)(3), the undisputed facts show both that: (i) Plaintiff had actual knowledge of her claims relating to the pre-2009 Plan years by no later than 2003, and (ii) the acts constituting her alleged fiduciary breaches during those periods arose more than six years prior to the filing of this action. 29 U.S.C. §§ 1113(1)(A), (2). Alternatively, if the Court agrees that Plaintiff's claims properly arise under ERISA § 502(a)(1)(B), as Defendants have previously argued, then federal choice of law principles dictate a two-year limitations period. Under any scenario, however, Plaintiff's claims are time-barred to the extent they relate to periods earlier than January 2009.

Finally, Plaintiff has sued the wrong defendants. There is no evidence that any of the Defendants engaged in any of the challenged fiduciary conduct. To the contrary, Defendants' only role with respect to the WAP was their consideration of potential amendments or modifications to the WAP's design. Because such conduct, as a matter of law, is not fiduciary in nature, Defendants are entitled to summary judgment on this additional basis. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 443-45 (1999) ("[E]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate [a plan.] When employers undertake those actions, they do not act as fiduciaries[.]" (quotations omitted)).

For these reasons and for the reasons set forth in Defendants' Response to Plaintiff's Motion of Partial Summary Judgment, the Court should enter summary judgment in favor Defendants and dismiss Plaintiff's claims in their entirety.[1]

---

[1] Contemporaneous with this Motion and Brief in Support, Defendants have filed their Response to Plaintiff's Motion for Partial Summary Judgment. *See* Doc. No. 91. To the extent the issues discussed therein overlap with the issues discussed in Defendants' Motion, they are hereby incorporated by reference.

3

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION

CONFIDENTIAL

RBC-PAUL000009956

## NATURE AND STAGE OF PROCEEDINGS

On January 11, 2011, Plaintiff filed this purported class action under ERISA. The Original Class Action Complaint ("Original Complaint") alleged class-wide claims against the following defendants: (1) RBC Capital Markets Corporation; (2) the WAP; (3) RBC Centura Bank; and (4) RBC U.S. Insurance Services, Inc. Asserting claims for benefits under ERISA § 502(a)(1)(B) and breaches of fiduciary duty under §§ 502(a)(2) and (a)(3), the Original Complaint sought to recover benefits that allegedly were (or may be) improperly denied under the terms of the WAP. *See* Cmpl. (Doc. No. 1) at ¶¶ 19-26.

On March 21, 2011, Defendants filed a motion to dismiss the Original Complaint on the grounds that Plaintiff admittedly had failed to exhaust the administrative remedies prescribed in Section 7 of the WAP. Defs. MTD (Doc. No. 22). On April 7, 2011, rather than opposing Defendants' motion to dismiss, Plaintiff filed her First Amended Class Action Complaint ("Amended Complaint"). The Amended Complaint no longer names the WAP as a Defendant, nor does it specifically bring suit under ERISA § 502(a)(1)(B). However, the claims that remain continue to seek recovery of "all vested accrued WAP benefits" that were (or may be) "forfeited" under the terms of the WAP. *See* Am. Cmpl. (Doc. No. 24) ¶ 117 and ¶¶ 10(c), 11, 23, 27, 28.

On April 27, 2011, Plaintiff filed a Motion for Class Certification and Supporting Brief, seeking certification of her claims under Federal Rule of Civil Procedure 23(b)(1), (b)(2) or (b)(3). Plaintiff's class certification motion has been fully briefed by the parties and is awaiting a ruling from this Court. *See* Pl. Mot. for Class Cert. (Doc. No. 31); Def. Opp. to Pl. Mot. for Class Cert. (Doc. No. 45); Pl. Reply in Supp. of Mot. for Class Cert. (Doc. No. 46); Def. Sur-Reply in Opp. to Mot. for Class Cert. (Doc. No. 50); Pl. Supp. Reply in Supp. Mot. for Class Cert. (Doc. No. 55); Def. Supp. Sur-Reply in Opp. Mot. for Class Cert. (Doc. No. 58).

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 82

CONFIDENTIAL

RBC-PAUL000009957

On May 12, 2011, Defendants filed a Motion to Dismiss Plaintiff's First Amended Class Action Complaint and Brief in Support ("Motion to Dismiss"), again, on the grounds that Plaintiff admittedly had failed to exhaust the administrative remedies prescribed in Section 7 of the WAP. Defendant's Motion to Dismiss has been fully briefed by the parties and is awaiting a ruling from this Court. *See* Def. MTD (Doc No. 37); Pl. Resp. to Def. MTD (Doc. No. 41); Def. Reply in Supp. MTD (Doc. No. 44); Def. Notice of Supp. Auth. (Doc. No. 65); Pl. Resp. to Notice of Supp. Auth. (Doc. No. 68). Accordingly, Defendants have not filed an answer.

On November 18, 2011, pursuant to the Amended Scheduling and Docket Control Order (Doc. No. 54), fact discovery concluded. The parties thereafter exchanged expert reports related to the merits of Plaintiff's claims and conducted expert discovery. The case is currently set for a bench trial as to liability on June 21, 2012. *See* Am. Sched. and Dkt. Control Order (Doc. No. 54). Issues pertaining to appropriate damages or other remedies have been bifurcated, and are to be addressed by the parties following a ruling on the merits of Plaintiff's claims. *See id.*

## STATEMENT OF ISSUES TO BE CONSIDERED

1.      Whether Defendants are entitled to summary judgment because the WAP, which is designed for the primary purpose of attracting and retaining valuable employees and requires distribution of benefits to participants prior to termination unless they expressly elect otherwise, is an "employee pension benefit plan," 29 U.S.C. § 1002(3), governed by ERISA. *See* Argument Section I, *infra*.

2.      Whether, in the event the WAP is covered by ERISA, Defendants are entitled to summary judgment because the WAP is a "top hat" plan and, therefore, exempt from ERISA's vesting, funding and fiduciary duty provisions. *See* Argument Section II, *infra*.

3.      Whether, in the event the WAP is covered by ERISA, Defendants are entitled to

5

CONFIDENTIAL

RBC-PAUL000009958

summary judgment because Plaintiff admittedly has failed to exhaust her administrative remedies available under Section 7 of the WAP prior to filing this action. *See* Argument Section III, *infra*.

      4.    Whether, in the event the WAP is covered by ERISA, Defendants are entitled to summary judgment on Plaintiff's claims to the extent they are based on the WAP's status as a top hat plan prior to 2009. *See* Argument Section IV, *infra*.

      5.    Whether, in the event the WAP is covered by ERISA, Defendants are entitled to summary judgment because none of the named Defendants is a fiduciary with respect to Plaintiff's claims. *See* Argument Section V, *infra*.

## STATEMENT OF UNDISPUTED FACTS

**I.**    **The WAP Is Designed To Attract And Retain Valuable Employees By Allowing Them To Defer Compensation To A Time Of Their Choosing.**

    The WAP "is a nonqualified, deferred compensation plan pursuant to which a select group of management or highly compensated employees . . . may be offered the opportunity to elect to defer receipt of a portion of their compensation to be earned with respect to the upcoming Plan Year." Am. Cmpl. Ex. A, 2008 WAP § 1.1. While the WAP is "not intended" to be an ERISA-covered plan, it nonetheless provides that, in the event the Plan is "determined to be an 'employee pension benefit plan,' the Company believes that it" is a top hat plan, "exempt from many of ERISA's requirements." *Id.* § 5.11. The WAP is very different from the Company 401(k) Plan, which is intended to be an ERISA-covered plan and is offered to all of its employees. *See* Ex. 1, Sikich Dep. at 141:15-25.

    The WAP is specifically designed to attract and retain valuable employees. *Id.* at 40:12-15; Ex. 2, Buchert Dep. at 98:1-7.  The WAP serves this purpose by allowing participants to defer compensation, including annual bonuses. Ex. 2 at 51:7-9.  The WAP does not condition

6

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 84

CONFIDENTIAL

RBC-PAUL000009959

receipt of these benefits on retirement or termination; rather, participants receive WAP benefits while still employed at RBC, unless they expressly elect otherwise. Ex. 3, Sikich Decl. ¶¶ 4-5.

**A.      The WAP Provides Deferred Compensation In The Form Of Bonuses And Matching Contributions.**

Both voluntary deferrals and Company Contributions are made under the WAP. Participants may voluntarily defer up to 30% of their compensation on a pre-tax basis to their WAP accounts. *See* Am. Cmpl. Ex. A, 2008 WAP § 2.2; Ex. 4, 2008 WAP Summary (FC) at 1. Voluntary deferrals are always 100% vested and cannot be forfeited, and thus are not directly at issue in this case. *Id.* § 4.1.

The WAP further provides two types of Company Contributions: Bonuses and Matching Contributions. For example, in 2008 and 2009, Financial Consultants who achieved gross production (*i.e.,* revenue generation) of at least $300,000 were awarded a Productivity Bonus into their WAP accounts equal to 1.75% to 5.0% (in 2008), or 2.25% to 5.0% (in 2009), of their production for that year. Ex. 4, 2008 WAP Summary (FC) at 2; Ex. 5, 2009 WAP Summary (FC) at 2. Starting in 2010, the bonus structure was amended, such that Financial Consultants and Branch Directors with gross production of at least $400,000 received a Productivity Bonus equal to 2.25% to 5.0% of their annual production. In addition, those with six or more years of service received a Loyalty Bonus equal to 0.25% to 4.0% of their annual production. *See, e.g.,* Ex. 6, 2010 WAP Summary (FC/BD) at 2; Ex. 7, 2011 WAP Summary (FC/BD) at 2. The Productivity and Loyalty bonuses paid under the WAP serve as the primary vehicle through which RBC pays annual bonuses to its Financial Consultants. *See* Ex. 2, Buchert Dep. at 18:21-19:4, 42:3-43:13.

Matching Contributions, which were provided between 2003 and 2009, were a function of participants' voluntary deferrals, gross production and tenure. For example, a "fixed match"

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 85

CONFIDENTIAL

RBC-PAUL000009960

equal to 25% of a participant's voluntary deferrals was available to all Financial Consultants in 2008 and 2009. *See, e.g.,* Ex. 4, 2008 WAP Summary (FC) at 1; Ex. 5 2009 WAP Summary (FC) at 1. In addition, a "premium match" ranging from 5.0% to 40% of the participant's voluntary deferrals was available to Financial Consultants with more than six years of service, provided they met certain production thresholds. *See id.* at 2. Starting in 2010, Matching Contributions for Financial Consultants and Branch Directors were eliminated in favor of an increase in Productivity Bonus rates and the addition of the Loyalty Bonus described above. *Compare* Ex. 4 at 1-2, *with* Ex. 6, 2010 WAP Summary (FC/BD) at 1-2.

Unlike voluntary deferrals, which are 100% vested at all times, Company Contribution are subject to varying vesting schedules. Company Contributions to Financial Consultants are subject to five-year "cliff" vesting. *See, e.g.,* Ex. 5, 2009 WAP Summary (FC) at 1-2. By contrast, Company Contributions to Branch Directors, Complex Directors and certain divisional presidents and Regional Directors are subject to four-year "cliff" vesting. *See, e.g.,* Ex. 8, 2009 WAP Summary (BD/CD) at 2; Ex. 9, 2009 WAP Summary (PCG Director) at 2.

### B. Participants' WAP Benefits Are Distributed While They Are Still Employed At RBC, Unless The Participant Specifically Elects Otherwise.

WAP participants' Company Contributions are distributed to them while they are still employed at RBC. In fact, for the 2007-2009 Plan years, the WAP *mandated* that all Company Contributions to Financial Consultants, Branch Directors or Complex Directors who had qualifying production of between $300,000 and $350,000 had to be distributed immediately upon vesting, and could not be deferred to retirement or termination. Ex. 3, Sikich Decl. ¶ 5.

As for all other WAP participants, they were given the annual option to elect to receive their Company Contributions while still employed at RBC, or instead, to receive them after they left the Company. *Id.* ¶ 4. However, if the participant did not make a specific election, the Plan

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 86

CONFIDENTIAL

RBC-PAUL000009961

mandated that his or her Company Contributions for that year would be distributed while he or she was still employed. *Id.* In each Plan year for which complete information is available (2007-2011), the majority of WAP participants were slated for in-service distributions of their Company Contributions. *Id.* ¶ 6.

## II.     The WAP's Eligibility Requirements.

The WAP contains two express eligibility requirements.  First, it requires that participants neither reside nor perform the majority of their services in Canada.  *See* Am. Cmpl. Ex. A, 2008 WAP § 2.1(b).  Second, it requires that employees satisfy minimum "compensation or production" thresholds or other requirements prescribed by the WAP's administrative committee ("WAP Committee").  *See id.* § 2.1(a).

The Plan sponsors' U.S. employees have generally become eligible for the WAP based on their annual production, annual compensation, and/or job title.  To qualify for the WAP between 2003 and 2008, production employees, including Financial Consultants, needed to generate greater than $300,000 in fiscal year production.  *See* Jt. Stip. (Doc. No. 75) at ¶¶ 1(b), 2(b), 3(b), 4(b), 5(b) & 6(a)-(d).[2]  By contrast, certain non-production employees, including Plaintiff, were eligible for the WAP if their fiscal year compensation exceeded $150,000.  *See, e.g., id.* ¶¶ 6(e)-(h).  Finally, certain divisional directors and presidents, as well as Regional Directors, were eligible for the WAP based on their title alone.  *See, e.g., id.* ¶ 6(i).

In October 2008, the WAP Committee amended the production and compensation thresholds in effect for the 2009 and 2010 plan years.  Ex. 10, WAP Committee Minutes.  Starting in 2009, the compensation threshold for non-production employees was increased from $150,000 to $350,000.  *Compare* Jt. Stip. ¶ 6(e)-(h), *with id.* ¶ 7(e)-(f).  Starting in 2010, the

---

[2] Branch Directors and Complex Directors were eligible for the 2008 and 2009 WAPs if they met *either* a minimum production threshold of $300,000, *or* if they had at least $150,000 in annual compensation.  Jt. Stip. ¶¶ 6(c)-(d), 7(c).

9

CONFIDENTIAL

RBC-PAUL000009962

gross production threshold for production employees was increased from $300,000 to $400,000. *Compare id.* ¶¶ 7(a)-(d) & (f), *with id.* ¶¶ 8(a) & (c).[3]   The WAP Committee made the decision to amend the WAP's eligibility thresholds as a result of on-going internal analyses of the percentage of employees who were eligible to participate in the WAP.   *See* Ex. 1, Sikich Dep. at 31:21-33:13, 73:9-19; 81:3-83:7, 84:14-87:5.   The purpose of these amendments was to ensure that the WAP would continue to qualify as a "top hat" plan, in the event it were determined to be an "employee pension benefit plan" under ERISA.   *See id.* at 24:9-25:16, 28:17-30:12, 82:14-83:7, 83:17-84:19, 262:6-264:10; *see also* Am. Cmpl. Ex. A, 2008 WAP § 5.11.

Eligibility determinations for each Plan year are made in two phases.   The first phase occurs in November of the year preceding the Plan year.   During this phase, any current employee whose fiscal year (October - September) pay or production (or guaranteed pay or trailing twelve-month production for new hires) meets the applicable eligibility thresholds is deemed eligible for the WAP for the ensuing Plan year. *See* Ex. 3, Sikich Decl. ¶ 7.[4]

The second phase of eligibility determinations occurs during the Plan year itself. Specifically, newly hired employees could become *immediately* eligible for the current year's WAP based on their trailing twelve month production, or their guaranteed fiscal year compensation at RBC.   *Id.*   Thus, a Financial Consultant hired on June 1, 2008, would have immediately become eligible for the 2008 WAP if his or her trailing twelve month production at his or her former employer was greater than $300,000.   *Id.*   Likewise, a non-production employee hired on June 1, 2008, would have immediately become eligible for the 2008 WAP if he or she had guaranteed compensation of at least $150,000.   *Id.*

---

[3]  In 2010, the separate packet codes for Financial Consultants and Branch Directors merged.  *Compare* Jt. Stip. ¶¶ 7(a)-(c) *with* ¶ 8(a).  In addition, the eligibility threshold for Complex and Regional Directors was increased to over $250,000 in fiscal year compensation. *Id.* ¶ 8(b).

[4]  Participants were *not* permitted to be "grandfathered" into the WAP .  Ex. 3, Sikich Decl. ¶ 8.

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 88

CONFIDENTIAL

RBC-PAUL000009963

III.     **The Composition Of WAP Participants.**

A.     **Financial Consultants.**

Financial Consultants are unique, highly-valuable employees, who comprise the largest single group of WAP participants.  Financial Consultants act as the "face" of RBC in connection with interfacing with clients, to whom they provide investment and other financial advice.  *See* Ex. 11, Brazelton Dep. at 12:22-14:5, 15:25-19:5, 19:21-20:21.  While Financial Consultants are affiliated with RBC formally, they are very much entrepreneurs in that their financial success is dependent almost exclusively on their ability to develop their own book of business.  *See id.* 12:20-17:2, 19:21-20:21.  Unlike ordinary employees whose services can be replaced by hiring and training a new employee, Financial Consultants who leave RBC take with them not only their own personal talent but their individual book of business and the stream of commission revenue it generates for the Company.  *See id.* at 21:2-24:4.  In short, promising Financial Consultants are highly sought after employees at RBC and within the financial services industry generally.  *See, e.g., id.* at 20:18-23; Ex. 2, Buchert Dep. at 23:9-14, 25:10-22, 27:20-37:23.

Take for example former RBC Financial Consultant – and Plaintiff's witness – Lewis Brazelton.  He testified that when he left RBC for Morgan Stanley in August 2009, he was able to take with him virtually all of the more than 575 clients comprising his book of business.  *See* Ex. 11, Brazelton Dep. at 21:2-23:8; Ex. 12, Brazelton's Client List.  This was not a phenomenon unique to Brazelton; rather, Brazelton testified that, in his experience, Financial Consultants who left RBC typically took virtually all of their clients with them.  *See, e.g., id.* 23:9-24:4.

Brazelton further testified that, when he was recruited by Morgan Stanley, he was offered a generous signing bonus equal to a large percentage of his annual production at RBC.  While Brazelton, upon advice of Plaintiff's counsel, declined to divulge the amount of that bonus, he testified that it was commensurate with what he understood to be customary within the industry:

11

CONFIDENTIAL
RBC-PAUL000009964

between 50% and 200% of the Financial Consultant's prior year's production, which in Brazelton's case was $1.8 million in 2008. *See id.* at 60:16-61:20; Ex. 13, Brazelton 2008 Production. Brazelton testified that, during his career at RBC, Financial Consultants were regularly recruited by competitors offering similar enticements. *See id.* at 58:22-61:20.

Precisely because of their value and importance to RBC's business model, the WAP is designed to attract and retain Financial Consultants. As discussed, the WAP provides the attractive benefit of allowing participants to defer compensation and bonuses on a pre-tax basis. *See supra* at 6-8. In addition, the WAP's vesting periods for Company Contributions provide a strong incentive for Financial Consultants to remain at RBC so that the benefits of deferred compensation can be fully realized. *See id.* at 8.

RBC also takes special effort to tailor the WAP to the preferences of its participants. For example, focus groups have been used to gauge participants' level of satisfaction with the WAP, and to receive feedback on ways in which to improve the WAP. Ex. 3, Sikich Decl. ¶ 9. Feedback from participants, moreover, has led to numerous changes to the WAP's operation: additional investment options were added; participants were given greater flexibility to move their WAP investments among different investment vehicles within the WAP; and matching contributions were eliminated in favor of annual bonus payments through the WAP. *See id.*; *see also* Ex. 1, Sikich Dep. at 154:4-155:6.

### B.    Complex Directors And Branch Directors.

Another substantial group of WAP participants are Complex Directors and Branch Directors. These employees have primarily managerial responsibilities.[5] Complex Directors have "overall supervisory responsibility for all Complex employees including [B]ranch

---

[5] Between 2003 and 2006, Branch Directors and Complex Directors were eligible for the WAP based on their management titles alone. Jt. Stip. ¶¶ 1(e), 2(e), 3(e) and 4(e). Starting in 2007, these employees also had to satisfy minimum production *or* compensation thresholds. *See id.* ¶¶ 5(c)-(d), 6(c)-(d), 7(c)-(d), 8(a)-(b), 9(a)-(b).

12

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION

CONFIDENTIAL

RBC-PAUL000009965

[D]irectors, assistant branch manager(s), Financial [Consultants], branch support staff, the assistant, administrative and/or complex managers and all Complex operations personnel." Ex. 14, CD Job Description.  Complex Directors bear ultimate responsibility for setting and meeting annual budgets, meeting growth and profitability targets, and recruiting and retaining Financial Consultants within his or her Complex.  *See id.*; Ex. 15, RBC Org. Chart.

Branch Directors (also called "Branch Managers") have responsibility over the day-to-day functioning of the branch locations where Financial Consultants work.  *See* Ex. 16, BM Job Description.  Their primary duties include to: (1) "[p]rovide business development advice, counsel and coaching to the financial consultants in his/her branch"; (2) "[p]rovide on-site supervision for a limited number of supervisor functions including the approval of new accounts, new option accounts and all incoming and outgoing written correspondences"; (3) "[c]oordinate his/her branch's business development and marketing efforts"; (4) "[e]nsure, as appropriate, that his/her financial consultants receive the necessary training"; (5) "[e]ffectively and professionally represent RBC . . . in the community"; (6) "[a]ssist the [C]omplex [D]irector with the recruitment of both experienced financial consultants and trainees"; and (7) "[e]nsure that . . . all employees conduct themselves in a professional manner."  *Id.*

### C.    Business Line Directors And Presidents, And Regional Directors.

Various business line directors and presidents, as well as Regional Directors, were eligible for the WAP based on their title alone between 2003 and 2009, but were required to meet minimum compensation thresholds starting in 2010.  *Compare* Jt. Stip. ¶¶ 1(f), 2(f), 3(f), 4(f), 4(h), 5(i), 6(i) and 7(g), *with id.* ¶¶ 8(b) & 9(b).  Regional Directors have leadership responsibility for the Complex Directors within their regions, and business line presidents and directors, in turn, have leadership over all of the regions within their particular business unit.

13

CONFIDENTIAL

RBC-PAUL000009966

*See, e.g.,* Ex. 15, RBC Org. Chart.  As reflected in the accompanying organizational chart, these employees rank near the top of the corporate hierarchy.  *See id.*

### D.     Other Non-Production Participants.

In addition to the specific employee groups above, participants in the WAP also included employees from RBC's different business segments, including divisions of other businesses RBC acquired over the years. For example, in 2008 and 2009, Liberty (an acquired division) employees with an executive level designation and Centura (an acquired division) employees with a Vice President level designation were eligible to participate in the WAP, provided they earned (or had guaranteed pay) more than $150,000 (in 2008) or $350,000 (in 2009).  *See* Jt. Stip. ¶¶ 6(e) & 7(e),

Because Plaintiff earned more than $150,000 in the preceding fiscal years, she was eligible to participate in the WAP during the 2003 through 2008 Plan years.  Ex. 17, Tolbert Dep. at 112:21-113:7, 116:3-24.[6]  Plaintiff has claimed that she was merely a "secretary" at RBC.  Pl. MPSJ (Doc. No. 84) at 4, 5.  In fact, however, she a federal and state licensed securities broker and was employed as a Vice President, Senior Investment Associate at the time she participated in the WAP.  *See* Ex. 17, Tolbert Dep. at 61:7-13; 86:8-10, 102:15-103:9.  In this role, Plaintiff was part of an "inseparable team" with RBC Financial Consultant Lewis Brazelton, *see* Am. Cmpl. at 27-28, n.38, and routinely recommended and advised Brazelton's 575+ clients as to specific investment strategies and answered any questions they had concerning those strategies, *see, e.g.,* Ex. 17, Tolbert Dep. at 27:7-25; 62:8-64:13, 67:2-19, 73:2-13.

Following her termination from RBC, Tolbert promptly began working with Brazelton at Morgan Stanley, where she continues to service his clients as she did at RBC.  *Id.* at 31:13-

---

[6] Plaintiff was ineligible for the 2009 WAP, because she did not earn more than the $350,000 annual compensation threshold that took effect in that year.  Ex. 17, Tolbert Dep. at 116:7-13.

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 92

CONFIDENTIAL

RBC-PAUL000009967

33:17.  In making the move to Morgan Stanley, Plaintiff was able to secure a compensation package that was commensurate with what she earned during her last 5 years at RBC, as well as a $200,000 chunk of Brazelton's signing bonus.  *See id.* at 42:8-16 (was paid $130,000 and also earned another $109,000 in bonus in 2010); 47:5-20 (received part of Brazelton's signing bonus).

## IV.   WAP Eligible Employees Represent A Fraction Of The Plan Sponsors' Total Workforce And Earn Substantially More Than The Workforce as a Whole.

### A.   Only A Fraction Of Plan Sponsor Employees Are Eligible For The WAP.

While the Plan sponsors, including parent company the Royal Bank of Canada – which is not named in the Amended Complaint – employed a combined total of more than 80,000 employees in the U.S. and Canada in each year, the WAP's eligibility requirements have ensured that only a fraction of those employees were eligible to participate in the WAP.  *See* Ex. 18, Niden Supp. ¶ 46 & Rpt. Ex. 7.  First, as discussed above, the WAP's eligibility provisions expressly require that, to participate, an employee must perform the majority of his or her work within the U.S.  *See supra* at 9.  This requirement effectively eliminates tens of thousands of Royal Bank of Canada's employees from participation in the WAP each year.  *See* Ex. 18, Niden Supp. Rpt. ¶ 46 & Ex. 7.  The additional annual minimum production and compensation thresholds further limit participation among U.S. employees.  *See id.*

Taking into account the total workforce of all Plan sponsors, between 2004 and 2010, the percentage of employees who were eligible to participate in the WAP ranged from 1.97% to 3.31%, annually. Ex. 18, Niden Supp. Rpt. ¶ 46.[7]  The WAP's overall eligibility percentage for those years was just 2.84%.  *Id.*  Considering the U.S. workforce only, the percentage of employees eligible to participate in the WAP between 2003 and 2010 ranged from 6.99% (2003) to 17.11% (2006), with an overall eligibility rate for those years of 13.39%.  *Id.* & Rpt. Ex. 7.

---

[7] Because data concerning RBC's Canadian workforce was unavailable for 2003, Niden limited her eligibility analysis of all Plan sponsor employees to Plan years 2004-2010. Ex. 18, Niden Supp. Rpt. ¶ 46 n.35.

15

CONFIDENTIAL                                    RBC-PAUL000009968

**B.     WAP Eligible Employees Earn Substantially More Than Non-Eligible Employees And The Workforce As A Whole.**

Defendant's expert witness, Cathy M. Niden, Ph.D., "reviewed and compared the available compensation data for the WAP eligible and non-eligible employees at RBC[.]"  Ex. 19, Niden Rpt. ¶ 27.  Her analyses to date have focused separately on (1) the total combined workforce of all Plan sponsors (U.S. and Canada), and (2) the U.S. workforce of RBC's domestic subsidiaries.  *See id.* ¶¶ 27-41; Ex. 18, Niden Supp. Rpt. ¶¶ 47-58.  Based on these analyses, Niden has concluded that "[t]hroughout the time the WAP has been offered, eligible participants . . . have earned significantly higher compensation than both the non-eligible work force and the work force as a whole."  Ex. 19, Niden Rpt. ¶ 13; *see also* Ex. 18, Niden Supp. Rpt. ¶ 47.

**1.     WAP Eligible Employees Earned Significantly More Than The Workforce As A Whole.**

Niden has found that, as a statistical matter, the compensation of WAP eligible employees during all years analyzed "significantly exceed[ed] that of the workforce as a whole."  Ex. 19, Niden Rpt. ¶ 37; *see also* Ex. 18, Niden Supp. Rpt. ¶ 47.[8]  This conclusion holds regardless of whether WAP eligible compensation is compared to the total workforce of all Plan sponsor employees (U.S. and Canada) or to the U.S. workforce only:

- **Median Compensation of the Total Workforce.**  During the years analyzed, the median compensation of WAP eligible employees ranged from $204,894 to $362,215, while the median compensation of all Plan sponsor employees ranged from $28,330 to $53,848.  Ex. 18, Niden Supp. Rpt. ¶ 50.  Thus, the median compensation of WAP eligible employees was between 5.2 and 7.2 times (on average 6.2 times) greater than that of all Plan sponsor employees.

---

[8] Niden analyzed compensation data for WAP eligible employees and the U.S. workforce in all years between 2002 and 2010.  Ex. 19, Niden Rpt. ¶¶ 27-41.  Because data was not available concerning the combined U.S. and Canadian workforce in 2002 and 2003, her analysis for that group is limited to the period 2004 through 2010.  Ex. 18, Niden Supp. ¶ 46 n.35.

16

CONFIDENTIAL                                                                              RBC-PAUL000009969

*Id.* ¶ 51.   In fact, the median compensation of WAP eligible employees was greater than the compensation of at least 94% of Plan sponsor employees during the years analyzed.  *Id.* ¶ 52.

- **Median Compensation of the U.S. Workforce Only.**  During the years analyzed, the median compensation of WAP eligible employees ranged from $204,894 to $362,215, while the median compensation of U.S. employees ranged from just $41,751 to $69,007.  Ex. 19, Niden Rpt. ¶ 31.  Thus, the median compensation of WAP eligible employees was between 3.2 and 5.2 times (on average 4.3 times) greater than that of all U.S. employees.  *Id.* ¶ 32.  In fact, the median compensation of WAP eligible employees was greater than the compensation of at least 87% of all U.S. employees during the years analyzed.  *Id.* ¶ 33.

- **Average Compensation of the Total Workforce.**  During the years analyzed, the average compensation of WAP eligible employees ranged from $275,000 to $539,797, while the average compensation of all Plan sponsor employees ranged from $53,766 to $97,875.  Ex. 18, Niden Supp. Rpt. ¶ 53.  Thus, the average compensation of WAP eligible employees was between 4.0 and 5.5 times greater than that of all Plan sponsor employees.  *Id.* ¶ 54.  In fact, the average compensation of WAP eligible employees was greater than the compensation of at least 96% of all Plan sponsor employees during the years analyzed.  *Id.*

- **Average Compensation of the U.S. Workforce Only.**  During the years analyzed, the average compensation of WAP eligible employees ranged from $275,000 to $539,797, while the average compensation of all U.S. employees ranged from $87,959 to $154,427.  Ex. 19, Niden Rpt. ¶ 34.  Thus, the average compensation of WAP eligible employees was between 2.2 and 3.7 times greater than that of all U.S. employees.  *Id.* ¶ 35.  In fact, the average compensation of WAP eligible employees was greater than the compensation of at least 93% of all U.S. employees during the years analyzed.  *Id.*

17

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 95

CONFIDENTIAL

RBC-PAUL000009970

### 2. WAP Eligible Employees Earned Significantly More Than Non-Eligible Employees.

As would be expected in light of the above findings, Niden also found that compensation earned by WAP eligible employees vastly exceeded that of *non-eligible* employees in all years considered. Once again, this conclusion holds regardless of whether WAP eligible compensation is compared to the total workforce of all Plan sponsor employees (U.S. and Canada) or to the U.S. workforce only:

- **Median Compensation of the Total Workforce (Non-Eligible).** During the years analyzed, the median compensation for all WAP eligible employees was between $204,894 to $362,215, while the median compensation for non-eligible employees of all Plan sponsors was between $27,913 and $52,620. Ex. 18, Niden Supp. Rpt. ¶ 57. Thus, the median compensation of WAP eligible employees was between 5.3 and 7.4 times (on average 6.3 times) greater than that of all non-eligible Plan sponsor employees. *Id.*

- **Median Compensation of the U.S. Workforce (Non-Eligible).** During the years analyzed, the median compensation of WAP eligible employees ranged from $204,894 to $362,215, while the median compensation of all U.S. employees ranged from $32,052 to $58,655. Ex. 19, Niden Rpt. ¶ 39. Thus, the median compensation of WAP eligible employees was between 4.2 and 6.3 times (on average 5.1 times) greater than that of all non-eligible U.S. employees. *Id.*

- **Average Compensation of the Total Workforce (Non-Eligible).** During the years analyzed, the average compensation of all WAP eligible employees ranged from $275,000 to $539,797, while the average compensation of all Plan sponsor employees ranged from $49,400 to $85,060. Ex. 18, Niden Supp. Rpt. ¶ 58. Thus, the average compensation of all WAP eligible employees was between 4.7 and 6.5 times greater than that of all Plan sponsor employees during

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 96

CONFIDENTIAL

RBC-PAUL000009971

all years considered. *Id.*

• **Average Compensation of the U.S. Workforce (Non-Eligible).** During the years analyzed, the average compensation of WAP eligible employees ranged from $275,000 to $539,797, while the average compensation of all non-eligible U.S. employees ranged between from $57,599 to $87,474. Ex. 19, Niden Rpt. ¶ 40. Thus, the average compensation of WAP eligible employees was between 3.7 and 6.4 times greater than that of non-eligible U.S. employees. *Id.*

## V.   The WAP Contains An Administrative Claims Procedure, Which Plaintiff Chose Not To Exhaust.

Section 7 of the WAP prescribes a specific procedure for participants to challenge forfeitures of Company Contributions or any other adverse benefits determination. Am. Cmpl. Ex. A, 2008 WAP §§ 7.2-7.5. First, claims must be submitted in writing to the WAP Committee within 90 days. The WAP Committee then has 90 days to review the claim and provide the participant with written or electronic notification of its determination. *Id.* § 7.3. If the claim is denied, the participant has 60 days to submit an appeal. Within 60 days of the appeal, the WAP Committee must render a final decision. *Id.* § 7.4.

Plaintiff seeks to recover in this case Company Contributions that were forfeited when her employment at RBC was terminated "for [c]ause" in August 2009. Am. Cmpl. ¶¶ 27-31. Although Plaintiff was aware of the administrative claims procedure outlined above, she admittedly did not take advantage of it. *See* Ex. 17, Tolbert Dep. 160:11-161:20, 162:15, 163:8-164:13. Instead, Plaintiff "just dropped" the matter based solely on her "interpretation of what would happen" to her claim given that the WAP Committee had denied a claim brought by her boss, Brazelton. *Id.* 168:2, 189:15-20; *see also id.* 163:8-164:13, 165:10-13; 169:22-23; 189:9-190:2. However, Plaintiff admitted that: (1) she knew nothing about Brazelton's claim at the

19

CONFIDENTIAL

RBC-PAUL000009972

time she "just dropped" her own; (2) the basis for Brazelton's claim did not matter to her; and

(3) she would have felt the same way about her claim no matter how different Brazelton's claim

was from her own. *See id.* 166:10-11, 169:24-170:8.

## ARGUMENT

I. **Plaintiff's Claims Fail Because The WAP Is Not Governed by ERISA.**

A. **For ERISA To Apply, Plaintiff Must Show That The WAP Was Expressly Designed To Provide Retirement Income, Or That It Does So As A Result Of Its "Systematic" Operation.**

Before the Court can even begin to evaluate her top hat claims, Plaintiff must first

establish that the WAP is governed by ERISA.  ERISA is not intended "to control every aspect

of the employer-employee relationship or every promise made to employees." *Murphy*, 611 F.2d

at 574.  Rather, in order for ERISA to apply, Plaintiff must first prove that the WAP constitutes

an "employee benefit plan," as defined in 29 U.S.C. § 1002(3).  *See, e.g., Boos v. AT&T, Inc.*,

643 F.3d 127, 130 (5th Cir. 2011); *Davis v. Guardian Life Ins. Co. of Am.*, 2007 WL 2491344, at

*4 (W.D. La. Aug. 30, 2007) ("The burden of showing whether a plan is subject to ERISA falls

on the party asserting ERISA's application.").[9]

According to Plaintiff, the WAP is governed by ERISA because it constitutes an

"employee pension benefit plan." *See* Pl. MPSJ at 23 & n. 111.  An employee pension benefit

plan is a plan "that by its express terms or as a result of surrounding circumstances . . . (i)

provides retirement income to employees, or (ii) results in a deferral of income by employees for

periods extending to the termination of covered employment or beyond." 29 U.S.C.

§ 1002(2)(A).  In other words, such a plan exists in one of two circumstances:  Either the plan

---

[9] An "employee benefit plan" is defined as either "an employee welfare benefit plan *or* an employee pension benefit plan." 29 U.S.C. § 1002(3) (emphasis added).  A "top hat" plan is not an independent form of ERISA plan; rather, it is a "subset" of the two types defined by § 1002(3) and must qualify under that provision before being subject to ERISA. *See, e.g., Emmenegger*, 197 F.3d at 932 n.6 ("[A] 'top hat' plan must be an ERISA 'plan' in the first instance."); *Long v. Excel Telecomms. Corp.*, 2000 WL 1562808, at *3 (N.D. Tex. Oct. 18, 2000) (a top hat plan is not a third type of ERISA plan, and starting with the top hat analysis "puts the cart before the horse").

20

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 98

CONFIDENTIAL

RBC-PAUL000009973

*expressly* provides for the distribution of benefits at retirement or upon termination of covered employment, or it creates this same effect "as a result of surrounding circumstances." *See id.*

In a widely cited decision, the Fifth Circuit cautioned that the "employee pension benefit plan" definition must "not to be read as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach." *Murphy*, 611 F.2d at 575. Rather, "[t]he words 'provides retirement income' patently refer only to plans *designed for the purpose of paying retirement income* whether as a result of their express terms or surrounding circumstances." *Id.* (emphasis added); *see also Williams v. Wright*, 927 F.2d 1540, 1547 (11th Cir. 1991) (focus of the "pension plan" inquiry is whether a plan "was designed primarily for the purpose of providing retirement income"); *Raskin v. CyNet, Inc.*, 131 F. Supp. 2d 906, 909-10 (S.D. Tex. 2001) (same); *Int'l Paper Co. v. Suwyn*, 978 F. Supp. 506, 510 (S.D.N.Y. 1997) ("[G]enerally only plans designed for the purpose of paying retirement income should be considered to provide retirement income under ERISA." (quotations omitted)).

Consistent with the principle articulated in *Murphy*, a plan should *not* be deemed an "employee pension benefit plan" when its primary purpose is something other than providing retirement income. *See, e.g., Murphy*, 611 F.2d at 575-76; *Hahn v. Nat'l Westminster Bank, N.A.*, 99 F. Supp. 2d 275, 279 (E.D.N.Y. 2000) (no ERISA employee pension benefit plan "will be found where payments made are not to 'provide retirement income,' but, instead, serve some other purpose"). Thus, deferred compensation plans designed to retain valuable employees or to reward and encourage performance – as opposed to providing retirement income – are *not* covered by ERISA. *See, e.g., Murphy*, 611 F.2d at 575-76; *Emmenegger*, 197 F.3d at 933 ("The purpose of the vesting provision is to strengthen the connection between service and reward. The goal is not to defer payment to the participant until termination or retirement, and the record

21

CONFIDENTIAL

RBC-PAUL000009974

indicates that the vesting requirement in fact did not have that result."); *McKinsey v. Sentry Ins.*, 986 F.2d 401, 406 (10th Cir. 1993) (finding deferred compensation program for "Sales Representatives," which included benefits based in part on each participant's production, was not subject to ERISA); *Houston v. Saracen Energy Advisors, L.P.*, 2009 WL 890384, at *1, *8 (S.D. Tex. Mar. 27, 2009) (incentive plan was not covered by ERISA where purposes were "to provide select employees (a) incentives related to their performance and continued employment; (b) an opportunity to participate in the profits (and losses) of the funds managed by [the company]; and (c) deferred compensation").

Finally, the mere fact that a plan *may* result in the deferral of compensation until retirement or termination does not bring it within ERISA's coverage. To the contrary, courts generally hold a plan is not covered by ERISA when: (1) payments under the plan represent *current* benefits (*e.g.*, performance bonuses) that simply come to fruition at a future date;[10] or (2) benefits are deferred to termination or retirement as a result of participant *choice*, as opposed to a *systematic* attribute of the plan. *Compare, e.g., Emmenegger*, 197 F.3d at 933 ("While a participant may postpone his redemption of [the benefit] until termination or retirement, this is strictly at the option of the participant, and there is nothing in the terms of the program that would result in such deferral with the purposeful consistency required to make deferral systematic.") *and Hahn*, 99 F. Supp. 2d at 280 ("The mere presence of an option to defer compensation to post-retirement income no more transforms the [plan] into a plan covered by

---

[10] *See, e.g., Murphy*, 611 F.2d at 575-76 ("[The program] was evidently designed to provide *current* rather than *retirement* income to Inexco's employees." (emphases added)); *Wright*, 927 F.2d at 1546 (distinguishing between payments made after retirement pursuant to a *current* employment contract and a plan designed "to specifically provide for an employee's retirement"); *Int'l Paper*, 978 F. Supp. at 511 (noting that a primary factor in determining status as a pension plan is whether benefits are paid on a current basis before retirement age or are otherwise available periodically during the course of employment); *Hagel v. United Land Co.*, 759 F. Supp. 1199, 1202 (E.D. Va. 1991) ("A more natural reading of § 1002(2)(A)(ii)'s requirement that there be a 'deferral of income . . . to the termination of covered employment or beyond' is that the statute requires that a plan generally defer the receipt of income to the termination of employment. The statute is not satisfied when . . . a portion of withheld income happens to become due after termination.").

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 100

CONFIDENTIAL

RBC-PAUL000009975

ERISA than the fact that payments under the [plan] could continue into an employee's post-employment period."), *with Kaufman v. S&A Rest. Corp.*, 2008 WL 2242621, at *7 (N.D. Tex. May 30, 2008) (deferred compensation plan may be covered by ERISA where, unlike *Emmenegger* and *Hahn*, participants could only redeem up to 40% of their vested benefits during employment, while the remainder was mandatorily distributed at retirement or termination).

**B.     The Undisputed Facts Demonstrate That The WAP Is Not An Employee Pension Benefit Plan Under ERISA.**

Applying the above principles, it is clear that the WAP is not an "employee pension benefit plan" under ERISA.  Specifically, the undisputed facts demonstrate that:  (1) the WAP is *not* expressly designed to provide retirement income, and (2) the WAP does *not* systematically defer income to periods beyond termination of employment.

**1.     The WAP Is Not Designed To Provide Retirement Income.**

The WAP's stated purpose is "to provide an opportunity for [select] employees to invest a portion of their compensation in tax-deferred savings and investment options in an effort to support long-term savings and to allow such employees to share in the Company's growth and profitability, if any."  Am. Cmpl. Ex. 1 § 1.1.  This provision makes no mention of providing retirement income.  Indeed, the WAP expressly states that it is not intended to be an "employee pension benefit plan" under ERISA:

> Although the Plan is *not intended* to be a tax-qualified plan under Code Section 401, the Plan *might be determined to be* an "employee pension benefit plan" as defined by ERISA.  *If the Plan is determined to be* an "employee pension benefit plan," the Company believes that it constitutes an unfunded plan of deferred compensation maintained for a selected group of management or highly compensated employees and, therefore, exempt from many ERISA requirements. . . .

*Id.* § 5.11 (emphasis added).  In other words, while the WAP was designed with the express purpose of providing deferred compensation in a manner *not* covered by ERISA, it took the pragmatic additional step of seeking to ensure that, even if the WAP were nonetheless found to

23

CONFIDENTIAL

RBC-PAUL000009976

be an ERISA-covered plan, it would not be subject to all of ERISA's requirements.  *See id.*

Rather than being designed to provide retirement benefits, it is undisputed that the WAP is primarily used as a mechanism to attract and retain valuable employees.  For example, the vesting schedules associated with Productivity and Loyalty Bonuses served the dual purpose of rewarding WAP participants for their service and creating a strong financial motivation for employees to remain at RBC.  *See Emmenegger*, 197 F.3d at 933 ("The purpose of the vesting provision is to strengthen the connection between service and reward.").  The parties are therefore in agreement that the WAP's primary purpose is to attract and retain valuable employees.  *See, e.g.*, Pl. MPSJ at 7 ("the WAP was introduced and maintained to recruit and retain quality employees"); Ex. 1, Sikich Dep. 40:12-43:11 (agreeing that the "strategic objective of WAP [is] to attract and retain financial consultants" and explaining how the WAP was a "key element" for doing so within a very competitive environment).[11]

The WAP's non-retirement purpose also is reflected in the concept of "hook development," which Plaintiff has highlighted.  *See* Pl. MPSJ at 7.  Hook development is Defendants' practice of evaluating Financial Consultants' unvested WAP balances as a percentage of their annual production.  *See, e.g.*, Ex. 20, Hook Development Review.  The internal "hook" goal has been for those balances to equal 30% of Financial Consultants' annual production, because at that level the financial motivation for Financial Consultants to stay with the Company is at its strongest.  *See id.*  In short, as Plaintiff has readily conceded, the "Defendants introduced and maintained the WAP as an important tool to entice and retain quality employees."  Am. Cmpl. ¶ 76.

---

[11]  Plaintiff's Partial Motion for Summary Judgment argues that Defendants "conceded" that the WAP is an "employee pension benefit plan" based on a lone email that was sent to participants in 2008.  For the reasons set forth in Defendants' Response to Plaintiff's Partial Motion for Summary Judgment, that argument fails both as a matter of fact and a matter of law.  *See* Def. Resp. to Pl. MPSJ at 25-26.

24

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 102

CONFIDENTIAL

RBC-PAUL000009977

Furthermore, beyond attracting and retaining valuable employees, the WAP also is designed to permit RBC to enhance participants' overall compensation by providing both bonuses and matching contributions in recognition of their performance during the preceding fiscal year. *See supra* at 7-8; *see also* Ex. 2, Buchert Dep. at 42:3-44:23 (explaining the WAP is an integral part of compensation planning because it is the exclusive vehicle through which annual bonuses are paid to Financial Consultants); Ex. 1, Sikich Dep. at 41:7-13 (stating that the WAP was a key element of compensation because a significant amount came from WAP bonuses based on production and length of service). By pegging these Company Contributions to participant's fiscal year performance, the WAP quite clearly provides *current* income subject to a specific vesting period, as opposed to conditioning the receipt of any benefits on the participant's retirement or termination from employment. These undisputed facts therefore underscore the conclusion that the WAP is not designed for the primary purpose of providing retirement income to its participants. *See* cases discussed *supra* at 21-22.

<blockquote>

2.     **The WAP's Operation Does Not Result In The Systematic Deferral Of Income To Retirement Or Periods Beyond Termination.**

</blockquote>

The WAP's operation also is consistent with that of plans courts have found to be not subject to ERISA. *See supra* at 22-23. First and foremost, the WAP does not condition the receipt of vested benefits on a participant's retirement or termination. To the contrary, some participants are *required* to receive WAP benefits while they were still employed by RBC. Ex. 3, Sikich Decl. ¶ 5. The remaining participants automatically receive WAP benefits while still employed by RBC, *unless* they expressly elect otherwise. *Id.* ¶ 4.

Importantly, RBC also does not encourage participants to defer receipt of their WAP benefits to retirement or termination. *See, e.g.*, Ex. 21, 2004 WAP Summary at 1 (explaining that the WAP "is flexible, allowing you to choose how much you defer, how it is invested and

25

*when it is paid out*," and encouraging each participant to "[s]elect a distribution option that works for you"); Ex. 22, 2006 WAP Summary at 1-2 (same and noting that "you can use your [WAP] distribution for any purpose").  Indeed, in 2006, participants were given the option to amend their prior distribution elections, meaning that if they had previously elected to receive WAP benefits upon retirement or termination, they could now elect to receive those distributions while still employed at RBC.  Ex. 23, WAP Design Enhancements 2007 at 4.  As a result of this flexibility and choice, the *majority* of WAP participants are slated for in-service distributions. Ex. 3, Sikich Decl. ¶ 6.

In sum, not only is the WAP's primary purpose to attract and retain valuable employees, but it in no way conditions – either by its terms or systematic operation – the receipt of Plan benefits on a participant's retirement or termination from employment.  To the contrary, while some participants elected to receive their WAP benefits upon termination, the undisputed facts show that such elections were made "strictly at the option of the [individual] participant, and [that] there is nothing in the terms of the [Plan] that would result in such a deferral with the purposeful consistency required to make [such] deferral systematic." *Emmenegger*, 197 F.3d at 933-34; *see also, e.g., McKinsey*, 986 F.2d at 406 (holding that participants' mere option to defer distribution of vested benefits to retirement or termination did not create a "*systematic*" deferral needed to trigger ERISA's coverage); *Hahn*, 99 F. Supp. 2d at 280 ("The mere presence of an option to defer compensation to post-retirement [or post-termination] income [does not] transform[] the [plan] into a plan covered by ERISA[.]").  Accordingly, the WAP is not an employee pension benefit plan and Plaintiff's claims should be dismissed on that threshold basis.

26

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 104

CONFIDENTIAL

RBC-PAUL000009979

**II.     Even Assuming ERISA Applies, The WAP Is A "Top Hat" Plan Exempt From ERISA's Vesting, Funding And Fiduciary Duty Provisions.**

As discussed *supra* at 6 & 23, the WAP is expressly designed so that, in the event it is determined to be an "employee pension benefit plan" subject to ERISA, it will nonetheless satisfy ERISA's "top hat" exemptions.   These provisions free an employer from many of ERISA's requirements, in recognition of the fact that top hat plan participants "unlike their rank-and-file counterparts, are capable of protecting their own pension interests."   *Alexander v. Brigham & Women's Physicians Org., Inc.*, 513 F.3d 37, 43 (1st Cir. 2008).

To qualify for ERISA's top hat exemptions, a plan must be: (1) "unfunded"; and (2) "maintained primarily for the purpose of providing deferred compensation for a select group or management or highly compensated employees."   *Reliable Home Health Care, Inc. v. Union Cent. Ins. Co.*, 295 F.3d 505, 512 (5th Cir. 2002) (citing *Demery*, 216 F.3d at 287); *see also* 29 U.S.C. §§ 1051(2), 1081(a)(3) and 1101(a).   There is no genuine issue of material fact that those statutory requirements are satisfied here.

**A.     The WAP Is Unfunded.**

Plaintiff has conceded that the WAP is "unfunded," Pl. MPSJ at 28, and that conclusion is unavoidable.  To "determin[e] whether a plan is 'funded' or 'unfunded' under ERISA, a court must first look to the surrounding facts and circumstances, including the status of the plan under non-ERISA law.  Second, a court should identify whether [the plan] is funded by a res separate from the general assets of the company.  In doing so, the mere fact that a plan is funded through an insurance policy is not dispositive of a plan's status as funded or unfunded for ERISA purposes." *Reliable Home Health Care*, 295 F.3d at 513-14.

Critical to the first inquiry is "whether the beneficiary could 'establish, through the plan documents, a legal right any greater than that of an unsecured creditor to a specific set of funds

27

CONFIDENTIAL

RBC-PAUL000009980

from which the employer is, under the terms of the plan, obligated to pay the deferred compensation.'" *Id.* at 513 (quoting *Demery*, 216 F.3d at 287).   Here, the WAP expressly provides that participants have no greater rights than unsecured creditors:

> All Participants are general unsecured creditors of the Plan Obligor with respect to amounts payable pursuant to distributions from the accounts described in (a) and (b) above.
>
> As such, Participants and their estates will not have any secured or preferred interest by way of trust, escrow, lien or otherwise in any specific assets, of the Employers.  The Plan does not require that any hypothetical investments under this Plan be funded by the Company.  If a Plan Obligor, in fact, elects to set aside monies or other assets to meet its obligations under the Plan (there being no obligation to do so) through creation of a trust or otherwise, such monies or other assets will be subject to the claims of its general creditors, and neither any Participant nor any beneficiary of any Participant will have a legal, beneficial or security interest therein.

Am. Cmpl. Ex. A, 2008 WAP § 8.2

Furthermore, it is undisputed that WAP contributions are *not* subject to tax liability at the time they are made, but rather, only are taxed when the participant receives a distribution of those contributions at a later date.  *See* Ex. 2, Buchert Dep. at 59:5-21; *see also* Am. Cmpl. Ex. A §§ 5.9, 5.10.  Thus, the WAP "is more likely than not to be regarded as unfunded[.]" *Reliable Home Health Care*, 295 F.3d at 513-14.

Turning to the second step of the funding inquiry, it is clear that RBC has not established "a res separate from the general assets of the company" from which to fund WAP distributions. *See id.* at 514.  To be sure, RBC has a trust containing company stock commensurate with the value of participants' company stock holdings in the WAP and also maintains hedge investments to account for expected liability associated with WAP distributions.  *See* Ex. 1, Sikich Dep. at 277:20-285:11.  However, neither of these set-asides render the WAP "funded" within the meaning of ERISA. *See Reliable Home Health Care*, 295 F.3d at 514 (insurance policies used to cover expected benefits did not render plan "funded," as they were not owned by participants).

28

CONFIDENTIAL

RBC-PAUL000009981

**B.      The WAP Is Maintained For The Primary Benefit Of A Select Group Of Highly Compensated Employees.**

To determine whether a plan is maintained for the primary benefit of "a select group of management or highly compensated employees," courts evaluate both "quantitative and qualitative" factors. *See, e.g., Daft v. Advest, Inc.*, 658 F.3d 583, 595 (6th Cir. 2011). First, the "select group" component requires a *quantitative* analysis of the percentage of the plan sponsor's total workforce that is eligible to participate in the plan. *See id.* Second, the "management or highly compensated employees" component requires a *qualitative* analysis of the eligible employees' duties (for "management"), *or* their compensation relative to other employees in the workforce (for "highly compensated"). *See, e.g., id.* at 595; *Alexander,* 513 F.3d at 43; *Demery,* 216 F.3d at 288-89. Finally, courts also consider as another *qualitative* factor the language of the plan and other evidence to ensure that it is in accord with ERISA's top hat requirements. *See, e.g., Daft*, 658 F.3d at 595. Applying the undisputed facts to each of these factors demonstrates that the WAP is properly classified as a top hat plan

**1.      Only A Fraction Of The Total Workforce Qualifies For The WAP.**

As Plaintiff has acknowledged, "[t]he Royal Bank of Canada, together with its U.S. participating subsidiaries," sponsor the WAP. Am. Cmpl. ¶ 19 and Ex. A, 2008 WAP § 1.1 (WAP is for "employees of the Royal Bank of Canada . . . and its Participating Subsidiaries"). Nonetheless, Plaintiff directs her claims and her arguments at *only* RBC's *subsidiaries* – thereby excluding thousands of employees who worked for the much larger Plan sponsor, the Royal Bank of Canada.[12] However, the selectivity analysis requires a comparison of all employees who satisfied the plan's eligibility requirements to *all employees* in the plan sponsors' workforce.

---

[12] Plaintiff elsewhere acknowledges the relevance of the Canadian workforce. In fact, both her Amended Complaint and her Motion for Partial Summary Judgment cite the high compensation of several executives of parent-company the Royal Bank of Canada who work in Canada. *See, e.g,* Pl. MPSJ at 35-36; Am. Cmpl. ¶ 101.

29

CONFIDENTIAL

RBC-PAUL000009982

*See, e.g., Demery*, 216 F.3d at 288-89.   Thus, there is no sound basis for excluding those members of the Plan sponsors' workforce who work in Canada.   Indeed, the only reason those employees did not participate in the WAP is that they did not satisfy at least one of its express *eligibility* requirements – namely, that the employee perform the majority of his or her services in the U.S.  *See supra* at 9; Am. Cmpl. Ex. A, 2008 WAP § 2.1(b).

Comparing the total number of eligible employees to the total workforce of all Plan sponsors, there is no question that the WAP is sufficiently "select" to constitute a top hat plan. Between 2004 and 2010, the total percentage of all Plan sponsor employees who were eligible for the WAP ranged from 1.97% to 3.31%.  Ex. 18, Niden Supp. Rpt. ¶ 46.[13]  These percentages are far below the threshold needed to conclude that a plan is sufficiently "select" to constitute a top hat plan under ERISA.  *Compare Demery*, 216 F.3d at 289 (holding that 15.34% is within "the acceptable size for a 'select group'") *and Alexander*, 513 F.3d at 44 (same where 8.7% of all plan sponsor employees were eligible) *and Callan v. Merrill Lynch & Co., Inc.*, 2010 WL 3452371, at *10 (S.D. Cal. Aug. 30, 2010) (agreeing with 15% threshold), *with Darden v. Nationwide Mut. Ins. Co.*, 717 F. Supp. 388, 397 (E.D.N.C. 1989) (plan not sufficiently select where, over a four year period, 18.7% of all plan sponsor employees were eligible), *aff'd* 922 F.2d 303 (4th Cir. 1991), *rev'd on other grounds* 503 U.S. 318 (1992).

### 2.   Even As Compared To The U.S. Workforce Only, The WAP Is Sufficiently Select.

Even accepting, for the sake of argument, Plaintiff's focus on *only* the workforce of the U.S. subsidiaries named in the Amended Complaint, the record demonstrates that the Plan is still

---

[13] Because data concerning the Canadian workforce was not available for the 2003 Plan year, an eligibility percentage accounting for the combined total workforce for all Plan sponsors is not possible in that year.  However, considering only the workforce of RBC's U.S. based subsidiaries who sponsored the WAP, the eligibility percentage in 2003 was just 6.99% – well below the threshold needed to satisfy ERISA's top hat exemptions.  *See* Ex. 18, Niden Supp. Rpt. Ex. 7.

30

CONFIDENTIAL

RBC-PAUL000009983

sufficiently select to constitute a top hat plan.  The percentage of U.S. employees who were eligible for the WAP fluctuated annually between 2003 and 2010.  For example, in 2003, just 6.99% of the U.S. workforce was eligible to participate in the WAP.  Ex. 18, Niden Supp. Rpt. Ex. 7.  This number crept upward from 2004 to 2006 as the U.S. workforce fluctuated.  *See id.* ¶¶ 7, 14.  Accordingly, the WAP Committee decided in October 2008 to amend the WAP's eligibility requirements by increasing the compensation and production thresholds for future Plan years.  Ex. 10, WAP Committee Minutes.  As a result, the percentage of U.S. employees who were eligible to participate in the WAP decreased sharply from a high of 17.11% in 2006 to 14.91% in 2009, and to just 10.56% in 2010.  *See* Ex. 18, Niden Supp. Rpt. Ex. 7.

When viewed over its lifetime and taking into account fluctuations in the U.S. workforce, the WAP's overall eligibility rate was just 13.39%.  *Id.* ¶ 46.  This eligibility rate is commensurate with that of other plans courts have found to be sufficiently select to satisfy ERISA's top hat requirements.  For example, in the Second Circuit's seminal decision in *Demery* (cited favorably by the Fifth Circuit in *Reliable Home Health Care*, 295 F.3d at 512-13), the court held that a plan was sufficiently select where 15.34% of all employees were eligible to participate.  *Demery*, 216 F.3d at 289; *see also Callan*, 2010 WL 3452371, at *10 (selectivity requirement met because "less than 15%" of the plan sponsor's total workforce was eligible).  Moreover, the WAP's overall eligibility rate is far below the 18.7% found to render the employer's plan insufficiently select in *Darden*, 717 F. Supp. at 397 (calculating an 18.7% overall eligibility rate over multiple years).

In her Motion for Partial Summary Judgment, Plaintiff has advanced alternative eligibility percentages submitted by her expert, Saul Solomon.  *See* Pl. MPSJ at 37.  But the methodology Solomon used to calculate those percentages is flawed and cannot create a genuine

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 109

CONFIDENTIAL

RBC-PAUL000009984

issue of material fact. As explained in Defendants' Response to Plaintiff's Partial Motion for Summary Judgment, Solomon's methodology, which takes a snapshot of the U.S. workforce on December 31 each year, is inconsistent with both the process RBC actually used to determine eligibility each year and relevant legal authority, and it also fails to account for the substantial volatility in the size of RBC's workforce from year-to-year. *See* Def. Resp. to Pl. MPSJ at 30-33; *see also* Ex. 18, Niden Supp. Rpt. ¶¶ 7-17. Regardless, even accepting Solomon's flawed methodology, the WAP's overall eligibility rate for 2003 through 2010 is just 15.51%, *see* Ex. 18, Niden Supp. Rpt. ¶ 46, which is entirely commensurate with the eligibility rates deemed sufficiently select to satisfy ERISA's top hat requirements in *Demery* and *Callan*.

### 3. The WAP Primarily Benefits Highly Compensated Employees.

To determine whether a plan is offered for the primary benefit of "highly compensated" employees, courts compare the compensation of those employees who met the plan's eligibility requirements to that of *either* the workforce as a whole *or* all non-eligible employees. *Compare, e.g.*, *Demery*, 216 F.3d at 289 ("[T]he average salary of plan participants was more than double that of the average salary of all [bank] employees. We find this did make them 'highly compensated'[.]"), *with Daft*, 658 F.3d at 595 (stating that the relevant analysis is "the compensation disparity between top hat plan members and *non-members*" (emphasis added)), *and Callan*, 2010 WL 3452371, at *11 (applying both tests but endorsing the latter). Under either approach, the WAP is offered for the primary benefit of "highly compensated" employees.

### a. WAP Eligible Employees Earned Significantly More Than Double That Of The Workforce As A Whole.

Numerous courts have found that the appropriate analysis for determining whether a plan is offered for the primary benefit of highly compensated employees is to compare the average income of eligible employees to that of all plan sponsor employees. *See, e.g.*, *Demery*, 216 F.3d

32

CONFIDENTIAL

RBC-PAUL000009985

at 289; *Alexander*, 513 F.3d at 46; *Belka v. Rowe Furniture Corp.*, 571 F. Supp. 1249, 1253 (D. Md. 1983). Applying this test, Courts generally find that where eligible employees' average compensation exceeds that of the workforce as a whole by double or more, then the plan meets the "highly compensated" requirement. *See, e.g., Demery*, 216 F.3d at 289; *Callan*, 2010 WL 3452371, at *11. The WAP easily satisfies this standard.

To start with, comparing the average compensation of WAP eligible employees to that of all Plans sponsor employees (U.S. and Canada) demonstrates that WAP eligible employees earned between 4.0 and 5.5 times more than the workforce as a whole. Ex. 18, Niden Supp. ¶ 54. Even when the analysis is limited to the U.S. workforce, WAP eligible employees' average compensation is between 2.2 and 3.7 times greater than that of all U.S. employees. Ex. 19, Niden Rpt. at ¶ 35. Indeed, Plaintiff's own expert calculates an even greater compensation disparity, finding that WAP eligible employees earned on average between 2.91 and 4.01 times more than that of all U.S. employees. *See* Pl. App. (Doc. No. 84) Tab 13 at 20 (Table 1.6).[14]

Moreover, the use of averages actually *understates* the compensation disparity between WAP eligible employees and the workforce as a whole. As both parties' experts have observed, "averages are heavily affected by extremely large or small values of compensation." Ex. 19, Niden Rpt. ¶ 30; *see also* Ex. 18, Niden Supp. Rpt. ¶¶ 18-27, 49; Pl. App. Tab 13 at 16-17 (when median compensation is "lower than the average," it "indicates that the average is skewed upward"). Indeed, the median compensation of WAP eligible employees ranged from 5.2 to 7.2 times (on average 6.2 times) that of all Plan sponsor employees during the years analyzed. Ex. 18, Niden Supp. Rpt. ¶ 51. And considering U.S employees only, the median compensation of

---

[14] Plaintiff Motion for Partial Summary Judgment completely ignores this part of her expert's analysis, as well as the widely accepted tests for determining whether a plan is offered primarily to "highly compensated" employees. As explained in Defendants' Response to Plaintiff's Motion for Partial Motion for Summary Judgment, the compensation comparisons Plaintiff does advocate are misleading and unsupported by any legal authority. *See* Def. Resp. to Pl. MPSJ at 37-42.

CONFIDENTIAL

RBC-PAUL000009986

eligible employees likewise ranged from 3.2 to 5.2 times (on average 4.3 times) greater than that of the workforce as a whole.  Ex. 19, Niden Rpt. ¶ 32.

In short, whether using average or median compensation, the significant pay disparity between WAP eligible employees and the workforce as a whole demonstrates conclusively that the WAP was maintained for the primary benefit of "highly compensated" employees.  *See, e.g.*, *Demery*, 216 F.3d at 289; *Callan*, 2010 WL 3452371, at *11; *Belka*, 571 F. Supp. at 1253 (rejecting plaintiff's "attack" that average compensation "figures presented by defendant [were] skewed by the very high salaries" of some participants, because even under a median salary approach eligible employees made three times that of the workforce as a whole).

### b.     WAP Eligible Employees Earned Vastly More than Non-Eligible Employees.

While numerous courts have compared the compensation of eligible employees to that of the total workforce, some courts, including the Sixth Circuit, have found that the appropriate analysis to determine whether a plan primarily benefits "highly compensated" employees is to assess the compensation disparity between eligible employees and non-eligible employees.  *See, e.g.*, *Daft*, 558 F.3d at 595; *Callan*, 2010 WL 3452371, at *11; *Simpson v. Ernst & Young*, 879 F. Supp. 802, 816 (S.D. Ohio 1994).  The WAP passes this test with flying colors as well.

Starting with the total workforce for all Plan sponsors, the average compensation of WAP eligible employees ranged from 4.7 to 6.5 times greater than that of all non-eligible employees. Ex. 18, Niden Supp. Rpt. ¶ 58.  Likewise, the median compensation of WAP eligible employees ranged from 5.3 to 7.4 times greater than that of all non-eligible Plan sponsor employees.  *Id.* ¶ 57.  A similarly large compensation disparity is found within the U.S. workforce only, as WAP eligible employees earned between 3.7 and 6.4 times more than that of all non-eligible U.S. employees. Ex. 19, Niden Rpt. ¶ 40. In addition, WAP eligible employees' median compensation

34

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 112

CONFIDENTIAL

RBC-PAUL000009987

was between 4.2 and 6.3 times (on average 5.1 times) greater than that of all non-eligible U.S. employees. *Id.* ¶ 39.

Accordingly, under either of the approaches endorsed by federal courts, the undisputed facts show that the WAP was maintained for the primary benefit of highly compensated employees. *See, e.g., Callan,* 2010 WL 3452371, at *11 (plan was primarily for "highly compensated" employees where average eligible employee compensation exceeded that of all employees by a ratio of 2:1 and that of non-eligible employees by a ratio of 3:1).

### 4. The WAP's Plain Language And Its Primary Purpose Are Consistent With ERISA's Top Hat Requirements.

Finally, in addition to the quantitative and qualitative factors above, courts also consider "the actual language of the plan," and other evidence of the plan's purpose, to ensure that the plan is consistent with ERISA's top hat requirements. *Daft,* 658 F.3d at 595. There is no question here that the WAP's plain language is consistent with the top hat requirements. Section 1.1 of the WAP states that it is a "deferred compensation plan" offered to "a select group of management or highly compensated employees." Am. Cmpl. Ex. A, 2008 WAP § 1.1. Section 5.11 further states that, to the extent the WAP is found to be covered by ERISA, it is designed to "constitute[] an unfunded plan of deferred compensation maintained for a select group of management or highly compensated employees[.]" *Id.* § 5.11.

Other evidence further demonstrates that the WAP's purpose is consistent with the top hat requirements. For example, in *Demery,* the Second Circuit found it highly relevant to the top hat analysis that the plan in question: (1) "was supplemental to [the employer's] pension plan, not a substitute for it," and (2) "was established 'as a means to retain valuable employees[.]'" 216 F.3d at 287. The court held that "[t]hese factors *must weigh in favor* of classifying the Plan as a top hat plan." *Id.* (emphasis added).

35

CONFIDENTIAL                                                                                RBC-PAUL000009988

Those same two factors are present here.   First, the WAP was offered to qualifying employees as a further benefit in addition to the Company 401(k) retirement plan.  Ex. 1, Sikich Dep. 141:15-25.   Second, there is no question that the WAP was "established as a means to retain valuable employees."   Indeed, Plaintiff's Amended Complaint acknowledges that "Defendants introduced and maintained the WAP as an important tool to entice and retain quality employees."  Am. Cmpl. ¶ 76; *see also* Pl. MPSJ at 7 (same).

While Plaintiff has argued in her Motion for Partial Summary Judgment that the WAP *cannot* be deemed a top hat plan *because* it is designed to "recruit and retain quality employees," *see* Pl. MPSJ at 7, 29, this contention is unsupported by legal authority and is negated by the Second Circuit's reasoning in *Demery*.  Plaintiff's argument also is illogical, as it suggests that the goal of recruiting and retaining valuable employees is somehow inconsistent with providing a unique and valuable deferred compensation plan to a "select group of management or highly compensated employees."  29 U.S.C. § 1101(a).  These two concepts are not mutually exclusive as Plaintiff suggests, but rather, go hand-in-hand.  *See, e.g., Demery*, 216 F.3d at 287; *Alexander*, 513 F.3d at 40 (holding that plans specifically created to improve the employer's "ability to recruit and retain top-flight surgeons" were top hat plans).[15]

In sum, a review of the undisputed facts demonstrates that all of the qualitative and quantitative factors courts consider in evaluating whether a plan qualifies for ERISA's top hat exemptions are easily satisfied here.  *See supra* at 29.  Accordingly, Defendants are entitled to summary judgment on all of Plaintiff's claims for the additional reason that the WAP satisfies

---

[15] As discussed *supra* at 23-26, the recruiting and retention purpose of the WAP shows that it is not an employee pension benefit plan, particularly when coupled with the fact that the Plan did not systematically defer benefits to retirement or termination.  This latter fact distinguishes the WAP from the top hat plans at issue in *Demery* and *Alexander*.  In those plans, the participants could not receive benefits until retirement or death and, thus, the plans clearly were covered by ERISA.  *See Demery*, 216 F.3d at 285 ("Participants in the Plan would vest upon reaching retirement age[.]"); *Alexander v. Brigham & Women's Physicians Org., Inc.*, 467 F. Supp. 2d 136, 139 (D. Mass. 2006) (benefits "could not be withdrawn . . . until a [participant] retired or died"), *aff'd Alexander*, 513 F.3d 37.

CONFIDENTIAL

RBC-PAUL000009989

the top hat exemptions from ERISA's vesting, funding and fiduciary duty provisions.

### III. Defendants Are Entitled To Summary Judgment Because Plaintiff Admittedly Failed To Comply With The WAP's Administrative Claims Procedure.

The parties already have extensively briefed the issue of whether ERISA's administrative exhaustion requirement applies to Plaintiff's claims in connection with Defendants' motion to dismiss. Accordingly, Defendants will merely summarize the legal points from that briefing:

- Fifth Circuit precedent requires individuals who seek to pursue claims for benefits under ERISA § 502(a)(1)(B) to first exhaust all available procedures for challenging benefits determinations under the plan, including appeal procedures, *before* he or she may file an action in federal court. Def. MTD (Doc. No. 37) at 7-8.

- The Fifth Circuit also has made clear that a plaintiff may not avoid the administrative exhaustion requirement by characterizing benefits claims as fiduciary breach claims under §§ 502(a)(2) or (a)(3). Rather, to avoid exhaustion, the fiduciary breach claim must be truly *independent* of a claim for denied benefits. *See id.* at 8-9.

- Plaintiff's Amended Complaint merely re-casts her benefits claim under § 502(a)(1)(B) as fiduciary breach claims under §§ 502(a)(2)-(3) in an attempt to avoid administrative exhaustion. Her claims do not arise from a breach of fiduciary duty that is *independent* of her claims for unpaid benefits. *See id.* at 8-10.

- The conclusion that Plaintiff's claims arise under § 502(a)(1)(B), is underscored by the structure of ERISA § 502. Plaintiff's claim does not arise under § 502(a)(2), because she does not seek to recover plan losses resulting from mismanagement of plan assets. And § 502(a)(3) does not apply because Plaintiff's claim for unpaid benefits (and clarification of future benefits) can be addressed under § 502(a)(1)(B). *See id.* at 11-12; *see also* Def. Reply in Supp. MTD (Doc. No. 44) at 6-7.

- Finally, that Plaintiff's claim for benefits is based on her contention that the WAP's forfeiture provisions violate ERISA, does not remove her claim from the ambit of § 502(a)(1)(B), or the administrative exhaustion requirement. *See id.* at 3-5 and 7-9.

- To the contrary, courts have repeatedly found that analogous claims for benefits that would be owed but for allegedly "illegal" plan provisions properly arise under § 502(a)(1)(B). *See id.* And at least one Circuit court has recently endorsed administrative exhaustion based on identical claims arising from an alleged failure to satisfy ERISA's top hat exemption requirement. *See* Def. Notice of Supp. Auth. (Doc. No. 65).

These principles establish not only that Plaintiff's claims arise under ERISA § 502(a)(1)(B), but that they also are subject to the administrative exhaustion requirement. *See, e.g., McGowin,* 363

37

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 115

CONFIDENTIAL

RBC-PAUL000009990

F.3d at 559.

Once the Court reaches these conclusions, the undisputed facts leave no doubt that Defendants are entitled to summary judgment based on Plaintiff's admitted failure to exhaust the administrative process set forth in Section 7 of the WAP.    In her deposition, Plaintiff admitted that she was fully aware of the WAP's claims procedure.  Ex. 17, Tolbert Dep. at 160:4-161:20; 167:13-17.   Yet, rather than submit a claim, she chose to "just drop[]" the matter, because she knew that the WAP Committee had denied a claim her boss, Brazelton, had brought before it. *Id.* at 162:13-15, 163:17-164:13, 167:25-168:2.    While Plaintiff's lawyers have pled that exhaustion would have been futile based, in part, on the denial of Brazelton's claim, *see* Am. Cmpl. ¶ 113, Plaintiff has now admitted that she knew absolutely nothing about Brazelton's claim, much less why it was denied, *see* Ex. 17, Tolbert Dep. at 164:25-165:24, 168:19-21, 169:7-170:8.   Indeed, Plaintiff testified that it would have made no difference to her whether Brazelton's claim was similar to hers or completely different; either way, she was not going to submit her claim to the WAP Committee. *See id.* at 165:25-166:9, 169:18-170:8, 189-8-190:2.

Given these undisputed facts, there is no basis for excusing Plaintiff's failure to exhaust the Plan's administrative remedies.   Indeed, as Plaintiff has conceded in responding to Defendants' motion to dismiss, this Circuit narrowly limits the so-called "futility" exception to the administrative exhaustion requirement to situations in which "the plan administrator is hostile or biased against the claimant."  Pl. Resp. to Def. MTD (Doc. No. 41) at 17; *McGowin*, 363 F.3d at 559 (recognizing the same "futility" standard).  Because no such evidence has been presented here, Defendants are entitled to summary judgment on the alternative ground that Plaintiff failed to exhaust her administrative remedies under the WAP.

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 116

CONFIDENTIAL

RBC-PAUL000009991

IV.     **Defendants Are Entitled To Summary Judgment To The Extent Plaintiff Seeks To Recover For Plan Years Prior To 2009.**

Plaintiff's allegations extend over the life of the WAP and cover nearly a decade.  As she concedes, however, the WAP's eligibility requirements remained virtually unchanged from 2002 until the 2009 Plan year, when Defendants increased the compensation and production thresholds needed to qualify for the WAP.  Thus, to the extent Plaintiff's claims are based on the WAP's alleged top hat status prior to 2009, they are time-barred under any of the potential limitations periods that may be applied to those claims.

First, if the Court finds that Plaintiff's claims properly arise under ERISA § 502(a)(2) or (a)(3), a three-year statute of limitations bars them to the extent they challenge the WAP's top hat status prior to the 2009 Plan year, because Plaintiff had "actual knowledge" of such claims well before January 11, 2008 (*i.e.*, three years before the filing of the complaint).  *See* 29 U.S.C. § 1113(2).  Second, even if the Court finds that Plaintiff did not have actual knowledge of such claims before January 11, 2008, ERISA's statute of repose bars them because they arose more than six years before Plaintiff filed this action.  *See id.* § 1113(1).  Finally, if the Court agrees with RBC that Plaintiff's allegations are properly construed as claims for benefits under ERISA § 502(a)(1)(B), then a two-year limitations period should apply and likewise bars any claim challenging the WAP's top hat status prior to 2009.

A.     **Plaintiff Had Actual Knowledge Of Her Claim More Than Three Years Before She Filed This Action.**

ERISA requires that a plaintiff file suit within three years of the earliest date on which she obtains "actual knowledge" of an alleged breach.  29 U.S.C. § 1113(2).  Actual knowledge requires that the plaintiff have knowledge of the "'material facts necessary to understand that some claim exists.'"  *Babcock v. Hartmarx Corp.*, 182 F.3d 336, 339 (5th Cir. 1999) (quoting

39

CONFIDENTIAL

RBC-PAUL000009992

*Maher v. Strachan Shipping Co.*, 68 F.3d 951 (5th Cir. 1995)).  In other words, a plaintiff must have "knowledge of all relevant facts at least sufficient to give the plaintiff knowledge that a fiduciary duty has been breached or ERISA provision violated." *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1178 (3d Cir. 1992); *see also Reich v. Lancaster*, 55 F.3d 1034, 1057 (5th Cir. 1995). This does not mean that Plaintiff must know the precise cause of action that would provide relief, *see Babcock*, 182 F.3d at 339, nor does it mean that "the statute of limitations can never begin to run until a plaintiff first consults a lawyer," *Gluck*, 960 F.2d at 1177.

The first step is to define the alleged fiduciary breach.  Here, the Amended Complaint specifically enumerates Defendants' alleged failure to: (i) cause the WAP to create, fund, and maintain a trust fund for the WAP participants' benefit, and (ii) discharge their duties with respect to the WAP solely in the interests of the participants.  Am. Cmpl. ¶ 120.  Elsewhere, Plaintiff emphasizes that this case is only about "whether at all relevant times the WAP has been a lawful top hat plan." *Id.* ¶ 33 and ¶¶ 103, 107, 115.  In other words, the breach Plaintiff alleges is the failure to administer the WAP in accordance with ERISA's funding, vesting and anti-forfeiture provisions.  Plaintiff's allegations and testimony make clear that she had knowledge of this alleged conduct well before January 11, 2008 (*i.e.*, three years before the complaint).

First, Plaintiff admits that she began receiving information about the Plan in 2001.  Am. Cmpl. ¶ 97; Ex. 17, Tolbert Dep. at 112:7-14.  She was informed of her own eligibility in 2002, participated in the WAP from 2003 to 2008, and received regular information about the benefits under the Plan throughout that time.  *Id.* at 112:17-22; 113:3-9; 116:18-22.  During this entire period, Plaintiff admits that she knew that compensation of at least $150,000 was required for her and others to be WAP-eligible.  Am. Cmpl. ¶¶ 97-99.  And she also concedes that the compensation eligibility requirement did not change from 2002 until the 2009 Plan year.  Am.

40

CONFIDENTIAL

RBC-PAUL000009993

Cmpl. ¶ 79.

Second, Plaintiff also was informed that the WAP was designed for "a select group of management or highly compensated employees of the Royal Bank of Canada . . . and its Participant Subsidiaries," as that phrase appeared in the first sentence of each version of the WAP. *See, e.g.*, Ex. 24, WAP (Nov. 1, 2003) § 1.1; Ex. 25, WAP (Nov. 30, 2004) § 1.1. This requirement is repeated in the WAP's eligibility requirements, *id.* § 2.1, as well as in the express statement that RBC intended the WAP to be "an unfunded plan of deferred compensation maintained for a select group of management or highly compensated employees and, therefore, is exempted from many ERISA requirements," *id.* § 5.9. Plaintiff further testified that she reviewed a Summary Plan Description containing this statement as early as December 2001. Ex. 17, Tolbert Dep. 138:16-24. Moreover, each iteration of the WAP informs participants of: (a) the WAP's vesting provisions (§ 4); (b) its forfeiture provisions (§§ 4.3, 4.5); (c) the Plan's unfunded status (§§ 5.9 (and later 5.11), 8.2(c)); and (d) participants' status as general unsecured creditors without a secured or preferred interest in any specific Company assets, whether in trust or otherwise (§ 8.2(c)). Plaintiff can hardly claim to have been unaware of these components of the WAP's administration, each of which she now challenges.

Third, Plaintiff knew the relevant facts that were "at least sufficient to give [her] knowledge that a fiduciary duty has been breached or ERISA provision violated." *Gluck*, 960 F.2d at 1178. It is Plaintiff's position that she *herself* should never have been included in the WAP. Specifically, she contends that she was never a "highly compensated" employee, and that she was never in a "highly-placed managerial position" while employed at RBC. Ex. 17, Tolbert Dep. at 186:5-7; *see also* Am. Cmpl. ¶ 24. Plaintiff also has testified that the mere fact that she was allowed to participate was "one of the criteria" underlying her assertion that the WAP was

41

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 119

CONFIDENTIAL

RBC-PAUL000009994

not a top hat plan, *see* Ex. 17, Tolbert Dep. at 186:8-13, and that she believes that "the fact that there was a big disparity in what [she] made and what [Lewis Brazelton] made would make [the WAP] not a top hat plan," *id.* at 156:18-20. *See also* Am. Cmpl. ¶ 98 ("[Plaintiff] could hardly be considered as highly compensated when compared to other employees of Defendants.").

Accepting Plaintiff's testimony and allegations at face value, it necessarily follows that she had actual knowledge as early as 2002 that RBC allegedly was operating the WAP contrary to its express terms of limiting eligibility to "a select group of management or highly compensated employees," Am. Cmpl. Ex. A § 1.1. That Plaintiff may not have understood the nuances of the ERISA top hat analysis, such as the percentage of employees who participated in the WAP over time or the precise provision under which her claim arises, does not negate her actual knowledge of the material facts sufficient for her to know that a fiduciary breach may have occurred. *See Babcock*, 182 F.3d at 339. Consequently, her claims arising prior to three years before filing this action – which includes any challenge to the WAP's top hat status prior to the 2009 Plan year – should be time-barred. *See id.*; *see also* 29 U.S.C. § 1113(2).

## B. Plaintiff's Claims Challenging The WAP's Top Hat Status Prior To 2009 Also Are Barred By ERISA's Six-Year Statute Of Repose.

Even if the Court finds that Plaintiff did not have actual knowledge by January 2008 of her claims challenging the WAP's pre-2009 top hat status, they are nonetheless barred by ERISA's six-year statute of repose. ERISA provides that no action may be brought for breach of fiduciary duty after six years following "the date of the last action which constituted a part of the breach or violation." 29 U.S.C. § 1113(1). This limitations period is designed to protect plan fiduciaries and is considered "a statute of repose, establishing an outside limit of six years in which to file suit, and tolling does not apply." *Radford v. Gen'l Dynamics Corp.*, 151 F.3d 396, 400 (5th Cir. 1998); *see also Archer v. Nissan Motor Acceptance Corp.*, 550 F.3d 506, 508 (5th

42

CONFIDENTIAL

RBC-PAUL000009995

Cir. 2008) (the six-year period in § 1113 serves "as an absolute barrier to an untimely suit").

Again, Plaintiff broadly alleges that Defendants breached their fiduciary responsibilities by administering the WAP – at *all* times since its 2002 inception – in violation of ERISA's funding, vesting and anti-forfeiture provisions. *See* Am. Cmpl. ¶ 120; *see also id.* ¶¶ 10, 11, 16. Plaintiff makes no attempt to identify a particular date on which this alleged breach occurred and instead asserts that the WAP was illegally administrated, because, at all times, it has failed to meet ERISA's top hat requirements. *See* Am. Cmpl. ¶ 33; *see also, e.g., id.* ¶¶ 31, 103, 107, 115.

However, because ERISA's six-year limitations period is a "statute of repose that cannot be equitably tolled," the "continuing violation" doctrine generally does not apply to extend the application of § 1113(1) beyond the conduct actually constituting a breach. *Gosselink v. Am. Tel. & Tel., Inc.*, 1999 WL 33737341, at * 11 (S.D. Tex. Aug. 4, 1999) (rejecting argument that a new fiduciary breach occurred each time defendants misapplied allegedly unlawful compensation formula).[16] Thus, a plaintiff cannot avoid expiration of the six-year period prescribed in § 1113(1) by simply pleading that an alleged fiduciary breach continued over time. *See Martin*, 271 Fed. Appx. at 261 (ERISA claims based on wrongful classification of employees were barred because classification occurred at the outset of employment, and plaintiffs did not allege "any part of a breach of fiduciary duty within the six-year statute of limitations that is independent of or other than a mere continuation of what occurred in [the time-barred period]"); *David v. Alphin*, 2011 WL 4402759, at *12 (initial selection of affiliated

---

[16] *See also Martin v. Pub. Serv. Elec. & Gas Co., Inc.*, 271 Fed. Appx. 258, 261 (3d Cir. 2008); *David v. Alphin*, 2011 WL 4402759, at * 11-12 (W.D.N.C. Sept. 22, 2011); *Leber v. Citigroup, Inc.*, 2010 WL 935542 (S.D.N.Y. Mar. 16, 2010); *Tibble v. Edison Int'l*, 639 F. Supp. 2d 1074, 1086 (C.D. Cal. 2009) ("There is no 'continuing violation' theory to claims subject to ERISA's statute of limitations."); *Abbott v. Lockheed Martin Corp.*, 2009 WL 839099, at *6 (S.D. Ill. Mar. 31, 2009); *Kanawi v. Bechtel Corp.*, 590 F. Supp. 2d 1213, 1225 (N.D. Cal. 2008) (same). *Cf. Berger v. AXA Network LLC*, 459 F.3d 804, 815-16 (7th Cir. 2006) (breach occurred when company changed its method of determining eligibility for plan, and thus refusing to apply continuing violations doctrine where plaintiff simply "felt the continuing effects" of an alleged unlawful decision); *Phillips v. Alaska Hotel and Rest. Employees Pension Fund*, 944 F.2d 509, 520 (9th Cir. 1991) (rejecting continuing violation theory under § 1113(2) for ERISA breach of fiduciary duty claims).

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 121

CONFIDENTIAL

RBC-PAUL000009996

investment options, not continuing to include or failure to remove them in subsequent years, constituted the breach for limitations purposes); *Leber*, 2010 WL 935442, at *7 (same); *cf. Berger*, 459 F.3d at 816; *Phillips*, 944 F.2d at 520 (rejecting argument that a new breach occurred every time fiduciary was faced with a new decision about whether to relax vesting rules, finding that decision to "maintain the status quo" was not a new breach because all of the conduct was "of the same character"). Rather, the six-year limitations period may only be interrupted if the plaintiff identifies a distinct and independent fiduciary breach.

Applying these principles, Plaintiff's challenges to the WAP's top hat status prior to the 2009 Plan year necessarily arise from conduct occurring before January 11, 2005 – *i.e.*, six years before she filed her complaint on January 11, 2011. Plaintiff admits that the WAP was established prior to 2002, and that she began participating in 2003. *See* Am. Cmpl. ¶¶ 97-98. Plaintiff also acknowledges that WAP eligibility "was *always* based solely on an employee's business production or compensation level," *id.* ¶ 72 (emphasis added), and that the WAP's eligibility requirements in effect as of 2002 remained in place until 2009, *id.* ¶¶ 72-74. Further, Plaintiff insists that, as early as March 2001, WAP participants were "hardly a 'select group' by any standard." *Id.* ¶ 78; *see also id.* ¶ 94. Finally, Plaintiff refers to the foregoing as establishing a "clear and continuing violation" of Plaintiff's rights under ERISA. *Id.* ¶ 106.

In short, Plaintiff's allegations are expressly based upon RBC's alleged failure to meet the top hat requirements at any time after 2002, and certainly prior to January 11, 2005. Aside from the amendments to the WAP's eligibility requirements that took effect in 2009, Plaintiff cannot identify any other independent alleged breach between 2002 and 2005, on which she can rely to avoid the expiration of the six-year period of repose set forth in 29 U.S.C §1113(1).[17]

---

[17] To be clear, Defendants do not contend that Plaintiff is time-barred to the extent her claims are based on the WAP's top hat status during the 2009, 2010 and 2011 Plan years. The administration of the WAP during that time

44

CONFIDENTIAL                                                    RBC-PAUL000009997

Accordingly, Plaintiff's claims based on her challenges to the WAP's top hat status prior to 2009 are time-barred and Defendants are entitled to summary judgment on this additional basis.

### C.  If The Court Agrees That Plaintiff's Claims Properly Arise Under ERISA § 502(a)(1)(B), Then A Two-Year Statute Of Limitations Should Apply.

If the court agrees with RBC's assertion that Plaintiff's claims – regardless of the fiduciary breach label she attempts to impose – are appropriately considered claims for benefits under ERISA § 502(a)(1)(B), then Minnesota's two-year statute of limitations for breach of contract should apply.  *See* Minn. Stat. § 541.07.  The parties have already briefed this issue extensively with respect to Plaintiff's Motion for Class Certification, and Defendants therefore summarize that briefing here:

- Because ERISA does not provide a statute of limitations for claims for benefits under 29 U.S.C. § 1132(a)(1)(B), courts look to the most analogous state statute of limitations for such claims.  To determine which state's law is the proper source for the analogy, the court must apply federal choice-of-law principles.  Def. Resp. to Pl. Mot. to Certify Class.  (Doc. No. 45) at 16.

- Although the Fifth Circuit has not considered whether a forum state's law *always* applies in a (purported) class action involving a plan created and administered in another state, several other circuit courts have rejected such an automatic choice-of-law rule in favor of one that "selects a statute of limitations from the forum state's law unless another state has more significant contacts with the dispute."  *Id.* at 14-15.

- Factors critical to this analysis include which state has a more significant relationship with the dispute, where corporate decisions were made and documented, whether the forum is "simply a spoke rather than a hub" of the lawsuit, and whether there was evidence of the parties' justified expectations that a particular state's laws would fill the gaps in federal ERISA law by including a choice of law provision.  *Id.* at 15.

- Applying that analysis to this case, Minnesota law is the appropriate source from which to borrow the most analogous statute of limitations.  Plaintiff's claims cover the entire country; Defendants are headquartered, and the WAP is administered, in Minnesota; the WAP was executed in Minnesota; and the WAP contains a choice of law provision that states that Minnesota law will apply to the extent ERISA does not.  *Id.* at 15-16.

---

was based on amended eligibility thresholds, which represent precisely the type of discrete, separate conduct that distinguishes this period from her claims arising under the 2002-2008 Plan years.

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
No. 3:16-cv-05616-RBL - Page 123

CONFIDENTIAL

RBC-PAUL000009998

- Under Minnesota law, a claim for benefits under ERISA § 532(a)(1)(B) is typically characterized as a contract action for statute of limitations purposes, which carries with it the two-year limitations period prescribed in Minn. Stat. § 541.07. *Id.* at 16.

Under these principles, if the Court determines that Plaintiff's claims are properly brought under ERISA § 502(a)(1)(B), the Minnesota statute of limitations for breach of contracts would apply. Accordingly, to the extent Plaintiff's claims are based on pre-2009 conduct, they are time-barred and Defendants are entitled to summary judgment on this alternative basis.

## V. Plaintiff Has Failed To Name Any Defendant Who Can Be Held Liable For The Alleged Breaches Of Fiduciary Duty.

Finally, Plaintiff's claim is fundamentally flawed in that, despite alleging fiduciary breach claims under ERISA §§ 502(a)(2) and (a)(3), she has failed to name a single Plan fiduciary as a defendant in this case. It is well-settled that a person can be deemed a fiduciary under ERISA "only 'to the extent' he has or exercises specified authority, discretion or control over a plan or its assets[.]" *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 251 (5th Cir. 2008) (citing 29 U.S.C. § 1002(21)). Furthermore, the Supreme Court has made clear that conduct related to the decision to "modify, amend or terminate [a] plan[,]" cannot give rise to fiduciary liability. *Hughes Aircraft Co.*, 525 U.S. at 444; *see also Lockheed Corp. v. Spink*, 517 U.S. 882, 891 (1996) ("[T]he act of amending a pension plan does not trigger ERISA's fiduciary provisions[.]"). This is because such decisions typically concern "the form or structure of the Plan such as who is entitled to receive Plan benefits and in what amounts," and thus involve conduct that is more akin to the settlor of a trust, as opposed to the fiduciary role of plan administration or management. *See Hughes*, 525 U.S. at 444-45.

In this case, there is no evidence that any of the named Defendants engaged in any fiduciary conduct with respect to the WAP. To the contrary, the evidence developed in discovery shows that the only role the Defendants played with respect to the WAP was that of a

46

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 124

CONFIDENTIAL

RBC-PAUL000009999

typical Plan sponsor.   For example, it is undisputed that Defendants were involved in the preliminary analysis relating to the decision to amend the WAP's eligibility requirements in 2008.   *See* Ex. 1, Sikich Dep. at 24:9-25:16, 64:23-72:7.   However, because such actions indisputably were related to "modif[ications]" and "amend[ments]" to the WAP, which ultimately would determine "who [was] entitled to receive Plan benefits and it what amounts," by definition, they were not fiduciary in nature.   *Hughes*, 525 U.S. at 444-45.   Accordingly, because the record is devoid of any evidence showing that the named Defendants engaged in any of the challenged fiduciary conduct, they are entitled to summary judgment on that further basis.

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully submit that there are no genuine issues of material fact and that they are entitled to summary judgment on each of Plaintiff's claims in this matter.

Respectfully submitted,

RBC Capital Markets Corporation; RBC Capital Markets, LLC;  RBC Centura Bank; and RBC U.S. Insurance Services, Inc.

by:  s/ Christopher J. Boran_____

| | |
|---|---|
| | Sari M. Alamuddin (*admitted pro hac vice*) |
| | Ill. State Bar No. 6215689 |
| Alison J. Gates | Christopher J. Boran (*admitted pro hac vice*) |
| TX State Bar No.24055535 | Ill. State Bar No. 6282552 |
| Federal ID No. 706309 | MORGAN, LEWIS & BOCKIUS LLP |
| MORGAN, LEWIS & BOCKIUS LLP | 77 West Wacker Drive, Fifth Floor |
| 1000 Louisiana, Suite 4200 | Chicago, Illinois 60601 |
| Houston, Texas 77002 | T:  312.324.1000 |
| T:  713.890.5157 | F:  312.323.1001 |
| F:  713.890.5001 | E:  cboran@morganlewis.com |

47

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 125

CONFIDENTIAL

RBC-PAUL000010000

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Defendants' Motion for Summary Judgment and Brief in Support has been sent to counsel of record through the Court's CM/ECF system and by U.S. mail, return receipt requested, this 26th day of January, 2012, as follows:

Mr. Geoffrey H. Bracken
Gardere Wynne Sewell LLP
1000 Louisiana, Suite 3400
Houston, Texas 77002-5007

Mr. William G. Whitehill
Mr. Joe B. Harrison
1601 Elm Street, Suite 3000
Dallas, Texas 75201

s/ Christopher J. Boran

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 126

CONFIDENTIAL

RBC-PAUL000010001

# EXHIBIT 5

No.  13-20213

# United States Court of Appeals
## *for the*
# Fifth Circuit

---

BRENDA TOLBERT, JOSEPH R. NEUHAUS, JR.,
and LAWRENCE GIFT, JR.,

**PLAINTIFFS-APPELLANTS,**

v.

RBC CAPITAL MARKETS CORPORATION, now known as RBC Capital
Markets, L.L.C., RBC CENTURA BANK, now known as RBC Bank (USA), and
RBC INSURANCE SERVICES, INC.,

**DEFENDANTS-APPELLEES.**

---

On Appeal from the United States District Court for the
Southern District of Texas, Houston Division, No. 4:11-cv-107, The Honorable
Keith P. Ellison Presiding

---

## BRIEF OF DEFENDANTS-APPELLEES

---

Allyson N. Ho
MORGAN, LEWIS & BOCKIUS LLP
1717 Main Street, Suite 3200
Dallas, Texas 75201-7347
214.466.4000

Sari M. Alamuddin
Christopher J. Boran
Matthew A. Russell
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, Fifth Floor
Chicago, Illinois 60601
312.324.1146

*Attorneys for Defendants-Appellees*

---

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following persons and entities as described in Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the Judges of this Court may evaluate possible disqualifications or recusals.

| Persons or Entities | Counsel and Law Firms |
| --- | --- |
| Brenda Tolbert | Geoffrey H. Bracken |
| Joseph R. Neuhaus, Jr. | Joe B. Harrison |
| Lawrence Gift, Jr. | William G. Whitehill |
| | Stacy R. Obenhaus |
| Royal Bank of Canada | Gardere Wynne Sewell LLP |
| RBC Capital Markets LLC | |
| RBC Capital Markets U.S. Bank | Sari M. Alamuddin |
| Network | Allyson N. Ho |
| RBC U.S. Insurance Services Inc. | Christopher J. Boran |
| RBC Insurance Holdings Inc. | Matthew A. Russell |
| RBC USA Holdco Corporation | Morgan Lewis & Bockius LLP |
| The Royal Bank of Canada U.S. | |
|   Wealth Accumulation Plan | |

/s/ Christopher J. Boran

i

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs have requested oral argument.  If the Court grants that request, then defendants respectfully request the opportunity to present argument.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS .......................................................i

STATEMENT REGARDING ORAL ARGUMENT ............................................ ii

TABLE OF AUTHORITIES ..........................................................................v

STATEMENT OF ISSUES ...........................................................................1

STATEMENT OF THE CASE ........................................................................1

STATEMENT OF FACTS ............................................................................3

I.      RBC Designs The WAP To Attract And Retain Key Employees By
        Awarding Annual Bonuses And Other Incentives ................................3

        A.      The WAP Is Based On A Combination Of Bonuses And
                Vesting Requirements .......................................................3

        B.      By Its Express Terms, The WAP Does Not Purport To Be An
                ERISA Pension Plan..........................................................6

        C.      The WAP Requires Distribution Of Benefits Upon Vesting For
                Certain Participants And All Others Who Do Not Timely Elect
                Otherwise In Writing .........................................................7

II.     Eligibility Requirements Ensure That Only A Highly Compensated
        Fraction Of The Workforce Qualifies For The WAP...............................8

III.    Plaintiffs Leave RBC, Go To Work For A Competitor, And Then Sue
        RBC To Recover Bonuses And Other Awards Forfeited Under The
        Express Terms Of The WAP .......................................................10

IV.     The District Court Grants Summary Judgment To RBC Because The
        WAP Is Not An ERISA Pension Plan .............................................12

SUMMARY OF ARGUMENT .....................................................................16

ARGUMENT .........................................................................................21

I.      The District Court Correctly Held That The WAP Is Not An
        Employee Pension Benefit Plan Under ERISA....................................21

        A.      ERISA Applies Only To Plans "Designed For The Purpose Of
                Paying Retirement Income, Whether As A Result Of Their
                Express Terms Or Surrounding Circumstances." ................22

iii

# TABLE OF CONTENTS

(continued)

Page

B.  The WAP Was Not Designed For The Primary Purpose Of
Paying Retirement Income, But Instead To Recruit And Retain
Key Employees By Providing Bonuses And Other Incentives..........25

1.  The WAP's Express Terms Do Not Trigger ERISA
Coverage .................................................................................26

2.  The WAP Is Not An Employee Pension Benefit Plan As
A Result Of Surrounding Circumstances..................................34

a.  The WAP's Operation Does Not Skew
Distributions Toward Retirement Years....................... 35

b.  RBC Did Not Prevent Or Discourage Participants
From Receiving In-Service Distributions..................... 39

c.  Only A Minority Of WAP Participants Elected To
Delay Distributions Until Termination......................... 43

C.  The District Court's Decision Is Faithful To The Policies
Underlying ERISA's Regulation Of Pension Benefits .....................46

II.  This Court May, Alternatively, Affirm The District Court's Judgment
Based On ERISA's Top-Hat Exemptions. ...................................................47

A.  The WAP Was Maintained For A Select Group Of Highly
Compensated Employees ..................................................................48

1.  A Small Fraction Of Employees Qualified For The WAP......49

2.  WAP-Eligible Employees Were Highly Compensated...........51

3.  The WAP's Language And Purpose Support Application
Of The Top-Hat Exemptions ..................................................52

B.  Plaintiffs' Contrary Arguments Are Without Merit...........................53

1.  This Case Is Not Carrabba ....................................................54

2.  Production Is Not An "Illegal" Eligibility Requirement ........55

3.  Though Not Required By The Top-Hat Exemptions,
WAP Participants Have Substantial Influence ........................58

CONCLUSION ......................................................................................................61

iv

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alexander v. Brigham & Women's Physicians Org., Inc.*,
    467 F. Supp. 2d 136 (D. Mass. 2006)...........................................................51, 61

*Alexander v. Brigham & Women's Physicians Org., Inc.*,
    513 F.3d 37 (1st Cir. 2008)...........................................................*passim*

*Boos v. AT&T, Inc.*,
    643 F.3d 127 (5th Cir. 2011) ...........................................................*passim*

*Callan v. Merrill Lynch & Co., Inc.*,
    2010 WL 3452371 (S.D. Cal. Aug. 30, 2010)...........................................................*passim*

*Carrabba v. Randalls Food Markets, Inc.*,
    38 F. Supp. 2d 468 (N.D. Tex. 1999), *aff'd*
    252 F.3d 721 (5th Cir. 2001) ...........................................................53, 54, 55, 59

*Cramer v. Appalachian Reg'l Healthcare, Inc.*,
    2012 WL 5332471 (E.D. Ky. Oct. 29, 2012) ...........................................................52, 60

*Critelli v. Fidelity Nat'l Title Ins. Co. of N.Y.*,
    2007 WL 749693 (E.D.N.Y. Mar. 7, 2007)...........................................................29, 37

*Daft v. Advest, Inc.*,
    658 F.3d 583 (6th Cir. 2011) ...........................................................48, 50, 51

*Demery v. Extebank Deferred Comp. Plan (B)*,
    216 F.3d 283 (2d Cir. 2000) ...........................................................*passim*

*Doody v. Ameriquest Mortgage Co.*,
    242 F.3d 286 (5th Cir. 2001) ...........................................................48

*Emmenegger v. Bull Moose Tube Co.*,
    197 F.3d 929 (8th Cir. 1999) ...........................................................*passim*

*Hahn v. Nat'l Westminster Bank, N.A.*,
    99 F. Supp. 2d 275 (E.D.N.Y. 2000) ...........................................................38

*Harris ex rel. Harris v. Pontotoc County Sch. Dist.*,
   635 F.3d 685 (5th Cir. 2011) ...............................................................................40

*Holansky v. Prudential Financial*,
   2004 WL 1404016 (N.D. Ill. June 21, 2004)......................................................32

*Houston v. Aramark Corp.*,
   112 F. App'x 132 (3d Cir. 2004) .................................................................*passim*

*Houston v. Saracen Energy Advisors, LP*,
   2009 WL 890384 (S.D. Tex. Mar. 27, 2009) ......................................................27

*In re Meinen*,
   228 B.R. 368 (Bankr. W.D. Pa. 1998).............................................27, 28, 32, 45

*In re Silicon Graphics, Inc.*,
   363 B.R. 690 (Bankr. S.D.N.Y. 2007)............................................................31, 32

*Leaverton v. RBC Capital Markets Corp.*,
   2011 WL 243764 (W.D. Wash. Aug. 26, 2010) ...............................................33

*McKinsey v. Sentry Ins.*,
   986 F.2d 401 (10th Cir. 1993) ....................................................................*passim*

*MDPhysicians & Assocs., Inc. v. State Bd. of Ins.*,
   957 F.2d 178 (5th Cir. 1992) .............................................................................40

*Murphy v. Inexco Oil Co.*,
   611 F.2d 570 (5th Cir. 1980) ......................................................................*passim*

*Nachman Corp. v. Pension Benefit Guar. Corp.*,
   446 U.S. 359 (1980)..........................................................................................22

*Oatway v. Am. Int'l Group, Inc.*,
   325 F.3d 184 (3d Cir. 2003) .................................................................25, 29, 59

*Reliable Home Health Care, Inc. v. Union Cent. Ins. Co.*,
   295 F.3d 505 (5th Cir. 2002) ........................................................................2, 47

*SDJ, Inc. v. Houston*,
   841 F.2d 107 (5th Cir. 1988) ............................................................................59

*Spacek v. Maritime Ass'n*,
    134 F.3d 283 (5th Cir. 1998) ...................................................................58

*Spitz v. Berlin Industries, Inc.*,
    1994 WL 48593 (N.D. Ill. Feb. 16, 1994) .........................................32

*Weekley v. Thales Fund Mgmt., LLC*,
    2012 WL 6808523 (S.D.N.Y. Dec. 28, 2012) ....................................27

## STATUTES

26 U.S.C. § 72(t) .......................................................................45

29 U.S.C. § 1001 .................................................................*passim*

29 U.S.C. § 1002(2)(A) ......................................................*passim*

29 U.S.C. § 1051(2) ...............................................................47

29 U.S.C. § 1081(a)(3) ..........................................................47

29 U.S.C. § 1101(a)(1) ......................................................*passim*

29 U.S.C. § 1132(a)(2).............................................................1

29 U.S.C. § 1132(a)(3).............................................................1

## REGULATIONS

29 C.F.R. § 2510.3-2(a) ..........................................................38

29 C.F.R. § 2510.3-2(c) ..........................................................37

## OTHER AUTHORITIES

DOL Adv. Op. 81-27A 1981 WL 17748 ...................................35

DOL Op. Ltr. 2002-13A, 2002 WL 31846478 .........................33

DOL Op. Ltr. 77-85, 1977 WL 5438 ........................................................34

DOL Op. Ltr. 79-33A, 1979 WL 6971 ....................................................34

DOL Op. Ltr. 80-31A, 1980 WL 8978 ....................................................34

DOL Op. Ltr. 81-24A, 1981 WL 17745 ..................................................33

DOL Op. Ltr. 81-27A, 1981 WL 17748 ..............................................34, 58

DOL Op. Ltr. 82-29A, 1982 WL 21212 ..............................................18, 33

DOL Op. Ltr. 83-33A, 1983 WL 22518 ..................................................34

DOL Op. Ltr. 84-12A, 1984 WL 23427 ..................................................33

DOL Op. Ltr. 90-14A, 1990 WL 123933 ............................................58, 60

DOL Op. Ltr. 90-17A, 1990 WL 263441 ................................................35

DOL Op. Ltr. 98-02A, 1998 WL 103654 ................................................58

www.freedictionary.com/provide ..........................................................25

www.merriam-webster/dictionary.com/dictionary/provide ....................................25

## STATEMENT OF ISSUES

1.     Whether the district court correctly held that an employer's plan—called a "wealth accumulation plan" and designed to attract and retain key employees by awarding annual bonuses and other incentives that, once vested, were distributed to participants during their employment absent a contrary written election—is *not* an "employee pension benefit plan" under ERISA, 29 U.S.C. § 1002(2)(A).

2.     Whether, alternatively, the district court's dismissal of plaintiffs' ERISA breach of fiduciary duty claims should be affirmed because the wealth accumulation plan—even assuming it were an ERISA pension plan—is "maintained . . . primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees," 29 U.S.C. § 1101(a)(1), and is thus a "top-hat" plan exempt from ERISA's fiduciary duty provisions.

## STATEMENT OF THE CASE

Plaintiffs Brenda Tolbert, Joseph Neuhaus, and Lawrence Gift assert claims for breach of fiduciary duty under ERISA § 502(a)(2)-(3), 29 U.S.C. § 1132(a)(2)-(3), against their former employer, RBC Capital Markets, and other sponsors of Royal Bank of Canada's wealth accumulation plan ("WAP") seeking to recover bonuses and other awards they forfeited under the terms of

1

the WAP when their employment at RBC ended in 2009 (Tolbert) and 2011 (Neuhaus and Gift).  R.1641; R.1642 n.3.

Plaintiffs' claims are predicated on their contention that the WAP is subject to ERISA and not a valid "top-hat" plan under that statute.  R.227-56; R.1642.  A "top hat" plan is an "unfunded" ERISA plan "maintained . . . primarily for the purpose of providing deferred compensation to a select group of management or highly compensated employees."  29 U.S.C. § 1101(a)(1). Top-hat plans "are exempt from ERISA's fiduciary provisions as well as its participation, vesting, and funding provisions."  *Reliable Home Health Care, Inc. v. Union Cent. Ins. Co.*, 295 F.3d 505, 512 (5th Cir. 2002).

The parties filed cross motions for summary judgment.  RBC moved on the grounds that plaintiffs could not establish that the WAP is an ERISA pension plan and, even if it were, it is an exempt top-hat plan.  Doc. 91. Plaintiffs moved for summary judgment on the top-hat issue only.  Doc. 84.

The district court granted RBC's summary judgment motion and denied plaintiffs' partial summary judgment motion.  R.1633; R.1670.  The court held that as a matter of law, the WAP is not an "employee pension benefit plan" within the meaning of ERISA, 29 U.S.C. § 1002(2)(A).  R.1670.  The court thus did not address the parties' top-hat plan arguments.  R.1642.  This appeal followed.  R.1671.

2

## STATEMENT OF FACTS

**I.    RBC Designs The WAP To Attract And Retain Key Employees By Awarding Annual Bonuses And Other Incentives.**

Defendants RBC Capital Markets Corporation, RBC Centura Bank, and RBC Insurance Services Inc. (collectively "RBC") are two subsidiaries and one former subsidiary of the Royal Bank of Canada ("Royal Bank").    R.227; R.1278.  RBC is a leader in the financial services industry, providing investment banking, financial planning, and other financial services to both individual and institutional clients.

### A.    The WAP Is Based On A Combination Of Bonuses And Vesting Requirements.

Financial consultants are, as plaintiffs put it, the "lifeblood" of RBC's business.  Appellants' Br. ("Br.") at 7.  They are responsible for obtaining and nurturing clients, providing those clients with sound investment advice, and in turn generating billions of dollars in annual revenue for RBC.  Doc. 91, Ex. 11 at 12:22-14:5, 15:25-20:21.

RBC faces enormous competition in recruiting and retaining financial consultants.  *Id.*, Ex. 11 at 20:14-21:1; *id.* Ex. 2 at 25:10-22, 27:14-37:23.  Not only are these employees hard to come by and difficult to retain, but when they

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 139

leave a firm they take their clients with them. *Id.*, Ex. 11 at 21:2-24:4; *id.* Ex.

12; Doc. 111, Ex. 1 at 38:20-39:16, 40:14-25; *id.*, Ex. 2 at 26:2-20, 76:13-77:1.[1]

Given their importance, RBC designed and maintained the WAP in large

part to "attract and retain financial consultants." Doc. 91, Ex. 1 at 40:6-15. To

that end, the WAP is one of two "key components" of a financial consultant's

compensation. *Id.*, Ex. 2 at 18:10-16. The first component—available to all

financial consultants—was a monthly commission-based payment, determined

by applying a fixed percentage to the financial consultant's gross production

throughout the year. *Id.* at 13:15-17:17; Doc. 92, Ex. 14 at 2.

The second component included bonuses and other incentives awarded

through the WAP. These "Company Contributions" were awarded only to those

who satisfied the WAP's eligibility requirements, *infra* at 8, and included:

- **Productivity Bonuses** awarded at the end of the fiscal year in an amount equal to 1.75% to 5% of the financial consultant's gross production for the year, *see, e.g.*, Doc. 91, Exs. 4, 5;

- **Loyalty Bonuses** based on the financial consultant's annual production and length of service at RBC, *see, e.g.*, *id.*, Exs. 6, 7; and

---

[1]  For example, plaintiffs Gift and Neuhaus left RBC for Morgan Stanley, and when they left, their clients followed. *See infra* at 11-12. Tolbert, who was terminated for cause, was able to secure immediate employment—and a $200,000 signing bonus—at Morgan Stanley. *See infra* at 10-11.

- **Matching Contributions** awarded as a percentage of a financial consultant's Voluntary Deferred Compensation that increased based on production and tenure, *see, e.g.*, *id.*, Exs. 4, 5.

To further RBC's goal of attracting and retaining successful financial consultants, bonuses and matching contributions were not immediately available to the financial consultants.  Instead, they became payable after a five-year vesting period.  Doc. 91, Exs. 3-5.  If a participant's employment at RBC ended in the interim, Bonuses and Matching Contributions were forfeited.  R. 43 § 4.6; *see also* R.1641.[2]

By awarding annual bonuses and matching contributions subject to vesting, the WAP not only incentivized increased production, but also helped retain valuable employees and served as an important recruiting tool.  *Id.*, Ex. 1 at 40:12-42:10; Ex. 2 at 98:9-19.    Indeed, RBC's plan competes with comparable plans used throughout the industry to compensate financial consultants.  *See id.*, Ex. 2 at 25:13-22; 27:14-37:23; *id.*, Ex. 23 at 2.  The WAP thus helps RBC "recruit [financial consultants] away from competitors [and] to keep the competitors from recruiting [financial consultants] away from [RBC.]" Doc. 91, Ex. 1 at 42:6-10.

---

[2]   Exceptions were made for participants whose employment ended because of death or disability; participants who left RBC under an approved "business transition agreement;" and participants whose age plus years-of-service totaled at least 60 (R.37) and who signed a non-competition and non-solicitation agreement.  R.42 § 4.2(a)-(b); R.37.

5

The WAP also helps recruit and retain other employees, such as those who manage financial consultants.  Doc. 91, Exs. 6-8.  These management employees—who maintain their own books of business—are also eligible for bonuses and matching contributions.  *Id.*; R.243.  Divisional presidents and vice presidents and other highly compensated employees also qualified for the WAP, and were awarded Matching Contributions.  Doc. 91, Ex. 9.[3]

## B.    By Its Express Terms, The WAP Does Not Purport To Be An ERISA Pension Plan.

Section 5.11 of the WAP expressly states that it is "not intended" to be an ERISA pension plan.  R.48; R.1661-62.  Section 5.11 further clarifies that, in the event the Plan is nevertheless "determined to be" an ERISA plan, "the Company believes that it constitutes" a top-hat plan, "exempt from many ERISA requirements."  R.48; R.1661, 1669-70.

Moreover, Section 1.1 of WAP states:

---

[3]    In addition to serving as a bonus vehicle, the WAP allows qualifying participants to defer portions of their annual compensation into the plan.  R.38 § 2.2.  These voluntary deferrals were always 100 percent vested and could not be forfeited.  R.42 § 4.1.  They are not at issue in this case.

The WAP also contains provisions related to "Mandatory Deferred Compensation."  R.39 § 2.3.  These deferrals applied only to complex directors and branch directors, Doc. 91, Ex. 8, and were eliminated at the end of 2010, *see id.*, Ex. 6.  Because none of the plaintiffs was subject to mandatory deferrals, they too are not at issue.

6

> [The WAP] is a nonqualified, deferred compensation plan pursuant to
> which a select group of management or highly compensated
> employees . . . may be offered the opportunity to elect to defer receipt
> of a portion of their compensation to be earned with respect to an
> upcoming Plan year.  The Plan is designed to provide an opportunity
> for such employees to invest a portion of their compensation in tax-
> deferred savings and investment options in an effort to support long-
> term savings and allow such employees to share in the Company's
> growth and profitability, if any.

R.34.  The WAP was thus designed to serve a different function than the RBC

401(k) plan, which unlike the WAP was offered to all employees as a means to

save for retirement.  Doc. 91, Ex. 1 at 141:15-25.

### C.     The WAP Requires Distribution Of Benefits Upon Vesting For Certain Participants And All Others Who Do Not Timely Elect Otherwise In Writing.

The WAP requires that company contributions to certain participants be

paid upon vesting.  Doc. 91, Ex. 3 ¶5; *id.*, Ex. 1 at 298:3-14.  This group

included financial consultants or branch directors with gross production in the

preceding fiscal year of $300,000 to $350,000.  *Id.*, Ex. 3 ¶5.  All other

participants could choose to receive distributions of their benefits for that year

"in-service"—that is, upon vesting and while still employed at RBC—or elect in

writing to delay distribution until they left RBC.  *Id.* ¶4; R.44-45 § 5.3(a)-(b).

The WAP otherwise required in-service distributions if a participant did not

make a timely election.  Doc. 91, Ex. 3 ¶4; R.45 § 5.2(b)(iv).

7

Plaintiffs Gift and Neuhaus received in-service distributions of their vested WAP benefits and used that money to finance their children's college education.  Doc. 111, Ex. A at 82:11-83:2; *id.*, Ex. B at 62:1-63:12.  Plaintiffs were not alone:  Between 51 percent and 66 percent of participants received "in-service" distributions of their benefits between 2007 and 2011.  Doc. 91, Ex. 3 ¶6.

## II.  Eligibility Requirements Ensure That Only A Highly Compensated Fraction Of The Workforce Qualifies For The WAP.

The WAP imposes two eligibility requirements.  First, the employee must neither reside nor perform the majority of her services in Canada.   R.38 § 2.1(b).   Second, the employee must satisfy minimum "compensation or production" thresholds set by a designated WAP committee.  *Id.* § 2.1(a).  These requirements must be satisfied by every participant in each plan year.  Doc. 91, Ex. 3 ¶¶7-8.[4]

As of January 2008, the WAP's annual production threshold for financial consultants and other commission-based employees was $300,000.  Doc. 91, Exs. 4-5; *see also* Doc. 75 ¶6.  Meanwhile, the compensation threshold for non-production, or salaried, employees was $150,000.  *Id.*

_____

[4]   Eligibility determinations were made in two stages—before the plan year and during it.  Doc. 91, Ex. 3 ¶7.

8

In October 2008, the WAP committee amended these thresholds. Doc. 91, Ex. 10; *see also* Doc. 75 ¶¶7-8. As a result, the production threshold for 2010 increased to $400,000, and the compensation threshold for 2009 increased to $350,000. *Compare id.* ¶¶7(e) & 8(a)-(c), *with id.* ¶6. Because Tolbert earned less than $350,000 in 2008, she did not qualify for the WAP in 2009. Doc. 91, Ex. 17 at 116:7-13.

Due to the WAP's eligibility requirements, only a fraction of employees qualified for participation. Of the combined RBC-Royal Bank workforce, the percentage who qualified between 2004 and 2010 ranged from 1.97 percent to 3.31 percent annually, with an overall eligibility rate of 2.84%. Doc. 91, Ex. 18 ¶46.[5]

Indeed, eligible employees earned significantly more than their co-workers. The average compensation of all eligible employees between 2002 and 2010 ranged from $275,000 to $539,797. Doc. 91, Ex. 19 ¶34. A comparison of these figures to the average compensation of all non-eligible employees revealed:

---

[5]    Plaintiffs argued below that Royal Bank's workforce should be excluded from analysis because it contained Canadian employees who did not satisfy the WAP's first eligibility requirement. Doc. 93 at 37-41. Considering the RBC workforce only, the eligibility rate still ranged from only 6.99 percent to 17.11 percent annually, with an overall rate of 13.39 percent. Doc. 91, Ex. 18 ¶46 & Niden Rpt. Ex. 7.

9

- Eligible employees earned 4.7 to 6.5 times more than non-eligible RBC and Royal Bank employees.  Doc. 91, Ex. 18 ¶58.

- Eligible employees earned 3.7 to 6.4 times more than non-eligible RBC employees.  *Id.*, Ex. 19 ¶40.[6]

## III.    Plaintiffs Leave RBC, Go To Work For A Competitor, And Then Sue RBC To Recover Bonuses And Other Awards Forfeited Under The Express Terms Of The WAP.

Plaintiff Tolbert worked at RBC until August 2009, when she was terminated for cause.  R.232 ¶27; R.253 n.39.  At the time, Tolbert's title was Vice President, Senior Investment Associate.   Doc. 91, Ex. 17 at 86:7-10.  Tolbert earned over $150,000 annually and qualified for the WAP between 2003 and 2008, but not in 2009 after the eligibility thresholds changed.  Doc. 91, Ex. 17 at 112:21-113:7, 116:3-24.

Tolbert's pay depended largely on the salary and bonuses she negotiated with RBC financial consultant Lewis Brazelton, with whom she formed an "inseparable team," R.253 n.39.  A licensed securities broker for over 30 years, Doc. 91, Ex. 17 at 27:7-19, Tolbert provided regular investment advice to the more than 575 clients comprising Brazelton's book of business, *id.* at 62:8-64:13, 67:2-19, 73:2-13; *see also id.*, Ex. 11 at 21:2-23:8 & Ex. 12 (client list).

Within weeks of leaving RBC in August 2009, Brazelton and Tolbert teamed up once again—this time with RBC competitor Morgan Stanley.  *Id.* at

---

[6]    Use of median compensation data increased these disparities.  Doc. 91, Ex. 19, ¶¶30-32, 34-35, 39-40; *id.*, Ex. 18 ¶¶21-23, 49-54, 57-58.

10

31:13-33:17.   As is common in the industry, Brazelton was not only able to bring to Morgan Stanley almost all of the clients he and Tolbert serviced at RBC, Doc. 91, Ex. 11 at 22:2-24:4, but both Brazelton and Tolbert also received generous signing bonuses, *see id.*, Ex. 17 at 42:8-16 (Tolbert's bonus was $200,000); *id.*, Ex. 11 at 60:13-61:20 & Ex. 13 (Brazelton's was between 50 percent and 200 percent of his last twelve months of production at RBC, which was $1.8 million).

Plaintiff Neuhaus was a financial consultant for over 20 years when RBC recruited him in 1994.   Doc. 111, Ex. A at 36:24-38:6.   Neuhaus brought roughly 90 percent of his clients to RBC and personally negotiated his compensation package, including a $210,000 signing bonus.   *Id.* at 39:7-16, 45:11-21, 48:13-15.  Neuhaus participated in the WAP between 2003 and 2011.

After entertaining offers from multiple firms, Neuhaus left RBC for Morgan Stanley in 2011.   *Id.* at 7:7-10, 70:3-10.   Neuhaus again personally negotiated his compensation, including a signing bonus.   *Id.* at 113:12-18. When Neuhaus left RBC, he took with him "well over 50 [percent]" of the clients comprising his $300 million book of business, *id.* at 40:23-25, 66:3-15, as well as other RBC employees who were part of his team, *id.* at 55:4-56:13.

Plaintiff Gift worked as a financial consultant at six different firms before joining RBC in 2004.  Doc. 111, Ex. B at 8:7-8, 10:14-22, 13:2-15:24, 19:16-21,

74:2-12.  Gift participated in the WAP between 2004 and 2011.  *Id.* at 32:12-33:16.  In 2011, Gift also left RBC for Morgan Stanley, where he joined Tolbert, Brazelton, and Neuhaus.  *Id.* at 6:12-16.  Like the others, Gift took most of his clients with him, *id.* at 26:2-20, 76:13-77:1, and secured a substantial signing bonus, *see id.* at 24:5-14, 57:15-25 (typical bonus is between 70 percent and 100 percent of trailing twelve months of production, which was roughly $700,000 when he left RBC).

After joining Morgan Stanley, the plaintiffs sued RBC to recover Bonuses and Matching Contributions they forfeited, in accordance with the terms of the WAP, upon their departure from RBC.  R.227-57.

## IV.    The District Court Grants Summary Judgment To RBC Because The WAP Is Not An ERISA Pension Plan.

The district court held, as a matter of law, that the WAP is not an employee pension benefit plan under ERISA.  R.1670.  Because this holding disposed of plaintiffs' claims, the court did not address the additional grounds for summary judgment advanced by RBC, including that the WAP is a top-hat plan exempt from ERISA's fiduciary duty provisions.  R.1642.

The district court explained that deciding whether the WAP is an "employee pension benefit plan" required the court to "determine if the WAP, by its *express terms* or as a result of *surrounding circumstances*, provided retirement income to participants or resulted in the deferral of income for

12

periods extending to, or after, termination of employment." R.1645 (emphases added). The court also noted that both parties agreed "that the Court can determine the WAP's ERISA status as a matter of law under the facts of this case." R.1644.

To that end, the court engaged in an "in-depth review of the WAP" (R.1645) as a prelude to its "express terms" and "surrounding circumstances" analyses, bearing in mind that "the proponents of an ERISA plan must prove that the plan was 'designed for the purpose of paying retirement income whether as a result of [its] express terms or surrounding circumstances.'" R.1651 (quoting *Murphy v. Inexco Oil Co.*, 611 F.2d 570, 575 (5th Cir. 1980)).

Applying these principles, the court explained that nothing in the express terms of the WAP demonstrated that it was designed for the purpose of providing retirement or post-termination income.

First, the court noted that "[n]either retirement nor termination/post-termination income was an expressly stated purpose or goal of the plan." R.1652.

Second, the court explained that "[c]lose inspection of the WAP provisions themselves reveals no express terms for providing retirement or termination/post-termination income to employees." R.1652-54. To the contrary, "[i]f an eligible participant's account balance was received on a

13

termination/post-termination basis, it was an anticipated consequence of the participant's written election and not due to the goal, design, or express terms of the plan." R.1655.

Third, relying Department of Labor guidance, the district court explained that the WAP in no way "condition[ed] the receipt of vested benefits on a participant's retirement or termination." R.1655-56. "[S]ome participants were required to receive WAP benefits while they were still employed by the company; others automatically received WAP benefits while still employed unless they expressly and timely elected otherwise." R.1656.

The district court next considered whether the WAP is a pension plan based on "surrounding circumstances." The court first explained that the mere option for some participants to defer WAP distributions to termination was not the type of "surrounding circumstance" that triggers ERISA coverage. R.1659-60. Although this option meant that "under certain conditions," WAP distributions could be made upon termination or retirement, such "result was the consequence of a participant's own written election, not the operation or administration of the WAP." R.1660.

The court also found unpersuasive plaintiffs' contention that various RBC communications referencing the WAP's "top hat" status and "retirement" generally established "the requisite surrounding circumstances." R.1660, 1664.

14

The court explained that the "top hat" references were entirely "consistent with the WAP's own language and DOL registration letter, which essentially stated that [the] WAP was not intended to be an employee pension benefit plan under ERISA but, should it be held as such, that it was intended to qualify as a top hat plan."  R.1660-61.

The retirement references also were insignificant because they did not "encourage, much less require, participants to defer receipt of their WAP benefits until retirement or termination, or discourage participants from taking their benefits on an in-service basis."  R.1666.

Finally, the district court rejected plaintiffs' miscellaneous "surrounding circumstances" arguments.  For example, the court rejected plaintiffs' attempt to show statistically that "certain percentages [of WAP participants] elected annually to defer distributions until termination of employment," R.1666, noting that the majority of WAP participants—including Gift and Neuhaus—did *not* elect to delay distributions until termination, R.1667.  Moreover, the court emphasized that the "*design of the plan at issue, not the individual participants' intended use of the proceeds*," is the perspective from which ERISA coverage must be determined.  R.1667 (quoting *Houston v. Aramark Corp.*, 112 F. App'x 132, 136 (3d Cir. 2004) (emphasis added below)).

15

## SUMMARY OF ARGUMENT

**I.**      In enacting ERISA, Congress "did not . . . attempt to control every aspect of the employer-employee relationship or every promise made to employees." *Murphy*, 611 F.2d at 574.   For ERISA to apply here, plaintiffs were required to prove that the WAP constitutes an "employee pension benefit plan."   29 U.S.C. § 1002(2)(a).   That, in turn, required plaintiffs to prove that the WAP by its "express terms" or "surrounding circumstances" provides "retirement income to employees" or "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond[.]"   29 U.S.C. § 1002(2)(A).   Plaintiffs cannot carry that burden as a matter of law, as the district court correctly held.

Apparently unable to challenge that holding directly, plaintiffs resort to mischaracterizing it.   Their brief repeatedly claims (*e.g.*, at 16-17) without citation that the district court improperly "add[ed] a mandatory condition on pension plan elections that does not exist in ERISA or its legislative history—namely, an ERISA 'pension plan' may not give participants an option to receive his or her benefits other than at retirement or separation from service."   The district court did no such thing—it simply (and correctly) held that, considering the WAP's express terms and surrounding circumstances, the mere "existence of [an] option" for some WAP participants to delay distributions of benefits until

16

"termination" did not automatically trigger ERISA coverage.  R.1655, 1660. Nothing in the district court's opinion even remotely suggests, as plaintiffs' contend (at 11), that a plan's "sole distribution option must be at retirement or separation" to fall within ERISA's coverage.

The district court's actual holding is entirely consistent with Fifth Circuit precedent.  This Court has made clear that the "employee pension benefit plan" definition is "not algorithmic" and is "not to be read as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach." *Murphy*, 611 F.2d at 575.  Accordingly, plans that are *not* "designed for the purpose of paying retirement" or post-termination income, *id.*, but to reward and retain employees through bonuses and other incentives are generally not governed by ERISA, *see, e.g.*, *Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929, 933 (8th Cir. 1999).  The district court correctly applied these principles and its holding that the WAP is not an employee pension benefit plan should be affirmed.

To begin, nothing in the WAP's express terms evinces a "*primary* purpose of paying retirement" or post-termination income.  *Murphy*, 611 F.2d at 575 (emphasis added).  As plaintiffs themselves highlighted below, the WAP "indisputably" was "created and maintained . . . *primarily* as a tool to recruit, develop, and retain" financial consultants and was "rolled out . . . *purely* for

17

compensation reasons, as it was common in the financial industry to have plans such as this one." Doc. 84 at 6 (emphasis added). Thus, even plaintiffs agree that the WAP's "primary thrust" was not to provide retirement income. *Murphy*, 611 F.2d at 574. And because the WAP did *not* "condition distribution" of benefits "upon termination of employment or retirement," it was "not by its express terms an employee pension benefit plan" under ERISA. DOL Op. Ltr. 82-29A, 1982 WL 21212, at *2.

Nor was the WAP a pension plan based on surrounding circumstances. Nothing about the operation or administration of the WAP had the effect of delaying distributions of benefits until retirement or termination. And it is undisputed that the majority of WAP participants received distributions of their benefits while still employed at RBC. Indeed, two of the three plaintiffs here received "in-service" distributions of their WAP benefits.

Plaintiffs try to turn these undisputed facts to their advantage by arguing that *some* participants *could* use WAP benefits for retirement. But courts have consistently held that the mere *option* to defer benefits until retirement is insufficient to trigger ERISA coverage. *See, e.g.*, *Emmenegger*, 197 F.3d at 933-34; *McKinsey v. Sentry Ins.*, 986 F.2d 401, 406 (10th Cir. 1993). And it also is well-established that "the design of the plan at issue, *not the individual participants' intended use of the proceeds*, must be the perspective from which

18

the definition of 'employee pension benefit plan' is determined." *Houston*, 112 F. App'x at 136 (emphasis added) (citing *Murphy*).

Contrary to plaintiffs' hyperbolic claims, the district court's holding in no way undercuts the policies that animate ERISA. The WAP indisputably was designed to recruit and retain key employees—not to provide retirement benefits. ERISA simply does not apply, as the district court correctly held.

**II.**     Alternatively, even if the WAP were an ERISA plan, the district court's decision still should be affirmed because ERISA's top-hat provisions exempt the WAP from plaintiffs' fiduciary duty claims. These exemptions preclude liability for alleged fiduciary breaches where a plan is "unfunded" and maintained "primarily" for "a select group of management or highly compensated employees." 29 U.S.C. § 1101(a)(1). Because the parties agree that the WAP is unfunded, the only question remaining is whether it was maintained for a select group of highly compensated employees. And it was.

First, during plaintiffs' employment, the WAP was maintained for a "select group" because just 2.85 percent of the RBC-Royal Bank workforce qualified to participate. Second, WAP-eligible employees were "highly compensated"—indeed, they earned up to six-and-a-half times more than non-eligible employees. Third, both the WAP's language and purpose support

19

application of the top-hat exemptions.  The district court's decision should be

affirmed for these reasons as well.

# ARGUMENT

## I.   The District Court Correctly Held That The WAP Is Not An Employee Pension Benefit Plan Under ERISA.

Relying on this Court's precedent requiring a careful analysis of the WAP's terms and surrounding circumstances, the district court correctly held that the WAP is not an "employee pension benefit plan" under ERISA.   29 U.S.C. § 1002(2)(A).   Central to the district court's holding was its recognition that to the extent WAP benefits are distributed upon termination, such distributions are "a consequence of a participant's own written election" and not the WAP's express terms, operation, or administration.   R.1655.

Apparently unable to challenge the district court's reasoning on its own terms, plaintiffs resort to mischaracterizing its holding.   Plaintiffs repeatedly claim (without citation) that the district court "add[ed] from the bench" a "condition" that "providing deferred benefits at retirement or separation must be the plan's *sole and exclusive* distribution option" before ERISA will apply.   Br. 18 (emphasis added); *see also id.* at 11, 17, 26, 34, 49-50.   But the district court did nothing of the kind.

The district court held only that—considering the WAP's terms and surrounding circumstances—the mere "existence of the option" for some participants to elect to delay distributions until retirement or termination did not trigger ERISA coverage.   R.1655-66; R.1660.   The district court did not even

21

suggest—much less hold—that plan benefits must be distributed "exclusive[ly]" upon retirement or separation before a plan will fall within ERISA's ambit. Indeed, plaintiffs do not even attempt to identify where in the district court's opinion such a holding can be divined.

As demonstrated below, the district court's actual holding is fully consistent with this Court's precedents—which plaintiffs ignore until 16 pages into their argument section—and those of other Circuits, and is faithful to the policies underlying ERISA. It should be affirmed.

### A. ERISA Applies Only To Plans "Designed For The Purpose Of Paying Retirement Income, Whether As A Result Of Their Express Terms Or Surrounding Circumstances."

In enacting ERISA, "Congress did not . . . attempt to control every aspect of the employer-employee relationship or every promise made to employees." *Murphy*, 611 F.2d at 574. Rather, it "sought only to deal with those types of plans that had created the problems it sought to remedy." *Id.* These problems included pension plans under which "many employees with long years of employment were losing *anticipated retirement benefits* owing to [a] lack of vesting" and funding. *Id.* (emphasis added); *see also Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 375 (1980) (Congress wanted to ensure "that if a worker has been promised a defined pension benefit upon retirement . . . he actually will receive it"). ERISA thus applies only to "an employee welfare

22

benefit plan or an employee pension benefit plan or a plan which is both."
*Murphy*, 611 F.2d at 574 (quotations omitted).

Plaintiffs claim that the WAP is an "employee pension benefit plan,"
which is a plan that "by its *express terms* or as a result of *surrounding circumstances* . . . provides retirement income to employees, or . . . results in a deferral of income by employees for periods extending to the termination of covered employment or beyond[.]"  29 U.S.C. § 1002(2)(A) (emphases added). Thus, to establish ERISA coverage, plaintiffs must prove that (1) the WAP by its "express terms" provided retirement or deferred post-termination income, or (2) did so "as a result of surrounding circumstances."  *Id.*; *see also Murphy*, 611 F.2d at 574 (party asserting ERISA coverage bears the burden of proof).  As a matter of law, plaintiffs cannot make either showing.

As this Court has repeatedly held, the employee pension benefit plan "definition is not algorithmic" and must not be "read as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach." *Murphy*, 611 F.2d at 575; *Boos v. AT&T, Inc.*, 643 F.3d 127, 134 (5th Cir. 2011).  "The words 'provides retirement income' patently refer only to *plans designed for the purpose of paying retirement income* whether as a result of their express terms or surrounding circumstances." *Id.* (quoting *Murphy*, 611 F.2d at 575 (emphasis in original)).

23

When plaintiffs finally get around to confronting this Court's decisions in *Murphy* and *Boos*, they argue (at 29-33) that the Court's reasoning must be narrowly confined to plans that do not involve any deferral of income. This is mistaken. In both cases, the Court confronted plans that, in some instances, "provide[d] retirement income" to participants, yet this Court still held that ERISA did not apply. In reaching these holdings, the Court made clear that the critical inquiry is whether the "primary purpose" or "primary thrust" of a plan is to pay retirement income—recognizing that ERISA was not intended to address "incidental" payment of retirement benefits. *Murphy*, 611 F.2d 574-75; *Boos*, 643 F.3d at 133-34. There is no logical reason for limiting *Murphy* and *Boos* to plans that involve no deferral of income—indeed, doing so would run afoul of this Court's instructions that the pension plan definition not be treated like an "elastic girdle." The principle established in *Murphy* therefore applies to any application of the employee pension benefit plan definition. *See, e.g.*, *McKinsey*, 986 F.2d at 405-06 (applying *Murphy* to a "deferred compensation" plan); *Houston*, 112 F. App'x at 136 ("The design of the plan at issue . . . must be the perspective from which the definition of 'employee benefit pension plan' is determined.").[7]

---

[7]   Plaintiffs' contention (at 19-20 & n.3) that the statutory definition should turn on the Dictionary.com definition of "provide" is directly at odds with this Court's

24

**B.     The WAP Was Not Designed For The Primary Purpose Of Paying Retirement Income, But Instead To Recruit And Retain Key Employees By Providing Bonuses And Other Incentives.**

Consistent with *Murphy* and *Boos*, other courts of appeals have uniformly held that plans designed primarily to reward or retain employees—as opposed to providing retirement or post-termination income—are not governed by ERISA. *See, e.g.*, *Oatway v. Am. Int'l Group, Inc.*, 325 F.3d 184, 189 (3d Cir. 2003) (ERISA inapplicable where plan "was not created for the purpose of providing retirement income, but rather was . . . designed to provide a financial incentive for employees to remain with AIG and improve their performance"); *Emmenegger*, 197 F.3d at 932 (same where plan's "objectives" were to "encourag[e] selected managers to stay with" the company and "compensat[e] [them] for services rendered"); *McKinsey*, 986 F.3d at 406 (same where plan was designed to reward employees' "loyalty" and to "provid[e] a method for sharing in the growth of the Company"). The WAP is just such a plan.

It is undisputed that the primary purpose of the WAP is *not* to provide retirement or deferred post-termination income, but rather, to attract and retain

---

consistent interpretation of the employee pension benefit plan definition. In any event, plaintiffs' own argument is undermined by alternative definitions of the word "provide" in the very source they cite. *See* www.freedictionary.com/provide ("[t]o set down as a stipulation" and "[t]o make a stipulation or condition"); *see also* www.merriam-webster.com/dictionary/provide ("to make a proviso or stipulation" and "to have as a condition").

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 161

key employees by awarding bonuses and other compensation-based incentives. Plaintiffs emphasized below that "RBC's documents and testimony *indisputably establish* that it created and maintained the WAP *primarily as a tool to recruit, develop, and retain*" financial consultants.    Doc. 84 at 6 (emphasis added). Plaintiffs also agreed that "RBC rolled out the WAP *purely for compensation reasons*, as it was *common in the financial industry* to have plans such as this one."  *Id*. (emphases added).

Accordingly, because there is no genuine dispute that the WAP was not designed for the purpose of paying retirement or post-termination income, the only question is whether its "express terms" or "surrounding circumstances" suggest otherwise.  As demonstrated next, the answer is no.

### 1.    The WAP's Express Terms Do Not Trigger ERISA Coverage.

The WAP's express statements concerning its design are fully consistent with its non-retirement purpose.  First, WAP Section 1.1 states that the Plan will "provide an opportunity for [qualifying] employees to invest a portion of their compensation in tax-deferred savings and investment options in an effort to support long-term savings and to allow such employees to share in the Company's growth and profitability[.]"  R.34.  As the district court correctly recognized, "[n]either retirement nor . . . post-termination income was an expressly stated purpose or goal" of the Plan.  R.1652.

26

This conclusion is buttressed by WAP Section 5.11, which clarifies that the WAP was "not intended" to be an ERISA pension plan, but if it nevertheless was determined to be one, then RBC "believe[d] that it constitute[d]" an exempt top-hat plan. R.48. The WAP's express terms thus make clear that it was designed to provide deferred compensation—including bonuses—in a manner *not* governed by ERISA.

Plaintiffs argue (at 36) that the WAP's reference to ERISA's top-hat exemptions "shows the intent for it to be a pension plan." But as the district court correctly observed (R.1670), that RBC sought to ensure the WAP's exempt status in the *unintended* event it was found to be a pension plan only reinforces the conclusion that it was *not* designed for the purpose of paying retirement or post-termination income. *See Houston v. Saracen Energy Advisors, LP*, 2009 WL 890384, at *7 (S.D. Tex. Mar. 27, 2009) (rejecting argument that plan's reference to its top-hat status amounted to "express terms" establishing a design to provide ERISA-covered pension benefits); *see also Weekley v. Thales Fund Mgmt., LLC*, 2012 WL 6808523, at *2-4 (S.D.N.Y. Dec. 28, 2012) (same).

Relying on *In re Meinen*, 228 B.R. 368 (Bankr. W.D. Pa. 1998), plaintiffs argue also (at 36) that the WAP's statement that it would "support long-term savings" shows that it was intended to be a pension plan. The plan in *Meinen*,

27

however, was expressly designed "to encourage and assist [e]mployees in providing funds for *old age security* by supplementing *monthly pensions*[.]" *Id.* at 373 (emphases added). That is a far cry from the WAP's statement that it would "support long-term savings." R.34. As in the district court, plaintiffs "proffer no . . . authority" for the proposition that "'support[ing] long-term savings' is equivalent to 'providing retirement income to employees.'" R.1652.

Moreover, the WAP's statement that it would "support long-term savings" is entirely consistent with its non-retirement purpose. For most WAP participants, including Gift and Neuhaus, "long-term savings" meant only that their benefits would be distributed after five years of vesting and tax-deferred growth. These benefits could thus be "saved" to finance a child's education, place a down payment on a home, purchase an engagement ring, or for any other non-retirement purpose as a reward for a job well done.

Indeed, as the district court correctly recognized, "the WAP did not require participants to defer compensation until termination [or retirement.]" R.1655. To the contrary, it required some participants to receive distributions of their benefits promptly upon vesting, and did so by default for everyone else, absent a timely, written election to the contrary. Hence, when retirement or post-termination distributions occurred under the WAP, it was purely a "consequence of the participant's written election and not due to the goal,

28

design, or express terms of the plan." R.1655. These undisputed facts compel the conclusion that the WAP is not a pension plan by its express terms.

That conclusion accords with this Court's reasoning in *Murphy*, which makes clear that the mere fact that some participants may receive retirement income through a plan does not trigger ERISA coverage—instead, courts must consider whether the payment of retirement income was the "primary thrust" of the plan. 611 F.2d at 574-75. Thus, as the Third Circuit has read *Murphy*, it is the "*design* of the plan at issue" and "*not* the individual participant's *intended use* of the proceeds" that is the key to the analysis. *Houston*, 112 F. App'x at 136 (emphases added). Not surprisingly, after *Murphy*, courts hold that the mere option to defer receipt of benefits until retirement or termination does not trigger ERISA coverage. *See, e.g.*, *Emmenegger*, 197 F.3d at 933 (no ERISA coverage where post-termination distributions were "strictly at the option" of plan participants); *McKinsey*, 986 F.2d at 406 (same).[8]

While the WAP does permit some participants to defer distributions until retirement or termination, such payments were "incidental" to the WAP's "primary thrust" of providing current compensation in a manner designed to attract and retain key employees. *Boos*, 643 F.3d at 134; *see also, e.g.*, *Oatway*,

---

[8]  *See also Critelli v. Fidelity Nat'l Title Ins. Co. of N.Y.*, 2007 WL 749693, at *4 (E.D.N.Y. Mar. 7, 2007) ("It is well established in the Second Circuit that a mere option to defer compensation is insufficient to trigger ERISA coverage").

325 F.3d at 189 (any "post-retirement payments were only incidental to the goal of providing current compensation" in a manner "designed to provide a financial incentive for employees to remain with AIG"); *McKinsey*, 986 F.2d at 406 (holding that option to "defer payment of bonus and interest allocations until the termination of employment" under a "deferred compensation plan" designed to promote "loyalty to the organization" and "provid[e] a method for sharing in the growth of the Company" did not trigger ERISA coverage). The overwhelming weight of authority therefore supports the district court's finding that the WAP is not an ERISA plan by its express terms.

Faced with this authority, plaintiffs assert (at 19) that the WAP merely gave participants an "early distribution option." But plaintiffs mischaracterize the WAP. As explained, the WAP is not a plan that merely permits "early distribution" of benefits that otherwise would be paid out upon retirement. Rather, it *requires* certain participants to receive "in-service" distributions and does so for everyone else absent a contrary written election. Based on their false premise, plaintiffs trot out a series of bankruptcy and district court decisions they claim support the proposition that such "early distribution" options do not preclude ERISA coverage. Br. 20-23. Predictably, these cases do not help plaintiffs.

Their lead case is *In re Silicon Graphics, Inc.*, 363 B.R. 690 (Bankr. S.D.N.Y. 2007).  Plaintiffs argue (at 21) that "[t]he only factual difference between *Silicon Graphics* and the present case is that the default [distribution] election in *Silicon* was retirement and the default in the WAP is in-service," but that this difference is "irrelevant" to determining ERISA coverage.  Plaintiffs are wrong on both fronts.

First, the plan in *Silicon Graphics* was quite different than the WAP.  Not only did it expressly state that it was a "supplemental *retirement* plan" and "that it [was] governed by ERISA," but it also expressly conditioned distribution of benefits upon termination of employment, unless another unspecified option was "agreed upon with an individual employee."  363 B.R. at 697 (emphasis added).[9]  In stark contrast, the WAP does *not* claim to be a retirement plan.  Nor does it expressly condition distribution of benefits upon termination.  Just the opposite:  it mandates "in-service" distributions for some and does so by default for everyone else.  Thus, sound reasoning—not "faulty logic," Br. 27—led the district court to conclude that *Silicon Graphics* is inapposite.

Second, plaintiffs are wrong in suggesting that there is no relevant difference between a plan that provides retirement benefits subject only to a

---

[9]  Contrary to plaintiffs' assertion (at 20), the *Silicon Graphics* plan did *not* give participants an "option" to receive distributions "in-service."  363 B.R. at 697.

limited "early withdrawal" option and one, like the WAP, that *mandates* pre-termination distributions unless a participant affirmatively elects otherwise. In the former scenario, the plan structure reflects a "primary thrust" to provide retirement income. This is especially true when the plan is expressly designed to provide retirement income, as in *Silicon Graphics*. In the latter scenario, by contrast, the plan structure strongly suggests that post-termination income is merely "incidental" to the plan's "primary thrust"—particularly where, as here, the plan was designed for a non-retirement purpose. *See Boos*, 643 F.3d at 134; *Houston*, 112 F. App'x at 136.

The other cases plaintiffs cite are likewise irrelevant. As already discussed, the plan in *Meinen* was expressly designed to provide retirement benefits. The same is true of the plan in *Spitz v. Berlin Industries, Inc.*, which was designed to "provide an enhanced source of retirement funds for participants." 1994 WL 48593, at *1 (N.D. Ill. Feb. 16, 1994).[10] And while plaintiffs also rely on a decision denying a motion to dismiss in *Holansky v. Prudential Financial*, that court expressly made "no findings as to what facts

---

[10] Moreover, the *Spitz* plan only allowed participants to receive *some* of their vested benefits before age 58, and even then they could only obtain incremental distributions before age 65. *See id.* at *4.

may or may not meet [plaintiff's] burden of proof" for establishing ERISA

coverage.  2004 WL 1404016, at *2 (N.D. Ill. June 21, 2004).[11]

Although plaintiffs also discuss several inapposite DOL Opinion Letters,

they fail to mention on-point DOL guidance which plainly supports the district

court's "express terms" analysis.  The DOL has repeatedly advised that when a

plan does not "*condition* distribution" of benefits "upon termination of

employment or retirement," then it "is *not* by its express terms an employee

pension benefit plan" under ERISA.  DOL Op. Ltr. 82-29A, 1982 WL 21212, at

*2 (emphasis added); *see also* DOL Op. Ltr. 2002-13A, 2002 WL 31846478, at

*3 (same); DOL Op. Ltr. 84-12A, 1984 WL 23427, at *2 (same); DOL Op. Ltr.

81-24A, 1981 WL 17745, at *2 (same).  Like the plans in these advisory

opinions, nothing "other than the passage of a fixed period of time" prevented

participants from receiving distributions of their WAP benefits.  DOL Op. Ltr.

---

[11]  Plaintiffs elsewhere rely on *Leaverton v. RBC Capital Markets Corp.*, 2011
WL 243764 (W.D. Wash. Aug. 26, 2010), which they claim "ruled that the
WAP is an ERISA 'pension plan.'"  Br. 14.  But *Leaverton*, which decided a
Rule 12(b)(6) motion to dismiss, held no such thing.  It held only that, on the
face of the complaint, plaintiff had failed to exhaust administrative prerequisites
for bringing any *purported* ERISA claim.  *See* R.1509-17.  The court engaged in
no analysis as to whether the WAP is an employee pension benefit plan—much
less suggested that the WAP is a pension plan because "it gives employees who
want to save for their retirement or until they separate from service the ability to
do so" as plaintiffs would have it.  Br. 15.  Presumably, that is why plaintiffs did
not cite the decision in their principal summary judgment briefing below, *see*
Docs. 84 & 93, and also why the district court correctly "ignored" it, Br. 14.

84-12A, 1984 WL 23427, at *2.  To the extent distributions were made upon

retirement or termination, it was merely the result of a participant's own

voluntary election—*not* an express condition of the WAP.[12]

### 2.     The WAP Is Not An Employee Pension Benefit Plan As A Result Of Surrounding Circumstances.

The surrounding circumstances test asks whether a plan that is not by its

express terms a pension plan has the same effect based on the manner in which

it operates or is administered.  For example, the DOL has advised that a plan

"might" be a pension plan as result of surrounding circumstances "if

distributions under the [p]lan are skewed towards the last years of participants'

careers," DOL Op. Ltr. 81-27A, 1981 WL 17748, at *3, or "if an employer . . .

prevents or discourages participants' requesting or receiving" pre-termination

---

[12]  Like the bankruptcy and district court decisions they cite, the DOL opinion letters upon which plaintiffs rely involved plans that were expressly designed to provide retirement benefits and only allowed participants to obtain limited early withdrawals, often subject to penalties or other conditions.  *See* DOL Op. Ltr. 83-33A, 1983 WL 22518 (conditioned distribution upon retirement with early withdrawals only under "certain conditions"); DOL Op. Ltr. 80-31A, 1980 WL 8978 (plan designed to "accumulate a competence for . . . old age" and certain benefits acquired "within 25 years of retirement . . . would continue [to be paid] beyond retirement"); DOL Op. Ltr. 79-33A, 1979 WL 6971 (plan designed to be a "qualified" retirement plan and conditioned certain benefits on termination); DOL Op. Ltr. 77-85, 1977 WL 5438 (plan designed "to provide . . . security in retirement" and only permitted pre-retirement withdrawals of certain "employer contributions").  Accordingly, the district court correctly disregarded these opinion letters.  R.1663-64.

distributions, DOL Op. Ltr. 90-17A, 1990 WL 263441, at *2. No such circumstances exist here.

### a. The WAP's Operation Does Not Skew Distributions Toward Retirement Years.

As the district court correctly concluded, although the WAP allowed some participants to delay distributions until termination, this was not a result compelled by "the operation or administration of the WAP." R.1660. To the contrary, the WAP was designed and operated such that distributions were presumptively made *before* termination. Not only did Gift and Neuhaus receive pre-termination distributions of their WAP benefits, but so too did up to 66 percent of their fellow WAP participants. Nothing about the WAP's operation or administration "skewed" distributions "towards the last years of participants' careers." DOL Adv. Op. 81-27A 1981 WL 17748, at *3.

The Eighth Circuit's decision in *Emenegger* strongly reinforces that conclusion. There, the Eighth Circuit addressed a plan designed to retain key employees by providing bonuses subject to vesting—much like the WAP. 197 F.3d at 931-32. Participants received payment of their vested benefits at "redemption value" upon "certain triggering events, such as retirement, disability, death, termination without cause, or takeover." *Id*. at 932. Alternatively, participants could choose to redeem their vested benefits while

35

still employed and, if they did, would receive those benefits at redemption value or the lesser "book value." *See id.* at 932-33.[13]

Based on these facts, the Eighth Circuit held that the plan was not an employee pension benefit plan under ERISA. As the court explained, there were "neither requirements set nor penalties threatened or imposed for a participant's redemption of [benefits] before his termination or retirement" and thus nothing would "regularly compel participants to wait until they leave" the company to receive distribution of their benefits. *Id.* at 933-34. The same analysis is reflected in decisions of the Tenth and Third Circuits. *See McKinsey*, 986 F.2d at 406; *Houston*, 112 F. App'x at 136.

And it applies here as well. Like the plan in *Emmenegger*, the WAP was designed to incentivize key employees to remain with RBC by providing bonuses subject to vesting. Although some participants could choose to delay their distributions until termination, as in *Emmenegger*, there were absolutely no "requirements" or "penalties" that would "compel" participants to do so. 197 F.3d at 933-34. Thus, post-termination distributions resulted from pure participant choice—"not the operation or administration of the WAP." R.1660.

---

[13] Though somewhat unclear, it appears from the Eighth Circuit's description that while "original participants" could receive vested benefits while still employed at "full redemption value," all other participants could only do so at the lesser book value. *Emmenegger*, 197 F.3d at 931-33.

Plaintiffs insist (at 44) that the district court misapplied *Emmenegger*. They argue, principally, that *Emmenegger* is irrelevant because it addressed a pure bonus plan, whereas the WAP provides bonuses alongside other incentives. Plaintiffs claim that this distinction is critical because bonuses are exempt from ERISA under the following regulation:

> [T]he terms "employee pension benefit plan" and "pension plan" *shall not include payments* made by an employer to some or all of its employees *as bonuses for work performed*, unless such payments are *systematically deferred* to the termination of covered employment or beyond, or so as to provide retirement income to employees.

29 C.F.R. § 2510.3-2(c) (emphasis added). Plaintiffs' argument fails.

For starters, while it is true that the WAP is not a "pure" bonus plan, nothing in the above regulation requires purity. *See Critelli*, 2007 WL 749693, at *1, 3-4 (evaluating under the bonus regulation a plan in which participants could "defer[] payment of portions of [their] salary, and up to 100% of [their] annual bonus, until a future date"). By its terms, the regulation excludes from ERISA coverage *any* "bonuses for work performed," unless such bonuses are "systematically deferred" to termination. Here, it is undisputed that the WAP *did* provide bonuses for work performed and that participation in the WAP was itself a reward for the small percentage of employees who qualified.

Furthermore, the above regulation is interpretive, not definitional. Nowhere in ERISA or the relevant regulations is there any formal "bonus plan"

37

definition.  The bonus regulation is just one of several regulatory *examples* of the types of arrangements that fall outside ERISA's coverage.  29 C.F.R. § 2510.3-2(a) (noting that the section helps "clarif[y] the limits of the defined terms 'employee pension benefit plan'").  Thus, courts have applied the bonus regulation to a variety of plan structures designed primarily to reward or incentivize employees.  *See, e.g.*, *Murphy*, 611 F.2d at 575 (noting that plan "participation rights were given to employee as 'bonuses for work performed'"); *Hahn v. Nat'l Westminster Bank, N.A.*, 99 F. Supp. 2d 275, 279 (E.D.N.Y. 2000) (applying bonus regulation because plan "was created to provide additional compensation to current employees in recognition of their value").  Because the WAP indisputably provided "bonuses for work performed" and awarded participation rights only to employees who could meet its strict eligibility requirements—with absolutely no "guarantee[]" that they would qualify from one year to the next, *Murpy*, 611 F.2d at 575—the bonus regulation and cases applying it are instructive.

In all events, there is simply no getting around that *Emmenegger* involved a plan with striking similarities to the WAP.  While plaintiffs have tried hard to distinguish some of the particulars, there is no avoiding the fact that *both plans* were designed to reward and retain key employees; *both plans* awarded benefits subject to vesting; and *both plans* allowed participants to receive distributions

38

without any "restrictions" or "penalties" that would "compel" them to delay distribution until retirement or termination.  197 F.3d at 931-34.  Accordingly, *neither plan* constitutes an "employee pension benefit plan" under ERISA.

> **b.    RBC Did Not Prevent Or Discourage Participants From Receiving In-Service Distributions.**

Far from preventing or discouraging participants from receiving in-service distributions, RBC *required* some participants to receive in-service distributions and consistently encouraged everyone else to "[s]elect a distribution option that works for you."  Doc. 91, Ex. 21 at 1; *id.*, Ex. 22 at 1-2 ("[Y]ou can use your [WAP] distributions for any purpose.").  Nevertheless, the option for some participants to defer WAP distributions until termination is fleeting—if a participant does not *timely* submit a *written* election to defer until termination, then the WAP *mandates* that his benefits be distributed immediately upon vesting.  R.45 § 5.3(b)(iv).

Despite these undisputed facts, plaintiffs argue that surrounding circumstances triggering ERISA coverage can be found in certain RBC communications, which they claim "acknowledged" and "promoted" the WAP as a retirement plan.  Br. 37-40.  The district court correctly rejected these arguments.  R.1660-62, 1664-66.

Plaintiffs base their "acknowledgement" argument primarily on a November 2008 email sent internally to certain directors.  Br. 7 (citing Doc. 84,

Tab 8); *see also id.* at 38-39.  That email states that the WAP is "an important part of the total rewards package offered at RBC" and is "integral to [RBC's] Finishing Well strategy."  Doc. 84, Tab 8.  The email also notes that changes were made to the WAP's eligibility requirements to help ensure its satisfaction of ERISA's top-hat requirements.  *Id.*[14]

Plaintiffs' reliance on this email is misplaced.  First, the email's suggestion that the WAP is a "retirement plan" is nowhere near sufficient to establish ERISA coverage.  *See MDPhysicians & Assocs., Inc. v. State Bd. of Ins.*, 957 F.2d 178, 183 n.7 (5th Cir. 1992) (holding that although plan documents "all stated that ERISA controlled," such statements were insufficient to establish ERISA coverage).  Moreover, as the district court recognized, the email's top-hat statements were entirely "consistent with the WAP's own language . . . which essentially stated that the WAP was not intended to be an

---

[14]  Plaintiffs also attribute this statement to RBC:  "A key objective of the WAP is to enable top producers to *retire* well . . . ."  Br. 7 (emphasis added).  Plaintiffs cite Tab 4 of their summary judgment appendix (*id.*), but that language appears nowhere in Tab 4.  Plaintiffs probably meant to cite an exhibit attached to their response to RBC's motion for summary judgment.  *See* Doc. 93, Tab 24.  But even if they had cited it correctly, the exhibit shows that the quoted language above was *not made by RBC*, but instead by a third-party consultant, Mercer.  *See id.*  Thus, it is inadmissible hearsay.  *See Harris ex rel. Harris v. Pontotoc County Sch. Dist.*, 635 F.3d 685, 692 (5th Cir. 2011) ("Hearsay . . . cannot be used to create a genuine issue of material fact to avoid summary judgment.").

employee pension benefit plan under ERISA but, should it be held as such, that it was intended to be a top hat plan." R.1660-61.[15]

Furthermore, the email's generic statement that the WAP was "integral" to RBC's "Finishing Well strategy" is of no help to plaintiffs.[16]  Nothing in that email can even remotely be interpreted as discouraging participants from receiving pre-termination distributions of their benefits.  Rather, the email merely advises complex directors to "remind financial consultants approaching a compensation production threshold of the financial benefits [including, Productivity Bonuses] awaiting them once they surpass that threshold."  Doc. 84, Tab 8 at RBC001407; *see also* R.1661-62 (discussing the same email).

Plaintiffs also get nowhere with their contention (at 43) that RBC acknowledged the WAP as an ERISA pension plan when it "registered the WAP as a 'top hat' plan with the U.S. Department of Labor."  In reality, the actual record evidence—which plaintiffs do not cite—establishes that RBC simply notified the DOL that "*should [the WAP] be considered a pension plan under*

---

[15]  As the district court also recognized, R.1661, this same analysis applies to a similar statement contained in an internal email from 2006 noted in plaintiffs' brief (at 8, citing Doc. 84, Tab 16).  And it also applies to plaintiffs' arguments regarding an RBC communication addressing hypothetical questions and stating that if the WAP were found not to be a valid top-hat plan, then it may have to be terminated. *See* Br. 40.

[16]  Plaintiffs proffered no evidence establishing what RBC's "Finishing Well" strategy entailed—they simply presume it relates exclusively to retirement.

*ERISA*," RBC believed it was an exempt top-hat plan.   Doc. 84, Tab 10 (emphasis added).   As the district court explained, this "statement evinces nothing more than [RBC's] well-documented position that the WAP was not an ERISA pension plan, but that if it were at some point found to be an ERISA pension plan, that it was an ERISA-exempt top hat plan."   R. 1669-70.[17]

Plaintiffs' argument that RBC "promoted" the WAP as a retirement plan fails as well.   Plaintiffs contend (at 8, 38), without citation, that RBC told employees that the WAP "works hand-in-hand" with other retirement programs and that it was part of a "menu of retirement savings."   A review of the record evidence not cited by plaintiffs, however, discloses that they have taken their quotations out of context.   For example, a WAP summary from 2008 does *not* state that the WAP was part of a "menu of retirement savings."   It states only that RBC "offer[s] a menu of retirement savings *and deferred compensation vehicles* that are among the most innovative and attractive in the industry." Doc. 91, Ex. 4 at RBC000199 (emphasis added).   The WAP, of course, fell within the latter category.[18]

_____

[17]   The same analysis disposes of plaintiffs' contention (at 38) that the WAP must be an ERISA plan because it sought to increase eligibility requirements to ensure its compliance with ERISA's top-hat exemptions.

[18]   The statement that the WAP worked "hand-in-hand" with RBC's 401(k) was simply the heading contained in a section of the 2006 Plan summary explaining

DECL WEINSTEIN OPPO DEFS' MTN PARTIAL SJ AND
ISO PLTFS' RULE 56(D) MOTION
NO. 3:16-cv-05616-RBL - Page 178

Plaintiffs also contend (at 8) that RBC "emphasized" the option for some participants to delay distributions until termination. The "evidence" plaintiffs cite for this argument is a Q&A document that merely described—*in neutral terms*—the distribution options available under the Plan. Doc. 84, Tab 8 at RBC001408. As the district court recognized, neither this document nor any others plaintiffs cite "encouraged one distribution election over the other." R.1662. Instead, RBC encouraged participants simply to "[s]elect a distribution option that works for you." Doc. 91, Ex. 21 at 1; *see also id.*, Ex. 22 at 1-2.

### c.  Only A Minority Of WAP Participants Elected To Delay Distributions Until Termination.

It is undisputed that the majority of WAP participants—between 51 percent and 66 percent—were slated to receive in-service distributions of WAP benefits between 2007 and 2011. It also is undisputed that both Gift and Neuhaus received distributions of their WAP benefits while still employed at RBC. Nevertheless, without citing any authority, plaintiffs argue counter-intuitively that the WAP is an ERISA pension plan because a minority "selected retirement treatment every year." Br. 40-41. The district court correctly rejected this argument, and this Court should as well.

---

that IRS rules affected the amount WAP-eligible employees could contribute annually to the company 401(k) plan. Doc. 93, Tab 26 at PL-00125. This lone statement in no way "promoted" the WAP as a retirement plan or encouraged participants to use it as one.

43

This Court's decision in *Boos* is instructive. There, this Court addressed a plan designed to provide discounted phone service to retirees. 643 F.3d at 134. The Court readily concluded that this arrangement "provide[d] retirement income" for some retirees covered by the plan, 643 F.3d at 134. The Court nevertheless held that the plan was not an "employee pension benefit plan" because retirement income was only "incidental" to the plan's "primary thrust," and, "significant[ly]," because the plan did not provide retirement income to *all* participants. *Id.*

Similarly, in *Houston*, the Third Circuit held that a plan was not governed by ERISA where the plaintiff had "intended to fund his retirement with [plan benefits], and [where] the plan[] resulted in a deferral of a portion of his income to his retirement date." 112 F. App'x at 136. Relying on this Court's decision in *Murphy*, 611 F.2d 570, the court reasoned that "[t]he design of the plan at issue, not the individual participants' intended use of the proceeds, must be the perspective from which the definition of 'employee pension benefit plan' is determined." *Id.* Because the plan was designed "to align key employees' interests with those of" the company, the court held that a participant's "choice" to defer plan benefits to fund his retirement did not trigger ERISA coverage. *Id.*

These cases confirm that it is not enough that a plan may "provide[] retirement income" to some participants, *see Boos*, 643 F.3d at 134, or that

44

some participants may intend to defer plan benefits for that purpose, *see Houston*, 112 F. App'x at 136. The critical inquiry is whether the plan was designed "for the purpose of providing" retirement or post-termination income as a result of "surrounding circumstances." *Murphy*, 611 F.3d at 575.

Here, "the WAP's flexible design allowed participants to use their account balances as they saw fit, to meet their own individual needs." R.1668. This design was intended to maximize RBC's ability to attract and retain key employees amidst intense industry competition and to compete with comparable plans offered by RBC competitors. That a minority of participants chose to receive their benefits upon termination does not constitute a surrounding circumstance transforming the WAP into an ERISA pension plan. *See, e.g.*, *Boos*, 643 F.3d at 134; *Houston*, 112 F. App'x at 136.[19]

---

[19] Plaintiffs also contend that because "[r]etirees generally earn less than employees" the WAP should be deemed a pension plan because participants might be encouraged, for tax reasons, to delay distributions until retirement. Br. 41-42. This argument is untenable. Were it accepted, *any* plan that does not absolutely bar deferring receipt of benefits to termination would be governed by ERISA. Not surprisingly, that is not the law.

Although plaintiffs cite *Meinen* yet again, the tax consequences addressed there were those imposed under IRC § 72(t)—a 10 percent tax *penalty* on early withdrawals from qualified *retirement* plans. 228 B.R. at 381; 26 U.S.C. § 72(t). Moreover, as the district court correctly recognized, IRC § 72(t) was only relevant in *Meinen* because the court had *already* determined that the plan was governed by ERISA. R.1668-69. Plaintiffs' reliance on *Holansky* (at 22, 41) is misplaced for the same reason.

## C.     The District Court's Decision Is Faithful To The Policies Underlying ERISA's Regulation Of Pension Benefits.

Plaintiffs dramatically argue that if the district court's decision stands, it will "deny ERISA protection to thousands of ERISA plans, making those plans riskier for employees and discouraging employees from using them to save for their retirement." Br. 50.  Nothing could be further from the truth.  The district court's holding in no way affects plans designed for the primary purpose of paying retirement or post-termination income, or plans that allow some limited "early withdrawals" of vested benefits—like many 401(k) and other widely-recognized pension plans.  To the contrary, the district court carefully tailored its analysis and holding to the particular terms and circumstances of the WAP—a plan plaintiffs admit was designed to "attract, retain, and develop" employees by providing "compensation" in a manner unique to the industry, Doc. 84 at 6.[20]

Similarly unfounded is plaintiffs' criticism (at 15-17) that the district court failed to construe ERISA "liberally." Br. 15-17.  This Court has long recognized that ERISA is not intended to address every benefit plan offered to employees.  *Murphy*, 611 F.2d at 574.  It was enacted to address plans that promised retirement benefits but lacked protections ensuring the eventual

---

[20]  Plaintiffs devote a section of their brief to the proposition that a limited early withdrawal option—subject to tax penalties and other restrictions—in a standard issue pension plan does not foreclose ERISA coverage.  Br. 34-35.  But this case indisputably does not involve a plan or an option of that type.  R.1663.

46

payment of those benefits.  *Id.*  ERISA thus is not intended to regulate plans that have as their "primary thrust" something other than providing retirement benefits—even when those plans may, in some instances, result in the payment of retirement or post-termination income.  *Id.*  Because the WAP indisputably falls within this latter category, the district court's determination that it is not an employee pension benefit plan is both correct and entirely consistent with the policies underlying ERISA.

## II.   This Court May, Alternatively, Affirm The District Court's Judgment Based On ERISA's Top-Hat Exemptions.[21]

A top-hat plan must be (1) "unfunded" and (2) "maintained primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees."  *Reliable Home Health Care*, 295 F.3d at 512; 29 U.S.C. §§ 1101(a)(1), 1051(2), 1081(a)(3).  If the WAP satisfied these requirements, then it is exempt from ERISA's vesting, funding, and fiduciary duty provisions and plaintiffs' claims necessarily fail.  *Id.*

---

[21]  Plaintiffs affirmatively challenge (at 61-68) several of RBC's other alternative summary judgment arguments from below.  None of plaintiffs' challenges presents grounds for reversal, but instead relate to RBC's alternative defenses that the district court did not address and that this Court need not reach unless it reverses the district court and further rejects the alternative grounds for affirmance on the top-hat issue.  In that event, the proper course would be to remand and allow the district court to address those defenses in the first instance.  Accordingly, RBC has not addressed these ancillary issues here.

47

The parties agree that the first top-hat requirement—that the plan be "unfunded"—is satisfied. Doc. 84 at 28; Doc. 91 at 27-28. As shown below, the second requirement is satisfied as well. The top-hat issue thus presents another ground for affirmance. *See, e.g.*, *Doody v. Ameriquest Mortgage Co.*, 242 F.3d 286, 289 (5th Cir. 2001) ("We are required . . . to affirm the district court's judgment if it was correct, even if for a reason not articulated.").

### A.    The WAP Was Maintained For A Select Group Of Highly Compensated Employees.

Courts have developed a series of "quantitative and qualitative" tests for determining whether a plan is maintained for "a select group of management or highly compensated employees." *Daft v. Advest, Inc.*, 658 F.3d 583, 595 (6th Cir. 2011); *see also Alexander v. Brigham & Women's Physicians Org., Inc.*, 513 F.3d 37, 44-46 (1st Cir. 2008); *Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 288-89 (2d Cir. 2000). First, the "select group" requirement is determined *quantitatively* by calculating the percentage of the plan sponsor's "total workforce" that is eligible for the plan. *Id*. Second, the "management or highly compensated employees" requirement is determined through a *qualitative* analysis of eligible employees' duties (for "management") *or* their compensation relative to the workforce (for "highly compensated"). *Id*. Third, the plan's language and purpose are evaluated to ensure that both accord with the top-hat requirements. *Id*.

48

Plaintiffs' brief makes no mention of these established tests for determining a plan's top-hat status. This is not surprising. Any straightforward application of these tests demonstrates that, if the WAP is an ERISA plan, it is an exempt top-hat plan.

### 1.    A Small Fraction Of Employees Qualified For The WAP.

Under the *quantitative* test above, courts hold that plans are maintained for a "select group" where around 15 percent or less of the plan sponsor's workforce is eligible to participate. *See, e.g.*, *Demery*, 216 F.3d at 289 (holding "select group" requirement satisfied where 15.34 percent of total workforce was eligible); *Alexander*, 513 F.3d at 44 (same where 8.7 percent of the total workforce was eligible); *Callan v. Merrill Lynch & Co., Inc.*, 2010 WL 3452371, at *10 (S.D. Cal. Aug. 30, 2010) ("[P]lans that limit participation to 15 [percent] or less of the workforce have consistently been treated as top hat plans."). Here, just 2.84 percent of the total RBC-Royal Bank workforce qualified for the WAP, *see supra* at 9, and thus the "select group" requirement is easily satisfied.

Recognizing their dilemma, plaintiffs argue (at 57-58) that the 2.85 percent eligibility rate is erroneous because it includes in the "total workforce" Royal Bank employees who worked or resided in Canada and thus failed the

WAP's first eligibility requirement.  Plaintiffs offer no authority supporting their contention, and none exists.

In evaluating whether a plan is maintained for a "select group," courts consider both the "actual language of the plan" and the "total workforce" of its plan sponsors.  *Daft*, 658 F.3d at 595; *Callan*, 2010 WL 3452371, at *10-12.  By its terms, the WAP is available to "employees of Royal Bank," R.34 § 1.1, and RBC who satisfy its annual eligibility requirements, *see* R.36 ("Employer") & R. 38 § 2.1(a).  And it is undisputed that Royal Bank employees regularly qualified for and participated in the WAP.  Doc. 95, Ex. B ¶4.  That the WAP's *non-financial* eligibility requirement disqualified many Royal Bank employees does not justify excluding them from the "select group" analysis any more than other employees' failure to satisfy the WAP's *financial* eligibility requirements justifies excluding them from the analysis.  After all, both requirements are designed to limit the WAP to a "select group" of employees.

Moreover, inclusion of Royal Bank employees in the "select group" analysis accords with the First Circuit's treatment of the issue in *Alexander*. There, the court held that a plan was maintained for a "select group" where 8.7 percent of *all hospital employees* were eligible to participate.  513 F.3d at 44-46.  It made no difference that the plan was offered only to those employees who were "surgeons . . . [and] full-time faculty at Harvard Medical School,"

50

*Alexander v. Brigham & Women's Physicians Org., Inc.*, 467 F. Supp. 2d 136, 140 (D. Mass. 2006)—a non-financial eligibility requirement that necessarily disqualified most hospital employees, *see Alexander*, 513 F.3d at 40-41. Likewise, it should make no difference here that the WAP's non-financial eligibility requirement disqualified many—but certainly not all—Royal Bank employees.

Regardless, even when Royal Bank employees are excluded, it remains clear that the WAP was limited to a "select group." Considering only the RBC workforce, the WAP's overall eligibility rate was just 13.39 percent, and is thus in-line with eligibility rates of other valid top-hat plans. *See Demery*, 216 F.3d at 289; *Callan*, 2010 WL 3452371, at *10.[22]

## 2. WAP-Eligible Employees Were Highly Compensated.

To determine whether a plan is maintained for "highly compensated" employees, courts compare eligible employees' compensation to that of *either* all non-eligible employees *or* the workforce as a whole. *Compare Daft*, 658 F.3d at 595 (courts should consider "the compensation disparity between top hat

---

[22] Plaintiffs' expert generated alternative eligibility percentages, but in doing so ignored the WAP's eligibility determination process and incorrectly assumed that the WAP was available only to employees hired before the start of each plan year. Doc. 91, Ex. 18 ¶¶7-17. Although his percentages are therefore unreliable, even under his flawed approach, the WAP's overall eligibility rate for the years examined was just 15.51 percent, *id.* ¶ 46—which is in line with the plan deemed sufficiently "select" in *Demery*.

51

plan members and non-members"), *with Demery*, 216 F.3d at 289 (comparing the "average salary of plan participants" to "the average salary of all [plan sponsor] employees") *and Callan*, 2010 WL 3452371, at *11 (applying both analyses but endorsing the former). Under either analysis, courts hold that eligible employees are "highly compensated" if they earn more than double the comparison group. *See, e.g.*, *Demery*, 216 F.3d at 289; *Alexander*, 513 F.3d at 46; *Callan*, 2010 WL 3452371, at *11; *Cramer v. Appalachian Reg'l Healthcare, Inc.*, 2012 WL 5332471, at *5 (E.D. Ky. Oct. 29, 2012).

The WAP easily satisfies this standard. Even when the analysis is limited to the RBC workforce, WAP eligible employees earned between 3.7 and 6.4 times more than all non-eligible employees and between 2.2 and 3.7 times more than the workforce as a whole. Doc. 91, Ex. 19 ¶¶35, 40. The compensation disparity only grows when Royal Bank employees are properly included in the analysis. *Id.*, Ex. 18 ¶¶53-54. Accordingly, the WAP was maintained for highly compensated employees.

### 3.    The WAP's Language And Purpose Support Application Of The Top-Hat Exemptions.

The WAP's language and purpose are fully consistent with ERISA's top-hat requirements. With respect to plan language, the WAP was expressly designed so that in the "unintended" event it might be determined to be an

52

"employee pension benefit plan," it would constitute an exempt top-hat plan. R.48 § 5.11. This language plainly accords with ERISA's top-hat exemptions.

The primary purpose of the WAP also is consistent with the top-hat exemptions. In *Demery*, the Second Circuit noted that the subject plan "was established as a means to retain valuable employees" and was offered in addition to—not as a "substitute" for—a separate pension plan. 216 F.3d at 287 (quotations omitted). The Second Circuit held that "[t]hese factors must weigh in favor of classifying the [p]lan as a top hat plan." *Id.*; *accord Alexander*, 513 F.3d at 40 (top-hat plan was designed "to recruit and retain top-flight surgeons").

So too here. Not only is it undisputed that the WAP was "created and maintained" to "recruit, retain, and develop" valuable employees, Doc. 84 at 6, but it also is undisputed that RBC offered employees a separate 401(k) plan so that they could save for retirement, Doc. 91, Ex. 1 at 141:15-25. Thus, the WAP's primary purpose supports application of ERISA' top-hat exemptions.

### B.     Plaintiffs' Contrary Arguments Are Without Merit.

Plaintiffs make three principal arguments that the WAP does not satisfy the top-hat requirements: (1) the WAP was not maintained for a "select group" under *Carrabba v. Randalls Food Markets, Inc.*, 38 F. Supp. 2d 468 (N.D. Tex. 1999), *aff'd* 252 F.3d 721 (5th Cir. 2001); (2) the WAP's production-based

53

eligibility requirement is "illegal;" and (3) WAP participants lacked "substantial influence." Br. 53-57, 59-60. None withstands scrutiny.

### 1.    This Case Is Not *Carrabba*.

Plaintiffs rely heavily on *Carrabba* to argue that the WAP was not maintained for a "select group." Br. 52-54. But *Carrabba* is distinguishable and does nothing to undermine the conclusion that the WAP may, alternatively, be classified as a top-hat plan.

The district court in *Carrabba*, after a bench trial, held that a plan expressly designed "to provide death and retirement benefits" to grocery store employees was not a top-hat plan. 38 F. Supp. 2d at 470, 478. In reaching this holding, the court emphasized two things. First, the court lamented the lack of interpretive authority concerning "the meaning of the words 'a select group,' as used in the statute." *Id.* at 478. Second, the court emphasized the lack of evidence suggesting that the plan was limited to a select group of either management or highly compensated employees. *Id.* Indeed, the record showed that (1) "all salaried employees" were "invited to participate in the plan," and (2) eligible employees earned as little as $11,180 annually. *Id.* at 473.[23]

---

[23] The $11,180 figure is in 1974 dollars, and is equivalent to approximately $53,000 in 2013 dollars.

The situation here is fundamentally different. First, since *Carrabba*, courts have developed an analytical framework for determining whether a plan satisfies ERISA's top-hat requirements. *See supra* at 48. This framework, which plaintiffs conspicuously ignore, provides the tools needed to give effect to the "down-selection" principle plaintiffs infer from *Carrabba*. Br. 53.

Second, unlike in *Carrabba*, there is a wealth of evidence showing that the WAP was in fact maintained for a select group of highly compensated employees. *See supra* at 49-52. Far from permitting "all salaried employees" to participate, the WAP's eligibility requirements ensured that only a fraction of the workforce ever qualified for the WAP and that those who did earned many times more than those who did not. *Cf. Demery*, 216 F.3d at 285, 289-89 (top-hat plan found where eligibility was offered to "bank officers" and "managers" regardless of pay); *Alexander*, 513 F.3d at 40-41 (same where eligibility was based on surgeons generating a minimum level of revenue for the hospital); *Callan*, 2010 WL 3452371, at *10 (same where eligibility was based on "level of eligible compensation").

## 2. Production Is Not An "Illegal" Eligibility Requirement.

Plaintiffs next argue that the annual "production" threshold used to determine WAP eligibility for employees paid on a commission basis was "illegal" because it resulted in some employees, including financial consultants,

55

qualifying for the WAP even though their commission-based earnings were below the annual compensation threshold used to determine WAP eligibility for salaried employees. Br. 54-57. This argument is flawed on several levels.

*First*, plaintiffs cite no authority for the proposition that employers must use equivalent eligibility requirements for all top-hat plan participants. That is not surprising, as nothing in the statutory language prescribes the eligibility criteria an employer must use for a top-hat plan. *See* 29 U.S.C. § 1101(a)(1). Courts instead look to whether, as a result of *whatever* eligibility requirements are used, the plan operates for the primary benefit of highly compensated employees. In *Demery*, for instance, the Second Circuit held that a plan was maintained primarily for highly compensated employees, despite that its eligibility requirements had nothing to do with employee compensation. *See* 216 F.3d at 285, 289; *see also Alexander*, 513 F.3d at 40-41 (top-hat plan was maintained for "highly compensated employees" where eligibility turned on revenue surgeons generated for the hospital).

*Second*, it would make little sense for RBC to use something other than production to determine WAP eligibility for financial consultants. Production is the critical metric that RBC uses to evaluate these key employees—the very

same metric used to determine their annual productivity and loyalty bonuses. *See supra* at 4.[24]

*Third*, it makes no difference that a financial consultant might qualify for the WAP even though his *commission-based* earnings fall below the compensation threshold used for salaried employees. For starters, a substantial portion of financial consultant pay—namely, productivity bonuses and loyalty bonuses—is not reflected in commission earnings. Moreover, financial consultants are exceedingly valuable employees. Not only are they directly responsible for generating billions in revenue for RBC, but when they leave a firm they take that revenue with them. Accordingly, it is logical and lawful that financial consultants are subject to their own WAP eligibility thresholds.

*Fourth*, there is no real question that financial consultants and other employees who qualify for the WAP based on production are highly compensated. Between 2002 and 2010, these employees earned on average $211,772 to $306,523 per year—or between 2.9 and 4.0 times more than all non-WAP eligible RBC employees. Doc. 91, Ex. 19 ¶45.

---

[24] Plaintiffs claim (at 9) that "every year hundreds" of financial consultants "were allowed to participate" in the WAP "although they could not meet the compensation threshold" used for salaried employees. In support, they cite a chart created by their expert. *See* Doc. 121, Ex. A-2. This chart is not based on actual financial consultant compensation, but on *estimated* commission earnings *exclusive of* annual bonuses. *Id.* Thus, it is meaningless.

57

### 3.      Though Not Required By The Top-Hat Exemptions, WAP Participants Have Substantial Influence.

In a 1990 opinion letter, the DOL expressed its "view . . . that in providing relief for 'top hat' plans . . . , Congress recognized that certain individuals, by virtue of their position or compensation level, have the ability to affect *or substantially influence*, through negotiation *or otherwise*, the design and operation of their deferred compensation plan[.]"  DOL Op. Ltr. 90-14A, 1990 WL 123933, at *1 (emphasis added).[25]  This Court and others have since referenced the DOL's letter in discussing the top-hat exemptions.  *See, e.g.*, *Spacek v. Maritime Ass'n*, 134 F.3d 283, 296 n.12 (5th Cir. 1998); *Alexander*, 513 F.3d at 47.

From these references, plaintiffs make the leap that only those plans in which each participant can bargain individually for personalized plan terms satisfy ERISA's top-hat exemptions.  Br. 59-60.  This attempt to infer "a nascent requirement that every employee covered by a top-hat plan possess the power to negotiate the terms of that plan is simply too much of a stretch," and was therefore squarely rejected by the First Circuit.  *Alexander*, 513 F.3d at 47.

---

[25]  Because the DOL has never issued any regulations concerning application or interpretation of ERISA's top-hat exemptions, it typically declines to provide guidance as to whether any specific plan satisfies those exemptions.  *See, e.g.*, DOL Op. Ltr. 98-02A, 1998 WL 103654, at *2; DOL Op. Ltr. 81-27A, 1981 WL 17748, at *4.

58

No court has ever held "that when an otherwise valid top-hat plan is offered to a 'select group of management or highly compensated employees,' that plan will lose its exempt status if any one of the covered employees lacks individual bargaining power." *Id.* at 48 n.9.

Nevertheless, plaintiffs argue that "Fifth Circuit law" imposes such a requirement. They rely on this Court's two-sentence *per curiam* order affirming, in one stroke, several decisions issued in *Carrabba.* 252 F.3d 721 (5th Cir. 2001). But even the district court in *Carrabba* declined to adopt the individual bargaining power test plaintiffs advance. While that court noted in *dicta* that the DOL's letter above was "[p]erhaps" useful, its actual holding was more limited: "The furthest the court can go is to express the conclusion that it cannot find from the evidence that the participants of the [plan] were 'a select group'[.]" 38 F. Supp. 2d at 478. The district court's *dicta* is not "Fifth Circuit law." *See SDJ, Inc. v. Houston*, 841 F.2d 107, 108 (5th Cir. 1988) (a summary order "affirms only the judgment of the court below").

In any event, WAP participants *did* wield "substantial influence." As discussed *supra* at 49-52, both quantitative and qualitative analyses show that the WAP was restricted to a "select *group*" of "highly compensated employees," 29 U.S.C. § 1101(a)(1) (emphasis added). This is particularly relevant considering that the top-hat exemptions themselves speak in terms of "groups"

59

of employees—not individuals.  *See, e.g.*, *Alexander*, 513 F.3d at 48 ("These cases recognize the sensible proposition that it is the configuration of the group as a whole that controls.  If . . . Congress was singularly concerned with an individual's ability to fend for himself or herself, we think it unlikely that Congress would have framed the statute in terms of 'groups' at all.").

It also is undisputed that WAP participants repeatedly and successfully lobbied for various changes to the WAP, including, for example, increased Productivity Bonuses.  Doc. 91, Ex. 3 ¶9.  Tolbert's partner Brazelton testified that he personally suggested changes to the Plan's investment fund menu, *id.*, Ex. 11 at 52:23-53:22, and it is undisputed that such changes were made to the WAP, *id.*, Ex. 3 ¶9.  *Cf. Demery*, 216 F.3d at 289-90 (affirming top-hat status even though record was "silent" as to substantial influence); *Cramer*, 2012 WL 5332471, at *6 (same).

Furthermore, plaintiffs themselves possessed the ability to "substantially influence" the WAP through "negotiation *or otherwise*."  DOL Op. Ltr. 90-14A, 1990 WL 123933, at *1 (emphasis added).  Take Neuhaus for example.  When he was recruited to RBC, he was able to personally negotiate his financial compensation and signing bonus.  Moreover, when he later left RBC for rival Morgan Stanley, he took his $300 million book of business, the vast majority of his clients, and key members of his team along with him.  *Supra* at 10-11.  If

60

this is not evidence of "substantial influence," then it is difficult to fathom what would be. *Cf. Alexander*, 467 F. Supp. 2d at 147 (reasoning that top-hat plan status was reinforced by the fact that the plan "was established as a result of the threat that profitable surgeon[s] would leave" and was "revised" based on a plan participant "proposal"), *aff'd* 513 F.3d 37.

In sum, the WAP is a top-hat plan exempt from ERISA's fiduciary duty obligations and the district court's decision can be affirmed on that alternative, independent basis.

## CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment to RBC should be affirmed.

Respectfully submitted,

by: /s/ Christopher J. Boran

| | |
|---|---|
| Allyson N. Ho | Sari M. Alamuddin |
| MORGAN, LEWIS & BOCKIUS LLP | Christopher J. Boran |
| 1717 Main Street, Suite 3200 | Matthew A. Russell |
| Dallas, Texas 75201-7347 | MORGAN, LEWIS & BOCKIUS LLP |
| 214.466.4000 | 77 West Wacker Drive, Fifth Floor |
| | Chicago, Illinois 60601 |
| | 312.324.1146 |

*Attorneys for Defendants-Appellees*

61

# CERTIFICATE OF SERVICE

I certify that a copy of the foregoing Brief of Defendants-Appellees was filed using this Court's CM/ECF system and thus served by the Court's CM/ECF system by deliver to the following on October 16, 2013:

> Joe B. Harrison
> William G. Whitehill
> Stacy R. Obenhaus
> Gardere Wynne Sewell LLP
> 1601 Elm Street, Suite 3000
> Dallas, Texas 75201
> sobenhaus@gardere.com
> bwhitehill@gardere.com
>
>
> Geoffrey H. Bracken
> Gardere Wynne Sewell LLP
> 1000 Louisiana Street, Suite 3300
> Houston, Texas 77002
> gbracken@gardere.com

by: /s/ Christopher J. Boran

62

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because:

    1. This brief contains 13,873 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

    2. This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because the brief has been prepared using proportionally-spaced typeface using Microsoft Word with Times New Roman 14-point font.

by:  /s/ Christopher J. Boran

63