The Honorable Ronald B. Leighton

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

MARTY PAUL, an individual, and
BRIAN BUSKIRK, an individual,

              Plaintiffs,

v.

RBC CAPITAL MARKETS, LLC, a
Minnesota limited liability company; ROYAL
BANK OF CANADA, a Canadian corporation;
and ROYAL BANK OF CANADA US
WEALTH ACCUMULATION PLAN, an
employee benefit plan,

              Defendants.

Case No. 3:16-cv-05616-RBL

**DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

**NOTE ON MOTION CALENDAR:
February 2, 2018**

ORAL ARGUMENT REQUESTED

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Dr., 5th Floor
Chicago, IL 60601
+1.312.324.1000

**Page**

I.     **INTRODUCTION** ..................................................................... 1

II.    **STATEMENT OF FACTS** ...................................................... 3

      A.      RBC Designed The WAP To Attract And Retain Valuable Employees .............. 3

      B.      The WAP's Eligibility Requirements .......................................... 4

      C.      The Composition Of WAP Participants ........................................ 4

      D.      Only 2.8% Of RBC's Total Workforce Was WAP-Eligible, And Eligible Employees Earned, On Average, Five Times More Than The Average RBC Employee .................................................................... 6

      E.      WAP-Eligible Employees Had "Substantial Influence" To Impact The Plan's Terms—And Exercised That Influence To Effectuate Changes Over Time ..................................................................... 6

      F.      Plaintiffs Were "Highly Compensated" And Valuable RBC Employees ........... 7

III.   **ARGUMENT** ....................................................................... 8

      A.      Plaintiffs' Complaint Seeks Relief That Is Not Available Under ERISA ........... 8

           1.      Counts I and II Do Not Seek To Enforce The WAP As Written ............... 9

           2.      Count III Challenges Non-Fiduciary Conduct And Seeks Individual Relief Unavailable Under ERISA Section 502(a)(2) ............ 10

           3.      Plaintiffs Do Not Seek "Appropriate Equitable Relief" Under Section 502(a)(3)—And The Relief That May Be Available Would Not Help Them ......................................................... 12

                a.      Section 502(a)(3) Does Not Authorize The Relief Requested ............................................................. 13

                b.      Equitable Reformation Of The WAP Would Not Benefit Plaintiffs ............................................................ 14

      B.      Plaintiffs' Claims Are Untimely. ........................................... 16

           1.      RBC Expressly Repudiated The Rights Plaintiffs Now Seek To Enforce Under ERISA Section 502(a)(1)(B) and (a)(3) (Counts I, II, and IV) ........................................................... 16

           2.      Plaintiffs' Fiduciary Breach Claims Are Untimely Because They Knew Of The Purported Breaches More Than Three Years Before Filing Suit ........................................................... 18

      C.      The WAP Was A Top-Hat Plan Exempt From Most Of ERISA's Requirements ................................................................ 20

           1.      The WAP Was Unfunded ............................................... 20

           2.      The WAP Was Maintained For The Primary Benefit Of A Select Group Of Highly Compensated Employees ............................... 20

                a.      Only A Fraction Of RBC's Total Workforce Qualified For The WAP .............................................................. 21

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(NO. 3:16-CV-05616-RBL) – PAGE i

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Dr., 5th Floor
Chicago, IL 60601
+1.312.324.1000

# TABLE OF CONTENTS
### (continued)

**Page**

b.    The WAP Primarily Benefits Highly Compensated Employees ................................................................................ 22

3.    The WAP's Plain Language And Primary Purpose Support Top-Hat Status ......................................................................... 22

4.    Although No "Substantial Influence" Element Is Required, WAP Participants Had Such Influence Over The Plan ..................... 23

IV.    **CONCLUSION** ............................................................................. 24

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Dr., 5th Floor
Chicago, IL 60601
+1.312.324.1000

## I.    INTRODUCTION

Plaintiffs bring this lawsuit under ERISA to recover benefits they claim were unlawfully "forfeited" and "improperly withheld" under the Wealth Accumulation Plan ("WAP" or "Plan") sponsored by the Royal Bank of Canada ("RBC").  *See* Dkt. 1, Compl. ¶¶ 1-2.  The undisputed facts make clear that plaintiffs' claims fail as a matter of law.  Fed. R. Civ. P. 56.[1]

Plaintiffs do not dispute that RBC designed and administered the WAP as a "top hat" plan, a deferred compensation plan for a "select group of management or highly compensated employees," exempt from most of ERISA's substantive provisions.  *See* 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a).  Nor do plaintiffs allege that any defendant misapplied or violated the WAP's terms, meaning plaintiffs received everything to which they were entitled under the Plan. It is likewise undisputed that plaintiffs reaped massive financial benefits by participating in the WAP for well over a decade—available *because* the Plan was administered as a top hat plan— including contributions from RBC, tax-deferred investment growth, and in-service pay-outs totaling more than $1.2 million between 2006 and 2011.  Plaintiffs also cannot reasonably claim ignorance of the WAP's terms, which they only now claim were unlawful since its inception.

Nevertheless, plaintiffs ask the Court to retroactively invalidate the WAP as a top hat plan, not because *they* should have been excluded from its benefits—as they indisputably were "highly compensated" themselves—but because RBC allowed *others* to participate.  *See* Compl. ¶¶ 34, 47.  Plaintiffs' claims fail as a matter of law for several independent reasons.

***First***, ERISA does not authorize the relief plaintiffs seek.  Plaintiffs assert claims under all three of ERISA's primary civil enforcement provisions.  *See* 29 U.S.C. § 1132(a)(1)-(3).  But the crux of this lawsuit is that they suffered individualized damages (forfeited benefits) because the WAP's terms violated ERISA's vesting provisions.  This type of claim is properly brought under Section 502(a)(3), *not* Sections 501(a)(1)(B) or (a)(2).  However, plaintiffs' Complaint does not seek any "appropriate equitable relief" available under Section 502(a)(3).

---

[1] Pursuant to the Court's August 29, 2017 order, Dkt. 23, the Royal Bank, RBC Capital Markets LLC, and the WAP (together, "defendants") moved for summary judgment on the threshold issue of whether the WAP was a "pension benefit plan" governed by ERISA at all.  Dkts. 24, 28.  Granting that motion in RBC's favor would resolve this case.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Dr., 5th Floor
Chicago, IL 60601
+1.312.324.1000

Given the nature of plaintiffs' claims, one potential form of "appropriate equitable relief" may be reformation of the WAP. Such a remedy, however, is available only in the event of fraud (which plaintiffs do not allege) or mistake (which the Complaint does not identify). Even then, reformation can be used only to conform a plan to either the sponsor's true intent or terms mutually agreed-upon by the parties. Here, it is undisputed that RBC intended the WAP to be "exempt from many ERISA requirements," and plaintiffs cannot reasonably claim they expected otherwise. Thus, to reform the WAP simply by engrafting ERISA's vesting, funding, and fiduciary provisions upon a plan expressly designed to be *exempt* from those very provisions would not align the WAP with *either* RBC's intent *or* the parties' understanding.

There is an equitable way to do both, however, should the Court find the WAP was over-inclusive and that reformation should apply: reform the Plan so eligibility *was* restricted to an appropriately "select" group. Such relief not only would correct any "mistake[n]" belief to the contrary, but also would tailor the remedy to the actual violation. The top hat exemption exists because highly compensated employees are capable of protecting their own interests. As such, the only people even potentially put in harm's way by an over-inclusive plan are those who *should not* have been allowed to participate. Plaintiffs do not claim they were among that group, but instead seek a bail-out on the backs of those who supposedly were. ERISA does not grant plaintiffs an escape hatch from Plan terms that only could have harmed others, if anyone at all.

***Second***, plaintiffs' claims are untimely. To the extent they arise under Sections 502(a)(1)(B) or (a)(3), RBC clearly repudiated the rights plaintiffs now seek to enforce long before the limitations cutoff. To the extent they assert a viable claim for fiduciary breach under Section 502(a)(2), they had "actual knowledge" of the alleged breach well outside the limitations period. In short, plaintiffs knew at all times that RBC's awards did not vest until a certain time and could be forfeited if they left RBC before then, that the WAP was "unfunded," and that most ERISA provisions *did not* apply. Plaintiffs not only knew how the WAP worked, but their testimony confirms they also never truly believed the Plan was limited to a "select group" of "highly compensated" employees. Rather than act on their knowledge, plaintiffs sat by and

Morgan, Lewis & Bockius LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 60615-1596
+1.312.324.1000

reaped the benefits of participating in the WAP, suing only after leaving RBC and experiencing *exactly* what RBC and the Plan said would happen all along.

**Third**, if the Court even reaches the merits, the WAP was indeed an exempt "top hat" plan. Plaintiffs concede the WAP was "unfunded," and the evidence establishes it was limited to a "select group" of "highly compensated employees." Over the relevant period, only 2.8% of RBC's overall workforce was eligible to participate, and the eligible employees earned, on average, more than *five times* more than the average RBC employee.

Plaintiffs undoubtedly will ask this Court to deny summary judgment based upon *Tolbert v. RBC Capital Mkts. LLC*, 2015 WL 2138200 (S.D. Tex. Apr. 28, 2015). But this motion presents different arguments involving different plaintiffs and different facts. For example, unlike the named plaintiff in *Tolbert*, plaintiffs' status as indisputably "highly compensated" provides the basis for RBC's position that the relief they seek here is not "appropriate equitable relief" under ERISA. Likewise, RBC's untimeliness arguments are based on facts unique to these plaintiffs and different legal standards in this circuit. And even if the Court reaches the question of whether the WAP was a valid top hat plan, the *Tolbert* decision rested upon a purportedly "disputed" fact that is far more clearly *undisputed* here: the WAP was limited to a small fraction of the total Plan-sponsor workforce.

Accordingly, the Court should enter summary judgment in defendants' favor.

## II.     STATEMENT OF FACTS[2]

### A.     RBC Designed The WAP To Attract And Retain Valuable Employees.

The WAP was designed as "a nonqualified, deferred compensation plan pursuant to which a select group of management or highly compensated employees . . . may be offered the opportunity to elect to defer a receipt of a portion of their compensation to be earned with respect to the upcoming Plan Year." Dkt. 24 at 5 (quoting Nov. 2010 WAP § 1.1). Although the WAP

---

[2] RBC's previous Motion described the WAP's terms and design, certain changes over time, and plaintiffs' employment at RBC. Dkt. 24 at 2-9. RBC incorporates those facts and supporting exhibits as if fully set forth here. Additional exhibits referenced herein are attached to the Declaration of M. Russell, Exhibit 1 to this Motion.

Morgan, Lewis & Bockius LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

is "not intended" to be an ERISA plan at all, it provides that, if it is deemed "an 'employee pension benefit plan,' the [Royal Bank] believes that it" qualifies as a top hat plan. *Id.* (§ 5.10).

The WAP was specifically designed and intended to attract and retain valuable employees, including high-performing financial consultants ("FCs") like plaintiffs. *See* Dkt. 24 at 3-4. And the WAP advanced that objective by paying bonuses and other awards—available only through the WAP—subject to specified vesting schedules. *Id.* This design not only incentivized employees to increase production, but also helped RBC retain valuable employees by requiring continued service to receive unvested awards. *Id.* at 4.

**B.     The WAP's Eligibility Requirements.**

The WAP is available to qualifying employees of the Plan's sponsor, the Royal Bank, and "Participating Subsidiaries." Ex. A, 2010 WAP § 1.1; Compl. ¶¶ 16, 22; Ex. B, Jt. Stip. ¶ 10. The WAP contains two express eligibility requirements. Employees must (1) neither reside nor perform the majority of their services in Canada, and (2) satisfy minimum "compensation or production" thresholds or other requirements. Ex. A, § 2.1(a)-(b); Ex. B ¶ 10.

Thus, RBC employees working primarily in the U.S. generally became eligible for the WAP based on their annual production, annual compensation, and/or job title.[3] From 2003 to 2008, production-based employees (including FCs) had to generate more than $300,000 in gross production over the preceding fiscal year. Ex. B ¶¶ 1-6. By contrast, certain non-production employees became eligible if their compensation exceeded $150,000. *Id.* In October 2008, RBC decided to amend these thresholds to ensure the WAP continued to remain appropriately "select" to qualify as a top hat plan. Starting in 2009, the compensation threshold for non-production employees was increased from $150,000 to $350,000. *Id.* ¶ 7. In 2010, the production threshold for production employees was increased to $400,000. *Id.* ¶¶ 8-9.[4]

---

[3] Since 2004, approximately 275 employees of the Royal Bank (*i.e.*, not its U.S. subsidiaries) have qualified for the WAP because they perform services primarily in the U.S. Ex. C, 3/23/2012 Decl. of G. Sikich ¶ 4.
[4] RBC increased other eligibility thresholds not relevant to plaintiffs' claims here. *See* Ex. B ¶ 8(b) (reflecting increase of compensation threshold for Complex and Regional Directors to more than $250,000). RBC also eliminated the ability of most WAP participants to qualify based on title alone, imposing either a compensation threshold or a combination of a certain title *and* a minimum compensation. *See, e.g.*, *id.* ¶¶ 7-8.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

## C. The Composition Of WAP Participants.

RBC maintained the WAP as an added benefit for key, high-performing employees. The primary WAP-eligible population was FCs, who are RBC's link to its clients and vital to its success. Dkt. 24 at 3. RBC faces stiff competition in recruiting and retaining well performing FCs, and the WAP was an important tool in its arsenal to both attract new FCs and retain FCs already at RBC. *Id.* Not only are these employees hard to come by and difficult to keep, but when they leave, they typically take their clients and even other RBC employees with them. *Id.*

Plaintiffs are prime examples. Paul was consistently recruited to leave RBC, even receiving offers of signing bonuses of more than $2 million. Ex. D, 4/27/17 Paul Tr. at 80. Moreover, Paul recruited Buskirk and three other RBC employees after he was terminated for cause in 2011. *Id.* at 14-15. Both Paul and Buskirk took nearly all of their clients with them. *Id.* at 173-74; Ex. E, 4/28/17 Buskirk Tr. at 47. As Buskirk explained, this is typical in an industry where "most brokers get a fairly large percentage of their clients following them." *Id.* at 46-47.

Another large group of WAP participants were Complex and Branch Directors. These Directors possessed managerial responsibilities, though many, like Paul, also served as "producing" FCs. *See* Ex. D at 101-102. Complex Directors had "overall supervisory responsibility for all Complex employees including branch directors, assistant branch manager(s), [FCs], branch support staff, the assistant, administrative and/or complex managers and all Complex operations personnel." Ex. F, CD Job Description. Branch Directors had responsibility over branch-level operations where FCs and others worked. Ex. G, BD Job Description. From 2003 to 2006, these Directors became WAP-eligible based on their titles, but starting in 2007, they had to have both a qualifying title *and* satisfy either the minimum production *or* compensation thresholds. Ex. B ¶ 5.

Various business line directors and presidents, as well as Regional Directors, were eligible for the WAP based on their title from 2003 through 2009, but were also required to meet a minimum compensation threshold in 2010 and 2011. Ex. B ¶¶ 1-9. Regional Directors are responsible for all "complexes" (including Complex Directors) in their regions, while business

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

line presidents and directors, in turn, had responsibility over all of the "regions" within their particular business unit. *See* Ex. H, Org. Chart, RBC Wealth Mgmt., PCG.

The WAP also was available to employees in other RBC business segments, including divisions of businesses RBC acquired over the years. For example, in 2009 and 2010, Liberty (an acquired division) or Centura (another acquired division) employees with both an executive-level designation or title *and* compensation of more than $350,000 were eligible. Ex. B ¶¶ 7-8.

**D.      Only 2.8% Of RBC's Total Workforce Was WAP-Eligible, And Eligible Employees Earned, On Average, Five Times More Than The Average RBC Employee.**

It is undisputed that from 2004 through 2011, the WAP's eligibility requirements ensured that only a small fraction of the Plan sponsor's (*i.e.*, the Royal Bank's) total workforce was eligible to participate in the WAP. Ex. I, Garrett Rpt. ¶ 15. Specifically, the total percentage of all RBC employees eligible to participate from 2004 through 2011 ranged from just 2.0% to 3.4% annually, with an overall eligibility percentage of just 2.8%. *Id.*

Moreover, WAP-eligible employees earned far more than RBC's total workforce. *Id.* ¶¶ 17-25. From 2004 to 2011, the average compensation of WAP-eligible employees ranged from $356,808 to $539,427, while the average of all Plan-sponsor employees ranged from $58,317 to $96,400. *Id.* Ex. 5A. As such, the average WAP-eligible employee earned between 4.5 and 6.3 times more than the average RBC employee (on average, 5.4 times more). *Id.* Ex. 5A & ¶ 23. Moreover, the median WAP-eligible employee was in the top 3% to 5% of all RBC earners (*i.e.*, made more than 95% to 97% of all employees). *Id.* ¶ 28.[5]

**E.      WAP-Eligible Employees Had "Substantial Influence" To Impact The Plan's Terms—And Exercised That Influence To Effectuate Changes Over Time.**

In addition to the influence inherent in their status as highly compensated, heavily recruited employees, WAP participants were able to protect their interests in the Plan. For example, RBC maintained "Advisory Councils" for both FCs and Branch Directors, the former of which Buskirk, who served as its president for two years, described as "a select group of

---

[5] Not surprisingly, the compensation of WAP-eligible employees exceeded that of *non-eligible* employees by an even greater margin. The average compensation of all WAP-eligible employees was between 5.2 and 7.6 times greater than that of all non-eligible RBC employees (on average, 6.2 times greater). Ex. H ¶ 23.

Morgan, Lewis & Bockius LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

producing brokers that gather together on a quarterly basis" to "represent[] the FC body" and raise issues affecting FCs to management. Ex. E at 23-24, 28. The Advisory Councils also served as a "sounding board" for FCs, specifically soliciting feedback from the FC population. *Id.* at 31-32. The FC Advisory Council met with RBC at least four times annually, including interfacing directly with RBC's executive management. *Id.* at 26-27; *see also* Ex. D at 83-86.[6]

Indeed, RBC took various efforts over the years to tailor the WAP to its participants' preferences, and many "significant changes" were made "by direct feedback from the [FC] population". Ex. J, 7/11/17 Sikich Tr. at 203. These included: (1) more investment options; (2) allowing participants to change investments more often (and later without limit); (3) permitting post-employment distributions in up to 10 annual installments (rather than two); (4) allowing the re-deferral of contributions elected for in-service distributions; (5) lifting certain restrictions on trading RBC stock; and (6) replacing RBC matching awards with Productivity and Loyalty bonuses, meaning participants could increase their WAP accounts *without* making voluntary contributions to receive a match. Ex. K, 1/25/2012 Decl. of G. Sikich ¶ 9.[7]

**F.      Plaintiffs Were "Highly Compensated" And Valuable RBC Employees.**

Both plaintiffs were "highly compensated." Paul concedes this—and for good reason, as he was among RBC's most productive employees. Ex. D at 55-59. Paul agreed he was a "top performer" in several years, among "maybe the top 75" producers in the entire company. *Id.* at 53-54. As such, Paul earned over $1 million every year since 2006—reaching as high as $1.86 million—and from 2003 through 2010, averaged roughly $1.15 million per year, putting him in the top 1% of all RBC employees. *See* Ex. D at 54-57; Ex. L, Garrett Rebuttal Rpt. Ex. 18A. Over this time, Paul earned between *13.0 to 22.4 times* more than the average RBC employee, and between *14.7 and 26.1 times* more than those not eligible for the WAP. *Id.*; Ex. I, Ex. 5A.

---

[6] Buskirk also recalled that the WAP Committee oversaw the Plan, and the Committee often "requested suggestions." Ex. E, at 113. Buskirk even suggested changes himself about the Plan's investment options, and when asked whether the Committee generally incorporated participant suggestions replied, "Oh, I'm sure it did." *Id.*
[7] *See also* Ex. J, at 203-04 (citing participant feedback wanting "more investment options," "more investment flexibility," and fewer restrictions on trading into the RBC share account, as well as "a lot of push to eliminate the company matching contributions from the [FC] population," a "significant reason" the WAP moved to "independent . . . bonuses going in, independent of whether or not the [FC] is voluntarily deferring").

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 60615-1596
+1.312.324.1000

Buskirk was a successful FC in his own right, estimating he earned between $350,000 to $400,000 annually in the years before his departure in 2012, though "there were obviously some years where it was more than that." Ex. E at 75. Indeed, from 2003 through 2011, data shows Buskirk earned an average of $263,088, putting him in the top 3% to 5% of all RBC employees annually. Ex. L, Ex. 18B. Over this period, Buskirk earned, on average, 3.4 times more than the average RBC employee, and between 3.1 and 5.1 times more than non-eligible employees. *Id.*

Plaintiffs' departures from RBC illustrate their clout. Paul was terminated for cause in March 2011, and since leaving has run an office under affiliations with several companies— taking his clients with him at each stop. Dkt. 24 at 7-8. When Paul left, he discussed joining multiple RBC competitors with an up-front bonus of "[a]nywhere from 150 to 300 percent in [his] trailing production." Ex. D at 193. Paul estimated that this would have translated into an immediate bonus of at least $2 million, and more likely "three to six million." *Id.* Paul, however, decided to go "independent," forming his own 1099 organization. *Id.* at 198-200. Paul recruited at least four other RBC employees to join him—including Buskirk. *Id.*[8]

Buskirk also took nearly all his clients upon joining Paul, Dkt. 24 at 7-8, and he too acts as his own 1099 entity, Ex. E at 17-18; Ex. D at 200. From the start, Buskirk was fully aware of the WAP's vesting provisions, *see* Ex. E at 91, and knew that if he left, he would forfeit unvested amounts in his WAP account, *id.* at 104-06, 137-38. From his perspective, most WAP participants "always knew [forfeiture] was there. And it was part of . . . . Part of the structure" of the WAP. *Id.* at 138-39. However, Buskirk was also confident that his earnings in just "a couple years" after leaving RBC would easily cover his forfeitures from the WAP. *Id.*

### III.    ARGUMENT[9]

**A.    Plaintiffs' Complaint Seeks Relief That Is Not Available Under ERISA.**

Before turning to the merits, the Court must first determine the true nature of plaintiffs' claims and under which ERISA section they properly arise. Plaintiffs seek "the benefits Defendants illegally withheld, along with other damages, attorney's fees and costs." Compl. ¶ 1.

---

[8] *See also* Lighthouse Wealth Mgmt., https://www.lighthousegigharbor.com/team.html (last visited Jan. 7, 2018).
[9] RBC incorporates its statement of the summary judgment standards from its previous Motion. Dkt. 24 at 10.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 60615-1596
+1.312.324.1000

The Complaint states four counts, together seeking to recover under all three of ERISA's primary civil enforcement provisions. *Id.* ¶¶ 60-89; 29 U.S.C. § 1132(a)(1)-(3).

These provisions represent "the exclusive vehicle for actions by ERISA-plan participants," and the Court "may not infer [additional] causes of action in the ERISA context, since that statute's carefully crafted and detailed enforcement scheme provides strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly." *Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 953-54 (9th Cir. 2014) (quotations omitted). Accordingly, "[u]nder ERISA, the issue is not whether the statute bars a particular cause of action, but rather whether the statute affirmatively *authorizes* such a suit." *Id.* (quotations omitted). Here, ERISA does not authorize the relief the Complaint requests.

**1.      Counts I and II Do Not Seek To Enforce The WAP As Written.**

Plaintiffs bring Counts I and II under ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). They seek "benefits due . . . under the WAP," and also ask this Court to "revoke the illegal forfeiture of their benefits" and declare "their benefits under the WAP are fully vested and non-forfeitable" and that the "WAP must be funded" in trust. Compl. ¶¶ 62, 74.

Section 502(a)(1)(B) does not afford this type of relief. That provision authorizes a participant to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). As the text reiterates, this section "speaks of '*enforc[ing]*' the 'terms of the plan,' not of *changing* them." *Cigna Corp. v. Amara*, 563 U.S. 421, 436 (2011) (emphases in original); *Moyle v. Liberty Mut. Ret. Benefit Plan*, 823 F.3d 948, 960 (9th Cir. 2016).

Here, plaintiffs already received everything to which the WAP entitled them, and they do not allege otherwise. That is, they received substantial bonuses and contributions from RBC for more than a decade, were allowed to voluntarily defer additional amounts and earn tax-deferred growth, and already received several large "in-service" payouts of these very benefits, as the WAP called for. *See* Dkt. 24 at 8. RBC also adhered to the WAP's terms upon their departures, paying Buskirk all vested WAP amounts—voluntary and RBC contributions—but forfeiting the

unvested portion,[10] while paying Paul all vested voluntary deferrals, but forfeiting the remaining amounts because he was terminated for "cause," a finding he does not challenge here.[11]

Accordingly, plaintiffs cannot recover any "benefits due . . . under the WAP," Compl. ¶ 61, because they are owed no benefits "under the WAP." And Section 502(a)(1)(B) does not authorize the Court to "revoke" or change WAP provisions, *id.* ¶ 62, or "declar[e]" the WAP contains terms RBC did not include in it, *id.* ¶ 74. *See Amara*, 563 U.S. at 436; *Moyle*, 823 F.3d at 960, 965. If plaintiffs are entitled this sort of relief, it must come from elsewhere in ERISA.

### 2. Count III Challenges Non-Fiduciary Conduct And Seeks Individual Relief Unavailable Under ERISA Section 502(a)(2).

Plaintiffs also claim a breach of fiduciary duty under Sections 502(a)(2) and 409(a), but this theory strives to fit a round peg in a square hole. Again, the crux of the Complaint is that certain WAP terms were illegal, had ERISA applied. Compl. ¶¶ 1, 21, 62. The only "fiduciary breach" alleged is that RBC applied those terms as written.[12] Count III is thus a repackaged claim that the Plan itself was unlawful, not a distinct claim for any independent fiduciary breach.

Section 502(a)(2) authorizes suit "for appropriate relief under section 1109 of this title." 29 U.S.C. § 1132(a)(2). Section 409(a), in turn, provides that a "person who is a fiduciary with respect to a plan" may be "personally liable" for a breach of ERISA's fiduciary duties. 29 U.S.C. § 1109(a). Plaintiffs' claim under these provisions suffers at least three dispositive flaws.

*First*, a top hat plan is not subject to ERISA's fiduciary duties, meaning its administrators "cannot be held personally liable for their breach." *Koeplin v. Klotz*, 265 F. Supp. 3d 1039, 1043 (N.D. Cal. 2017).[13]

---

[10] *See* Compl. ¶ 48; Ex. E at 107-08 (agreeing he received all vested amounts); Ex. A § 4.6 (forfeiture provision).
[11] *See* Compl. ¶ 35; *see also* Ex. A § 4.3 (governing forfeiture for employee "involuntarily terminated for Cause").
[12] *See, e.g.*, Compl. ¶ 82 (alleging breach "by failing to fully vest Plaintiffs in their plan benefits" per ERISA's "mandatory minimum vesting schedules"); *id.* ¶ 83 (alleging breach by "purporting to forfeit" plaintiffs' accounts).
[13] *See Goldstein v. Johnson & Johnson*, 251 F.3d 433, 443 (3d Cir. 2001) ("[I]t is well established in the caselaw that there is no cause of action for breach of fiduciary duty involving a top hat plan."); *Opus Bank v. Axis Ins. Co.*, 2015 WL 12656942, at *4-5 (C.D. Cal. Oct. 29, 2015) ("[T]he absence of fiduciary responsibility with respect to top-hat plans means that administrators of those plans are not fiduciaries under ERISA."); *cf. In re Luna*, 406 F.3d 1192, 1208 (10th Cir. 2005) (finding someone was "subject to fiduciary liability without notice" would "not only be unfair, but it would also disserve a core purpose of ERISA, which is to create a system whereby accountable fiduciaries are motivated by their accountability to protect the interests of participants") (quotations omitted).

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 60615-1596
+1.312.324.1000

*Second*, even if Section 502(a)(2) authorized the Court to retroactively impose ERISA's fiduciary standards upon individuals who in good faith believed they *did not* apply, plaintiffs challenge non-fiduciary conduct and name no defendant who acted as a fiduciary with respect to the supposed "breaches." *See* 29 U.S.C. § 1002(21)(A); *Pegram v. Herdich*, 530 U.S. 211, 225-26 (2000). It is well-settled that employers "are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate [ERISA] . . . plans. When employers undertake those actions, they do not act as fiduciaries, but are analogous to the settlors of a trust." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 443 (1999) (quoting *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996)). Count III challenges "decision[s] regarding the *form or structure of the Plan* such as *who is entitled to receive Plan benefits* and in what amounts, or how such benefits are calculated"—conduct by which "ERISA's fiduciary duty requirement simply is not implicated." *Id.* at 444 (emphases added). Here, RBC established and amended the WAP's terms and modified its eligibility requirements—indisputably decisions about "who [was] entitled to receive Plan benefits and in what amounts." *Id.* at 444-45. These are not fiduciary actions.[14]

*Third*, plaintiffs seek damages unavailable under Sections 409(a) and 502(a)(2). *See* Compl. ¶¶ 76, 86. A fiduciary may be held personally liable "to make good *to such plan* any losses *to the plan* resulting from such breach, and to restore *to such plan* any profits of such fiduciary which have been made through use of *assets of the plan* by the fiduciary." 29 U.S.C. § 1109(a) (emphases added). Section 502(a)(2) is thus "concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan, rather than with the rights of an individual," and does not authorize individual damages. *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 (1985).[15] Rather, plaintiffs "must allege that the fiduciary injured the benefit plan or otherwise jeopardize[d] the entire plan or put at risk plan assets." *Wise v. Verizon Commc'ns, Inc.*, 600 F.3d 1180, 1189-90 (9th Cir. 2010).

---

[14] These quintessential settlor actions are fundamentally different than the WAP Committee's forfeiture of plaintiffs' benefits, their true grievance here. Indeed, the WAP states that "[t]he Plan will be administered by the Committee" and delegates to the Committee responsibility for resolving claims. Ex. A § 7.1. The Complaint, however, does not name the Committee or any individual member, while RBC expressly delegated this authority. *Id.*

[15] *See also Moyle*, 823 F.3d at 961 ("The *Varity* court found that § 1109(a) provided relief only for benefit plans and not individuals[.]") (citing *Varity Corp. v. Howe*, 516 U.S. 489, 508-09 (1996)).

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
PAGE 11

Morgan, Lewis & Bockius LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 60615-1596
+1.312.324.1000

Plaintiffs do not allege any "losses to the [WAP]" as a whole or that any breach "put at risk plan assets." Nor can they: the WAP *had no assets*, as it was an unfunded plan in which they were unsecured creditors. *Infra* at 20. In fact, the Complaint confirms that what plaintiffs really seek are individualized awards resulting from their own forfeitures.[16] This is precisely the sort of individualized injury not remediable by Section 502(a)(2). *See Russell*, 473 U.S. at 138.

Plaintiffs are not left without recourse, even if the Court finds they have a viable fiduciary breach claim. But they must proceed under the proper enforcement provision: Section 502(a)(3), not Section 502(a)(2). Summary judgment therefore is appropriate on Count III.

### 3. Plaintiffs Do Not Seek "Appropriate Equitable Relief" Under Section 502(a)(3)—And The Relief That May Be Available Would Not Help Them.

If plaintiffs are to recover under ERISA, therefore, it must be authorized by Section 502(a)(3), 29 U.S.C. § 1132(a)(3). *See* Compl. ¶¶ 87-89 (Count IV). That provision authorizes a civil action to "(A) enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter[.]" 29 U.S.C. § 1132(a)(3).

Both the Supreme Court and Ninth Circuit are clear that "Congress intended to limit the relief available under § 1132(a)(3) to those categories of relief that were *typically* available in equity (such as injunction, mandamus, and restitution), but not compensatory damages, and did not authorize any legal remedies[.]" *Gabriel*, 773 F.3d at 954 (quotations omitted). "Money damages are, of course, the classic form of *legal* relief," *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993), and a plaintiff thus cannot "disguise an attempt to obtain monetary relief as a traditional equitable remedy," *Gabriel*, 773 F.3d at 954; *Bilyeu v. Morgan Stanley Long Term Disability Plan*, 683 F.3d 1083, 1094 (9th Cir. 2012) (requesting that a party "pay money out of her general assets" is "quintessentially legal, rather than equitable relief").

---

[16] *See, e.g.*, Compl. ¶ 82 (alleging breach "by failing *to fully vest Plaintiffs* in their plan benefits"); *id.* ¶ 83 (alleging breach "by purporting to forfeit [certain of] Paul's . . . and Buskirk's" WAP accounts); *id.* Prayer ¶¶ C-F (seeking order directing RBC "to pay over *to Paul*" and "*to Buskirk*" all forfeitures and "[a]warding *Paul*" and "*Buskirk* all *damages* resulting from" RBC's "forfeiture of Paul's" and "of Buskirk's" forfeited amounts) (emphases added).

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

Count IV is flawed for two reasons: (1) the relief plaintiffs do seek is not available; and (2) other potential equitable relief would not result in any monetary damages *to them*.

### a. Section 502(a)(3) Does Not Authorize The Relief Requested.

Count IV seeks only an injunction under Section 502(a)(3)(A), saying nothing about "appropriate equitable relief" under Section 502(a)(3)(B). Compl ¶ 89. Specifically, plaintiffs ask the Court to (1) "enjoin Defendants from failing to fully vest Paul . . . and from failing to fully vest Buskirk" in the amounts forfeited, and (2) issue "an injunction to prevent Defendants' further refusal to pay Plaintiffs all WAP benefits due." *Id.* This type of negative injunction—asking the Court to "prevent" RBC from *not paying* money owed (*i.e.*, requiring RBC to pay)—is a classic example of legal damages under the guise of an equitable remedy. The Supreme Court offered a similar example: "'an injunction to compel the payment of money past due under a contract, or specific performance of a past due monetary obligation, was not typically available in equity,' and thus not available under § 1132(a)(3)." *Gabriel*, 773 F.3d at 954 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210-11 (2002)).[17]

The only other relief plaintiffs identify that arguably constitutes "equitable relief" is "a constructive trust on the assets of any Defendant." Compl., Prayer ¶ H. Courts repeatedly hold, however, that such a constructive trust is not available where, as here, plaintiffs can identify no specific funds in the defendant's possession to which they are entitled.[18] As such, "the unfunded nature of top hat plans prevents the imposition of a constructive trust, since deferred compensation to be paid pursuant to such plans cannot be 'identified' as belonging to the plan participants." *Hill v. Opus Corp.*, 464 B.R. 361, 391 (C.D. Cal. 2011); *see also In re Wash. Mut., Inc.*, 450 B.R. 490, 504 (D. Del. 2011). Plaintiffs identify no other mechanism for obtaining a monetary award here. As such, they have "not advanced a specific theory . . . [that]

---

[17] Plaintiffs' Complaint elsewhere does not even try to disguise the relief sought, requesting "all *damages* resulting from Defendants' purported forfeiture," which RBC must "pay over to" them. Compl., Prayer ¶¶ C-F; *id.* ¶ 1.

[18] *See Amara*, 563 U.S. at 439 ("[T]raditionally speaking, relief that sought a lien or a constructive trust was legal relief, not equitable relief, unless the funds in question were *particular* funds or property in the defendant's possession."); *Knudson*, 534 U.S. at 213-14 (where "the property sought to be recovered or its proceeds have been dissipated so that no product remains, the plaintiff's claim is only *that of a general creditor*, and the plaintiff cannot enforce a constructive trust of or an equitable lien upon other property of the defendant") (emphasis added).

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

falls within a traditional form of equitable relief," *Bilyeu*, 683 F.3d at 1097 n.7, and the Court should not go looking for one for them.

> **b.** **Equitable Reformation Of The WAP Would Not Benefit Plaintiffs.**

This is not to say that ERISA leaves a participant in a plan that fails to meet the top hat exemption with no remedy at all. Plaintiffs' problem, however, is that "*appropriate* equitable relief" would not grant *them* the monetary damages they seek. If the Court finds a violation of ERISA, one possible form of "appropriate equitable relief" may be to reform the WAP. *See Amara*, 563 U.S. at 441 ("The power to reform contracts (as contrasted with the power to enforce contracts as written) is a traditional power of an equity court, not a court of law[.]"); *Skinner v. Northrop Grumman Ret. Plan B*, 673 F.3d 1162 (9th Cir. 2012). The Ninth Circuit is clear that whether evaluated under traditional principles of trust or contract law, "reformation is proper only in cases of fraud and mistake." *Id.* at 1166-67; *see also Gabriel*, 773 F.3d at 955. Plaintiffs do not allege anything akin to fraud, meaning that route is foreclosed.

Plaintiffs, then, must establish a "mistake" that would have allowed reformation of the WAP in a traditional court of equity. Under trust law principles, "a court may reform a trust instrument *to accord with the settlor's intent* if there is evidence that a mistake of fact or law affected the terms of the instrument and if there is evidence *of the settlor's true intent*." *Skinner*, 673 F.3d at 1166 (emphases added). Similarly, under contract principles, "a court may reform a contract to reflect *the true intent of the parties* if *both parties* were mistaken about the content or effect of the contract. The court may reform the contract to capture the terms *upon which the parties had a meeting of the minds*." *Id.* (citations omitted) (emphases added). Thus, under either approach, a plaintiff seeking equitable reformation must demonstrate "that [the plan] contains terms that fail to reflect [the] drafter's true intent." *Id.*[19]

Here, nothing suggests that the WAP fails to reflect precisely what RBC intended it to provide. To the contrary, the WAP itself establishes RBC's "true intent" that it would be an

---

[19] *See also Gabriel*, 773 F.3d at 955; Radford, Mary F. & Bogert, George G. et al., *The Law of Trusts & Trustees* § 991 ("The Court may reform the terms of a trust, even if unambiguous, to conform the terms *to the settlor's intention* if it is proved by clear and convincing evidence that both *the settlor's intent* and the terms of the trust were affected by a mistake of fact or law, whether in expression or inducement.") (emphases added).

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

unfunded top hat plan free from ERISA's restrictions. *Supra* at 3-4, 20. Indeed, it was this very design that allowed RBC to offer plaintiffs such valuable benefits in the first place and why it served as an effective retention device. Nor can plaintiffs legitimately contend *they* had any expectation that the WAP was subject to ERISA's funding, vesting, and other provisions, as RBC expressly told them the WAP was an unfunded plan *exempt* from these terms. As such, "reforming" the WAP by simply superimposing ERISA's provisions onto a Plan expressly intended to be exempt from ERISA would not align the WAP with *either* RBC's "true intent" *or* the parties' mutual understanding; in fact, it would contradict both.

However, if a violation existed, there is an equitable way to reform the WAP to conform to *both* RBC's intent *and* the parties' "meeting of the minds": limit the WAP to an appropriately "select" group. If any "mistake" resulted in the ERISA violation alleged, it must have been the understanding that the WAP was selective enough to qualify as a top hat plan. The logical recourse for *that* "mistake" is not to effectively blow up the Plan as it was designed and operated for more than a decade by engrafting terms that no party ever intended would apply, but rather to match the Plan to RBC's intention, and the parties' understanding, that it was a top hat plan.

Not only would this align the remedy to the parties' understanding, as Ninth Circuit law requires, but it would more equitably tailor the relief to the actual violation. Congress allowed the top hat exemption because it considered highly compensated employees capable of protecting their own interests, meaning ERISA's safeguards are unnecessary. *Infra* at 23. For all other employees, federal regulation was needed to ensure adequate protection of their benefits. *Id.* Thus, by the statute's plain language and underlying policy, the only individuals who might be harmed by an over-inclusive top hat plan are those who *should not* have been eligible.

Here, appropriate reformation of the WAP would not result in damages to plaintiffs. Under any reasonable formulation, both Paul and Buskirk were "highly compensated" RBC employees. *Supra* at 7. They do not allege otherwise, but instead piggyback on other employees they now claim should not have received the same generous WAP benefits they did. But ERISA was not designed to grant such a windfall; after all, "the concept of fairness [is] the paramount

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
PAGE 15

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

principle of equity." *Bilyeu*, 683 F.3d at 1099 (Rawlinson, J., concurring in part, dissenting in part). Because plaintiffs would fall outside any group of employees for whom equitable reformation might provide relief, the Court should grant summary judgment on Count IV.

**B.     Plaintiffs' Claims Are Untimely.**[20]

    **1.     RBC Expressly Repudiated The Rights Plaintiffs Now Seek To Enforce Under ERISA Section 502(a)(1)(B) and (a)(3) (Counts I, II, and IV).**

ERISA does not establish a specific limitations period for claims under Sections 502(a)(1)(B) or (a)(3) (Counts I, II, and IV); rather, the Court applies the most analogous state statute of limitations. *See, e.g.*, *Chuck v. Hewlett Packard Co.*, 455 F.3d 1026, 1031 (9th Cir. 2006). Here, that statute is Washington's six-year limitations period for breach of contract claims. *See Wise*, 600 F.3d at 1187 (citing Wash. Rev. Code § 4.16.040).

An ERISA claim for benefits accrues when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the violation. *See, e.g.*, *Chuck*, 455 F.3d at 1032-33; *see also Thompson v. Ret. Plan for Emp.'s of S.C. Johnson & Son, Inc.*, 651 F.3d 600, 604 (7th Cir. 2011); *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010). Thus, such a claim accrues when a plan "communicates 'a clear and continuing repudiation' of a claimant's rights under a plan." *Chuck*, 455 F.3d at 1031-32 (quotations omitted).[21]

The analysis here is simple: plaintiffs claim their WAP awards were subject to ERISA's vesting, funding, and fiduciary requirements, while the WAP always stated directly that their benefits were subject to longer vesting periods, could be forfeited, and the WAP was a top hat plan "exempted from many ERISA requirements." Exs. M & N, 2003 & 2004 WAP §§ 4.2, 4.3, 4.5, 5.9. The WAP also clearly states it is an unfunded plan in which participants are general unsecured creditors—*i.e.*, no ERISA trust backstopped their benefits. *Id.* §§ 5.9, 8.2. Other

---

[20] Although plaintiffs filed their Complaint on July 11, 2016, RBC and each plaintiff entered into a tolling agreement covering the claims in this lawsuit (which were later amended and extended). Compl. ¶¶ 45 n.1, 58 n.2. Paul's agreement tolled the limitations period starting on February 19, 2013; Buskirk's did the same on November 5, 2013. Russell Decl. ¶ 24. Thus, the Court should consider these dates to be when each plaintiff "filed" his claims.

[21] *See also, e.g.*, *S.C. Johnson*, 651 F.3d at 604; *Miller v. Fortis Benefits Ins. Co.*, 475 F.3d 516, 520-21 (3d Cir. 2007) ("[A] *formal* denial is not required if there already was a repudiation of the benefits by the fiduciary which was *clear* and made known to the beneficiary."); *Carey v. Int'l Bhd. of Elec. Workers Local 363 Pension Plan*, 201 F.3d 44, 47-48 (2d Cir. 1999) (same).

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

communications reiterated these terms to plaintiffs over the years, including annual summaries, FC Compensation Plans, and WAP enrollment materials.[22] It is hard to conceive of a much clearer repudiation of the very rights to which plaintiffs now claim they were entitled all along.

Indeed, plaintiffs' testimony confirms they understood how the WAP operated, and they cannot avoid RBC's communications by purporting not to have read them.[23] In fact, Buskirk knew that if he chose to leave RBC, he would forfeit all unvested WAP amounts. Ex. E at 104-06, 137-38. According to him, "*most people already – always knew* [forfeiture] was there. And it was part of . . . . Part of the structure" of the WAP. *Id.* at 138-39 (emphasis added). Buskirk thus also "knew what was going to happen to [his] benefits" if he left, and he "knew . . . that [he] would lose what [he] lost" under WAP. *Id.* at 137-38 ("I knew what I was losing.").

A recent Fourth Circuit ruling, issued after the *Tolbert* summary judgment ruling, is instructive. In *Bond v. Marriott International*, like here, participants alleged that a compensation plan did not satisfy ERISA's top hat requirements and thus violated the statute's vesting provisions. 637 F. App'x 726, 728 (4th Cir. 2016). The Fourth Circuit held that plaintiffs' claims were untimely, finding Marriott's repeated statements in a prospectus and elsewhere that the plan was unfunded and designed to be a top hat plan *exempt* from ERISA's vesting, funding,

---

[22] For example, annual WAP summaries described the Plan as unfunded, noted that "all amounts" awarded by RBC were subject to vesting, and cautioned that awards "not vested at the participant's employment termination date will be forfeited." *See* Ex. O, 2003 WAP SPD at 2, 6-8; *see also* Ex. P, 2004 WAP Summary at 2, 4 (RBC awards are "subject to five-year cliff vesting. Match earned for 2004 will vest on January 1, 2010"); Ex. Q, 2005 WAP Summary at 2, 4 (same, "Match earned for 2005 will vest on January 1, 2011"). The annual FC Compensation Plan reiterated that RBC's awards would not "become fully vested" for five years ("a five-year cliff vesting period"), and directed employees to "[s]ee the [WAP] document for complete details." *See, e.g.*, Ex. R, 2006 Comp. Plan, at 7-10 ("The 2006 WAP productivity bonus and company matches are credited to your WAP account in February of 2007 and become fully vested five years later in January of 2012."). Eligible employees must enroll for the WAP each year they qualified. *See* Ex. S, Paul 2000 Enrollment; Ex. T, Buskirk 2000 Enrollment; Ex. U, 2006 Enrollment Form. Plaintiffs certified they read these forms, attesting they "agree that [their] deferred compensation shall be reflected only in unfunded accounts," their "rights under the plan will be no greater than the rights of any other general unsecured creditor," and "the terms and conditions of the plan . . . have been made available" and they "received a copy of, and read, the plan document for this plan, which governs [their] rights with respect to [their] deferred compensation." *Id.*; *see also* Ex. S; Ex. T. Plaintiffs agreed they received these or similar Plan communications while in the Plan. *See* Ex. E at 94, 111-12 (Buskirk recalled receiving SPDs, reading "at least some of them" in full, and skimming others to "kind of refresh [his] memory"); *id.* at 30, 80-81 (confirming he received annual FC Compensation Plans, which included "the parameters to participate in the [WAP]" and to which "[a]ll the brokers" had access); Ex. D at 35-40 (agreeing he signed his 2000 WAP enrollment form).

[23] *See, e.g.*, *In re Northrop Grumman Corp. ERISA Litig.*, 2015 WL 10433713, at *19-22 (C.D. Cal. Nov. 24, 2015) (plan disclosures and summaries established knowledge of alleged violation, as the proper mailing of documents raises presumption it was received and read, and ERISA does not allow avoiding knowledge by "willful blindness").

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

and fiduciary provisions "clearly informed plan participants that the [benefits] were not subject to ERISA's vesting requirements, the very claim" at issue. *Id.* at 729-30, 32. The facts here dictate the same result. RBC clearly repudiated the very rights plaintiffs now seek to enforce.

2. **Plaintiffs' Fiduciary Breach Claims Are Untimely Because They Knew Of The Purported Breaches More Than Three Years Before Filing Suit**.

For similar reasons, if the Court finds a viable claim for fiduciary breach under Section 502(a)(2), it is also time-barred because plaintiffs had "actual knowledge" more than three years before filing suit. 29 U.S.C. § 1113(2). Unlike claims under Sections 502(a)(1)(B) and (a)(3), a plaintiff must file a claim for fiduciary breach under Section 502(a)(2) within three years of "the *earliest* date on which [he] had actual knowledge of the breach or violation." *Id.* (emphasis added). Thus, "the earliest date of actual knowledge of a breach begins the limitations period, even if the breach continues. When a plaintiff has actual knowledge of a breach, § 1113(2) operates to keep her from sitting on her rights and allowing the series of related breaches to continue." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1196 (9th Cir. 2016) (citing *Phillips v. Alaska Hotel & Rest. Employees Pension Fund*, 944 F.2d 509, 520-21 (9th Cir. 1991)).

Falling within this provision means having "actual knowledge of the *underlying facts* giving rise to the alleged violation, not knowledge that the underlying facts violate[] ERISA, and knowledge of the consequences or effects of the alleged breach of fiduciary duty." *Moyle v. Liberty Mut. Ret. Benefit Plan*, 2016 WL 7242021, at *9-11 (S.D. Cal. Dec. 15, 2016) (emphasis added) (collecting cases).[24] Moreover, a plaintiff's actual knowledge of a breach need not coincide with when he or she actually suffered *harm*, which is "irrelevant except as the circumstances may shed light on when [plaintiff] gained actual knowledge of the alleged breach or violation." *Ziegler v. Conn. Gen. Life Ins. Co.*, 916 F.2d 548, 552 (9th Cir. 1990).

Here, the only true breach plaintiffs assert is that the WAP Committee enforced, rather than ignored, the Plan's written terms. *Supra* at 10. But plaintiffs were aware of the supposedly offending WAP provisions since they began participating in the WAP, and certainly by February

---

[24] *See also In re Northrop Grumman*, 2015 WL 10433713 at *19 (Section 1113(2) "is triggered by . . . knowledge of the transaction that constituted the alleged violation, not by their knowledge of the law") (quotations omitted).

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

2010. *Supra* at 17 & n.22.  They were not entitled to wait until RBC applied those provisions *to them*, knowing it was how the WAP operated all along.[25]

Nor can plaintiffs avoid this conclusion by re-framing the supposed breach as the WAP's failure to meet the top hat exemption.  Putting aside that decisions about WAP eligibility are not fiduciary conduct, *supra* at 11, plaintiffs confirmed they *never* believed the WAP was limited to a "select group of management or highly compensated employees."  Buskirk made clear he believed more than a "select group" of such employees, however defined, were eligible well before 2010.[26]  And Paul agreed the WAP was over-inclusive throughout his participation.[27]  Notably, both plaintiffs rely primarily on the fact that Paul's "assistant," Kim Taurman, was WAP-eligible despite not being a producing FC and, to their mind, not "highly compensated."  *See* Ex. D at 46-48; Ex. E at 115-16.  Ms. Taurman, however, was eligible only in *a single year*—2008—by virtue of earning more than $150,000 in 2007.  *See* Ex. 1, Russell Decl. ¶ 25.

Thus, by at least February 2010, plaintiffs knew everything necessary to challenge the WAP's top hat status.  In fact, aside from hiring an attorney, it is not clear what, if anything, plaintiffs knew about the WAP's top hat status in 2013 that they *did not* know in 2009 or before.  Rather than assert a claim at the "earliest date" they knew of the purported breach, they decided to reap the benefits of the purported "breach" until it no longer suited their own interests.

---

[25] *See Ziegler*, 916 F.3d at 550-52 (noting that "plaintiffs need not await actual injury," finding fiduciary breach claims accrued upon execution of an allegedly illegal contract, *not* when defendant actually distributed amounts under that contract, though plaintiff "could not accurately quantify its injury until" distribution).

[26] For example, Buskirk confirmed he knew the WAP's eligibility thresholds—which did not change for FCs from 2003 to 2008—and in his opinion, "the people that were highly compensated at RBC were the officers of the – firm and the managers."  Ex. E at 72; Ex. B ¶¶ 1-6.  Buskirk also purported to know all along that "there were thousands" of WAP participants, and "I don't know that you could say that was a select group."  *Id.* at 115, 122.

[27] For instance, Paul knew "there were people that qualified that weren't president's council, that weren't chairman's council, that weren't even brokers."  Ex. D at 46; *id.* at 49 (Paul believed the WAP was not limited to a select group "[b]ecause there w[ere] people that weren't president's council, weren't chairman's council, weren't managers[.]").  Paul further explained that although "chairman's council" employees *were* "highly compensated," he did not "believe president's council were, in my opinion of what a highly compensated person is."  *Id.* at 51; *see id.* at 52 ("[A] $300,000 level of production is not a significant level of production . . . . I didn't see $300,000 of production being a high performer, and so I guess I would not consider them highly compensated.").  But it is undisputed that the WAP has *never* been limited to the degree Paul now says it should have been.  Ex. B ¶¶ 1-10.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 60615-1596
+1.312.324.1000

**C.** **The WAP Was A Top-Hat Plan Exempt From Most Of ERISA's Requirements.**

Even if the court reaches the merits, the WAP qualified as a valid "top hat" plan. In creating this exemption, Congress recognized that certain employees, "unlike their rank-and-file counterparts, are capable of protecting their own pension interests." *Alexander v. Brigham & Women's Physicians Org., Inc.*, 513 F.3d 37, 43 (1st Cir. 2008). To qualify, a plan must be: (1) "unfunded," and (2) "maintained primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a). The undisputed facts confirm the WAP qualified here.

**1.** **The WAP Was Unfunded.**

Plaintiffs concede the WAP was "unfunded." Compl. ¶¶ 72-74 (alleging the WAP "must be funded"); *id.* ¶ 85 (alleging WAP assets were not "held in trust"). This conclusion is unavoidable, as the WAP states that participants "are general unsecured creditors"; they do "not have any secured or preferred interest" in specific assets; the WAP "does not require that any hypothetical investments under this Plan be funded"; and any assets RBC may earmark for the WAP remain "subject to the claims of [RBC's] general creditors[.]" Ex. A § 8.2. Consistent with these terms, RBC did not establish any trust or *res* separate from its general assets.[28] These facts establish the WAP's "unfunded" status.[29]

**2.** **The WAP Was Maintained For The Primary Benefit Of A Select Group Of Highly Compensated Employees.**

To assess this requirement, courts evaluate a series of both "qualitative and quantitative" factors. *See Daft v. Advest, Inc.*, 658 F.3d 583, 595 (6th Cir. 2011); *Callan v. Merrill Lynch & Co.*, 2010 WL 3452371, (S.D. Cal. Aug. 30, 2010) at *10 (outlining similar four-factor test, and citing *Duggan*, 99 F.3d at 310-11). First, the "select group" component requires a *quantitative* analysis of the percentage of the plan sponsor's total workforce eligible to participate. *Id.* Second, the "management or highly compensated employees" component requires a *qualitative* analysis of the eligible employees' duties (for "management"), *or* their compensation relative to

---

[28] *See* Ex. J at 26-27 (explaining the WAP was an "unfunded plan" with "no assets that back up [WAP] accounts").
[29] *See, e.g., In re ComUnity Lending, Inc.*, 399 F. App'x 242, 243 (9th Cir. 2010)*; Duggan v. Hobbs*, 1995 WL 150535, at *3 (N.D. Cal. Mar. 28, 1995), *aff'd by* 99 F.3d 307 (9th Cir. 1996).

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 60606-1596
+1.312.324.1000

other employees in the workforce (for "highly compensated").  *See id.* at *9-11; *Daft*, 658 F.3d at 595; *Alexander*, 513 F.3d at 43.  Finally, courts consider as another *qualitative* factor the plan's language to ensure it is consistent with ERISA's top hat requirements.  *See, e.g.*, *Callan*, 2010 WL 3452371 at *12; *Daft*, 658 F.3d at 595.

### a. Only A Fraction Of RBC's Total Workforce Qualified For The WAP.

There is no reasonable dispute that the WAP was sufficiently "select."  The WAP's sponsor is the Royal Bank, and employees of it and its subsidiaries may be eligible.  Compl. ¶¶ 16, 22; Ex. A § 1.1; Ex. B ¶ 10.  Between 2004 and 2011, only 2.0% to 3.4% of all RBC employees were eligible, with an average of 2.8%.  Ex. I ¶ 15.  These percentages—which plaintiffs' expert *does not* refute—are far below any arguable threshold for ERISA's "selectivity" requirement.  *Callan*, 2010 WL 3452371 at *10 ("[P]lans that limit participation to 15% or less of the workforce have consistently been treated as top hat plans.").[30]

The district court's denial of summary judgment in *Tolbert* does not counsel otherwise.  *See* 2015 WL 2138200.  There, the parties "disagree[d] as to the relevant numbers," particularly which "workforce" applied.  *Id.* at *9.  But there can be no debate here: unlike in *Tolbert*, plaintiffs concede the Royal Bank was the WAP's sponsor, Compl. ¶¶ 16, 22, name it as a *defendant* facing potential liability to them, stipulate "that any employee 'of an Employer' may become eligible," Ex. B ¶ 10, and cannot dispute that at least 275 employees of the Royal Bank (as opposed to U.S. subsidiaries) actually were eligible, *supra* at n.3.  As such, the only relevant "number" here is RBC's total workforce.[31]  Yet plaintiffs do not even *address* that data, offering nothing to refute the facts establishing the WAP was sufficiently "select" as a matter of law.

---

[30] *Compare Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 288-89 (2d Cir. 2000) (15.34% is within "the acceptable size for a 'select group'"); *and Alexander*, 513 F.3d at 44 (plan for up to 8.7% of employees was sufficiently select); *with Darden v. Nationwide Mut. Ins. Co.*, 717 F. Supp. 388, 397 (E.D.N.C. 1989) (plan not sufficiently "select" where 18.7% of plan sponsor employees were eligible over four-year period), *aff'd* 922 F.2d 203 (4th Cir. 1991), *rev'd on other grounds* 503 U.S. 318 (1992).

[31] *See, e.g.*, *Callan*, 2010 WL 3452371 at *10 (evaluating percentage of "Merrill Lynch's total workforce" eligible for compensation plan for financial advisors); *see also Alexander*, 513 F.3d at 40-41, 46 (comparing eligible surgeons to hospital system's "overall employee population"); *Duggan*, 99 F.3d at 312 (evaluating "employer's entire work force"); *Sikora v. UPMC*, 153 F. Supp. 3d 820, 824-25 (W.D. Pa. 2015) (the "proper inquiry" is the "total workforce"), *aff'd by* 876 F.3d 110, 113 (3d Cir. 2017) (evaluating "the entire [employer] workforce").

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 60615-1596
+1.312.324.1000

### b. The WAP Primarily Benefits Highly Compensated Employees.

To assess whether a plan was offered primarily for the benefit of "highly compensated" employees, courts typically evaluate the compensation disparity between eligible employees and either (i) the plan sponsor's total workforce (*i.e.*, including eligible employees), or (ii) all non-eligible employees.[32] A plan typically meets the "highly compensated" requirement where eligible employees' compensation exceeds that of either group by at least double or more.[33]

As outlined above, the average compensation of WAP-eligible employees was between *4.5 and 6.3 times* higher than all RBC employees, and *5.2 and 7.6 times* more than non-eligible employees. Ex. I ¶ 23 & Ex. 5A. Plaintiffs' expert again offers no calculations regarding the total Plan-sponsor workforce, meaning these figures are undisputed.

Further, plaintiffs cannot reasonably dispute *they* were "highly compensated." As noted, Paul averaged around $1.15 million annually and earned between *13 and 22 times* more than the average RBC employee. *Supra* at 7. Likewise, Buskirk was in the top 3% to 5% of RBC earners each year, and the discrepancy between his compensation and that of the average RBC employee was significantly above the multiples required for a valid top hat plan. *Supra* at 8.

### 3. The WAP's Plain Language And Primary Purpose Support Top-Hat Status.

The "actual language of the plan" and other evidence of RBC's objectives in establishing the Plan also are consistent with the top hat requirements. *See Daft*, 658 F.3d at 595; *Callan*, 2010 WL 3452371 at *10. The WAP's plain language indisputably reflects its intent to establish a top hat plan—it states this expressly. Ex. A § 1.1, 5.10, 8.2. And other evidence demonstrates the WAP's purpose was consistent with the purpose underlying the top hat exemption.[34]

In sum, the undisputed facts demonstrate that the WAP satisfied *all* of the qualitative and quantitative factors courts typically consider in evaluating ERISA's top hat exemption.

---

[32] *Compare Demery*, 216 F.3d at 289 (comparing to all employees), *with Daft*, 658 F.3d at 595 (comparing "top hat plan members and non-members"), *and Callan*, 2010 WL 3452371 at *11 (applying both but endorsing the latter).
[33] *See, e.g.*, *Demery*, 216 F.3d at 289; *Callan*, 2010 WL 3452371 at *11.
[34] For example, the WAP was offered in addition to RBC's 401(k) plan, and it indisputably was established to retain valuable employees, both facts favoring top-hat status. *See, e.g.*, *Demery*, 216 F.3d at 287 (fact that plan was "supplemental to [employer's] pension plan, and not a substitute for it," and established "to retain valuable employees" supported top hat status); *Alexander*, 513 F.3d at 40 (plans created to help "recruit and retain top-flight surgeons" were top hat plans); *Callan*, 2010 WL 3452371 at *10.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 60615-1596
+1.312.324.1000

### 4. Although No "Substantial Influence" Element Is Required, WAP Participants Had Such Influence Over The Plan.

Plaintiffs allege that the Court should impose an additional prerequisite for top-hat status: that participants had enough bargaining power "to be able to exert substantial influence over the design or operation" of the WAP. Compl. ¶ 65. This position is incorrect legally and factually.

*First*, ERISA contains no "substantial influence" element as part of the top-hat analysis. To the contrary, by the statute's plain terms, an "unfunded" plan offered to a "select group" of "highly compensated" employees is a top hat plan, without more. *See* 29 U.S.C. §§ 1101(a)(1).

Plaintiffs cite a 27-year-old DOL opinion letter (Compl. ¶ 65) that noted the agency's "view" that, in enacting ERISA's top hat exemptions, "Congress recognized that certain individuals, *by virtue of their position or compensation level*, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan[.]" DOL Op. Ltr. 90-14A (May 8, 1990) (emphasis added). However, the DOL letter "speaks only to Congress's rationale for enacting the top-hat provision"—*i.e.*, offers "a gloss on Congress's intentions"—but does not impose an additional requirement that a participant must have some abstract threshold of bargaining power. *Alexander*, 513 F.3d at 47 (declining to "depart from the plain language of the statute and jerry-build onto it a requirement of individual bargaining power"); *see also Sikora*, 876 F.3d at 115-16. Rather, ERISA's existing requirement of a "select group of management or highly compensated employees" already acts as the proxy for employees with sufficient "influence."[35]

Nothing in *Duggan v. Hobbs* holds to the contrary. *See* Compl. ¶ 65. The "plan" at issue in that case was a severance agreement with a single, indisputably "highly compensated" employee, negotiated by his attorney amidst a dispute over commissions. 99 F.3d at 310. After first noting that the DOL letter set forth "the *policy underlying* the top-hat exception," *id.* at 310 (emphases added), the court went on to consider evidence of the plaintiff's influence over his agreement only *after* evaluating whether its coverage was "limited to a small percentage of the employer's entire work force," *id.* at 312. And there was no question that plaintiff *did* bargain

---

[35] *See, e.g.*, *Sikora*, 876 F.3d at 116 ("Congress felt justified in including the top-hat plan provisions in ERISA, at least in part *because* individuals in positions such as [plaintiff's] may influence their plans.) (emphasis in original).

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 60615-1596
+1.312.324.1000

over his agreement, and he was "the only employee ever to receive retirement benefits" from the employer. *Id.* at 312-13. At most, *Duggan* suggests only that evidence of direct negotiations might *bolster* the case for a top hat plan, not that it is an additional statutory prerequisite.[36]

Thus, although some courts have considered the DOL's letter, *none* has held that "when an otherwise valid top-hat plan is offered to a 'select group of management or highly compensated employees,' that plan will lose its exempt status if any one of the covered employees lacks individual bargaining power." *Alexander*, 513 F.3d at 46, 48 n.9.

*Second*, even if the Court were inclined to consider this factor, WAP participants could—and repeatedly did—"affect or substantially influence" the WAP. The undisputed facts above illustrate that participants not only had the clout needed to impact the WAP, but in fact *used* that influence to effectuate changes over time. *Supra* at 6-8. And plaintiffs' departures underscore why they could: Paul was recruited by RBC's competitors, offered a sign-on bonus of anywhere from $2 million to $6 million (more than enough to offset WAP forfeitures from RBC), went "independent," and then recruited four RBC employees to join him. *Id.* Buskirk was one of those employees, took nearly all of his clients with him, and—*knowing* he would forfeit unvested WAP benefits—calculated that it was still worth his while to leave. *Id.* This reflects precisely the type of "influence" underpinning ERISA's top hat exemption. *See Alexander*, 513 F.3d at 41 (noting "standard corporate governance and decisionmaking mechanisms stood available" for changing plan, and employer responded to employee feedback).

## IV.   CONCLUSION

For the above reasons, the Court should grant summary judgment to RBC on all claims.

---

[36] Several courts, including from within the Ninth Circuit, have since agreed *Duggan* did not impose a new element for the top hat exemption. *See Sikora*, 153 F. Supp. 3d at 827-28 ("It is plain that there has not been one federal court that has applied 'bargaining power' as an element in determining whether a deferred compensation plan is a top hat plan that is exempt from ERISA coverage. This Court declines to be the first."), *aff'd by* 876 F.3d at 116; *Alexander*, 513 F.3d at 47, 48 n.9; *Callan*, 2010 WL 3452371 at *10 (noting that "[n]either the Ninth Circuit nor any court sitting in the Ninth Circuit has clarified" what test applies, but finding *Duggan* endorsed "a similar analysis" to a "four-part test set forth by the Sixth Circuit in *Bakri v. Venture Mfg. Co.*, 473 F.3d 677, 680 (6th Cir. 2007)"— which applied the same factors RBC outlined above, but *not* a distinct "substantial influence" element).

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

DATED: January 11, 2018                    Respectfully submitted,


                                           By: /s/ Matthew A. Russell
                                               Matthew A. Russell

                                               Sari M. Alamuddin (*admitted pro hac vice*)
                                                   sari.alamuddin@morganlewis.com
                                               Christopher J. Boran (*admitted pro hac vice*)
                                                   christopher.boran@morganlewis.com
                                               Matthew A. Russell (*admitted pro hac vice*)
                                                   matthew.russell@morganlewis.com
                                               MORGAN, LEWIS & BOCKIUS LLP
                                               77 West Wacker Drive, 5th Floor
                                               Chicago, Illinois 60601
                                               312.324.1000 (Telephone)
                                               312.323.1001 (Facsimile)

                                               Kevin J. Hamilton (WSBA #15648)
                                               William B. Stafford (WSBA #39849)
                                               Perkins Coie LLP
                                               1201 Third Avenue, Suite 4900
                                               Seattle, WA 98101-3099
                                               206.359.8000 (Telephone)
                                               206.359.9000 (Facsimile)

                                               *Attorneys for Defendants*

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 11, 2018, I electronically filed the foregoing Defendants' Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

 /s/ *Matthew A. Russell*
Matthew A. Russell

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000