UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MARTY PAUL, an individual; and BRIAN BUSKIRK, an individual, | No. 3:16-cv-05616-RBL |
| Plaintiffs, | **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | NOTE ON MOTION CALENDAR: February 2, 2018 |
| RBC CAPITAL MARKETS, LLC, a Minnesota limited liability company; ROYAL BANK OF CANADA, a Canadian corporation; and ROYAL BANK OF CANADA US WEALTH ACCUMULATION PLAN, an employee benefit plan, | **ORAL ARGUMENT REQUESTED** |
| | REDACTED |
| Defendants. | |

YARMUTH WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

# I.    INTRODUCTION AND RELIEF REQUESTED

Defendants RBC Capital Markets, Royal Bank of Canada, and Royal Bank of Canada US Wealth Accumulation Plan (collectively, "RBC" or "Defendants") deprived Marty Paul and Brian Buskirk ("Plaintiffs") of millions of dollars of compensation they had earned and deferred to the Royal Bank of Canada US Wealth Accumulation Plan (the "WAP").  Those purported forfeitures violate various provisions of the Employee Retirement Income Security Act ("ERISA").  29 U.S.C. §§ 1053(a)(1), 1053(a)(2)(B).  Defendants contend that the forfeitures were permissible because the WAP is not an ERISA-covered "employee pension benefit plan," and even if it was, it would be a "top hat" plan, a rare form of pension benefit plan that is exempt from many of ERISA's substantive requirements based on Congress's determination that eligible employees, who are supposed to be limited to the employer's highest echelons, have such strength in bargaining that they do not need ERISA's protections.  *See* 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1).[1]

As shown by this motion, the WAP was not a top hat plan, which ERISA defines as "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees."  29 U.S.C. § 1101(a)(1).  When considering whether a pension plan achieves this vaunted status, courts look to various factors to determine whether eligible employees had sufficient bargaining power, whether the plan was sufficiently selective, and whether all eligible employees were either management-level or sufficiently highly compensated.

With respect to the WAP, there is no question that participants lacked bargaining power, as RBC's U.S. Deferred Compensation Plan Manager Gabriela Sikich has admitted that no WAP participant has ever successfully negotiated the terms of the WAP.

---

[1] The parties addressed whether the WAP is an "employee pension benefit plan" under ERISA in previously filed motions for summary judgment.  *See* Dkt. Nos. 24, 26, 28 and 29.  For the purposes of this motion, Plaintiffs assume the Court will determine the WAP to have been an "employee pension benefit plan" under ERISA, either on Plaintiffs' summary judgment motion or at trial.



Declaration of Elizabeth S. Weinstein ("Weinstein Decl."), Ex. 1 ("Sikich 7/11/17 Dep.") 201:19-23; *see also* Weinstein Decl., Ex. 2 ("Sikich 9/8/11 Dep.") 156:5-20.[2]

Courts also consider the percentage of employees who are eligible to participate in what must be a highly selective plan. No court has found a plan to be sufficiently selective when more than 16% of the workforce was eligible to participate, and many courts have found plans covering *far smaller* percentages of the workforce to be insufficiently selective. Here, more than 16% of RBC's applicable workforce was eligible in four of the seven years relevant to Plaintiffs' claims.[3] That percentage reached as high as 22.7% for 2007 and exceeded 20% for three consecutive years. In *all* relevant years the percentage of the workforce eligible to participate was comfortably in double digits.

Additionally, to qualify for top hat status a plan's eligible employees must be either management-level or highly compensated. Here the vast majority of employees eligible to participate in the WAP were not management-level, and a significant number of the non-management employees were also not highly compensated. Indeed, in many years a substantial number of WAP-eligible employees earned *less than* the average compensation of RBC's workforce as a whole.

As early as 2006 RBC knew the "top hat" status of the WAP was tenuous at best. However, RBC knowingly risked exemption status so as not to adversely affect recruitment and retention of its financial consultants. Only after the financial downturn in 2008 did RBC belatedly take action to meaningfully tighten WAP eligibility. Beginning in 2009, RBC raised the compensation threshold for non-producers, but delayed tightening the

---

[2] Both of RBC's disclosed fact witnesses in this case, Gabriela Sikich and Tammy Buchert (RBC's former Manager of Financial Compensation Planning) previously were deposed in the *Tolbert* case. In depositions in this case, both Sikich and Buchert confirmed that they "testified truthfully and accurately" in the *Tolbert* depositions. Sikich 7/11/17 Dep. 17:3-5; Weinstein Decl. Ex. 4 ("Buchert 7/12/17 Dep.") 16:11-13.

[3] The relevant years are 2005 (the earliest year for which Mr. Paul's WAP contributions were forfeited by RBC) to 2012 (the last year Mr. Buskirk participated in the WAP). *See* Pls.' Mot. for Part. Summ. J. (Dkt. No. 26).



production-based eligibility threshold for RBC's financial consultants ("FCs") until 2010. Later, in 2012, likely recognizing that the WAP's alleged top hat status had been irreversibly lost due to years of lax eligibility requirements, RBC froze and discontinued the WAP, replacing it with a "New WAP" that likely met the top hat standards by imposing enormously tightened eligibility requirements.

By this motion, Plaintiffs seek a declaration that the WAP does not meet the stringent requirements to qualify for the top hat exemption and is therefore subject to all ERISA requirements, including, without limitation, those provisions relating to vesting, funding, fiduciary obligations, notice, and reporting. Because the WAP failed to meet the top hat exemption, RBC's forfeitures of Plaintiffs' WAP contributions violate ERISA's mandatory minimum vesting and anti-forfeiture provisions and were therefore unlawful. If the Court grants Plaintiffs' motions on the "pension plan" and "top hat" issues, all that will be left for trial is determination of the damages to which Plaintiffs are entitled due to Defendants' illegal conduct.

## II.    FACTS

Plaintiffs' previously filed Motion for Partial Summary Judgment describes the general operation of the WAP and Plaintiffs' participation in it. *See* Motion for Partial Summary Judgment (Dkt. No. 26) at 2-6.

### A. RBC's Two-Tiered WAP Eligibility System Resulted In Ever Increasing Numbers Of WAP-Eligible Employees Through 2008.

RBC determined WAP-eligibility one of two ways. Participants must *either* have met a certain compensation threshold *or*, if they were Financial Consultants ("FCs"), have met a certain "production" threshold. *See* Weinstein Decl., Ex. 6. Production is the revenue generated for RBC by an FC, *i.e.*, "fees and commissions a client pays to RBC," and does not directly correlate to compensation. Buchert 7/12/17 Dep. 43:11-13; Weinstein Decl., Ex. 5 ("Buchert 10/27/11 Dep.") 261:2-18; 226:3-10; 229:10-14. As a result of this two-tiered eligibility system, FCs—who RBC does not consider management-level



YARMUTH WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

employees—could become WAP-eligible based on production, even if they earned compensation well below the compensation-based eligibility threshold. Weinstein Decl., Ex. 3 ("Sikich 9/28/10 Dep.") 16:7-11; *see also* Weinstein Decl., Ex. 6. For instance, in 2007, a $300,000 producer could earn as little as $109,000, and possibly less. Buchert 7/12/17 Dep. 122:13-123:5; Sikich 7/11/17 Dep. 166:24-25.

From the years 2003 through 2008, the compensation threshold for the WAP was $150,000; the production threshold remained at $300,000 from 2003 through 2009. Weinstein Decl., Ex. 6 at ¶¶ 1-7. In other words, a "non-producer" had to earn $150,000 in compensation to be eligible for the WAP, while a "producer (most commonly an FC) would be eligible if she produced $300,000 in revenue to RBC, irrespective of her actual compensation.

From 2003 through 2009, the number of WAP-eligible employees grew tremendously, from 1,279 employees to 2,689 employees. Declaration of Saul Solomon in Support of Plaintiff's Motion for Partial Summary Judgment ("Solomon Decl."), Ex. 1 ("Solomon Report") at ¶ 34. WAP-eligible employees comprised only 6.3% of RBC's total workforce in 2003, but skyrocketed above 20% in 2006 and above 22% in 2007 and 2008. *Id.* On average, eligible FCs earned substantially less than non-FC eligible employees during that same period. *See id.* at ¶¶ 57-63 & Tables 1.7 and 1.8 (the average compensation of non-FC WAP-eligible employees for the years 2004 to 2008 ranged from $388,683 to $497,093; the average compensation of FC WAP-eligible employees for that same period ranged from $203,851 to $237,572). Even more telling, the average compensation of WAP-eligible employees whose compensation did not meet the compensation threshold was *lower* than the average compensation for all RBC employees since 2006. *See id.* at ¶ 67 & Table 1.8B.

YARMUTH WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

**B. As Early As 2006, RBC Knew It Had A Top Hat Problem, Yet Delayed Action.**

In 2006, RBC's U.S. Deferred Compensation Plan Manager expressed significant concerns based on outside legal counsel's advice that the compensation threshold for WAP eligibility should be raised from $150,000 to $250,000, warning that "further analysis [was] required to provide a defendable position that plan participation is only reserved for 'a selected group of management or highly compensated employees.'" Weinstein Decl., Ex. 7 at 17; *see also* Sikich 7/11/17 Dep. 138:23-140:19. ████████████████████

██████████████████████████████████████████████

████████████████████████ ; Ex. 7 at 17; *see also* Sikich 7/11/17 Dep. 143:15-144:20 (raising eligibility requirements "would be a negative impact"). Ms. Sikich alerted several RBC Executive Committee members that she was "working with outside legal counsel…[to get] a better picture of our potential risk and exposure of losing [the top hat] exemption." Weinstein Decl., Ex. 9; *see also* Sikich 7/11/17 Dep. 151:2-152:16. In response, RBC's President and CEO, John Taft, tasked Ms. Sikich with controlling the "growing size of WAP, which creates now a material impact on our financials and creates concern about the 'top hat' status of the plan." Weinstein Decl., Ex. 10; *see also* Sikich 7/11/17 Dep. 153:5-17.

Ms. Sikich, in turn, retained a human resources consulting firm that observed that one of the "[r]easons for changing WAP" was that the "Plan must be updated to comply with IRC Section 409A and ERISA." Weinstein Decl., Ex.11 at 4. One of the recommendations was to significantly tighten eligibility requirements. *Id.* at 4, 7. However, RBC took no action to tighten WAP eligibility requirements for fear of causing attrition among FCs who would no longer be WAP-eligible. *See* Sikich 9/8/11 Dep. at 52:17-24; Weinstein Decl., Ex. 6; *see also* Buchert 10/27/11 Dep. 120:2-11 (Regional Directors reported that FCs reacted negatively to the prospect of an increase in the production-based eligibility threshold from $300,000 to $400,000); Buchert 7/12/17 Dep.

YARMUTH WILSON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

45:25-46:12, 123:17-124:11.  The result, in the words of Ms. Sikich, was "WAP

purgatory," meaning that RBC executives elected to continue the operation of the WAP

without reforming it to attempt to maintain top hat status (if it ever had such status) in direct

contravention of Ms. Sikich's warnings.  Weinstein Decl., Ex. 12; *see also* Sikich 7/11/17

Dep. 172:13-18 (discussing resistance to changes as causing "WAP purgatory").

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████.  At that time, RBC calculated various

statistics related to the WAP and presented them in a matrix, which showed that between

2003 and 2007, the percentage of WAP-eligible employees[4] more than doubled.  *Id.*, Ex. 14

("2008 WAP Matrix").[5]  RBC also performed an analysis "to review whether or not the

plan was for a select group of management or highly compensated employees…'"  *Id.*, Ex.

15 ("Top Hat Analysis Review").  The Top Hat Analysis Review showed that, as of January

2008, the WAP eligibility percentage was 17.72%.  *Id.*[6]  As a result of these analyses, Ms.

Sikich recommended raising the compensation-based eligibility threshold from $150,000 to

---

[4] The WAP Plan Documents provide that: "No deferrals, Company Contributions or other benefits are available under the Plan, other than deferrals, Company Contributions or other benefits in respect of services rendered to the Employers by an Employee: (i) who is a non-resident of Canada for purposes of the Income Tax Act (Canada) throughout the period during which the services were rendered' or (ii) other than services that were primarily (A) rendered in Canada; (B) rendered in connection with a business carried on by an Employer in Canada; or (C) a combination of services described in (A) and (B)" ("U.S. employees").

[5] The number of "WAP Eligible" employees and the overall "Workforce" numbers as presented in the 2008 WAP Matrix understates the percentage of eligible employees due to RBC's inclusion of employees who were no longer employed by RBC or not yet hired by RBC for the applicable year.  Solomon Report at ¶ 39.  Additionally, the 2008 WAP Matrix presents data for the incorrect plan year, labeling the information for the 2009 plan year "2008."  *Id.* at ¶ 40.

[6] The workplace data as presented in the Top Hat Analysis Review was inflated because, as RBC acknowledged, it relied on a total employee population of 15,095, which was "based on any employee who worked in 2007 regardless of employment status."  Weinstein Decl., Ex. 15 at 4; *see also* Solomon Report at ¶¶ 42-50 (2,835 of the employees included in the 15,095 "total employee population" number were terminated on or before December 31, 2007, and thus could not participate in the WAP in 2008; the 15,095 number also included employees terminated prior to 2007 who received some amount of compensation in 2007; additionally, 115 of the 15,095 employees were not hired until after December 31, 2007).  As a result, RBC overstated the denominator used in the ratio analysis from 12,145 employees to 15,095 employees, and thus inaccurately reduced the ratio from 22.1% to 17.7%.  Solomon Report at ¶¶ 51-52.

YARMUTH  WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

1  $350,000, and raising the production-based eligibility threshold from $300,000 to $400,000.

2  Weinstein Decl., Ex. 15 at 5.

3          After years of delay, RBC ultimately approved modifications to the WAP eligibility

4  criteria (recommended years before) in October 2008, implementing the compensation

5  threshold changes in 2009, but delaying the FC production threshold changes until 2010.

6  *See* Weinstein Decl., Ex. 6; *see also* Sikich 9/8/11 Dep. 77:3-78:21; Sikich 7/11/17 Dep.

7  145:1-21.  According to Ms. Sikich, RBC delayed raising the production threshold to give

8  FCs time to ramp up their production.  Sikich 7/11/17 Dep. 182:2-5, 194:2-5.  Despite

9  explosive growth in WAP eligibility, RBC feared that an immediate increase in the

10  production threshold (even two years after it had initially been recommended) would

11  disappoint formerly eligible FCs and have an adverse effect on recruitment and retention.

12  Sikich 7/11/17 Dep. 194:6-10; 194:13-15.  Ms. Sikich further admitted that RBC selected

13  $400,000 as the production threshold because it was the "sweet spot" of recruiting, not to

14  ensure only highly compensated FCs would be eligible.  Sikich 9/8/11 Dep. 97:23-100:11;

15  Sikich 7/11/17 Dep. 143:2-14 (RBC focused solely on the production, and not the

16  compensation, of low-end producers).

17          As a result of these modifications, the percentage of the RBC workforce that was

18  WAP-eligible dropped from 22.1% in 2008 to 11.7% in 2010.  Solomon Report at ¶ 34.

19  **C.  RBC Ultimately Discontinued The WAP And Created A New Deferred**
       **Compensation Program With Substantially Tightened Eligibility Requirements.**
20

21          Ultimately RBC discontinued the WAP in favor of a new deferred compensation

22  plan with drastically stricter eligibility requirements and other modifications.  *See*

    Weinstein Decl., Ex. 16 (2012 Frozen Plan Document); Ex. 17 (2012 New WAP Plan
23

    Document) ("This Plan is a new plan that is wholly separate from the US Wealth
24

    Accumulation Plan…that was frozen as of January 1, 2012").  The New WAP requires non-
25
    producers to have annual cash compensation of $1,000,000 or more.  Sikich 7/11/17 Dep.
26

YARMUTH WILSON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

75:14-15. As for the production threshold, each year only the top 400 producing FAs[7] are eligible for the New WAP, far less than half the number that annually qualified for the WAP. *Id.* 75:5-9; Weinstein Decl., Ex. 18 at 11-12 (2013 Financial Advisor Compensation Plan); Solomon Report ¶ 88 (between 886 and 1,145 FCs were WAP eligible in each of the applicable years).

## III.    ARGUMENT

### A. Summary Judgment Standard.

Summary judgment is appropriate where "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Assoc.*, 809 F.2d 626 (9th Cir. 1987). As detailed below, courts consider various factors to determine whether a plan qualifies for the "top hat" exemption under ERISA. Here, the undisputed facts related to each of the relevant factors compels a single conclusion—the WAP is not a top hat plan.

### B. Top Hat Plans Are Exempt From ERISA Requirements Based On The High Position Or Relative Compensation Of Participants.

ERISA is a "comprehensive statute that subjects a wide variety of employee benefit plans to complex and far-reaching rules designed to protect the integrity of those plans and the expectations of their participants and beneficiaries." *Duggan v. Hobbs*, 99 F.3d 307, 309-310 (9th Cir. 1996); *Smith v. CMTA-IAM Pension Trust*, 746 F.2d 587, 589 (9th Cir. 1984) ("ERISA…is remedial legislation which should be liberally construed in favor of protecting participants in employee benefits plans."). ERISA's protective provisions include, among others, (1) a prohibition on employers from forfeiting employees' vested and accrued benefits (29 U.S.C. § 1053(a)) and (2) minimum vesting requirements (29 U.S.C. § 1053).

---

[7] Since the launch of the New WAP, the title "financial consultant" (FC) was replaced with "financial advisor" (FA). Sikich 7/11/17 Dep. 21:6-10.

PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL – Page 8



YARMUTH WILSON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

ERISA broadly applies to all employee benefit plans unless they are specifically exempted by a statutory provision. One such "rare sub-species of ERISA plans" is the so-called "top hat plan," which is defined by ERISA as "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. § 1101(a)(1); *see Gillam v. Nev. Power Co.*, 488 F.3d 1189, 1193 (9th Cir. 2007). The "top hat" exception exists because "Congress recognized that certain individuals, by virtue of their positions or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan." *Duggan*, 99 F.3d at 310 (citing DOL Opin. Letter 90-14A, 1990 ERISA LEXIS 12); *Alexander v. Brigham and Women's Physicians Org., Inc.*, 513 F.3d 37, 43 (1st Cir. 2008) ("The origins of the top-hat provision lie in Congress's insight that high-echelon employees, unlike their rank-and-file counterparts, are capable of protecting their own pension interests."). As such, Congress exempted top hat plans from the fiduciary, funding, participation, and vesting requirements applicable to other employee pension benefit plans. *Duggan*, 99 F.3d at 310 (citing 29 U.S.C. §§ 1101(a)(1), 1081(a)(3) and 1051(2)).

Courts look to the policy rationale of the top hat exception as "a reliable guidepost for the task of statutory interpretation." *Alexander*, 513 F.3d at 43; *see also Carrabba v. Randalls Food Mkts., Inc.*, 38 F. Supp. 2d 468, 477 (N.D. Tex. 1999) ("The mere fact that the employer intends the plan to be a reward to 'key' employees does not satisfy the degree of selectivity contemplated by the statutes. Rather, the statute contemplates that a top hat plan will be for the benefit of 'high-ranking employees.'") (internal citations omitted). Critically, the employer bears the burden of establishing that a particular plan meets the top hat requirements. *Callan v. Merrill Lynch & Co.*, No. 09-CV-0566-BEN, 2010 U.S. Dist. LEXIS 89997, at *26 (S.D. Cal. Aug. 27, 2010); *Deal v. Kegler Brown Hill & Ritter Co. L.P.A.*, 551 F. Supp. 2d 694, 700 (S.D. Ohio 2008) (citing *Barrowclough v. Kidder,*

PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL – Page 9

YARMUTH WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

*Peabody & Co.*, 752 F.2d 923, 932 (3d Cir. 1985)).  In other words, to take advantage of the exemptions from ERISA's substantive requirements, RBC must prove that the WAP meets the stringent top hat requirements.

Per the statutory language, a top hat plan must (1) be unfunded, (2) exist primarily for the purpose of providing deferred compensation, and (3) benefit "a select group of management or highly compensated employees."  29 U.S.C. § 1101(a)(1); *see Duggan*, 99 F.3d at 310, 312.  As the Department of Labor has explained, because "the term 'primarily' refers to the purpose of the plan (*i.e.*, the benefits provided) and not the participant composition of the plan…a plan which extends coverage beyond 'a select group of management or highly compensated employees' would not constitute a 'top-hat' plan [under ERISA]."  DOL Opin. Letter 90-14A, 1990 ERISA LEXIS 12, at *6; *see, e.g.*, *In re New Valley Corp.*, 89 F.3d 143, 148 (3d Cir. 1996) (to be a top hat plan, a plan "must cover only high level employees"); *Carrabba*, 38 F. Supp. 2d at 478 (plan did not meet top hat requirements because it was not maintained "primarily…for a select group"); *Hollingshead v. Burford Equip. Co.*, 747 F. Supp. 1421, 1430 (M.D. Ala. 1990) (plan did not achieve top hat status because it "extended coverage beyond a select group of highly compensated employees").  In other words, as explained by the Department of Labor in a recent amicus brief, because the term "primarily" in the statutory text modifies the purpose of the top hat exemption, "the most important purpose of the plan must be to provide deferred compensation to a select group of management or highly compensated employees….It does not mean that the 'select group' may be primarily composed of management or highly compensated individuals."  Weinstein Decl., Ex. 19.

Because the WAP extended coverage far beyond "a select group of management or highly compensated employees," as shown below, the WAP cannot be considered a top hat plan under ERISA.

YARMUTH WILSDON PLLC
1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

**C. Courts Look To Various Factors In Determining Whether Plans Are Maintained For A "Select Group of Management or Highly Compensated Employees."**

ERISA does not define the primary terms in 29 U.S.C. § 1101(a)(1)—"select group," "management," or "highly compensated employee." However, courts have developed various tests to give meaning to these terms and determine whether pension plans achieve top hat status.

In *Duggan*, the Ninth Circuit considered whether the purported top hat plan was "limited to a small percentage of the employer's entire work force" and whether the participating employees "exerted influence over the design and operation" of the plan. 99 F.3d at 312. The Sixth Circuit has adopted a four-factor test, looking to the two factors enumerated by the Ninth Circuit in *Duggan* as well as compensation disparities and the actual language in the plan. *See Bakri v. Venture Mfg. Co.*, 473 F.3d 677, 678 (6th Cir. 2007); *see also Callan*, 2010 U.S. Dist. LEXIS 89997, at *28 (applying the four-factor *Bakri* test). Other courts have likewise applied variations of these same four factors. *See, e.g.*, *Alexander*, 513 F.3d at 44-46 (considering plan's specific language, percentage of participants as part of the workforce, participants' relative compensation, and participants' bargaining power); *Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 287-90 (2d Cir. 2000) (considering percentage of workforce that qualified for plan, nature of participants' positions and their ability to effectively negotiate with management, and comparative compensation of participants). Qualitative factors in addition to quantitative factors contribute to the fact-specific inquiry. *Duggan*, 99 F.3d at 312 (the "select group" requirement is "more than a mere statistical analysis").

These various factors, as outlined below, serve as the framework for determining whether a plan meets the requirements for top hat status under 29 U.S.C. § 1101(a)(1).

**Percentage of Employees Eligible For Plan**

• The percentage of employees eligible to participate in a plan (also known as the "ratio test") is a quantitative factor.



YARMUTH WILSON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

- There is no bright line rule for when the percentage of eligible employees becomes so high that the plan is no longer "selective" enough for top hat status, however court opinions analyzing various plans are instructive:
    - Plans for which less than 5% of the workforce is eligible often qualify for top hat status provided that other requirements (*i.e.*, applying only to management or highly compensated employees) are met. *See, e.g., Duggan*, 99 F.3d at 312; *Sikora v. UPMC*, 153 F. Supp. 3d 820, 824-25 (W.D. Pa. 2015), *aff'd* 876 F.3d 110 (3d Cir. 2017).
    - No court has found a plan for which over 16% of the workforce was eligible to meet top hat requirements. *Guiragoss v. Khoury*, 444 F. Supp. 2d 649, 660 (E.D. Va. 2006).
    - Less than 16% eligibility does not guarantee top hat status; courts examine other factors. *See, e.g., Daft v. Advest, Inc.*, No. 5:06-cv-1876, 2008 U.S. Dist. LEXIS 7384, at *19 (N.D. Ohio Jan. 18, 2008), *overruled on other grounds by* 658 F.3d 583 (6th Cir. 2011).

**Nature of Eligible Employees' Duties**

- The nature of plan participants' duties, and whether they are management-level employees, is a qualitative factor. *See Guiragoss*, 444 F. Supp. 2d at 660.

**Compensation of Participating Employees**

- Alternatively to the management-status inquiry, courts look to whether plan participants are "highly compensated" compared to other employees or the workforce as a whole.
- Common types of comparative compensation analyses include comparing the average salary of participants to the average salary of all employees (*see, e.g., Demery*, 216 F.3d at 288), comparing the compensation of the "minimally-qualifying" participants to average employee compensation (*see, e.g., Daft*, 2008 U.S. Dist. LEXIS 7384, at *16),

YARMUTH WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

and ranking the participants' salaries within the workforce (*see, e.g.*, *Guiragoss*, 44 F. Supp. 2d at 663; DOL Opin. Letter 85-37A, 1985 ERISA LEXIS 7, at *2-6).

### Bargaining Power

- Courts determine whether the plan participant had sufficient bargaining power to influence the plan. *Duggan*, 99 F.3d at 313; *Leonard v. Sunnyglen Corp. (In re Battram)*, 214 B.R. 621, 625-26 (Bankr. C.D. Cal. 1997).

### Language in Plan and Other Employer Statements

- Employer statements showing it has maintained limits on plan eligibility to ensure selectivity supports a finding that a plan meets top hat requirements. *See, e.g.*, *Cramer v. Appalachian Reg'l Healthcare, Inc.*, Case No. 5:11-49-KKC, 2012 U.S. Dist. LEXIS 154624, at *16 (E.D. Ky. Oct. 29, 2012).

## D. The WAP Is Not A "Top Hat" Plan.

Applying the undisputed facts here to the factors described above demonstrates that the WAP is not a top hat plan.

### 1. The WAP Is Not Sufficiently "Selective" To Be A Valid Top Hat Plan.

Selectivity, based on the ratio test, requires determination of both the number of employees who were eligible to participate in the WAP and the total number of RBC employees. *See, e.g., Duggan*, 99 F.3d at 312. Here, the relevant population for determining WAP eligibility is RBC's total U.S. workforce for the simple reason that, per the terms of the WAP and by ERISA itself, the WAP was only offered to the U.S. workforce. *See, e.g.*, Weinstein Decl., Ex. 20 at ¶ 1.1 (the WAP's full name is the "Royal Bank of Canada US Wealth Accumulation Plan"). Residents of Canada were never permitted to participate, no matter their level of compensation or production. And, unlike the compensation or productivity thresholds, at no time did RBC alter this basic requirement either for incentive purposes or to reduce the number of WAP participants. *See* Weinstein Decl., Ex. 20 at ¶ 2.1(a) & ¶ 2.1(b); Ex. 6. Indeed, RBC itself consistently



YARMUTH WILSON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

declined to include Canadian employees in its own WAP eligibility calculations. *See, e.g.*, Sikich 9/8/11 Dep. at 143:24-144:4 (when calculating percentages of WAP-eligible employees, "[w]e just look at the U.S. work force"); Sikich 7/11/17 Dep. 122:17-19; 197:13-198:3.

Because a single plan existed during the years when Plaintiffs made their WAP contributions, the WAP's top hat status is dependent on eligibility rates from throughout the relevant period. Sikich 7/11/17 Dep. 77:6-21; 132:1-5. The alternative view, that the WAP could fall out of top hat compliance one year but regain compliance the next, and that RBC could retroactively "cure" the WAP's compliance issues by tightening eligibility, would lead to nonsensical results. For instance, assuming the WAP did not meet the top hat exemption, certain WAP participants including Mr. Paul and Mr. Buskirk had sufficient years of service that any funds deferred to the WAP would have immediately become non-forfeitable per ERISA's minimum vesting requirements (29 U.S.C. § 1053). If RBC could merely course-correct the WAP by tightening eligibility requirements, participants' non-forfeitable right to funds would be illusory, as RBC would hold the power to retroactively eliminate participants' non-forfeitable rights at any time. This likely is why in 2012, RBC finally created a "New WAP" with greatly tightened eligibility requirements.[8]

Here, the WAP was well outside the appropriate "selectivity" range for a top hat plan. In 2005, 18.0% of RBC's workforce was WAP eligible. Solomon Report at ¶ 34. The percentage of eligible employees rose to over 20% in 2006, even higher to 22.7% in 2007, and remained above 22% in 2008. *Id.*[9] These eligibility rates far exceed the rates of

---

[8] When Plaintiffs' counsel asked RBC's identified witness why RBC created the "New WAP" as opposed to tightening the eligibility requirements of the WAP, she was instructed by RBC's counsel not to answer. Sikich 7/11/17 Dep. 67:13-68:23.

[9] To calculate these percentages, Solomon used the number of RBC employees eligible to participate in the WAP as of December 31 of each year and the total number of employees in the workforce as of December 31 of that same year, because the WAP plan years began on January 1. Solomon Report at ¶¶ 33-34. Solomon also performed an alternate analysis based on the average number of employees in a given year, which yields similar results: 17.3% of RBC's workforce was WAP eligible in 2005, and that percentage rose to 22.4% in



YARMUTH WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

plans found to qualify for top hat status. *See, e.g., Duggan*, 99 F.3d at 312 (5% eligibility rate); *Sikora*, 153 F. Supp. 3d at 824-25 (W.D. Pa. 2015) (0.2% eligibility rate); *Cramer*, 2012 U.S. Dist. LEXIS 154624, at *5 (0.4% eligibility rate); *Fishman v. Zuirch Am. Ins. Co.*, 539 F. Supp. 2d 1036, 1046 (N.D. Ill. 2008) (less than 1% eligibility rate); *Belka v. Rowe Furniture Corp.*, 571 F. Supp. 1249, 1252 (D. Md. 1983) (between 1.6% and 4.6% eligibility rate).

In fact, the WAP eligibility rates of 18% to 22.7% during the 2005 through 2008 period exceed by **two to almost seven points** the highest eligibility rates *ever* found to be sufficiently selective for top hat status. *Guiragoss*, 444 F. Supp. 2d at 660 (surveying past decisions and finding "no existing authority that affirms top hat status for a plan representing more than 16% of the total workforce"); *see also Callan*, 2010 U.S. Dist. LEXIS 89997, at *27-28. For instance, a North Carolina District Court specifically found a plan offered to 18.7% of an employer's workforce—a rate lower than the WAP's 2006-2008 rates—to be "too large to be considered 'select' for the purposes of the top-hat exemption." *Darden v. Nationwide Mut. Ins. Co.*, 717 F. Supp. 388, 397 (E.D.N.C. 1989), *aff'd*, 922 F.2d 203 (4th Cir. 1991), *rev'd on other grounds,* 503 U.S. 318 (1992); *see also Demery,* 216 F.3d at 289 (plan with 15.34% eligibility is "probably at or near the upper limit of the acceptable size for a 'select group.'"). At least one other court has found, as part of its top hat analysis, that selectivity rates *well below* the WAP's 2005 to 2008 rates represented a "significant number of employees." *See, e.g., Daft,* 2008 U.S. Dist. LEXIS 7384, at *19 (even if percentage of eligible employees was 12.78%, as opposed to 15%, as

---

2008. Solomon Report at ¶ 35. Unlike the ratio test calculations performed by Defendants' expert Dr. Garrett, who included employees who were terminated prior to the start of the relevant plan year as well as employees who were not yet hired until after the end of the plan year, Solomon's ratio test calculations include only employees who were eligible for a particular plan year. Solomon Decl., Ex. 2 ("Solomon Rebuttal Report") at ¶ 12. Additionally, unlike Dr. Garrett's analysis, which considers all employees who were employed at any time during the 14 months prior to the end of the plan year, including seasonal hires and interns, Solomon performed the ratio test at a fixed point in time (December 31 of the year prior to the plan year) or, alternatively, based on the average number of eligible employees and total employees for each year. *Id.* at ¶ 13.



plaintiff contended, that rate was sufficiently high to support a finding that plan was not selective enough to meet top hat requirements); *see also* DOL Opin. Letter 85-37A, 1985 ERISA LEXIS 7, at *2-6 (despite having a low percentage of eligible employees, plan does not meet top hat requirements based on other factors).

Although the WAP eligibility rates dropped to just under 15% between 2009 and 2011, these lowered rates do not affect the WAP's top hat status because, as explained above, RBC cannot retroactively cure the WAP's top hat status by lowering eligibility rates without depriving participants of their rights to non-forfeitable funds. Moreover, the 2009 to 2011 rates still represent a "significant number of employees" and greatly exceed the 5% or lower eligibility rates typical of top hat plans. Further, other factors (*see infra* §§ III.D.2-5) cause the WAP to fall short of the top hat requirements irrespective of the eligibility rates.

RBC's own analysis supports a finding that the WAP had blown its top hat status during the relevant period. The Top-Hat Analysis Review, which (as described above) suffers from fatal flaws that have skewed the eligibility percentages down, showed that WAP eligibility had increased to over 17% in 2008.[10] Weinstein Decl., Ex. 15 at 3-4. Even using these improperly understated eligibility rates, the WAP was less selective than any plan found by a court to meet top hat selectivity requirements.

In sum, the WAP's eligibility ratios compel a finding that the WAP was not limited to a "select group" as required by ERISA for top hat status. This alone is dispositive of the top hat issue.

### 2. RBC Extended WAP Participation Beyond Management-Level Employees.

Regardless of how selective a plan is, it cannot achieve top hat status unless its primary purpose is to cover "management or highly compensated employees." 29 U.S.C. §

---

[10] Similarly, the data analyzed by RBC in the 2008 WAP Matrix, which understated the WAP eligibility percentage, as described above, nonetheless showed the WAP eligibility ratio hovering between 12% and 15% during the years 2005 to 2007. Weinstein Decl., Ex. 14.



YARMUTH WILSON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

1101(a)(1); *see Guiragoss*, 444 F. Supp. 2d at 661 ("If plan participation is not based on an employees' [sic] managerial status or compensation level, then the plan is not a top hat plan regardless of participation.").[11]  Put simply, "[i]n number, the plan must cover relatively few employees.  In character, the plan must cover only high level employees." *In re New Valley Corp.*, 89 F.3d at 148; *see also Spacek v. Maritime Ass'n*, 134 F.3d 283, 296 n.12 (5th Cir. 1998) ("[T]op hat participants, unlike ordinary pension plan participants, are typically high-ranking management personnel [and] are therefore better equipped than ordinary pension plan participants to effectively protect their interests in the employee benefits bargaining process.") (citing *Duggan*, 99 F.3d at 310).

Courts have variously defined "management" as "upper echelon," "top-level," and "high-ranking."  *See In re New Valley Corp.*, 89 F.3d at 148; *Gallione v. Flaherty*, 70 F.3d 724, 727 (2d Cir. 1995); *Bigda v. Fischbach Corp.*, 898 F. Supp. 1004, 1015 (S.D.N.Y. 1995).  For example, in *Bakri*, the Sixth Circuit found the "selectivity" requirement was not met based, in part, on evidence that participants included "secretarial/administrative positions and people with manager titles who supervised no one."  *Bakri*, 473 F. 3d at 679; *see also Guiragoss*, 44 F. Supp. 2d at 663 ("selectivity" requirement was not met based, in part, on fact that participants were not management-level or highly compensated); *cf. Carrabba*, 38 F. Supp. 2d at 476 (selectivity requirement was met where, "[w]ith…*de minimis* exceptions, all persons eligible to participate in the [plan] were part of the management of [the employer]…").

Here, WAP participants included large numbers of non-management employees. Per RBC's own testimony, its "top executives" included only employees with titles such as

---

[11] The clause "management or highly compensated employees" in 29 U.S.C. § 1101(a)(1) is disjunctive. *Sikora*, 153 F. Supp. 3d at 825 n.6; *see also Fishman,* 539 F. Supp. 2d at 1045.  As such, to achieve top hat status, a plan must have the primarily purpose of deferring compensation to either a select group of management or a select group of highly-compensated employees.  Because RBC admits that most WAP-eligible employees were not management, this test can only be met based on the eligible employees' compensation.



regional director, managing director, and complex directors. Sikich 9/28/10 Dep. 16:12-20; 38:11-39:6. Rather than attempt to limit WAP eligibility to these individuals, RBC specifically targeted FCs—who were not management—for WAP participation by creating a production-level threshold for WAP eligibility in addition to the compensation-level threshold. Sikich 9/28/10 Dep. 16:7-11. In addition, other employees with non-management roles, such as research analysts and salespersons, were eligible for the WAP. Sikich 9/28/10 Dep. 75:24-87:24. This diverse composition of WAP participants weighs against a finding that the WAP is a top hat plan. *Cf.* DOL Opin. Letter 85-37A, 1985 ERISA LEXIS 7, at *2-6 ("in view of the broad range of salaries and positions of the employees represented to be covered under the Plan, the Plan [does not meet the top hat requirements]").

### 3. RBC Extended WAP-Eligibility Beyond Highly-Compensated Employees.

Given that most WAP-eligible employees were not management, the WAP's top hat status depends upon whether eligible employees were highly compensated.[12] 29 U.S.C. § 1101(a)(1). The statutory term "highly compensated" necessarily requires a comparative analysis between the compensation of eligible employees and the larger workforce.

As noted above, RBC allowed the production-based eligibility threshold for FCs to remain at $300,000 until 2010, when RBC finally raised the threshold to $400,000. *See* Weinstein Decl., Ex. 6. This allowed widespread WAP eligibility among FCs. Prior to implementation of the heightened threshold, the percentage of FCs who were WAP eligible never dipped below 50%, ranging from 57.2% to 66.9%. Solomon Report at ¶ 88. Even after RBC implemented the heightened $400,000 production threshold, the percentage of WAP-eligible FCs ranged from 45.9% to 52.6%. *Id.* This caused FCs to comprise between 39.4% and 64.6% of all WAP-eligible employees during the relevant time. *Id.* at ¶ 92 &

---

[12] The Court need not reach this factor, or any of the following factors, as the WAP eligibility ratio well exceeds the level permitted for a plan to qualify for the top hat exemption. *See* Section III.D.1, *supra*.



Table 2.1. Courts have found similar statistics to show insufficient selectivity. For instance, when analyzing a plan that allowed more than 50% of account managers and 30% of the company's employees to be eligible for participation, the *Daft* Court noted a lack of selectivity due to "[t]he broadness of participation among account managers and the high percentage of workers that fill that position." *Daft*, 2008 U.S. Dist. LEXIS 7384, at *14.

Strikingly, the vast majority of these WAP-eligible FCs were not "highly productive" compared to the overall FC population. For instance, approximately two-thirds of WAP-eligible FCs had production levels lower than the average eligible FCs, and between one-fifth and one-half of these WAP-eligible FCs had production levels lower than the average for *all* FCs during the relevant period. Solomon Report at ¶¶ 94-97, Table 2.1, Figure 2B & Figure 2C; *see also* ███████████████████████████████████████████████████████████████████████; Buchert 7/12/17 Dep. 121:12-15; ████████████████████████████████████████████████████████████████████████████. Moreover, WAP-eligible FCs earned on average less than double the compensation of all employees in the years 2006 through 2008, and never more than 2.15 times the average RBC employee during the relevant period. Solomon Report at ¶ 62 & Table 1.8. This is outside the acceptable range for "highly compensated" employees, which courts have defined, at the high end, as over three to four times the compensation of average employees (*see Belka*, 571 F. Supp. at 1252), and, at the low end, as over two times the compensation of average employees. *See Demery*, 216 F.3d at 288; *Callan*, 2010 U.S. Dist. LEXIS 89997, at *31; *see also Sikora*, 153 F. Supp. 3d at 825-26 (participants were "highly compensated" where average compensation for all employees was about 10% of average compensation of participants).

Additionally, analyzing the WAP based on the lowest-qualifying WAP-eligible employees also shows that the WAP was "bottom-heavy" in that large portions of the

YARMUTH WILSON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

WAP-eligible population were comprised of these lowest-qualifying employees. During the years when the compensation-based eligibility threshold was $150,000 (2005-2008), approximately 20% of WAP eligible employees earned less than that threshold; during the years the compensation-based eligibility threshold was $350,000 (2009-2011), approximately 50% of WAP-eligible employees earned less than that threshold. Solomon Report at ¶ 65 & Table 1.8A. Between 2005 and 2011 the average compensation for these lowest-qualifying WAP eligible employees (*i.e.*, eligible FCs who earned less than the WAP compensation-based eligibility threshold) ranged from $110,399 (in 2005) to $115,020 (in 2011). Solomon Report at ¶ 66 & Table 1.8B. Comparing these compensation figures to the average compensation of all RBC employees shows that, in all but one year during the relevant period, the average compensation of these lowest-qualifying WAP-eligible employees was actually *lower* than that of the average RBC employee. Solomon Report at ¶ 66 & Table 1.8B. For instance, in 2010 the average salary of these lowest-qualifying WAP-eligible employees was *$41,775 less* than the average salary for all employees. *Id.* RBC's witnesses do not dispute this, admitting that an FC who produced $300,000 could earn as little as $109,000, and possibly less. Buchert 7/12/17 Dep. 122:13-123:5; Sikich 7/11/17 Dep. 166:24-25. Focusing on the compensation of one particular type of FC employee, coded FCENTRY, tells a similar story—the average compensation of WAP-eligible FCENTRY employees was *less than* the average compensation of RBC's relevant workforce. *See* Solomon Report at ¶¶ 79-80 & Table 1.12.

By these measures, the WAP was completely out-of-step with top hat standards, which require that "highly compensated" employees earn significantly *more* than the average employee. For instance, one court found the plan at issue met the "highly compensated" requirement based on that plan's lowest-earning participants earning salaries *3.75 times higher* than the average employee. *Fishman*, 539 F. Supp. 2d at 1045. Another

YARMUTH WILSON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

court analyzing lowest-qualifying plan participants found the "highly-compensated" requirement met based on all but the bottom 10% of participants earning salaries *more than double* the average company-wide salaries. *Belka*, 571 F. Supp. at 1252. Here, where the WAP's lowest-qualifying employees earned *less* than average RBC employees, the WAP cannot be considered to apply only to "highly compensated" employees.

In sum, as demonstrated through multiple analyses of compensation data, the WAP does not meet any of the various standards set forth by courts for determining that WAP-eligible employees are "highly compensated."

### 4. WAP Participants Lacked Sufficient Bargaining Power For The WAP To Be A Valid Top Hat Plan.

As explained above, the rationale for the top hat exception is that top hat plan participants have adequate bargaining power to protect their own interests and thus do not require the primary protections of ERISA. *See Duggan*, 99 F.3d at 310; *Alexander*, 513 F.3d at 43. In *Duggan*, the Ninth Circuit focused this "bargaining power" inquiry on an individual's impact, concluding that the participant had sufficient bargaining power to meet 29 U.S.C. § 1101(a)(1)'s requirements based on the participant having "exerted influence over the design and operation of his severance Agreement through his attorney and his negotiations with [the company president] [and having] exerted sufficient influence to become the only employee ever to receive retirement benefits form [the employer]." 99 F.3d at 313. Following the *Duggan* framework, district courts in the Ninth Circuit have looked to whether individual participants "had some effect on the design and operation of the plan." *Leonard*, 214 B.R. at 625-26 (plan met top hat requirements because individual participant exerted influence over plan).[13]

---

[13] Other courts have looked, instead, to whether plan participants, as a group, possessed bargaining power. *See, e.g., Alexander*, 513 F.3d at 48; *Cramer*, 2012 U.S. Dist. LEXIS 154624, at *10. However, as explained by the *Carrabba* Court, the bargaining power inquiry logically must be focused on the individual and not the group, as "[o]f course, as a group, to the extent they could act cohesively, [the participants] undoubtedly could influence the design and operation of [the applicable plan], but that would be true of any group of employees



Courts routinely have found that plans do not meet top hat requirements based on evidence that participants "had little ability to negotiate pension, pay or bonus compensation." *Bakri*, 473 F.3d at 678; *see also Carrabba*, 38 F. Supp. 2d at 478 (plan does not meet top hat requirements based on a lack of evidence that "any significant number of the participants in the [plan] individually had bargaining power of that kind").

Here, unlike the employees in *Duggan* or *Leonard*, RBC has conceded that individual employees have not had the ability to alter the WAP or its administration. *See* Sikich 7/11/17 Dep. 201:19-23. Because individual employees lack the ability to influence the administration of the WAP or otherwise protect their own interests in the funds they contributed to the WAP, the WAP participants did not have adequate bargaining power to justify exempting the WAP from ERISA's protections.

### 5. RBC's Own Statements and Actions Reveal That RBC Did Not Take The Necessary Steps For The WAP To Meet The Top Hat Requirements.

In addition to the factors cited above, courts consider an employer's own statements when determining top hat status. Courts have consistently found, however, that "[a] plan…cannot merely state it complies with ERISA's top hat exemptions in order to qualify thereunder." *Callan*, 2010 U.S. Dist. LEXIS 89997, at *32; *see also Carrabba*, 38 F. Supp. 2d at 478 (despite employer's intention and "good-faith belief" that the plan at issue qualified for top hat status, and employer's inclusion of language in the plan agreement reciting a purpose mirroring the statutory top hat language, plan did not meet top hat requirements based on lack of participant bargaining power). Thus, the WAP documents' statement that "the Company believes" the WAP to be a top hat plan (*see, e.g.*, Weinstein Decl. Ex. 20 at ¶ 5.10) does not bolster RBC's top hat argument, much less overcome the mountain of evidence showing the WAP was not sufficiently selective or limited to highly compensated employees.

---

within a company." 38 F. Supp. 2d at 478. Either way, RBC's witnesses could point to little more than increased investment choice due to participants' "group" influence. Sikich 7/11/17 Dep. 202:18-204:6.

PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL – Page 22



YARMUTH WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

Employer statements showing that an employer has maintained limits on plan eligibility to retain selectivity, however, have been found to evidence a plan's top hat status. *See, e.g.*, *Cramer*, 2012 U.S. Dist. LEXIS 154624, at *16. Here, the evidence shows RBC's opposite effort. RBC long recognized that the WAP lacked the required selectivity for top hat status. As early as 2006, Ms. Sikich began analyzing the WAP eligibility criteria and resulting populations of WAP-eligible employees, raising concerns that the WAP may not have met the top hat requirements. Weinstein Decl., Ex. 10; Ex. 7 at 17; Ex. 9. RBC's management, however, perceived tightening WAP eligibility as a risk RBC's recruitment and retention. *Id.*, Ex. 7 at 17; ███████. Consequently, even after recommendations from RBC's outside legal counsel and human resources consultants "to increase the PCG (FC) Eligibility Threshold," RBC knowingly oversaw an *increase* in WAP-eligible employees between 2006 and 2008, thus further jeopardizing any chance the WAP had to meet top hat requirements, and resulting in "WAP purgatory," as termed by Ms. Sikich. Weinstein Decl., Ex. 23 at 2; Ex. 12; Sikich 7/11/17 Dep. 172:13-18. Put simply, when forced to choose between bringing the WAP into top hat compliance or favoring FC recruitment and retention through lax eligibility, RBC prioritized FC recruitment and retention. By 2008, when RBC performed its WAP analyses, even according to RBC's own flawed calculations (which systematically understated the eligibility ratio) the WAP eligibility percentage was 17.72%. Weinstein Decl., Ex. 15.

When RBC finally did authorize tightening eligibility criteria, RBC delayed raising the production-based threshold until 2010, purportedly to give FCs time to ramp up their production, while acknowledging the deleterious effect an immediate increase would have on recruitment and retention. Sikich 7/11/17 Dep. 182:2-5; 194:2-15. Moreover, because FC production levels did not directly translate to compensation levels, RBC's retention of a production-based eligibility threshold for the WAP allowed non-management plan participants to qualify at compensation levels far below those for management. Buchert

YARMUTH WILSON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

10/27/11 Dep. 261:2-18; 226:3-10, 229:10-14.  The record makes clear that RBC's goal was never to ensure participants were "management" or "highly compensated," as required by ERISA.  Sikich 7/11/17 Dep. 143:2-14 (compensation of minimally qualified eligible employees "was not what we were looking at for eligibility").[14]  Indeed, RBC did not consider the average FC production as part of "the equation" when determining the new production-based eligibility threshold.  Sikich 9/8/11 Dep. 171:6-172:17; *see also id.* 97:23-100:11 (RBC chose the $400,000 production level not to target highly-compensated FCs, but because it was the "sweet spot" for recruiting).  As a result, RBC's compensation-based eligibility threshold increase had no effect on the average compensation of employees who earned less than the compensation threshold for any given year.  For these employees, average compensation hovered between $98,000 and $117,000, both before and after RBC raised the compensation-based eligibility threshold from $150,000 to $350,000.  Solomon Report at ¶ 66 & Table 1.8B.  Moreover, the number of WAP-eligible employees with compensation less than the compensation-based eligibility threshold jumped from 17.6% in 2008 to 63.2% in 2009 (when RBC raised the compensation-based eligibility threshold to $350,000).  Solomon Report at ¶ 64 & Table 1.8A.

Put simply, the manner in which RBC attempted to reform the WAP in 2008 belies any claim that RBC maintained the WAP "primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees," per ERISA's mandate.

## IV.    CONCLUSION

For the reasons set forth above, this Court should grant Plaintiffs' Motion for Partial Summary Judgement and find that the WAP is not a top hat plan under 29 U.S.C. § 1051(2), 29 U.S.C. § 1081(a)(3), and 29 U.S.C. § 1101(a)(1).

---

[14] In contrast, the New WAP's compensation threshold of $1 million (up from $350,000 for the WAP) and cap of 400 FAs (down from as many as 1,316 FCs for the WAP) constitute meaningfully strict eligibility requirements directed at highly compensated employees.



Dated: January 11, 2018.

**YARMUTH WILSDON PLLC**

By: *s/Elizabeth S. Weinstein*
Jeremy E. Roller, WSBA No. 32021
Elizabeth S. Weinstein, WSBA No. 45763
1420 Fifth Avenue, Suite 1400
Seattle, WA 98101
Phone: 206.516.3800
Fax: 206.516.3888
Email: jroller@yarmuth.com
            eweinstein@yarmuth.com

*Attorneys for Plaintiffs Marty Paul and
Brian Buskirk*



**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

**PERKINS COIE LLP**
Kevin J. Hamilton
William B. Stafford
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Email: khamilton@perkinscoie.com
       wstafford@perkinscoie.com

**MORGAN, LEWIS & BOCKIUS LLP**
Sari M. Alamuddin*, pro hac   vice*
Christopher J. Boran, *pro hac vice*
Matthew A. Russell, *pro hac vice*
77 West Wacker Drive, Fifth Floor
Chicago, IL 60601
Email: sari.alamuddin@morganlewis.com
       christopher.boran@morganlewis.com
       matthew.russell@morganlewis.com

*Attorneys for Defendants RBC Capital*
*Markets, LLC, Royal Bank of Canada, and*
*Royal Bank of Canada US Wealth*
*Accumulation Plan*

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Dated:  January 11, 2018, at Seattle, Washington.



*s/Sue Stephens*
Sue Stephens, Legal Assistant

PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL – Page 26



714.01 sa111502 1/11/18