1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Honorable Ronald B. Leighton

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MARTY PAUL, an individual; and
BRIAN BUSKIRK, an individual,

                    Plaintiffs,

     v.

RBC CAPITAL MARKETS, LLC, a
Minnesota limited liability company;
ROYAL BANK OF CANADA, a
Canadian corporation; and ROYAL
BANK OF CANADA US WEALTH
ACCUMULATION PLAN, an employee
benefit plan,

                  Defendants.

No. 3:16-cv-05616-RBL

**DECLARATION OF SAUL SOLOMON IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

NOTE ON MOTION CALENDAR:
February 2, 2018

**ORAL ARGUMENT REQUESTED**

     I, SAUL SOLOMON, declare as follows:

     1.     I am over the age of 18 and a resident of Texas.  I have been retained by Yarmuth Wilsdon PLLC on behalf of Plaintiffs to provide certain analyses in connection with the above-referenced matter.  I make this declaration based on my personal information and belief.

     2.     Attached hereto as **Exhibit 1** is a true and correct copy of the Expert Report of Saul Solomon, dated September 29, 2017.

YARMUTH WILSDON PLLC
1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

1         3.     Attached hereto as **Exhibit 2** is a true and correct copy of the Expert

2   Rebuttal Report of Saul Solomon, dated November 20, 2017.

3         4.     As described in greater detail in the Expert Report and the Expert Rebuttal

4   Report, my analysis therein is based upon my review of the documents listed in those

5   reports, most of which were produced by Defendants in this matter and in the *Tolbert*

6   matter.

7

8         I declare under penalty of perjury of the laws of the United States of America that

9   the foregoing is true and correct.

10       Dated: January __9__, 2018, at Houston, Texas.

11

12

13                       Saul Solomon

14

15

16

17

18

19

20

21

22

23

24

25

26

DECL SOLOMON IN SUPPORT OF PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL – Page 2

YARMUTH WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1

## CERTIFICATE OF SERVICE

2      I hereby certify that on this date, I electronically filed the foregoing document with

3    the Clerk of the Court using the CM/ECF system, which will send notification of such filing

4    to the following:

5    **PERKINS COIE LLP**

6    Kevin J. Hamilton
     William B. Stafford

7    1201 Third Avenue, Suite 4900
     Seattle, WA 98101-3099

8    Email: khamilton@perkinscoie.com
            wstafford@perkinscoie.com

9

10   **MORGAN, LEWIS & BOCKIUS LLP**
     Sari M. Alamuddin*, pro hac   vice*

11   Christopher J. Boran, *pro hac vice*
     Matthew A. Russell, *pro hac vice*

12   77 West Wacker Drive, Fifth Floor
     Chicago, IL 60601

13   Email: sari.alamuddin@morganlewis.com

14          christopher.boran@morganlewis.com
            matthew.russell@morganlewis.com

15

     *Attorneys for Defendants RBC Capital*
16   *Markets, LLC, Royal Bank of Canada, and*
     *Royal Bank of Canada US Wealth*
17   *Accumulation Plan*

18

19      I declare under penalty of perjury under the laws of the State of Washington that the

20   foregoing is true and correct.

21      Dated:  January 11, 2018 at Seattle, Washington.

22
                          *s/Sue Stephens*
23                        Sue Stephens, Legal Assistant

24

25

26

DECL SOLOMON IN SUPPORT OF PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL – Page 3



YARMUTH  WILSDON PLLC
1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

714.01 sa050603 1/9/18

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT TACOMA

| | | |
|---|---|---|
| **MARTY PAUL, an individual; and BRIAN BUSKIRK, an individual,** | § § § | |
| **Plaintiffs,** | § § | **No.: 3:16-cv-05616-RBL** |
| **v.** | § § | |
| **RBC CAPITAL MARKETS, LLC, a Minnesota limited liability company; ROYAL BANK OF CANADA, a Canadian Corporation; and ROYAL BANK OF CANADA US WEALTH ACCUMULATION PLAN, an employee benefit plan,** | § § § § § § § | |
| **Defendants.** | § § | |

---

## EXPERT REPORT OF SAUL SOLOMON

---

## I.    INTRODUCTION AND ASSIGNMENT

1. I have been retained by Yarmuth Wilsdon PLLC on behalf of its clients, Messrs. Marty Paul and Brian Buskirk (collectively "Plaintiffs"), to provide certain analyses in connection with the above referenced matter. I have been asked to analyze certain employee data of the Royal Bank of Canada and its U.S. participating subsidiaries (collectively "RBC"), for the years 2003 through 2011 to identify various attributes to assist the Court in determining if the RBC U.S. Wealth Accumulation Plan (the "WAP") qualifies as a top-hat plan as described in 29 U.S.C. §§1051(2), 1081(a)(3), and 1101(a)(1). The analysis contained herein is based on a review of

the documents listed in Exhibit 3 by me and staff working under my supervision. A summary description of the claims, my analysis and related opinions follow.

2.  I am a Managing Director with Berkeley Research Group, LLC ("BRG"). A copy of my current curriculum vitae is attached as Exhibit 1, and a listing of trial testimony and depositions during the past five years is attached as Exhibit 2. BRG is being compensated for the time I devote to this engagement at my standard hourly rate of $695 per hour and for the time spent by staff who assisted me at their standard hourly rates. This compensation is not contingent upon either the substance of my opinions or the outcome of this dispute.

3.  I reserve the right to supplement this report and my opinions contained herein should additional information be provided to me.

## II.    BACKGROUND

4.  Plaintiff Mr. Marty Paul ("Paul") was employed by RBC Capital Markets or its predecessor from 1994 through March 7, 2011.[1] Plaintiff Mr. Brian Buskirk ("Buskirk") was employed by RBC Capital Markets or its predecessor from 1985 through August 10, 2012.[2] Plaintiffs allege that they have been participants as defined in the Employee Retirement Income Security Act of 1974 ("ERISA") § 3(7), 29 U.S.C. § 1002(7) in the WAP at all relevant times.[3]

5.  Defendant RBC Capital Markets, LLC, ("RBC Capital Markets") is a limited liability company organized under the laws of Minnesota and doing business in Washington State. Defendant Royal Bank of Canada is a bank operating globally and employing workers in the United States. Plaintiffs allege that both Royal Bank of Canada and RBC Capital Markets have been "employers" within the meaning of ERISA § 3(5), 29 U.S.C. § 1002(5) at all relevant times. Royal Bank of Canada is the ultimate parent of RBC Capital Markets.[4]

6.  The Plaintiffs also claim that the WAP is an "employee benefit pension plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).[5]

---

[1] Complaint for Damages, Declaratory Relief, and Injunctive Relief, p. 2-3.
[2] Complaint for Damages, Declaratory Relief, and Injunctive Relief, p. 3.
[3] Complaint for Damages, Declaratory Relief, and Injunctive Relief, p. 2-3.
[4] Complaint for Damages, Declaratory Relief, and Injunctive Relief, p. 3.
[5] Complaint for Damages, Declaratory Relief, and Injunctive Relief, p. 3; *see also Tolbert v. RBC Capital Markets Corp., et al.*, 758 F.3d 619 (5th Cir. 2014).

7. Paul was a participant in the WAP in or before 2000, when he was employed by the predecessor of RBC Capital Markets.[6] The WAP purports to make certain contributions in a participant's account balance forfeitable to Royal Bank of Canada, regardless of whether the vesting schedule for such contributions has been met, if a participant's employment is terminated for cause. On March 7, 2011, Paul was terminated "for cause" and, thereafter, on March 15, 2012, RBC Capital Markets notified Paul that his "Company Contributions (and mandatory deferrals), both vested and unvested, have been forfeited in the amount of $1,612,152."[7]

8. Buskirk was a participant in the WAP when he was employed by the predecessor of RBC Capital Markets. Any company contributions in a participant's account balance purportedly vest on a schedule set by the WAP Committee. On August 10, 2012, Buskirk resigned from RBC Capital Markets and, in November of 2012, Buskirk received a Fidelity NetBenefits transaction history report indicating that $297,676 was forfeited from his WAP account,[8] which is the portion of his account balance that was "unvested Company Contributions".[9]

9. ERISA imposes rules on employers to protect the interests of employee retirement benefit plan participants. One exemption from ERISA is the top-hat plan exemption. Under this exemption, any plan that is unfunded and "'maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees' is exempt from the participation, vesting, funding and fiduciary responsibility rules of ERISA" and instead is subject to ERISA's limited reporting and disclosure requirements.[10]

10. Plaintiffs allege that the WAP was not a top-hat plan and, "to the extent the WAP's vesting schedule conflicts with ERISA's mandatory minimum vesting schedule, it is invalid and unenforceable,"[11] and its forfeiture provisions for termination for cause are also invalid and unenforceable.[12] As a result, the Plaintiffs claim that "Paul's Mandatory Deferral Contributions and Company Contributions were non-forfeitable irrespective of any reason for Paul's

---

[6] Complaint for Damages, Declaratory Relief, and Injunctive Relief, p. 9.
[7] Complaint for Damages, Declaratory Relief, and Injunctive Relief, p. 9.
[8] Complaint for Damages, Declaratory Relief, and Injunctive Relief, p. 12.
[9] Complaint for Damages, Declaratory Relief, and Injunctive Relief, p. 13.
[10] "The Impact of ERISA's 'Top Hat' Exemption on Non-Qualified Deferred Compensation Plans", Guardian Business Resource Center for Advanced Sales, December 10, 2008.
[11] Complaint for Damages, Declaratory Relief, and Injunctive Relief, p. 5.
[12] Complaint for Damages, Declaratory Relief, and Injunctive Relief, p. 5.

termination"[13] and "Buskirk's Company Contributions were non-forfeitable irrespective of the vesting schedule set by the WAP Committee."[14]

11. RBC defines the WAP as "a nonqualified, deferred compensation plan pursuant to which a select group of management or highly compensated employees of the Royal Bank of Canada… and its Participating Subsidiaries… may be offered the opportunity to elect to defer receipt of a portion of their compensation to be earned with respect to the upcoming Plan Year."[15]

12. Department of Labor ("DOL") Advisory Opinions and case law provide guidance that the courts and the DOL have looked at when asked whether a "select group of management or highly compensated employees" exists in a given business for purposes of top-hat qualifications.[16]

13. I understand that certain analytical factors identified by court cases include the following:

14. The Ratio Test: The ratio test compares the number of employees eligible to participate in the deferred compensation plan and the total number of employees included in the workforce. I am not rendering a legal opinion; however, I understand that courts have often examined this ratio in determining whether a deferred compensation plan is primarily offered to a select group of management or highly compensated employees.

   a. In *Belka v. Rowe Furniture*, the plan covered 4.6% of the workforce and a select group of management/highly compensated employees was found to exist.[17]

   b. In *Duggan v. Hobbs*, the plan covered less than 5% of the workforce (one participant) and was found to be a top-hat plan. While the percentage of covered employees was low, the plan also qualified because the court found that the one participant could exert influence over the plan design.[18]

---

[13] Complaint for Damages, Declaratory Relief, and Injunctive Relief, p. 9.
[14] Complaint for Damages, Declaratory Relief, and Injunctive Relief, p. 12.
[15] 2010 RBC - US WAP Prospectus, RBC-PAUL000000105.
[16] "The Impact of ERISA's 'Top Hat' Exemption on Non-Qualified Deferred Compensation Plans", Guardian Business Resource Center for Advanced Sales, December 10, 2008.
[17] *Belka v. Rowe Furniture*, 571 F. Supp. 1249, 1252 (D. Md. 1983).
[18] *Duggan v. Hobbs*, 99 F.3d 307, 312 (9th Cir. 1996).

c.  In *Demery v. Extebank Deferred Compensation Plan*, while plan participation was offered to 15.34% of the workforce, it was offered only to bank officers, most of whom were employed in managerial positions and the participants' average compensation was more than twice the average compensation of Extebank employees. The courts ruled that it was a top-hat plan.[19] In contrast, in *Darden v. Nationwide Mutual Insurance Co*., the plan covering 18.7% of the workforce did not qualify for top-hat status.[20]

d.  In *Daft v. Advest, Inc*., the court considered the "percentage of workforce invited to join the plan." At least 30% of Advest, Inc.'s total workforce was eligible to participate. All brokers were invited to participate, if they met "low gross commission threshold." The plan did not qualify as offered to a select group because; 1) "the broad offer of participation to account managers," 2) "the low gross commissions needed to qualify" (half met the requirement and participated), and 3) "the high percentage of workers that fill the position of account managers."[21]

e.  In *Bakri v. Venture*, the court noted that it considered "both qualitative and quantitative factors, including (1) the percentage of the total workforce invited to join the plan (quantitative), (2) the nature of their employment duties (qualitative), (3) the compensation disparity between top hat plan members and non-members (qualitative), and (4) the actual language of the plan agreement (qualitative)."[22]

f.  It should be noted that a low ratio alone may not guarantee top-hat status. DOL Advisory Opinion 85-37A found that a plan was not a top-hat plan even though it had a ratio test under 7%.[23] As such, other factors need to be weighed in analyzing a top-hat plan.

15. Compensation Level: Certain employees of RBC qualify for eligibility to participate in the WAP by meeting a minimum gross compensation level. Courts have looked at compensation

---

[19] *Demery v. Extebank Deferred Compensation Plan*, 216 F.3d 283, 288 (2nd Cir. 2000).

[20] *Darden v. Nationwide Mutual Ins.Co.*, 717 F. Supp. 388, 397 (E.D. N.C. 1989).

[21] *Daft v. Advest, Inc.*, No. 5:06-cv-1876, 2008 WL 190436, *7 (D. Ohio Jan. 18, 2008); *rev'd on other grounds*, *Daft v. Advest, Inc.*, 658 F. 3d 583 (6th Cir. 2011).

[22] *Bakri v. Venture Mfg. Co.*, 473 F. 3d 677 (6th Cir. 2007).

[23] "The Impact of ERISA's 'Top Hat' Exemption on Non-Qualified Deferred Compensation Plans," Guardian Business Resource Center for Advanced Sales December 10, 2008.

in determining whether or not a deferred compensation plan is offered primarily to a select group of highly compensated individuals.

a. The courts in *Belka v. Rowe Furniture* and *Demery v. Extebank Deferred Compensation Plan* considered the average salary of those individuals who participated or were covered by the plan and the average salary for all employees.[24]

b. In *Daft v. Advest, Inc*., the court noted that it is more relevant to provide a "comparison of the salary earned by employees minimally qualifying for participation…against the average salary of all…employees" in determining if a group of employees is highly compensated.[25] In other words, the court considered the compensation of the lowest compensated employee who was eligible to participate in the plan as compared to the average compensation for all employees to be the most useful in this case. The court also noted that consideration of the range of salaries is also more useful than the average salary.

c. In *Bakri v. Venture* and *Callan v. Merrill Lynch*, the court considered the compensation disparity by comparing the compensation between top hat plan members and non-members[26] as one of the factors in determining whether the plan was a top hat or not.

16. Production Level: RBC financial consultants ("FCs" or investment brokers) qualify for eligibility to participate in the WAP by meeting a minimum gross production level rather than by meeting a minimum compensation level. Courts have looked at production/commission levels in determining whether or not a deferred compensation plan is offered primarily to a select group of highly compensated individuals. As noted in *Daft v. Advest, Inc*., all brokers were invited to participate, if they met "low gross commission threshold" and the "determination that the gross commission threshold was 'low' was a reasonable inference based on the information in the record that more than half of the account managers participated in the plan. The Court reasonably inferred this was, at best, an average commission."[27] In

---

[24] *Belka v. Rowe Furniture*, 571 F. Supp. 1249, 1252 (D. Md. 1983) and *Demery v. Extebank Deferred Compensation Plan*, 216 F.3d 283, 288 (2d Cir. 2000).

[25] *Daft*, 2008 WL 190436 at *6.

[26] *Bakri v. Venture Mfg. Co.*, 473 F. 3d 677 (6th Cir. 2007) and *Callan v. Merrill Lynch & Co.*, No. 09-cv-0566, 2010 WL 3452371 (S.D Cal. Aug. 30, 2010).

[27] *Daft v. Advest, Inc.*, No. 5:06-cv-1876, 2008 WL 190436, *7 (D. Ohio Jan. 18, 2008); *rev'd on other grounds*, *Daft v. Advest, Inc.*, 658 F.3d 583 (6th Cir. 2011).

6

*Tolbert v. RBC Capital Markets Corporation*, the court stated that, "[a]lthough Plaintiffs argue that one set of WAP participants, the financial consultants, are eligible for participation based upon their production, the comparison factors remain unchanged in that their salaries or other compensation are the relevant metric here."[28] As such, I have analyzed the FC production and compensation levels in a similar manner in which I analyzed the Non-FC compensation levels.

## III.   SUMMARY OF OPINIONS

17. For the years 2003 through 2011, I performed the following calculations:

   a.   I calculated the percentage of employees eligible to participate in the WAP as compared to the total RBC Workforce;[29]

   b.   I calculated the percentage of employees eligible to participate in the WAP with compensation less than the compensation eligibility threshold[30] as compared to total eligible employees;

   c.   I compared the compensation ranges of employees eligible to participate in the WAP with compensation less than the compensation eligibility threshold[31] and the average compensation of the total Workforce;

   d.   For all employees, for Non-FCs and for FCs, I have determined the following ratios:

      i.   I compared the average annual compensation for employees eligible to participate in the WAP and those who enrolled as participants to the average compensation of the total Workforce;

      ii.   I grouped WAP eligible employees into the following NDT[32] compensation

---

[28] *Tolbert v. RBC Capital Markets Corporation*, No. H-11-0107 (S.D. Texas April 28, 2015).
[29] Workforce is defined herein as the total RBC U.S. workforce.
[30] Employees eligible to participate in the WAP with compensation less than the compensation eligibility threshold consisted primarily of FCs whose eligibility was based on a production level threshold rather than a compensation threshold.
[31] Employees eligible to participate in the WAP with compensation less than the compensation eligibility threshold consisted primarily of FCs whose eligibility was based on a production level threshold rather than a compensation threshold.
[32] NDT compensation is Non-Discrimination Testing compensation (Deposition of Gabriela Sikich dated July 11, 2017, p. 121-122).

ranges: a) Less than $150,000, b) $150,000 to $349,999, c) $350,000 to $499,999, and d) $500,000 or greater. I then calculated the number of WAP eligible employees within each range; and

    iii.  I calculated the percentage of eligible employees with annualized compensation less than the average compensation of the top 20%[33] of all employees for each year;

e.  I calculated the percentage of eligible Non-FCs with compensation less than the average compensation for all employees eligible to participate in the WAP;

f.  I determined the percentage participation rates of all eligible employees with compensation of $500,000 or more and employees with compensation less than $500,000;

g.  I calculated the percentage of FCs eligible to participate in the WAP;

h.  I analyzed the number of eligible FCs with production less than $600,000 and $750,000, which RBC documents describe as the average and "highly productive" FC production, respectively;

i.  I determined the number of eligible FCs with production that was within 100% and 110% of the production eligibility threshold; and

j.  I calculated the number of eligible FCs with production less than the average production of eligible FCs.

A summary of these results are listed below followed by a detailed discussion of these analyses and others in the subsequent sections of this report.

18.  The ratio of employees eligible to participate in the WAP to the total Workforce (based upon the relevant number of employees at the beginning of each plan year) was a low of 6.3% in plan year 2003 and rapidly increased to a high of 22.7% in plan year 2007 and 22.1% in plan year 2008. The ratio dropped significantly in 2009 to 14.6% and again in 2010 to 11.7% as a

---

[33] This is one way the Internal Revenue Service defines a "Highly Compensated Employee" for retirement plans (https://www.irs.gov/retirement-plans/plan-participant-employee/definitions (visited September 20, 2017)).

result of implementing changes in eligibility criteria. In 2011, the ratio increased to 13.9%. See paragraph 34.

19. In addition to the calculation in paragraph 18, which analyzes the ratio at the beginning of each plan year, I also calculated the ratio based on the average number of employees eligible to participate in the WAP to the average total Workforce during the calendar year preceding each plan year. This ratio was a low of 6.3% in plan year 2003 and rapidly increased to a high of 21.4% in plan year 2007 and 22.4% in plan year 2008. The ratio dropped in 2009 to 18.1% and again in 2010 to 13.2% as a result of implementing changes in eligibility criteria. In 2011, the ratio continued to decrease to 12.8%. See paragraph 35.

20. For FCs, whose eligibility is based on a certain production level rather than compensation, the compensation may be lower than the compensation eligibility requirement. The percentage of WAP eligible employees with compensation less than the minimum compensation eligibility requirement ranged from a low of 17.6% in 2008 to as high as 63.2% in 2009. From 2003 through 2005, at least 25% of the WAP eligible employees did not earn sufficient compensation to overcome the lower minimum compensation threshold of $150,000. See paragraph 64. Further, the average compensation for WAP eligible employees with compensation less than the minimum compensation eligibility requirement was less than the average compensation of the total Workforce from 2006 to 2011. See paragraph 67.

21. More eligible FCs had compensation in the range of $150,000 to $349,999 in every year than any other compensation range. However, in 2009, when the eligibility for Non-FC employees to participate in the WAP was a minimum gross compensation level of $350,000, 39.7% of eligible FCs, or 517, had compensation that was less than $150,000 and 45.5% of eligible FCs, or 593, had compensation in the range of $150,000 to $349,999. Thus, in 2009, 85.3% of FCs who were eligible to participate in the WAP earned less than the minimum gross compensation eligibility criteria for Non-FC employees. Additionally, the change in the eligibility criteria in 2010 did not significantly affect the number of FCs within this range. However, the 2010 change did significantly impact the number of eligible FCs with compensation less than $150,000, which went from 517 in 2009 to 207 in 2010 for a reduction of 60%. In 2011, the number of eligible FCs with compensation less than $150,000 declined

*Expert Report of Saul Solomon*
*September 29, 2017*

again by 52% to 99. Still, the number of eligible FCs with compensation less than $150,000 was greater than those with compensation of $350,000 to $499,999 and those with $500,000 plus in compensation in every year until 2011. See paragraph 71.

22. More eligible Non-FC employees had compensation in the range of $150,000 and $349,999 than any other compensation range for the years 2003 - 2008. However, in 2009, when the eligibility criteria for this group was changed, the number of Non-FC eligible employees with compensation in this range dropped from 747 in 2008 to 156 in 2009 for a reduction of 79.1%. In 2010 and 2011, the largest number of eligible Non-FCs had compensation greater than $500,000. See paragraph 70. However, for the plan years 2003 through 2011, a majority of Non-FCs who were eligible to participate in the WAP had compensation that was less than the average compensation for all eligible employees. See paragraph 83.

23. The percent of eligible Non-FC employees with compensation less than the average of the top 20% of all employees ranges from 41% in 2003 up to 65% in 2008. When the changes in eligibility criteria were implemented, this number dropped to 28% in 2009 and 13% in 2010 meaning that not until 2010 did almost all eligible Non-FC employees have average annual compensation greater than the top 20% of the Workforce. However, in 2011, the percent of eligible Non-FC employees with compensation less than the average of the top 20% of all employees increased by 246% to 32%. See paragraph 75.

24. In contrast, the percent of eligible FC employees with compensation less than the average  of the top 20% of all employees ranges from 75% in 2003 up to 89% in 2008 (and even higher at 90% in 2006).  When the changes in eligibility criteria were implemented, this number only drops to 86% in 2009, 86% in 2010, and 84% in 2011 meaning that this group is not highly compensated relative to the top 20% of the Workforce. See paragraph 76.

25. Nearly half or more than half of all FCs were eligible to participate in the WAP each year with the number of eligible FCs ranging from 49.0% in 2004 to a high of 66.9% in 2008. The percentage drops to 53.0% in 2009 and 45.9% in 2010, but rebounded in 2011 to 52.6%. See paragraph 88.

26. Because FCs achieve WAP eligibility by meeting productivity thresholds, for each year, I calculated the number of eligible FCs with production less than the average production of eligible FCs. The number of eligible FCs whose production is less than the average production for eligible FCs ranges from 64% to 70% for the plan years 2004 through 2011. See paragraph 94. Moreover, most eligible FCs' production was less than $600,000 (ranging from 47% to 71%) and $750,000 (ranging from 66% to 84%) for 2004 through 2011. See paragraph 99. During the same time period, about 10% to 17% of eligible FCs had production that was within 10% of the production eligibility requirement. See paragraph 102.

27. In addition, a higher percentage of lower level employees participate in the WAP than more highly compensated employees. For 2004 through 2011, no more than 30% of eligible "high level" employees who made over $500,000 participated in the WAP. In 2011, only 16% of eligible highly compensated employee participated in the WAP. In contrast, for lower level eligible employees who made less than $500,000, at least 61% participated in the WAP for each plan year. In 2009 and 2010, 100% of lower level employees participated in the WAP. See paragraph 85.

28. As a whole, WAP eligible employees had compensation ranging from 2.91 to 3.64 times the average compensation of the entire Workforce. The lowest ratio of 2.91 occurred in 2008 while the highest of 3.64 occurred in 2010, after the eligibility changes were implemented. See paragraph 57. The range of compensation for eligible employees is vast, as evidenced by comparing the average annual compensation for the highest compensated group of employees (compensation of $500,000 or more) in 2007 of $1,727,578 to the average annual compensation of the lowest compensated group (compensation of less than $150,000) of $116,628 in 2007. In fact, the average annual compensation of the highest compensated group is 14.8 times that lowest compensated group in 2007. See paragraph 80.

29. Non-FC WAP eligible employees had compensation ranging from 3.76 to 6.87 times the average compensation of the entire Workforce. The lowest ratio of 3.76 occurred in 2008 while the highest of 6.87 occurred in 2010, after the eligibility changes were implemented. See paragraph 60.

30. FC WAP eligible employees had compensation ranging from only 1.67 to 2.22 times the average compensation of the entire Workforce. The lowest ratio of 1.67 occurred in 2007 while the highest of 2.22 occurred in 2011, demonstrating that the change in eligibility criteria had little effect on the average compensation of FCs eligible to participate in the WAP. Additionally, because the average compensation for eligible FCs is considerably lower than that of eligible Non-FCs, the inclusion of the eligible FCs significantly lowers the compensation ratio for the entire group of eligible employees. See paragraph 62.

## IV.   ANALYSIS

31. I have been asked to analyze employee data for the years 2003 through 2011 and make certain calculations and analysis regarding: 1) the number of employees eligible to participate in the WAP each year, 2) compensation levels of employees eligible to participate in the WAP, and 3) production levels of FCs eligible to participate in the WAP.

32. To complete my analyses, I have reviewed and used multiple Excel files Defendants provided detailing the number of employees employed each year that included hire dates, termination dates, if applicable, and compensation levels for each employee. I have reviewed and used multiple Excel files provided by Defendants detailing the number of employees eligible for the WAP for each year that included hire dates, termination dates, if applicable, compensation levels and participation information for each employee. I have reviewed and used multiple Excel files provided by Defendants detailing the production levels for all financial consultants for each year. A complete list of information I considered is located at Exhibit 3 of this report.

### A. THE RATIO TEST

33. The ratio test compares the number of employees eligible to participate in the plan[34] and the total number of employees in the workforce.[35] Here, I divided the total number of employees

---

[34] WAP eligible employees are all employees who were listed on the WAP Eligible data tabs in "RBC-PAUL000011153.xls", "RBC-PAUL000011177.xls", "RBC-PAUL000011134.xls", and all employees in "TOLBERT0000675.xls". This excludes employees who were terminated before or hired after January 1 of the plan year. For example, for plan year 2004, eligible employees are excluded if they were terminated before or hired after January 1, 2004 because they would not have been considered eligible as of January 1, 2004.

[35] Workforce employees are all employees who were listed on the previous year's WAP All EES data tabs in "RBC-PAUL000011153.xls", "RBC-PAUL000011177.xls", "RBC-PAUL000011134.xls", and all employees in "TOLBERT0001023.xls" and RBC-PAUL000011149.xls." This excludes employees who were terminated before or

eligible  to participate in the WAP as of December 31st by the total number of employees in the  RBC workforce in the U.S. (the "Workforce") as of the same December 31st for each year.

34. WAP plan years are based on calendar years with the inception of a new plan year occurring on January 1st. As such, I counted the number of eligible employees and total Workforce employed as of December 31, 2007 to calculate the ratio of the percent of eligible employees for the WAP plan year in 2008.  The same calculation was done for each plan year from 2003 through 2011.  The results of my calculations are as follows:

| All Eligible Employees / Total Workforce by Plan Year | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **2003** | **2004** | **2005** | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** |
| **Count of Eligible Employees** | | | | | | | | |
| 1,279 | 2,315 | 2,384 | 2,143 | 2,416 | 2,689 | 2,036 | 1,553 | 1,825 |
| **Count of All Employees** | | | | | | | | |
| 20,389 | 13,991 | 13,240 | 10,625 | 10,646 | 12,145 | 13,963 | 13,282 | 13,087 |
| **Percent of Eligible Employees** | | | | | | | | |
| 6.3% | 16.5% | 18.0% | 20.2% | 22.7% | 22.1% | 14.6% | 11.7% | 13.9% |

35. I have also calculated the ratio test based on the average number of eligible employees and average number of total employees in the Workforce for each year.  The average number of eligible employees is determined by taking an average of the number of employees eligible  to participate in the WAP as of December 31st for the two preceding calendar years. For example, for plan year 2004, the average number of eligible employees of 1,797 is based on the count of eligible employees as of December 31, 2002 and December 31, 2003, 1,279 and 2,315, respectively.  The average number of total employees in the Workforce is determined in a similar manner.  The results of my calculations are as follows:[36]

---

hired after January 1 of the plan year.  For example, for plan year 2004,  any employee on the 2003 All EES tab who was terminated before or hired after January 1, 2004 is excluded. Data for calendar year 2009 provided in RBC-PAUL000011134.xls reflects 16,442 employees, while RBC-PAUL000011177.xls reflects 16,011 employees in 2009 calendar year. It is my understanding that RBC is unaware why there is a discrepancy between the two headcounts. I have reviewed the 441 additional employees included in RBC-PAUL000011134.xls and determined that these employees were not eligible for participation in the WAP. Thus, to be conservative, we have included those 441 employees in our database. Additionally, hire  and termination dates for calendar year 2009 and 2010 employees were provided separately in RBC-PAUL000011148.xls and  RBC-PAUL000011149.xls. For 2009, the number and list of employees in the separate file included employees  terminated prior to 2009 and some duplicates; therefore, I have merged the hire and termination information into the  new database.  The NDT compensation was the same in the new files for the employees except for three whose  original NDT comp was $20 million higher than the new data. It is my understanding that RBC indicated the old data was incorrect; so I have made an adjustment for these employees so the compensation matches the new data. For 2010, the number of employees and NDT comp were the same, so I have  used the latest file received.

[36] For plan year 2003, the calculation is based on the count of eligible employees and the Workforce as of December 31, 2002 because no data for the Workforce was provided for calendar year 2001.

*Expert Report of Saul Solomon*
*September 29, 2017*

| Average Eligible Employees / Average Total Workforce by Plan Year | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** |
| **Average of Eligible Employees** | 1,279 | 1,797 | 2,350 | 2,264 | 2,280 | 2,553 | 2,363 | 1,795 | 1,689 |
| **Average of All Employees** | 20,389 | 17,190 | 13,616 | 11,933 | 10,636 | 11,396 | 13,054 | 13,623 | 13,185 |
| **Percent of Eligible Employees** | 6.3% | 10.5% | 17.3% | 19.0% | 21.4% | 22.4% | 18.1% | 13.2% | 12.8% |

### i. The 2008 WAP Matrix

36. I understand that RBC performed an analysis in the latter part of 2008 in which it calculated various statistics relating to the WAP. These statistics were presented in the 2008 WAP Matrix.[37] Included in this analysis was RBC's calculation of the number of eligible employees to total Workforce. In 2009, RBC raised WAP eligibility thresholds for non-producers and raised WAP eligibility thresholds in 2010 for producers. The WAP eligibility thresholds were raised for the plan years 2009 and 2010 to decrease the number of participants.[38] See the Stipulation of Facts Regarding WAP Eligibility for a complete list of historical eligibility requirements for participation in the WAP.

### a. The Cutoff Date

37. I reviewed the calculations in the 2008 WAP Matrix and compared them to my calculations. The percent of eligible employees reported by RBC in the 2008 WAP Matrix are displayed below in Table 1.1 "Percent of Eligible Employees per Defendants' 2008 WAP Matrix".

38. In Table 1.2 "Percent of Eligible Employees per Defendants and Corrected for Hire and Termination Dates," also presented below, the first set of columns under "Defendant Data" simply summarize the "WAP Eligible" and "All EES" Excel files provided by the Defendants.[39] The second set of columns, "Defendant Data and Employed at Dec. 31," contains my calculation of the ratio of eligible employees to the total Workforce.

39. As is evident, the numbers reported by Defendants are not always consistent. My results contained in the last columns of Table 1.2 have been adjusted to only include employees employed as of December 31st each year. Limiting the data to only include persons employed

---

[37] WAP Matrix, RBC00002266.
[38] Deposition of Gabriela Sikich dated July 11, 2017, p. 145, 180.
[39] "RBC-PAUL000011177.xls", "RBC-PAUL000011153.xls", "TOLBERT0000675.xls", "TOLBERT0001023.xls", "RBC-PAUL000011134.xls", and "RBC-PAUL000011149.xls".

at December 31 is a more appropriate method of calculating the ratio because employees who are no longer employed as of December 31st simply cannot be eligible to participate in the WAP at the start of the next plan year. The same is true for employees not yet hired as of January 1st. I have chosen to calculate the ratio at the inception of each plan year because ideally a company would want to know this ratio when determining eligibility each year and it will only include employees who may be eligible to participate in the WAP for each plan year. I have also calculated the ratio based on the average number of employees each year to account for any substantive change in staffing levels throughout the year.

### b. RBC Uses Wrong Dates

40. The 2008 WAP Matrix also appears to misstate the plan year for the information provided. For example, as summarized in Table 1.1 below, in the 2008 WAP Matrix, the row containing information for the 2008 plan year is actually information for the 2009 plan year. Specifically, 2,393 WAP Eligible employees as counted by RBC corresponds to the Excel information on the tab labeled "2009 WAP Eligible". The 17,418 employees as counted by RBC corresponds to the Excel information on the tab labeled "2008 All EES".

41. As discussed in more detail below and shown in Table 1.2, the number of employees as of December 31, 2008 should be compared to the number of WAP eligible employees as of December 31, 2008 for an apples-to-apples comparison to determine the ratio of eligible employees to the total Workforce for WAP eligibility in 2009 at the inception of the plan year (January 1, 2009). A discussion supporting my methodology, as well as the impact of using the Defendants' methodology, follows.

| Table 1.1 Percent of Eligible Employees Per Defendants' 2008 WAP Matrix | | | |
|---|---|---|---|
| | **Defendant WAP Matrix** | | |
| **Calendar Year** | **Count of Eligible Employees** | **Count of All Employees** | **Percent of Eligible Employees** |
| 2002 | 1,366 | 19,210 | 7.11% |
| 2003 | 1,366 | 19,210 | 7.11% |
| 2004 | 2,451 | 18,745 | 13.08% |
| 2005 | 2,160 | 16,533 | 13.06% |
| 2006 | 1,914 | 13,289 | 14.40% |
| 2007 | 2,287 | 15,340 | 14.91% |
| 2008 | 2,393 | 17,418 | 13.74% |
| 2009 | 1,540 | 16,012 | 9.62% |

| Table 1.2 Percent of Eligible Employees Per Defendants and Corrected for Hire and Termination Dates | | | | | | |
|---|---|---|---|---|---|---|
| | **Defendant Data** | | | **Defendant Data and Employed at Dec. 31** | | |
| **Plan Year** | **Count of Eligible Employees** | **Count of All Employees** | **Percent of Eligible Employees** | **Count of Eligible Employees** | **Count of All Employees** | **Percent of Eligible Employees** |
| 2003 | 1,343 | 20,389 | 6.6% | 1,279 | 20,389 | 6.3% |
| 2004 | 2,497 | 19,210 | 13.0% | 2,315 | 13,991 | 16.5% |
| 2005 | 2,444 | 18,836 | 13.0% | 2,384 | 13,240 | 18.0% |
| 2006 | 2,342 | 16,533 | 14.2% | 2,143 | 10,625 | 20.2% |
| 2007 | 2,585 | 13,289 | 19.5% | 2,416 | 10,646 | 22.7% |
| 2008 | 2,931 | 15,095 | 19.4% | 2,689 | 12,145 | 22.1% |
| 2009 | 2,393 | 17,418 | 13.7% | 2,036 | 13,963 | 14.6% |
| 2010 | 1,678 | 16,442 | 10.2% | 1,553 | 13,282 | 11.7% |
| 2011 | 1,827 | 15,555 | 11.7% | 1,825 | 13,087 | 13.9% |

*c. Workforce*

42. In the document labeled "RBC-US Wealth Accumulation Plan (WAP), Top-Hat Analysis Review,"[40] Defendants state that as of January 2008, the total employee population is 15,095 therefore implying that 15,095 is the total Workforce count (on or about December 31, 2007) who could have been eligible for the WAP in 2008 at the inception of the plan

---

[40] RBC – US Wealth Accumulation Plan (WAP), Top-Hat Analysis Review, August 7, 2008, (RBC02077 – 2082). The number of employees as of January 2008 of 15,095 does not match 2008 WAP Matrix 2007 employee count of 15,340.

year on January 1, 2008.[41] The data, however, shows that this figure includes any employee who received any compensation in 2007 regardless of his or her employment status as of December 31, 2007 or duration of employment in that year. However, 2,835 of these 15,095 employees were terminated on or before December 31, 2007 and thus could never qualify to participate in 2008. The Defendants' count of 15,095 employees in calendar year 2007 also includes individuals that were terminated in 2004, 2005, and 2006 but for some reason received compensation in 2007 (with the exception of individuals who had negative compensation who are also included in the Defendants' analysis). Consequently, Defendants overstate the denominator used in the ratio analysis and that overstatement reduces the ratio.

43. Additionally, 115 employees were not hired until after December 31, 2007. Subtracting terminated employees (2,835) and new hires after December 31, 2007 (115) from the total employee count of 15,095 leaves a revised count of 12,145 employees as of December 31, 2007 who could have been considered when making eligibility decisions for 2008.[42] Defendants also included individuals who appear to have worked for only a couple of days (for instance, Vicki Collins had a hire date of August 6, 2007, a termination date of August 8, 2007, and compensation of $289.77).

44. Figure 1A and Table 1.3 below display the distribution of employees in the calendar year 2007 Workforce by their termination dates and hire dates. As can be seen, Defendants have overestimated the Workforce as of December 31, 2007 by approximately 20%. These same trends appear in all the other years for which we received hire and termination dates (calendar years 2003-2010).

---

[41] The total employee population of 15,095 corresponds to the Excel files Defendants provided specifically, RBC-PAUL000011177, tab labeled "2007 All EES".

[42] This document was only created for 2008 in conjunction with a review of the plan. The Defendants have produced figures from other sources, but they are not consistent. For example, RBC00002266 reports that there were 15,340 employees in 2007. As the number of total employees for 2007 reported in the 2008 review document 15,095 matches the data provided to us, I have solely used the data provided by RBC to calculate these figures for other years.



Figure 1A
2007 Workforce Composition

| Table 1.3 | | | |
|---|---|---|---|
| **Calendar Year 2007 All Employees** | | | |
| Dates | Count | Cumulative Count | Cum. % of Total Workforce Provided by Defendants |
| Terminated before Jan. | 134 | 134 | 0.9% |
| Terminated between Jan. - Mar. | 708 | 842 | 5.6% |
| Terminated between Apr. - Jun. | 624 | 1,466 | 9.7% |
| Terminated between Jul. - Sep. | 824 | 2,290 | 15.2% |
| Terminated between Oct.-Dec. | 545 | 2,835 | 18.8% |
| **Total Employees Terminated During Year** | **2,835** | **2,835** | **18.8%** |
| **Hired After Dec.** | **115** | **2,950** | **19.5%** |
| **Employed Workforce at Dec. 31** | **12,145** | | **80.5%** |
| **Total Workforce Provided by Defendants** | **15,095** | | |

45. Because Defendants include employees who received compensation in 2007 regardless of employment status and include some employees hired after December 31, 2007, Defendants understate the calculation of the percent of employees eligible to participate and

understate the average compensation of the entire Workforce. In all calendar years from 2003-2010, at least 15.9% of the employees should be excluded because they were terminated before or hired after December 31st of the calendar year.

### d. Compensation of Terminated Employees

46. To demonstrate how the inclusion of employees terminated prior to December 31, 2007 understates the calculation of the average compensation of the Workforce in 2007, consider the following:

- The average compensation for employees terminated prior to 12/31/07 is $42,868.

- The median compensation for employees terminated prior to 12/31/07 is $14,366.

- The minimum compensation for employees terminated prior to 12/31/07 is -$4,000.

- The maximum compensation for employees terminated prior to 12/31/07 is $5,952,842.

47. Table 1.4 below displays the average, median, minimum and maximum Non-Discrimination Testing ("NDT") compensation for employees terminated prior to December 31st of each calendar year.

| Table 1.4 NDT Compensation Statistics for All Employees Terminated Prior to December 31 of the Calendar Year | | | | |
|---|---|---|---|---|
| Calendar Year | Average | Median | Minimum | Maximum |
| 2003 | $34,740 | $12,512 | $2 | $4,968,974 |
| 2004 | $32,143 | $15,341 | $0 | $3,143,500 |
| 2005 | $39,050 | $18,455 | -$7,025 | $4,901,818 |
| 2006 | $39,546 | $14,059 | -$4,116 | $4,363,077 |
| 2007 | $42,868 | $14,366 | -$4,000 | $5,952,842 |
| 2008 | $38,750 | $13,677 | $1 | $3,222,627 |
| 2009 | $38,111 | $17,142 | -$6,458 | $2,156,983 |
| 2010 | $54,653 | $20,586 | $2 | $1,625,666 |

48. The median is determined by arranging the values of the population in numerical order and picking the middle point of those values. For calendar year 2007, a median of $14,366 indicates that, at most, half of the specific population had compensation above $14,366 and

*Expert Report of Saul Solomon*
*September 29, 2017*

the other half of the population had compensation below $14,366. The median is much lower than the average, which indicates that the average is pushed upward by the inclusion of a few outliers with high compensation and thus, the group is bottom heavy. This is confirmed by the inclusion of the maximum compensation of approximately $6 million, which is about 414 times higher than the median compensation. Thus, a large number of terminated employees had less than the average compensation. These data trends hold in all other years that hire and termination dates were provided (calendar years 2003-2010).

49. Additionally, comparing the 2007 compensation amounts of those who were terminated in 2007 to those who were employed at December 31, 2007, it is easily discernable how the compensation of the terminated employees biases downward the average total employee compensation when the terminated employees are included in the entire Workforce.

50. Specifically, Table 1.5 compares the distribution of employees terminated prior to and employed at December 31, 2007. A much larger percentage of employees who were terminated prior to December 31, 2007 earned less than $45,000 (81%) compared to employees still employed at December 31, 2007 (39.3%). Including these employees lowers the Workforce average compensation, particularly because the figures are not annualized. This is also true when including employees who were hired during the year as only partial-year NDT compensation is reported for the time period actually worked. Similar trends can be seen for other years.

| Table 1.5 | | | | |
|---|---|---|---|---|
| **Distribution of All Employees by NDT Compensation and Termination Date** | | | | |
| **Calendar Year 2007** | | | | |
| NDT Compensation | Count of Employees Terminated before Dec. 31 | Count of Employees Still Employed at Dec. 31 | % of Terminated Employees in Range | % of Non-Terminated Employees in Range |
| Less than or Equal to $10,000 | 1,112 | 569 | 39.2% | 4.7% |
| $10,001 to $45,000 | 1,185 | 4,203 | 41.8% | 34.6% |
| $45,001 to $100,000 | 309 | 3,788 | 10.9% | 31.2% |
| $100,001 to $500,000 | 201 | 3,128 | 7.1% | 25.8% |
| $500,000+ | 28 | 457 | 1.0% | 3.8% |
| **Total** | **2,835** | **12,145** | **100.0%** | **100.0%** |

*Expert Report of Saul Solomon*
*September 29, 2017*

*e. Number of Eligible Employees*

51. Defendants state in the "RBC – US Wealth Accumulation Plan (WAP) Top-Hat Analysis Review" that the number of employees eligible to participate in the WAP in 2008 is 2,675 and therefore the percent of employees eligible to participate in the WAP in 2008 is, according to them, 17.7% (2,675/15,095).[43] However, using the revised figures this percent is much higher at 22% even using the Defendants' number of eligible employees (2,675/12,145).

52. Additionally, it is unclear how Defendants tallied the WAP eligible employees to come to a  count of 2,675 as of January 2008. The number of employees included in the data file for WAP eligible employees in 2008 is 2,931 of which 28 were terminated prior to December 31, 2007 and 214 were hired after December 31, 2007. Subtracting these amounts from the total count leaves a revised WAP eligible count of 2,689 for the WAP in 2008.  Using the revised counts described above, the correct measurement of WAP eligible employees to the total Workforce is 22.1% (2,689/12,145) for the 2008 plan year.

53. Based on the reasons described in detail above, the 2008 WAP Matrix should not be relied upon as an accurate measurement of the number  of  eligible employees to total Workforce (the ratio test). More specifically, the 2008 WAP Matrix understates the ratio since it appears to use the wrong calendar year's data in calculating the ratio for a particular plan year and considers employees who were terminated prior to December 31st or not even employed during the qualifying calendar year.

### B. COMPENSATION LEVEL ANALYSIS

54. From 2003 through 2008, most non-production employees (production employees consist primarily of financial consultants and branch managers who qualify for the WAP by meeting production thresholds)[44] could qualify for eligibility to participate in the WAP by

---

[43] RBC – US Wealth Accumulation Plan (WAP), Top-Hat Analysis Review, August 7, 2008, (RBC 02077 – 2082).
[44] RBC assigns a packet code to employees who may be eligible to participate in the WAP.  Financial consultants are identified in the data by the WAP Packet code of FINCONSULT, FCSELECT, and FCENTRY.

meeting a minimum gross compensation level of $150,000. This threshold was changed to $350,000 for the plan year 2009.[45]

55. The Excel files provided by RBC for all employees contained the NDT compensation for each employee by year; however, it did not contain the amount of Benefits Salary for each employee for each year. NDT compensation is based on a calendar year. According to the Stipulation of Facts Regarding WAP Eligibility, in some years, certain employees meet eligibility requirements for the WAP with a minimum level based on fiscal year compensation, referred to by RBC as "Benefits Salary".

56. Because Benefits Salary was not provided for all employees for all years analyzed,[46] I have used NDT compensation[47] to measure compensation levels. Based upon my review of NDT compensation and Benefits Salary and considering that Benefits Salary was not provided for every year, it is my opinion that using NDT compensation is a reasonable approach in measuring compensation. Additionally, RBC itself used NDT compensation when calculating the statistics in the 2008 WAP Matrix as evidenced in the column labeled "Average Comp of Workforce", which is calculated using NDT compensation in the Excel files provided by RBC.[48]

### i. Compensation Ratios for Eligible Employees

57. For each year, I calculated the average compensation for all employees eligible to participate in the WAP and those who enrolled as participants[49] to the average compensation of the total Workforce.

---

[45] Deposition of Gabriela Sikich dated July 11, 2017, p. 145.

[46] Benefits Salary was not provided in the tabs "2004 WAP Eligible" and "2005 WAP Eligible" in the Excel file named "RBC-PAUL000011153".

[47] When preparing my analysis below, I used annualized NDT compensation. NDT compensation was annualized based on the hire and termination dates for each employee. If an employee was hired and/or terminated in the year that the NDT was reported, the average daily wage for the time worked during that year was estimated and then multiplied by the total number of days in the calendar year.

[48] While BRG was unable to re-calculate the exact Average Comp of the Workforce for every year in the 2008 WAP Matrix using NDT compensation, the years 2003, 2005, and 2008 average did match exactly based on RBC's counts. BRG's calculation of the average using RBC's counts for the years 2004, 2007, and 2009 were off by less than 2% in each year so it is reasonable to assume that RBC used NDT compensation for this statistic in the 2008 WAP Matrix.

[49] Participants for each year are defined as those WAP eligible employees who have a total deferral percentage in the data provided greater than 0.

*Expert Report of Saul Solomon*
*September 29, 2017*

| Table 1.6 | | | | |
|---|---|---|---|---|
| **Compensation Ratio for Eligible Employees - <span style="color:red">For All Employees</span>** | | | | |
| **Plan Year** | **Average Compensation for WAP Eligible** | **Average Compensation for WAP Participants** | **Average Compensation for All Employees** | **Ratio of Eligibles to All Employees** | **Ratio of Participants to All Employees** |
| 2004 | $323,874 | $324,511 | $94,862 | 3.41 | 3.42 |
| 2005 | $331,249 | $322,528 | $105,930 | 3.13 | 3.04 |
| 2006 | $346,005 | $313,813 | $115,074 | 3.01 | 2.73 |
| 2007 | $376,985 | $319,360 | $128,908 | 2.92 | 2.48 |
| 2008 | $385,200 | $317,250 | $132,149 | 2.91 | 2.40 |
| 2009 | $386,580 | $304,005 | $117,181 | 3.30 | 2.59 |
| 2010 | $479,133 | $357,132 | $131,786 | 3.64 | 2.71 |
| 2011 | $549,581 | $383,462 | $152,571 | 3.60 | 2.51 |

58. As a whole, WAP eligible employees had compensation ranging from 2.91 to 3.64 times the average compensation of the entire Workforce. The lowest ratio of 2.91 occurred in 2008 while the highest of 3.64 occurred in 2010 after the eligibility changes were implemented. Also, from 2005 through 2011, the average compensation for WAP eligible employees is at least as high as the average compensation of those who participated in the WAP indicating that more lower-compensated employees actually participated in the WAP.

59. As noted above, FCs qualify for eligibility to participate in the WAP by meeting a minimum gross production level rather than by meeting a minimum compensation level as is the case for non-production employees (Non-FCs). Thus, I have analyzed the compensation of Non-FCs and FCs separately. Below is the compensation of Non-FCs as compared to all employees.

60. For each year, I calculated the average compensation for the Non-FC employees eligible to participate in the WAP, and those who enrolled as participants, to the average compensation of the total Workforce.  The results are as follows:

*Expert Report of Saul Solomon*
*September 29, 2017*

| Plan Year | Average Compensation for WAP Eligible (Non-FCs) | Average Compensation for WAP Participants (Non-FCs) | Average Compensation for All Employees | Ratio of Eligibles to All Employees | Ratio of Participants to All Employees |
|---|---|---|---|---|---|
| **Table 1.7** | | | | | |
| **Compensation Ratio for Eligible Employees - For Non-FCs** | | | | | |
| 2004 | $388,683 | $431,938 | $94,862 | 4.10 | 4.55 |
| 2005 | $410,306 | $434,180 | $105,930 | 3.87 | 4.10 |
| 2006 | $459,440 | $442,731 | $115,074 | 3.99 | 3.85 |
| 2007 | $507,862 | $451,520 | $128,908 | 3.94 | 3.50 |
| 2008 | $497,093 | $442,637 | $132,149 | 3.76 | 3.35 |
| 2009 | $678,688 | $523,235 | $117,181 | 5.79 | 4.47 |
| 2010 | $905,210 | $693,586 | $131,786 | 6.87 | 5.26 |
| 2011 | $878,851 | $639,560 | $152,571 | 5.76 | 4.19 |

61. Non-FC WAP eligible employees had average annual compensation ranging from a low of $388,683 in 2004 to a high of $905,210 in 2010. The change in eligibility criteria for this group is evidenced by the increase in average compensation from 2008 to 2009 and again in 2010.

62. For each year, I compared the average annual compensation for FCs[50] eligible to participate in the WAP and those enrolled as participants to the average compensation of the total Workforce. The results are shown below in Table 1.8.

---

[50] When analyzing compensation for FCs, I have used NDT compensation data for employees who have a WAP packet code of "FCENTRY", "FCSELECT", or "FINCONSULT".

| Table 1.8 | | | | | |
|-----------|---|---|---|---|---|
| **Compensation Ratio for Eligible Employees - <span style="color:red">For FCs</span>** | | | | | |
| **Plan Year** | **Average Compensation for WAP Eligible (FCs)** | **Average Compensation for WAP Participants (FCs)** | **Average Compensation for All Employees** | **Ratio of Eligibles to All Employees** | **Ratio of Participants to All Employees** |
| 2004 | $209,351 | $218,332 | $94,862 | 2.21 | 2.30 |
| 2005 | $208,461 | $216,145 | $105,930 | 1.97 | 2.04 |
| 2006 | $203,851 | $211,380 | $115,074 | 1.77 | 1.84 |
| 2007 | $215,718 | $223,047 | $128,908 | 1.67 | 1.73 |
| 2008 | $237,572 | $246,198 | $132,149 | 1.80 | 1.86 |
| 2009 | $225,718 | $239,925 | $117,181 | 1.93 | 2.05 |
| 2010 | $259,589 | $275,530 | $131,786 | 1.97 | 2.09 |
| 2011 | $339,240 | $328,089 | $152,571 | 2.22 | 2.15 |

63. FC WAP eligible employees had compensation ranging from 1.67 to 2.22 times the average compensation of the entire Workforce. The lowest ratio of 1.67 occurred in 2007 while the highest ratio of 2.22 occurred in 2011 demonstrating that the change in eligibility criteria had little effect on the average compensation of FCs eligible to participate in the WAP.

### ii. Minimal Compensation Ratios for Eligible Employees

64. In *Daft v. Advest, Inc.*, the court found that averages are not useful for determining whether the plan participants count as "a select group of highly compensated employees". More relevant is a comparison of the salary earned by employees minimally qualifying for participation in the  plan against the average salary of all employees.[51] I have calculated the number of eligible employees with compensation that was less than the minimum compensation requirement for each plan year. The results are shown below in Table 1.8A.

---

[51] *Daft*, 2008 WL 190436 at *6.

*Expert Report of Saul Solomon*
*September 29, 2017*

| Table 1.8A | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Number of Eligible Employees with Annualized NDT Compensation Less than Compensation Eligibility Requirements** | | | | | | | | | |
| **Plan Year** | **2003** | **2004** | **2005** | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** |
| Compensation Threshold | $ 150,000 | $ 150,000 | $ 150,000 | $ 150,000 | $ 150,000 | $ 150,000 | $ 350,000 | $ 350,000 | $ 350,000 |
| Total Eligible Employees | 1,279 | 2,315 | 2,384 | 2,143 | 2,416 | 2,689 | 2,036 | 1,553 | 1,825 |
| Total Employees with No Previous Year NDT Compensation Data | 44 | 46 | 7 | 16 | 157 | 31 | 17 | 15 | 1 |
| Total Below Compensation Based Eligibility Requirements | 354 | 585 | 599 | 459 | 432 | 474 | 1,287 | 865 | 833 |
| Total Above Compensation Based Eligibility Requirements | 881 | 1,684 | 1,778 | 1,668 | 1,827 | 2,184 | 732 | 673 | 991 |
| **% Below Compensation Based Eligibility Requirements** | **27.7%** | **25.3%** | **25.1%** | **21.4%** | **17.9%** | **17.6%** | **63.2%** | **55.7%** | **45.6%** |
| **% Above Compensation Based Eligibility Requirements** | **68.9%** | **72.7%** | **74.6%** | **77.8%** | **75.6%** | **81.2%** | **36.0%** | **43.3%** | **54.3%** |

65. Eligible employees with compensation that was less than the minimum compensation requirement comprised primarily of FCs as their eligibility for the WAP is based on production level and not compensation as it is for Non-FCs. For 2003 through 2011, the percentage of WAP eligible employees with compensation less than the minimum compensation eligibility requirement ranged from 17.6% to as high as 63.2%. The lowest percentage of 17.6% occurred in 2008 while the highest of 63.2% occurred in 2009 after the eligibility changes were implemented. In other words, 63.2% of the WAP eligible employees in 2009 did not earn sufficient compensation to overcome the minimum compensation threshold of $350,000. From 2003 through 2005, at least 25% of the WAP eligible employees did not earn sufficient compensation to overcome the lower minimum compensation threshold of $150,000.

66. I have also identified the compensation ranges for the WAP eligible employees with compensation less than the minimum compensation eligibility requirement for each plan year. The results are shown below in Table 1.8B.

| Table 1.8B | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Statistics for Eligible Employees with Annualized NDT Compensation Less than Compensation Eligibility Requirements | | | | | | | | | |
| Plan Year | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
| Compensation Threshold | $ 150,000 | $ 150,000 | $ 150,000 | $ 150,000 | $ 150,000 | $ 150,000 | $ 350,000 | $ 350,000 | $ 350,000 |
| Total Eligible Employees | 1,279 | 2,315 | 2,384 | 2,143 | 2,416 | 2,689 | 2,036 | 1,553 | 1,825 |
| Minimum Salary of Eligible Employees Below Compensation Based Eligibility Requirements | $ 246 | $ 564 | $ 2,733 | $ 1,706 | $ 7,269 | $ 8,352 | $ 1,061 | $ 3,097 | $ 408 |
| Maximum Salary of Eligible Employees Below Compensation Based Eligibility Requirements | $ 149,921 | $ 150,000 | $ 150,000 | $ 149,946 | $ 149,879 | $ 150,000 | $ 350,000 | $ 349,762 | $ 349,773 |
| Average Salary of Eligible Employees Below Compensation Based Eligibility Requirements | $ 111,858 | $ 98,664 | $ 110,399 | $ 108,103 | $ 116,166 | $ 110,038 | $ 99,189 | $ 90,011 | $ 115,020 |
| Average Compensation for All Employees | $ 71,508 | $ 94,862 | $ 105,930 | $ 115,074 | $ 128,908 | $ 132,149 | $ 117,181 | $ 131,786 | $ 152,571 |

67. It is very clear from Table 1.8B that many WAP eligible employees with compensation less than the minimum compensation eligibility requirement for non-FCs also earned less than the average compensation for all employees. For instance, for year 2008, the average compensation for WAP eligible employees with compensation less than the minimum compensation eligibility requirement was $110,038, $22,111 or 17% less than the $132,149 average compensation for the total Workforce. In fact, the average compensation for WAP eligible employees with compensation less than the minimum compensation eligibility requirement was less than the average compensation for the total Workforce every year from 2006 to 2011.

### *iii. Eligible Compensation Ranges over Time*

68. I calculated the number of eligible employees with compensation within certain ranges. As shown in Figure 1B below, most WAP eligible employees have annual compensation ranging from $150,000 to $349,999 in every year. However, the number of WAP eligible employees within this range drops significantly in 2009 and again in 2010, as well as in 2011, when the eligibility criteria are changed.



69. For each year, I also calculated the number of WAP eligible Non-FC employees with compensation falling within certain ranges. The results are as follows:



70. Figure 1C, above, illustrates that largest number of Non-FC eligible employees had compensation between $150,000 and $349,999 from 2004 through 2008. However, when

*Expert Report of Saul Solomon*
*September 29, 2017*

the eligibility criteria for this group changed in 2009, the largest number of Non-FC eligible employees had compensation greater than $500,000.



71. Figure 1D above shows that the largest number of eligible FCs had compensation between $150,000 to $349,999 in every year and the change to the eligibility criteria in 2010 did not significantly affect this group. However, the 2010 change did have a significant impact on the number of eligible FCs with compensation less than $150,000 which was the entry threshold for Non-FC employees. Yet, the number of eligible FCs with compensation less than $150,000 was still greater than those with compensation of $350,000 and higher in every year until 2011.

### iv. Eligible Employees with Compensation Less Than the Top 20%

72. For retirement plans, one way the Internal Revenue Service defines a "Highly Compensated Employee" is "[a]n individual who…was in the top 20% of employees when ranked by compensation."[52]

73. Because the WAP was purportedly for a select group of highly compensated employees, I calculated the percent of eligible employees with annualized compensation less than the average compensation of the top 20% of all employees for each year.

---

[52] https://www.irs.gov/retirement-plans/plan-participant-employee/definitions (visited September 20, 2017).

*Expert Report of Saul Solomon*
*September 29, 2017*

**Table 1.9**

**Percentage Below the Average Annualized NDT Compensation
of the Top 20% of All Employees by Plan Year**

**For All Eligible Employees**

| Plan Year | Average Comp of All Employees | Avg Comp for Top 20% in Terms of NDT Comp for All Employees | Total Number of WAP Eligible Employees | Number of Eligible Employees Making Less than Top 20% | Percent of All Eligible Employees Making Less than Top 20% |
|---|---|---|---|---|---|
| 2003 | $71,508 | $242,661 | 1,279 | 788 | 62% |
| 2004 | $94,862 | $305,288 | 2,315 | 1,566 | 68% |
| 2005 | $105,930 | $332,252 | 2,384 | 1,731 | 73% |
| 2006 | $115,074 | $364,397 | 2,143 | 1,587 | 74% |
| 2007 | $128,908 | $411,448 | 2,416 | 1,735 | 72% |
| 2008 | $132,149 | $423,347 | 2,689 | 2,033 | 76% |
| 2009 | $117,181 | $364,602 | 2,036 | 1,329 | 65% |
| 2010 | $131,786 | $397,495 | 1,553 | 947 | 61% |
| 2011 | $152,571 | $489,031 | 1,825 | 1,169 | 64% |

74. In Table 1.9 above, in every year the majority of all eligible employees have annual compensation less than the average compensation for the top 20% of all employees indicating that the substantial majority of eligible employees are not highly compensated relative to the top 20%.

**Table 1.10**

**Percentage Below the Average Annualized NDT Compensation
of the Top 20% of All Employees by Plan Year**

**For Eligible Non-FC Employees**

| Plan Year | Average Comp of All Employees | Avg Comp for Top 20% in Terms of NDT Comp for All Employees | Total Number of WAP Eligible Non-FC Employees | Number of Eligible Non-FC Employees Making Less than Top 20% | Percent of Eligible Non-FC Employees Making Less than Top 20% |
|---|---|---|---|---|---|
| 2003 | $71,508 | $242,661 | 508 | 207 | 41% |
| 2004 | $94,862 | $305,288 | 1,481 | 861 | 58% |
| 2005 | $105,930 | $332,252 | 1,449 | 910 | 63% |
| 2006 | $115,074 | $364,397 | 1,190 | 727 | 61% |
| 2007 | $128,908 | $411,448 | 1,333 | 805 | 60% |
| 2008 | $132,149 | $423,347 | 1,539 | 1,005 | 65% |
| 2009 | $117,181 | $364,602 | 725 | 203 | 28% |
| 2010 | $131,786 | $397,495 | 533 | 71 | 13% |
| 2011 | $152,571 | $489,031 | 711 | 230 | 32% |

75. Table 1.10 shows the percent of eligible Non-FC employees with compensation less than the average of the top 20%. The change in eligibility criteria in 2009 and 2010 and the corresponding effect is clearly evidenced by the drop in the number of eligible Non-FCs from 1,005 (65%) in 2008 to 203 (28%) in 2009 and further to 64 (13%) in 2010. However, the percent of eligible Non-FC employees with compensation less than the average of the top 20% of all employees increased by 246% to 32% in 2011.

| | | | | | |
|---|---|---|---|---|---|
| **Table 1.11** | | | | | |
| **Percentage Below the Average Annualized NDT Compensation of the Top 20% of All Employees by Plan Year** <br> **For Eligible FC Employees** | | | | | |
| **Plan Year** | **Average Comp of All Employees** | **Avg Comp for Top 20% in Terms of NDT Comp for All Employees** | **Total Number of WAP Eligible FC Employees** | **Number of Eligible FC Employees Making Less than Top 20%** | **Percent of Eligible FC Employees Making Less than Top 20%** |
| 2003 | $71,508 | $242,661 | 771 | 581 | 75% |
| 2004 | $94,862 | $305,288 | 834 | 705 | 85% |
| 2005 | $105,930 | $332,252 | 935 | 821 | 88% |
| 2006 | $115,074 | $364,397 | 953 | 860 | 90% |
| 2007 | $128,908 | $411,448 | 1,083 | 930 | 86% |
| 2008 | $132,149 | $423,347 | 1,150 | 1,028 | 89% |
| 2009 | $117,181 | $364,602 | 1,311 | 1,126 | 86% |
| 2010 | $131,786 | $397,495 | 1,020 | 876 | 86% |
| 2011 | $152,571 | $489,031 | 1,114 | 939 | 84% |

76. Table 1.11 shows the percent of eligible FC employees with compensation less than the average of the top 20%. The change in eligibility criteria in 2010 for FCs is not associated with a corresponding drop in the percent of eligible FCs with compensation less than the top 20%. Instead, from 2004 through 2011, the number of eligible FCs with compensation less than the average of the top 20% is consistently above 80% indicating that this group is not highly compensated relative to the top 20%.

77. According to Tammy Buchert, the former RBC Capital Markets Finance Manager, a high level of production does not necessarily equate to a high level of compensation.[53] So while RBC sets eligibility for the WAP based on production levels, it does not necessarily mean

---

[53] Deposition of Tammy Buchert from *Tolbert v RBC Capital Market Corp., et al* dated October 27, 2011, p. 226-229.

*Expert Report of Saul Solomon*
*September 29, 2017*

that the individuals selected to participate are highly compensated, or especially, part of a select group.

### *v. Eligible FCs Make Less than Other Eligible Employees*

78. A simple analysis of the average compensation of all WAP eligible employees by packet code quickly identifies those eligible employees who are most highly compensated, as demonstrated by Table 1.12 below.[54]

79. According to Gabriela Sikich, RBC's corporate representative witness in *Brazelton v. RBC*, FCs do not have managerial responsibilities and are not part of management. However, she does consider them highly compensated.[55] Table 1.12, however, compares the average compensation of FCs to the other groups of employees eligible for WAP in each year and FCs (packet codes FINCONSULT, FCSELECT, and FCENTRY) have average compensation near the bottom of the range for each year. Packet codes are created by RBC to identify eligibility requirements and participation options (i.e., types of contributions, type of vesting, etc.)[56] and may be introduced or discontinued due to changes in the WAP options.[57]

---

[54] RBC assigns a packet code to employees who may be eligible to participate in the WAP. In general, the packet codes correspond to groups of employees with a similar job type. See the Stipulation of Facts Regarding WAP Eligibility for a list of packet codes and eligibility criteria for each year.

[55] Deposition of Gabriela Sikich in *Brazelton v. RBC* dated September 28, 2010, p. 15-16.

[56] Deposition of Gabriela Sikich dated July 11, 2017, p. 82-84, 99-100.

[57] For example, see discussion related to introduction of packet code FCENTRY in 2006 in deposition of Gabriela Sikich dated July 11, 2017, p. 106-107.

*Expert Report of Saul Solomon*
*September 29, 2017*

**Table 1.12**
**WAP Eligible Employee Average Annualized NDT Comp - All Employees**
**By Packet Code and Plan Year**

| Packet Code | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | Average Across All Years |
|---|---|---|---|---|---|---|---|---|---|---|
| RBCCentura-StaffBonus | | $1,462,291 | | | | | | | | $1,462,291 |
| DIRECTOR | $928,779 | $1,217,721 | $1,027,618 | $1,002,314 | | | | | | $1,052,769 |
| PCGDIRECT | | | | | $918,933 | $981,492 | $734,733 | | | $874,118 |
| STIEXEC | | | | $1,669,698 | $1,727,578 | $504,124 | $742,252 | $935,129 | $897,666 | $651,288 |
| CAPITALMKT | | $455,988 | $542,610 | $518,095 | $617,067 | | | | | $537,608 |
| FIGNCBANK | | | | | | $471,344 | | | | $471,344 |
| FIGNC | | | | | $455,707 | | | | | $455,707 |
| FICMCOMM | $457,175 | $481,177 | $441,277 | $441,788 | $406,318 | $317,054 | | | | $439,547 |
| FICMNONCOM | $404,725 | $505,906 | $416,267 | $469,055 | $204,925 | | | | | $448,815 |
| BRANCHMGR | $267,650 | $361,465 | $336,066 | $348,673 | $395,244 | $453,734 | $414,356 | $533,907 | $449,620 | $375,424 |
| CENTURA | | $351,499 | $516,347 | $318,505 | $313,641 | | | | | $356,363 |
| FCSELECT | | | | | | | $324,997 | $326,108 | $492,365 | $325,738 |
| GENERAL | $269,785 | $282,923 | $290,823 | $304,118 | $372,433 | | | | | $311,249 |
| LIBERTY | | $232,379 | $242,573 | $298,423 | $233,822 | | | | | $244,381 |
| FINCONSULT | $206,391 | $209,351 | $208,461 | $203,851 | $238,031 | $261,084 | $248,378 | $258,658 | $336,438 | $230,812 |
| MORTGAGE | | $212,720 | $192,278 | | | | | | | $203,490 |
| BRMGRENTRY | | | | | $133,865 | $137,868 | $141,159 | | | $137,779 |
| FCENTRY | | | | | $116,628 | $105,337 | $104,648 | | | $108,781 |
| Missing | $23,083 | $163,477 | | | | | | | | $157,373 |
| **Average of Eligible** | **$273,507** | **$323,874** | **$331,249** | **$346,005** | **$376,985** | **$385,200** | **$386,580** | **$479,133** | **$549,581** | |
| **Average of All Employees** | **$71,508** | **$94,862** | **$105,930** | **$115,074** | **$128,908** | **$132,149** | **$117,181** | **$131,786** | **$152,571** | |

80. In 2007 for example, eligible employees with the WAP packet code of STIEXEC (deferral bonus only executives)[58] had an average annual compensation of $1,727,578 and PCGDIRECT (Private Client Group Directors)[59] eligible employees had an average annual compensation of $918,933, whereas BRMGRENTRY (complex director/branch manager without a post-employment distribution option)[60] eligible employees had an average annual compensation of $133,865 and FCENTRY (financial consultant without a post-employment distribution option)[61] eligible employees had an average annual compensation of $116,628. The average annual compensation for all employees in 2007 was $128,908.

### vi. Range of Compensation

81. The range of compensation for eligible employees is vast, as evidenced by comparing the average annual compensation for STIEXEC (highest compensated group) in 2007 of $1,727,578 to the average annual compensation of FCENTRY (lowest compensated eligible

---

[58] Deposition of Gabriela Sikich dated July 11, 2017, p. 35.
[59] Deposition of Gabriela Sikich in *Brazelton v. RBC* dated September 28, 2010, p. 56.
[60] Deposition of Gabriela Sikich dated July 11, 2017, p.106-107, 109-110.
[61] Deposition of Gabriela Sikich dated July 11, 2017, p. 106-107.

group) of $116,628. In fact, the average annual compensation of STIEXEC is 14.8 times that of FCENTRY in 2007. The average annual compensation for eligible financial consultants in 2007 was $215,718 (see Table 1.8). Compensation for FCs is discussed elsewhere in other sections of this report. The range of the average annual compensation across all years for each packet code for eligible employees is illustrated in Figure 1E below.



### vii. Other Comparisons

82. For the plan year 2004, 10.1% of eligible Non-FC employees made less than the average NDT compensation for all employees ($94,862[62]), 77.2% made less than $500,000, and

---

[62] See Table 1.6.

*Expert Report of Saul Solomon*
*September 29, 2017*

48.1% made  less $250,000 in NDT compensation for eligible employees as demonstrated in Figure 1F below.



83. Similarly, as seen in Figure 1G, the majority of eligible Non-FC employees have compensation that is less than the average compensation of eligible employees.

*Expert Report of Saul Solomon*
*September 29, 2017*



84. Figures 1H and 1I display detailed distributions of annualized NDT compensation of eligible Non-FC employees for 2004. Similar trends can be seen in other years. As is evident by Figure 1H below, in 2004, a substantial portion (39.0%) of eligible Non-FCs had annual compensation ranging from $151,000 to $300,000. Figure 1I illustrates that on a cumulative basis 77.2% of eligible Non-FCs have compensation less than $500,000.



Figure 1H
Distribution of Eligible Employees by Annualized NDT Compensation - Non-FCs
For Plan Year 2004



Figure 1I
Cumulative Distribution of Eligible Employees by Annualized NDT Compensation - Non-FCs
For Plan Year 2004

### *viii. Lower Level Employees Participated at a Higher Rate*

85. Moreover, a higher percentage of lower level employees participate in the WAP than more highly compensated employees. In Table 1.13 below, I have calculated the percentage of eligible employees who participated in the WAP by packet code. For the purposes of this table, I have grouped together packet codes that have an average annualized NDT compensation of $500,000 or more as a conservative proxy for "high level" employees and those who made less than $500,000 as "low level". In the plan year 2008, only 30% of eligible employees who made over $500,000 participated in the WAP compared to 89% of employees who made less than $500,000.

**Table 1.13**
**WAP Eligible Employee Participation**
**By Packet Code and Plan Year**
**For Non-FCs**

| Packet Code | Percent of Participating Eligible Employees | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
| RBCCentura-StaffBonus | | 0% | | | | | | | |
| DIRECTOR | 100% | 100% | 100% | 100% | | | | | |
| PCGDIRECT | | | | | 100% | 100% | 100% | | |
| STIEXEC | | | | 100% | 75% | 29% | 22% | 19% | 16% |
| CAPITALMKT | | 17% | 22% | 20% | 25% | | | | |
| FIGNCBANK | | | | | 99% | | | | |
| FIGNC | | | | | 44% | | | | |
| FICMCOMM | 71% | 73% | 75% | 60% | 49% | 41% | | | |
| FICMNONCOM | 100% | 100% | 100% | 98% | 0% | | | | |
| BRANCHMGR | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 61% |
| CENTURA | | 14% | 28% | 28% | 27% | | | | |
| GENERAL | 72% | 84% | 81% | 81% | 57% | | | | |
| LIBERTY | | 36% | 45% | 64% | 62% | | | | |
| MORTGAGE | | 26% | 26% | | | | | | |
| BRMGRENTRY | | | | | | 100% | 100% | 100% | |
| Blank | 0% | 0% | | | | | | | |
| **Total** | **88%** | **48%** | **52%** | **54%** | **47%** | **36%** | **38%** | **25%** | **18%** |
| **Percent of High Level Eligibles Participating** | **100%** | **22%** | **26%** | **23%** | **26%** | **30%** | **23%** | **19%** | **16%** |
| **Percent of Low Level Eligibles Participating** | **87%** | **61%** | **67%** | **83%** | **68%** | **89%** | **100%** | **100%** | **61%** |

86. Similarly, Figure 1J displays the percentage of eligible employees by participation and their average annual NDT compensation. Starting in 2006, the average annualized NDT compensation of non-participants for Non-FC employees was higher than the average

*Expert Report of Saul Solomon*
*September 29, 2017*

annualized NDT compensation of participants. Moreover, the difference in average annual NDT compensation and the number of non-participants increased over time.



V.   **FC PRODUCTION LEVEL ANALYSIS**

87. RBC FCs qualify for WAP eligibility by meeting a minimum gross production level, rather than by meeting a minimum compensation level.[63] Furthermore, an FC's production level does not directly correlate to his or her actual compensation.[64] As such, I have analyzed the production levels of FCs separately but in a similar manner in which I analyzed the minimum compensation levels for all Non-FCs.[65]

---

[63] Deposition of Gabriela Sikich dated July 11, 2017, p. 87-88.
[64] Deposition of Tammy Buchert from *Tolbert v RBC Capital Market Corp., et al* dated October 27, 2011, p. 226-228.
[65] The analyses performed in this section are based on TOLBERT0001112, TOLBERT0001114-22, and TOLBERT0001124-25,

*Expert Report of Saul Solomon*
*September 29, 2017*

### *i. Most FCs Are Eligible to Participate*

88. For each year, I calculated the percentage of financial consultants eligible to participate in the WAP as compared to the total number of FCs.[66]  The results are as follows:

| Eligible FCs / Total FCs by Plan Year | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2004** | **2005** | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** |
| **Number of Eligible FCs** | 827 | 939 | 945 | 1,013 | 1,145 | 1,316 | 886 | 1,113 |
| **Number of FCs** | 1,688 | 1,641 | 1,569 | 1,533 | 1,711 | 2,484 | 1,930 | 2,114 |
| **Eligible FCs As a Percent of Total FCs** | 49.0% | 57.2% | 60.2% | 66.1% | 66.9% | 53.0% | 45.9% | 52.6% |

89. In *Daft v. Advest, Inc.*, all brokers were eligible to participate in the plan if they met certain gross commission thresholds. In 1993, half the financial advisors met the threshold and participated in the plan. The court held that the gross commission threshold was low because more than half of the account managers participated in the plan. The court inferred that it was, at best, the average commission.[67] Similarly, all RBC FCs are eligible to participate if they meet a certain gross production level, and in every year, from 2005 through 2009, as well as in 2011, more than half of all FCs were eligible to participate in the WAP.

90. RBC had 1,711 FCs in 2008 and 1,145 or 66.9% were eligible to participate in the WAP. The figure below displays the distribution and number of eligible and non-eligible FCs each year.

---

[66] All employees that were listed in the "FC Eligibility" for each year were considered an FC, regardless of the title provided.  FCs were limited to employees who were hired before or terminated after December 31 of the calendar year.  Eligibility for FCs using the production data is based on the eligibility category defined in the data.  There are a few instances where it appears that eligibility had not yet been determined for a given employee.  These employees are excluded.

[67] *Daft.*, 2008 WL 190436 at *4.



Figure 2A
Distribution and Number of Eligible and Non-Eligible Financial Consultants

*ii. Most FCs Are Below Average Producers*

91. I also calculated the number of eligible FCs with production less than the average production of eligible FCs.  The results are as follows:

| Percent of Eligible FCs with Production / TTMP Less than the Average of Eligible FCs by Plan Year | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
| Number of Eligible FCs with Production / TTMP Less than the Average of Eligible FCs | 559 | 598 | 635 | 666 | 740 | 875 | 620 | 758 |
| Number of Eligible FCs | 827 | 939 | 945 | 1,013 | 1,145 | 1,316 | 886 | 1,113 |
| Percent of Eligible FCs with Production / TTMP Less than the Average of Eligible FCs | 67.6% | 63.7% | 67.2% | 65.7% | 64.6% | 66.5% | 70.0% | 68.1% |

Notes: TTMP is the trailing twelve-month production for eligible FCs.

92. As shown in Table 2.1 below, in 2008, there are 1,711 FCs, which represents 11.3% of the Workforce provided by the Defendants (15,095) or 14.1% of the 12,145 employees.[68] There are 1,145 eligible FCs, which represent 42.6% of all eligible employees (2,689).

| | | | | |
|---|---|---|---|---|
| **Table 2.1** | | | | |
| **Summary of Eligible Financial Consultants from the Production Data** | | | | |
| **Plan Year** | **Number of FCs** | **Number of Eligible FCs** | **Total Number of Eligible Employees** | **Eligible FCs as a Percentage of Total Eligible Employees** |
| 2004 | 1,688 | 827 | 2,315 | 35.7% |
| 2005 | 1,641 | 939 | 2,384 | 39.4% |
| 2006 | 1,569 | 945 | 2,143 | 44.1% |
| 2007 | 1,533 | 1,013 | 2,416 | 41.9% |
| 2008 | 1,711 | 1,145 | 2,689 | 42.6% |
| 2009 | 2,484 | 1,316 | 2,036 | 64.6% |
| 2010 | 1,930 | 886 | 1,553 | 57.1% |
| 2011 | 2,114 | 1,113 | 1,825 | 61.0% |

93. In 2008, the average production/TTMP for eligible FCs was $643,092, and the median production/TTMP was $519,153 suggesting the average is skewed by a small number of high producers.

94. Additionally, 740 or 65% of eligible FCs were below the average production of eligible FCs while 502 or 44% of eligible FCs had production below the average production of all FCs as shown in Table 2.2. As shown in Figures 2B and 2C, similar results are observed in other years.

---

[68] An eligible employee is enrolled (or participating) if the total deferral percentage is greater than 0 and they were hired prior to January 1 of that year. For financial consultants, this not the same criteria used to actually determine eligibility. Therefore, I discuss the eligibility of financial consultants based on the production data. The population of FCs in the production data is based on the end of the fiscal year (September 30), whereas the total number of eligible employees and total employees are based on the end of the calendar year. Despite this small discrepancy, the two datasets identify roughly the same financial consultants and are therefore reasonably comparable.

| | | | | Number of Eligible FCs with Production / TTMP Less than the Average of Eligible FCs | Percent of Eligible FCs with Production / TTMP Less than the Average of Eligible FCs | | | Number of Eligible FCs with Production / TTMP Less than the Average of All FCs | Percent of Eligible FCs with Production / TTMP Less than the Average of All FCs |
|---|---|---|---|---|---|---|---|---|---|
| Plan Year | Number of Eligible FCs | Average Production / TTMP of Eligible FCs | Median Production / TTMP of Eligible FCs | | | Average Production / TTMP of All FCs | Median Production / TTMP of All FCs | | |
| 2004 | 827 | $562,417 | $444,753 | 559 | 68% | $359,435 | $288,006 | 215 | 26% |
| 2005 | 939 | $562,954 | $457,767 | 598 | 64% | $395,197 | $326,991 | 334 | 36% |
| 2006 | 945 | $573,420 | $468,042 | 635 | 67% | $413,615 | $340,134 | 358 | 38% |
| 2007 | 1,013 | $591,831 | $480,510 | 666 | 66% | $450,898 | $370,441 | 439 | 43% |
| 2008 | 1,145 | $643,092 | $519,153 | 740 | 65% | $486,223 | $396,964 | 502 | 44% |
| 2009 | 1,316 | $661,764 | $541,803 | 875 | 66% | $410,495 | $317,342 | 398 | 30% |
| 2010 | 886 | $724,303 | $593,796 | 620 | 70% | $456,602 | $372,531 | 175 | 20% |
| 2011 | 1,113 | $764,581 | $607,424 | 758 | 68% | $520,381 | $408,461 | 393 | 35% |

**Table 2.2**

**Analysis of Eligible Financial Consultants Production Data In Relation to the Higher of Average Production / TTMP**

Notes: TTMP is the trailing twelve-month production for eligible FCs.

95. Figure 2B graphically shows the percent of eligible FCs with production/TTMP less than the average of all FCs for each year.



**Figure 2B**
**Percent of Eligible FCs with Production/TTMP Less than the Average of All FCs**

Notes: TTMP is the trailing twelve-month production for eligible FCs.

96. Figure 2C illustrates the distribution of eligible FC production/TTMP around the average FC production/TTMP for each year.



Notes: TTMP is the trailing twelve-month production for eligible FCs.

### *iii. The Vast Majority of Eligible FCs are not "Highly Productive"*

97. In 2005, RBC considered FCs with production of $750,000 or more as "Highly Productive".[69] Among eligible FCs in 2008, for example, 866, or 76%, did not qualify as high-level producers as defined by a $750,000 threshold as seen in Table 2.3 below.

98. Separately, RBC described $600,000 as the average production level for FCs in October 2008.[70] In 2008, for example, 682, or 60% of eligible FCs had production/TTMP less than $600,000.

99. Table 2.3 and Figure 2D below for trends against these benchmarks in other years.

| | | \multicolumn{2}{c}{} | \multicolumn{2}{c}{} |
|---|---|---|---|---|---|

<table>
<tr><td colspan="6" align="center"><b>Table 2.3</b><br><b>Analysis Eligible Financial Consultants Production Data</b></td></tr>
<tr><td><b>Plan Year</b></td><td><b>Number of Eligible FCs</b></td><td><b>Number of Eligible FCs with Production / TTMP Less than $750k</b></td><td><b>Percent of Eligible FCs with Production / TTMP Less than $750k</b></td><td><b>Number of Eligible FCs with Production / TTMP Less than $600k</b></td><td><b>Percent of Eligible FCs with Production / TTMP Less than $600k</b></td></tr>
<tr><td>2004</td><td>827</td><td>693</td><td>84%</td><td>588</td><td>71%</td></tr>
<tr><td>2005</td><td>939</td><td>784</td><td>83%</td><td>647</td><td>69%</td></tr>
<tr><td>2006</td><td>945</td><td>787</td><td>83%</td><td>656</td><td>69%</td></tr>
<tr><td>2007</td><td>1,013</td><td>825</td><td>81%</td><td>673</td><td>66%</td></tr>
<tr><td>2008</td><td>1,145</td><td>866</td><td>76%</td><td>682</td><td>60%</td></tr>
<tr><td>2009</td><td>1,316</td><td>987</td><td>75%</td><td>769</td><td>58%</td></tr>
<tr><td>2010</td><td>886</td><td>634</td><td>72%</td><td>454</td><td>51%</td></tr>
<tr><td>2011</td><td>1,113</td><td>730</td><td>66%</td><td>528</td><td>47%</td></tr>
</table>

Notes: TTMP is the trailing twelve-month production for eligible FCs.

100. Figure 2D graphically illustrates the number of eligible FCs with production less than $750,000 and $600,000 for each year. As discussed above, RBC documents describe $600,000 as the average FC production in October 2008.[71]

---

[70] TOLBERT0000938.
[71] TOLBERT0000938.

*Expert Report of Saul Solomon*
*September 29, 2017*



Notes: TTMP is the trailing twelve-month production for eligible FCs.

### iv. FCs Minimally Eligible to Participate

101.    From 2003 to 2009, FCs were required to have fiscal year production greater than $300,000 in order to be eligible to participate in the WAP. This was raised to $400,000 for the plan years 2010 and 2011. The Stipulation of Facts Regarding WAP Eligibility provides a summary of the eligibility requirements by plan year and packet code.

102.    Based on the annual production data provided, in plan years 2010 and 2011, 130 (15%) and 167 (15%) FCs had production/TTMP between 100% and 110% of the eligibility threshold - meaning that these eligible FCs produce on the margin of the qualifying production. Table 2.4 below displays similar trends for other years.

*Expert Report of Saul Solomon*
*September 29, 2017*

| | | | Number of Eligible FCs with Production / TTMP within +10% of the Eligibility Threshold | Percent of Eligible FCs with Production / TTMP within +10% of the Eligibility Threshold |
|---|---|---|---|---|
| **Plan Year** | **Number of Eligible FCs** | **Eligibility Threshold** | | |
| 2004 | 827 | $300,000 | 144 | 17% |
| 2005 | 939 | $300,000 | 132 | 14% |
| 2006 | 945 | $300,000 | 143 | 15% |
| 2007 | 1,013 | $300,000 | 140 | 14% |
| 2008 | 1,145 | $300,000 | 115 | 10% |
| 2009 | 1,316 | $300,000 | 142 | 11% |
| 2010 | 886 | $400,000 | 130 | 15% |
| 2011 | 1,113 | $400,000 | 167 | 15% |

**Table 2.4
Eligible FCs with Production /
TTMP Between 100% and 110% of Threshold**

Notes: TTMP is the trailing twelve-month production for eligible FCs.

### v. Ineligible FCs Are Allowed to Participate

103.    From 2003 to 2010, eligible FCs were required to have fiscal year production greater than
$300,000. In 2010, this requirement was raised to a minimum fiscal year production level
greater than $400,000.[72] The Stipulation of Facts Regarding WAP Eligibility provides a
summary of the eligibility requirements by plan year and PKT code.

---

[72] Deposition of Gabriela Sikich dated July 11, 2017, p. 145.

104.    Based on the annual production data provided, in the plan years 2005, 2008 and 2009, certain employees were eligible to participate in the WAP even though they failed to meet the production requirement of $300,000 either by last year's fiscal year production or by TTMP when hired. In 2005, one FC failed to the meet the eligibility criteria but was still eligible to participate. The same occurred for two FCs in 2008 and twelve FCs in 2009.

## VI.    ASSUMPTIONS AND LIMITING CONDITIONS

105.    This report is based solely upon the information that has been provided to me and is described in this report. This report was prepared solely for use in this matter and should not be used for any other purpose. Possession of this report, or a copy thereof, does not carry with it the right of publication of all or part of it, nor may it be used for any other purpose (other than stated above) without the previous written consent of BRG, and in any event only with proper authorization. This report reflects facts and conditions existing at the report date. Subsequent events have not been considered, and I have no obligation to update my report for such events and conditions.

106.    I reserve the right to supplement this report at a later date if new information becomes available.

*           *           *           *           *

Respectfully submitted,

*Saul Sol*

Saul Solomon

## Curriculum Vitae                     Exhibit 1



**SAUL SOLOMON**
BERKELEY RESEARCH GROUP, LLC
700 Louisiana Street, Suite 2600
Houston, Texas 77002

Direct: 713.481.9431          Mobile: 713.806.3868          Fax: 713.236.8596
ssolomon@thinkbrg.com

## EDUCATION

BBA, Accounting (highest honors)          University of Texas at Austin, 1977

## PRESENT EMPLOYMENT

Managing Director, Berkeley Research Group, LLC

## PREVIOUS POSITIONS

Managing Director, UHY Advisors FLVS, Inc., 1981–2010
National practice leader of Forensic, Litigation, and Valuation Services Group, and a member of its Executive Committee. Member of the Management Committee for UHY Advisors, Inc. and a partner with UHY LLP, a licensed CPA firm.

Senior Auditor, Ernst & Young, Houston, Texas, 1977–1981
Planned, supervised, and conducted audits on a diverse range of companies and industries.

## CERTIFICATIONS AND DESIGNATIONS

Certified Public Accountant (CPA)
Certified Fraud Examiner (CFE)
Certified in Financial Forensics (CFF)
Accredited in Business Valuation (ABV)
Certified Valuation Analyst (CVA)

## PROFESSIONAL AFFILIATIONS

American Institute of Certified Public Accountants
Texas Society of Certified Public Accountants
Houston Chapter of TSCPA
National Association of Certified Valuation Analysts
Association of Certified Fraud Examiners

Exhibit 1



## BUSINESS AND NOT-FOR-PROFIT AFFILIATIONS

Children's Museum of Houston, 2009–present
Member, Finance Committee and Investment Committee


## SELECTED SPEAKING ENGAGEMENTS AND PROFESSIONAL PUBLICATIONS

(1) "Be Precise or Pay the Price: Tips for Deal Language," Texas Lawyer In-House Counsel Summit, November 6, 2014
(2) "Calculating Lost Profits for Emerging Companies: A Case Study," presented for the AICPA, September 2004
(3) "Case Studies, Calculating Damages for Emerging Businesses," presented for the NLSSA, May 2004
(4) "Case Studies, Damage Calculations," presented for the NLSSA, November 2002
(5) "Claims Against Fiduciaries – The CPA's Role, American Institute of CPAs," presented at the National Advanced Litigation Services Conference, October 1999
(6) Business Valuations Seminar, NLSSA, January 1999


## PROFESSIONAL EXPERIENCE

Mr. Solomon specializes in forensic financial investigations, financial and economic analysis in disputes, and valuation of businesses. His experience includes the following areas:

- Damages calculations – Lost profits, fraud, punitive
- Forensic and investigative accounting, fraud investigations
- Valuation of business entities
- Intellectual property, trade secrets matters
- Evaluation of accounting and auditing issues, financial reporting, application of Generally Accepted Accounting Principles, and auditing standards
- Bankruptcy matters – Forensic and fraud investigations, solvency analysis
- Securities fraud, including state and federal class action
- Class certifications financial analysis
- Purchase price and earnout disputes
- ERISA class-action damages
- Accounting and financial reporting fraud
- Oil and gas royalty disputes
- Class action claims administration
- Alter ego and piercing the corporate veil investigations
- Personal injury, wrongful death, wrongful termination, discrimination and damage calculations
- Family law and estate matters

In connection with his previous employment in public accounting over a 33 year time, Mr. Solomon has been responsible for the financial reporting of privately owned, public, and nonprofit organizations in a variety of industries including energy, manufacturing and distribution, retail, construction and real estate,

Exhibit 1



healthcare, financial, professional services, and technology.  He served as prior local practice leader for audit and financial reporting engagements, developed an audit and financial reporting department and was primarily responsible for technical compliance on financial reporting engagements, including compliance with the peer review process.

Mr. Solomon has also provided a variety of financial consulting to corporate clients, including:

- Financial analysis, budgeting, and forecasting
- Tax planning
- Assistance with financing
- Merger and acquisition services, including financial due diligence
- Establishing inventory control and desired levels
- Internal accounting controls and development of policies and procedures
- Analysis of budgetary controls and compliance

**TESTIMONY EXPERIENCE**

Mr. Solomon has provided testimony in State District Courts, Family Law Courts, and Federal Courts and has testified in excess of 200 times in over 175 cases, involving a variety of financial, accounting, forensic, or economic issues.  Mr. Solomon has also served as a third party neutral arbitrator and has actively participated in mediations and arbitration proceedings, both as an expert and consultant.

**TRIALS**

| Case | Date | Judge/Court | Client | Attorney Plaintiff/Petitioner | Attorney Defendant/Respondent |
|---|---|---|---|---|---|
| 1) Beach Capital Partnership, L.P. vs. DeepRock Venture Partners, L.P. | 2/11 | 55th Judicial District Court Harris County, Texas | D | Robert Louis Theriot - Liskow & Lewis | Sean R. O'Brien - Arkin Kaplan Rice LLP |
| 2) George A. Dishman, et al. v. BBVA Compass Bank | 4/11 | U.S. District Court Eastern District of Texas Beaumont Division | D | Barrett H. Reasoner - Gibbs & Bruns LLP | Howard Close and Kathleen S. Rose - Wright & Close, LLP |
| 3) NCI Building Systems, Inc. vs. Kelly R. Ginn, Green-Span Profiles, L.P., Green-Span Management, L.L.C. and BKG Investments, L.L.C. | 10/11 | 11th Judicial District Court Harris County, Texas | D | Rusty Hardin - Rusty Hardin & Associates, PC Melissa Judd - Littler Mendelson, P.C. | Stephen W. Schueler - Winstead PC |
| 4) American Senterfitt, et al. vs. Scott D. Martin | 12/11 | Arbitration 55th Judicial District Court Harris County, Texas | D | Craig Smyser and Justin M. Waggoner - Smyser Kaplan & Veselka, L.L.P. | David Kent Bissinger - Siegmyer Oshman & Bissinger LLP |
| 5) JSW Steel (USA) Inc. vs. Liberty Mutual Group, Inc. and Liberty Mutual Fire Insurance Company | 1/12 | U.S. District Court Southern District of Texas Galveston Division | P | Hunter M. Barrow - Thompson & Knight LLP | Gerald McElroy, Jr. - Zelle Hofmann Voelbel & Mason, L.L.P. |
| 6) Teri Heggelund, Dag Heggulund, and Jack DeLage vs. Schlumberger Technology Corporation | 1/12 | American Arbitration Association | D | Chris Hanslik and Ryan Bardo - Boyar Miller | W. Ray Whitman, Michelle D. Pector, and James H. Nye - Baker and Hostetler LLP |
| 7) Contender Offshore Services, LLC, et al. v. Bassoe Offshore (USA), Inc., et al. | 2/12 | 127th Judicial District Court Harris County, Texas | D | Martin A. Shellist - Shellist Lazarz Slobin LLP Todd J. Zuker and E. Michelle Bohreer - Bohreer & Zucker LLP | James G. Munisteri - Gardere Wynne Sewell LLP. |
| 8) Transatlantic Holdings, Inc., et al. v. American International Group, Inc. | 7/12 | American Arbitration Association | P | Joseph H. Meltzer and Sharan Nirmul - Kessler Topaz Meltzer & Check, LLP | Joseph S. Allerhand, Anthony J. Albanese, Stacy Nettleton, and Brant D. Kuehn - Weil, Gotshal & Manges LLP |

TRIALS

| Case | Date | Judge/Court | Client | Attorney Plaintiff/Petitioner | Attorney Defendant/Respondent |
|------|------|-------------|--------|-------------------------------|-------------------------------|
| 9) In the Matter of the Arbitration of Campbell Harrison & Dagley, LLP, et. al. v. Albert G. Hill, III, et. al. | 9/12 | American Arbitration Association | P | Howard L. Close and Thomas C. Wright - Wright & Close, LLP | Irell & Manella LLP |
| 10) MB Industries, LLC, et al. vs. Hunter Building & Manufacturing LP, et al. | 10/12 | 215th Judicial District Court Harris County, Texas | D | Mike Martin - Maloney, Martin, LLP Steve A. Bryant - Steve A. Bryant & Associates | Howard L. Close - Wright & Close LLP |
| 11) United States of America v. Rodney Watts | 5/13 | United States District Court Eastern District of New York | D | Loretta E. Lynch - United States Attorney, Eastern District of New York | Marion Bachrach - Thompson & Knight LLP |
| 12) In the Matter of the Marriage of Jimmy Tran and Hoang-Yen Thi Dang | 2/14 | 309th Judicial District Court Harris County, Texas | R | W. Thomas Liddell - Law Office of W. Thomas Liddell Lan T. Nguyen - Shortt & Nguyen, P.C. | Richard Flowers and Todd Frankfort - Flowers & Frankfort |
| 13) In Re: Royce Homes, LP, Debtor Rodney Tow, Trustee vs. John H. Speer, Amergy Bank, N.A., et al. | 3/14 & 6/14 | U.S. District Court Southern District of Texas, Houston Division | P | Cooper & Scully; Cage Hill & Niehaus, LLP; Jones Morris Klevenhagen LLP; and Tow & Koenig PLLC | Nathan Sommers Jacobs PC; McKool Smith PC; Hughes Watters & Askanase; Munsch Hardt Kopf & Harr P.C.; Zukowski, Bresenhan & Sinex, L.L.P.; Law Offices of Peter Johnson; O'Donnell, Ferebee et al.; Young & Brooks; and Wilshire Scott PC |
| 14) Mohammad Anwar Farid Al-Saleh v. Harry Sargeant III, et al. | 6/15 | 319th Judicial District Court, Nueces County, Texas | D | Daniel D. Pipitone and Kenneth W. Bullock, II Munsch Hardt Kopf & Harr P.C. | Mark T. Mitchell and Deirdre B. Ruckman Gardere Wynne Sewell LLP Jorge C. Rangel and Jaime S. Rangel The Rangel Law Firm P.C. |

**TRIALS**

| Case | Date | Judge/Court | Client | Attorney Plaintiff/Petitioner | Attorney Defendant/Respondent |
|---|---|---|---|---|---|
| 15) Pilepro LLC, et al. vs. Humprey Chang, et al. | 10/15 | United States District Court, Western District of Texas, Austin Division | P | Andrew Brown, The Brown Firm, PLLC | Andrew C. Callari Callari & Summers |
| 16) William Jones, Ameritech College Operations, LLC, et al. v. Main Street Capital Corporation, et al. | 12/16 | American Arbitration Association | P | Michael Richardson and Seepan Parseghian Beck Redden, LLP | Mark R. Gaylord and David Mooers-Putzer - Ballard Spahr, LLP Ray T. Torgerson, Andrew C. Fertitta, and Jim D. Aycock - Porter Hedges, LLP |
| 17) Frontier Tubular Solutions, Inc. v. Richard Ridgeway and Cynthia Ridgeway | 2/17 | 281st Judicial District Court Harris County, Texas | D | Richard Hunter Barrow Thompson & Knight LLP | Suzanne Bonham Seyfarth Shaw |
| 18) Ten Lords, Ltd., et al. v. Jet Pay Corp., f/n/a Universal Business Payment Solutions Acquisition Corp., et al. | 5/17 | 429th Judicial District Collin County, Texas | D | Larry R. Boyd and Charles J. Crawford Abernathy Roeder Boyd & Hullett, P.C. | Micah Dortch Cooper & Scully, P.C. |
| 19) Connie Jean Smith, individually and on behalf of all others similarly situated vs. Seeco, Inc. n/k/a SWN Production (Arkansas), LLC, et al. | 6/17 | United States District Court, Eastern District of Arkansas, Western Division | P | Brad Seidel, Seidel Law Firm Sean Handler, Kessler Topaz Meltzer & Check, LLP Jason E. Roselius, Jack Mattingly, Jr., Brian Cramer, and Tanner W. Hicks - Mattingly & Roselius PLLC Ben H. Caruth, Gordon Caruth & Virden PLC Erik Danielson, Danielson Law Firm | R. Paul Yetter and Robert K. Ellis, Yetter Coleman LLP Thomas Daily, Daily & Woods, PLLC Michael V. Powell and Elizabeth Tiblets, Locke Lord LLP Rex M. Terry, Hardin, Jesson & Terry, PLC Marc S. Tabolsky, Schiffer Odom Hicks & Johnson PLLC |
| 20) Shannon Medical Center v. Triad Holdings III, LLC v. Don W. Hughes, M.D., First Financial Trust & Asset Management Co. as Custodian FBO Don Hughes, Jr. | 8/17 | 340th Judicial District Court, Tom Green County, Texas | D | William H. Ford and Veronica S. Wolfe Ford Murray, PLLC | Michael Stockham and Reed Randel Thompson and Knight LLP |

**DEPOSITIONS (In Addition to Above)**

| Case | | Date | Judge/Court | Client | Attorney Plaintiff/Petitioner | Attorney Defendant/Respondent |
|---|---|---|---|---|---|---|
| 1) | William S. Harris, Reginald E. Howard, and Peter M. Thornton, Sr. on Behalf of Themselves and All Others Similarly Situated v. James E. Koenig; State Street Bank and Trust Company; Waste Management Retirement Savings Plan et al. | 1/11 | U.S. District Court District of Columbia | P | Gregory Y. Porter - Bailey & Glasser LLP Ellen M. Doyle - Stember Feinstein Doyle Payne & Cordes, LLC | O'Melveny & Myers, LLP |
| 2) | Gary Sawyer, et al., v E. I. DuPont de Nemours and Company | 1/11 | U.S. District Court Southern District of Texas Galveston Division | P | Michael P. Cash and Wade Howard - Gardere Wynne Sewell LLP | Russell Manning - Manning Ward Harrison Venicia & Rodriguez |
| 3) | In RE Merck & Co., Inc. Securities, Derivative & "ERISA" Litigation | 5/11 | U.S. District Court District of New Jersey | P | Keller Rohrback, P.L.C. and Barroway Topaz Kessler Meltzer & Check LLP | Cravath Swaine & Moore LLP |
| 4) | Avalon RF, Inc. v. WiFi Wireless, Inc. | 9/11 | Superior Court of the State of California County of San Diego Central Division | D | Ilona Antonyan - The Law Office of Ilona Antonyan, APC | Howard L. Close - Wright & Close, LLP |
| 5) | Anadarko Petroleum Corporation v. Noble Drilling (U.S.) LLC | 10/11 | U.S. District Court Southern District of Texas Houston Division | P | Alison L. Smith and Steven Spears - McDermott Will & Emery LLP | Paul J. Dobrowski, Lee M. Larkin and Anthony D. Weiner - Dobrowski L.L.P. |

**DEPOSITIONS (In Addition to Above)**

| Case | Date | Judge/Court | Client | Attorney Plaintiff/Petitioner | Attorney Defendant/Respondent |
|---|---|---|---|---|---|
| 6) Noble Drilling Services, Inc. vs. Certex USA, Inc., Bridon-American Corp., and Bridon International, Ltd. / Anadarko Petroleum Corp. and Kerr-McGee Corporation vs. Noble Drilling (U.S.) LLC, et al. vs. Certex USA, Inc., et al. (Consolidated) | 12/11 | U.S. District Court Southern District of Texas Houston Division | P | Alison L. Smith and Steven Spears - McDermott Will & Emery LLP (Anadarko Petroleum Corp.) | Paul J. Dobrowski, Lee M. Larkin, Anthony D. Weiner, and Danielle N. Andrasek - Dobrowski LLP (Noble Drilling Services, Inc. and Noble Drilling (U.S.) LLC<br>Karri Webb and Todd Wright - Barker Lyman, P.C. (Certex USA, Inc.)<br>Barry R. Ostrager, Tyler B. Robinson, Seth M. Kruglak, and Jeffery L. Roether with Thacher & Bartlett LLP. (Bridon-American Corp. and Bridon International, Ltd.)<br>John R. Strawn, Jr. - Strawn Pickens LLP (Bridon-American Corp. and Bridon International, Ltd.) |
| 7) Brenda Tolbert v. RBC Capital Markets Corporation n/k/a RBC Capital Markets, LLC et al. | 1/12 | U.S. District Court Southern District of Texas Houston Division | P | Geoffrey H. Bracken - Gardere Wynne Sewell LLP | Sari M. Alamuddin, Chris Boran, and Alison Gates - Morgan, Lewis & Bockius LLP |
| 8) CompSource Oklahoma, et al. v. BNY Mellon, N.A. and The Bank of New York Mellon | 2/12 | U.S. District Court Eastern District of Oklahoma | P | Brad Seidel - Nix, Patterson & Roach, LLP<br>Peter H. LeVan, Jr. - Kessler Topaz Meltzer Check LLP | Weldon Stout and Ron Wright - Wright Stout & Wilburn<br>Damien Marshall and Scott E. Grant - Boies, Schiller & Flexner LLP |
| 9) Trustees of the Local 464A United Food and Commercial Workers Union Pension Fund, et al. v. Wells Fargo Bank, N.A. et al. | 3/12 | U.S. District Court District of New Jersey | P | Edward W. Ciolko, Joseph H. Meltzer, Peter H. LeVan, Jr. and Joseph A. Weeden - Kessler Topaz Meltzer & Check, LLP | Diane A. Bettino and Thomas L. Allen - Reed Smith LLP |

DEPOSITIONS (In Addition to Above)

| Case | Date | Judge/Court | Client | Attorney Plaintiff/Petitioner | Attorney Defendant/Respondent |
|---|---|---|---|---|---|
| 10) Wind Composite Services Group, LLC vs. Jeffrey D. Henning and Wind Services Group, Inc. | 3/12 | 269th Judicial District Court Harris County, Texas | P | James G. Munisteri, Michael P. Cash, and Jessica Mason - Gardere Wynne Sewell, LLP | Michael E. Richardson and David J. Beck - Beck Redden & Secrest, LLP |
| 11) Denver Employees Retirement Plan v. JPMorgan Chase Bank, N.A. | 9/12 | Supreme Court of the State of New York County of New York | P | Stuart M. Grant, Brenda F. Szydlo, Megan D. McIntyre, and Abraham Alexander - Grant & Eisenhofer, P.A. | Lewis R. Clayton and Jonathan H. Hurwitz - Paul, Weiss, Rifkind, Wharton & Garrison LLP |
| 12) Flavio Castaneda M.D., Individually, and Flavio Castaneda M.D., P.A. v. Community Health Systems Inc., Owner of Webb Hospital Corporation, aka Laredo Texas Hospital Company LP dba Laredo Medical Center, et al. | 10/12 | 368th Judicial District Court of Williamson County, Texas | D | Elizabeth Higginbotham and Richard H. Ihfe - Ihfe & Associates P.C. | James G. Munisteri - Gardere Wynne Sewell LLP |
| 13) In RE Principal U.S. Property Account ERISA Litigation | 2/13 | U.S. District Court Southern District of Iowa, Central Division | P | Derek W. Loeser, Lynn L. Sarko, and Cari Laufenberg - Keller Rohrback LLP Gary Gotto and James Bloom - Keller Rohrback, PLC | Gregory C. Braden, Sean K. McMahan, Deborah S. Davidson, and Nicole Diller - Morgan, Lewis & Bockius LLP Brian L. Campbell - Whitfield & Eddy PLC |
| 14) The Houston Exploration Company, et al. vs. Lary Insurance Services, Inc., et al. | 6/13 | 234th Judicial District Court Harris County, Texas | P | Paul S. Francis - Baker & Hostetler LLP | Adair & Myers, PLLC; Beck Redden & Secrest; Cantey & Hanger, LLP; Faubus & Scarborough LLP; Legge, Farrow, Kimmitt, McGrath & Brown, LLP; Scarborough Ward LLP; and Spagnoletti & Co. |

**DEPOSITIONS (In Addition to Above)**

| Case | Date | Judge/Court | Client | Attorney Plaintiff/Petitioner | Attorney Defendant/Respondent |
|---|---|---|---|---|---|
| 15) In Re: Bank of America Corp. Securities Derivative and Employment Retirement Income Security Act (ERISA) Litigation - Related to Schwab S&P 500 Index Fund, et al. v. Bank of America Corp., et al. | 7/13 | U.S. District Court Southern District of New York | P | Grant & Eisenhofer P.A., Lieff Cabraser Heimann & Bernstein, LLP, Entwistle & Cappucci LLP, and Susman Godfrey LLP | Paul, Weiss, Rifkind, Wharton & Garrison LLP,  Shearman & Sterling LLP, Debevoise & Plimpton LLP, Dechert LLP, and Baker Botts LLP |
| 16) Spear Marketing, Inc. v. Bancorpsouth Bank and Argo Data Resource Corp. | 10/13 | U.S. District Court Northern District of Texas Dallas Division | P | Samuel E. Joyner Ross Joyner PLLC | Haynes and Boone, LLP and Andrews Kurth, LLP |
| 17) Barcel USA, LLC v. Baja Distributors, Inc., et al. | 10/13 | U.S. District Court Southern District of California | D | Garcia Sullivan & Lopez LLP | Howard Close - Wright & Close, LLP |
| 18) In RE: Fountainebleau Las Vegas Contract Litigation | 2/14 | U..S. District Court Southern District of Florida Miami Division | P | J. Michael Hennigan, Kirk Dillman, and Robert Mockler - McKool Smith, P.C. | O'Melveny & Myers LLP Hunton & Williams LLP |
| 19) Shelita Turner, et al. v. Goodwill Industries of Houston | 3/14 | U.S. District Court Southern District of Texas Houston Division | D | Michelle Bohreer - Bohreer & Zucker, LLP | Carol Nelkin - Nelkin & Nelkin, P.C. |
| 20) In Re: Green Valley Growers, Inc., Debtor, Randy Williams, Chapter 7 Trustee vs. Houston Plants & Garden World, Inc., et al. | 8/14 | United States District Court, Southern District of Texas, Houston Division | P | Kane Russell Coleman & Logan PC | Hoover Slovacek LLP |
| 21) Ruhrpumpen, Inc. vs. Flowserve Corporation | 9/14 | United States District Court, Northern District of Texas, Dallas Division | P | Cokinos Bosien & Young, P.C. - Charles Getman | Norton Rose Fulbright LLP |
| 22) Milton O. Johnston & Company, Ltd. v. NGM Insurance Company, et al. | 3/15 | 125th Judicial District Court, Harris County, Texas | D | Russell Hardin, Jr. Rusty Hardin & Associates, LLP | Robert G. Dees and Christopher W. Martin Martin Disiere Jefferson & Wisdom LLP |

**DEPOSITIONS (In Addition to Above)**

| Case | Date | Judge/Court | Client | Attorney Plaintiff/Petitioner | Attorney Defendant/Respondent |
|------|------|-------------|--------|-------------------------------|-------------------------------|
| 23) In Re Mentor Corp. Obtape Transobiturator Sling Products Liability Litigation | 5/15 | United States District Court, Middle District of Georgia, Columbus Division | P | William Barfield The Potts Law Firm, LLP | John Q. Lewis and Dustin B. Rawlin Tucker Ellis LLP |
| 24) Chartis Specialty Insurance Company vs. Tesoro Corporation, et al. | 6/15 | United States District Court, Western District of Texas, San Antonio Division | P | David Timmins, Scott L. Davis and Jason Heep Gardere Wynne Sewell LLP | Joshua Fuchs and Bernard P. Bell Jones Day |
| 25) Coutinho & Ferrostaal, Incorporated n/k/a C&F International Incorporated v. Milton Wayne Pickle a/k/a Wayne Pickle, and Steelcom Pipe International, LLC | 8/15 | 11th Judicial District Court Harris County, Texas | D | Rick Lee Oldenettel and Kevin M. Long Oldenettel and McCabe | Stephen W. Schueler Winstead, PC |
| 26) Pamela Green v. American Modern Home Insurance Company | 9/15 | United States District Court, Western District of Arkansas, Texarkana Division | P | Joseph H. Meltzer, Kessler Topaz Meltzer & Check LLP | Baker Hostetler LLP |
| 27) NRW, Inc. vs. Mike Bindra, et al. | 11/15 | United States District Court, Southern District of New York | P | Leslie D. Corwin, Blank Rome LLP | Adelman Matz P.C. |
| 28) Houston Galleria Lodging Associates, LLC vs. West Loop Hospitality LLC, et al. | 12/15 | 55th Judicial District Court, Harris County, Texas | D | Roger L. McCleary, Beirne Maynard & Parsons, LLP Rodney L. Drinnon, McCathern PLLC | Lloyd E. Kelley, Lloyd E. Kelley & Associates Johnie J. Patterson, Walker & Patterson, PC |
| 29) Jeff Dennington, et al. vs. State Farm & Casualty Company, et al. | 1/16 | United States District Court, Western District of Arkansas, Texarkana Division | P | Joseph H. Meltzer, Kessler Topaz Meltzer & Check LLP | Schiff Hardin LLP |
| 30) Darnita Riggins v. American Family Mutual Insurance Company | 12/15 & 3/16 | United States District Court, Western District of Missouri, Central Division | P | David T. Butsch, Butsch Roberts & Associates Joe D. Jacobson, Green Jacobson P.C. | Lisa M. Bolliger and James D. Griffin, Scharnhorst Ast Kennard Griffin, P.C. |

**DEPOSITIONS (In Addition to Above)**

| Case | | Date | Judge/Court | Client | Attorney Plaintiff/Petitioner | Attorney Defendant/Respondent |
|---|---|---|---|---|---|---|
| 31) | BTG Pactual Commodities (US) LLC vs. EDF Trading North America LLC | 5/16 | United States District Court, Southern District of Texas, Houston Division | P | David A. Baay, Sutherland Asbill & Brennan LLP | Katherine H. Kunz Susman Godfrey L.L.P. |
| 32) | Frontier Tubular Solutions, Inc. v. Richard Ridgeway and Cynthia Ridgeway | 8/16 | 281st Judicial District Court, Harris County, Texas | D | Suzanna Bonham, Seyfarth & Shaw LLP | Hunter Barrow Thompson & Knight LLP |
| 33) | In Re: Peabody Energy Corporation, et al. | 8/16 | United States Bankruptcy Court, Eastern District of Missouri, Eastern Division | D | Davis Polk & Wardwell LLP | Michael J. Moscato Curtis, Mallet-Prevost, Colt & Mosle LLP |
| 34) | Elie Boukheir v. Andrew Benjamin Wolan | 8/16 | 240th Judicial District Court, Fort Bend County, Texas | D | Mario E. de la Garza, and Eric Hawley Tucker, Barnes, Garcia & de la Garza, PC David Sheller The Sheller Law Firm, PLLC | Mark E. Yborra Levin & Clinebell |
| 35) | Beaver County Employees' Retirement Fund, et al. vs. Tile Shop Holdings, Inc. | 9/16 | United States District Court District of Minnesota | P | Matthew L. Mustokoff Kessler Topaz Meltzer & Check LLP Samuel H. Rudman Robbins Geller Rudman & Dowd LLP | Wendy J. Wilding and Justin P. Krypel Faegre Baker Daniels LLP |
| 36) | Jeffrey Bailey, et al. v. State Farm Fire and Casualty Company | 11/16 | United States District Court Eastern District of Kentucky at Ashland | P | Erik D. Peterson, M. Austin Mehr, Philip G. Fairbanks, and Bartley K. Hagerman Mehr Fairbanks Trial Lawyers, PLLC | David Klapheke Boehl Stopher & Graves, LLP Heidi Dalenberg and Patricia T. Mathy Riley Safer Holmes & Cancila LLP |
| 37) | Teddy Glenn Abrams, Jr. v. JJelcor, Inc. d/b/a Action Rental and Takeuchi MFG (US) Ltd. | 12/16 | 506th Judicial District Court, Waller County, Texas | D | J. Andrew Love Wright & Close LLP | Fred Hagans and William Hagans - Hagans Montgomery & Rustay, PC Larkin C. Eakin, Jr. Eakin Law Firm |

DECL SOLOMON ISO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 64

**DEPOSITIONS (In Addition to Above)**

| Case | | Date | Judge/Court | Client | Attorney Plaintiff/Petitioner | Attorney Defendant/Respondent |
|---|---|---|---|---|---|---|
| 38) | David Braden, et al. v. Foremost Insurance Company Grand Rapids, Michigan | 12/16 | United States District Court Western District of Arkansas Texarkana Division | P | Joseph H. Meltzer, Kessler Topaz Meltzer & Check LLP | Stacy Allen and Marilyn Montano Jackson Walker LLP J. Dennis Chambers Atchley Russell Waldrop & Hlavinka LLP |
| 39) | Wellshire Financial Services, LLC, d/b/a LoanStar Title Loans, and d/b/a MoneyMax Title Loans, and d/b/a LoanMax; Meadowwood Financial Services, LLC, d/b/a LoanStar Title Loans, and d/b/a MoneyMax Title Loans; and Integrity Texas Funding, LP v. TMX Finance Holdings, Inc.; TMX Finance, LLC; TMX Finance of Texas, Inc.; and TitleMax of Texas, Inc. | 8/17 | 152nd Judicial District Court Harris County, Texas | P | Daniel Johnson Sutherland Asbill & Brennan LLP Joseph D. Wargo Wargo & French LLP | Roland Garcia Greenberg Traurig LLP |

**Documents Considered**                                                                          **Exhibit 3**

| Description | Starting Bates | Ending Bates |
|---|---|---|
| **Legal Documents** | | |
| Complaint for Damages, Declaratory Relief, and Injunctive Relief filed July 11, 2016 | N/A | N/A |
| Stipulation of Facts Regarding WAP Eligibility | N/A | N/A |
| | | |
| **Depositions** | | |
| Deposition of Gabriela Sikich and Exhibits dated July 11, 2017. | N/A | N/A |
| Deposition of Tammy Buchert and Exhibits dated July 12, 2017. | N/A | N/A |
| Deposition of Tammy Buchert from *Tolbert v RBC Capital Market Corp., et al* dated October 27, 2011. | RBC-PAUL000008339 | RBC-PAUL000008409 |
| Deposition of Gabriela Sikich from *Benhayon v Royal Bank of Canada, et al* dated August 28, 2009. | RBC00002269 | RBC00002405 |
| Deposition of Gabriela Sikich from *Brazelton v RBC Capital Markets Corp., et al* dated September 28, 2010. | RBC-PAUL000009167 | RBC-PAUL000009203 |
| Deposition of Gabriela Sikich from *Tolbert v RBC Capital Market Corp., et al* dated September 8, 2011. | RBC-PAUL000009394 | RBC-PAUL000009473 |
| | | |
| **Documents** | | |
| 2010_1 | RBC-PAUL000011124 | N/A |
| 2010_2 | RBC-PAUL000011125 | N/A |
| 2011 Sample of Ees, Includes Employee Names, IDs, Start/End Dates | RBC-PAUL000011126 | N/A |
| 2011 Sample of Ees, Includes Employee Names, IDs, Start/End Dates | RBC-PAUL000011127 | N/A |
| 2011 Sample of Ees, Includes Employee Names, IDs, Start/End Dates | RBC-PAUL000011128 | N/A |
| 2011 Sample of Ees, Includes Employee Names, IDs, Start/End Dates | RBC-PAUL000011129 | N/A |
| 2011 Sample of Ees, Includes Employee Names, IDs, Start/End Dates | RBC-PAUL000011130 | N/A |
| 2011 Sample of Ees, Includes Employee Names, IDs, Start/End Dates | RBC-PAUL000011131 | N/A |
| 2010 All Ees, 2011 WAP Elligible | RBC-PAUL000011132 | N/A |
| 2010-2011 Employee Names and IDs | RBC-PAUL000011133 | N/A |
| 2010 All Ees, 2011 WAP Elligible, 2011 All Ees | RBC-PAUL000011134 | N/A |
| Employee Names, IDs, Start/End Dates | RBC-PAUL000011135 | N/A |
| 2011 Recruiting Information | RBC-PAUL000011137 | N/A |
| Headcount | RBC-PAUL000011138 | N/A |
| Headcount | RBC-PAUL000011139 | N/A |
| Headcount | RBC-PAUL000011140 | N/A |
| Headcount | RBC-PAUL000011141 | N/A |
| Duplicate of RBC-PAUL000011141 | RBC-PAUL000011142 | N/A |
| Headcount | RBC-PAUL000011143 | N/A |
| Duplicate of RBC-PAUL000011138 | RBC-PAUL000011144 | N/A |
| Duplicate of RBC-PAUL000011139 | RBC-PAUL000011145 | N/A |
| Duplicate of RBC-PAUL000011140 | RBC-PAUL000011146 | N/A |
| WAP Eligible Employee data for Plan Year 2003 - 2005 and All Employees Data for Calendar Years 2003 - 2005 | RBC-PAUL000011147 | N/A |
| 2009 All Employees with Hire and Termination Date | RBC-PAUL000011148 | N/A |
| 2010 All Employees with Hire and Termination Date | RBC-PAUL000011149 | N/A |
| 2011 New Hires with Termination Date | RBC-PAUL000011150 | N/A |
| 2005 All Employees and Names | RBC-PAUL000011151 | N/A |

DECLARATION IN SUPPORT OF PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 66

**Documents Considered**                                                                                               **Exhibit 3**

| Description | Starting Bates | Ending Bates |
|---|---|---|
| 2006 All Employees Annual Compensation | RBC-PAUL000011152 | N/A |
| WAP Eligible Employee data for Plan Year 2003 - 2005 and All Employees Data for Calendar Years 2003 - 2005 | RBC-PAUL000011153 | N/A |
| 2003 All Employees NDT Compensation | RBC-PAUL000011154 | N/A |
| 2003 All Employees Compensation | RBC-PAUL000011155 | N/A |
| List of 2005 WAP Employees | RBC-PAUL000011156 | N/A |
| List of Employees - Year and Use Unknown | RBC-PAUL000011157 | N/A |
| 2006 WAP Employees | RBC-PAUL000011158 | N/A |
| List of Employees - Year and Use Unknown | RBC-PAUL000011159 | N/A |
| 2005 WAP Employees | RBC-PAUL000011160 | N/A |
| 2007 WAP Employees | RBC-PAUL000011161 | N/A |
| 2008 WAP Employees | RBC-PAUL000011162 | N/A |
| 2004 WAP Employees - Capital Markets Separated | RBC-PAUL000011163 | N/A |
| 2004 WAP Employees | RBC-PAUL000011164 | N/A |
| 2005 WAP Employees | RBC-PAUL000011165 | N/A |
| List of Employees - Year and Use Unknown | RBC-PAUL000011166 | N/A |
| Duplicate of RBC-PAUL000011158 | RBC-PAUL000011167 | N/A |
| Duplicate of RBC-PAUL000011159 | RBC-PAUL000011168 | N/A |
| Duplicate of RBC-PAUL000011160 | RBC-PAUL000011169 | N/A |
| Duplicate of RBC-PAUL000011161 | RBC-PAUL000011170 | N/A |
| Duplicate of RBC-PAUL000011162 | RBC-PAUL000011171 | N/A |
| Duplicate of RBC-PAUL000011163 | RBC-PAUL000011172 | N/A |
| Duplicate of RBC-PAUL000011164 | RBC-PAUL000011173 | N/A |
| Duplicate of RBC-PAUL000011165 | RBC-PAUL000011174 | N/A |
| Duplicate of RBC-PAUL000011156 | RBC-PAUL000011175 | N/A |
| Native Form of RBC-PAUL000011126-31 | RBC-PAUL000011176 | N/A |
| WAP Eligible Employee data for Plan Year 2006 - 2010 and All Employees Data for Calendar Years 2006 - 2009 | RBC-PAUL000011177 | N/A |
| 2007 RBC – US Wealth Accumulation Plan (Wap) Summary | RBC-PAUL000007500 | N/A |
| 2010 RBC - US WAP Prospectus | RBC-PAUL000000102 | RBC-PAUL000000118 |
| 2012 RBC - US WAP Prospectus | RBC-PAUL000003341 | RBC-PAUL000003357 |
| 2002_1 | RBC-PAUL000011284 | N/A |
| 2004_1 | RBC-PAUL000011285 | N/A |
| 2004_2 | RBC-PAUL000011286 | N/A |
| 2005_1 | RBC-PAUL000011287 | N/A |
| 2005_2 | RBC-PAUL000011288 | N/A |
| 2006_1 | RBC-PAUL000011289 | N/A |
| 2006_2 | RBC-PAUL000011290 | N/A |
| 2007_1 | RBC-PAUL000011291 | N/A |
| 2007_2 | RBC-PAUL000011292 | N/A |
| 2008_1 | RBC-PAUL000011293 | N/A |
| 2008_2 | RBC-PAUL000011294 | N/A |

DECL SOLOMON ISO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 67

**Documents Considered**                                                                                                                  **Exhibit 3**

| Description | Starting Bates | Ending Bates |
|---|---|---|
| 2009_1 | RBC-PAUL000011295 | N/A |
| 2009_2 | RBC-PAUL000011296 | N/A |
| 2008 RBC WAP Matrix | RBC00002266 | RBC00002266 |
| RBC - US WAP Top-Hat Analysis Review | RBC 02077 | RBC 02082 |
| 2006 NDT Compensation | TOLBERT0000673 | N/A |
| 2010 NDT Compensation | TOLBERT0000674 | N/A |
| 2010 WAP Eligibility and Enrollment | TOLBERT0000675 | N/A |
| 2011 WAP Eligibles | TOLBERT0000676 | N/A |
| Compensation of Employees - Year Unknown | TOLBERT0000677 | N/A |
| 401k Wages for NDT 2005 - Employee names not identified | TOLBERT0000678 | N/A |
| 2009 NDT Compensation for all Employees | TOLBERT0000679 | N/A |
| 2008 NDT Compensation for all Employees | TOLBERT0000680 | N/A |
| 2002 NDT Compensation for All Employees | TOLBERT0001023 | N/A |
| 2002 FC WAP Eligible Data | TOLBERT0001111 | N/A |
| 2009 FC WAP Eligible Data | TOLBERT0001112 | N/A |
| 2009 FC WAP Eligible Data | TOLBERT0001113 | N/A |
| 2009 FC WAP Eligible Data | TOLBERT0001114 | N/A |
| 2006 FC WAP Eligible Data | TOLBERT0001115 | N/A |
| 2009 FC WAP Eligible Data | TOLBERT0001116 | N/A |
| 2010 FC WAP Eligible Data | TOLBERT0001117 | N/A |
| 2011 FC WAP Eligible Data | TOLBERT0001118 | N/A |
| 2005 FC WAP Eligible Data | TOLBERT0001119 | N/A |
| 2007 FC WAP Eligible Data | TOLBERT0001120 | N/A |
| 2008 FC WAP Eligible Data | TOLBERT0001121 | N/A |
| 2008 FC WAP Eligible Data | TOLBERT0001122 | N/A |
| 2003 FC WAP Eligible Data | TOLBERT0001123 | N/A |
| 2004 FC WAP Eligible Data | TOLBERT0001124 | N/A |
| 2009 FC WAP Eligible Data | TOLBERT0001125 | N/A |
| Headcount | TOLBERT0001163 | N/A |
| Slide Presentation: 2006 FC Compensation Planning, Pre-reading materials for Meeting #1 April 8, 2005 | TOLBERT0000750 | TOLBERT0000771 |
| Slide presentations for Executive Committee prepared by RBC Wealth Management: 2010 FC Compensation Planning | TOLBERT0000869 | TOLBERT0000876 |
| Slide presentations for different audiences prepared by RBC Wealth Management: 2010 FC Compensation Planning | TOLBERT0000933 | TOLBERT0000944 |
| 2007 Summary WAP Statistics | TOLBERT0001204 | N/A |
| 2008 Summary WAP Statistics + Top Hat Data | TOLBERT0001205 | N/A |
| 2008 Summary WAP Statistics | TOLBERT0001206 | N/A |
|  |  |  |
| **Research** |  |  |
| "Definitions", IRS, https://www.irs.gov/retirement-plans/plan-participant-employee/definitions | N/A | N/A |
| "The Impact of ERISA's top-hat Exemption on Non-Qualified Deferred Compensation Plans", Guardian Business Resource Center, Advisor 9440 | N/A | N/A |

**Documents Considered**                                                                                          **Exhibit 3**

| Description | Starting Bates | Ending Bates |
|---|:---:|:---:|
| Bakri v. Venture Mfg. Co., 473 F. 3d 677 (6th Cir. 2007) | N/A | N/A |
| Belka v. Rowe Furniture, 571 F. Supp. 1249, 1252 (D. Md. 1983) | N/A | N/A |
| Callan v. Merrill Lynch & Co., No. 09-cv-0566, 2010 WL 3452371 (S.D Cal. Aug. 30, 2010) | N/A | N/A |
| Daft v. Advest, Inc., No. 5:06-cv-1876, 2008 WL 190436, *7 (D. Ohio Jan. 18, 2008); rev'd on other grounds, Daft v. Advest, Inc., Nos. 08-3212, 10-3151, 2011 WL 4430852 (6th Cir. Sept. 23, 2011) | N/A | N/A |
| Darden v. Nationwide Mutual Ins.Co., 717 F. Supp. 388, 397 (E.D. N.C. 1989) | N/A | N/A |
| Demery v. Extebank Deferred Compensation Plan, 216 F.3d 283, 288 (2nd Cir. 2000) | N/A | N/A |
| Duggan v. Hobbs, 99 F.3d 307, 312 (9th Cir. 1996) | N/A | N/A |
| Financial Consultant Industry Comp. Research - "2009 Best Basic Pay" | N/A | N/A |
| Financial Consultant Industry Comp. Research - "2011 Best Pay if You're Producing" | N/A | N/A |
| Financial Consultant Industry Comp. Research - "Compensation 2010" | N/A | N/A |
| Financial Consultant Industry Comp. Research - Morgan Stanley Pay Grid 2009 | N/A | N/A |
| Financial Consultant Industry Comp. Research - Raymond James Pay Grid 2009 | N/A | N/A |
| Financial Consultant Industry Comp. Research - RBC Pay Grid 2009 | N/A | N/A |
| Financial Consultant Industry Comp. Research - Smith Barney Pay Grid 2009 | N/A | N/A |
| Tolbert v. RBC Capital Markets Corporation, No. H-11-0107 (S.D. Texas April 28, 2015) | N/A | N/A |

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

| | | |
|---|---|---|
| **MARTY PAUL, an individual; and BRIAN BUSKIRK, an individual,** | § § § | |
| **Plaintiffs,** | § § § | **No.: 3:16-cv-05616-RBL** |
| **v.** | § § | |
| **RBC CAPITAL MARKETS, LLC, a Minnesota limited liability company; ROYAL BANK OF CANADA, a Canadian Corporation; and ROYAL BANK OF CANADA US WEALTH ACCUMULATION PLAN, an employee benefit plan,** | § § § § § § § | |
| **Defendants.** | § § § | |

---

## EXPERT REBUTTAL REPORT OF SAUL SOLOMON

---

## I.   INTRODUCTION AND ASSIGNMENT

1.  The following is based upon my review and analysis of the report of Dr. Daniel Garrett dated September 29, 2017 (the "Garrett Report") issued in the above-captioned matter. In his report, Dr. Garrett offers his opinions on some of the same items I discussed in the report I issued in this matter on September 29, 2017 (the "BRG Report").

*Expert Rebuttal Report of Saul Solomon*
*November 20, 2017*

2.  I have been retained by Yarmuth Wilsdon PLLC on behalf of its clients, Messrs. Marty Paul
    and Brian Buskirk (collectively "Plaintiffs"), to analyze certain employee data of RBC[1] for the
    years 2003 through 2011 to identify various attributes to assist the Court in determining if the
    WAP qualifies as a top-hat plan as described in 29 U.S.C. §§ 1051(2), 1081(a)(3), and
    1101(a)(1), and to respond to the Garrett Report.

3.  I am a Managing Director with BRG. A copy of my current curriculum vitae was included in
    the BRG Report. Attached as Exhibit 1 is an updated listing of my trial and deposition
    testimony during the past five years, and attached as Exhibit 2 is a listing of the new
    information I and staff working with me have considered in our review and analysis of the
    Garrett Report. BRG is being compensated for the time I devote to this engagement at my
    standard hourly rate of $695 per hour and for the time spent by staff who assisted me at their
    standard hourly rates. This compensation is not contingent upon either the substance of my
    opinions or the outcome of this dispute.

4.  I reserve the right to supplement this report and my opinions contained herein should additional
    information be provided to me.

## II.  SUMMARY OF OPINIONS

5.  Based on my review and analysis of the Garrett Report, my opinions remain the same as I
    stated in the BRG Report. As set forth in greater detail below, Dr. Garrett's conclusions are
    misleading and erroneous for at least the following reasons:

    a.  The Garrett Report and Dr. Garrett's analysis incorrectly include employees who were not
        even hired until after the applicable plan year, which both misstates the WAP eligibility
        ratios and is contrary to his stated methodology.

    b.  Dr. Garrett's ratio test calculations are further incorrect as they do not reflect the actual ratio
        of WAP-eligible employees to the number of total employees at any point in time, as they
        include all employees who worked for RBC at any time from November 1st of the prior plan
        year through the end of each plan year. As of every date in such 14-month periods, this
        methodology will include past employees who have terminated their employment and future

---

[1] Terms defined in the BRG Report are used throughout this report as well.

*Expert Rebuttal Report of Saul Solomon*
*November 20, 2017*

employees who have not yet begun their employment. Thus, at no date in the 14-month period is Dr. Garrett's ratio reflective of actual employees in the workforce as compared to the actual WAP-eligible employees.

c. Inclusion of Canadian employees in the ratio tests is contrary to RBC's 2008 WAP Matrix. Further, it is illogical from both a common sense perspective and a financial perspective because Canadian employees are never eligible to participate in the WAP.

d. The number of employees considered as part of the total workforce in the compensation analysis performed by Dr. Garrett is less than the number of employees Dr. Garrett included in the total workforce for his ratio tests because in the compensation analysis he does not consider all employees terminated between November 1st and December 31st of the prior plan year as he did in the ratio tests. There is no logical basis for counting employees differently in one analysis than in the other.

e. Dr. Garrett also improperly reduces the total workforce considered in his compensation analysis by excluding partial year employees and employees with NDT compensation of zero. Again, exclusion of these employees from the compensation analysis is inconsistent with his ratio test, which includes these employees in his calculations.

6. Additionally, Dr. Garrett does not consider, nor has he made any attempt to evaluate, the percentage of employees eligible to participate in the WAP with compensation less than the compensation eligibility threshold[2] as compared to total eligible employees or the percentage of FCs eligible to participate in the WAP, both factors that the courts[3] have determined are relevant to the assessment of plans with participants who are financial advisors. In the BRG Report, I found that in each year analyzed nearly half or more than half of all FCs were eligible to participate in the WAP, with the percentage of eligible FCs ranging from a low of 49.0% of all FCs in 2004 to a high of 66.9% of all FCs in 2008. The percentage dropped to 53.0% in 2009 and 45.9% in 2010, but rebounded in 2011 to 52.6%. In addition, the percentage of

---

[2] Employees eligible to participate in the WAP with compensation less than the compensation eligibility threshold consisted primarily of FCs whose eligibility was based on a production level threshold rather than a compensation threshold.

[3] *Daft v. Advest, Inc.*, No. 5:06-cv-1876, 2008 WL 190436, *6-*7 (D. Ohio Jan. 18, 2008); *rev'd on other grounds*, *Daft v. Advest, Inc.*, 658 F.3d 583 (6th Cir. 2011).

*Expert Rebuttal Report of Saul Solomon*
*November 20, 2017*

WAP eligible employees with compensation less than the minimum compensation eligibility requirement ranged from a low of 17.6% in 2008 to as high as 63.2% in 2009. From 2003 through 2005, at least 25% of the WAP eligible employees did not earn sufficient compensation to overcome the lower minimum compensation threshold of $150,000. Further, the average compensation for WAP eligible employees with compensation less than the minimum compensation eligibility requirement was less than the average compensation of the total Workforce from 2006 to 2011. Put another way, for these six years the average compensation of eligible FCs who would not have qualified based on minimum compensation (rather than minimum production) was *less* than the average compensation of the Workforce. These findings clearly demonstrate that the WAP included substantial numbers of eligible employees who were not highly compensated in relation to the Workforce as a whole. Dr. Garrett's analysis is flawed because he ignored the data that clearly demonstrates this fact.

## III.   ANALYSIS

7.  The Garrett Report purports to have determined the percentage of RBC's workforce that was WAP-eligible for each plan year from 2003 to 2011 (the "ratio test"), as well as the following compensation analyses:

    a.  Comparison of the median compensation of WAP-eligible employees to the median compensation of all employees and non-eligible employees for each plan year based on the NDT compensation for that respective plan year and the prior plan year; and

    b.  Comparison of the mean/average compensation of WAP-eligible employees to the mean/average compensation of all employees and non-eligible employees for each plan year based on the NDT compensation for that respective plan year and the prior plan year.

    Dr. Garrett also determined which percentile of the workforce's compensation distribution the median compensation of WAP-eligible employees would be in for each plan year based on the NDT compensation for that respective plan year and the prior plan year.

8.  In his report, Dr. Garrett concludes that

*Expert Rebuttal Report of Saul Solomon*
*November 20, 2017*

- "RBC employees eligible to participate in the WAP were a small percentage of all of RBC's employees. The percentages varied over the years I examined and averaged 2.8 percent.
- If only U.S. employees are considered, the eligibility percentages varied over the years examined and averaged 13.6 percent.
- The compensation of employees eligible to participate in the WAP was distinctly greater than the compensation of all of RBC employees and all non-eligible RBC employees in each of the years I examined."[4]

Dr. Garrett determined that the WAP eligibility ratio for U.S. employees only ranged from a low of 7.0% in 2003 to a high of 17.3% in 2006.

9. Based upon my review and analysis of the Garrett Report, my opinions are set forth below. I will discuss each analysis more fully in the order it appears in the Garrett Report.

### A. WAP ELIGIBILITY RATIOS (THE RATIO TEST)

10. Dr. Garrett performs the ratio test by first relying on the list of WAP-eligible employees for each plan year produced by RBC without any adjustments. He then determines the total workforce by adding the number of U.S. employees to the number of Canadian employees for the same plan year. The number of employees is adjusted in two ways. One, Dr. Garrett excludes all employees with termination dates prior to November 1st of the prior year or those without names. Two, he adds employees from the prior plan year who were terminated between November 1st and December 31st of the prior plan year if they were not already included in the number of employees for the plan year at issue. In short, Dr. Garrett calculates the WAP eligibility ratios based on the total WAP-eligible employees list as produced by RBC for a plan year and the total number of employees who were not terminated by November 1st of the prior year. For plan year 2004, Dr. Garrett's total U.S. workforce is based on all employees with names who had termination dates after November 1, 2003 or those who had no termination dates listed in both the "2004 All EES" and "2003 All EES" data files and, thus, he included employees who were terminated between November 1, 2003 and December 31, 2004 in his

---

[4] Garrett Report, p. 2.

analysis. The Garrett Report performs this calculation both for (1) U.S. and Canadian employees and (2) U.S. employees only.

11. A fundamental difference between the Garrett Report and BRG Report is the source data that is utilized in the ratio tests to determine the total workforce. Dr. Garrett relies primarily on the list of employees for the current plan year while the BRG Report utilizes the list of employees for the previous calendar year. For instance, for the plan year 2004, the Garrett Report uses the "2004 All EES" data. However, the BRG Report utilizes the "2003 All EES" data in its ratio analysis for plan year 2004. The 2003 data is what would have been available to RBC regarding eligibility for plan year 2004 as of the start of that plan year. RBC did not have the "2004 All EES" data at that date and thus would not be in a position to utilize that information in assessing plan eligibility for 2004. Thus, the different data sources would result in different results for each plan year even if the methodology were the same.

### *i. Methodology*

12. The Garrett Report states that,

> [i]n determining the size of the workforce for a given plan year, it is therefore relevant to include all employees who were considered for eligibility in the WAP for that plan year (i.e. the combination of the first and second stages). The ratio of WAP-eligible employees to all employees is then calculated as the number of WAP-eligible employees provided in the WAP-eligible employee file divided by the number of employees considered for eligibility in that plan year.[5]

However, Dr. Garrett's analysis contradicts his methodology as stated above and is incorrect as it contains employees who could not have possibly been considered for eligibility in that plan year because they were not even hired until after the end of the plan year. As noted in the BRG Report, the list of employees provided by RBC for each year included employees who were not only terminated prior to the start of the year but it also contained employees who were not hired until after the end of the year. Similarly, the list of WAP-eligible employees also includes employees who were not hired until after the end of the plan year and Dr. Garrett failed to

---

[5] Garrett Report, p. 6.

6

*Expert Rebuttal Report of Saul Solomon*
*November 20, 2017*

exclude such employees from his calculations. The Garrett Report's erroneous inclusion of employees who were not even hired until after the plan year understates the WAP eligibility ratios. The table below illustrates the number of employees included in Dr. Garrett's analysis who were not even hired until after the plan year.

| Number of Employees included in Dr. Garrett's Headcount for the Calendar Year Who Were Hired After the Calendar Year | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** |
| **Count of Employees** | 504 | 384 | 228 | 163 | 115 | 43 | - | - | - |

13. Additionally, Dr. Garrett's analysis does not provide the actual ratio of WAP-eligible employees to the number of total employees at any point in time. When determining the total number of employees, Dr. Garrett simply considers all employees who were employed at some time after November 1st of the prior year, which as of every date will include past employees who have terminated their employment and future employees who have not yet began their employment. This overly simplistic assumption would consider seasonal hires, such as interns, who are generally employed for only a few weeks, as well as those who were terminated between November 1st of the prior year and the end of the plan year and all new hires during the 14 months prior to the plan year end. Therefore, at no date is Dr. Garrett's ratio reflective of actual employees in the workforce as compared to the actual WAP-eligible employees. Since the actual number of WAP-eligible employees and total employees fluctuates from day to day, in order to provide an accurate and precise determination of the ratio test, it is important to calculate this ratio at a fixed point in time rather than including all who were employed at some time after November 1st of the prior year. This analysis can also be performed on a periodic basis as well (e.g., on the first day of each month in the plan year) to evaluate the effect of substantial changes in staffing on the WAP eligibility ratios, if any, for each plan year. The BRG Report reflects the ratio test based on the actual WAP-eligible employees and total employees in the Workforce at the beginning of each plan year, as well as the average based on the average number of eligible employees and average number of total employees in the Workforce for each year. Unlike the Garrett Report, this yields a calculation of the actual ratio as of the beginning of the plan year and the actual average ratio for each plan year.

14. If Dr. Garrett's ratio test for U.S. employees only for plan year 2004 is adjusted to determine the actual ratio based on actual WAP eligible employees and total employees as of December 31, 2004, as reflected in the 2004 plan year data sets,[6] the following adjustments would be made:

| Description | WAP-Eligible | All U.S. Employees | Ratio |
|---|---|---|---|
| Per Garrett Report, Exh. 4B | 2,497 | 19,246 | 13.0% |
| | | | |
| Less: Employees terminated between 11/1/03-12/31/03 from "2003 All EES" not already in "2004 All EES" | - | (506) | |
| Less: Employees terminated as of December 31, 2003 | (24) | (129) | |
| Less: Employees terminated in 2004 | (367) | (4,992) | |
| Less: Employees hired after December 31, 2004 | (23) | (384) | |
| Add: Garrett removed all employees without a name but with compensation | - | 5 | |
| **Employed at December 31** | 2,083 | 13,240 | 15.7% |

Similar adjustments can be made for each plan year to determine the actual ratio.

### *ii. Inclusion of Canadian Employees*

15. The Garrett Report performs a ratio test in which it includes Canadian employees as part of the total workforce for each plan year. Although the inclusion of the Canadian employees is a legal issue and I am not offering any legal opinions regarding whether it is appropriate to consider RBC's Canadian employees or not, I note that RBC's 2008 WAP Matrix did not include Canadian employees when it calculated the WAP eligibility ratios for 2002 through 2009. Additionally, from a common sense perspective and a financial perspective, it is illogical to include the Canadian employees in the determination of the WAP eligibility ratio for a plan year if these employees are precluded from ever being eligible to participate in the WAP.[7]

---

[6] The adjusted "All U.S. Employees" of 13,240 based on Dr. Garrett's ratio test for plan year 2004 differs from the "Count of All Employees" of 13,991 reflected in the BRG Report for the same plan year as a result of the differing data sources and measurement dates. Dr. Garrett relies on the "2004 All EES" for his total employee count and thus the values have been adjusted to December 31, 2004, while the BRG Report utilizes the "2003 All EES" to calculate the total workforce as of December 31, 2003, which is the data that RBC would have available at that date.

[7] My understanding is that the WAP excludes Canadian RBC employees from participation in the WAP.

**B. MEAN AND MEDIAN COMPENSATION ANALYSES**

16. As noted above, for each plan year, the Garrett Report and BRG Report are utilizing different data sources and thus the calculations for the compensation analyses would not be the same even if both reports relied on the same methodology.

17. When evaluating the compensation of WAP-eligible employees as compared to the compensation of non-eligible employees and the total workforce, Dr. Garrett relies on the list of WAP-eligible employees for each plan year produced by RBC without any adjustments to determine which employees on the list of all U.S. employees for that same plan year are WAP-eligible and which are non-eligible. He then determines the total workforce by summing the number of U.S. employees and the number of Canadian employees for the same plan year. The number of employees is adjusted in two ways. One, Dr. Garrett excludes all employees without names and/or with hire and/or termination dates in the same plan year (partial year employees). Two, he excludes employees with termination dates prior to the same plan year and/or employees with NDT compensation of zero or less. For the remaining employees, once he has calculated the mean and median compensation of non-eligible employees and the total workforce, Dr. Garrett compares these values to the mean and median compensation of the WAP-eligible employees. The Garrett Report performs this calculation both for (1) U.S. and Canadian employees and (2) U.S. employees only.

18. Dr. Garrett also compares the prior year's compensation for the WAP-eligible employees with the prior year's compensation of non-eligible employees and the total workforce for each plan year. In this analysis, Dr. Garrett uses the list of WAP-eligible employees for each plan year produced by RBC as compared to the list of the previous year's all U.S. employees to determine the eligible and non-eligible employees. Dr. Garrett used the compensation from the previous year's employees to calculate the mean and median NDT compensation for both the eligible employees and non-eligible employees. In this analysis, Dr. Garrett excludes all employees without names, those with hire and termination dates in the prior plan year (partial year employees), employees with termination dates before the prior plan year, and/or employees with NDT compensation of zero or less. Thus, for plan year 2004, Dr. Garrett's total U.S. workforce is based on all named employees listed in the "2003 All EES" schedule who had termination dates after December 31, 2002, or no termination dates listed, was not a

partial employee in 2003, and/or had NDT compensation exceeding zero. Once he has calculated the mean and median compensation of non-eligible employees and the total workforce, Dr. Garrett compares these values to the mean and median compensation of the WAP-eligible employees. The Garrett Report performs this calculation both for (1) U.S. and Canadian employees and (2) U.S. employees only.

19. The compensation analysis performed by Dr. Garrett as described above is inconsistent with the ratio test in the Garrett Report. The substantive difference between the compensation analysis and the ratio test is the number of employees considered as part of the total workforce. First, compensation of the workforce is limited to employees who were not terminated prior to the plan year. In contrast, Dr. Garrett considered the total workforce to be those who were not terminated as of November 1st of the prior plan year for his ratio test calculations. Thus, Dr. Garrett includes more employees in the total workforce for his WAP eligibility ratio analysis than in his compensation analysis, while keeping the WAP-eligible employees the same in both analyses. The Garrett Report provides no explanation or rationale as to why the number of total employees should differ between the two analyses. It is illogical and improper to perform these two analyses with different sets of data. By using a larger number for the total workforce in his ratio test, Dr. Garrett's WAP eligibility ratios are artificially depressed.

20. Similarly, Dr. Garrett also decreases the total workforce further by excluding partial year employees (employees with hire or termination dates in the plan year) and employees with NDT compensation of zero or less without any explanation, although he includes these employees in the ratio test. When determining the total number of employees for the WAP eligibility ratios, Dr. Garrett simply considers all employees who were not terminated by November 1st of the prior year. Again, it is illogical to include certain employees in the ratio test but exclude them when evaluating the compensation for that same plan year.

21. Exhibit 3 illustrates that, in each of the three primary analyses included in the Garrett Report, Dr. Garrett uses a different universe of eligible and potentially eligible employees. For example, in Schedule 4B - Percentage of Employees Eligible for Wealth Accumulation Plan (U.S. Employees Only), Dr. Garrett shows that, of 19,246 employees potentially eligible to

participate in the WAP, only 2,497 (13.0%) were actually eligible to participate in the WAP in 2004.[8] However, when Dr. Garrett calculates the Current Year NDT Compensation by WAP Eligibility, he assumes that only 11,423 employees are potentially eligible to participate in the WAP, and 1,937 (17.0%) were actually eligible to participate in the WAP in 2004.[9] Furthermore, when Dr. Garrett calculates the Prior Year NDT Compensation by WAP Eligibility, he assumes that 11,840 employees are potentially eligible to participate in the WAP, and 2,054 (17.3%) were actually eligible to participate in the WAP in 2004.[10] Dr. Garrett suggests in his eligibility analysis a much lower ratio of eligibility than he calculates in his own compensation analysis. These differences can be observed in Dr. Garrett's analyses for each plan year. *See* Exhibit 3.

## C. POPULATION COMPENSATION DISTRIBUTION

22. The Garrett Report also utilizes the data from its compensation analyses (as discussed above) to determine where the median compensation for WAP-eligible employees falls in the distribution of all employees' compensation. Based on his analysis, Dr. Garrett concludes that the median WAP-eligible compensation ranged from the 88th percentile to the 97th percentile of all employees' compensation, depending on total workforce assumption (Canadian and U.S. employees or U.S. employees only).

23. Because Dr. Garrett performs this analysis based on the results of his compensation analyses, the issues I discussed above related to the compensation analyses apply to his compensation distribution analysis as well, including the inconsistencies in the WAP-eligible and total employee populations between various analyses for the same plan year, the exclusion of certain employees (partial year and zero NDT compensation), and inclusion of employees who were not even hired until after the applicable plan year.

24. While the Garrett Report provides an illustrative example of the median compensation for WAP-eligible employees relative to the distribution of compensation for all employees in

---

[8] 2,497 employees actually eligible to participate in the WAP / 19,246 employees potentially eligible to participate in the WAP = 13.0%
[9] RBC-PAUL000012252_compensation_analysis_us_t
[10] RBC-PAUL000012253_compensation_analysis_us_t_1

Figure 2, it is more instructive to consider the actual distribution of compensation for WAP-eligible employees vis-à-vis the distribution of compensation for all employees. For example, below is the distribution of annualized current year NDT compensation for WAP-eligible employees and all U.S. employees based on the Garrett Report's ratio tests for the plan year 2004. Dr. Garrett's illustration of the median compensation for WAP-eligible employees relative to the distribution of compensation for all employees suggests that WAP eligible compensation should begin in a high compensation range relative to all employees. However, when considering the actual compensation distribution, over 10% of WAP-Eligible employees in 2004 have annualized NDT compensation below $75,000 and almost 55% of WAP-Eligible employees in 2004 have annualized NDT compensation below $225,000. Dr. Garrett's theoretical illustration misrepresents the actual data available to him by suggesting that all WAP-Eligible employees have high compensation relative to all employees when, in fact, they clearly do not.  A similar overlap can be observed in other plan years, which was not considered by Dr. Garrett.



*Expert Rebuttal Report of Saul Solomon*
*November 20, 2017*

## IV.   FACTORS NOT CONSIDERED BY THE GARRETT REPORT

### A. MINIMAL COMPENSATION RATIOS

25. As noted in the BRG Report, in *Daft v. Advest, Inc.*, the court found that a more relevant measurement for determining whether the plan participants count as "a select group of highly compensated employees" is a comparison of the salary earned by employees minimally qualifying for participation in the  plan against the average salary of all employees.[11] I have calculated the number of eligible employees with compensation that was less than the minimum compensation requirement for each plan year based on Dr. Garrett's data for U.S. employees. The results are shown below in Figure 2. *See also* Exhibit 4.[12] (This chart relates to Table 1.8A in the BRG Report.)



26. Eligible employees with compensation that was less than the minimum compensation requirement comprised primarily of FCs as their eligibility for the WAP is based on production

---

[11] *Daft*, 2008 WL 190436 at *6.

[12] As noted above, the Garrett Report and BRG Report are utilizing different data sources and thus the calculations would not generate the same results even if both reports relied on the same methodology.

level and not compensation. For 2003 through 2011, the percentage of WAP eligible employees with compensation less than the minimum compensation eligibility requirement ranged from 14.8% to as high as 65.8% in Dr. Garrett's Current Year NDT Compensation Analysis and from 16.4% to as high as 62.6% in his Prior Year NDT Compensation Analysis. The lowest percentage in Dr. Garrett's Current Year NDT Compensation Analysis of 14.8% occurred in 2007 and the lowest in his Prior Year NDT Compensation Analysis of 16.4% occurred in 2008. The highest percentages of 65.8% in Dr. Garrett's Current Year NDT Compensation Analysis and 62.6% in his Prior Year NDT Compensation Analysis both occurred in 2009, after eligibility changes were implemented. In other words, in Dr. Garrett's Compensation Analyses, 65.8% and 62.6% of the WAP eligible employees in 2009 did not earn sufficient compensation to overcome the minimum compensation threshold of $350,000. From 2003 through 2005, at least 20% of the WAP eligible employees did not earn sufficient compensation to overcome the lower minimum compensation threshold of $150,000.

27. I have also identified the compensation ranges for the WAP eligible employees with compensation less than the minimum compensation eligibility requirement for each plan year based on Dr. Garrett's data for U.S. employees. The results are shown in Exhibit 5. To illustrate the compensation of minimally qualifying employees related to the compensation of all employees, Figure 3 charts the average salary of eligible employees with compensation below the compensation based eligibility requirements compared to the average compensation for all employees.

*Expert Rebuttal Report of Saul Solomon*
*November 20, 2017*



28. The figure above shows that many WAP eligible employees with compensation less than the minimum compensation eligibility requirement for non-FCs also earned less than the average compensation for all employees. For instance, for year 2008, the average compensation for WAP eligible employees with current year compensation less than the minimum compensation eligibility requirement was $112,177, which was $10,324 (8%) less than the $122,500 average current year compensation for the total U.S. workforce. The average compensation for WAP eligible employees with prior year compensation less than the minimum compensation eligibility requirement was $115,045, which was $27,531 (19%) less than the $142,576 average prior year compensation for the total U.S. workforce for 2008. In fact, the average compensation for WAP eligible employees with compensation less than the minimum compensation eligibility requirement was less than the average compensation for the total workforce every year from 2005 to 2008.

*Expert Rebuttal Report of Saul Solomon*
*November 20, 2017*

## B. ELIGIBILITY RATIOS OF FCS

29. For each year, I calculated the percentage of financial consultants eligible to participate in the WAP as compared to the total number of FCs based on Dr. Garrett's data for U.S. employees. The results are as follows:

| Dr. Garrett's Eligible FCs / Total FCs by Plan Year | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2004** | **2005** | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** |
| **Number of Eligible FCs** | 827 | 939 | 945 | 1,013 | 1,068 | 1,091 | 886 | 1,113 |
| **Number of FCs** | 1,687 | 1,641 | 1,569 | 1,533 | 1,524 | 1,607 | 1,930 | 2,114 |
| **Eligible FCs As a Percent of Total FCs** | 49.0% | 57.2% | 60.2% | 66.1% | 70.1% | 67.9% | 45.9% | 52.6% |

30. In *Daft v. Advest, Inc.*, all brokers were eligible to participate in the plan if they met certain gross commission thresholds. In 1993, half the financial advisors met the threshold and participated in the plan. The court held that the gross commission threshold was low because more than half of the account managers participated in the plan. The court inferred that it was, at best, the average commission.[13] Similarly, all RBC FCs are eligible to participate if they meet a certain gross production level. In every year from 2005 through 2009, as well as in 2011, more than half of all FCs were eligible to participate in the WAP. Based on Dr. Garrett's data, as an example, RBC had 1,524 FCs in 2008 and 1,068 (70.1%) were eligible to participate in the WAP.

31. The figure below displays the distribution and number of eligible and non-eligible FCs each year based on Dr. Garrett's data for U.S. employees.

---

[13] *Daft*, 2008 WL 190436 at *4.

DECL SOLOMON ISO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 86

*Expert Rebuttal Report of Saul Solomon*
*November 20, 2017*



*Expert Rebuttal Report of Saul Solomon*
*November 20, 2017*

## V.   ASSUMPTIONS AND LIMITING CONDITIONS

32. This report is based solely upon the information that has been provided to me and is described in this report. This report was prepared solely for use in this matter and should not be used for any other purpose. Possession of this report, or a copy thereof, does not carry with it the right of publication of all or part of it, nor may it be used for any other purpose (other than stated above) without the previous written consent of BRG, and in any event only with proper authorization. This report reflects facts and conditions existing at the report date. Subsequent events have not been considered, and I have no obligation to update my report for such events and conditions.

33. I reserve the right to supplement this report at a later date if new information becomes available.

\*       \*       \*       \*       \*

Respectfully submitted,

*Saul Solomon*
Saul Solomon

**SAUL SOLOMON**

**EXHIBIT 1**

**TRIALS**

| Case | | Date | Judge/Court | Client | Attorney Plaintiff/Petitioner | Attorney Defendant/Respondent |
|------|---|------|-------------|--------|-------------------------------|-------------------------------|
| 1) | Beach Capital Partnership, L.P. vs. DeepRock Venture Partners, L.P. | 2/11 | 55th Judicial District Court Harris County, Texas | D | Robert Louis Theriot - Liskow & Lewis | Sean R. O'Brien - Arkin Kaplan Rice LLP |
| 2) | George A. Dishman, et al. v. BBVA Compass Bank | 4/11 | U.S. District Court Eastern District of Texas Beaumont Division | D | Barrett H. Reasoner - Gibbs & Bruns LLP | Howard Close and Kathleen S. Rose - Wright & Close, LLP |
| 3) | NCI Building Systems, Inc. vs. Kelly R. Ginn, Green-Span Profiles, L.P., Green-Span Management, L.L.C. and BKG Investments, L.L.C. | 10/11 | 11th Judicial District Court Harris County, Texas | D | Rusty Hardin - Rusty Hardin & Associates, PC Melissa Judd - Littler Mendelson, P.C. | Stephen W. Schueler - Winstead PC |
| 4) | American Senterfitt, et al. vs. Scott D. Martin | 12/11 | Arbitration 55th Judicial District Court Harris County, Texas | D | Craig Smyser and Justin M. Waggoner - Smyser Kaplan & Veselka, L.L.P. | David Kent Bissinger - Siegmyer Oshman & Bissinger LLP |
| 5) | JSW Steel (USA) Inc. vs. Liberty Mutual Group, Inc. and Liberty Mutual Fire Insurance Company | 1/12 | U.S. District Court Southern District of Texas Galveston Division | P | Hunter M. Barrow - Thompson & Knight LLP | Gerald McElroy, Jr. - Zelle Hofmann Voelbel & Mason, L.L.P. |
| 6) | Teri Heggelund, Dag Heggelund, and Jack DeLage vs. Schlumberger Technology Corporation | 1/12 | American Arbitration Association | D | Chris Hanslik and Ryan Bardo - Boyar Miller | W. Ray Whitman, Michelle D. Pector, and James H. Nye - Baker and Hostetler LLP |
| 7) | Contender Offshore Services, LLC, et al. v. Bassoe Offshore (USA), Inc., et al. | 2/12 | 127th Judicial District Court Harris County, Texas | D | Martin A. Shellist - Shellist Lazarz Slobin LLP Todd J. Zuker and E. Michelle Bohreer - Bohreer & Zucker LLP | James G. Munisteri - Gardere Wynne Sewell LLP. |
| 8) | Transatlantic Holdings, Inc., et al. v. American International Group, | 7/12 | American Arbitration Association | P | Joseph H. Meltzer and Sharan Nirmul - Kessler Topaz Meltzer & Check, LLP | Joseph S. Allerhand, Anthony J. Albanese, Stacy Nettleton, and Brant D. Kuehn - Weil, Gotshal & Manges LLP |

DECL. SOLOMON ISO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 89

**TRIALS**

| Case | | Date | Judge/Court | Client | Attorney Plaintiff/Petitioner | Attorney Defendant/Respondent |
|------|---|------|-------------|--------|-------------------------------|-------------------------------|
| 9) | In the Matter of the Arbitration of Campbell Harrison & Dagley, LLP, et. al. v. Albert G. Hill, III, et. al. | 9/12 | American Arbitration Association | P | Howard L. Close and Thomas C. Wright - Wright & Close, LLP | Irell & Manella LLP |
| 10) | MB Industries, LLC, et al. vs. Hunter Building & Manufacturing LP, et al. | 10/12 | 215th Judicial District Court Harris County, Texas | D | Mike Martin - Maloney, Martin, LLP<br>Steve A. Bryant - Steve A. Bryant & Associates | Howard L. Close - Wright & Close LLP |
| 11) | United States of America v. Rodney Watts | 5/13 | United States District Court Eastern District of New York | D | Loretta E. Lynch - United States Attorney, Eastern District of New York | Marion Bachrach - Thompson & Knight LLP |
| 12) | In the Matter of the Marriage of Jimmy Tran and Hoang-Yen Thi Dang | 2/14 | 309th Judicial District Court Harris County, Texas | R | W. Thomas Liddell - Law Office of W. Thomas Liddell<br>Lan T. Nguyen - Shortt & Nguyen, P.C. | Richard Flowers and Todd Frankfort - Flowers & Frankfort |
| 13) | In Re: Royce Homes, LP, Debtor Rodney Tow, Trustee vs. John H. Speer, Amergy Bank, N.A., et al. | 3/14 & 6/14 | U.S. District Court Southern District of Texas, Houston Division | P | Cooper & Scully; Cage Hill & Niehaus, LLP; Jones Morris Klevenhagen LLP; and Tow & Koenig PLLC | Nathan Sommers Jacobs PC; McKool Smith PC; Hughes Watters & Askanase; Munsch Hardt Kopf & Harr P.C.; Zukowski, Bresenhan & Sinex, L.L.P.;  Law Offices of Peter Johnson; O'Donnell, Ferebee et al.; Young & Brooks; and Wilshire Scott PC |
| 14) | Mohammad Anwar Farid Al-Saleh v. Harry Sargeant III, et al. | 6/15 | 319th Judicial District Court, Nueces County, Texas | D | Daniel D. Pipitone and Kenneth W. Bullock, II<br>Munsch Hardt Kopf & Harr P.C. | Mark T. Mitchell and Deirdre B. Ruckman Gardere Wynne Sewell LLP Jorge C. Rangel and Jaime S. Rangel The Rangel Law Firm P.C. |

DECL SOLOMON ISO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 90

**TRIALS**

| Case | Date | Judge/Court | Client | Attorney Plaintiff/Petitioner | Attorney Defendant/Respondent |
|---|---|---|---|---|---|
| 15) Pilepro LLC, et al. vs. Humprey Chang, et al. | 10/15 | United States District Court, Western District of Texas, Austin Division | P | Andrew Brown, The Brown Firm, PLLC | Andrew C. Callari Callari & Summers |
| 16) William Jones, Ameritech College Operations, LLC, et al. v. Main Street Capital Corporation, et al. | 12/16 | American Arbitration Association | P | Michael Richardson and Seepan Parseghian Beck Redden, LLP | Mark R. Gaylord and David Mooers-Putzer - Ballard Spahr, LLP Ray T. Torgerson, Andrew C. Fertitta, and Jim D. Aycock - Porter Hedges, LLP |
| 17) Frontier Tubular Solutions, Inc. v. Richard Ridgeway and Cynthia Ridgeway | 2/17 | 281st Judicial District Court Harris County, Texas | D | Suzanne Bonham Seyfarth Shaw | Hunter Barrow Thompson & Knight LLP |
| 18) Ten Lords, Ltd., et al. v. Jet Pay Corp., f/n/a Universal Business Payment Solutions Acquisition Corp., et al. | 5/17 | 429th District Court of Collin County, Texas | D | Larry R. Boyd and Charles J. Crawford Abernathy Roeder Boyd & Hullett, P.C. | Micah Dortch Cooper & Scully, P.C. |
| 19) Connie Jean Smith, individually and on behalf of all others similarly situated vs. Seeco, Inc. n/k/a SWN Production (Arkansas), LLC, et al. | 6/17 | United States District Court, Eastern District of Arkansas, Western Division | P | Brad Seidel, Seidel Law Firm Sean Handler, Kessler Topaz Meltzer & Check, LLP Jason E. Roselius, Jack Mattingly, Jr., Brian Cramer, and Tanner W. Hicks - Mattingly & Roselius PLLC Ben H. Caruth, Gordon Caruth & Virden PLC Erik Danielson, Danielson Law Firm | R. Paul Yetter and Robert K. Ellis, Yetter Coleman LLP Thomas Daily, Daily & Woods, PLLC Michael V. Powell and Elizabeth Tiblets, Locke Lord LLP Rex M. Terry, Hardin, Jesson & Terry, PLC Marc S. Tabolsky, Schiffer Odom Hicks & Johnson PLLC |
| 20) Shannon Medical Center v. Triad Holdings III, LLC v. Don W. Hughes, M.D., First Financial Trust & Asset Management Co. as Custodian FBO Don Warren | 8/17 | 340th Judicial District Court, Tom Green County, Texas | D | William H. Ford and Veronica S. Wolfe Ford Murray, PLLC | Michael Stockham and Reed Randel Thompson and Knight LLP |

**DEPOSITIONS (In Addition to Above)**

| Case | Date | Judge/Court | Client | Attorney Plaintiff/Petitioner | Attorney Defendant/Respondent |
|------|------|-------------|--------|-------------------------------|-------------------------------|
| 1) William S. Harris, Reginald E. Howard, and Peter M. Thornton, Sr. on Behalf of Themselves and All Others Similarly Situated v. James E. Koenig; State Street Bank and Trust Company; Waste Management Retirement Savings Plan et al. | 1/11 | U.S. District Court District of Columbia | P | Gregory Y. Porter - Bailey & Glasser LLP Ellen M. Doyle - Stember Feinstein Doyle Payne & Cordes, LLC | O'Melveny & Myers, LLP |
| 2) Gary Sawyer, et al., v E. I. DuPont de Nemours and Company | 1/11 | U.S. District Court Southern District of Texas Galveston Division | P | Michael P. Cash and Wade Howard - Gardere Wynne Sewell LLP | Russell Manning - Manning Ward Harrison Venicia & Rodriguez |
| 3) In RE Merck & Co., Inc. Securities, Derivative & "ERISA" Litigation | 5/11 | U.S. District Court District of New Jersey | P | Keller Rohrback, P.L.C. and Barroway Topaz Kessler Meltzer & Check LLP | Cravath Swaine & Moore LLP |
| 4) Avalon RF, Inc. v. WiFi Wireless, Inc. | 9/11 | Superior Court of the State of California County of San Diego Central Division | D | Ilona Antonyan - The Law Office of Ilona Antonyan, APC | Howard L. Close - Wright & Close, LLP |
| 5) Anadarko Petroleum Corporation v. Noble Drilling (U.S.) LLC | 10/11 | U.S. District Court Southern District of Texas Houston Division | P | Alison L. Smith and Steven Spears - McDermott Will & Emery LLP | Paul J. Dobrowski, Lee M. Larkin and Anthony D. Weiner - Dobrowski L.L.P. |

**DECL SOLOMON ISO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 92**

**DEPOSITIONS (In Addition to Above)**

| Case | Date | Judge/Court | Client | Attorney Plaintiff/Petitioner | Attorney Defendant/Respondent |
|---|---|---|---|---|---|
| 6) Noble Drilling Services, Inc. vs. Certex USA, Inc., Bridon-American Corp., and Bridon International, Ltd. / Anadarko Petroleum Corp. and Kerr-McGee Corporation vs. Noble Drilling (U.S.) LLC, et al. vs. Certex USA, Inc., et al. (Consolidated) | 12/11 | U.S. District Court Southern District of Texas Houston Division | P | Alison L. Smith and Steven Spears - McDermott Will & Emery LLP (Anadarko Petroleum Corp.) | Paul J. Dobrowski, Lee M. Larkin, Anthony D. Weiner, and Danielle N. Andrasek - Dobrowski LLP (Noble Drilling Services, Inc. and Noble Drilling (U.S.) LLC Karri Webb and Todd Wright - Barker Lyman, P.C. (Certex USA, Inc.) Barry R. Ostrager, Tyler B. Robinson, Seth M. Kruglak, and Jeffery L. Roether with Thacher & Bartlett LLP. (Bridon-American Corp. and Bridon International, Ltd.) John R. Strawn, Jr. - Strawn Pickens LLP (Bridon-American Corp. and Bridon International, Ltd.) |
| 7) Brenda Tolbert v. RBC Capital Markets Corporation n/k/a RBC Capital Markets, LLC et al. | 1/12 | U.S. District Court Southern District of Texas Houston Division | P | Geoffrey H. Bracken - Gardere Wynne Sewell LLP | Sari M. Alamuddin, Chris Boran, and Alison Gates - Morgan, Lewis & Bockius LLP |
| 8) CompSource Oklahoma, et al. v. BNY Mellon, N.A. and The Bank of New York Mellon | 2/12 | U.S. District Court Eastern District of Oklahoma | P | Brad Seidel - Nix, Patterson & Roach, LLP Peter H. LeVan, Jr. - Kessler Topaz Meltzer Check LLP | Weldon Stout and Ron Wright - Wright Stout & Wilburn Damien Marshall and Scott E. Grant - Boies, Schiller & Flexner LLP |
| 9) Trustees of the Local 464A United Food and Commercial Workers Union Pension Fund, et al. v. Wells Fargo Bank, N.A. et al. | 3/12 | U.S. District Court District of New Jersey | P | Edward W. Ciolko, Joseph H. Meltzer, Peter H. LeVan, Jr. and Joseph A. Weeden - Kessler Topaz Meltzer & Check, LLP | Diane A. Bettino and Thomas L. Allen - Reed Smith LLP |

**DEPOSITIONS (In Addition to Above)**

| Case | Date | Judge/Court | Client | Attorney Plaintiff/Petitioner | Attorney Defendant/Respondent |
|------|------|-------------|--------|-------------------------------|-------------------------------|
| 10) Wind Composite Services Group, LLC vs. Jeffrey D. Henning and Wind Services Group, Inc. | 3/12 | 269th Judicial District Court Harris County, Texas | P | James G. Munisteri, Michael P. Cash, and Jessica Mason - Gardere Wynne Sewell, LLP | Michael E. Richardson and David J. Beck - Beck Redden & Secrest, LLP |
| 11) Denver Employees Retirement Plan v. JPMorgan Chase Bank, N.A. | 9/12 | Supreme Court of the State of New York County of New York | P | Stuart M. Grant, Brenda F. Szydlo, Megan D. McIntyre, and Abraham Alexander - Grant & Eisenhofer, P.A. | Lewis R. Clayton and Jonathan H. Hurwitz - Paul, Weiss, Rifkind, Wharton & Garrison LLP |
| 12) Flavio Castaneda M.D., Individually, and Flavio Castaneda M.D., P.A. v. Community Health Systems Inc., Owner of Webb Hospital Corporation, aka Laredo Texas Hospital Company LP dba Laredo Medical Center, et al. | 10/12 | 368th Judicial District Court of Williamson County, Texas | D | Elizabeth Higginbotham and Richard H. Ihfe - Ihfe & Associates P.C. | James G. Munisteri - Gardere Wynne Sewell LLP |
| 13) In RE Principal U.S. Property Account ERISA Litigation | 2/13 | U.S. District Court Southern District of Iowa, Central Division | P | Derek W. Loeser, Lynn L. Sarko, and Cari Laufenberg - Keller Rohrback LLP Gary Gotto and James Bloom - Keller Rohrback, PLC | Gregory C. Braden, Sean K. McMahan, Deborah S. Davidson, and Nicole Diller - Morgan, Lewis & Bockius LLP Brian L. Campbell - Whitfield & Eddy PLC |
| 14) The Houston Exploration Company, et al. vs. Lary Insurance Services, Inc., et al. | 6/13 | 234th Judicial District Court Harris County, Texas | P | Paul S. Francis - Baker & Hostetler LLP | Adair & Myers, PLLC; Beck Redden & Secrest; Cantey & Hanger, LLP; Faubus & Scarborough LLP; Legge, Farrow, Kimmitt, McGrath & Brown, LLP; Scarborough Ward LLP; and Spagnoletti & Co. |

DECL SOLOMON ISO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 94

**DEPOSITIONS (In Addition to Above)**

| Case | Date | Judge/Court | Client | Attorney Plaintiff/Petitioner | Attorney Defendant/Respondent |
|------|------|-------------|--------|-------------------------------|-------------------------------|
| 15) In Re: Bank of America Corp. Securities Derivative and Employment Retirement Income Security Act (ERISA) Litigation - Related to Schwab S&P 500 Index Fund, et al. v. Bank of America Corp., et al. | 7/13 | U.S. District Court Southern District of New York | P | Grant & Eisenhofer P.A., Lieff Cabraser Heimann & Bernstein, LLP, Entwistle & Cappucci LLP, and Susman Godfrey LLP | Paul, Weiss, Rifkind, Wharton & Garrison LLP, Shearman & Sterling LLP, Debevoise & Plimpton LLP, Dechert LLP, and Baker Botts LLP |
| 16) Spear Marketing, Inc. v. Bancorpsouth Bank and Argo Data Resource Corp. | 10/13 | U.S. District Court Northern District of Texas Dallas Division | P | Samuel E. Joyner - Ross Joyner PLLC | Haynes and Boone,LLP and Andrews Kurth, LLP |
| 17) Barcel USA, LLC v. Baja Distributors, Inc., et al. | 10/13 | U.S. District Court Southern District of California | D | Garcia Sullivan & Lopez LLP | Howard Close - Wright & Close, LLP |
| 18) In Re: Fontainebleau Las Vegas Contract Litigation | 2/14 | U.S. District Court Southern District of Florida Miami Division | P | J. Michael Hennigan, Kirk Dillman, and Robert Mockler - McKool Smith, P.C. | O'Melveny & Myers LLP Hunton & Williams LLP |
| 19) Shelita Turner, et al. v. Goodwill Industries of Houston | 3/14 | U.S. District Court Southern District of Texas Houston Division | D | Michelle Bohreer - Bohreer & Zucker, LLP | Carol Nelkin - Nelkin & Nelkin, P.C. |
| 20) In Re: Green Valley Growers, Inc., Debtor, Randy Williams, Chapter 7 Trustee vs. Houston Plants & Garden World, Inc., et al. | 8/14 | United States District Court, Southern District of Texas, Houston Division | P | Kane Russell Coleman & Logan PC | Hoover Slovacek LLP |
| 21) Ruhrpumpen, Inc. vs. Flowserve Corporation | 9/14 | United States District Court, Northern District of Texas, Dallas Division | P | Cokinos Bosien & Young, P.C. - Charles Getman | Norton Rose Fulbright LLP |
| 22) Milton O. Johnston & Company, Ltd. v. NGM Insurance Company, et al. | 3/15 | 125th Judicial District Court, Harris County, Texas | D | Russell Hardin, Jr. Rusty Hardin & Associates, LLP | Robert G. Dees and Christopher W. Martin Martin Disiere Jefferson & Wisdom LLP |

**DEPOSITIONS (In Addition to Above)**

| Case | Date | Judge/Court | Client | Attorney Plaintiff/Petitioner | Attorney Defendant/Respondent |
|------|------|-------------|--------|-------------------------------|-------------------------------|
| 23) In Re Mentor Corp. Obtape Transobiturator Sling Products Liability Litigation | 5/15 | United States District Court, Middle District of Georgia, Columbus Division | P | William Barfield The Potts Law Firm, LLP | John Q. Lewis and Dustin B. Rawlin Tucker Ellis LLP |
| 24) Chartis Specialty Insurance Company vs. Tesoro Corporation, et al. | 6/15 | United States District Court, Western District of Texas, San Antonio Division | P | David Timmins, Scott L. Davis and Jason Heep Gardere Wynne Sewell LLP | Joshua Fuchs and Bernard P. Bell Jones Day |
| 25) Coutinho & Ferrostaal, Incorporated n/k/a C&F International Incorporated v. Milton Wayne Pickle a/k/a Wayne Pickle, and Steelcom Pipe International, LLC | 8/15 | 11th Judicial District Court Harris County, Texas | D | Rick Lee Oldenettel and Kevin M. Long Oldenettel and McCabe | Stephen W. Schueler Winstead, PC |
| 26) Pamela Green v. American Modern Home Insurance Company | 9/15 | United States District Court, Western District of Arkansas, Texarkana Division | P | Joseph H. Meltzer, Kessler Topaz Meltzer & Check LLP | Baker Hostetler LLP |
| 27) NRW, Inc. vs. Mike Bindra, et al. | 11/15 | United States District Court, Southern District of New York | P | Leslie D. Corwin, Blank Rome LLP | Adelman Matz P.C. |
| 28) Houston Galleria Lodging Associates, LLC vs. West Loop Hospitality LLC, et al. | 12/15 | 55th Judicial District Court, Harris County, Texas | D | Roger L. McCleary, Beirne Maynard & Parsons, LLP Rodney L. Drinnon, McCathern PLLC | Lloyd E. Kelley, Lloyd E. Kelley & Associates Johnie J. Patterson, Walker & Patterson, PC |
| 29) Jeff Dennington, et al. vs. State Farm & Casualty Company, et al. | 1/16 | United States District Court, Western District of Arkansas, Texarkana Division | P | Joseph H. Meltzer, Kessler Topaz Meltzer & Check LLP | Schiff Hardin LLP |
| 30) Darnita Riggins v. American Family Mutual Insurance Company | 12/15 & 3/16 | United States District Court, Western District of Missouri, Central Division | P | David T. Butsch, Butsch Roberts & Associates Joe D. Jacobson, Green Jacobson P.C. | Lisa M. Bolliger and James D. Griffin, Scharnhorst Ast Kennard Griffin, P.C. |

DECL SOLOMON ISO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 96

**DEPOSITIONS (In Addition to Above)**

| Case | | Date | Judge/Court | Client | Attorney Plaintiff/Petitioner | Attorney Defendant/Respondent |
|---|---|---|---|---|---|---|
| 31) | BTG Pactual Commodities (US) LLC vs. EDF Trading North America LLC | 5/16 | United States District Court, Southern District of Texas, Houston Division | P | David A. Baay, Sutherland Asbill & Brennan LLP | Katherine H. Kunz Susman Godfrey L.L.P. |
| 32) | Frontier Tubular Solutions, Inc. v. Richard Ridgeway and Cynthia Ridgeway | 8/16 | 281st Judicial District Court, Harris County, Texas | D | Suzanna Bonham, Seyfarth & Shaw LLP | Hunter Barrow Thompson & Knight LLP |
| 33) | In Re: Peabody Energy Corporation, et al. | 8/16 | United States Bankruptcy Court, Eastern District of Missouri, Eastern Division | D | Davis Polk & Wardwell LLP | Michael J. Moscato Curtis, Mallet-Prevost, Colt & Mosle LLP |
| 34) | Elie Boukheir v. Andrew Benjamin Wolan | 8/16 | 240th Judicial District Court, Fort Bend County, Texas | D | Mario E. de la Garza, and Eric Hawley Tucker, Barnes, Garcia & de la Garza, PC David Sheller The Sheller Law Firm, PLLC | Mark E. Yborra Levin & Clinebell |
| 35) | Beaver County Employees' Retirement Fund, et al. vs. Tile Shop Holdings, Inc. | 9/16 | United States District Court District of Minnesota | P | Matthew L. Mustokoff Kessler Topaz Meltzer & Check LLP Samuel H. Rudman Robbins Geller Rudman & Dowd LLP | Wendy J. Wilding and Justin P. Krypel Faegre Baker Daniels LLP |
| 36) | Jeffrey Bailey, et al. v. State Farm Fire and Casualty Company | 11/16 | United States District Court Eastern District of Kentucky at Ashland | P | Erik D. Peterson, M. Austin Mehr, Philip G. Fairbanks, and Bartley K. Hagerman Mehr Fairbanks Trial Lawyers, PLLC | David Klapheke Boehl Stopher & Graves, LLP Heidi Dalenberg and Patricia T. Mathy Riley Safer Holmes & Cancila LLP |
| 37) | Teddy Glenn Abrams, Jr. v. JJelcor, Inc. d/b/a Action Rental and Takeuchi MFG (US) Ltd. | 12/16 | 506th Judicial District Court, Waller County, Texas | D | J. Andrew Love Wright & Close LLP | Fred Hagans and William Hagans - Hagans Montgomery & Rustay, PC Larkin C. Eakin, Jr. Eakin Law Firm |

DECL SOLOMON ISO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 97

**DEPOSITIONS (In Addition to Above)**

| Case | Date | Judge/Court | Client | Attorney Plaintiff/Petitioner | Attorney Defendant/Respondent |
|---|---|---|---|---|---|
| 38) David Braden, et al. v. Foremost Insurance Company Grand Rapids, Michigan | 12/16 | United States District Court Western District of Arkansas Texarkana Division | P | Joseph H. Meltzer, Kessler Topaz Meltzer & Check LLP | Stacy Allen and Marilyn Montano Jackson Walker LLP J. Dennis Chambers Atchley Russell Waldrop & Hlavinka LLP |
| 39) Wellshire Financial Services, LLC, d/b/a LoanStar Title Loans, d/b/a MoneyMax Title Loans, and d/b/a LoanMax; Meadowwood Financial Services, LLC, d/b/a LoanStar Title Loans, and d/b/a MoneyMax Title Loans; and Integrity Texas Funding, LP v. TMX Finance Holdings, Inc.; TMX Finance, LLC; TMX Finance of Texas, Inc.; and TitleMax of Texas, Inc. | 8/17 | 152nd Judicial District Court Harris County, Texas | P | Daniel Johnson Sutherland Asbill & Brennan LLP Joseph D. Wargo Wargo & French LLP | Roland Garcia Greenberg Traurig LLP |
| 40) EB IP Holdings LLC, and Professional Drivers of Georgia, Inc. d/b/a ProDrivers v. Pro-Driver Leasing Systems, Inc. and PDL, Inc. | 10/17 | United States District Court Southern District of Texas Houston Division | D | Tammy Terry Osha Liang LLP Jeffrey B. Sladkus The Sladkus Law Group | Howard Close Wright & Close, LLP |

**Documents Considered**                                                                                      **Exhibit 2**

| Description | Starting Bates | Ending Bates |
|---|---|---|
| **Expert Reports** | | |
| Report of Saul Solomon dated September 29, 2017 | N/A | N/A |
| Report, Exhibits, and Work Papers of Daniel M. Garrett, Ph.D dated September 29, 2017 | N/A | N/A |
| | | |
| **Documents** | | |
| To Fidelity | RBC-PAUL000012250 | N/A |
| Garrett Work Papers | RBC-PAUL000012251 | N/A |
| Garrett Work Papers | RBC-PAUL000012252 | N/A |
| Garrett Work Papers | RBC-PAUL000012253 | N/A |
| Garrett Work Papers | RBC-PAUL000012254 | N/A |
| Garrett Work Papers | RBC-PAUL000012255 | N/A |
| Garrett Work Papers | RBC-PAUL000012256 | N/A |
| Garrett Work Papers | RBC-PAUL000012257 | N/A |
| Garrett Work Papers | RBC-PAUL000012258 | N/A |
| Garrett Work Papers | RBC-PAUL000012259 | N/A |
| Garrett Work Papers | RBC-PAUL000012260 | N/A |
| Garrett Work Papers | RBC-PAUL000012261 | N/A |
| Garrett Work Papers | RBC-PAUL000012262 | N/A |
| Garrett Work Papers | RBC-PAUL000012263 | N/A |
| Garrett Work Papers | RBC-PAUL000012264 | N/A |
| Garrett Work Papers | RBC-PAUL000012265 | N/A |
| Garrett Work Papers | RBC-PAUL000012266 | N/A |
| Garrett Work Papers | RBC-PAUL000012267 | N/A |
| Garrett Work Papers | RBC-PAUL000012268 | N/A |
| Garrett Work Papers | RBC-PAUL000012269 | N/A |
| Garrett Work Papers | RBC-PAUL000012270 | N/A |
| Garrett Work Papers | RBC-PAUL000012271 | N/A |
| Garrett Work Papers | RBC-PAUL000012272 | N/A |
| Garrett Work Papers | RBC-PAUL000012273 | N/A |
| Garrett Work Papers | RBC-PAUL000012274 | N/A |
| Garrett Work Papers | RBC-PAUL000012275 | N/A |
| Notes on Import Files - Garrett Work Papers | N/A | N/A |
| Garrett Report Analysis - Garrett Work Papers | N/A | N/A |
| all_data.csv - Garrett Work Papers | N/A | N/A |
| Garrett Report Analysis_Exhibits Only - Garrett Work Papers | N/A | N/A |
| Garrett Report Analysis_Import Only - Garrett Work Papers | N/A | N/A |
| CADUSD - Request Builder - Garrett Work Papers | N/A | N/A |
| Call Execute - Garrett Work Papers | N/A | N/A |
| RBC-Paul 11297_std - Garrett Work Papers | N/A | N/A |
| RBC-Paul 11298_std - Garrett Work Papers | N/A | N/A |

| Exhibit 3 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Percent of Eligible Employees by Schedule in the Garrett Report * | | | | | | | | | | |
| **Schedule from Garrett Report** | | **2003** | **2004** | **2005** | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** |
| Garrett Exhibit 4B - Percentage of Employees Eligible for Wealth Accumulation Plan (U.S. Employees Only) | # of Employees Eligible | 1,342 | 2,497 | 2,444 | 2,342 | 2,585 | 2,931 | 2,393 | 1,678 | 1,931 |
| | # of Potentially Eligible Employees | 19,126 | 19,246 | 17,504 | 13,547 | 15,312 | 17,596 | 16,433 | 15,664 | 15,783 |
| | Percent of Eligible Employees | **7.0%** | **13.0%** | **14.0%** | **17.3%** | **16.9%** | **16.7%** | **14.6%** | **10.7%** | **12.2%** |
| Garrett Exhibit 5B - Comparison of Current Year NDT Compensation by WAP Eligibility (U.S. Employees Only) | # of Employees Eligible | 1,114 | 1,937 | 1,811 | 1,900 | 2,131 | 2,368 | 1,844 | 1,405 | 1,623 |
| | # of Potentially Eligible Employees | 11,840 | 11,423 | 8,771 | 8,691 | 9,913 | 11,849 | 11,545 | 11,211 | 10,704 |
| | Percent of Eligible Employees | **9.4%** | **17.0%** | **20.6%** | **21.9%** | **21.5%** | **20.0%** | **16.0%** | **12.5%** | **15.2%** |
| Garrett Exhibit 5D - Comparison of Prior Year NDT Compensation by WAP Eligibility (U.S. Employees Only) | # of Employees Eligible | - | 2,054 | 2,189 | 1,942 | 2,004 | 2,445 | 1,819 | 1,280 | 1,677 |
| | # of Potentially Eligible Employees | - | 11,840 | 11,423 | 8,771 | 8,691 | 9,913 | 11,849 | 11,545 | 11,211 |
| | Percent of Eligible Employees | **n/a** | **17.3%** | **19.2%** | **22.1%** | **23.1%** | **24.7%** | **15.4%** | **11.1%** | **15.0%** |

* Analysis is based on data underlying Garrett Report as provided in all_data.csv

| | | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Exhibit 4** | | | | | | | | | | |
| **Number of Eligible Employees in Dr. Garrett's Compensation Analysis with Compensation Less Than the Minimum Compensation Requirement \*** | | | | | | | | | | |
| | Compensation Threshold | $ 150,000 | $ 150,000 | $ 150,000 | $ 150,000 | $ 150,000 | $ 150,000 | $ 350,000 | $ 350,000 | $ 350,000 |
| Garrett Exhibit 5B - Comparison of Current Year NDT Compensation by WAP Eligibility (U.S. Employees Only) | Total Eligible Employees | 1,114 | 1,937 | 1,811 | 1,900 | 2,131 | 2,368 | 1,844 | 1,405 | 1,623 |
| | Total Below Compensation Based Eligibility Requirements | 287 | 418 | 378 | 339 | 315 | 433 | 1,214 | 661 | 783 |
| | Total Above Compensation Based Eligibility Requirements | 827 | 1,519 | 1,433 | 1,561 | 1,816 | 1,935 | 630 | 744 | 840 |
| | **% Below Compensation Based Eligibility Requirements** | **25.8%** | **21.6%** | **20.9%** | **17.8%** | **14.8%** | **18.3%** | **65.8%** | **47.0%** | **48.2%** |
| Garrett Exhibit 5D - Comparison of Prior Year NDT Compensation by WAP Eligibility (U.S. Employees Only) | Total Eligible Employees | - | 2,054 | 2,189 | 1,942 | 2,004 | 2,445 | 1,819 | 1,280 | 1,677 |
| | Total Below Compensation Based Eligibility Requirements | - | 501 | 532 | 374 | 347 | 401 | 1,139 | 674 | 776 |
| | Total Above Compensation Based Eligibility Requirements | - | 1,553 | 1,657 | 1,568 | 1,657 | 2,044 | 680 | 606 | 901 |
| | **% Below Compensation Based Eligibility Requirements** | **n/a** | **24.4%** | **24.3%** | **19.3%** | **17.3%** | **16.4%** | **62.6%** | **52.7%** | **46.3%** |

\* Analysis is based on data underlying Garrett Report as provided in all_data.csv

| | | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Exhibit 5** | | | | | | | | | | |
| **Statistics for Eligible Employees in Dr. Garrett's Compensation Analysis with Compensation Less Than the Minimum Compensation Requirement *** | | | | | | | | | | |
| | Compensation Threshold | $ 150,000 | $ 150,000 | $ 150,000 | $ 150,000 | $ 150,000 | $ 150,000 | $ 350,000 | $ 350,000 | $ 350,000 |
| Garrett Exhibit 5B - Comparison of Current Year NDT Compensation by WAP Eligibility (U.S. Employees Only) | Minimum Salary of Eligible Employees Below Compensation Based Eligibility Requirements | 19,721 | 4,702 | 14,276 | 9,470 | 2,711 | 2,938 | 1,674 | 35,870 | 7,813 |
| | Maximum Salary of Eligible Employees Below Compensation Based Eligibility Requirements | 149,961 | 150,000 | 149,946 | 149,879 | 150,000 | 150,000 | 350,000 | 349,773 | 349,773 |
| | Average Salary of Eligible Employees Below Compensation Based Eligibility Requirements | 112,187 | 113,781 | 113,730 | 118,678 | 113,102 | 112,177 | 173,013 | 226,376 | 233,082 |
| | Average Compensation for All Employees | 102,561 | 112,246 | 126,507 | 137,964 | 142,576 | 122,500 | 133,283 | 149,713 | 165,490 |
| Garrett Exhibit 5D - Comparison of Prior Year NDT Compensation by WAP Eligibility (U.S. Employees Only) | Minimum Salary of Eligible Employees Below Compensation Based Eligibility Requirements | - | 1,379 | 12,144 | 14,276 | 43,725 | 16,818 | 2,938 | 42,639 | 16,456 |
| | Maximum Salary of Eligible Employees Below Compensation Based Eligibility Requirements | - | 150,000 | 150,000 | 149,946 | 149,879 | 150,000 | 350,000 | 349,762 | 349,773 |
| | Average Salary of Eligible Employees Below Compensation Based Eligibility Requirements | n/a | 100,178 | 112,220 | 119,751 | 123,504 | 115,045 | 191,007 | 214,675 | 229,356 |
| | Average Compensation for All Employees | - | 102,561 | 112,246 | 126,507 | 137,964 | 142,576 | 122,500 | 133,283 | 149,713 |

* Analysis is based on data underlying Garrett Report as provided in all_data.csv