1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

8

MARTY PAUL, an individual, and
BRIAN BUSKIRK, an individual,

9

Plaintiffs,

10

v.

11

RBC CAPITAL MARKETS, LLC, a
Minnesota limited liability company; ROYAL
BANK OF CANADA, a Canadian corporation;
and ROYAL BANK OF CANADA US
WEALTH ACCUMULATION PLAN, an
employee benefit plan,

12
13
14
15

Defendants.

16
17
18
19
20
21
22
23
24
25
26

Case No. 3:16-cv-05616-RBL

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY
JUDGMENT**

**NOTE ON MOTION CALENDAR:
February 2, 2018**

ORAL ARGUMENT REQUESTED

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
(NO. 3:16-CV-05616-RBL)

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Dr., 5th Floor
Chicago, IL 60601
+1.312.324.1000

# TABLE OF CONTENTS

**Page**

I.    **INTRODUCTION** ................................................................................................ 1

II.   **ARGUMENT** ..................................................................................................... 3

    A.  Plaintiffs' Motion Underscores Why RBC Is Entitled To Summary Judgment ........................................................................................ 3

        1.  Plaintiffs Confirm That They Seek Relief Not Available To Them ......... 3

        2.  Plaintiffs' Motion Also Confirms They Had All Facts Necessary To Bring Their Claims More Than Six Years Before Filing Suit ............. 4

    B.  The WAP Was A Top-Hat Plan Exempt From Most Of ERISA's Provisions ......................................................................................... 5

        1.  Plaintiffs Improperly Exclude Much Of RBC's Total Workforce— And Thus Do Not Dispute The Facts Establishing The WAP's Top-Hat Status ...................................................................... 5

        2.  The WAP Was A Valid Top Hat Plan Even Using RBC's U.S. Workforce—And At A Minimum Genuine Issues Of Fact Exist. ............ 8

            a.  The WAP Was Limited To A "Select Group" Of U.S. Employees ..................................................................... 9

                (1)  The WAP Was "Select" Under Plaintiffs' Flawed Percentages ....................................................... 9

                (2)  Plaintiffs Artificially Inflate The WAP's Eligibility Rate ................................................................. 10

            b.  The WAP Was Maintained For "Highly Compensated" Employees ................................................................... 13

                (1)  WAP-Eligible Employees Earned Substantially More Than RBC's Total U.S. Workforce And Non-Eligible Employees. .................................................. 14

                (2)  Plaintiffs' Alternative Compensation Analyses Are Unfounded ........................................................ 14

            c.  Plaintiffs' Individual Bargaining Power Arguments Are Meritless ................................................................... 17

            d.  RBC's Undisputed Monitoring Of The WAP Does Not Negate—And In Fact Confirms—The Plan's Top Hat Status ........................................................................ 20

    C.  At Minimum, Plaintiffs Have Not Established Their Claims As A Matter Of Law ...................................................................................... 24

III.  **CONCLUSION** ............................................................................................... 24

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
(NO. 3:16-CV-05616-RBL) – PAGE i

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Dr., 5th Floor
Chicago, IL 60601
+1.312.324.1000

# I. INTRODUCTION

Plaintiffs' Motion for Partial Summary Judgment asks the Court to find as a matter of law that the Wealth Accumulation Plan ("WAP") failed to satisfy ERISA's "top hat" exemption in each year from at least 2005 through 2011. Dkt. 41 ("Mot."). In doing so, plaintiffs ignore the core undisputed facts that doom their claims and instead distort the record, rely upon immaterial and misleading statistics, and eschew accepted top-hat tests in favor of alternative "factors" and comparisons having little basis in fact or law. Plaintiffs' Motion should be denied.

To start, plaintiffs' Motion confirms that their claims fail on several threshold grounds. *See* Dkt. 37, Defs.' Mot. for S.J. ("DMSJ"). Plaintiffs reiterate that they seek individualized money "damages" for purported statutory violations. Mot. at 3. As RBC explained, such a claim properly arises, if at all, under ERISA Section 502(a)(3), *not* Sections 502(a)(1)(B) or (a)(2), undercutting Counts I, II, and III. DMSJ at 12-15. However, nowhere do plaintiffs contend that *they* were not "highly compensated," tacitly conceding that (i) they seek a windfall, after almost a decade of reaping the WAP's generous benefits, based on a violation that could only have harmed others; and (ii) the most likely form of "appropriate equitable relief" under Section 502(a)(3) would not result in the "damages" they seek. *Id.* Further, plaintiffs' Motion confirms their claims are untimely, as they concede the WAP was administered consistently over the relevant period—including the very vesting and forfeiture provisions they now challenge—and that these terms and RBC's intention that the WAP was a top hat plan were well-known to employees. For any of these reasons, the Court should grant summary judgment in RBC's favor.

Even if the Court reaches plaintiffs' "top hat" arguments, however, their Motion fails. At every turn, plaintiffs try to steer the focus away from well-accepted legal authorities and toward alternative and fundamentally flawed analyses. But in the end, the *material* facts are undisputed, and they establish that the WAP was maintained for "a select group of management or highly compensated employees." 29 U.S.C. § 1101(a)(1).

First, plaintiffs present *no evidence* to refute RBC's showing that the WAP was a valid top hat plan when considering its "total workforce," as case after case requires. DMSJ at 20-21.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Dr., 5th Floor
Chicago, IL 60601
+1.312.324.1000

Instead, they improperly exclude from their analysis much of that total workforce, focusing solely on RBC's U.S. employees. Plaintiffs offer no authority (or logic) for excluding these individuals. To the contrary, they concede the Royal Bank of Canada is the WAP's corporate sponsor; stipulate that its employees *could* have been eligible if they met the applicable criteria; name the Royal Bank as a defendant here; and claim it bears responsibility for their alleged harm. Properly using RBC's "total workforce," the WAP indisputably was a valid top hat plan.

Second, the WAP satisfied the top hat exemption even under plaintiffs' analysis. By their expert's own (flawed) calculations, the WAP was limited to an overall eligibility rate of 15.36% from 2003 through 2011, and the average WAP-eligible employee earned between 2.91 and 3.64 times more than the average U.S. employee. Both measures are in line with what courts find sufficient. At a minimum, however, plaintiffs have not negated the WAP's top-hat status as a matter of law. Their methodology for calculating the Plan's eligibility rate is inconsistent with RBC's actual process *and* legal authority, inflating their numbers. And their expert's compensation analysis ignores the approaches used by nearly every court, and instead offers alternative metrics that carve the WAP into sub-groups and compare *only* those groups to one another. As RBC's expert explains, these approaches are misleading and incorrect.

Third, multiple circuit decisions have rejected plaintiffs' attempt to read into the top-hat test a distinct "substantial influence" requirement, much less one that requires evidence that every *individual* participant could bargain for personalized plan terms. Even so, the undisputed facts, including plaintiffs' own testimony, confirm that WAP-eligible employees in fact had "substantial influence" over the WAP, on both an individual and collective level.

Fourth, plaintiffs' version of events surrounding RBC's continuing evaluation of the WAP badly mischaracterizes the record. The Court need not even delve into these weeds, however, because nothing about these events impact the *legal* question before this Court, which is resolved by the well-accepted factors other courts routinely apply.

For these reasons and those in RBC's Motion, the Court should enter summary judgment in RBC's favor. At a minimum, factual disputes exist that require denying plaintiffs' Motion.

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
PAGE 2

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

## II.    ARGUMENT[1]

**A.    Plaintiffs' Motion Underscores Why RBC Is Entitled To Summary Judgment.**

Before turning to the "top hat" issue—the exclusive focus of plaintiffs' Motion—plaintiffs' arguments confirm RBC's position that plaintiffs (1) request forms of relief unavailable under ERISA, and (2) sat on their rights, knowing the WAP's terms, structure, eligibility thresholds, and purported over-inclusivity for well over six years.  DMSJ at 8-19.

### 1.    Plaintiffs Confirm That They Seek Relief Not Available To Them.

RBC's Motion explained why plaintiffs' claims must arise under ERISA Section 502(a)(3); why that provision does not authorize the relief their Complaint actually requests; and why equitable reformation of the WAP would not result in the money damages they seek. Plaintiffs' Motion does nothing to refute these arguments and, in fact, confirms they are correct.

First, plaintiffs reiterate that they seek the payment of individual damages allegedly caused by RBC's forfeiture of portions of their WAP accounts.  Mot. at 3 (seeking only a declaration that the WAP did not meet ERISA's top-hat exemption and a trial to determine "the damages to which Plaintiffs are entitled").  Nowhere do plaintiffs seek to enforce the terms of the WAP as written (for Counts I and II, under ERISA § 502(a)(1)(B)), nor do they identify any specific breach of fiduciary duty causing harm to the "plan as a whole" (for Count III, under ERISA § 502(a)(2)).  *See* DMSJ at 10.  As such, their Motion makes clear that plaintiffs' claims can only be construed as a challenge to the WAP's legality under Section 502(a)(3).  *Id.* at 12.

Second, plaintiffs' Motion confirms that the conduct they challenge was not fiduciary in nature, nor have they identified any defendant acting in a fiduciary capacity.  DMSJ at 10-11. Rather, the sole focus of their Motion is RBC's conduct with respect to the WAP's design, terms, and eligibility.  These classic "settlor" functions are the province of the Plan sponsor, not a fiduciary.  *Id.*  Indeed, many of plaintiffs' own exhibits focus on the financial impact *to RBC* of myriad changes to the WAP, confirming these are plan-sponsor actions.  *See* Pls.' Exs. 7, 8, 10, 11, 13, 21, 22, 23.  Having identified no fiduciary conduct, Count III falters out of the gates.

---

[1] RBC incorporates the Statement of Facts in its Motion (Dkt. 37) as if set forth fully herein.  To the extent additional facts pertain specifically to plaintiffs' Motion, RBC addresses them throughout the discussion below.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

Third, not once do plaintiffs disavow that *they* were "highly compensated."  DMSJ at 7-8.  Instead, they focus exclusively on the alleged plight of the "bottom" and "lowest-compensated" eligible employees, *i.e.*, others who they now say should have been excluded from the WAP's valuable benefits entirely.  *See* Mot. at 19-20.  As RBC explained, because plaintiffs indisputably were "top hat" employees, they are not among the individuals even potentially harmed by the violation they allege.  DMSJ at 15-16.  If the Court finds the WAP was over-inclusive, therefore, equitable reformation would not grant plaintiffs the money "damages" they seek.  *Id.*

In fact, if the Court harbored any concern over drawing a precise line for an appropriately "select" WAP—which is unnecessary, as it need only find *these* plaintiffs were "highly compensated"—plaintiffs have already done it, even conceding they *would* have been eligible.  In discussing changes to RBC's compensation programs in 2012, *infra* at 23, plaintiffs concede that new eligibility thresholds—compensation of $1 million "and cap of 400 FAs," representing RBC's "Chairman's" and "President's" Councils—were "meaningfully strict eligibility requirements directed at highly compensated employees," Mot. at 24 n.14; *id.* at 3 (the "new WAP" "likely met the top hat standards").  But Paul admittedly earned more than $1 million *and* qualified for Chairman's Council each year at issue here.  DMSJ at 19 n.27; Defs.' Ex. D at 54-57.  And Buskirk testified that "probably my last 15, 20 years [at RBC] I was either president's or chairman's [council]."  Ex. V, Buskirk Tr. 20-22.  As such, plaintiffs would not benefit from reformation of the WAP, and they offer no other avenue to recover the "damages" they seek.

2.     **Plaintiffs' Motion Also Confirms They Had All Facts Necessary To Bring Their Claims More Than Six Years Before Filing Suit.**

Plaintiffs' Motion also highlights why their claims are untimely, whether construed as properly arising under ERISA Section 502(a)(1)(B) and/or (a)(3), or as a fiduciary breach claim under Section 502(a)(2).  *See* DMSJ at 16-18.  As RBC explained, the WAP has, at all relevant times, expressly stated that awards are subject to vesting and forfeiture, and that it was intended to be an exempt top hat plan.  *Id.* at 16.  WAP communications made these terms clear, and participants understood how the WAP operated.  *Id.* at 16-17.  And at no time did either plaintiff believe the WAP was limited to "highly compensated" employees.  *Id.* at 19.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

Plaintiffs' Motion confirms RBC's position. Among other things, they argue the WAP's eligibility criteria did not change between 2003 and 2008, yet claim it was not "select" since at least 2005. Mot. at 4, 14. They further assert that a financial consultant ("FC") with $300,000 in production—the alleged minimum to become WAP-eligible until 2010—was *never* a "highly compensated" employee, fell below other "average" FCs, and would have earned a "low" salary, just north of $100,000 per year. Mot. at 18, 20. Moreover, by arguing that RBC delayed changing the WAP for fear of employee protest or attrition, plaintiffs concede the WAP's terms *were* well-known across RBC's workforce. *Id.* Nothing in plaintiffs' Motion suggests they learned anything new in 2012 that they did not know more than six years prior.

**B.      The WAP Was A Top-Hat Plan Exempt From Most Of ERISA's Provisions.**

Even if the Court reaches the merits, when evaluated properly the undisputed evidence confirms the WAP was a valid top hat plan. The parties largely agree on the legal framework: a top hat plan must be "unfunded" and maintained for a "select group of management or highly compensated employees," 29 U.S.C. § 1101(a)(1), and courts evaluate a number of quantitative and qualitative factors in determining if a plan meets these criteria. *See* DMSJ at 20; Mot. at 9. The parties' paths diverge, however, in evaluating these factors. RBC's Motion emphasizes well-accepted approaches used by other courts, while plaintiffs focus on secondary factors and made-up comparisons that are not instructive in answering the core questions here: was the WAP "select," and was it maintained for "highly compensated" employees?[2]

**1.      Plaintiffs Improperly Exclude Much Of RBC's Total Workforce—And Thus Do Not Dispute The Facts Establishing The WAP's Top-Hat Status.**

Plaintiffs' entire top-hat analysis relies exclusively upon RBC's "U.S. workforce." Mot. at 13. By doing so, plaintiffs improperly exclude much of RBC's overall employee population.

Court after court, including the Ninth Circuit, has made clear that the baseline against which a top hat plan's selectivity should be measured is the "total workforce" of the plan's corporate sponsor. *See Duggan v. Hobbs*, 99 F.3d 307, 312 (9th Cir. 1996) (evaluating "employer's entire work force"); DMSJ at 20-21 (collecting cases). Likewise, to determine if a

---

[2] Plaintiffs do not challenge the WAP's "unfunded" status, conceding this element of the exemption. DMSJ at 20.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

top hat plan is offered to "highly compensated" employees, courts typically compare the average compensation of eligible employees to that of either *all* plan-sponsor employees or those who are not eligible. *See id.* at 22. Yet plaintiffs here ignore RBC's total workforce altogether, thus offering *no evidence* of the WAP's characteristics when compared to all RBC employees.

As such, the facts set forth in RBC's Motion are undisputed. That evidence establishes the WAP was sufficiently "select," as its eligibility ranged from just 2.0% to 3.4% of all RBC employees between 2004 and 2011. DMSJ at 6. And WAP-eligible employees were "highly compensated," earning, on average, between 4.5 and 6.3 times more than the average RBC employee, and between 5.2 and 7.6 times more than the average non-eligible employee. *Id.* at 22. By any measure, these figures establish the WAP's top-hat status as a matter of law. *Id.*

Plaintiffs give no valid reason for excluding thousands of RBC employees, nor can they. Plaintiffs' own Complaint concedes "[t]he Royal Bank of Canada is the 'plan sponsor' of the WAP within the meaning of ERISA." Dkt. 1 ¶ 16; *id.* ¶ 22. Moreover, the WAP provided that it was available to qualifying "employees of the Royal Bank . . . *and its Participating Subsidiaries.*" DMSJ at 4 (quoting § 1.1) (emphasis added). Indeed, plaintiffs stipulated that "any employee 'of an Employer' may become eligible," and that "Employer" is defined as the Royal Bank "and Participating Subsidiaries." Pls.' Ex. 6, ¶ 10. Plaintiffs' Complaint further confirms that "[t]he Royal Bank of Canada operates globally and employs workers in the United States," Dkt. 1 ¶ 8, and that one such U.S. employer was defendant RBC Capital Markets, a Royal Bank subsidiary, *id.* ¶¶ 7-8, 34-35, 47-48. Although RBC Capital Markets is headquartered in the U.S., it too has a significant number of employees in Canada.[3] If that were not enough, plaintiffs have *sued both* the Royal Bank and RBC Capital Markets, claiming each should be directly liable to them. And yet they ask the Court to ignore the entire workforce of *both* entities in determining that liability.

Plaintiffs offer only two ostensible justifications for doing so: (1) the WAP precluded residents of Canada from participating, "no matter their level of compensation or production";

---

[3] *See, e.g.*, RBC Capital Mkts., Key Facts (Q4 2017), https://www.rbccm.com/assets/rbccm/docs/about-us/cm-keyfacts.pdf (last visited Jan. 19, 2018) (as of November 2017, RBC Capital Markets had 2,952 Canadian employees across 10 offices, with 2,753 U.S. employees across 40 offices).

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
PAGE 6

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

and (2) RBC looked only to the U.S. workforce when evaluating the WAP internally.  Mot. at 13.  The first argument is incorrect.  The second is both incomplete and inconsequential.

First, plaintiffs misconstrue the WAP's eligibility provisions.  The Plan contains two express requirements: an employee must (1) be "a non-resident of Canada" *or* render services primarily outside of Canada; and (2) satisfy minimum "compensation or production" thresholds or other requirements.  Defs.' Ex. A, § 2.1(a)-(b).  Plaintiffs are thus incorrect in asserting that "[r]esidents of Canada were never permitted to participate," Mot. at 13, as any employee who rendered services primarily outside of Canada could be eligible.  In fact, RBC offered unrefuted evidence that roughly 275 employees of the Royal Bank (as opposed to U.S. subsidiaries) were WAP-eligible, DMSJ at 4 n.3 (citing Defs.' Ex. C), and testimony confirmed Canadian residents were among this group, eligible by providing services "primarily" in the U.S., Ex. W, Sikich 7/11/17 Dep. at 122-123 ("[W]e do have participants in the [WAP] based on the fact . . . they may reside in Canada, but they had U.S.-based compensation.  If they had U.S.-based compensation, they may be eligible.").  To include those employees only in the "WAP-eligible" part of the calculation (the numerator), while ignoring scores of other RBC employees comprising the "total workforce" (the denominator) improperly inflates the eligibility rate.[4]

Regardless, even if plaintiffs were correct that all Canadian residents were ineligible, they offer no sound basis for treating this eligibility criterion differently than any other.  Why should the Court discard RBC employees who failed to meet the WAP's *first* eligibility requirement, yet simultaneously consider (as plaintiffs do) the thousands of U.S. employees who failed to meet the *second* requirement?  Both acted to whittle RBC's overall workforce to a "select" group.  The First Circuit's ruling in *Alexander* is instructive.  The plan in that case was open exclusively to "surgeons who were full-time faculty at Harvard Medical School," but also required exceeding a minimum "net practice income."  513 F.3d 37, 40-41 (1st Cir. 2008).  Despite that all surgeons (eligible and ineligible) comprised less than one-third of the plan sponsor's "aggregate workforce," the court affirmed top-hat status based on the percentage of the "overall employee

---

[4] ERISA is fully applicable to plans administered in the U.S. that are provided for the benefit of U.S. and foreign employees alike.  *See, e.g.*, *Lasheen v. The Loomis Co.*, 2006 WL 618289 (E.D. Cal. Mar. 9, 2006).

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

population" eligible for the plan. *Id.* at 40-41, 46. Like the many RBC employees whom plaintiffs want to exclude, over *two-thirds* of the plan-sponsor employees in *Alexander* were not surgeons or full-time Harvard faculty, meaning they could *never* qualify for the plan "no matter their level of compensation or production" (Mot. at 13). The top-hat case law confirms the Court should consider RBC's "total workforce," and plaintiffs point to no authority to the contrary.

Second, plaintiffs are wrong to suggest RBC's internal analyses of the WAP dictates a different approach. To start, what RBC evaluated has no bearing on the legal question of whether the WAP comprised a sufficiently "select" group of employees. Indeed, had RBC never evaluated the WAP's eligibility at all, the analysis would be the same: what percentage of all RBC employees were eligible? To hold differently would punish RBC for proactively monitoring the WAP, meaning, under plaintiffs' view, RBC would have been better off ignoring the Plan's eligibility altogether. This result would be as nonsensical as it sounds.

In any event, plaintiffs' contention that RBC "declined to include Canadian employees" (Mot. at 13-14) is misleading, as it suggests RBC affirmatively rejected this approach or deemed its full workforce to be irrelevant. To the contrary, asked why RBC used U.S. employees, its witness testified, "I don't think that there was a bright-li[ne] test between just looking at the U.S. population versus . . . looking at RBC globally." Pls.' Ex. 1 at 197-98. As such, it made good sense for RBC to take the more conservative approach of ensuring the WAP was "select" using the U.S. workforce, as doing so necessarily meant it was "select" when using its total workforce.

In the end, neither plaintiffs nor their expert refute the facts establishing that the WAP was sufficiently "select" and limited to "highly compensated" employees, taking into account RBC's total workforce. As these facts are undisputed, summary judgment is appropriate.

> **2.      The WAP Was A Valid Top Hat Plan Even Using RBC's U.S. Workforce—And At A Minimum Genuine Issues Of Fact Exist.**

Even if the Court considers only RBC's U.S. workforce, plaintiffs' own analyses confirm that the WAP qualified as a top hat plan. Those analyses, however, are fundamentally flawed in numerous respects, skewing the data in their favor and distorting the facts. At a minimum, therefore, RBC has established genuine issues of fact regarding the WAP's top-hat status.

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
PAGE 8

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

### a.   The WAP Was Limited To A "Select Group" Of U.S. Employees.

#### (1)   The WAP Was "Select" Under Plaintiffs' Flawed Percentages.

Courts often hold that plans limited to roughly "15% or less of the workforce have consistently been treated as top hat plans." *Callan v. Merrill Lynch & Co.*, 2010 WL 3452371, at *10 (S.D. Cal. Aug. 30, 2010); DMSJ at 21.  Using the annual eligibility data calculated by plaintiffs' expert, Saul Solomon, the WAP's overall eligibility rate from 2003 through 2011 was just 15.36%. Dkt. 43, Ex. 1 ¶ 34; Russell 2/2/18 Decl. ¶ 10.  Even ignoring the myriad problems with his methodology, addressed below, this is almost precisely the same rate (15.34%) deemed sufficiently "select" in *Demery v. Extebank*, 216 F.3d 283, 289 (2d Cir. 2000); *see* DMSJ at 21.[5]

Plaintiffs strive to avoid this conclusion by advocating an all-or-nothing approach, under which they isolate the WAP's purported eligibility ratios for *each* year, then argue that so long as the WAP exceeded the applicable threshold in *any* year, its top hat status was gone for good and could never be resuscitated.  *See* Mot. at 14, 16.  Plaintiffs offer no case law or other authority for such a restrictive approach, the implications of which are impractical and illogical.

First, plaintiffs cannot have it both ways.  On the one hand, they claim the WAP was "a single plan" from 2003 to 2011, asserting its "top hat status is dependent on eligibility rates from throughout the relevant period."  Mot. at 14.  Yet in the next breath, plaintiffs seek to invalidate the WAP's top-hat status over nearly a decade without even addressing the *overall* eligibility rate over that period, or accounting for the material fluctuations in RBC's workforce and the various actions RBC took to limit eligibility, which, as explained below, necessarily showed results over a period of years, not days or months.  *Infra* at 21-23.  If plaintiffs conceptualize the WAP as a "single plan," they must account for its overall eligibility rate over time.

The only justification plaintiffs provide for their approach is a straw-man argument that contradicts the facts of this case.  Plaintiffs argue that if "the WAP could fall out of top hat compliance one year but regain compliance the next," this could lead to "nonsensical results" because RBC could simply "retroactively cure" the WAP and thus forfeit benefits that should

---

[5] This overall rate also is well below the *average* 18.7% rate (over a four-year period) rendering the plan insufficiently select in *Darden v. Nationwide Mut. Ins. Co.*, 717 F. Supp. 388, 397 (E.D.N.C. 1989), *aff'd* 922 F.2d 203 (4th Cir. 1991), *rev'd on other grounds* 503 U.S. 318 (1992).

Morgan, Lewis & Bockius LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

have become vested.  Mot. at 14.  RBC does not take this position, nor would the Court need to adopt it.  Unlike this supposedly "nonsensical" hypothetical, the WAP *did not* jump into and out of top-hat compliance each year, even using plaintiffs' own calculations.

Even under plaintiffs' view of the WAP, there is a clear dividing line after RBC established more restrictive eligibility criteria in 2009.  Plaintiffs' own expert found that, even limited only to U.S. employees, eligibility dropped to 14.6% (2009), 11.7% (2010), and 13.9% (2011).  Dkt. 43, Ex. 1 ¶ 34.  Thus, even if the Court finds the WAP was over-inclusive in certain years before these changes, it is *undisputed* that RBC's actions brought the WAP well within the eligibility rates other courts deem "select."[6]  Regardless, plaintiffs' "year-by-year" approach is misguided, and Solomon's overall average rate of 15.36% was sufficiently "select."

(2)     **Plaintiffs Artificially Inflate The WAP's Eligibility Rate.**

Although even Solomon's overall eligibility findings support RBC, his calculations are flawed in numerous respects.  In short, Solomon calculates the WAP's eligibility rate on a single, arbitrarily selected date (December 31).  This analysis is inconsistent with *both* RBC's actual process for determining WAP eligibility *and* relevant legal authority.  The result is that Solomon improperly excludes scores of employees from both: (i) the group of employees RBC in fact deemed eligible each year, *and* (ii) the total U.S. workforce from which they were selected.

RBC determined WAP eligibility for each Plan year in two distinct phases.  First, in the November preceding the Plan year, RBC identified any current employee whose fiscal year (October to September) compensation or production satisfied the applicable eligibility thresholds.  Defs.' Ex. K, 1/25/12 Sikich Decl. ¶ 7.  If so, those employees were deemed eligible for the WAP for the ensuing Plan year.  For example, to determine eligibility for the 2011 Plan year (starting January 1, 2011), RBC would identify eligible employees in November 2010, based upon their compensation or production from October 2009 to September 2010.

---

[6] Plaintiffs are wrong to suggest that this would impact any benefits the Court might find should have been "vested" under ERISA *before* 2009.  Rather, those awards could be deemed vested, while contributions to the WAP from 2009 to 2011 would be handled consistently with the WAP's status as an appropriately "select" top hat plan.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

The second phase occurred during the Plan year itself. New employees could become *immediately* eligible for the current year's WAP, if they met the eligibility criteria based upon either their trailing twelve-month production at their prior employer, or their guaranteed fiscal-year compensation at RBC. *Id.* Thus, a FC hired in June 2011 would be immediately eligible to participate for the remaining six months of the 2011 WAP if his or her trailing twelve-month production exceeded $400,000, while a non-production employee hired in June 2011 would be eligible for the 2011 WAP if she was guaranteed at least $350,000 in compensation at RBC.

Defendants' expert, Daniel Garrett, evaluated the WAP's eligibility rate according to this two-staged process. That is, Garrett identified the total number of U.S. employees RBC *actually* determined to be eligible for the WAP over a given Plan year, then divided that figure by the total number of U.S. employees over the same time period. Defs.' Ex. I, ¶¶ 8-9, 14. This approach thus takes into account both the total number of employees considered for eligibility in the first phase and the total workforce considered throughout the second phase. *Id.*[7]

Not only does Garrett's approach mirror RBC's actual process, but it is consistent with regulations used to calculate employee percentages in other ERISA contexts. For example, one factor used to determine whether a partial "termination" of a qualified retirement plan has occurred (thus triggering the immediate vesting of accrued benefits) requires analyzing the percentage of employees affected by a reduction in force. If 20% or more of plan participants are terminated, a legal presumption arises that a partial termination of the plan occurred. *See, e.g., Matz v. Household Int'l Tax Reduction Inv. Plan*, 388 F.3d 570, 577-78 (7th Cir. 2004). To determine whether a reduction meets this 20% threshold, the total number of plan participants who were terminated is divided by the *combined* total number of employees who were eligible for the plan "at the start of the applicable period *and the employees who became participants during the applicable period*." Rev. Ruling 2007-43, 2007-28 I.R.B. 45 (emphasis added). This is precisely Garrett's methodology for determining the WAP's eligibility rate in each Plan year.

---

[7] To illustrate, assume that in November 2010, RBC had 15,000 U.S. employees, 1,500 of whom qualified for the 2011 WAP. RBC then hired 2,500 employees in June 2011, 150 of whom met the WAP's eligibility requirements. To account for each employee considered for the 2011 WAP, Garrett would divide the 1,650 total eligible employees by the 17,500 total U.S. employees considered in the 2011 Plan year, yielding an eligibility rate of 9.4%.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

By contrast, Solomon's "snapshot" approach simultaneously ignores RBC's eligibility process *and* excludes a large number of WAP-eligible employees and the total workforce pool from which they were chosen. By using a date before the Plan year even starts, Solomon ignores the second phase of RBC's eligibility process entirely, meaning his numbers do not reflect *any* employees (WAP-eligible or otherwise) RBC hired over the actual Plan year. *See* Defs.' Ex. L, ¶¶ 11-18. Solomon justifies this approach by misleadingly asserting that someone "not yet hired" as of January 1 could not be eligible for the WAP *on that date*. Dkt. 43, Ex. 1 ¶ 39. As explained, employees hired during the year could, and often did, become immediately eligible for the rest of that Plan year. Further, this method excludes not only newly hired WAP-eligible employees, but *all other* employees RBC hired during a given Plan year.[8]

Solomon exacerbates the effect of this flaw by discarding from the total U.S. workforce (the denominator) any employee who was in fact considered for eligibility during RBC's first phase determination, but who happened to leave RBC between November 1 and December 31 of the preceding year. *See* Ex. X, Garrett Dep. at 45-50. While an employee deemed eligible on November 1 could not actually *participate* in the WAP the upcoming year if he or she left RBC before January 1, it makes no sense to exclude from the total U.S. workforce *all* employees who left RBC during that period, as they indisputably *were* considered for eligibility. To the contrary, this approach entirely divorces the analysis from the total pool of employees considered.

In addition, Solomon admits that calculating an eligibility rate on a specific date means ignoring the volatility and fluctuation inherent in a workforce like RBC's. Ex. Y, Solomon Tr. at 65-70. Employees come and go over an entire year, sometimes in droves due to acquisitions or divestitures. Both the data and testimony confirm this, as RBC experienced material shifts in its U.S. workforce between 2003 and 2011.[9] Solomon's approach ignores these fluctuations and

---

[8] Plaintiffs also attack Garrett's analysis because it purportedly includes employees who were "not yet hired until after the end of the plan year." Mot. at 15 n.9. As Garrett explained, however, two of the three available data sources indicate a small group of employees were paid by RBC in the plan year(s) in question and some were even deemed WAP-eligible, but they also showed "start dates" in *later* years. Ex. X, Garrett Dep. at 38-39; 63-64, 71, 90-91. This data thus suggests these employees were employed during the plan year(s) in question, left RBC, then were re-employed at the later "start date." *Id.* Thus, Solomon's *exclusion* of these employees is the true flaw. *Id.*
[9] Solomon's own analysis confirms that RBC's total U.S. workforce dropped almost 50% from 2003 (20,389 employees) to 2007 (10,625 employees), while the number of FCs over that time—the largest contingent of WAP-

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

disregards the realities of administering the WAP. RBC could not know in advance the WAP's true eligibility rate for a given Plan year, nor could it immediately revise eligibility thresholds before each Plan year began, as the metrics for the fiscal year ending the prior September had already resolved eligibility for that upcoming year. As such, any significant change to the WAP necessarily would not bear fruit until some future time.[10] In fact, Solomon agrees that "a logical approach" for evaluating a plan's selectivity "would be looking at the information that they know at that point in time which would be looking back. They can't tell what's going to happen in the next year[.]" Ex. Y, Solomon Dep. at 60-61. Garrett's approach accomplishes this "look-back" analysis for the *entire* Plan year; Solomon does so for a single day.

Using an appropriate measure, the WAP's overall eligibility rate fell safely within the ranges other courts deem "select," even considering only RBC's U.S. employees. Garrett found that the Plan's average eligibility rate from 2003 through 2011 was just 13.6%, Defs.' Ex. I ¶ 16 & Ex. 4B, with an overall average of 13.4%, Russell 2/2/18 Decl. ¶ 11. Though the WAP reached a peak in 2006 after material shifts in RBC's workforce, RBC immediately took several proactive steps that reduced the Plan's U.S. eligibility rate to 14.6% in 2009, 10.7% in 2010, and 12.2% in 2011, Defs.' Ex. I, Ex. 4B. When viewed over the relevant period, therefore, the Plan was sufficiently "select" even using only the U.S. eligibility rate.

### b. The WAP Was Maintained For "Highly Compensated" Employees.

Plaintiffs' Motion strives to avoid the well-accepted methods for evaluating whether eligible employees are "highly compensated." Instead, they slice the WAP-eligible employees into groups, then pit them against one another. Mot. at 18-21. Plaintiffs' statistical sleights of hand do not disguise the fact that WAP-eligible employees were "highly compensated."[11]

---

eligible employees—remained roughly the same. Dkt. 43, Ex. 1 ¶¶ 34, 88. As witnesses explained, RBC experienced several transactions over this period. Ex. W, 7/11/17 Sikich Tr. at 103-104 (acquisition of Liberty Life Insurance, Centrua, and Sterling Mortgage); *id.* at 177-81 (acquisitions of Ferris Baker Watts and J.B. Hanauer).

[10] Take the 2011 Plan year for example. RBC determined eligibility in November 2010, based on compensation or production from October 2009 to September 2010. Employees worked the entire 2010 fiscal year under the impression that whatever eligibility thresholds were communicated in fall 2009 were, in fact, their targets to become WAP-eligible for 2011. As such, modifications for the 2011 Plan year should be communicated in the fall of 2009.

[11] Plaintiffs' argument that the WAP included employees who were not "management" is irrelevant. ERISA permits a select group of "management *or* highly compensated employees," 29 U.S.C. § 1101(a)(1) (emphasis added); *see Alexander*, 513 F.3d at 146 (participants "highly compensated" only); *Callan*, 2010 WL 3452371, at *11 (same).

Morgan, Lewis & Bockius LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

As outlined in RBC's Motion, courts typically evaluate whether a plan is limited to "highly compensated" employees by comparing the average compensation of eligible employees to that of either (i) the total plan-sponsor workforce, or (ii) all non-eligible employees. DMSJ at 22. Courts generally find that where the average eligible employee earns at least two- to three-times the applicable comparator, the plan meets the "highly compensated" requirement. *Id.* (collecting cases). Despite acknowledging this approach (Mot. at 12-13, 19), nowhere does plaintiffs' Motion *even state* the average compensation of *all* WAP-eligible employees at any point in time. For good reason, as even their own expert's conclusions support RBC's position.

Plaintiffs' expert Solomon found that the average WAP-eligible employee earned between *2.91 and 3.64 times* more than the average U.S. employee from 2003 to 2011. Dkt. 43, Ex. 1 ¶¶ 57-58. These figures are actually *higher* than the disparities calculated by RBC's expert using the U.S. workforce only. Defs.' Ex. I, Ex. 5B (average eligible employee earned 2.8 to 3.5 times the average U.S. employee). These numbers—notably missing from plaintiffs' Motion—confirm there is no genuine dispute that this factor favors top-hat status. *See* DMSJ at 21.[12]

Solomon did not calculate the average compensation of the *non-eligible* U.S. employees, meaning plaintiffs do not offer evidence to rebut or refute RBC's calculations. *See* Defs.' Ex. I, Ex. 5B. From 2004 through 2011, the average WAP-eligible employee earned between *5.2 and 7.6 times* more than the average non-eligible RBC employee, *id.* Ex. 5A, and between *4.9 and 6.1 times* more than the average non-eligible U.S. employee, *id.* Ex. 5B.[13]

(2)    **Plaintiffs' Alternative Compensation Analyses Are Unfounded.**

In lieu of the methods used by virtually every court—presumably recognizing they do not favor plaintiffs—Solomon slices-and-dices the WAP-eligible employees into sub-groups, then

---

[12] The disparity is even greater when properly considering RBC's *total* workforce. The average WAP-eligible employee earned between *4.5 and 6.3 times* more than the average RBC employee. Defs.' Ex. I, Ex. 5A.

[13] If anything, using averages understates the disparity between WAP-eligible employees and the overall workforce. Both experts agree that averages "can be notably influenced by outliers, i.e., by people who make either very little or very much," and generally "skew" the data. Defs.' Ex. I ¶ 18; *see also* Defs.' Ex. L ¶¶ 20, 24; Dkt. 43, Ex. 1 ¶¶ 48, 93. Using the median data reveals an even greater disparity, as the median WAP-eligible employee earned between *5.2 and 7.5 times* more than the median RBC employee, Defs.' Ex. I, Ex. 5A, and between *3.5 and 5.5 times* more than the median U.S. employee, *id.* Ex. 5B. Solomon offers no median calculations.

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
PAGE 14

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

compares them to one another.  Mot. at 18-21.  The tacit premise underlying this alternative analysis is that a top hat plan must be offered only to RBC's very *highest*—not merely "highly"—compensated employees.  Plaintiffs provide no valid authority for this approach, and the statutory language rejects it.  29 U.S.C. § 1101(a)(1).  Rather, the top hat provision "has been interpreted more generally to mean that not every member of the select group need belong to the upper tier of management or fit within the highest stratum of compensation," because "it is the configuration of the group as a whole that controls."  *Alexander*, 513 F.3d at 48 (collecting cases); *see also Alexander*, 467 F. Supp. 2d 136, 144 (D. Mass. 2006) (finding top hat plan even where some non-eligible employees earned *more* than eligible employees).

By contrast, plaintiffs' argument focuses exclusively on FCs.  Mot. at 18-21.  For example, they observe that more than half of FCs were WAP-eligible each year, and argue the "vast majority" of eligible FCs had production below the average of "the overall FC population."  *Id.*  Plaintiffs argue that some FCs earned less than others, while claiming the disparity between eligible FCs and *all* U.S. employees was insufficient.  *Id.*  Plaintiffs also contend the WAP was "bottom heavy," because many eligible FCs were toward the lower-end of the WAP's full compensation spectrum.  *Id.* at 19-20.  These calculations are irrelevant to the WAP's *overall* composition, and plaintiffs offer no valid authority for isolating FCs while excluding all other WAP-eligible employees.[14]  More fundamentally, a compensation plan is almost always going to be "bottom heavy," no matter where eligibility is drawn.  If the WAP limited eligibility to employees earning $1 million or more, then more eligible employees would fall closer to the $1 million mark than would earn, say, $10 million.  That such a plan may be "bottom heavy" says nothing about whether its participants are "highly compensated."

Plaintiffs then build upon these flaws by treating the WAP's compensation and production eligibility thresholds as though they were equivalents.  *See* Mot. at 4, 20-21.  But this

---

[14] Indeed, by Solomon's own calculations, FCs represented only 12.06% to 17.79% of RBC's total U.S. workforce, meaning plaintiffs' myopic focus on FCs ignores more than 80% of RBC's other U.S. employees in every year.  *See* Dkt. 43, Ex. 1  ¶¶ 34, 92.  Solomon also reports that FCs comprised between 35.7% and 64.6% of the total WAP-eligible U.S. employees, depending on the year, meaning plaintiffs' analysis also ignores between 35.4% and 64.3% of all *WAP-eligible* employees.  *Id.*  This was not a plan solely for FCs, and it should not be evaluated as such.

compares apples to oranges, as the compensation criteria *did not apply* to most production-based employees, and vice versa. *See* Pls.' Ex. 6 ¶¶ 1-9. RBC established various eligibility criteria for employees across its several business lines and "packet codes" over multiple years. *Id.* The cumulative effect of these eligibility criteria on the WAP's composition is what matters—and this is determined using the well-accepted methods addressed above. Instead, plaintiffs suggest that any *production*-based employee whose income did not exceed the *compensation* criteria necessarily was not "highly compensated." Mot. at 20. Nothing in ERISA demands a single threshold, nor that eligibility be based directly on compensation alone. Rather, the important point is that, whatever the criteria, the plan is maintained for "highly compensated" employees.[15]

Finally, plaintiffs take this piecemeal analysis one step further still, by extracting only the "lowest-compensated" part of the WAP-eligible *FC sub-group* and comparing them, on average, to *all* U.S. employees (including other WAP-eligible employees). Mot. at 20. Putting aside that the "lowest-compensated" eligible employees arguably should not even be part of this analysis, *infra* at 22, RBC's expert explained why this approach unfairly uses the fact that any average of an entire workforce will be skewed by a small number of outliers,[16] Defs.' Ex. L, ¶¶ 45-46.

The only case plaintiffs cite in support of their purported "bottom heavy" approach is the district court's decision denying reconsideration of a summary judgment ruling in *Daft v. Advest, Inc.*, 2008 WL 190436 (N.D. Ohio Jan. 18, 2008). Mot. at 12, 19. Reliance on this ruling is misplaced for several reasons. First, it was reversed. 658 F.3d 583 (6th Cir. 2011). Although plaintiffs represent that the decision was "overruled on other grounds," the Sixth Circuit held that the court should never even have conducted its "sweeping, *de novo* review of the top-hat issue"

---

[15] Plaintiffs' Motion provides a real-life example. Effective in 2009, RBC increased the *compensation* eligibility threshold to $350,000—a minimum that did not apply to production-based employees. Mot. at 20. That RBC decided to offer the WAP to fewer *compensation*-based employees says nothing about whether the remaining *production*-based employees were actually "highly compensated." Thus, plaintiffs' observation that the number of FCs who "earned less than the WAP compensation-based eligibility threshold" increased in 2009 is both obvious and meaningless. *See* Defs.' Ex. L ¶¶ 33-35. Naturally, more RBC employees would earn less than $350,000 than did $150,000. Or stated differently, does the overnight increase in the compensation threshold to $350,000 suddenly mean a production-based employee who earned $349,000 was *not* "highly compensated"? Of course not. It means only that RBC chose to eliminate more employees from the compensation side of the WAP ledger.

[16] Solomon's compensation analysis also uses *annualized* figures, derived by extrapolating certain partial-year data as though an employee worked the entire year. This approach adds even further problems. Defs.' Ex. L, ¶¶ 25-32.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 60615-1596
+1.312.324.1000

in the first place, because the existing record lacked the information necessary to "allow a reasoned determination of the top-hat issue"—the very analysis the district court erroneously undertook. *Id.* at 594-97. If that were not enough, in doing so, the Sixth Circuit repeatedly emphasized "the proper legal standard when determining the top-hat issue," which requires considering: "(1) the percentage of the total workforce invited to join the plan (quantitative), (2) the nature of their employment duties (qualitative); (3) *the compensation disparity between top hat plan members and non-members (qualitative)*; and (4) the actual language of the plan agreement (qualitative)." *Id.* at 595-96 (quoting *Bakri v. Venture Mfg. Co.*, 473 F.3d 677, 678 (6th Cir. 2007)) (emphasis added). Ultimately, the plan administrative committee's "failure to consider all four of the *Bakri* factors" constituted "application of the incorrect legal standard." *Id.* at 597. Notably absent from those factors? Plaintiffs' so-called "bottom heavy" analysis.[17]

In the end, plaintiffs' Motion says little more than that certain portions of the WAP-eligible population earned less than an array of other arbitrary thresholds. These comparisons are meaningless, offer no insight into the overall composition of the WAP-eligible employees, and ignore a significant—and the most highly compensated—portion of that very group. Under any valid method, the WAP was limited to "highly compensated" employees.

### c.    Plaintiffs' Individual Bargaining Power Arguments Are Meritless.

RBC's Motion explained that ERISA does not impose a "substantial influence" element for establishing a valid top hat plan. DMSJ at 23-24. Plaintiffs appear to agree, noting only that Congress's "rationale for the top hat exception" was that such employees can "protect their own interests and thus do not require the primary protections of ERISA." Mot. at 21. Nonetheless, plaintiffs argue that WAP participants "did not have adequate bargaining power" here because

---

[17] Plaintiffs' also try to analogize *Daft* on its facts, arguing the plan there allowed "more than 50% of account managers and 30% of the company's employees to be eligible." Mot. at 19. But these account managers were the *only* employees eligible; participation was open to *all* of them, if they met a "relatively low" commission threshold; and after employees qualified once, they were "grandfathered" into the plan each year thereafter, "regardless of their commissions in later years." 2007 WL 7024715, at *2, 5 (N.D. Ohio Nov. 13, 2007). Here, plaintiffs attempt to bring this case within *Daft* only *after* isolating FCs, ignoring that as many as 65% of other WAP-eligible employees were *not FCs*, and all employees had to qualify for the WAP anew each year. Dkt. 43, Ex. 1 ¶¶ 34, 92.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

"*individual employees* lack the ability to influence" the Plan "or otherwise protect their own interest." Mot. at 22 (emphasis added). This position is both legally and factually incorrect.

First, the Court need not address a distinct "substantial influence" factor for the reasons stated in RBC's Motion (at 23-24). If a plan is sufficiently "select" and maintained for "highly compensated" employees, as the WAP was, it meets the statutory definition of a top hat plan.

Second, even if this factor were relevant, Congress cannot have intended that courts would invalidate a plan's top-hat status where a single participant might lack bargaining power on an *individual* basis. In fact, the very DOL Opinion Letter upon which courts addressing this factor rely states that top hat plan participants are presumed to be able to "affect or substantially influence, through negotiation *or otherwise*," the design and operation of their plan. DOL Op. Ltr. 90-14A (emphasis added). As such, the DOL "recognized that top hat plan participants have other means, beside direct negotiation, to affect or influence their plans." *Sikora v. UPMC*, 153 F. Supp. 3d 820, 830 (W.D. Pa. 2015), *aff'd by* 876 F.3d 110 (3d Cir. 2017).

Moreover, imposing an individual bargaining requirement would be as untenable and impractical as it sounds. As the First Circuit explained in *Alexander*, if this were required, "every top hat plan [could] be rendered noncompliant by demonstrating that a single covered employee lacks individual bargaining power, no matter the overall characteristics of the select group of management or highly compensated employees" to which he or she belongs. 513 F.3d at 47 (quotations omitted). Not only that, but requiring that each employee be able to negotiate unique plan terms would render it virtually impossible for employers to design and administer a top hat plan in any uniform way. ERISA expressly speaks in terms of a "plan" maintained by an employer for a "group" of "employees." 29 U.S.C. § 1101(a)(1). If "Congress was singularly concerned with an individual's ability to fend for himself or herself," it is highly "unlikely that Congress would have framed the statute in terms of 'groups' at all." *Alexander*, 513 F.3d at 48.

Third, under any formulation, WAP-eligible employees—including plaintiffs—*had* both individual and collective influence. As RBC explained, direct feedback from FCs and others led to several material changes to the WAP over time. DMSJ at 7-8, 24; *see* Defs.' Ex. J at 203.

Morgan, Lewis & Bockius LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

Aside from this direct influence, it is undisputed that high-performing FCs are heavily recruited, paid sizeable recruiting bonuses by competitors, and typically take their clients—and other RBC employees—if they leave. DMSJ at 5. In fact, plaintiffs' argument that RBC was so concerned about mollifying FCs that it put off increasing the WAP's eligibility threshold, even if true (*infra* at 21-23), only highlights the influence these employees actually had over the WAP. *See* Mot. at 5-7. Plaintiffs exemplified this influence: both were high-performing employees who served on internal Advisory Councils, and whose departures reflected their "influence." DMSJ. at 7-8; *Alexander*, 467 F. Supp. 2d at 147 (noting the plan "was established as a result of the threat that a very profitable surgeon would leave BSG for a more lucrative position," which "indicates that successful surgeons have both options and bargaining power").

Plaintiffs' entire argument that individual employees lacked sufficient "bargaining power" rests on a *single* excerpt from the deposition of Gabriela Sikich, RBC's former Defined Benefit Plan Manager. *See* Mot. at 22 (citing Pls.' Ex. 1 at 201:19-23). Based on this testimony, plaintiffs aver that RBC "admitted that no WAP participant has ever successfully negotiated the terms of the WAP," and "individual employees have not had the ability to alter the WAP or its administration." Mot. at 1, 22. This greatly overstates Ms. Sikich's testimony. She was asked, hypothetically, to assume a branch director asked her to modify the WAP's vesting schedule on a personal, one-time basis. Pls.' Ex. 1 at 201. Not surprisingly, Ms. Sikich indicated she would deny such a request, as it contradicts the WAP's written terms. *Id.* at 201-02. But this does not mean that no individual participant ever influenced the WAP. In fact, Ms. Sikich elaborated that many "significant changes" to the WAP "over the course of many years" have been the result of "direct feedback from our FA population." *Id.* at 202-03. As such, Ms. Sikich's testimony does not sustain plaintiffs' assertions, but rather means only that she would not agree to make individual exceptions from the WAP's *existing* written terms or apply the Plan in different ways. Indeed, plaintiffs' reliance on this testimony only underscores the point that if *actual* individual bargaining is required, RBC could never offer a uniform plan at all, but rather would have to administer personalized arrangements with different terms for different employees.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

### d. RBC's Undisputed Monitoring Of The WAP Does Not Negate—And In Fact Confirms—The Plan's Top Hat Status.

Finally, plaintiffs devote much of their Motion to mischaracterizing events surrounding RBC's internal evaluation of the WAP from 2006 to 2008, including several modifications they concede *reduced* the Plan's eligibility rates over time. *See* Mot. at 5-7. As outlined below, plaintiffs' story is unsustainable, as it ignores critical parts of the evidence and distorts what in reality was an ongoing, proactive process for ensuring the WAP *remained* a valid top hat plan.

More fundamentally, however, nothing about plaintiffs' narrative is relevant to the *legal* question of whether the WAP was in fact a valid top hat plan. As explained, the WAP satisfied each factor courts typically consider in this analysis, the outcome of which would not change *even if* everything plaintiffs assert was accurate or, for that matter, if RBC never considered the WAP's eligibility at all. Nowhere do plaintiffs explain why these "facts" are material to their claims. Instead, they try to rope in this narrative by arguing that courts "consider an employer's own statements when determining top hat status." Mot. at 22. But plaintiffs' entire discussion focuses on RBC's *internal* conduct (*id.* at 5-8), whereas courts typically focus on the "actual language of the plan" and other *outward* evidence of a plan's purpose. *See, e.g.*, *Daft*, 658 F.3d at 595; *Cramer v. Appalachian Reg'l Healthcare, Inc.*, 2012 WL 5332471, at *5-6 (E.D. Ky. Oct. 29, 2012). The WAP's language, evidence of its purpose, and participant communications all confirm RBC administered the Plan specifically to meet the top hat exemption. DMSJ at 22.

Regardless, plaintiffs repeatedly mischaracterize the evidence to argue that "RBC's goal was never to ensure participants were 'management' or 'highly compensated.'" Mot. at 24. This could not be further from the truth; many of the same documents plaintiffs cite and evidence they ignore reflects various efforts by RBC to do exactly that. To start, the foundation of plaintiffs' argument is that RBC was more concerned with "prioritizing FC recruitment and retention," than with ensuring "top hat compliance." Mot. at 23. These two objectives are not mutually exclusive—in fact, they typically go hand-in-hand. *See Demery*, 216 F.3d at 287; *Alexander*, 467 F. Supp. 2d at 142-43 ("A desire to recruit and retain excellent employees would be a common, rather than unusual, motive for establishing a top hat plan."); *Callan*, 2010 WL

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 60601-5_596
+1.312.324.1000

3452371, at *8 (finding top hat plan used to attract and retain Merrill Lynch financial advisors). The WAP's undisputed purpose was to offer an extra benefit to key employees, while also incentivizing them to stay at RBC. DMSJ at 3-4.[18]

From this unsound foundation, plaintiffs offer a distorted view of RBC's evaluation of the WAP over time. Rather than suggest RBC was allowing the WAP to run rampant, the actual evidence reflects a prudent, proactive process to deal with a continually changing workforce, resulting in several concrete actions to ensure the WAP's top hat status. For example:

- Plaintiffs assert that "RBC knew it had a top hat problem" as early as 2006, relying almost exclusively on a March 2006 presentation. Mot. at 5 (citing Pls.' Ex. 7). This document, however, shows that the WAP's top-hat status was just one of *nine* different topics for discussion. Pls.' Ex. 7 at 2, 16-17. Moreover, Ms. Sikich has repeatedly testified that the 2006 review was *not* rooted in any concern the Plan was out of compliance with ERISA, but rather an overall strategic review to identify areas for many different potential design enhancements or modifications. *See* Ex. Z, Sikich 9/8/11 Tr. at 31-33, 44-45, 83-84, 262-64.[19]

- Plaintiffs contend that RBC ignored a March 2006 recommendation by outside counsel to increase the WAP's eligibility threshold. Mot. at 5. The presentation they cite, however, preceded any formal legal review of the WAP and expressly states "further analysis is required." Pls.' Ex. 7; *see* Ex. Z, Sikich 9/8/11 Tr. at 30-32. RBC engaged outside counsel at this time "to determine on a proactive basis" if there were issues concerning the WAP's top-hat status, Ex. W, Sikich 7/11/17 Tr. at 106, particularly in light of "multiple acquisitions over the course of the last couple of years" that altered RBC's U.S. workforce, Ex. Z, Sikich 9/8/11 Tr. at 32. And just one week later, in one of plaintiffs' own exhibits (Ex. 9), Ms. Sikich summarized the March 23 meeting by stating that counsel was only just "embarking on the analysis" and that she hoped to have formal "recommendations" at a future date.

- Plaintiffs argue that RBC took "no action" on the recommendations by an outside consultant, Mercer, to "significantly tighten eligibility requirements" in 2007. Mot. at 5-6. To the contrary, RBC *implemented* Mercer's only recommendation immediately. Plaintiffs rely on an August 21, 2006 presentation, *id.* at 5, which stated a *single* proposed "Plan Design Change[]" aimed at the WAP's eligibility. Pls.' Ex. 11 at 7. That lone suggestion was to revise the production-based eligibility threshold from $300,000 to $350,000, while still allowing FCs with production from $300,000 to

---

[18] Even the *Tolbert* court observed that "the fact that the WAP was intended from its inception to be a top hat plan for deferred compensation to certain employees stands as the very reason RBC was able to utilize it as a recruitment and retention tool." *Tolbert v. RBC Capital Mkts., LLC*, 2015 WL 2138200, at *4 (S.D. Tex. Apr. 28, 2015).

[19] Plaintiffs' own exhibits confirm that a comprehensive review of the WAP was in the works well *before* the March 2006 presentation and had nothing to do with the WAP's eligibility thresholds. *See, e.g.*, Pls.' Ex. 22, at 9 (showing that, as early as April 8, 2005, RBC was contemplating "a major re-design next year (for the 2006 plan year implementation)" to address "the financial issues" of the WAP, with *no mention* of the Plan's top-hat status).

$350,000 to participate, but requiring them to receive distributions upon vesting. *Id.* RBC made this change right away, effective for the upcoming Plan year (2007). *See* Pls.' Ex. 6, ¶¶ 4-5; Ex. Z, Sikich 9/8/11 Dep. at 297-299; Pls.' Ex. 23 at 2-3.[20]

- In perhaps the most egregious distortion of the record, plaintiffs assert that Ms. Sikich's off-handed use of the phrase "WAP purgatory" in a September 2006 email to Mercer meant "that RBC executives elected to continue the operation of the WAP without reforming it to attempt to maintain top hat status (if it ever had such status) in direct contravention of Ms. Sikich's warning." Mot. at 6, 23 (citing Pls.' Ex. 12). This is demonstrably false. Their first source, the email itself, reflects Ms. Sikich's response to Mercer's inquiry about "how things were ending up" with the *dozens* of recommendations it had made about the WAP; nothing in this email suggests her remark was directed at the WAP's "top hat status." *Supra* at 21; *see also* Pls.' Exs. 7, 11, 23. Their second and only other source, Ms. Sikich's testimony, only confirms her comment *was not* directed at WAP eligibility or its top hat status. She said she was referring to RBC's evaluation of many potential Plan changes, and when asked about the eligibility threshold specifically, she said she *could not* "speak to that one specific proposed change. It was – there were multiple different change proposals, as you can see in one of the other earlier exhibits." Ex. W, Sikich 7/11/17 Dep. at 173.[21]

- Plaintiffs aver that RBC increased the WAP's eligibility criteria only "[a]fter years of delay." Mot. at 7. This is false. As noted, RBC could not know the impact of the changes it *did make* for 2007 until that year ended, *supra* at 12-13, which is precisely when it undertook another review in early 2008, Mot. at 6 (citing Pls.' Exs. 14, 15). By then, the WAP's eligibility rate had increased, *id.*, which Ms. Sikich explained was the direct result of one acquisition in mid-2007 (J.B. Hanauer) and another in mid-2008 (Ferris Baker Watts), both having a higher proportion of WAP-eligible employees than the existing U.S. workforce, thus increasing the eligibility rate. Ex. W, Sikich 7/11/17 Tr. at 177-78, 180-81.[22] Because RBC already determined WAP

---

[20] As explained in RBC's first summary judgment motion, eliminating even the *option* of post-employment distributions arguably removed the "FC Entry" and "BD Entry" groups (i.e., production from $300,000 to $350,000) from ERISA's coverage altogether, as the WAP could *never* "result[] in a deferral of income . . . to the termination of covered employment or beyond" for those participants. 29 U.S.C. § 1002(2)(A)(ii); *see* Dkt. 24, at 13. Either way, removing these employees from the top-hat analysis indisputably was both RBC's and Mercer's intent and understanding in making these changes. *See* Ex. W, Sikich 7/11/17 Dep. at 107-08, 110 (because contributions "would be automatically paid out upon vesting, [] they would not be considered in our – our top-hat analysis"). RBC also communicated this intent directly to employees. *See, e.g.*, Exs. AA & BB. At minimum, RBC's actions belie plaintiffs' assertions that it took "no action" to modify the WAP's eligibility thresholds. Mot. at 23.

[21] *See also* Ex. W, Sikich 7/11/17 Dep. at 172-73 (RBC "was looking at, that time, again, between that period of time, 2006 and 2007, *a lot of changes* to the program and socializing those changes," and "as you can see in one of the previous exhibits, we were going through *all of these multiple different* . . . change proposals, and *there were multiple of them*. And so my reference there was, with *all these changes* that we were proposing, we had internal champions of some of those changes, and then we had opposition on some of those changes.") (emphases added).

[22] RBC acquired JB Hanauer on May 18, 2007, and Ferris Baker Watts on June 20, 2008. *See* https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=4370082; https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=1446748 (both last visited Jan. 24, 2018). Not only did these acquisitions unexpectedly alter the composition of the U.S. workforce, but the WAP-eligible population also skewed higher for 2007 and 2008 because many new employees received "up-front retention bonuses" to induce them to stay, making them eligible for that year—causing the eligible group to "dramatically increase"—even if they may not be eligible in future years. Ex. W, Sikich 7/11/17 Tr. at 177-78, 180-81.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

eligibility for 2008 (in fall 2007), and because the second acquisition occurred *mid-year* 2008 (meaning those employees were immediately eligible for the 2008 WAP), RBC's first chance to modify the WAP's eligibility thresholds to account for these developments was before the 2009 Plan year. This is precisely what it did in October 2008, raising the compensation threshold from $150,000 to $350,000. *See* Mot. at 6-7; Pls.' Ex. 6 ¶¶ 6-7. At the *same* time (October 2008), RBC modified the production threshold from $300,000 to $400,000, though it would take effect for the 2010 Plan year (*i.e.*, when RBC determined eligibility in November 2009). Mot. at 23; Pls.' Ex. 6 ¶¶ 7-8. Although plaintiffs criticize this "delay" too, Mot. at 23, at the time of that decision, the 2008 fiscal year had already *ended*, meaning FCs who were told the production threshold more than a year before would have presumed they already met the criteria for receiving WAP awards in 2009. As such, RBC understandably wanted to "provide[] an opportunity [for FCs] to increase their production level so they could be eligible to participate when the eligibility thresholds went up, because they were losing out on productivity bonuses." Ex. W, Sikich 7/11/17 Tr. at 181-82.

Finally, plaintiffs suggest that changes to the WAP effective January 1, 2012, show that RBC recognized the WAP was *not* a valid top hat plan before that date, as eligibility became "drastically stricter." Mot. at 7. This position is untenable for multiple reasons. To start, plaintiffs' insinuations once again ignore Ms. Sikich's testimony. RBC decided to establish the "new WAP" not because it believed the "old WAP" was improper in *prior* years, but because RBC would be divesting its Centura Bank business line in early 2012, causing "significant changes in the organizational structure." Ex. W, Sikich 7/11/17 Tr. at 65-67. "Centura Bank had a significant population that were not eligible for the WAP," meaning that removing those employees from the denominator (i.e., RBC's total U.S. workforce), while subtracting far fewer Centura employees from the numerator (i.e., the WAP-eligible employees), would cause a "significant impact" on the WAP's eligibility rate. *Id.* at 65-66, 72. This testimony belies the suggestion that the "new WAP" represented a concession that the "old WAP" was invalid.

Regardless, plaintiffs' attempt to use the "new WAP" as evidence suggesting the "old WAP" was unlawful constitutes a "subsequent remedial measure" inadmissible to establish liability. Fed. R. Civ. P. 407; *Noble v. McClatchy Newspapers*, 533 F.2d 1081, 1090 (9th Cir. 1975), *vacated on other grounds by* 433 U.S. 904 (1977) (affirming exclusion of evidence that defendant later deleted purportedly unlawful provisions from contracts, because it is not

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

permissible to draw an "inference of guilt or wrongdoing" from such subsequent acts).[23]  In fact, plaintiffs' Motion illustrates precisely the heads-I-win, tails-you-lose position in which an employer like RBC would find itself if such an action could be used against it.  On the one hand, plaintiffs argue there was a "single WAP" from at least 2003 to 2011, meaning that (according to them) once the WAP's top-hat status was gone in *any* year, it was gone for good, no matter how restrictive RBC made the WAP.  *See* Mot. at 14.  But, on the other hand, when RBC created an entirely *new* plan in 2012, in part to cut off any ongoing liability under precisely this sort of "all-or-nothing" theory, plaintiffs claim this was admission that the prior WAP was unlawful.  This illustrates exactly why the "subsequent remedial measure" doctrine exists.  *See* Fed. R. Civ. P. 407, Adv. Comm. 1972 cmts. (the Rule "rejects the suggested inference that fault is admitted" by later actions, and also "rests on a social policy of encouraging people to take" remedial actions).

**C.  At Minimum, Plaintiffs Have Not Established Their Claims As A Matter Of Law.**

Based on the undisputed facts set forth above, as well as the additional arguments in RBC's Motion, the Court should grant summary judgment in RBC's favor.  However, if the Court disagrees with respect to any or all of plaintiffs' claims, there can be little doubt that RBC has established that *plaintiffs* are not entitled to judgment as a matter of law, and the Court should deny their Motion in its entirety.  Indeed, the *Tolbert* district court concluded that the plaintiffs in that case did not establish their claims as a matter of law.  2015 WL 2138200, at *11.  Here, although there are critical differences between this case and *Tolbert* that warrant summary judgment in RBC's favor, *see* DMSJ at 3, 21, plaintiffs have offered arguments and evidence virtually identical to those the *Tolbert* court already deemed insufficient to warrant summary judgment.  Thus, if the Court denies RBC's Motion, it should deny plaintiffs' Motion as well.

## III.  CONCLUSION

For the above reasons, the Court should deny plaintiffs' Motion in its entirety and, conversely, grant summary judgment to RBC on all claims.

---

[23] It is well settled that a party may neither obtain nor withstand summary judgment based on evidence that would be inadmissible at trial.  *See, e.g.*, *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

DATED: February 2, 2018                Respectfully submitted,


By: /s/ Matthew A. Russell
    Matthew A. Russell

    Sari M. Alamuddin (*admitted pro hac vice*)
        sari.alamuddin@morganlewis.com
    Christopher J. Boran (*admitted pro hac vice*)
        christopher.boran@morganlewis.com
    Matthew A. Russell (*admitted pro hac vice*)
        matthew.russell@morganlewis.com
    MORGAN, LEWIS & BOCKIUS LLP
    77 West Wacker Drive, 5th Floor
    Chicago, Illinois 60601
    312.324.1000 (Telephone)
    312.323.1001 (Facsimile)

    Kevin J. Hamilton (WSBA #15648)
    William B. Stafford (WSBA #39849)
    Perkins Coie LLP
    1201 Third Avenue, Suite 4900
    Seattle, WA 98101-3099
    206.359.8000 (Telephone)
    206.359.9000 (Facsimile)

    *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 2, 2018, I electronically filed the foregoing Defendants'
Opposition to Plaintiffs' Motion for Partial Summary Judgment [Dkt. 41] with the Clerk of the
Court using the CM/ECF system, which will send notification of such filing to all counsel of
record.

    /s/ *Matthew A. Russell*
Matthew A. Russell

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
PAGE 26

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000