THE HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

MARTY PAUL, an individual, and
BRIAN BUSKIRK, an individual,

        Plaintiffs,

v.

RBC CAPITAL MARKETS, LLC, a
Minnesota limited liability company; ROYAL
BANK OF CANADA, a Canadian corporation;
and ROYAL BANK OF CANADA US
WEALTH ACCUMULATION PLAN, an
employee benefit plan,

        Defendants.

Case No. 3:16-cv-05616-RBL

**DECLARATION OF MATTHEW
A. RUSSELL IN SUPPORT OF
DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY
JUDGMENT**

DECLARATION OF MATTHEW A. RUSSELL IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT

Morgan, Lewis & Bockius LLP
Attorneys at Law
77 W. Wacker Dr., 5th Floor
Chicago, IL 60601
+1.312.324.1000

1    I, Matthew A. Russell, declare and state as follows:

2        1.    I am an associate at the law firm of Morgan, Lewis & Bockius LLP and one of the

3    attorneys representing Defendants RBC Capital Markets, LLC, Royal Bank of Canada, and the

4    Royal Bank of Canada U.S. Wealth Accumulation Plan in the above-captioned lawsuit.  I am

5    competent to make this declaration and have personal knowledge of the facts stated herein.

6        2.    The documents referenced below have either been produced in this litigation or

7    generated over the course of this litigation.

8        3.    Attached hereto as **Exhibit V** is a true and correct copy of selected pages of the

9    deposition transcript of Brian Buskirk taken on April 28, 2017, in this litigation.

10       4.    Attached hereto as **Exhibit W** is a true and correct copy of selected pages of the

11   deposition transcript of Gabriella Sikich taken on July 11, 2017, in this litigation.

12       5.    Attached hereto as **Exhibit X** is a true and correct copy of selected pages of the

13   deposition transcript of Daniel M. Garrett, Ph.D, taken on December 8, 2017.

14       6.    Attached hereto as **Exhibit Y** is a true and correct copy of selected pages of the

15   deposition transcript of Saul Solomon, taken on December 12, 2017.

16       7.    Attached hereto as **Exhibit Z** is a true and correct copy of selected pages of the

17   deposition transcript of Gabriela Sikich taken on September 8, 2011, in the in the matter of

18   *Tolbert, et al. v. RBC Capital Markets Corp., et al.*, No. 4:11-cv-00107 (S.D. Tex.), and which

19   has been produced to plaintiffs in this litigation.

20       8.    Attached hereto as **Exhibit AA** is a true and correct copy of an email from the

21   RBC US Benefits Department regarding "2007 WAP Enrollment Begins Today," dated

22   December 11, 2006, and Bates-numbered RBC000314-15.

23

24

25

26    DECLARATION OF MATTHEW A. RUSSELL IN SUPPORT OF
      DEFENDANTS' OPPOSITION TO PLAINTIFFS'
      MOTION FOR PARTIAL SUMMARY JUDGMENT
      PAGE 1

9.     Attached hereto as **Exhibit BB** is a true and correct copy of an email from the RBC US Retirement Benefits Department regarding "2008 WAP Enrollment Begins Today (CDBDE)," dated November 26, 2007, and Bates-numbered RBC000458-59.

10.     Using the calculations of plaintiffs' expert witness, Saul Solomon, the aggregate or overall U.S. eligibility rate for the RBC U.S. Wealth Accumulation Plan from 2003 through 2011 was 15.36%. I reached this calculation using the data Mr. Solomon reported at ¶ 34 of his September 29, 2017 Expert Report. I first added the "Count of Eligible Employees" for each year from 2003 through 2011 (the first row of his table), obtaining a total of 18,640 WAP-eligible employees over that period. I next added the "Count of All Employees" for each year from 2003 through 2011 (the second row of his table), obtaining a total of 121,368 U.S. employees over that period. I then divided the former by the latter, to obtain an overall eligibility rate of 15.3582% over this period.

11.     Using the calculations of defendants' expert witness, Daniel M. Garrett, the aggregate or overall U.S. eligibility rate for the RBC U.S. Wealth Accumulation Plan from 2003 through 2011 was 13.41%. I reached this calculation using the data Dr. Garrett reported in Exhibit 4B of his September 29, 2017 Expert Report. I conducted a similar calculation to that described above with respect to Mr. Solomon, by adding the "WAP-Eligible Employees" in each year (the second column of Exhibit 4B), and dividing that number (20,143 eligible employees) by the sum of the "Total Potentially Eligible for WAP" in each year (the fifth column of Exhibit 4B) (150,211). The result is an overall or aggregate eligibility rate of 13.4098% over that period.

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED: February 2, 2018                    Respectfully submitted,


By: /s/ *Matthew A. Russell*
    Matthew A. Russell

    Sari M. Alamuddin (*admitted pro hac vice*)
      sari.alamuddin@morganlewis.com
    Christopher J. Boran (*admitted pro hac vice*)
      christopher.boran@morganlewis.com
    Matthew A. Russell (*admitted pro hac vice*)
      matthew.russell@morganlewis.com
    MORGAN, LEWIS & BOCKIUS LLP
    77 West Wacker Drive, 5th Floor
    Chicago, Illinois 60601
    312.324.1000 (Telephone)
    312.323.1001 (Facsimile)

    Kevin J. Hamilton (WSBA #15648)
    William B. Stafford (WSBA #39849)
    Perkins Coie LLP
    1201 Third Avenue, Suite 4900
    Seattle, WA 98101-3099
    206.359.8000 (Telephone)
    206.359.9000 (Facsimile)

    *Attorneys for Defendants*

DECLARATION OF MATTHEW A. RUSSELL IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
PAGE 3

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Drive, 5th Floor
Chicago, IL 606015-1596
+1.312.324.1000

## CERTIFICATE OF SERVICE

I hereby certify that on February 2, 2018, I electronically filed the foregoing Declaration of Matthew A. Russell in Support of Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

 /s/ *Matthew A. Russell*
Matthew A. Russell

DECLARATION OF MATTHEW A. RUSSELL IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
PAGE 4

The Honorable Ronald B. Leighton

1

2

3

4

5                     UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF WASHINGTON
6

7   MARTY PAUL, an individual, and
    BRIAN BUSKIRK, an individual,              Case No. 3:16-cv-05616-RBL
8
                      Plaintiffs,              **INDEX OF EXHIBITS TO**
9                                              **DEFENDANTS' OPPOSITION TO**
    v.                                         **PLAINTIFFS' MOTION FOR**
10                                             **PARTIAL SUMMARY**
    RBC CAPITAL MARKETS, LLC, a                **JUDGMENT**
11  Minnesota limited liability company; ROYAL
    BANK OF CANADA, a Canadian corporation;
12  and ROYAL BANK OF CANADA US
    WEALTH ACCUMULATION PLAN, an
13  employee benefit plan,

14                    Defendants.

15

16

17

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| V | Deposition Transcript of Brian W. Buskirk, April 28, 2017 (excerpts) |
| W | Deposition Transcript of Gabriela Sikich, July 11, 2017 (excerpts) |
| X | Deposition Transcript of Daniel M. Garrett, Ph.D., December 8, 2017 (excerpts) |
| Y | Deposition Transcript of Saul Solomon, December 12, 2017 (excerpts) |
| Z | Deposition Transcript of Gabriela M. Sikich, in the case of *Tolbert v. RBC Capital Mkts*, No. 4:11-cv-107 (S.D. Tex.), September 8, 2011 (excerpts) |
| AA | December 11, 2006 Email re: "2007 WAP Enrollment Begins Today," Bates-labeled RBC000314 |
| BB | November 26, 2007 Email re: "2008 WAP Enrollment Begins Today (CDBDE)," Bates-labeled RBC000458 |

24

25

26

INDEX OF EXHIBITS TO DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
(NO. 3:16-CV-05616-RBL) – PAGE I

MORGAN, LEWIS & BOCKIUS LLP
Attorneys at Law
77 W. Wacker Dr., 5th Floor
Chicago, IL 60601
+1.312.324.1000

# EXHIBIT V

1        IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

2             IN AND FOR THE COUNTY OF KING

3    _____

4    MARTY PAUL, an individual; and      )
     BRIAN BUSKIRK, an individual;       )
5                                        )
                                         )    Case No.
6                                        )
                 Plaintiffs,             )    3:16-cv-05616-RBL
7                                        )
            vs.                          )
8                                        )
     RBC CAPITAL MARKETS, LLC, a         )
9    Minnesota limited liability         )
     company; ROYAL BANK OF CANADA, a    )
10   Canadian corporation; and ROYAL     )
     BANK OF CANADA US WEALTH            )
11   ACCUMULATION PLAN, an employee      )
     benefit plan,                       )
12                                       )
                 Defendants.             )
13   _____

14   _____

15        VIDEOTAPED DEPOSITION OF BRIAN W. BUSKIRK

16

17                  April 28, 2017

18                   8:33 a.m.

19

20          1201 Third Avenue, Suite 4900

21              Seattle, Washington

22

23

24

25        Eva P. Jankovits, CCR No. 1915



1  describe what you mean when you say "production"?

2      A.  Gross production, assets, fees, commissions.

3      Q.  Essentially what you have brought into RBC or

4  Dain --

5      A.  Yes.

6      Q.  -- depending?

7          Were you a member of those -- either of those

8  councils?

9      A.  I was.

10     Q.  Whatever the easiest way to do it is, were you

11 a member for your entire time at RBC?

12     A.  My last -- and I really don't remember, but

13 probably my last 15, 20 years I was either president's or

14 chairman's.

15     Q.  You mentioned those were based on

16 performance/production.  Do you recall and --

17     A.  The levels?

18     Q.  Yeah.  Acknowledging they might have changed

19 over time, do you recall even generally what the levels

20 were?

21     A.  No, I really don't, other than percentages.  I

22 think president's was either the top 10 percent.  I don't

23 think it ever was 15.  And chairman's was probably 5 or

24 president's might have been 15 and chairman's 10.  But as

25 the company grew in size, that number also decreased.



1        Q.   The percentage or the --

2        A.   Yeah.  So it would be chairman's.  I know when

3    I left I think it was in the top 5 percent.  And I think

4    there may have been another level at 1 percent, but I

5    don't recall.

6        Q.   That was -- you anticipated my next question.

7    Was -- so then I gather chairman's council was the

8    higher --

9        A.   Yes.

10       Q.   -- recognition to president's?

11       A.   Yes.

12       Q.   Again, I -- acknowledging it would maybe differ

13   from year to year, do you remember whether you were in

14   the chairman's council or for how many years you were in

15   the chairman's council?

16       A.   Probably five or six.

17       Q.   Do you recall when those were?

18       A.   I don't.

19       Q.   Do you think they were consecutive?

20       A.   They were.

21       Q.   And why are you certain of that one?

22       A.   Because as the company grew in size, my

23   production, there were more people qualifying for

24   chairman's, and so I dropped down to president's.  So I

25   think probably the last three or four years at RBC I was



1  president and probably for five or six years before that

2  I was chairman's.  And then probably five or six years

3  before that I was president.

4      Q.  And to put a bit of a timeline on that, you

5  left RBC in August of 2012; is that right?

6      A.  Yes.  You know, yeah.

7      Q.  Do you --

8      A.  I -- you know, I didn't recall until we were

9  reviewing my documents on Monday, but that's -- that's

10  right.

11      Q.  Okay.  Was there any function to these

12  president or chairman's council?  I mean, did they do

13  anything, or was it just an honor?

14      A.  You received free cards, free notepads.  You

15  also -- all of state licensing was free.  And then you

16  would go on a recognition trip if you chose.

17      Q.  Did you generally attend?

18      A.  I did.  Not all, but for the longest time they

19  allowed you as chairmans to go to the president's if you

20  couldn't make the chairman's trip and vice versa.  And

21  then as time progressed, they did away with that option

22  so there were a couple times we weren't able to go.

23      Q.  So all right.  I got kind of sidetracked with

24  the councils.  You also mentioned the broker advisory

25  council?



# EXHIBIT W

Paul, et ano. v. RBC Capital Markets, LLC, et al.                    Gabriela Sikich

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

_____

|                                        |   |                      |
| MARTY PAUL, an individual; and         | ) |                      |
| BRIAN BUSKIRK, an individual,          | ) |                      |
|                                        | ) |                      |
|              Plaintiffs,               | ) |                      |
|                                        | ) |                      |
|           v.                           | ) | No. 3:16-cv-05616-RBL |
|                                        | ) |                      |
| RBC CAPITAL MARKETS, LLC, a            | ) |                      |
| Minnesota limited liability            | ) |                      |
| company; ROYAL BANK OF CANADA,         | ) |                      |
| a Canadian corporation; and            | ) |                      |
| ROYAL BANK OF CANADA US WEALTH         | ) |                      |
| ACCUMULATION PLAN, an employee         | ) |                      |
| benefit plan,                          | ) |                      |
|                                        | ) |                      |
|              Defendants.               | ) |                      |
|                                        | ) |                      |

_____

DEPOSITION UPON ORAL EXAMINATION

OF

GABRIELA SIKICH

_____

Taken at 50 South Sixth Street
Minneapolis, Minnesota

DATE TAKEN:   July 11, 2017

REPORTED BY:  Ryan Ziegler, RPR, CCR 3348

Electronically signed by Ryan Ziegler (501-016-583-0410)                    bb087722-dbe5-4f2f-a3b2-67a07ab86c9a

1    accumulation plan that was frozen on January 1, 2012," and

2    it's defined as the "frozen plan."  Do you see that?

3        A.    I do.

4        Q.    So this -- this plan is separate from the plan

5    that is reflected in Exhibits 2 through 8; correct?

6        A.    That's correct.

7        Q.    And why was that done?

8              MR. RUSSELL:  Object -- excuse me.  Objection

9    to form.

10       A.    It was at the time that we actually then -- we had

11   some significant changes within the organizational

12   structure and where we had to freeze this plan and then

13   start a new WAP along with the -- introducing the U.S.

14   deferred advantage plan.

15   BY MR. ROLLER:

16       Q.    So when you say "freeze this plan," it's freezing

17   the WAP or -- or the old WAP; right?

18       A.    Freezing the old WAP.

19       Q.    And then this document is the -- essentially

20   the -- the beginning of the new WAP; right?

21       A.    That's correct.

22       Q.    And you said there were significant

23   organizational -- did you say organizational changes?

24       A.    Correct.  In 2012, a significant amount of what --

25   what drove primarily all of these changes is that we

Electronically signed by Ryan Ziegler (501-016-583-0410)                    bb087722-dbe5-4f2f-a3b2-67a07ab86c9a

Page 66

1    divested what was once called the Centura Bank or the RBC

2    bank, so it significantly changed -- changed the U.S.

3    population.

4          Q.   So RBC sold Centura Bank?

5          A.   Yes.  Divested.  Correct.

6          Q.   And that divestiture was a factor in creating the

7    new WAP?

8          A.   Correct.

9          Q.   Why?

10         A.   For top-hat purposes, Centura Bank had a

11   significant population that were not eligible for WAP, so

12   therefore, when we did our top-hat analysis, the numbers --

13   because they had such a large workforce that were not

14   WAP-eligible.

15         So what happens is, is that we need to restructure

16   our deferred comp, because at this point in time, when we

17   looked at the numbers, the top-hat numbers, we could no

18   longer have the same eligibility levels that we've had in

19   the past.

20         And so in working with outside counsel, it was --

21   we needed to significantly change eligibility in WAP, and

22   then what we did is we created not a top-hat plan but a

23   deferred compensation plan, the deferred advantage plan, to

24   basically provide, again, for individuals that wanted to

25   have voluntary deferral that no longer met the threshold

Electronically signed by Ryan Ziegler (501-016-583-0410)                    bb087722-dbe5-4f2f-a3b2-67a07ab86c9a

Paul, et ano. v. RBC Capital Markets, LLC, et al.                    Gabriela Sikich

Page 67

 1   for eligibility to participate in WAP.

 2        Q.   So when the new WAP was created, there were

 3   significant eligibility changes; correct?

 4        A.   That is correct.

 5        Q.   And they were -- I assume they were significantly

 6   tightened, the eligibility requirements?

 7        A.   Yes.  They were definitely increased

 8   significantly.

 9        Q.   And we'll get into this a bit more later on today,

10   but it's true that, over time, eligibility changes were

11   made to the old WAP; correct?

12        A.   That is correct.

13        Q.   So why not simply make those eligibility changes

14   to the old WAP?

15        A.   Because of the significant -- because of the

16   significant eligibility change, historically, we

17   did have -- we did elevate them.  But with this divestiture

18   from the bank, it had a significant impact on the

19   eligibility, and with working with outside counsel, had

20   said, "Well, at this" --

21                MR. RUSSELL:  Hold on.  I'm just going to

22   caution you that, to the extent you had conversations with

23   outside counsel, you're not to testify to the substance of

24   the --

25                THE WITNESS:  Okay.

Electronically signed by Ryan Ziegler (501-016-583-0410)                    bb087722-dbe5-4f2f-a3b2-67a07ab86c9a

1    for eligibility to participate in WAP.

2         Q.   So when the new WAP was created, there were

3    significant eligibility changes; correct?

4         A.   That is correct.

5         Q.   And they were -- I assume they were significantly

6    tightened, the eligibility requirements?

7         A.   Yes.  They were definitely increased

8    significantly.

9         Q.   And we'll get into this a bit more later on today,

10   but it's true that, over time, eligibility changes were

11   made to the old WAP; correct?

12        A.   That is correct.

13        Q.   So why not simply make those eligibility changes

14   to the old WAP?

15        A.   Because of the significant -- because of the

16   significant eligibility change, historically, we

17   did have -- we did elevate them.  But with this divestiture

18   from the bank, it had a significant impact on the

19   eligibility, and with working with outside counsel, had

20   said, "Well, at this" --

21             MR. RUSSELL:  Hold on.  I'm just going to

22   caution you that, to the extent you had conversations with

23   outside counsel, you're not to testify to the substance of

24   the --

25             THE WITNESS:  Okay.

Page 72

 1                    MR. RUSSELL:  Objection.  Asked and answered.

 2       A.    It's based on the divestiture of the bank, and it

 3   had such a significant impact, when you look at some

 4   top-hat analysis numbers -- and as I mentioned earlier,

 5   our -- the bank population, the majority of the workforce

 6   were not eligible to participate.

 7            So with that significant change in the U.S.

 8   landscape, we could not have the same eligibility in WAP

 9   and still maintain a deferred compensation plan for our --

10   for our population.

11            So we created a completely separate plan,

12   non-top-hat plan, specifically just a deferred compensation

13   plan.  So it still provided a vehicle for the company,

14   primarily for FAs and BDs, to still continue to receive

15   company contributions, but in a different type of deferred

16   comp -- deferred comp arrangement.

17   BY MR. ROLLER:

18       Q.    And nothing prevented RBC from doing that prior to

19   2012?

20       A.    There was no need.

21       Q.    Why do you say there was no need?

22       A.    Because there wasn't such a significant change in

23   the overall U.S. population.

24       Q.    How much was the change in the U.S. population by

25   the Centura divestiture?

Electronically signed by Ryan Ziegler (501-016-583-0410)                    bb087722-dbe5-4f2f-a3b2-67a07ab86c9a

Paul, et ano. v. RBC Capital Markets, LLC, et al.        Gabriela Sikich

Page 103

1     A.   Correct.

2     Q.   So there was no set production or compensation

3  threshold?

4     A.   Correct.

5     Q.   Do you know how branch managers were paid in 2005?

6     A.   I do not know.

7     Q.   Do you know the minimum that branch managers

8  earned in -- well, actually, I should say 2004 given this

9  was for 2005 eligibility.

10    A.   I do not know.

11    Q.   F refers to directors.  What is a director?

12    A.   It's a designation by RBC.

13    Q.   Essentially a title?

14    A.   Title.  I -- again, from my perspective, it's

15  based on title.  The designation and their responsibilities

16  is outside of my world.

17    Q.   I understand.

18        G refers to "RBC Liberty, Capital Markets,

19  Centura, and Mortgage."  Do you know what RBC Liberty is?

20    A.   It was an acquisition.  It was Liberty Life

21  Insurance.

22    Q.   And so for the 2005 WAP, a Liberty employee, to

23  participate in the WAP, had to have a title of VP level or

24  above?

25    A.   Correct.

Electronically signed by Ryan Ziegler (501-016-583-0410)         bb087722-dbe5-4f2f-a3b2-67a07ab86c9a

Page 104

1      Q.    Capital Markets employees, the packet code

2   "CAPITALMKT," do you see that?

3      A.    I do.

4      Q.    That required a 2004 cash comp of 150,000;

5   correct?

6      A.    Correct.

7      Q.    And how does the CAPITALMKT packet code differ

8   from the "GENERAL" packet code?

9      A.    They were a separate entity or a separate business

10   line.  They did not participate prior to 2005.

11      Q.    Centura employees, I think -- is that the Centura

12   we were talking about that RBC divested from a few years

13   ago?

14      A.    Yeah.  That's the RBC banking entity that we

15   divested back in 2012.

16      Q.    And what was Centura?

17      A.    It's a bank.

18      Q.    Do you know where the bank operated?

19      A.    It was down, I would say, the region, Southeast.

20      Q.    And "Mortgage" employees, what -- what are

21   "Mortgage" employees?

22      A.    It was an acquisition of a mortgage company.

23      Q.    Do you know the name of the mortgage company?

24      A.    Sterling Mortgage.

25      Q.    For the 2006 eligibility requirements, I believe

Electronically signed by Ryan Ziegler (501-016-583-0410)                              bb087722-dbe5-4f2f-a3b2-67a07ab86c9a

Page 106

1      A.    That is correct.

2      Q.    But then I also see that it looks like it's added

3    financial consultants with production between 300,000 and

4    350,000, and that packet code is shortened to "FCENTRY."

5    Do you see that?

6      A.    I do.

7      Q.    What is that about?

8            MR. RUSSELL:  Object to form.

9            You can answer.

10     A.    The FCENTRY group was introduced based on working

11   with outside counsel and doing work related to top-hat.

12   BY MR. ROLLER:

13     Q.    Do you know why it was introduced?

14     A.    In 2006, we entertained with outside counsel to

15   review and to provide a memorandum as it relates to any --

16   to information as it relates to top-hat opinions or --

17   and -- and certain court cases to determine on a proactive

18   basis if we had any issues with some of our concerns about

19   our top-hat for the WAP.

20           MR. RUSSELL:  And I would just caution you

21   again -- what you've testified is fine -- but not to

22   divulge the substance of the legal advice.

23   BY MR. ROLLER:

24     Q.    But am I reading this correctly that financial

25   consultants with production as low as $300,000 could still

Electronically signed by Ryan Ziegler (501-016-583-0410)                    bb087722-dbe5-4f2f-a3b2-67a07ab86c9a

Paul, et ano. v. RBC Capital Markets, LLC, et al.                    Gabriela Sikich

Page 107

 1   participate in the WAP in 2007?

 2        A.   On a different version of WAP, yes.

 3        Q.   So they -- it was the same WAP, but they could

 4   participate on different terms?

 5        A.   They -- this was a group that we had introduced so

 6   that they could still be eligible to receive the company

 7   contributions, but they did not have the option to elect a

 8   post-employment distribution, and it was automatically paid

 9   out at the time the company contributions vested.

10        Q.   So their -- their deferral schedule was set?  They

11   couldn't defer post retirement?

12        A.   Correct.

13        Q.   And do you know why it was done?

14        A.   Yes.  It was done based on work that we did in

15   that we were advised that --

16             MR. RUSSELL:  And I know -- I know it's hard.

17   I would instruct you not to speak as to what you were

18   advised.  You can testify that the reason something

19   occurred was on the advice of counsel, if that makes sense.

20        A.   So the reason this occurred was on advice of

21   counsel, and --

22             MR. RUSSELL:  Yeah.  And I don't -- I'm not

23   instructing the witness how to answer, but I want to be

24   careful with privilege issues.

25

Electronically signed by Ryan Ziegler (501-016-583-0410)                    bb087722-dbe5-4f2f-a3b2-67a07ab86c9a

Page 108

1    BY MR. ROLLER:

2        Q.   So what -- what was the reason that FCs with

3    production between 300 and 350,000 could not elect to --

4    well, essentially had to take the distributions on vesting?

5              MR. RUSSELL:  You can answer that -- if you

6    know the answer independent of advice you got from counsel,

7    you can answer that.

8        A.   For the reasons that they did not have a

9    post-employment distribution option and that it would be

10   automatically paid out upon vesting, that they would not be

11   considered in our -- our top-hat analysis.

12   BY MR. ROLLER:

13       Q.   Why would they not be considered in the top-hat

14   analysis?

15       A.   Because there was no post-employment opportunity.

16       Q.   And do you know why the fact that there wasn't a

17   post-employment opportunity would preclude them from being

18   considered in the top-hat analysis?

19             MR. RUSSELL:  And I'm going to object to the

20   extent that calls for a legal --

21             MR. ROLLER:  I just -- I asked if she --

22             MR. RUSSELL:  -- conclusion.

23             MR. ROLLER:  I asked if she knew why.  I

24   didn't ask the reason why.

25       A.   Yes.

Electronically signed by Ryan Ziegler (501-016-583-0410)                    bb087722-dbe5-4f2f-a3b2-67a07ab86c9a

Page 110

1    directors with production between 300,000 and 250,000 with

2    the packet code "BRMGENTRY."  Do you see that?

3         A.   I do.

4         Q.   And --

5              MR. RUSSELL:  Just to clarify, I think you

6    said 250.  So the record is clear, it's 350.

7              MR. ROLLER:  350.  Yes.

8    BY MR. ROLLER:

9         Q.   That requires the title of branch director --

10   director or complex director and production between 300,000

11   and 350,000; correct?

12        A.   Correct.

13        Q.   And is the reason for the distinction between 5C

14   and 5D the same as the reason for the distinction between

15   5A and 5B?

16        A.   Correct.

17        Q.   Let's skip to paragraph 7E in particular.  And

18   for -- there are a number of packet -- sorry.  There are a

19   number of groups of employees there; correct?

20        A.   Correct.

21        Q.   Do they all fall within -- for the 2009 WAP, all

22   fall within the STIEXE packet code?

23        A.   Correct.

24        Q.   Setting aside job levels or titles, the

25   compensation component for E, subparagraphs 1 through 3,

Electronically signed by Ryan Ziegler (501-016-583-0410)                    bb087722-dbe5-4f2f-a3b2-67a07ab86c9a

Page 122

1    did our top-hat analysis, we needed a point of reference to

2    determine compensation across all U.S. entities.

3           And we wanted -- we need to have an avenue that we

4    knew was -- would be consistent year after year after year

5    so that our testing would be consistent.

6           So we decided that the nondiscrimination testing

7    comp would be the best place to capture overall

8    compensation and also then be able to identify, you know,

9    if someone was active during the year or termed during the

10   year so that we would have, again, a very consistent

11   picture year after year when we do our non- -- our top- --

12   our top-hat analysis.

13       Q.   For the qualified plan nondiscrimination testing,

14   do you look at the compensation of non-U.S.-based

15   employees?

16       A.   No.

17       Q.   And for the top-hat testing, do you look at the

18   compensation of non-U.S.-based employees?

19       A.   No.

20       Q.   Why not?

21       A.   We do have -- we do have participants in the

22   nonqual plan based on the fact -- either A, No. 1, they may

23   reside in Canada, but they had U.S.-based compensation.  If

24   they had U.S.-based compensation, they may be eligible.

25           Also in the past, we've had individuals that have

Electronically signed by Ryan Ziegler (501-016-583-0410)                    bb087722-dbe5-4f2f-a3b2-67a07ab86c9a

Page 123

1    resided in the U.S. have a nonqualified deferred comp

2    balance and have subsequently moved to Canada.  So you have

3    cross-borders that have had balances within the deferred

4    comp plans.

5        Q.   Have those two cross-borders been considered for

6    the top-hat analysis?

7                 MR. RUSSELL:  Object to form.

8                 You can answer.

9        A.   They would have come across in the top-hat

10   analysis if they were eligible for that year.  We wouldn't

11   pull them into account if they just were a participant and

12   had an account balance.

13   BY MR. ROLLER:

14       Q.   And just to the left of the column we were just

15   talking about, "Ben Salary for Next Year," what does that

16   refer to?

17       A.   That reflects the -- for 2008 eligibility, so we

18   use the ben sal from 10/1/06 through 9/30/07.

19       Q.   And what's the source of that data?

20       A.   Ben sal comes directly off of our payroll system,

21   SAP.

22       Q.   And does the 2007 nondiscrimination comp come from

23   the same place?

24       A.   The 2007 nondiscrimination testing comes directly

25   from Fidelity.

Electronically signed by Ryan Ziegler (501-016-583-0410)                    bb087722-dbe5-4f2f-a3b2-67a07ab86c9a

Page 172

     1      A.   Yes.

     2      Q.   The CC on Janet's e-mail has a "TRS."  Do you know

     3   what that is?

     4      A.   I'm sorry.  Where are you seeing this?

     5      Q.   Below the original message line.  It's a little

     6   more than a third of the way down, from Janet's -- Janet's

     7   original message to you.

     8      A.   I don't know what -- what that TC [sic] represents

     9   or who that goes to.

    10      Q.   In the second sentence, in you writing back to

    11   Janet, you write, "Well, the WAP purgatory continues."

    12   What did you mean by "WAP purgatory"?

    13      A.   The reference was basically saying that we were

    14   looking at, that time, again, between that period of time,

    15   2006 and 2007, a lot of changes to the program and

    16   socializing those changes.  We had some support internally,

    17   others that weren't -- not necessarily as supportive of

    18   those changes.

    19      Q.   Just so I understand, there were changes that were

    20   supported and other changes that were not, or there were

    21   changes that some people supported and other people did

    22   not?

    23      A.   Well, as you can see in one of the previous

    24   exhibits, we were going through all of these multiple

    25   different prop- -- change proposals, and there were

Electronically signed by Ryan Ziegler (501-016-583-0410)                    bb087722-dbe5-4f2f-a3b2-67a07ab86c9a

1    multiple of them.  And so my reference there was, with all

2    these changes that we were proposing, we had internal

3    champions of some of those changes, and then we had

4    opposition on some of those changes.

5        Q.   So one of the prior e-mails referenced a legal

6    counsel recommendation to change comp eligibility threshold

7    from 150 to 250.  Do you remember that?

8        A.   In the previous exhibits, yep.

9        Q.   Yeah.

10       A.   Yes.

11       Q.   Was there an internal champion of that proposed

12   change?

13       A.   I can't speak to that one specific proposed

14   change.  It was -- there were multiple different change

15   proposals, as you can see in one of the other earlier

16   exhibits.  So I can't specifically say who was or wasn't a

17   champion or opposition for that particular recommendation

18   from Mercer.

19       Q.   I was talking about the recommendation from legal

20   counsel to raise the comp threshold from 150 to 250.  Do

21   you know whether there was an internal champion or opponent

22   of that recommendation?

23       A.   I do not know specific individuals.  No.

24       Q.   Do you know whether there was anybody?  Whether

25   there -- you know, the -- which specific individual it was

Electronically signed by Ryan Ziegler (501-016-583-0410)                    bb087722-dbe5-4f2f-a3b2-67a07ab86c9a

 1      Q.    Do you know who drafted it?

 2      A.    I do not.

 3      Q.    Do you know when this would have been drafted?

 4      A.    Based on the background, it would be in 2008.

 5      Q.    And you know that because it refers to an

 6   April 2008 analysis?

 7      A.    Correct.

 8      Q.    And was that the kind of analysis you were talking

 9   about before, there -- where there was analysis of the

10   percentage of workforce and the comparison of compensation

11   of participants -- or rather eligible employees versus the

12   workforce in general?

13      A.    Correct.

14      Q.    Anything else that would have gone into that

15   analysis?

16      A.    Well, in 2008, there was a significant increase in

17   the percent of eligibles based on two acquisitions.

18      Q.    What were those acquisitions?

19      A.    Ferris -- just give me a moment.  Ferris Baker

20   Watts, which was a financial institution; and JB Hanauer,

21   also a financial institution.

22            So with those acquisitions, what occurred was,

23   since the majority of their population were eligible to --

24   for -- for WAP and also were going to be receiving a

25   retention bonus into WAP, it significantly increased our

Page 178

1    eligible WAP numbers compared to prior to the acquisition.

2         Q.    And so that was for the 2008 plan year?

3         A.    Correct.

4         Q.    And if you could turn to the third page, which in

5    the lower right corner ends in 1027, it's written,

6    "Percentage of employees eligible for WAP has increased

7    over time from 6 to 17 percent."  Do you see that?

8         A.    I do.

9         Q.    And that 17 percent, do you think that would have

10   been in 2008?

11        A.    It was -- the -- the -- I do know that the

12   eligibility threshold increased in 2008, and I do know that

13   it was due to the fact that we had those two acquisitions.

14        Q.    The eligibility threshold increased in 2008 for

15   the 2008 plan year or for the 2009 plan year?

16        A.    I do know that we did multiple analyses in 2008,

17   and I can't concur whether or not it was for 2008 or 2009.

18        Q.    Can we look back at that eligibility stipulation

19   to determine that?  That would be Exhibit 15.  Can you

20   determine by looking at Exhibit 15 whether the eligibility

21   threshold was changed in 2008 or 2009?

22              MR. RUSSELL:  And just to be clear, you're

23   still referring to compensation as opposed to production?

24              MR. ROLLER:  Yes.

25

Electronically signed by Ryan Ziegler (501-016-583-0410)                    bb087722-dbe5-4f2f-a3b2-67a07ab86c9a

Paul, et ano. v. RBC Capital Markets, LLC, et al.                    Gabriela Sikich

Page 179

 1   BY MR. ROLLER:

 2       Q.    I think 2008 eligibility is discussed on page 5

 3   and 2009 on page 6.

 4       A.    Just to clarify, you're saying that you want me to

 5   confirm that the 2008 cash compensation was upped in two

 6   thousand -- effective 2009?

 7       Q.    Yeah.  Is that right?

 8       A.    Yes.

 9       Q.    And cash compensation was not upped in 2008;

10   correct?

11       A.    It was not.

12             MR. RUSSELL:  I'm sorry.  Just so our record

13   is clear, you said "upped in 2008."  It -- effective for

14   the plan year of 2008.

15             MR. ROLLER:  For the plan year of 2008.

16   That's what I was referring to.  Yeah.  I think we're clear

17   on that.

18             MR. RUSSELL:  Yeah.

19             MR. ROLLER:  Okay.

20   BY MR. ROLLER:

21       Q.    I'd like to direct your attention again to the

22   third page.  Part of the second paragraph reads, "The

23   increase in the number of eligible employees would suggest

24   an increase in the compensation and production eligibility

25   threshold."  Do you see that?

Electronically signed by Ryan Ziegler (501-016-583-0410)                    bb087722-dbe5-4f2f-a3b2-67a07ab86c9a

Page 180

1      A.     Am I looking at the right -- "Observations Today"

2    at the top?

3      Q.     Page 3, "Observations Today," middle paragraph.

4      A.     I do see that.

5      Q.     Why would it suggest an increase in the

6    compensation and production eligibility threshold?

7      A.     Based on the fact that we've -- what we're seeing

8    is the percentage of eligible employees had increased over

9    time, the recommendation would be that we would need to

10   increase the compensation and production eligibility

11   thresholds for future plan years.

12     Q.     To get that percentage of eligible workforce down;

13   correct?

14     A.     That was the goal.  Correct.

15     Q.     Do you know how the numbers here -- where it

16   refers to an increase from 6 to 17 percent, how those were

17   calculated?

18     A.     I personally didn't do the calculation.  Again,

19   one of my members of my staff, but we looked at, after the

20   recent acquisitions and knowing that our eligibility

21   numbers would increase based on those acquisitions, we

22   performed a similar analysis as we've done in the past, and

23   it went from single digits to double digits.

24     Q.     When you say it went from single digits to double

25   digits, that was the change over time?

Electronically signed by Ryan Ziegler (501-016-583-0410)                    bb087722-dbe5-4f2f-a3b2-67a07ab86c9a

1     A.    It included changes over time, but the big jump to

2   the 17 percent was really related to those key acquisitions

3   where we knew our eligible population, particularly for

4   FCs, would dramatically increase because of the fact that

5   those two acquisitions had a sizable number of FAs that

6   would have been eligible to participate, and they became

7   participants based on the fact that they received up-front

8   retention bonuses that were deferred into WAP.

9     Q.    Okay.  Let's turn to the recommendation page,

10  page 5.  And that page reads, "Effective for 2009/10,

11  increase WAP eligibility thresholds to: Fiscal year

12  production for FCs and branch directors from 300,000 up to

13  400,000.  (Introduce change for 2010.)"

14        Can you tell me why that change was done two years

15  later as opposed to the next plan year?

16             MR. RUSSELL:  Objection to form.

17             You can answer.

18    A.    The reason, we wanted to provide an opportunity

19  for FAs -- give them notice that, to be eligible to

20  participate, they would have to increase their production

21  levels from 3 to 400.

22        And by giving them advance notice, it provided

23  them an opportunity to increase their production level so

24  they could be eligible to participate when the eligibility

25  thresholds went up, because they were losing out on

Electronically signed by Ryan Ziegler (501-016-583-0410)                bb087722-dbe5-4f2f-a3b2-67a07ab86c9a

Page 182

1   productivity bonuses.

2           So it was our way of giving them an opportunity a

3   year in advance to basically work on their production and

4   move it up from a 300 to 400 so they could participate in

5   the following year.

6   BY MR. ROLLER:

7       Q.   And that concern outweighed the concern of being

8   out of compliance with the top-hat exception?

9               MR. RUSSELL:  Objection to form, and

10  misstates her testimony.

11              You can answer.

12      A.   It -- to answer that, I -- because there was

13  not -- again, going back to top-hat and what constitutes a

14  select group, we did not have any specific regulatory

15  guidance as far as what constitutes a select group.

16          Therefore, and since we did not have that guidance

17  and we were relying on just circuit court case rulings, the

18  belief was this would have a significant impact on our FAs

19  between 300 and 400,000 in production, and it seemed

20  reasonable without that true guidance that, yes, giving

21  them a window of a year to increase their production to

22  meet eligibility seemed reasonable.

23  BY MR. ROLLER:

24      Q.   Because you didn't want them to earn less by not

25  being able to participate in the WAP?

Electronically signed by Ryan Ziegler (501-016-583-0410)                    bb087722-dbe5-4f2f-a3b2-67a07ab86c9a

 1    "Why the amount of increase from 150,000 to 350,000?"  The

 2    answer is, "Taking into account the overall RBC U.S.

 3    population and number of employees that were eligible to

 4    participant" -- it probably means "participate" -- "in WAP,

 5    we needed to increase the threshold."  Then it goes on.  Do

 6    you know why the RBC U.S. population was used in that

 7    analysis?

 8        A.    Based on the fact that the U.S. population had --

 9    the platform was changing as far as a combination --

10    primarily of the combination of all the acquisitions.  So

11    the U.S. workforce was changing rapidly, not through just

12    natural growth but through acquisitions.

13        Q.    When considering the percentage of the workforce

14    that is eligible for the WAP in -- in the analyses that you

15    spoke about earlier this afternoon, the denominator was

16    always the U.S. workforce; correct?

17        A.    Well, the U.S. workforce denominator changes.

18        Q.    Yeah.

19              But the -- but it was the -- the denominator was

20    the U.S. workforce, not the global workforce?

21        A.    The U.S. workforce.

22        Q.    Do you know why that was?

23        A.    Specifically, no, for the fact that -- the

24    definition of, when you look at that denominator, you look

25    at -- could look at the fact of plan sponsor, and the plan

Page 198

1   sponsor is RBC.  So the quest- -- I don't think that there

2   was a bright-light test between just looking at U.S.

3   population versus you're looking at RBC globally.

4          Q.   I see.

5               (Exhibit No. 37 marked.)

6   BY MR. ROLLER:

7          Q.   Ms. Sikich, do you recognize Exhibit 37?

8          A.   Yes.

9          Q.   What is it?

10         A.   It's basically an overview of the wealth

11  accumulation plan.

12         Q.   Do you know who prepared it?

13         A.   It was a combination, but I'd -- I did -- I did

14  provide input.

15         Q.   So did you author parts of it, or --

16         A.   Parts of it.

17         Q.   Who was the owner of the document?

18         A.   I believe at that time it would have probably been

19  Dan Szabo.

20         Q.   Do you know if this was ever circulated?

21         A.   I can't confirm that it was.

22         Q.   Do you know who would know?  Mr. Szabo?

23         A.   Mr. Szabo.

24         Q.   Ms. Sikich, I'd like you to turn to the -- well,

25  the first page of the presentation, but it's the second

Electronically signed by Ryan Ziegler (501-016-583-0410)                                    bb087722-dbe5-4f2f-a3b2-67a07ab86c9a

Paul, et ano. v. RBC Capital Markets, LLC, et al.                    Gabriela Sikich

Page 201

 1   sought accelerated vesting?

 2       A.   Through which avenue?

 3       Q.   Any avenue.

 4       A.   Not that I'm aware of.

 5       Q.   Do you know who would be aware of that?

 6       A.   That would probably be through legal.

 7       Q.   Do you know what would happen if -- I want you to

 8   go back in time to when mandatory deferrals were in place.

 9   If a branch director who made mandatory deferrals came to

10   RBC and said, "You know, these are supposed to vest three

11   years from now.  I want mine to vest now," what would

12   happen with that kind of request?

13       A.   If that request came directly to me?

14       Q.   Yeah.

15       A.   I would deny the request.

16       Q.   Why?

17       A.   It was -- it didn't fall under the provisions of

18   the plan.

19       Q.   And are the provisions of the plan ever deviated

20   from?

21       A.   No.

22       Q.   Do people request deviations?

23       A.   Yes.

24       Q.   Do you know how often that happens?

25       A.   Well, if they request a formal claim against the

Electronically signed by Ryan Ziegler (501-016-583-0410)                    bb087722-dbe5-4f2f-a3b2-67a07ab86c9a

Page 202

1   plan, they would have to go through the formal claims

2   procedure as far as having potentially accelerated vesting.

3       Q.   What about prior to a termination or a forfeiture?

4            MR. RUSSELL:  Object to form.

5       A.   We have never accelerated -- outside of

6   potentially what occurs outside of the plan, we have not

7   made exceptions for accelerated vesting within the

8   guidelines of the plan.

9   BY MR. ROLLER:

10      Q.   And do you know if -- if accelerated vesting --

11  other than the example you gave with selling the book of

12  business, do you know if accelerated vesting has ever been

13  requested?

14      A.   From me personally, yes.  They have requested it,

15  and I've denied it.  Anything after that, I'm not aware of.

16      Q.   How many times has that happened?

17      A.   More than 20, less than 40.

18      Q.   Is it fair to say that a WAP participant does not

19  have the ability to affect the terms of the WAP?

20           MR. RUSSELL:  Object to form.

21      A.   I think the population has the ability to

22  influence the terms of the plan based on all of the changes

23  and the evolution of the plan and the provisions over the

24  last, I would say, 10 to 15 years.

25

Electronically signed by Ryan Ziegler (501-016-583-0410)          bb087722-dbe5-4f2f-a3b2-67a07ab86c9a

Paul, et ano. v. RBC Capital Markets, LLC, et al.                    Gabriela Sikich

Page 203

 1   BY MR. ROLLER:

 2       Q.   And when you say "the population," what do you

 3   mean by that?

 4       A.   That if you look at the significant changes that

 5   we have made to the -- to WAP over the course of the many

 6   years, many of those changes are by direct feedback from

 7   our FA population.

 8       Q.   Other than -- well, like, what kinds of changes?

 9       A.   The changes as far as we wanted -- they wanted

10   more investment options.  They wanted more investment

11   flexibility.  They wanted the ability not to be restricted

12   into, like, the RBC share account.  A whole host of changes

13   that, like I said, have occurred over many of those years.

14       Q.   Other than changes relating to the hypothetical

15   investments that the -- their money goes into, are there

16   changes that WAP participants have advocated and have been

17   adopted in the WAP?

18               MR. RUSSELL:  Object to form.

19       A.   The -- there was a lot of push to eliminate the

20   company matching contributions from the FA population based

21   on the fact that, in order to receive those matches, the --

22   the FA was required to have voluntary deferrals, so I think

23   that was a significant reason that we eliminated the

24   company matches.

25               So now the plan has specifically independent

Electronically signed by Ryan Ziegler (501-016-583-0410)                    bb087722-dbe5-4f2f-a3b2-67a07ab86c9a

# EXHIBIT X

Paul, et ano. v. RBC Capital Markets, LLC, et al.          Daniel M. Garrett, Ph.D.

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

--oOo--

MARTY PAUL, an individual; and      )
BRIAN BUSKIRK, an individual,       )    Case No.:
                                    )    3:16-cv-05616-RBL
          Plaintiffs,               )
                                    ) Volume I
     v.                             )
                                    )      Pages 1 - 160
RBC CAPITAL MARKETS, LLC, a         )
Minnesota limited liability         )
company; ROYAL BANK OF CANADA,      )
a Canadian Corporation; and         )
ROYAL BANK OF CANADA US WEALTH      )
ACCUMULATION PLAN, an employee      )
benefit plan,                       )
                                    )
          Defendants.               )
_____)

DEPOSITION OF

DANIEL M. GARRETT, Ph.D.

Friday, December 8, 2017

Reported By:
KELLY NEWTON, CSR. NO. 13849
-----------------------------------------------------------

1    report -- sitting here today in view of his rebuttal

2    report, what might you elaborate on?

3    A.        He has an opinion that -- that my exclusion --

4    sorry, my analysis of employees, some employees whose

5    start date was after the year in question, he has an

6    opinion that that's improper, and I think he's improper

7    on that.  I can elaborate on that -- be happy to

8    elaborate on that if you'd like.

9            I don't know, I kind of have to refresh myself

10   with what he said.  It's hard to remember everything.

11   Q.        Yeah, I think we'll come around in more detail,

12   but why don't you go ahead and elaborate on that last

13   point right now, if you could.

14   A.        Sure.  So, there are employees in the data for a

15   given year that have start dates that are later than the

16   given year, and Mr. Solomon -- what he does in his

17   analysis is exclude them as if they weren't employees

18   that year, and I think that's improper.

19           There are really three pieces of information.

20   One is the data indicates -- RBC indicates they were

21   employees, some were eligible employees; two, there's

22   NDT compensation for those employees in those years;

23   and, three, there's a start date that's after those

24   years.  Mr. Solomon ignores those first two pieces of

25   information, and I think in fact they should have

1    privacy, right, because RBC is going to be very

2    thoughtful about people its paying, right, and there is

3    really money be paid or data about the money they were

4    paid.  And that's not all the data about them, but

5    there's more fields in the data.

6         And I think there's a straightforward

7    explanation for why sometimes the start date is after

8    the date in question, and that is they're employees who

9    have more than one spell of employment at RBC, and it

10   looks like this field -- they have one field for start

11   date.  And for an employee who had been there before and

12   left, that whole start date would get clobbered, as we

13   say, with a new start date there for their second spell

14   of employment.  And whenever the snapshots of data were

15   made, it was that later start day that occupies that

16   field.

17        So, the evidence that I reviewed indicates that

18   these really were employees and should be considered for

19   whatever analysis purposes for that year.

20   Q.      And that criticism of Mr. Solomon's approach

21   relates to the -- the workforce ratio, not to

22   compensation ratios; is that correct?

23   A.      It would relate to both, because he would be

24   excluding their compensation as well in his compensation

25   analysis.

1  not generally include people terminated prior to the

2  plan year.  That's my belief at the moment.

3  BY MR. ROLLER:

4  Q.       Do you know what you would need to do to confirm

5  that belief?

6  A.       Either I or one of my teammates would look at

7  the data and verify that, check that.

8  Q.       Going back to the body of the report, not the

9  appendix, and directing your attention to paragraph 15,

10  my understanding is that paragraph 15 is telling us that

11  Exhibit 4A reflects the results of the calculation that

12  is described in paragraph 14 and then in the paragraphs

13  of the appendix we were just talking about; is that

14  correct?

15  A.       Yes, for the U.S. and Canadian workforce.

16  Q.       So, let's flip to Exhibit 4A, please.  So, just

17  to pick an example, in 2008, by your calculations, 3.4

18  percent of RBC's U.S. and Canadian workforce was

19  eligible to participate in the WAP; is that right?

20  A.       Yes.

21  Q.       Is there a particular date that the number was

22  3.4 percent?

23  A.       My 3.4 percent comes -- matches the process that

24  RBC used to determine eligibility.  So, it considers all

25  of the employees who were considered in the first stage

Paul, et ano. v. RBC Capital Markets, LLC, et al.                    Daniel M. Garrett, Ph.D.

Page 46

1    determined to be eligible or not roughly around November

2    1st and any employee subsequently hired during -- up to

3    the end of the plan year, all of whom -- about all of

4    whom the eligibility determination was reached and gives

5    that looking-backward assessment of the entire plan

6    year.

7    Q.      I don't think that answered my question.  Is

8    there a particular date where that 3.4 percent was the

9    percentage of the workforce that was eligible?

10   A.      There's not one day where that was the

11   percentage necessarily, but the percentages of the

12   accumulation, all the days during the determination

13   process.

14   Q.      With the data that you were provided by RBC or

15   RBC's counsel, would it be possible to calculate the

16   percentage of the workforce that was eligible on a

17   particular date?

18   A.      I think so, yes.

19   Q.      Did you do that?

20   A.      No.

21   Q.      Why didn't you do that?

22   A.      Because I think the relevant determination is

23   looking back, what was the fraction of the employees --

24   of all the employees considered for eligibility, what

25   fraction were granted eligibility.  And that's the

1    process that RBC used, and I created a calculation that

2    quantified the outcome of that process.

3    Q.       So, is that kind of a number that it begins at

4    November 1 of T minus 1 and ends at December 31 of T?

5    A.       That's the range of the -- the time range of the

6    process, yes.

7    Q.       But there's no -- there's no one particular date

8    in that 14-month time range where the eligibility

9    percentage is what is listed on this Exhibit 4A?

10            MR. BORAN:  Objection.  Asked and answered.

11            THE WITNESS:  That's right.  My analysis is a

12   process analysis, not a single-date analysis.

13   BY MR. ROLLER:

14   Q.       Let's flip to paragraph 16 of the actual report,

15   and please correct me if I'm wrong, but my understanding

16   is what paragraph 16 is getting across is that Exhibit

17   4B reflects the percentage of the RBC U.S.-only

18   workforce that was eligible to participate in a given

19   plan year.

20   A.       Correct.

21   Q.       Let's turn to appendix 1.  I'm looking in

22   paragraphs 5 to 7, and I don't see a description of how

23   the calculation was made for U.S. employees only.

24            Am I missing something there?

25   A.       Maybe you're right.  Maybe it doesn't say

1    distinctly how that's done.  But I can tell you, it was

2    just the same analysis, but not including the Canadian

3    employees.

4    Q.      Okay.  I figured that.  So, it basically would

5    be the same as the overall workforce number with the

6    exception of, in paragraph 6, you don't add the Canadian

7    employees for year T?

8    A.      That's correct.

9    Q.      Okay.  So, let's turn to Exhibit 4B.  And as

10   with the workforce that included the Canadian employees

11   -- as with the calculations that included the Canadian,

12   as an example, let's look at plan year 2008.

13          I'm reading this as your calculation of the RBC

14   U.S.-only employees who were eligible to participate in

15   the WAP for plan year 2008 was 16.7 percent; is that

16   right?

17   A.      Yes.

18   Q.      And from your answer on the Canadian employees,

19   I think I know the answer to this, but is there a

20   particular date in -- between November 1 of 2007 and

21   December 31 of 2008 where the actual ratio was 16.7

22   percent?

23   A.      There might not be, but I am calculating this

24   ratio over the range of time.  I considered all the

25   employees who were considered for WAP eligibility, so my

1   -- my analysis spans that 14-month range that we've been

2   talking about.

3   Q.       So, there might be a date where it's 16.7

4   percent, but that would be by happenstance?

5   A.       Yes.

6   Q.       And I don't believe the absence of Canadian

7   employees will change this answer, but I want to ask the

8   question again.

9            With the data you have, would it be possible to

10  calculate the percentage of RBC U.S.-only employees who

11  were eligible on a particular date?

12  A.       I believe so, yes.

13  Q.       And did you do that?

14  A.       No.

15  Q.       And why did you not do that?

16  A.       Because I thought the best way to think about

17  what fraction of RBC employees were WAP eligible would

18  be to follow the process, to mimic -- mirror the process

19  that RBC used, which was a two-stage process.  They make

20  an initial determination based on fiscal year T minus 1

21  and the salary, and they make that determination around

22  November 1st.  And then for any employees who enter the

23  workforce from that initial determination through the

24  end of the plan year, RBC also makes a WAP-eligibility

25  determination.

1          And so I consider all of those employees as well

2     and whether or not they were granted eligibility.  And

3     my number reflects that all -- you know, it's a

4     looking-back measure of the eligibility ratio for that

5     plan year.

6     Q.       And why is it best to look at that over that

7     14-month time frame as opposed to picking any particular

8     dates within that 14-month time frame?

9     A.       Well, it's like thinking about a student's GPA

10    over a academic year.  You would look at each of the

11    classes they took in winter -- in fall quarter, winter

12    quarter, spring quarter, and possibly summer quarter and

13    take the grade for each class and the number of hours

14    and add those up -- multiply and add those up and divide

15    by the number of hours, and that would give you the GPA

16    for that year.

17         And if you wanted to ask yourself the question,

18    how did the student do in that year, the GPA would be

19    metric -- for that year would be a metric to use.  You

20    could -- similarly, if you just reported the GPA from

21    the fall quarter, that's not an answer to how did the

22    student do that year.

23    Q.       What -- would it be accurate to include in the

24    GPA a class that a student started, but within the

25    period that they were permitted to drop it, dropped the

Paul, et ano. v. RBC Capital Markets, LLC, et al.                    Daniel M. Garrett, Ph.D.

                                                                    Page 63

1    A.       Yes.

2    Q.       I'd like to direct your attention to paragraph

3    13 of your rebuttal report, Exhibit 3.  And in the first

4    line of that -- the first words actually of that

5    paragraph 13, you refer to Solomon's snapshot approach.

6             Do you see that?

7    A.       I do.

8    Q.       And that -- is it your understanding that

9    snapshot is of December 31 of the year preceding the

10   plan year?

11   A.       That's the date of the snapshot.

12   Q.       Okay.  So, that would be December 31 of T minus

13   1, to use the terminology we were using when discussing

14   your opening report?

15   A.       Yes.

16   Q.       Did you have the data to determine whether that

17   December 31 snapshot was accurate as of December 31 for

18   the ratio of WAP-eligible employees to U.S. employees?

19   A.       Yes.

20   Q.       And did you make that determination?

21   A.       The answer is it is not the right value.

22   Q.       Why is it not the right value?

23   A.       Because he -- for one reason, because he

24   excludes these employees that we've talked about already

25   who were employees in the plan year, were employed as of

1    12/31 of T minus 1.  But he excludes them because their

2    start date is after the plan year, and that's a mistake.

3    Q.      Do you know how many employees that is?

4    A.      He quantifies it in his second report.

5    Q.      Okay.  Aside -- aside from that contention,

6    could you do the calculation?  Could you confirm whether

7    that snapshot was accurate as of December 31?

8    A.      I can't say, sitting here.

9    Q.      Did you try to do that?

10   A.      No.

11   Q.      Why not?

12   A.      Because that calculation ignores a number of

13   employees that are -- that were considered for that plan

14   year for eligibility.  And I think -- so, it's

15   incomplete.  It's like taking a GPA from just the fall

16   quarter.  It doesn't tell you accurately what the GPA

17   was for the year.

18   Q.      Because it doesn't include from November 1 of T

19   minus 1 through December 31 of T?

20   A.      Well, specifically, it ignores -- it ignores

21   employees who are considered for eligibility and granted

22   it or not.  It ignores those employees who are hired

23   after November 1st -- yeah, it ignores employees hired

24   after November 1st of T minus 1 completely.

25          Let me clarify that.  It ignores some employees

Paul, et ano. v. RBC Capital Markets, LLC, et al.                    Daniel M. Garrett, Ph.D.

                                                          Page 71

1    year.

2    Q.     Could you have calculated it for one date,

3    recognizing that you have an objection to whether that

4    is what a court should look at, but could you have

5    calculated it for one date?

6          MR. BORAN:  Objection.  Mischaracterizes

7    testimony.

8          THE WITNESS:  I don't think you can calculate it

9    precisely given the shortcoming in the data that we've

10   been talking about a little bit, which is that the hire

11   date of the employees whose hire date in the data is

12   after the plan year is not known with certainty.  And so

13   I don't know that the data allow you to precisely

14   calculate the -- any snapshot eligibility ratio.

15   BY MR. ROLLER:

16   Q.     So, you're saying there's -- the data doesn't

17   reflect an accurate hire date for those employees?

18   A.     I'm not disputing that the hire date in the data

19   is inaccurate -- the hire date may be accurate for the

20   second spell of work or the nth spell of work.  It is

21   not -- it is not the accurate hire date for these

22   employees whose hire date is after the plan year,

23   obviously there's a tension, right, in the data.

24          So, they weren't hired in that spell of work

25   that is in the plan year.  They weren't hired as of that

Paul, et ano. v. RBC Capital Markets, LLC, et al.                    Daniel M. Garrett, Ph.D.

Page 90

1   Q.      I'd like to direct your attention to the table

2   on page 7, just above paragraph 13, and that table is

3   entitled, "Number of Employees Included in Dr. Garrett's

4   Headcount for the Calendar Year Who Were Hired After the

5   Calendar Year."  Do you see that?

6   A.      I do.

7   Q.      And is it your understanding that these

8   employees reflect the issue we had been talking about

9   this morning of an employee being at the company,

10  leaving, and coming back?

11  A.      Yes.

12  Q.      That's your understanding?

13  A.      Yes.

14  Q.      And how do you -- how do you know that?

15  A.      Well, two things.  I know that they are at the

16  company in these various plan years, and I know that

17  because they're on the company -- the All Employee file

18  and sometimes on the Eligible Employee file, and I know

19  that they have income in the -- in the particular plan

20  year.  And then we've looked at these employees in

21  subsequent years, and they generally show up in the plan

22  year which has the higher date associated with the

23  higher -- they show up in the year associated with the

24  higher date.  And so you can see the spells of work for

25  these employees across the years.

Paul, et ano. v. RBC Capital Markets, LLC, et al.                    Daniel M. Garrett, Ph.D.

Page 91

1    Q.       And would it be possible to calculate

2    eligibility ratios accounting for these employees who

3    you believe were present, left and came back using

4    Mr. Solomon's methodology?

5    A.       We've talked a lot about this, and the challenge

6    for him with these employees is it's not clear when in

7    the plan year they were hired.  So, he cannot calculate

8    precisely the single day of eligibility ratio.

9            But that problem doesn't affect my analysis

10   because I'm indifferent to what days they worked.  I

11   simply -- my analysis of eligibility ratios just

12   concerned itself with whether they were considered for

13   eligibility.

14   Q.       I'd like to move on to the compensation ratio

15   analysis.  I believe we've already established that RBC

16   does have employees in the 2003 to 2011 time period

17   we're talking about here were partial-year employees,

18   correct?

19   A.       Correct.

20   Q.       And Solomon deals with this by annualizing the

21   compensation to provide an estimate as to what the

22   annualized compensation would be, correct?

23   A.       For the partial-year employees, correct.

24   Q.       Yes.  And you contend that that annualization

25   for partial-year employees introduces error, correct?

# EXHIBIT Y

```
1                 UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF WASHINGTON
2                         AT TACOMA

3
   MARTY PAUL, an           *
4  individual; and BRIAN    *
   BUSKIRK, an individual,  *
5          Plaintiffs,      *
                            * C.A. NO. 3:16-cv-05616-RBL
6  VS.                      *
                            *
7  RBC CAPITAL MARKETS, LLC,*
   ET AL.,                  *
8          Defendants.      *

9     ****************************************************

10     ORAL AND VIDEOTAPED DEPOSITION OF SAUL SOLOMON

11                        VOLUME 1

12                    DECEMBER 12, 2017

13     ****************************************************

14      ORAL AND VIDEOTAPED DEPOSITION of SAUL SOLOMON,

15  produced as a witness at the instance of the Defendants,

16  and duly sworn, was taken in the above-styled and

17  numbered cause on December 12, 2017, from 8:55 a.m. to

18  2:19 p.m., before Carol Jenkins, CSR, RPR, CRR, in and

19  for the State of Texas, reported by machine shorthand,

20  at the offices of Morgan, Lewis & Bockius, 1000

21  Louisiana, Suite 4000, Houston, Texas 77002, pursuant to

22  notice and the Federal Rules of Civil Procedure.

23

24

25
```



1 they were not hired as of December 31, you did not

2 include them in your analysis?

3      A.    That's correct.  And again, because we were

4 looking at eligibility at that point in time and the

5 ratio at that point in time.  And again, you can look at

6 it at any point in time.  You can look at it at January

7 31st and they would have been employed then and the

8 ratio would be something different.

9      Q.    Do you have any opinion as to whether a -- when

10 an employer is looking to determine that it is -- its

11 plan is top hat compliant, as to whether it should be

12 looking back to see what actually happened with respect

13 to the plan or looking forward to anticipate what should

14 be happening with respect to the plan?

15           MR. ROLLER:  Object to the form.

16      A.    Well, you know, again, I think it could be

17 looked at either way.  I do think that if, you know, the

18 company were looking at this on an ongoing basis as, you

19 know, they did try to do with the WAP matrix, I believe,

20 they would be looking at the information that they know

21 at that point in time which would be looking back.  They

22 can't tell what's going to happen in the next year

23 beyond, you know, what they have that's actually taken

24 place through that date.

25           So that would be a logical approach to



1  take for a company of trying to evaluate their status

2  with the top hat requirements at any point in time on an

3  ongoing basis.

4      Q.   (By Mr. Alamuddin)  Let me make sure I

5  understand.  If -- if you turn to your report on page

6  21, paragraph 52, this is in connection with your

7  discussion of the WAP 2008 WAP matrix.  You make the

8  point in paragraph 52 that the number of employees

9  included in the data file for WAP eligible employees in

10 2008 is 2,931, of which 28 were terminated prior to

11 December 31, 2007, and 214 were hired after December 31,

12 2007.

13           Do you see that?

14     A.   Yes.  I see where we're looking at.  The -- the

15 turnover during -- during November, December, right?

16     Q.   So if I am understanding your methodology, your

17 December 31 snapshot methodology correctly in analyzing

18 the ratio for plan year 2008, you would be excluding

19 those 28 individuals who were terminated prior to

20 December 31, 2007, and the 214 who were hired after

21 December 31, 2007; is that right?

22     A.   Yes.

23     Q.   Do you know how many employees would have been

24 staying with the same plan year of 2008, do you know how

25 many employees would have been excluded from the total



1  not they were employed for a day or a month or the

2  entire time period.  And so, you know, because of that,

3  you know, his workforce numbers and his eligible

4  numbers, both the numerator and the denominator, never

5  reflected actual count of people who were actually

6  employed at any -- any time during that 14-month time

7  period.

8      Q.   One thing, though, you would agree with me on

9  is that if you do an analysis as a particular point in

10  time, say, December 31 of the prior plan year as you've

11  done, you don't know what's at what -- how the

12  eligibility ratios are actually going to influence the

13  workforce in the coming plan year because you don't know

14  whether there's going to be any reorganization or

15  reduction or some other event that might influence the

16  numerator and the denominator; is that right?

17      A.   Well --

18           MR. ROLLER:  Object to the form of the

19  question.

20           You can answer.

21           THE WITNESS:  I'm sorry.

22      A.   You do know by calculating the ratio as of the

23  end of the next plan year, beginning of the next plan

24  year.  So you -- you can account for changes in the

25  makeup of the workforce, the size of the workforce and



1 the makeup of eligibility if that happened to be a

2 significant change, that would be reflective in the next

3 year's ratio.

4            Now, again I said you can cal -- you can

5 make this calculation every quarter, every month.  You

6 can make it every day if you wanted to to account for

7 those changes if you thought it was necessary based on

8 your given circumstances.

9     Q.   (By Mr. Alamuddin)  Let me follow up on

10 something you just said.

11            You said that you could account for that

12 at the -- at the beginning of the next plan year.  But

13 -- but if you had looked at the December 31 ratio the

14 next year, you'd be looking for the coming year again?

15 You wouldn't be looking back to see what actually

16 happened during the plan year, correct?

17     A.   No, it -- but it would be based on that -- that

18 current year's data, you know, the year that just

19 passed.  So the data that just occurred would -- and --

20 and the numbers as they existed at December 31st of that

21 year would be incorporating anything that happened

22 during the year.

23     Q.   Well, how would it incorporate anything that

24 happened during the year since it would be looking

25 forward to and analyzing the ratio of the upcoming plan



1  year?

2      A.   Well, that's -- it's not what it's doing.  It's

3  looking back.  Again, my calculation is looking back

4  using the data that already did occur and saying for the

5  beginning of the next plan year, here's what the

6  situation looks like.

7              And Dr. Garrett's approach looked at it

8  after the fact and also included, you know, the numbers

9  for everybody that came and went during the year.  And,

10  you know, I'm including those people who came and

11  stayed, you know, as of December 31st.  But if they came

12  and went, they're -- they're not going to be in the

13  calculation.  Say they're not -- just simply not there.

14      Q.   I understand, then, you've explained quite well

15  your critique of Dr. Garrett's ratio methodology, but

16  let me ask you this:  If you had used the same

17  methodology as Dr. Garrett, would you have come up with

18  the same results?

19      A.   Well, with the one exception, I think, being it

20  appears again that he included employees that may have

21  been hired after the end of the plan year that he's

22  evaluating.  That seemed to be inconsistent if that's

23  true.  And that's what the data seemed to reflect from

24  what we could tell.

25      Q.   Do you know how excluding those individuals



1  would affect Dr. Garrett's ratios under his methodology?

2  Did you test it?

3      A.   No, I didn't recalculate it.  I don't imagine

4  it would be a material change, but it would be a change.

5      Q.   Let's go back to your original report for a

6  second.

7      A.   (Witness nods head.)

8      Q.   In paragraph 35 of your report, you also

9  indicate that you've calculated the average number of

10  both the numerator and the denominator for two

11  December 31 dates; is that right?

12      A.   Yes.

13      Q.   And what was the purpose of that analysis?

14  What were you trying to show there?

15      A.   Well, again, this would help account for

16  significant -- any significant changes in the workforce

17  from a total number of employee standpoint as well as

18  the makeup of the workforce if, you know, from year to

19  year, if the makeup of the workforce resulted in a

20  higher proportion of eligible employees or less

21  eligible.  Taking an average of the beginning and end of

22  each year would at least give you some weighting of

23  that.

24      Q.   And if I understand what you've done, you've

25  taken the average eligibility numbers in the two years



1  before the WAP plan year for which -- for which you're

2  analyzing.  In other words, under your approach, if

3  you're looking at the eligibility ratio for 2004, you --

4  you did that analysis using 12/31/03 and 12/31/02

5  snapshot averages?

6      A.  Yes.  Correct.

7      Q.  Let me ask you:  Why would you do it that way

8  as opposed to using the -- the snapshot data from the

9  actual plan year in question, in other words, averaging

10 out 12/31/03 and 12/31/04, for example, to -- to look at

11 plan year 2004?

12     A.  Well, again, the answer is the same as the one

13 before that why we looked back instead of forward on the

14 analysis even for the one single date for the ratio

15 test.  It's the same issue.

16          The subsequent year is unknown as of the

17 beginning of each plan year.  You don't know what's

18 going to occur in the next 12 months.  You don't have

19 that data.  What you do have is you have the data for

20 the prior year, so you have the beginning of the prior

21 year and the end of the prior year.  And that's what we

22 -- what we averaged for that reason.

23          Again, we were trying to replicate what

24 information would have been available to someone looking

25 at eligibility, looking at the top hat status or these



1  criteria that may be relevant.  As of a point in time,

2  they would only be able to look at the prior data.  They

3  don't have the subsequent year's data at that point in

4  time.  They're looking at the data as of December 31st

5  of '08.  They don't have '09 information available to

6  them.  They only have '08 and '07 and prior.

7      Q.   But just to be -- to be clear, RBC is not

8  making eligible determinations as of December 31,

9  correct?

10          MR. ROLLER:  Object to the form.

11      A.   Making them just prior to that, you know, like

12  a month or two before is what I understand.  October,

13  November of the prior year based on information --

14  salary information relating to the prior year.

15      Q.   (By Mr. Alamuddin)  And --

16      A.   So it's consistent with the prior approach.

17  Again, they don't have -- in order to determine who's

18  eligible for 2009, they have to use 2008 comp data to

19  see if they -- and production data to see if they

20  qualify.

21      Q.   But they wouldn't have the annualized NDT

22  compensation for calendar year 2008 -- they wouldn't

23  have the entire NDT compensation for calendar year 2008

24  in determining -- in doing an analysis of what plan year

25  2009 might look at -- like; is that right?



# EXHIBIT Z

1

(1)                    UNITED STATES DISTRICT COURT
                         SOUTHERN DISTRICT OF TEXAS
(2)                          HOUSTON, TEXAS

(3)

(4)    Brenda Tolbert,

(5)                    Plaintiff,
                                          Civil Action No.
(6)                                       4:11-CV-00107
       -vs-
(7)
       RBC Capital Markets
(8)    Corporation, et al.,

(9)                    Defendants.

(10)

(11)

(12)   ----------------------------------------------------

(13)

(14)                  VIDEOTAPED 30(b)(6) DEPOSITION

                              OF
(15)
                        GABRIELA M. SIKICH
(16)

(17)   ----------------------------------------------------

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)   DATE TAKEN:  9/8/11      BY:  Amy L. Larson, RPR

08:19:20 (1) Q. Did you bring it to his attention by way of a

08:19:23 (2) document or an oral conversation?

08:19:25 (3) A. I don't recall.

08:19:26 (4) Q. What did you tell him about the -- about any

08:19:30 (5) concerns on your part about the top hat

08:19:34 (6) status?

08:19:35 (7) MR. ALAMUDDIN: Object to form.

08:19:36 (8) THE WITNESS: I had raised the

08:19:40 (9) fact that due to the last couple of years of

08:19:43 (10) acquisitions that our population had -- had

08:19:47 (11) changed and that we need to actually

08:19:50 (12) reexamine and look at our top hat status.

08:19:54 (13) BY MR. HARRISON:

08:19:55 (14) Q. Did someone bring that information to you

08:19:59 (15) that caused you to begin to think about it or

08:20:01 (16) was that some initiative that you undertook

08:20:03 (17) on your own that you just realized that we've

08:20:06 (18) got these growing numbers and we need to look

08:20:08 (19) at it?

08:20:08 (20) A. Outside legal counsel.

08:20:10 (21) Q. All right. So the first person who brought

08:20:12 (22) to your attention the fact that these growing

08:20:14 (23) numbers need to be reexamined would have been

08:20:17 (24) outside counsel?

08:20:18 (25) A. Outside counsel. But it wasn't pertained to

08:20:21  (1)      the growing numbers, it was just outside

08:20:23  (2)      counsel making us aware that we should

08:20:25  (3)      examine where we -- where we landed as far as

08:20:28  (4)      eligibility.

08:20:28  (5)   Q.  All right.  So the sequence was, then,

08:20:31  (6)      this -- this idea of reexamining the -- the

08:20:34  (7)      top hat status based upon the growing

08:20:37  (8)      numbers, that emanated first by outside

08:20:41  (9)      counsel suggesting to you you need to look at

08:20:44  (10)     these numbers?

08:20:44  (11)              MR. ALAMUDDIN:  Object to form,

08:20:47  (12)     misstates the testimony.

08:20:48  (13)  BY MR. HARRISON:

08:20:48  (14)  Q.  Am I correct?

08:20:50  (15)  A.  No.

08:20:50  (16)  Q.  All right.  Outside counsel tells you what?

08:20:54  (17)              MR. ALAMUDDIN:  I'm going to

08:20:55  (18)     object and --

08:20:56  (19)              MR. HARRISON:  I'll rephrase it.

08:20:57  (20)  BY MR. HARRISON:

08:20:57  (21)  Q.  How did -- what brought you -- what got you

08:20:59  (22)     to the point where you approached John Taft

08:21:02  (23)     to say, "I'm concerned or have concerns"?

08:21:06  (24)  A.  I didn't approach John Taft to say I had

08:21:09  (25)     concerns.  I had -- I approached John Taft to

08:21:11 (1)    say that we need to look at the numbers.

08:21:13 (2)  Q.  All right.  And why did you think you needed

08:21:15 (3)    to look at the numbers?

08:21:16 (4)  A.  We needed to look at the numbers twofold, one

08:21:19 (5)    based on outside legal counsel had indicated

08:21:21 (6)    that we should examine the -- our eligibility

08:21:24 (7)    numbers in light of the fact that we had had

08:21:27 (8)    multiple acquisitions over the course of the

08:21:29 (9)    last couple of years.

08:21:30 (10) Q.  And you agreed that that was a good idea?

08:21:32 (11) A.  Yes.

08:21:33 (12) Q.  So you told John Taft, "We should look at

08:21:36 (13)    this"?

08:21:36 (14) A.  Correct.

08:21:37 (15) Q.  And he agreed?

08:21:38 (16) A.  Yes.

08:21:39 (17) Q.  All right.  And then he sends this e-mail,

08:21:43 (18)    which in effect puts you in charge of that

08:21:45 (19)    project?

08:21:47 (20) A.  It wasn't just the top hat project, it was an

08:21:50 (21)    overall review of the WAP.

08:21:54 (22) Q.  Including the top hat status, whether or not

08:21:56 (23)    these numbers would suggest that something

08:21:58 (24)    needed to be done differently?

08:21:59 (25) A.  Correct.

08:21:59 (1)    Q.   Okay.  Now, did you assemble, then, a team of
08:22:04 (2)         people to help you make this analysis?
08:22:08 (3)    A.   Yes.
08:22:09 (4)    Q.   And within the organization who did you put
08:22:11 (5)         on your team to help you make this analysis?
08:22:14 (6)    A.   It would have included my manager, Dan Szabo.
08:22:19 (7)         It would have included Karen Yurick, who,
08:22:23 (8)         again, works in the service center,
08:22:25 (9)         specifically focuses on -- on WAP.  It would
08:22:27 (10)        have been Kristen Borucki who also -- who
08:22:30 (11)        also works in the service center who focuses
08:22:32 (12)        on WAP.  And then we also engaged Mercer as
08:22:37 (13)        well.
08:22:37 (14)   Q.   Okay.  If we look again at the e-mail, it
08:22:40 (15)        says in the next to last paragraph, "I asked
08:22:43 (16)        Gabriela to work towards getting decisions
08:22:45 (17)        from the Dain operating committee in time for
08:22:47 (18)        us to implement changes to WAP in time for
08:22:50 (19)        open enrollment for the 2007 plan."  Do you
08:22:54 (20)        see that?
08:22:54 (21)   A.   I do.
08:22:55 (22)   Q.   Was that deadline met?  Were there decisions
08:23:01 (23)        from the operating committee in time to
08:23:03 (24)        implement changes to the WAP in time for that
08:23:06 (25)        open enrollment?

44

08:32:54  (1)    Q.   Did you read this sentence to suggest to you
08:32:56  (2)         that they were telling you that -- that
08:33:00  (3)         perhaps your numbers, your thresholds needed
08:33:03  (4)         to be adjusted so that the top hat status can
08:33:06  (5)         be maintained?
08:33:07  (6)    A.   No.
08:33:08  (7)    Q.   Okay.  But that's what -- that's what
08:33:13  (8)         John Taft had suggested needed to be looked
08:33:17  (9)         at, didn't he?
08:33:19  (10)                  MR. ALAMUDDIN:  Object to form.
08:33:20  (11)                  THE WITNESS:  We needed to look at
08:33:21  (12)         the numbers, correct.
08:33:22  (13)                  MR. HARRISON:  Yes.
08:33:22  (14)   BY MR. HARRISON:
08:33:22  (15)   Q.   In fact, specifically, he talked about
08:33:23  (16)         concerns over maintaining the top hat status
08:33:27  (17)         back in April of '06 when he sent you that
08:33:30  (18)         e-mail, correct?
08:33:31  (19)                  MR. ALAMUDDIN:  Object to form.
08:33:32  (20)                  THE WITNESS:  It was -- it was
08:33:33  (21)         more of a proactive approach to look at the
08:33:36  (22)         numbers to ensure the fact that we preserved
08:33:38  (23)         our top hat status.
08:33:40  (24)                  MR. HARRISON:  Yeah.
08:33:40  (25)

08:33:40 (1)    BY MR. HARRISON:

08:33:40 (2)    Q.  Specifically, what he said was, "The growing

08:33:42 (3)        size of WAP, which creates" -- "Which creates

08:33:45 (4)        now a material impact on our financials and

08:33:48 (5)        creates concerns about the top hat status of

08:33:51 (6)        the plan."  The only way in which the growing

08:33:53 (7)        size of the WAP could create concerns about

08:33:55 (8)        the top hat status of the plan would be the

08:33:59 (9)        question of whether or not it was not

08:34:01 (10)       selective enough to meet the requirements;

08:34:03 (11)       isn't that true?

08:34:04 (12)                   MR. ALAMUDDIN:  Object to form.

08:34:05 (13)                   THE WITNESS:  It was a directive

08:34:08 (14)       to basically look at the numbers to ensure

08:34:10 (15)       the fact that based on the acquisitions that

08:34:12 (16)       had occurred in the course of the last couple

08:34:14 (17)       of years, that we felt comfortable with the

08:34:19 (18)       numbers, the analysis.

08:34:21 (19)   BY MR. HARRISON:

08:34:21 (20)   Q.  Whether it's based upon acquisitions or

08:34:23 (21)       whether it's based upon anything else, you

08:34:26 (22)       understood, even back in April of 2006, that

08:34:29 (23)       to maintain your top hat status it had to be

08:34:32 (24)       a -- it had to be a plan which was primarily

08:34:35 (25)       designed for a select group of management or

83

| | | |
|---|---|---|
| 09:19:01 | (1) | that you thought would be safe -- |
| 09:19:03 | (2) | MR. ALAMUDDIN: Object to form. |
| 09:19:04 | (3) | BY MR. HARRISON: |
| 09:19:05 | (4) | Q. -- right? |
| 09:19:05 | (5) | A. It's not that we weren't safe. It's what we |
| 09:19:10 | (6) | were trying to do is to continue to preserve |
| 09:19:13 | (7) | that select group. |
| 09:19:14 | (8) | Q. Well, whether you were safe or not depends |
| 09:19:17 | (9) | upon what some judge says about whether you |
| 09:19:20 | (10) | were safe, right? You understand that -- |
| 09:19:22 | (11) | that simply because you think you're safe, |
| 09:19:25 | (12) | doesn't necessarily mean that you are safe, |
| 09:19:27 | (13) | you understand that, right? |
| 09:19:28 | (14) | MR. ALAMUDDIN: Object to form. |
| 09:19:35 | (15) | THE WITNESS: Correct. I -- |
| 09:19:37 | (16) | BY MR. HARRISON: |
| 09:19:37 | (17) | Q. So nobody -- no -- nobody had ever looked -- |
| 09:19:41 | (18) | prior to 2008, nobody had ever looked at your |
| 09:19:45 | (19) | participation percentage versus your |
| 09:19:47 | (20) | workforce and said, "You are safe at this |
| 09:19:49 | (21) | level," correct? |
| 09:19:50 | (22) | MR. ALAMUDDIN: Hold on a second. |
| 09:19:52 | (23) | Are you talking about, like, a judicial |
| 09:19:53 | (24) | entity? |
| 09:19:54 | (25) | MR. HARRISON: Yes. |

84

| | | |
|---|---|---|
| 09:19:54 | (1) | MR. ALAMUDDIN: Okay. |
| 09:19:55 | (2) | MR. HARRISON: Correct. |
| 09:19:55 | (3) | MR. ALAMUDDIN: So no judicial |
| 09:19:57 | (4) | entity had looked at your numbers and |
| 09:19:59 | (5) | determined that -- |
| 09:20:00 | (6) | THE WITNESS: No. |
| 09:20:01 | (7) | BY MR. HARRISON: |
| 09:20:01 | (8) | Q. And no governmental agency had looked at your |
| 09:20:04 | (9) | numbers and said you're safe? You had no |
| 09:20:06 | (10) | letter from any governmental authority that |
| 09:20:09 | (11) | had the power to call you unsafe that said |
| 09:20:11 | (12) | you are safe, right? |
| 09:20:12 | (13) | A. Correct. |
| 09:20:12 | (14) | Q. Okay. You -- you were -- there was some |
| 09:20:14 | (15) | concern about whether or not if the numbers |
| 09:20:17 | (16) | got any bigger maybe you wouldn't be safe, |
| 09:20:20 | (17) | that was the whole reason you were doing |
| 09:20:21 | (18) | this, right? |
| 09:20:22 | (19) | A. It was a proactive approach, yes. |
| 09:20:24 | (20) | Q. Okay. And so what you were doing in 2008 by |
| 09:20:28 | (21) | running all these scenarios was you were |
| 09:20:30 | (22) | looking at if we raise the threshold to this |
| 09:20:34 | (23) | number, what kind of a percentage |
| 09:20:37 | (24) | participation will that produce, right? |
| 09:20:41 | (25) | A. Eligibility, yes. |

| | | |
|---|---|---|
| 13:22:13 | (1) | A. Correct. |
| 13:22:14 | (2) | Q. And if you jeopardized your top hat status, |
| 13:22:18 | (3) | that had all kinds of bad consequences in |
| 13:22:23 | (4) | terms of taxes for people, right? |
| 13:22:26 | (5) | A. If we compromised the -- |
| 13:22:28 | (6) | Q. No, if you -- if you judged wrong, if you -- |
| 13:22:32 | (7) | if you got the pool too big and, therefore, |
| 13:22:34 | (8) | lost your top hat exemption, that would mean |
| 13:22:37 | (9) | adverse tax consequences to your employees |
| 13:22:40 | (10) | who were part of the plan, right? |
| 13:22:42 | (11) | A. Correct. |
| 13:22:42 | (12) | Q. That was something you really, really, really |
| 13:22:45 | (13) | wanted to avoid, right? |
| 13:22:48 | (14) | MR. ALAMUDDIN: Object to form. |
| 13:22:49 | (15) | THE WITNESS: Yes. |
| 13:22:50 | (16) | MR. HARRISON: Okay. |
| 13:22:51 | (17) | BY MR. HARRISON: |
| 13:22:51 | (18) | Q. So you start out this whole process because |
| 13:22:54 | (19) | the number is close enough to where it has |
| 13:22:56 | (20) | caught John Taft's attention and he wants |
| 13:22:59 | (21) | people to look at and revisit the issue of |
| 13:23:02 | (22) | eligibility, right? |
| 13:23:03 | (23) | MR. ALAMUDDIN: Object to the form |
| 13:23:04 | (24) | of the question. |
| 13:23:07 | (25) | THE WITNESS: It was -- it was a |

13:23:09 (1)          process of taking a proactive approach.

13:23:11 (2)                    MR. HARRISON:  I understand that.

13:23:12 (3)                    THE WITNESS:  Yeah.

13:23:13 (4)   BY MR. HARRISON:

13:23:14 (5)   Q.  Somebody wanted to take a proactive approach

13:23:17 (6)       and try as best you could, assuming you were

13:23:19 (7)       safe then, to take a second look at these

13:23:21 (8)       numbers and make sure you did not suddenly

13:23:23 (9)       become unsafe because you had failed to take

13:23:26 (10)      appropriate action, right?

13:23:28 (11)  A.  Correct.

13:23:29 (12)  Q.  Okay.  So if you made a mistake in this

13:23:33 (13)      proactive approach and restricted yourself

13:23:36 (14)      too much by raising the threshold higher than

13:23:38 (15)      you needed and limiting the participants more

13:23:41 (16)      than you had to, that wasn't going to

13:23:44 (17)      jeopardize your top hat status, was it?

13:23:47 (18)                   MR. ALAMUDDIN:  Object to form.

13:23:48 (19)                   THE WITNESS:  No.

13:23:50 (20)                   MR. HARRISON:  Okay.

13:23:51 (21)  BY MR. HARRISON:

13:23:52 (22)  Q.  On the other hand, if you made a mistake and

13:23:54 (23)      didn't raise the threshold high enough and

13:23:57 (24)      didn't get restrictive enough, that could

13:24:00 (25)      jeopardize your top hat status, right?

13:24:03 (1)  A.  Yes.

13:24:03 (2)  Q.  Okay.  So your testimony is that some outside

13:24:07 (3)      lawyer gave advice that you relied upon in

13:24:13 (4)      deciding not to raise your threshold

13:24:17 (5)      eligibility from 2006 clear to 2010?

13:24:23 (6)              MR. ALAMUDDIN:  Object to the

13:24:26 (7)      form, mischaracterizes the record.

13:24:28 (8)  BY MR. HARRISON:

13:24:28 (9)  Q.  Is that what you're saying?

13:24:29 (10) A.  Yes.

13:24:30 (11) Q.  So some lawyer gave you advice when the

13:24:33 (12)     purpose of the lawyer was to make sure you --

13:24:36 (13)     you got good advice so that you would not

13:24:39 (14)     lose your top hat status, you're telling me

13:24:42 (15)     that some lawyer gave you advice that

13:24:44 (16)     resulted in making a decision not to raise

13:24:48 (17)     the eligibility threshold?

13:24:51 (18)             MR. ALAMUDDIN:  Object to form,

13:24:53 (19)     asked and answered.

13:24:53 (20)             THE WITNESS:  Correct.

13:24:55 (21)             MR. HARRISON:  Okay.  Fair enough.

13:25:03 (22) BY MR. HARRISON:

13:25:03 (23) Q.  Back to this Exhibit 20 for a second, the

13:25:06 (24)     second sentence, it says, "Based on Mercer's

13:25:09 (25)     in-depth review and to address the goals and

| | | |
|---|---|---|
| 14:07:28 | (1) | time talking about the eligibility threshold |
| 14:07:30 | (2) | in terms of a production number, you have to |
| 14:07:32 | (3) | have a certain production number to become |
| 14:07:35 | (4) | WAP eligible.  And I understand that -- why |
| 14:07:38 | (5) | you were revisiting those numbers at |
| 14:07:40 | (6) | different times. |
| 14:07:41 | (7) | What I don't understand here is how this |
| 14:07:43 | (8) | change that is referred to in this document |
| 14:07:48 | (9) | of moving -- how this change has anything to |
| 14:07:53 | (10) | do with WAP top hat exemption status.  Can |
| 14:07:57 | (11) | you explain that? |
| 14:07:58 | (12) | A.  It was based on the fact that if they didn't |
| 14:08:01 | (13) | have the opportunity to defer into retirement |
| 14:08:04 | (14) | or selected distribution date, that they |
| 14:08:06 | (15) | would not have to be included in our |
| 14:08:08 | (16) | eligibility numbers. |
| 14:08:09 | (17) | Q.  So this document is not -- this doesn't have |
| 14:08:13 | (18) | anything to do with eligibility based upon |
| 14:08:18 | (19) | what their production number was, this |
| 14:08:20 | (20) | document has to do with whether or not they |
| 14:08:23 | (21) | had the ability to, what -- do what?  You |
| 14:08:32 | (22) | lost me.  Sorry. |
| 14:08:33 | (23) | MR. ALAMUDDIN:  I object to the |
| 14:08:34 | (24) | form.  But you can explain it again. |
| 14:08:36 | (25) | THE WITNESS:  Do you want me to |

14:08:38 (1)     explain?

14:08:39 (2)                    MR. HARRISON:  Please.

14:08:39 (3)                    THE WITNESS:  So the entry group

14:08:42 (4)     we rolled out effectively for 2007 which

14:08:44 (5)     impacted both the branch directors and the

14:08:47 (6)     financial consultants, and it was for

14:08:48 (7)     individuals that had -- had production

14:08:50 (8)     between 300 to 350.  And for that -- for that

14:08:54 (9)     group or that population, their version of

14:08:57 (10)    the -- of the program did not allow them to

14:09:00 (11)    elect a distribution date, whether it be

14:09:02 (12)    in-service or at retirement, and it would be

14:09:05 (13)    automatically distributed to them at the time

14:09:07 (14)    that the company contributions were vested.

14:09:11 (15)                   MR. HARRISON:  Okay.

14:09:11 (16)    BY MR. HARRISON:

14:09:11 (17)    Q.  So this document is not telling us, is not

14:09:14 (18)    telling us that there was some increase in

14:09:18 (19)    the production required of branch managers as

14:09:23 (20)    a result of an effort to maintain top hat

14:09:26 (21)    status, that's not what this document is

14:09:28 (22)    talking about?

14:09:29 (23)    A.  About -- about increasing eligibility?

14:09:30 (24)    Q.  Yes.

14:09:31 (25)    A.  Right.  Correct.

299

| | | |
|---|---|---|
| 14:09:32 | (1) | Q. Okay. Thank you. That helps. |
| 14:09:42 | (2) | MR. ALAMUDDIN: Are we done with |
| 14:09:43 | (3) | this one? |
| 14:09:45 | (4) | MR. HARRISON: Yes. |
| 14:09:45 | (5) | MR. ALAMUDDIN: Do you want her to |
| 14:09:47 | (6) | keep the stipulations in front her? |
| 14:09:49 | (7) | MR. HARRISON: I don't think |
| 14:09:50 | (8) | she'll need them again. Thank you. |
| 14:09:57 | (9) | BY MR. HARRISON: |
| 14:09:57 | (10) | Q. Turn to -- no, we've already done that. |
| 14:09:59 | (11) | Go back to Exhibit 13 in your stack here |
| 14:10:03 | (12) | a second. There's a page I failed to ask you |
| 14:10:07 | (13) | about. |
| 14:10:12 | (14) | A. (Complies.) |
| 14:10:13 | (15) | Q. And turn to page 13 of the document. |
| 14:10:29 | (16) | A. (Complies.) |
| 14:10:29 | (17) | MR. ALAMUDDIN: Okay. So it's my |
| 14:10:31 | (18) | fault. |
| 14:10:34 | (19) | THE WITNESS: Okay. |
| 14:10:35 | (20) | MR. ALAMUDDIN: Clipping was never |
| 14:10:36 | (21) | my strong suit. |
| 14:10:37 | (22) | MR. HARRISON: All right. |
| 14:10:37 | (23) | BY MR. HARRISON: |
| 14:10:38 | (24) | Q. On page 13 what -- what it appears to be |
| 14:10:40 | (25) | showing is a distribution -- the percentage |

# EXHIBIT AA

**Christ, V. Loraine**

| | |
|---|---|
| **From:** | RBC US Benefits Department (RBC Dain) |
| **Sent:** | Monday, December 11, 2006 3:45 PM |
| **Subject:** | 2007 WAP Enrollment Begins Today |

Last week, you received e-mail notification of your eligibility for the 2007 RBC U.S. Wealth Accumulation Plan (WAP). You have also received additional information via inter-office mail about the enhanced plan. If you have not received the inter-office packet yet, you should get it soon. You do not need to wait for the packet before you enroll because the information in the packet is also attached to this email.

**Please note that the 2007 WAP enrollment period begins today. Please carefully review the information in this e-mail and complete your enrollment by midnight (EST) on the December 31, 2006 deadline.**

*Complex/Branch Director Plan Information*
Attached to this e-mail are three documents with important additional information for complex and branch directors about the WAP:

- RBC U.S. Wealth Accumulation Plan Summary for BD/CDs;
- 2007 Plan Investment Summary; and
- WAP Beneficiary Form.

  

2007 WAP    Investment    Beneficiary_F
ary CD&BD Emmary 2007.corm 2007.doc

In addition, the RBC U.S. Wealth Accumulation Plan Document and Prospectus is available online at www.401k.com. Please take the time to review these documents before enrolling in the plan.

**Please note:** Branch Directors who are eligible for WAP because they had FY 2006 production of $300,000 to $350,000 will automatically receive an in-service distribution in the year company contributions become fully vested. For the 2007 plan year, your distribution will be vested in 2012. Your account will be valued as of July 1, 2012 and paid to you as soon as possible after 2012 if you are an active employee on July 1, 2012.

The reason for this change was based on an extensive analysis which determined that an increase to the eligibility threshold was needed in order to maintain WAP's top-hat exemption status. Top hat exemption status is only an issue if the plan allows for a distribution option either to or beyond separation from service. Maintaining a top hat exemption status is critical to the plan participants in order to continue to provide this deferred compensation benefit.

*How To Enroll*
Complete your 2007 WAP enrollment before the December 31, 2006 deadline using the following instructions:

- Go to the Fidelity Web site (**www.401k.com**)
- Under the "Log In to NetBenefits" section on the upper right side of your screen, enter your log in information (SSN or customer ID and PIN) to access your Fidelity NetBenefits account*
- Select the RBC U.S. Wealth Accumulation Plan link. This will take you to the 2007 WAP enrollment page
- Print a copy of your on-line enrollment confirmation to keep for your records. This is the only confirmation you will receive.

1

CONFIDENTIAL
RBC 000314

EXHIBIT
24
Plaintiff

After logging in, you will have access to the online RBC U.S. Wealth Accumulation Plan Document and Prospectus, as well as your current account information.

*\* If you forgot your PIN, select the "Forgot Your PIN?" link for assistance. If you are a new site user, select the "New User Registration" link.*

### *Financial Consultant Plan Information*
As employees in your complex or branch may have questions about WAP, the 2007 FC WAP summaries have been attached to this e-mail for your reference. For 2007, there are two versions of the FC WAP summary:
1. for FCs with FY 2006 production over $350,000; and
2. for FCs with FY 2006 production between $300,000 to $350,000 (referred to as the "Entry" version). In order for WAP to maintain an IRS top hat exemption status, FCs in the "Entry" version will receive their 2007 WAP distribution valued on July 1, 2013. They will not be able to choose their distribution option.

  

2007 WAP    2007 WAP
ummary FC.pcmary FC Entry

In addition, all FCs received a link to a new interactive WAP Calculator tool that was developed to assist them in determining how WAP participation can impact compensation and wealth balances. Although this tool was not designed for complex or branch directors, you may access it by clicking the following link: **http://infonet/contents/GroupSites/PrivateClientGroup/WAPCalculator.htm**

### *Questions*
If you have any questions about WAP or the online enrollment process, please contact the HR Service Center at 866-HR SERVE (477-3783).

2

CONFIDENTIAL
RBC 000315

# EXHIBIT BB

| | |
|---|---|
| **From:** | RBC US Retirement Benefits Department |
| **Sent:** | Monday, November 26, 2007 8:24 AM |
| **Subject:** | 2008 WAP Enrollment Begins Today (CDBDE) |

Last week, you were notified via e-mail that you are eligible to participate in the 2008 RBC U.S. Wealth Accumulation Plan (WAP).

**Please note that the 2008 WAP enrollment period begins today. Please carefully review the information in this e-mail and complete your enrollment by midnight (EST) on the December 14, 2007 deadline.**

*Complex/Branch Director Plan Information*
Attached to this e-mail are three documents with important additional information for complex and branch directors about the WAP:
- RBC U.S. Wealth Accumulation Plan Summary for BD/CDs;
- 2008 Plan Investment Summary; and
- WAP Beneficiary Form.

    

Summary -     Investment    Beneficiary_F
:D&BD Entry  Immary 2008.|orm 2008.pdf

In addition, the RBC U.S. Wealth Accumulation Plan Document and Prospectus is available online at www.401k.com. Please take the time to review these documents before enrolling in the plan.

**Please note:** Branch Directors who are eligible for WAP because they had FY 2007 production of $300,000 to $350,000 will automatically receive an in-service distribution in the year company contributions become fully vested. For the 2008 plan year, your distribution will be vested in 2013. Your account will be valued as of July 1, 2013 and paid to you as soon as possible after July 1, 2013 if you are an active employee on July 1, 2013.

*How To Enroll*
Complete your 2008 WAP enrollment before the December 14, 2007 deadline using the following instructions:
- Go to the Fidelity Web site (www.401k.com)
- Under the "Log In to NetBenefits" section on the upper right side of your screen, enter your log in information (SSN or customer ID and PIN) to access your Fidelity NetBenefits account*
- Select the RBC U.S. Wealth Accumulation Plan link. This will take you to the 2008 WAP enrollment page
- Print a copy of your on-line enrollment confirmation to keep for your records. This is the only confirmation you will receive.
- Once your enrollment has been completed you will receive emails from the Benefits Center at Fidelity notifying you they received your Payroll deduction election and/or Investment election. No action is necessary when you receive these emails, they are for informational purposes only.

After logging in, you will have access to the online 2008 RBC U.S. Wealth Accumulation Plan Document and Prospectus, as well as your current account information.

*\* If you forgot your PIN, select the "Forgot Your PIN?" link for assistance. If you are a new site user, select the "New User Registration" link.*

CONFIDENTIAL
RBC 000458

*Financial Consultant Plan Information*

As employees in your complex or branch may have questions about WAP, the 2008 FC WAP summaries have been attached to this e-mail for your reference. For 2008, there are two versions of the FC WAP summary:

1. for FCs with FY 2007 production over $350,000; and
2. for FCs with FY 2007 production between $300,000 to $350,000 (referred to as the "Entry" version). In order for WAP to maintain an IRS top hat exemption status, FCs in the "Entry" version will receive their 2008 WAP distribution valued on July 1, 2014. They will not be able to choose their distribution option.

    

Summary -     Summary -
FC Final 2008.FC Entry Fina

In addition, all FCs received a link to a new interactive WAP Calculator tool that was developed to assist them in determining how WAP participation can impact compensation and wealth balances. Although this tool was not designed for complex or branch directors, you may access it by clicking the following link:
**http://infonet/contents/GroupSites/PrivateClientGroup/WAPCalculator.htm**

*Changes for 2008*

- Beginning January 1, 2008, exchanges out of the RBC Share Account processed prior to market close on a normal business day will now occur on the same business day. You will no longer have to wait until the last business day of the month for your exchange out of the RBC Share Account to occur.
- Beginning January 1, 2008, the annual return on the RBC Interest Account will be based solely on the 3 month LIBOR rate, instead of the 3 month LIBOR rate + 50 basis points.

*Questions*

If you have any questions about WAP or the online enrollment process, please contact the HR Service Center at 866-HR SERVE (477-3783).

CONFIDENTIAL
RBC 000459