1

Honorable Ronald B. Leighton

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

10

MARTY PAUL, an individual; and
BRIAN BUSKIRK, an individual,

11

                    Plaintiffs,

12

13          v.

14   RBC CAPITAL MARKETS, LLC, a
     Minnesota limited liability company;

15   ROYAL BANK OF CANADA, a
     Canadian corporation; and ROYAL

16   BANK OF CANADA US WEALTH
     ACCUMULATION PLAN, an employee

17   benefit plan,

18                    Defendants.

No. 3:16-cv-05616-RBL

**PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

NOTED ON MOTION CALENDAR:
February 2, 2018

**ORAL ARGUMENT REQUESTED**

19

20

21

22

23

24

25

26

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL

In the first nineteen pages of RBC's Motion for Summary Judgment (Dkt. No. 37) ("RBC MSJ"), RBC asserts meritless arguments apparently designed to distract this Court from the central issue in this litigation—whether the WAP is a legitimate top hat plan.  As shown in Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 44) (the "Top Hat MSJ"), the WAP surely is not a top hat plan (which likely is why, in 2012, RBC froze it and created a new plan with substantially tightened eligibility requirements).  At a minimum, disputed issues of fact and statistical analysis preclude summary judgment in RBC's favor.

**A.**     **The WAP Is Not A Top Hat Plan.**

**1.**     **RBC's Ratio Test Uses The Wrong Numbers and Flawed Math.**

RBC asserts that from 2004 to 2011, only 2.0% to 3.4% of the relevant workforce was eligible to participate in the WAP.  RBC MSJ at 21.  RBC's calculations suffer from two fatal flaws, as demonstrated below.

**a.**     **RBC Artificially Inflates the Denominator in the Ratio Test by Improperly Including Canadian Employees.**

RBC is asking this Court to find that a deferred compensation plan meets top hat requirements when, in several years, more than one out of five employees of the relevant workforce were eligible—an eligibility rate significantly higher than **any plan** found by **any court** to meet the top hat selectivity requirements.  In an attempt to artificially drive down that ratio, RBC urges that its Canadian employees be counted in the denominator for ratio test purposes.  This position defies logic and appears borne of desperation, as RBC repeatedly has recognized that the appropriate workforce includes only U.S. employees.

RBC makes much of the fact that the parties here stipulated "that any employee 'of an Employer' may become eligible" for the WAP (RBC MSJ at 21); however, the parties were merely reciting language used in the WAP, and also included another qualification in the WAP—that "an employee neither reside nor perform the majority of his or her services in Canada in order to become eligible for the WAP in any given year."  Decl. of Elizabeth S. Weinstein in Support of Pls.' Mot. for Partial Summ. J. (Dkt. No. 42) ("Weinstein

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL – Page 1

YARMUTH WILSON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

Decl."), Ex. 6 (citing WAP ¶ 2.1(a) and (b)).  RBC's assertion that this was not the case in *Tolbert* is false.  RBC created the WAP exclusively for employees of RBC and its family of companies living and working in the United States, as the WAP documents have always provided.[1]  Indeed, the full title of the WAP is the "Royal Bank of Canada **US** Wealth Accumulation Plan."  Weinstein Decl., Ex. 20 at ¶ 1.1 (emphasis added).  Moreover, RBC's witnesses, prior RBC court submissions, and internal documents all confirm that for purposes of the eligibility ratio, the United States workforce is the relevant denominator.[2]

### b.  RBC's Calculation of a "Ratio" Over Time Is Logically Flawed and Understates WAP Eligibility.

RBC expert Daniel Garrett's calculation of the eligibility ratio is fatally flawed for the reason described above, *i.e.*, it includes RBC's Canadian employees in the denominator of the ratio, even though those employees were explicitly **barred** from ever being eligible for the WAP.  *See* Section A.1.a, *supra*.  But that is not the only glaring flaw in his analysis.  His "calculation" of the eligibility ratio does not accurately reflect the number of employees in RBC's workforce at any point in time.  Plaintiffs' expert Saul Solomon describes the inaccurate and misleading nature of Dr. Garrett's eligibility ratio methodology:

> When determining the total number of employees, Dr. Garrett simply considers all employees who were employed at some time after November 1st of the prior year, which as of every date will include past employees who have terminated their employment and future employees who have not yet begun their employment.  This overly simplistic assumption would consider seasonal hires,

---

[1] Plaintiffs do not quibble with RBC's assertion that, over the years, certain employees of the Royal Bank of Canada were WAP-eligible.  But, per the WAP (and as reflected in the parties' stipulation) those employees did not reside in or perform the majority of their services in Canada.  In other words, those employees (and other RBC employees who met this geographic restriction but did not meet the production- or compensation-based thresholds to participate in the WAP) were a part of the RBC U.S. workforce upon which Mr. Solomon's calculations are based.

[2] *See, e.g.*, Weinstein Decl., Ex. 2 (Sikich 9/8/11 Dep.) at 143:24-144:4; Ex. 1 (Sikich 7/11/17 Dep.) at 122:17-19; 197:13-198:3; Ex. 14; Ex. 15 at 3-4; Decl. of Elizabeth S. Weinstein in Opp'n to Defs' Mot. for Summ. J. ("Weinstein Opp'n Decl."), Ex. 18 ¶ 8; Ex. 19 at 4-5, 34; Ex. 20 at Sikich Decl. ¶ 6; Ex. 21 ¶ 21 & Ex. K.  In a separate case litigated by RBC, RBC submitted, and the District of Minnesota relied upon, a declaration from Ms. Sikich that included only the U.S. workforce for the WAP eligibility ratio.  *See In re RBC Dain Rauscher Overtime Litig.*, 703 F. Supp. 2d 910, 948-49 (D. Minn. 2010).  Accordingly, RBC should be judicially estopped from now taking a different position by arguing that RBC employees who lived or worked in Canada should be included in the eligibility ratio.  *See Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783 (9th Cir. 2001).

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL – Page 2



1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1  such as interns, who are generally employed for only a few weeks, as well as
2  those who were terminated between November 1st of the prior year and the end of
   the plan year and all new hires during the 14 months prior to the plan year end.

3  Solomon Decl., Ex. 2 ¶ 13.[3]  Accordingly, Dr. Garrett's methodology never provides an

4  accurate eligibility ratio for any point in time.[4]  *Id.*

5          Absent Dr. Garrett's mathematical trickery, RBC's eligibility ratio is, in multiple

6  years, two to almost seven points higher than **any plan any court has ever found to be a**

7  **legitimate top hat plan**, *i.e.*, 16%.[5]  Even using Dr. Garrett's fuzzy math, RBC admits that

8  for three years RBC's eligibility ratio was higher than any court-approved top hat plan.  *See*

9  Decl. of Matthew A. Russell in Support of Defs.' Mot. for Summ. J. (Dkt. No. 38) ("Russell

10  Decl."), Ex. I (Ex. 4B (between 2006 and 2008, the WAP eligibility ratio ranged from

11  16.7% to 17.3%)).  This admission alone is sufficient for this Court to grant Plaintiffs' Top

12  Hat MSJ, finding the WAP did not meet the stringent requirements for a valid top hat plan.

13      **2.      RBC Mis-States the Primary Purpose Test.**

14          Under ERISA, a top hat plan "is unfunded and is maintained by an employer

15  primarily for the purpose of providing deferred compensation for a select group of

16  management or highly compensated employees."  29 U.S.C. § 1101(a)(1).  RBC misapplies

17  the "primary purpose" test by arguing that because the "WAP was maintained for the

---

[3] Dr. Garrett admits that inclusion of these short-term workers, who typically earned less than longer-term workers, had the effect of driving down the eligibility ratio.  *See* Weinstein Opp'n Decl., Ex. 1 at 78:4-15; 79:4-80:16.  Terminated workers earned, on average, far less than RBC's workforce as a whole.  *See* Decl. of Saul Solomon in Support of Pls.' Mot. for Partial Summ. J. (Dkt. No. 43) ("Solomon Decl."), Ex. 1 ¶¶ 46-50.  RBC's gamesmanship on this point is reinforced by the fact that when calculating salary differentials between WAP-eligible employees and RBC's workforce as a whole, Dr. Garrett did the exact opposite—he excluded partial year employees and those below a certain compensation threshold.  *See* Solomon Decl., Ex. 2 ¶¶ 19-20 ("[I]t is illogical to include certain employees in the ratio test but exclude them when evaluating the compensation for that same plan year.").

[4] Dr. Garrett admits that although he could have calculated the eligibility ratio for particular dates given the data RBC provided to him, he did not.  Weinstein Opp'n Decl. Ex. 1 at 45:21-46:20; 47:7-12; 48:9-49:14.  Dr. Garrett further admits that if the ratios he calculated were the true ratios on any one date, it would be by pure "happenstance."  *Id.* at 49:3-5; 89:15-25.

[5] In 2007, 22.7% of RBC's U.S. workforce qualified for the WAP, which is more than 40% greater than the most inclusive plan ever found to qualify for top hat status.  *Guiragoss v. Khoury*, 444 F. Supp. 2d 649, 660 (E.D. Va. 2006).  From 2004 to 2008, the WAP's eligibility ratio exceeded the highest threshold every year.  Solomon Decl., Ex. 1 ¶ 34.



primary benefit of a select group of highly compensated employees" and "primarily benefits highly compensated employees," it is a top hat plan. *See* RBC MSJ at 20, 22. The Department of Labor has explained, however, that because "the term 'primarily' refers to the purpose of the plan (*i.e.*, the benefits provided) and not the participant composition of the plan . . . a plan which extends coverage beyond 'a select group of management of highly compensated employees' would not constitute a 'top-hat' plan [under ERISA]." DOL Opin. Letter 90-14A, 1990 ERISA LEXIS 12, at *6; *see also, e.g.*, *In re New Valley Corp.*, 89 F.3d 143, 148 (3d Cir. 1996) (top hat plan may "cover only high level employees"). Put another way, **only a select group** of management or highly compensated employees may participate in a plan for it to be considered top hat. As detailed in prior briefing, *see* Top Hat MSJ at 16-21, and below, because numerous non-management and non-highly compensated employees participated in the WAP, it is not a top hat plan.

### 3. Non-Management and Non-Highly Compensated Employees were Eligible for the WAP.

RBC does not contend that the WAP qualifies for top hat status based on management's eligibility for good reason—a large portion of eligible employees were not management. *See* Solomon Decl., Ex. 1 ¶ 92 & Table 2.1 (non-management FCs comprised between approximately 40% and 65% of all WAP-eligible employees); *see also* Top Hat MSJ at 16-18. RBC accordingly pins its top hat argument on compensation.

It is unsurprising that RBC characterizes the "primary purpose" inquiry as focusing on who the WAP benefits, as opposed to what the primary purpose of the plan is (*i.e.*, to defer compensation). *See* Section A.2, *supra*. Whether the WAP benefitted some highly compensated RBC employees is not the relevant inquiry. Rather, the Court must consider the entire population eligible for the WAP to determine whether it benefits only a select group of highly compensated employees.

In its summary judgment motion, RBC argues only that WAP eligible employees earned, on average, some multiple of all RBC employees and, on average, some multiple of



non-WAP eligible employees.  *See* RBC MSJ at 22.[6]  Setting aside RBC's improper

inclusion of Canadian employees in this comparison, this tells the Court little regarding the

compensation characteristics of RBC's WAP-eligible workforce.

Plaintiffs incorporate their argument set forth in the Top Hat MSJ and the analysis

set forth in the Solomon opening and rebuttal reports, which show that the WAP cannot be

found to benefit only a select group of highly compensated employees.  *See* Top Hat MSJ at

18-21; Solomon Decl. Ex. 1 ¶¶ 54-104; Solomon Decl. Ex. 2 ¶¶ 16-31.

RBC cannot dispute that:

- Before the FC production threshold was raised to $400,000, well over half, and in one year more than two-thirds, of FCs were WAP eligible.  Solomon Decl., Ex. 1 ¶ 88.
- Between one-fifth and one-half of WAP-eligible FCs had production levels lower than the average level of <u>all</u> (not just WAP qualifying) FCs.  *Id.* ¶¶ 94-97, Table 2.1, Fig. 2B & 2C.
- During the years when the compensation-based eligibility threshold was $150,000, approximately 20% of WAP eligible employees earned less than that threshold; when that threshold was raised to $350,000, about 50% of WAP eligible employees earned less than that amount.  *Id.* ¶¶ 65-66 & Tables 1.A & 1.B.
- FCs who earned less than the compensation-based threshold earned, on average, <u>less than</u> the average RBC employee; for instance, in 2010 the average salary of such employees was over $40,000 <u>less</u> than the average salary for all employees.  *Id.* ¶ 66 & Table 1.8B.
- Similarly, FC employees coded FCENTRY earned <u>less than</u> the average compensation of RBC's relevant workforce.  *Id.* ¶¶ 78-80 & Table 1.12.

How can a deferred compensation plan be limited to a "select group" of "highly

compensated employees" or management when each year many eligible employees earned

less than the workforce average?  It can't, and the WAP wasn't.

### 4.    WAP Participants Lacked Individual Bargaining Power.

Finally, RBC contends that individual participants in a top hat plan need not be able

to affect the design and operation of the plan.  *See* RBC MSJ at 23-24.  The Ninth Circuit

disagrees.  In *Duggan v. Hobbs*, 99 F.3d 307 (9th Cir. 1996), even after finding that a

---

[6] Repeating the same mistake made in calculating the eligibility ratio, Dr. Garrett improperly includes in his compensation analysis RBC employees who lived or worked in Canada, even though those employees were barred from participation in the WAP irrespective of their compensation.



deferred compensation plan covered an employee who earned 4.2 to 5 times the average company employee and that the plan covered less than 5% of the workforce—both statistics indicating that the *Duggan* plan was far more selective than the WAP—the Ninth Circuit declined to find that the plan was a top hat plan without first considering the participant's ability to "exert[] influence over the design and operation of" the plan. *Duggan*, 99 F.3d at 313-13.  Only after finding that the participant had such ability, and indeed did influence the plan, did the *Duggan* Court find that the plan met top hat requirements. *Id.*  The individual bargaining power element has been embraced by other courts as well.  *See, e.g.*, *Leonard v. Sunnyglen Corp.*, 214 B.R. 621, 625-26 (Bankr. C.D. Cal. 1997); *Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 289-90 (2d Cir. 2000) ("Ability to negotiate is an important component of top hat plans; . . . top hat plans have been exempted from ERISA's substantive requirements because Congress deemed top-level management, unlike most employees, to be capable of protecting their own pension expectations.") (internal citation omitted); *Bakri v. Venture Mfg. Co.*, 473 F.3d 677, 679 (6th Cir. 2007) (overturning finding that plan was top hat based in part on fact that employees "had little ability to negotiate pension, pay or bonus compensation"); *Carrabba v. Randalls Food Mkts., Inc.*, 38 F. Supp. 2d 468, 478 (N.D. Tex. 1999) (evidence that no "significant number of the participants in the [plan] individually had bargaining power" to "protect their … deferred compensation expectations by direct negotiations with the employer" precluded finding that plan was top hat).

Indeed, addressing this very same plan, the *Tolbert* Court found that, even setting aside the eligibility ratio test and comparative compensation, summary judgment could not be granted to RBC because it had "not shown that a significant number of WAP participants individually had the required bargaining power."  *Tolbert v. RBC Capital Mkts. Corp.*, No. H-11-0107, 2015 U.S. Dist. LEXIS 55196, at *19, 2015 WL 2138200 (S.D. Tex. April 28, 2015) (emphasis added).  On that basis the *Tolbert* Court denied summary judgment, while

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL – Page 6

YARMUTH WILSON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

observing that the parties' experts' divergent methodologies and conclusions regarding the WAP's selectivity also "raise[d] numerous factual issues that cannot, and will not, be resolved at" summary judgment. *Id.*, 2015 U.S. Dist. LEXIS 55196, at *27.

RBC cannot avoid the fact that individual WAP eligible employees had no ability to affect the terms or administration of the WAP.[7] Indeed, RBC's witness on this point has admitted as much. *See* Weinstein Opp'n Decl., Ex. 2 (Sikich 8/28/09 Dep.) at 69:22-70:11 (acknowledging that individual WAP participants had no ability to negotiate the terms of the WAP); Weinstein Decl., Ex. 1 (Sikich 7/11/17 Dep.) at 201:19-23.

**B.     ERISA Authorizes Plaintiffs To Seek Relief For RBC's Illegal Conduct.**

Plaintiffs seek relief under three parts of ERISA's civil enforcement provisions— Section 502(a)(1)(B), Section 502(a)(2), and Section 502(a)(3).  29 U.S.C. § 1132(a)(1)-(3); Compl. (Dkt. No. 1) ¶¶ 60-89.  RBC spends the bulk of its Motion arguing that, as a matter of law, none of these enforcement provisions authorize the relief Plaintiffs seek.  Each of these attacks on Plaintiffs' claims fail.

**1.     Section 502(a)(1)(B) Authorizes Plaintiffs To Seek Enforcement Of The WAP's Terms In Conformity With ERISA.**

ERISA Section 502(a)(1)(B) authorizes an employee "to recover benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  Tracking Section 502(a)(1)(B), Plaintiffs' First Claim seeks the enforcement of rights and recovery of benefits in the form of the revocation of RBC's illegal forfeiture of their benefits and the distribution of the full amount of those illegal forfeitures.  Compl. ¶¶ 60-62.  Again tracking

---

[7] The various changes RBC points to that allegedly arose from WAP participants' feedback were all as a result of group efforts.  *See* RBC MSJ at 6; Weinstein Decl., Ex. 1 (Sikich 7/12/17 Dep.) at 203.  But, as explained by the *Carrabba* Court, this bargaining inquiry must be focused on the individual and not the group, as "[o]f course, as a group, to the extent they could act cohesively, [the participants] undoubtedly could influence the design and operation of [a plan], but that would be true of any group of employees within a company."  38 F. Supp. 2d at 478.  Further, none of these alleged changes go to "protect[ing] [participants'] retirement and deferred compensation expectations," which is the purpose of this inquiry.  *Bakri*, 473 F.3d at 678 (quoting *Carrabba*, 38 F. Supp. 2d at 478).



Section 502(a)(1)(B), Plaintiffs' Second Claim seeks a declaratory judgment to clarify Plaintiffs' rights to benefits due them under the WAP, including a declaration that the WAP must be funded according to a method that satisfies ERISA.

Recent Supreme Court and Ninth Circuit cases have made clear that "plan reformation" is not available under Section 502(a)(1)(B).  In *Cigna Corp. v. Amara*, 563 U.S. 421 (2011), an employer made fundamental changes to its pension plan that reduced participants' benefits without giving the participants proper notice as mandated under ERISA, causing participants "likely harm."  *Id.* at 424-25, 431-32.  Under the authority of Section 502(a)(1)(B), the district court replaced the plan terms with a new provision to benefit the participants, and ordered enforcement of that judicially-drafted provision.  563 U.S. at 433.  The Supreme Court found that, in doing so, the district court had exceeded the bounds of Section 502(a)(1)(B)'s "enforcement" authority, and had, instead, "changed" or "reformed" the plan terms.  563 U.S. at 435-36; *accord. Moyle v. Liberty Mut. Ret. Ben. Plan*, 823 F.3d 948, 960 (9th Cir. 2016) (Section 502(a)(1)(B) authorizes "the enforcement of the terms of the plan [but not] chang[ing] the terms of the plan").

RBC's Section 502(a)(1)(B) argument fails because it mischaracterizes Plaintiffs' claims as seeking the "reformation" of the WAP rather than the "enforcement" of the WAP.  In *Amara*, the district court re-wrote plan terms; here, Plaintiffs do not request that this Court draft <u>any</u> new WAP provisions.  To the contrary, the relief Plaintiffs seek is for the Court to interpret the illegal WAP terms—*i.e.*, the WAP terms violating ERISA's vesting, funding, and trust requirements (Weinstein Decl., Ex. 20 ¶¶ 4.2, 4.3, 4.5, 5.10, and 8.2)—in concert with ERISA.  *See* Compl. ¶¶ 71-73.

*Amara* in no way abrogates a court's duty to interpret a plan's terms in light of statutory authority.  Indeed, the Supreme Court distinguished that well-established judicial practice from the district court's "reformation" of the plan at issue in *Amara*.  536 U.S. at 436 (specifically instructing courts to "look outside the plan's written language in deciding

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL – Page 8

YARMUTH WILSON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

what those terms are, *i.e.*, what the language means").  Here, Plaintiffs request no more than that the Court "look outside" the WAP's written language to ERISA itself to determine the benefits afforded by the WAP.  There is a long history of courts using Section 502(a)(1)(B) for that very purpose, including in the context of awarding relief to participants for harm caused by plan terms in violation of ERISA.  *See, e.g.*, *Daft v. Advest, Inc.*, No. 5:06-cv-1876, 2010 U.S. Dist. LEXIS 3152, at *8 (N.D. Ohio Jan. 15, 2010), *rev'd on other grounds* 658 F.3d 583 (6th Cir. 2011) (post-*Amara* decision describing district court's award of relief based on Section 502(a)(1)(B) without criticism; *see also West v. AK Steel Corp. Ret. Accumulation Pension Plan*, 484 F.3d 395, 405 (6th Cir. 2007) ("Although [Defendant] has a point that Section 502(a)(1)(B) offers redress only for the recovery of benefits, enforcement of rights, or clarification of rights to future benefits under the terms of the Plan, those terms must nevertheless comply with ERISA.").

RBC offers no basis for its expanded reading of *Amara*.  The relief Plaintiffs seek is wholly based on the Court's power to conform the inherently illegal WAP provisions to the statutory mandates and, as such, is "interpretation" and "enforcement," not "reformation." Moreover, even if Section 502(a)(1)(B) did not authorize such relief, that relief is authorized under Section 502(a)(3), as requested under Plaintiffs' Fourth Claim for "an injunction to prevent Defendants' further refusal to pay Plaintiffs all WAP benefits due under ERISA."  Compl. ¶ 89; *Amara*, 563 U.S. at 440; *see* Section B.3, *infra*.

### 2. Section 502(a)(2) Authorizes Plaintiffs To Seek Relief For RBC's Breach of Fiduciary Duties.

Plaintiffs also seek relief under Section 502(a)(2), which authorizes claims for breaches of fiduciary duties.  Specifically, Plaintiffs claim that Royal Bank of Canada and RBC Capital Markets (the "Fiduciary Defendants") breached their fiduciary duties by failing to operate the WAP for the exclusive benefit of its participants in violation of Section 403(c)(1), violating Section 203(a)'s vesting and non-forfeiture requirements, violating Section 402(b)(1)'s funding requirements, and violating Section 409(a)'s trust



1    requirement.  Compl. ¶¶ 75-86.  RBC does not contend that the Fiduciary Defendants did

2    not commit these breaches, but instead disputes Plaintiffs' ability to seek relief under

3    Section 502(a)(2) and also that the conduct upon which Plaintiffs' base their claim is

4    actionable under Section 502(a)(2).  RBC MSJ at 13.  Each of RBC's contentions fails.

5          As a threshold matter, the issues RBC raises regarding Plaintiffs' breach of fiduciary

6    duty claim cannot be determined until the question of whether the WAP is a top hat plan

7    has been resolved.  *Carrabba v. Tom Thumb Food & Drugs*, No. 4:96-CV-651, 1997 U.S.

8    Dist. LEXIS 21026, at *18 (N.D. Tex. Dec. 30, 1997) ("Because the top hat issue has not

9    been resolved, the court cannot rule as a matter of law that plaintiffs cannot prevail on their

10   claims for breach of fiduciary duty.").  Plaintiffs' sought-for relief depends upon a finding

11   that Defendants have failed to prove that the WAP is a top hat plan; thus, for the purposes

12   of this motion, the pertinent question is whether, assuming the WAP is <u>not</u> a top hat plan,

13   Section 502(a)(2) authorizes Plaintiffs' breach of fiduciary duty claims.

14         RBC's contention that its application of the plan terms "as written" cannot be the

15   basis for a breach of fiduciary duty (RBC MSJ at 13) fails where, as here, the plan contains

16   terms that contradict its fiduciary duties.  In fact, Section 404(a), governing fiduciary duties

17   under ERISA, provides that a fiduciary's obligations are to "discharge [their] duties with

18   respect to a plan solely in the interest of the participants and beneficiaries and…in

19   accordance with the documents and instruments governing the plan <u>insofar as such</u>

20   <u>documents and instruments are consistent with the provisions of [ERISA]</u>."  29 U.S.C. §

21   1104(a)(1)(D) (emphasis added).  As such, "a trustee may not hide behind the terms of the

22   trust documents to protect himself from liability where there is an 'inherent inconsistency'

23   between a provision in a plan document and a fiduciary duty expressed elsewhere in

24   ERISA."  *Cement & Concrete Workers Dist. Council Pension Fund v. Ulico Cas. Co.*, 387

25   F. Supp. 2d 175, 184 (E.D.N.Y. 2005); *see also Agway, Inc. Emps.' 401(k) Thrift Inv. Plan.*

26   *v. Magnuson*, No. 5:03-cv-1060, 2006 U.S. Dist. LEXIS 74670, at *74-75 (N.D.N.Y. Jul.

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL – Page 10

YARMUTH WILSON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

1   13, 2006) ("Indeed, ERISA casts upon fiduciaries an affirmative, overriding obligation to

2   reject plan terms where those terms would require such imprudent actions in contravention

3   of the fiduciary duties imposed under ERISA.")  Here, the WAP terms identified in the

4   Complaint directly violate the Fiduciary Defendants' obligations to "discharge [their] duties

5   with respect to a plan solely in the interest of the participants and beneficiaries and for the

6   exclusive purpose of providing benefits to participants and their beneficiaries."  29 U.S.C. §

7   1104(a)(1)(A)(i).  Thus, RBC's attempt to "hide behind" the WAP terms fails.

8        RBC also contends that Plaintiffs' claim under Section 502(a)(2) does not implicate

9   fiduciary duties or name a fiduciary defendant, despite that Plaintiffs' allegations adhere to

10  ERISA's statutory definition of fiduciary duties.  ERISA defines a fiduciary as anyone who

11  "exercises any discretionary authority or discretionary control respecting management of

12  such plan or exercises any authority or control respecting management or disposition of its

13  assets."  29 U.S.C. § 1002(21)(A)(i).  The Ninth Circuit has directed that ERISA's

14  definition of fiduciary duties should be liberally construed, and cautioned that "ERISA

15  defines 'fiduciary' not in terms of formal trusteeship, but in <u>functional</u> terms of control and

16  authority over the plan."  *Thomas, Head & Greisen Emps. Trust v. Buster*, 24 F.3d 1114,

17  1117 (9th Cir. 1994); *Johnson v. Couturier*, 572 F.3d 1067, 1076 (9th Cir. 2009).[8]

18       RBC provides no authority to support its contention that the alleged fiduciary

19  breaches, *see* Compl. ¶¶ 75-86, should be classified as non-fiduciary.  *Hughes Aircraft Co.*

20  *v. Jacobson* concerns amending plans and, in fact, specifically draws a distinction between

21  the non-fiduciary act of amending a pension plan to change eligibility requirements and the

22  fiduciary act of administrating the plan's assets.  RBC MSJ at 14 (citing *Hughes*, 525 U.S.

23  432, 444 (1999)).  All of Plaintiffs' breach of fiduciary duty allegations relate to the

---

[8] RBC also improperly contends that the Fiduciary Defendants delegated their responsibilities over the WAP,
and thus they can avoid liability for breach of any fiduciary duties. RBC MSJ at 14 n.14 (citing WAP ¶ 7.1).
To be clear, Section 7.1 of the WAP Plan Document provides only that the Committee has the authority "to
make all determinations <u>provided for in the Plan</u>." Weinstein Decl., Ex. 20 § 7.1 (emphasis added).  Here,
Plaintiffs' claims under Section 502(a)(2) are not based on <u>following</u> WAP policies, but on <u>formulating</u> WAP
policies and failing to abide by ERISA when the WAP did not comply with that law.



1  Fiduciary Defendants' administrative and managerial conduct and disposition of assets in

2  violation of ERISA provisions and resulting in RBC's wrongful forfeiture of Plaintiffs'

3  benefits, and, as such, implicate fiduciary conduct under Section 502(a)(2).  *See, e.g.*,

4  *Thomas v. Bostwick*, No. 13-cv-02544-JCS, 2014 U.S. Dist. LEXIS 123524, at *15-17

5  (N.D. Cal. Sep. 3, 2014) ("breach of fiduciary duties…includes wrongful taking or transfer

6  of plan assets."); *see also In re Northrop Grumman Corp. ERISA Litig.*, No. CV-6-06213-

7  MMM, 2015 U.S. Dist. LEXIS 176822, at *115-23 (C.D. Cal. Nov. 24, 2015).

8       Lastly, RBC improperly portrays Plaintiffs as seeking individual damages outside

9  the scope of Section 502(a)(2).  RBC cites *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134,

10  142 (1985), which the Supreme Court has since held not to apply to defined contribution

11  plans, such as the WAP.  *See LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256

12  (2008).  In *LaRue*, the Supreme Court clarified that, for defined contribution plans,

13  "although § 502(a)(2) does not provide a remedy for individual injuries distinct from plan

14  injuries, that provision does authorize recovery for fiduciary breaches that impair the value

15  of plan assets in a participant's individual account." *Id.* at 256; *see, e.g.*, *Norris v. Mazzola*,

16  231 F. Supp. 3d 412, 431 (N.D. Cal. 2017) (Section 502(a)(2) authorized plaintiff's claims

17  to recover employer contributions that employer improperly retained rather than transferring

18  to plaintiff's individual account, thus reducing the benefits plaintiff was eligible to receive).

19  Nor does RBC provide any authority for its contention that Plaintiffs are unable to recover

20  damages because the WAP was improperly unfunded in violation of ERISA.  That absence

21  of funding is one of the breaches alleged.  RBC's logic is again circular, as this first requires

22  determination of whether the WAP was a top hat plan.  Here, under the authority of *LaRue*,

23  Plaintiffs' claim for breach of fiduciary duty seeks damages based on RBC's illegal

24  forfeiture of their benefits, which arose from their deferred compensation in the WAP.

25       **3.    Plaintiffs' Claims For Relief Are Authorized By Section 502(a)(3).**

26       Section 502(a)(3) is a "catchall provision that acts as a safety net, offering

YARMUTH WILSON PLLC

1    appropriate equitable relief for injuries caused by violations that [Section 502] does not

2    elsewhere adequately remedy," and, as such, plaintiffs may bring simultaneous claims

3    under Section 502(a)(3) and other subparts of Section 502.  *Moyle,* 823 F.3d at 959 (citing

4    *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996)).  Section 502(a)(3) authorizes civil actions

5    "to enjoin any act or practice which violates any provision of this title or the terms of the

6    plan, or to obtain other appropriate equitable relief to redress such violations or to enforce

7    any provisions of this title or the terms of the plan."  29 U.S.C. § 1132(a)(3).  Under Section

8    502(a)(3), Plaintiffs seek to enjoin RBC from failing to fully vest their contributions and to

9    prevent RBC from further refusing to pay all benefits due under ERISA.  Compl. ¶ 89.

10           Despite RBC's contrary claim, "[t]he fact that [] relief takes a monetary form does

11   not remove it from the category of equitable relief."  *Amara*, 563 U.S. at 441.  Indeed, as

12   explained by the Supreme Court in *Amara*, the "monetary remedy against a trustee" was

13   historically "exclusively equitable" and may be "appropriate equitable relief" under Section

14   502(a)(3) when "a breach of trust [is] committed by a fiduciary encompassing any violation

15   of a duty imposed upon that fiduciary."  *Id.* at 441-42.  For instance, in *Gabriel v. Alaska*

16   *Elec. Pension Fund*, the Ninth Circuit distinguished compensatory damages, which are

17   unavailable under Section 502(a)(3), from "restitution in <u>equity</u>" in the form of a plaintiff

18   seeking "money or property identified as belonging in good conscience to the plaintiff [that]

19   could clearly be traced to particular funds or property in the defendant's possession."  773

20   F.3d 945, 954-55 (9th Cir. 2014) (emphasis in original) (internal citation and quotation

21   omitted)[9]; *cf. Pender,* 788 F.3d at 365 (the remedy sought by Plaintiffs under Section

22   502(a)(3) was equitable because it consisted of the "profits generated using assets that

23   belonged to them" rather than generic damages).  Put simply, equitable remedies seek the

24   "<u>particular</u> funds or property in the defendant's possession," as opposed to damages

25

26   _____
     [9] The Ninth Circuit vacated the district court's pre-*Amara* ruling that the plaintiff in that case was not entitled
     to any form of appropriate equitable relief, remanding so that the district court could consider the availability
     of a "monetary remedy against a trustee."  773 F.3d at 949.



incurred merely as a result of harm caused by the defendant.  *Amara*, 563 U.S. at 439.

The relief Plaintiffs seek here is not generalized damages caused by RBC's illegal conduct, but specific compensation Plaintiffs **earned** that "belong[s] in good conscience" to them.  Plaintiffs' WAP contributions can be "clearly traced" to "particular funds" in RBC's possession, making the monetary relief sought by Plaintiffs "appropriate equitable relief" under Section 502(a)(3).[10]

The same reasoning applies to Plaintiffs' claim for a constructive trust "on the assets of any Defendant in the amount by which that Defendant was enriched at the expense of the WAP or any participant or beneficiary."  Compl., Prayer For Relief ¶ H.  Section 502(a)(3) authorizes a constructive trust precisely because, unlike in *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2012) (cited in RBC MSJ at 16), Plaintiffs are *not* akin to a "general creditor," but instead seek a constructive trust on the "particular funds" in RBC's possession that can be "clearly traced" to Plaintiffs' own forfeited WAP benefits.  *See Amara*, 563 U.S. at 439 (distinguishing *Great-West Life* from instances where plaintiffs seek "particular funds…in the defendant's possession").  Moreover, a constructive trust to hold the assets of an unfunded plan "is the logical way in which damages caused by a breach of fiduciary duty would be repaid to [an unfunded] plan."  *Tom Thumb Food & Drugs*, 1997 U.S. Dist. LEXIS 21026, at *18.  To deny a plan participant a constructive trust on the basis that the plan was <u>improperly unfunded in violation ERISA</u>, as RBC suggests, is circular and would frustrate Section 502(a)(3)'s civil enforcement purpose.  RBC has no authority for barring the equitable remedy of constructive trust on that basis.[11]

Furthermore, contrary to RBC's characterization, the relief Plaintiffs seek is not a

---

[10] *Mertens v. Hewitt Assocs.*, 508 U.S. 248 (1993) (RBC MSJ at 15) is inapposite because in that case the beneficiary sought punitive and extra-contractual damages against a nonfiduciary.  *Cf. Amara*, 563 U.S. at 442 ("the fact that the defendant in this case, unlike the defendant in *Mertens*, is analogous to a trustee makes a critical difference").

[11] *Hill v. Opus Corp.*, 464 B.R. 361, 390-91 (C.D. Cal. 2011), and *In re Wash. Mut., Inc.*, 450 B.R. 490, 504 (D. Del. 2011) (RBC MSJ at 16), which discuss income deferral of plans found <u>to meet</u> top hat requirements in bankruptcy estates, have no bearing on Plaintiffs' claim for relief, which depends upon a finding that the WAP is <u>not</u> a top hat plan.



1    negative injunction, but an injunction against an affirmative act, *i.e.*, RBC's forfeiture of

2    Plaintiffs' benefits.  Even if Plaintiffs did seek a negative injunction, however such relief

3    has been specifically characterized by the Supreme Court as "obviously fall[ing] within

4    [the] category [of equitable relief]."  *Amara*, 563 U.S. at 440.  In an attempt to undermine

5    that clear authority, RBC draws an improper conclusion from *Gabriel*.  In that case, the

6    Ninth Circuit singled out negative injunctions that provide compensatory damages,

7    explaining that these specific types of relief were not available under Section 502(a)(3).

8    773 F.3d at 954-55 (noting "an injunction to compel the payment of money past due under a

9    contract, or specific performance of a past due monetary obligation, was not typically

10   available in equity").  Here, however, under their Section 502(a)(3) claim, Plaintiffs seek

11   injunctions providing equitable remedies, which are authorized under Section 502(a)(3).

12         Section 502(a)(3) also authorizes reformation of the WAP's illegal terms in

13   accordance with ERISA's statutory authority.  *Amara*, 563 U.S. at 440.  Section 502(a)(3)

14   specifically authorizes reformation "in order to remedy the false or misleading information

15   provided by a plan fiduciary," in the instance of "mistake or fraud."  *Gabriel*, 773 F.3d at

16   955 (citing *Amara*, 563 U.S. at 440).  As applicable here, a "mistake" is established through

17   "evidence that a mistake of fact or law affected the terms of a trust instrument [along with]

18   evidence of the settlor's true intent."  *Gabriel*, 773 F.3d at 955 (internal quotation omitted).

19   Fraud is established when "a party's assent to a contract was induced by the other party's

20   misrepresentations as to the terms or effect of the contract and he was justified in relying on

21   the other party's misrepresentations."  *Id.*

22         Once again, RBC employs a circular argument, claiming that Plaintiffs cannot

23   establish a "mistake" or "fraud" because the WAP's terms <u>do</u> reflect RBC's intent—to

24   create an unfunded top hat plan.  RBC MSJ at 17-18.  Assuming the WAP is not top hat,

25   however, as required to assess the availability of Plaintiffs' sought-for relief, one of these

26   conditions <u>must</u> be met—either RBC mistakenly believed that the WAP was a top hat plan

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL – Page 15

YARMUTH WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

and thus included terms (acceptable only for top hat plans) that violate ERISA, or RBC knew that the WAP was not a top hat plan and thus deceived participants by enforcing terms that violate ERISA.  In either case, Section 502(a)(3) authorizes reformation of the WAP in accordance with ERISA.

Moreover, RBC's conclusion that the equitable reformation remedy would necessarily take the form of "limit[ing] the WAP to an appropriately 'select' group" is fundamentally wrong-headed.  Without a shred of legal authority, RBC contends that the only practical type of WAP "reformation" would be the fundamental revamping of the WAP to retroactively exclude large numbers of WAP participants.  Shed of these participants, RBC posits the WAP would comply with top hat requirements.  RBC MSJ at 18.  But this effectively would compound one ERISA violation with another by illegally cutting back WAP benefits.[12]  RBC dismisses out of hand the most logical type of reformation, and one that RBC itself espoused in answering an "FAQ" regarding what would happen if the WAP were found not to qualify as a top hat plan: "all vested balances would be distributed to plan participants…"  Weinstein Opp'n Decl., Ex. 17.   In fact, courts have recognized that they should "place [participants] in basically the same financial position in which they would be if the employer had complied with the minimum requirements necessary for the [plan] to satisfy the accrual and vesting provisions of ERISA."  *Carrabba*, 145 F. Supp. 2d at 770-71 ("equity would be served" if the relief described would be granted to participants in plans purported to be top hat plans).

**C.     RBC Has Not Proved That Plaintiffs' Claims Were Untimely.**

Because ERISA does not provide a limitations period for Section 502(a)(1) or 502(a)(3) actions, federal courts borrow analogous state statutes of limitation.  *See, e.g., Wise v. Verizon Commc'ns. Inc.*, 600 F.3d 1180, 1184 (9th Cir. 2010).  Here, the analogous statute is RCW 4.16.040, providing a six-year limitations period for breach of contract.  *Id.*

---

[12] Not only would such action presumably spawn a multitude of legal claims by the affected WAP participants, but the logistics of this sort of mass-cutback seem insurmountable.



1  As for fiduciary duty claims brought under Section 502(a)(2), ERISA provides a three-year

2  statute of limitations.  29 U.S.C. § 1113.  The parties entered into tolling agreements

3  whereby Mr. Paul's claims would be considered "filed" on February 19, 2013, and Mr.

4  Buskirk's claims would be considered "filed" on November 5, 2013.  Weinstein Opp'n

5  Decl. ¶¶ 2-3.

6        Because the statute of limitations is an affirmative defense for which RBC bears the

7  burden of proof, RBC "must establish beyond peradventure all of the essential elements of

8  the defense to warrant judgment in its favor."  *Sender v. Franklin Res., Inc.*, 931 F. Supp.

9  2d 959, 979 (N.D. Cal. 2013) *rev'd and remanded on other grounds*, 606 F. App'x 379 (9th

10  Cir. 2015).  Here, RBC is estopped from asserting a statute of limitations affirmative

11  defense, and, even setting that aside, RBC has not met its burden of establishing the

12  "essential elements" of its statute of limitations affirmative defense.

13        **1.    RBC Is Estopped From Asserting A Statute Of Limitations Affirmative
                    Defense Because, Per The Mandatory Procedure Set Forth In The
14                  WAP, Plaintiffs Were Not Permitted To File Suit Earlier.**

15        The language of the WAP Plan Documents is clear:

16        No action at law or in equity may be brought to recover benefits or otherwise
          enforce the provisions of the Plan unless the Participant or beneficiary has
17        exhausted all remedies under this SECTION 7.  Any action brought after exhaustion
          of such remedies must be brought within ninety (90) days after the Participant or
18        beneficiary has received final notice of an Adverse Benefit Determination under
          Section 7.4.
19

20  Weinstein Opp'n Decl., Ex. 3 ¶ 7.5.  Section 7 provides for exhaustive internal claim

21  procedures, including making a claim within 90 days of when the participant knew or

22  should have known of his claim for benefits and, if an Adverse Benefit Determination is

23  received, requesting review of a denied claim within 60 days of receipt of the Adverse

24  Benefit Determination.  *Id.* ¶¶ 7.2-7.4.

25        After Plaintiffs first learned of RBC's forfeiture of their WAP benefits on March 15,

26  2012, and November 30, 2012, respectively, Plaintiffs followed RBC's proscribed internal

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL – Page 17

YARMUTH WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

review procedures, as detailed in Section 7 of the WAP.  Weinstein Opp'n Decl., Exs. 4, 5.[13]  Then, upon RBC's rejection of their appeals on December 14, 2012, and September 11, 2013, respectively, when Plaintiffs had "exhausted all remedies" as required under Section 7, Plaintiffs timely brought legal actions within the 90 days proscribed by Section 7.5.  Compl. ¶ 45 n.1; Weinstein Opp'n Decl. ¶¶ 2-3.  Because Plaintiffs were not permitted to bring claims until <u>after</u> their exhaustion of remedies under Section 7 per the express terms of the WAP, RBC is estopped from now asserting a statute of limitations affirmative defense.  *See Lamantia v. Voluntary Plan Adm'rs, Inc.*, 401 F.3d 1114, 1119 (9th Cir. 2005) (applying the "general rule" that "a defendant will be estopped from setting up a statute-of-limitations defense when its own prior representations or conduct have caused the plaintiff to run afoul of the statute" when claimant abided internal ERISA benefits appeal process).

**2.      RBC Has Not Proved That Plaintiffs' Benefits Claims Were Actually Denied or That Plaintiffs Had Reason To Know Their Benefits Claims Were Denied Before December 14, 2012 And September 11, 2013, Respectively.**

Under Ninth Circuit law, "an ERISA cause of action accrues either at the time benefits are actually denied or when the [claimant] has reason to know that the claim has been denied." *Chuck v. Hewlett Packard Co.*, 455 F.3d 1026, 1031 (9th Cir. 2006).  "A claimant has a 'reason to know'…when the plan communicates a clear and continuing repudiation of a claimant's rights under a plan such that the claimant could not have reasonably believed but that his or her benefits had been finally denied." *Wise*, 600 F.3d at 1188.  As explained in *Bond v. Marriott Int'l, Inc.*, the case upon which RBC principally

---

[13]Mr. Paul received the letter notifying him of his WAP benefits forfeiture on March 15, 2012.  Weinstein Opp'n Decl., Ex. 4.  Mr. Paul sent RBC a benefits demand letter on April 20, 2012 (*id.*, Ex. 7), and on July 19, 2012, RBC denied Mr. Paul's claim for benefits (*id.*, Ex. 8).  Then, on August 16, 2012, Mr. Paul appealed the claim denial (*id.*, Ex. 9), and RBC rejected Mr. Paul's appeal on December 14, 2012 (*id.*, Ex. 10).  Mr. Paul brought suit approximately two months later, on February 19, 2013.  Compl. ¶ 45 n.1.  Mr. Buskirk learned of his WAP benefits forfeiture when the forfeiture posted to his account on November 30, 2012.  Weinstein Opp'n Decl., Ex. 5.  Mr. Buskirk sent RBC a benefits demand letter on January 22, 2013 (*id.*, Ex. 11), and on April 19, 2013, RBC denied Mr. Buskirk's claim for benefits (*id.*, Ex. 12).  Then, on May 13, 2013, Mr. Buskirk appealed the claim denial (*id.*, Ex. 13), which RBC rejected on September 11, 2013 (*id.*, Ex. 14).  Mr. Buskirk entered into a tolling agreement two months later, on November 5, 2013.  *Id.* ¶ 3.

YARMUTH WILSON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1    relies, "the 'formal denial' rule is generally applied in ERISA cases…[but for] limited

2    circumstances [when] the rule is impractical to use."  637 Fed. App'x 726, 731 (4th Cir.

3    2016) (cited in RBC MSJ at 20).  "To hold otherwise would require lay participants and

4    beneficiaries to be constantly alert for errors or abuses that might give rise to a claim and

5    start the statute of limitations running."  *Rodriguez v. MEBA Pension Trust*, 872 F.2d 69, 72

6    (4th Cir. 1989).

7             "Actual claim denials" under the first prong of the claim accrual test are

8    communications directed to the individual claimant stating a definitive denial of a <u>specific

9    claim for benefits</u>, and not plan provisions or other company-wide policy statements

10   regarding participants' benefits more generally.  *See, e.g., Goodes v. Pac. Gas & Elec. Co.*,

11   598 Fed. App'x 516, 517 (9th Cir. 2015) (claimant had "reason to know" of final claim

12   denial, at the earliest, as of plan administrator's letter stating the final benefit amount he

13   would receive and that benefit payments would end); *Wise*, 600 F.3d at 1188 (claim accrual

14   began when claimant received her fourth and final denial-of-claim notice); *Wetzel v. Lou

15   Ehlers Cadillac Group Long Term Disability Ins. Program*, 222 F.3d 643, 650 (9th Cir.

16   2000) (claim accrual did <u>not</u> begin on date claimant received letter from plan administrator

17   that both stated the decision to limit benefits and invited claimant to furnish further

18   information; instead, claim accrual began when claimant received letter stating that claim

19   had been denied and no further benefits would be paid).

20           The second prong of the claim accrual test—when the claimant "has reason to know

21   that the claim has been denied,"—is used only when the "actual denial" rule is

22   "impractical," such as when claimants did not participate in an internal claims process or

23   when they received information from their plan administrator about their specific benefits

24   outside of the formal claims process.  *See, e.g., Chuck*, 455 F.3d at 1033 (where plan

25   administrator did not set up internal claim process, claim accrued at time when plan

26

YARMUTH WILSON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

administrator sent letters denying claimant's benefits).[14]  If, as here, an internal claims procedure exists and the plan administrator clearly communicates to a claimant the denial of benefits with that procedure, a claim denial letter fulfills both prongs of the claim accrual test.  *See, e.g.*, *Wise*, 600 F.3d at 1188 ("The fourth letter triggered [claimant's] ERISA claim because only after receiving this letter was she informed that no further internal appeals were possible and that her opportunity to submit more medical documental had ceased."); *Wetzel*, 222 F.3d at 650 (claim denial letter was "the clear rejection" of claimant's claim); *Gordon v. Deloitte & Touche, LLP*, No. 11-CV-00912, 2011 U.S. Dist. LEXIS 150371, at *14-15 (C.D. Cal. Dec. 28, 2011) (claim denial letter "explain[ing] that there were no additional benefits available" after a certain date constituted a "clear and continuing repudiation of Plaintiff's claims" as of that date).

Pursuant to RBC's internal review process, RBC formally denied Mr. Paul's appeal of his benefits denial on December 14, 2012, and formally denied Mr. Buskirk's appeal September 11, 2013. Weinstein Opp'n Decl., Exs. 10, 14.  RBC's appeal denials are "actual denials" of Plaintiffs' benefits and RBC's "clear repudiation" of rights under the claim accrual rule.  Indeed, as in *Wise*, these denial letters even contained clear language that the internal claim process was over and informed Plaintiffs, for the first time, that they were entitled to pursue a civil action under ERISA Section 502(a).  *Cf. Wise*, 600 F.3d at 1188.

There is no evidence to suggest (much less <u>prove</u>, as is RBC's burden) that the "actual denial" rule is "impractical" here and that some event other than Plaintiffs' receipt of the appeal denial letters constituted RBC's "clear repudiation" of Plaintiffs' rights. Indeed, Mr. Paul testified that, until he received the March 15, 2012 letter stating that certain WAP contributions would be forfeited, he had "never thought [his WAP

---

[14] *See also Bond*, 637 Fed. App'x at 732 (applying "clear repudiation" rule when claimant did not participate in an internal claims process and thus did not receive "formal" claim denial letter); *Carey v. IBEW Local 363 Pension Plan*, 201 F.3d 44, 45-50 (2d Cir. 1999) (claim accrued on plan administrator's denial of claimant's application for benefits, which pre-dated claim that benefits had been wrongfully withheld); *Miller*, 475 F.3d at 522 (complainant's receipt of erroneously-calculated benefits served as "clear repudiation" of his rights in the absence of his failure to make an internal claim regarding benefits) (cited in RBC MSJ at 19-20).



contributions] were at risk of being withheld," and that the March 15, 2012 letter "caught [him] completely by surprise." Paul Dep. at 44:25-45:7.[15] Mr. Paul also testified that he did not recall reading any documents describing the WAP, and did not have an understanding of the WAP's vesting provisions. Paul Dep. at 40:19-25; 42:22-43:6. Put simply, there is no evidence in the record that Mr. Paul had reason to know his benefits were denied prior to March 15, 2012, let alone prior to February 19, 2007, as would be required for RBC to succeed on its statute of limitations affirmative defense.

Mr. Buskirk's testimony that he received certain WAP documents and had a general expectation that he would lose certain contributions upon termination is legally insufficient to establish that RBC issued a "clear and continuing repudiation" of his rights for multiple reasons. RBC MSJ at 20 and n.22. First, Mr. Buskirk's testimony does not specify when he gained a general awareness that WAP contributions could be forfeited, and thus does not establish that he had reason to know his benefits were "actually denied" prior to November 5, 2007, as would be required for RBC to succeed on its statute of limitations affirmative defense. Buskirk Dep. at 104:17-20; 137:7-18; 138:9-139:4.[16] Moreover, even if his testimony was sufficiently specific as to the date of his knowledge, Mr. Buskirk's general awareness of certain WAP terms does not prove that he had reason to know the forfeiture was a repudiation of benefits to which he was entitled unless he also knew that the WAP was not a top hat plan. *Cf. Fenwick v. Merrill Lynch & Co.*, 570 F. Supp. 2d 366, 372 (D. Conn. 2008) ("[P]laintiffs had no notice that the terms of the AE Plan repudiated their entitlement to accrued benefits because they had no knowledge of…whether the Plan was subject to ERISA."). It is undisputed that neither Plaintiff knew that the WAP was not a top

---

[15] Relevant excerpts from the deposition of Marty Paul are attached as Exhibit 15 to the Weinstein Opp'n Declaration. In fact, Mr. Paul testified repeatedly that, before receiving the March 15, 2012 letter, he was not aware he could forfeit contributions, even if he was terminated for cause. Paul Dep. at 43:25-44:13; 140:7-25; 160:16-23; 184:11-15; 202:16-21. RBC's statement that "plaintiffs' testimony confirms they understood how the WAP operated" is patently false with respect to Mr. Paul. RBC MSJ at 20.

[16] Relevant excerpts from the deposition of Brian Buskirk are attached as Exhibit 16 to the Weinstein Opp'n Declaration. This testimony falls well short of establishing that Mr. Buskirk "understood how the WAP operated," as RBC claims. RBC MSJ at 20.



1    hat plan, nor does RBC even suggest that Plaintiffs "had reason to know" of that fact.[17]

2         RBC has not met its burden to prove that Plaintiffs' claims were actually denied or

3    that they had reason to know those claims were denied outside the limitations period.

4        **3.    RBC Has Not Proved That Plaintiffs Had Actual Knowledge Of RBC's Breach Because Plaintiffs Did Not Know The WAP Was Not A Top Hat Plan.**

6         The three-year statute of limitations for claims brought under Section 502(a)(2)

7    requires a two-step analysis: "first, when did the alleged 'breach or violation' occur; and

8    second, when did [the plaintiff] have 'actual knowledge' of the breach or violation?"

9    *Ziegler v. Conn. Gen. Life Ins. Co.*, 916 F.2d 548, 550-51 (9th Cir. 1990).

10        Here, as described above (*see* Section B.2, *supra*), Plaintiffs have alleged that RBC

11   breached its fiduciary duties by failing to operate the WAP, which is not a top hat plan, in

12   compliance with ERISA.  Because the WAP terms are not inherently in violation of ERISA,

13   Plaintiffs' breach of fiduciary duty did not automatically occur when the WAP was enacted,

14   as RBC contends.  RBC MSJ at 21 (citing *Ziegler*, 916 F.2d at 551 (plan administrator

15   breached its fiduciary duties upon execution of an agreement that contained a term that,

16   without any preconditions, would result in harm in plaintiffs)); *see also M & R Inc. Co. v.*

17   *Fitzsimmons*, 685 F.2d 283 (9th Cir. 1982) (breach of fiduciary duty under ERISA occurred

18   at time of agreement creation because agreement contained transaction prohibited by

19   ERISA).  Instead, the breach happened here only when <u>two</u> events occurred: (1) the WAP

20   became non-compliant with the top hat exemption, and (2) RBC enforced WAP terms in

21   violation of ERISA.

22        The "actual knowledge" standard "is not satisfied by knowledge that the fiduciary

23   acted but, rather, requires knowledge of the breach of duty."  *Moyle,* 2016 U.S. Dist. LEXIS

---

[17] Nor is there a policy reason to look beyond RBC's "formal" claim denials here, considering Plaintiffs brought suit (or, in the case of Mr. Buskirk, entered a tolling agreement with RBC) merely <u>two months</u> after receiving the "formal" claim denials.  Compl. ¶ 45 n.1; Weinstein Opp'n Decl. ¶¶ 2-3; *cf. Chuck*, 455 F.3d at 1033-36 (applying "clear repudiation" rule where claimant brought ERISA claim eleven years after he received his final benefit payment); *Miller*, 475 F.3d at 522-23 (applying "clear repudiation" rule where claimant failed to investigate his benefit payments for fifteen years).



174432, at *27 (cited in RBC MSJ at 21).[18]  Although a plaintiff need not have "actual knowledge to establish a cognizable ERISA claim," he must have "knowledge of the facts underlying the alleged violation" and "knowledge of the negative consequences of these facts."  *Id*. at *35-36.  The inquiry into "actual knowledge" is "entirely factual, requiring examination of the record."  *Ziegler*, 916 F.2d at 552.

As the Ninth Circuit explained in *Spragg v. Pacific Telesis Group*, "[d]isclosure of a transaction that is not inherently a statutory breach of fiduciary duty cannot communicate the existence of an underlying breach.  [Only] once an individual has actual knowledge of the act that constitutes the breach and knows the harmful effect of the act, a cause of action for breach of fiduciary action accrues."  No. 97-15541, 1999 U.S. App. LEXIS 1304, at *8 (9th Cir., Jan. 27, 1999) (internal quotations and citations omitted).  Here, RBC must prove that prior to February 19, 2010 (for Mr. Paul) and prior to November 5, 2010 (for Mr. Buskirk), Plaintiffs had "actual knowledge of the act that constitutes the breach"—*i.e.*, the WAP's noncompliance with top hat standards—as well as the "harmful effect of the act," *i.e.*, RBC's wrongful withholding of benefits.

Mr. Paul's testimony that he did not recall reading the WAP or descriptions of it and both Plaintiffs' testimony that they lacked understanding of certain WAP terms implicated by Plaintiffs' breach claim shows that Plaintiffs did <u>not</u> have "actual knowledge" that the WAP was not top hat.  Paul Dep. at 40:19-25; 42:22-43:6 (Mr. Paul lacked an understanding of the vesting term); Buskirk Dep. at 99:23-100:5 (Mr. Buskirk lacked an understanding of the funding term).  Further, given that the WAP's top hat status is so legally and factually complex that both parties have brought in experts to analyze the issue, and considering RBC to date maintains the WAP <u>does</u> meet top hat standards, it is absurd

---

[18] *Tibble v. Edison Int'l*, 843 F.3d 1187, 1196 (9th Cir. 2016) (cited in RBC MSJ at 21) relates to the "actual knowledge" standard when a plaintiff has alleged "a series of discrete but related breaches," finding that in such cases, the limitations period "does not begin anew with each related breach."  Here, each subpart of Plaintiffs' breach of fiduciary claim relies on the same factual premise—that RBC enforced WAP terms in violation of ERISA—and it is Plaintiffs' "actual knowledge" of that factual premise that is at issue.

YARMUTH WILSON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1  for RBC to contend Plaintiffs had "actual knowledge" of the WAP's failed top hat status in

2  2010.

3       In addition, "actual knowledge" of a plan administrator's breach must be premised

4  on a claimant's receipt of representations about his individual benefits, not merely a belief

5  regarding a general impact on all participants' benefits.  For instance, in *Moyle* (cited in

6  RBC MSJ at 21-22), determination of when a plaintiff had "actual knowledge" of his

7  employer's breach of fiduciary duty focused on the date the plan administrator informed

8  him that he was not entitled to certain retirement benefits, as a result of which the plaintiff

9  contacted his attorney, all of which evidenced the plaintiff's "actual knowledge" of the facts

10  to establish a cognizable legal claim and the detrimental effect it would have on him.

11  *Moyle*, 2016 U.S. Dist. LEXIS 174432, at *35-36; *see also Ziegler*, 916 F.2d at 552

12  (plaintiff had "actual knowledge" of breach based on employer "unequivocally and

13  specifically inform[ing] [plaintiff]" in response to plaintiff's inquiry to employer that a

14  specific contractual term would detrimentally affect his pension benefits).  In contrast, the

15  *Moyle* Court recognized that another plaintiff, who had learned from other participants that

16  the plan generally was not providing certain pension benefits to participants, did <u>not</u> have

17  "actual knowledge" of her plan administrator's breach until she herself retired and was

18  informed by the plan administrator that "her specific benefits" would be impacted.  *Id.* at

19  *37-38.  Here, even setting aside that Plaintiffs had no "actual knowledge" that the WAP

20  was not a top hat plan, Plaintiffs could not have had "actual knowledge" of RBC's breach

21  of fiduciary duty until they were informed of the detrimental effect RBC's breach would

22  have on them, *i.e.*, RBC's forfeiture of their WAP benefits, on March 15, 2012, and

23  November 30, 2012, respectively.

24                            * * *

25       For the reasons set forth above, this Court should deny Defendants' Motion for

26  Summary Judgment.

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL – Page 24



YARMUTH WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1

Dated:  February 2, 2018.          **YARMUTH WILSDON PLLC**

2

By: *s/Jeremy E. Roller*

3

Jeremy E. Roller, WSBA No. 32021

Elizabeth Weinstein, WSBA No. 45763

4

1420 Fifth Avenue, Suite 1400

Seattle, WA 98101

5

Phone:  206.516.3800

6

Fax:  206.516.3888

Email: jroller@yarmuth.com

7

eweinstein@yarmuth.com

8

*Attorneys for Plaintiffs Marty Paul and*

*Brian Buskirk*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL – Page 25

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on this date, I electronically filed the foregoing document with

3    the Clerk of the Court using the CM/ECF system, which will send notification of such filing

4    to the following:

5    **PERKINS COIE LLP**

6    Kevin J. Hamilton
     William B. Stafford
7    1201 Third Avenue, Suite 4900
     Seattle, WA 98101-3099
8    Email: khamilton@perkinscoie.com
              wstafford@perkinscoie.com
9

10   **MORGAN, LEWIS & BOCKIUS LLP**
     Sari M. Alamuddin, *pro hac vice*
11   Christopher J. Boran, *pro hac vice*
     Matthew A. Russell, *pro hac vice*
12   77 West Wacker Drive, Fifth Floor
     Chicago, IL 60601
13   Email: sari.alamuddin@morganlewis.com
              christopher.boran@morganlewis.com
14            matthew.russell@morganlewis.com

15
     *Attorneys for Defendants RBC Capital*
16   *Markets, LLC, Royal Bank of Canada, and*
     *Royal Bank of Canada US Wealth*
17   *Accumulation Plan*

18
           I declare under penalty of perjury under the laws of the State of Washington that the
19
     foregoing is true and correct.
20

21         Dated:  February 2, 2018 at Seattle, Washington.

22                                             *s/Sue Stephens*_____
                                               Sue Stephens, Legal Assistant
23

24

25

26

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL – Page 26