UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MARTY PAUL, an individual; and
BRIAN BUSKIRK, an individual,

        Plaintiffs,

    v.

RBC CAPITAL MARKETS, LLC, a
Minnesota limited liability company;
ROYAL BANK OF CANADA, a
Canadian corporation; and ROYAL
BANK OF CANADA US WEALTH
ACCUMULATION PLAN, an employee
benefit plan,

        Defendants.

No. 3:16-cv-05616-RBL

**DECLARATION OF ELIZABETH S.
WEINSTEIN IN OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

NOTE ON MOTION CALENDAR:
February 2, 2018

**ORAL ARGUMENT REQUESTED**

I, ELIZABETH S. WEINSTEIN, declare as follows:

1.    I am one of the attorneys representing Plaintiffs Marty Paul and Brian

Buskirk in this action.  I make this declaration based on my personal knowledge and on

records maintained by my firm with respect to the above-captioned matter.

2.    On February 19, 2013, Mr. Paul filed a complaint alleging substantially the

same claims against Defendants as alleged in the Complaint (Dkt. No. 1).  *See Paul v. RBC*

*Capital Markets LLC, et al.*, No. 3:13-cv-05119-RBL (W.D. Wash.).  In early May 2013,

Mr. Paul and Defendants agreed to enter a tolling agreement for Mr. Paul's claims against

DECLARATION OF ELIZABETH S. WEINSTEIN IN
OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL – Page 1

YARMUTH WILSDON PLLC
1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

Defendants, tolling the limitations period beginning on February 19, 2013, pending certain developments in a purported class action lawsuit in the Southern District of Texas captioned *Tolbert v. RBC Capital Markets LLC, et al.*, No. 4:11-cv-00107 (S.D. Tex.). Per that agreement, Mr. Paul voluntarily dismissed his claims against Defendants without prejudice. That tolling agreement was subsequently amended and extended.

3.      Following Mr. Buskirk's exhaustion of administrative remedies under the WAP, Mr. Buskirk and Defendants agreed to enter a tolling agreement for Mr. Buskirk's claims against Defendants, tolling the limitations period beginning on November 5, 2013, pending certain developments in *Tolbert v. RBC Capital Markets LLC, et al.*, No. 4:11-cv-00107 (S.D. Tex.). That tolling agreement was subsequently amended and extended.

4.      Attached hereto as **Exhibit 1** are true and correct copies of excerpts from the deposition of Daniel M. Garrett, Ph.D. taken on December 8, 2017.

5.      Attached hereto as **Exhibit 2** are true and correct copies of excerpts from the deposition of Gabriela Sikich taken on August 28, 2009 in *Benhayon v. Royal Bank of Canada, et al.*, Case No. CV08-06090 FMC, (C.D. Cal.). This deposition transcript was produced in this matter by Defendants as RBC-PAUL000010652-65. Per agreement from counsel, this document has been de-designated from Confidential.

6.      Attached hereto as **Exhibit 3** is a true and correct copy of the Amended and Restated Royal Bank of Canada US Wealth Accumulation Plan and Prospectus dated November 1, 2009. This document was produced in this matter by Defendants as RBC-PAUL000003138-59. Per agreement from counsel, this document has been de-designated from Confidential.

7.      Attached hereto as **Exhibit 4** is a true and correct copy of a letter from Gabriela Sikich to Marty Paul dated March 15, 2012. This document was produced in this matter as RBC-PAUL000003952. Per agreement from counsel, this document has been de-designated from Confidential.

YARMUTH WILSON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

8.  Attached hereto as **Exhibit 5** is a true and correct copy of a Retirement Savings Statement for Brian Buskirk dated January 1, 2012 – December 31, 2012. This document was produced in this matter by Defendants as RBC-PAUL000004613-32. Per agreement from counsel, this document has been de-designated from Confidential.

9.  Attached hereto as **Exhibit 7** is a true and correct copy of a letter from Jeffrey Curnutt (Thorson Barnett & McDonald, P.C.) to Lisa Sorensen (RBC) dated April 20, 2012. This document was produced in this matter by Defendants as RBC-PAUL000000597-98. Per agreement from counsel, this document has been de-designated from Confidential.

10.  Attached hereto as **Exhibit 8** is a true and correct copy of a letter from Todd Schnell (RBC) to Jeffrey Curnutt (Thorson Barnett & McDonald, P.C.) dated July 19, 2012. This document was produced in this matter by Defendants as RBC-PAUL000000600-01. Per agreement from counsel, this document has been de-designated from Confidential.

11.  Attached hereto as **Exhibit 9** is a true and correct copy of a letter from Jeffrey Cornutt (Thorson Barnett & McDonald, P.C.) to Todd Schnell (RBC) dated August 16, 2012. This document was produced in this matter by Defendants as RBC-PAUL000000602-03. Per agreement from counsel, this document has been de-designated from Confidential.

12.  Attached hereto as **Exhibit 10** is a true and correct copy of a letter from Todd Schnell (RBC) to Jeffrey Curnutt (Thorson Barnett & McDonald, P.C.) dated December 14, 2012. This document was produced in this matter by Defendants as RBC-PAUL000000571-73. Per agreement from counsel, this document has been de-designated from Confidential.

13.  Attached hereto as **Exhibit 11** is a true and correct copy of a letter from Jeffrey Cornutt (Thorson Barnett & McDonald, P.C.) to Kristen Kimmell (RBC) dated January 22, 2013. This document was produced in this matter by Defendants as RBC-

YARMUTH WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

PAUL000003989-90.  Per agreement from counsel, this document has been de-designated from Confidential.

14.     Attached hereto as **Exhibit 12** is a true and correct copy of a memorandum from Todd Schnell (RBC) to the RBC USA WAP Committee dated April 19, 2013.  This document was produced in this matter by Defendants as RBC-PAUL000000327-28.  Per agreement from counsel, this document has been de-designated from Confidential.

15.     Attached hereto as **Exhibit 13** is a true and correct copy of a letter from Jeffrey Curnutt (Thorson Barnett & McDonald, P.C.) to Todd Schnell (RBC) dated May 13, 2013.  This document was produced in this matter by Defendants as RBC-PAUL000000325-26.  Per agreement from counsel, this document has been de-designated from Confidential.

16.     Attached hereto as **Exhibit 14** is a true and correct copy of a letter from Casey Jarchow (RBC) to Jeffrey Curnutt (Thorson Barnett & McDonald, P.C.) dated September 11, 2013.  This document was produced in this matter by Defendants as RBC-PAUL000000329-30.  Per agreement from counsel, this document has been de-designated from Confidential.

17.     Attached hereto as **Exhibit 15** are true and correct copies of excerpts from the deposition of Marty Paul taken on April 27, 2017.

18.     Attached hereto as **Exhibit 16** are true and correct copies of excerpts from the deposition of Brian Buskirk taken on April 28, 2017.

19.     Attached hereto as **Exhibit 17** is a true and correct copy of an "FAQ" document describing top hat plans marked as Exhibit 36 to the deposition of Gabriela Sikich.  This document was produced in this matter by Defendants as RBC-PAUL000010766-68.  Per agreement from counsel, this document has been de-designated from Confidential.

DECLARATION OF ELIZABETH S. WEINSTEIN IN
OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL – Page 4

YARMUTH WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

20.     Attached hereto as **Exhibit 18** is a true and correct copy of the Declaration of Gabriela Sikich in Support of Defendants' Motion for Summary Judgment as to Plaintiff Kennedy's Claims dated June 23, 2009 in *In Re RBC Dain Rauscher Overtime Litigation*, No. 2:08-cv-06090-FMC-AGR (D. Minn). This document was produced in this matter by Defendants as RBC 001420-23. Per agreement from counsel, this document has been de-designated from Confidential.

21.     Attached hereto as **Exhibit 19** is a true and correct copy of a Memorandum of Law in Support of Motion for Summary Judgment as to Plaintiff Kennedy's Claims filed on July 14, 2009 in *In Re RBC Dain Rauscher Overtime Litigation,* No. 2:08-cv-06090-FMC-AGR (D. Minn). This document was produced in this matter by Defendants as RBC 001604-18. Per agreement from counsel, this document has been de-designated from Confidential.

22.     Attached hereto as **Exhibit 20** is a true and correct copy of Defendants' Supplemental Reply Brief Regarding Plaintiff's Claim for Benefits Under the Royal Bank of Canada US Wealth Accumulation Plan filed on September 28, 2009 in *In Re RBC Dain Rauscher Overtime Litigation*, No. 2:08-cv-06090-FMC-AGR (D. Minn). This document was produced in this matter by Defendants as RBC-PAUL000010744-58. Per agreement from counsel, this document has been de-designated from Confidential.

23.     Attached hereto as **Exhibit 21** is a true and correct copy of the Expert Report of Cathy M. Niden, Ph.D. dated December 2, 2011 from *Tolbert v. RBC Capital Markets Corp., et al.*, No. 4:11-CV-107 (S.D. Tex.). This document was produced in this matter by Defendants as RBC-PAUL000010379-445. Per agreement from counsel, this document has been de-designated from Confidential.

YARMUTH WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated:  February 2, 2018, at Seattle, Washington.


*s/Elizabeth S. Weinstein*
Elizabeth S. Weinstein

YARMUTH WILSDON PLLC

1420 FIFTH AVENUE, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

**PERKINS COIE LLP**
Kevin J. Hamilton
William B. Stafford
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Email: khamilton@perkinscoie.com
        wstafford@perkinscoie.com

**MORGAN, LEWIS & BOCKIUS LLP**
Sari M. Alamuddin*, pro hac  vice*
Christopher J. Boran, *pro hac vice*
Matthew A. Russell, *pro hac vice*
77 West Wacker Drive, Fifth Floor
Chicago, IL 60601
Email: sari.alamuddin@morganlewis.com
        christopher.boran@morganlewis.com
        matthew.russell@morganlewis.com

*Attorneys for Defendants RBC Capital Markets, LLC, Royal Bank of Canada, and Royal Bank of Canada US Wealth Accumulation Plan*

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Dated:  February 2, 2018 at Seattle, Washington.

*s/Sue Stephens*
_____
Sue Stephens, Legal Assistant

DECLARATION OF ELIZABETH S. WEINSTEIN IN
OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL – Page 7

714.01 sa253001 2/2/18



# EXHIBIT 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

--oOo--


MARTY PAUL, an individual; and      )
BRIAN BUSKIRK, an individual,       )    Case No.:
                                    )    3:16-cv-05616-RBL
         Plaintiffs,                )
                                    ) Volume I
    v.                              )
                                    )      Pages 1 - 160
RBC CAPITAL MARKETS, LLC, a         )
Minnesota limited liability         )
company; ROYAL BANK OF CANADA,      )
a Canadian Corporation; and         )
ROYAL BANK OF CANADA US WEALTH      )
ACCUMULATION PLAN, an employee      )
benefit plan,                       )
                                    )
         Defendants.                )
_____ )


DEPOSITION OF

DANIEL M. GARRETT, Ph.D.

Friday, December 8, 2017




Reported By:
KELLY NEWTON, CSR. NO. 13849
------------------------------------------------------------

 1   not generally include people terminated prior to the

 2   plan year.  That's my belief at the moment.

 3   BY MR. ROLLER:

 4   Q.       Do you know what you would need to do to confirm

 5   that belief?

 6   A.       Either I or one of my teammates would look at

 7   the data and verify that, check that.

 8   Q.       Going back to the body of the report, not the

 9   appendix, and directing your attention to paragraph 15,

10   my understanding is that paragraph 15 is telling us that

11   Exhibit 4A reflects the results of the calculation that

12   is described in paragraph 14 and then in the paragraphs

13   of the appendix we were just talking about; is that

14   correct?

15   A.       Yes, for the U.S. and Canadian workforce.

16   Q.       So, let's flip to Exhibit 4A, please.  So, just

17   to pick an example, in 2008, by your calculations, 3.4

18   percent of RBC's U.S. and Canadian workforce was

19   eligible to participate in the WAP; is that right?

20   A.       Yes.

21   Q.       Is there a particular date that the number was

22   3.4 percent?

23   A.       My 3.4 percent comes -- matches the process that

24   RBC used to determine eligibility.  So, it considers all

25   of the employees who were considered in the first stage

Paul, et ano. v. RBC Capital Markets, LLC, et al.                    Daniel M. Garrett, Ph.D.

Page 46

1    determined to be eligible or not roughly around November

2    1st and any employee subsequently hired during -- up to

3    the end of the plan year, all of whom -- about all of

4    whom the eligibility determination was reached and gives

5    that looking-backward assessment of the entire plan

6    year.

7    Q.      I don't think that answered my question.  Is

8    there a particular date where that 3.4 percent was the

9    percentage of the workforce that was eligible?

10   A.      There's not one day where that was the

11   percentage necessarily, but the percentages of the

12   accumulation, all the days during the determination

13   process.

14   Q.      With the data that you were provided by RBC or

15   RBC's counsel, would it be possible to calculate the

16   percentage of the workforce that was eligible on a

17   particular date?

18   A.      I think so, yes.

19   Q.      Did you do that?

20   A.      No.

21   Q.      Why didn't you do that?

22   A.      Because I think the relevant determination is

23   looking back, what was the fraction of the employees --

24   of all the employees considered for eligibility, what

25   fraction were granted eligibility.  And that's the

DECL. WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 11

Paul, et ano. v. RBC Capital Markets, LLC, et al.                    Daniel M. Garrett, Ph.D.

Page 47

1    process that RBC used, and I created a calculation that

2    quantified the outcome of that process.

3    Q.      So, is that kind of a number that it begins at

4    November 1 of T minus 1 and ends at December 31 of T?

5    A.      That's the range of the -- the time range of the

6    process, yes.

7    Q.      But there's no -- there's no one particular date

8    in that 14-month time range where the eligibility

9    percentage is what is listed on this Exhibit 4A?

10           MR. BORAN:  Objection.  Asked and answered.

11           THE WITNESS:  That's right.  My analysis is a

12    process analysis, not a single-date analysis.

13    BY MR. ROLLER:

14    Q.      Let's flip to paragraph 16 of the actual report,

15    and please correct me if I'm wrong, but my understanding

16    is what paragraph 16 is getting across is that Exhibit

17    4B reflects the percentage of the RBC U.S.-only

18    workforce that was eligible to participate in a given

19    plan year.

20    A.      Correct.

21    Q.      Let's turn to appendix 1.  I'm looking in

22    paragraphs 5 to 7, and I don't see a description of how

23    the calculation was made for U.S. employees only.

24           Am I missing something there?

25    A.      Maybe you're right.  Maybe it doesn't say

Page 48

1    distinctly how that's done.  But I can tell you, it was

2    just the same analysis, but not including the Canadian

3    employees.

4    Q.       Okay.  I figured that.  So, it basically would

5    be the same as the overall workforce number with the

6    exception of, in paragraph 6, you don't add the Canadian

7    employees for year T?

8    A.       That's correct.

9    Q.       Okay.  So, let's turn to Exhibit 4B.  And as

10   with the workforce that included the Canadian employees

11   -- as with the calculations that included the Canadian,

12   as an example, let's look at plan year 2008.

13            I'm reading this as your calculation of the RBC

14   U.S.-only employees who were eligible to participate in

15   the WAP for plan year 2008 was 16.7 percent; is that

16   right?

17   A.       Yes.

18   Q.       And from your answer on the Canadian employees,

19   I think I know the answer to this, but is there a

20   particular date in -- between November 1 of 2007 and

21   December 31 of 2008 where the actual ratio was 16.7

22   percent?

23   A.       There might not be, but I am calculating this

24   ratio over the range of time.  I considered all the

25   employees who were considered for WAP eligibility, so my

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 13

Paul, et ano. v. RBC Capital Markets, LLC, et al.                    Daniel M. Garrett, Ph.D.

Page 49

1    -- my analysis spans that 14-month range that we've been

2    talking about.

3    Q.        So, there might be a date where it's 16.7

4    percent, but that would be by happenstance?

5    A.        Yes.

6    Q.        And I don't believe the absence of Canadian

7    employees will change this answer, but I want to ask the

8    question again.

9             With the data you have, would it be possible to

10   calculate the percentage of RBC U.S.-only employees who

11   were eligible on a particular date?

12   A.        I believe so, yes.

13   Q.        And did you do that?

14   A.        No.

15   Q.        And why did you not do that?

16   A.        Because I thought the best way to think about

17   what fraction of RBC employees were WAP eligible would

18   be to follow the process, to mimic -- mirror the process

19   that RBC used, which was a two-stage process.  They make

20   an initial determination based on fiscal year T minus 1

21   and the salary, and they make that determination around

22   November 1st.  And then for any employees who enter the

23   workforce from that initial determination through the

24   end of the plan year, RBC also makes a WAP-eligibility

25   determination.

Paul, et ano. v. RBC Capital Markets, LLC, et al.                    Daniel M. Garrett, Ph.D.

Page 78

1    know as a fact, but I've seen employees whose -- I would

2    be not at all surprised if RBC had temporary employees.

3    BY MR. ROLLER:

4    Q.        In looking at the data for the years that are at

5    issue in this litigation, did you see anything to

6    indicate that RBC had temporary or short-term employees?

7    A.        Temporary or short-term, yes.

8    Q.        Do you know whether those short-term employees

9    typically earned more or less than long-term employees?

10   A.        Typically -- in a given year, they'd earn less

11   generally than a long-term employee because they were

12   only there part of the year.

13   Q.        Do you know if on a per-week or per-day basis

14   they would typically earn more or less?

15   A.        I can speculate, but I don't know.

16   Q.        Do you have the data for the years that are at

17   issue in this litigation to determine that?

18   A.        Certainly, for some employees, you would see in

19   the data a start date and a termination date that's

20   inside of a year, and you could look at their daily --

21   one could calculate their daily compensation.  I don't

22   know how many hours they worked, so they could be making

23   a generous salary per hour, but just working a few

24   hours.  You couldn't distinguish that.  But you can

25   certainly compare daily compensation for a partial-year

1    employee to daily compensation for other employees.

2          You would be missing -- there would be bonus

3    issues and stuff like that, too.

4    Q.      I'd like you to assume that temporary employees

5    are typically paid less on a per-unit-of-work basis than

6    long-term employees.

7    A.      Okay.

8    Q.      Would you agree that if that assumption is

9    correct, temporary employees would have a lower WAP

10   eligibility rate than long-term employees?

11   A.      Yes.

12   Q.      And if that is correct, would inclusion of

13   temporary employees who left during the course of the

14   year likely make the ratio lower than -- the eligibility

15   ratio lower than a ratio that looks only at employees

16   employed on a particular date?

17   A.      Well, the correct ratio is the one, so all the

18   employees considered for the -- for eligibility; and,

19   relative to that, ignoring the employees who are

20   temporary overstates the eligibility ratio.

21   Q.      I understand your position that you should look

22   over 14 months, but that's not -- that's not the

23   question I asked.

24          Understanding that's your position, would the

25   inclusion of -- and under the assumption that temporary

DECL. WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 16

Paul, et ano. v. RBC Capital Markets, LLC, et al.                    Daniel M. Garrett, Ph.D.

Page 80

1    employees earn less on a per-unit-of-work basis than

2    long-term employees and therefore have a lower WAP

3    eligibility rate, would including temporary employees

4    who left during the course of the year be likely to make

5    the ratio lower than one that looks only at employees

6    employed on a particular date?

7    A.        I'm going to give you exactly the right answer

8    in terms of the sign you want.  If you ignore the

9    temporary employees, you will over- -- you will inflate

10   the eligibility ratio.

11   Q.        But I'm talking about a temporary employee who

12   is employed as of a particular date.

13             So, you're saying that if you ignore temporary

14   employees when you look on a particular date, the ratio

15   will be higher?

16   A.        I would say that, but that's not what I did say.

17   Q.        In paragraph 11 of your rebuttal report, you

18   write that "In contrast to the Garrett report's

19   consideration of the entire process for determining WAP

20   eligibility each plan year, Solomon ignores RBC's actual

21   process and instead takes a one-day snapshot approach."

22             Do you see that?

23   A.        I do.

24   Q.        Tell me how the actual process relates to the

25   determination of the participation ratio.

1    that some employees of the Royal Bank of Canada

2    participated in the WAP.

3            So, that's the rationale with including Canada.

4    Q.      So, are you offering an opinion that the

5    Canadian employees should be considered in the

6    denominator?

7    A.      I understand that's a legal issue, and I'm not

8    offering a legal opinion.

9            MR. ROLLER:  I'm about to move on to the

10   compensation ratio, but given that it's noon, now might

11   be a good time for a break.

12           MR. BORAN:  Sound good to you, Dan?

13           THE WITNESS:  Yes.

14           (Lunch break taken in the proceedings.)

15           (Exhibit 5 was marked for identification.)

16   BY MR. ROLLER:

17   Q.      Dr. Garrett, welcome back from lunch.  Thank you

18   for coming back.  I want to move off the eligibility

19   ratio in just a moment, but I have one follow-up

20   question -- well, that's probably not true, I may have

21   more than one.

22           You've been handed what's been marked Exhibit 5,

23   which is Mr. Solomon's rebuttal report.

24           You've seen that before, correct?

25   A.      Yes.

Page 160

1    STATE OF CALIFORNIA     )
                             )  ss.
2    COUNTY OF ALAMEDA       )

3

4            I, the undersigned, duly qualified Certified

     Shorthand Reporter of the State of California, do hereby
5
     certify:
6
             That the witness in the foregoing deposition named
7
     was present at the time and place therein specified;
8
             That the said proceeding was taken before me as a
9
     Certified Shorthand Reporter at the said time and
10
     place, and was taken down in shorthand writing by me;
11
             That I am a Certified Shorthand Reporter of the
12
     State of California, that the said proceeding was
13
     thereafter transcribed by means of computer-aided
14
     transcription, and that the foregoing transcript
15
     constitutes a full, true and correct report of the
16
     proceedings which then took place;
17
             That I am a disinterested person to the said
18
     action.
19
             IN WITNESS WHEREOF, I have hereunto subscribed my
20
     hand this 20th day of December, 2017.
21

22
                             _____
23                           Kelly Newton, CSR No. 13849
24
25

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 19

# EXHIBIT 2

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In re | ) | |
| STEVEN BENHAYON, an Individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. CV08-06090 FMC |
| | ) | (AGRx) |
| ROYAL BANK OF CANADA, a | ) | |
| Canadian company, business form | ) | |
| unknown; RBC WEALTH MANAGEMENT | ) | |
| COMPANY, formerly RBC DAIN | ) | |
| RAUSCHER, INC., business form | ) | |
| unknown; THE ROYAL BANK OF | ) | |
| CANADA US WEALTH ACCUMULATION | ) | |
| PLAN, formerly known a RBC Dain | ) | |
| Rauscher Wealth Accumulation | ) | |
| Plan; and DOES 1 through 20, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

DEPOSITION OF RULE 30(B)(6) WITNESS

FOR ROYAL BANK OF CANADA

GABRIELA SIKICH

(Pages 1 through 135)

Taken on Friday, August 28, 2009, at 8:05 a.m.

Reported by:  Lisa Moskowitz
             CSR No. 10816, RPR, CLR

Plaintiff's Supp.
Exh. 22

CONFIDENTIAL

CONFIDENTIAL
RBC00002269

RBC-PAUL000010652

```
 1     Q.   Same question with regard to 2004.

 2     A.   300,000.

 3     Q.   Same question regarding 2005.

 4     A.   300,000.

 5     Q.   Same question regarding 2006.

 6     A.   300,000.

 7     Q.   '07.

 8     A.   300,000.

 9     Q.   '08.

10     A.   300,000.

11     Q.   And '09.

12     A.   300,000.

13     Q.   Okay.  Now, you've also indicated -- those are

14   the -- when looking at eligibility factors, you would

15   take into account the gross fiscal cash compensation for

16   the year as well as production levels; correct?

17     A.   Correct.

18     Q.   Would there be any other factors that you'd

19   take into consideration regarding eligibility?

20     A.   No, those are the only two.

21     Q.   Okay.  Now, you had talked about plan design.

22   Why don't we go a little bit into that.  As plan manager

23   what was your role in designing the plan in 2003, let's

24   say?  Well, let me strike that.

25          I'd like to ask generally what you mean by plan
```

                                                    32

CONFIDENTIAL
RBC00002300

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 22
CONFIDENTIAL

RBC-PAUL000010653

1    their fiscal year prior year production.

2       Q.  And the same is true of the highly-compensated

3    employees component of that?

4       MS. CLAXTON:  That is the fact with respect to

5    that component.

6    BY MR. SALCEDO:

7       Q.  Is that the sole factor in determining whether

8    a WAP participant is -- or WAP-eligible employee is a

9    member of a select group?

10       MS. CLAXTON:  I'm going to object it's asked

11    and answered.

12       THE WITNESS:  I'll take my attorney's advice.

13       MS. CLAXTON:  I'm not instructing you not to

14    answer.  I'm simply interposing that objection on the

15    record.

16       You can answer the question if you can.

17       THE WITNESS:  As I indicated earlier, there is

18    two tiers of determining whether or not they meet the

19    eligibility threshold, and one is based on production

20    and one is based on total cash compensation.

21    BY MR. SALCEDO:

22       Q.  Okay.  Were you ever privy or did you ever

23    review Mr. Renhayon's performance evaluations prior to

24    receiving the demand letter in this case?

25       A.  No, I'm not privy to that information.

132

CONFIDENTIAL
RBC00002400

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 23

CONFIDENTIAL

RBC-PAUL000010654

BY MR. SALCEDO:

2      Q.   What documents did you rely on in forming this

3   sentence that states the percentage of employees

4   eligible for WAP has increased over time from 6 to

5   17 percent?

6      A.   Attorney-client privilege.

7      Q.   Are you saying that you spoke to attorneys

8   regarding this percentage increase, and as such you are

9   unable to divulge that information to me?

10     A.   Correct.

11          MS. CLAXTON:  Counsel, when you see the

12   spreadsheets, this calculation can be completed from the

13   spreadsheets that we'll be providing as well.  You just

14   need to do the math.

15          MR. SALCEDO:  Well, that's no fun.

16          MS. CLAXTON:  I know we went to law school so

17   we didn't have to do math, but you can do the math.

18   BY MR. SALCEDO:

19     Q.   The second sentence here states that, "As many

20   factors do support the top-hat status of WAP, the

21   increase in the number of eligible employees would

22   suggest an increase in the compensation and production

23   eligibility threshold."

24          What was or is your basis for that statement?

25     A.   Again, attorney-client privilege.

CONFIDENTIAL

CONFIDENTIAL
RBC00002451

RBC-PAUL000010655

Q.   And, again, this is in part because or due to
the fact that you had a conversation regarding this
issue with an attorney, and you don't want to divulge
that information?

A.   Correct.

MS. CLAXTON:  It's protected by the privilege.
It doesn't have anything to do with desire.

BY MR. SALCEDO:

Q.   How are you aware that the percent of total
workforce eligible for the plan is most frequent --- the
most frequent factor reviewed by the courts?

A.   Again, attorney-client privilege.

Q.   At the second big bullet point here or arrow
under "current status," it states, "As of January, 2008,
there were 2,675 employees eligible for WAP out of
15,095 of general population."  There's a little star
there indicating that the total employee population
based on any employee who worked in 2007 regardless of
employment status.

By that statement are you saying that the
entire RBC U.S. employee population -- out of ---

MS. CLAXTON:  I think you should start over
again.

MR. SALCEDO:  I think so.  Strike that.
Can you put on the record that I'm laughing?

CONFIDENTIAL
RBC00002452

MS. CLAXTON: Sometimes it's wiser to bail out

2    in the middle.

3         MR. SALCEDO: That is true. Let me have a sip

4    of water so I can get this one out.

5         THE WITNESS: It's a tongue twister.

6    BY MR. SALCEDO:

7       Q.   Does that 15,095 figure represent the total

8    number of U.S.-based RBC employees?

9       A.   Correct.

10      Q.   Okay. It does not include RBC employees in

11   Canada or elsewhere?

12      A.   No, it does not.

         Q.   Okay. That was easier.

14       To your knowledge, where does the fixed-income

15   business line or business unit fit into this general

16   population at the time you made this analysis?

17      A.   That would be Capital Markets.

18      Q.   That would be Capital Markets?

19      A.   Correct.

20      Q.   Okay. So the minimum fiscal year compensation

21   at the time of this analysis was still $150,000 a year?

22      A.   Correct.

23      Q.   Okay. Any reason why that business line's

24   compensation eligibility requirement did not change and

25   other branches did, they went up to 300 grand --

CONFIDENTIAL
RBC00002453

CONFIDENTIAL

RBC-PAUL000010657

group, the eligibility requirement was changed from

2  $150,000 to $350,000 or would be changed?

3   A.   Correct.

4   Q.   Okay.  What was the reasoning behind that?

5   A.   Again, just looking at our overall workforce

6  and determining that we wanted to maintain a top-hat

7  status, and hence we needed to bump up eligibility

8  thresholds.

9   Q.   Did you think that had you not bumped up the

10  eligibility thresholds you might have lost the top-hat

11  exemption or status of the WAP?

12       MS. CLAXTON:   I'm going to object that calls

     for a legal conclusion and calls for speculation and

14  lacks foundation.

15       And I'm going to instruct her not to answer the

16  question.

17  BY MR. SALCEDO:

18   Q.   Was anybody else helping with you this

19  analysis -- strike that.

20       Did anybody else contribute to this analysis

21  other than yourself?

22       MS. CLAXTON:   I'm going to object to the extent

23  it violates the attorney-client privilege and attorney

24  work product doctrine.

     ///

CONFIDENTIAL
RBC00002455

CONFIDENTIAL

RBC-PAUL000010658

BY MR. SALCEDO:

2      Q.   Other than attorneys.

3      A.   Rephrase that question, please.

4      Q.   Sure.  Other than attorneys, was there anybody

5  else with whom you conferred or collaborated in

6  generating this analysis?

7           MS. CLAXTON:  We're willing to stipulate on the

8  record, Counsel, obviously all these recommendations

9  were based on consultation with counsel.  To the extent

10 there was anyone else, I'm not sure where you're going

11 with that.  But we'll stipulate to that.

12          THE WITNESS:  How you phrased that I would say,

again, attorney-client privilege.

14 BY MR. SALCEDO:

15     Q.   Okay.  I don't want to know about what was said

16 with the attorneys.  But are you able to tell me that

17 you collaborated with non-attorneys regarding the

18 generation of this analysis?  And that can be a "yes" or

19 "no."

20     A.   No.

21     Q.   So you did this ---

22          MS. CLAXTON:  We've already stipulated,

23 Counsel.  I'm not going to let her respond any further

24 on these questions.

25          MR. SALCEDO:  What was the stipulation, again?

CONFIDENTIAL
RBC00002456

RBC-PAUL000010659

1      technically required to be unfunded.

2           Q.   Too many technicallys in there.

3           A.   Based on IRS.

4           Q.   Okay.  So you're basing your testimony that the

5      benefits under the WAP are unfunded on IRS regulations?

6           A.   Correct.

7           Q.   That you have knowledge of?

8           A.   Correct.

9           Q.   Okay.  Can you identify those IRS regulations?

10          A.   No, I cannot off the top of my head.

11          Q.   Okay.  Would you be able to look into that and

12     I can --

13               MS. CLAXTON:  No, we're not leaving a blank on

14     this.  That would also call for a legal conclusion.

15     BY MR. SALCEDO:

16          Q.   Do you work with IRS regulations on a regular

17     basis in your capacity as the plan manager?

18          A.   Yes.

19          Q.   Okay.  Did you participate in the filing of a

20     statement with the U.S. Department of Labor registering

21     the WAP as a top-hat plan on or about March 13, 2001?

22          A.   That was done prior to -- it was filed, and I'm

23     aware of the filing, but I personally did not do the

24     filing.

25          Q.   Did you contribute in any way to the content of

CONFIDENTIAL
RBC00002460

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 29
CONFIDENTIAL

RBC-PAUL000010660

1  hers.  We are out of here.

2            MR. SALCEDO:  You got me there.  We're at

3  2 o'clock or just about.  How about we take five

4  minutes.  I'm about to wrap up.

5            MS. CLAXTON:  Okay.

6            (Recess taken from 1:57 p.m. to 2:03 p.m.)

7  BY MR. SALCEDO:

8      Q.   At any point in time with regard to the

9  fixed-income Capital Markets unit, was there a WAP

10  participant that did not make $150,000 or more, to your

11  knowledge?

12     A.   So let's look at that.  When you talk about

13  fixed-income non-commission, the requirement was 150- in

14  cash compensation.  If you're looking at fixed-income

15  non-commission, it was the requirement of 300- in

16  production or above.

17     Q.   Okay.  In either event, to your knowledge, was

18  there a WAP participant that did not meet the 150- or

19  the 300,000 requirement that was still allowed to

20  participate in the WAP?

21     A.   No, no exceptions were made.

22     Q.   Were any of the WAP participants from 2002 to

23  2007 able to negotiate the terms of the WAP agreement

24  that applied to them?

25     A.   Can you describe to me what you mean by

CONFIDENTIAL
RBC00002474

"negotiate"?

2      Q.   Sure.  Were any of these individuals that were

3   WAP participants or that were WAP eligible rather, if

4   they were handed, let's say, a 2005 WAP plan, were they

5   able to go to you or to somebody else in charge of the

6   plan and change a term or provision in the plan?

7           MS. CLAXTON:  Are you asking if the individual

8   participant could do that?

9           MR. SALCEDO:  Right.

10          THE WITNESS:  An individual participant

11   probably not, but as a business unit, yes.

12   BY MR. SALCEDO:

       Q.   Okay.  What do you mean by that?

14      A.   Similar to what I said earlier that based on

15   looking at the different plan provisions, that an

16   example would be financial consultants, they feel that

17   they wanted different distributional options.  They

18   would put forth that.  Determining whether or not it

19   falls within the guidelines, the regulations, it would

20   happen.

21      Q.   Was that something that in this instance, the

22   financial consultant participants or the employees

23   rather, they would come to you to offer that proposal?

24      A.   They would probably --- the escalation would be

     they would go to their branch directors.  The branch

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
CONFIDENTIAL NO. 3:16-cv-05616-RBL - Page 31

CONFIDENTIAL
RBC00002475

RBC-PAUL000010662

1  directs, hence, would go to complex directors.  Complex

2  directors, hence, would go to regional directors.  And

3  at that point regional directors would come to me.

4      Q.    Are you aware of any time in 2002 to 2007 where

5  anybody in the fixed-income Capital Markets unit, i.e.,

6  plaintiff's business unit made a proposal to change the

7  terms of the WAP agreement -- of the WAP plan?

8      A.    Not that I recall.

9      Q.    Was there ever a point in time between 2000 --

10  between the inception of the WAP and to the present

11  where -- this is to your knowledge -- where the company

12  was unable to afford the WAP?

       A.    No.

14     Q.    Okay.  When employees from 2001 to 2007 or 2002

15  to 2007 would make WAP contributions, be it deferred

16  compensation or whatever, would that money be allocated

17  only to investment vehicles or instruments, or would

18  it -- some of that money go to the general assets of the

19  company?

20          MS. CLAXTON:  Can you read back that question,

21  please.

22          (Record read.)

23          THE WITNESS:  It would go directly to the

24  investment vehicles, but keep in mind is that it's still

25  an unsecured -- it's still an unsecured liability.  So

CONFIDENTIAL
RBC00002476

RBC-PAUL000010663

1    misstates her testimony.

2            If you can answer the question.

3            THE WITNESS:  I can't answer the question.  I'm

4    not aware of any.

5    BY MR. SALCEDO:

6        Q.    Okay.  You had testified that you or your

7    group -- who was it?  Kristin, Yurick, and two other

8    people, I believe, would generate plan brochures and

9    distribute them to WAP participants or WAP-eligible

10   employees; is that correct?

11       A.    Well, it was a collaborative effort.  We do it

12   on an annual basis based on is there any provision

13   changes for that year and also always increasing the

14   need to be transparent and also having employees have a

15   really good basis and understanding how the plan works.

16       Q.    That's what I'm getting at.  Was that the main

17   vehicle that you used or that was used by the company to

18   inform the WAP participants of the terms of the

19   particular WAP agreement between 2002 and 2007?

20       A.    What vehicle?

21       Q.    Brochures.

22       A.    Correct.

23       Q.    Did you ever have any personal meetings with

24   eligible employees regarding what the terms were that

25   applied to them?

CONFIDENTIAL
RBC00002479

RBC-PAUL000010664

REPORTER'S CERTIFICATE

The undersigned Certified Shorthand Reporter licensed in the State of California does hereby certify:

That the foregoing deposition was taken before me at the time and place therein set forth at which time the witness was duly sworn by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed, said transcript being a true copy of my shorthand notes thereof.

That the dismantling of the original transcript will void the reporter's certificate.

I further declare that I have no interest in the outcome of the action.

In witness whereof, I have subscribed my name this _____ day of _____, 2_____.


_____
LISA MOSKOWITZ
CSR NO. 10816, RPR, CLR

CONFIDENTIAL
RBC00002486

RBC-PAUL000010665

# EXHIBIT 3

# Amended and Restated

## Royal Bank of Canada

## US Wealth Accumulation Plan

## And Prospectus

---

## The date of this document is NOVEMBER 1, 2009

This document constitutes part of
a prospectus covering securities
that have been registered under
The Securities Act of 1933

RBC Financial Group

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT

CONFIDENTIAL
RBC-PAUL000003138

# TABLE OF CONTENTS

**Page**

SECTION 1 INTRODUCTION ................................................................................1
  1.1   General Nature and Purpose of the Plan .............................................1
  1.2   Definitions ...............................................................................................1
  1.3   Rules of Interpretation ..........................................................................4

SECTION 2 DEFERRALS AND DEEMED INVESTMENTS .........................5
  2.1   Eligibility. ..............................................................................................5
  2.2   Election to Voluntarily Defer Compensation ....................................5
  2.3   Mandatory Deferral of Compensation ...............................................6
  2.4   Election of Investments ........................................................................6
  2.5   Intra-Plan Transfers .............................................................................6
  2.6   Company Contributions .......................................................................6

SECTION 3 INFORMATION CONCERNING INVESTMENT ALTERNATIVES ...................7
  3.1   Company Common Shares. ..................................................................7
  3.2   Plan Interest Rate .................................................................................8
  3.3   Mutual Funds ........................................................................................8
  3.4   Valuation ...............................................................................................8

SECTION 4 VESTING .......................................................................................9
  4.1   Vesting of Voluntary Deferred Compensation ..................................9
  4.2   Vesting of Mandatory Deferred Compensation and Company Contributions .............9
  4.3   Termination For Cause ........................................................................9
  4.4   Terminations Due to Restructuring .....................................................9
  4.5   Change in Control ...............................................................................10
  4.6   Forfeitures ...........................................................................................10

SECTION 5 DISTRIBUTIONS ........................................................................10
  5.1   Distributions ........................................................................................10
  5.2   Distribution Dates ...............................................................................10
  5.3   Distribution Due to a Change In Control ..........................................12
  5.4   Form of Distributions .........................................................................12
  5.5   Distributions to Beneficiaries ............................................................13
  5.6   Designation of Beneficiary ................................................................13
  5.7   Disclaimers by Beneficiaries .............................................................14
  5.8   Federal Income Tax ...........................................................................14
  5.9   Tax Withholding .................................................................................15
  5.10   ERISA Matters ..................................................................................15

SECTION 6 SPENDTHRIFT PROVISIONS ..................................................15

SECTION 7 ADMINISTRATION ....................................................................16
  7.1   The Committee ....................................................................................16
  7.2   Claims Procedure ...............................................................................16

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 37

CONFIDENTIAL

RBC-PAUL000003139

7.3 Making a Claim................................................................16
7.4 Requesting Review of a Denied Claim................................16
7.5 In General....................................................................17

SECTION 8 OTHER ADMINISTRATIVE MATTERS ..................................17
8.1 Reporting....................................................................17
8.2 Plan Obligor; Status as Unsecured General Creditors................17
8.3 Disclaimer of Employment and Bonus Rights........................18
8.4 Administrative Expenses of the Plan.................................18
8.5 No Compensation Under the Qualified Plan ........................18
8.6 Voting Rights...............................................................18
8.7 Governing Law..............................................................18

SECTION 9 AMENDMENT OR TERMINATION ......................................18
9.1 Amendments to and Termination of Plan............................18
9.2 Merger.......................................................................19
9.3 Applicability to Successors..............................................19

-ii-

CONFIDENTIAL

RBC-PAUL000003140

# SECTION 1
# INTRODUCTION

**1.1    General Nature and Purpose of the Plan**.  The Royal Bank of Canada US Wealth Accumulation Plan (the "**Plan**") is a nonqualified, deferred compensation plan pursuant to which a select group of management or highly compensated employees of the Royal Bank of Canada (the "**Company**") and its Participating Subsidiaries (collectively, the "**Employers**") may be offered the opportunity to elect to defer receipt of a portion of their compensation to be earned with respect to the upcoming Plan Year.  The Plan is designed to provide an opportunity for such employees to invest a portion of their compensation in tax-deferred savings and investment options in an effort to support long-term savings and allow such employees to share in the Company's growth and profitability, if any.  The Plan was formerly known as the RBC Dain Rauscher Wealth Accumulation Plan, was amended and restated effective for the Plan Year beginning on January 1, 2005, was further amended and restated effective for the Plan Year beginning on January 1, 2007, was further amended and restated effective for the Plan Year beginning on January 1, 2008, and **is hereby further amended and restated effective for the Plan Year beginning on January 1, 2010**.  This Plan restatement supersedes all prior versions of the Plan and any deferrals or contributions made pursuant to a prior version of the Plan will be governed by this Plan.

**1.2    Definitions**.

"**Account Balance**" means, for any given date, a Participant's Deferred Compensation and Company Contributions, plus or minus the hypothetical investment performance thereon.

"**Adverse Benefit Determination**" means a claim for benefits by a Participant, beneficiary or personal representative that has been denied in whole or in part.

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**Cause**" means, as determined by the Committee or its assignee, the occurrence of any one of the following: (a) any act of dishonesty, willful misconduct, negligence, gross negligence, intentional or conscious abandonment or neglect of duty; (b) any failure by the Employee to comply with any written policy, rule or code, including but not limited to an Employer's Code of Conduct or Code of Ethics, as applicable; (c) commission of a criminal activity, fraud or embezzlement; (d) violation of any rule or regulation of any self-regulatory agency with which the Employee is licensed, regardless of whether such agency takes disciplinary action against the Employee; (e) the loss or suspension of any license necessary to perform in the occupation for which Employee was hired, or the commission of any action that would cause Employee to become unbondable; (f) a failure to reasonably cooperate in any investigation or proceeding concerning an Employer or any Employer Affiliate; (g) any

CONFIDENTIAL                                                                                          RBC-PAUL000003141

unauthorized disclosure or use of confidential information or trade secrets; (h) any violation of any restrictive covenant, such as a non-compete, non-solicit or non-disclosure agreement, between the Participant and an Employer or any Employer Affiliate; (i) personal or professional conduct of Employee which, in the reasonable and good faith judgment of the Committee or its assignee, injures or tends to injure the reputation of an Employer or otherwise adversely effects the interests of an Employer; (j) failure to perform Employee's duties and obligations to a level required by an Employer; or (k) any other act as determined by the Committee in good faith; provided, however, that in the event an Employee is party to an employment agreement with an Employer that contains a different definition of Cause, the definition of Cause contained in such employment agreement will be controlling.

"**Change in Control**" means the Company's sale of (a) at least 75% of the equity or (b) all or substantially all of the assets of a Participating Subsidiary to a person or entity (or a collection of Persons or entities acting as a group) that is not a Company Affiliate, other Employer or Employer Affiliate. A Change in Control will be deemed to have occurred only if such transaction meets the requirements of a "change in control" (as described in Treasury Regulation § 1.409A-3(i)(5)) with respect to the Participating Subsidiary.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended, and includes the regulations and guidance in effect thereunder.

"**Committee**" means the Head of Human Resources, or those executives designated by the Head of Human Resources to administer this Plan. The members of the Committee, if any, serve at the pleasure of the Head of Human Resources, who has the power to appoint and remove members from time to time.

"**Company**" means Royal Bank of Canada, a Schedule I bank under the Bank Act (Canada) with its corporate headquarters in Toronto, Ontario, Canada, and any successor or assign.

"**Company Contribution**" means additional contributions that may be made by the Company in the form of a Matching Contribution or a Discretionary Contribution.

"**Deferred Compensation**" means, with respect to each Participant, the sum of his or her Voluntary Deferred Compensation and Mandatory Deferred Compensation.

"**Disability**" means the Participant's injury or illness that both (a) qualifies him or her for benefits under a long-term disability plan covering eligible employees of the Participant's Employer and (b) causes the Participant to be absent from his or her employment with his or her Employer for a continuous period of not less than 12 months.

"**Discretionary Contribution**" means a Company Contribution described in Section 2.6(b).

"**Election Form**" means the eligible Employee's written election setting forth (a) the percentage of an Employee's Gross Cash Compensation he or she elects to defer, (b) the distribution dates for his or her Deferred Compensation and Company Contributions, and (c) such other information as determined by the Committee.

-2-

CONFIDENTIAL RBC-PAUL000003142

"**Employee**" means an individual classified as a common law employee by, and on the payroll of, an Employer.

"**Employers**" means the Company and Participating Subsidiaries.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and includes the regulations and guidance in effect thereunder.

"**FICA**" means the Federal Insurance Contribution Act.

"**Fund Addition Date**" means such times as interest or dividends are paid or other distributions are made in connection with a Mutual Fund.

"**Gross Cash Compensation**" has the meaning ascribed to "Recognized Compensation" under the Qualified Plan on the first day of each Plan Year to which an election to defer compensation relates. Gross Cash Compensation is Recognized Compensation that is earned by an Employee for services rendered during a Plan Year, whether or not paid in such Plan Year, and includes any amounts an Employee contributes to the Qualified Plan or an employer-sponsored cafeteria plan from his or her total compensation. If an Employee so elects at the time of entering into a business transition plan with an Employer, payments from a business transition plan are included in Gross Cash Compensation. The preceding sentence is applicable only for business transition plans entered into on or after January 1, 2007.

"**In-Service Payment Date**" means a distribution date, as elected by the Employee on his or her Election Form, that occurs while the Participant is an Employee (or an employee of an Employer Affiliate).

"**Mandatory Deferred Compensation**" means the percentage of an Employee's Gross Compensation that the Committee may, from time to time and in its sole and absolute discretion, designate as a required deferral to the Plan for such Employee.

"**Matching Contribution**" means a Company Contribution described in Section 2.6(a).

"**Matching Threshold Amount**" means an amount of Deferred Compensation, as determined by the Committee with respect to each Plan Year, that is credited to a Participant's account during such Plan Year that may be eligible for a Matching Contribution in accordance with standards and guidelines determined annually by the Committee.

"**Mutual Funds**" means any of the mutual funds that have been selected by the Committee, as supplemented, replaced or eliminated from time-to-time at the discretion of the Committee.

"**Mutual Fund Price**" means, unless otherwise determined by the Committee, the daily reported closing price of an interest in, or units of, the Mutual Funds.

"**NYSE**" means the New York Stock Exchange.

-3-

CONFIDENTIAL

RBC-PAUL000003143

"**Participant**" means an individual who has an Account Balance.

"**Participating Subsidiary**" means a corporation, now or in the future, affiliated with the Company that adopts, or has adopted, the Plan. No corporation may become a Participating Subsidiary without prior consent of the Committee. Such participation is subject to such limitations as the Committee may impose and will cease upon a Change in Control of such Participating Subsidiary.

"**Person**" means any individual, sole proprietorship, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, institution, public benefit corporation, entity or government instrumentality, division, agency, body or department.

"**Plan**" means the Royal Bank of Canada US Wealth Accumulation Plan, as set forth in this document and as amended from time to time.

"**Plan Interest Rate**" means an interest rate determined from time to time by the Committee.

"**Plan Obligor**" means the party that is responsible for satisfaction of amounts payable to Participants.

"**Plan Year**" means, with respect to a particular year, the 12-month period beginning January 1 and ending December 31 of such year.

"**Qualified Plan**" means the RBC-U.S.A. Retirement and Savings Plan, as amended from time to time.

"**Retirement**" means the Separation of a Participant whose age and years of employment (as determined using the service rules set forth in the Qualified Plan) with the Employers when combined equals 60.

"**Separation**" means the separation of employment from the Employers or any Employer Affiliate, as the case may be, of a Participant, other than due to such Participant's death, Disability or termination for Cause pursuant to the terms set forth herein. Transfers of employment among the Employers and their Affiliates will not be a "Separation" for purposes of this Plan, and any Separation must constitute a "separation from service" under Code Section 409A.

"**Valuation Date**" means the business day that falls on or immediately after July 1 of each year that a distribution is due a Participant.

"**Voluntary Deferred Compensation**" means the portion or percentage of an Employee's Gross Compensation that the Employee elects to defer to the Plan in accordance with Section 2.2.

    **1.3**    **Rules of Interpretation**. Whenever appropriate, words used herein in the singular may be read in the plural, or words used herein in the plural may be read in the singular; the

CONFIDENTIAL                            RBC-PAUL000003144

masculine may include the feminine and the words "hereof," "herein" or "hereunder" or other similar compounds of the word "here" mean and refer to this entire Plan and not to any particular paragraph or section of this Plan unless the context clearly indicates to the contrary. The titles given to the various sections of this Plan are inserted for convenience of reference only and are not part of this Plan and they will not be considered in determining the purpose, meaning or intent of any provision hereof. Any reference in this Plan to a statute or regulation will be considered also to mean and refer to any subsequent amendment or replacement of that statute or regulation.

## SECTION 2
## DEFERRALS AND DEEMED INVESTMENTS

**2.1    Eligibility**.

(a)    Employees eligible to participate in the Plan are any of the select group of management or highly compensated employees of an Employer whose compensation or production otherwise exceeds a level deemed appropriate by the Committee and who are invited to become Participants by the Committee.

(b)    No deferrals, Company Contributions or other benefits are available under the Plan, other than deferrals, Company Contributions or other benefits in respect of services rendered to the Employers by an Employee:

(i)    who is a non-resident of Canada for purposes of the Income Tax Act (Canada) throughout the period during which the services were rendered; or

(ii)    other than services that were primarily (A) rendered in Canada; (B) rendered in connection with a business carried on by an Employer in Canada; or (C) a combination of services described in (A) and (B).

(c)    Notwithstanding anything in the Plan to the contrary, individuals who are employees of a "nonqualified entity," as that term is described under Code Section 457A, are not eligible to participate in the Plan. No deferrals, Company Contributions or other benefits are available under the Plan with respect to compensation for services rendered by such an employee.

**2.2    Election to Voluntarily Defer Compensation**. Eligible Employees may enroll in the Plan by electing to make Voluntary Deferred Compensation contributions for the next succeeding Plan Year. The Committee has the discretion to limit the amount of Voluntary Deferred Compensation or the amount of Gross Compensation that may be taken into account for making Voluntary Deferred Compensation contributions. Elections must be made no later than December 31 of the year immediately preceding the year in which such Voluntary Deferred Compensation will be earned; provided, however, that subject to such changes as may be determined by the Committee, a new Employee who is eligible to participate in the Plan has 30 days from such Employee's hiring date to submit an Election Form for such Plan Year. **For a given Plan Year, an election to defer compensation is irrevocable after it is accepted by the Committee**. An election by an Employee who is first eligible to participate in the Plan during a given year becomes effective beginning the first day of the month following the date such Election Form is submitted and accepted by the Committee.

-5-

CONFIDENTIAL
RBC-PAUL000003145

The Committee will from time to time establish the maximum percentage of a Participant's Gross Cash Compensation that he or she may elect to defer under the Plan. Voluntary Deferred Compensation will be deferred by payroll reduction.

**2.3    Mandatory Deferral of Compensation**.  On each payroll date, the Employers will reduce each eligible Employee's Gross Compensation by any Mandatory Deferred Compensation and contribute it to the Plan on such Employee's behalf.

**2.4    Election of Investments**.  On each Plan Year's Election Form, a Participant (or Employee for the first Election Form) may choose the form of the hypothetical investment of his or her Deferred Compensation by electing to credit such deferrals for any Plan Year to one or more of the hypothetical investments established by the Committee.  The available hypothetical investments are described in <u>SECTION 3</u>.  If a Participant fails to elect how deferrals are deemed to be invested, such Deferred Compensation will be deemed to be invested at the Plan Interest Rate.

Accounts for Participants will be established for bookkeeping purposes only and will not be considered as, or as evidence of the creation of, a trust fund or a transfer or other segregation of assets for the benefit of the Participants or their estates.  Such accounts will be established and credited with the appropriate amounts as provided for in the Plan as of the end of each business day, or in the case of any Company Contributions determined after the end of the Plan Year, on or around the last day of February following the end of the Plan Year.  Amounts deemed credited to a Participant's account in cash will not be credited with interest, and will not be deemed to be invested in any interest-bearing item.

**2.5    Intra-Plan Transfers**.  Subject to such rules as the Committee, from time to time and in its sole and absolute discretion, may impose, a Participant may elect to have all or a portion of his or her Account Balance transferred to any other type of hypothetical investment. Participants may initiate an intra-Plan transfer by submitting a request in writing to the Company in such form as the Committee determines.  Requests made during any month to transfer Account Balances into another hypothetical investment will be honored at the time/times determined by the Committee.

**2.6    Company Contributions**.  The Committee will establish whether and the extent to which a Participant is eligible for one or more of the following types of Company Contributions:

(a)    *Matching Contributions*.  The Company may make Matching Contributions equal to a percentage of a Participant's Voluntary Deferred Compensation up to the Matching Threshold Amount, subject to the following:

(i)    The Matching Threshold Amount and related Matching Contributions may vary with certain performance-based measures established by the Participating Subsidiary, or such other performance factors as determined by the Committee.  The Matching Threshold Amount will be based on a performance grid approved annually by the Committee and distributed to each Participant.

(ii)    If a Participant is entitled to a Matching Contribution, after the end of the Plan Year (or at such other time as the Committee, in its sole discretion,

-6-

determines) his or her account will be deemed to have been allocated the number of Company common shares, including fractional shares, resulting from dividing the amount of such Matching Contribution by the closing price per Company common share on the NYSE as reported on the day of crediting.

(iii)    The Participant may diversify his or her Matching Contributions and related investment returns from a deemed investment in Company common shares at the Participant's Separation, provided that the applicable Employer classifies such Separation as "retirement" on the applicable separation from service forms. For this purpose, classification as "retirement" is not necessarily a "Retirement," as used in this Plan.

(b)    *Discretionary Contributions.*    The Company may make Discretionary Contributions in such other amount as determined by the Committee in its sole discretion. The Discretionary Contribution amount may vary from Participant to Participant and may be made based on any criteria, including recommendations from a Participating Subsidiary, as determined by the Committee. If a Participant is entitled to a Discretionary Contribution, his or her account will be deemed to have been allocated the amount of such Discretionary Contribution on the date determined by the Committee. Such Discretionary Contribution will be invested as determined by the Committee in its discretion, but may be based on any election by such eligible Participant, and may be changed by the Participant at any time.

## SECTION 3
## INFORMATION CONCERNING INVESTMENT ALTERNATIVES

**3.1    Company Common Shares**.

(a)    *Company Common Shares.*    For any Plan Year, in connection with a Participant's election to have a portion of his or her Deferred Compensation credited toward Company common shares, such Participant's account will be deemed to have been allocated the number of Company common shares, including fractional shares, resulting from dividing such portion of the Participant's Deferred Compensation and Company Contributions allocated to the investment in Company common shares by the closing price per Company common share on the NYSE as reported on the day of crediting.

(b)    *Dividends on Company Common Shares.*    At such times as the Company declares dividends on its common shares, an amount equal to the number of Company common shares credited to a Participant's account on the record date multiplied by the declared dividend per share in U.S. dollars (such dividend to be calculated without taking into account any and all Canadian withholding taxes to which such dividend might be subject, if actually paid) will be credited, on the payment date, to such Participant's account in cash (if dividends are paid in cash) or in Company common shares (if dividends are declared in common shares), or in such other property determined by the Committee.

-7-

CONFIDENTIAL

RBC-PAUL000003147

(c)  *Additional Purchases of Company Common Shares*.  All amounts credited to a Participant's account as a result of cash dividends will be used on a daily basis (or on such other date as determined by the Committee in its sole discretion) to purchase hypothetical Company common shares.  The number of additional Company common shares credited to each Participant's account after the end of each day due to the hypothetical purchases described in this paragraph will be equal to the number of Company common shares, including fractional shares, derived by dividing the total amount of cash credited to the Participant's account as described in this Section 3.1 by the closing price per Company common share on the NYSE as reported on the date of the hypothetical purchase of the Company common shares credited to such Participant's account under this Section 3.1.

**3.2  Plan Interest Rate**.  Participants may elect to have all or a portion of their Deferred Compensation invested at the Plan Interest Rate.

**3.3  Mutual Funds**.

(a)  *Mutual Funds*.  A Participant may elect to have all or a portion of their Deferred Compensation, Discretionary Contributions, and Matching Contributions after a Separation classified by an Employer as a "retirement" deemed invested in one or more Mutual Funds.  A Participant's account will be allocated the number of units (including fractional units) of a Mutual Fund equal to the portion of his or her Account Balance allocated to investments in Mutual Funds divided by the Mutual Fund Price.

(b)  *Interest or Dividends on Mutual Funds*.  On each Fund Addition Date, a determination will be made as to the number of units (including fractional units) of the Mutual Fund that will be credited to a Participant's account as of the Fund Addition Date.  On the Fund Addition Date, an amount equal to the number of units of the Mutual Fund credited to a Participant's account multiplied by the amount of the interest or dividend per unit of the Mutual Fund will be credited to such Participant's account, or other fund determined by the Committee.  Interest payments or other distributions will be deemed reinvested in additional units of the Mutual Fund at prevailing market prices on the Fund Addition Date.

**3.4  Valuation**.  Except for changes resulting from intra-Plan transfers described in Section 2.5, the notional value of a Participant's accounts will be updated daily to reflect any increases or decreases in the value of the Participant's hypothetical investment.

The account of a Participant with a hypothetical investment in Mutual Funds will be debited by an amount representing a quarterly fee.  The amount of the quarterly fee will be determined by multiplying the value of the Participant's hypothetical investment in Mutual Funds, as described above, by a decimal determined by the Committee, which for 2009 is 0.000625.  The Committee will from time to time review this calculation and may change the decimal factor used in this calculation.

-8-

CONFIDENTIAL
RBC-PAUL000003148

# SECTION 4
## VESTING

**4.1     Vesting of Voluntary Deferred Compensation**.   All Voluntary Deferred Compensation recorded in a Participant's account will be fully vested at all times.

**4.2     Vesting of Mandatory Deferred Compensation and Company Contributions**. Mandatory Deferred Compensation and Company Contributions in a Participant's account will vest on the date or dates determined by the Committee, in its sole discretion.  The Committee will announce any prospective change in the vesting schedule with respect to Mandatory Deferred Compensation and Company Contributions (and the related investment returns, if any) prior to December 31 of the year preceding each new Plan Year.   Unless otherwise amended by the Committee, all time period measurements for the vesting schedules established by the Committee will begin on January 1 of the Plan Year following the Plan Year to which a Company Contribution relates.    Notwithstanding the foregoing, a Participant's Mandatory Deferred Compensation and Company Contributions will immediately vest in full upon:

> (a)     the death or Disability of such Participant while an employee of an Employer or an Employer Affiliate; or

> (b)     the Separation of a Participant, who prior to Separation and with the consent of his or her Employer, has (i) entered into a business transition agreement with the Private Client Group or (ii) met the requirements under the Plan for Retirement and who has entered into a non-competition, non-solicitation and related agreement at the request of the Participant's employer in the form then approved by the Committee.  The non-competition agreement will require a Participant, for at least a one-year period, to refrain from participating, directly or indirectly, in any business in which an Employer is engaged at the time of such Participant's Separation in any geographic area in which the Employer, as appropriate, is competing at such time.

**4.3     Termination For Cause**.   Notwithstanding anything to the contrary in this SECTION 4, if a Participant is involuntarily terminated for Cause from an Employer or an Employer Affiliate at any time prior to the distribution of his or her Account Balance, upon such Participant's Separation, all of his or her Mandatory Deferred Compensation and Company Contributions will be forfeited, regardless of whether the vesting schedule has otherwise been satisfied with respect to such shares or assets, and the proceeds thereof will be deemed returned to the Company.  The Committee has full discretionary authority to determine whether a Participant was terminated for Cause, and, if (a) a Participant has a voluntary Separation, and (b) the Committee thereafter determines that the Participant could have been involuntary terminated by an Employer or Employer Affiliate for Cause, then the Participant will be treated as though he or she was involuntarily terminated for Cause for all purposes of this Plan.

**4.4     Terminations Due to Restructuring**.   In the event a Participant ceases to be employed by the Employers and their Affiliates due to an organizational restructuring (as determined in the sole discretion of the Committee), all Mandatory Deferred Compensation in such Participant's account will become vested, but all unvested Company Contributions will be forfeited.

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 47
CONFIDENTIAL                                                                    RBC-PAUL000003149

**4.5　Change in Control**.　In the event of a Change in Control of a Participating Subsidiary, each Participant who is employed by such Participating Subsidiary immediately prior to the date on which the Change in Control is consummated and who, due to the Change in Control (as determined by the Committee), is no longer employed by an Employer immediately after the Change in Control will become vested in his or her Mandatory Deferred Compensation and Company Contributions as follows:

(a)　*Minimum Vesting*.　The unvested portion of each affected Participant's Mandatory Deferred Compensation and Company Contributions will be vested pro rata, based on the period of time that has elapsed from the effective date of the contribution to the date of the Change in Control relative to the total vesting period related to such contribution.　Before a Change in Control event, the Committee will establish a reasonable method for calculating the pro rata portion of each affected Participant's Account Balance.

(b)　*Discretionary Vesting*.　The Board has the discretionary authority to vest any amount held in an affected Participant's account that remains unvested after the application of paragraph (a) above.　In making its determination, the Board may consider the terms of the transaction governing the Change in Control, the financial impact on the Employers, and any other factors it deems relevant to its determination.

**4.6　Forfeitures**.　Except as otherwise specifically set forth herein, all Company Contributions and Mandatory Deferred Compensation and related deemed investment returns that are not vested on the Participant's Separation date will be deemed forfeited, and such Participant's account will be appropriately reduced.

## SECTION 5
## DISTRIBUTIONS

**5.1　Distributions**.　Except as otherwise described below, upon electing to participate in the Plan for a Plan Year, a Participant will also make an election with respect to the timing of the payment of the amounts credited to such Participant's account for such Plan Year.

**5.2　Distribution Dates**.

(a)　*Distribution Pursuant to the In-Service Payment Date*.　If the Participant selected an In-Service Payment Date, then subject to this <u>SECTION 5</u> and any other terms and conditions the Committee may impose, distributions will be made in a single payment in the specified year promptly after, but in no event after the 90th day following, July 1 of such year.　With the consent of the Committee, a Participant may change the In-Service Payment Date pursuant to the procedures established by the Committee and the restrictions under Code Section 409A, which generally require making a written request more than 12 months in advance of the In-Service Payment Date and selecting a new In-Service Payment Date that will occur at least five years after the originally selected date.

-10-

CONFIDENTIAL

RBC-PAUL000003150

(b)     *Distribution on Separation or Retirement.*

(i)     If (A) the Participant elected payment on Separation on his or her Election Form or (B) if such Separation occurs prior to the otherwise scheduled In-Service Payment Date, then subject to this <u>SECTION 5</u> and any other terms and conditions the Committee may impose, the Participant's Account Balance will be distributed due to Separation, less any amount owed by the Participant to an Employer at the time of Separation pursuant to a promissory note or otherwise incurred in the normal course of business; <u>provided</u>, however, that any offset is limited to $5,000 and will occur at the same time and in the same amount as the debt otherwise would have been paid by the Participant.

(ii)     If distribution is made due to Separation, distributions will be made in either a lump sum payment or in installments, as selected by the Participant on his or her Election Form. Available forms of distribution include a single lump sum or, if a Participant meets the requirements for Retirement at the time of Separation, substantially equal annual installments for up to ten years.

(iii)     Any single lump sum payment and the first installment of any series of installment payments will be made promptly after, but in no event after the 90th day following, the July 1 of the Plan Year that begins following the year of Separation, and each annual installment will occur promptly after, but in no event after the 90th day following, the July 1 of each year thereafter. Subject to reduction as set forth in clause (i) above, each installment will be equal to a fraction of all vested amounts deemed allocated to the Participant's account, the numerator of such fraction being one and the denominator being the number of installments remaining to be paid. For example, if the Participant has elected five annual installments, the first installment will be equal to one-fifth of the Participant's total vested Account Balance on the date such Account Balance is valued for purposes of the first payment date and the second installment will be equal to one-fourth of the Participant's account on the date such account is valued for purposes of the second payment date, etc.

(iv)     If the Participant did not indicate a distribution date on his or her Election Form, or if the Election Form was not timely filed, then distribution of the Account Balance will be made promptly after, but in no event after the 90th day following, the July 1 immediately after the date of vesting.

(v)     Distributions pursuant to this section will be made pro-rata from all of a Participant's hypothetical investments.

(vi)     For purposes of Code Section 409A, each installment payment will be treated as a separate single payment.

(c)     *Distributions Following Death or Disability.* Distributions following death will follow the procedures set forth in <u>Section 5.5</u>. Distributions following Disability will be made in a single payment to the Participant promptly after, but in no

-11-

CONFIDENTIAL
RBC-PAUL000003151

event after the 90th day following, the date the Participant satisfies the definition of Disability.

(d)  *Other*.

(i)  The Committee reserves the right to distribute accounts and terminate participation of Participants who transfer employment outside of the United States; <u>provided</u>, however, that no acceleration of distribution will be made in contravention of Code Section 409A.

(ii)  Notwithstanding anything to the contrary in this <u>Section 5.2</u>, but subject to <u>Section 5.3</u>, all Deferred Compensation and Company Contributions contributed to this Plan during a period when a Participant was deemed a "special participant" under a prior version of this Plan will be distributed in full promptly after, but in no event after the 90th day following, the July 1 of the sixth Plan Year following the Plan Year for which the contribution is made. The Participant's account will be valued as of the Valuation Date on or immediately preceding the distribution date.

**5.3**  **Distribution Due to a Change In Control**.  If, as a result of a Change in Control, a Participant's employer that is a Participating Subsidiary ceases to be a Participating Subsidiary under the Plan, each Participant who is employed by such Participating Subsidiary immediately prior to the date on which the Change in Control is consummated and who, due to the Change in Control (at the determination of the Committee), is no longer employed by a Participating Subsidiary immediately after the Change in Control will receive his or her vested Account Balance on the date on or promptly after, but in no event after the 90th day following, the date the Change in Control is consummated.

**5.4**  **Form of Distributions**.

(a)  *Distributions of Company Common Shares*.

(i)  All distributions of hypothetical investments in Company common shares will be in the form of Company common shares, less the number of common shares equal to the minimum amount necessary to satisfy withholding requirements with respect to all applicable federal, state and local taxes. Any Company common shares distributed under the Plan will be Company common shares that have been previously issued and that are currently trading in the market, or, subject to the approval of the Board of Directors of the Company and any required regulatory and shareholder approvals, authorized but previously unissued Company common shares;

(ii)  The value of each Company common share credited to a Participant's account will be equal to the closing price per Company common share on the NYSE as reported for the Valuation Date; and

(iii)  All distributions will be in the form of whole Company common shares. Fractional shares, if any, will be distributed in cash.

-12-

CONFIDENTIAL
RBC-PAUL000003152

(b) *Distributions of Investments in Mutual Funds*. A Participant's hypothetical investment in mutual funds will be distributed in cash, less the amount of cash necessary to satisfy withholding requirements with respect to all applicable federal, state and local taxes. The value of a Participant's hypothetical investment in Mutual Funds will be determined by multiplying the total number of units of the Mutual Fund credited to the Participant's account by the Mutual Fund Price, in each case, measured as close as practicable to the Valuation Date.

(c) *Distributions of Investment in the Plan Interest Rate*. A Participant's hypothetical investment in the Plan Interest Rate will be distributed in cash, less the amount of cash needed to satisfy withholding requirements with respect to all applicable federal, state and local taxes.

Notwithstanding Section 5.4(b) or (c), as applicable, the Committee, in its sole and absolute discretion, may cause distributions with respect to a Participant's Account Balance to be made, at the Company's option, in Company common shares that have been previously issued and that are currently trading in the market, or, subject to the approval of the Board of Directors of the Company and any required regulatory and shareholder approvals, authorized but previously unissued shares; the value of all such shares will be equal to the closing price per Company common share on the NYSE as reported for the Valuation Date.

**5.5    Distributions to Beneficiaries**. Distribution of the Account Balance of a Participant who dies before any payment to such Participant is made will be made to such Participant's beneficiary or the Participant's estate in a single lump sum as of the date of the Participant's death. If the Participant dies after payments have commenced but before distribution is completed, the Participant's remaining Account Balance will be distributed to the Participant's beneficiary in lump sum after the Participant's death. For purposes of complying with Code Section 409A, such distribution will occur by the end of the calendar year in which the death occurs or by the fifteenth day of the third month following the date of death, if later. Notwithstanding the foregoing sentence, if the Committee is not timely notified of the death of the Participant and therefore cannot reasonably begin or make payments by the distribution deadline required by Code Section 409A, a lump sum distribution will be made to the beneficiary as soon as possible following the Committee's receipt of the death notification, subject to any tax, interest, and penalties imposed by Section 409A.

**5.6    Designation of Beneficiary**. Each Participant has the right to designate in writing, in form satisfactory to the Committee, one or more beneficiaries to receive the unpaid vested balance of the Participant's account in the event of such Participant's death, and may change or revoke any prior beneficiary designation by a similar instrument in writing. Any beneficiary designation must be received by the Committee before the Participant's death. Any beneficiary designation of a Participant's spouse will be made void in the event of a divorce, unless either a binding court order provides otherwise or the Participant redesignates his or her former spouse as the beneficiary. If a Participant fails to designate a beneficiary or, having revoked a prior beneficiary designation, fails to designate a new beneficiary, or in the event the Participant's beneficiary designation fails, in whole or in part, by reason of the prior death of a designated beneficiary, divorce or for any other cause, then the undistributed vested balance of the

-13-

CONFIDENTIAL

RBC-PAUL000003153

Participant's account, or the portion thereof as to which such designation fails, as the case may be, will be paid to the Participant's estate.

   **5.7    Disclaimers by Beneficiaries**.  A beneficiary entitled to a distribution of all or a portion of a deceased Participant's accounts may disclaim his or her interest therein subject to the following requirements.  To be eligible to disclaim, a beneficiary must be a natural person, must not have received a distribution of all or any portion of such accounts at the time such disclaimer is executed and delivered, and must have attained at least 21 years of age as of the date of the Participant's death.  Any disclaimer must be in writing and must be executed personally by the beneficiary before a notary public.  A disclaimer will state that the beneficiary's entire interest in the undistributed accounts is disclaimed or will specify what portion thereof is disclaimed.  To be effective, duplicate original executed copies of the disclaimer must be both executed and actually delivered to the Committee after the date of the Participant's death but not later than 180 days after the date of the Participant's death.  A disclaimer will be irrevocable when delivered to the Committee.  A disclaimer will be considered to be delivered to the Committee only when actually received by the Committee.  The Committee will be the sole judge of the content, interpretation and validity of a purported disclaimer.  Upon the filing of a valid disclaimer, the beneficiary will be considered not to have survived the Participant as to the interest disclaimed and any distribution made to the beneficiary will be reversed.  A disclaimer by a beneficiary will not be considered to be a transfer of an interest in violation of the provisions of <u>SECTION 6</u> and will not be considered to be an assignment or alienation of benefits in violation of any law prohibiting the assignment or alienation of benefits under this Plan.  The Committee will not  recognize any other form of attempted disclaimer.

   **5.8    Federal Income Tax**.

      (a)    *Tax Consequences of Participating in the Plan*.  The Plan provides that the election to defer any portion of a Participant's compensation, and the establishment of a fixed date or schedule for payment, is made prior to the performance of the personal services for an Employer to which the compensation relates.  Accordingly, the Company believes that Participants are not expected to recognize either the deferred amounts or the Company Contributions as ordinary income for federal income tax purposes until such amounts are actually paid or distributed to them by the Company; <u>provided</u>, that, such amounts may still be subject to FICA taxes when deferred to the Plan.  Similarly, the Company is not expected to be allowed any income tax deduction on account of the Plan until, and for its taxable year in which, a Participant recognizes ordinary income hereunder, to the extent such amount satisfies the general rules concerning deductibility of compensation.  As described above and in <u>Section 5.9</u> below, it is expected that the Company will be required to withhold or otherwise collect income and other payroll taxes upon such amounts as required under Code Section 3402 and certain other Code sections.

      (b)    *Compliance with Code Section 409A*.  Except as specifically provided in <u>Section 5.5</u>, it is intended that any income or payments to a Participant provided pursuant to this Plan will not be subject to the additional tax and interest under Code Section 409A. The provisions of the Plan will be interpreted and construed in favor of complying

CONFIDENTIAL

RBC-PAUL000003154

with any applicable requirements of Code Section 409A necessary to avoid the imposition of additional tax, interest or penalties under Code Section 409A.

(c) *Participants Should Consult Their Tax Advisors.* Due to the complexity of the applicable provisions of the Code, this summary of certain federal income tax consequences sets forth only the general tax principles affecting the Plan. These general tax principles are subject to changes that may be brought about by subsequent legislation or by regulations and administrative rulings, which may be applied on a retroactive basis. Neither the Company nor any Participating Subsidiary has obtained, and as a result of various provisions the Plan is not eligible for, a ruling from the Internal Revenue Service regarding the federal income tax consequences associated with participation in the Plan. Participants may be subject to state or local income taxes as a result of their election to defer compensation pursuant to the Plan, and Participants should refer to the applicable laws in those jurisdictions. **Accordingly, each Plan Participant should consult his or her own tax counsel on questions regarding tax liabilities arising upon any election to defer compensation pursuant to the Plan and any distributions made to such Participant pursuant to the Plan.**

**5.9 Tax Withholding**. All distribution payments will be treated as wages for tax purposes and therefore will be made net of all applicable income, FICA (to the extent not already withheld at the time of deferral), payroll and other taxes required to be withheld. In connection with any event that gives rise to a federal or other governmental tax withholding obligation on the part of the Company or any of its Affiliates relating to amounts under the Plan (including, without limitation, FICA tax), (a) a Participant's employer may deduct or withhold (or cause to be deducted or withheld) from any payment or distribution to a Participant, whether or not pursuant to the Plan, or (b) the Committee will be entitled to require that the Participant remit cash to the Company, his or her employer or any of its Affiliates (through payroll deductions or otherwise), in each case in an amount sufficient in the opinion of the Company to satisfy such withholding obligations. Further, as permitted under Treasury Regulation § 1.409A-3(j)(4)(vi), the distribution of an Participant's account may be accelerated to satisfy employment taxes and wage withholding at the source.

**5.10 ERISA Matters**. Although the Plan is not intended to be a tax-qualified plan under Code Section 401, the Plan might be determined to be an "employee pension benefit plan" as defined by ERISA. If the Plan is determined to be an "employee pension benefit plan," the Company believes that it constitutes an unfunded plan of deferred compensation maintained for a select group of management or highly compensated employees and, therefore, exempt from many ERISA requirements. A statement has been filed with the Department of Labor to comply with ERISA reporting and disclosure requirements.

**SECTION 6**
**SPENDTHRIFT PROVISIONS**

Neither any Participant nor the personal representative of any Participant has any transferable interest in the Participant's account or any right to anticipate, alienate, dispose of, pledge or encumber the same prior to actual receipt of payments in accordance with the rules described in <u>SECTION 4</u> and <u>SECTION 5</u>, nor will the same be subject to attachment,

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 53
CONFIDENTIAL

RBC-PAUL000003155

garnishment, execution following judgment or other legal process instituted by creditors of the Participant or the personal representative of the Participant.

# SECTION 7
# ADMINISTRATION

**7.1    The Committee**.   The Plan will be administered by the Committee.   The Committee has the full power and sole discretionary authority to make all determinations provided for in the Plan, including, without limitation, promulgating rules and regulations as the Committee considers necessary or appropriate for the implementation and management of the Plan as well as rules to address potential conflicts of interest and determination of a termination of employment due to Cause under <u>Section 4.3</u>; <u>provided</u> that the Board of Directors of the Company also has the full power and discretionary authority to make determinations with respect to the Plan having the effect of materially increasing the cost of the Plan to an Employer, including, without limitation, decisions regarding Company Contributions, eligibility to participate in the Plan, and discretionary vesting in the event of a Change in Control (as described in <u>Section 4.5(b)</u>).

**7.2    Claims Procedure**.  If any Participant or his or her estate is in disagreement with any determination that has been made for payment under this Plan, a claim may be presented to the Committee in accordance with procedures set forth in this <u>SECTION 7</u>.

**7.3    Making a Claim**.   The claim must be written and must be delivered to the Committee within 90 days the Participant or beneficiary knows or should have known of his or her claim for benefits.  Within 90 days after the claim is delivered, the claimant will receive either: (a) a decision or (b) a notice describing special circumstances requiring a specified amount of additional time (but no more than 180 days from the day the claims as delivered) to reach a decision.

In the event of an Adverse Benefit Determination, the claimant will receive a written or electronic notice specifying: (a) the reasons for the determination; (b) the Plan provisions on which the Adverse Benefit Determination is based; (c) any additional information needed in connection with the claim and the reason such information is needed; and (d) a description of the Plan's review procedures, including a statement of the Participant's right to bring a civil action under ERISA Section 502(a) following an Adverse Benefit Determination upon appeal.  Notice of the claimant's right to request a review (as described in <u>Section 7.4</u>) will also be given to the claimant.

**7.4    Requesting Review of a Denied Claim**.   A claimant may request that a denied claim be reviewed.  The request for review must be written and must be delivered to the Committee within 60 days after claimant's receipt of written or electronic Adverse Benefit Determination.  A request for review may (but is not required to) include issues and comments that the claimant wants considered in the review, even if such information was not provided in the initial request for benefits.  The claimant may examine pertinent Plan documents, including the records and other documentation, by asking the Committee for such documents. Within 60 days after delivery of a request for review, the claimant will receive either: (a) a decision; or (b) a

-16-

CONFIDENTIAL                                                            RBC-PAUL000003156

notice describing special circumstances requiring a specified amount of additional time (but no more than 120 days from the day the request for review was delivered) to reach a decision.

The Committee may require the claimant to submit such additional facts, documents or other material as it deems necessary or advisable in making its review. The Committee will notify the claimant in writing or electronically of its decision. If the Adverse Benefit Determination is confirmed in whole or in part, the communication will set forth: (a) the specific reasons for the decision; (b) the specific references to the Plan provisions on which the decision is based; (c) a statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to and copies of all documents, records, or other information relevant to the claim; and (d) a statement regarding the claimant's right to bring an action under ERISA Section 502(a).

**7.5 In General.** All decisions on claims and on reviews of denied claims will be made by the Committee. The Committee also reserves the right to delegate its authority to make decisions. The Committee may, in its discretion, hold one or more hearings. If a claimant does not receive a decision within the specified time, the claimant should assume the claim or appeal was denied on the date the specified time expired. The claimant may, at the claimant's own expense, have an attorney or other representative act on behalf of the claimant, but the Committee reserves the right to require a written authorization.

No action at law or in equity may be brought to recover benefits or otherwise enforce the provisions of the Plan unless the Participant or beneficiary has exhausted all remedies under this SECTION 7. Any action brought after exhaustion of such remedies must be brought within ninety (90) days after the Participant or beneficiary has received final notice of an Adverse Benefit Determination under Section 7.4.

## SECTION 8
## OTHER ADMINISTRATIVE MATTERS

**8.1 Reporting.** As soon as administratively feasible after each calendar quarter end, the Company will prepare and make available to each Participant a report showing (a) the amounts credited to the Participant's account since the last report from the Company, and (b) the amounts of any distributions made since the last report. At its discretion, the Company may prepare and make available more frequent reports to Participants.

**8.2 Plan Obligor; Status as Unsecured General Creditors.**

(a) The Company will be the Plan Obligor with respect to distributions from all accounts; provided, however, that the Participant's Participating Subsidiary will be the Plan Obligor with respect to investments of Mandatory Deferred Compensation and related Company Contributions thereon, except as set forth in Section 8.2(b) below.

(b) The Company will be the Plan Obligor with respect to all accounts of Participants who are residents, for tax purposes, in California and Arizona during the Plan Year.

-17-

CONFIDENTIAL
RBC-PAUL000003157

(c)     All Participants are general unsecured creditors of the relevant Plan Obligor with respect to amounts payable pursuant to distributions from the accounts described in (a) and (b) above.

As such, Participants and their estates will not have any secured or preferred interest by way of trust, escrow, lien or otherwise in any specific assets, of the Employers. The Plan does not require that any hypothetical investments under this Plan be funded by the Company. If a Plan Obligor, in fact, elects to set aside monies or other assets to meet its obligations under the Plan (there being no obligation to do so) through the creation of a trust or otherwise, such monies or other assets will be subject to the claims of its general creditors, and neither any Participant nor any beneficiary of any Participant will have a legal, beneficial or security interest therein.

**8.3     Disclaimer of Employment and Bonus Rights**.  The Plan is not a contract for employment and does not grant any employee the right to be retained in the employment of the Employers or to obtain any compensation.  Upon dismissal or severance of employment, no Participant will have any right or interest under the Plan, other than as specifically provided herein.

**8.4     Administrative Expenses of the Plan**.  Participants will be responsible for all administrative expenses incurred with respect to this Plan and for all administrative expenses and other fees of this Plan (to the extent such expenses are not paid by the Company), including the costs of outsourced record-keeping (which expenses will be deducted proportionately among Participants' accounts).

**8.5     No Compensation Under the Qualified Plan**.  Unless the Qualified Plan specifically provides otherwise, no amounts of Deferred Compensation and related Company Contributions, if any, credited to any account of a Participant will constitute "Recognized Compensation" for purposes of the Qualified Plan, as such terms are defined in such plan, nor any other employee benefit plan of the Company or its Affiliates.

**8.6     Voting Rights**.  Participants' accounts under the Plan are bookkeeping accounts and, accordingly, Participants will not have any voting rights with respect to any common shares or any units or other interests in Mutual Funds deemed allocated to any Participant's account.

**8.7     Governing Law**.  This instrument has been executed and delivered in the State of Minnesota and has been drawn in conformity to the laws of that state to the extent not preempted by federal law and will be construed and enforced in accordance with the laws of the State of Minnesota.

**SECTION 9**
**AMENDMENT OR TERMINATION**

**9.1     Amendments to and Termination of Plan**.  While the Company intends for the Plan to continue indefinitely, it may be amended or terminated at any time by the Committee or the Board of Directors of the Company or by the Company, including, without limitation (a) to ensure that neither the Plan Obligors nor the Participants are subject to adverse Canadian or United States tax consequences and (b) to modify the form of distribution of Participants' accounts; underlined{provided}, however, that no such amendment or termination will have the effect of

-18-

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 56
CONFIDENTIAL

RBC-PAUL000003158

(i) reducing the vested portion of amounts already credited to a Participant's account; (ii) extending the time of distribution of such Participant's accounts, without the consent of such Participant and only in a manner permitted by Code Section 409A; or (iii) causing a violation of Code Section 409A. In the event of a termination of the Plan, all accounts will be deemed vested and amounts credited thereto will be distributed to Participants in accordance with the distribution guidelines under Code Section 409A.

**9.2** **Merger**. The Committee may cause all or part of this Plan to be merged with all or a part of any other nonqualified deferred compensation plan maintained by any company. If the Committee agrees to such a merger, the Committee will specify in writing the terms and conditions of such merger and may obtain such consents and agreements as it deems necessary or desirable.

**9.3** **Applicability to Successors**. This Plan will be binding upon and inure to the benefit of the Company and to the extent that the Company is a Plan Obligor under the Plan for any accounts, the Participating Subsidiaries, their successors and assigns, each Participant, his or her personal representatives and any beneficiaries. If the Company becomes a party to any merger, consolidation or reorganization, this Plan will remain in full force and effect as any obligation of the Company or its successors in interest.

-19-

CONFIDENTIAL

RBC-PAUL000003159

# EXHIBIT 4



March 15, 2012

Marty Paul
3622 Horsehead Bay Drive
Gig Harbor, WA 98335

RE:  RBC US Wealth Accumulation Plan ("WAP")

Dear Mr. Paul:

As you are aware, during your employment with RBC, you participated in the RBC US Wealth Accumulation Plan ("WAP").  As of February 28, 2012, your total balance, vested and unvested, was $2,592,046.

As you further are aware, your employment with RBC terminated on March 7, 2011. After reviewing the circumstances of your separation from employment, and pursuant to the provisions of the Plan, including but not limited to Sections 4.3, the WAP Committee determined that your separation from RBC was for "cause."  Accordingly, your Company Contributions (and mandatory deferrals), both vested and unvested, have been forfeited in the amount of $1,612,152.

If you have any questions regarding this decision, or desire to challenge this decision, we refer you to the Plan, including Section 7, or invite you to contact the Committee directly through Gabriela Sikich at (612) 371-7666 or Gabriela.Sikich@RBC.com.

Sincerely,

Gabriela Sikich
US Defined Contribution Plans Manager

CONFIDENTIAL
RBC-PAUL000003952

# EXHIBIT 5



**RBC US Deferred Compensation Plan**

**Retirement Savings Statement**
January 1, 2012 - December 31, 2012

ENV#MG000011
MG 14022 T

BRIAN BUSKIRK
7646 CHICO WAY NW
BREMERTON, WA 98312

If you have questions about your account, please call the RBC - U.S.A. Retirement Help Line at Fidelity at 1-866-697-1002 8:30 am to midnight EST or access your account on-line at www.netbenefits.com/RBC

## Your Account Summary

| | |
|---|---|
| Beginning Balance | $457,659.21 |
| Employee Contributions | 20,558.84 |
| Employer Contributions | 53,091.00 |
| Forfeitures | -297,676.04 |
| Dividends and Interest | 13,783.99 |
| Withdrawal | -94,770.89 |
| Fees | -881.79 |
| Change in Market Value | 63,565.95 |
| Ending Balance | $215,330.27 |

| Additional Information | |
|---|---|
| Vested Balance | $215,330.27 |

**Inception to date contribution**

| | |
|---|---|
| Your Personal Rate of Return | 18.3% |
| Year to Date | 18.3% |

Your Personal Rate of Return is calculated with a time-weighted formula, widely used by financial analysts to calculate investment earnings. It reflects the results of your investment selections as well as any activity in the plan account(s) shown. There are other Personal Rate of Return formulas used that may yield different results. Remember that past performance is no guarantee of future results.

## Your Asset Allocation



■ Stocks 100%

Your investments are currently allocated among the displayed asset classes. Percentages and totals may not be exact due to rounding.

## Your Account Activity
Use this section as a summary of transactions that occurred in your account during the statement period.

| Activity | ABF Sm Cap Val Inst | AF EuroPac Growth R6 | AF Fundamntl Invs A | AF Grth Fund Amer R6 | AMG Sys Lg Cp Val IS |
|---|---|---|---|---|---|
| Beginning Balance | $11,909.33 | $31,478.94 | $18,809.87 | $38,302.46 | $7,242.49 |
| Employee Contributions | 1,027.94 | 2,055.88 | 2,055.88 | 2,055.88 | 0.00 |
| Employer Contributions | 1,225.20 | 2,450.40 | 2,450.40 | 2,450.40 | -3,524.00 |
| Forfeitures | -7,310.24 | -12,643.35 | -12,499.00 | -12,479.40 | 80.84 |
| Dividends and Interest | 338.17 | 397.22 | 335.98 | 285.23 | 0.00 |
| Withdrawal | 0.00 | -8,768.14 | 0.00 | -13,196.77 | -19.12 |
| Fees | -35.04 | -76.41 | -57.85 | -91.08 | 1,146.22 |
| Change in Market Value | 1,610.52 | 4,892.16 | 3,235.83 | 6,937.41 | $4,926.43 |
| Ending Balance | $8,765.88 | $19,786.70 | $14,331.11 | $24,264.13 | |

Please read this statement carefully. Any error must be reported to Fidelity Investments within 90 days.

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 61
CONFIDENTIAL

RBC-PAUL000004613

## Your Account Activity (continued)

| Activity | Artisan Intl Val Inv | BlkRk Global Alloc A | Blkrk Sm Cap Gr Eq I | Invs Comstock Y | Invs Sm Cap Disc Y |
|---|---|---|---|---|---|
| Beginning Balance | $20,342.03 | $30,305.30 | $12,195.15 | $30,624.70 | $41,414.72 |
| Employee Contributions | 2,055.88 | 2,055.89 | 1,027.94 | 0.00 | 2,055.87 |
| Employer Contributions | 2,450.40 | 2,450.40 | 1,225.20 | 0.00 | 2,450.40 |
| Forfeitures | -10,293.06 | -24,636.23 | -7,195.35 | -4,013.17 | -13,607.02 |
| Dividends and Interest | 199.64 | 253.22 | 898.28 | 461.58 | 2,464.77 |
| Withdrawal | -4,762.87 | -4,237.99 | 0.00 | -13,863.84 | -13,385.69 |
| Fees | -54.29 | -70.65 | -35.73 | -59.40 | -96.64 |
| Change in Market Value | 4,153.15 | 2,430.97 | 475.93 | 3,997.06 | 3,782.17 |
| Ending Balance | $14,090.88 | $8,550.91 | $8,591.42 | $17,146.93 | $25,078.58 |

| Activity | Jensen Qual Grth Is | RBC Share Account | RBC SMID Cap Grth I | TRP Mid Cap Growth | Vang Windsor II Adm |
|---|---|---|---|---|---|
| Beginning Balance | $20,196.24 | $105,729.00 | $19,799.12 | $31,674.91 | $13,379.50 |
| Employee Contributions | 2,055.89 | 0.00 | 0.00 | 2,055.90 | 0.00 |
| Employer Contributions | 2,450.40 | 28,587.00 | 0.00 | 2,450.40 | 0.00 |
| Forfeitures | -10,247.49 | -128,451.79 | -4,258.91 | -26,287.73 | -5,651.12 |
| Dividends and Interest | 299.80 | 5,611.74 | 1,246.65 | 554.59 | 292.86 |
| Withdrawal | -5,226.94 | -19,332.46 | -7,466.90 | -4,529.29 | 0.00 |
| Fees | -52.02 | -10.19 | -40.87 | -76.56 | -35.44 |
| Change in Market Value | 2,472.28 | 18,165.55 | 1,646.27 | 3,562.18 | 1,857.96 |
| Ending Balance | $11,948.16 | $10,298.88 | $10,925.36 | $9,404.40 | $9,843.76 |

| Activity | Virtus Contrn Val A | Total |
|---|---|---|
| Beginning Balance | $24,255.45 | $457,659.21 |
| Employee Contributions | 2,055.89 | 20,558.84 |
| Employer Contributions | 2,450.40 | 53,091.00 |
| Forfeitures | -14,578.18 | -297,676.04 |
| Dividends and Interest | 63.39 | 13,783.99 |
| Withdrawal | 0.00 | -94,770.89 |
| Fees | -70.50 | -881.79 |
| Change in Market Value | 3,200.29 | 63,565.95 |
| Ending Balance | $17,376.74 | $215,330.27 |

## Market Value of Your Account

Displayed are the beginning and ending values of your account in dollars, and either shares of mutual funds or Company Stock.

| Investment | Shares on 12/31/2011 | Shares on 12/31/2012 | Price on 12/31/2011 | Price on 12/31/2012 | Market Value on 12/31/2011 | Market Value on 12/31/2012 |
|---|---|---|---|---|---|---|
| **Stock Investments** | | | | | **$457,659.21** | **$215,330.27** |
| AF Fundamntl Invs A | 531.502 | 351.425 | $35.39 | $40.78 | 18,809.87 | 14,331.11 |
| AF Grth Fund Amer R6 | 1,333.651 | 706.585 | $28.72 | $34.34 | 38,302.46 | 24,264.13 |
| AMG Sys Lg Cp Val IS | 805.615 | 473.695 | $8.99 | $10.40 | 7,242.49 | 4,926.43 |
| BlkRk Global Alloc A | 1,668.795 | 433.177 | $18.16 | $19.74 | 30,305.30 | 8,550.91 |
| Blkrk Sm Cap Gr Eq I | 519.827 | 369.206 | $23.46 | $23.27 | 12,195.15 | 8,591.42 |
| Invs Comstock Y | 2,013.459 | 962.770 | $15.21 | $17.81 | 30,624.70 | 17,146.93 |
| Invs Sm Cap Disc Y | 4,225.992 | 2,432.452 | $9.80 | $10.31 | 41,414.72 | 25,078.58 |
| TRP Mid Cap Growth | 600.700 | 166.538 | $52.73 | $56.47 | 31,674.91 | 9,404.40 |
| Virtus Contrn Val A | 1,029.081 | 652.035 | $23.57 | $26.65 | 24,255.45 | 17,376.74 |
| RBC Share Account | 2,074.745 | 170.794 | $50.96 | $60.30 | 105,729.00 | 10,298.88 |
| Vang Windsor II Adm | 292.448 | 188.831 | $45.75 | $52.13 | 13,379.50 | 9,843.76 |
| Jensen Qual Grth Is | 761.548 | 401.349 | $26.52 | $29.77 | 20,196.24 | 11,948.16 |
| Artisan Intl Val Inv | 810.762 | 463.821 | $25.09 | $30.38 | 20,342.03 | 14,090.88 |

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 16-cv-05616-RBL - Page 62

CONFIDENTIAL

RBC-PAUL000004614

## Market Value of Your Account (continued)

| Investment | Shares on 12/31/2011 | Shares on 12/31/2012 | Price on 12/31/2011 | Price on 12/31/2012 | Market Value on 12/31/2011 | Market Value on 12/31/2012 |
|---|---|---|---|---|---|---|
| AF EuroPac Growth R6 | 896.070 | 480.493 | $35.13 | $41.18 | 31,478.94 | 19,786.70 |
| ABF Sm Cap Val Inst | 626.477 | 411.544 | $19.01 | $21.30 | 11,909.33 | 8,765.88 |
| RBC SMID Cap Grth I | 1,495.401 | 795.150 | $13.24 | $13.74 | 19,799.12 | 10,925.36 |
| **Account Total** | | | | | **$457,659.21** | **$215,330.27** |

Remember that a dividend payment to fund shareholders reduces the share price of the fund, so a decrease in the share price for the statement period does not necessarily reflect lower fund performance.

This plan represents an unfunded, nonqualified plan, and no funded account has been established for you. In the event of a bankruptcy or insolvency, you would be an unsecured general creditor of the plan sponsor. For more information, refer to the plan documents.
Please check your account information frequently and promptly review correspondence, account statements, and confirmations as they are made available to you. Contact Fidelity immediately if you see or suspect unauthorized activity, errors, discrepancies, or if you have not received your account documents or information.

Some of the administrative services performed for the Plan were underwritten from the total operating expenses of the Plan's investment options.

## Market Value by Plan Year
This section displays the Market Value of your account by Year of Deferral.

| Plan Year | Contribution Source | Distribution Election | Distribution Type | Market Value on 12/31/2012 | Effective Date |
|---|---|---|---|---|---|
| 2007 | | | | | |
| | Employee Voluntary | Election Unknown | | | Unknown |
| 2007 Employee Voluntary | | | | 48,745.41 | |
| **2007 Total** | | | | **48,745.41** | |
| 2008 | | | | | |
| | Employee Voluntary | Election Unknown | | | Unknown |
| 2008 Employee Voluntary | | | | 45,964.84 | |
| **2008 Total** | | | | **45,964.84** | |
| 2009 | | | | | |
| | Employee Voluntary | Election Unknown | | | Unknown |
| 2009 Employee Voluntary | | | | 51,203.51 | |
| **2009 Total** | | | | **51,203.51** | |
| 2010 | | | | | |
| | Employee Voluntary | Election Unknown | | | Unknown |

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 2:16-cv-05616-RBL - Page 63

CONFIDENTIAL

RBC-PAUL000004615

## Market Value by Plan Year (continued)
This section displays the Market Value of your account by Year of Deferral.

| Plan Year | Contribution Source | Distribution Election | Distribution Type | Market Value on 12/31/2012 | Effective Date |
|---|---|---|---|---|---|
| **2010 Employee Voluntary** | | | | 47,362.79 | |
| **2010 Total** | | | | 47,362.79 | |
| **2012** | Employee Voluntary | Election Unknown | | | Unknown |
| **2012 Employee Voluntary** | | | | 22,053.72 | |
| **2012 Total** | | | | 22,053.72 | |
| **Total Market Value** | | | | 215,330.27 | |

## Message From RBC

If you have any questions about your account, please call the RBC - USA Retirement Help Line at 1-866-697-1002, or access your account online at www.netbenefits.com/RBC.

## Market Value of Distributions
This section displays the current Market Value of your account by distribution election.

| Distribution Year: | Funds: | Shares On: 12/31/2012 | Price On: 12/31/2012 | Market Value: 12/31/2012 | Total Market Value: 12/31/2012 |
|---|---|---|---|---|---|
| **Other Account Holdings** | | | | | |
| | TRP Mid Cap Growth | 166.538 | 56.47 | 9,404.40 | |
| | AF Fundamntl Invs A | 351.425 | 40.78 | 14,331.11 | |
| | BlkRk Global Alloc A | 433.177 | 19.74 | 8,550.91 | |
| | Artisan Intl Val Inv | 463.821 | 30.38 | 14,090.88 | |
| | Jensen Qual Grth Is | 401.349 | 29.77 | 11,948.16 | |
| | AMG Sys Lg Cp Val IS | 473.695 | 10.40 | 4,926.43 | |
| | Invs Comstock Y | 962.770 | 17.81 | 17,146.93 | |
| | Invs Sm Cap Disc Y | 2,432.452 | 10.31 | 25,078.58 | |
| | Blkrk Sm Cap Gr Eq I | 369.206 | 23.27 | 8,591.42 | |
| | Vang Windsor II Adm | 188.831 | 52.13 | 9,843.76 | |
| | RBC SMID Cap Grth I | 795.150 | 13.74 | 10,925.36 | |
| | ABF Sm Cap Val Inst | 411.544 | 21.30 | 8,765.88 | |
| | Virtus Contrn Val A | 652.035 | 26.65 | 17,376.74 | |
| | AF EuroPac Growth R6 | 480.493 | 41.18 | 19,786.70 | |
| | AF Grth Fund Amer R6 | 706.585 | 34.34 | 24,264.13 | |
| | RBC Share Account | 170.794 | 60.30 | 10,298.88 | |
| | | | | | 215,330.27 |
| **Total Market Value** | | | | | 215,330.27 |

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 2:16-cv-05616-RBL - Page 64

CONFIDENTIAL

RBC-PAUL000004616

## Your Contribution Elections as of 08/10/2016

This section displays the funds in which your future contributions will be invested.

| Investment | Employee Voluntary | DAP Employer 8 YR Cliff | 2004 Voluntary Deferral | 2015 Voluntary Election | 3 Year Grad |
|---|---|---|---|---|---|
| ABF Sm Cap Val Inst | 5% | 5% | 5% | 5% | 5% |
| AF EuroPac Growth R6 | 10% | 10% | 10% | 10% | 10% |
| AF Fundmntl Inv R6 | 10% | 10% | 10% | 10% | 10% |
| Artisan Intl Val Inv | 10% | 10% | 10% | 10% | 10% |
| BlkRk Global Alloc I | 10% | 10% | 10% | 10% | 10% |
| Jensen Qual Grth Is | 10% | 10% | 10% | 10% | 10% |
| TRP Grth Stk Trust B | 10% | 10% | 10% | 10% | 10% |
| TRP Is Mid Cp Eq Gr | 25% | 25% | 25% | 25% | 25% |
| Virtus Contrn Val I | 10% | 10% | 10% | 10% | 10% |
| Total | 100% | 100% | 100% | 100% | 100% |

| Investment | 5yr Cliff Restrict Vest | DAP 5YR Restricted Vest | 4yr Cliff Restrict Vest | DAP 3 YEAR GRAD | Employer 8 Year Cliff |
|---|---|---|---|---|---|
| ABF Sm Cap Val Inst | 5% | 0% | 5% | 5% | 5% |
| AF EuroPac Growth R6 | 10% | 0% | 10% | 10% | 10% |
| AF Fundmntl Inv R6 | 10% | 0% | 10% | 10% | 10% |
| Artisan Intl Val Inv | 10% | 0% | 10% | 10% | 10% |
| BlkRk Global Alloc I | 10% | 0% | 10% | 10% | 10% |
| Jensen Qual Grth Is | 10% | 0% | 10% | 10% | 10% |
| RBC Share Account | 0% | 100% | 0% | 0% | 0% |
| TRP Grth Stk Trust B | 10% | 0% | 10% | 10% | 10% |
| TRP Is Mid Cp Eq Gr | 25% | 0% | 25% | 25% | 25% |
| Virtus Contrn Val I | 10% | 0% | 10% | 10% | 10% |
| Total | 100% | 100% | 100% | 100% | 100% |

| Investment | Dap Employer 5 Year Cliff | DAP Bonus 5 yr Cliff | Dap Voluntary |
|---|---|---|---|
| ABF Sm Cap Val Inst | 0% | 5% | 5% |
| AF EuroPac Growth R6 | 0% | 10% | 10% |
| AF Fundmntl Inv R6 | 0% | 10% | 10% |
| Artisan Intl Val Inv | 0% | 10% | 10% |
| BlkRk Global Alloc I | 0% | 10% | 10% |
| Jensen Qual Grth Is | 0% | 10% | 10% |
| RBC Share Account | 100% | 0% | 0% |
| TRP Grth Stk Trust B | 0% | 10% | 10% |
| TRP Is Mid Cp Eq Gr | 0% | 25% | 25% |
| Virtus Contrn Val I | 0% | 10% | 10% |
| Total | 100% | 100% | 100% |

| Contributions | Employee Voluntary | Employer 5 yr Cliff | WAP Bonus 5yr Cliff |
|---|---|---|---|
| This Period | $20,558.84 | $28,587.00 | $24,504.00 |
| Year to Date | $20,558.84 | $28,587.00 | $24,504.00 |
| **Total Account Balances** | **215,330.27** | **0.00** | **0.00** |

## Your Transaction Detail

This section will provide you with detailed day to day activity in your account during the statement period.

| Trade Date | Transaction Type | Source | Shares | Price | Transaction Amount |
|---|---|---|---|---|---|
| **ABF Sm Cap Val Inst** | | | | | |
| 01/03/2012 | Contribution | WAP Bonus 5yr Cliff | 63.318 | $19.35 | $1,225.20 |
| 01/10/2012 | Contribution | Employee Voluntary | 1.066 | $19.74 | $21.05 |
| 02/07/2012 | Recordkeeping Fee | Employee Voluntary | -0.006 | $21.24 | -0.12 |
| 02/07/2012 | Realized G/L | Employee Voluntary | | | $0.03 |
| 02/07/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.006 | $21.24 | -0.13 |

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 65
CONFIDENTIAL

RBC-PAUL000004617

# Your Transaction Detail (continued)

| Trade Date | Transaction Type | Source | Shares | Price | Transaction Amount |
|---|---|---|---|---|---|
| 02/07/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.06 |
| 02/10/2012 | Contribution | Employee Voluntary | 14.921 | $21.01 | $313.50 |
| 03/09/2012 | Contribution | Employee Voluntary | 2.083 | $21.16 | $44.07 |
| 03/30/2012 | Trustee Fee | Employee Voluntary | -0.227 | $21.39 | -4.87 |
| 03/30/2012 | Realized G/L | Employee Voluntary | | | $1.09 |
| 03/30/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.214 | $21.39 | -4.59 |
| 03/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.97 |
| 04/10/2012 | Contribution | Employee Voluntary | 1.923 | $20.27 | $38.98 |
| 04/20/2012 | Recordkeeping Fee | Employee Voluntary | -0.006 | $20.68 | -0.13 |
| 04/20/2012 | Realized G/L | Employee Voluntary | | | $0.04 |
| 04/20/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.006 | $20.68 | -0.12 |
| 04/20/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.05 |
| 05/10/2012 | Contribution | Employee Voluntary | 17.961 | $20.25 | $363.72 |
| 06/08/2012 | Contribution | Employee Voluntary | 1.032 | $19.48 | $20.10 |
| 06/29/2012 | Trustee Fee | Employee Voluntary | -0.239 | $20.16 | -4.85 |
| 06/29/2012 | Realized G/L | Employee Voluntary | | | $0.83 |
| 06/29/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.214 | $20.16 | -4.32 |
| 06/29/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.70 |
| 07/10/2012 | Contribution | Employee Voluntary | 1.009 | $20.00 | $20.17 |
| 07/31/2012 | Recordkeeping Fee | Employee Voluntary | -0.007 | $20.04 | -0.17 |
| 07/31/2012 | Realized G/L | Employee Voluntary | | | $0.06 |
| 07/31/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.006 | $20.04 | -0.15 |
| 07/31/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.08 |
| 08/10/2012 | Contribution | Employee Voluntary | 17.043 | $20.57 | $350.58 |
| 08/10/2012 | Realized G/L | Employee Voluntary | | | $0.21 |
| 08/10/2012 | Contrib Adj | Employee Voluntary | -7.662 | $20.57 | -157.61 |
| 09/10/2012 | Contrib Adj | Employee Voluntary | 0.624 | $21.45 | $13.38 |
| 09/28/2012 | Trustee Fee | Employee Voluntary | -0.246 | $21.25 | -5.25 |
| 09/28/2012 | Realized G/L | Employee Voluntary | | | $1.08 |
| 09/28/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.214 | $21.25 | -4.55 |
| 09/28/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.93 |
| 10/19/2012 | Recordkeeping Fee | Employee Voluntary | -0.007 | $21.13 | -0.16 |
| 10/19/2012 | Realized G/L | Employee Voluntary | | | $0.05 |
| 10/19/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.006 | $21.13 | -0.15 |
| 10/19/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.08 |
| 11/30/2012 | Forfeited Amount | WAP Bonus 5yr Cliff | -342.400 | $21.35 | -7,310.24 |
| 11/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $1,510.53 |
| 12/20/2012 | Dividend | Employee Voluntary | 15.810 | $21.39 | $338.17 |
| 12/31/2012 | Trustee Fee | Employee Voluntary | -0.257 | $21.30 | -5.48 |
| 12/31/2012 | Realized G/L | Employee Voluntary | | | $1.10 |
| **AF EuroPac Growth R6** | | | | | |
| 01/03/2012 | Contribution | WAP Bonus 5yr Cliff | 68.086 | $35.99 | $2,450.40 |
| 01/10/2012 | Contribution | Employee Voluntary | 1.178 | $35.73 | $42.09 |
| 02/07/2012 | Recordkeeping Fee | Employee Voluntary | -0.010 | $38.63 | -0.38 |
| 02/07/2012 | Realized G/L | Employee Voluntary | | | -0.02 |
| 02/07/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.006 | $38.63 | -0.26 |
| 02/07/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.03 |
| 02/10/2012 | Contribution | Employee Voluntary | 16.354 | $38.34 | $627.01 |
| 03/09/2012 | Contribution | Employee Voluntary | 2.246 | $39.23 | $88.13 |
| 03/30/2012 | Trustee Fee | Employee Voluntary | -0.374 | $39.48 | -14.79 |
| 03/30/2012 | Realized G/L | Employee Voluntary | | | -0.62 |
| 03/30/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.241 | $39.48 | -9.50 |
| 03/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | -0.24 |
| 04/10/2012 | Contribution | Employee Voluntary | 2.058 | $37.89 | $77.96 |
| 04/20/2012 | Recordkeeping Fee | Employee Voluntary | -0.010 | $39.02 | -0.38 |
| 04/20/2012 | Realized G/L | Employee Voluntary | | | -0.02 |
| 04/20/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.006 | $39.02 | -0.23 |
| 05/10/2012 | Contribution | Employee Voluntary | 19.332 | $37.63 | $727.45 |
| 06/08/2012 | Contribution | Employee Voluntary | 1.130 | $35.58 | $40.20 |

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
No. 3:16-cv-05616-RBL - Page 66
CONFIDENTIAL

RBC-PAUL000004618

## Your Transaction Detail (continued)

| Trade Date | Transaction Type | Source | Shares | Price | Transaction Amount |
|---|---|---|---|---|---|
| 06/29/2012 | Trustee Fee | Employee Voluntary | -0.287 | $37.06 | -10.65 |
| 06/29/2012 | Realized G/L | Employee Voluntary | | | -1.11 |
| 06/29/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.194 | $37.06 | -7.18 |
| 06/29/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | -0.62 |
| 07/02/2012 | Withdrawal | Employee Voluntary | -161.560 | $37.10 | -5,993.88 |
| 07/02/2012 | Realized G/L | Employee Voluntary | | | -680.28 |
| 07/02/2012 | Withdrawal | WAP Bonus 5yr Cliff | -74.778 | $37.10 | -2,774.26 |
| 07/02/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | -314.89 |
| 07/10/2012 | Contribution | Employee Voluntary | 1.107 | $36.44 | $40.35 |
| 07/31/2012 | Recordkeeping Fee | Employee Voluntary | -0.010 | $37.76 | -0.38 |
| 07/31/2012 | Realized G/L | Employee Voluntary | | | -0.01 |
| 07/31/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.008 | $37.76 | -0.26 |
| 07/31/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | -0.05 |
| 08/10/2012 | Contribution | Employee Voluntary | 18.212 | $38.50 | $701.16 |
| 08/10/2012 | Realized G/L | Employee Voluntary | | | $5.25 |
| 08/10/2012 | Contrib Adj | Employee Voluntary | -8.188 | $38.50 | -315.23 |
| 09/10/2012 | Contrib Adj | Employee Voluntary | 0.685 | $39.09 | $26.76 |
| 09/28/2012 | Trustee Fee | Employee Voluntary | -0.295 | $39.78 | -11.72 |
| 09/28/2012 | Realized G/L | Employee Voluntary | | | -0.36 |
| 09/28/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.193 | $39.78 | -7.69 |
| 09/28/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | -0.07 |
| 10/19/2012 | Recordkeeping Fee | Employee Voluntary | -0.009 | $40.13 | -0.37 |
| 10/19/2012 | Realized G/L | Employee Voluntary | | | $0.02 |
| 10/19/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.005 | $40.13 | -0.25 |
| 10/19/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.06 |
| 11/30/2012 | Forfeited Amount | WAP Bonus 5yr Cliff | -309.204 | $40.89 | -12,643.35 |
| 11/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $205.43 |
| 12/26/2012 | Dividend | Employee Voluntary | 9.712 | $40.90 | $397.22 |
| 12/31/2012 | Trustee Fee | Employee Voluntary | -0.299 | $41.18 | -12.37 |
| 12/31/2012 | Realized G/L | Employee Voluntary | | | $0.12 |
| | | | | | |
| **AF Fundamntl Invs A** | | | | | |
| 01/03/2012 | Contribution | WAP Bonus 5yr Cliff | 67.935 | $36.07 | $2,450.40 |
| 01/10/2012 | Contribution | Employee Voluntary | 1.154 | $36.47 | $42.09 |
| 02/07/2012 | Recordkeeping Fee | Employee Voluntary | -0.005 | $38.18 | -0.20 |
| 02/07/2012 | Realized G/L | Employee Voluntary | | | $0.06 |
| 02/07/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.006 | $38.18 | -0.19 |
| 02/07/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.03 |
| 02/10/2012 | Contribution | Employee Voluntary | 16.535 | $37.92 | $627.01 |
| 03/09/2012 | Contribution | Employee Voluntary | 2.274 | $38.76 | $88.13 |
| 03/16/2012 | Dividend | Employee Voluntary | 0.992 | $39.41 | $39.10 |
| 03/16/2012 | Dividend | WAP Bonus 5yr Cliff | 0.972 | $39.41 | $38.33 |
| 03/30/2012 | Trustee Fee | Employee Voluntary | -0.195 | $39.36 | -7.71 |
| 03/30/2012 | Realized G/L | Employee Voluntary | | | $1.50 |
| 03/30/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.192 | $39.36 | -7.57 |
| 03/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $1.56 |
| 04/10/2012 | Contribution | Employee Voluntary | 2.059 | $37.86 | $77.95 |
| 04/20/2012 | Recordkeeping Fee | Employee Voluntary | -0.005 | $38.65 | -0.20 |
| 04/20/2012 | Realized G/L | Employee Voluntary | | | $0.06 |
| 04/20/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.006 | $38.65 | -0.19 |
| 04/20/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.03 |
| 05/10/2012 | Contribution | Employee Voluntary | 19.179 | $37.93 | $727.45 |
| 06/08/2012 | Contribution | Employee Voluntary | 1.091 | $36.85 | $40.20 |
| 06/13/2012 | Dividend | Employee Voluntary | 1.154 | $36.39 | $41.99 |
| 06/13/2012 | Dividend | WAP Bonus 5yr Cliff | 1.056 | $36.39 | $38.42 |
| 06/29/2012 | Trustee Fee | Employee Voluntary | -0.209 | $37.81 | -7.96 |
| 06/29/2012 | Realized G/L | Employee Voluntary | | | $1.23 |
| 06/29/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.193 | $37.81 | -7.28 |
| 06/29/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $1.26 |
| 07/10/2012 | Contribution | Employee Voluntary | 1.085 | $37.19 | $40.35 |

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 67
CONFIDENTIAL

RBC-PAUL000004619

## Your Transaction Detail (continued)

| Trade Date | Transaction Type | Source | Shares | Price | Transaction Amount |
|---|---|---|---|---|---|
| 07/31/2012 | Recordkeeping Fee | Employee Voluntary | -0.008 | $38.40 | -0.29 |
| 07/31/2012 | Realized G/L | Employee Voluntary | | | $0.05 |
| 07/31/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.007 | $38.40 | -0.26 |
| 07/31/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.06 |
| 08/10/2012 | Contribution | Employee Voluntary | 17.887 | $39.20 | $701.16 |
| 08/10/2012 | Realized G/L | Employee Voluntary | | | $10.62 |
| 08/10/2012 | Contrib Adj | Employee Voluntary | -8.042 | $39.20 | -315.23 |
| 09/10/2012 | Contrib Adj | Employee Voluntary | 0.669 | $39.99 | $26.77 |
| 09/12/2012 | Dividend Adj | Employee Voluntary | -0.023 | $40.08 | -0.92 |
| 09/12/2012 | Dividend | Employee Voluntary | 1.109 | $40.08 | $44.47 |
| 09/12/2012 | Dividend | WAP Bonus 5yr Cliff | 0.962 | $40.08 | $38.53 |
| 09/28/2012 | Trustee Fee | Employee Voluntary | -0.220 | $40.12 | -8.76 |
| 09/28/2012 | Realized G/L | Employee Voluntary | | | $1.61 |
| 09/28/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.193 | $40.12 | -7.75 |
| 09/28/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $1.72 |
| 10/19/2012 | Recordkeeping Fee | Employee Voluntary | -0.006 | $40.23 | -0.28 |
| 10/19/2012 | Realized G/L | Employee Voluntary | | | $0.11 |
| 10/19/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.006 | $40.23 | -0.25 |
| 10/19/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.09 |
| 11/30/2012 | Forfeited Amount | WAP Bonus 5yr Cliff | -308.999 | $40.45 | -12,499.00 |
| 11/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $2,821.41 |
| 12/19/2012 | Dividend | Employee Voluntary | 2.345 | $40.97 | $96.06 |
| 12/31/2012 | Trustee Fee | Employee Voluntary | -0.220 | $40.78 | -8.96 |
| 12/31/2012 | Realized G/L | Employee Voluntary | | | $1.80 |
| | | | | | |
| **AF Grth Fund Amer R6** | | | | | |
| 01/03/2012 | Contribution | WAP Bonus 5yr Cliff | 83.631 | $29.30 | $2,450.40 |
| 01/10/2012 | Contribution | Employee Voluntary | 1.416 | $29.73 | $42.09 |
| 02/07/2012 | Recordkeeping Fee | Employee Voluntary | -0.015 | $31.63 | -0.48 |
| 02/07/2012 | Realized G/L | Employee Voluntary | | | $0.03 |
| 02/07/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.010 | $31.63 | -0.28 |
| 02/07/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | -0.01 |
| 02/10/2012 | Contribution | Employee Voluntary | 19.861 | $31.57 | $627.01 |
| 03/09/2012 | Contribution | Employee Voluntary | 2.735 | $32.22 | $88.13 |
| 03/30/2012 | Trustee Fee | Employee Voluntary | -0.578 | $32.94 | -19.00 |
| 03/30/2012 | Realized G/L | Employee Voluntary | | | $1.19 |
| 03/30/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.323 | $32.94 | -10.65 |
| 03/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.74 |
| 04/10/2012 | Contribution | Employee Voluntary | 2.453 | $31.78 | $77.95 |
| 04/20/2012 | Recordkeeping Fee | Employee Voluntary | -0.013 | $32.27 | -0.47 |
| 04/20/2012 | Realized G/L | Employee Voluntary | | | $0.08 |
| 04/20/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.008 | $32.27 | -0.27 |
| 04/20/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.04 |
| 05/10/2012 | Contribution | Employee Voluntary | 22.919 | $31.74 | $727.45 |
| 06/08/2012 | Contribution | Employee Voluntary | 1.303 | $30.86 | $40.20 |
| 06/29/2012 | Trustee Fee | Employee Voluntary | -0.429 | $31.59 | -13.54 |
| 06/29/2012 | Realized G/L | Employee Voluntary | | | $0.30 |
| 06/29/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.228 | $31.59 | -7.20 |
| 06/29/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.22 |
| 07/02/2012 | Withdrawal | Employee Voluntary | -263.364 | $31.69 | -8,346.01 |
| 07/02/2012 | Realized G/L | Employee Voluntary | | | $236.41 |
| 07/02/2012 | Withdrawal | WAP Bonus 5yr Cliff | -153.069 | $31.69 | -4,850.76 |
| 07/02/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $137.44 |
| 07/10/2012 | Contribution | Employee Voluntary | 1.296 | $31.13 | $40.35 |
| 07/31/2012 | Recordkeeping Fee | Employee Voluntary | -0.015 | $31.86 | -0.48 |
| 07/31/2012 | Realized G/L | Employee Voluntary | | | $0.03 |
| 07/31/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.008 | $31.86 | -0.26 |
| 07/31/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.03 |
| 08/10/2012 | Contribution | Employee Voluntary | 21.443 | $32.70 | $701.17 |
| 08/10/2012 | Realized G/L | Employee Voluntary | | | $10.51 |

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 68
CONFIDENTIAL

RBC-PAUL000004620

## Your Transaction Detail (continued)

| Trade Date | Transaction Type | Source | Shares | Price | Transaction Amount |
|---|---|---|---|---|---|
| 08/10/2012 | Contrib Adj | Employee Voluntary | -9.640 | $32.70 | -315.23 |
| 09/10/2012 | Contrib Adj | Employee Voluntary | 0.798 | $33.54 | $26.76 |
| 09/28/2012 | Trustee Fee | Employee Voluntary | -0.437 | $33.94 | -14.84 |
| 09/28/2012 | Realized G/L | Employee Voluntary | | | $1.33 |
| 09/28/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.229 | $33.94 | -7.74 |
| 09/28/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.73 |
| 10/19/2012 | Recordkeeping Fee | Employee Voluntary | -0.014 | $33.78 | -0.46 |
| 10/19/2012 | Realized G/L | Employee Voluntary | | | $0.04 |
| 10/19/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.007 | $33.78 | -0.24 |
| 10/19/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.04 |
| 11/30/2012 | Forfeited Amount | WAP Bonus 5yr Cliff | -364.362 | $34.25 | -12,479.40 |
| 11/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $1,314.50 |
| 12/19/2012 | Dividend | Employee Voluntary | 8.270 | $34.49 | $285.23 |
| 12/31/2012 | Trustee Fee | Employee Voluntary | -0.442 | $34.34 | -15.17 |
| 12/31/2012 | Realized G/L | Employee Voluntary | | | $1.50 |
| **AMG Sys Lg Cp Val IS** | | | | | |
| 02/07/2012 | Recordkeeping Fee | Employee Voluntary | -0.008 | $9.94 | -0.08 |
| 02/07/2012 | Realized G/L | Employee Voluntary | | | $0.03 |
| 02/07/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.006 | $9.94 | -0.06 |
| 02/07/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.02 |
| 03/30/2012 | Trustee Fee | Employee Voluntary | -0.292 | $10.34 | -3.02 |
| 03/30/2012 | Realized G/L | Employee Voluntary | | | $0.50 |
| 03/30/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.212 | $10.34 | -2.19 |
| 03/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.59 |
| 04/20/2012 | Recordkeeping Fee | Employee Voluntary | -0.008 | $10.06 | -0.08 |
| 04/20/2012 | Realized G/L | Employee Voluntary | | | $0.03 |
| 04/20/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.005 | $10.06 | -0.05 |
| 04/20/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.02 |
| 06/29/2012 | Trustee Fee | Employee Voluntary | -0.291 | $9.78 | -2.85 |
| 06/29/2012 | Realized G/L | Employee Voluntary | | | $0.34 |
| 06/29/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.211 | $9.78 | -2.06 |
| 06/29/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.46 |
| 07/31/2012 | Recordkeeping Fee | Employee Voluntary | -0.010 | $9.90 | -0.10 |
| 07/31/2012 | Realized G/L | Employee Voluntary | | | $0.03 |
| 07/31/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.007 | $9.90 | -0.07 |
| 07/31/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.02 |
| 09/28/2012 | Trustee Fee | Employee Voluntary | -0.292 | $10.56 | -3.08 |
| 09/28/2012 | Realized G/L | Employee Voluntary | | | $0.56 |
| 09/28/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.211 | $10.56 | -2.23 |
| 09/28/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.63 |
| 10/19/2012 | Recordkeeping Fee | Employee Voluntary | -0.010 | $10.62 | -0.10 |
| 10/19/2012 | Realized G/L | Employee Voluntary | | | $0.03 |
| 10/19/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.007 | $10.62 | -0.07 |
| 10/19/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.02 |
| 11/30/2012 | Forfeited Amount | WAP Bonus 5yr Cliff | -337.872 | $10.43 | -3,524.00 |
| 11/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $958.16 |
| 12/26/2012 | Dividend | Employee Voluntary | 7.818 | $10.34 | $80.84 |
| 12/31/2012 | Trustee Fee | Employee Voluntary | -0.296 | $10.40 | -3.08 |
| 12/31/2012 | Realized G/L | Employee Voluntary | | | $0.52 |
| **Artisan Intl Val Inv** | | | | | |
| 01/03/2012 | Contribution | WAP Bonus 5yr Cliff | 95.607 | $25.63 | $2,450.40 |
| 01/10/2012 | Contribution | WAP Bonus 5yr Cliff | 1.658 | $25.38 | $42.09 |
| 02/07/2012 | Recordkeeping Fee | Employee Voluntary | -0.009 | $27.08 | -0.24 |
| 02/07/2012 | Realized G/L | Employee Voluntary | | | $0.03 |
| 02/07/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.005 | $27.08 | -0.20 |
| 02/07/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.10 |
| 02/10/2012 | Contribution | Employee Voluntary | 23.457 | $26.73 | $627.01 |
| 03/09/2012 | Contribution | Employee Voluntary | 3.192 | $27.61 | $88.13 |

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 69

CONFIDENTIAL

RBC-PAUL000004621

## Your Transaction Detail (continued)

| Trade Date | Transaction Type | Source | Shares | Price | Transaction Amount |
|---|---|---|---|---|---|
| 03/30/2012 | Trustee Fee | Employee Voluntary | -0.333 | $27.92 | -9.29 |
| 03/30/2012 | Realized G/L | Employee Voluntary | | | $0.35 |
| 03/30/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.251 | $27.92 | -7.01 |
| 03/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.17 |
| 04/10/2012 | Contribution | Employee Voluntary | 2.930 | $26.60 | $77.95 |
| 04/20/2012 | Recordkeeping Fee | Employee Voluntary | -0.009 | $27.25 | -0.24 |
| 04/20/2012 | Realized G/L | Employee Voluntary | | | $0.03 |
| 04/20/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.005 | $27.25 | -0.18 |
| 04/20/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.08 |
| 05/10/2012 | Contribution | Employee Voluntary | 27.327 | $26.62 | $727.45 |
| 06/08/2012 | Contribution | Employee Voluntary | 1.579 | $25.46 | $40.20 |
| 06/29/2012 | Trustee Fee | Employee Voluntary | -0.275 | $26.47 | -7.30 |
| 06/29/2012 | Realized G/L | Employee Voluntary | | | -0.02 |
| 06/29/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.216 | $26.47 | -5.71 |
| 06/29/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | -0.16 |
| 07/02/2012 | Withdrawal | Employee Voluntary | -122.493 | $26.58 | -3,255.86 |
| 07/02/2012 | Realized G/L | Employee Voluntary | | | -129.66 |
| 07/02/2012 | Withdrawal | WAP Bonus 5yr Cliff | -56.697 | $26.58 | -1,507.01 |
| 07/02/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | -60.04 |
| 07/10/2012 | Contribution | Employee Voluntary | 1.554 | $25.97 | $40.35 |
| 07/31/2012 | Recordkeeping Fee | Employee Voluntary | -0.010 | $26.82 | -0.26 |
| 07/31/2012 | Realized G/L | Employee Voluntary | | | $0.02 |
| 07/31/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.006 | $26.82 | -0.20 |
| 07/31/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.06 |
| 08/10/2012 | Contribution | Employee Voluntary | 25.414 | $27.59 | $701.16 |
| 08/10/2012 | Realized G/L | Employee Voluntary | | | $10.92 |
| 08/10/2012 | Contrib Adj | Employee Voluntary | -11.426 | $27.59 | -315.23 |
| 09/10/2012 | Contrib Adj | Employee Voluntary | 0.931 | $28.74 | $26.77 |
| 09/28/2012 | Trustee Fee | Employee Voluntary | -0.286 | $28.72 | -8.21 |
| 09/28/2012 | Realized G/L | Employee Voluntary | | | $0.59 |
| 09/28/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.216 | $28.72 | -6.19 |
| 09/28/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.32 |
| 10/19/2012 | Recordkeeping Fee | Employee Voluntary | -0.008 | $29.01 | -0.26 |
| 10/19/2012 | Realized G/L | Employee Voluntary | | | $0.08 |
| 10/19/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.006 | $29.01 | -0.19 |
| 10/19/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.05 |
| 11/30/2012 | Forfeited Amount | WAP Bonus 5yr Cliff | -344.595 | $29.87 | -10,293.06 |
| 11/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $938.73 |
| 12/19/2012 | Dividend | Employee Voluntary | 6.546 | $30.50 | $199.64 |
| 12/31/2012 | Trustee Fee | Employee Voluntary | -0.290 | $30.38 | -8.81 |
| 12/31/2012 | Realized G/L | Employee Voluntary | | | $1.06 |
| **BlkRk Global Alloc A** | | | | | |
| 01/03/2012 | Contribution | WAP Bonus 5yr Cliff | 132.597 | $18.48 | $2,450.40 |
| 01/10/2012 | Contribution | Employee Voluntary | 2.266 | $18.58 | $42.10 |
| 02/07/2012 | Recordkeeping Fee | Employee Voluntary | -0.006 | $19.39 | -0.11 |
| 02/07/2012 | Realized G/L | Employee Voluntary | | | $0.01 |
| 02/07/2012 | Recordkeeping Fee | Employer 5 yr Cliff | -0.019 | $19.39 | -0.37 |
| 02/07/2012 | Realized G/L | Employer 5 yr Cliff | | | -0.01 |
| 02/07/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.008 | $19.39 | -0.12 |
| 02/07/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | -0.02 |
| 02/10/2012 | Contribution | Employee Voluntary | 32.555 | $19.26 | $627.00 |
| 03/09/2012 | Contribution | Employee Voluntary | 4.508 | $19.55 | $88.14 |
| 03/30/2012 | Trustee Fee | Employee Voluntary | -0.225 | $19.63 | -4.43 |
| 03/30/2012 | Realized G/L | Employee Voluntary | | | $0.20 |
| 03/30/2012 | Trustee Fee | Employer 5 yr Cliff | -0.681 | $19.63 | -13.36 |
| 03/30/2012 | Realized G/L | Employer 5 yr Cliff | | | -0.26 |
| 03/30/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.245 | $19.63 | -4.80 |
| 03/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.15 |
| 04/10/2012 | Contribution | Employee Voluntary | 4.080 | $19.11 | $77.96 |

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 2:16-cv-05616-RBL - Page 70

CONFIDENTIAL

RBC-PAUL000004622

## Your Transaction Detail (continued)

| Trade Date | Transaction Type | Source | Shares | Price | Transaction Amount |
|---|---|---|---|---|---|
| 04/20/2012 | Recordkeeping Fee | Employee Voluntary | -0.007 | $19.26 | -0.11 |
| 04/20/2012 | Recordkeeping Fee | Employer 5 yr Cliff | -0.018 | $19.26 | -0.34 |
| 04/20/2012 | Realized G/L | Employer 5 yr Cliff | | | -0.02 |
| 04/20/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.008 | $19.26 | -0.12 |
| 04/20/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | -0.02 |
| 05/10/2012 | Contribution | Employee Voluntary | 38.489 | $18.90 | $727.44 |
| 06/08/2012 | Contribution | Employee Voluntary | 2.185 | $18.40 | $40.20 |
| 06/29/2012 | Trustee Fee | Employee Voluntary | -0.254 | $18.79 | -4.76 |
| 06/29/2012 | Realized G/L | Employee Voluntary | | | -0.02 |
| 06/29/2012 | Trustee Fee | Employer 5 yr Cliff | -0.540 | $18.79 | -10.14 |
| 06/29/2012 | Realized G/L | Employer 5 yr Cliff | | | -0.66 |
| 06/29/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.245 | $18.79 | -4.60 |
| 06/29/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | -0.05 |
| 07/02/2012 | Withdrawal | Employer 5 yr Cliff | -224.827 | $18.85 | -4,237.99 |
| 07/02/2012 | Realized G/L | Employer 5 yr Cliff | | | -262.91 |
| 07/10/2012 | Contribution | Employee Voluntary | 2.162 | $18.66 | $40.35 |
| 07/19/2012 | Dividend | Employee Voluntary | 2.696 | $18.84 | $50.78 |
| 07/19/2012 | Dividend | Employer 5 yr Cliff | 5.712 | $18.84 | $107.63 |
| 07/19/2012 | Dividend | WAP Bonus 5yr Cliff | 2.585 | $18.84 | $48.69 |
| 07/31/2012 | Recordkeeping Fee | Employee Voluntary | -0.009 | $18.85 | -0.17 |
| 07/31/2012 | Realized G/L | Employee Voluntary | | | $0.02 |
| 07/31/2012 | Recordkeeping Fee | Employer 5 yr Cliff | -0.018 | $18.85 | -0.35 |
| 07/31/2012 | Realized G/L | Employer 5 yr Cliff | | | -0.01 |
| 07/31/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.009 | $18.85 | -0.16 |
| 07/31/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.01 |
| 08/10/2012 | Contribution | Employee Voluntary | 36.557 | $19.18 | $701.17 |
| 08/10/2012 | Realized G/L | Employee Voluntary | | | $2.12 |
| 08/10/2012 | Contrib Adj | Employee Voluntary | -16.435 | $19.18 | -315.23 |
| 09/10/2012 | Contrib Adj | Employee Voluntary | 1.380 | $19.39 | $26.76 |
| 09/28/2012 | Trustee Fee | Employee Voluntary | -0.269 | $19.57 | -5.28 |
| 09/28/2012 | Realized G/L | Employee Voluntary | | | $0.21 |
| 09/28/2012 | Trustee Fee | Employer 5 yr Cliff | -0.543 | $19.57 | -10.62 |
| 09/28/2012 | Realized G/L | Employer 5 yr Cliff | | | -0.24 |
| 09/28/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.245 | $19.57 | -4.80 |
| 09/28/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.15 |
| 10/19/2012 | Recordkeeping Fee | Employee Voluntary | -0.009 | $19.59 | -0.17 |
| 10/19/2012 | Realized G/L | Employee Voluntary | | | $0.02 |
| 10/19/2012 | Recordkeeping Fee | Employer 5 yr Cliff | -0.018 | $19.59 | -0.33 |
| 10/19/2012 | Realized G/L | Employer 5 yr Cliff | | | -0.03 |
| 10/19/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.009 | $19.59 | -0.16 |
| 10/19/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.01 |
| 11/30/2012 | Forfeited Amount | Employer 5 yr Cliff | -868.068 | $19.54 | -16,962.05 |
| 11/30/2012 | Realized G/L | Employer 5 yr Cliff | | | -409.44 |
| 11/30/2012 | Forfeited Amount | WAP Bonus 5yr Cliff | -392.742 | $19.54 | -7,674.18 |
| 11/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $210.58 |
| 12/19/2012 | Dividend | Employee Voluntary | 2.338 | $19.72 | $46.12 |
| 12/31/2012 | Trustee Fee | Employee Voluntary | -0.271 | $19.74 | -5.35 |
| 12/31/2012 | Realized G/L | Employee Voluntary | | | $0.24 |
| **Blkrk Sm Cap Gr Eq I** | | | | | |
| 01/03/2012 | Contribution | WAP Bonus 5yr Cliff | 51.566 | $23.76 | $1,225.20 |
| 01/10/2012 | Contribution | Employee Voluntary | 0.863 | $24.38 | $21.05 |
| 02/07/2012 | Recordkeeping Fee | Employee Voluntary | -0.004 | $26.73 | -0.13 |
| 02/07/2012 | Realized G/L | Employee Voluntary | | | $0.06 |
| 02/07/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.005 | $26.73 | -0.13 |
| 02/07/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.05 |
| 02/10/2012 | Contribution | Employee Voluntary | 11.938 | $26.26 | $313.50 |
| 03/09/2012 | Contribution | Employee Voluntary | 1.667 | $26.43 | $44.07 |
| 03/30/2012 | Trustee Fee | Employee Voluntary | -0.190 | $27.12 | -5.16 |
| 03/30/2012 | Realized G/L | Employee Voluntary | | | $1.50 |

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 71
CONFIDENTIAL

RBC-PAUL000004623

# Your Transaction Detail (continued)

| Trade Date | Transaction Type | Source | Shares | Price | Transaction Amount |
|---|---|---|---|---|---|
| 03/30/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.176 | $27.12 | -4.77 |
| 03/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $1.37 |
| 04/10/2012 | Contribution | Employee Voluntary | 1.546 | $25.20 | $38.97 |
| 04/20/2012 | Recordkeeping Fee | Employee Voluntary | -0.006 | $25.40 | -0.13 |
| 04/20/2012 | Realized G/L | Employee Voluntary | | | $0.02 |
| 04/20/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.005 | $25.40 | -0.12 |
| 04/20/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.04 |
| 05/10/2012 | Contribution | Employee Voluntary | 14.943 | $24.34 | $363.72 |
| 06/08/2012 | Contribution | Employee Voluntary | 0.871 | $23.07 | $20.10 |
| 06/29/2012 | Trustee Fee | Employee Voluntary | -0.200 | $24.12 | -4.84 |
| 06/29/2012 | Realized G/L | Employee Voluntary | | | $0.94 |
| 06/29/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.176 | $24.12 | -4.25 |
| 06/29/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.85 |
| 07/10/2012 | Contribution | Employee Voluntary | 0.854 | $23.62 | $20.18 |
| 07/31/2012 | Recordkeeping Fee | Employee Voluntary | -0.007 | $23.83 | -0.17 |
| 07/31/2012 | Realized G/L | Employee Voluntary | | | $0.04 |
| 07/31/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.006 | $23.83 | -0.15 |
| 07/31/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.06 |
| 08/10/2012 | Contribution | Employee Voluntary | 14.205 | $24.68 | $350.58 |
| 08/10/2012 | Realized G/L | Employee Voluntary | | | -2.93 |
| 08/10/2012 | Contrib Adj | Employee Voluntary | -6.386 | $24.68 | -157.61 |
| 09/10/2012 | Contrib Adj | Employee Voluntary | 0.514 | $26.02 | $13.38 |
| 09/28/2012 | Trustee Fee | Employee Voluntary | -0.205 | $26.68 | -5.49 |
| 09/28/2012 | Realized G/L | Employee Voluntary | | | $1.47 |
| 09/28/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.176 | $26.68 | -4.70 |
| 09/28/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $1.30 |
| 10/19/2012 | Recordkeeping Fee | Employee Voluntary | -0.007 | $25.82 | -0.17 |
| 10/19/2012 | Realized G/L | Employee Voluntary | | | $0.04 |
| 10/19/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.006 | $25.82 | -0.15 |
| 10/19/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.06 |
| 11/30/2012 | Forfeited Amount | WAP Bonus 5yr Cliff | -281.288 | $25.58 | -7,195.35 |
| 11/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $1,764.91 |
| 12/06/2012 | Dividend | Employee Voluntary | 39.485 | $22.75 | $898.28 |
| 12/31/2012 | Trustee Fee | Employee Voluntary | -0.230 | $23.27 | -5.37 |
| 12/31/2012 | Realized G/L | Employee Voluntary | | | $0.77 |
| **Invs Comstock Y** | | | | | |
| 02/07/2012 | Recordkeeping Fee | Employee Voluntary | -0.024 | $16.50 | -0.41 |
| 02/07/2012 | Realized G/L | Employee Voluntary | | | $0.16 |
| 02/07/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.010 | $16.50 | -0.17 |
| 02/07/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.07 |
| 03/15/2012 | Dividend | Employee Voluntary | 5.932 | $17.08 | $101.32 |
| 03/15/2012 | Dividend | WAP Bonus 5yr Cliff | 2.366 | $17.08 | $40.42 |
| 03/30/2012 | Trustee Fee | Employee Voluntary | -0.903 | $17.10 | -15.45 |
| 03/30/2012 | Realized G/L | Employee Voluntary | | | $5.44 |
| 03/30/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.361 | $17.10 | -6.16 |
| 03/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $2.18 |
| 04/20/2012 | Recordkeeping Fee | Employee Voluntary | -0.023 | $16.75 | -0.39 |
| 04/20/2012 | Realized G/L | Employee Voluntary | | | $0.15 |
| 04/20/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.008 | $16.75 | -0.15 |
| 04/20/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.07 |
| 06/14/2012 | Dividend | Employee Voluntary | 6.809 | $15.95 | $108.61 |
| 06/14/2012 | Dividend | WAP Bonus 5yr Cliff | 2.716 | $15.95 | $43.32 |
| 06/29/2012 | Trustee Fee | Employee Voluntary | -0.598 | $16.39 | -9.79 |
| 06/29/2012 | Realized G/L | Employee Voluntary | | | $3.11 |
| 06/29/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.144 | $16.39 | -2.36 |
| 06/29/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.77 |
| 07/02/2012 | Withdrawal | Employee Voluntary | -495.030 | $16.43 | -8,133.34 |
| 07/02/2012 | Realized G/L | Employee Voluntary | | | $2,677.52 |
| 07/02/2012 | Withdrawal | WAP Bonus 5yr Cliff | -348.783 | $16.43 | -5,730.50 |

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
No. 16-cv-05616-RBL - Page 72

CONFIDENTIAL

RBC-PAUL000004624

## Your Transaction Detail (continued)

| Trade Date | Transaction Type | Source | Shares | Price | Transaction Amount |
|---|---|---|---|---|---|
| 07/02/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $1,886.50 |
| 07/31/2012 | Recordkeeping Fee | Employee Voluntary | -0.021 | $16.47 | -0.34 |
| 07/31/2012 | Realized G/L | Employee Voluntary | | | $0.12 |
| 07/31/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.005 | $16.47 | -0.08 |
| 07/31/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.03 |
| 09/20/2012 | Dividend | Employee Voluntary | 4.123 | $17.66 | $72.81 |
| 09/20/2012 | Dividend | WAP Bonus 5yr Cliff | 0.992 | $17.66 | $17.52 |
| 09/28/2012 | Trustee Fee | Employee Voluntary | -0.600 | $17.42 | -10.45 |
| 09/28/2012 | Realized G/L | Employee Voluntary | | | $3.74 |
| 09/28/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.144 | $17.42 | -2.51 |
| 09/28/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.92 |
| 10/19/2012 | Recordkeeping Fee | Employee Voluntary | -0.019 | $17.81 | -0.34 |
| 10/19/2012 | Realized G/L | Employee Voluntary | | | $0.14 |
| 10/19/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.005 | $17.81 | -0.08 |
| 10/19/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.03 |
| 11/30/2012 | Forfeited Amount | WAP Bonus 5yr Cliff | -230.775 | $17.39 | -4,013.17 |
| 11/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $1,463.20 |
| 12/07/2012 | Dividend | Employee Voluntary | 4.428 | $17.52 | $77.58 |
| 12/31/2012 | Trustee Fee | Employee Voluntary | -0.602 | $17.81 | -10.72 |
| 12/31/2012 | Realized G/L | Employee Voluntary | | | $3.97 |
| **Invs Sm Cap Disc Y** | | | | | |
| 01/03/2012 | Contribution | WAP Bonus 5yr Cliff | 247.765 | $9.89 | $2,450.40 |
| 01/10/2012 | Contribution | Employee Voluntary | 4.163 | $10.11 | $42.09 |
| 02/07/2012 | Recordkeeping Fee | Employee Voluntary | -0.048 | $11.00 | -0.52 |
| 02/07/2012 | Realized G/L | Employee Voluntary | | | $0.14 |
| 02/07/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.030 | $11.00 | -0.32 |
| 02/07/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.09 |
| 02/10/2012 | Contribution | Employee Voluntary | 57.471 | $10.91 | $627.01 |
| 03/09/2012 | Contribution | Employee Voluntary | 7.954 | $11.08 | $88.13 |
| 03/30/2012 | Trustee Fee | Employee Voluntary | -1.796 | $11.18 | -20.08 |
| 03/30/2012 | Realized G/L | Employee Voluntary | | | $4.64 |
| 03/30/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -1.044 | $11.18 | -11.66 |
| 03/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $2.27 |
| 04/10/2012 | Contribution | Employee Voluntary | 7.355 | $10.60 | $77.96 |
| 04/20/2012 | Recordkeeping Fee | Employee Voluntary | -0.047 | $10.96 | -0.51 |
| 04/20/2012 | Realized G/L | Employee Voluntary | | | $0.14 |
| 04/20/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.027 | $10.96 | -0.29 |
| 04/20/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.09 |
| 05/10/2012 | Contribution | Employee Voluntary | 68.113 | $10.68 | $727.45 |
| 06/08/2012 | Contribution | Employee Voluntary | 3.910 | $10.28 | $40.19 |
| 06/29/2012 | Trustee Fee | Employee Voluntary | -1.344 | $10.50 | -14.11 |
| 06/29/2012 | Realized G/L | Employee Voluntary | | | $2.32 |
| 06/29/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.754 | $10.50 | -7.92 |
| 06/29/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.94 |
| 07/02/2012 | Withdrawal | Employee Voluntary | -801.454 | $10.60 | -8,495.41 |
| 07/02/2012 | Realized G/L | Employee Voluntary | | | $1,830.07 |
| 07/02/2012 | Withdrawal | WAP Bonus 5yr Cliff | -461.347 | $10.60 | -4,890.28 |
| 07/02/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $1,053.39 |
| 07/10/2012 | Contribution | Employee Voluntary | 3.883 | $10.39 | $40.34 |
| 07/31/2012 | Recordkeeping Fee | Employee Voluntary | -0.045 | $10.55 | -0.48 |
| 07/31/2012 | Realized G/L | Employee Voluntary | | | $0.11 |
| 07/31/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.027 | $10.55 | -0.28 |
| 07/31/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.06 |
| 08/10/2012 | Contribution | Employee Voluntary | 64.328 | $10.90 | $701.17 |
| 08/10/2012 | Realized G/L | Employee Voluntary | | | $4.33 |
| 08/10/2012 | Contrib Adj | Employee Voluntary | -28.920 | $10.90 | -315.23 |
| 09/10/2012 | Contrib Adj | Employee Voluntary | 2.337 | $11.45 | $26.76 |
| 09/28/2012 | Trustee Fee | Employee Voluntary | -1.370 | $11.32 | -15.50 |
| 09/28/2012 | Realized G/L | Employee Voluntary | | | $3.42 |

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
No. 3:16-cv-05616-RBL - Page 73
CONFIDENTIAL

RBC-PAUL000004625

## Your Transaction Detail (continued)

| Trade Date | Transaction Type | Source | Shares | Price | Transaction Amount |
|---|---|---|---|---|---|
| 09/28/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.755 | $11.32 | -8.54 |
| 09/28/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $1.55 |
| 10/19/2012 | Recordkeeping Fee | Employee Voluntary | -0.044 | $11.18 | -0.49 |
| 10/19/2012 | Realized G/L | Employee Voluntary | | | $0.12 |
| 10/19/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.024 | $11.18 | -0.26 |
| 10/19/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.07 |
| 11/30/2012 | Forfeited Amount | WAP Bonus 5yr Cliff | -1,205.228 | $11.29 | -13,607.02 |
| 11/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $2,446.02 |
| 12/07/2012 | Dividend | Employee Voluntary | 245.007 | $10.06 | $2,464.77 |
| 12/31/2012 | Trustee Fee | Employee Voluntary | -1.522 | $10.31 | -15.68 |
| 12/31/2012 | Realized G/L | Employee Voluntary | | | $2.07 |
| **Jensen Qual Grth Is** | | | | | |
| 01/03/2012 | Contribution | WAP Bonus 5yr Cliff | 91.365 | $26.82 | $2,450.40 |
| 01/10/2012 | Contribution | Employee Voluntary | 1.551 | $27.13 | $42.09 |
| 02/07/2012 | Recordkeeping Fee | Employee Voluntary | -0.008 | $28.20 | -0.22 |
| 02/07/2012 | Realized G/L | Employee Voluntary | | | $0.03 |
| 02/07/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.005 | $28.20 | -0.20 |
| 02/07/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.10 |
| 02/10/2012 | Contribution | Employee Voluntary | 22.314 | $28.10 | $627.01 |
| 03/09/2012 | Contribution | Employee Voluntary | 3.069 | $28.72 | $88.13 |
| 03/21/2012 | Dividend | Employee Voluntary | 1.632 | $29.09 | $47.47 |
| 03/21/2012 | Dividend | WAP Bonus 5yr Cliff | 1.383 | $29.09 | $40.21 |
| 03/30/2012 | Trustee Fee | Employee Voluntary | -0.299 | $29.38 | -8.78 |
| 03/30/2012 | Realized G/L | Employee Voluntary | | | $0.65 |
| 03/30/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.252 | $29.38 | -7.43 |
| 03/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.57 |
| 04/10/2012 | Contribution | Employee Voluntary | 2.756 | $28.29 | $77.96 |
| 04/20/2012 | Recordkeeping Fee | Employee Voluntary | -0.008 | $28.90 | -0.23 |
| 04/20/2012 | Realized G/L | Employee Voluntary | | | $0.04 |
| 04/20/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.005 | $28.90 | -0.20 |
| 04/20/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.10 |
| 05/10/2012 | Contribution | Employee Voluntary | 25.805 | $28.19 | $727.45 |
| 06/08/2012 | Contribution | Employee Voluntary | 1.450 | $27.73 | $40.20 |
| 06/20/2012 | Dividend | Employee Voluntary | 1.771 | $28.14 | $49.85 |
| 06/20/2012 | Dividend | WAP Bonus 5yr Cliff | 1.412 | $28.14 | $39.72 |
| 06/29/2012 | Trustee Fee | Employee Voluntary | -0.240 | $28.30 | -6.78 |
| 06/29/2012 | Realized G/L | Employee Voluntary | | | $0.23 |
| 06/29/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.218 | $28.30 | -6.15 |
| 06/29/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.21 |
| 07/02/2012 | Withdrawal | Employee Voluntary | -126.167 | $28.32 | -3,573.05 |
| 07/02/2012 | Realized G/L | Employee Voluntary | | | $148.32 |
| 07/02/2012 | Withdrawal | WAP Bonus 5yr Cliff | -58.400 | $28.32 | -1,653.89 |
| 07/02/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $68.65 |
| 07/10/2012 | Contribution | Employee Voluntary | 1.450 | $27.82 | $40.35 |
| 07/31/2012 | Recordkeeping Fee | Employee Voluntary | -0.007 | $28.13 | -0.23 |
| 07/31/2012 | Realized G/L | Employee Voluntary | | | $0.07 |
| 07/31/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.008 | $28.13 | -0.22 |
| 07/31/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.02 |
| 08/10/2012 | Contribution | Employee Voluntary | 24.304 | $28.85 | $701.17 |
| 08/10/2012 | Realized G/L | Employee Voluntary | | | $7.73 |
| 08/10/2012 | Contrib Adj | Employee Voluntary | -10.927 | $28.85 | -315.23 |
| 09/10/2012 | Contrib Adj | Employee Voluntary | 0.915 | $29.24 | $26.76 |
| 09/18/2012 | Dividend | Employee Voluntary | 1.212 | $29.63 | $35.91 |
| 09/18/2012 | Dividend | WAP Bonus 5yr Cliff | 1.055 | $29.63 | $31.28 |
| 09/28/2012 | Trustee Fee | Employee Voluntary | -0.251 | $29.24 | -7.32 |
| 09/28/2012 | Realized G/L | Employee Voluntary | | | $0.44 |
| 09/28/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.218 | $29.24 | -6.36 |
| 09/28/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.42 |
| 10/19/2012 | Recordkeeping Fee | Employee Voluntary | -0.007 | $29.04 | -0.23 |

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 74
CONFIDENTIAL

RBC-PAUL000004626

## Your Transaction Detail (continued)

| Trade Date | Transaction Type | Source | Shares | Price | Transaction Amount |
|---|---|---|---|---|---|
| 10/19/2012 | Realized G/L | Employee Voluntary | | | $0.07 |
| 10/19/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.007 | $29.04 | -0.20 |
| 10/19/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.03 |
| 11/30/2012 | Forfeited Amount | WAP Bonus 5yr Cliff | -348.199 | $29.43 | -10,247.49 |
| 11/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $752.09 |
| 12/20/2012 | Dividend | Employee Voluntary | 1.834 | $30.19 | $55.36 |
| 12/31/2012 | Trustee Fee | Employee Voluntary | -0.251 | $29.77 | -7.47 |
| 12/31/2012 | Realized G/L | Employee Voluntary | | | $0.59 |
| **RBC Share Account** | | | | | |
| 01/03/2012 | Contribution | Employer 5 yr Cliff | 549.011 | $52.07 | $28,587.00 |
| 02/07/2012 | Recordkeeping Fee | Employee Voluntary | -0.003 | $53.85 | -0.16 |
| 02/07/2012 | Realized G/L | Employee Voluntary | | | $0.04 |
| 02/07/2012 | Recordkeeping Fee | Employer 5 yr Cliff | -0.040 | $53.85 | -2.15 |
| 02/07/2012 | Realized G/L | Employer 5 yr Cliff | | | $0.37 |
| 02/07/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.003 | $53.85 | -0.13 |
| 02/07/2012 | Realized G/L | WAP Bonus 5yr Cliff | 0.000 | $53.85 | $0.04 |
| 02/24/2012 | Dividend | Employee Voluntary | 1.620 | $54.64 | $88.49 |
| 02/24/2012 | Dividend | Employer 5 yr Cliff | 22.994 | $54.64 | $1,256.43 |
| 02/24/2012 | Dividend | WAP Bonus 5yr Cliff | 1.322 | $54.64 | $72.19 |
| 04/20/2012 | Recordkeeping Fee | Employee Voluntary | -0.003 | $57.62 | -0.16 |
| 04/20/2012 | Realized G/L | Employee Voluntary | | | $0.04 |
| 04/20/2012 | Recordkeeping Fee | Employer 5 yr Cliff | -0.038 | $57.62 | -2.20 |
| 04/20/2012 | Realized G/L | Employer 5 yr Cliff | | | $0.50 |
| 04/20/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.003 | $57.62 | -0.14 |
| 04/20/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.05 |
| 05/24/2012 | Dividend | Employee Voluntary | 1.832 | $50.01 | $91.62 |
| 05/24/2012 | Dividend | Employer 5 yr Cliff | 26.013 | $50.01 | $1,300.91 |
| 05/24/2012 | Dividend | WAP Bonus 5yr Cliff | 1.494 | $50.01 | $74.75 |
| 07/02/2012 | Withdrawal | Employer 5 yr Cliff | -374.878 | $51.57 | -19,332.46 |
| 07/02/2012 | Realized G/L | Employer 5 yr Cliff | | | $1,843.02 |
| 07/31/2012 | Recordkeeping Fee | Employee Voluntary | -0.003 | $51.13 | -0.19 |
| 07/31/2012 | Realized G/L | Employee Voluntary | | | $0.07 |
| 07/31/2012 | Recordkeeping Fee | Employer 5 yr Cliff | -0.044 | $51.13 | -2.21 |
| 07/31/2012 | Realized G/L | Employer 5 yr Cliff | | | $0.25 |
| 07/31/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.002 | $51.13 | -0.11 |
| 07/31/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.05 |
| 08/24/2012 | Dividend | Employee Voluntary | 1.769 | $54.22 | $95.93 |
| 08/24/2012 | Dividend | Employer 5 yr Cliff | 21.156 | $54.22 | $1,147.05 |
| 08/24/2012 | Dividend | WAP Bonus 5yr Cliff | 1.443 | $54.22 | $78.26 |
| 10/19/2012 | Recordkeeping Fee | Employee Voluntary | -0.003 | $58.91 | -0.20 |
| 10/19/2012 | Realized G/L | Employee Voluntary | | | $0.07 |
| 10/19/2012 | Recordkeeping Fee | Employer 5 yr Cliff | -0.040 | $58.91 | -2.35 |
| 10/19/2012 | Realized G/L | Employer 5 yr Cliff | | | $0.56 |
| 10/19/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.004 | $58.91 | -0.19 |
| 10/19/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.05 |
| 11/23/2012 | Dividend | Employee Voluntary | 1.746 | $58.48 | $102.10 |
| 11/23/2012 | Dividend | Employer 5 yr Cliff | 20.875 | $58.48 | $1,220.76 |
| 11/23/2012 | Dividend | WAP Bonus 5yr Cliff | 1.424 | $58.48 | $83.28 |
| 11/30/2012 | Forfeited Amount | Employer 5 yr Cliff | -2,042.255 | $58.88 | -120,247.98 |
| 11/30/2012 | Realized G/L | Employer 5 yr Cliff | | | $27,316.13 |
| 11/30/2012 | Forfeited Amount | WAP Bonus 5yr Cliff | -139.331 | $58.88 | -8,203.81 |
| 11/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $2,788.49 |
| **RBC SMID Cap Grth I** | | | | | |
| 02/07/2012 | Recordkeeping Fee | Employee Voluntary | -0.017 | $14.74 | -0.26 |
| 02/07/2012 | Realized G/L | Employee Voluntary | | | $0.07 |
| 02/07/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.008 | $14.74 | -0.12 |
| 02/07/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.05 |
| 03/30/2012 | Trustee Fee | Employee Voluntary | -0.641 | $15.18 | -9.72 |

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 75

CONFIDENTIAL

RBC-PAUL000004627

## Your Transaction Detail (continued)

| Trade Date | Transaction Type | Source | Shares | Price | Transaction Amount |
|---|---|---|---|---|---|
| 03/30/2012 | Realized G/L | Employee Voluntary | | | $2.10 |
| 03/30/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.296 | $15.18 | -4.49 |
| 03/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $1.39 |
| 04/20/2012 | Recordkeeping Fee | Employee Voluntary | -0.017 | $15.05 | -0.25 |
| 04/20/2012 | Realized G/L | Employee Voluntary | | | $0.06 |
| 04/20/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.008 | $15.05 | -0.12 |
| 04/20/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.05 |
| 06/29/2012 | Trustee Fee | Employee Voluntary | -0.442 | $14.65 | -6.47 |
| 06/29/2012 | Realized G/L | Employee Voluntary | | | $1.43 |
| 06/29/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.174 | $14.65 | -2.56 |
| 06/29/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $1.02 |
| 07/02/2012 | Withdrawal | Employee Voluntary | -315.840 | $14.69 | -4,639.69 |
| 07/02/2012 | Realized G/L | Employee Voluntary | | | $536.64 |
| 07/02/2012 | Withdrawal | WAP Bonus 5yr Cliff | -192.458 | $14.69 | -2,827.21 |
| 07/02/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $359.10 |
| 07/31/2012 | Recordkeeping Fee | Employee Voluntary | -0.015 | $14.33 | -0.22 |
| 07/31/2012 | Realized G/L | Employee Voluntary | | | $0.06 |
| 07/31/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.006 | $14.33 | -0.09 |
| 07/31/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.04 |
| 09/28/2012 | Trustee Fee | Employee Voluntary | -0.442 | $15.34 | -6.77 |
| 09/28/2012 | Realized G/L | Employee Voluntary | | | $1.73 |
| 09/28/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.174 | $15.34 | -2.68 |
| 09/28/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $1.14 |
| 10/19/2012 | Recordkeeping Fee | Employee Voluntary | -0.013 | $14.99 | -0.20 |
| 10/19/2012 | Realized G/L | Employee Voluntary | | | $0.06 |
| 10/19/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.005 | $14.99 | -0.08 |
| 10/19/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.04 |
| 11/30/2012 | Forfeited Amount | WAP Bonus 5yr Cliff | -279.273 | $15.25 | -4,258.91 |
| 11/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $1,787.76 |
| 12/20/2012 | Dividend | Employee Voluntary | 90.076 | $13.84 | $1,246.65 |
| 12/31/2012 | Trustee Fee | Employee Voluntary | -0.498 | $13.74 | -6.84 |
| 12/31/2012 | Realized G/L | Employee Voluntary | | | $1.03 |

**TRP Mid Cap Growth**

| Trade Date | Transaction Type | Source | Shares | Price | Transaction Amount |
|---|---|---|---|---|---|
| 01/03/2012 | Contribution | WAP Bonus 5yr Cliff | 46.112 | $53.14 | $2,450.40 |
| 01/10/2012 | Contribution | Employee Voluntary | 0.774 | $54.39 | $42.09 |
| 02/07/2012 | Recordkeeping Fee | Employee Voluntary | -0.002 | $57.85 | -0.12 |
| 02/07/2012 | Realized G/L | Employee Voluntary | | | $0.02 |
| 02/07/2012 | Recordkeeping Fee | Employer 5 yr Cliff | -0.006 | $57.85 | -0.38 |
| 02/07/2012 | Realized G/L | Employer 5 yr Cliff | | | $0.07 |
| 02/07/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.003 | $57.85 | -0.15 |
| 02/10/2012 | Contribution | Employee Voluntary | 10.884 | $57.61 | $627.01 |
| 03/09/2012 | Contribution | Employee Voluntary | 1.492 | $59.07 | $88.13 |
| 03/30/2012 | Trustee Fee | Employee Voluntary | -0.084 | $59.70 | -5.02 |
| 03/30/2012 | Realized G/L | Employee Voluntary | | | $0.46 |
| 03/30/2012 | Trustee Fee | Employer 5 yr Cliff | -0.240 | $59.70 | -14.37 |
| 03/30/2012 | Realized G/L | Employer 5 yr Cliff | | | -0.03 |
| 03/30/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.088 | $59.70 | -5.23 |
| 03/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.35 |
| 04/10/2012 | Contribution | Employee Voluntary | 1.361 | $57.29 | $77.96 |
| 04/20/2012 | Recordkeeping Fee | Employee Voluntary | -0.002 | $58.75 | -0.13 |
| 04/20/2012 | Realized G/L | Employee Voluntary | | | $0.03 |
| 04/20/2012 | Recordkeeping Fee | Employer 5 yr Cliff | -0.006 | $58.75 | -0.38 |
| 04/20/2012 | Realized G/L | Employer 5 yr Cliff | | | $0.07 |
| 04/20/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.003 | $58.75 | -0.13 |
| 04/20/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | -0.02 |
| 05/10/2012 | Contribution | Employee Voluntary | 12.618 | $57.65 | $727.45 |
| 06/08/2012 | Contribution | Employee Voluntary | 0.722 | $55.67 | $40.20 |
| 06/29/2012 | Trustee Fee | Employee Voluntary | -0.093 | $56.78 | -5.29 |
| 06/29/2012 | Realized G/L | Employee Voluntary | | | $0.21 |

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 76
CONFIDENTIAL

RBC-PAUL000004628

## Your Transaction Detail (continued)

| Trade Date | Transaction Type | Source | Shares | Price | Transaction Amount |
|---|---|---|---|---|---|
| 06/29/2012 | Trustee Fee | Employer 5 yr Cliff | -0.191 | $56.78 | -10.85 |
| 06/29/2012 | Realized G/L | Employer 5 yr Cliff | | | -0.61 |
| 06/29/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.088 | $56.78 | -4.99 |
| 06/29/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.11 |
| 07/02/2012 | Withdrawal | Employer 5 yr Cliff | -79.559 | $56.93 | -4,529.29 |
| 07/02/2012 | Realized G/L | Employer 5 yr Cliff | | | -241.02 |
| 07/10/2012 | Contribution | Employee Voluntary | 0.723 | $55.81 | $40.35 |
| 07/31/2012 | Recordkeeping Fee | Employee Voluntary | -0.003 | $55.95 | -0.17 |
| 07/31/2012 | Realized G/L | Employee Voluntary | | | $0.02 |
| 07/31/2012 | Recordkeeping Fee | Employer 5 yr Cliff | -0.007 | $55.95 | -0.37 |
| 07/31/2012 | Realized G/L | Employer 5 yr Cliff | | | -0.01 |
| 07/31/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.003 | $55.95 | -0.17 |
| 07/31/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.02 |
| 08/10/2012 | Contribution | Employee Voluntary | 12.160 | $57.66 | $701.17 |
| 08/10/2012 | Realized G/L | Employee Voluntary | | | $0.84 |
| 08/10/2012 | Contrib Adj | Employee Voluntary | -5.467 | $57.66 | -315.23 |
| 09/10/2012 | Contrib Adj | Employee Voluntary | 0.451 | $59.41 | $26.77 |
| 09/28/2012 | Trustee Fee | Employee Voluntary | -0.097 | $59.09 | -5.79 |
| 09/28/2012 | Realized G/L | Employee Voluntary | | | $0.48 |
| 09/28/2012 | Trustee Fee | Employer 5 yr Cliff | -0.190 | $59.09 | -11.28 |
| 09/28/2012 | Realized G/L | Employer 5 yr Cliff | | | -0.12 |
| 09/28/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.088 | $59.09 | -5.17 |
| 09/28/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.29 |
| 10/19/2012 | Recordkeeping Fee | Employee Voluntary | -0.003 | $57.96 | -0.18 |
| 10/19/2012 | Realized G/L | Employee Voluntary | | | $0.03 |
| 10/19/2012 | Recordkeeping Fee | Employer 5 yr Cliff | -0.006 | $57.96 | -0.35 |
| 10/19/2012 | Realized G/L | Employer 5 yr Cliff | | | $0.03 |
| 10/19/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.003 | $57.96 | -0.16 |
| 10/19/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.01 |
| 11/30/2012 | Forfeited Amount | Employer 5 yr Cliff | -305.159 | $59.06 | -18,022.69 |
| 11/30/2012 | Realized G/L | Employer 5 yr Cliff | | | -274.45 |
| 11/30/2012 | Forfeited Amount | WAP Bonus 5yr Cliff | -139.943 | $59.06 | -8,265.04 |
| 11/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $508.16 |
| 12/14/2012 | Dividend | Employee Voluntary | 9.979 | $55.58 | $554.59 |
| 12/31/2012 | Trustee Fee | Employee Voluntary | -0.104 | $56.47 | -5.88 |
| 12/31/2012 | Realized G/L | Employee Voluntary | | | $0.18 |

**Vang Windsor II Adm**

| Trade Date | Transaction Type | Source | Shares | Price | Transaction Amount |
|---|---|---|---|---|---|
| 02/07/2012 | Recordkeeping Fee | Employee Voluntary | -0.004 | $48.89 | -0.16 |
| 02/07/2012 | Realized G/L | Employee Voluntary | | | $0.01 |
| 02/07/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.002 | $48.89 | -0.09 |
| 02/07/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.03 |
| 03/30/2012 | Trustee Fee | Employee Voluntary | -0.116 | $51.42 | -5.94 |
| 03/30/2012 | Realized G/L | Employee Voluntary | | | $1.11 |
| 03/30/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.066 | $51.42 | -3.46 |
| 03/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.91 |
| 04/20/2012 | Recordkeeping Fee | Employee Voluntary | -0.003 | $50.21 | -0.15 |
| 04/20/2012 | Realized G/L | Employee Voluntary | | | $0.04 |
| 04/20/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.002 | $50.21 | -0.09 |
| 04/20/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.03 |
| 06/28/2012 | Dividend | Employee Voluntary | 2.161 | $48.25 | $104.28 |
| 06/28/2012 | Dividend | WAP Bonus 5yr Cliff | 1.261 | $48.25 | $60.84 |
| 06/29/2012 | Trustee Fee | Employee Voluntary | -0.118 | $49.38 | -5.76 |
| 06/29/2012 | Realized G/L | Employee Voluntary | | | $0.82 |
| 06/29/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.069 | $49.38 | -3.36 |
| 06/29/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.68 |
| 07/31/2012 | Recordkeeping Fee | Employee Voluntary | -0.004 | $50.01 | -0.20 |
| 07/31/2012 | Realized G/L | Employee Voluntary | | | $0.05 |
| 07/31/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.003 | $50.01 | -0.12 |
| 07/31/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.02 |

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 16-cv-05616-RBL - Page 77

CONFIDENTIAL

RBC-PAUL000004629

## Your Transaction Detail (continued)

| Trade Date | Transaction Type | Source | Shares | Price | Transaction Amount |
|---|---|---|---|---|---|
| 09/28/2012 | Trustee Fee | Employee Voluntary | -0.117 | $52.19 | -6.08 |
| 09/28/2012 | Realized G/L | Employee Voluntary | | | $1.19 |
| 09/28/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.069 | $52.19 | -3.55 |
| 09/28/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.87 |
| 10/19/2012 | Recordkeeping Fee | Employee Voluntary | -0.004 | $52.56 | -0.20 |
| 10/19/2012 | Realized G/L | Employee Voluntary | | | $0.05 |
| 10/19/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.003 | $52.56 | -0.12 |
| 10/19/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.02 |
| 11/30/2012 | Forfeited Amount | WAP Bonus 5yr Cliff | -108.801 | $51.94 | -5,651.12 |
| 11/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $1,441.02 |
| 12/26/2012 | Dividend | Employee Voluntary | 2.460 | $51.93 | $127.74 |
| 12/31/2012 | Trustee Fee | Employee Voluntary | -0.118 | $52.13 | -6.16 |
| 12/31/2012 | Realized G/L | Employee Voluntary | | | $1.22 |

**Virtus Contrn Val A**

| Trade Date | Transaction Type | Source | Shares | Price | Transaction Amount |
|---|---|---|---|---|---|
| 01/03/2012 | Contribution | WAP Bonus 5yr Cliff | 103.088 | $23.77 | $2,450.40 |
| 01/10/2012 | Contribution | Employee Voluntary | 1.747 | $24.09 | $42.09 |
| 02/07/2012 | Recordkeeping Fee | Employee Voluntary | -0.010 | $25.67 | -0.25 |
| 02/07/2012 | Realized G/L | Employee Voluntary | | | $0.06 |
| 02/07/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.009 | $25.67 | -0.25 |
| 02/07/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.09 |
| 02/10/2012 | Contribution | Employee Voluntary | 24.512 | $25.58 | $627.01 |
| 03/09/2012 | Contribution | Employee Voluntary | 3.386 | $26.03 | $88.13 |
| 03/30/2012 | Trustee Fee | Employee Voluntary | -0.376 | $26.21 | -9.86 |
| 03/30/2012 | Realized G/L | Employee Voluntary | | | $2.29 |
| 03/30/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.350 | $26.21 | -9.18 |
| 03/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $2.13 |
| 04/10/2012 | Contribution | Employee Voluntary | 3.079 | $25.32 | $77.96 |
| 04/20/2012 | Recordkeeping Fee | Employee Voluntary | -0.009 | $26.09 | -0.25 |
| 04/20/2012 | Realized G/L | Employee Voluntary | | | $0.08 |
| 04/20/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.009 | $26.09 | -0.23 |
| 04/20/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.07 |
| 05/10/2012 | Contribution | Employee Voluntary | 28.087 | $25.90 | $727.45 |
| 06/08/2012 | Contribution | Employee Voluntary | 1.629 | $24.68 | $40.20 |
| 06/21/2012 | Dividend | Employee Voluntary | 1.042 | $24.32 | $25.35 |
| 06/21/2012 | Dividend | WAP Bonus 5yr Cliff | 0.921 | $24.32 | $22.40 |
| 06/29/2012 | Trustee Fee | Employee Voluntary | -0.395 | $25.03 | -9.92 |
| 06/29/2012 | Realized G/L | Employee Voluntary | | | $1.85 |
| 06/29/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.349 | $25.03 | -8.76 |
| 06/29/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $1.72 |
| 07/10/2012 | Contribution | Employee Voluntary | 1.639 | $24.62 | $40.35 |
| 07/31/2012 | Recordkeeping Fee | Employee Voluntary | -0.013 | $25.09 | -0.34 |
| 07/31/2012 | Realized G/L | Employee Voluntary | | | $0.09 |
| 07/31/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.013 | $25.09 | -0.31 |
| 07/31/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.07 |
| 08/10/2012 | Contribution | Employee Voluntary | 27.638 | $25.37 | $701.17 |
| 08/10/2012 | Realized G/L | Employee Voluntary | | | -3.36 |
| 08/10/2012 | Contrib Adj | Employee Voluntary | -12.425 | $25.37 | -315.23 |
| 09/10/2012 | Contrib Adj | Employee Voluntary | 1.023 | $26.15 | $26.76 |
| 09/28/2012 | Trustee Fee | Employee Voluntary | -0.407 | $25.91 | -10.56 |
| 09/28/2012 | Realized G/L | Employee Voluntary | | | $2.19 |
| 09/28/2012 | Trustee Fee | WAP Bonus 5yr Cliff | -0.349 | $25.91 | -9.08 |
| 09/28/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $2.04 |
| 10/19/2012 | Recordkeeping Fee | Employee Voluntary | -0.014 | $26.32 | -0.34 |
| 10/19/2012 | Realized G/L | Employee Voluntary | | | $0.06 |
| 10/19/2012 | Recordkeeping Fee | WAP Bonus 5yr Cliff | -0.013 | $26.32 | -0.30 |
| 10/19/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $0.06 |

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 78
CONFIDENTIAL

RBC-PAUL000004630

## Your Transaction Detail (continued)

| Trade Date | Transaction Type | Source | Shares | Price | Transaction Amount |
|---|---|---|---|---|---|
| 11/30/2012 | Forfeited Amount | WAP Bonus 5yr Cliff | -560.268 | $26.02 | -14,578.18 |
| 11/30/2012 | Realized G/L | WAP Bonus 5yr Cliff | | | $3,265.10 |
| 12/20/2012 | Dividend | Employee Voluntary | 0.580 | $26.98 | $15.64 |
| 12/31/2012 | Trustee Fee | Employee Voluntary | -0.408 | $26.65 | -10.87 |
| 12/31/2012 | Realized G/L | Employee Voluntary | | | $2.48 |

## A Message from Fidelity Investments

To access performance information on the investment options available in your Plan - log onto NetBenefits at www.401k.com or call your plan's toll-free number.

Before investing in any mutual fund, please carefully consider the investment objectives, risks, charges and expenses. For this and other information, call or write Fidelity for a free prospectus. Read it carefully before you invest.

Fidelity Brokerage Services LLC, Member NYSE, SIPC, 900 Salem Street, Street, Smithfield, RI 02917.

459279

## Investment Fee Information

Fidelity Select Gold Portfolio assesses a short-term trading fee of 0.75% for shares held less than 30 days.

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 79

CONFIDENTIAL

RBC-PAUL000004631

# Your Statement Glossary

**Average Annual Total Return**
This is the hypothetical rate of return that, if the investment option achieved it over a year's time, would produce the same cumulative total return if the investment option performed consistently over the entire period. A total return is expressed in a percentage and tells you how much the investment has earned or lost over time, assuming that all dividends and capital gains are reinvested.

**Change in Market Value**
The change in value reflects the fluctuations in the price per share of the investment option because of changes in their underlying investments (stocks, bonds or short term investments). In the Account Summary section of your statement, this number is the total of all changes in all of your investments due to these types of fluctuations.

**Dividends**
In the investment options of your plan, including mutual funds and company stock (if applicable), dividends are money paid to shareholders that comes from the investment income that the fund has earned. Depending on the rules of your plan, dividends on company stock may be reinvested into your retirement account or paid to you in cash.

**Market Value**
Market Value is the dollar value of the investments in your account. You can calculate the market value by using the following formula:
Market Value = Number of shares in your account x Price per share of the fund.

**Shares**
Shares are your units of ownership of each investment in your account.

**Share Price**
The value of one share of each investment in your account is called share price. It is determined by taking the total value of the whole investment option on a given day and dividing it by the number of shares outstanding.

**Vesting**
Vesting refers to your level of ownership in company contributions and any associated earnings. When the company contributes money to your account, it resides in your account, under your name. This money becomes fully yours once you have satisfied the vesting requirements of your plan. You are always entitled to 100% of your contributions and any associated earnings.

---

### Some special information about other sections that may appear in your account statement.

**Asset Allocation**
Investments can be divided into three major asset classes: Stocks, Bonds, and Short Term Investments. These asset classes represent the different types of underlying securities that may be held in the investment option(s) you own. Please note that you may be invested in a blended fund where the fund holdings are invested in more than one asset class.

**Stocks**
Stocks can add a growth component to your portfolio. They represent ownership or equity in a company. Stocks have the potential to outperform other types of investments over the long term. However, stocks tend to have wider price fluctuations over short periods of time than other securities.

**Bonds**
Bonds can add an income portion to your portfolio. They represent a loan to a corporation or Government Agency, and provide the opportunity for higher current income than short-term investments. Unlike short-term investments and stable value investments, bond prices fluctuate with changes in interest rates.

**Short Term**
Short term investments can add stability to your portfolio. They provide current income and seek to preserve the value of your investment. They also tend to provide the lowest returns over the long term. Examples of these investments include certificates of deposit (CDs), Treasury Bills and Money Market Instruments.

**Market Indices**
A Market index can measure the general trends in the performance of particular market segments. You can use the appropriate market index to compare the performance (Average Annual Return) of the options in which you're invested.

**Standard and Poor's 500**
The S&P 500 incorporates a broad base of 500 stocks, including industrial, utility, and financial companies. Some of its stocks have a greater influence on the direction of the market. The S&P 500 calculation takes this into account by giving greater weight to these stocks. The companies that make up the S&P 500 are traded on the American and New York Stock Exchanges, as well as the Over-The-Counter Exchange.

**Barclays Aggregate Bond Index**
This measures the total return of over 6,000 high-quality bond issues, including government, corporate, and mortgage sectors. Bonds in this price-weighted index have an average maturity of 10 years.

**Morgan Stanley EAFE Index**
The MSCI EAFE Index (Morgan Stanley Capital International Europe, Australasia, and Far East, Index) is an unmanaged index and includes the reinvestment of dividends. It is designed to represent the performance of developed stock markets outside the United States and Canada. The MSCI EAFE Index is a registered service mark of Morgan Stanley and has been licensed for use by FMR Corp.

---

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 16-cv-05616-RBL - Page 80
CONFIDENTIAL

RBC-PAUL000004632

THIS PAGE INTENTIONALLY LEFT BLANK

**EXHIBIT 6**

# EXHIBIT 7

# THORSON
# BARNETT &
# McDONALD, P.C.
*Attorneys at Law*

3315 Two Union Square
601 Union Street
Seattle, Washington 98101
Telephone: (206) 467-1240
Fax: (206) 467-1230

JEFFREY G. CURNUTT
(206) 467-1258

April 20, 2012

## VIA CERTIFIED MAIL

RBC WAP Committee
Attn: Lisa Sorensen
MS P07
60 South 6th Street
Minneapolis, MN 55402

Re:    Marty Paul – Claim for Benefits under the RBC US Wealth Accumulation Plan

Ms. Sorensen:

Our firm has been retained by former RBC employee, Marty Paul, to represent him with respect to benefits under the RBC US Wealth Accumulation Plan ("WAP"). **This letter is Mr. Paul's claim for benefits under WAP Section 7 and DOL Reg. §2560.503-1.** Unfortunately, the WAP document does not indicate an address for the Committee, nor does it identify any of the individual Committee members by name. Accordingly, we are sending this claim to you in your capacity as the Director of Human Resources for RBC Wealth Management and as the "Head of Human Resources" as defined in the WAP. We trust you will also share this claim for benefits with Dan Szabo, Darryl Traweek and Mary Zimmer (and any additional or replacement member(s) of the Committee).

We have been provided with a copy of a March 15, 2012 letter from Gabriela Sikich, which indicates that Mr. Paul's "Company Contributions (and Mandatory Deferrals), both vested and unvested, have been forfeited in the amount of $1,612,152." The letter further indicates that the decision to forfeit Mr. Paul's WAP benefits was based on the Committee's determination that his separation from service was "for cause" under WAP Section 4.3. We believe the Committee's determination is unsupportable under the WAP document and the Employee Retirement Income and Security Act of 1974 ("ERISA").

First, no conduct by Mr. Paul during his tenure with RBC can be construed to constitute "Cause" as that term is described in WAP Sections 1.2 and 4.3 or under any reasonable legal standard.

Second, even if Mr. Paul's separation had been for "Cause" under the WAP document, the use of so-called "bad-boy clauses" conflicts with numerous statutory requirements and is unenforceable. Specifically, WAP Sections 1.2 and 4.3 violate several ERISA provisions, including without limitation, minimum vesting rules, anti-alienation and anti-assignment rules, the exclusive benefit rule and the prohibition against reversion of plan assets to the employer.

CONFIDENTIAL

RBC-PAUL000000597

Third, under ERISA's mandatory minimum vesting standards, Mr. Paul was required to fully vest in his accrued WAP benefits after completing no more than three (3) years of service under a "cliff" vesting schedule or after completing six (6) years of service under a graduated vesting schedule. Mr. Paul worked for RBC from August 1, 1994 through March 7, 2011, a period in excess of 16 years. Therefore, under either of the minimum vesting schedules under the statute, Mr. Paul has been 100% vested in all employee and employer contributions to the WAP on his behalf (including all Mandatory Employee Deferrals and Company Contributions) for more than a decade.

Finally, ERISA specifically provides that plan assets must be held for the exclusive purpose of paying benefits to participants and beneficiaries and may not inure to the benefit of the employer. This is one of the reasons that ERISA requires plan assets to be held in a trust managed by a trustee with exclusive discretionary authority over the assets. RBC may not simply forfeit Mr. Paul's accrued benefit and keep the plan assets for its own use.

For the reasons described above, Mr. Paul is entitled to a distribution of his entire WAP account balance, and no portion of such balance (without regard to the source of the contribution or any prior determination by the Committee as to the vested/unvested status of such amount) is subject to reduction, offset or forfeiture. We urge the Committee to review and reverse its decision to forfeit Mr. Paul's WAP benefits and to instead distribute his entire WAP account balance according to his distribution election.

We look forward to receiving your timely written reply (along with the reasons therefore) in accordance with WAP Section 7.2 and the applicable ERISA claims procedure regulations.

Sincerely,

THORSON BARNETT & MCDONALD, P.C.

Jeffrey G. Curnutt

Enclosures
cc:   Gabriela Sikich
     Marty Paul
     Jeremy Roller
     Lee Thorson

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 84
CONFIDENTIAL                                RBC-PAUL000000598

# EXHIBIT 8

 **RBC Wealth Management®**

**Todd Schnell**
Vice President -
Senior Associate General Counsel
RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402-4422

Direct:   612-371-7263
Fax:      866-947-4603
todd.schnell@rbc.com

July 19, 2012

<u>**VIA FACSIMILE (206-467-1230) & OVERNIGHT MAIL**</u>
Mr. Jeffrey G. Curnutt
Thorson Barnett & McDonald, P.C.
3315 Two Union Square
601 Union Street
Seattle, Washington 98101

>          Re:     *Mr. Marty Paul*
>                  *RBC U.S. Wealth Accumulation Plan*

Dear Mr. Curnutt:

The RBC US Wealth Accumulation Plan ("Plan") Committee (the "Committee"), received your letter of April 20, 2012, in which you requested reinstatement of Marty Paul's Company Contributions which forfeited following termination of his employment on March 7, 2011. This letter is sent on behalf of and at the direction of the Committee.

At the direction of the Committee, RBC's compensation team met on July 17, 2012, and reviewed the following documents and information in considering Mr. Paul's claim:

1.      April 20, 2012, letter from Jeffrey G. Curnutt, attorney for Mr. Paul.
2.      FINRA Form U5 for Mr. Paul.
3.      Letter from Gabriela Sikich dated March 15, 2012.
4.      Amended and Restated Royal Bank of Canada US Wealth Accumulation Plan and Prospectus dated November 1, 2009.

After discussion involving the compensation team and a full review of the evidence, documents, and your April 20, 2012, letter:

- The compensation team determined that termination of Mr. Paul's employment based on a violation of the Code of Conduct and other RBC policy satisfies the definition of "Cause" in Section 1.2 of the Plan. Accordingly, the compensation team concluded that all Company Contributions are forfeited, pursuant to Section 4.3 of the Plan.

- The compensation team noted that Section 5.10 of the Plan states the Plan is not intended to be a tax-qualified plan subject to ERISA. The compensation team further noted that Section 5.10 states that, in the event the Plan might be determined to be an "employee pension benefit plan" subject to the provisions of ERISA, RBC "believes that it constitutes an unfunded plan of deferred compensation maintained for a select group of management or highly compensated employees and, therefore, [is] exempt from many ERISA requirements." The compensation team concluded it is responsible for making determinations pursuant to the existing Plan provisions. Any further determination as to whether the Plan is an "employee pension benefit

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
No. 16-cv-05616-RBL - Page 86
CONFIDENTIAL                                                                  RBC-PAUL000000600

plan" subject to the provisions of ERISA is outside the scope of the Committee's authority. Accordingly, the compensation team made no determinations with regard to these issues.

Based on the determinations set forth above, the Committee has determined to deny Mr. Paul's claim. Pursuant to Section 7.4 of the Plan, Mr. Paul is entitled to request a review of the foregoing denial of his claim for distribution of his vested and unvested Company Contributions.

If Mr. Paul desires such a review, please comply with the provisions of Section 7.4 and direct any written request to my attention. Further, Mr. Paul is entitled to bring a civil action under ERISA Section 502(a) following an Adverse Benefit Determination upon appeal.

Sincerely,

Todd W. Schnell

cc:     RBC US Wealth Accumulation Plan Committee

CONFIDENTIAL

RBC-PAUL000000601

# EXHIBIT 9

**THORSON BARNETT & McDONALD, P.C.**
*Attorneys at Law*

3315 Two Union Square
601 Union Street
Seattle, Washington 98101
Telephone: (206) 467-1240
Fax: (206) 467-1230

JEFFREY G. CURNUTT
(206) 467-1258

August 16, 2012

<span style="text-decoration: underline">**VIA CERTIFIED MAIL**</span>

RBC Wealth Management
Attn: Todd Schnell
RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402

Re:     Marty Paul – Appeal and Review of Adverse Benefit Determination with respect to Benefits under the RBC US Wealth Accumulation Plan ("WAP")

Mr. Schnell:

We have received your letter of July 19, 2012 (the "Adverse Benefit Determination"), in which you indicate the Committee has reviewed Marty Paul's claim for benefits under the WAP and has determined to uphold its denial of a portion of those benefits. Whereas Mr. Paul's claim requested a distribution of his entire WAP account, we note the Adverse Benefit Determination specifies that forfeiture was sustained only as to the Company Contributions. Accordingly, we assume you are taking appropriate action to timely distribute the portion of Mr. Paul's account attributable to Mandatory Deferred Compensation (and any earnings thereon) according to his distribution election.

As previously outlined in his claim, Mr. Paul is fully vested in and remains entitled to a distribution of his entire WAP account. No portion of the balance is subject to reduction, and forfeiture of any part of Mr. Paul's WAP benefit violates a number of ERISA provisions. **Accordingly, Mr. Paul hereby requests, pursuant to WAP § 7.4 and DOL Reg. §2560.503-1(h), that the WAP Committee review and reverse the Adverse Benefit Determination and instead distribute his entire WAP account balance according to his distribution election.** Per your request, we have directed this appeal to your attention on behalf of the WAP Committee.

In addition, please provide us with all documents, records, and other information relevant to Mr. Paul's claim for benefits. Note that the Committee must furnish, and this request includes, all materials relied upon in making the benefit determination as well as materials that were submitted, considered, or generated in the course of making the benefit determination, without regard to whether such materials were relied upon in making such determination. This request also includes, without limitation, all Plan documents and all rules or regulations promulgated by the Committee to implement or manage the Plan and to address potential conflicts of interest and

H:\23279\001\RBC WAP Claim\ABD Appeal ltr 8-16-12.doc

CONFIDENTIAL

RBC-PAUL000000602

determination of a termination for Cause under WAP Section 4.3, and all documents (including Mr. Paul's employee file, the Code of Conduct and any "other RBC policy") relating to the Committee's determination that termination was for Cause.

The Adverse Benefit Determination further indicates that the WAP intends to be exempt from certain ERISA requirements because it is an unfunded "top-hat" plan. Because this conclusion is a prerequisite to making any determination with respect to Mr. Paul's entitlement to benefits under the WAP, the request for documents, records, and other information described herein specifically also includes, without any limitation, all information pertaining to the determination that the WAP qualified as a "top-hat" plan during all periods of participation by Mr. Paul. Notwithstanding your assertion that determination of "top-hat" status "is outside the scope of the Committee's authority," WAP Section 7.1 specifically vests in the Committee "the full power and sole discretionary authority to make all determinations provided for under the Plan...." If a determination as to the "top-hat" status of the WAP was in fact made by someone other than the Committee, as is suggested in the Adverse Benefit Determination, please identify such other person(s) by name and title.

We look forward to receiving the Committee's decision, and, if the original determination is confirmed in any part, the reasons for the denial of benefits and all supporting materials, within the time periods described under WAP Section 7.4 and DOL Reg. § 2560.503-1(i)(1).

Sincerely,

THORSON BARNETT & MCDONALD, P.C.

Jeffrey G. Curnutt

cc:     RBC US Wealth Accumulation Plan Committee
        Marty Paul
        Jeremy Roller

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 90

CONFIDENTIAL

RBC-PAUL000000603

# EXHIBIT 10

 **RBC Wealth Management®**

**Todd Schnell**
Vice President -
Senior Associate General Counsel
RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402-4422

Direct:   612-371-7263
Fax:      866-947-4603
todd.schnell@rbc.com

December 14, 2012

**<u>VIA FACSIMILE (206-467-1230) & OVERNIGHT MAIL</u>**
Mr. Jeffrey G. Curnutt
Thorson Barnett & McDonald, P.C.
3315 Two Union Square
601 Union Street
Seattle, Washington 98101

> *Re:*   *Mr. Marty Paul*
> *US Wealth Accumulation Plan ("Plan")Appeal*

Dear Mr. Curnutt:

On behalf of the WAP Committee (the "Committee"), I am responding to the appeal filed by you on behalf of Mr. Marty Paul by letter dated August 16, 2012 (the "Appeal") from the claim denial sent on July 19, 2012 ("Denial"). As you know, by letter of October 4, 2012, I advised you that the Committee required additional time to review the Appeal and provide a final response, due to special circumstances. As this letter explains in greater detail, the Committee has decided to deny the Appeal.

As an initial matter, my letter of July 19, 2012, stated the Compensation Team/WAP Committee made the determination to deny Mr. Paul's claim. However, as noted in your letter of August 16, 2012, the letter made express reference only to the Company Contributions. In fact, the Compensation Team reviewed all amounts that had been forfeited and its denial of Mr. Paul's claim applied to both the Company Contributions and Mandatory Deferrals. Company Contributions and Mandatory Deferrals are treated identically pursuant to Section 4.3 of the Plan. Accordingly, the Committee's review of Mr. Paul's Appeal included a review of, and made a final determination on, forfeiture of Mr. Paul's vested and unvested Company Contributions and Mandatory Deferrals.

The Committee met on December 7, 2012 and reviewed the following documents and information in considering Mr. Paul's Appeal:

1.  Documents and information from July 17, 2012 Compensation Team review.  Specifically:
    *   April 20, 2012, letter from Jeffrey G. Curnutt, attorney for Mr. Paul.
    *   FINRA Form U5 for Mr. Paul.
    *   Letter from Gabriela Sikich dated March 15, 2012.

2.  Letter from Todd Schnell dated July 19, 2012.

3.  August 16, 2012, letter from Jeffrey G. Curnutt, attorney for Mr. Paul.

4.  Disclosure Event Details portion of BrokerCheck report for Mr. Paul.

5.  Amended and Restated Royal Bank of Canada US Wealth Accumulation Plan and Prospectus dated November 1, 2009.

RBC Wealth Management, a division of RBC Capital Markets, LLC, Member NYSE/FINRA/SIPC.

After discussion involving the Committee members, and a full review of the evidence, documents, and your letter dated August 16, 2012:

- The Committee determined that termination of Mr. Paul's employment based on a violation of the Code of Conduct and other RBC policy satisfies the definition of "Cause" in Section 1.2 of the Plan. Accordingly, the Committee concluded that all Company Contributions and Mandatory Deferrals are forfeited, pursuant to Section 4.3 of the Plan.

- The Committee determined that the Plan is not intended to be a tax-qualified plan subject to ERISA, as stated in Section 5.10 of the Plan. The Committee further determined that Section 5.10 of the Plan makes clear that the intent of RBC, as the settlor of the Plan, was that the Plan, if considered a pension plan, would be deemed a top-hat plan.

- The Committee determined that you are entitled to "examine pertinent Plan documents" pursuant to Section 7.4 of the Plan. A response to your request for documents will be provided under separate cover.

Based on the determinations set forth above, the Committee has determined to deny Mr. Paul's Appeal.

Based on the foregoing, and pursuant to Section 7.4 of the Plan, the Adverse Benefit Determination denying your request for reinstatement of Mr. Paul's vested and unvested Company Contributions and Mandatory Deferrals is confirmed in whole. Further, Mr. Paul is entitled to receive, upon request and free of charge, reasonable access to and copies of all documents, records, or other information relevant to his claim. As set forth above, copies of the documents and information relevant to Mr. Paul's claim for benefits will be provided under separate cover. Finally, Mr. Paul is entitled to bring a civil action under ERISA Section 502(a) within 90 days following an Adverse Benefit Determination upon appeal.

Sincerely,

Todd W. Schnell

cc:    RBC US Wealth Accumulation Plan Committee

```
                              *********************
                              ***   TX REPORT   ***
                              *********************

          TRANSMISSION OK

          TX/RX NO               1355
          RECIPIENT ADDRESS      912064671230
          DESTINATION ID
          ST. TIME               12/14 17:10
          TIME USE               01'22
          PAGES SENT             3
          RESULT                 OK
```



**RBC Wealth Management**

# Fax Cover Sheet

**To:**        Mr. Jeffrey G. Curnutt

**Fax #**      206-467-1230

**Phone #:**

**From:**      Todd Schnell

**Fax #:**     866-947-4603

**Phone #:**   612-371-7263

**Date:**      December 14, 2012

**Number of pages (including cover page):**   **3**

**Notes:**

**RE: US Wealth Accumulation Plan Appeal /
Mr. Marty Paul**

# EXHIBIT 11

# THORSON BARNETT & McDONALD, P.C.
### Attorneys at Law

3315 Two Union Square
601 Union Street
Seattle, Washington 98101
Telephone: (206) 467-1240
Fax: (206) 467-1230

JEFFREY G. CURNUTT
(206) 467-1258

January 22, 2013

**VIA CERTIFIED MAIL**

RBC US Wealth Accumulation Plan Committee
Attn: Kristen Kimmell
MS P07
60 South 6th Street
Minneapolis, MN 55402

Re:     Brian Buskirk – Claim for Benefits under the RBC US Wealth Accumulation Plan

Ms. Kimmell:

Former RBC employee, Brian Buskirk, has retained our firm to represent him with respect to his benefits under the RBC US Wealth Accumulation Plan ("WAP"). **This letter is Mr. Buskirk's claim for benefits under DOL Reg. § 2560.503-1 and Section 7 of the WAP document.** We direct this claim to you in your capacity as Chair of the WAP Committee ("Committee") and trust you will also share the claim with the other members of the Committee and the WAP's advisors, as appropriate.

At the time of his separation from service on August 10, 2012, Mr. Buskirk had been employed by RBC Capital Markets and its predecessors for roughly 27 years. Pursuant to the mandatory minimum vesting schedules provided for under the Employee Retirement Income and Security Act of 1974 ("ERISA"), Mr. Buskirk was required to fully vest in his accrued WAP benefits after completing no more than three (3) years of service under a "cliff" vesting schedule or after completing no more than six (6) years of service under a graduated vesting schedule. Under either of these vesting formulas, Mr. Buskirk has been 100% vested in all employee and employer contributions to the WAP on his behalf for many years.

We have recently been provided with a Fidelity NetBenefits transaction history report which appears to indicate that $297,676 was forfeited from Mr. Buskirk's WAP account as of November 30, 2012. In addition to disobeying the vesting rules described above, forfeiture of a participant's vested WAP account balance violates a number of other ERISA requirements, including statutory provisions governing funding and the anti-assignment of benefits. For example, ERISA specifically mandates that plan assets be held in a trust for the exclusive purpose of paying benefits to participants. RBC may not simply forfeit Mr. Buskirk's accrued benefit and convert the plan assets for its own use.

ERISA contains a narrow exception to many of its requirements for plans maintained primarily for the purpose of providing benefits to a select group of management or highly

IH:\23359\RBC WAP Claim\WAP Committee ltr 1-22-13.doc

compensated employees (so-called "top hat" plans). However, as the Committee is already well aware, the WAP fails to qualify as a top hat plan for two primary reasons. First, because the WAP has covered thousands of participants at a time, the eligible employees cannot possibly constitute a "select group" as contemplated by the top hat exception. Second, even if the exception's quantitative requirement had been consistently satisfied during every year of Mr. Buskirk's participation, the majority of participants never possessed sufficient control over the design and operation of the WAP to exempt the plan from ERISA's protection.

Because the WAP was not a top hat plan during all years of his participation, Mr. Buskirk is 100% vested in all benefits accrued under the WAP regardless of the extent to which such benefits are attributable to his own salary deferrals or to employer contributions made on his behalf. Accordingly, Mr. Buskirk remains entitled to his entire WAP account, and no portion his benefit is subject to reduction, offset or forfeiture.

We urge the Committee to carefully review this claim for benefits and to promptly restore all forfeited amounts (along with any lost earnings thereon) to Mr. Buskirk's WAP account. We look forward to receiving your timely written reply (along with the reasons therefore) in accordance with WAP Section 7.2 and the ERISA claims procedure regulations.

Sincerely,

THORSON BARNETT & MCDONALD, P.C.

Jeffrey G. Curnutt

Enclosures
cc:   Gabriela Sikich
      Todd Schnell
      Brian Buskirk
      Jeremy Roller

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 97

CONFIDENTIAL

RBC-PAUL000003990

# EXHIBIT 12



Todd W. Schnell
Vice President –
Senior Associate General Counsel
RBC Plaza -- P18
(612) 371-7263 direct dial
(866) 947-4603 fax

MEMBER NYSE/SIPC

| To: | RBC USA WAP COMMITTEE |
| From: | Todd W. Schnell |
| Date: | April 19, 2013 |
| Regarding: | Brian Buskirk |
| | January 22, 2013 WAP Claim |

**Request:**  Mr. Buskirk requests the Committee review his forfeiture of unvested contributions under the WAP.

**Background:**  Mr. Buskirk voluntarily terminated his employment on or about August 10, 2012, and subsequently commenced employment with Northwest Asset Management.

**Documents Reviewed:**

1. January 22, 2013, letter from Jeffrey G. Curnutt, attorney for Mr. Buskirk.
2. FINRA Form U5 and BrokerCheck for Mr. Buskirk.
3. Amended and Restated Royal Bank of Canada US Wealth Accumulation Plan and Prospectus, Frozen as of January 1, 2012, dated January 1, 2012.
4. Summary of Mr. Buskirk's WAP Account (History for 10/01/2012 to 12/31/2012)
5. Memorandum Opinion and Order, filed March 27, 2013, in Tolbert, et al., v. RBC Capital Markets Corporation, et al., US District Court, Southern District of Texas (Houston Division) Case 4:11-cv-11017

**Analysis:**  At the time his employment terminated, Mr. Buskirk was subject to the Amended and Restated Royal Bank of Canada US Wealth Accumulation Plan and Prospectus, Frozen as of January 1, 2012, dated January 1, 2012 (the "Plan").

Mr. Buskirk claims to have been notified of the forfeiture of his unvested Company Contributions, in the amount of $297,676, via his Fidelity NetBenefits transaction history report of November 30, 2012. Mr. Buskirk now requests that the Committee reinstate the forfeited balance of his WAP account.

**1. Timeliness of Mr. Buskirk's Claim.**  Pursuant to Section 7.3 of the Plan, Mr. Buskirk had 90 days from the time he knew or should have known of his WAP forfeiture to file a claim. Mr. Buskirk was notified of his forfeiture via his Fidelity NetBenefits transaction history report of November 30, 2012, and made his claim to the WAP committee via letter dated January 22, 2013. Accordingly, Mr. Buskirk's claim was brought within the timeframe required under the Plan.

**2. Forfeiture of Mr. Buskirk's Unvested Company Contributions.**  Mr. Buskirk asserts, pursuant to the Employee Retirement Income and Security Act of 1974 ("ERISA"), based on his length of service with RBC Capital Markets and its predecessors ("roughly 27 years"), he was entitled to a vesting of all company contributions. At the time of his termination, Mr. Buskirk had unvested Company Contributions from years 2007-2012. These amounts were forfeited pursuant to Section 4.6 of the Plan.

**3. Non-ERISA Plan.**  Mr. Buskirk asserts that forfeiture of his unvested WAP balance violates various provisions of ERISA, including ERISA's minimum vesting requirements.

Initially, pursuant to the express terms of Section 1.1 and 5.10 of the Plan, the Plan is not intended to be a tax-qualified plan subject to ERISA. The issue of whether the Plan is subject to ERISA was subject to litigation in Tolbert, et al., v. RBC Capital Markets Corporation, et al., US District Court, Southern District of Texas (Houston Division) Case 4:11-cv-11017. On March 27, 2013, that Court issued a Memorandum Opinion and Order in which it held the WAP plan is not an employee pension benefit plan and is not subject to ERISA. The Committee is entitled to properly rely on the decision of the US District Court and the express language of the WAP Plan and to determine that is it not an ERISA plan.

4. **WAP "top-hat" status.** Mr. Buskirk also challenges the "top-hat" status of the WAP plan. Again, Section 5.10 of the Plan states the Plan is not intended to be a tax-qualified plan subject to ERISA, but then further states that, in the event the Plan might be determined to be an "employee pension benefit plan" subject to the provisions of ERISA, RBC "believes that it constitutes an unfunded plan of deferred compensation maintained for a select group of management or highly compensated employees and, therefore, [is] exempt from many ERISA requirements." If the Committee concludes that the WAP Plan is not an ERISA plan, it arguably need not reach the issue of the Plan's status as a "top-hat" plan.

However, for the purpose of this review, the Committee will view this as an alternative and separate argument. Accordingly, Mr. Buskirk challenges the WAP Plan's "top-hat" qualification for two reasons: (1) "because the WAP has covered thousands of participants at a time" such that it cannot constitute a plan that covers only a "select-group"; and (2) because "the majority of participants never possessed sufficient control over the design and operation of the WAP to exempt the plan from ERISA's protection."

For purposes of Mr. Buskirk's claim, the Committee must determine, based on the terms of the Plan and the relevant facts, whether, if the Plan is subject to the provisions of ERISA it falls into the "top-hat" exception. Again, relying on the arguments made in the Tolbert litigation, the Committee can reasonably conclude that neither of the two identified grounds for challenge are sufficient and that the WAP would meet the requirements for a "top-hat" plan.

Any further determination as to what Mr. Buskirsk's rights would be if the Plan were an "employee pension benefit plan" subject to the provisions of ERISA is outside the scope of the Committee's authority. Accordingly, the compensation team made no determinations with regard to these issues.

Outcome:    At the direction of the Committee, RBC's Compensation Team reviewed the forgoing on April 17, 2013. After a full review of the evidence, documents, and Mr. Curnutt's January 22, 2013, letter, the Compensation Team Denied Mr. Buskirk's request for reinstatement of his unvested Company Contributions.

CONFIDENTIAL            RBC-PAUL000000328

# EXHIBIT 13

**THORSON**
**BARNETT &**
**MCDONALD, P.C.**
*Attorneys at Law*

3315 Two Union Square
601 Union Street
Seattle, Washington 98101
Telephone: (206) 467-1240
Fax: (206) 467-1230

RBC WEALTH MANAGEMENT
MAY 17 2013
LEGAL DEPARTMENT

JEFFREY G. CURNUTT
(206) 467-1258

May 13, 2013

**VIA CERTIFIED MAIL**
RBC Wealth Management
Attn: Todd Schnell
RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402

Re:   Brian Buskirk — Appeal and Review of Adverse Benefit Determination with
      respect to Benefits under the RBC US Wealth Accumulation Plan ("WAP")

Mr. Schnell:

We have received your April 19, 2013 letter (the "Adverse Benefit Determination"), in
which you indicate the WAP Committee has denied Brian Buskirk's claim for benefits under the
WAP. As outlined in his claim, Mr. Buskirk is fully vested in and remains entitled to a
distribution of his entire WAP account. No portion of the balance is subject to reduction, and
forfeiture of any part of his benefit violates ERISA. **Mr. Buskirk therefore requests, pursuant
to WAP § 7.4 and DOL Reg. § 2560.503-1(h), that the WAP Committee review and reverse
the Adverse Benefit Determination and distribute his entire WAP account according to his
distribution election.** As requested in the Adverse Benefit Determination, we direct this appeal
to your attention on behalf of the WAP Committee.

The Adverse Benefit Determination indicates "that Sections 1.1 and 5.10 of the Plan state
that the Plan is not intended to be a tax-qualified plan subject to ERISA." First, qualification
under the Internal Revenue Code ("Code") is a separate issue from whether a plan is subject to
ERISA. Many plans that fail to satisfy the requirements under Code § 401(a) are nevertheless
subject to ERISA. Second, neither of the cited WAP provisions says that the WAP intends to be
exempt from ERISA. To the contrary, Section 5.10 specifically contemplates that the WAP may
be an "employee pension benefit plan" and also indicates that a filing was submitted to the
Department of Labor "to comply with ERISA reporting and disclosure requirements."

The Adverse Benefit Determination further indicates that, notwithstanding its reliance on
the Order issued by the US District Court for the Southern District of Texas in *Tolbert, et al., v.
RBC Capital Markets Corporation, et al.* No. 4:11-cv-00107, the WAP Committee undertook to
analyze whether the WAP satisfies the numerosity and participant control requirements to be a
"top-hat" plan. Please provide copies of all data and documents pertaining to the determination
that the WAP would have qualified as a "top-hat" plan during all periods Mr. Buskirk's
participation if it is determined that the WAP is indeed an "employee benefit pension plan."

As required by DOL Reg. § 2560.503(1)(h)(2)(iii) please provide us with all documents, records, and other information relevant to Mr. Buskirk's claim for benefits. Note that this requirement includes all materials relied upon in making the benefit determination as well as materials submitted, considered, or generated in the course of making the benefit determination, without regard to whether such materials were relied upon in making such determination. This request also includes, without limitation, all Plan documents and all rules or regulations promulgated by the WAP Committee to implement or manage the WAP.

We look forward to receiving the Committee's determination, and, if the original decision to forfeit a portion of Mr. Buskirk's benefit is confirmed in any part, the reasons for the denial of benefits and all supporting materials, within the time periods described under WAP Section 7.4 and DOL Reg. § 2560.503-1(i)(1).

Sincerely,

THORSON BARNETT & MCDONALD, P.C.

Jeffrey G. Curnutt

cc:   RBC US Wealth Accumulation Plan Committee
      Brian Buskirk
      Bruce Buskirk
      Jeremy Roller

CONFIDENTIAL                                    RBC-PAUL000000326

# EXHIBIT 14

**RBC Wealth Management**®

**Casey Erin Jarchow**
Senior Counsel -
Employment
RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402-4422

Phone:  612-371-7672
Fax:     866-260-1449
casey.jarchow@rbc.com

September 11, 2013

**VIA FACSIMILE (206-467-1230) & OVERNIGHT MAIL**
Mr. Jeffrey G. Curnutt
Thorson Barnett & McDonald, P.C.
3315 Two Union Square
601 Union Street
Seattle, Washington 98101

> Re:    *Mr. Brian Buskirk*
> *RBC U.S. Wealth Accumulation Plan Appeal*

Dear Mr. Curnutt:

On behalf of the WAP Committee (the "Committee"), I am responding to the appeal filed by you on behalf of Mr. Brian Buskirk by letter dated May 13, 2013 (the "Appeal") from the claim denial sent on April 19, 2013 ("Denial"). As you know, by letter of July 3, 2013, I advised you that the Committee required additional time to review the Appeal and provide a final response, due to special circumstances. As this letter explains in greater detail, the Committee has decided to deny the Appeal.

The Committee met on September 10, 2013, and reviewed the following documents and information in considering Mr. Buskirk's appeal:

> 1.  Documents and information from April 17, 2013 compensation team review.
> 2.  May 13, 2013, letter from Jeffrey G. Curnutt, attorney for Mr. Buskirk.
> 3.  Amended and Restated Royal Bank of Canada US Wealth Accumulation Plan and Prospectus, Frozen as of January 1, 2012, dated January 1, 2012.
> 4.  Demographic data developed in <u>Tolbert, et al., v. RBC Capital Markets Corporation, et al.</u>, US District Court, Southern District of Texas (Houston Division) Case 4:11-cv-11017

After discussion involving the Committee members, and a full review of the evidence, documents, and your letter dated May 13, 2013:

- The Committee noted that Mr. Buskirk voluntarily terminated his employment with RBC and that all unvested Company Contributions were properly forfeited pursuant to Section 4.6 of the Plan.

- The Committee noted that Sections 1.1 and 5.10 of the Plan state the Plan is not intended to be a tax-qualified plan subject to ERISA.

- The Committee then took notice of the issues raised, and Order issued, in <u>Tolbert, *et al.*, v. RBC Capital Markets Corporation, *et al.*</u>, US District Court, Southern District of Texas (Houston Division) Case 4:11-cv-11017. Specifically, the Committee took notice

of the March 27, 2013 Memorandum Opinion and Order in which the Court held the WAP plan is not an employee pension benefit plan and is not subject to ERISA. The Committee is entitled to properly rely on the decision of the US District Court and the express language of the WAP Plan and determined that is it not an ERISA plan.

- Notwithstanding the forgoing, and for the purposes of fully responding to this appeal, the Committee considered, as an alternative and separate argument, the "top-hat" status challenges identified in the January 22, 2013 letter: the WAP Plan is not "top-hat" qualified (1) "because the WAP has covered thousands of participants at a time" such that it cannot constitute a plan that covers only a "select-group"; and (2) because "the majority of participants never possessed sufficient control over the design and operation of the WAP to exempt the plan from ERISA's protection."

- The Committee noted that Section 5.10 states that, in the event the Plan might be determined to be an "employee pension benefit plan" subject to the provisions of ERISA, RBC "believes that it constitutes an unfunded plan of deferred compensation maintained for a select group of management or highly compensated employees and, therefore, [is] exempt from many ERISA requirements." The Committee also relied on the analysis, arguments and demographic data in the Tolbert litigation related to the issues raised. Based on the entirety of this information, the Committee reasonably concluded that identified grounds for challenge are insufficient and that the WAP would meet the requirements for a "top-hat" plan.

Based on the determinations set forth above, the Committee has determined to deny Mr. Buskirk's Appeal.

Based on the foregoing, and pursuant to Section 7.4 of the Plan, the Adverse Benefit Determination denying your request for reinstatement of Mr. Buskirk's unvested Company Contributions is confirmed in whole. Further, Mr. Buskirk is entitled to receive, upon request and free of charge, reasonable access to and copies of all documents, records, or other information relevant to his claim. Finally, Mr. Buskirk is entitled to bring a civil action under ERISA Section 502(a) within 90 days following an Adverse Benefit Determination upon appeal.[1]

Sincerely,

Casey Erin Jarchow

cc:     RBC US Wealth Accumulation Plan Committee

---

[1] Nothing in the foregoing, including the reference to ERISA Section 502(a), should be deemed a concession that the Plan is an "employee pension benefit plan" subject to ERISA.

# EXHIBIT 15

```
1              IN THE UNITED STATES DISTRICT COURT

2                 WESTERN DISTRICT OF WASHINGTON

3                          AT TACOMA

4    _____

5    MARTY PAUL, an individual; and      )
     BRIAN BUSKIRK, an individual,       )
6                                        )
                    Plaintiffs,          )   Case No.
7                                        )
               vs.                       )
8                                        )   3:16-cv-05616-RBL
     RBC CAPITAL MARKETS, LLC, a         )
9    Minnesota limited liability         )
     company; ROYAL BANK OF CANADA, a    )
10   Canadian corporation; and ROYAL     )
     BANK OF CANADA US WEALTH            )
11   ACCUMULATION PLAN, an employee      )
     benefit plan,                       )
12                                       )
                    Defendants.          )
13
     _____
14

15

16          VIDEOTAPED DEPOSITION OF MARTY PAUL, VOLUME I

17                        April 27, 2017

18                          8:00 a.m.

19              1201 Third Avenue, Suite 4900

20                    Seattle, Washington

21

22

23

24

25          Eva P. Jankovits, CCR No. 1915
```

ESQUIRE

DECL. WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 108

800.211.DEPO (3376)
EsquireSolutions.com

1          MR. ALAMUDDIN:  Let's mark this as Exhibit 2.

2                    (Exhibit No. 2 marked for

3                     identification.)

4          THE WITNESS:  Thank you.

5      Q.  (By Mr. Alamuddin)  Mr. Paul, I'm showing you

6  what we marked as Defendants' Exhibit 2, which is a

7  multipage document entitled Royal Bank of Canada, Summary

8  Description of 2003 RBC Dain Rauscher Wealth Accumulation

9  Plan.

10          First question is:  Have you seen this document

11  before?

12      A.  Not that I remember.

13      Q.  Do you recall receiving, on an annual basis,

14  summary descriptions of the wealth accumulation plan?

15      A.  Not that I remember.

16      Q.  It could have happened; you just don't

17  remember?

18      A.  Yeah.

19      Q.  Have you ever, throughout your -- did you ever,

20  throughout your tenure at RBC, read the wealth

21  accumulation plan document?

22      A.  Not that I remember.

23      Q.  Did you read any documents that describe the

24  wealth accumulation plan?

25      A.  No, not that I remember.

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 109

ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

1    voluntary.

2        Q.  And do you recall when contributions were

3    mandatory in the plan?

4        A.  Like I say, I don't remember when that was.  I

5    think that that was towards the end of my employment at

6    RBC, so I don't know if that was 2011 or 2010.  But I

7    don't think they were mandatory in 1999 or 2003 or -- so,

8    no, I don't remember when.

9        Q.  I interrupted you.  You were telling me your

10   understanding how the plan operated.  So you mentioned

11   that you withheld money from your paycheck.

12       A.  Yeah.  You would defer -- similar to

13   contributing to a 401(k), they would withhold it from

14   your paycheck, and then you would invest it in -- however

15   you wanted to.  Well, within the amount of investments

16   there were.  Then there was a period of time -- and I

17   don't remember when this started -- that a portion of it

18   had to be an RBC stock, but I don't remember what year

19   that was or what portion.

20           And that's about how I remember my 401(k) and

21   my WAP, to be honest.

22       Q.  Did you have any understanding as to what the

23   vesting provisions or requirements were of the WAP?

24       A.  No, because they -- they -- I think they moved

25   around a bit during -- I didn't even realize I started in



1   1999, but -- but I remember the vesting changing.  And I

2   don't remember if it started at four years and then

3   eventually became five years and -- or if there was a

4   portion that was longer or less depending on if you were

5   a manager or a producer or -- or not.  So I don't know if

6   I answered your question.

7        Q.  Well, somewhat.  So where did you get the --

8   the understandings that you just described to me, which

9   is that the vesting changed over time, at some point

10  there were four or five or they may -- depends on the

11  position?

12       A.  Or your length of service or your age.  I think

13  those were qualifiers too.  I don't know if they were

14  qualifiers to contribute or you retired.  You know, that

15  was a vesting inflection point, so...  I think there was

16  multiple inflection points of vesting.

17       Q.  And where did you get your understanding of

18  those multiple inflection points as you testified?

19       A.  Well, mostly in hindsight, after I was --

20  received a letter in 2012 that my vested portion was

21  being withdrawn or clawed back by the company, that -- I

22  didn't even think it was possible.  I thought those were

23  retirement dollars and that I was to receive them a year

24  after employment.

25       Q.  Where did you get that understanding from?

ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

1        A.  Well, when I left, I rolled over my 401(k) and

2    was under the impression that one year after you left

3    employment you received the rest of the proceeds.  I

4    don't know if that was in a letter from RBC or just my

5    impression of what the plan was because I didn't receive

6    notice.  I wasn't getting them when I left.  And I recall

7    there being a 12-month period of time to where you

8    received it.

9        Q.  You mentioned you -- you weren't getting them.

10   Getting what?

11       A.  The wealth accumulation dollars, which was a

12   surprise to me because they were vested, and I thought I

13   would roll them when I rolled over my 401(k) when I left.

14       Q.  How did you know they were vested?

15       A.  Because it would say "vested" on them.

16       Q.  On what exactly?

17       A.  Well, I think it said "vested" on a letter that

18   RBC sent to me and that they were claiming back my vested

19   balance.

20       Q.  Right.

21       A.  So I don't know what portion was vested or not.

22   I just remember it being a lump sum, and there were years

23   where some was vested and there were years where some was

24   not.

25       Q.  And that's what I'm trying to drill down to, is

1    did you have any understanding before you received the

2    letter from RBC telling you that you would be forfeiting

3    contributions how vesting worked, what portion of your

4    WAP dollars were vested versus unvested?

5         A.  Well, I never thought they were at risk of

6    being withheld.  That was a very daunting letter and

7    caught me completely by surprise.

8         So I think your question was, do you remember

9    when you knew or how you knew.  And I think that letter

10   was the signalling moment in my life.

11        Q.  If you turn to Exhibit 2, I know you testified

12   that you don't recall reading this document, but I want

13   to ask you some questions about it regardless.

14        If you go to Page -- and you'll see at the

15   bottom there's what we call a Bates number, RBC001066.

16        A.  Okay.

17        Q.  Section A, General Nature and Purpose of the

18   Plan.  Section A reads, The plan is a nontax-qualified,

19   deferred compensation plan pursuant to which a select

20   group of management or highly compensated employees of a

21   company and its participating subsidiaries (as defined

22   below) will be offered the opportunity to elect on an

23   annual basis to defer receipt of a portion of

24   compensation to be earned with respect to the upcoming

25   year.

ESQUIRE

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 113

800.211.DEPO (3376)
EsquireSolutions.com

1          Separate and apart from whether you recall

2   reading this document, did you understand the WAP to be a

3   nontax-qualified plan?

4          MR. ROLLER:  Object to the form, but you can

5   answer.

6          A.  I -- I considered it pretax dollars, if that's

7   what you mean by tax -- "nontaxed" or "tax deferred."

8          Q.  (By Mr. Alamuddin)  Did you understand that the

9   WAP was only intended to be offered to a select group of

10  management or highly compensated employees of the

11  company?

12         A.  No, I didn't because the qualification level

13  changed throughout the period of time I was there.  And

14  there were people that qualified that weren't president's

15  council, that weren't chairman's council, that weren't

16  even brokers.  My assistant qualified, and she never gave

17  advice.

18         Q.  And your assistant being?

19         A.  Kim Taurman.

20         Q.  Do you know what salary Ms. Taurman was making

21  at the time she qualified?

22         A.  I think her salary was about 45,000.

23         Q.  And she had no production?

24         A.  She had no production.  I paid her in addition

25  to RBC's salary.

DECL. WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 114

1         A.  I believe --

2             MR. ROLLER:  Object to the form, but you can

3    answer.

4         A.  I believe chairman's council were.  I don't

5    believe president's council were, in my opinion of what a

6    highly compensated person is.

7         Q.  (By Mr. Alamuddin)  And what is your opinion of

8    a highly compensated person?

9         A.  I think somebody that makes over $100,000 a

10   year.  And I don't think, in 1999 or 2000, president's

11   council people made over $100,000 a year because I -- I

12   just read fairly quick, but I -- on this thing here, it

13   says production of $300,000.  And I don't think a

14   $300,000 producer in 1999 made over $100,000 a year.

15        Q.  Would you agree with me that whether someone is

16   highly compensated is going to vary over time?  In other

17   words, $100,000 in 1999 was different than $100,000 in

18   2010, for example.

19        A.  Well, from inflation?

20        Q.  Yes.

21        A.  Yeah.  $100,000 is different in the year 2010

22   than 1999.

23        Q.  So let me -- so when you say $100,000 to be

24   highly compensated, are you talking about in 1999/2000

25   dollars?

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 115

1  don't --

2      Q.  Well, there's the -- the letter attaches the

3  plan document, does it not?

4      A.  Oh, I -- I didn't know if that was attached

5  just for this or this was all -- I don't remember this

6  cover letter and the emotion I felt when I read it.

7          You know, it had been -- I -- it had been money

8  I thought was coming and I just had to wait a year.  You

9  know, I rolled over my 401(k) the summer before that, and

10  told my wife and felt to myself that not to worry, you

11  know, that next summer we'll roll over the WAP and -- and

12  move on.

13      Q.  Why had you rolled over the 401(k) the summer

14  before that?

15      A.  I didn't want to leave any money at RBC.

16      Q.  But you were still employed -- or so are you

17  saying that you rolled over the -- the 401(k) immediately

18  after your termination in March --

19      A.  Well, within a month or two or three.  I

20  don't -- it wasn't immediately.  It was not on my mind.

21      Q.  And -- and is it your testimony that before you

22  received this March 15th, 2012 letter, that you were not

23  aware that you could forfeit contributions if you were

24  terminated for cause?

25      A.  I was not aware.

```
1   STATE OF WASHINGTON )
                        ) ss
2   County of King      )

3          I, Eva P. Jankovits, the undersigned Washington
    Certified Court Reporter, pursuant to RCW 5.28.010 authorized
4   to administer oaths and affirmations in and for the State of
    Washington, do hereby certify:

5
           That the annexed and foregoing deposition of MARTY
6   PAUL was taken before me and completed on April 27, 2017, and
    thereafter was transcribed under my direction;

7
           I further certify that according to CR 30 (e) the
8   witness was given the opportunity to examine, read and sign
    the deposition after the same was transcribed, unless
9   indicated in the record that the review was reserved;
10         I further certify that I am not a relative or
    employee of any such attorney or counsel, and that I am not
11  financially interested in the said action or the outcome
    thereof;

12
           I further certify that the witness before
13  examination was by me duly sworn to testify the truth, the
    whole truth and nothing but the truth;

14
           I further certify that the deposition, as
15  transcribed, is a full, true and correct transcript of the
    testimony, including questions and answers, and all
16  objections, motions and exceptions of counsel made and taken
    at the time of the foregoing examination and was prepared
17  pursuant to Washington Administrative Code 308-14-135, the
    transcript preparation format guideline;

18
           I further certify that I am herewith securely
19  sealing the said deposition and promptly delivering the same
    to Attorney Sari M. Alamuddin.

20
           IN WITNESS WHEREOF, I have hereunto set my
21  signature this 8th day of May, 2017.

22
23  _____
           Eva P. Jankovits, Certified Court Reporter No. 1915
24         in and for the State of Washington, residing in
           Seattle, Washington.
25         My CCR certification expires 7/3/17.
```

ESQUIRE

DECL. WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 117

800.211.DEPO (3376)
EsquireSolutions.com

## In the Matter Of:

## PAUL vs RBC CAPITAL MARKETS

3:16-cv-05616-RBL

## MARTY PAUL

*April 27, 2017*

*Volume II*



800.211.DEPO (3376)
EsquireSolutions.com

1   balance was 2.592.

2        Q.  And you received the -- the difference between

3   the 2.592 and the $1.612 million, correct?

4        A.  I believe so, yes.

5        Q.  And -- and did you understand what that amount

6   consisted of?  In other words, what that amount

7   represented, I should say?

8            MR. ROLLER:  Object to the form.

9            You can answer.

10       A.  The amount that I received?

11       Q.  (By Mr. Alamuddin)  Yes.

12       A.  I haven't thought about it before now, and I

13  don't -- I don't -- too spontaneous to think about what

14  that check even was.  I can't really -- I -- I don't

15  remember.

16       Q.  Did you have an understanding at the time as to

17  why a certain portion of your WAP contributions were

18  being returned to you as opposed to the remainder, which

19  were being forfeited?

20       A.  No.  I just was informed that a portion I would

21  get now and a portion I would get in a year.  I don't

22  recall what -- why I got the first portion and why I had

23  to wait a year to get the second portion.

24       Q.  And who was it that informed you of that fact?

25       A.  I don't remember.



DECL. WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 119

1    haven't spent a lot of time on it.

2         Q.  But you do recognize it as the complaint that

3    was filed on your behalf in the federal district court?

4         A.  Yes.

5         Q.  And did you get an opportunity to review the

6    complaint before it was finalized and filed with the

7    court?

8         A.  Yes.

9         Q.  And you had the opportunity to check the

10   factual allegations to make sure that they were accurate?

11        A.  I believe so, yes.

12        Q.  I want to ask you a few questions about some of

13   the allegations in your complaint.

14        A.  Okay.

15        Q.  If you turn to Page 9 of the complaint, which

16   is Paragraph 34.

17        A.  Okay.

18        Q.  Paragraph 34 alleges, in part, At times during

19   Paul's participation in the WAP, and including the time

20   of his termination from RBC Capital Markets, the WAP

21   covered employees who were not members of a select group

22   of management or highly compensated employees.

23            Do you see that?

24        A.  I do.

25        Q.  And earlier you mentioned the fact you -- you

ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

1    identified Kim Taurman, your assistant, as being one of

2    those employees; am I right?

3        A.  Well, she wasn't management, and I didn't

4    consider her a highly compensated employee.

5        Q.  Right.  So presumably she is one of the

6    individuals you are referring to here who you claim were

7    not members of a select group of management or highly

8    compensated employees?

9        A.  Correct.

10        Q.  Are there any others that you're thinking of

11    that -- who participated in the WAP that you believed

12    were not members of a select group of management or

13    highly compensated employees?

14        MR. ROLLER:  Object to the form of the

15    question, but you can answer.

16        A.  Well, I think, like I answered earlier, I

17    didn't -- I think my def- -- my perception of highly

18    compensated may be different than -- I don't even know if

19    there's a standard of highly compensated, but considering

20    -- and I didn't know what the production threshold was,

21    but in the documents you -- but there, 300,000.  You

22    know, I didn't -- you know, that person probably made

23    less than $150,000 a year and maybe even less than a

24    hundred depending on the production table at the time

25    that was issued.

DECL. WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 121

1              So -- so yeah, I do not -- I agree with this.

2    I do not think that people that participated in the WAP

3    were a select group of management or highly compensated

4    employees.

5         Q.  (By Mr. Alamuddin)  No, I'm sure you agree with

6    it because it's an allegation in your complaint.  My

7    question was a little different, which was --

8         A.  Oh, I'm sorry.

9         Q.  -- are you thinking of any individuals in

10   particular who you believe participated in the WAP who

11   are not members of a select group of management or highly

12   compensated employees beyond Ms. Taurman that we've

13   already --

14        A.  Yeah, a specific person?

15        Q.  Yes.

16        A.  Well, I didn't consider Brian Buskirk a highly

17   compensated person.  I don't know if other -- I just

18   didn't discuss WAP with people.  Nor did I discuss

19   401(k)s with people at work.  It just wasn't something we

20   did.

21             But seeing this here, George Bonney would have

22   been eligible for WAP.  Brian Randall would have been

23   eligible for WAP.  Bruce Kuersey would have been eligible

24   for WAP.

25        Q.  These are all financial consultants?

1          A.   That they did not follow the terms that they

2     put in place?

3          Q.   (By Mr. Alamuddin)   Yes.

4          A.   I don't know if they didn't follow the terms

5     they put in place.   I mean, I'm assuming they didn't let

6     somebody that made under -- or produce under 300,000

7     participate, but Kim didn't produce.   That's the only

8     person I know firsthand that didn't produce, and I don't

9     know what income she made or what year she -- it maybe

10    had been two or three years that she qualified.

11         Q.   So I understand that, but I guess my -- my --

12    did you -- did you understand that the WAP had certain

13    provisions that allowed the company to forfeit

14    contributions?

15         A.   No.

16         Q.   Okay.   Do you know whether in this case you're

17    challenging whether the company correctly applied those

18    forfeiture provisions in the doc- -- in the plan itself?

19         A.   No, I don't know.

20         Q.   Do you know how "cause" is defined under the

21    terms of the WAP?

22         A.   Only other than what I've read here, but no, I

23    don't understand the legal definition.

24         Q.   Are you contending in this case that the

25    company did not have cause to terminate you as that term

1   was just, How you doing?  How you doing?  And how's

2   business?  How's family?

3          Q.  You also mention in response to this

4   interrogatory having a conversation with Kim Taurman

5   regarding forfeiture of your WAP benefits and her

6   participation in the WAP.

7              Do you see that?

8          A.  Mm-hm.  Yes.

9          Q.  And when did you have that conversation with

10  her?

11         A.  Oh, I think I've had that conversation with her

12  a lot.  I don't know of any -- several specific times.

13         Q.  Well, this -- this answer says recalls having

14  "a" conversation.

15             When did that particular conversation occur?

16         A.  I asked -- I may have asked her on that

17  conversation if she knew of any -- you know, we were

18  working together in 2012 when I got the letter that I was

19  -- that it was being forfeit- -- forfeited, and just told

20  her I couldn't believe it, you know, that they would take

21  vested balance.

22             I had interpreted the letter that they had a

23  choice to do it.  The WAP committee chose.  In fact, I

24  think that cover letter even says that.  I just said, you

25  know, I've known these people for 16 years.  I would have

DECL. WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 124

```
 1  STATE OF WASHINGTON )
                        ) ss
 2  County of King      )

 3          I, Eva P. Jankovits, the undersigned Washington
    Certified Court Reporter, pursuant to RCW 5.28.010 authorized
 4  to administer oaths and affirmations in and for the State of
    Washington, do hereby certify:

 5
            That the annexed and foregoing deposition of MARTY
 6  PAUL was taken before me and completed on April 27, 2017, and
    thereafter was transcribed under my direction;

 7
            I further certify that according to CR 30 (e) the
 8  witness was given the opportunity to examine, read and sign
    the deposition after the same was transcribed, unless
 9  indicated in the record that the review was reserved;

10          I further certify that I am not a relative or
    employee of any such attorney or counsel, and that I am not
11  financially interested in the said action or the outcome
    thereof;

12
            I further certify that the witness before
13  examination was by me duly sworn to testify the truth, the
    whole truth and nothing but the truth;

14
            I further certify that the deposition, as
15  transcribed, is a full, true and correct transcript of the
    testimony, including questions and answers, and all
16  objections, motions and exceptions of counsel made and taken
    at the time of the foregoing examination and was prepared
17  pursuant to Washington Administrative Code 308-14-135, the
    transcript preparation format guideline;

18
            I further certify that I am herewith securely
19  sealing the said deposition and promptly delivering the same
    to Attorney Sari M. Alamuddin.

20
            IN WITNESS WHEREOF, I have hereunto set my
21  signature this 9th day of May, 2017.

22
23  _____
            Eva P. Jankovits, Certified Court Reporter No. 1915
24          in and for the State of Washington, residing in
            Seattle, Washington.
25          My CCR certification expires 7/3/17.
```

ESQUIRE

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 125

800.211.DEPO (3376)
EsquireSolutions.com

# EXHIBIT 16

1            IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

2                    IN AND FOR THE COUNTY OF KING

3    _____

4    MARTY PAUL, an individual; and      )
     BRIAN BUSKIRK, an individual;       )
5                                        )
                                         )      Case No.
6                                        )
                Plaintiffs,              )      3:16-cv-05616-RBL
7                                        )
            vs.                          )
8                                        )
     RBC CAPITAL MARKETS, LLC, a         )
9    Minnesota limited liability         )
     company; ROYAL BANK OF CANADA, a    )
10   Canadian corporation; and ROYAL     )
     BANK OF CANADA US WEALTH            )
11   ACCUMULATION PLAN, an employee      )
     benefit plan,                       )
12                                       )
                Defendants.              )
13

14   _____

15

          VIDEOTAPED DEPOSITION OF BRIAN W. BUSKIRK
16

17                      April 28, 2017

18                       8:33 a.m.

19

              1201 Third Avenue, Suite 4900
20

              Seattle, Washington
21

22

23

24

25           Eva P. Jankovits, CCR No. 1915

1           At any point in time, not just in 2000, but in

2     sitting today, have you read the terms of the Wealth

3     Accumulation Plan before?

4           A.  At any time?

5           Q.  At any time.

6           A.  Yes.

7           Q.  When was that?

8           A.  No idea.

9           Q.  Can we get in the ballpark a little bit?  Was

10    it while you were participating?

11          A.  Sure.  Yes.

12          Q.  Do you think you would have read it before you

13    first decided to participate or --

14          A.  Yes.

15          Q.  And you understood whatever deferrals you would

16    decide to make would be subject to the terms of the plan?

17          A.  I did.

18          Q.  I want to go to the second to last paragraph

19    on -- on 4365.  It starts with "I agree."  Do you see

20    that?

21          A.  Yes.

22          Q.  So I'll read it.

23          I agree that my deferred compensation shall be

24    reflected only in unfunded accounts established on Dain

25    Rauscher's records, and my rights under the plan will be

ESQUIRE
800.211.DEPO (3376)
EsquireSolutions.com

1  no greater than the rights of any other general unsecured

2  creditor of Dain Rauscher.

3      Do you recall that fact?

4      A.  No, I don't.  I don't even, even today,

5  understand what that means.

6      Q.  Well, that was -- that was my next question,

7  was do you have an understanding of what that means?

8      A.  No.

9      Q.  Given that this was close to 20 years ago, I

10  suspect you don't actually remember signing this, but do

11  you believe that you would have read this form thoroughly

12  before you decided to sign it?

13      A.  Oh, I would hope so, but I can't guarantee

14  that.

15      Q.  Okay.  So that was -- we jumped one ahead.

16  That was 26.  If you could go to Exhibit 25.

17      Do you recognize this document?

18      A.  I don't.

19      Q.  So I'm going to just describe it briefly.  It's

20  RBC -- top left it says, RBC US Deferred Compensation

21  Plan.  It's a retirement savings statement.

22      Is that your name and former address there on

23  the top?  I'm on -- I'm on Page 4570, the first page.

24      A.  It is my name and address.

25      Q.  So it looks to me to be an account statement

1      A.  I do.

2      Q.  So this is the statement for 2012.

3          First, there is a line for withdrawal again in

4   2012.  See that?

5      A.  I do.

6      Q.  We -- I think we covered this, but 2012 was the

7   year that you left RBC?

8      A.  Correct.

9      Q.  There's a forfeiture line this year of

10  approximately 297,000.  Do you see that?

11     A.  I do.

12     Q.  What do you understand that to be?

13     A.  The part of the wealth accumulation that was

14  forfeited to RBC.

15     Q.  Why was it forfeited, to your understanding?

16     A.  Probably not vested.

17     Q.  When you decided to leave RBC in 2012, did you

18  understand that one of the consequences would be that the

19  unvested amount would be forfeited?

20     A.  I did.

21     Q.  You did.

22     A.  I did.

23     Q.  Did it play a role in your decision to leave?

24     A.  No.

25     Q.  No.  Why's that?

1   pursuant to which a select group of management or highly

2   compensated employees of the company and its

3   participating subsidiaries will be offered the

4   opportunity to elect on an annual basis to defer receipt

5   of a portion of compensation to be earned with respect to

6   the upcoming year.

7           Did I read that right?

8       A.  You did.

9       Q.  It was a longer sentence than I thought going

10  into it.

11          Do you think the WAP was offered to a select

12  group of management or highly compensated employees?

13      A.  I don't know how we could say that totally

14  because "select group," I don't know how many

15  participants there were at RBC, but there were thousands,

16  and I don't know that you could say that was a select

17  group.

18          I mean, I think, just in my own sphere, I mean,

19  Kim Taurman.  Kim participated and she wasn't, in my

20  opinion, highly compensated or a select group.  I think

21  that it was really set up for the benefit of the bigger

22  producers in the firm, but not necessarily a select or

23  highly compensated.

24          I mean, when you look at the qualification of

25  300,000 in production to qualify, I mean, I don't know

ESQUIRE
DECL. WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 131

800.211.DEPO (3376)
EsquireSolutions.com

1   how Kim got in there, but she wasn't doing 300,000.   I

2   mean, she wasn't even a producer.   And --

3        Q.  Can I stop you there for one second?

4        A.  Please.

5        Q.  No, no.  It's with respect to Ms. Taurman.  Do

6   you know whether the WAP was limited only to producers?

7        A.  Good question.  I do not.

8        Q.  I'll circle back on a couple things, but do you

9   remember what her salary or her total compensation

10  annually might have been?

11       A.  I don't.  But at that time, it had to probably

12  be less than a hundred thousand.

13       Q.  You say "at that time," and when do you mean?

14       A.  Well, when this document, 2003.

15       Q.  Was -- to your knowledge, was Ms. Taurman, was

16  she working with RBC already in 2003, or do you know when

17  she joined?

18       A.  Yeah, she was.

19       Q.  Second thing I think you mentioned was -- I

20  think you were estimating, but she earned less than a

21  hundred thousand?

22       A.  I can't imagine she was making that.

23       Q.  Why do you -- why do you say that?

24       A.  Because in 2003, my assistant was probably

25  making 45 or 50.  And I'd be surprised if Kim was making

ESQUIRE

DECL. WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 132

800.211.DEPO (3376)
EsquireSolutions.com

1       Q.  Does that change your opinion at all?  Is

2   someone who earns $150,000 in 2003 highly compensated?

3       A.  Yeah.  I would think probably.  I just think

4   that for somebody -- or a parameter to do 300,000 or

5   10 percent of a 2,500 or 3,000 broker base doesn't feel

6   select and -- I mean, I -- my -- my feeling for somebody

7   who's highly compensated and a select group, I -- you

8   know, it's all personal, but I'm thinking you're talking,

9   you know, maybe 1, 2, 3, 4 percent of the company.

10          I mean, I always felt more select as a

11  chairman's than I ever did as a president.  And you could

12  see the difference in the sizes of the groups that went

13  to the recognition trips.  Yeah, I don't know.

14      Q.  No, I understand.  It's -- it's a term that

15  doesn't necessarily have a defined meaning.

16      A.  Yeah.

17      Q.  What -- under that -- that reading of a select

18  group, I don't think you would have been able to

19  participate in the WAP.

20      A.  No, I don't think that I would.  And I -- you

21  know, I think the -- the WAP was a bonus.  And I felt I

22  was really pleased to be able to participate in it, but

23  that's not really my point of whether I could or not.

24  But I didn't necessarily feel like I was in a select

25  group because I was one of 300 people that could

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 133

1          Do you remember whether they would forfeit

2     their WAP benefits that are invested when they left?

3          A.   I don't, but I'm sure they did.

4          Q.   But it wasn't something you ever discussed with

5     them?

6          A.   No, no.

7          Q.   How about when you left RBC in 2012 and you had

8     been recruited by Mr. Paul; did the two of you discuss

9     what would happen with your WAP benefits when you left?

10         A.   I knew what was going to happen with my

11    benefits.  And, yeah, we discussed it and -- you know, we

12    ran the numbers, and I didn't agree with it.  And a part

13    of it is because when you look at some of this

14    documentation, it was always RBC's pitch that your

15    payouts were greater than 50 percent because of the WAP.

16    And I always figured that that was part of my

17    compensation.  And I knew, though, that I would lose what

18    I lost, but I didn't agree with it.

19         Q.   Mm-hm.  Assuming you qualified, or anyone, a

20    broker, qualified every year and contributed into the

21    WAP, there always would have been some amount unvested,

22    right, because each year's would have been subject to the

23    next five years' vesting period?

24         A.   But if you retired, you got the fully --

25    fully -- the full amount.

1        Q.   Okay.  So yes to the first question?

2        A.   Yes to the first question.

3        Q.   The vesting accelerated if you --

4        A.   Retired.

5        Q.   -- met qualifications --

6        A.   Yeah.

7        Q.   -- for retirement?

8        A.   Yeah.

9        Q.   Okay.  When you had the discussions with

10   Mr. Paul about the WAP, what -- what did those entail?

11   What did you talk about?

12        A.   Just the fact that I -- I knew what I was

13   losing and just that what I was getting would more than

14   make up for what I was losing.

15        Q.   And that's what you meant by "ran the numbers"?

16        A.   Yeah.

17        Q.   When you say what you were getting, what does

18   that mean?

19        A.   Increased payout, ability to run our own firm.

20        Q.   Okay.  Anything else that you remember?

21        A.   No.

22        Q.   At some point -- well, I should back up.

23             When -- when did you learn about your WAP

24   forfeiture?

25        A.   I think most people already -- always knew it

1    was there.  And it was part of --

2                        (Cell phone interruption.)

3              THE WITNESS:  I'm sorry.

4              Part of the structure.

5              MR. RUSSELL:  You want to grab it?

6              THE WITNESS:  No, I would just silence it, but

7    if you don't mind it ringing for a second --

8              MR. RUSSELL:  Okay.

9              THE WITNESS:  -- or two.

10             MR. RUSSELL:  Sure.

11        Q.  (By Mr. Russell)  I guess my question probably

12   wasn't very clear, but when do you recall being told

13   formally that you were going to be forfeiting the --

14        A.  No.

15        Q.  -- unvested amount?

16        A.  No.  Other than this document that you showed

17   earlier that showed the forfeiture.

18        Q.  Your account statement?

19        A.  Yeah.  I didn't really know what that number

20   would be in a finalization, but I knew it was probably

21   somewhere around 300,000.

22        Q.  Well, if we could pull out your -- your

23   resignation letter again, it was Exhibit 22, I believe.

24        A.  (Witness complies.)

25        Q.  Okay.  Did you find that?

DECL. WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 136

1 participation in the WAP, and including his time of

2 separation from RBC Capital Markets, the WAP covered

3 employees who were not members of a select group of

4 management or highly compensated employees.  See that?

5      A.  I do.

6      Q.  And as I said, I may have asked this.  Forgive

7 me if it's the same answer, but I think it was in a

8 different context before.

9      What -- what is your basis for making that

10 allegation in the complaint?

11      A.  Kim Taurman.

12      Q.  Mm-hm.  And is there anything else?

13      A.  No.

14      Q.  I noticed that sentence starts with "at times";

15 do you see that?  At times during your participation in

16 the WAP?

17      A.  I do.

18      Q.  I read that to mean there might have been other

19 times when it did include or cover employees who were not

20 members of a select group?

21      A.  I don't remember.

22      Q.  Okay.  Here today, regardless of what this

23 says, do you believe there were times when the WAP was

24 for a select group of management or highly compensated

25 employees?

ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

1  STATE OF WASHINGTON )
                        ) ss
2  County of King       )

3       I, Eva P. Jankovits, the undersigned Washington
   Certified Court Reporter, pursuant to RCW 5.28.010 authorized
4  to administer oaths and affirmations in and for the State of
   Washington, do hereby certify:

5
        That the annexed and foregoing deposition of BRIAN
6  W. BUSKIRK was taken before me and completed on
   April 28, 2017, and thereafter was transcribed under my
7  direction;

8       I further certify that according to CR 30 (e) the
   witness was given the opportunity to examine, read and sign
9  the deposition after the same was transcribed, unless
   indicated in the record that the review was reserved;
10
        I further certify that I am not a relative or
11 employee of any such attorney or counsel, and that I am not
   financially interested in the said action or the outcome
12 thereof;
13      I further certify that the witness before
   examination was by me duly sworn to testify the truth, the
14 whole truth and nothing but the truth;
15      I further certify that the deposition, as
   transcribed, is a full, true and correct transcript of the
16 testimony, including questions and answers, and all
   objections, motions and exceptions of counsel made and taken
17 at the time of the foregoing examination and was prepared
   pursuant to Washington Administrative Code 308-14-135, the
18 transcript preparation format guideline;
19      I further certify that I am herewith securely
   sealing the said deposition and promptly delivering the same
20 to Attorney Matthew A. Russell.
21      IN WITNESS WHEREOF, I have hereunto set my
   signature this 9th day of May, 2017)
22      _____
23      _____
        Eva P. Jankovits, Certified Court Reporter No. 1915
24      in and for the State of Washington, residing in
        Seattle, Washington.
25      My CCR certification expires 7/3/17.

# EXHIBIT 17



Exhibit _____ 36
Witness SIKICH, G.
Date 7·11·2017

Buell Realtime Reporting
(206) 287-9066

## What is a "top-hat" plan?

A top-hat plan is a type of non-qualified deferred compensation plan intended to provide a small group of key executives or other highly compensated employees the ability to defer on a pre-tax basis above the limits imposed on qualified plans such as a 401(k) plan.

## What's the difference between a non-qualified plan and a qualified plan?

Non-qualified deferred compensation arrangements are unsecured, unfunded and are exempt from most of the substantive requirements under ERISA. A qualified plan such as a 401(k) plan must hold assets in a trust and must comply with ERISA requirements related to participation, vesting and fiduciary responsibility.

## Why the increase in the compensation level to be eligible to participate in WAP?

This year we completed an analysis on WAP to determine whether or not the plan was offered to a "select group" of employees. What is problematic is that ERISA or the Department of Labor has not provided any statutory definitions or regulations' defining what constitutes a "select group" of employees. The only guidance we have is based on recent circuit court rulings from cases were top-hat plans have been challenged to be a qualified plan. Taking into account both qualitative and quantitative factors we determined that the eligibility threshold for WAP needed to be increased.

## Why the amount of increase from $150,000 to $350,000?

Taking into account the overall RBC US population and the number of employees that were eligible to participant in WAP we needed to increase the threshold in order to maintain the requirement that this program is only offered to highly compensation and a select group of employees. Since WAP's inception back in 2002 the eligibility threshold has remained unchanged where as compensation has increased.

## What would happen if WAP would not be considered a top-hat plan?

In the event it would be determined that WAP is not a top-hat plan the plan would have to be terminated and all vested balances would be distributed to plan participants and become taxable as ordinary income in the year of distribution.

Plaintiff's Supp.
Exh. 34

RBC 02099
CONFIDENTIAL

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| LEWIS E. BRAZELTON, §<br>§<br>§ Plaintiff, §<br>§<br>V. §<br>§<br>RBC CAPITAL MARKETS §<br>CORPORATION, ET AL. §<br>§<br>Defendants. §<br>§ | CIVIL ACTION NO.<br><br>4:10-cv-00320<br><br>**JURY DEMANDED** |

### DEFENDANT'S PRIVILEGE LOG

| Bates # | Date | Author | Recipient | Description | Privilege Asserted |
|---|---|---|---|---|---|
| RBC 2089-2098 | June 2006 | Sandra Cohen, Aileen Dowd (Outside Counsel from Osler, Hoskin, & Harcourt) | Gabriela Sikich, RBC Defined Contribution Plan Manager | Memorandum prepared by outside counsel explaining the criteria for qualifying as a top-hat plan and analyzing WAP's top-hat status. | Attorney client privilege; |
| RBC 2100 | Undated | Gabriela Sikich, RBC Defined Contribution Plan Manager | Todd Schnell, RBC Legal | Summary of corporate activities affecting eligibility statistics with respect to WAP, prepare at request of RBC's legal department. | Attorney-client privilege |
| RBC 2101-2102 | October 28, 2008 | | Guests:<br>Dan Szabo<br>Mary Zimmer<br>Darryl Traweek<br>Lisa Sorenson<br>Gabriela Sikich<br>Todd Schnell | Redacted non-responsive portions of WAP Committee meeting minutes regarding litigation, mutual | Non-responsive; Attorney-client privilege |

| | | | | fund decisions, and trading restrictions. | |
|---|---|---|---|---|---|

Respectfully submitted,

*V. Loraine Christ*

V. Loraine Christ
TX State Bar No. 24050417
Federal ID No. 611166
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana, Suite 4200
Houston, Texas 77002
(713) 890-5157 Telephone
(713) 890-5001 Facsimile

Sari M. Alamuddin
*admitted pro hac vice*
Ill. State Bar No. 6215689
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, Fifth Floor
Chicago, Illinois 60601
312.324.1000
312.324.1001 (facsimile)

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing documents have been sent to counsel of record through facsimile and by hand this ll th day of June, 2010, as follows:

Mr. Geoffrey H. Bracken
Michael Abbott
GARDERE WYNNE SEWELL LLP
1000 Louisiana, Suite 3400
Houston, Texas 77002-5007

*V. Loraine Christ*

V. Loraine Christ

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
CONFIDENTIAL
NO. 3:16-cv-05616-RBL - Page 142

RBC-PAUL000010768

# EXHIBIT 18

| IN RE RBC DAIN RAUSCHER OVERTIME LITIGATION | MASTER FILE: 06-03093 JRT-FLN **DECLARATION OF GABRIELA SIKICH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF KENNEDY'S CLAIMS** |
|---|---|

I, Gabriela Sikich, declare pursuant to 28 U.S.C. § 1746 that the factual statements set forth below are true and correct to the best of my knowledge, information and belief:

1.     I am over the age of 18.  I have personal knowledge of the facts stated in this Declaration, and if called to testify to these facts, I would be competent to do so.

2.     I am currently employed by RBC Capital Markets Corporation as a U.S. Defined Contribution Plan Manager.  I have held my current position since December 2005.

3.     From at least 2002 to the present, the Royal Bank of Canada has sponsored the Royal Bank of Canada US Wealth Accumulation Plan ("the WAP").

4.     As U.S. Defined Contribution Plan Manager, I am familiar with and have access to business records regarding the terms of the WAP, eligibility requirements for various employees to participate in the WAP, the number of employees who were eligible to participate in the WAP, and the election of certain benefits under the WAP.  I also have access to business records reflecting the compensation earned by various employees of WAP-participating entities (which, at present, are RBC Capital Markets Corporation, RBC Bank, and RBC Insurance).

DB1/63142864.4

CONFIDENTIAL
RBC 001420

5. True and correct copies of the summaries and descriptions of plan provisions for Financial Consultants (*i.e.*, Summary Plan Descriptions or "SPDs for FCs") for WAP plan years 2002 through 2007 are attached hereto as Exhibit A.

6. True and correct copies of the Royal Bank of Canada Summary Description of 2002 Dain Rauscher Wealth Accumulation Plan, the Royal Bank of Canada Summary Description of 2003 Dain Rauscher Wealth Accumulation Plan, Dain Rauscher Wealth Accumulation Plan Amended and Restated as of March 31, 2003, and Amended and Restated Royal Bank of Canada US Wealth Accumulation Plan and Prospectus for WAP plan years 2004 through 2007 are attached hereto as Exhibit B.

7. For Financial Consultants ("FCs"), eligibility in WAP plan years 2003 through 2007 was limited to those FCs whose previous fiscal year production was at least $300,000. An FC whose previous fiscal year production was at least $300,000 would earn at least $117,000 in that year, and potentially more, based on the terms of RBC's FC Compensation Plan. True and correct copies of excerpts of RBC's FC Compensation Plans for 2003 through 2007 are attached hereto as Exhibit C.

8. Only a small percentage of the employees of WAP-participating entities are eligible to participate in the WAP:

- in 2003, only 7.11% of those employees were WAP-eligible;

- in 2004, only 13.08% of those employees were WAP-eligible;

- in 2005, only 13.06% of those employees were WAP-eligible;

- in 2006, only 14.40% of those employees were WAP-eligible; and

- in 2007, only 14.91% of those employees were WAP-eligible.

2

CONFIDENTIAL
RBC_001421

9. Former RBC Capital Markets Corporation employee Plaintiff Christopher Kennedy never met the WAP's eligibility requirements, and thus, he never participated in the WAP. Kennedy did participate in RBC's 401(k) plan, which is available as a vehicle for retirement savings to all RBC employees.

10. The average annual compensation of WAP-eligible employees in WAP plan years 2003 through 2007 was as follows:

- $269,156 in 2003,
- $310,908 in 2004,
- $315,494 in 2005,
- $327,348 in 2006, and
- $345,030 in 2007.

11. The average annual compensation of the workforce of all WAP-participating entities in Plan years 2003 through 2007 was:

- $75,132 in 2003,
- $79,758 in 2004,
- $83,900 in 2005,
- $104,603 in 2006, and
- $106,416 in 2007.

12. Beginning in 2007, WAP participants could elect some of their contributions for in-service distribution, and others for Retirement Distribution. In the 2007 Plan year, 57% of WAP participants elected in-service distribution of at least some

CONFIDENTIAL
RBC 001422

part of their WAP contributions.  In 2007, 43% of all WAP assets were elected for in-service distribution.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 23 day of June, 2009 at ___11.20 am___.

_Gabriela Sikich_
Gabriela Sikich

4

CONFIDENTIAL
RBC901433

# EXHIBIT 19

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE RBC DAIN RAUSCHER OVERTIME LITIGATION | MASTER FILE: 06-03093 JRT-FLN<br><br>**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF KENNEDY'S CLAIMS** |

Defendants RBC Capital Markets Corporation, *et al.* ("RBC") respectfully submit

their memorandum of law in support of their summary judgment motion as to California

and ERISA Plaintiff Christopher Kennedy's claims (Counts I-XI and XV of the operative

complaint).

I.    **INTRODUCTION**

Kennedy worked as a Senior Investment Associate and Financial Consultant

("FC") with RBC from April 2002 to July 2007.  Although brokers like Kennedy long

have been recognized as exempt, Kennedy contends he was a mere salesman of "financial

products."  But his argument was dispelled in 2006, when the DOL made clear that

employees performing the type of duties he performed here are exempt from overtime

under the administrative exemption. *See* DOL Op. Letter, November 26, 2006.  As a

result, Kennedy's wage and hour claims under federal and California law fail.

Kennedy's Wealth Accumulation Plan ("WAP") claims fare no better.  He

contends RBC violated California Labor Code Sections 221 and 400-410 by making

payroll deductions for WAP contributions, and retaining those contributions upon

termination of the WAP participant's employment.  (SCAC ¶ 13, 164-165.)  In the

alternative, he alleges that the WAP is an ERISA-covered plan, and that RBC breached a

1

RBC 001604

C.    **Kennedy's Compensation.**

FCs are paid commission and fee-based earnings which can vary from month to month. However, every FC has always had a minimum compensation "floor" equal to or in excess of the federal salary basis requirement. Before September 1, 2004, the floor was at least $1,170 per month in California; after September 1, 2004, the floor was $2,340 per month in California. (Iverson Decl., ¶ 11; Kennedy 194:13-195:7.) Thus, in any month in which an FC's commission-based earnings calculation fell below the minimum, the difference was added to the FC's pay and noted as "Minimum Comp" on his pay report. (Iverson Decl., ¶¶ 8-9; Iverson Decl. Exh. C.) After September 1, 2004, RBC instituted a policy of offsetting minimum compensation payments in future months in the calculation of commission-based earnings, and notated the amount on the pay statement as "Minimum Comp Recovery." (Iverson Decl., ¶¶ 8-9.) However, the minimum compensation was fully guaranteed each month. Only if the FC's commissions in a subsequent month exceeded the minimum compensation amount would RBC recover any previous minimum compensation. (Iverson Decl., ¶¶ 8-9.)

D.    **Kennedy Never Was Eligible For Nor Participated In The WAP.**

Throughout Kennedy's employment at RBC, RBC sponsored the Royal Bank of Canada US Wealth Accumulation Plan ("the WAP"). (*See* Sikich Decl. Exh. A, 2002-2007 WAP SPDs for FCs; Sikich Decl. Exh. B, 2002-2007 WAP Plan documents.) Eligibility for WAP participation was limited to a select group of management or highly compensated employees. (Sikich Decl. Exh. B, 1/2003 WAP Plan at 1, 3/31/2003 at 6, § 2.1, and 2004-2007 at 3, § 2.1(a).) The percentage of RBC's workforce that was WAP-

4

RBC 001605

eligible was 7.11% in 2003, 13.08% in 2004, 13.06% in 2005, 14.40% in 2006, and 14.91% in 2007.  (Sikich Decl. ¶ 8.)

WAP eligibility for FCs in Plan years 2003 through 2007 was limited to those whose previous fiscal year production was at least $300,000.  (Sikich Decl. ¶ 7; Sikich Decl. Exh. A, 2003-2006 WAP SPDs at 2.)  Those FCs would earn at least $117,000 annually.  (Sikich Decl. ¶ 7; Sikich Decl. Exh. C.)  In fact, during each of the Plan years 2003 through 2007, the average compensation of WAP-eligible employees was between $269,156 and $345,030 per year.  (Sikich Decl. ¶ 10.)  In contrast, the average compensation of the total workforce of WAP-participating entities was between $75,132 and $106,416 per year.  (Sikich Decl. ¶ 11.)  Thus, on average, WAP-eligible employees in Plan years 2003 through 2007 earned at least 3 times as much (in 2006), and as high as 4.5 times as much (in 2003) as the total workforce of WAP-participating entities.  (Sikich Decl. ¶¶ 10-11.)

Kennedy never met the WAP's eligibility requirements, and thus never participated in the WAP.  (Sikich Decl. ¶ 9.)  Kennedy did, however, participate in RBC's 401(k) plan.  (Sikich Decl. ¶ 9; Kennedy 48:9-22, 267:1-13.)

E.    **WAP Participants Were Immediately 100% Vested In Voluntarily Deferred Compensation For WAP Investment; RBC Also Provided Matching Contributions And Productivity Bonuses That Vested After Five Years.**

Eligible FCs could voluntarily contribute up to 30% of their total earnings ("Voluntary Contributions") and WAP Productivity Bonuses (described below) into a variety of investment vehicles.  (Sikich Decl. Exh. A, 2003-2007 WAP SPD at 2-3;

5

RBC 001606

Sikich Decl. Exh. B, 1/2003 WAP Plan at 1-2, 3/31/2003 at 6, § 3.1.1, and 2004-2007 at 4, § 2.2.) Voluntary Contributions and any related earnings under the WAP were always 100% vested. (Sikich Decl. Exh. A, 2003-2006 WAP SPD at 3 and 2007 at 1; Sikich Decl. Exh. B, 1/2003 WAP Plan at 5, 3/31/2003 at 12, § 5.1, 2004-2006 at 8, § 4.1, and 2007 at 7, § 4.1.)

The first 15% of an FC's Voluntary Contributions was eligible for both Fixed and Premium Company Matches. (Sikich Decl. Exh. A, 2003-2006 WAP SPD at 3 and 2007 at 1.) Fixed and Premium matching contributions were placed into the RBC Share Account (*i.e.*, invested in RBC company stock). (Sikich Decl. Exh. A, 2003, 2006 WAP SPD at 3-4 and 2004-2005, 2007 at 3.) Finally, all FCs with fiscal year production of at least $300,000 were eligible for a WAP Productivity Bonus – even if they chose not to make Voluntary Contributions to the WAP. (Sikich Decl. Exh. A, 2003-2007 WAP SPD at 3.)

In contrast to the Voluntary Contributions, there was a five-year cliff vesting period for the Fixed and Premium Matches and the WAP Productivity Bonus (collectively, "Company Contributions"). (Sikich Decl. Exh. A, 2003-2006 WAP SPD at 3 and 2007 at 2-3.) All Company Contributions in the WAP not vested on the participant's employment termination date were forfeited, and the participant's account was appropriately reduced. (Sikich Decl. Exh. B, 1/2003 WAP Plan at 6, 3/31/2003 at 13, § 5.2.4, and 2004-2007 at 8, § 4.5.)

RBC 001607

**F.    FCs Could Elect In-Service Distribution Of Vested Shares At No Penalty.**

In every Plan year from 2003 – 2007, FCs could elect to receive an in-service lump sum distribution of vested WAP benefits, at a time of their choice, at no penalty. (Sikich Decl. Exh. A, 2003-2006 WAP SPDs at 2 and 2007 at 4; Sikich Decl. Exh. B, 1/2003 WAP Plan at 6, 3/31/2003 at 14, § 6.1.1, 2004-2006 at 9, § 5.3, and 2007 at 8, § 5.3.)

As an alternative to in-service distribution in Plan years 2003 through 2006, the WAP offered FCs distribution of vested shares in two annual installments after the FC participant left RBC. (Sikich Decl. Exh. A, 2003-2006 WAP SPD at 2; Sikich Decl. Exh. B, 1/2003 WAP Plan at 7, 3/31/2003 at 14, § 6.1.1, and 2004-2006 at 9, §5.2.) In 2003, 2004 and 2006, the WAP also offered a retirement distribution option, under which the distribution was spread over 5 years, if the participant qualified for retirement. (Sikich Decl. Exh. A, 2003, 2004, and 2006 WAP SPD at 2.)

For the first time in 2007, the WAP offered FCs, as the only alternative to in-service distribution, a Retirement Distribution Option that allowed the FC to spread the WAP distribution over 1 to 10 years after leaving RBC, if the FC's age plus years of RBC service equaled 60 or more (the "Rule of 60"). (Sikich Decl. Exh. A, 2007 WAP SPD at 4.) If the FC elected this option, but terminated employment before satisfying the "Rule of 60," shares were paid in one lump sum valued on a date certain in the year after the FC left RBC. (Sikich Decl. Exh. A, 2007 WAP SPD at 4.)

7

RBC 001608

In the 2007 Plan year (the year in which Kennedy's employment terminated), 57%

of WAP participants elected in-service distribution of at least part of their WAP

contributions, amounting to 43% of all WAP assets (as beginning in 2007, participants

could elect some of their contributions for in-service distribution, and others for

Retirement Distribution). (Sikich Decl. ¶ 12.)

## III.    ARGUMENT

### A.    Kennedy's Wage Claims Under The FLSA Fail Because Kennedy Qualified For The Administrative Exemption.

New regulations setting forth the requirements for the administrative exemption

were promulgated on August 23, 2004. Because Kennedy's employment straddled that

date, his claim must be analyzed under the prior and current regulations. Under either,

Kennedy was "exempt" from the overtime and minimum wage provisions of the FLSA.

29 U.S.C. § 213(a)(1).

#### 1.    Kennedy Qualified For The Administrative Exemption Prior To August 23, 2004.

Prior to August 23, 2004, the "short test" requirements for the administrative

exemption were: (1) the employee was compensated on a salary or fee basis at a rate of

not less than $250 per week; (2) the employee's primary duty consisted of either the

performance of office or non-manual work directly related to management policies or

general business operations of the employer or its customers; and (3) the employee's

primary duty included the exercise of discretion and independent judgment. 29 C.F.R. §§

541.2(a)(1), 541.2(b), 541.2(e)(2) (pre-2004). Kennedy satisfied all these requirements.

8

RBC 001609

2.    **Kennedy's California Claims Fail On The Merits.**

a.    **WAP Contributions Are Not "Theretofore Paid Wages" Under California Labor Code Sections 221 and 400-410.**

As a threshold matter, the undisputed facts foreclose Kennedy's claim that

employees "forfeited *all* income within the [WAP] upon termination of employment,

*including employee contributions.*" (SCAC ¶ 38) (emphasis added).  In fact, Voluntary

Contributions were always 100% vested. (Sikich Decl. Exh. A, 2006 WAP SPD at 3 and

2007 at 1; Sikich Decl. Exh. B, 1/2003 WAP Plan at 5, 3/31/2003 at 12, § 5.1, 2004-2006

at 8, § 4.1, and 2007 at 7, § 4.1.)  To the extent that Kennedy contends that forfeiture of

non-vested Company Contributions upon termination of employment violates the

California Labor Code, his claim still fails as a matter of law.  California Labor Code

Section 221 makes it unlawful "for any employer to collect or receive from an employee

any part of *wages theretofore paid* by said employer to said employee." *See*

*International Business Machines Corporation, v. Bajorek*, 191 F.3d 1033, 1038 (9th Cir.

1999) (emphasis added); Cal. Lab. Code § 221.  As explained below, WAP contributions

are not earned or paid wages under the Code.

(1)    **Investment Shares Have No Ascertainable Value, And Therefore Are Not "Wages" Under California Law.**

WAP contributions are not "wages" because their value depends not on the

employee's work, but on the performance of the investments in which they were placed.

*See Serio v. Wachovia Securities*, LLC, No. 06-cv-4681 (DMC), 2007 U.S. Dist. LEXIS

63341, at **49-51 (D.N.J. Aug. 27, 2007).  In *Serio*, plaintiffs alleged that their

RBC 001610

contributions to a deferred compensation plan similar to the WAP qualified as "wages"
and that the defendants willfully failed to pay those wages upon termination of their
employment in violation of New York law. *Id.* at *49. The *Serio* court dismissed this
claim. *Id.* at **49-50. The court found that the plaintiffs' shares at the time of
distribution did not constitute "wages" because "their value depended on Prudential's
stock performance and had no connection to work performed by the participants." *Id.* at
**49-50; *see also Guiry v. Goldman*, 814 N.Y.S.2d 617 (1st Dept. 2006) ("unvested
equity-based compensation" is not "wages" because "its value to the recipient depends on
the firm's 'overall financial success,' not simply on the employee's personal
productivity").[7]

 Likewise, the value of WAP contributions, which are "unvested equity-based
compensation," depends entirely on the performance of the financial vehicles in which
those contributions are invested. As such, they do not give rise to an expectation of a
calculable sum of money, and are not "wages" under California law. *See* Cal. Lab. Code
§ 200.

---

[7] *Serio* is consistent with the Ninth Circuit's interpretation of California law. *See*
*Bajorek*, 191 F.3d at 1038-1040 (stock options are not wages under California Labor
Code Section 221 because "they ordinarily do not give rise to an expectation of a
calculable sum of money. The value of the stock awarded in options may be . . . affected
by the fortuities of stock market behavior . . ."); *see also Duvall v. Galt Med. Corp.*, No.
C-07-03714 JCS, 2007 U.S. Dist. LEXIS 89587, at *28-33 (N.D. Ca. Nov. 27, 2007)
(granting motion to dismiss California Labor Code claims because stock options are not
"wages").

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 156

RBC 001611

(2)    **Company Matching Contributions Are Not Earned**
       **Until They Are Vested.**

Under basic incentive compensation plans, the point at which the wage is actually

earned is determined by the parties' agreement. *See Prachasaisoradej*, 42 Cal. 4th at 228

("[e]mployees expectations with respect to these supplementary payments . . . derived

exclusively from the terms of the Plan itself"); *Koehl*, 142 Cal. App. 4th at 1337. Put

another way, the employer offers a "stated benefit [] in exchange for the service of an

employee, and upon the employee's completion of the required services in accordance

with the terms of the plan, a binding contract is formed under which the employer is

obligated to deliver the promised benefits." *Neisendorf v. Levi Strauss & Co.*, 143 Cal.

App. 4th 509, 523 (2006). Such a benefit may be contingent on future events, including

the employee's continued employment as of a specific target date, without running afoul

of the Labor Code's prohibition against the forfeiture of wages. *See Prachasaisoradej*,

42 Cal. 4th at 228 ("where the parties so understand and agree, final compensation, or at

least a portion thereof, may be contingent on events that occur after the employee has

performed a service"); *see also Marsh v. Prudential Securities, Inc.*, 802 N.E.2d 610, 616

(N.Y. App. Div. 2003) (distinguishing "golden handcuffs" forfeiture provisions in

bonuses from those applicable to payroll deductions programs).

Here, the WAP explicitly provided that Company Contributions were subject to 5-

year cliff vesting and that unvested shares would be forfeited upon termination of

employment. (*See* Sikich Decl. Exh. A, 2003-2007 WAP SPD at 2; Sikich Decl. Exh. B,

1/2003 WAP Plan at 6, 3/31/2003 at 13, § 5.2.4, and 2004-2007 at 8, § 4.5.)

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 157

RBC 001612

Accordingly, they consisted of benefits "contingent on future events." Consequently, their forfeiture does not run afoul of the California Labor Code.[8]

### 3.  Kennedy's ERISA Claims Fail On The Merits.

Alternatively, Kennedy alleges that the WAP's terms violate ERISA. (SCAC ¶ 13, 166-169.)[9] Kennedy's ERISA claims also fail on the merits.

#### a.  The WAP Is Not An ERISA Covered Pension Plan.

ERISA covers "employee benefit plans," including "employee pension benefit plans." *Houston v. Saracen Energy Advisors, LP*, No. H-08-1948, 2009 U.S. Dist. LEXIS 26307, at *8 (S.D. Tex. March 27, 2009). ERISA defines a "pension plan" as a plan maintained by an employer that "by its express terms or as a result of surrounding circumstances . . . provides retirement income to employees, or results in a deferral of income by employees for periods extending to the termination of covered employment or beyond." 29 U.S.C. § 1002(2)(A)(i) & (ii).

---

[8]  Kennedy also brings claims under Labor Code sections 400 through 410, which set forth the manner in which a cash bond may be exacted from an employee to cover merchandise entrusted to him. *See* Cal. Lab. Code §§400-410; *Steinhebel v. Los Angeles Times Comm'n., LLC*, 126 Cal. App. 4th 696, 702, 710-11 (Cal. App. 2d. Dist. 2005) (referencing sections 400-410 as "prohibiting deductions from wages for business losses not caused by dishonest or willful act or culpable negligence of the employee"). Kennedy has failed to articulate how these provisions are relevant to the WAP's terms. In any event, Kennedy's Sections 400-410 claim fails for the same reasons as his California Labor Code Section 221 claim. *See Steinhebel*, 126 Cal. App. at 710-711 (analyzing and dismissing Sections 400-410 claims along with Section 221 claim).

[9]  Kennedy's alternative pleading presumably acknowledges that if the WAP is an ERISA-covered pension plan, then his California wage deduction claim is preempted by ERISA. *See, e.g., Violette v. Ajilon Finance*, No. 03-5520 (JLL), 2005 U.S. Dist. LEXIS 22859, at *10, n.3 (D.N.J. Sept. 30, 2005) (noting that since the court concluded the plan at issue was a top hat plan, Section 514(a) of ERISA preempted plaintiff's state law claims); *Northwest Airlines, Inc. v. Phillips*, 594 F. Supp. 2d 1075, 1089-90 (D. Minn. 2009) (ERISA preempted plaintiff's Minnesota, California, and Washington state laws).

The Secretary of Labor has specifically excluded bonus programs from the definition of a pension plan under ERISA, "unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees." *Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929, 932 (8th Cir. 1999) (citing 29 C.F.R. § 2510.3-2(c)). In *Emmenegger*, the Eighth Circuit found that the redemption of shares under a phantom stock plan could not be characterized as "payments [that] are systematically deferred" to termination or "so as to provide retirement income" where, even though the stock provided post-employment income for some eligible participants, it allowed participants to redeem their vested shares at any time during their tenure with the company, at full value, for any reason. 197 F.3d at 933.

*Emmenegger* is dispositive here. The WAP has always allowed participants to elect in-service distribution of vested shares, at a time of their choosing, at no penalty. (Sikich Decl. Exh. A, 2003-2006 WAP SPDs at 2 and 2007 at 4; Sikich Decl. Exh. B, 1/2003 WAP Plan at 6, 3/31/2003 at 14, § 6.1.1, 2004-2007 at 8, § 5.3.) In fact, in Plan year 2007 (when Kennedy's employment with RBC terminated), 57% of WAP participants elected to have 43% of the total WAP assets distributed in-service. (Sikich Decl. ¶ 12.) Because the WAP is not designed to "systematically" provide *retirement* income, it is not an employee "pension benefit plan" under ERISA. *See* DOL Op. Ltr. 98-02A.

31

RBC 001614

**b.**    **Even If The WAP Is An ERISA Covered Plan, It Is A Top Hat Plan, Exempt From ERISA's Fiduciary Requirements.**

Even if the WAP is an ERISA-covered pension plan, Kennedy's ERISA breach of fiduciary duty claim still fails because the WAP qualifies as a top hat plan. Top hat plans are exempt from ERISA's participation, vesting, funding, and fiduciary provisions. *See Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 287 (2d Cir. 2000).

A top hat plan is "unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." *Demery*, 216 F.3d at 287 (citing 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1)). Kennedy does not challenge the fact that the WAP is unfunded. *See* SCAC ¶ 164 (alleging that the WAP provides for payroll deductions as an investment "in the general assets of the employer"); *Demery*, 216 F.3d at 287 (plan is unfunded where "benefits thereunder will be paid . . . solely from the general assets of the employer"). Rather, Kennedy contends that the WAP includes more than "a select group of management or highly compensated employees within the meaning of . . . ERISA." (SCAC ¶ 168.) The undisputed facts, however, foreclose his contention.

There is no "bright line" test that establishes when participation is too large to be deemed select. Rather, courts look to both quantitative and qualitative factors. *Demery*, 216 F.3d at 288. In *Demery*, the court rejected the plaintiffs' contention that because the plan was offered to 15.34% of bank employees (a "quantitative" analysis factor), it was offered to more than a "select group." *Id*. The court noted that the percentage of eligible participants alone could not be dispositive, without also considering the positions held by

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 160

RBC 001615

the participants. *Id.* The court also rejected the plaintiffs' contention that the eligible group, which included bank assistant vice presidents and branch managers, were not a "select group," since they were not key executives. *Id.* Rather, the court found that the plan was appropriately limited to "highly valued" managerial employees. *Id.; see also Bakri v. Venture Mfg. Co.*, No. 3:03-CV-405, 2005 U.S. Dist. LEXIS 26076, at **12-18 (S.D. Ohio Oct. 31, 2005) (granting summary judgment on ERISA claim, finding plan was limited to a "select group" where participation was limited to half or less of management employees; rejecting argument that the plan was not "top hat" because it was not limited to the very top employees and those who supervised others); *Belka v. Rowe Furniture Corp.*, 571 F.Supp. 1249, 1253 (D. Md. 1983) (plan permitting participation of salesmen and some individuals not highly compensated was still "'primarily designed' for individuals who are *either* management or highly compensated") (emphasis in original).

The *Demery* court further noted that the average salary of the participants was more than double that of the average salary of all bank employees, which made the participants "highly compensated" within the meaning of ERISA. 216 F.3d at 289. Finally, the *Demery* court found it significant that the statute defines a top hat plan as "primarily" designed to provide deferred compensation for certain individuals who are management or highly compensated, suggesting that if a plan "were principally intended for management and highly compensated employees, it would not be disqualified from top hat status simply because a very small number of the participants did not meet that criteria, or met one of the criteria but not the other." *Id.*

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 161

RBC 001616

Here, during Plan years 2003 through 2007, only 7.11 to 14.91% of RBC's workforce were eligible to participate in the WAP. (Sikich Decl. ¶ 8.) Thus, the group of WAP-eligible employees was quantitatively select. *See Demery*, 216 F.3d at 289 (plan was a top hat plan where 15.34% of the workforce was offered participation); *see also Alexander v. Brigham and Women's Phys. Org., Inc.*, 513 F.3d 37, 46 (1st Cir. 2008) (8.7% of the workforce was quantitatively select).

Second, WAP-eligible FCs generally held the title of Associate Vice President and above and were highly valued, given their high level of production. (*See* Sikich Decl. Exh. C.) *See also Alexander*, 513 F.3d at 46 (plan limited to the highest-earning surgeons was qualitatively select).

Finally, WAP-eligible employees were highly compensated. The average earnings of all WAP-eligible employees from 2003 through 2007 were between $269,156 and $345,030 per year. (Sikich Decl. ¶ 10.) WAP-eligible employees earned at least 3 times as much as the general workforce of WAP-participating subsidiaries, and in one year, earned 4.5 times as much. *See Alexander*, 513 F.3d at 46 (plan contributors were highly compensated where they earned five times the income of the workforce); *Demery*, 216 F.3d at 289 (plan-eligible were highly compensated where they earned more than twice the average workforce earnings). In fact, in 2007, the Internal Revenue Service (IRS) defined the Highly Compensated Employee Limitation ("HCE") under §414(q)(1)(B) of the Internal Revenue Code of 1986 using an earnings threshold of $100,000 per year. *See* IR-2008-118. RBC's WAP-eligible employees easily meet these IRS standards. *See*

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 162

RBC 001617

*Belka*, 571 F.Supp. at 1253 (considering IRS standard for "highly compensated" in determining that plan participants were within a "select group").[10]

### c.    The Terms Of The WAP Do Not Violate ERISA's Participation Rules.

Finally, even if the WAP is an ERISA-covered non-top hat plan, Kennedy's claim that he and others were denied WAP participation in violation of ERISA still cannot survive summary judgment.  (SCAC ¶ 71.)

"So long as a plan does not discriminate based on age or length of service, nothing in ERISA requires a plan to extend benefits to every common law employee." *Kolling v. American Power Conversion Corp.*, 347 F.3d 11, 14 (1st Cir. 2003); *see also Bauer v. Summit Bancorp*, 325 F.3d 155 (3d Cir. 2003) (plan lawfully excluded hourly employees because employer could limit plan participation to certain groups or classifications of employees, not based upon age or length of service).  Because the WAP does not condition participation on age or length of service, its participation requirements do not run afoul of ERISA, and RBC should be granted summary judgment on Kennedy's claim.

## IV.    CONCLUSION

RBC respectfully requests that this Court grant its motion.

---

[10] The existence of the 401(k) plan, in which Kennedy *did* participate, underscores that the WAP is not a retirement vehicle, but rather, a bonus plan to reward a select group of highly contributing employees. *See Emmenegger*, 197 F.3d 929 at 287 (noting that top hat plan was supplemental to defendant's pension plan, not a substitute for it, and was established as a means to retain valuable employees.)

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 163

RBC 001618

# EXHIBIT 20

1  LINDA CLAXTON, State Bar No. 125729
2  linda.claxton@ogletreedeakins.com
   CHRISTOPHER W. DECKER, State Bar No. 229426
3  christopher.decker@ogletreedeakins.com
4  OGLETREE, DEAKINS, NASH,
   SMOAK & STEWART, P.C.
5  633 West Fifth Street, 53rd Floor
   Los Angeles, California 90071
6  Telephone:  (213) 239-9800
7  Facsimile:  (213) 239-9045

8  Attorneys for Defendants
9  ROYAL BANK OF CANADA, RBC CAPITAL MARKETS
   CORPORATION (incorrectly named and sued as "RBC WEALTH
10 MANAGEMENT COMPANY, formerly RBC DAIN RAUSCHER,
   INC."), and THE ROYAL BANK OF CANADA US WEALTH
11 ACCUMULATION PLAN

12

13            UNITED STATES DISTRICT COURT

14           CENTRAL DISTRICT OF CALIFORNIA

15

16 | STEVEN BENHAYON,                          | Case No. CV08-06090 FMC(AGRx)
17 |                Plaintiff,                  | **DEFENDANTS' SUPPLEMENTAL**
   |                                            | **REPLY BRIEF REGARDING**
18 |        v.                                  | **PLAINTIFF'S CLAIM FOR**
   |                                            | **BENEFITS UNDER THE ROYAL**
19 | ROYAL BANK OF CANADA, a                   | **BANK OF CANADA US WEALTH**
   | Canadian company, business form           | **ACCUMULATION PLAN**
20 | unknown; RBC WEALTH                        |
   | MANAGEMENT COMPANY, formerly              | DJ:      Florence-Marie Cooper
21 | RBC DAIN RAUSCHER, INC.,                   | Courtroom: (Roybal) 750
   | business form unknown; THE ROYAL          | MJ:      Alicia G. Rosenberg
22 | BANK OF CANADA US WEALTH                   | Courtroom: (Spring) 23
   | ACCUMULATION PLAN, formerly               |
23 | known as RBC Dain Rauscher Wealth         | Discovery Cut-Off: September 30, 2009
   | Accumulation Plan; and, DOES 1            | Pre-trial Conference: January 25, 2010
24 | through 20,                                | Trial:              February 16, 2010
25 |                Defendants.                 |

26

27                                    Plaintiff's Supp.
28                                      Exh. 32

                                          CASE NO. CV08-06090 FMC(AGRx)
7796619_2   DEFENDANTS' SUPPLEMENTAL REPLY BRIEF REGARDING PLAINTIFF'S CLAIM FOR BENEFITS
            UNDER THE ROYAL BANK OF CANADA US WEALTH ACCUMULATION PLAN

DECL. WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 2:16-cv-05616-RBL - Page 165

CONFIDENTIAL                                          RBC-PAUL000010744

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ...................................................................................... I

I.      PRELIMINARY STATEMENT ............................................................... 1

II.     DEFENDANTS' STYLED THEIR OPENING BRIEF AS A MOTION
        FOR SUMMARY JUDGMENT OUT OF AN ABUNDANCE OF
        CAUTION AND TO AVOID ANY PREJUDICE TO PLAINTIFF. ............. 1

III.    THE FURTHER DISCOVERY CONDUCTED BY PLAINTIFF
        AFTER THIS COURT'S AUGUST 10, 2009 ORDER DOES NOT
        AFFECT THE COURT'S RULING ON THE ERISA PORTION OF
        THE CASE. .............................................................................................. 3

IV.     THE COURT SHOULD DISREGARD PLAINTIFF'S OBJECTIONS
        TO THE SECOND DECLARATION OF GABRIELA SIKICH .................. 6

V.      CONCURRENTLY HEREWITH, DEFENDANTS ARE FILING AN
        AMENDED SECOND DECLARATION OF GABRIELA SIKICH TO
        CORRECT A COMPUTATIONAL ERROR IN THE DOCUMENT
        PREVIOUSLY FILED WITH THE COURT. ............................................ 8

VI.     CONCLUSION ........................................................................................ 8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

7730619_2

i                              CASE NO. CV08-06090 FMC(AGRx)

DEFENDANTS' SUPPLEMENTAL REPLY BRIEF REGARDING PLAINTIFF'S CLAIM FOR BENEFITS
UNDER THE ROYAL BANK OF CANADA US WEALTH ACCUMULATION PLAN

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT

No. 3:16-cv-05616-RBL - Page 166

CONFIDENTIAL                                                    RBC-PAUL000010745

1

## **TABLE OF AUTHORITIES**

2

3

**Page(s)**

CASES

4

5

*Abatie v. Alta Life & Health Ins. Co.,*
   458 F.3d 955 (9th Cir. 2006) ...........................................................4, 5

6

7

*Aramony v. United Way Replacement Benefit Plan,*
   191 F.3d 140 (2d. Cir. 1999) ...........................................................4

8

9

*Carr v. First Nationwide Bank,*
   816 F.Supp. 1476 .............................................................................4

10

11

*Kearney v. Standard Ins. Co.,*
   175 F.3d 1084 (9th Cir. 1999) ......................................................3

12

13

*Kennedy v. Plan Adm'r for DuPont Sav. and Inv. Plan,*
   ___ U.S. ____129 S.Ct. 865 (2009) .........................................3, 4, 6

14

*Montour v. Hartford Life & Accident Ins. Co.,*
   ___ F.3d ___, 2009 WL 2914516 ..................................................5

15

16

*Sznewajs v. U.S. Bancorp Amended and Restated Supplemental Benefits Plan,*
   572 F.3d 727 (9th Cir. 2009) ....................................................5, 6

17

18

OTHER AUTHORITIES

19

20

Federal Rule of Civil Procedure 56 ..........................................................2

21

Local Rules 56-1-56-4 .............................................................................2

22

23

24

25

26

27

28

CASE NO. CV08-06090 FMC(AGRx)

DEFENDANTS' SUPPLEMENTAL REPLY BRIEF REGARDING PLAINTIFF'S CLAIM FOR BENEFITS
UNDER THE ROYAL BANK OF CANADA US WEALTH ACCUMULATION PLAN

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 2:16-cv-05616-RBL - Page 167

7720619_2

CONFIDENTIAL

RBC-PAUL000010746

1    **I.    PRELIMINARY STATEMENT**

2          In accordance with this Court's August 10, 2009 Order On Plaintiff's Ex Parte

3    Application And Amended Briefing Schedule, Defendants Royal Bank of Canada,

4    RBC Capital Markets Corporation (incorrectly named and sued as "RBC Wealth

5    Management Company, formerly RBC Dain Rauscher, Inc.."), and The Royal Bank

6    of Canada US Wealth Accumulation Plan (collectively "Defendants") hereby submit

7    their Supplemental Reply Brief in support of their Motion for Partial Summary

8    Judgment On Plaintiff's Claim For Benefits Under The Royal Bank of Canada US

9    Wealth Accumulation Plan (the "Motion").

10         Defendants previously filed a reply brief in support the Motion on August 5,

11   2009.  After that brief was filed, this Court issued its August 10, 2009 Order, which

12   amended the briefing schedule for the ERISA portion of the case and provided that

13   Defendants' reply brief would be due September 28, 2009, rather than August 5,

14   2009, as previously set by the Court.

15         Defendants' reply brief filed on August 5, 2009 addresses those matters raised

16   in Plaintiff's Opening Brief filed on July 22, 2009.  To avoid needlessly expanding

17   the record, this brief will be limited to addressing developments in this litigation

18   since that brief was filed which may be relevant to the Court's decision on the

19   Motion.  Defendants respectfully refer the Court to their prior submissions in support

20   of the Motion for all matters not addressed herein.

21   **II.   DEFENDANTS' STYLED THEIR OPENING BRIEF AS A MOTION
     FOR SUMMARY JUDGMENT OUT OF AN ABUNDANCE OF**

22   **CAUTION AND TO AVOID ANY PREJUDICE TO PLAINTIFF.**

23         After Defendants filed their reply brief, this Court issued its August 10, 2009

24   Order stating that Defendants had ignored the Court's May 4, 2009 Minute Order by

25   filing a motion for summary judgment rather than an Opening Brief on the question

26   of ERISA benefits.  Defendants never intended to disregard this Court's directions

27   and were in fact attempting to comply with those directions in good faith.  Based on

28   the May 4, 2009 Minute Order, Defendants understood that the Court had requested

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 2:16-cv-05616-RBL - Page 168
CONFIDENTIAL                                                        RBC-PAUL000010747

7730619_2

1  briefing from the parties which would resolve "the ERISA portion of the case."
2  Defendants further believed that, if that portion of the case were resolved in their
3  favor, they would be entitled to judgment on Plaintiff's claim for benefits under the
4  Royal Bank of Canada U.S. Wealth Accumulation Plan (the "WAP") and wished to
5  make an affirmative request for such relief. Arguably then, Defendants' opening
6  brief would be, in substance, a dispositive motion regarding that claim to which the
7  requirements of Federal Rule of Civil Procedure 56 and Local Rules 56-1 through
8  56-4 might conceivably apply. Hence, out of an abundance of caution, and to avoid
9  any possible waiver of its right to judgment should the Court resolve the ERISA
10  portion of the case in its favor, Defendants styled their opening brief as a motion for
11  partial summary judgment and submitted the supporting documents required for the
12  Court to rule on such a motion.
13       Defendants viewed this approach as a conservative one which could not
14  possibly prejudice Plaintiff. Styling their opening brief as a motion for partial
15  summary judgment would not require Plaintiff to meet any unanticipated legal issues
16  or evidence, since the Court had already announced that these briefs would fully
17  resolve the merits of Plaintiff's claim for benefits under the WAP. Moreover, given
18  that these briefs were intended to resolve the ERISA portion of the case, Plaintiff
19  was already required to make the necessary showing to prevail on the merits, which
20  is _more_ than the showing that would be required to defeat a motion for summary
21  judgment. Additionally, since Plaintiff had already enjoyed more than four months
22  to conduct discovery, he had more than sufficient opportunity to develop whatever
23  evidence he felt he needed to make this showing. Finally, the stipulated briefing
24  schedule allowed Plaintiff two weeks to prepare his responsive brief, more than the
25  time provided under the Federal Rules of Civil Procedure or the Local Rules of this
26  Court to oppose a motion for summary judgment. Consequently, a motion for partial
27  summary judgment would not impose any burdens on Plaintiff that he was not
28  already required to meet and he would not be unduly prejudiced if Defendants

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 16-cv-05616-RBL - Page 169
CONFIDENTIAL                                                    RBC-PAUL000010748

7710619_2

1 proceeded in this manner.

2      Based on the Court's August 10, 2009 Order, Defendants now understand that

3 the Court wished to resolve the ERISA portion of the case by way of briefing, but

4 without resort to the usual procedures for obtaining summary judgment. Defendants

5 apologize for any confusion they have created by their earlier misunderstanding and

6 have complied with the provisions of that Order. Moreover, Defendants have no

7 objection should the Court wish to conduct a court trial of Plaintiff's claim for

8 benefits under the WAP based on the existing court record, in the manner provided

9 in *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094-95 (9th Cir. 1999).

10 **III.**   **THE FURTHER DISCOVERY CONDUCTED BY PLAINTIFF AFTER**
**THIS COURT'S AUGUST 10, 2009 ORDER DOES NOT AFFECT THE**
11      **COURT'S RULING ON THE ERISA PORTION OF THE CASE.**

12      In its August 10, 2009 Order, this Court granted Plaintiff leave to take the

13 deposition of Gabriela Sikich. Defendants complied and the deposition was

14 completed on August 28, 2009. At the deposition, Defendants also produced 290

15 pages of documents at the deposition, in response to various Requests for Production

16 included with the Notice of Deposition. During this period, Defendants also

17 responded to Plaintiff's Special Interrogatories (Set Two) and provided Plaintiff with

18 unredacted versions of 43 pages previously produced in redacted form. No other

19 discovery has taken place since the Court issued its August 10, 2009 Order.

20      While Plaintiff may offer some of the testimony, documents and/or responses

21 obtained from this discovery for the Court's consideration, none of it has any bearing

22 on the issues the Court must decide at this juncture. The ERISA portion of this case

23 is a straight-forward claim by Plaintiff that he was improperly denied benefits under

24 the WAP, which both sides have agreed to treat as a pension plan subject to ERISA

25 for purposes of this Motion. Whether an employee is entitled to benefits under an

26 ERISA plan "stands or falls by the terms of the plan." *Kennedy v. Plan Adm'r for*

27 *DuPont Sav. and Inv. Plan*, ___ U.S. ___129 S.Ct. 865, 875 (2009) (internal

28 quotation marks and citation omitted). Thus, if the provisions of the WAP are

7736619_2

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
CONFIDENTIAL NO. 2:16-cv-05616-RBL - Page 170

RBC-PAUL000010749

1  unambiguous, which they are, then Plaintiff's claim must be rejected, and any

2  argument that those terms are somehow unreasonable or were set up "in bad faith" is

3  simply irrelevant. *Aramony v. United Way Replacement Benefit Plan*, 191 F.3d 140,

4  149 (2d. Cir. 1999) ("As a general matter, unambiguous language in an ERISA plan

5  must be interpreted and enforced in accordance with its plain meaning"); *Carr v.*

6  *First Nationwide Bank*, 816 F.Supp. 1476, 1493 (N.D.Cal.,1993 (where plan

7  language is unambiguous, its natural meaning is conclusive). Specifically, any

8  appeal to fiduciary duties misses the mark, since an ERISA plan administrator is

9  bound to pay benefits in accordance with the terms of the plan, and any departure

10  from those terms would constitute a breach the administrator's statutory duties.

11  *Kennedy*, ___ U.S. ___,129 S.Ct. at 875. Hence, to adjudicate Plaintiff's claim,

12  this Court need only review the terms of the WAP plan document (specifically

13  Section 4), which is already in evidence, and apply them to the undisputed facts

14  concerning the date of Plaintiff's termination and the vested status of his WAP

15  benefits on that date. Any further evidence Plaintiff may offer cannot change the

16  clear result that the benefits he seeks were forfeited because his employment with

17  Defendants ended before those benefits vested.

18      Any further evidence Plaintiff may offer is unavailing even if the Court finds

19  that the relevant terms of the WAP are ambiguous or that factual determinations are

20  required before those terms can be applied to Plaintiff's circumstances. Since the

21  WAP confers discretion on the WAP Committee to administer claims – a point

22  Plaintiff does not dispute – its decision on these matters is reviewable in court only

23  for an abuse of discretion. *Abatie v. Alta Life & Health Ins. Co.*, 458 F.3d 955, 965

24  (9th Cir. 2006). Such review, moreover, is limited to the administrative record which

25  the plan administrator had before it at the time the decision was made. *Id.* at 970.

26  That record has already been introduced into evidence and authenticated, and

27  nothing obtained in subsequent discovery alters its scope. Thus, any additional

28  evidence Plaintiff may offer in connection with his reply brief would be evidence

7730619_2

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT

CONFIDENTIAL NO. 2:16-cv-05616-RBL - Page 171

RBC-PAUL000010750

1   that was not part of the administrative record, which this Court cannot consider to

2   determine Plaintiff's entitlement to the benefit he seeks. *Id.*

3       Nor can Plaintiff escape the bar on evidence outside the administrative record

4   by suggesting that the evidence he has obtained is somehow relevant to demonstrate

5   that the WAP Committee acted under a conflict of interest. While a court may

6   consider evidence outside the administrative record for this limited purpose, *see id.,*

7   the goal of such inquiry is only to determine "the degree to which the conflict

8   appears improperly to have influenced a plan administrator's decision." *Montour v.*

9   *Hartford Life & Accident Ins. Co.*, ___ F.3d ___, 2009 WL 2914516 at *5. Here,

10  however, there is no evidence of any such improper influence. To the contrary, Ms.

11  Sikich testified both in her declaration submitted with Defendants' reply papers and

12  at deposition that none of the members of the WAP Committee responsible for

13  deciding Plaintiff's entitlement to benefits under the WAP (i) were employed by the

14  entity responsible for paying those benefits, or (ii) were aware of the financial

15  consequences of their decision. (Second Decl. of G. Sikich In Support Of

16  Defendants' Motion for Partial Summary Judgment [dkt. # 39-2] at 2:4-13; Sikich

17  Depo.[1] at 45:17-47:22, 59:9-60:20 & 61:24-63:7.) Discovery, moreover, has not

18  revealed any evidence that these decision-makers failed to follow established

19  procedures in considering Plaintiff's claim, disregarded or downplayed materials

20  submitted by Plaintiff, or gave undue weight to opposing evidence. Thus, there are

21  no facts or circumstances suggesting that a conflict of interest tainted the

22  administrative decision-making process and no reason to conclude that an abuse of

23  discretion occurred.

24      Finally, any further evidence Plaintiff may offer pertaining to the WAP's top-

25  hat status is irrelevant since the same framework applies to the judicial review of a

26  claim for benefits "for all covered plans, top hat or otherwise." *Sznewajs v. U.S.*

27  _____

28  [1] The relevant excerpts of the Deposition of Gabriela Sikich are attached as
    Exhibit A to the Second Declaration of Christopher W. Decker In Support Of
    Defendants' Motion For Partial Summary Judgment, filed concurrently herewith.

DECL. WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 16-cv-05616-RBL - Page 172

7730619_2
CONFIDENTIAL
RBC-PAUL000010751

1   *Bancorp Amended and Restated Supplemental Benefits Plan*, 572 F.3d 727, 734 (9th

2   Cir. 2009). Specifically, a participant's entitlement to benefits is determined solely

3   by the terms of the plan document and the plan administrator's decision is

4   reviewable only for an abuse of discretion. *Id.* at passim. Indeed, the only difference

5   between the two types of plans which Plaintiff has suggested may affect the outcome

6   of this litigation is that the administrators of ERISA plans (other than top-hat plans)

7   are subject to ERISA fiduciary duty rules. However, as explained above, that

8   difference is immaterial here, since, in reviewing a claim for benefits, ERISA plan

9   administrators must exercise their fiduciary duties *in accordance with the terms of*

10  *the plan document. See, e.g., Kennedy*, ___ U.S. ____,129 S.Ct. at 875.

11  Accordingly, in this instance, the analysis of Plaintiff's claim for benefits is the same

12  regardless of whether the WAP is a top-hat plan or not, and the Court need not even

13  resolve whether the WAP falls within the top-hat plan exemption.

14  **IV.   THE COURT SHOULD DISREGARD PLAINTIFF'S OBJECTIONS TO THE SECOND DECLARATION OF GABRIELA SIKICH.**

15      The Court's briefing schedule for the ERISA portion of the case provided that

16  the parties would submit *simultaneous* opening and reply briefs, which necessarily

17  forecloses either side from responding to the other's second submission.

18  Nonetheless, after Defendants filed their reply papers on August 5, 2009, which

19  included the Second Declaration of Gabriela Sikich In Support Of Defendant's

20  Motion For Partial Summary Judgment, Plaintiff filed evidentiary objections to that

21  declaration. This Court should disregard the objections since they exceed the scope

22  of the briefing requested by the Court.

23      In any event, Plaintiff's objections are without merit. Plaintiff objects that Ms.

24  Sikich is "wholly unqualified to render any testimony as to the administration,

25  management, or operation of the WAP Committee" because she is not a member of

26  that committee. (Pl.'s Obj. to Second Decl. of G. Sikich [dkt. # 41] at 2:14-2:28.]

27  However, Ms. Sikich does not testify to any of these matters in her Second

28

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT

CONFIDENTIAL
NO. 16-cv-05616-RBL - Page 173

RBC-PAUL000010752

1  Declaration, but only provides information regarding the percentage of Defendants'

2  workforce eligible to participate in the WAP, the average compensation of those

3  eligible to participate and Defendant's workforce generally, and the membership of

4  the WAP Committee.  She further testifies in her declaration that this information is

5  based on her own personal knowledge or her review of Defendants' business records,

6  establishing the necessary foundation for that testimony and an exception to the

7  hearsay rule. (Second Decl. of G. Sikich [dkt. # 39-2] at 1:5-8.)

8      Plaintiff further objects to paragraphs 6-8 of the Ms. Sikich's Second

9  Declaration on the grounds that her testimony regarding the contents of Defendants'

10  business records constitutes hearsay, violates the best evidence rule and is given

11  without adequate personal knowledge.  However, Ms. Sikich is not attempting to

12  establish the contents of those records, but is rather relying on them to establish

13  certain facts regarding the percentage of employees eligible to participate in the

14  WAP, their average compensation, and the average compensation of Defendants'

15  workforce generally.  Since those business records qualify for an exception to the

16  hearsay rule, Ms. Sikich may rely on them to establish the facts which they describe.

17  Her personal knowledge of the contents of these records is provided by her own

18  testimony in the declaration. (Second Decl. of G. Sikich [dkt. # 39-2] at 1:12-18.)

19      Finally, Plaintiff objects that Ms. Sikich's Second Declaration improperly

20  introduces new evidence not presented at the time of Defendant's opening brief.

21  However, the facts in Ms. Sikich's Second Declaration respond directly to the

22  arguments advanced by Plaintiff in his opening brief, specifically that (i) the WAP is

23  not a top-hat plan because participation is not limited to a select group of

24  management or highly compensated employees, and (ii) the members of the WAP

25  Committee who decided Plaintiff's claim for benefits had a financial incentive to

26  deny that claim.  Accordingly, the declaration is proper as a rebuttal of the evidence

27  offered by Plaintiff in connection with his opening brief.

28

DEFENDANTS' SUPPLEMENTAL REPLY BRIEF REGARDING PLAINTIFF'S CLAIM FOR BENEFITS
UNDER THE ROYAL BANK OF CANADA US WEALTH ACCUMULATION PLAN

7730619_2

CONFIDENTIAL

RBC-PAUL000010753

1   **V.   CONCURRENTLY HEREWITH, DEFENDANTS ARE FILING AN**
2   **AMENDED SECOND DECLARATION OF GABRIELA SIKICH TO**
    **CORRECT A COMPUTATIONAL ERROR IN THE DOCUMENT**
3   **PREVIOUSLY FILED WITH THE COURT.**

4   After completing their filing on August 5, 2009, Defendants became aware

5   that the Second Declaration of Gabriela Sikich filed concurrently with Defendants'

6   reply papers contained a computational error.  Specifically, the average annual

7   compensation of WAP-eligible employees in WAP plan years 2003 through 2007

8   had been understated.  The corrected numbers are provided in the Amended Second

9   Declaration of Gabriela Sikich In Support Of Defendants' Motion For Partial

10  Summary Judgment On Plaintiff's Claim For Benefits Under The Royal Bank Of

    Canada U.S. Wealth Accumulation Plan, which is being filed concurrently herewith.

11  In its reply papers, Defendants relied on the incorrect data only to support their

12  argument that WAP participants qualify as "highly-compensated employees"

13  because they earn at least twice the average for Defendants' employees generally and

14  in excess of $100,000 per year.  (Defs.' Reply Memo. [dkt. # 39] at 5:17-6:9.)  Since

15  this is all the more true based on the corrected data, the error in the data previously

16  provided is not material.

17  Defendants served the Amended Second Declaration of Gabriela Sikich on

18  Plaintiff on August 25, 2009, in advance of the deposition of Ms. Sikich.  (See

19  Amended Second Declaration of G. Sikich, filed concurrently herewith, at 2.)  Thus,

20  Plaintiff has had a full opportunity to inspect the amended declaration and examine

21  Ms. Sikich regarding its contents.  Consequently, Plaintiff has not been prejudiced by

22  the error or subsequent correction.

23  **VI.   CONCLUSION**

24  For all foregoing reasons, in addition to those set forth in the papers previously

25  filed by Defendants on July 22, 2009 and August 5, 2009, this Court should

26  adjudicate Plaintiff's claim for benefits under the WAP in favor of Defendants and

27  enter judgment accordingly.

28

DEFENDANTS' SUPPLEMENTAL REPLY BRIEF REGARDING PLAINTIFF'S CLAIM FOR BENEFITS
UNDER THE  ROYAL BANK OF CANADA US WEALTH ACCUMULATION PLAN

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 16-cv-05616-RBL - Page 175
CONFIDENTIAL                                            RBC-PAUL000010754

1  DATED:  September 28, 2009

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.


By:   /s/ Christopher W. Decker
        Christopher W. Decker
Attorneys for Defendants
ROYAL BANK OF CANADA, RBC
CAPITAL MARKETS CORPORATION
(incorrectly named and sued as "RBC
WEALTH MANAGEMENT COMPANY,
formerly RBC DAIN RAUSCHER,
INC."), and THE ROYAL BANK OF
CANADA US WEALTH
ACCUMULATION PLAN

7730619.2 (OGLETREE)

9      CASE NO. CV08-06090 FMC(AGRx)

DEFENDANTS' SUPPLEMENTAL REPLY BRIEF REGARDING PLAINTIFF'S CLAIM FOR BENEFITS
UNDER THE ROYAL BANK OF CANADA US WEALTH ACCUMULATION PLAN

7730619_2

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT

CONFIDENTIAL

RBC-PAUL000010755

1  LINDA CLAXTON, State Bar No. 125729
   linda.claxton@ogletreedeakins.com
2  CHRISTOPHER W. DECKER, State Bar No. 229426
   christopher.decker@ogletreedeakins.com
3  OGLETREE, DEAKINS, NASH,
   SMOAK & STEWART, P.C.
4  633 West Fifth Street, 53rd Floor
   Los Angeles, California 90071
5  Telephone:  (213) 239-9800
   Facsimile:  (213) 239-9045
6
   Attorneys for Defendants
7  ROYAL BANK OF CANADA, RBC CAPITAL MARKETS
   CORPORATION (incorrectly named and sued as "RBC WEALTH
8  MANAGEMENT COMPANY, formerly RBC DAIN RAUSCHER,
   INC."), and THE ROYAL BANK OF CANADA US WEALTH
9  ACCUMULATION PLAN

10

11                    UNITED STATES DISTRICT COURT

12                   CENTRAL DISTRICT OF CALIFORNIA

13

14  STEVEN BENHAYON,                    Case No. CV08-06090 FMC(AGRx)

        Plaintiff,                     SECOND DECLARATION OF
15                                      GABRIELA SIKICH  IN SUPPORT
                                        OF DEFENDANTS' MOTION FOR
16      v.                              PARTIAL SUMMARY
                                        JUDGMENT ON PLAINTIFF'S
17  ROYAL BANK OF CANADA, a             CLAIM FOR BENEFITS UNDER
    Canadian company, business form     THE  ROYAL BANK OF CANADA
18  unknown; RBC WEALTH                 US WEALTH ACCUMULATION
    MANAGEMENT COMPANY, formerly        PLAN
19  RBC DAIN RAUSCHER, INC.,
    business form unknown; THE ROYAL
20  BANK OF CANADA US WEALTH            DJ:        Florence-Marie Cooper
    ACCUMULATION PLAN, formerly         Courtroom: (Roybal) 750
21  known as RBC Dain Rauscher Wealth   MJ:        Alicia G. Rosenberg
    Accumulation Plan; and, DOES 1      Courtroom: (Spring) 23
22  through 20,

        Defendants.                     Trial Date: February 16, 2010
23

24

25

26

27

28

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 2:16-cv-05616-RBL - Page 177

CONFIDENTIAL                                        RBC-PAUL000010756

# DECLARATION OF GABRIELA SIKICH

GABRIELA SIKICH declares:

1.     I am the US Defined Contribution Plan Manager for RBC Capital Markets Corporation, a defendant in this action.

2.     The facts stated in this declaration are true of my own knowledge or my review of the business records of the Royal Bank of Canada and/or its subsidiaries.

3.     If called as a witness, I could and would competently testify as to the truthfulness of the facts contained herein.

4.     From at least 2002 to the present, the Royal Bank of Canada has sponsored the Royal Bank of Canada US Wealth Accumulation Plan ("the WAP Plan").

5.     I am familiar with and have access to business records regarding the terms of the WAP, eligibility requirements for various employees to participate in the WAP, the number of employees who were eligible to participate in the WAP, and the election of certain benefits under the WAP. I also have access to business records reflecting the compensation earned by various employees of WAP-participating entities (which, at present, are RBC Capital Markets Corporation, RBC Bank, and RBC Insurance).

6.     Only a small percentage of the employees of WAP-participating entities are eligible to participate in the WAP. In 2003, only 7.11% of those employees were WAP-eligible. In 2004, only 13.08% of those employees were WAP-eligible. In 2005, only 13.06% of those employees were WAP-eligible. In 2006, only 14.40% of those employees were WAP-eligible. And in 2007, only 14.91% of those employees were WAP-eligible.

7.     The average annual compensation of WAP-eligible employees in WAP plan years 2003 through 2007 was as follows: $269,156 in 2003; $310,908 in 2004; $315,494 in 2005; $327,348 in 2006; and $345,030 in 2007.

8.     The average annual compensation of the workforce of all

Second Decl. of G
Sikich ISO

DECL. WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 4:16-cv-05616-RBL - Page 178

CONFIDENTIAL

RBC-PAUL000010757

1 | WAP—participating entities in Plan years 2003 through 2007 was as follows:

2 | $75,132 in 2003; $79,758 in 2004; $83,900 in 2005; $104,603 in 2006; and $106,416

3 | in 2007.

4 |     9.    I am familiar with the membership of the WAP Committee during

5 | calendar years 2007 and 2008. The members of the WAP Committee present at the

6 | December 7, 2007 meeting, and who participated in the consideration of the Mr.

7 | Benhayon's request for accelerated vesting (following which the request was denied)

8 | were: Dan Szabo, Mary Zimmer, Jim Chapman, and Lisa Sorenson. The same four

9 | individuals were also the members of the WAP Committee present at the April 8,

10 | 2008 meeting, and who participated in the consideration of the Mr. Benhayon's

11 | appeal of his denied request (following which the appeal was denied). None of these

12 | four individuals is employed by the Royal Bank of Canada. All are employed by an

13 | entity distinct from the Royal Bank of Canada.

14 |     I declare under penalty of perjury under the laws of the United States of

15 | America that the foregoing is true and correct.

16 |

17 | Executed this 5th day of August 2009 at Minneapolis, Minnesota.

18 |

19 |

20 | *Gabriela Sikich* (signature)

21 | Gabriela Sikich

22 |

23 |

24 |

25 |

26 |

27 |

28 |

CONFIDENTIAL                   RBC-PAUL000010758

# EXHIBIT 21

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF TEXAS

### HOUSTON DIVISION

| | | |
|---|---|---|
| BRENDA TOLBERT, | § | |
| | § | |
| Plaintiff | § | |
| | § | No. 4:11-CV-107 |
| v. | § | |
| | § | The Honorable Keith P. Ellison |
| RBC CAPITAL MARKETS | § | |
| CORPORATION n/k/a RBC CAPITAL | § | |
| MARKETS, LLC, ET AL., | § | |
| | § | |
| Defendants. | § | |

# Expert Report of Cathy M. Niden, Ph.D.

# December 2, 2011

## I.     Qualifications

1.      I, Cathy M. Niden, am a Managing Director and Principal at Navigant Economics (formerly known as "Chicago Partners"), a leading business and economics consulting firm which provides litigation support services, including expert testimony, in the fields of economics and finance.  In my capacity as an economic expert, I have extensive experience with statistical analysis of economic and financial data.  Moreover, I have testified in a variety of litigation matters brought under the Employee Retirement Income Security Act ("ERISA").

2.      I hold a Ph.D. in business with concentrations in finance and economics from the Booth School of Business (formerly known as the "Graduate School of Business") of the University of Chicago.  I also hold an M.B.A. from the Booth School of Business of the University of Chicago.

3.      Formerly, I was an Assistant Professor at the College of Business Administration of the University of Notre Dame and at the Joseph M. Katz Graduate School of Business of the University of Pittsburgh.  While at the University of Notre Dame and the University of Pittsburgh, I taught courses on financial economics.  I also taught undergraduate econometrics while at the University of Notre Dame.

4.      I also served as Academic Economic Fellow and Associate Chief Economist at the Office of Economic Analysis of the U.S. Securities and Exchange Commission.

5.      Navigant Economics bills my time at the rate of $630 per hour.  My compensation is not dependent on the content of my testimony or the outcome of this litigation.  My curriculum vitae, which lists my prior testimony and my publications, is attached as Exhibit A.

## II.     Introduction

6.      RBC Capital Markets, LLC, RBC Bank (USA) and RBC U.S. Insurance Services Inc. (collectively, "Defendants" or "RBC") are business segments of the Royal

1

CONFIDENTIAL                                                    RBC-PAUL000010380

Bank of Canada.[1] RBC Bank (USA) operates 420 banking centers in a six-state region of southeastern United States.[2] RBC U.S. Insurance provides travel-related insurance products.[3] RBC Capital Markets, LLC is a major provider of investment banking services worldwide.[4]

7.      I understand that since 2002, Defendants and their parent company, Royal Bank of Canada, have sponsored the Royal Bank of Canada U.S. Wealth Accumulation Plan ("WAP"), a "nonqualified, deferred compensation plan" offered to a "select group of management or highly compensated employees."[5] I understand that the Plan is not intended to be a tax-qualified plan under Code Section 401, but if the Plan is determined to be an "employee pension benefit plan," RBC believes that it constitutes an unfunded plan of deferred compensation maintained for a select group of management or highly compensated employees and, therefore, exempt from many ERISA requirements.[6]

8.      I understand that at all relevant times, eligibility to participate in the WAP has been determined by a combination of factors, including the employee's annual compensation, job title, and "production" or business generation (the "Eligibility Criteria"), as outlined in the  Joint Stipulation of Facts ("Joint Stipulation").  *See* Exhibit B.

9.      The WAP enables participants to defer a portion of their compensation and direct those amounts to notional accounts that are credited with amounts that reflect the rates of return on various investment alternatives, including Company Common Shares, the Plan Interest Rate, and several mutual funds, depending on the

---

[1] http://www.rbc.com/aboutus/about2.html, downloaded on November 5, 2011.
[2] http://www.rbcbankusa.com/company/cid-96903.html, downloaded on November 5, 2011.
[3] http://www.rbctravelprotection.com/about-us.html, downloaded on November 5, 2011.  RBC U.S. Insurance also provided life and health insurance until April 29, 2011, when these businesses were sold. *See* http://www.rbcinsurance.com/us/personal.html, downloaded on November 5, 2011.
[4] https://www.rbccm.com/about/cid-202770.html, downloaded on November 5, 2011.
[5] Amended and Restated Royal Bank of Canada US Wealth Accumulation Plan And Prospectus, November 1, 2008, attached as Exhibit A to Plaintiff's First Amended Class Action Complaint, § 1.1.
[6] Amended and Restated Royal Bank of Canada US Wealth Accumulation Plan And Prospectus, November 1, 2008, attached as Exhibit A to Plaintiff's First Amended Class Action Complaint, § 5.11, p. 15.

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 183

CONFIDENTIAL

RBC-PAUL000010381

participant's allocation. Company Contributions (composed of productivity bonuses, loyalty bonuses, and employer matching contributions), if any, are directed to participants' notional investment in Company Common Shares. This case centers on the WAP provisions concerning the forfeiture of unvested Company Contributions.[7]

10. I understand that Plaintiff Brenda Tolbert was employed by RBC Capital Markets or its predecessors from December 1971 until August 2009, and was a WAP participant during the six years (2003-2008) preceding her termination.[8] I further understand that Ms. Tolbert was terminated for cause in August 2009, thereby forfeiting Company Contributions to her WAP account amounting to approximately $27,000.[9]

11. Plaintiff claims that Defendants have been insufficiently selective in determining which employees are eligible to participate in the WAP, resulting in a participant pool that does not meet the requirements to be classified as a "top-hat" plan under ERISA. Specifically, Plaintiff claims that the WAP participant pool does not represent a "select group of management or highly compensated employees."[10] Plaintiff further claims that the WAP's allegedly excessive inclusiveness invalidates the WAP's "top hat" exemption from ERISA's "reporting and disclosure, funding, accrual, vesting, anti-cutback, and fiduciary requirements,"[11] and therefore renders Plaintiff's forfeiture of Company Contributions to her WAP account improper under ERISA.[12]

12. Plaintiff brings this case "on behalf of all persons who – within the last four years – have or had at least five years of service with RBC ...; are current or former employees of Defendants(s); and were participants in the WAP or who are personal representatives for or beneficiaries of any such person who is deceased ..."[13] Plaintiff

---

[7] *Id.*, § 4.3. Termination for cause results in the forfeiture of any Mandatory Deferred Compensation," defined as "the percentage of an Employee's Gross Compensation that the Committee may, from time to time and in its sole and absolute discretion, designate as a required deferral to the Plan for such Employee. *Id.*, § 1.2.
[8] Plaintiff's First Amended Class Action Complaint, ¶¶ 1 and 27.
[9] Plaintiff's First Amended Class Action Complaint, ¶¶ 23 and 27.
[10] Plaintiff's First Amended Class Action Complaint, ¶46, citing 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1).
[11] Plaintiff's First Amended Class Action Complaint, ¶10.
[12] Plaintiff's First Amended Class Action Complaint, ¶10.
[13] Plaintiff's First Amended Class Action Complaint, ¶8.

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 184

CONFIDENTIAL

RBC-PAUL000010382

asks that the Court make a declaratory judgment that "the WAP has not been a lawful top hat plan."[14] Plaintiff makes various claims for relief, including that Defendants restore vested accrued WAP benefits that have been forfeited and establish and maintain "a separate trust to hold and protect all vested accrued WAP benefits."[15]

## III.     Summary of Opinions

13.     I have been asked by counsel for Defendants to review and analyze data on U.S. based employees' compensation, production, and job titles that relate to their eligibility to participate in the WAP during Plan Years 2003 through 2011. I have been assisted by members of Navigant Economics' staff working under my supervision. The materials I have reviewed are listed in Exhibit C. Based on this review and analysis, I have reached the following opinions:

- Throughout the time that the WAP has been offered, eligible participants, including but not limited to participants eligible by virtue of production, have earned significantly higher compensation than both the non-eligible work force and the work force as a whole;

- There is a positive and statistically significant correlation between production and compensation, thereby supporting the use of production as a WAP eligibility criterion; and

- The methodology that Plaintiff has used to calculate the percent of employees who are eligible for the WAP suffers from a flaw which renders the methodology unreliable. As a result, Plaintiff overstates the percentage of eligible employees in every year analyzed.

14.     Section IV describes the WAP and the Eligibility Criteria for participation in the WAP. Section V describes the data used in the analysis for this Report. Section VI presents detailed bases for my opinions. Section VII concludes this Report.

---

[14] Plaintiff's First Amended Class Action Complaint, ¶ 115.
[15] Plaintiff's First Amended Class Action Complaint, ¶¶ 115-121.

4

CONFIDENTIAL                                                    RBC-PAUL000010383

## IV. WAP Eligibility Criteria

15.     The eligibility criteria for participation in the WAP are summarized for each Plan Year from 2003 through 2011 in the Joint Stipulation of Facts, attached as Exhibit B. For employees who are evaluated according to their "production" or business generation ("production-based" employees), eligibility for participation in the WAP in a Plan Year requires a certain level of "production" for the preceding year. For compensation-based employees, eligibility in a particular Plan Year generally depends on the employee's total cash compensation and/or job title in the preceding year.

16.     For example, participation in the WAP during 2003 required compensation-based employees to have received annualized cash compensation during the preceding year greater than $150,000.[16] For Financial Consultants who are production-based employees, participation in the WAP in 2003 required 2002 fiscal year[17] annualized gross production greater than $300,000.[18] Other job title-based criteria permit Branch Managers in the Private Client Group and SEG Directors to participate in the WAP.[19]

17.     The eligibility criteria for participation in Plan Years 2004 through 2008 continue to maintain a minimum compensation in the preceding fiscal year (e.g., November 1, 2002 to October 31, 2003 for the 2004 plan year) of $150,000, and for production-based employees, a minimum production in the preceding fiscal year of $300,000.[20] Qualifying job titles and combinations of job title, salary and production needed to participate in the WAP vary from year to year.[21] For Plan Years after 2003, certain provisions are made for new hires in a particular year who have guaranteed

---

[16] Joint Stipulation of Facts, ¶ 1.
[17] Royal Bank of Canada's fiscal year ends on October 31. *See, e.g.,* Royal Bank of Canada form 40F for the fiscal year ended October 31, 2003, cover page.
[18] Joint Stipulation of Facts, ¶ 1.
[19] Joint Stipulation of Facts, ¶ 1.
[20] The WAP eligibility criteria vary in referring to the threshold compensation and production as requiring "at least" or "greater than" the specified amounts. *See* Joint Stipulation.
[21] Joint Stipulation of Facts, ¶¶ 2-6.

CONFIDENTIAL                                                    RBC-PAUL000010384

compensation in the following year that meets or exceeds the $150,000 minimum, and compensation is observed on a fiscal year, rather than a calendar year, basis.[22]

18.     Beginning with Plan Year 2009, the eligibility criteria became more restrictive. The eligibility criteria for participation in the WAP in 2009 raised the minimum compensation in the preceding fiscal year to $350,000 for most employee categories.

19.     The eligibility criteria were revised again in 2010, this time to require production in the preceding fiscal year to exceed $400,000 for production-based employees.[23]

20.     Throughout this report I refer to employees whose eligibility for participation in the WAP is evaluated based on their production as "production based" employees and other employees as "non-production based employees."

## V.     Data

21.     I have reviewed data produced in this litigation pertaining to the WAP eligible employees and the U.S. based RBC workforce as a whole.

22.     Files have been produced which contain the universe of WAP eligible employees for each Plan Year from 2003 to 2011 (the "WAP Eligibility Files").[24] These files contain eligible employees' names, NDT (Non-Discrimination Testing) Compensation and WAP Qualifying Compensation for the preceding year, numerical identifiers for the employees, and employees' hire and termination dates, if applicable.[25] The WAP Eligibility Files also contain Packet Codes for each employee corresponding to the job titles enumerated in the Joint Stipulation.

---

[22] Joint Stipulation of Facts, ¶¶ 2-9.
[23] Joint Stipulation of Facts, ¶¶ 8-9.
[24] 2003-05 Eligibility Data.xls, 2006-10 Eligibility Data.xls, TOLBERT 675 (updating 2010), and TOLBERT 676 (2011). Entries with duplicate numerical identifiers and last names have been removed.
[25] NDT compensation is measured on a calendar-year basis, whereas WAP Qualifying Compensation (designated in the data as "Qualifying Compensation" or "Benefits Salary") is measured from the previous October 1st through September 30th of the operating year in question.

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 187

CONFIDENTIAL                    RBC-PAUL000010385

23.     Data for the workforce as a whole are available for operating years 2002 through 2010 (the "All Employees Files").[26] Each file contains employees' names, their hire and termination dates, a numerical identifier, and employees' NDT Compensation.

24.     I have augmented the data available in the WAP Eligibility and All Employees Files with annual production data covering operating years 2002 to 2010 (the "Production Files").[27] These files contain Annualized Production numbers for production-based employees.[28]

25.     The data have limitations that I have addressed in various ways. For example, in my statistical analysis of compensation, I exclude employees who have unusually low salaries, which I have defined as compensation for an employee working the entire year that falls below the annualized federal minimum wage,[29] and also employees who have missing compensation values, or values equal to zero. Hire and termination dates missing in some years have been populated, where possible, using hire and termination dates for the same employee in other years.[30]

26.     When combining datasets, I give priority to matching employee records based on the numerical identifiers given in the data. In the event that matches cannot be found with the numerical identifiers, I match records using names and NDT compensation; if no match is found using names and NDT compensation, I match by

---

[26] TOLBERT 1023 (2002), 2003-05 Eligibility Data, 2006-10 Eligibility Data, TOLBERT 679 (updating 2009), TOLBERT 674 (updating 2010). Entries with duplicate numerical identifiers and last names have been removed.

[27] TOLBERT 1111 (2001), TOLBERT 1123 (2002), TOLBERT 1124 (2003), TOLBERT 1119 (2004), TOLBERT 1115 (2005), TOLBERT 1120 (2006), TOLBERT 1121-1122 (2007), TOLBERT 1112-1114 and 1116 (2008), TOLBERT 1117 (2009), and TOLBERT 1118 (2010). Translations for numerical identifiers used in years prior to 2006 are found in SAP IDs from Lawson (4).xls. The Production Files were matched to the WAP Eligibility Files and ALL Employees Files using numerical identifiers, names, and hire dates. Entries with duplicate numerical identifiers and last names have been removed.

[28] Annualized Production is measured from the previous November 1st through October 31st of the operating year in question.

[29] The statutory minimum wage times 2,080 hours.

[30] In instances where dates conflicted for the same employee, I have chosen the earliest hire date and the latest termination date given in the data.

7

CONFIDENTIAL
RBC-PAUL000010386

names and hire dates.[31] Whenever there is conflicting information, I give precedence first to the All Employees Files and then to the WAP Eligibility Files.

# VI. Opinions

## A. Eligible Employees Receive Significantly Higher Compensation than both the Workforce as a Whole and Non-Eligible Employees

27.    I have reviewed and compared the available compensation data for the WAP eligible and non-eligible employees at RBC reflected in the files described in the preceding section. The analysis described below clearly rejects the premises that eligible employees receive similar compensation to that of either the workforce as a whole or non-eligible employees.

### 1. Compensation of Eligible Employees Significantly Exceeds Compensation of the Workforce as a Whole

28.    Exhibit D presents the median and mean values of compensation for the entire workforce, and also for groups partitioned according to eligibility for the WAP. This information is presented for each year from 2002 through 2010.

29.    It is important to draw the distinction between the median and mean as measures of typical or representative compensation. The mean is a simple average of all values, and it can be greatly influenced by large outliers. On the other hand, the median is the value for the person in the middle of the distribution – half of the people have higher compensation, the other half have lower compensation.

30.    The distinction between these measures is important in this case because the simple averages are heavily affected by extremely large or small values of compensation. For example, in 2004, the mean compensation for the workforce as a whole is $119,062, while the median compensation is equal to $57,437. This difference

---

[31] When matching the Production files to the All Employees files and WAP Eligibility files, I match records based on names alone if no match is found using the criteria described above.

CONFIDENTIAL                                                          RBC-PAUL000010387

reflects the influence on the mean of employees who had relatively large compensation. As a consequence of the mean's sensitivity to extreme values of compensation, the median value of compensation for any particular group – e.g., the workforce as a whole, WAP eligible employees or non-eligible employees – is likely more representative of the typical or average employee in that group.

31.     The evidence reported in Panel A of Exhibit D shows that employees who were eligible for the WAP had significantly higher median compensation than is observed for the workforce as a whole. This can be seen by comparing the median compensation of eligible employees, which varies from $203,869 in 2005 to $362,635 in 2010, with the median compensation of all employees, which varies from $41,644 in 2002 to $69,007 in 2010.

32.     It is apparent from the evidence presented in Panel A of Exhibit D that the median compensation of WAP eligible employees is a multiple of several times the same year's median compensation of the workforce as a whole. Indeed, the median compensation of WAP eligible employees during this nine year period ranged from 3.2 times to 5.3 times the median compensation of all employees. Looking at the nine year period from 2002 through 2010 as a whole, the median compensation of WAP eligible employees was 4.3 times the median compensation of the entire workforce, on average.

33.     In addition, I evaluate where the median WAP eligible compensation falls in the distribution of compensation of all employees. For example, if the median compensation of eligible employees were equal to the median compensation of all employees, one would expect the WAP eligible median to represent approximately the 50th percentile of compensation for all employees. However, as seen in Exhibit D, the median compensation of WAP eligible employees exceeds the compensation of over 87% of the workforce in every year analyzed (these percentiles range from 87.2 in 2007 to 92.1 in 2002).

34.     Panel B of Exhibit D reports similar information for mean compensation each year to that described for the medians in the preceding paragraphs. The mean compensation of WAP eligible employees significantly exceeds that of the workforce as

9

CONFIDENTIAL
RBC-PAUL000010388

a whole in every year from 2002 through 2010. The mean compensation of WAP eligible employees varies from $274,619 in 2002 to $541,528 in 2010, as compared with a range of $87,254 to $152,427 for all employees.

35. Looking at the mean compensation of eligible employees as a multiple of the mean compensation of the entire workforce in the same year, Exhibit D reports that this multiple varies from 2.2 to 3.8. Likewise, the mean compensation of WAP eligible employees exceeds that of over 93% of the workforce as a whole in each of the years analyzed (these percentiles range from 93.3 to 96).[32]

36. Exhibits E-1 through E-9 present histograms, which are graphical representations of the distributions of compensation received by WAP eligible employees (red bars) and the workforce as a whole (blue bars). These histograms, which are presented for each year from 2002 through 2010, clearly illustrate that the compensation distributions of WAP eligible employees are generally associated with higher compensation levels than the corresponding distribution for all employees.

37. The foregoing discussion presents strong evidence that the compensation of WAP eligible employees significantly exceeds that of the workforce as a whole. In the next subsection, I compare the compensation of WAP eligible employees to that of non-eligible employees.

---

[32] Exhibit D also provides the results of three statistical tests assessing whether the observed differences in compensation between WAP eligible employees and all employees are statistically significant. The results of all three tests support the conclusion that eligible employees have statistically significantly greater compensation than the workforce as a whole. The first statistical analysis, shown in Panel A, tests whether the median values of compensation are equal between WAP eligible and all employees using a statistical procedure called the "Wilcoxon Rank-Sum" test. Based on the results of this test, I find that WAP eligible employees have greater median compensation than all employees and that the differences are statistically significant in every year of the analysis. In the second analysis, shown in Panel B, I use a common technique in statistics, known as a "t-test," to assess whether the mean values of employees' compensation are equal between the eligible employees and all employees. As with the tests comparing medians, I find that WAP eligible employees have higher mean compensation than does the workforce as a whole, and that the difference is statistically significant in every year of the analysis. The final statistical analysis, shown in Panel C, tests whether the distributions of compensation are the same for WAP eligible employees and all employees using the "Kolmogorov-Smirnov" test. In all years of the analysis, the results of this test reject at a high level of statistical significance the premise that the distributions are the same.

CONFIDENTIAL                                                      RBC-PAUL000010389

### 2. Compensation of Eligible Employees Significantly Exceeds Compensation of Non-Eligible Employees

38. It follows from the discussion in the preceding paragraphs showing that WAP eligible employees earn significantly higher compensation than the workforce as a whole, that WAP eligible employees also earn significantly higher compensation than non-eligible employees. For completeness, Exhibit D also presents a comparison of median and mean compensation between WAP eligible and non-eligible employees in each year from 2002 through 2010.

39. Panel A of Exhibit D shows that WAP eligible employees have significantly higher median compensation than the non-eligible employees. As noted in the preceding subsection, the median compensation of WAP eligible employees varies from $203,869 to $362,635. In contrast, the median compensation observed for non-eligible employees varies from only $38,968 to $58,845. Likewise, the median compensation of WAP eligible employees in the same year varies from 4.2 to 6.3 times the median compensation of non-eligible employees during 2002 to 2010. For this entire nine year period, the median compensation of WAP eligible employees was on average 5.1 times the median compensation of non-eligible employees.

40. Similarly, Panel B of Exhibit D shows that employees who were eligible for the WAP had significantly higher mean compensation than non-eligible employees. The compensation means measured for WAP eligible employees vary from $274,619 to $541,528 during the period from 2002 through 2010; the compensation means of non-eligible employees measured during the same period are substantially smaller – only $57,309 to $88,341. During this period, the mean compensation of WAP eligible employees ranged from 3.8 times to 6.4 times the mean compensation of non-eligible employees.[33]

---

[33] As with the compensation comparison of WAP eligible employees and the entire workforce discussed above, Exhibit D also provides the results of the three tests of the statistical significance – Wilcoxon Rank-Sum test (Panel A), t-test (Panel B), and Kolmogorov-Smirnov test (Panel C) – of the observed differences between the median, mean and distribution of compensation for the comparison of eligible and non-eligible employees. Wilcoxon Rank-Sum confirms that WAP eligible employees have significantly

CONFIDENTIAL

RBC-PAUL000010390

41.    Exhibits F-1 through F-9 provide histograms presenting the compensation distributions of WAP eligible (red bars) and non-eligible employees (blue bars). These histograms clearly illustrate that the compensation distributions of WAP eligible employees are generally associated with higher compensation levels than the corresponding distribution for non-eligible employees.

### B. There is a Positive and Statistically Significant Correlation Between Production and Compensation, Thereby Supporting the Use of Production as a WAP Eligibility Criterion

42.    I understand that Plaintiffs may argue that pegging the WAP eligibility of production-based employees to a production threshold is not an effective way to ensure that only highly compensated employees are eligible for the plan. However, this argument is wrong for at least two reasons.

43.    First, Exhibit G compares the compensation of production-based WAP eligible employees with that of all employees and non-eligible employees. Panel A of this exhibit shows that the median compensation of WAP eligible production-based employees significantly exceeds the median observed for all employees in every year from 2002 through 2010. During the period from 2002 to 2010, the median compensation of production-based WAP eligible employees ranges from 2.7 times to 4.2 times the median compensation of all employees, and the average multiple over this entire nine year period is 3.3 times. Moreover, the median compensation of production-based WAP eligible employees exceeds the compensation of over 82% of the workforce in every year analyzed, with the yearly percentile ranging from 82.3 to 89.8.[34]

---

greater median compensation than non-eligible employees, the "t-test" for equality of compensation means shows that the WAP eligible employees have higher mean compensation than non-eligible employees, and the "Kolmogorov-Smirnov" test to assess the equality of the compensation distributions for eligible and non-eligible employees reject at a high level of statistical significance the idea that the distributions are the same. All of these results are statistically significant in every year of the analysis.

[34] In addition, Exhibit G reports the results of the Wilcoxon Rank Sum test for equality of compensation medians (Panel A), the t-test for equality of compensation means (Panel B) and the Kolmogorov Smirnov test of compensation distributions (Panel C). All of these tests reject at a high degree of statistical significance the premises that eligible production based employees have the same compensation as either the workforce as a whole or non-eligible employees.

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 193

CONFIDENTIAL

RBC-PAUL000010391

44.     Similar evidence for the mean compensation of eligible production-based employees can be seen in Panel B of Exhibit G. These results show that the mean compensation of WAP eligible production-based employees exceeds the mean compensation of all employees in every year analyzed, with the mean compensation ranging from 1.6 to 2.4 times the mean for all employees. In addition, the mean compensation of WAP eligible production-based employees exceeds the compensation of over 86% of the workforce in every year of the analysis. This yearly percentile ranges from 86.5 to 92.6.

45.     The median and mean compensation of WAP eligible production-based employees also exceed the corresponding measures observed for non-eligible employees in every year from 2002 through 2010. Panel A of Exhibit G shows that the median compensation of production-based WAP eligible employees ranges from a multiple of 3.5 to 4.4 times the median compensation of non-eligible employees. Similarly, Panel B of Exhibit G shows that the mean compensation of production-based WAP eligible employees ranges from a multiple of 2.9 to 4.0 times the mean compensation of non-eligible employees.

46.     Exhibits H-1 through H-9 provide histograms comparing the compensation distributions of WAP eligible production-based employees and non-eligible employees. These histograms, which are presented for each year from 2002 through 2010, clearly illustrate that the production-based eligibility criteria create an economically significant distinction between the compensation distributions of eligible production-based employees and non-eligible employees.

47.     Second, I find that the production and compensation of production-based employees exhibit a large positive correlation that is statistically significant. I employ a well-known statistical technique called a regression that is often used to estimate the degree of correlation between two variables. Here, I modeled the compensation of production-based employees as a linear function of those same employees' production for each year from 2002 through 2010. The results, shown in Exhibit I, demonstrate that $1 of additional production is associated with an additional $0.41 of compensation, on

13

CONFIDENTIAL

RBC-PAUL000010392

average. This relation is highly statistically significant in each year. I test the statistical significance of the relation between compensation and production using a t-test of the hypothesis that compensation is unrelated to production. The p-values of 0.0 indicate that there is only an infinitesimal likelihood that compensation and production are uncorrelated and that the estimated high degree of correlation could be observed merely by chance.

48.     To give an example of what this calculation means, suppose that an employee had production of $500,000 in 2004. Using the estimated regression intercept of -$15,381 and the estimated coefficient on production of 0.4219, the model predicts that his compensation would be $195,569. If, on the other hand, the employee had production of $600,000 then the model predicts that his compensation would be equal to $237,759, an increase of $42,190. Similarly, if the employee's production were to increase by another $100,000, to $700,000, the model would predict that his compensation would increase by another $42,190 to $279,949. The results for other years are similar.

49.     An additional measure of the strength of the correlation between compensation and production is the "r-squared" statistic associated with the regression results. This statistic is a measure of how much of the variance in compensation is explained by the level of production. Here the estimated r-squared statistics indicate that in every year from 2002 through 2010, between approximately 83% and 93% of the variation in production-based employees' compensation is explain by variation in their production. Thus, factors other than production are needed to explain no more than about 7% to 17% of the variation in production-based employees' compensation.

### C.  Plaintiffs' Calculations are Flawed, Unreliable and Overstate the Percentage of Eligible Employees in Every Year Analyzed

50.     I understand that a calculation by Plaintiff of the percentage of employees eligible for the WAP in Plan Years 2004 through 2009 is provided in a document entitled

CONFIDENTIAL                                              RBC-PAUL000010393

"Tolbert's 'Selection Criteria' Analysis," attached here as Exhibit J.[35]  Because of an error in the methodology used in Plaintiff's calculation, these percentages are unreliable and artificially inflated in every year of Plaintiff's analysis.

51.     Plaintiff reports counts of eligible and all employees based on the number of employees who worked at RBC on October 31st of each year.  To do this, Plaintiff excludes any employees listed in the "All Employees" files who were terminated prior to October 31st of each year, as well as all employees hired after October 31st of each year.  For example, for the 2008 WAP plan, only employees who worked at RBC as of October 31, 2007 were included.

52.     While eligibility for inclusion in a particular Plan Year's WAP program is determined on October 31st of the preceding year, employees hired between October 31st of the preceding year and December 31st of the Plan Year also may be eligible.[36]

53.     As a consequence, I find Plaintiff's methodology of determining eligibility by looking at a single date – October 31 – and excluding employees who are hired after that date to be incorrect.  In fact, I find that a large number of employees who are hired after October 31st of the preceding year are determined to be eligible to participate in the WAP during a particular PlanYear .

54.     To correct this flaw in Plaintiff's analysis, I calculate the number of employees in the entire workforce for each Plan Year as the number of employees active during the corresponding calendar year plus employees who were active as of October 31 of the preceding year but terminated between November 1 and December 31 of the that (preceding) year.  Exhibit K shows the number of employees deemed eligible for the WAP in each Plan Year from 2003 through 2011, as well the comparable total number of employees that results from correcting Plaintiff's error.[37]

---

[35] *See* DALLAS-#2269513-v2-Tolbert_Chart.docx - Stipulation Regarding Data.
[36] This method of counting employees picks up new hires during the Plan Year as well as employees with start dates preceding the current Plan Year who became RBC employees when their employer was acquired by RBC during the Plan Year.
[37] The number of employees in the workforce in each Plan Year listed in Exhibit J exceeds the number of employees for whom information on the prior year's compensation is available and analyzed in Exhibits D through H.

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 196

CONFIDENTIAL

RBC-PAUL000010394

55.     Exhibit K also presents corrected annual eligibility percentages based on my revised calculations, along with a comparison of the results of Plaintiff's calculations with my corrected calculations.  As can be seen in Exhibit K, Plaintiff overstates the percentage of eligible employees in every year analyzed.

## VII.  Conclusions

56.     The foregoing discussion establishes that the WAP eligibility criteria select eligible participants that have greater compensation than both the workforce as a whole and non-eligible employees, and the differences observed are both economically and statistically significant.  This is true regardless of whether or not the employee's eligibility is determined by production.  Not surprisingly, compensation and production are highly correlated in each of the years analyzed, such that the marginal dollar of production translates into approximately $0.41 of additional compensation, on average.

57.     In addition, Plaintiff makes a fundamental error in calculating the percentage of the workforce eligible to participate in the WAP in each Plan Year by excluding employees with hire dates between November 1 of the preceding year and December 31 of the Plan Year from the workforce as a whole.  As a consequence, Plaintiff's analysis substantially overstates the annual WAP eligibility percentages.

58.     My work on this case is ongoing. As such, I reserve the right to modify or supplement my opinions in response to the receipt of new information or data, questions that Plaintiff's counsel may ask me in deposition, and the commentary of Plaintiff's expert regarding my opinions.

December 2, 2011

_____

Cathy M. Niden, Ph.D.

16

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 197

CONFIDENTIAL

RBC-PAUL000010395


## Cathy M. Niden, Ph.D.

30 South Wacker, Suite 3400
Chicago, Illinois 60606
direct:  312.583.2167
main:   312.251.5900
fax:     312.251.5201
mobile: 312.925.5959
email:   cathy.niden@naviganteconomics.com

**BIO/SUMMARY**

Cathy M. Niden, Managing Director and Principal, provides expertise in financial economics specializing in financial markets, securities litigation and employee benefits. She has served as expert witness in cases alleging economic damages in a wide variety of contexts, including securities fraud, ERISA violations in connection with defined benefit and defined contribution retirement plans, wrongful termination, and breach of contract. She has also served as expert witness at the class certification stage in 10b-5 and ERISA matters, and has opined on market efficiency and conflicts of interest among potential class members in this context. She has published scholarly articles in the *Journal of Finance* and *Financial Management*. Dr. Niden served as Associate Chief Economist and Academic Fellow at the Securities and Exchange Commission Office of Economic Analysis. In addition, she served as a faculty member at the University of Notre Dame and the University of Pittsburgh. Dr. Niden received her AB, MBA, and PhD degrees from the University of Chicago.

**EDUCATION**

PhD, Finance and Economics, University of Chicago, Graduate School of Business, 1988.

MBA, Finance, University of Chicago, Graduate School of Business, 1984.

AB, Business, University of Chicago, 1981.

**PRESENT POSITION**

Navigant Economics (formerly Chicago Partners), a subsidiary of Navigant Consulting, Chicago, Illinois, Managing Director and Principal (March 2010 – present).

**OTHER POSITIONS HELD**

DePaul University, Chicago, Illinois. Adjunct Professor (Spring 2010).

Loyola University of Chicago, Chicago, Illinois, Adjunct Professor (Winter/Spring 2010).

LECG, Evanston, Illinois. Director (September 2006 – March 2010).

1

CONFIDENTIAL                                                                 RBC-PAUL000010396

Lexecon Inc., Chicago, Illinois. Senior Vice President (November 2003–July 2006); Vice President (December 2001–November 2003). Economist (March 1998 – December 2001).

US Securities and Exchange Commission, Office of Economic Analysis, Washington, DC, Associate Chief Economist (February 1997–February 1998); Academic Economic Fellow (July 1996–February 1998).

Department of Finance and Business Economics, College of Business Administration, University of Notre Dame, Notre Dame, Indiana. Assistant Professor (August 1990–March 1998, on leave July 1996–February 1998).

Joseph M. Katz Graduate School of Business, University of Pittsburgh, Pittsburgh, Pennsylvania. Assistant Professor (September 1988–August 1990); Lecturer in Finance (September 1986–August 1988).

Loyola University of Chicago, Chicago, Illinois; Lecturer in Finance (Autumn 1984).


## PUBLICATIONS AND RESEARCH

"The Information Content of Credit Default Swap Prices," *The Andrews Derivatives Litigation Reporter*, July 21, 2008. Coauthor: Rosa M. Abrantes-Metz.

"Economic Analysis in Securities Class Certifications," in Litigation Services Handbook," *The Role of the Financial Expert, Fourth Edition, 2008 Supplement*, ed. Roman L. Weil, Peter B. Frank, Kevin D. Kreb and Michael J. Wagner, (Hoboken: John Wiley & Sons, forthcoming 2008), Chapter 18A. Coauthor: Mohan Rao.

"Economic Analysis in ERISA Class Actions Involving Employee Investments in Company Stock," *Benefits & Compensation Digest*, April 2007 Web-Exclusive Edition, http://www.ifebp.org/pdf/webexclusive/07apr.pdf.

"Current Perspectives on Shareholder Proposals: Lessons from the 1997 Proxy Season," *Financial Management,* Spring 1999, pp. 89–98. Coauthors: Stuart Gillan and Cynthia J. Campbell.

Invited book review of *Anatomy of a Merger* by Alexandra Post, *Journal of Finance,* December 1994, pp. 1932–1935.

"Volume and Autocovariances in Short-Horizon Individual Security Returns," *Journal of Finance,* September 1994, pp. 1305–1329; also abstracted in *Journal of Finance,* July 1994, pp. 1063–1064. Coauthors: Jennifer Conrad and Allaudeen Hameed.

"An Empirical Analysis of White Knight Corporate Takeovers: Synergy and Overbidding;" *Financial Management,* Winter 1993, pp. 28–45.

"Order Flow, Trading Costs and Corporate Acquisition Announcements," *Financial Management,* Winter 1992, pp. 22–31. Coauthor: Jennifer Conrad.

2

CONFIDENTIAL

RBC-PAUL000010397

**TESTIMONY**

*Michael J. Thompson, et al., v. Retirement Plan for Employees of S.C. Johnson & Sons, Inc., and Retirement Plan for Employees of JohnsonDiversey Inc.*, United States District Court, Eastern District of Wisconsin, Case No. 07-C-1047 (Deposition: September 10, 2009).

*Glen Tibble, et al., v. Edison International, et al.,* United States District Court, Central District of California, Case No. 07-05359 (Deposition: May 21, 2009).

*Apollo Property Partners, LLC, v. Diamond Houston, Inc., Northbrook; and Diamond Houston I, LP, Diamond Houston, Inc., v. Apollo Property Partners, LLC, Prieur J. Leary, Jr. and Leary Development, LLC,* American Arbitration Association, Case No. 51-148-Y-01448-07 (Testimony: April 18, 2009).

*Gerald George, et al., v. Kraft Foods Global, Inc., et al.,* United States District Court, Northern District of Illinois, Case No. 1:08-cv-03799 (Deposition: December 18, 2008).

*In Re: Alco Industries, Inc. v. Wachovia Corporation, et al.,* United States District Court for the Eastern District of Pennsylvania, Civil Action No. 04-6090 (Deposition: April 5, 2007).

*In Re: Wayman Wendell Cheatham, M.D. v. MannKind Corporation, et al.,* Superior Court for the State of California for the County of Los Angeles, Case No. BC333845 (Deposition: February 22, 2007).

*In Re: John Brugos, et al. v. Garry Nannenga, et al.,* United States District Court for the Northern District of Indiana, South Bend Division, Case No. 2:03CV-547RM (Deposition: December 13, 2006).

*In Re: Sheila Hertzberg, et al., v. Asia Pulp & Paper Company, Ltd., et al.,* United States District Court for the Southern District of New York, Case No. 01-CV-7351 (Testimony: February 27, 2006).

*In Re: Electronic Data Systems Corporation ERISA Litigation,* United States District Court for the Eastern District of Texas, Tyler Division, No. 6:03-MD-1512, Lead Case 6:03-CV-126 (Testimony: June 22, 2005).

*In Re: Joseph Vecchio, Joseph Vecchio Unitrust, Michael Vecchio and William Kaiser v. Waste Management, Inc., f/k/a USA Waste Services, Inc., Rodney R. Proto, and Earl E. DeFrates*, District Court of Harris County, Texas, 270th Judicial District, No. 2003-22897, Houston, Texas (Deposition: February 18, 2005).

*In Re: Tribune Company v. Commissioner*, United States Tax Court, Docket Number 17443-02, Los Angeles, California (Testimony: December 15, 2004).

3

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT

CONFIDENTIAL

RBC-PAUL000010398

*In Re: Liberty Re (Bermuda) v. Transamerica Occidental Life Insurance Company*, Arbitration Before: Richard E. Stewart, Monica Hainer and T. Richard Kennedy (Deposition: April 1, 2004).

*In Re: Anthony Lomangino, et al., v. Waste Management, Inc. and Waste Management Holdings, Inc.*, American Arbitration Association Northern Case Management Center, Case No. 13 199 02361 01 (Testimony: November 18, 2002; Deposition October 3, 2002).

*In Re: Hickory Hills Development Company, LLC, Michael J. Bogese, Jr., David L. Carter, and Interstate Investment Company, L.P. v. The Lake County Solid Waste Management District*, Lake County Superior Court, Hammond, Indiana, No. 45D05-0008-CP-560 (Deposition: November 12, 2002).

*In Re: Aetna Inc. Securities Litigation*, United States District Court for the Eastern District of Pennsylvania, MDL Docket No. 1219 (All Cases), (Deposition: June 27, 2000).

## PROFESSIONAL ASSOCIATIONS

Midwest Financial Association: Director-Institutional (since February 2010).

Financial Management Association: Member; Practitioner Director (2003–2004).

American Bar Association: Associate Member.

4

CONFIDENTIAL

RBC-PAUL000010399

GARDERE

*attorneys and counselors ▪ www.gardere.com*

Direct: 713-276-5739
Direct Fax: 713-276-6739
gbracken@gardere.com

November 30, 2011

*Via Messenger*

The Honorable Keith P. Ellison
United States District Judge
515 Rusk Avenue, Room 3716
Houston, Texas 77002

RE:     Civil Action No. 4:11:CV-00107; *Brenda Tolbert v. RBC Capital Markets Corporation n/k/a RBC Capital Markets, LLC; et al.,* in the United States District Court for the Southern District of Texas; Our File No. 136702.01

Dear Judge Ellison:

Enclosed for your review is a courtesy copy of the following document which was e-filed with the Court today:

**1. Joint Stipulation of Facts [Dkt. #75].**

Please note that the Stipulation was e-filed under seal by agreement of the parties and in accordance with the Agreed Protective Order signed on March 10, 2011 [Dkt. #18].

Please contact me if you have any questions or need further information.

Sincerely,

Geoffrey H. Bracken

GHB:pak
Enclosure

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO 2:16-cv-05616-RBL - Page 202

CONFIDENTIAL                                                                        RBC-PAUL000010400

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| BRENDA TOLBERT, | § | |
| | § | |
| Plaintiff | § | |
| | § | No. 4:11-CV-107 |
| v. | § | |
| | § | Judge Keith P. Ellison |
| RBC CAPITAL MARKETS | § | |
| CORPORATION n/k/a RBC CAPITAL | § | |
| MARKETS, LLC, ET AL., | § | |
| | § | |
| Defendants. | § | |

## JOINT STIPULATION OF FACTS

Defendants RBC Capital Markets Corporation, RBC Centura Bank, and RBC U.S.

Insurance Services, Inc. (collectively "Defendants") and Plaintiff Brenda Tolbert hereby stipulate

to the following facts:[1]

1.      The eligibility requirements for the 2003 Royal Bank of Canada U.S. Wealth

Accumulation Plan ("WAP") were as follows:

    (a)      **General ("GENERAL")**: 2002 Annualized Calendar Year Cash Compensation greater than $150,000.

    (b)      **Financial Consultants ("FINCONSULT")**: 2002 Fiscal Year ("FY") Annualized Gross Production of greater than $300,000.

    (c)      **Fixed Income, Commissioned ("FICMCOMM")**: 2002 Annualized Calendar Year Cash Compensation of greater than $150,000.

    (d)      **Fixed Income, Non-Commissioned ("FICMNONCOM")**: 2002 Annualized Calendar Year Cash Compensation of greater than $150,000.

    (e)      **Private Client Group (PCG) Branch Managers ("BRANCHMGR")**: Title of PCG Branch Manager.

---

[1] Defendants do not by these stipulations concede that any stipulated fact is relevant in this case and reserve the right to in the future dispute the relevance of such information.

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 203

(f) **SEG Directors ("DIRECTOR")**: Title of SEG Director.

2. The eligibility requirements for the 2004 WAP were as follows:

(a) **General ("GENERAL")**: Eligible Pay 11/1/2002 through 10/31/2003 *plus* FY 2003 Bonus totaling at least $150,000, *or* a New Hire in FY 2003 with a base salary of at least $150,000.

(b) **Financial Consultants ("FINCONSULT")**: 2003 FY Production of greater than $300,000.

(c) **Fixed Income, Commissioned ("FICMCOMM")**: Eligible Pay 11/1/2002 through 10/31/2003 *plus* FY 2003 Bonus totaling at least $150,000, *or* a new hire during FY 2003 with annualized paid compensation of at least $150,000.

(d) **Fixed Income, Non-Commissioned ("FICMNONCOM")**: Eligible Pay 11/1/2002 through 10/31/2003 *plus* FY 2003 Bonus totaling at least $150,000, *or* a New Hire during FY 2003 with (i) a base salary of at least $150,000 *or* (ii) guarantee of at least $150,000 in FY 2004.

(e) **PCG Branch Managers ("BRANCHMGR")**: Title of PCG Branch Manager.

(f) **Directors ("DIRECTOR")**: Title and/or designation of RBC Dain Rauscher Director.

(g) **RBC Liberty, Capital Markets, Centura and Mortgage**:

(i) Liberty and RBC Capital Markets employees (**"Liberty" and "CAPITAL MARKETS"**): Title of Vice President level and above.

(ii) Centura employees (**"Centura"**): Title of Vice President level and above, as designated by RBC Banking U.S. Operating Committee, *and* minimum FY 2003 Total Cash Compensation of at least $150,000.

(iii) Mortgage employees (**"Mortgage"**): Title of Mortgage Loan Officer with minimum FY 2003 Total Cash Compensation of at least $150,000.

3. The eligibility requirements for the 2005 WAP were as follows:

(a) **General ("GENERAL")**: Eligible Pay 11/1/2003 through 10/31/2004 *plus* FY 2004 bonus totaling at least $150,000, *or* a New Hire during FY 2004 with a base salary of at least $150,000.

(b) **Financial Consultants ("FINCONSULT")**: 2004 FY Production of greater than $300,000.

DB1/ 67912250.1

2

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
No. 3:16-cv-05616-RBL - Page 204

CONFIDENTIAL

RBC-PAUL000010402

(c) **Fixed Income, Commissioned ("FICMCOMM")**: Eligible Pay 11/1/2003 through 10/1/2004 *plus* FY 2004 bonus totaling at least $150,000, *or* a New Hire during FY 2004 with annualized paid compensation of at least $150,000.

(d) **Fixed Income, Non-Commissioned ("FICMNONCOM")**: Eligible Pay 11/1/2003 through 10/31/2004 *plus* FY 2004 bonus totaling at least $150,000, *or* a New Hire during FY 2004 with (i) a base salary of at least $150,000 *or* (ii) guarantee of at least $150,000 in FY 2005.

(e) **PCG Branch Managers ("BRANCHMGR")**: Title of PCG Branch Manager.

(f) **Directors ("DIRECTOR")**: Title and/or designation of RBC Dain Rauscher Director.

(g) **RBC Liberty, Capital Markets, Centura and Mortgage**:

   (i) <u>Liberty employees</u> (**"LIBERTY"**): Title of Vice President level and above.

   (ii) <u>Capital Markets employees</u> (**"CAPITALMKT"**): FY 2004 Total Cash Compensation of at least $150,000.

   (iii) <u>Centura employees</u> (**"CENTURA"**): Title of Vice President level and above, as designated by RBC Banking U.S. Operating Committee, *and* minimum FY 2004 Total Cash Compensation of at least $150,000.

   (iv) <u>Mortgage employees</u> (**"MORTGAGE"**): Status as a commissioned employee *and* a minimum FY 2004 Total Cash Compensation of at least $150,000.

4. The eligibility requirements for the 2006 WAP were as follows:

(a) **General ("GENERAL")**: Eligible pay 11/1/2004 through 10/31/2005 *plus* FY 2005 bonus totaling at least $150,000, *or* a New Hire during FY 2005 with a base salary of at least $150,000.

(b) **Financial Consultants ("FINCONSULT")**: 2005 FY Production of greater than $300,000.

(c) **Fixed Income, Commissioned ("FICMCOMM")**: Eligible pay 11/1/2004 through 10/31/2005 *plus* FY 2005 bonus totaling at least $150,000, *or* a New Hire during FY 2005 with annualized paid compensation of at least $150,000.

(d) **Fixed Income, Non-Commissioned ("FICMNONCOMM")**: Eligible pay 11/1/2004 through 10/31/2005 *plus* FY 2005 bonus totaling at least $150,000, *or* a New Hire during FY 2005 with (i) a base salary of at least $150,000 *or* (ii) guarantee of at least $150,000 in FY 2006.

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 205

CONFIDENTIAL

RBC-PAUL000010403

(e) **PCG Complex and Branch Directors ("BRANCHMGR")**: Title of Branch Director or Complex Director.

(f) **Directors ("DIRECTOR")**: Title and/or designation of RBC Dain Rauscher Director.

(g) **RBC Liberty, Capital Markets and Centura:**

(i) Liberty employees **("LIBERTY")**: Title of Vice President level and above *and* minimum FY 2005 Total Cash Compensation of at least $150,000.

(ii) Capital Markets employees **("CAPITALMKT")**: FY 2005 Total Cash Compensation of at least $150,000.

(iii) Centura employees **("CENTURA")**: Title of Vice President level and above, as designated by RBC Banking U.S. Operating Committee, *and* minimum FY 2005 Total Cash Compensation of at least $150,000.

(h) **Executive Level Presidents ("STIEXEC")**: Includes a small number (approximately 4) of executive level presidents with greater than $150,000 in FY 2005 Total Cash Compensation.

5. The eligibility requirements for the 2007 WAP were as follows:

(a) **Financial Consultants ("FINCONSULT")**: 2006 FY Production of greater than $350,000.

(b) **Financial Consultants with Production $300,000 to $350,000 ("FCENTRY")**: 2006 FY Production between $300,000 and $350,000.

(c) **PCG Complex and Branch Directors ("BRANCHMGR")**: Title of Branch Director or Complex Director *and* (i) 2006 FY Production greater than $350,000 *or* (ii) 2006 Benefits Salary of at least $150,000.

(d) **Branch and Complex Directors with Production between $300,000 and $350,000 ("BRMGENTRY")**: Title of Branch Director or Complex Director *and* 2006 FY Production of $300,000 to $350,000.

(e) **RBC General, Capital Markets, GPB, STIEXEC, Centura and Liberty:**

(i) Liberty employees **("LIBERTY")**: designation of "PL06" and above *and* 2006 Benefits Salary of at least $150,000, including new hires during FY 2006 with the requisite job level *and* a base salary of at least $150,000;

(ii) Centura employees **("CENTURA")**: designation of Vice President and above *and* 2006 Benefits Salary of at least $150,000, including new hires

DB1/ 67912250.1

4

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 206

CONFIDENTIAL

RBC-PAUL000010404

during FY 2006 with the requisite job level *and* base salary of at least $150,000;

(iii)   <u>Non-Centura and Non-Liberty employees</u> (**"CAPITAL MARKETS" AND "STIEXEC" and "GENERAL"**):   2006 Benefits Salary of at least $150,000, including new hires in 2007 with a base salary of at least $150,000:

(f)   **Fixed Income, Commissioned ("FICMCOMM"):** 2006 Benefits Salary of at least $150,000 *or* a New Hire during 2007 with (i) a base salary of $150,000 *or* (ii) guarantee of at least $150,000 in FY 2007.

(g)   **Fixed Income, Non-Commissioned Banking ("FIGNCBANK"):** 2006 Benefits Salary of at least $150,000 *or* a New Hire during FY 2006 with (i) a base salary of $150,000 *or* (ii) guarantee of at least $150,000 in FY 2007.

(h)   **Fixed Income, Non-Commissioned Non-Banking ("FIGNC"):** 2006 Benefits Salary of at least $150,000 *or* a New Hire during FY 2006 with (i) a base salary of $150,000 *or* (ii) guarantee of at least $150,000 in FY 2007.

(i)   **PCG Directors ("PCGDIRECT"):** Title of PCG President or Regional Director.

6.   The eligibility requirements for the 2008 WAP were as follows:

(a)   **Financial Consultants ("FINCONSULT"):** 2007 FY Production of greater than $350,000.

(b)   **Financial Consultants with Production $300,000 to $350,000 ("FCENTRY"):** 2007 FY Production between $300,000 and $350,000.

(c)   **PCG Complex and Branch Directors ("BRANCHMGR"):** Title of Branch Director or Complex Director *and* (i) 2007 FY Production greater than $350,000 *or* (ii) 2007 Benefits Salary of at least $150,000.

(d)   **Branch and Complex Directors with Production between $300,000 and $350,000 ("BRMGENTRY"):** Title of Branch Director or Complex Director *and* (i) 2007 FY Production of $300,000 to $350,000 *or* (ii) 2007 Benefits Salary of at least $150,000.

(e)   **General, Capital Markets, GPB, STIEXEC, VAM, Liberty, Centura ("STIEXEC"):**

(i)   <u>Liberty employees:</u>  designation of "PL06" and above *and* 2007 Benefits Salary of at least $150,000, including new hires during FY 2007 with the requisite job level *and* a base salary of at least $150,000;

DB1/ 67912250.1                                          5

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 207
CONFIDENTIAL                                            RBC-PAUL000010405

    (ii)    <u>Centura employees</u>: designation of Vice President and above *and* 2007 Benefits Salary of at least $150,000, including new hires during FY 2007 with the requisite job level *and* base salary of at least $150,000;

    (iii)    <u>Non-Centura and Non-Liberty employees</u>: 2007 Benefits Salary of at least $150,000, including new hires in FY 2007 with a base salary of at least $150,000.

(f)    **Fixed Income, Commissioned ("FICMCOMM"):** 2007 Benefits Salary of at least $150,000 *or* a New Hire during 2007 with (i) a base salary of $150,000 *or* (ii) guarantee of at least $150,000 in FY 2008

(g)    **Fixed Income, Non-Commissioned Banking ("STIEXEC"):** 2007 Benefits Salary of at least $150,000 *or* a New Hire during 2007 with (i) a base salary of $150,000 *or* (ii) guarantee of at least $150,000 in FY 2008

(h)    **Fixed Income, Non-Commissioned Non-Banking ("STIEXEC"):** 2007 Benefits Salary of at least $150,000 *or* a New Hire during 2007 with (i) a base salary of $150,000 *or* (ii) guarantee of at least $150,000 in FY 2008

(i)    **PCG Directors ("PCGDIRECT"):** Title of PCG President or Regional Director

7.    The eligibility requirements for the 2009 WAP were as follows (by packet code):

(a)    **Financial Consultants ("FINCONSULT"):** 2008 FY Production of greater than $350,000

(b)    **Financial Consultants with Production from $300,000 to $350,000 ("FCENTRY"):** 2008 FY Production between $300,000 and $350,000.

(c)    **PCG Complex and Branch Directors ("BRANCHMGR"):** Title of Branch Director or Complex Director *and* (i) 2008 FY Production greater than $350,000 *or* (ii) 2008 Benefits Salary of at least $150,000

(d)    **Branch and Complex Directors with Production between $300,000 and $350,000 ("BRMGENTRY"):** Title of Branch Director or Complex Director *and* 2008 FY Production of $300,000 to $350,000.

(e)    **General, Capital Markets, GPB, STIEXEC, VAM, Liberty, Centura, Non-PCG Commission ("STIEXEC"):**

    (i)    <u>Liberty</u>: designation of PL06 and above *and* 2008 Benefits Salary of at least $350,000, including new hires during FY 2008 with the requisite job level *and* a base salary of at least $350,000;

    (ii)    <u>Centura</u>: designation of Vice President and above *and* 2008 Benefits Salary of at least $350,000, including new hires during FY 2008 with the requisite job level *and* base salary of at least $350,000;

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT

(iii)  <u>Non-Centura and Non-Liberty</u>: 2008 Benefits Salary of at least $350,000, including new hires in FY 2008 with a base salary plus guaranteed bonus of at least $350,000.

(f)  **Financial Consultants, Select Teams (No match) ("FCSELECT")**: 2008 FY Production greater than $350,000.

(g)  **PCG Directors ("PCGDIRECT")**: Title of PCG President or Regional Director.

8.  The eligibility requirements for the 2010 WAP were as follows:

(a)  **Financial Consultants and Branch Directors ("FINCONSULT")**: 2009 FY Production greater than $400,000

(b)  **PCG Complex and Regional Directors ("BRANCHMGR")**: Title of Complex Director or Regional Director *and* 2009 Benefits Salary of at least $250,000

(c)  **Financial Consultants, Select Teams (No match) ("FCSELECT")**: 2009 FY Production greater than $400,000

(d)  **General, Capital Markets, GPB, STIEXEC, VAM, Liberty, Centura, Non-PCG Commission ("STIEXEC")**:

(i)  <u>Liberty</u>: designation of PL06 and above *and* 2009 Benefits Salary of at least $350,000, including new hires during FY 2009 with the requisite job level and a base salary of at least $350,000;

(ii)  <u>Centura</u>: designation of Vice President and above *and* 2009 Benefits Salary of at least $350,000, including new hires during FY 2009 with the requisite job level *and* base salary of at least $350,000;

(iii)  <u>Non-Centura and Liberty</u>: 2009 Benefits Salary of at least $350,000, including new hires during FY 2009 with a base salary plus guaranteed bonus of at least $350,000

9.  The eligibility requirements for the 2011 WAP are as follows:

(a)  **Financial Consultants and Branch Directors ("FINCONSULT")**: 2010 FY Production greater than $400,000.

(b)  **PCG Complex and Regional Directors ("BRANCHMGR" or "BRANCHMGR-RD")**: Title of Complex Director or Regional Director *and* 2010 Benefits Salary of at least $250,000

(c)  **Financial Consultants, Select Teams (No match) ("FCSELECT")**: 2010 FY Production greater than $400,000

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 16-cv-05616-RBL - Page 209

CONFIDENTIAL              RBC-PAUL000010407

(d) **General, Capital Markets, GPB, STIEXEC, VAM, Liberty, Centura, Non-PCG Commission ("STIEXEC"):**

(i) <u>Liberty</u>: designation of PL06 and above *and* 2010 Benefits Salary of at least $350,000, including new hires during FY 2010 with the requisite job level and a base salary of at least $350,000;

(ii) <u>Centura</u>: designation of Vice President and above *and* 2010 Benefits Salary of at least $350,000, including new hires during FY 2010 with the requisite job level *and* base salary of at least $350,000;

(iii) <u>Non-Centura and Liberty</u>: 2010 Benefits Salary of at least $350,000, including new hires during FY 2010 with a base salary plus guaranteed bonus of at least $350,000

10. All employees who met the applicable requirements set forth in paragraphs 1-9 above were eligible for and invited to participate in the WAP, except for those otherwise eligible employees who terminated their employment with RBC before being invited to participate for the following plan year.

11. Defendants did not further limit participation in the WAP from among the above-described pool of WAP-eligible employees.

12. All documents produced by any party are true and correct copies of the originals and are what they purport to be.

Respectfully submitted,

Plaintiff Brenda Tolbert

by: s/ Joe B. Harrison

Geoffrey H. Bracken
Gardere Wynne Sewell LLP
1000 Louisiana, Suite 3400
Houston, Texas 77002-5007

William G. Whitehill

RBC Capital Markets Corporation; RBC Capital Markets, LLC; RBC Centura Bank; and RBC U.S. Insurance Services, Inc.

by: s/ Christopher J. Boran

Sari M. Alamuddin (*admitted pro hac vice*)
Ill. State Bar No. 6215689
Christopher J. Boran (*admitted pro hac vice*)
Ill. State Bar No. 6282552

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
No. 3:16-cv-05616-RBL - Page 210

CONFIDENTIAL

RBC-PAUL000010408

Joe B. Harrison
1601 Elm Street, Suite 3000
Dallas, Texas 75201

MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, Fifth Floor
Chicago, Illinois 60601
312.324.1000 (Telephone)
312.323.1001 (Facsimile)

Alison J. Gates
TX State Bar No.24055535
Federal ID No. 706309
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana, Suite 4200
Houston, Texas 77002
713.890.5157 (Telephone)
713.890.5001 (Facsimile)

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 211

CONFIDENTIAL

RBC-PAUL000010409

## Sealed Events

4:11-cv-00107 Tolbert v. RBC Capital Markets Corporation et al

### U.S. District Court

### SOUTHERN DISTRICT OF TEXAS

### Notice of Electronic Filing

The following transaction was entered by Bracken, Geoffrey on 11/30/2011 at 2:55 PM CST and filed on 11/30/2011

| | |
|---|---|
| **Case Name:** | Tolbert v. RBC Capital Markets Corporation et al |
| **Case Number:** | 4:11-cv-00107 |
| **Filer:** | RBC Capital Markets Corporation |
| | Brenda Tolbert |
| | RBC Centura Bank n/k/a RBC Bank (USA) |
| | RBC U.S. Insurance Services, Inc. |

**Document Number:** 75

**Docket Text:**
**Sealed Event, filed.**

**4:11-cv-00107 Notice has been electronically mailed to:**

Alison Jacobs Gates    agates@morganlewis.com

Christopher J Boran    cboran@morganlewis.com

Geoffrey H Bracken    gbracken@gardere.com, eblankenship@gardere.com

James Caleb Scott    jscott@gardere.com

Sari M Alamuddin    salamuddin@morganlewis.com

William G Whitehill    bwhitehill@gardere.com, jharrison@gardere.com, jscott@gardere.com,
phutcheson@gardere.com, qwalker@gardere.com, rgordon@gardere.com

**4:11-cv-00107 Notice has not been electronically mailed to:**

Matthew A Russell
Morgan Lewis & Bockius LLP
77 West Wacker Drive
Chicago, IL 60601

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1045387613 [Date=11/30/2011] [FileNumber=14049948
-0] [40214be7635c0b3d0ec53f5134247b22174b9ce8190ed705edfbfb517dafdc62e
efedf44dcc059aea40c0f82d1bd30529c80cf6f4d7cbeaac59107cc1972fed6]]

CONFIDENTIAL    RBC-PAUL000010410

# Exhibit C
## Documents Considered

| | Date |
|---|---|
| **Publicly Available Documents/Websites** | |
| http://www.rbc.com/aboutus/about2.html | November 15, 2011 |
| http://www.rbcbankusa.com/company/cid-96903.html | November 15, 2011 |
| http://www.rbctravelprotection.com/about-us.html | November 15, 2011 |
| http://www.rbcinsurance.com/us/personal.html | November 15, 2011 |
| https://www.rbccm.com/about/cid-202770.html | November 15, 2011 |
| | |
| **Court Documents** | |
| Amended and Restated Royal Bank of Canada US Wealth Accumulation Plan And Prospectus, November 1, 2008, attached as | November 1, 2008 |
| Exhibit A to Plaintiff's First Amended Class Action Complaint | April 7, 2011 |
| Plaintiff's First Amended Class Action Complaint | November 30, 2011 |
| Joint Stipulation of Facts | September 8, 2011 |
| Deposition of GABRIELA M. SIKICH in Tolbert | October 27, 2011 |
| Deposition of TAMMY BUCHERT in Tolbert | |
| | |
| **SEC Filings** | |
| Royal Bank of Canada form 40F | October 31, 2003 |
| | |
| **Production Documents** | |
| 2003-05 Eligibility Data.xls | |
| TOLBERT0002447 | |
| 2006-10 Eligibility Data.xls | |
| TOLBERT0000676A | |
| TOLBERT0002448 | |
| TOLBERT0002449 | |
| TOLBERT0002450 | |
| SAP IDs from Lawson (4).xls | |
| TOLBERT0000675_2010_WAP_Eligibility_and_Enrollment_1-1-10_to.xls | |
| TOLBERT0000676_2011_Eligibles.xls | |
| TOLBERT 679.xls | |
| TOLBERT 674.xls | |
| TOLBERT0001023.xls | |

TOLBERT0001111.xls
TOLBERT1123.xls
TOLBERT1124.xls
TOLBERT0001119.xls
TOLBERT0001115.xls
TOLBERT0001120.xls
TOLBERT0001121.xls
TOLBERT0001122.xls
TOLBERT0001112.xls
TOLBERT0001113.xls
TOLBERT0001114.xls
TOLBERT0001116.xls
TOLBERT0001117.xls
TOLBERT0001118.xls
TOLBERT0000677_Comp_All_To_Fid.xlsx
TOLBERT0000673_2006_NDT_Comp_to_Fidelity.xls
TOLBERT0000674_2010_NDT_Data_FINAL.xls
TOLBERT0000678_Data_to_Fidelity_for_NDT.xls
TOLBERT0001163_CONFIDENTIAL_2007 Position title_JobName_PL_NoFTE - Production version.XLS
TOLBERT0001164_CONFIDENTIAL_2008 Pos Title_JobName_PL_NoFTE - Production version.XLS
TOLBERT0001165_CONFIDENTIAL_2009 Pos Title_Job Name_PL_NoFTE - Production version.XLS
TOLBERT0001166_CONFIDENTIAL_2010 PosTitle_JobName_PL_NoFTE - Production version.XLS
TOLBERT0001167_CONFIDENTIAL_2006 Name_Position_Title_and_Job_Name_NoFTE_-_Production_version.XLS
TOLBERT0001168_CONFIDENTIAL_2006 Name Position Title and Job Name NoFTE - Production version.XLS
TOLBERT0001169_CONFIDENTIAL_2007 Position title_JobName_PL_NoFTE - Production version.XLS
TOLBERT0001170_CONFIDENTIAL_2008 Pos Title_JobName_PL_NoFTE - Production version.XLS
TOLBERT0001171_CONFIDENTIAL_2009 Pos Title_Job Name_PL_NoFTE - Production version.XLS
TOLBERT0001172_CONFIDENTIAL_2010 PosTitle_JobName_PL_NoFTE - Production version.XLS
TOLBERT0000679_NDT_To_Fidelity_2009_v2.csv
TOLBERT0000680_NDT_Wages_RBC_2008_SENT_TO_FIDELITY.csv
Tolbert 676_2011 Eligibles.xlsx

Tolbert1123.xlsx
Tolbert1124.xlsx
RBC001022 - RBC001047.pdf
RBC001048 - RBC001064.pdf
RBC001082.pdf
RBC001208.pdf

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT

CONFIDENTIAL

RCB001180.pdf

TOLBERT0000611 - TOLBERT0000632 - 2011 Plan Document and Prospectus .pdf

TOLBERT0000633 - TOLBERT0000635 - Summary - Commission 2011.pdf

RBC 2 - RBC 270.pdf

Tolbert 633 - 654 and Tolbert 686 - 714.pdf

DALLAS-#226913-v2-Tolbert_Chart.docx - Stipulation Regarding Data

CONFIDENTIAL

RBC-PAUL000010413

# Exhibit D. Comparison of Medians and Means of Annual Pay Distributions, by Operating Year

## Panel A: Median Compensation

| Group | Salary Variable | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Operating Year | | | | |
| All Employees | NDT Compensation | 41,644 | 52,014 | 57,437 | 63,100 | 66,198 | 68,199 | 63,154 | 66,238 | 69,007 |
| Non-eligible Employees | NDT Compensation | 38,968 | 43,531 | 46,504 | 48,999 | 51,801 | 52,692 | 54,064 | 58,845 | 57,346 |
| Eligible Employees | Qualifying Compensation | 205,033 | 226,590 | 228,471 | 203,869 | 231,100 | 243,750 | 299,250 | 332,246 | 362,635 |
| | Eligible Multiple of All | 4.9x | 4.4x | 4.0x | 3.2x | 3.5x | 3.6x | 4.7x | 5.0x | 5.3x |
| | Eligible Multiple of Non-eligible | 5.3x | 5.2x | 4.9x | 4.2x | 4.5x | 4.6x | 5.5x | 5.6x | 6.3x |
| Percentile of Comp. Distribution Corresponding to Eligible Median: | | 92.1 | 89.7 | 88.7 | 88.0 | 87.5 | 87.2 | 90.6 | 92.0 | 91.4 |
| P-Value of Wilcoxon Test for Equality of Medians: Eligible vs. All | | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 |
| P-Value of Wilcoxon Test for Equality of Medians: Eligible vs. Non-eligible | | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 |

## Panel B: Mean Compensation

| Group | Salary Variable | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Operating Year | | | | |
| All Employees | NDT Compensation | 87,254 | 109,461 | 119,062 | 129,570 | 139,429 | 144,241 | 123,552 | 136,060 | 152,427 |
| Non-eligible Employees | NDT Compensation | 73,070 | 57,309 | 60,452 | 61,688 | 64,486 | 63,408 | 73,375 | 88,341 | 84,869 |
| Eligible Employees | Qualifying Compensation | 274,619 | 340,791 | 340,045 | 285,146 | 349,176 | 365,411 | 463,964 | 462,500 | 541,528 |
| | Eligible Multiple of All | 3.1x | 3.1x | 2.9x | 2.2x | 2.5x | 2.5x | 3.8x | 3.4x | 3.6x |
| | Eligible Multiple of Non-eligible | 3.8x | 5.9x | 5.6x | 4.6x | 5.4x | 5.8x | 6.3x | 5.2x | 6.4x |
| Percentile of Comp. Distribution Corresponding to Eligible Mean: | | 95.1 | 94.3 | 94.0 | 93.6 | 93.5 | 93.3 | 94.8 | 96.0 | 95.1 |
| P-Value of T-Test for Equality of Means: Eligible vs. All | | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 |
| P-Value of T-Test for Equality of Means: Eligible vs. Non-eligible | | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 |

## Panel C: Kolmogorov-Smirnov Test for Equality of Distributions

| | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Operating Year | | | | |
| P-Value of K-S Test for Equality of Distributions: Eligible vs. All | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 |
| P-Value of K-S Test for Equality of Distributions: Eligible vs. Non-eligible | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 |

Note: Data for each operating year include employees active as of October 31, as well as new hires from November 1 to the subsequent October 31.

CONFIDENTIAL

RBC-PAUL000010414



**Exhibit E1**

## Distribution of Employees by Pay Group, WAP Year 2003

Note: Counts exclude partial-year employees and employees with pay below the annualized minimum wage.

※ All Employees 2003 (Left Axis)    ※ Eligible Employees 2003 (Right Axis)

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 217

CONFIDENTIAL                                               RBC-PAUL000010415



Exhibit E2

Distribution of Employees by Pay Group, WAP Year 2004



# Exhibit E3

## Distribution of Employees by Pay Group, WAP Year 2005

Note: Counts exclude partial-year employees and employees with pay below the annualized minimum wage.

※All Employees 2005 (Left Axis)　　※Eligible Employees 2005 (Right Axis)

Pay groups: 0 - 50,000; 50,000 - 100,000; 100,000 - 150,000; 150,000 - 200,000; 200,000 - 250,000; 250,000 - 300,000; 300,000 - 350,000; 350,000 - 400,000; 400,000 - 450,000; 450,000 - 500,000; 500,000 - 550,000; 550,000 - 600,000; 600,000 - 650,000; 650,000 - 700,000; 700,000 - 750,000; 750,000 - 800,000; 800,000+

CONFIDENTIAL

RBC-PAUL000010417



Exhibit E4

# Distribution of Employees by Pay Group, WAP Year 2006

Note: Counts exclude partial-year employees and employees with pay below the annualized minimum wage.

※ All Employees 2006 (Left Axis)    ※ Eligible Employees 2006 (Right Axis)

CONFIDENTIAL

RBC-PAUL000010418



**Exhibit E5**

# Distribution of Employees by Pay Group, WAP Year 2007

Note: Counts exclude partial-year employees and employees with pay below the annualized minimum wage.

※ All Employees 2007 (Left Axis)   ※ Eligible Employees 2007 (Right Axis)

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 221
CONFIDENTIAL

RBC-PAUL000010419

Exhibit E6



Distribution of Employees by Pay Group, WAP Year 2008

Note: Counts exclude partial-year employees and employees with pay below the annualized minimum wage.

※All Employees 2008 (Left Axis)    ※Eligible Employees 2008 (Right Axis)

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 222
CONFIDENTIAL                                                    RBC-PAUL000010420



# Exhibit E7

## Distribution of Employees by Pay Group, WAP Year 2009

Note: Counts exclude partial-year employees and employees with pay below the annualized minimum wage.

※ All Employees 2009 (Left Axis)   ※ Eligible Employees 2009 (Right Axis)

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 223
CONFIDENTIAL                                RBC-PAUL000010421



**Exhibit E8**

# Distribution of Employees by Pay Group, WAP Year 2010

Note: Counts exclude partial-year employees and employees with pay below the annualized minimum wage.

※All Employees 2010 (Left Axis)

※Eligible Employees 2010 (Right Axis)



Exhibit E9

# Distribution of Employees by Pay Group, WAP Year 2011

Note: Counts exclude partial-year employees and employees with pay below the annualized minimum wage.

※ All Employees 2011 (Left Axis)    ※ Eligible Employees 2011 (Right Axis)



Exhibit F1

Distribution of Employees by Pay Group, WAP Year 2003

Note: Counts exclude partial-year employees and employees with pay below the annualized minimum wage.

※ Non-eligible Employees 2003 (Left Axis)    ※ Eligible Employees 2003 (Right Axis)

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
CONFIDENTIAL    NO. 3:16-cv-05616-RBL - Page 226    RBC-PAUL000010424



# Exhibit F2

## Distribution of Employees by Pay Group, WAP Year 2004

Note: Counts exclude partial-year employees and employees with pay below the annualized minimum wage.

▨ Non-eligible Employees 2004 (Left Axis)        ▨ Eligible Employees 2004 (Right Axis)

Pay groups: 0 - 50,000; 50,000 - 100,000; 100,000 - 150,000; 150,000 - 200,000; 200,000 - 250,000; 250,000 - 300,000; 300,000 - 350,000; 350,000 - 400,000; 400,000 - 450,000; 450,000 - 500,000; 500,000 - 550,000; 550,000 - 600,000; 600,000 - 650,000; 650,000 - 700,000; 700,000 - 750,000; 750,000 - 800,000; 800,000 +



**Exhibit F3**

## Distribution of Employees by Pay Group, WAP Year 2005

Note: Counts exclude partial-year employees and employees with pay below the annualized minimum wage.

※ Eligible Employees 2005 (Right Axis)

※ Non-eligible Employees 2005 (Left Axis)

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 228

CONFIDENTIAL

RBC-PAUL000010426



Exhibit F4

# Distribution of Employees by Pay Group, WAP Year 2006

Note: Counts exclude partial-year employees and employees with pay below the annualized minimum wage.

※ Non-eligible Employees 2006 (Left Axis)    ※ Eligible Employees 2006 (Right Axis)

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 229
CONFIDENTIAL

RBC-PAUL000010427



**Exhibit F5**

**Distribution of Employees by Pay Group, WAP Year 2007**

Note: Counts exclude partial-year employees and employees with pay below the annualized minimum wage.

☒ Eligible Employees 2007 (Right Axis)

☒ Non-eligible Employees 2007 (Left Axis)

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 230
CONFIDENTIAL                                        RBC-PAUL000010428

# Exhibit F6

## Distribution of Employees by Pay Group, WAP Year 2008



Note: Counts exclude partial-year employees and employees with pay below the annualized minimum wage.

※ Non-eligible Employees 2008 (Left Axis)    ※ Eligible Employees 2008 (Right Axis)

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 231
CONFIDENTIAL                                                    RBC-PAUL000010429



Exhibit F7

Distribution of Employees by Pay Group, WAP Year 2009

Note: Counts exclude partial-year employees and employees with pay below the annualized minimum wage.

※ Non-eligible Employees 2009 (Left Axis)    ※ Eligible Employees 2009 (Right Axis)

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 232

CONFIDENTIAL

RBC-PAUL000010430

# Exhibit F8

## Distribution of Employees by Pay Group, WAP Year 2010



Note: Counts exclude partial-year employees and employees with pay below the annualized minimum wage.

▓ Non-eligible Employees 2010 (Left Axis)    ▓ Eligible Employees 2010 (Right Axis)

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 233
CONFIDENTIAL

RBC-PAUL000010431



**Exhibit F9**

# Distribution of Employees by Pay Group, WAP Year 2011

Note: Counts exclude partial-year employees and employees with pay below the annualized minimum wage.

▨ Non-eligible Employees 2011 (Left Axis)    ▨ Eligible Employees 2011 (Right Axis)

# Exhibit G. Comparison of Medians and Means of Annual Pay Distributions For Production-Based Eligible Employees Relative to Non-Eligible and All Employees, by Operating Year

**Panel A: Median Compensation**

| Group | Salary Variable | Operating Year | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
| All Employees | NDT Compensation | 41,644 | 52,014 | 57,437 | 63,100 | 66,198 | 68,199 | 63,154 | 66,238 | 69,007 |
| Non-eligible Employees | NDT Compensation | 38,968 | 43,531 | 46,504 | 48,999 | 51,801 | 52,692 | 54,064 | 58,845 | 57,346 |
| Eligible Production Employees | Qualifying Compensation | 173,089 | 167,940 | 172,453 | 169,616 | 188,405 | 198,322 | 223,108 | 235,362 | 242,292 |
| | *Eligible Production Multiple of All* | 4.2x | 3.2x | 3.0x | 2.7x | 2.8x | 2.9x | 3.5x | 3.6x | 3.5x |
| | *Eligible Production Multiple of Non-eligible* | 4.4x | 3.9x | 3.7x | 3.5x | 3.6x | 3.8x | 4.1x | 4.0x | 4.2x |
| *Percentile of Comp. Distribution Corresponding to Production Median:* | | 89.8 | 86.1 | 84.5 | 82.3 | 83.3 | 84.0 | 86.3 | 87.7 | 87.2 |
| *P-Value of Wilcoxon Test: Eligible Production vs. All* | | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 |
| *P-Value of Wilcoxon Test: Eligible Production vs. Non-eligible* | | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 |

**Panel B: Mean Compensation**

| Group | Salary Variable | Operating Year | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
| All Employees | NDT Compensation | 87,254 | 109,461 | 119,062 | 129,570 | 139,429 | 144,241 | 123,552 | 136,060 | 152,427 |
| Non-eligible Employees | NDT Compensation | 73,070 | 57,309 | 60,452 | 61,688 | 64,486 | 63,408 | 73,375 | 88,341 | 84,869 |
| Eligible Production Employees | Qualifying Compensation | 212,422 | 214,471 | 219,812 | 211,596 | 242,261 | 252,063 | 292,038 | 288,628 | 306,975 |
| | *Eligible Production Multiple of All* | 2.4x | 2.0x | 1.8x | 1.6x | 1.7x | 1.7x | 2.4x | 2.1x | 2.0x |
| | *Eligible Production Multiple of Non-eligible* | 2.9x | 3.7x | 3.6x | 3.4x | 3.8x | 4.0x | 4.0x | 3.3x | 3.6x |
| *Percentile of Comp. Distribution Corresponding to Production Mean:* | | 92.6 | 89.7 | 88.4 | 86.5 | 87.9 | 88.3 | 90.3 | 90.8 | 90.6 |
| *P-Value of T-Test: Eligible Production vs. All* | | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 |
| *P-Value of T-Test: Eligible Production vs. Non-eligible* | | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 |

**Panel C: Kolmogorov-Smirnov Test for Equality of Distributions**

| | Operating Year | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
| *P-Value of K-S Test: Eligible Production vs. All* | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 |
| *P-Value of K-S Test: Eligible Production vs. Non-eligible* | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 |

Note: Data for each operating year include employees active as of October 31, as well as new hires from November 1 to the subsequent October 31.

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 235
CONFIDENTIAL

RBC-PAUL000010433



# Exhibit H1

## Distribution of Non-Eligible and Production-Based Eligible Employees by Pay Group, WAP Year 2003

Note: Counts exclude partial-year employees and employees with pay below the annualized minimum

▨ Non-eligible Employees 2003 (Left Axis)    ▨ Eligible Production 2003 (Right Axis)

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 236
CONFIDENTIAL                                          RBC-PAUL000010434



**Exhibit H2**

**Distribution of Non-Eligible and Production-Based Eligible Employees by Pay Group, WAP Year 2004**

Note: Counts exclude partial-year employees and employees with pay below the annualized minimum wage.

※ Non-eligible Employees 2004 (Left Axis)     ※ Eligible Production 2004 (Right Axis)

**Exhibit H3**

# Distribution of Non-Eligible and Production-Based Eligible Employees by Pay Group, WAP Year 2005



Note: Counts exclude partial-year employees and employees with pay below the annualized minimum wage.

※ Non-eligible Employees 2005 (Left Axis)　　※ Eligible Production 2005 (Right Axis)

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 238

CONFIDENTIAL

RBC-PAUL000010436

# Exhibit H4

## Distribution of Non-Eligible and Production-Based Eligible Employees by Pay Group, WAP Year 2006



Note: Counts exclude partial-year employees and employees with pay below the annualized minimum wage.

☒ Non-eligible Employees 2006 (Left Axis)   ☒ Eligible Production 2006 (Right Axis)

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 2:16-cv-05616-RBL - Page 239

CONFIDENTIAL

RBC-PAUL000010437



**Exhibit H5**

## Distribution of Non-Eligible and Production-Based Eligible Employees by Pay Group, WAP Year 2007

Note: Counts exclude partial-year employees and employees with pay below the annualized minimum wage.

※ Non-eligible Employees 2007 (Left Axis)   ※ Eligible Production 2007 (Right Axis)

# Exhibit H6



## Distribution of Non-Eligible and Production-Based Eligible Employees by Pay Group, WAP Year 2008

Note: Counts exclude partial-year employees and employees with pay below the annualized minimum wage.

※ Non-eligble Employees 2008 (Left Axis)    ※ Eligble Production 2008 (Right Axis)

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 2:16-cv-05616-RBL - Page 241
CONFIDENTIAL                                                    RBC-PAUL000010439

# Exhibit H7



## Distribution of Non-Eligible and Production-Based Eligible Employees by Pay Group, WAP Year 2009

Note: Counts exclude partial-year employees and employees with pay below the annualized minimum wage.

※ Non-eligible Employees 2009 (Left Axis)   ※ Eligible Production 2009 (Right Axis)

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 242

CONFIDENTIAL

RBC-PAUL000010440

# Exhibit H8

## Distribution of Non-Eligible and Production-Based Eligible Employees by Pay Group, WAP Year 2010



Note: Counts exclude partial-year employees and employees with pay below the annualized minimum wage.

Non-eligible Employees 2010 (Left Axis)    Eligible Production 2010 (Right Axis)

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 2:16-cv-05616-RBL - Page 243

CONFIDENTIAL                                                    RBC-PAUL000010441

# Exhibit H9



## Distribution of Non-Eligible and Production-Based Eligible Employees by Pay Group, WAP Year 2011

Note: Counts exclude partial-year employees and employees with pay below the annualized minimum wage.

※ Non-eligible Employees 2011 (Left Axis)　　※ Eligible Production 2011 (Right Axis)

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 244

CONFIDENTIAL

RBC-PAUL000010442

# Exhibit I. Regression Showing the Relationship Between Employee Pay and Production For Production-Based Employees, by Operating Year

### Results of Regression of Compensation on Production, Eligible Production Employees

| Year | Estimates | | T-Statistics | | R-Squared |
| --- | --- | --- | --- | --- | --- |
| | Intercept | Coefficient | Intercept | Coefficient | |
| 2002 | -8,934 | 0.4180 | -2.04 | 57.96 | 82.74% |
| 2003 | -30,134 | 0.4476 | -7.89 | 75.29 | 88.06% |
| 2004 | -15,381 | 0.4219 | -4.94 | 87.59 | 89.77% |
| 2005 | -12,247 | 0.3969 | -4.43 | 94.27 | 91.16% |
| 2006 | -9,162 | 0.3981 | -2.63 | 77.76 | 86.76% |
| 2007 | -11,033 | 0.3780 | -3.06 | 80.17 | 85.51% |
| 2008 | -16,872 | 0.4502 | -3.58 | 84.18 | 85.66% |
| 2009 | -4,223 | 0.4042 | -0.87 | 71.96 | 88.11% |
| 2010 | -4,994 | 0.4026 | -1.61 | 120.49 | 93.19% |

**Model: Compensation = Intercept + Coefficient * Production**

The Intercept is the estimate of compensation corresponding to the case where production is zero.
'Coefficient' is the estimated increase in compensation for an extra dollar of production.
The T-statistic measures how many standard errors the estimates are from zero.
R-Squared is the percentage of variation in compensation explained by the model.

Boldface indicates statistical significance at the 1% level or better, using a two-tailed test.

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 245
CONFIDENTIAL

RBC-PAUL000010443

### III. Tolbert's "Selection Criteria" Analysis

Using the data produced by Defendants, Tolbert performed an analysis consistent with Defendants' actual selection criteria for existing employees. The results of that analysis are as follows:

| Comparison of All Employees and Eligible Employees Based on Employment as of October 31 | | | |
|---|---|---|---|
| Plan Year[4] | All Employees[5] | Eligible Employees[6] | Eligibles as a % of A Employees |
| 2004 | 2,324 | 14,525 | 16.0% |
| 2005 | 2,400 | 14,221 | 16.9% |
| 2006 | 2,114 | 10,663 | 19.8% |
| 2007 | 2,427 | 10,647 | 22.8% |
| 2008 | 2,690 | 12,272 | 21.9% |
| 2009 | 2,072 | 14,184 | 14.6% |

---

[4] Plan years 2003 and 2010 have been excluded from this chart because complete hire or termination information was not provided for all employees in 2002 and 2009, respectively.

[5] The All Employees numbers come from the All Employees' file for the calendar year end (December 31st) that corresponds closest to the end of the fiscal year (September 30th) that is used to determine eligibility of for the next years' WAP. For example, for the plan year 2008, the number of employees is the from the 2007 All Employees file and is the number of employees who were actually employed on October 31, 2007 (the approximate date eligibility was determined each year). Specifically, these employees were listed in the "All EES" data tabs in "RBC000004.xls" and "RBC000002.xls". Employees that were fired on or before or hired after October 31 of the plan year were excluded. Thus, the number of all employees above is the number of employees who were employed in 2007 at which time eligibility for the 2008 plan year was determined.

[6] Similarly, the number of Eligibles comes from WAP Eligible files but counts only those persons deemed eligible for the 2008 plan year who were actually employed on October 31, 2007. Specifically, WAP eligible employees are all employees who were listed on the WAP Eligible data tabs in "RBC000004.xls" and "RBC000002.xls" excluding employees who were fired before or hired after October 31 of the plan year. For example, for plan year 2008, eligible employees are excluded if they were fired on or before or hired after October 31, 2007 because they would not have been considered eligible as of November 1, 2007.

DALLAS 2269513v.2

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 246

CONFIDENTIAL

RBC-PAUL000010444

# Exhibit K. Percentage of Employees Eligible for Wealth Accumulation Plan by Plan Year

| Plan Year | Plaintiffs' Calculated Percent Eligible from Proposed Stipulation | Total Number of Employees | | | WAP Eligible Employees | |
|---|---|---|---|---|---|---|
| | | Employed During the Calendar Year | Terminated between Nov. 1 and Dec. 31 of Previous Year | Total Potentially Eligible for WAP | WAP Eligible Employees | Corrected Percent of Employees Eligible for WAP |
| | | [1] | [2] | [3] | [4] | [5] |
| 2003 | | 19,210 | NA | 19,210 | 1,342 | 6.99% |
| 2004 | 16.0% | 18,808 | 606 | 19,414 | 2,494 | 12.85% |
| 2005 | 16.9% | 16,404 | 1,351 | 17,755 | 2,444 | 13.77% |
| 2006 | 19.8% | 13,288 | 401 | 13,689 | 2,342 | 17.11% |
| 2007 | 22.8% | 15,095 | 344 | 15,439 | 2,585 | 16.74% |
| 2008 | 21.9% | 17,418 | 335 | 17,753 | 2,931 | 16.51% |
| **Averages:** | | | | | | |
| 2003-2008 | 19.5% | | | | | 13.99% |
| 2003-2008* | 19.2% | | | | | 13.69% |
| 2009 | 14.6% | 16,425 | 438 | 16,863 | 2,393 | 14.19% |
| 2010 | | 15,555 | 342 | 15,897 | 1,678 | 10.56% |
| 2011 | | NA | 273 | | 1,838 | NA |

[1] From Plan Year All Employees Files.
[2] From preceding year's All Employees Files.
[3] Equal to sum of [1] and [2].
[4] From Plan Year WAP Eligibility Files.
[5] Equal to [4] divided by [3].

All counts exclude duplicate records, defined as records with the same employee number and last name.
* The asterisked average is equal to (average WAP eligible employees, 2003-2008) divided by (average total employees, 2003-2008).

DECL WEINSTEIN IN OPPOSITION
TO DEFS' MOTION FOR SUMMARY JUDGMENT
NO. 3:16-cv-05616-RBL - Page 247
CONFIDENTIAL
RBC-PAUL000010445