|  |  |
|---|---|
| | HONORABLE RONALD B. LEIGHTON |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MARTY PAUL and BRIAN BUSKIRK,<br><br>Plaintiffs,<br><br>v.<br><br>RBC CAPITAL MARKETS LLC, et al.,<br><br>Defendants. | CASE NO. C16-5616 RBL<br><br>ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT |

THIS MATTER is before the Court on the parties' second round of cross motions for partial summary judgment [Dkt. #s 37 and 41]. Plaintiffs Marty Paul and Brian Buskirk are financial consultants (FCs) formerly employed by Defendant RBC Capital Markets[1]. Paul and Buskirk allege that after they left RBC, RBC violated the Employee Retirement Income Security Act (ERISA) by improperly forfeiting millions of dollars of deferred, unvested compensation that Paul and Buskirk claim they earned by participating in RBC's Wealth Accumulation Plan (WAP). In a prior Order, the Court determined that the Fifth Circuit's opinion in *Tolbert v. RBC*

---

[1] RBC Capital Markets is the U.S. subsidiary of Defendant Royal Bank of Canada. This Order will use RBC to refer to the former, and to the defendants generally, but will name both where the distinction makes a difference.

ORDER - 1

*Capital Mkts. Corp.*, 758 F.3d 619 (5th Cir. 2014), collaterally estopped RBC from re-litigating the WAP's status as an employee pension benefit plan under ERISA. [Dkt. # 54].

RBC now seeks summary judgment on three bases: (1) ERISA cannot provide the relief plaintiffs seek because they do not claim that RBC *violated* the WAP, they have not identified a breach of fiduciary duty, and they are not entitled to equitable relief; (2) plaintiffs' claims are untimely because they knew of and enjoyed the WAP's provisions for years before they sued; and (3) in any event, the WAP is a "top hat" plan exempt from most of ERISA's substantive provisions because it is an "unfunded plan" "maintained for the benefit of a select group of highly compensated employees." *See* 29 U.S.C. §§ 1051(2), 1081(a)(3), and 1101(a).

Paul and Buskirk seek summary judgment on their claim that the WAP applied to too many employees (including some who were neither select nor highly compensated) to qualify for the top hat exemption. They claim the WAP is therefore subject to ERISA, including provisions relating to vesting, funding, fiduciary obligations, notice, and reporting. They seek a determination that RBC violated ERISA when it forfeited their deferred compensation, leaving for trial the amount of their resulting damages.

## I. DISCUSSION

**A. Summary Judgment Standard.**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable

factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323-24.

**B. The WAP's status as a top hat plan is a question of fact.**

In the Court's view, the threshold[2] issue is whether RBC's WAP was a top hat plan. RBC emphasizes that it *intended* it to be such a plan, and Plaintiffs implicitly concede that the ultimate inquiry is one of fact.

An ERISA "top hat plan" is "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. § 1101(a)(1). Top hat plans are generally exempt from ERISA. ERISA does not define the terms of this exemption but various authorities have addressed what is required.

The Plaintiffs argue that the top hat plans are intended to be a "rare subspecies" of ERISA plans, because that statute's protections are to be "liberally construed" in favor of

---

[2] RBC initially argues that plaintiffs' claims fail on several "threshold" grounds, raised in its own Summary Judgment motion—primarily the relief they seek is not available under ERISA, and their claims are untimely. This Order will nevertheless address the top hat issue first.

participants in employee benefit plans. These protections include prohibitions on forfeiting vested and accrued benefits.

Paul and Buskirk argue that top hat plans must exist primarily for the purpose of providing deferred compensation to a "select group" of "management or highly compensated employees." They argue the WAP was over-inclusive, with as much as 22% of RBC's American workforce eligible for inclusion in 2008, including some who were neither management nor highly compensated in comparison to others. RBC knew that the WAP had problems—acknowledging internally that it was in "WAP purgatory"—and it ultimately replaced the WAP with a different plan.

Plaintiffs correctly argue that Courts look to several factors to determine if a plan is a "top hat" plan. *See Duggan v. Hobbs*, 99 F.3d 307, 309-310 (9th Cir. 1996) (considering whether participation was limited to a small percentage and whether participants exerted influence over the design and operation of the plan); *Bakri v. Venture Mfg. Co.*, 473 F.3d 677, 678 (6th Cir. 2007) (considering *Duggan*'s factors, as well as compensation disparities and the plan language[3]); s*ee also Tolbert v. RBC Capital Mkts. Corp.*, 2015 WL 2138200 at *9 (S.D. Tex. Apr. 28, 2015).

Plaintiffs argue that no court has ever determined a plan to be a top hat plan when more than 16% of employees participated. *See Guiragoss v. Khouy*, 44 F. Supp. 2d 649 (E.D. Va. 2006). They seem to suggest that below that figure, a court must look to other factors, but above it, the question is settled as a matter of law. They argue that the WAP was not selective enough

---

[3] Plaintiffs do not dispute that RBC intended the WAP to be a top hat plan, and the language of the plan reflects that intention. This is of course only one (probably self-serving, but in any event non-dispositive) factor, but it is some evidence supporting the finding the WAP was a top hat plan.

to be a top hat plan, and that it fatally permitted non-managers (including specifically FCs like Paul and Buskirk) to participate. They provide expert analysis of the plan, its participants, their compensation and titles, and the like, all in an effort to obtain a judgment as a matter of law that the WAP was not a top hat plan.

RBC argues that Paul and Buskirk have distorted the facts and focused on "alternative" top hat eligibility tests rather than accepted ones. It argues that the analysis should include reference to RBC's (and Defendant Royal Bank of Canada's, which is the WAP's sponsor) total workforce, not just its U.S. employees, and that when the analysis properly does so, the WAP is indisputably a top hat plan—only 2.8% of defendants' workforce was eligible to participate, and those employees earned more than five times the amount the average employee earned. It points out that the median WAP-eligible employee was in the top 3% to 5% of all RBC and Royal Bank earners.

RBC also argues that even if only the U.S. employees are considered, the WAP was *still* a top hat plan, at least for the bulk of the relevant time from, from 2003 and 2011: less than 16% of those employees were eligible, and participating employees earned roughly three times more than the average U.S. employee. It offers its own expert testimony that plaintiffs' expert's methodology is flawed and misleading, because it improperly carves the WAP into subgroups and then compares them to each other.

The Court is again persuaded by *Tolbert*, this time by the District Court's post-remand opinion on this same issue. There, Judge Ellison articulated the same two part inquiry this Court faces: whether the *primary purpose* of the plan is to provide deferred compensation for a *group of management or highly compensated employees*. *Id*. at *3. As the parties agree, this involves evaluation of both quantitative and qualitative factors.

*Tolbert* rejected the parties' claims that the WAP's status as a top hat plan could be ascertained by looking only at the "math" or percentage of participating employees: "the four selectivity factors are interwoven, and no one factor, standing alone, is determinative. . . . As a result [RBC has] raised a genuine issue of material fact as to this quantitative aspect of the selectivity issue[.]" *Id*. at *9-10.

The proper denominator to be used to ascertain the percentage of eligible employees in a large, multinational corporation like the Royal Bank and RBC is not a question that can be or should be resolved on summary judgment. Plaintiffs argue that only U.S. employees were eligible to participate in the WAP (which would not be surprising, since ERISA is a U.S. law) but even that factual point is disputed; RBC points out that 275 non-U.S. Royal Bank employees were WAP-eligible. They also argue that over time, the number of eligible employees was less than the 16% threshold plaintiffs claim is dispositive. And, even if the percentage was too high for some portion of the relevant period, it is only one factor. Paul and Buskirk's Motion for Summary Judgment on their claim that the WAP was not a top hat plan as a matter of law on this basis is **DENIED**.

The same is true of the qualitative factor of the participants' roles in the company. Unlike Tolbert, Paul and Buskirk were in fact "highly compensated," and while they were not "management" they were so compensated because they were (very) successful at the company's core investment mission. The amount of plaintiffs' (and the other participants') compensation, *vis a vis* the rest of the workforce, and its impact on the top hat status—the subject of the competing expert testimony—presents a question fact that must be resolved at trial. The parties' competing Motions for Summary Judgment on this point are **DENIED**.

Finally, RBC argues that plaintiffs' emphasis on the "substantial influence" requirement is misguided; the exemption does not require that every participant have such influence over the terms of the plan. Tolbert's argument that the WAP's primary purpose was not to provide deferred compensation, but rather to recruit and retain productive employees was not persuasive[4] to that court, and Paul and Buskirk do not strenuously repeat it here. They do emphasize, however, that the WAP was not selective (or not selective enough), and was extended to non-management and non-highly-compensated employees who had no meaningful bargaining power to influence its terms.

As Judge Ellison explained in *Tolbert*, the selectivity factor is multifaceted and does lend itself to a straightforward determination. After a thorough review of the genesis of the "substantial influence" factor [a DOL opinion letter] and other cases construing it, he properly concluded that it was a part of the selectivity factor, and not a stand-alone factor. He also rejected Tolbert's claim that the each individual plaintiff had to have "substantial influence" over the WAP or its terms; top hat status requires instead that a "significant number of the participants in the plan had bargaining power of that kind." *Tolbert* at *7, *citing Carrabba v. Randalls Food Markets, Inc.*, 38 F. Supp. 2d 468, 470 (N.D. Tex. 1999), *aff'd* 252 F.3d 721 (5th Cir. 2001). It also cited with approval the First Circuit's more strident rejection of an individual bargaining power requirement in *Alexander v. Brigham & Women's Physicians Org., Inc.*, 513 F.3d 37, 47 (1st Cir. 2008):

> We decline the appellant's invitation to depart from the plain language of the statute and jerry-build onto it a requirement of individual bargaining power. The DOL opinion letter speaks only to Congress's rationale for enacting the top-hat provision. It does not present itself as an interpretation of the provision's requirements, nor

---

[4] "[T]he fact that the WAP was intended from its inception to be a top hat plan for deferred compensation to certain employees stands as the very reason RBC was able to utilize it as a recruitment and retention tool." *Tolbert* at *4.

does it make any mention of the need for or propriety of demanding that employers demonstrate their employees' ability to negotiate the terms of deferred compensation plans.

As *Tolbert* correctly pointed out, if congress wanted to incorporate a "significant influence" (or the more stringent "individual bargaining power") factor into the top hat statute, it certainly could have done so. *Tolbert* at *8. In any event, Judge Ellison denied the cross motions for summary judgment on this basis as well. *Id*. at *9. Following this sound reasoning, this Court cannot determine as matter of law that the WAP participants did not have enough influence over the plan to permit the factual finding that it was a top hat plan. Plaintiffs' Motion on this basis is **DENIED**. RBC's cross motion on these same factors is also **DENIED**; the determination of the WAP's status as a top hat plan is a question of fact requiring a trial.

**C. Relief Available under ERISA.**

RBC argues even if the WAP was not a top hat plan, ERISA does not provide Paul and Buskirk the relief they seek: they are not seeking to *enforce* the WAP, they are seeking to *change* it, retroactively, years after they learned of (and took advantage of) its terms. It argues that ERISA § 502(a)(1)(B) [29 U.S.C. § 1132(a)(1)(B)] is not the proper vehicle to revoke or change plan provisions.

Paul and Buskirk argue that their "revocation of RBC's illegal forfeiture of benefits" claim fits squarely within § 502(a)(1)(B)'s enforcement authority; they ask the Court to interpret the WAP in concert with ERISA. They argue there is a well-established judicial practice of "looking outside the plan's written language in deciding what those terms are, i.e., what the language means." They ask the Court to do nothing more than to look outside the WAP's written language to ERISA itself to determine the benefits it affords. They ask the Court to use its power

to conform the "inherently illegal"[5] WAP provisions to ERISA's statutory mandates, and they characterize that claim as one for interpretation and enforcement, not reformation.

§ 502(a)(1)(B) authorizes a plaintiff's civil lawsuit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." As RBC emphasizes, and plaintiffs concede, the Supreme Court rejected the idea that § 502(a)(1)(B) authorizes the reformation[6] of a plan:

> Where does § 502(a)(1)(B) grant a court the power to *change* the terms of the plan as they previously existed? The statutory language speaks of "*enforc[ing]*" the "terms of the plan," not of *changing* them. 29 U.S.C. § 1132(a)(1)(B) (emphasis added). The provision allows a court to look outside the plan's written language in deciding what those terms are, *i.e.,* what the language means. *See UNUM Life Ins. Co. of America v. Ward,* 526 U.S. 358, 377–379 (1999) (permitting the insurance terms of an ERISA-governed plan to be interpreted in light of state insurance rules). But we have found nothing suggesting that the provision authorizes a court to alter those terms, at least not in present circumstances, where that change, akin to the reform of a contract, seems less like the simple enforcement of a contract as written and more like an equitable remedy.

*CIGNA Corp. v. Amara*, 563 U.S. 421, 435–36 (2011).

Plaintiffs argue that at least one post-*Amara* Circuit Court opinion left untouched a District Court's award of relief akin to that they seek. *See Daft v. Advest Inc.*, 2010 U.S. Dist. LEXIS 3152 at *8 (N.D. Ohio 2010), *rev'd on other grounds* 658 F.3d 583 (6th Cir. 2011). But that is not persuasive authority for effectively, if not literally, re-writing out the parts of the WAP that plaintiffs no longer favor. They do not seek to use extrinsic evidence to determine what the parties intended; it is *clear* what the parties intended, and why. They instead seek to alter the "forfeiture of unvested deferred income" provisions that are plainly in the WAP. RBC's claim that altering the WAP to delete the forfeiture provisions is not a "civil enforcement action" under

---

[5] In support of their argument that their claims are timely, Paul and Buskirk later claim that the WAP terms are "*not* inherently in violation of ERISA." Dkt. # 50 at 22 (emphasis added).

[6] Reformation is a possibility under § 502(a)(3), discussed below.

§ 502(a)(1)(B) is correct, and its Motion for Summary Judgment on this claim is **GRANTED** and that claim is **DISMISSED** with prejudice.

Plaintiffs also assert § 502(a)(2) breach of fiduciary duty claims against both RBC Capital Markets and the Royal Bank of Canada. They argue that the "fiduciary defendants" breached their duties by failing to operate the WAP for the "exclusive benefit of participants" and violating various ERISA provisions regarding vesting, forfeiture, and trust. They argue that RBC cannot "hide" behind the WAP's written terms when there is an "inherent inconsistency between a provision in a plan document and a fiduciary duty expressed elsewhere in ERISA." *See Cement & Concrete Workers Dist. Council Pension Fund v. Ulico Cas. Co.*, 387 F. Supp. 2d 175, 184 (E.D.N.Y. 2005).

RBC argues that these claims fail as a matter of law—that plaintiffs are "trying to put a round peg into a square hole"—for two primary reasons. First, it claims plaintiffs cannot identify any conduct[7] to support a breach of fiduciary duty claim other than the plan sponsor's drafting (and then enforcing) the terms of the WAP. In other words, RBC claims, this is simply a re-packaged claim that the WAP was not lawful (because it was not in fact a top hat plan); it is not a distinct claim for breach of some fiduciary duty. They argue that decisions about the form or structure of the plan, such as who is entitled to receive Plan benefits and in what amounts, do not implicate ERISA's fiduciary duty requirement. *See Hughes Aircraft Co. v. Jacobsen*, 525 U.S. 432, 443 (1999) (employers are generally free to adopt modify or terminate ERISA plans, and when they do so, they are not acting as fiduciaries, but rather are analogous to settlors of a trust).

---

[7] RBC also points out that plaintiffs have not identified or sued any individual whom they claim owed fiduciary duties to them or the WAP.

Second, RBC argues that plaintiffs have not identified a breach of any fiduciary duty that harmed the plan "as a whole;" they instead seek individual damages in the form of their forfeited, unvested, deferred compensation. The text of ERISA § 409(a) supports this argument:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good *to such plan* any losses to the plan resulting from each such breach, and to restore *to such plan* any profits of such fiduciary which have been made through use of *assets of the plan* by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a) (emphasis added). And there are cases supporting the claim that plaintiffs cannot recover individual damages under this section; it relates to damages to the *plan's* assets, not the individual's. But the WAP did not *have any assets*—RBC intended and reasonably believed that the WAP was a top hat plan and, as a result it was "unfunded." There is no claim and no evidence that any fiduciary "profited from" or caused injury to the WAP; plaintiffs instead complain that under its clear terms, *they* forfeited deferred compensation when they were terminated for cause (Paul) and left voluntarily (Buskirk).

RBC relies largely on *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134 (1985). *Russell* held that a plan participant could not bring suit for consequential damages suffered when a defined benefit plan delayed paying the plaintiff benefits owed, and the delay did not 'impair" the plan itself. *Id*. at 140.

But as Paul and Buskirk argue, the Supreme Court subsequently loosened the requirement that an actionable fiduciary breach had to damage the plan, not an individual's interest in it:

> Whether a fiduciary breach diminishes plan assets payable to all participants and beneficiaries, or only to persons tied to particular individual accounts, it creates the kind of harms that concerned the draftsmen of § 409. Consequently, our references to the "entire plan" in *Russell,* which accurately reflect the operation of § 409 in the defined benefit context, are beside the point in the defined contribution context.

ORDER - 11

> Other sections of ERISA confirm that the "entire plan" language from *Russell,* which appears nowhere in § 409 or § 502(a)(2), does not apply to defined contribution plans. Most significant is § 404(c), which exempts fiduciaries from liability for losses caused by participants' exercise of control over assets in their individual accounts. *See also* 29 CFR § 2550.404c–1 (2007). This provision would serve no real purpose if, as respondents argue, fiduciaries never had any liability for losses in an individual account.

*LaRue v. DeWolff, Boberg & Assocs., Inc.,* 552 U.S. 248, 255–56 (2008).

On this latter point, plaintiffs are correct; under this authority it is not necessarily fatal to their claim that the damages they allege are individual rather than to the WAP itself.

But plaintiffs' response to RBC's first argument is not as persuasive. § 404(a) describes ERISA's fiduciaries duties: to "discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and in accordance with documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of ERISA."

Plaintiffs argue that "administering" and "managing" a plan, and disposition of "plan assets" in violation of ERISA (wrongful forfeiture of plaintiffs' deferred compensation benefits) implicate fiduciary conduct. They cite other district court cases generally holding that "wrongful taking or transfer" of plan assets is a breach of fiduciary duty actionable under § 502(a)(2). But they do not cite any case that is analogous to this one: a sponsor intends to create a top hat plan, both it and the participants take advantage of those terms, and when the relationship sours the participants claim that the plan was not a top hat plan and successfully claim that the sponsor's saying it *was,* was a breach of fiduciary duty leading to the recovery of individual damages. They do not cite a case specifically holding that a plan sponsor breaches its fiduciary duty by erroneously believing that its plan was a top hat plan, and administering and managing the plan on that basis. And in fairness, there is not a lot of on point authority either way. The most

persuasive case on whether following a flawed plan is an actionable breach is cited by both parties, *Cement & Concrete Workers, supra*. *Cement & Concrete Workers* addresses the subject distinction in a way that leans heavily toward RBC:

> Nevertheless, it is clear that the inquiry into whether a plan trustee has breached a fiduciary duty must be squarely directed at determining whether any of the trustees' actions or omissions in managing and administering the plan breached an ERISA fiduciary duty, rather than on whether the terms of the plan administered by the trustee violated ERISA in some respect.
>
> The proposition that "a trustee who administers a pension plan knowing it to be in violation of ERISA acts in violation of his fiduciary duties under ERISA," while perhaps facially attractive, is based on an overly broad reading of ERISA § 404(a), and comes to this court conspicuously unsupported by caselaw.

*Id*. at 185.

RBC is correct. Even construing "fiduciary duties" liberally, and even if suing the sponsor rather than the actual administrator is sufficient, and even if the damage alleged is to an individual and not the plan itself, in the absence of some articulable conduct that violates a fiduciary duty, correctly enforcing a flawed plan does not support a breach of fiduciary duty claim as a matter of law.

RBC's motion for summary judgment on plaintiffs' breach of fiduciary duty claim is **GRANTED** and that claim is **DISMISSED** with prejudice.

Finally, based on process of elimination, RBC argues that the plaintiffs' claims must arise, if at all, under ERISA § 502(a)(3)—a "catch all" provision that permits broad equitable relief. RBC argues that this claim too fails as a matter of law because plaintiffs are not seeking "appropriate equitable relief;" effectively seeking to enjoin it from not paying them the forfeited compensation is simply a plain-vanilla claim for money damages, not an equitable claim.

Plaintiffs argue, persuasively, that there are a number of equitable remedies that would permit them to recover their forfeited compensation, including a constructive trust and

restitution. RBC's better arguments go to whether it would be "equitable" to permit participants who were in fact highly compensated and who took advantage of the WAP for years to now complain about its forfeiture provisions. But that is not a summary judgment argument. RBC's motion for summary judgment on plaintiffs' § 502(a)(3) claim is **DENIED**.

**D. Paul and Buskirk were aware of the WAP's terms for years before they sought to invalidate it, but their claims did not accrue until 2012.**

RBC also argues that Paul and Buskirk's claims are time barred. It argues that Washington's analogous six-year limitations period applies to their § 502(a)(1)(B) or (a)(3) claims, and to their breach of fiduciary duty claim under § 502(a)(2). RBC is likely correct that "plaintiffs learned nothing in 2012 (when they argue their claims accrued) that they did not know about the WAP more than 6 years earlier." For the limitations period, though, the claim accrued when they were denied the benefits to which they claim they were entitled, and that happened in 2012. The claims are not time barred in the statute of limitations sense. The fact that the plaintiffs knew of the WAP's terms, and its potential problems, and took advantage of it for years before they decided it was more advantageous to dispute its status as a top hat plan, is an equitable factor that will be addressed during trial. RBC's limitations period summary judgment motion is **DENIED**.

//

//

//

//

//

//

//

## II. CONCLUSION

RBC's Motion for Summary Judgment [Dkt. #37] is **GRANTED in part and DENIED in part**.

Plaintiffs' Motion for Partial Summary Judgment [Dkt. #41] is **DENIED.**

IT IS SO ORDERED.

Dated this 31st day of July, 2018.

Ronald B. Leighton
United States District Judge